# 11-1324

[Oral argument not yet scheduled]

## United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT
## Docket No. 11-1324

ALI HAMZA SULIMAN AHMAD AL BAHLUL,

*Petitioner,*

*v.*

UNITED STATES,

*Respondent.*

APPEAL FROM
COURT OF MILITARY COMMISSION REVIEW (CMCR-09-001)

## BRIEF OF PETITIONER

Michel Paradis
CAPT Mary McCormick, JAGC, U.S. Navy
MAJ Todd E. Pierce, JA, U.S. Army
1620 Defense Pentagon
Washington, DC 20301-1620
michel.paradis@osd.mil
TEL: 1.703.696.9490 x115
FAX: 1.703.696.9575

*Counsel for Petitioner*

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

### A. Parties and *Amici* Appearing Below

The parties and *amici* who appeared before the Court of Military

Commission Review in connection with this appeal were:

1. Ali Hamza Ahmad Suliman al Bahlul, *Appellant*

2. United States of America, *Appellee*

3. *Amicus Curiae* the Office of the Chief Defense Counsel, Col Peter Masciola, USAF (on brief)

4. *Amicus Curiae* Robert David Steele and Others in the United States Intelligence Community, McKenzie Livingston (on brief)

5. *Amicus Curiae* Historians, Political Scientists and Constitutional Law Professors, Sarah Paoletti (on brief)

6. *Amicus Curiae* National Institute of Military Justice, Michelle Lindo (on brief)

7. *Amicus Curiae* Montana Pardon Project, Clemens P. Work and University of Montana Criminal Defense Clinic, Jeffrey Renz (on brief)

8. *Amicus Curiae* Human Rights Committee of the American Branch of the International Law Association, Jordan J. Paust (on brief)

### B. Parties Appearing in this Court

1. Ali Hamza Ahmad Suliman al Bahlul, *Petitioner*

2. United States of America, *Respondent*

3. Anticipated *Amici*: a) International Law Professors; c) Retired Military and Intelligence Officers; c) the National Institute for Military Justice.

i

## C. Rulings under Review

This appeal is from a decision of the United States Court of Military Commission Review in *United States v. Ali Hamza Ahmad Suliman al Bahlul*, CMCR 09-001(*en banc* September 9, 2011). The decision is appended hereto at App. 3-141 and is reported at ___ F.Supp. 2d ___, 2011 WL 4916373.

## D. Related Cases

This case has not previously been filed with this court or any other court. Counsel are aware of no other cases that meet this Court's definition of related.

Dated: March 9, 2012                    By: /s/ Michel Paradis
                                          *Counsel for Petitioner*

# TABLE OF CONTENTS

Table of Authorities ......................................................................................v

Glossary of Terms ........................................................................................x

Jurisdictional Statement ..............................................................................1

Statement of Issues.......................................................................................2

Statutes & Regulations ................................................................................3

Statement of Facts ........................................................................................4

    A. Circumstances leading to Mr. Bahlul's Arrest (1999-2001) ...........................4

    B. Proceedings before the Military Commissions (2004-2008) ........................5

    C. The Evidence at Trial................................................................................7

    D. The Film at the Center of this Case .........................................................8

    E. Post-Trial Proceedings (2008-2011)............................................................11

Summary of Argument................................................................................12

Argument ....................................................................................................14

I.  The Military Commission Convened to Try Mr. Bahlul Lacked
Jurisdiction Over the Charges Against Him. .........................................14

    A. Standard of Review...................................................................................15

    B. None of the charges are offenses against the law of war. ...........................16

        1. Material support is not an offense against the law of war.......................18

        2. Inchoate conspiracy is not an offense against the law of war..................19

        3. Inchoate solicitation is not an offense against the law of war..................21

    C. The CMCR applied the wrong standard in holding that Ms.
Crawford could convene the military commission in this case..........................23

        1. The CMCR's reliance on indeterminate international norms to
sustain this conviction replaces the traditional legal inquiry with
an exercise in crime by analogy. ............................................................24

2. The CMCR built its analogies around the condemnation of terrorism, while ignoring this Court's rejection of terrorism as an offense against the law of nations........................................28

3. The CMCR's reliance on crime by analogy is itself inconsistent with international norms and disregards what was charged, tried and proven at trial..........................................................30

D. The CMCR misconstrued the scope of the Act...........................................33

E. The CMCR's narrow reading of the Act forces avoidable Constitutional problems.........................................................37

**II. Mr. Bahlul's Conviction for Making a Film Violates the First Amendment.........................................................43**

A. Standard of Review.........................................................44

B. The First Amendment limits the punishment of speech, regardless of its source.........................................................45

C. The government never proved his film went beyond advocacy to incitement.........................................................49

**III.     The Act Discriminates against Aliens in Violation of the Equal Protection Component of the Due Process Clause.........................................................54**

A. Standard of Review.........................................................54

B. Singling out aliens for prosecution by military commission serves no lawful purpose.........................................................55

C. Discriminating against aliens is not rational, let alone necessary...............56

**Conclusion.........................................................59**

**Addendum.........................................................60**

A. Statutes.........................................................60

B. Rules & Regulations.........................................................66

**Certificate of Compliance with Rule 32(a).........................................................68**

iv

# TABLE OF AUTHORITIES

*Petitioner rests his primary reliance on authorities marked with an ***

## Cases

*\*Brandenburg v. Ohio*, 395 U.S. 444 (1969)...................................................... 50, 52

*\*Ex parte Quirin*, 317 U.S. 1 (1942) ................................. 15, 16, 25, 27, 35, 41, 57

*\*Graham v. Richardson*, 403 U.S. 365 (1971) ............................................... 54, 56

*\*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) .... 16, 17, 20, 24, 33, 34, 35, 37, 41, 57

*\*Jecker v. Montgomery*, 13 How. 498 (1851). ............................................... 35, 40

*\*Snyder v. Phelps*, 131 S.Ct. 1207 (2011) .............................................................53

*Ambach v. Norwich*, 441 U.S. 68 (1979) ..............................................................54

*Baltimore and Annapolis R. Co. v. Washington Metropolitan Area Transit Authority*, 642 F.2d 1365 (D.C. Cir. 1980)...........................................................15

*Batson v. Kentucky*, 476 U.S. 79 (1986) ...............................................................55

*Bose Corp. v. Consumers Union of the U.S.*, 466 U.S. 485 (1984).......................45

*Boumediene v. Bush*, 553 U.S. 723 (2008) ...........................................................48

*Carmel v. Texas*, 529 U.S. 513 (2000)..................................................................40

*Celebrezze v. Kilborn*, 322 F.2d 166 (5th Cir. 1963) ...........................................16

*Cisneros v. Aragon*, 485 F.3d 1226 (10th Cir. 2007) ...........................................26

*Citizens United v. FEC*, 130 S.Ct. 876 (2010).....................................................45

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)...................... 57, 58

*Clinton v. Goldsmith*, 526 U.S. 529 (1999) ..........................................................16

*DeBartolo Corp. v. Florida Gulf Coast Trades Council*, 485 U.S. 568 (1988)......37

*Douglas v. California*, 372 U.S. 353 (1963)..........................................................55

*Downes v. Bidwell*, 182 U.S. 244 (1901)...............................................................48

*Ex parte Milligan*, 4 Wall. 2 (1866).....................................................................34

*First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765 (1978)...................................46

*Hess v. Indiana*, 414 U.S. 105 (1973)..............................................................50, 51

*Hooper v. California*, 155 U.S. 648 (1895) ............................................................37

*Humanitarian Law Project v. Holder*, 130 S.Ct. 2705 (2010) ..............................19

*In re Yamashita*, 327 U.S. 1 (1946) ......................................... 15, 16, 27, 35, 36, 41

*Johnson v. Eisentrager*, 339 U.S. 763 (1950).......................................................47

*Judulang v. Holder*, 132 S.Ct. 476 (2011)...........................................................57

*Kinsella v. U.S. ex rel. Singleton*, 361 U.S. 234 (1960) .........................................16

*Kleindienst v. Mandel*, 408 U. S. 753 (1972) .......................................................47

*Korematsu v. United States*, 323 U.S. 214 (1944)..................................................57

*Lamont v. Postmaster*, 381 U.S. 301 (1965)................................................... 46, 47

*Lee v. Madigan*, 358 U.S. 228 (1959)....................................................................14

*Lorillard Tobacco v. Reilly*, 533 U.S. 525 (2001) .................................................50

*Madsen v. Kinsella*, 343 U.S. 341 (1952)..............................................................34

*Mathews v. Diaz*, 426 U.S. 67 (1976) ...................................................................54

*McFarlane v. Ben-Menashe*, 1995 WL 799053 (D.D.C. 1995) .............................47

*McKesson Corp. v. Iran*, 539 F.3d 485 (D.C. Cir. 2008) ......................................48

*Meese v. Keene*, 481 U.S. 465 (1987)............................................................ 46, 47

*Murray v. The Charming Betsy*, 6 U.S. 64 (1804)..................................................38

*NAACP v. Claiborne Hardware*, 458 U. S. 886 (1982) .........................................49

*New York Times v. Sullivan*, 377 U.S. 254 (1964) .................................................47

*Nielson v. Johnson*, 279 U.S. 47 (1929) ...............................................................49

*Northern Pipeline v. Marathon Pipeline*, 458 U.S. 50 (1982) ..............................40

*Pacific Gas and Elec. Co. v. Public Utilities Com'n of California*, 475 U.S. 1
(1986) ...................................................................................................................45

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972)...................................31

*Prosecutor v. Milutinovíc*, Decision on Dragoljub Ojdaníc's Motion Challenging
Jurisdiction-Joint Criminal Enterprise, Case No. IT-99-37-AR72 (ICTY App.
Chamber, May 21, 2003) .....................................................................................20

*Reid v. Covert*, 354 U.S. 1 (1957)................................................................... 14, 15

*Runkle v. United States*, 122 U.S. 543 (1887) ................................................ 14, 16

*Schmuck v. United States*, 489 U.S. 705 (1989) ...................................................30

*Smith v. O'Grady*, 312 U.S. 329 (1941) ...................................................32

*Stern v. Marshall*, 131 S.Ct. 2594 (2011) ........................................ 15, 40

*Street v. United States*, 394 U.S. 576 (1969) ...........................................52

*Tate v. United States*, 359 F.2d 245 (D.C. Cir. 1966) ...........................56

*Texas v. Cobb*, 532 U.S. 162 (2001) .........................................................32

*United States ex rel. Turner v. Williams*, 194 U.S. 279 (1904) ..............47

*United States v. Arjona*, 120 U.S. 479 (1887) .........................................39

*United States v. Bond*, 131 S.Ct. 2355 (2011) ........................................48

*United States v. Boston & Me. R.R.*, 380 U.S. 157 (1965) ......................41

*United States v. Carolene Prods. Co.*, 304 U.S. 144 (1938) ...................56

*United States v. Hamdan*, 801 F.Supp.2d 1247 (C.M.C.R. 2011).......... 54, 56

*United States v. Jones*, 68 M.J. 465 (C.A.A.F. 2009).............................30

*United States v. Lindh*, 227 F.Supp. 565 (E.D.Va. 2002)........................57

*United States v. Moussaoui*, 591 F.3d 263 (4th Cir. 2010) .....................57

*United States v. Popa*, 187 F.3d 672 (D.C. Cir. 1999) ...........................44

*United States v. Salameh*, 152 F.3d 88, 112 (2d Cir. 1998) ...................52

