[ORAL ARGUMENT NOT SCHEDULED]
**UNITED STATES COURT OF APPEALS**
*for the* **District of Columbia Circuit**

| | |
|---|---|
| ALI HAMZA AHMAD SULIMAN AL BAHLUL,<br><br>Petitioner,<br><br>*v.*<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | No. 11-1324<br><br>PETITION<br>FOR HEARING EN BANC<br><br>DATE: April 26, 2012 |

COMES NOW petitioner Ali Hamza al Bahlul, pursuant to Fed.R.App.P. 35(a)(1) and 35(a)(2), and respectfully petitions this Court to hear his appeal initially *en banc*. Petitioner makes his request because two of this Court's panels have been presented with substantially different and arguably conflicting arguments respecting the scope and interpretation of the Military Commissions Act (codified as amended at 10 U.S.C. §§ 948a, *et seq*.) ("the Act"). This Court's interpretation of this statute is an issue of first impression and exceptional importance both to the public and to Mr. Bahlul, insofar as the arguments he has raised may be precluded by an intervening decision in another case.

Counsel for the United States has been consulted and does not consent to this request for an initial *en banc* hearing.

1

## STANDARD OF REVIEW

A hearing *en banc* is normally disfavored and will be ordered only if: (1) it "is necessary to secure or maintain uniformity of the courts decisions; or (2) the proceeding involves a question of exceptional importance." Fed.R.App.P. 35(a)(1) and 35(a)(2). *En banc* consideration is appropriate "to preserve the consistency of the law, to give appropriate attention to questions of exceptional importance, and to correct panel error, which we define as divergence from the views of the majority of the circuit judges." Douglas Ginsburg & Donald Falk, The D.C. Circuit Review September 1989 – August 1990: The Court En Banc: 1981-1990, 59 *Geo. Wash. L. Rev.* 1008, 1009 (1991) ("Ginsburg & Falk").

## FACTS

Two cases currently before this Court, *United States v. Hamdan* (No. 11-1257) and *United States v. Bahlul* (No. 11-1324), present appeals of decisions from the Court of Military Commission Review ("CMCR"). While not strictly related under the Court's rules, both cases ask this Court to decide the subject matter jurisdiction that can be lawfully conferred on military commissions convened in Guantanamo Bay under the Military Commissions Act.[1] Because these two cases

---

[1] The government has taken the position that the two cases are related. Brief for the United States at "Certificate as to Parties, Rulings, and Related Cases," p. ii-iii, *Hamdan v. United States* (D.C. Cir. 2011) (No. 11-1257).

2

are the first to properly raise this question, the CMCR *sui sponte* ordered both cases to be heard *en banc* in 2011.

In *Hamdan v. Rumsfeld*, 548 U.S. 557, 631 (2006), the Supreme Court held that military commissions convened under the Uniform Code of Military Justice require strict procedural parity with courts-martial. In response, Congress passed the Military Commissions Act to provide legislative authority for a comprehensive set of procedures for military commissions ("47A commissions") that vary from those used in courts-martial. 10 U.S.C. § 948b(a) (2006) (the Act's "purpose" is to "establish[] procedures governing the use of military commissions to try alien unlawful enemy combatants"). The Act further enumerates a non-exclusive list of offenses that can be tried by a 47A commission. 10 U.S.C. § 950v (2006). Among those are two variant theories of material support for terrorism, which parallel 18 U.S.C. §§ 2339A and 2339B, respectively. 10 U.S.C. § 950v(b)(25) (2006). The Act also includes general conspiracy and solicitation offenses. 10 U.S.C. §§ 950v(b)(28), 950u(2006).

The central issue in Mr. Bahlul's appeal is whether a military commission convened in Guantanamo Bay can be given jurisdiction over charges of inchoate conspiracy, inchoate solicitation and the 2339B variant of material support for terrorism. In *Hamdan*, the petitioner asks whether a military commission convened in Guantanamo Bay can be given jurisdiction over both the 2339A and 2339B

variants of material support for terrorism. Together, this Court has been presented with three different and conflicting arguments respecting the lawful scope of the Military Commissions Act.