*United States v. Shi*, 525 F.3d 709 (9th Cir. 2008)..................................25

*United States v. Smith*, 18 U.S. 153 (1820) ..................................... 16, 25

*United States v. Sumler*, 136 F.3d 188 (D.C. Cir. 1998) .........................32

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) .............. 45, 48

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2002). ............... 25, 28, 29

*Weinberger v. Rossi*, 456 U.S. 25 (1982) ................................................38

*Wong Wing v. United States*, 163 U.S. 228 (1896)..................................57

*Young v. United States*, 97 U.S. 39 (1877) ..............................................19

## Statutes

10 U.S.C. § 821 (1950) ..............................................................................35

10 U.S.C. § 822 (1950) ..............................................................................35

10 U.S.C. § 948a, note (2006) ...................................................................36

10 U.S.C. § 948b (2006) ...................................................................... 33, 36

10 U.S.C. § 948c (2006) ............................................................ 34, 54

10 U.S.C. § 948h (2006) ...............................................................36

10 U.S.C. § 950a (2009) ...............................................................30

10 U.S.C. § 950f (2006) ................................................................11

10 U.S.C. § 950f (2009) ................................................................30

10 U.S.C. § 950g (2009) ............................................................ 1, 15

10 U.S.C. § 950p (2006) ...............................................................34

18 U.S.C. § 2339B .......................................................................18

Articles of War, Act of Aug. 29, 1916, ch. 418, 39 Stat. 619 (1916).....................35

Joint Resolution to Authorize the Use of United States Armed Forces Against Iraq, Pub. L. 107-243 (2002) ...............................................................18

Material Support to Terrorism Prohibition Enhancement Act of 2004, Pub. L. 108-458 (2004) ...............................................................18

Military Commissions Act of 2006, Pub. L. 109-366 (2006).................................5

Military Commissions Act of 2009, Pub. L. 111-84 §§ 1801, *et seq.* (2009) .........11

U.S. Const., art. I § 8, cl. 10.........................................................35

U.S. Const., art. III § 2 ...............................................................40

## Other Authorities

152 Cong. Rec. H7940 (Sept. 27, 2006).................................................58

152 Cong. Rec. S10253 (Sept. 27, 2006)................................................36

152 Cong. Rec. S10274 (Sept. 27, 2006)................................................55

152 Cong. Rec. S10395 (Sept. 28, 2006)................................................55

156 Cong. Rec. S3078 (May 4, 2010) ...................................................55

Alberto Gonzalez, *Stopping Terrorists Before They Strike: The Justice Department's Power of Prevention* (Aug. 16, 2006)...........................................58

*Convention against Transnational Organized Crime*, Nov. 15, 2000, 2225 U.N.T.S. 209 (Treaty No. I-39574) ..................................................26

*Ex-Cop Here Quizzed on Klan Murder Plot*, Chicago Tribune (Dec. 27, 1968) ....50

Harry Edwards & Linda Elliot, *Federal Courts – Standards of Review* (West 2007) ......................................................................15

Initial Report of the United States to the United Nations Human Rights Committee on Compliance with the ICCPR (Jul. 29, 1994) .................................................22

Jennifer Elsea, *Terrorism and the Law of War: Trying Terrorists as War Criminals before Military Commissions*, CRS Report RL31191 (Dec. 11, 2001) ...............36

*L. Rep. Trials of War Criminals* (1949).................................................................20

Michael Kearney, *The Prohibition of Propaganda for War in International Law* (2007) .......................................................................................................................23

Military Commission Instruction No. 2 (Apr. 30, 2003) ........................................28

*Military Commissions*, 11 Op. Att'y Gen. 297 (1865) ...........................................39

Military Government and Civil Affairs, FM 27-5 (Dec. 22, 1943)........................34

*Proposed Legislation: Military Commissions Act of 2006*, H. Doc. 109-133 (Sept. 7, 2006) .................................................................................................................34

Remarks by the President in Address to the Nation (Mar. 17, 2003)......................18

Robert M. Gates, U.S. Dep't of Def., *Manual for Military Commissions* (2007 & 2010).........................................................................................................................36

Rome Statute of the International Criminal Court, 37 I.L.M. 999 (1998)...............31

Statute of the International Criminal Tribunal, 32 I.L.M. 1159 (1993) .................18

Statute of the Iraqi Special Tribunal (Dec. 10, 2003)...................................... 18, 20

Treaty of Commerce & Friendship U.S.-Yemen, T.I.A.S. 1535 (May 4, 1946).....48

*Trials of the Major War Criminals* (1947) ...................................................... 21, 22

William Winthrop, *Military Law and Precedents* (1920) .......................... 14, 17, 34

Wright & Miller, *Fed. Prac. & Proc. Judicial Review* (2012)................................16

## GLOSSARY OF TERMS

47A Commission..................................... Military Commissions convened pursuant to Title 18, Chapter 47A

"The Act" ..............Military Commissions Act of 2006, Pub. L. No. 109-366 (2006)

AE ................................................................................Appellate Exhibits

App. ……………………………………………Appendix I (unless otherwise noted)

CMCR .................................................. U.S. Court of Military Commission Review

DoD .................................................................United States Department of Defense

Edwards & Elliot.................................Hon. Harry Edwards & Linda Elliot, Federal Courts – Standards of Review (West 2007)

"The Manual"...................................Robert M. Gates, U.S. Dep't of Def., Manual for Military Commissions (2008 & 2010)

UCMJ .................................................................Uniform Code of Military Justice

Winthrop ...........................William Winthrop, *Military Law and Precedents* (1920)

## JURISDICTIONAL STATEMENT

On September 9, 2011, the Court of Military Commission Review ("CMCR") affirmed the judgment and sentence rendered against Petitioner as approved by the convening authority. App. 3-141. Petitioner filed a timely petition for review, 10 U.S.C. § 950g(c) (2009), which gave this Court "exclusive jurisdiction to determine the validity" of that final judgment. *Id*. § 950g(a).

## STATEMENT OF ISSUES

1.      Whether this law-of-war commission had jurisdiction over charges of conspiracy, solicitation, and material support for terrorism, which were not recognized offenses against the law of war at the time of Mr. Bahlul's conduct.


2.      Whether Mr. Bahlul's conviction violates the First Amendment, where his trial centered on a political film and the jury convicted him on the basis of political advocacy that did not rise to the level of criminal incitement.


3.      Whether the Military Commissions Act, whose procedures apply to aliens alone, violates the equal protection component of due process.

## STATUTES & REGULATIONS

All pertinent statutes and regulations relied on are set forth in the Addendum included with this brief.

## STATEMENT OF FACTS

Mr. Bahlul acknowledges that he is a member of al Qaeda, a supporter of Usama bin Laden, and that his beliefs remain consistent. In his late twenties, he traveled to Afghanistan to participate in the mujahedeen. The record shows that he never had foreknowledge of and did not participate in any terrorist act. His most significant contribution was a 90-minute film that the prosecution described as a "political argument." This film was at the center of the military commission trial that convicted him and from which he now appeals.

### A. Circumstances leading to Mr. Bahlul's Arrest (1999-2001)

Mr. Bahlul traveled from his home in Yemen to Afghanistan in late 1999. His purpose was to join what was broadly referred to as the "mujahedeen," a diverse group of mostly Arab Muslims fighting in support of the Taliban in Afghanistan. App. 250.

Once he arrived in Afghanistan, Mr. Bahlul attended various training camps and grew to admire bin Laden. In late November 1999, Mohammad Atta and Zaid Jarrah arrived at a guesthouse where he was staying. App. 201; 261; 271. Within one or two weeks of their arrival, Mr. Bahlul left and ultimately returned to Yemen. App. 252. The 9/11 Commission Report describes Atta and Jarrah being introduced to the al Qaeda leadership and being brought into the September 11th

4

plot sometime after Mr. Bahlul had left for Yemen. App. 9/11 Commission Report

(Jul. 22, 2004), App. 352-355; *see also* App. 201.

Mr. Bahlul returned to Afghanistan in early 2000. He worked for

approximately a year-and-a-half in al Qaeda's media office, which was controlled

by a Media Committee, chaired by Ayman al-Zawahiri. App. 254. In this position,

Mr. Bahlul had no authority to distribute propaganda, which was the purview of

the Security Committee. App. 253. A separate Military Media Office was

responsible for filming bin Laden and producing martyr wills. App. 272.

After the September 11th attacks, Mr. Bahlul stayed in bin Laden's entourage

in Afghanistan for approximately a month before leaving for Pakistan, where he

was arrested by Pakistani authorities, turned over to U.S. custody and transferred to

Guantanamo Bay. App. 255.

## B. Proceedings before the Military Commissions (2004-2008)

Two military commissions were convened to try Mr. Bahlul on a single

charge of conspiracy between 2004 and 2006. App. 143-151. This conspiracy

charge was supported by eleven overt acts pertaining to his activities with al Qaeda

from 1999 until his arrest. Because of legal challenges in other cases, both of these

commissions were dissolved. App. 152.

In October 2006, the President signed the Military Commissions Act of

2006, Pub. L. 109-366 (2006), which established a procedural framework for

5

military commissions ("47A Commissions") that varied from the procedures required under the Uniform Code of Military Justice ("UCMJ"). In February 2008, the Convening Authority, Ms. Susan Crawford, convened a military commission to try three charges in Guantanamo. App. 153-158. The first charge, conspiracy, was substantively identical to the conspiracy charge in the prior commissions. The second charge, solicitation, alleged that Mr. Bahlul's film was made for the purpose of advocating terrorism. The third charge, material support, incorporated the overt acts from the conspiracy charge to show that Mr. Bahlul provided material support to a terrorist organization.

Mr. Bahlul was arraigned in May 2008. App. 167. He asserted a desire to represent himself and this request was granted by the military judge, COL Peter Brownback, USA. Later that month, COL Brownback was replaced by Col Ronald Gregory, USAF. App. 159.

In August, Col Gregory convened a hearing, on motion of the government, to revisit the issue of self-representation. App. 168. Mr. Bahlul refused to participate after the government could not locate a document he had prepared for that purpose. App. 169. He then absented himself from the hearing and Col Gregory revoked his *pro se* status. App. 170.

At a hearing in September, Mr. Bahlul admitted most of the allegations against him, but nevertheless pleaded not guilty, stating "I'm not guilty, and what I

6

did was not a crime." App. 178. He asserted his intention to "boycott" his trial, rejected his appointed military lawyer and engaged in an extensive colloquy with Col Gregory over his objections to the military commission and the charges. App. 177-183.

### C. The Evidence at Trial

The factual allegations against Mr. Bahlul, which are not in significant dispute, span the period from his arrival in Afghanistan in 1999 until his arrest. He admits to swearing allegiance to bin Laden, performing secretarial duties, and editing together the film that was the centerpiece of the government's case. App. 180-184. He denied wearing explosives to avoid capture and was ultimately acquitted of this allegation. App. 184.

One of the alleged overt acts is that he "prepared the propaganda declarations styled as martyr wills" of Atta and Jarrah. The basis for this allegation is a letter he wrote in 2005 to introduce himself to a high-level al Qaeda leader, who had been publicly taken into U.S. custody. In that letter, he states that he "typed" or "transcribed" (طبع) the martyr wills, apparently after the September 11th attacks. App. 278-281; *see also* App. 201 (McFadden testimony). The videos of Atta and Jarrah rehearsing and then taping these statements show them reading

from and revising handwritten remarks. App. II, 1, 2.[1] These videos were taped in

January 2000, at a time when Mr. Bahlul was home in Yemen. App. 271; 275. The

record shows that Mr. Bahlul did not know that Atta or Jarrah were involved in any

plot until he saw their photographs in the media following the September 11th

attacks. App. 201; 271; 275.