Mr. Hamdan has mounted a direct, facial challenge to the constitutionality of the Act's inclusion of material support offenses. Reply Brief for Petitioner at 3, 13-14, *Hamdan v. United States* (D.C. Cir. 2011) (No. 11-1257). He argues that Congress intended to confer all 47A commissions with jurisdiction over all of the Act's enumerated offenses. *Id*. at 13-14. This Court must therefore strike down those parts of the Act that grant military commissions' jurisdiction over offenses that are not war crimes, because the inclusion of such offenses exceeds Congress' authority under the Define & Punish Clause. *Id.* at 9-10, 17-18.

In its response, the United States accepts Mr. Hamdan's reading of the statute, insofar as it also claims that the Act was intended to give any 47A commission jurisdiction over any of the enumerated offenses. The government further concedes that material support for terrorism is not recognized as a war crime under the law of nations.[2] Brief for the United States at 48, 55-56, 61, *Hamdan v. United States* (D.C. Cir. 2011) (No. 11-1257) ("Gov't Brief").

---

[2] In recent military commission proceedings convened in *United States v. Nashiri*, the government has taken the same position respecting conspiracy. *United States v. Nashiri*, AE046, Government Response to Defense Motion to Dismiss for Lack of Lack of [sic] Jurisdiction over the Charge of Conspiracy (Mar. 26, 2012) (excerpts

4

The government argues against Mr. Hamdan's challenge to the Act on the ground that "[u]nder U.S. common law traditionally applied in wartime" the offense is "otherwise triable by military commission." *See*, *e.g.*, Gov't Brief at 18, 22-23. Congress' war powers in conjunction with the Necessary and Proper Clause provide sufficient constitutional grounds on which to uphold Congress' conferral of jurisdiction over non-war crimes to military commissions *vel non*. *Id.* at 24-27, 48. Indeed, the government goes so far as to suggest that Congress has the constitutional authority to divert the prosecution of *any* crime to a military commission, so long as doing so bears some rational relationship to Congress' war powers. *Id.* at 26, n. 6.

Mr. Bahlul, by way of contrast to both the petitioner in *Hamdan* and the government, only raises constitutional grounds in the alternative to what he submits are adequate statutory grounds that avoid the resolution of any constitutional claim. *See*, *e.g.*, Brief for Petitioner at 12-13, 15, 38-41, *Bahlul v. United States* (D.C. Cir. 2011) (No. 11-1324) ("Pet. Brief").

In *Hamdan v. Rumsfeld*, a majority of the Supreme Court noted that the general term "military commission" referred to three types of commission, which draw their subject matter jurisdiction from distinct sources of authority. *Hamdan*, 548 U.S. at 595-596 (plurality op.); *id.* at 683 (Thomas, J., dissenting). Two have

of which are attached hereto). Mr. Bahlul anticipates that the government will take the same position next month when it files its responsive brief in his case.

broad subject-matter jurisdiction over most crimes, but can only be convened in areas of combat operations under martial law or foreign occupation. *Id*. at 595. The third, the so-called "law-of-war commission," can be convened outside areas of combat operations, but can only "try persons for offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals." *Ex parte Quirin*, 317 U.S. 1, 28 (1942). As explained in Mr. Bahlul's merits brief, the plain terms of the Act, its history and implementing regulations show that it was intended to apply broadly and provide an alternative statutory framework for all three types of commission.

Whether a particular commission has subject matter jurisdiction over a particular offense, in turn, depends on the type of commission convened. For the purposes of this case, the Supreme Court has held that "[s]ince Guantanamo Bay is neither enemy-occupied territory nor under martial law, the law-of-war commission is the only model available." *Hamdan*, 548 U.S. at 597 (plurality op.); *id*. at 683-84 (Thomas, J., dissenting). While the Act provides a more detailed statutory framework for military commissions than was historically provided under either the Uniform Code of Military Justice or the Articles of War that preceded it, Mr. Bahlul maintains that the question ultimately before this Court should be the same straightforward question presented in *Ex parte Quirin*, 317 U.S. 1 (1942) and

6

*In re Yamashita*, 327 U.S. 1 (1946): were the charges in this case offenses against the law of war triable by a law-of-war commission?