Mr. Bahlul's alleged connections to Atta and Jarrah are important to clarify

because his trial was not about the September 11th attacks, or any act of terrorism.

The government never alleged, nor presented any evidence and the jury never

found that he either participated in the September 11th attacks or had

foreknowledge of any terrorist plot. From the opening statement, through the

testimony of every witness to the summation, Mr. Bahlul's trial was about his film.

### D. The Film at the Center of this Case

The film[2] is referred to in the record by various names, including *State of the*

*Ummah*, *The Destruction of the American Destroyer the U.S.S. COLE*, and the

*COLE Video*. App. 142. Its production is listed as an overt act in support of the

conspiracy and material support charges. The prosecution's opening statement

---

[1] In App. II, 2 the tapings appear about 40% of the way through the video; the camera zooms in on the handwritten notes about 60% into the video.

[2] The film is appended in its entirety in Appendix II, 3.

8

referred to the film as the foundation of the central charge in the case –solicitation. App. 191-192.

Mr. Bahlul made this film in early 2001. He is not in this film. It does not show him committing any crimes. It does not contain do-it-yourself instructions on how to perpetrate crimes. He was not even the cameraman. He edited together found footage into what the prosecution described as "propaganda, political argument, and indoctrination of solicitation." App. 189.

The film opens and closes with footage of the *U.S.S. COLE* overlain by a simulated explosion. The remainder is a collage of footage, including news clips, broadcast speeches by bin Laden and others, and training camp videos. The diverse topics it covers span everything from the Israeli-Palestinian conflict, to corruption in the Saudi government, to the moral necessity of war.

The film is organized into three parts –"The Problem," "The Causes," and "The Solution." The Problem contains news footage from and commentary on conflicts in which Muslims are ostensibly being victimized. The Causes contains footage and commentary that is primarily about the Saudi royal family. The Solution begins with a plea for Muslim migration to Islamic countries. It then proceeds for thirty minutes on "preparation," which is composed of clips from training camps videos and speeches encouraging Muslims to undergo spiritual and

9

military training. Lastly, the film extols the moral necessity of "holy war" and praises those who have perpetrated suicide attacks.

Trial commenced on October 27, 2008. App. 185. Mr. Bahlul insisted that his appointed lawyer remain silent throughout. The government called fourteen witnesses. Three witnesses were federal prisoners, who testified about seeing the film at terrorist training camps. App. 202-04; 206; 209. Law enforcement officers testified on the video's production and the chain of custody linking it to Mr. Bahlul. App. 194-198; 214. Three interrogators testified largely about Mr. Bahlul's taking credit for the film's production. App. 199-201; 205. The government's last witness was a "propaganda expert [to] breakdown this video and place it in the context of other propaganda products produced by al Qaeda and their purposes." App. 190. On November 3, 2008, Mr. Bahlul was found guilty on all charges, excepting the overt act alleging he armed himself to avoid capture. App. 241-248.

The sentencing hearing commenced that same day. The government called two witnesses, victims of the *U.S.S. COLE* attack, who testified that they were personally offended after seeing the film on the Internet. App. 231-237. At the conclusion of testimony, Mr. Bahlul made an unsworn statement reaffirming his commitment to al Qaeda and after an hour of deliberation, the members sentenced him to life imprisonment. App. 240.

10

### E. Post-Trial Proceedings (2008-2011)

In June 2009, Ms. Crawford approved the findings and sentence without exception. App. 160-163. On September 1, 2009, Mr. Bahlul filed his merits brief with the CMCR. In October, the President signed the Military Commissions Act of 2009, Pub. L. 111-84 §§ 1801, *et seq.* (2009), which enacted a modified procedural framework for 47A Commissions. Briefing was complete, including supplemental argument respecting certain statutory changes, by the middle of November 2009. Oral argument was heard in January 2010.

In September 2010, following a series of procedural motions, the CMCR decided *sui sponte* to hear Mr. Bahlul's case *en banc*. App. 164. The *en banc* panel ordered a second round of briefing on two certified issues. App. 165-166. Briefing and oral argument on these issues was complete in March 2011.

In September 2011, the CMCR issued a decision, denying all of Mr. Bahlul's asserted errors. App. 3-141. The instant appeal followed.

11

## SUMMARY OF ARGUMENT

A military commission in Guantanamo convicted and sentenced Mr. Bahlul to life imprisonment. The primary allegation against him was that he made a 90-minute film that advocates war. The CMCR held that because his underlying conduct was inconsistent with "international norms," his conviction could be sustained. The CMCR's decision should be reversed on any one of three grounds.

**The military commission convened to try Mr. Bahlul lacked jurisdiction over the charges.** The CMCR either avoided or implicitly answered in the negative the critical question raised below, namely, whether the charges were offenses against the law of war at the time Mr. Bahlul allegedly committed them.

As the CMCR recognized, outside circumstances of military government not applicable here, the authority to convene military commissions derives from Congress' power to define and punish offenses against the law of nations. The Supreme Court has accordingly required a plain showing that the offense charged is, in fact, a law of nations offense.

The CMCR effectively acknowledges that none of the offenses charged were plainly established war crimes. Yet, the CMCR sustained the charges because it viewed the underlying conduct as inconsistent with international norms condemning terrorism. Doing so turned appellate review into an exercise in finding

12

crime by analogy; analogies built around a norm that, according to this Court, has not yet crystallized into a law of nations offense, let alone a war crime.

**Mr. Bahlul's trial infringed Constitutionally-protected speech.** The chief evidence in this case is a film. The record demonstrates that the only thing the film has ever provoked is debate. The government failed to produce any evidence that the film does anything more than advocate beliefs, and it never showed that it rose to the level of incitement. The CMCR improperly sustained a criminal conviction for making this film based on its subject matter and viewpoint.

**Congress improperly targeted aliens alone for prosecution by military commission.** The Act establishes an inferior criminal justice system that violates equal protection guarantees resting in fundamental due process. Rather than the strict scrutiny applicable to discrimination based on alienage, the CMCR applied a deferential rational basis test and erroneously found that it was enough that Congress sought to protect citizens from their foreign enemies.

**ARGUMENT**

## I. THE MILITARY COMMISSION CONVENED TO TRY MR. BAHLUL LACKED JURISDICTION OVER THE CHARGES AGAINST HIM.

Military tribunals are created *ad hoc* by a "convening authority." She issues an order that creates the tribunal for a specific case. The trial participants convene under her command to execute that order. When the trial concludes, the order expires and the tribunal ceases to exist. *Runkle v. United States*, 122 U.S. 543, 555-56 (1887); William Winthrop, *Military Law and Precedents* 49-50 (1920) ("Winthrop"), App. 365-366. The jurisdiction of a military tribunal is therefore no broader than the convening authority's lawful command.

Mr. Bahlul challenges Ms. Crawford's authority to convene a military commission to try the charges against him. The government carries a heavy burden to show that Ms. Crawford acted lawfully. "[T]he jurisdiction of military tribunals is a very limited and extraordinary jurisdiction derived from the cryptic language in Art. I, § 8, and, at most, was intended to be only a narrow exception to the normal and preferred method of trial in courts of law." *Reid v. Covert*, 354 U.S. 1, 21 (1957) (plurality op.); *Lee v. Madigan*, 358 U.S. 228, 232 (1959) ("The attitude of a free society toward the jurisdiction of military tribunals – our reluctance to give them authority to try people for nonmilitary offenses – has a long history.").

14

While the Act is more detailed than past legislation authorizing military commissions, the question before this Court is the same as the question presented in *Ex parte Quirin*, 317 U.S. 1 (1942) and *In re Yamashita*, 327 U.S. 1 (1946): were the charges in this case offenses against the law of war? The answer is no.

None of the charges allege offenses against the law of war, a fact the CMCR largely concedes. The CMCR's effort to affirm the charges in this case forced it to undertake a novel and standardless inquiry into the penumbra of international norms and to reach difficult Constitutional questions that the Act did not require.

## A. Standard of Review

This Court exercises *de novo* review over "matters of law." 10 U.S.C. § 950g(d) (2009); Hon. Harry Edwards & Linda Elliot, *Federal Courts – Standards of Review* 23 (West 2007) ("Edwards & Elliot"), App. 301.

Any time an Article I tribunal is convened, the federal courts must ensure that the Executive is not seeking to "chip away at the authority of the Judicial Branch . . . 'Slight encroachments create new boundaries from which legions of power can seek new territory to capture.'" *Stern v. Marshall*, 131 S.Ct. 2594, 2620 (2011) (quoting *Reid*, 354 U.S. at 39). In reviewing Ms. Crawford's claims to authority, this Court must give the charges in this case "close scrutiny." *Baltimore and Annapolis R. Co. v. Washington Metropolitan Area Transit Authority*, 642 F.2d 1365, 1371 (D.C. Cir. 1980) ("(e)fforts of an administrator or administrative

15

agency to enlarge or restrict the application of a statute should be subjected to close scrutiny.") (internal quotation omitted)); *see also* Wright & Miller, 33 *Fed. Prac. & Proc. Judicial Review* § 8382 (2012) ("A reviewing court can be expected to look more closely at an administrative interpretation that expands administrative authority or jurisdiction."); *cf. Clinton v. Goldsmith*, 526 U.S. 529, 536-37 (1999).

The government must "affirmatively and unequivocally" show that the military commission had jurisdiction over the charges Ms. Crawford approved; nothing is presumed in its favor. *Runkle*, 122 U.S. at 556. It must show that this commission was "restricted to the narrowest jurisdiction deemed absolutely essential" to its Constitutional purposes. *Kinsella v. U.S. ex rel. Singleton*, 361 U.S. 234, 240 (1960); *Hamdan v. Rumsfeld*, 548 U.S. 557, 598 (2006) (plurality op.).

## B. None of the charges are offenses against the law of war.

As in *Quirin* and *Yamashita*, the jurisdictional question any Court must answer is "if the offenses with which [Mr. Bahlul is] charged are offenses against the law of war." *Quirin*, 317 U.S. at 38. This is a straightforward question of law. To affirm, a court must identify an established law of war offense whose elements are necessarily included in the offense charged. *Hamdan*, 548 U.S. at 602 (plurality op.); *Quirin*, 317 U.S. at 29; *cf. United States v. Smith*, 18 U.S. 153, 161 (1820).

16

The CMCR implicitly acknowledged that none of the charges in this case survive this traditional analysis.[3] None of the charges in this case – conspiracy to commit war crimes, solicitation of war crimes, and the § 2339B-type material support for terrorism – were plainly established law of war offenses at the time Mr. Bahlul is alleged to have committed them.

The government has also conceded this with respect to material support. In the case of *Hamdan v. United States*, it conceded that material support is not an offense against the law of nations. Brief for the United States at 48, 55-56, 61, *Hamdan v. United States* (D.C. Cir. 2011) (No. 11-1257).