Mr. Bahlul therefore does not ask this Court to find that the statute is unconstitutional in all its applications. *See*, *e.g.*, Pet. Brief at 14-15, 34-37, 41. In contrast to Mr. Hamdan, Mr. Bahlul is willing to concede that certain non-war-crimes could be lawfully tried by a 47A commission convened by a military commander in an area of ongoing combat operations or military government. Here, by contrast, the convening authority was a civil servant with no command authority over any battlespace. Mr. Bahlul's asserted claim for relief is therefore only that this particular convening authority acted *ultra vires* in diverting the prosecution of these particular statutory offenses, which the government concedes are not war crimes, to a law-of-war commission convened in Guantanamo Bay. *See*, *e.g.*, Pet. Brief at 34-36.

The briefing in *Hamdan* is complete and oral argument is scheduled for May 3, 2012. Mr. Bahlul filed his merits brief on March 16, 2012. After seeking a thirty-day extension, the government's brief is now due on May 16, 2012. Mr. Bahlul assumes the government's arguments in his case will be consistent with what it has argued in *Hamdan* and elsewhere. Oral argument for Mr. Bahlul is ordered to be scheduled in the Court's next term, sometime in September 2012.

7

# ARGUMENT

As things stand, the *Hamdan* panel is being asked to reach avoidable constitutional questions raised by the parties' unduly narrow reading of the statute and is being deprived of full briefing on what Mr. Bahlul suggests is the more reasonable reading of the Act. Because the *Hamdan* panel is likely to issue a decision this term that will bind the panel hearing Mr. Bahlul's appeal, Mr. Bahlul is concerned that his legal position, which is supported both by the Act's history and ordinary canons of construction, will be precluded. Mr. Bahlul therefore requests that his case be initially heard *en banc* to ensure that the Court has the benefit of full briefing in making what will be its first and likely binding pronouncement on the construction of the Act.

While Mr. Bahlul recognizes that it is highly unusual to request hearing *en banc* prior to a three-judge panel ruling on the merits, he submits that doing so would serve the interests of judicial economy. Indeed, given the parallel postures of the *Hamdan* and *Bahlul* appeals, their common issues risk presenting a situation similar to what this Court confronted in *Spagnola v. Mathis*, 859 F.2d 223 (D.C. Cir 1988). There, two separate panels were reaching "separate, conflicting opinions regarding the availability of *Bivens* remedies to litigants challenging federal personnel actions." *Id*. at 225. "Rather than allow a race to the printshop to determine circuit precedent – a procedure that would be quite destructive of

8

collegiality – the court followed the sensible path of allowing both decisions to issue on the same day and then granting the inevitable suggestions for rehearing en banc." Ginsburg & Falk at 1024. This Court's grant of an *en banc* hearing would therefore serve judicial economy by pre-empting conflicting panel decisions on cases raising novel issues of exceptional importance. *See*, *e.g.*, *Cafeteria & Restaurant Workers Union v. McElroy*, 284 F.2d 173, 193 (D.C. Cir. 1960) (Fahy, J., dissenting) ("[H]ad a request for *en banc* hearing of this case been made before the [panel] heard it, or even before the [panel] decided it, such a hearing might reasonably have been granted because of the obvious importance of the case.").

Mr. Bahlul would also note the exceptional importance that both the President and Congress have placed on the military commission cases. The Military Commissions Act was described by President Bush as "one of the most important pieces of legislation in the war on terror." Remarks on Signing the Military Commissions Act of 2006, 42 Wkly. Comp. Pres. Doc. 1831 (Oct. 23, 2006). Congress has closely supervised the proceedings under the Act so far and has amended the Act at least twice in the five years since it was enacted, sometimes in direct response to issues raised during commission proceedings. *See*, *e.g.*, National Defense Appropriations Act for Fiscal Year 2010, Pub. L. 111-84 §§ 1801, *et seq*. (2009); National Defense Appropriations Act for Fiscal Year 2012, Pub. L. 112-81 §§ 1030, 1034 (2011). The government is currently pursuing

9

conspiracy charges against six defendants before 47A commissions in which the death penalty is being sought. These cases include the trial of the alleged planners of the September 11th attacks.