The inchoate charges of conspiracy and solicitation to commit war crimes have been explicitly rejected from the law of war. Going back at least to the Civil War, the United States has not recognized inchoate war crimes. *See Hamdan*, 548 U.S. at 604 (plurality op.) ("[I]t is not enough to intend to violate the law of war and commit overt acts in furtherance of that intention unless the overt acts either are themselves offenses against the law of war or constitute steps sufficiently substantial to qualify as an attempt.") (citing Winthrop at 841, App. 370). Inchoate

---

[3] With respect to conspiracy, the CMCR begins by acknowledging that the "viability of conspiracy as a war crime has long been the subject of controversy" and ultimately avoids "this enduring and complex controversy" altogether. App. 86. With respect to solicitation, the CMCR demurs that "[i]nchoate liability under international law continues to evolve." App. 111. After converting material support into the "underlying offense" of terrorism, the CMCR concedes that there is no "universally accepted definition of terrorism." App. 54-55.

17

offenses are a rare exception in the law of nations more broadly. When they have
been recognized, such as with genocide, they have been specifically provided for.
*See*, *e.g.*, Statute of the Iraqi Special Tribunal, arts. 10-15 (Dec. 10, 2003) ("Iraqi
Tribunal") (reserving inchoate liability for genocide), App. 406-427; Statute of the
International Criminal Tribunal, 32 I.L.M. 1159, 1173, art. 4(3) (1993) (same).

### 1.  Material support is not an offense against the law of war.

Material support offenses are novel domestic crimes. 18 U.S.C. § 2339B,
which is the parallel provision to the charge in this case, did not apply
extraterritorially until almost a year after Mr. Bahlul was first charged before a
military commission. Material Support to Terrorism Prohibition Enhancement Act
of 2004, Pub. L. 108-458 § 6603(c) (2004).

No international criminal tribunal has had jurisdiction over such an offense.
Of particular relevance here, the U.S. government did not include anything like §
2339B among the offenses triable by the war crimes tribunal it created in Iraq.
Iraqi Tribunal, arts. 10-14, App. 413-418. This is despite the fact that a primary
*casus belli* for Operation Iraqi Freedom was Ba'athist support for terrorist groups,
including al Qaeda. Joint Resolution to Authorize the Use of United States Armed
Forces Against Iraq, Pub. L. 107-243 (2002); Remarks by the President in Address
to the Nation (Mar. 17, 2003), App. 403. Material support was not even an offense

18

made triable in the military commissions struck down by the Supreme Court in

*Hamdan*. App. 377-398.

As described by the Chief Justice, § 2339B is quintessential policing

legislation. The statute "is on its face, a preventative measure – it criminalizes not

terrorist attacks themselves, but aid that makes the attacks more likely to occur."

*Humanitarian Law Project v. Holder*, 130 S.Ct. 2705, 2728 (2010).

Section 2339B may be an important preventative measure domestically. In

military government circumstances, it also may be useful for prosecuting those

under occupation who materially support an insurgency. In form and in substance,

however, § 2339B is not and never has been an offense against the law of war for

which a foreign national can be tried for entirely extraterritorial conduct. *Young v.*

*United States*, 97 U.S. 39, 66 (1877) (When a non-resident alien supports

hostilities against the United States, he may be properly targeted "by reason of his

hostile acts [as] an enemy . . . [but he] was no offender, in a criminal sense. He had

committed no crime against the laws of the United States or the laws of nations").

### 2.  Inchoate conspiracy is not an offense against the law of war.

There is an extensive and unanimous history of rejecting conspiracy to

commit war crimes. When the Supreme Court last addressed military commission

jurisdiction, a plurality of the Court held that the government failed to make a

"'merely colorable' case for inclusion of conspiracy among those offenses

19

cognizable by law-of-war military commission." *Hamdan*, 548 U.S. at 611. In making this finding, the plurality considered sources going back to before the Civil War and noted that the authoritative treatise on military law from that period "excludes conspiracy of any kind from his own list of offenses against the law of war." *Id.* at 608 (citing Winthrop, App. 368-369).

At the Nuremberg trials and in all of its war crimes prosecutions during the Second World War, the United States did "not recognize[] as a separate offense conspiracy to commit war crimes or crimes against humanity." 15 L. Rep. Trials of War Criminals 90 (1949), App. 324 . The plurality in Hamdan noted that the Nuremberg tribunal considered the question at length and ultimately were persuaded "that conspiracy in the truest sense is not known to international law." *Hamdan*, 548 U.S. at 611 (quotations omitted). Modern international criminal tribunals have equally rejected conspiracy to commit war crimes as a stand-alone offense. *See*, *e.g.*, *Prosecutor v. Milutinovíc*, Decision on Dragoljub Ojdaníc's Motion Challenging Jurisdiction-Joint Criminal Enterprise, Case No. IT-99-37-AR72 (ICTY App. Chamber, May 21, 2003). Not even the war crimes tribunal the United States established in Iraq had jurisdiction over conspiracy to commit war crimes. Iraqi Tribunal, at art. 13.

The CMCR declined to decide whether inchoate conspiracy to commit war crimes was an offense against the law of war. App. 88. Instead, it took notice of the

fact that the acts alleged were identical to the material support charge. Having

sustained that charge, it sustained the conspiracy charge by extension. App. 89; 92.

Even if that was an appropriate exercise of appellate review, the government's

recent concession that material support is also not an offense against the law of

nations leaves nothing to support the inchoate conspiracy charge in this case.

### 3. Inchoate solicitation is not an offense against the law of war.

The analysis that is fatal to the conspiracy charge is equally fatal to the

solicitation charge. Inchoate war crimes are not recognized as offenses against the

law of nations. Producing war propaganda, even when it exhorts others to commit

war crimes, has never itself been a war crime.

The face of Nazi propaganda, Hans Frietzsche, was tried at Nuremberg for

"incit[ing] and encourage[ing] the commission of war crimes." 22 *Trials of the*

*Major War Criminals* 584 (1947), App. 362 . This included broadcasts that

exhorted Germans to form guerilla bands and conduct a campaign of terrorism

against the invading Allied Forces. He was acquitted because there was no proof

that he intended to incite crimes against humanity (i.e. genocide), and because he

was not "a participant in the crimes charged. His aim was rather to arouse popular

sentiment in support of Hitler and the German war effort." *Id*. at 584-5, App. 362-

363. He was also acquitted of conspiracy to commit aggression because "[n]ever

did he achieve sufficient stature to attend the planning conferences which led to

21

aggressive war," despite the fact that he was responsible for a "vigorous propaganda campaign [that] was carried out before each major act of aggression." *Id*. at 583-84, App. 361-362.

Giving short shrift to the Frietzsche precedent, the CMCR instead focused on the conviction of Julius Streicher. App. 111. Streicher published the anti-Semetic pamphlet, *Der Sturmer*, and was convicted of genocide and persecution as crimes against humanity. 22 *Trials of the Major War Criminals* 547-49, App. 357-359. Streicher was not charged with war crimes and was acquitted of aggression because he, like Frietzsche, did not orchestrate operations and had no prior knowledge of specific plans. *Id*. at 547, App. 357.

Streicher and Frietzsche's acquittals of aggression are notable because the CMCR treated solicitation to commit aggressive war as analogous to the charges against Mr. Bahlul. App. 112. Inchoate solicitation, however, has never been applicable to aggression and the United States has adamantly opposed even hortatory efforts to prohibit war propaganda. *See*, *e.g.*, Initial Report of the United States to the United Nations Human Rights Committee on Compliance with the ICCPR, ¶ 597 (Jul. 29, 1994) ("Under the First Amendment, opinions and speech are protected categorically, without regard to content. Thus, the right to engage in

22

propaganda of war is as protected as the right to advocate pacifism, and the advocacy of hatred as protected as the advocacy of fellowship"), App. 320.[4]

Inchoate solicitation has only ever applied to genocide. The CMCR's suggestion that Mr. Bahlul's "actions equate to conduct and intent akin to that punishable as genocide" is beside the point. App. 112. He was tried for the inchoate solicitation of war crimes, which is not and has never been an offense against the law of war.

### C. The CMCR applied the wrong standard in holding that Ms. Crawford could convene the military commission in this case.

The CMCR affirmed this conviction by replacing the traditional inquiry into the law of war basis of the charged offenses with what it called the "substantial showing" test. App. 26-27. This test has no basis in law and the CMCR's use of broad analogies to sustain a criminal conviction violates the very international norms it claims to vindicate.

---

[4] Michael Kearney, *The Prohibition of Propaganda for War in International Law* 247 (2007) ("A significant impediment to the application of the prohibition of propaganda for war in international law, … has been the impact of the many reservations to Article 20(1). The primary justification for these reservations has been that since propaganda for war is not defined, it is not possible to respect the obligation to prohibit it by law without violating the right to freedom of expression. The failure to enforce these norms, the lack of state practice or opinio juris on the subject, and the large number of reservations and declarations to Article 20(1) provide little support to suggest that the prohibition of propaganda for war is a prohibition under customary international law."), App. 338.

23

1. **The CMCR's reliance on indeterminate international norms to sustain this conviction replaces the traditional legal inquiry with an exercise in crime by analogy.**

The CMCR's "substantial showing" test was ostensibly drawn from the plurality opinion in *Hamdan*, where Justice Stevens wrote that "At a minimum, the Government must make a substantial showing that the crime for which it seeks to try a defendant by military commission is acknowledged to be an offense against the law of war." *Hamdan*, 548 U.S. at 603.

The CMCR's "substantial showing test" asks something different, however. The CMCR first looks to see if the elements of the charges listed in the Manual were proven, which is not disputed in this case. App. 52-54, 89-90, 100-01. Then, instead of determining whether those elements constitute war crimes, it shifts the focus to the "acts" of the accused and whether treating those acts as punishable was "consistent with international norms." App. 27. Once satisfied that the underlying conduct was inconsistent with international norms, the statutory description of the charge is given "great deference," making irrelevant the "the name of the offense, the elements of that offense, the forum by which that offense is punishable, and the applicable rules/procedures . . . ." *Id.*

The CMCR's approach therefore replaces the traditional legal inquiry into whether the offenses charged are, in fact, offenses against the law of war with one that dispenses with the offenses charged altogether. Charges are no longer made up

24

of elements, which the government must prove beyond a reasonable doubt to establish that the accused committed a war crime. They are simply guideposts for assessing whether the international community frowns upon what has been alleged from the vantage of appellate review.

This approach has no legal basis. The case law dealing with the criminal jurisdiction conferred by the Define & Punish Clause does not speak of "consistency with international norms." Rather, like the Constitutional text, it speaks of "offenses against the law of nations." *See*, *e.g.*, *Quirin*, 317 U.S. at 28; *Smith*, 18 U.S. at 160 (requiring the offense be "defined by the law of nations with reasonable certainty."); *United States v. Yousef*, 327 F.3d 56, 105 (2d Cir. 2002). That narrow category is defined by the fact that they are "offenses against all states [and] may be punished by any state where the offender is found." *United States v. Shi*, 525 F.3d 709, 722 (9th Cir. 2008).

The CMCR's approach is a standardless exercise in crime by analogy. The CMCR opines on how the conduct alleged is "akin to," "similar to," "virtually identical to," "shares attributes with," and draws "analogical support" from aspects of over a dozen differing lines of legal authority, most of which are not even aspects of the law of war.[5] *See Yousef*, 327 F.3d at 99 ("The District Court erred,

---

[5] Respectively, App. 65, 71, 94, 102, 105, 112; 59, 72, 79, 82, 83, 94, 102; 71; 79; 81-82.

first, in its use of the sources of authority from which a court may discern the

content of customary international law and, second, in its conclusion that universal

jurisdiction may be expanded by judicial analogy to the crimes that currently are

subject to jurisdiction under the universality principle.").