When confronted with the need to interpret a novel and complex statute like the Military Commissions Act, this Court has not hesitated to hear a case *en banc* in the first instance. *See*, *e.g.*, *Buckley v. Valeo*, 519 F.2d 821, 824 (D.C. Cir 1975) (sitting *en banc* with a three judge district court panel in reviewing "the latest, and by far the most comprehensive, reform legislation passed by Congress concerning the election of the President, Vice-President and members of Congress"). This Court's resolution of the circumstances under which conspiracy charges may be brought, as well as the proper standard for evaluating what other offenses can lawfully be diverted to 47A commissions, will significantly impact the scope of the statutory scheme Congress created for military commissions, whether brought at Guantanamo Bay or elsewhere. Just as early challenges brought after the initial enactment of the Uniform Code of Military Justice still define the military justice system today, this Court's decision in Mr. Bahlul's appeal will have longstanding impact on the military commissions system. *Cf. Church of Scientology v. Foley*, 640 F.2d 1335, 1341 (D.C. Cir. 1981) (Robinson, dissenting from denial of rehearing *en banc*) ("There is now general agreement among the circuits that the 'truly extraordinary' cases meriting en banc treatment are those involving 'issue(s)

10

likely to affect many other cases' . . . in other words, those of real significance to the legal process as well as to the litigants." (footnotes and cites omitted)).

As reflected in Congress' regular attention and the President's remarks when signing the Act into law, these cases are of exceptional importance to the public at large. As one district court noted when denying Mr. Hamdan's request to enjoin his military commission under the Act, "The eyes of the world are on Guantanamo Bay. Justice must be done there, and must be seen to be done there, fairly and impartially." *Hamdan v. Gates*, 565 F.Supp.2d 130, 137 (D.D.C. 2008). This Court decided at least ten of the cases to arise out of the Watergate burglary *en banc* in the first instance, including petitions for interlocutory writs.[3] Although addressing

---

[3] *United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976) (unsuccessful appeal of conviction for conspiracy, obstruction of justice, and perjury); *United States v. Mardian*, 546 F.2d 973 (D.C. Cir. 1976) (successful appeal of conviction and denial of motion to sever); *United States v. Hunt*, 514 F.2d 270 (D.C. Cir. 1975) (partially successful appeal of the denial of a motion to withdraw guilty plea and dismiss indictment); *United States v. Barker*, 514 F.2d 208 (D.C. Cir. 1975) (unsuccessful appeal of the denial of a motion to withdraw guilty pleas); *United States v. Liddy*, 510 F.2d 669 (D.C. Cir. 1974) (unsuccessful appeal of finding of contempt); *United States v. Liddy*, 509 F.2d 428 (D.C. Cir. 1974) (unsuccessful appeal of conviction for conspiracy, burglary, and unlawful endeavor to intercept oral and wire communications and interception of communications); *United States v. McCord*, 509 F.2d 334 (D.C. Cir. 1974) (unsuccessful appeal of conviction for illegal interception of oral and wire communications, burglary, and other offenses related to the burglary of the Watergate Office Building); *In re Liddy*, 506 F.2d 1293 (D.C. Cir. 1974) (unsuccessful appeal of order of civil contempt); *Haldeman v. Sirica*, 501 F.2d 714 (D.C. Cir. 1974) (denying defendant's petitions for writs of prohibition or mandamus); *Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir.

11

different matters, the exceptional importance of these first military commission cases is comparable to the Watergate cases. Both had the significant potential to impact the public's confidence in the judicial system when confronted with crimes of great political significance. The foundational issues respecting 47A commissions' lawful jurisdiction are equally worthy of the swift and authoritative resolution that would be afforded by this Court sitting *en banc*.

## CONCLUSION

For the foregoing reasons, Mr. Bahlul respectfully requests that the Court hear his appeal *en banc*.

Respectfully submitted,

/s/ Michel Paradis
Michel Paradis
CAPT Mary McCormick, JAGC, U.S. Navy
MAJ Todd E. Pierce, JA, U.S. Army
1620 Defense Pentagon
Washington, DC 20301-1620
michel.paradis@osd.mil
TEL: 1.703.696.9490 x115
FAX: 1.703.696.9575
*Counsel for Petitioner*

---

1974) (appeal of a declaratory judgment action relating to whether the President had a legal duty to comply with a subpoena *duces tecum*).