Much of the CMCR's opinion consists of lists of foreign laws directed at

everything from organized crime to sedition. App. 59-63, 95-99, 105-112. None of

these are relevant to whether conspiracy, solicitation and material support are

offenses against the law of nations. They are not even relevant to establishing

international norms. "[T]he law of nations . . . does not include a norm simply

because the norm is enshrined in the domestic law of all civilized societies. Auto

theft is not a violation of international law." *Cisneros v. Aragon*, 485 F.3d 1226,

1231 (10th Cir. 2007).

When dealing with international law sources, the CMCR's opinion is a

hodgepodge. Little of what is cited bears on the law of war and most post-dates

Mr. Bahlul's arrest by months or years. The CMCR places heavy reliance, for

example, on the *Convention against Transnational Organized Crime*, Nov. 15,

2000, 2225 U.N.T.S. 209 (Treaty No. I-39574). App. 71, 94. This Convention

entered into force two years after Mr. Bahlul first arrived in Guantanamo and was

ratified by the United States in November 2005. But even if it had been in force at

any time relevant to the charges here, such non-self-executing treaties, resolutions

26

and covenants are hortatory instruments that encourage the greater uniformity of domestic laws. They do not establish international norms, let alone offenses against the law of war.

The CMCR draws analogies to "the criminal organization provisions of the Nuremburg Charter," genocide, aggressive war, prohibitions contained in martial-law orders during the Civil War, the loyalty offense of aiding the enemy, as well as what it called the "offense of complicity" and joint criminal enterprise. Yet, it never articulates any standard for how this mixed bag of analogies weighs for or against the offenses charged.

The CMCR's struggle to catalogue analogous legal authorities highlights how alien the charges in this case are to the law of war. In *Quirin*, the Court could hold that spying was plainly "an offense against the law of war" by citing to squarely pertinent sections of the military's war crimes code, *Quirin*, 317 U.S. at 34, supported by a footnote with a dozen concurring international authorities. *Id*. at 35, n.12. In *Yamashita*, the Court could cite to squarely pertinent provisions of the Hague Conventions. *Yamashita*, 327 U.S. at 16. In both cases, the inquiry into whether the charges alleged offenses against the law of war was straightforward. The Supreme Court did not undertake a survey of all the laws of the world to see if any were akin to the charges brought.

27

**2. The CMCR built its analogies around the condemnation of terrorism, while ignoring this Court's rejection of terrorism as an offense against the law of nations.**

The central international norm around which the CMCR built its analogies was "terrorism." App. 54. But terrorism is no more established than the charges of which Mr. Bahlul was convicted. Even Military Commission Instruction No. 2 (Apr. 30, 2003), App. 377-398, which set forth the offenses triable in the commission system struck down in *Hamdan*, did not list terrorism among its "War Crimes," but instead among its "Other Offense Triable by Military Commission."

The seminal case on the status of terrorism is this Court's decision in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984). This decision has been consistently reaffirmed and Mr. Bahlul relied upon it in his briefing below. Yet, neither *Tel-Oren* nor its progeny are cited in the CMCR's discussion of why terrorism was an international norm sturdy enough to support its analogies.

Months before Mr. Bahlul was first charged before a military commission, the Second Circuit reaffirmed *Tel-Oren*. *Yousef*, 327 F.3d at 106. The defendant in that case bombed a Malaysian airplane and challenged his prosecution on the ground that terrorism did not support the exercise of universal criminal jurisdiction. Though the defendant went beyond supporting a terrorist organization to the perpetration of terrorist acts, the Second Circuit agreed.

28

The Second Circuit extensively analyzed many of the same terrorism-related treaties, regional conventions and U.N. resolutions that the CMCR did. But instead of resting the defendant's conviction on the penumbra of these diverse sources, the Second Circuit recognized that their very diversity proved only that "[c]onfusion on the definition of 'terrorism' abounds." *Id*. at n. 42.

Even the CMCR conceded that the authority on which it relied "does not suggest that a universally accepted definition of terrorism existed at the time of appellant's charged conduct, or that such a definition currently exists in international law. A more accurate description of the treaty law addressing international terrorism would be *ad hoc*." App. 55.

This indeterminacy was irrelevant, however, because the CMCR set aside the question of whether the charges were offenses against the law of war. Instead, it said it could still affirm the conviction because the "underlying offense" of terrorism was "consistent with international norms applicable at the time of the charged conduct, consistent with the general principles of law recognized by civilized nations, and constitutes conduct in violation of the common law of armed conflict." App. 54; 63.

### 3. The CMCR's reliance on crime by analogy is itself inconsistent with international norms and disregards what was charged, tried and proven at trial.

The CMCR's "substantial showing test" is not a test at all. It is a nonexclusive assemblage of foreign and domestic legal authorities that can be balanced however a reviewing court feels appropriate in a given case. The CMCR's approach in this case warrants reversal for three reasons that go beyond its lack of a legal basis and the confusion it injects into appellate review.

*First*, it is contrary to the CMCR's statutory authority. The Act limits the CMCR's jurisdiction to a review of the "findings and sentence as approved by the convening authority." 10 U.S.C. § 950f(d) (2009). By affirming, as it did, on the basis of uncharged "underlying offenses," the CMCR is no longer reviewing the findings approved by the convening authority. It is substituting its own beliefs about what charges the record could hypothetically support.

Ms. Crawford made no findings on terrorism or any other choate offense. Insofar as terrorism is not a lesser-included offense, even she could not have substituted the "underlying offenses" and legal theories that the CMCR did. 10 U.S.C. § 950a(b) (2009) (authorizing the approval of so much of the finding as includes a lesser-included offense); *Schmuck v. United States*, 489 U.S. 705, 717 (1989) (the elements of a lesser included offense must be a subset of the charged offense); *United States v. Jones*, 68 M.J. 465, 470 (C.A.A.F. 2009) (same).

30

*Second*, imposing a criminal conviction on the basis of a *post hoc* survey of indeterminate international norms violates specific international norms against crimes by analogy. The principle of legality requires that "the definition of a crime shall be strictly construed and shall not be extended by analogy. In case of ambiguity, the definition shall be interpreted in favour of the person being investigated, prosecuted or convicted." Rome Statute of the International Criminal Court, 37 I.L.M. 999, art. 22(2) (1998); *see also Papachristou v. City of Jacksonville*, 405 U.S. 156, 169 (1972) ("[p]unishment by analogy . . . though long common in Russia, [is] not compatible with our Constitutional system.").

*Third*, once the elements of offenses are replaced by analogies to norms, criminal convictions stand on whatever sense of opprobrium a panel of judges feels toward the accused by the time his case reaches appellate review.

Nothing a trial would have put Mr. Bahlul on notice that he was being tried for any choate offense, let alone the diverse crimes and theories of liability that the CMCR used to sustain his conviction. The record shows that this trial was about his making a film and consorting with al Qaeda. This was precisely why he pleaded that he was "not guilty, and what I did was not a crime." App. 178. The presentation of the evidence, the instructions and the findings all rested on theories of inchoate liability that lacked some or all of the elements of any analogous crime.

31

In sustaining Mr. Bahlul's conviction on the basis of joint criminal enterprise, in particular, the CMCR resorted to a legal theory that the government explicitly disclaimed at trial. The original charges in this case alleged that Mr. Bahlul "joined a criminal enterprise." App. 153-155. On its own motion, the government struck this language and did not seek to have it revived. App. 172-176. After Col Gregory inadvertently mentioned the word "enterprise" in his instructions, App. 221-222, he went back and admonished the jury to "please strike the words 'or enterprise', that's not before you." App. 224-225.

The CMCR buries these facts in a footnote. App. 120. But no one, not least the accused, could have understood the charges in this case to depend on some implicit allegation of underlying criminality until the CMCR decided they did almost three years after his trial.

"[R]eal notice of the true nature of the charge against him [is] the first and most universally recognized requirement of due process." *Smith v. O'Grady*, 312 U.S. 329, 334 (1941). Insofar as the elements of the offense have been replaced by international norms, it is not even clear for what offenses jeopardy attached or counsel rights extend. *See*, *e.g.*, *United States v. Sumler*, 136 F.3d 188, 203 (D.C. Cir. 1998) (jeopardy turns on the "elements of the offenses, not the constituent facts either as alleged or proven"); *Texas v. Cobb*, 532 U.S. 162, 173 (2001) (same-elements test determines the scope of counsel rights).

32

**D. The CMCR misconstrued the scope of the Act.**

The CMCR appears to have proceeded from the presumption that the "offenses of which appellant stands convicted were explicitly defined, as [against the law of nations], by Congress in coordination with the President following the Supreme Court's decision in *Hamdan*, and explicitly intended to address punishment of those with whom the United States was and remains engaged in armed conflict." App. 18. This presumption suffers from two problems addressed in this and the next section.

The first problem is that such a presumption is inconsistent with the plain terms of the Act, its history and implementing regulations. The Supreme Court's core holding in *Hamdan* was that military commissions convened under the UCMJ required strict procedural parity with courts-martial. *Hamdan*, 548 U.S. at 631. The Act created a comprehensive set of procedures for 47A Commissions that could vary from those used in courts-martial. 10 U.S.C. § 948b(a) (2006) (the Act's "purpose" is to "establish[] procedures governing the use of military commissions to try alien unlawful enemy combatants"). According to the President, the Act was intended to "establish[] for the first time in our Nation's history a comprehensive statutory structure for military commissions that would allow for the fair and effective prosecution of captured members of al Qaeda and other unlawful enemy

combatants." *Proposed Legislation: Military Commissions Act of 2006*, H. Doc. 109-133, at 3 (Sept. 7, 2006), App. 400.

In responding to *Hamdan*, the Act did not seek to narrow or otherwise vary the traditional sources of military commission jurisdiction. *See*, *e.g.*, 10 U.S.C. §§ 948d(a) (2006) ("A military commission under this chapter shall have jurisdiction to try any offense made punishable by this chapter or the law of war"); 950p(a) (stating that the Act "codif[ies] offenses that have traditionally been triable by military commissions.").

In *Hamdan*, a majority of the Court noted that the general statutory term "military commission" authorized three types of commission, which draw their jurisdiction from distinct sources of authority. *Hamdan*, 548 U.S. at 595-596 (plurality op.); *id*. at 683 (Thomas, J., dissenting); *see also* Winthrop at 838, App. 367. Two are an extension of a field commander's authority to impose military government on areas under either martial law, *Ex parte Milligan*, 4 Wall. 2, 127 (1866), or foreign occupation. *Madsen v. Kinsella*, 343 U.S. 341, 357 (1952); *see also* Military Government and Civil Affairs, FM 27-5, at 1 (Dec. 22, 1943), App. 340. These commissions have broad criminal jurisdiction because they are "nothing more than the agents of the military power, to assist it in preserving order in the conquered territory, and to protect the inhabitants in their persons and

34

property while it was occupied by the American arms." *Jecker v. Montgomery*, 13 How. 498, 515 (1851).