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2012, a copy of the foregoing was filed electronically with the Court. Notice of this filing will be sent to all parties by operation of this Court's electronic filing system. Parties may access this filing through the Court's system.

Dated: April 26, 2012

Respectfully submitted,

/s/ Michel Paradis
Michel Paradis
CAPT Mary McCormick, JAGC, U.S. Navy
MAJ Todd E. Pierce, JA, U.S. Army
1620 Defense Pentagon
Washington, DC 20301-1620
michel.paradis@osd.mil
TEL: 1.703.696.9490 x115
FAX: 1.703.696.9575
*Counsel for Petitioner*

13

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

### A. Parties & *Amici* Appearing Below

The parties and *amici* who appeared before the Court of Military Commission Review in connection with this appeal were:

1. Ali Hamza Ahmad Suliman al Bahlul, *Appellant*

2. United States of America, *Appellee*

3. *Amicus* the Office of the Chief Defense Counsel, Col Peter Masciola, USAF (on brief)

4. *Amicus* Robert David Steele and Others in the United States Intelligence Community, McKenzie Livingston (on brief)

5. *Amicus* Historians, Political Scientists and Constitutional Law Professors, Sarah Paoletti (on brief)

6. *Amicus* National Institute of Military Justice, Michelle Lindo (on brief)

7. *Amicus* Montana Pardon Project, Clemens P. Work and University of Montana Criminal Defense Clinic, Jeffrey Renz (on brief)

8. *Amicus* Human Rights Committee of the American Branch of the International Law Association, Jordan J. Paust (on brief)

### B. Parties & *Amici* Appearing in this Court

1. Ali Hamza Ahmad Suliman al Bahlul, *Petitioner*

2. United States of America, *Respondent*

3. *Amicus* National Institute of Military Justice, Steve Vladeck (on brief)

4. *Amicus* International Law Professors, David Weissbrodt (on brief)

5. *Amicus* Robert J. Steele and Other Former Members of the U.S. Intelligence Community, McKenzie Livingston (on brief)

6. *Amicus* First Amendment Scholars and Historians and the Montana Pardon Project, Jeffrey Renz (on brief)

14

## C. Rulings under Review

This appeal is from a decision of the United States Court of Military Commission Review in *United States v. Ali Hamza Ahmad Suliman al Bahlul*, CMCR 09-001(*en banc* September 9, 2011). The decision is appended to Pet. Brief at App. 3-141 and is reported at 820 F.Supp.2d 1141 (2011).

## D. Related Cases

This case has not previously been filed with this court or any other court. Counsel are aware of no other cases that meet this Court's definition of related.

Dated: April 26, 2012

Respectfully submitted,

/s/ Michel Paradis
Michel Paradis
CAPT Mary McCormick, JAGC, U.S. Navy
MAJ Todd E. Pierce, JA, U.S. Army
1620 Defense Pentagon
Washington, DC 20301-1620
michel.paradis@osd.mil
TEL: 1.703.696.9490 x115
FAX: 1.703.696.9575
*Counsel for Petitioner*

**ADDENDUM**

*United States v. Nashiri*, AE046, Government Response to Defense Motion to Dismiss for Lack of Lack of [sic] Jurisdiction over the Charge of Conspiracy (Mar. 26, 2012) (excerpt)

**MILITARY COMMISSIONS TRIAL JUDICIARY**
**GUANTANAMO BAY, CUBA**

| | |
|---|---|
| UNITED STATES OF AMERICA | **AE 048** |
| v. | **Government Response**<br>To Defense Motion To Dismiss For Lack<br>Of Lack Of Jurisdiction Over The Charge<br>Of Conspiracy[1] |
| ABD AL RAHIM HUSSAYN<br>MUHAMMAD AL NASHIRI | 26 March 2012 |

**1. <u>Timeliness</u>**.

      This response is filed timely pursuant to Military Commissions Trial Judiciary Rule of

Court 3.7.c.(1).

**2. <u>Relief Sought</u>**.

      The government respectfully moves the Commission to deny defense's motion to dismiss

for lack of jurisdiction over the charge of conspiracy to commit terrorism and murder in violation

of the law of war.