The third type of military commission, known as a "law-of-war commission," is "utterly different." *Hamdan*, 548 U.S. at 596 (plurality op.). Unlike the other two, law-of-war commissions can be convened where the ordinary courts are open. *Quirin*, 317 U.S. at 45-46. As the CMCR recognized, they derive their jurisdiction from Congress' enumerated power to "define and punish . . . Offenses against the Law of Nations." U.S. Const., art. I § 8, cl. 10; App. 23; *Yamashita*, 327 U.S. at 7. Accordingly they "try persons for offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals." *Quirin*, 317 U.S. at 28.[6]

Precisely because the Act was intended to be "a comprehensive code to define and punish the conduct of widely disparate individuals in a global-battle

---

[6] Historically, Congress delegated convening authority under the Define & Punish Clause to commanders in the field. Articles of War, Act of Aug. 29, 1916, ch. 418, 39 Stat. 619, arts. 15, 72 (1916); *cf.* 10 U.S.C. §§ 821, 822 (1950). As a consequence, they would sometimes create military commissions that drew from both the Define & Punish Clause and military government jurisdiction. These hybrid military commissions "regularly tried war crimes and ordinary crimes together." *Hamdan*, 548 U.S. at 608 (plurality op.); *see also* Letter, Headquarters, United States Forces, European Theater, to Eastern Military District, *et al.*, AB 250.4 JAG-AGO, Subject: "Military Commissions," 25 August 1945, App. 348. When convened on non-hostile U.S. territory, however, the commissions' authority extended only to offenses against the law of war. *See*, *e.g.*, *Quirin*, 317 U.S. at 28; *Yamashita*, 327 U.S. at 7.

space," App. 19, the variant procedures of 47A Commissions can apply to whatever type of military commission circumstances necessitate. Congress gave the Secretary of Defense broad discretion to delegate convening authority to meet military demands. 10 U.S.C. § 948h (2006); *see also* 152 Cong. Rec. S10253 (Sept. 27, 2006) (statement of Sen. Graham).

Congress thus stated that its "purpose" was to broadly authorize "the use of military commissions . . . for violations of the law of war and other offenses triable by military commission." 10 U.S.C. § 948b(a) (2006). It again employed the general term "military commission" without distinguishing between types. *Cf. Yamashita*, 327 U.S. at 20. It did so against the background of *Hamdan* and briefings on the historical need to convene different types of military commissions. Jennifer Elsea, *Terrorism and the Law of War: Trying Terrorists as War Criminals before Military Commissions*, CRS Report RL31191, at 3 (Dec. 11, 2001). A statutory note states that its procedures are intended to complement whatever inherent authority the President's had "to establish military commissions for areas declared to be under martial law or in occupied territories should circumstances so require." 10 U.S.C. § 948a, note (2006). And the Secretary of Defense has twice issued rules that govern 47A Commissions convened pursuant to both military government and the law of war. Robert M. Gates, U.S. Dep't of Def., *Manual for Military Commissions*, pt. 2, Rule 201(a)(3) (2007 & 2010) ("The jurisdiction of a

military commission with respect to military government or the law of war is not affected by the place where the military commission sits except as otherwise expressly required by this Manual or applicable rule of international law.").

In this case, "[s]ince Guantanamo Bay is neither enemy-occupied territory nor under martial law, the law-of-war commission is the only model available." *Hamdan*, 548 U.S. at 597 (plurality op.); *id*. at 683-84 (Thomas, J., dissenting). Ms. Crawford was a civilian administrator appointed by the Secretary of Defense. Because she was not, for example, the allied commander in Iraq or Afghanistan, there is no basis for her to have been the convening authority of any type of hybrid commission. Indeed, Mr. Bahlul was not seized on the battlefield, but arrested in Pakistan and transferred to U.S. custody. The only charges for which Ms. Crawford could convene a military commission were offenses against the law of war pursuant to delegated authority under the Define & Punish Clause.

## E. The CMCR's narrow reading of the Act forces avoidable Constitutional problems.

The second problem is that the CMCR's expansive presumption is contrary to the settled rule that courts avoid interpretations of a statute that raise "serious Constitutional problems." *DeBartolo Corp. v. Florida Gulf Coast Trades Council*, 485 U.S. 568, 575 (1988); *Hooper v. California*, 155 U.S. 648, 657 (1895) ("The elementary rule is that every reasonable construction must be resorted to in order to

37

save a statute from unconstitutionality."). It also runs against the rule that statutes should not be read to conflict with international law "if any other possible construction remains." *Weinberger v. Rossi*, 456 U.S. 25, 32 (1982); *Murray v. The Charming Betsy*, 6 U.S. 64, 118 (1804).

Interpreting the Act as a comprehensive set of procedures applicable to military government and law-of-war commissions alike is consistent with the Act's text, history, and implementing regulations, as well as international law and the Constitution. Presuming, however, that Congress necessarily intended to authorize the unprecedented and expansive jurisdiction that Ms. Crawford asserted in this case raises at least three difficult Constitutional questions that invalidate the Act.

**Congress would have exceed its Define & Punish Clause power by prescribing crimes for law-of-war commissions that are not offenses against the law of war.** The Framers of the Constitution sought to ensure the national government had the power to punish offenders against the law of nations consistent with the fledgling country's status as a member of the community of nations that "could, or would, comply with its international duties." David Golove & Daniel Hulsebosch, *A Civilized Nation: The Early American Constitution, the Law of Nations, and the Pursuit of International Recognition*, 85 N.Y.U. L. Rev. 101, 104-105, 164 (2010). Recognizing that subjecting foreign nationals to criminal prosecution could easily provoke an international incident, the Constitution permits

38

Congress to define and punish, but not to create, offenses against the law of nations. *Military Commissions*, 11 Op. Att'y Gen. 297, 299 (1865) ("To *define* is to give the limits or precise meaning of a word or thing in being; to make is to call into being. Congress has power to *define*, not to make, the law of nations." (emphasis in original)).

The Supreme Court has consistently held that the Define & Punish Clause constrains Congress such that an offense is not punishable merely because Congress declares it so. The offense must already exist as a cognizable offense under international law. *See*, *e.g.*, *United States v. Arjona*, 120 U.S. 479, 488 (1887) ("Whether the offense as defined is an offense against the law of nations depends on the thing done, not on any declaration to that effect by congress."). Insofar as Congress is presumed to have defined offenses that even the government concedes are not actual offenses against the law of nations, the Act violates the Define & Punish Clause.

**The trial of federal crimes by Article I tribunals would unconstitutionally circumvent the federal courts' Article III jurisdiction.**

Military tribunals "necessarily encroach[] on the jurisdiction of federal courts set up under Article III of the Constitution . . . ." *Quarles*, 350 U.S. at 15. Like other Article I courts, they are an exception to the mandates of Article III, which "both defines the power and protects the independence of the Judicial Branch." *Northern*

39

*Pipeline v. Marathon Pipeline*, 458 U.S. 50, 58 (1982) (plurality op.). Article I tribunals' exceptional authority is therefore strictly bounded by the terms of the enumerated power under which they derive their authority. *Id*. at 66-70.

"Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.'" *Stern*, 131 S.Ct. at 2609 (quotation omitted); *Jecker*, 13 How. at 515 (a military commission cannot adjudicate claims within the exclusive jurisdiction of the federal courts). Insofar as Congress intentionally diverted the prosecution of federal crimes, such as conspiracy, solicitation and § 2339B material support to Article I courts, the Act unconstitutionally circumvents the federal courts' exclusive jurisdiction over the "trial of all crimes." U.S. Const., art. III § 2.

**The charges in this case would violate the *Ex Post Facto* Clause.** Over half of the legal authorities upon which the CMCR relied were promulgated, ratified or entered into force after Mr. Bahlul was brought to Guantanamo. The Title 18 provision on which the material support charge was based did not apply extraterritorially until 2004. And all of the offenses with which he was tried lack essential elements of any previously recognized war crime.

The Constitution rejects as *ex post facto* any law that "retrospectively eliminate[s] an element of the offense." *Carmel v. Texas*, 529 U.S. 513, 532-33 (2000). The CMCR dispensed with *Ex Post Facto* Clause objections in two

40

paragraphs. App. 84. All that was required under its international norm approach was the "similarity of the charged conduct" to some extant crimes and theories of liability. But similarity is not equality and norms are not elements. "The fact that a particular activity may be within the same general classification and policy of those covered does not necessarily bring it within the ambit of the criminal prohibition." *United States v. Boston & Me. R.R.*, 380 U.S. 157, 160 (1965). Insofar as Congress is presumed to have authorized the prosecution of the charges against Mr. Bahlul, the Act violates the *Ex Post Facto* Clause.

While these Constitutional questions are extraordinary, this case should be "resolved by ordinary rules . . . pertaining to the authority of Congress and the interpretation of its enactments." *Hamdan*, 548 U.S. at 637 (Kennedy, J., concurring). Like *Quirin* and *Yamashita*, and like ordinary court-martial cases, the jurisdiction of the military commission that tried Mr. Bahlul turns on the authority Congress delegated to its convening authority.

Ms. Crawford's authority in this case derived solely and exclusively from the Define & Punish Clause. The law-of-war commission she created accordingly could only try offenses against the law of war. Irrespective of their consistency with international norms, none of the charges with which Mr. Bahlul was convicted were war crimes. Ms. Crawford therefore exceeded the scope of her authority and Mr. Bahlul's conviction should be reversed.

41

In the alternative, this Court should vacate and remand back to the CMCR so that it can apply the traditional legal inquiry into whether the charges were, in fact, offenses against the law of war.

## II.  MR. BAHLUL'S CONVICTION FOR MAKING A FILM VIOLATES THE FIRST AMENDMENT.

"The chief evidence that you have in this case" is a film. App. 227. While the CMCR's opinion contains few citations to the record, the prosecutor's arguments and most of the testimony were about a film. This was the trial of a film and the fact that this film "contains the thoughts, the beliefs, the ideals of the accused …." *Id*.

To be sure, this film has a point of view that most Americans find offensive. It features speeches from bin Laden and other radicals advocating war. It glorifies violence. It does not offer balance in its vilification of the West and its Arab allies. Mr. Bahlul intended the film to support mujahedeen fighters around the world and to advocate that others do the same. After a week of testimony, this is what the government proved.

The government's case on the solicitation charge, and against Mr. Bahlul more broadly, revolved around one central allegation: this film "is propaganda, a political argument and indoctrination of solicitation." App. 188-189. "One of the central goals of the al Qaeda organization was to bring forth an Islamic government that met the desires of the leadership of al Qaeda, of Usama bin Laden and Ayman Zawahiri." *Id*. Mr. al Bahlul was convicted because he helped "to spread this message." *Id*.

43

The prosecution introduced Mr. Bahlul's personal book collection as evidence. App. 228. The government admitted the books by their covers because all the government wanted the jury to know was "the subject of the book which is shown by the title." App. 186.

In summation, the prosecution argued that what made Mr. Bahlul's film "unlawful" was its advocacy. "He *advocates* attacking civilians, he *advocates* attacking civilian objects, he *advocates* attacks, murder, and destruction of property in violation of the law of war through suicide operations." App. 226.

The CMCR held that this kind of trial was permissible under the First Amendment on two grounds. *First*, it held that because Mr. Bahlul is a Yemeni and because he made his film abroad, he "is not entitled and does not have the rights and protections provided by the First Amendment." App. 117. *Second*, it held that even if he did, his case did not require remand for retrial because the "obvious purpose of The Video was to incite others to join al Qaeda and to commit crimes against Americans or other U.S. interests or to support those who do." App. 122. Both holdings warrant reversal.

## A. Standard of Review

The scope of the First Amendment's application is a pure question of law that this Court decides *de novo*. *United States v. Popa*, 187 F.3d 672, 674 (D.C. Cir. 1999). Likewise, whether a trial judgment impermissibly infringes the freedom

44

of speech is reviewed *de novo*. "[I]n cases raising First Amendment issues [the Supreme Court has] repeatedly held that an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of the U.S.*, 466 U.S. 485, 499 (1984) (citations omitted); *see also* Edwards & Elliot at 3-4; 13-14, App. 297-300.