**3. <u>Overview</u>**.

      Congress and the President, acting together, gave this Commission jurisdiction to try the

offenses charged in this case, including conspiracy to commit terrorism and murder in violation

of the law of war.  Because Congress's grant of jurisdiction in 10 U.S.C. § 948d was

constitutional, this Court has subject matter jurisdiction over the charged Conspiracy offense.

      The grant of jurisdiction by Congress over the offenses enumerated in the 2009 Military

Commissions Act is constitutional for at least two reasons. First, Congress may, under its

collective War Powers, codify offenses traditionally triable by military commission and grant

---

[1] Defense counsel misnamed AE 048 in what appears to be a typographical error.  The title of that document is "Defense Motion to Dismiss For Lack of Jurisdiction Over The Charge of Terrorism" but the body of the document addresses the charge of Conspiracy.  AE 049 addresses lack of jurisdiction over the terrorism offense.

Orders, No. 174 (Jul. 19, 1901) at 2 (conspiring with insurgents); Hdqrs., Gen. Orders, No. 278

(Sep. 14, 1901) at 4 (combining and conspiring with band of armed outlaws).[7]

During World War II, the United States prosecuted eight Nazi saboteurs in military

commissions for offenses that included conspiracy, although the Supreme Court in considering

that case did not rule on the propriety of that charge. *See Quirin*, 317 U.S. at 23. The history of

the Nuremberg prosecutions illustrates that is has been the consistent position of the United

States that conspiracy to commit war crimes is itself punishable.  Just as the U.S. Government

charged and convicted the petitioners in *Quirin* with conspiracy to commit war crimes, it

likewise pursued charges of conspiracy to commit war crimes against the Nazis at Nuremberg.

At Nuremberg, the United States consistently argued that conspiracy to commit war crimes was

itself an independent crime.  In fact, American prosecutors, including Justice Robert Jackson, the

lead U.S. prosecutor, charged the Nazi defendants with conspiracy to commit war crimes, and

argued for conviction on those charges in his closing argument on the merits.  1 L. Rep. Trials of

the Major War Criminals 29 (1947) (Indictment); Telford Taylor, *The Anatomy of the*

*Nuremberg Trials: A Personal Memoir* 492 (Alfred A. Knopf 1992). The defense correctly

observes that, ultimately, the International Military Tribunal rejected the charges of conspiracy to

commit War Crimes and Crimes against Humanity, AE 048, p. 6, though it *did* accept an

independent conspiracy charge for Crimes against Peace. 22 L. Rep. Trials of War Criminals

469.  But while this history reflects a lack of *international* consensus for treating the standalone

offense of conspiracy as a war crime as a matter of customary international law, it remains

---

[7]  The defense cites Winthrop, for the proposition that inchoate crimes cannot be war crimes. AE 048, p. 5,   To
the contrary, Winthrop actually states, "[T]he jurisdiction of the military commission should be restricted to cases of
offence consisting in overt acts, i.e. in unlawful commissions or actual attempts to commit, and not in intentions
merely.  Winthrop at 841 (italics in original) (footnote omitted).  Winthrop does not state that this principle prohibits
conspiracy charges.  In fact, he refers to conspiracy as a wartime offense on the very next page.  *Id.* at 842.  Further,
as defined in the MCA, conspiracy does not punish "intentions merely," but rather requires proof of overt acts in
furtherance of the conspiracy, as will be proven in this case.

evidence of the continued *American* practice of treating conspiracy as an independent criminal offense *under the United States common law of war*.

Conspiracy to commit terrorism and murder in violation of the law of war, committed in the context of an armed conflict, is an unlawful act, perpetrators of which have traditionally been subject to trial by military commission. The prosecution of that offense by a United States military commission in this case is constitutional for numerous reasons, foremost among them because the prosecution is authorized by Congress in execution of its collective war-making powers. Military commissions are one tool among many that the Executive may use to discharge its Congressionally-authorized mandate to combat terrorism and wage war against al Qaeda. Accordingly, Congress lawfully determined, as an incident of its war-making powers, that individuals who commit acts of unlawful belligerency during an armed conflict by engaging in conspiracy to commit terrorism and murder in violation of the law of war are properly subject to trial by military commission, consistent with our nation's longstanding practice under the United States common law of war. This Commission thus has subject matter jurisdiction over Charge V.