**B. The First Amendment limits the punishment of speech, regardless of its source.**

The CMCR's first holding is erroneous on its face. "The identity of the speaker is not decisive in determining whether speech is protected." *Pacific Gas and Elec. Co. v. Public Utilities Com'n of California*, 475 U.S. 1, 8 (1986); *see also Citizens United v. FEC*, 130 S.Ct. 876, 898-99 (2010) ("Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. … Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others. … As instruments to censor, these categories are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content.").

The CMCR relied on the plurality in *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264-75 (1990) (plurality op.), to hold that the freedom of speech is

among those "rights or powers reserved to 'the people.'" App. 116. Limiting the application of the First Amendment in this way is wrong for four reasons.

*First*, the CMCR misreads *Verdugo*. The *Verdugo* plurality's reference to the "people" in the context of the First Amendment was a reference to the "right of the people to peaceably assemble." The freedom of speech is explicitly not cast in terms of individual rights. "[T]he First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978).

That stock of information includes political propaganda from abroad. The Supreme Court has passed at least twice upon the protection afforded to foreign political propaganda, as such. In *Lamont v. Postmaster*, 381 U.S. 301 (1965), the Court struck down import restrictions on foreign political propaganda because it was as much a part of the "flow of ideas to the public" as union advocacy or religious leafleting. *Id*. at 306. In *Meese v. Keene*, 481 U.S. 465 (1987), the Court held "the term 'political propaganda' does nothing to place regulated expressive materials 'beyond the pale of legitimate discourse.'" *Id*. at 480 (citation omitted).

The CMCR wrongly dismissed the substantial chilling effect that will result if our courts hold that foreign defendants cannot assert the freedom of speech, even in a criminal prosecution. App. 122-23. Not only could aliens be arrested for

political speech, politicians could sue foreign journalists without overcoming any First Amendment defenses, such as truth or lack of malice. *See*, *e.g.*, *McFarlane v. Ben-Menashe*, 1995 WL 799053 (D.D.C. 1995) *aff'd* 91 F.3d 1301 (D.C. Cir. 1996) (libel action by a U.S. politician against a foreign journalist). That will stifle Americans' ability to get information on precisely the areas of public concern, such as foreign policy, where the opinions of the rest of the world matter most to our political decisions.

The government cannot "prohibit, edit, or restrain the distribution of advocacy materials in an ostensible effort to protect the public from conversion, confusion or deceit." *Meese*, 481 U.S. at 480. This is true whether the prohibition comes at the point of delivery (as in *Lamont*) or point of origin (as here).

*Second*, because the freedom of speech protects the interests of society as a whole, the First Amendment limits the liability U.S. courts can impose just as strictly as it limits prior restraints. *New York Times v. Sullivan*, 377 U.S. 254, 265-66 (1964). This case does not present a situation where a foreign national is asserting a Constitutional right of action from abroad, *cf. Kleindienst v. Mandel*, 408 U. S. 753, 762 (1972); *United States ex rel. Turner v. Williams*, 194 U.S. 279 (1904), or suing to claim rights on a battlefield. *Cf. Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950). As a criminal defendant, Mr. Bahlul has standing to object to the unconstitutional use of the judicial system, irrespective of whether he is

47

personally within the zone of a Constitutional protection. "[W]here the litigant is a party to an otherwise justiciable case or controversy, she is not forbidden to object that her injury results from disregard of the federal structure of our Government." *Bond v. United States*, 131 S.Ct. 2355, 2366-67 (2011); *see also Verdugo*, 494 U.S. at 264 (distinguishing between an alien's ability to assert Constitutional violations that occurred abroad, and Constitutional violations that occurred "at trial.").

*Third*, assuming that the First Amendment's application turns on whether Mr. Bahlul has Constitutional rights, Guantanamo is an insular territory. *Boumediene v. Bush*, 553 U.S. 723, 770-72 (2008). Like Puerto Rico and Guam, "the Constitution has independent force in these territories, a force not contingent upon acts of legislative grace." *Id.* at 2254. The Supreme Court has held that speech rights are among those "natural rights enforced in the Constitution," which apply in the insular territories by simple virtue of being "indispensible to a free government." *Downes v. Bidwell*, 182 U.S. 244, 282-83 (1901).

*Fourth*, even if the Constitution did not have "independent force" in Guantanamo, Yemeni nationals in U.S. custody enjoy the "fullest protection" of our laws under the terms of a bilateral treaty with Yemen. Treaty of Commerce & Friendship U.S.-Yemen, T.I.A.S. 1535, arts. 3, 6 (May 4, 1946). Friendship Agreements are self-executing, *McKesson Corp. v. Iran*, 539 F.3d 485, 488 (D.C. Cir. 2008), and their rights conferring provisions are read liberally. *Nielson v.*

48

*Johnson*, 279 U.S. 47, 52 (1929) ("When a treaty provision fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more liberal interpretation is to be preferred.").

Whatever the basis, the First Amendment constrains the government when it puts a film on trial.

### C. The government never proved his film went beyond advocacy to incitement.

The CMCR held that Mr. Bahlul's conviction and sentence were acceptable because he made his film intending that individuals would be persuaded by it and act violently. With almost no citations to the record, it held that instructions addressing the speech issues were not required because the "message of The Video was an incitement to imminent lawless activity." App. 124.

This is error because the First Amendment requires more than "intent" and more than a lawless "message." Mr. Bahlul may advocate war. The Supreme Court "has made clear, however, that mere *advocacy* of the use of force or violence does not remove speech from the protection of the First Amendment." *NAACP v. Claiborne Hardware*, 458 U. S. 886, 928 (1982) (emphasis in original). The government cannot "forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent

lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).[7]

For lawless action to be "imminent," the speaker must address individuals, who are intended and likely to carry out specific criminal acts without further deliberation. *Hess v. Indiana*, 414 U.S. 105, 108-109 (1973). The mere tendency of speech, especially broadcast messages, to encourage illegality is insufficient to sustain a conviction. *See Lorillard Tobacco v. Reilly*, 533 U.S. 525, 579-80 (2001) (Thomas, J., concurring).

The record of trial in this case offers no basis to conclude that Mr. Bahlul's film satisfies *Brandenburg*. The government presented no evidence that the film was likely to provoke, or was even capable of provoking, imminent illegality. By the government's own description, the film is a political argument with the vague objective to "motivate more attacks of a similar nature" to the *COLE* attack. App. 237. The record of trial shows that, at worst, the film is the kind of "advocacy of

---

[7] Given the facts of *Brandenburg*, the Supreme Court made this holding well aware that the advocacy of violence often leads to or is accompanied by violence. Given the politics of civil rights in 1964 Ohio, brandishing weapons and calling for violence against minorities was not abstract teaching. The Klan was responsible for scores of homicides, bombings and acts of terrorism during this period. In fact, less than a month before briefing was submitted in *Brandenburg*, Ohio police disrupted a plot to assassinate the Justices of the Supreme Court. *Ex-Cop Here Quizzed on Klan Murder Plot*, Chicago Tribune (Dec. 27, 1968), App. 376.

illegal action at some indefinite future time" that is insufficient as a matter of law

to be prosecuted under *Brandenburg*. *Hess*, 414 U.S. at 108.

The government called three witnesses named in the solicitation charge;

American citizens who saw the film when they traveled to al Qaeda training

camps. The first witness, Mr. Goba, stated that the message he took from it was the

moral necessity to migrate to Afghanistan and prepare for war against the West.

App. 203-204. The second witness, Mr. Taher, testified that when it was shown at

an al Qaeda guesthouse in Pakistan, where the audience was presumably self-

selected for incitement, there "wasn't really that much of a reaction at the

guesthouse, no." App. 207. The third witness, Mr. Alwan, testified that rather than

stifling deliberation, the film provoked a lengthy debate over whether suicide

bombing could ever be morally justified. App. 210-211.

Far from incitement, both Taher and Alwan testified that watching the video

made them less likely to join al Qaeda on ideological grounds. App. 208

(testimony of Taher); App. 212-213. (testimony of Alwan). Other than the

understandable offense that the victims of the *COLE* attack testified to feeling after

seeing the film on the Internet, App. 231-233; 235-236, the only other testimony

on the film's effect was a "propaganda expert," who noted that some terrorism

suspects had been arrested with a copy on their hard drives. App. 219.

The government never proved more than advocacy and the jury was never instructed that anything more than advocacy was required. The military judge even included "propaganda" in his definition of "material support," implying that propaganda was *per se* illicit. App. 223. He gave no instruction that "the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. United States*, 394 U.S. 576, 592 (1969). He gave no instruction on the probative value of Mr. Bahlul's books as evidence. *Cf. United States v. Salameh*, 152 F.3d 88, 112 (2d Cir. 1998). He gave no instructions that "in any way refined the statute's bald definition of the crime in terms of mere advocacy not distinguished from incitement to imminent lawless action." *Brandenburg*, 395 U.S. at 448.

The prosecution made this case into a trial of Mr. Bahlul's thoughts, beliefs and ideals. It told the jury that his film is a "virus" that "creates more terrorism," App. 238, and introduced the covers of his books as evidence. The lack of any limiting instructions allowed the "jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression. In a case such as this, a jury is unlikely to be neutral with respect to the content of the speech, posing a real danger of becoming an instrument for the suppression of vehement, caustic, and sometimes unpleasant expression. Such a risk is unacceptable; in public debate we must tolerate insulting, and even outrageous,

52

speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Snyder v. Phelps*, 131 S.Ct. 1207, 1219 (2011) (internal quotations omitted).

Because the government provided no evidence and the jury made no findings that show the film exceeded the limits of *Brandenburg*, the judgment below should be reversed.

### III. THE ACT DISCRIMINATES AGAINST ALIENS IN VIOLATION OF THE EQUAL PROTECTION COMPONENT OF THE DUE PROCESS CLAUSE

#### A. Standard of Review

The Act creates a criminal justice system into which aliens are segregated. 10 U.S.C. §§ 948c, 948d (2006). "[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." *Graham v. Richardson*, 403 U.S. 365, 372 (1971) (citations omitted). To be permissible, discrimination must be necessary to achieving a compelling governmental interest. *Id.* at 376.

The CMCR rested without elaboration on its decision in *United States v. Hamdan*, 801 F.Supp.2d 1247 (C.M.C.R. 2011). There, it ruled that the Act warranted "deferential rational basis" scrutiny because of "the strong foreign policy implications associated with the war on terror, coupled with the recognition of the President's power over enemy aliens in times of war and Congress's power to enact legislation pertaining to aliens and its war powers . . . ." *Id.* at 1321.

The Supreme Court, however, has held that rational basis review is only appropriate for alienage distinctions made in matters of immigration and naturalization, federal benefits, and government employment. *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976); *Ambach v. Norwich*, 441 U.S. 68, 73-74 (1979). None of those exceptions are relevant here. Discrimination in criminal justice matters is

54

always closely scrutinized. *See*, *e.g.*, *Batson v. Kentucky*, 476 U.S. 79, 93, 97-98

(1986); *Douglas v. California*, 372 U.S. 353, 355 (1963).

### B. Singling out aliens for prosecution by military commission serves no lawful purpose.

Prosecuting aliens alone by military commission was not motivated by

national security or the rational operation of the war powers. The Act's history

shows that Congress created criminal procedures that it viewed as unacceptable if

applied to U.S. citizens.[8] Segregating aliens into military commissions was not

based on their dangerousness, but on a general feeling that such treatment is what

alien suspects "deserved." *See* 152 Cong. Rec. S10395 (Sept. 28, 2006) (statement

of Sen. Cornyn).