**II.    Congress properly exercised its authority under the define and punish clause when it determined that conspiracy, in the context of an armed conflict, is an offense triable by military commission.**

    **A.    Congress may lawfully criminalize violations of the law of nations under the Define and Punish Clause, including those that the United States has a preexisting international obligation to prevent.**

Congress's constitutional authority to "define and punish . . . Offences against the Law of Nations," U.S. Const. art. 1, § 8, cl. 10, provides an additional basis for concluding that this Commission has jurisdiction over the charge of conspiracy to commit Terrorism and Murder in Violation of the Law of War. As the defense concedes, it has been well-settled for more than a

century that the Define and Punish Clause permits Congress to subject unprivileged belligerents to trial by military commission for violations of established international law, in order to discharge our nation's existing international obligations.  In *United States v. Arjona*, 120 U.S. 479, 482-83 (1887), for example, the Supreme Court held that Congress had the authority under the Define and Punish Clause to declare that "the counterfeiting within the United States of the notes of a foreign bank or corporation" was "an offense against the law of nations," *id.* at 482-83, reasoning that "if the thing made punishable is one which the United States are required by their international obligations to use due diligence to prevent, it is an offense against the law of nations." *Id.* at 488.  This is true even if, as for the offense of which Ramon Arjona was convicted, the body of crimes defined in international written instruments or customary international law does not contain the specific national offense charged.  The Define and Punish Clause "authorize[s] Congress to derive from the often broadly phrased principles of international law a more precise code . . . necessary to bring the United States into compliance with rules governing the international community."  *Finzer v. Barry*, 798 F.2d 1450, 1455 (D.C. Circuit 1986), *aff'd in relevant part and rev'd in part*, 485 U.S. 312; *see also United States v. Bin Ladin*, 92 F. Supp. 2d 189, 220 (S.D.N.Y. 2000) ("Clause 10 does not merely give Congress the authority to punish offenses against the law of nations; it also gives Congress the power to 'define' such offenses.").

**B.  It is well-settled that the United States has an international obligation to prevent terrorism, which Congress is authorized to discharge by conferring jurisdiction over conspiracy to a military commission.**

While the standalone offense of conspiracy to commit war crimes has not attained international recognition as an affirmative law of war offense under customary international law, the United States is required to use "due diligence to prevent" the commission of acts of

terrorism.  Such due diligence surely may include use by Congress of its Define and Punish

Clause power, as discussed in greater detail in the government's response to AE 049 which the

government incorporates herein by reference.  *See, e.g.*, U.N. Declaration on International

Terrorism; International Convention for the Suppression of Terrorist Bombings, Dec.15, 1997,

2149 U.N.T.S. 284, 37 I.L.M. 249 (entered into force May 23, 2001); International Convention

for the Suppression of the Financing of Terrorism, Dec. 9, 1999, 2178 U.N.T.S. 197, 39 I.L.M.

270 (entered into force Apr. 10, 2002); *Arjona*, 120 U.S. at 488 (concluding that "if the thing

made punishable is one which the United States are required by their international obligations to

use due diligence to prevent, it is an offense against the law of nations").  In fact, the Define and

Punish Clause "authorizes Congress to derive from the often broadly phrased principles of

international law a more precise code . . . necessary to bring the United States into compliance

with rules governing the international community."  *Finzer*, 798 F.2d at 1455.

     As discussed in AE 049A, the government's response to AE 049,  terrorism as a mode of

warfare—which inherently includes a lack of respect for the principle of distinction—violates

international law.  Congress therefore made a reasonable decision to criminalize not only acts of

terrorism, but also conduct that directly facilitates such terrorism.  By including conspiracy in the

2009 M.C.A., Congress legislated "as a means to that end . . . , and it was clearly appropriate

legislation for that purpose."  *Arjona* 120 U.S. at 488.   Because criminalizing conspiracy in the

2009 M.C.A. bears a rational relationship to existing treaty-based obligations to criminalize acts

of terrorism or other violations of international law, this Commission has jurisdiction over the

conspiracy charge.  *See Finzer*, 798 F.2d at 1459; *United States v. Wang Kun Lue*, 134 F.3d 79,

84 (2d Cir. 1998) (rejecting argument that legislation implementing the Hostage Taking Treaty

was too broad because the legislation was "plainly adapted" to giving effect to the treaty).