Laws such as this, which impair equal justice in a criminal setting, cannot

survive strict scrutiny. "Both equal protection and due process emphasize the

central aim of our entire judicial system – all people charged with crime must, so

far as the law is concerned, 'stand on an equality before the bar of justice in every

---

[8] *See*, *e.g.*, 156 Cong. Rec. S3078 (May 4, 2010) (statement of Sen. Sessions) ("I want to be sure. I think we have this matter straight. I believe an alien unlawful belligerent who is captured should not be treated like a criminal. They should not be appointed a lawyer that day to tell them don't say anything."); 152 Cong. Rec. S10274 (Sept. 27, 2006) (statement of Sen. Bond) ("These people are not U.S. citizens, arrested in the U.S. on some civil offense; they are, by definition, aliens engaged in or supporting terrorist hostilities against the U.S.").

55

American court.'" *Tate v. United States*, 359 F.2d 245, 250 (D.C. Cir. 1966) (quoting *Griffin v. Illinois*, 351 U.S. 12, 17 (1956)).

Modern equal protection jurisprudence rests on the recognition that "more searching judicial inquiry" is required when "the operation of those political processes ordinarily to be relied upon to protect minorities" is curtailed. *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n. 4 (1938). The Supreme Court has repeatedly offered aliens as "a prime example of a 'discrete and insular' minority for whom heightened judicial solicitude is appropriate." *Graham*, 403 U.S. at 371 (citation omitted). By segregating non-citizens into an inferior criminal justice system, the Act engenders precisely the type of legislative animus toward a politically disenfranchised group that strict scrutiny is designed to police.

### C. Discriminating against aliens is not rational, let alone necessary.

Applying deferential rational basis scrutiny, the CMCR held that the government had a "legitimate purpose . . . to protect its citizens from its enemies." *Hamdan*, 801 F.Supp.2d at 1322. To effectuate that purpose, "Congress and the President have rightly determined that the treatment of foreign detainees captured on the battlefield in a foreign land has foreign policy implications, for which they are responsible." *Id*.

As an initial matter, Mr. Bahlul was not captured on a battlefield. He was arrested by a foreign sovereign and transferred to U.S. custody. Insofar as the

56

CMCR gave no reasons for its holding, it impossible to know how its rationale from *Hamdan* would apply to this case.

The greater problem is the CMCR's deference to such vague political prerogatives. In the intervening decision in *Judulang v. Holder*, 132 S.Ct. 476 (2011), the Supreme Court struck down a discretionary immigration policy because the government "failed to exercise its discretion in a reasoned manner." *Id.* at 484. *Judulang* is particularly instructive because it dealt with the government's plenary immigration authority, which enjoys far more deference than its application of criminal laws. *Wong Wing v. United States*, 163 U.S. 228, 237 (1896).

The Act's disparate treatment is not necessary to the government's interest in combating terrorism. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985). Regular federal courts have successfully prosecuted both non-citizens and citizens in this context. *See, e.g.*, *United States v. Moussaoui*, 591 F.3d 263 (4th Cir. 2010); *United States v. Lindh*, 227 F.Supp.2d 565 (E.D.Va. 2002). In all previous conflicts, "the principle of procedural parity was espoused as a background assumption." *Hamdan*, 548 U.S. at 617. Even during World War II, where national security was a rationale for this kind of invidious discrimination, *Korematsu v. United States*, 323 U.S. 214, 219 (1944), we did not establish special tribunals to try aliens apart from non-citizens. *Quirin*, 317 U.S. at 37-38. The

events of September 11th do not rationalize the establishment of segregated tribunals now.

The discrimination is not even rational. "Homegrown" citizen terrorists have been long recognized as an equal or greater threat. Alberto Gonzalez, *Stopping Terrorists Before They Strike: The Justice Department's Power of Prevention* (Aug. 16, 2006), App. 294. Yet, Congressional supporters of the Act were candid that it leaves this greater threat untouched.[9] In this context, alienage is "a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary and irrational." *Cleburne*, 473 U.S. at 446.

The law under which Mr. Bahlul was convicted is unprecedented and bears no rational relationship to any governmental interest that the Constitution condones. Accordingly, the judgment below should be reversed.

In the alternative, the CMCR's erroneous application of rational basis scrutiny requires the decision below be vacated and the case remanded, so that strict scrutiny can be applied.

---

[9] *See*, *e.g.*, 152 Cong. Rec. H7940 (Sept. 27, 2006) (statement of Rep. Buyer) ("Let's say an American citizen has been arrested for aiding and abetting a terrorist, maybe even participating in a conspiracy, or maybe participating in an action that harmed or killed American citizens. That American citizen cannot be tried in the military commission. His coconspirators could be tried in a military commission if they were an alien, but if that other coconspirator is an American citizen, they will be prosecuted under title 18").

58

**CONCLUSION**

For the reasons stated above, the judgment should be reversed and Mr. Bahlul's conviction and sentence vacated.

In the alternative, the decision of the CMCR should be vacated and the case remanded for the application of the correct standard of review on all of the issues heretofore specified.


 /s/ Michel Paradis _
Michel Paradis
CAPT Mary McCormick, JAGC, U.S. Navy
MAJ Todd E. Pierce, JA, U.S. Army
1620 Defense Pentagon
Washington, DC 20301-1620
michel.paradis@osd.mil
TEL: 1.703.696.9490 x115
FAX: 1.703.696.9575

*Counsel for Petitioner*

59

# ADDENDUM

## A. Statutes

### 10 U.S.C. § 948a, note (2006):

Sec. 2. CONSTRUCTION OF PRESIDENTIAL AUTHORITY TO ESTABLISH MILITARY COMMISSIONS.

The authority to establish military commissions under chapter 47A of title 10, United States Code, as added by section 3(a), may not be construed to alter or limit the authority of the President under the Constitution of the United States and laws of the United States to establish military commissions for areas declared to be under martial law or in occupied territories should circumstances so require.

### 10 U.S.C. § 948b (2006):

(a) Purpose.--This chapter establishes procedures governing the use of military commissions to try alien unlawful enemy combatants engaged in hostilities against the United States for violations of the law of war and other offenses triable by military commission.

### 10 U.S.C. § 948c (2006):

(a) Jurisdiction.--A military commission under this chapter shall have jurisdiction to try any offense made punishable by this chapter or the law of war when committed by an alien unlawful enemy combatant before, on, or after September 11, 2001.

60

**10 U.S.C. § 948d (2006):**

(a) Jurisdiction.--A military commission under this chapter shall have

jurisdiction to try any offense made punishable by this chapter or the law of war

when committed by an alien unlawful enemy combatant before, on, or after

September 11, 2001.

**10 U.S.C. § 948h (2006):**

Military commissions under this chapter may be convened by the Secretary

of Defense or by any officer or official of the United States designated by the

Secretary for that purpose.

**10 U.S.C. § 950a (2009):**

(b) LESSER INCLUDED OFFENSE. —Any reviewing authority with the

power to approve or affirm a finding of guilty by a military commission under this

chapter may approve or affirm, instead, so much of the finding as includes a lesser

included offense.

**10 U.S.C. § 950f (2009):**

(d) STANDARD AND SCOPE OF REVIEW. —In a case reviewed by the

court under this section, the Court may act only with respect to the findings and

sentence as approved by the convening authority. The Court may affirm only such

findings of guilty, and the sentence or such part or amount of the sentence, as the

Court finds correct in law and fact and determines, on the basis of the entire record,

61

should be approved. In considering the record, the Court may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the military commission saw and heard the witnesses.

**10 U.S.C. § 950g (2009):**

(a) EXCLUSIVE APPELLATE JURISDICTION. —Except as provided in subsection (b), the United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction to determine the validity of a final judgment rendered by a military commission (as approved by the convening authority and, where applicable, the United States Court of Military Commission Review) under this Chapter.

(b) EXHAUSTION OF OTHER APPEALS. —The United States Court of Appeals for the District of Columbia Circuit may not review a final judgment described in subsection (a) until all other appeals under this chapter have been waived or exhausted.

\*\*\*

(d) SCOPE AND NATURE OF REVIEW. —The United States Court of Appeals for the District of Columbia Circuit may act under this section only with respect to the findings and sentence as approved by the convening authority and as affirmed or set aside as incorrect in law by the United States Court of Military

62

Commission Review, and shall take action only with respect to matters of law, including the sufficiency of the evidence to support the verdict.

**10 U.S.C. § 950p (2006):**

(a) Purpose.--The provisions of this subchapter codify offenses that have traditionally been triable by military commissions. This chapter does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission.

**18 U.S.C. § 2339A:**

**(a) Offense.—** Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842 (m) or (n), 844 (f) or (i), 930 (c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442 of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section 46502 or 60123 (b) of title 49, or any offense listed in section 2332b (g)(5)(B) (except for sections 2339A and 2339B) or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned

for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

 **(b) Definitions.—** As used in this section—

**(1)** the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

**(2)** the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

**(3)** the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.

**18 U.S.C. § 2339B:**

**(a) Prohibited Activities.—**

**(1) Unlawful conduct.—** Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the

64

death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

\*          \*          \*

 **(d) Extraterritorial Jurisdiction.—**

**(1) In general.—** There is jurisdiction over an offense under subsection (a) if—

**(A)** an offender is a national of the United States (as defined in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101 (a)(22))) or an alien lawfully admitted for permanent residence in the United States (as defined in section 101(a)(20) of the Immigration and Nationality Act (8 U.S.C. 1101 (a)(20)));

**(B)** an offender is a stateless person whose habitual residence is in the United States;

65

**(C)** after the conduct required for the offense occurs an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States;

**(D)** the offense occurs in whole or in part within the United States;

**(E)** the offense occurs in or affects interstate or foreign commerce; or

**(F)** an offender aids or abets any person over whom jurisdiction exists under this paragraph in committing an offense under subsection (a) or conspires with any person over whom jurisdiction exists under this paragraph to commit an offense under subsection (a).

**(2) Extraterritorial jurisdiction.—** There is extraterritorial Federal jurisdiction over an offense under this section.

**(enacted with the Material Support to Terrorism Prohibition Enhancement Act of 2004, Pub.L. 108-458 § 6603(c) (2004))**

### B. Rules & Regulations

**Robert M. Gates, U.S. Dep't of Def.,** *Manual for Military Commissions*, **pt 2, Rule 201(a)(3) (2007):**

The jurisdiction of a military commission with respect to military government or the law of war is not affected by the place where the military commission sits except as otherwise expressly required by this Manual or applicable rule of international law.

66

**Robert M. Gates, U.S. Dep't of Def.,** ***Manual for Military Commissions*****, pt 2, Rule 201(a)(3) (2010):**

    The jurisdiction of a military commission with respect to military government or the law of war is not affected by the place where the military commission sits except as otherwise expressly required by this Manual or applicable rule of international law.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)


Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements


1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

[X] this brief contains 12,760 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ] this brief uses a monospaced typeface and contains ____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).


2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point font size and Times New Roman type style; *or*

[ ] this brief has been prepared in a monospaced typeface using _____ with _____.


Dated: March 9, 2012             By: /s/ Michel Paradis
                                    *Counsel for Petitioner*

68

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2012 a copy of the foregoing was filed electronically with the Court. Notice of this filing will be sent to all parties by operation of this Court's electronic filing system. Parties may access this filing through the Court's system.


Dated: March 9, 2012

Respectfully submitted,


/s/ Michel Paradis
*Counsel for Petitioner*