The Define and Punish Clause does not limit Congress to criminalizing established international law violations. Congress can also criminalize conduct and confer jurisdiction over that conduct, where doing so is "necessary and proper for carrying into Execution the foregoing Powers [enumerated in U.S. Const. Art. I. Sec. 8], and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. Art. I, Sec. 8, Cl. 18.

The Constitution empowers the President, "by and with Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." Art. II. Sec. 2. Cl. 2. This power to enter into international treaties is indisputably among those powers "vested by this Constitution in the Government of the United States" referred to by the Necessary and Proper clause. Art. I. Sec. 8, Cl. 18. Congress therefore has the power "To make all Laws which shall be necessary and proper for carrying into Execution" the international treaty obligations of the United States. Because the United States has long been bound by international treaties— including the Geneva Convention—that prohibit terrorism and obligate the United States to prevent terrorist acts, *see* AE 049A, Government Brief In Opposition to AE049, at Part I.C.2., Congress is therefore authorized by the Necessary and Proper clause of the Constitution to codify Conspiracy in violation of 10 U.S.C. § 905t(24) as an offense punishable by military commission, in order to discharge its international obligations to prevent terrorism. *See generally Missouri v. Holland*, 252 U.S. 416, 432, 40 S. Ct. 382, 64 L. Ed. 641, 18 Ohio L. Rep. 61 (1920) ("If [a] treaty is valid there can be no dispute about the validity of [a] statute [passed] under Article I, Section 8, as a necessary and proper means to execute the powers of the Government."); *Lue*, 134 F.3d 79, 84 (2d Cir. 1997) ("If the Hostage Taking Convention is a valid exercise of the Executive's treaty power, there is little room to dispute that the legislation

passed to effectuate the treaty is valid under the Necessary and Proper Clause."); *United States v. Belfast*, 611 F.3d 783, 805-806 (11th Cir.2010), *cert. denied* 131S.Ct. 1511 (2011) (holding that together,  U.S. Const. art. II, § 2, cl. 2 and art. I, § 8, cl. 18 empower Congress to enact any law that is necessary and proper to effectuate a treaty made pursuant to U.S. Const. art. II).

For much the same reason, even when the source of authority is an international agreement or U.N. resolution that may lack the same force as an international treaty, Congress is well within its power under the Necessary and Proper clause to "carry[] into Execution" its powers under both the Define and Punish clause and its war-making powers, by codifying Conspiracy as an offense triable by military commission.[8]

### C. Congress reasonably used the rubric of conspiracy to criminalize conduct that, under international law, is punishable under the doctrine of joint criminal enterprise.

Although conspiracy to commit war crimes has not has not yet attained international recognition as a standalone law of war offense under customary international law, it is closely related to the international law doctrine recognizing individual criminal liability based on participation in a joint criminal enterprise ("JCE").  When acting under the Define and Punish clause to punish *conduct that is punishable as a war crime under international law*, Congress can reasonably define that conduct under the traditional "conspiracy" rubric.

International tribunals have accepted participation in a joint criminal enterprise ("JCE") as a legitimate mode of individual criminal liability.  *See, e.g. Prosecutor v. Tadic*, IT-94-1-A, Judgment, Appeals Chamber (Jul. 15, 1999) ¶¶ 190-225; *see also Prosecutor v. Vasiljevic*, IT-

---

[8]  The defense's opening argument that ex-service members and the spouses of service members are not subject to military jurisdiction is irrelevant.  AE 049, p. 2.  The accused is neither an ex-service member nor the spouse of a service member.  And the defense's reliance upon *Northern Pipeline Const. Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 66 n.17 (1982), too, is inapposite, for that case dealt with the constitutionality of United States Bankruptcy Courts, not military commissions, and expressly distinguished between bankruptcy courts and military courts.  *Id.* at 71 ("Nor do the bankruptcy courts bear any resemblance to courts-martial, which are founded upon the Constitution's grant of plenary authority over the Nation's military forces to the Legislative and Executive branches.").