[Oral Argument Not Yet Scheduled]
No. 11-1324

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

ALI HAMZA AHMAD SULIMAN AL BAHLUL, Petitioner,

v.

UNITED STATES OF AMERICA, Respondent.

———————

ON PETITION FOR REVIEW FROM THE UNITED STATES COURT
OF MILITARY COMMISSION REVIEW

———————

BRIEF FOR THE UNITED STATES

———————

MARK S. MARTINS
 Brigadier General, U.S. Army
 Chief Prosecutor

EDWARD S. WHITE
 Captain, JAGC, U.S. Navy
 Appellate Counsel

FRANCIS A. GILLIGAN
 Appellate Counsel
 Office of the Prosecutor for
 Military Commissions

LISA O. MONACO
 Assistant Attorney General
 for National Security
J. BRADFORD WIEGMANN
 Deputy Assistant Attorney General
STEVEN M. DUNNE
 Chief, Appellate Unit
JOHN F. DE PUE
JEFFREY M. SMITH
 Attorneys
 National Security Division
 U.S. Department of Justice
 Washington, D.C. 20530

<u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

I.      <u>PARTIES</u>

Ali Hamza Ahmad Suliman al Bahlul is the petitioner in this case. The United States is the respondent. Amici supporting Bahlul include: Robert David Steele, Philip Giraldi, Raymond L. McGovern, Coleen Rowley, Glenn L. Carle, Lawrence Wilkerson, Thomas Drake, Stephen N. Xenakis, Marc Sageman, Robert Baer, David C. MacMichael, Raymond Close, and Elizabeth Murray, identified as "Robert D. Steele and Other Former Members of the U.S. Intelligence Community"; Caroline Winterer, Catherine O'Donnell, Clemens P. Work, and Simon Newman, identified as "First Amendment Scholars and Historians and the Montana Pardon Project"; the National Institute of Military Justice; and William Aceves, M. Cherif Bassiouni, John M. Bickers, Roger S. Clark, Geoffrey S. Corn, Constance de la Vega, Robert K. Goldman, Richard Goldstone, Peter Jan Honigsberg, David J. Luban, Fionnuala d. Ní Aoláin, Jens David Ohlin, Gabor Rona, Marco Sassòli, David Sloss, Beth Stephens, Jon Van Dyke, Beth Van Schaack, Stephen I. Vladeck, David S. Weissbrodt, and Richard Wilson, identified as "International Law Professors."

II.    <u>RULINGS</u>

The ruling under review in this case is the decision of the United States Court of Military Commission Review affirming petitioner's convictions.

III.    <u>PRIOR DECISIONS AND RELATED CASES</u>

The United States Court of Military Commission Review has issued a published decision in this case.  <u>United States v. Al Bahlul</u>, 820 F. Supp. 2d 1141 (CMCR 2011) (en banc) (Pet. App. 3).[1]

A case involving some of the same issues is also pending in this Court.  <u>See Salim Ahmed Hamdan v. United States</u>, No. 11-1257 (argued May 3, 2012).  That case presents the following issues in common with this case: (1) whether material support for terrorism constitutes an offense triable by military commission; and (2) whether confining the jurisdiction of military commissions to alien unlawful enemy combatants violates the equal protection component of the Due Process Clause.

DATED: May 16, 2012                    /s/ John F. De Pue
                                       John F. De Pue
                                       Attorney for Respondent

---

[1] "Pet. App." is the abbreviation for the Appendix to Brief of Petitioner.

<u>TABLE OF CONTENTS</u>

CERTIFICATE AS TO PARTIES, RULINGS, AND
    RELATED CASES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

I.   PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

II.  RULINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

III. PRIOR DECISIONS AND RELATED CASES. . . . . . . . . . . . . . . . . . . . . . . . . .  ii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

GLOSSARY OF ABBREVIATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xxi

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

QUESTIONS PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF PROCEEDINGS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    The Military Commissions Acts of 2006 and 2009. . . . . . . . . . . . . . 3

    B.    Bahlul's Conduct and Prosecution. . . . . . . . . . . . . . . . . . . . . . . . . . 7

        1.    The Evidence At Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        2.    Bahlul's Trial and Conviction. . . . . . . . . . . . . . . . . . . . . . . . 11

        3.    The Decision of the Court of Military Commission
            Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

INTRODUCTION AND SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . 19

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

I.      CONSPIRACY, SOLICITATION, AND PROVIDING
        MATERIAL SUPPORT TO TERRORISM ARE PROPERLY
        TRIABLE BY MILITARY COMMISSION. . . . . . . . . . . . . . . . . . 22

        A.      Congress's Constitutional War-Making Powers Provide
                Broad Authority To Subject These Offenses, When
                Committed During Armed Conflict, to Trial by Military
                Commission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

                1.      Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . 22

                2.      Congress Has the Authority, Pursuant to Its War-
                        Making Powers, To Codify U.S. Common Law of
                        War Offenses Triable by Military Commission.. . . . . . 23

                3.      Providing Material Support to Unlawful Belligerents
                        in an Armed Conflict Is an Offense That Has
                        Long Been Triable by Military Commission. . . . . . . . . 33

                4.      Conspiracy Is an Offense That Has Long Been
                        Triable by Military Commission. . . . . . . . . . . . . . . . . 39

                5.      Solicitation Is an Offense that Has Long Been
                        Triable by Military Commission. . . . . . . . . . . . . . . . . 48

        B.      Congress Properly Exercised Its Authority under the
                Define and Punish Clause When It Determined that
                Providing Material Support to Terrorism, Conspiracy,
                and Solicitation Are Offenses Triable by Military
                Commission. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

                1.      Introduction and Standard of Review. . . . . . . . . . . . . 50

                2.      Terrorism, as a Mode of Warfare, Violates the
                        Law of Nations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

iv

3.  Congress Reasonably Determined That Punishing
    the Provision of Material Support to Terrorism,
    Conspiracy, and Solicitation Fulfills Its International
    Responsibilities To Prevent and To Punish
    Terrorism. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

C.  The Purported Constitutional "Problems" Cited by
    Bahlul Pose No Bar to Affirmance of His Convictions.. . . . . 65

II.  BAHLUL'S CONVICTIONS DO NOT VIOLATE THE
     FIRST AMENDMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

A.  Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

B.  Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

    1.  Bahlul Was Not Convicted "On the Basis of Political
        Advocacy". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

    2.  An Alien Unprivileged Belligerent's Production
        of an Al Qaeda Video Soliciting Acts of Terrorism
        Is Not Protected from Prosecution by the First
        Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

        a.  An Alien Unprivileged Belligerent Engaged in
            Warfare Against the United States Cannot Invoke
            the First Amendment To Preclude Prosecution for
            Law-of-War Violations. . . . . . . . . . . . . . . . . . . . . 72

        b.  The First Amendment Does Not Shield from
            Punishment Those Who Provide Recruitment
            Services as Part of a Foreign Terrorist
            Organization.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

        c.  Speech that Constitutes Criminal Activity Such as
            Solicitation to Commit a Crime Does Not Enjoy
            First Amendment Protection. . . . . . . . . . . . . . . . 78

v

3.     Neither the Prosecution's Argument Nor the
Trial Court's Instructions to the Jury Constituted
Plain Error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

III.   SUBJECTING ONLY ALIEN UNLAWFUL ENEMY
BELLIGERENTS TO TRIAL BY MILITARY COMMISSION
DOES NOT VIOLATE THE EQUAL PROTECTION
COMPONENT OF THE DUE PROCESS CLAUSE.. . . . . . . . . . . 81

A.     Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

B.     Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

STATUTORY ADDENDUM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1a

# TABLE OF AUTHORITIES[*]

<u>Cases</u>:

Al-Bihani v. Obama,
590 F.3d 866 (D.C. Cir. 2010),
cert. denied, 131 S. Ct. 1814 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Al-Madhwani v. Obama,
642 F.3d 1071 (D.C. Cir.),
petition for cert. pending,
No. 11-7020 (filed Oct. 24, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Ambach v. Norwich,
441 U.S. 68 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

American Bus Ass'n v. Rogoff,
649 F.3d 734 (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Brandenberg v. Ohio,
395 U.S. 444 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78, 79

Chandler v. United States,
171 F.2d 921 (1st Cir. 1948). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Chicago & So. Air Lines, Inc. v. Waterman S.S. Corp.,
333 U.S. 103 (1948). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Colepaugh v. Looney,
235 F.2d 429 (10th Cir. 1956). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 43

---

[*]Authorities upon which we chiefly rely are marked with asterisks.

Collins v. Youngblood,
    497 U.S. 37 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.,
    887 F.2d 275 (D.C. Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Downes v. Bidwell,
    182 U.S. 244 (1901). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Finzer v. Barry, 798 F.2d 1450 (D.C. Cir. 1986),
    aff'd in part sub nom.
    Boos v. Barry, 485 U.S. 312 (1988). . . . . . . . . . . . . . . . . . . . . . . . . 51, 58

Graham v. Richardson,
    403 U.S. 365 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84, 85

Haig v. Agee,
    453 U.S. 280 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

* Hamdan v. Rumsfeld,
    548 U.S. 557 (2006). . . . . . . . . . 4, 19, 26, 27, 40, 43, 44, 45, 46, 52, 86, 87

Harisiades v. Shaughnessy,
    342 U.S. 580 (1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Heller v. Doe,
    509 U.S. 312 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

* Holder v. Humanitarian Law Project,
    130 S. Ct. 2705 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 39, 76, 79

Johnson v. Eisentrager,
    339 U.S. 763 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 83, 86

Judulang v. Holder,
    132 S. Ct. 476 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

Kleindienst v. Mandel,
    408 U.S. 753 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Lamont v. Postmaster Gen.,
    381 U.S. 301 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Mathews v. Diaz,
    426 U.S. 67 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

Meese v. Keene,
    481 U.S. 465 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Ex parte Milligan,
    71 U.S. (4 Wall.) 2 (1866).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Ex parte Mudd,
    17 F. Cas. 954 (S.D. Fla. 1868).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Mudd v. Caldera,
    134 F. Supp. 2d 138 (D.D.C. 2001),
    appeal denied, 309 F.3d 819 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . 40

Narenji v. Civiletti,
    617 F.2d 745 (D.C. Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

Nyquist v. Mauclet,
    432 U.S. 1 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

* Ex parte Quirin,
    317 U.S. 1 (1942). . . . . . . . . . . . . . . . . 20, 24, 26, 27, 28, 30, 31, 43, 62, 66

Rasul v. Myers,
        563 F.3d 527 (D.C. Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Reid v. Covert,
        354 U.S. 1 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Rice v. Paladin Enters., Inc.,
        128 F.3d 233 (4th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Rogers v. Tennessee,
        532 U.S. 451 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Rostker v. Goldberg,
        453 U.S. 57 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Salazar v. District of Columbia,
        602 F.3d 431 (D.C. Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 70, 82

Tel-Oren v. Libyan Arab Republic,
        726 F.2d 774 (D.C. Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

United States v. Al-Kassar,
        660 F.3d 108 (2d Cir. 2011),
        cert. denied, No. 11-784 (May 14, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . 67

* United States v. Arjona,
        120 U.S. 479 (1887). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 58

United States v. Bin Ladin,
        92 F. Supp. 2d 189 (S.D.N.Y. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

United States v. Comstock,
        130 S. Ct. 1949 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Duggan,
    743 F.2d 59 (2d Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

United States v. El-Mezain,
    664 F.3d 467 (5th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

United States v. Ferreira,
    275 F.3d 1020 (11th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84, 85

United States v. Lue,
    134 F.3d 79 (2d Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 84

United States v. Morton,
    391 F.3d 274 (D.C. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

United States v. Olano,
    507 U.S. 725 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 82

United States v. Rahman,
    189 F.3d 88 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78, 79

United States v. Stevens,
    130 S. Ct. 1577 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

United States v. Stewart,
    590 F.3d 93 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

United States ex rel. Turner v. Williams,
    194 U.S. 279 (1904). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72, 73

United States v. Verdugo-Urquidez,
    494 U.S. 259 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

United States v. White,
    610 F.3d 956 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

United States v. Young,
    470 U.S. 1 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

United States v. Yunis,
    924 F.2d 1086 (D.C. Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Constitution:

U.S. Constitution:

art. I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

        § 8, cl. 10
            (Define and Punish Clause). . . . .   20, 23, 25, 50, 57, 58, 62, 66

        § 8, cl. 18
            (Necessary and Proper Clause).. . . . . . . . . . . . . . . . 50, 57, 66

        § 9, cl. 3
            (Ex Post Facto Clause). . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 67

    amend. I. . . . . . . . . . . . .   2, 18, 20, 21, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78

    amend. V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 82

        (Due Process Clause). . . . . . . . . . . . . . . . . . . . . 2, 18, 21, 81, 82, 83

    amend. XIV (Equal Protection Clause). . . . . . . . . . . . . . . . . . . . . . . . . 85

Treaties:

Geneva Convention Relative to the Protection of Civilian
    Persons in Time of War, Aug. 12, 1949,
    6 U.S.T. 3516, T.I.A.S. No. 3365. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

International Convention for the Suppression of the Financing
    of Terrorism, Dec. 9, 1999, 2178 U.N.T.S. 197,
    39 I.L.M. 270 (entered into force Apr. 10, 2002). . . . . . . . . . . . . . . . . . . . 62

International Convention for the Suppression of Terrorist Bombings,
    Dec. 15, 1997, 2149 U.N.T.S. 284, 37 I.L.M. 249
    (entered into force May 23, 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61


Statutes:

Authorization for Use of Military Force,
    Pub. L. No. 107-40, 115 Stat. 224 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . 4

Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 et seq.. . . . . . . . . . . . . 85

Military Commissions Act of 2006, Pub. L. No. 109-366, 120
    Stat. 2600. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        10 U.S.C. § 948a (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

        10 U.S.C. § 948a(1) (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        10 U.S.C. § 948c (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 82

        10 U.S.C. § 948d(a) (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        10 U.S.C. § 950p (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

10 U.S.C. § 950p(a) (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 25

10 U.S.C. § 950p(b) (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

10 U.S.C. § 950u (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6, 18

10 U.S.C. § 950v(b)(24) (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

10 U.S.C. § 950v(b)(25) (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 17

10 U.S.C. § 950v(b)(25)(A) (2006). . . . . . . . . . . . . . . . . . . . . . . . . . 5

10 U.S.C. § 950v(b)(25)(B) (2006). . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

10 U.S.C. § 950v(b)(26) (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

10 U.S.C. § 950v(b)(27) (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

10 U.S.C. § 950v(b)(28) (2006). . . . . . . . . . . . . . . . . . . . . 3, 6, 18, 47

Military Commissions Act of 2009, Pub. L. No. 111-84,
    div. A, tit. XVIII, 123 Stat. 2574 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . 7

10 U.S.C. § 950c(a) (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

10 U.S.C. § 950f (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

10 U.S.C. § 950g(a) (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

10 U.S.C. § 950p(d) (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

10 U.S.C. § 950t(25) (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

10 U.S.C. § 950t(26) (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

10 U.S.C. § 950t(27) (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

10 U.S.C. § 950t(29) (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 47

10 U.S.C. § 950t(30) (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

National Defense Authorization Act for Fiscal Year 2010,
     Pub. L. No. 111-84, 123 Stat. 2190 (2009). . . . . . . . . . . . . . . . . . . . . 1, 7

     § 1801, 123 Stat. 2574. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     § 1804, 123 Stat. 2612. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Pub. L. No. 104-132, tit. III, § 301(a)(2), 110 Stat. 1247 (1996). . . . . . . . . . . . . 59

10 U.S.C. § 821 (UCMJ art. 21). . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

10 U.S.C. § 904 (UCMJ art. 104). . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

10 U.S.C. § 906. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

18 U.S.C. § 2339A(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Regulation:

66 Fed. Reg. 57,833, 57,834 (Nov. 13, 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . 4


Miscellaneous:

Trial of Altstötter, 6 L. Rep. Trials of War Criminals 1 (1948). . . . . . . . . . . . . . 67

Richard R. Baxter, So-Called "Unprivileged Belligerency":
     Spies, Guerrillas, and Saboteurs, 28 Brit. Y.B. Int'l L. 323
     (1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 32

Curtis A. Bradley & Jack L. Goldsmith, Congressional Authorization
     and the War on Terrorism, 118 Harv. L. Rev. 2047 (2005). . . . . . . . . . . . . 29

Commission of Responsibilities, Conference of Paris 1919,
     Violation of the Laws and Customs of War (Clarendon Press 1919). . . . . 53

John C. Dehn, The Hamdan Case and the Application of a Municipal
     Offence, 7 J. Int'l Crim. Justice 63, 75 (2009). . . . . . . . . . . . . . . . . . . . 29, 30

Dep't of the Army, Field Manual, FM 27-10,
     The Law of Land Warfare (1956). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 39

G.I.A.D. Draper, The Status of Combatants and the Question
     of Guerilla Warfare, 45 Brit. Y.B. Int'l L. 173 (1971). . . . . . . . . . . . . . . . . 38

The Flick Trial, 9 L. Rep. Trials of War Criminals 16 (1949). . . . . . . . . . . . . . . 60

Foreign Relations of the United States, Diplomatic Papers 1944,
     H.R. Doc. No. 79-303, pt. 1, vol. 1 (1945). . . . . . . . . . . . . . . . . . . . . . . 53, 54

Hans-Peter Gasser, Acts of Terror, "Terrorism" and International
     Humanitarian Law, 84 Int'l Rev. of the Red Cross 547 (2002). . . . . . . . . . 52

G.A. Res. 49/60, U.N. Doc. A/RES/49/60 (Dec. 9, 1994). . . . . . . . . . . . . . . . . . . 55

G.C.M.O. No. 356 (July 5, 1865). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

G.C.M.O. No. 452 (Aug. 22, 1865).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

G.C.M.O. No. 607 (Nov. 6, 1865).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

G.O. No. 13, HQ, Dep't of the Missouri (Dec. 4, 1861).. . . . . . . . . . . . . . . . 34, 36

G.O. No. 1, HQ, Dep't of the Missouri (Jan. 1, 1862). . . . . . . . . . . . . . . . . . . . . 35

G.O. No. 20, HQ, Dep't of the Missouri (Jan. 14, 1862). . . . . . . . . . . . . . . . . . . 36

G.O. No. 9, HQ, Dep't of the Mississippi (Mar. 25, 1862). . . . . . . . . . . . . . 36, 41

G.O. No. 15, HQ, Dep't of the Mississippi (Apr. 3, 1862).. . . . . . . . . . . . . . 36, 49

G.O. No. 19, HQ, Dep't of the Mississippi (Apr. 24, 1862).. . . . . . . . . . . . . 37, 48

G.O. No. 100, § IV (Apr. 24, 1863). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

G.O. No. 52, War Dep't (July 7, 1945). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

The Hostage Case (United States v. List), 11 Trials of War
        Criminals Before the Nuernberg Military Tribunals
        Under Control Council Law No. 10, at 757 (1950). . . . . . . . . . . . . . . . . . 32

Charles Roscoe Howland, A Digest of Opinions of The Judge Advocate
        General of the Army (1912). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

H.R. Doc. No. 55-314 (1899). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

H.R. Rep. No. 109-664, pt. 1 (2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

5 Journal of the Continental Congress (Aug. 21, 1776).. . . . . . . . . . . . . . . . . . . . 30

Francis Lieber, Guerrilla Parties Considered with Reference
    to the Laws and Usages of War (1862).. . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Francis Lieber, Instructions for the Government of
    Armies of the United States in the Field (1898). . . . . . . . . . . . . . . . . . . . . 35

Trial of Shigeki Motomura, 13 L. Rep. Trials of War
    Criminals 138 (1949). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Sean D. Murphy, Evolving Geneva Convention Paradigms
    in the "War On Terrorism": Applying the Core Rules to
    the Release of Persons Deemed "Unprivileged Combatants",
    75 Geo. Wash. L. Rev. 1105 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

National Commission on Terrorist Attacks Upon the United States,
    The 9/11 Commission Report (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

11 Op. Att'y Gen. 297 (1865). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Opinion of Special Board of Review, United States v. Colepaugh,
    CM 276026 (Mar. 27, 1945). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Opinion of The Judge Advocate General in the Matter of
    William Murphy (Mar. 21, 1866). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Prosecutor v. Taylor, Case No. SCSL-03-1-T, Judgement Summary
    (Special Court for Sierra Leone, Trial Chamber II, Apr. 26, 2012). . . . . . . 53

S.C. Res. 1189, U.N. Doc. S/RES/1189 (Aug. 13, 1998). . . . . . . . . . . . . . . . . . . 56

S.C. Res. 1373, U.N. Doc. S/RES/1373 (Sept. 28, 2001).. . . . . . . . . . . . . . . . 56, 62

Special Order No. 160, HQ, Dep't of the Missouri (Feb. 24, 1862) . . . . . . . . . . . 48

William H. Taft, IV, The Law of Armed Conflict After 9/11:
    Some Salient Features, 28 Yale J. Int'l L. 319 (2003). . . . . . . . . . . . . . . . . 38

Haridimos V. Thravalos, History, Hamdan, and Happenstance:
    "Conspiracy by Two or More To Violate the Laws of War by
    Destroying Life or Property in Aid of the Enemy", 3 Harv. Nat'l
    Sec. J. 223 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

1 Trial of the Major War Criminals Before the International
    Military Tribunal (1947). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 64

22 Trial of the Major War Criminals Before the International
    Military Tribunal (1948). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

U.S. War Dep't, A Manual for Courts-Martial (1917). . . . . . . . . . . . . . . . . . . . 31

1 The War of the Rebellion, Official Records
    of the Union and Confederate Armies (1894).  . . . . 34, 35, 36, 37, 41, 48, 49

W. Winthrop, A Digest of Opinions of The Judge Advocate General
    of the Army (1880). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

W. Winthrop, A Digest of Opinions of The Judge Advocate General
    of the Army (1895). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

W. Winthrop, A Digest of Opinions of The Judge Advocate General
    of the Army (1901). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

William Winthrop, <u>Military Law and Precedents</u> (2d ed. 1920)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25, 26, 27, 30, 31, 35, 41, 43, 46

<u>The Zyklon B Case</u>, 1 L. Rep. Trials of War Criminals 93 (1947). . . . . . . . . 60, 61

## GLOSSARY OF ABBREVIATIONS

App. Ex.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appellate Exhibit

AUMF. . . . . . . . . . . . . . . . . . . . . . . . . . . Authorization for Use of Military Force

CMCR. . . . . . . . . . . . . . . . . United States Court of Military Commission Review

Dig. Ops.. . . . . . . Digest of Opinions of The Judge Advocate General of the Army

FM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Army Field Manual

G.A. Res.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . General Assembly Resolution

G.C.M.O.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . General Court Martial Order

G.O.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . General Order

HLP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Humanitarian Law Project

HQ. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Headquarters

ILP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . International Law Professors

IMT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . International Military Tribunal

MCA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Military Commissions Act

OR. . . . . . . . . . . . . . . . . . . Official Records of the Union and Confederate Armies

Pet. App.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appendix to Brief of Petitioner

S.C. Res... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Security Council Resolution

UCMJ.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Uniform Code of Military Justice

U.N.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . United Nations

Winthrop. . . . . . . . . . . . . . . . . . William Winthrop, <u>Military Law and Precedents</u>

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 11-1324

ALI HAMZA AHMAD SULIMAN AL BAHLUL, Petitioner,

v.

UNITED STATES OF AMERICA, Respondent.

ON PETITION FOR REVIEW FROM THE UNITED STATES COURT
OF MILITARY COMMISSION REVIEW

BRIEF FOR THE UNITED STATES

## STATEMENT OF JURISDICTION

The military commission had jurisdiction over this case pursuant to Section

948d(a) of the Military Commissions Act of 2006 ("2006 MCA"), Pub. L. No.

109-366, 120 Stat. 2600.  10 U.S.C. § 948d(a) (2006).  The United States Court of

Military Commission Review ("CMCR") had appellate jurisdiction under Sections

950c(a) and 950f of the Military Commissions Act of 2009 ("2009 MCA"),

enacted as part of the National Defense Authorization Act for Fiscal Year 2010,

Pub. L. No. 111-84, 123 Stat. 2190 (2009).  10 U.S.C. §§ 950c(a), 950f (2009).

The CMCR issued its decision on September 9, 2011.  Bahlul's counsel filed a

timely petition for review in this Court on September 14, 2011.  This Court has

"exclusive appellate jurisdiction" to "determine the validity" of the final judgment

rendered by Bahlul's military commission, as approved by the convening authority

and the CMCR, pursuant to Section 950g(a) of the 2009 MCA.  10 U.S.C.

§ 950g(a) (2009).

## QUESTIONS PRESENTED

1.  Whether the offenses of providing material support for terrorism,

conspiracy to commit terrorist offenses, and solicitation to commit terrorist

offenses are, as Congress has found, properly triable by military commission.

2.  Whether Bahlul's convictions violate the First Amendment.

3.  Whether the Military Commissions Act of 2006 violated the equal

protection component of the Due Process Clause because it limited the jurisdiction

of military commissions to offenses committed by alien unlawful enemy

combatants.

## SUMMARY OF PROCEEDINGS

Bahlul, a detainee at Guantanamo Naval Base, Cuba, was charged with

conspiring with Usama bin Ladin and others to commit offenses triable by military

commission, including murder of protected persons, attacking civilians and

civilian objects, murder in violation of the law of war, destruction of property, and

providing material support for terrorism, in violation of 10 U.S.C. § 950v(b)(28)

(2006) (Charge I); solicitation to commit the substantive offenses alleged in

Charge I, in violation of 10 U.S.C. § 950u (2006) (Charge II); and providing

material support for terrorism, in violation of 10 U.S.C. § 950v(b)(25) (2006)

(Charge III).  Following trial before a military commission, Bahlul was convicted

on all three charges and sentenced to life imprisonment.  The convening authority

approved the findings and sentence.  On September 9, 2011, the en banc Court of

Military Commission Review affirmed the convictions and the sentence.  United

States v. Al Bahlul, 820 F. Supp. 2d at 1264.

## STATEMENT OF FACTS

A.    The Military Commissions Acts of 2006 and 2009

On September 11, 2001, members of the al Qaeda terrorist organization

executed one of the worst terrorist attacks in history against the United States.

Terrorists from that organization hijacked commercial airliners and used them as

missiles to attack prominent American targets, including the World Trade Center

and the Pentagon.  The attacks resulted in the loss of nearly 3,000 lives, the

destruction of billions of dollars worth of property, and severe damage to the

American economy.  See National Commission on Terrorist Attacks Upon the

United States, The 9/11 Commission Report 4-14 (2004).

3

On September 18, 2001, Congress passed, and the President signed, the Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107-40, 115 Stat. 224.  Among other things, the AUMF authorizes the President to "use all necessary and appropriate force against those nations, organizations or persons he determines planned, authorized, committed or aided" the 9/11 terrorist attacks.  Id. Acting pursuant to the AUMF, the President ordered the armed forces of the United States to conduct military operations against the Taliban, whose regime he determined harbored al Qaeda.  In addition, on November 13, 2001, the President issued a military order that directed the trial by military commission of non-citizens he had reason to believe were or had been members of al Qaeda; those who had engaged in, aided or abetted, or conspired to commit international acts of terrorism against the United States; and those who had harbored others covered by the military order.  See 66 Fed. Reg. 57,833, 57,834.

In Hamdan v. Rumsfeld, 548 U.S. 557 (2006), the Supreme Court held that the adoption by the President and the Secretary of Defense of military commission procedures that deviated from those governing courts-martial was inconsistent with the Uniform Code of Military Justice ("UCMJ").  In response, Congress enacted the Military Commissions Act of 2006, which provided statutory authority for the military commissions, limited their jurisdictional scope, codified offenses

4

triable by the commissions, and reformed their procedures to enhance the procedural rights of military commission defendants.

Under the 2006 MCA, only an "alien unlawful enemy combatant," defined as an alien who "has engaged in hostilities . . . against the United States . . . who is not a lawful enemy combatant," may be subject to trial by military commission. 10 U.S.C. §§ 948c, 948a(1) (2006). In addition, the 2006 MCA contained a list of offenses that were subject to trial by military commission.

One of the listed offenses was providing material support for terrorism:

Any person subject to this chapter who provides material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, an act of terrorism (as set forth in paragraph (24)), or who intentionally provides material support or resources to an international terrorist organization engaged in hostilities against the United States, knowing that such organization has engaged or engages in terrorism (as so set forth), shall be punished as a military commission under this chapter may direct.

10 U.S.C. § 950v(b)(25)(A) (2006). The 2006 MCA defined the phrase "material support or resources" to have "the meaning given that term in section 2339A(b) of title 18," which in turn defines the term to mean "any property, tangible or intangible, or service," including personnel and transportation. 10 U.S.C.

§ 950v(b)(25)(B) (2006); 18 U.S.C. § 2339A(b)(1).  The 2006 MCA defined

"terrorism" as follows:

> Any person subject to this chapter who intentionally kills or inflicts
> great bodily harm on one or more protected persons, or intentionally
> engages in an act that evinces a wanton disregard for human life, in a
> manner calculated to influence or affect the conduct of government or
> civilian population by intimidation or coercion, or to retaliate against
> government conduct, shall be punished . . . as a military commission
> under this chapter may direct.

10 U.S.C. § 950v(b)(24) (2006).

> The 2006 MCA also provided for a conspiracy offense:

> Any person subject to this chapter who conspires to commit one or
> more substantive offenses triable by military commission under this
> chapter, and who knowingly does any overt act to effect the object of
> the conspiracy, shall be punished . . . as a military commission under
> this chapter may direct.

10 U.S.C. § 950v(b)(28) (2006).

> In addition, the 2006 MCA contained a separate section addressing

solicitation:

> Any person subject to this chapter who solicits or advises another or
> others to commit one or more substantive offenses triable by military
> commission under this chapter shall, if the offense solicited or
> advised is attempted or committed, be punished with the punishment
> provided for the commission of the offense, but, if the offense
> solicited or advised is not committed or attempted, he shall be
> punished as a military commission under this chapter may direct.

10 U.S.C. § 950u (2006).

6

In 2009, Congress amended the MCA as part of the National Defense

Authorization Act for Fiscal Year 2010.  <u>See</u> Pub. L. No. 111-84, div. A, tit.

XVIII, 123 Stat. 2574.  Although the legislation, designated the "Military

Commissions Act of 2009," <u>id.</u> § 1801, 123 Stat. 2574, constituted a wholesale

substitution of the 2006 Act, the 2009 MCA adopted without change many of the

provisions of the 2006 MCA, including the material support offense, the

conspiracy offense, and the solicitation offense.  <u>See</u> 10 U.S.C. § 950t(25), (29),

(30) (2009); <u>see also</u> Pub. L. No. 111-84, § 1804, 123 Stat. 2612 (ratifying actions

taken under the 2006 MCA).

     B.    <u>Bahlul's Conduct and Prosecution</u>

        1.    <u>The Evidence At Trial</u>

Bahlul was born in Yemen and was well-educated.  Tr. 477.  After briefly

attending medical school in Romania, he moved to Saudi Arabia where his parents

lived.  Tr. 478-79, 503.  Inspired by jihadist rhetoric, he traveled to Pakistan in the

early 1990s for the purpose of fighting the Communist regime in Afghanistan.  Tr.

479, 504.  After approximately a year and a half in Afghanistan, where he attended

a training camp and participated in combat against the Communist regime, Bahlul

returned to Yemen to study petroleum production and subsequently went to work

for a company that was widely believed to be an al Qaeda front company.  Tr. 480, 505-06.

Sometime in 1999, Bahlul was recruited by al Qaeda to return to Afghanistan.  After providing him with a visa and money, recruiters arranged for him to travel to an al Qaeda camp in Afghanistan where he underwent military-type training.  Tr. 506-07.  At the conclusion of Bahlul's training, the security chief of al Qaeda arranged for Bahlul to meet Usama bin Ladin.  Tr. 508-09.  Familiar with bin Ladin's August 1996 declaration of war against the United States and bin Ladin's 1998 edicts to kill Americans wherever they were found, as well as with al Qaeda's acts of terrorism against U.S. embassies in Kenya and Tanzania, Bahlul took an oath of "bayat," pledging loyalty to bin Ladin, expressing his willingness to die for jihad, and promising unqualified obedience to al Qaeda.  Tr. 509-11, 589.  Bahlul decided to migrate with his family to Afghanistan for the purpose of preparing for jihad with al Qaeda.  Tr. 509.

Bin Ladin subsequently assigned Bahlul to work in al Qaeda's media office, where Bahlul was responsible for conducting press briefings, maintaining a media archive, and conducting research for bin Ladin's statements.  Tr. 513.  Bin Ladin also asked Bahlul to prepare a video highlighting the *U.S.S. Cole* operation.  Tr. 514.  As Bahlul subsequently explained, the purpose of the video was to exploit

8

the attack as a means of obtaining recruits for al Qaeda, and to encourage them to participate in jihad and, in particular, to "kill Americans."  Tr. 534-35, 588-89, 651-52.  After Bahlul completed work on the video, bin Ladin appointed Bahlul as his personal assistant and secretary for public relations.  Tr. 556.

While living in Afghanistan and serving al Qaeda, Bahlul met and roomed with Muhammed Atta and Ziad al Jarrah.  Tr. 555; Prosecution Ex. 15.  Bahlul facilitated Atta and Jarrah's pledge of bayat to bin Laden.  Id.  Bahlul also typed the text for their "martyr['s] wills," video statements made by suicide bombers about to embark on a mission.  Tr. 553-55; Prosecution Ex. 15.  The reasons for making such videos are propaganda, recruitment, and to motivate the suicide bombers to carry out their mission.  Tr. 553-54.  After making their martyr's wills, Atta and Jarrah undertook their mission – at 8:46 am on September 11, 2001, Atta piloted American Airlines Flight 11 into the North Tower of the World Trade Center, and at 10:03 am, United Airlines Flight 93, piloted by Jarrah, crashed in Shanksville, Pennsylvania.  Bahlul later wrote to Ramzi bin al-Shibh:

> I [swear] by Allah that I envy you for the direct role you had in the 9/11 events, at the same time, I praise Almighty Allah for allowing me to have a simple and indirect role, which was facilitating the pledge of fealty of Muhammad [Atta] and Ziyad al-Jarrah . . . to the mujahid Sheikh Usamah Bin-Ladin.  I also typed their martyr wills on a computer and personally handed it to Sheikh Usamah Bin-[Ladin].

9

> Because of my travel to Yemen, I missed the honor of videotaping them when they were reading their martyr wills.  I also praise Allah for introducing me to Marwan [al-Shehhi (the hijacker who piloted United Airlines Flight 175 into the South Tower of the World Trade Center)], as well as your honor and the rest of the courageous heroes of September.

Prosecution Ex. 15; see also Tr. 550-53.

Shortly before September 11, 2001, bin Laden ordered the evacuation of al Qaeda's base in Kandahar.  Tr. 562.  He instructed Bahlul to load the media equipment into the media van for evacuation, and Bahlul complied.  Id.  On September 11, while the men were on the run somewhere between Kabul and Khost, bin Laden instructed Bahlul to hook up the satellite receivers, telling him that it was very important to get the news on that day.  Id.  Bahlul attempted to get a signal but was unable to do so because of the mountainous terrain, and so the men listened to news of the attacks on the radio.  Id.  While on the run, at bin Laden's instruction, Bahlul used a mobile laptop that he kept for al Qaeda – a mobile "office on the run" – to research the economic impact of the September 11 attacks.  Tr. 563.

In December 2001, Bahlul was captured in Pakistan and turned over to U.S. military authorities.  Tr. 946.  In 2002, he was transported to the military detention facility at Guantanamo Naval Base, Cuba.  820 F. Supp. 2d at 1156.  While

confined there, he voluntarily spoke with multiple investigators, detailing his

background and acknowledging his involvement in al Qaeda, his status as an

officer, and his role in producing the *Cole* video.  Id. at 1162.  Bahlul sought to

justify the 9/11 attacks on the World Trade Center on the basis that it was the

"center of capitalism," and he stated that all Americans, including women and

children, were legitimate targets of al Qaeda suicide attacks.  Tr. 512-13.

2.     Bahlul's Trial and Conviction

Bahlul was charged with three crimes pursuant to the 2006 MCA.  The first

charge alleged conspiracy to commit terrorist acts:

> [Bahlul] did, in the context of and associated with an armed conflict,
> at various locations in Afghanistan and elsewhere, from in or about
> February 1999 through in or about December 2001, conspire and
> agree with Usama bin Ladin, Saif al 'Adl, and other members and
> associates of al Qaeda, known and unknown, to commit one or more
> substantive offenses triable by military commission, to wit: Murder of
> Protected Persons; Attacking Civilians; Attacking Civilian Objects[;]
> Murder in Violation of the Law of War[;] Destruction of Property in
> Violation of the Law of War[;] Terrorism[;] and Providing Material
> Support for Terrorism[;] and with knowledge of the unlawful
> purposes of the agreement, [he] willfully entered into the agreement
> with the intent to further those unlawful purposes, and knowingly
> committed [eleven enumerated] overt acts in order to accomplish
> some objective or purpose of the agreement . . . .

App. Ex. 59.

11

The second charge alleged solicitation of terrorist acts:

[Bahlul] did, in the context of and associated with an armed conflict,
from in or about February 1999 through in or about December 2001,
at various locations in Afghanistan, Pakistan and elsewhere,
wrongfully solicit, order, induce and advise Jaralla Saleh
Mohammad Kahla al Marri, Yahya Goba, Yassein Taher, Faysal
Hussein Galab, Shafal Mosed, Sahim Ahmed Alwan, and other
persons, known and unknown, to commit substantive offenses triable
by military commissions, to wit: Murder of Protected Persons;
Attacking Civilians; Attacking Civilian Objects; Murder in Violation
of the Law of War[;] Destruction of Property in Violation of the Law
of War; Terrorism[;] and Providing Material Support for Terrorism
. . . [and he did so] with the intent that said offenses actually be
committed.

Id.

The third charge alleged that Bahlul provided material support for terrorism:

[Bahlul] did, in the context of and associated with an armed conflict,
from in or about February 1999 through in or about December 2001,
at various locations in Afghanistan and elsewhere, intentionally
provide material support and resources to al Qaeda, an international
terrorist organization then engaged in hostilities against the United
States, including violent attacks on the United States' embassies at or
near Nairobi, Kenya and Dar es Salaam, Tanzania on or about
August 7, 1998; on the U.S.S. COLE at or near Aden, Yemen, on or
about October 12, 2000, and; at various locations in the United States
on or about September 11, 2001, knowing that al Qaeda has engaged
or engages in terrorism, by [eleven enumerated acts] . . . .

Id.

12

Bahlul was charged with engaging in eleven enumerated acts that were both acts in furtherance of the charged conspiracy and means of material support for terrorism:

a.    traveling to Afghanistan with the purpose and intent of joining al Qaeda;

b.    meeting with Saif al 'Adl, the head of the al Qaeda Security Committee, as a step toward joining the al Qaeda organization;

c.    undergoing military-type training at an al Qaeda sponsored training camp then located in Afghanistan near Mes Aynak;

d.    pledging fealty, or "bayat," to the leader of al Qaeda, Usama bin Laden, joining al Qaeda, and providing personal services in support of al Qaeda;

e.    preparing and assisting in the preparation of various propaganda products, including the video "The Destruction of the American Destroyer *U.S.S. Cole*," to solicit material support for al Qaeda, to recruit and indoctrinate personnel to the organization and objectives of al Qaeda, and to solicit, incite and advise persons to commit terrorism;

f.    acting as personal secretary and media secretary of Usama bin Laden in support of al Qaeda;

g.    arranging for [9/11 hijackers] Muhammed Atta . . . and Ziad al Jarrah . . . to pledge fealty, or "bayat," to Usama bin Laden;

h.    preparing the propaganda declarations styled as martyr wills of Muhammed Atta and Ziad al Jarrah in preparation for the acts of terrorism perpetrated by [them] on September 11, 2001;

i.      at the direction of Usama bin Laden, researching the economic effect of the September 11, 2001 attacks on the United States, and providing the result of that research to Usama bin Laden;

j.      operating and maintaining data processing equipment and media communications equipment for the benefit of Usama bin Laden and other members of the al Qaeda leadership, and;

k.      arming himself with an explosive belt, rifle, and grenades to protect and prevent the capture of Usama bin Laden.

<u>Id.</u>

On September 24, 2008, Bahlul entered his plea to the charges, conceding, first in general terms and later in specifics, that he had engaged in the conduct alleged, but denying that such conduct was criminal. Bahlul asserted:

I am not guilty.

And what I did and I will do, and I'm doing right now, is to kill Americans–to fight . . . America.

And if you allow me and you let me go to Yemen, I will not leave the American government anywhere on the face of this earth. I will fight them with my tongue and my hand and my money and myself until the last thought, until the last drop of blood. . . .

I said that I was of al Qaeda and I did these actions. Of course, I had said "not guilty." Correct. I'm not guilty, and what I did was not a crime. But in your point of view, I am a criminal; but I'm not a criminal.

Tr. 167, 175.

14

Bahlul then addressed the various charges and specifications against him,

admitting most of the key factual allegations while taking issue with certain

characterizations.  He admitted to solicitation:

> [I]nstigation to commit deliberate killing against protected
> individuals.  You call it this; we call it instigation to jihad.

> I played this role in media in al Qaeda, and I do the same here in the
> military court.

Tr. 176.  Bahlul admitted to providing material support to terrorism:

> Providing material support to terrorism.  This is your expression.  We
> in our religion call it cooperation with jihad and mujahedeen through
> our souls and through our wealth.  Yes, I supported; and, God willing,
> I will support with my soul, with my wealth, and with my intellectual
> [sic] and blood.

Id.  Bahlul also admitted most of the specific factual allegations.  See Tr. 177-79,

190-95.

Bahlul explained the importance of his role within the al Qaeda

organization:

> I was bored when I was in Afghanistan and working on computers
> and papers and cameras and TVs; and I asked bin Laden for a
> martyrdom operation, suicide operation; but he refused.  The reason
> why he refused was that he–that there are many other people other
> than you or so–the recruiting people through media gets you more
> people than suicidal attacks.

> Even in America, in every country in the world, media is the master
> ministry or department; and it has strategic goals, just like the United

15

> Nations and Internal Affairs and the Treasury Department; and [G]od
> bless us, his speech was right.

Tr. 195.

At Bahlul's military commission trial, the government introduced physical evidence and testimony from individuals alleged to have been solicited by Bahlul to commit terrorist acts, and the government also relied heavily on Bahlul's own statements: statements he made in a journal contemporaneous with relevant events, statements he made voluntarily to federal agents before his trial, and statements in letters he wrote at Guantanamo Bay. See, e.g., Tr. 503-72, 646-53. Bahlul did not put on a defense and instructed his counsel not to make arguments or objections. See, e.g., Tr. 15-17, 40, 77-78, 85, 95, 114. At the end of the trial, the members of the military commission found Bahlul guilty of each of the three charges and each of the seven charged objects of the conspiracy and solicitation offenses. App. Ex. 74. The members also found Bahlul guilty of ten overt acts in support of the conspiracy and the same ten acts of material support for terrorism, but found Bahlul not guilty of the eleventh charged overt act. Id.

At the sentencing phase, Bahlul praised the 9/11 attacks and sought to justify them. Tr. 968-69, 973. After promising that "we will continue the war," Bahlul summed up his own role as "a media man" for al Qaeda:

16

> Any journalist or media man in the world can write anything against the United States, but he would be a liar because his acts are in one place and his words are in another place; but as a media man in al Qaeda, we actually take the words into action; and the members of 9/11, they were all media men before they became military men; and I was number 20, but bin Laden refused.

Tr. 979.

The military commission sentenced Bahlul to life imprisonment. App. Ex. 77. The convening authority subsequently approved Bahlul's convictions and sentence. 820 F. Supp. 2d at 1264.

3.    The Decision of the Court of Military Commission Review

The CMCR, sitting en banc, affirmed Bahlul's convictions and sentence, finding that the offenses for which Bahlul was convicted were properly subject to trial by military commission. The court noted that the MCA "'does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission.'" 820 F. Supp. 2d at 1168 (quoting 10 U.S.C. § 950p (2006)). The CMCR found that providing material support for terrorism, as set forth in Section 950v(b)(25) of the 2006 MCA, was a codification of the well-established principle of American military jurisprudence that bands of guerillas and those who assist them are subject to trial by military tribunal (id. at 1184-88, 1216-18) and that persons such as Bahlul engaging in acts of terrorism

17

are indistinguishable from other unlawful combatants (id. at 1188).  The CMCR also held that the offense of conspiracy to violate the law of armed conflict, as set forth in Section 950v(b)(28) of the 2006 MCA, is a long-standing offense subject to trial by military commission.  Id. at 1225-27.  The court further held that solicitation, as set forth in Section 950u of the 2006 MCA, is properly subject to trial by military commission.  Id. at 1231-41.

The CMCR rejected Bahlul's arguments that his prosecution and convictions for activities that involved the development and dissemination of propaganda and recruiting materials violated the First Amendment (820 F. Supp. 2d at 1242-51); that the military judge improperly failed to instruct the commission members that Bahlul could only be convicted if the video he produced would likely bring about specific and imminent illegality (id. at 1250-51); that the MCA constitutes an unconstitutional bill of attainder (id. at 1251-56); that the MCA violates the equal protection component of the Due Process Clause because it only applies to aliens (id. at 1256); and that his life sentence was inappropriately severe (id. at 1258-64).[2]

---

[2]  The CMCR did not rule on the government's argument that Bahlul had waived all non-jurisdictional arguments by declining to raise them at trial before the military commission.  See 820 F. Supp. 2d at 1163-64, 1258. Characterizing the question of waiver as "complex," the CMCR decided to address Bahlul's non-jurisdictional challenges on the merits, and rejected each of them.  Id. at 1258.

<u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

In the Military Commissions Acts of 2006 and 2009, Congress established a historically grounded and narrowly defined military jurisdiction within which the United States could pursue accountability for serious crimes committed during armed conflict.  As the Supreme Court made clear in <u>Hamdan v. Rumsfeld</u>, "Congress has the power and responsibility to determine the necessity for military courts, and to provide the jurisdiction and procedures applicable to them."  548 U.S. at 645.  Military commissions have been part of our legal architecture since the Revolutionary War, and they are tailored to the realities of armed conflict. They are a lawful and reasonable means of addressing the threat posed by al Qaeda and its associated forces.  Indeed, Bahlul's role in al Qaeda's declared war against the United States, a war characterized by repeated acts of terrorism including attacks on innocent civilians and civilian targets, places his activities squarely within traditional military commission jurisdiction.

Despite the established pedigree of military commissions, Bahlul urges that Congress exceeded its constitutional authority in making subject to trial by such tribunals the offenses of providing material support to terrorists engaged in an armed conflict with the United States, as well as conspiracy and solicitation to commit acts of terrorism during armed conflict.  As we demonstrate below,

19

Congress's constitutional authority to make such offenses, when committed by alien unprivileged enemy belligerents, subject to trial by military commission extends beyond the category of crimes that are today regarded as violations of customary international law.  Congress's constitutional authority to codify military commissions resides both in its war-making powers and in its authority to "define and punish . . . Offences against the Law of Nations" (U.S. Const. art. I, § 8, cl. 10).  Moreover, Congress correctly concluded that, in codifying these offenses in the MCA, it was not "establish[ing] new crimes" but simply "codify[ing] offenses that have traditionally been triable by military commissions."  10 U.S.C. § 950p(a) (2006).  Each of the offenses at issue has a direct antecedent in "the system of common law applied by [this nation's] military tribunals," Ex parte Quirin, 317 U.S. 1, 30 (1942), and incorporated into military regulations at least since the Civil War.  The MCA did nothing more than codify these long-standing offenses and define their elements in a manner that narrowed and clarified their scope.

Moreover, Bahlul's convictions did not violate the First Amendment. Bahlul's contention that he was convicted merely for making an offensive video mischaracterizes the trial record.  In any event, even if Bahlul had been convicted on the basis of the video alone, that would not violate the First Amendment given

20

that: (1) Supreme Court precedent makes it clear that the First Amendment does not protect such acts when committed overseas by enemy aliens engaged in warfare against the United States; (2) the Supreme Court's recent decision in Holder v. Humanitarian Law Project, 130 S. Ct. 2705 (2010), holds that punishing activities such as Bahlul's made on behalf of a foreign terrorist organization does not violate the First Amendment; and (3) speech that constitutes the gravamen of a crime such as solicitation or conspiracy is not protected from prosecution by the First Amendment.

Bahlul's final claim – that, because the MCA confines the jurisdiction of military commissions to *alien* unlawful enemy combatants, it violates the equal protection component of the Due Process Clause of the Fifth Amendment – is likewise meritless. Even assuming *arguendo* that equal protection rights apply in the context of military commission proceedings against aliens held at Guantanamo Bay, Bahlul's argument fails on the merits because Congress's decision to limit the jurisdiction of military commissions to alien unlawful enemy combatants satisfies the rational basis test that applies in this context.

<u>ARGUMENT</u>

I.     <u>CONSPIRACY, SOLICITATION, AND PROVIDING
       MATERIAL SUPPORT TO TERRORISM ARE PROPERLY
       TRIABLE BY MILITARY COMMISSION</u>

     A.     <u>Congress's Constitutional War-Making Powers Provide Broad
       Authority To Subject These Offenses, When Committed
       During Armed Conflict, to Trial by Military Commission</u>

          1.     <u>Standard of Review</u>

Questions of law, including whether Congress's constitutional warmaking

powers authorize it to make certain offenses triable by military commission, are

subject to plenary review by this Court.  See <u>American Bus Ass'n v. Rogoff</u>, 649

F.3d 734, 737 (D.C. Cir. 2011).  Congress's determination that, in the context of

armed conflict, providing material support to terrorism, conspiring to commit

offenses in violation of the law of war, and solicitation to commit law-of-war

violations have traditionally been triable by military commission is entitled to

great deference.  See, e.g., <u>Rostker v. Goldberg</u>, 453 U.S. 57, 70 (1981) ("judicial

deference . . . is at its apogee when legislative action under the congressional

authority to raise and support armies . . . is challenged"); <u>Holder v. Humanitarian

Law Project</u> ("<u>HLP</u>"), 130 S. Ct. 2705, 2727 (2011) (explaining the "vital" role of

judicial deference to the political branches' factual and policy determinations in

cases involving "sensitive and weighty interests of national security and foreign affairs").

When Congress's constitutional powers are exercised, as they are here, in tandem with the Necessary and Proper Clause, reviewing courts "look to see whether the statute constitutes a means that is rationally related to the implementation" of Congress's enumerated powers.  United States v. Comstock, 130 S. Ct. 1949, 1956-57 (2010).

> 2.  Congress Has the Authority, Pursuant to Its War-Making Powers, To Codify U.S. Common Law of War Offenses Triable by Military Commission

Bahlul argues that the military commission "lacked jurisdiction over the charges against him" because, in his view, "[n]one of the charges allege offenses against the law of war."  Pet. Br. at 14-15.  This, he maintains, is because punishing the offenses that constitute the basis of his conviction – material support to terrorism, conspiracy to commit war crimes (including terrorism), and solicitation of others to commit law-of-war violations – falls outside the scope of Congress's constitutional authority under the "Define and Punish Clause."  Id. at 12, 38.  While, as discussed below, Bahlul's argument misapprehends the scope of authority provided by that Clause, Bahlul also ignores Congress's extensive war-making powers under Article I, which provide Congress with additional

23

constitutional authority to identify crimes subject to trial by military commission. And he ignores the significant set of crimes related to unlawful belligerency – spying being the most prominent – that are punishable under domestic law.

Prior to 2006, it was understood that the law applied by military commissions, including the substantive offenses, would develop by common law. In Quirin, the Supreme Court explicitly endorsed Congress's decision not to codify law-of-war offenses and instead to rely on the common law.  317 U.S. at 30 ("Congress had the choice of crystallizing in permanent form and in minute detail every offense against the law of war, or of adopting the system of common law applied by military tribunals so far as it should be recognized and deemed applicable by the courts.  It chose the latter course.").  After the Supreme Court's decision in Hamdan v. Rumsfeld raised doubts regarding which offenses were long-standing common law of war offenses, Congress codified its understanding of the common law of war that had long been applicable to enemy belligerents engaged in hostilities against the United States.

As the language of the 2009 MCA indicates, the offense provisions of the MCA "codify offenses that have traditionally been triable under the law of war or

24

otherwise triable by military commission." 10 U.S.C. § 950p(d) (2009).[3]

Congress's reference both to offenses "triable under the law of war" and to offenses "otherwise triable by military commission" is consistent with the understanding that Congress's constitutional authority to specify offenses triable by military commission does not flow solely from its power under the Define and Punish Clause, but also stems from its broad war-making powers under Article I, Section 8 of the Constitution.

As Colonel William Winthrop, whom the Supreme Court has described as the "Blackstone of Military Law," Reid v. Covert, 354 U.S. 1, 19 n.38 (1957) (plurality opinion), explained in his seminal treatise on military law: "[I]n general, it is those provisions of the Constitution which empower Congress to 'declare war,' and 'raise armies,' and which, in authorizing the initiation of war, authorize the employment of all necessary and proper agencies for its due prosecution, from which [the military commission] derives its original sanction." William Winthrop, Military Law and Precedents 831 (2d ed. 1920) (hereafter "Winthrop") (emphasis

---

[3] Section 950p(a) of the 2006 MCA contained Congress's determination that "[t]he provisions of this subchapter codify offenses that have traditionally been triable by military commissions." Section 950p(d) of the 2009 MCA contains this language from the 2006 MCA as well as the language quoted in the text, which clarifies that war crimes under international law are only a subset of the offenses triable by military commission.

omitted).  In identifying the class of offenses cognizable by military commission as "[v]iolations of the laws and usages of war," Winthrop explained that such offenses are "those principally, *in the experience of our wars*, made the subject of charges and trial."  Id. at 839 (emphasis added).

More recently, in Hamdan v. Rumsfeld, 548 U.S. 557 (2006), one issue was whether the Executive had properly identified the offense of conspiracy as subject to trial by military commission.  Although Justice Stevens' plurality opinion and Justice Thomas' dissenting opinion reached different conclusions on the question, both gave substantial consideration to domestic U.S. practice.  Justice Stevens explained that the fact that Congress, "in exercise of its constitutional authority to 'define and punish . . . Offences against the Law of Nations' . . . [did not] positively identify[ ] 'conspiracy as a war crime,'" id. at 601-02, was not "necessarily fatal to the Government's claim of authority to try the alleged offense by military commission; Congress, through Article 21 of the UCMJ, has 'incorporated by reference' the common law of war, which may render triable by military commission certain offenses not defined by statute."  Id. (quoting Quirin, 317 U.S.

at 30).[4]  Justice Stevens' use of the phrase "common law of war" is best understood

as embracing offenses that had traditionally been subject to trial by U.S. military

tribunals, as his opinion canvasses many domestic precedents before concluding

that, in the absence of legislation, conspiracy was not an offense subject to trial by

military commission.  Id. at 603-09.   Similarly, Justice Thomas observed that

"[t]he common law of war as it pertains to offenses triable by military commission

is derived from the 'experience of our wars' and our wartime tribunals."  Id. at 689

(quoting Winthrop, supra, at 839).  Justice Thomas concluded that our nation's

experience "is rife with evidence that establishes beyond any doubt that conspiracy

to violate the laws of war" is such an offense.  Id. at 698.

　　　Indeed, given that most of the military commissions in our nation's history

have been created by the Executive Branch, it is clear that constitutional war

_____

[4]  Article 21 of the UCMJ, 10 U.S.C. § 821, provides:

> The provisions of this chapter conferring jurisdiction upon
> courts-martials do not deprive military commissions, provost
> courts, or other military tribunals of concurrent jurisdiction
> with respect to offenders or offenses that by statute or by the
> law of war may be tried by military commissions, provost
> courts, or other military tribunals.

Nothing in the language of this statute precludes military commissions from
asserting jurisdiction over offenses, such as spying and aiding the enemy,
that are prosecuted under our own nation's law of war rather than as
violations of international law.

27

powers are a key source of authority for the creation of military commissions. Unlike Congress, the Executive does not possess a define and punish power, but like Congress, it does possess war powers.  See, e.g., Quirin, 317 U.S. at 26.  It would be anomalous indeed to suggest that the Executive Branch could draw on its war powers in the creation of military commissions but that Congress could not draw on its own war powers when doing the same.

Since the adoption of the Constitution, Congress and the Executive have repeatedly employed their war-making powers to punish by military commission a class of domestic law crimes.  These are crimes committed by unprivileged belligerents in the context of armed conflict that are traditionally punished by domestic law.  The United States has termed this body of law a domestic "common law of war," but whatever terminology is employed, it has long been clear that a class of wartime offenses exists that national authorities may criminalize and punish as a matter of domestic law.  As Major Richard Baxter (later a Judge on the International Court of Justice) explained in his seminal article, certain crimes committed by unprivileged belligerents during war have historically been subject to military commission jurisdiction even though these offenses are "probably to be construed as . . . offence[s] in violation of the military common law of the state concerned."  Richard R. Baxter, So-Called "Unprivileged Belligerency": Spies,

28

Guerrillas, and Saboteurs, 28 Brit. Y.B. Int'l L. 323, 338 (1951); see also Curtis A. Bradley & Jack L. Goldsmith, Congressional Authorization and the War on Terrorism, 118 Harv. L. Rev. 2047, 2132 (2005) (describing "spying and aiding the enemy" as within the "historical jurisdiction" of U.S. military commissions although not "offenses governed by international law").

The most prominent example of a domestic law-of-war crime which has traditionally been tried by military commission is spying. Spying is not a violation of the international law of war. See John C. Dehn, The Hamdan Case and the Application of a Municipal Offence, 7 J. Int'l Crim. Justice 63, 75 (2009) ("In other words, punishment [for spying] was only *permitted* by the law of nations, not directly imposed or required by it. Punishment would necessarily be imposed by the sovereign authority of the victim state."); Dep't of the Army, Field Manual 27-10, The Law of Land Warfare ¶ 77, app. A-21 (1956) (hereafter "FM 27-10") ("Spies are punished, not as violators of the laws of war, but to render that method of obtaining information as dangerous, difficult, and ineffective as possible."); Baxter, supra, at 333 ("The actions of a spy are not an international crime, for by his conduct he merely establishes that he is a belligerent with no claim to any of the protected statuses which international law has created."). Nonetheless, since the beginning of our nation, spying has been an offense punishable by military

29

tribunal. See Winthrop, supra, at 765; 5 Journal of the Continental Congress 693 (Resolution of Aug. 21, 1776) (providing that "all persons, not members of, nor owing allegiance to, any of the United States of America . . . who shall be found lurking as spies . . . shall suffer death, according to the law and usage of nations, by sentence of a court martial"); 10 U.S.C. § 906 (making spies punishable by court-martial).

As the Quirin Court explained, "[t]he spy who secretly and without uniform passes the military lines of a belligerent in time of war, seeking to gather military information and communicate it to the enemy" is a "familiar example[] of [a] belligerent[] who [is] generally deemed not to be entitled to the status of prisoner[] of war, but to be [an] offender[] against the law of war subject to trial and punishment by military tribunals." 317 U.S. at 31. Although Quirin here refers to the spy as an offender "against the law of war," the Court could not have been referring to the international law of war because, as noted, spying has never been understood to constitute a violation of the international law of war.[5] See also

_____

[5] While the Quirin Court suggested that the law of war was a "branch of international law," 317 U.S. at 29, its discussion of the long history of trying accused spies by military commission relied not on customary international law but instead on historical American practice dating to the Revolution. See id. at 31-34, 42 n.14; see also Dehn, supra, at 79-81 (the Quirin Court's citations to Winthrop demonstrate that the Court was relying on American practice, as Winthrop's treatise "contained scant references to . . . international materials,

Colepaugh v. Looney, 235 F.2d 429, 432 (10th Cir. 1956) (referring to the offense of spying as an example of a "concept of common law military justice").

A second long-standing violation of the U.S. law of war which has traditionally been tried by military commission is wrongfully aiding the enemy. Like spying, wrongfully aiding the enemy is not an international law of war violation but has long constituted an offense under the U.S. common law of war, making the offender subject to trial by military tribunal.[6]  Both wrongfully aiding the enemy and spying are therefore examples of offenses that, although not war crimes under international law, are subject to trial by military commission under the 2006 MCA and the 2009 MCA,[7] and exemplify codifications of this nation's long-standing "common law of war."  Quirin, 317 U.S. at 34.

The traditional practice of trying guerillas and their supporters by law-of-war military commission is similarly grounded in practice and history.  As Baxter

---

[and] did not assert that the law of nations or [international humanitarian law] alone defined criminal conduct or required punishment," an unsurprising conclusion "given the absence of crimes or punishment prescribed by the conventional [international humanitarian law] of that era").

[6]  See Winthrop, supra, at 955, 967, 981, 989; U.S. War Dep't, A Manual for Courts-Martial 234 (1917); see also 10 U.S.C. § 904 (UCMJ art. 104).

[7]  10 U.S.C. § 950v(b)(26) (2006) (wrongfully aiding the enemy); 10 U.S.C. § 950t(26) (2009) (same); 10 U.S.C. § 950v(b)(27) (2006) (spying); 10 U.S.C. § 950t(27) (2009) (same).

31

explained, under the law of war, guerillas "resemble spies" in that they are subject to domestic law punishment, but "not because of [their actions'] illegality in an international sense." Baxter, <u>supra</u>, at 336. The U.S. military tribunal at Nuremberg, in the <u>Hostage Case</u>, similarly noted that guerillas "are placed much in the same position as a spy" – they do not violate the international law of war, but the laws of war permit them to be treated as criminals by the opposing belligerents. <u>The Hostage Case (United States v. List)</u>, 11 Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10, at 757, 1245 (1950).[8] Numerous Civil War precedents, discussed below, confirm the traditional U.S. practice of trying such offenses by law-of-war military commissions, because these offenses, like spying, are considered punishable as a matter of domestic law.

---

[8] The <u>Hostage Case</u> is clear that spying and guerilla offenses are not offenses under international law, but, like <u>Quirin</u>, it uses certain international law terminology. Thus, although it is clear that the tribunal viewed guerrilla offenses as domestic law, not international law, offenses, it states that "a civilian who aids, abets, or participates in the fighting is liable to punishment" – under domestic, not international, law – "as a war criminal under the laws of war." <u>The Hostage Case</u>, <u>supra</u>, at 1246. In American practice, offenses related to unlawful belligerency have also sometimes been referred to as "law of war" offenses or even "war crimes" within the traditional jurisdiction of law-of-war military commissions. Certain references in <u>Quirin</u> and <u>Hamdan</u> to the "law of war" offenses subject to trial by military commission are best understood as encompassing not only the international laws of war, but also those wartime offenses that are punished by domestic law. Any other understanding of these precedents cannot be reconciled with the examples of spying and wrongfully aiding the enemy.

32

In enacting the MCA, Congress, exercising its constitutional war powers, has simply codified the offenses of providing material support to terrorists during an armed conflict against the United States, conspiring with others to engage in acts of terrorism in the context of armed conflict, and soliciting the commission of terrorist acts in the context of armed conflict.  Punishing alien unprivileged enemy belligerents who commit these crimes is an important incident to waging war.  Moreover, each of these crimes possesses a historical pedigree under our nation's common law of war similar to spying and unlawfully aiding the enemy and is therefore likewise subject to trial by military commission under the U.S. common law of war.

        3.      <u>Providing Material Support to Unlawful Belligerents in an Armed Conflict Is an Offense That Has Long Been Triable by Military Commission</u>

Bahlul argues that the offense of providing material support to terrorists who are engaged in hostilities against the United States is nothing more than an adaptation to the context of armed conflict of a "novel domestic crime[ ]" and is therefore not triable by military commission.  Pet. Br. 18.  Although the MCA defines this offense by the modern label of "providing material support for terrorism," providing aid and assistance to unlawful belligerents is a long-

recognized offense that has historically been triable by military commission under our common law of war.

During the Civil War, bands of guerillas, not regularly enlisted in the Confederate army, who attacked Union military forces, bases of supply, railroads, and civilian targets of opportunity were not perceived as legitimate combatants entitled to the privileges of belligerents but, instead, as outlaws, marauders, and spies. See Francis Lieber, Guerrilla Parties Considered with Reference to the Laws and Usages of War 5-8, 18-19 (1862). In December 1861, for example, Major General Henry Wagner Halleck, then commanding the Department of Missouri (and a renowned international lawyer), issued a General Order condemning, among other offenses, the commission by "[p]ersons not commissioned or enlisted in the service of the so-called Confederate States" of "acts of hostility" such as "murder, robbery, theft, pillaging and marauding." General Order ("G.O.") No. 13, Headquarters ("HQ"), Dep't of the Missouri (Dec. 4, 1861), reprinted in 1 The War of the Rebellion, Official Records of the Union and Confederate Armies, ser. II, at 233-36 (hereafter "1 OR ser. II") (1894). The General Order directed that such individuals not be treated as prisoners of war but as "criminals." Id.

Another of Halleck's general orders directed that the adjudication of "violation[s] of the laws of war," when not triable by courts-martial and not within

34

the jurisdiction of any existing civilian court, should be by "duly constituted military tribunal[s]" also referred to as "[m]ilitary commissions."  G.O. No. 1, HQ, Dep't of the Missouri (Jan. 1, 1862), 1 OR ser. II, at 247-49.  Significantly, General Order No. 1 distinguished between regularly enrolled members of "the military service of an enemy" – who were exempt from prosecution – and enemy "insurgents not militarily organized under the laws of the State, predatory partisans and guerilla bands," who were "not entitled to such exemptions" because they were "in a legal sense mere freebooters and banditti."  Id., 1 OR ser. II, at 249.

In a similar fashion, Army General Order No. 100 (1863), commonly referred to as the "Lieber Code," specifically identified two categories of "[a]rmed enemies not belonging to the hostile army" who were subject to trial by military commission for unlawfully engaging in acts of armed violence.  G.O. No. 100, § IV, art. 82 (Apr. 24, 1863), reprinted in Francis Lieber, Instructions for the Government of Armies of the United States in the Field 26 (1898).  The Lieber Code reflected a continuing understanding that, under the U.S. common law of war, those who engaged in hostilities as guerillas and marauders without being part of an organized army were subject to trial by military commission.  Id.  Colonel Winthrop later collected examples of individuals tried by military commission during the Civil War for engaging in illegal warfare as guerillas.  Winthrop, supra,

35

at 839-40; see, e.g., G.O. No. 15, HQ, Dep't of the Mississippi (Apr. 3, 1862), 1

OR ser. II, at 472-76 (approving convictions by military commission of six

individuals for "tak[ing] up arms as . . . insurgent[s]").

Critically, military authorities authorized trial by military commission of not

only those who committed such acts, but also those who knowingly joined with, or

provided aid and assistance to, such guerillas and marauders.  Halleck's General

Order No. 13, for example, condemned individuals who aided and assisted lawless

conduct by irregular belligerents as criminals subject to trial by military

commission.  G.O. No. 13, 1 OR ser. II, at 234.  General Orders approving

convictions by military commissions convened during the Civil War make clear

that not only those who engaged in such acts of unlawful belligerency, but also

those who knowingly joined with or aided and assisted such unlawful belligerents,

were subject to punishment as criminals under the law of war.  See, e.g., G.O. No.

20, HQ, Dep't of the Missouri (Jan. 14, 1862), 1 OR ser. II, at 402-06 (approving

convictions by military commission of five individuals for burning bridges, railroad

cars, and tracks, and for "*[g]iving aid and comfort to bridge burners*," in violation

of the law of war) (emphasis added); G.O. No. 9, HQ, Dep't of the Mississippi

(Mar. 25, 1862), 1 OR ser. II, at 464-71 (approving convictions by military

commission of (a) William Kirk for membership in a "marauding or guerila band

36

known as Jeff Thompson's band," and for committing acts of "rob[bery] and plunder[ing]" with that band; (b) John W. Montgomery for membership in the same guerilla band and for "*purchasing and driving cattle*" for the band; (c) I.N. Giddings for "*spy[ing]*" for the band; and (d) William Lisk for *furnishing a firearm to a guerilla* for the purpose of firing on a train carrying U.S. troops) (emphasis added); G.O. No. 19, HQ, Dep't of the Mississippi (Apr. 24, 1862), 1 OR ser. II, at 476-83 (approving convictions by military commission of (a) Matthew Thompson for "*joining, aiding and assisting* a band of robbers and bandits" engaged in the destruction of railroads and bridges and for attempting to steal a horse for the use of the bandits; (b) Owen C. Hickam for "*giv[ing] clothing and goods* to certain persons to be . . . appropriated to the use of persons in rebellion" in violation of the law of war; and (c) Samuel Jamerson for *feeding and sheltering* outlaws who had destroyed a railroad); see also 11 Op. Att'y Gen. 297, 312 (1865) ("to unite with banditti, jayhawkers, guerillas, or any other unauthorized marauders is a high offence against the laws of war; the offence is complete when the band is organized or joined").

For law-of-war purposes, there is a symmetry between the "guerillas," "marauders,"  and "saboteurs" historically tried by U.S. military commissions, on the one hand, and modern-day terrorists engaged in unlawful belligerency in the

37

context of armed conflict, on the other.  By whatever name they are called, the

legally salient point is that such individuals engage in acts of unlawful belligerency

– including, particularly, attacks on civilian targets – that are beyond the pale of

legitimate warfare.  Indeed, today's terrorists engaged in armed conflict have quite

properly been analogized to guerilla operatives of earlier times.  <u>See, e.g.</u>, Sean D.

Murphy, <u>Evolving Geneva Convention Paradigms in the "War On Terrorism":</u>

<u>Applying the Core Rules to the Release of Persons Deemed "Unprivileged</u>

<u>Combatants"</u>, 75 Geo. Wash. L. Rev. 1105, 1112 (2007) (observing that "[t]he

contemporary terrorist threat posed by a group such as al Qaeda is largely viewed

in the United States as comparable to Lieber's guerrilla brigands"); William H.

Taft, IV, <u>The Law of Armed Conflict After 9/11: Some Salient Features</u>, 28 Yale J.

Int'l L. 319, 320 (2003); G.I.A.D. Draper, <u>The Status of Combatants and the</u>

<u>Question of Guerilla Warfare</u>, 45 Brit. Y.B. Int'l L. 173, 183 (1971).

Congress lawfully determined, as an incident of its war-making powers, that

not only individuals who commit acts of unlawful belligerency during an armed

conflict by engaging in terrorism, but also those who knowingly provide material

aid and assistance to such unlawful belligerents by providing themselves or their

resources to such activity, are properly subject to trial by military commission in

accordance with our nation's long-standing practice under our domestic common

38

law of war.  Congress's manifest purpose in reaching this legislative conclusion

was to deter individuals who align with our nation's enemies from fostering acts of

terrorism as a means of conducting hostilities against U.S. armed forces and

launching attacks on U.S. civilians.  Cf. HLP, 130 S. Ct. at 2731 (linking the

federal material support statute to the constitutional responsibility of "[s]ecuri[ng]

[the nation] against foreign danger") (citation omitted).  The historical precedents

discussed above fully support Congress's wartime judgment.

4.    Conspiracy Is an Offense That Has Long Been
         Triable by Military Commission

The CMCR was also correct in holding that Congress properly exercised its

constitutional authority in making conspiracy to violate the laws of armed conflict

subject to trial by military commission.  820 F. Supp. 2d at 1230-31.  The offense

of conspiracy to violate the laws of war, including the murder of protected persons

and attacks against civilians and civilian objects, is both firmly rooted in our

nation's history and expressly recognized in "the long-standing public position of

the United States Army."  Id. at 1264-65 (Sims, J., concurring) (citing FM 27-10,

supra, ¶ 500, app. A-117) (conspiracy to commit a war crime is punishable as

such).  As Justice Thomas observed in Hamdan, "in the highest profile case to be

tried before a military commission relating to [the Civil War], namely, the trial of

39

the men involved in the assassination of President Lincoln, the charge provided

that those men had 'combin[ed], confederat[ed], and conspir[ed] . . . to kill and

murder' President Lincoln."  548 U.S. at 699 (Thomas, J., dissenting) (quoting

General Court Martial Order ("G.C.M.O.") No. 356 (July 5, 1865), reprinted in

H.R. Doc. No. 55-314, at 696 (1899)); see also Ex parte Mudd, 17 F. Cas. 954,

954 (S.D. Fla. 1868) (holding that three of the accused Lincoln conspirators were

properly subjected to trial by military commission because conspiring to

assassinate "the Commander in Chief of the army for military reasons" was a

violation of "the laws of war" like "spy[ing]" or the "barbarous treatment [of]

prisoners"); Mudd v. Caldera, 134 F. Supp. 2d 138, 145-47 (D.D.C. 2001)

(Friedman, J.) (upholding the Army's conclusion that convicted conspirator

Samuel Mudd was properly subject to trial by military commission, in light of the

intervening decisions in Quirin and Ex parte Milligan, 71 U.S. (4 Wall.) 2

(1866)),[9] appeal denied, 309 F.3d 819 (D.C. Cir. 2002).

_____

[9]  While Judge Friedman's opinion suggests that Mudd was convicted for
being an accessory after the fact, see 134 F. Supp. 2d at 140, the actual charge on
which Mudd and seven others were convicted was "combining, confederating, and
conspiring . . . to kill . . . Abraham Lincoln," G.C.M.O. No. 356, at 696, and
Mudd's conviction was based on conduct both before and after the assassination,
see id. at 698.

Likewise, former Confederate Army Captain Henry Wirz was convicted by a military commission of "combin[ing], confederat[ing], and conspir[ing] with [others] . . . , maliciously, traitoriously, and in violation of the laws of war, to impair and injure the health and to destroy the lives . . . of large numbers of Federal prisoners . . . in the military service of the United States of America, held as prisoners of war at Andersonville, in the State of Georgia, within the lines of the so-called Confederate States."  G.C.M.O. No. 607 (Nov. 6, 1865), reprinted in H.R. Doc. No. 55-314, at 789; see also Opinion of The Judge Advocate General in the Matter of William Murphy (Mar. 21, 1866) (available at XVI JAG Record Books 280) (approving conviction of William Murphy by a military commission, convened at St. Louis, Missouri, for conspiracy to burn and destroy steamboats); G.C.M.O. No. 452 (Aug. 22, 1865), reprinted in H.R. Doc. No. 55-314, at 724 (approving conviction of St. Leger Grenfel for "[c]onspiring, *in violation of the laws of war,* to release the rebel prisoners of war confined by authority of the United States" and "[c]onspiring, *in violation of the laws of war*, to lay waste and destroy the city of Chicago") (emphasis added); G.O. No. 9, 1 OR ser. II, at 470 (approving conviction of Joseph Sublett for conspiring to fire into trains of railroad cars); Winthrop, supra, at 839 n.5 (noting that criminal conspiracies can constitute offenses "of the first and second classes [of offenses subject to trial by

41

military commission] combined," i.e., both crimes ordinarily cognizable in federal or state court and violations of the law of war); id. (collecting cases); id. at 842 (noting that some charges, including conspiracy, can be alleged as both a "crime against society and a violation of the laws of war" and, on occasion, can be "represented [under] both elements").

In his 1880 compilation of the Digest of Opinions of The Judge Advocate General of the Army, Winthrop included as an "*offence*[] *against the laws and usages of war*" prosecuted by military commissions during the Civil War "[c]onspiracy by two or more to violate the laws of war by destroying life or property in aid of the enemy." See W. Winthrop, Digest of Opinions of The Judge Advocate General of the Army 328-29 (1880) ("Dig. Ops."). That offense was carried forward in subsequent editions of the Dig. Ops.[10]

---

[10]  See Dig. Ops. 1895, at 502-03; Dig. Ops. 1901, at 464-65; Charles Roscoe Howland, Dig. Ops. 1912, at 1070-71. The Hamdan plurality dismissed the authoritative significance of the Dig. Ops. references to conspiracy as a violation of the nation's common law of war, with Justice Stevens observing that none of the citations to the Record Books of The Judge Advocate General, upon which the 1912 edition of the Dig. Ops. relied, included a conspiracy offense. Hamdan, 548 U.S. at 607-08. However, Winthrop's 1880 compilation of the Dig. Ops. referred to JAG Record Book XXI at page 280 to support his inclusion of conspiracy as a violation of the law of war. Dig. Ops. 1880, at 329. The index to that volume, as it then existed, referenced the William Murphy case as beginning at page 280. As noted above, Murphy was prosecuted by a military commission for conspiring to burn and destroy steamboats. At some point subsequent to 1912, Volume XXI of the JAG Record Books, which contained the Murphy proceedings,

More recently, in Ex parte Quirin, eight Nazi saboteurs were convicted of, among other offenses, *conspiring* to violate the law of war.  317 U.S. at 23. Although the Supreme Court found it unnecessary to address the status of conspiracy as a law-of-war offense (see 548 U.S. at 606 (opinion of Stevens, J.) (citing Quirin, 317 U.S. at 46)), as Justice Thomas observed in Hamdan, "the common law of war cannot be ascertained from [the] Court's failure to pass upon an issue, or indeed to even mention the issue in its opinion; rather, it is ascertained by the practice and usage of war."  Id. at 699 (Thomas, J., dissenting) (citing Winthrop, supra, at 839).  The conspiracy count in Quirin constitutes convincing empirical evidence that, well into the 20th century, conspiracy continued to be understood by the Executive Branch to be a violation of our nation's common law of war subject to trial by military commission.

Similarly, in Colepaugh v. Looney, 235 F.2d at 433, the court upheld against a habeas corpus challenge the conviction by military commission of a

---

was mislabeled as Volume XVI.  Consequently, the Murphy case is now found in Volume XVI at page 280.  Justice Stevens' review of Volume XXI, as it presently exists, would therefore not have resulted in the discovery of this precedent. See Haridimos V. Thravalos, History, Hamdan, and Happenstance: "Conspiracy by Two or More To Violate the Laws of War by Destroying Life or Property in Aid of the Enemy", 3 Harv. Nat'l Sec. J. 223, 250-54 (2012).

German American who, along with a compatriot, had surreptitiously entered the United States during World War II to spy on behalf of Germany.  In that case, a Special Board of Review, the Judge Advocate General, and President Truman had each approved the two men's convictions by military commission for, among other things, conspiring to clandestinely enter the United States for the purpose of spying and espionage.  See G.O. No. 52, War Dep't (July 7, 1945).  In affirming the conviction, the Special Board of Review observed that "[i]t is well established that conspiracy to commit an offense against the laws of war is in itself an offense cognizable by a commission administering military justice."  Opinion of Special Board of Review, United States v. Colepaugh, CM 276026, at 29 (Mar. 27, 1945) (unpublished).  Accord Thravalos, supra, at 242-43 (discussing the jurisdiction of law-of-war military commissions to try conspiracy offenses committed during World War II and the Korean War).

These precedents demonstrate the error in Bahlul's assertion that "'[t]he crime of 'conspiracy' has rarely if ever been tried as such in this country by any law-of-war military commission not exercising some other form of jurisdiction.'"  Pet. Br. 19-20 (quoting Hamdan, 548 U.S. at 603-04 (opinion of Stevens, J.)).  Indeed, these prosecutions – several of which were widely publicized – demonstrate that the long-standing practice of the United States has been to punish

44

conspiracy in military commissions as an offense under our nation's common law of war.

Bahlul also relies on Justice Stevens' plurality opinion in <u>Hamdan</u> to argue (Pet. Br. 19-20) that inchoate offenses such as conspiracy were not historically recognized as war crimes subject to trial by military commission and that the examples discussed above do not support a different result because they also included charges based on the commission of consummated crimes.  To be sure, the <u>Hamdan</u> plurality did not find sufficient evidence for the President, acting alone, to punish conspiracy by military commission, but it specifically noted that Congress had not "positively identified" conspiracy as such, and warned against "concentrating in military hands" a degree of punitive power not contemplated by Congress.  <u>Hamdan</u>, 548 U.S. at 601.  Similarly, Justice Kennedy specifically declined to find that conspiracy was not properly chargeable as a violation of the common law of war because, in his view, such a holding was unnecessary to decide the case and the question was one for Congress to determine.  <u>Id.</u> at 655 (Kennedy, J., concurring in part).  Critically, Congress has now twice determined, through its enactment of the 2006 and 2009 MCAs, that conspiracy to commit terrorist acts is and traditionally has been an offense triable by military commission.

45

The idea that conspiracy, when historically charged as a violation of the common law of war, required proof of a completed offense distinct from the charged conspiracy (or, at the least, an attempt to commit such an offense) is unpersuasive.  The fact that allegations of misconduct in conspiracy counts could also constitute the basis for separate charges does not establish that a consummated offense was a *sine qua non* for a legally sufficient conspiracy offense.  See Hamdan, 548 U.S. at 701 n.13 (Thomas, J., dissenting).[11]  At most, it merely demonstrates that consummated crimes could serve as both overt acts of charged conspiracies and as a basis for separate offenses.

To be sure, our nation's common law of war does not allow for prosecution predicated on "intentions merely" (Winthrop, supra, at 841); instead, the class of cases subject to trial by military commission requires the commission of "*overt acts*."  Id.  There can be no doubt, however, that both the statutory offense and the allegations in this case satisfy that requirement.  Under the 2006 MCA, the offense of conspiracy requires proof beyond a reasonable doubt that the accused "conspire[d] to commit one or more substantive offenses triable by military commission" and "knowingly [did] any overt act to effect the object of the

_____

[11]  Indeed, in the Murphy case, discussed supra note 10, the specification alleging conspiracy lacked any reference to a consummated offense.

conspiracy."  10 U.S.C. § 950v(b)(28) (2006); see also 10 U.S.C. § 950t(29)

(2009) (same).[12]  In this case, the conspiracy count on which Bahlul was convicted

alleged that, in furtherance of a conspiracy to, among other things, murder

protected persons, attack civilians and civilian objects, destroy property, and

provide material support for terrorism, he underwent military-type training at an al

Qaeda camp; pledged "bayat" to Usama bin Ladin; prepared propaganda to recruit

personnel to al Qaeda; served as bin Ladin's personal and media secretary;

assisted in preparing martyr wills for two of the perpetrators of the 9/11 terrorist

attacks; researched the economic effect of that attack on the United States; and

maintained communication equipment for al Qaeda.  Consequently, Bahlul's

conspiracy conviction, and the statute on which it is based, are fully consistent

with our nation's long-standing practices pursuant to our common law of war.

---

[12] Amici International Law Professors (ILP Amicus Br. 28-32) maintain that, in the context of armed conflict, the criminalization of conspiracy is not feasible because it could "expose all members of a military organization to equal liability [for the conduct of their leaders] regardless of their behavior or standing in the organization."  Id. at 29.  The conspiracy offense set out in Section 950v(b)(28) of the 2006 MCA, however, neither subjects unwitting members of a military organization to the prospect of such a prosecution nor imposes punishment "on the notion of collective wrongdoing."  Id. at 30.  In order to obtain a conviction under the MCA, the government must prove, as it did in this case, that the defendant himself has "knowingly [committed] any overt act to effect the object of the conspiracy."  10 U.S.C. § 950v(b)(28) (2006).

5.    Solicitation Is an Offense that Has Long Been
Triable by Military Commission

Bahlul argues (Pet. Br. 21) that "[i]nchoate solicitation is not an offense

against the law of war."  To the contrary, our nation's common law of war, dating

to the Civil War, punished conduct of the same nature as that for which Bahlul

was convicted – "wrongfully solicit[ing], order[ing], induc[ing] and advis[ing]"

individuals to commit law of war violations, including murder in violation of the

law of war.  App. Ex. 59 (charge sheet).

General Orders approving the results of military commission hearings

during the Civil War demonstrate that those who induced others to commit

offenses triable by military commission were frequently prosecuted.  Francis

Skinner, for example, was convicted for "counsel[ing] and invit[ing]" other

persons to destroy a railroad in violation of the laws of war.  G.O. No. 19, 1 OR

ser. II, at 476-77.  James W. Barnes was convicted for inciting others to attack the

dwelling of a citizen, in violation of the laws of war.  Id., 1 OR ser. II, at 478.

Edmund Ellis was convicted for publishing newspaper articles "designed to

comfort the enemy and incite persons to rebellion."  Special Order No. 160, HQ,

Dep't of the Missouri (Feb. 24, 1862), 1 OR ser. II, at 453-57.  And Edward

Wingfield was convicted for "[i]nciting unlawful warfare" to "take up arms and to

commit acts of hostility against the property of the United States and the property

48

and persons in [its protection] contrary to the laws and customs of war." G.O. No. 15, 1 OR ser. II, at 475.

The evidence at trial demonstrated that Bahlul's conduct was the type that has traditionally been tried by U.S. military commissions exercising law-of-war jurisdiction. When interviewed following his apprehension, Bahlul admitted that the central purpose of the video that he created to glorify the attack on the *U.S.S. Cole* was to "build on the . . . attack for recruitment and propaganda purposes." Tr. 535; see also Tr. 545 (purpose of the video was to "instigate recruitments for suicide bombers"). Evidence at trial showed that the video was "effective . . . because it got a lot of recruits." Tr. 550. Its core message was "[g]o to Afghanistan, join Al Qaeda" and participate in "a suicide bombing." Id. Bahlul also facilitated the pledge of "bayat" to Bin Ladin of two of the 9/11 hijacker-pilots and typed speeches for their martyrdom wills, the purpose of which was to recruit other terrorists for al Qaeda and to "motivat[e]" the operatives to follow through with their suicide missions. Tr. 552-54.

49

B.  Congress Properly Exercised Its Authority under the Define and Punish Clause When It Determined that Providing Material Support to Terrorism, Conspiracy, and Solicitation Are Offenses Triable by Military Commission

1.  Introduction and Standard of Review

Congress's constitutional authority to "define and punish . . . Offences against the Law of Nations," U.S. Const. art. 1, § 8, cl. 10, provides an additional justification for its determination that the provision of material support to terrorism, conspiracy to violate the law of war (including through the commission of acts of terrorism), and soliciting others to commit law-of-war violations such as terrorist attacks are all offenses subject to trial and punishment by military commission. Engaging in terrorist acts as a mode of warfare violates international law, and the United States has an obligation under various international agreements and U.N. Security Council resolutions to prevent terrorist acts and to punish those who engage in such acts. Although material support for terrorism, conspiracy, and solicitation have not attained international recognition at this time as offenses under customary international law, the Define and Punish Clause, in tandem with the Necessary and Proper Clause, affords Congress ample authority to make these offenses subject to trial and punishment by military commission. These congressional determinations are supported by decisions from international tribunals established at the end of World War II, as well as international

50

agreements and other authoritative pronouncements within the international community.

This Court has recognized that, while "[d]eference to the judgment of Congress and the President [is] by no means absolute,"

> a determination by the political branches concerning the obligations of the United States is also a determination about the conduct of American foreign policy. Defining and enforcing the United States' obligations under international law require the making of extremely sensitive policy decisions, decisions which will inevitably color our relationships with other nations. Such decisions "are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility . . . ."

Finzer v. Barry, 798 F.2d 1450, 1458-59 (D.C. Cir. 1986) (quoting Chicago & So. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 111 (1948)), aff'd in part sub nom. Boos v. Barry, 485 U.S. 312 (1988); United States v. Bin Ladin, 92 F. Supp. 2d 189, 220 (S.D.N.Y. 2000) ("Clause 10 does not merely give Congress the authority to punish offenses against the law of nations; it also gives Congress the power to 'define' such offenses."). As Justice Kennedy explained in declining to address whether conspiracy was triable by military commission, "Congress, not the Court, is the branch in the better position to undertake the sensitive task of establishing a principle not inconsistent with the national interest or with

51

international justice." Hamdan, 548 U.S. at 655 (Kennedy, J., concurring in part) (internal quotation marks and citation omitted).

The Hamdan plurality indicated that, *in the absence of legislation* "positively identif[ying] [an offense] as a war crime," the government would be required to "make a substantial showing that the crime for which it seeks to try a defendant by military commission is acknowledged to be an offense against the law of war." 548 U.S. at 601-03. Congress has now twice enacted legislation, which two Presidents have signed into law, identifying the offenses of providing material support to terrorism during an armed conflict, conspiracy to violate the law of war during such a conflict, and soliciting others to violate the law of war as offenses triable by military commission. Its determinations are entitled to substantial deference.

> 2. Terrorism, as a Mode of Warfare, Violates the Law of Nations

There can be little doubt that international law prohibits the commission of acts of terrorism – particularly those directed against innocent civilians – as a mode of warfare. See Hans-Peter Gasser, Acts of Terror, "Terrorism" and International Humanitarian Law, 84 Int'l Rev. of the Red Cross 547, 568 (2002) (noting that the Geneva Conventions and their Protocols, other treaties, and customary international law "prohibit without any exception terrorist acts

52

committed in the course of an international or non-international armed conflict").

Indeed, as recently as last month, former Liberian President Charles Taylor was

criminally convicted by the Special Court for Sierra Leone on eleven counts,

including aiding and abetting and planning the commission of acts of terrorism in

violation of the Geneva Conventions and Additional Protocol II thereto.  See

Prosecutor v. Taylor, Case No. SCSL-03-1-T, Judgement Summary ¶¶ 56-57, 59,

177, 181 (Trial Chamber II Apr. 26, 2012).

International condemnation of the use of terrorism during armed conflict

goes back at least to the conclusion of World War I, when the Allied Nations

condemned Germany and its allied governments for a litany of "violations of the

laws and customs of war," including "the execution of a system of terrorism" that

involved "[m]urders and massacres [of non-combatants] . . . [and] the arbitrary

destruction of public and private property."  Commission of Responsibilities,

Conference of Paris 1919, Violation of the Laws and Customs of War 16-17

(Clarendon Press 1919).  During World War II, the Judge Advocate General of the

U.S. Army included "[s]ystematic terrorism" and "[w]anton destruction of

property" in a published list of war crimes subject to trial by military commission

under the "laws and customs of war."  Foreign Relations of the United States,

53

Diplomatic Papers 1944, H.R. Doc. No. 79-303, pt. 1, vol. 1, at 1267, 1272-73 (1945).

In the wake of World War II, the Geneva Conventions of 1949 expressly prohibited terrorism as a mode of warfare. In particular, Article 33 of the Geneva Convention Relative to the Protection of Civilian Persons in Time of War prohibits all measures of "intimidation *or of terrorism*" against the civilian population in the territory of a party to the conflict. 6 U.S.T. 3516, T.I.A.S. No. 3365 (Aug. 12, 1949) (emphasis added). In enacting the 2006 MCA, Congress properly concluded that terrorism committed as a mode of armed conflict constitutes a "modern-day war crime[]," that is, a "practice[] contrary to the law of nations" that has "the same status as traditional war crimes." H.R. Rep. No. 109-664, pt. 1, at 25 (2006).

Although the prohibitions against terrorism that Congress codified in the 2006 MCA govern the conduct of alien "unlawful enemy combatant[s] . . .engaged in hostilities . . . against the United States," 10 U.S.C. § 948(a) (2006), Congress's determination that terrorism constitutes a practice "contrary to the law of nations," id., is also supported by developments in the international community that extend beyond the context of armed conflict. See, e.g., United States v. Yunis, 924 F.2d 1086, 1091 (D.C. Cir. 1991) (noting that certain acts of terrorism are "recognized

54

by the community of nations as of [such] universal concern" as to enable any

nation obtaining custody over an offender to prosecute him).  Indeed, as the

CMCR observed, in a series of multilateral conventions, the international

community has not only branded as crimes the various means by which acts of

terrorism are carried out, but has also imposed upon the signatory nations an

affirmative obligation to criminalize the proscribed activities under their own

domestic laws.  <u>See</u> 820 F. Supp. 2d at 1195 n.72 (collecting international

terrorism conventions to which the United States is a party).

 Moreover, the United Nations has broadly condemned the acts, methods,

and practices of terrorism as "criminal" acts that are inconsistent with the

international community's most basic principles and values.  For example, the

1994 U.N. Declaration on Measures to Eliminate International Terrorism

condemns "all acts, methods and practices of terrorism, as criminal and

unjustifiable, wherever and by whomever committed," and urges member states

"[t]o ensure the apprehension and prosecution or extradition of perpetrators of

terrorist acts, in accordance with the relevant provisions of their national law."

G.A. Res. 49/60, U.N. Doc. A/RES/49/60, ¶ 5(b) (Dec. 9, 1994).  Consistent with

this general condemnation of terrorism, the U.N. Security Council has specifically

and repeatedly denounced Usama bin Ladin and his associates as terrorists and

emphatically condemned al Qaeda's terrorist attacks as crimes.  <u>See, e.g.</u>, S.C. Res. 1189, U.N. Doc. S/RES/1189 (Aug. 13, 1998) (condemning al Qaeda's attacks on U.S. embassies in Kenya and Tanzania); S.C. Res. 1373, ¶ 2(b), U.N. Doc. S/RES/1373 (Sept. 28, 2001) (condemning the terrorist attacks of September 11, 2001, and terrorism as a crime, and requiring all member states to "[t]ake the necessary steps to prevent the commission of terrorist acts").  Congress thus had ample support for its conclusion that terrorism committed in the context of an armed conflict violates the law of nations, and that al Qaeda's terrorist activities in particular violated principles of international law.

Bahlul argues that terrorism is not universally condemned as an international crime, citing two concurring opinions from <u>Tel-Oren v. Libyan Arab Republic</u>, 726 F.2d 774 (D.C. Cir. 1984).  <u>See</u> <u>id.</u> at 795-96 (opinion of Edwards, J.) (noting a "divergence as to basic norms" whether "terrorism" can constitute a means for accomplishing legitimate political goals); <u>id.</u> at 807 (opinion of Bork, J.) (noting a lack of international consensus in the condemnation of terrorist activity).  But as Judge Robb observed in his concurrence, "[w]hen a case presents broad and novel questions of this sort, courts ought . . . [to] look to Congress and the President" for guidance.  <u>Id.</u> at 827 (opinion of Robb, J.).  Congress has, since the <u>Tel-Oren</u> decision and against the backdrop of the international developments

listed above, afforded precisely that sort of guidance, defining "terrorism" in the context of an armed conflict as an offense triable by military commission and determining that, at least as a mode of warfare, it is universally condemned as a crime.

   3.    Congress Reasonably Determined That Punishing
         the Provision of Material Support to Terrorism,
         Conspiracy, and Solicitation Fulfills Its
         International Responsibilities To Prevent and To
         Punish Terrorism

Although the offenses of conspiracy, solicitation, and providing material support to terrorism have not attained international recognition at this time as offenses under customary international law, Congress's power under the Define and Punish Clause is not narrowly confined to the codification of criminal offenses that have achieved that status. In United States v. Arjona, 120 U.S. 479 (1887), the Supreme Court held that Congress had the authority under the Define and Punish Clause, coupled with the Necessary and Proper Clause, to prohibit counterfeiting the notes or securities of another nation. The Court found that the law of nations recognizes the obligation of one nation to punish those who, within its own jurisdiction, counterfeit the money of another nation. Id. at 483. Given that obligation, the Court found that a prohibition against the counterfeiting of foreign securities was "necessary and proper to afford th[e] protection" against

57

counterfeiting foreign currency as "it is one that is needed to carry into execution a power conferred by the constitution on the government of the United States." Id. at 487.  The Court concluded that, "if the thing made punishable is one which the United States are required by their international obligations to use due diligence to prevent, it is an offense against the law of nations." Id. at 488.[13]

In twice enacting the MCA, Congress decided to criminalize not only acts of terrorism committed during an armed conflict, but also conduct that directly facilitates such acts, conspiracy to engage in such acts, and soliciting others to commit such acts.  As in Arjona, Congress could reasonably have concluded that such prohibitions are "needed to carry into execution" the United States' obligations under international law to exercise "due diligence to prevent" terrorism and violations of the law of war.  See 120 U.S. at 487-88.  Congress reasonably concluded that punishing those who intentionally support terrorism, those who conspire to engage in terrorism, and those who solicit others to engage in terrorism was necessary to prevent terrorist activity, particularly given the

---

[13]   This Court has also recognized that the Define and Punish Clause "authorize[s] Congress to derive from the often broadly phrased principles of international law a more precise code . . . necessary to bring the United States into compliance with rules governing the international community." Finzer, 798 F.2d at 1455.

challenges inherent in identifying and interdicting terrorists.  Cf. Pub. L. No. 104-132, tit. III, § 301(a)(2), 110 Stat. 1247 (1996) (statutory finding, in support of domestic material support statute, that "the Constitution confers upon Congress the power to punish crimes against the law of nations and to carry out the treaty obligations of the United States"); United States v. Lue, 134 F.3d 79, 84 (2d Cir. 1998) (rejecting argument that legislation implementing Hostage Taking Treaty was too broad because the legislation was "plainly adapted" to giving effect to the treaty).

In a series of tribunal decisions, treaties, and other authoritative pronouncements, the international community has made it plain that conduct whose purpose is to bring about war crimes, acts of terrorism, and similar offenses involving attacks on civilian populations cannot be tolerated and will be subject to criminal sanction.  Bahlul's activities on behalf of al Qaeda's terrorist regime fall well within the scope of such prohibitions.

As early as the end of the Second World War, military tribunals administering international law condemned those who knowingly facilitated war crimes as war criminals themselves.  In 1947, for example, a U.S. military tribunal sitting in Nuremberg, Germany, as an "international tribunal" under the mandate of the Allied Control Council convicted Friedrich Flick and Otto Steinbrinck of,

59

among other charges, providing financial support for the illicit activities of the

Nazi S.S. through their membership in the "Himmler Circle of Friends."  The Flick

Trial, 9 L. Rep. Trials of War Criminals 1, 16, 28-29 (1949).  Declaring that it was

"administer[ing] international law," the tribunal in that case explained that the

gravamen of the offense was the provision of financial support to a criminal

organization, the S.S., with knowledge that it was engaged in the commission of

war crimes.  Id. at 16, 28-29.  In rejecting a defense argument that Flick and

Steinbrinck "could not be liable because there had been no statute nor judgment

declaring the S.S. a criminal organization and incriminating those who were

members or in other manner contributed to its support," the tribunal recognized

more than 60 years ago that "[o]ne who knowingly by his influence and money

contributes to the support [of such an organization] must, under settled legal

principles, be deemed to be, if not a principal, certainly an accessory to such

crimes."  Id. at 29.

     Similarly, a British military tribunal sitting in Hamburg, Germany sentenced

to death both the owner of a German chemical firm and his primary deputy who,

"in violation of the laws and usages of war," supplied the gas-producing substance

Zyklon B to the S.S., "well knowing" that it would be used to murder

concentration-camp inmates.  The Zyklon B Case, 1 L. Rep. Trials of War

Criminals 93, 93 (1947).  The prosecution's theory of culpability, which the tribunal accepted, was that to knowingly supply a commodity to a branch of the state using it to commit a war crime also rendered the supplier culpable as a war criminal.  Id. at 93-94, 102-03; see also Trial of Shigeki Motomura, 13 L. Rep. Trials of War Criminals 138, 138 (1949) (reporting a Netherlands East Indies case in which Dutch authorities tried and convicted a naval officer and subordinates in a military court for actions supportive of efforts by Japanese units to terrorize the civilian population and characterizing the actions as "contrary to the laws and customs of war").

Several international agreements lend further support to Congress's determination that not only terrorists, but also those who knowingly facilitate acts of terrorism in the context of armed conflict, are engaged in criminal conduct that has been condemned by the international community.  For example, Article 2.1 of the 1997 Terrorist Bombing Convention[14] makes it an offense for any person unlawfully and intentionally to deliver, place, discharge or detonate an explosive or other lethal device, in or against a place of public use, with the intent to cause death or serious bodily injury.  Article 2.3(c) of the Convention further provides

---

[14] International Convention for the Suppression of Terrorist Bombings, Dec. 15, 1997, 2149 U.N.T.S. 284, 37 I.L.M. 249 (entered into force May 23, 2001).

that a "person also commits an offence" if that person

> [i]n any . . . way contributes to the commission of one or more
> offences . . . by a group of persons acting with a common purpose . . .
> [if] such contribution shall be intentional and either be made with the
> aim of furthering the general criminal activity or purpose of the group
> or . . . made in the knowledge of the intention of the group to commit
> the offence or offences concerned.

See also International Convention for the Suppression of the Financing of

Terrorism, Dec. 9, 1999, 2178 U.N.T.S. 197, 39 I.L.M. 270, art. 2.1 (entered into

force Apr. 10, 2002) (defining the provision of financing to terrorists as an

offense); U.N. Security Council Resolution 1373, ¶ 2(e) (imposing on all member

states the responsibility to "[e]nsure that any person who participates . . . in

supporting terrorist acts [be] brought to justice and ensure that . . . such terrorist

acts are established as serious criminal offences in domestic laws").  These

sources of international law provided Congress with an ample basis under the

Define and Punish Clause to conclude that providing material support to terrorism,

conspiracy to commit terrorism, and solicitation to commit terrorism, in the

context of armed conflict, bear a sufficiently close relationship to terrorism itself

so as to constitute offenses triable by military commission.[15]

_____

[15] While the choice of forum here is not governed by international law, as a
matter of U.S. municipal law, custom, and practice, such an offense is properly
triable by military commission when committed by an unlawful belligerent in the
context of armed conflict against the United States.  See Quirin, 317 U.S. at 38-40.

62

Congress's decision to punish conspiracy and solicitation likewise draws historical support from the Nuremberg Tribunals. The International Military Tribunal ("IMT") convicted Nazi propagandist Julius Streicher of conspiracy to commit crimes against humanity and sentenced him to death. As publisher of the anti-Semitic newspaper, <u>Der Sturmer</u>, Streicher had disseminated articles demanding the annihilation and extermination of the Jewish population. The Tribunal held that "Streicher's incitement to murder and extermination at the time when Jews in the East were being killed under the most horrible conditions clearly constitutes persecution on political and racial grounds in connection with War Crimes as defined by the [Tribunal's] Charter." 1 <u>Trial of the Major War Criminals Before the International Military Tribunal</u> 303, 304 (1947).

Bahlul contends that the Streicher decision lacks precedential value to support his convictions because both Streicher and his subordinate were acquitted of conspiring to wage an aggressive war. Bahlul maintains that, as a consequence of the "acquittals of aggression," the CMCR erred in relying on the Streicher decision to affirm Bahlul's conviction for "solicitation to commit aggressive war." Pet. Br. 22. But Bahlul was not convicted of "solicitation to commit aggressive war." He was convicted of soliciting others, *inter alia*, to commit "Murder of Protected Persons" and "Murder in Violation of the Law of War." 820 F. Supp. 2d

63

at 1222.  Moreover, the acquittals of Streicher and his subordinate on the

aggressive war count were based on the fact that they were not within Hitler's

inner circle of advisors, were not present when Hitler explained his decisions to

wage aggressive war, and "there [was] no evidence to prove that [Streicher] had

knowledge of those policies."  1 <u>Trial of the Major War Criminals Before the</u>

<u>International Military Tribunal</u> 302; 22 <u>Trial of the Major War Criminals Before</u>

<u>the International Military Tribunal</u> 584-85 (1948) (acquittal of subordinate).  The

same cannot be said of Bahlul, who was at the center of al Qaeda's leadership in

his role as bin Ladin's propaganda minister, knew of bin Ladin's pronouncements

declaring war on the United States, and disseminated al Qaeda propaganda to

potential recruits.  <u>See, e.g.</u>, Tr. 516-19; Prosecution Ex. 33A (minutes of meetings

attended by Bahlul and high-level al Qaeda operatives).

        Given the international precedents and agreements discussed above,

Congress was well within its power to conclude that criminalizing material

support for terrorism, conspiracy to commit terrorist acts, and solicitation to

commit terrorist acts, in the context of armed conflict, was necessary and proper to

prevent and punish the use of terrorism as a means of armed conflict, which is

universally condemned as a violation of the law of nations.

C.    The Purported Constitutional "Problems" Cited by Bahlul Pose
       No Bar to Affirmance of His Convictions

Bahlul argues that "[t]he CMCR's narrow reading of the [MCA] forces

avoidable Constitutional problems," Pet. Br. 37, namely, that "Congress would

have exceed [sic] its Define & Punish Clause power;" that the trial by military

commission "would unconstitutionally circumvent the federal courts' Article III

jurisdiction;" and that the "charges in this case would violate the *Ex Post Facto*

Clause." Id. at 38-40.  While it is not entirely clear what is meant by the "narrow

reading" of the MCA (which is described in the next sentence as an "expansive

presumption"), none of the constitutional issues raised by Bahlul presents any bar

to this Court affirming his convictions.

It is noteworthy that Bahlul raises these constitutional issues in the guise of

a "canon of construction" rather than as direct constitutional claims.  This is likely

because these arguments were forfeited below.  Bahlul did not raise any of these

issues in the trial court.  See Tr. 85 (waiving pretrial motions).  Even in his

opening brief before the CMCR, Bahlul declined to raise any of these issues

except the argument that his material support conviction (but not his conspiracy or

solicitation convictions) violated the Ex Post Facto Clause.  See Brief on Behalf of

Appellant (CMCR Sept. 1, 2009).  But even apart from forfeiture, these

constitutional arguments have no merit.

65

The first purported problem – that Congress "would have exceed[ed] its Define [and] Punish power" – is not a problem for the reasons described above. Congress acted well within its power pursuant to the Define and Punish Clause in conjunction with the Necessary and Proper Clause. See supra Part I.B. In any event, Congress was not limited to its Define and Punish power in enacting the MCA, as its war powers also permit it to make these long-standing violations of the U.S. common law of war triable by military commission. See supra Part I.A.

Article III is similarly no bar to this Court's affirmance of Bahlul's convictions. As the Quirin Court explained, "it was not the purpose or effect of § 2 of Article III, read in the light of the common law, to enlarge the then existing right to a jury trial," but rather "[t]he object was to preserve unimpaired trial by jury in all those cases in which it had been recognized by the common law." 317 U.S. at 39. Thus, "§ 2 of Article III and the Fifth and Sixth Amendments cannot be taken to have extended the right to demand a jury to trials by military commission, or to have required that offenses against the law of war not triable by jury at common law be tried only in the civil courts." Id. at 40. Bahlul's offenses of conviction are no more crimes to which the right to a jury attached at common law than the offenses at issue in Quirin – sabotage, spying, aiding the enemy, and conspiracy.

66

Finally, Bahlul's convictions present no problem under the Ex Post Facto Clause.[16]  The crimes for which Bahlul was convicted are traditional common law crimes, and "[t]he common law, in short, presupposes a measure of evolution that is incompatible with stringent application of *ex post facto* principles."  <u>Rogers v. Tennessee</u>, 532 U.S. 451, 461 (2001); <u>cf.</u> Trial of Altstötter, 6 L. Rep. Trials of War Criminals 1, 41 (1948) ("To have attempted to apply the *ex post facto* principle to judicial decisions of common international law would have been to strangle that law at birth."); <u>see also</u> <u>id.</u> at 43 ("As applied in the field of international law that principle requires proof before conviction that the accused knew or should have known . . . that he would be subject to punishment if caught.").  Moreover, "[f]air warning does not require that the defendants understand that they could be subject to criminal prosecution *in the United States* so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere."  <u>United States v. Al-Kassar</u>, 660 F.3d 108, 119 (2d Cir. 2011), <u>cert. denied</u>, No. 11-784 (May 14, 2012).

---

[16]  The Supreme Court has described the Ex Post Facto Clause as a structural limitation on Congress's power, <u>Downes v. Bidwell</u>, 182 U.S. 244, 277 (1901), and Congress incorporated ex post facto principles into the terms of the MCA itself, <u>see</u> 10 U.S.C. § 950p(b) (2006).

Bahlul could have no claim under any application of ex post facto principles because the conduct for which he was convicted – conspiring to, *inter alia*, murder civilians, providing material support to terrorism, and soliciting others to violate the laws of war – has long been considered criminal and thus was not "*innocent when done.*" Collins v. Youngblood, 497 U.S. 37, 42 (1990).

Bahlul's actions and statements confirm that he knew that he was involved in criminal activity. For example, Bahlul knowingly typed the martyrdom wills of 9/11 hijacker-pilots Atta and Jarrah for use in conjunction with a suicidal terrorist attack. See Tr. 554. Bahlul later expressed, in writing, his pride in having played a role in the attacks, but also his regret that he had not been able to play an even greater role in the September 11 attacks. See Prosecution Ex. 15; Tr. 550-53. And Bahlul repeatedly boasted of the ongoing campaign by al Qaeda to kill Americans, notably singling out as targets civilians in general and women and children in particular. See, e.g., Tr. 512. Bahlul's conduct was "self-evidently criminal." Al-Kassar, 660 F.3d at 119.

Bahlul maintains (Pet. Br. 30-31) that the CMCR affirmed his convictions on the basis of "analogies," none of which would have placed him on notice that he could be convicted of offenses based on inchoate liability. But, as described above, our own nation's common law of war has long recognized the offenses of

68

providing aid to unprivileged belligerents, conspiring to commit violations of the

law of war, and soliciting law-of-war violations as offenses triable by military

commission.  Indeed, as CMCR Judge Sims observed in his concurring opinion

below, our nation's long-standing practice with respect to the offenses for which

Bahlul was convicted "serves as persuasive evidence of the view of the United

States as to the state of the law of armed conflict. . . .  Accordingly, when a person

. . . chooses to commit [such] acts against the United States, he or she should not

be surprised to find themselves [sic] in the custody of the United States military

facing trial by military commission for these long-standing violations of the law of

war."  820 F. Supp. 2d at 1265.

## II.    BAHLUL'S CONVICTIONS DO NOT VIOLATE THE FIRST AMENDMENT

### A.    Standard of Review

While the question whether a conviction violates the First Amendment is a

question of law that would normally be reviewed *de novo*, because Bahlul did not

raise this issue before the trial court, it is forfeited.  See, e.g., United States v.

Olano, 507 U.S. 725, 731 (1993).  As such, this Court reviews only for "plain

error" and may reverse or vacate the convictions only if "there is (1) 'error' that is

(2) 'plain,' (3) 'affects substantial rights' of the parties, and (4) 'seriously affect[s]

the fairness, integrity or public reputation of judicial proceedings.'"  Salazar v.

69

District of Columbia, 602 F.3d 431, 437 (D.C. Cir. 2010) (quoting Olano, 507

U.S. at 732).

B.    Argument

Bahlul's contention that he was convicted solely for making a film and that

this violates his First Amendment rights suffers from two fatal flaws:  Bahlul was

not convicted simply for making the *Cole* video, and, in any event, the making of

the video was not protected from prosecution by the First Amendment.

1.    Bahlul Was Not Convicted "On the Basis of Political
      Advocacy"

Bahlul's First Amendment argument relies on a mischaracterization of the

trial record: He was not convicted simply for making a video, nor was he

convicted for having offensive beliefs.  He was convicted for conspiring with bin

Laden and others to, *inter alia*, murder protected persons, attack civilians, and

commit terrorism; for soliciting acts of terrorism; and for materially supporting

terrorism through ten separately proved categories of conduct, only one of which

was "prepar[ing] and assist[ing] in the preparation of various propaganda

products, including the video 'The Destruction of the American Destroyer U.S.S.

Cole,' to solicit material support for al Qaeda."  App. Ex. 59; App. Ex. 74.

Moreover, the evidence supporting these convictions consisted of much more than

the *Cole* video.

Bahlul swore bayat, a loyalty oath, to bin Laden and al Qaeda with full knowledge that he was pledging to support al Qaeda's goals of engaging in terrorism and killing Americans.  Tr. 510-12.  He maintained al Qaeda's video and audio library.  Tr. 513.  He did research for bin Laden's statements.  Id.  And he served as media secretary to bin Laden, running what Bahlul would later call "the master ministry."  Tr. 195.  By his own admission – or more accurately, by his own boast – he also played a role in "the 9/11 events."  Prosecution Ex. 15.

Contrary to the impression left by his brief to this Court, Bahlul was not a mere purveyor of offensive ideas.  Indeed, as Bahlul told the commission, "as a media man in al Qaeda, we actually take the words into action."  Tr. 979.  Bahlul even condemned journalists who criticize the United States but do not act against it, calling them "liar[s]."  Id.  Bahlul's actions, not his beliefs, formed the basis of his convictions for conspiracy, solicitation, and material support for terrorism.

> 2.  <u>An Alien Unprivileged Belligerent's Production of an Al Qaeda Video Soliciting Acts of Terrorism Is Not Protected from Prosecution by the First Amendment</u>

Given Bahlul's overall course of conduct in support of al Qaeda, his act of creating the *Cole* video is not protected from prosecution by the First Amendment for at least three independent reasons: (1) an alien engaged in war against the United States from abroad is not entitled to First Amendment protection for his

conduct; (2) services to or in conjunction with a foreign terrorist organization, even those that consist of speech, may be punished consistently with the First Amendment; and (3) speech that constitutes unlawful conduct, such as solicitation of criminal conduct, is similarly not protected.

a.    An Alien Unprivileged Belligerent Engaged in Warfare Against the United States Cannot Invoke the First Amendment To Preclude Prosecution for Law-of-War Violations

At the time he made the *Cole* video, Bahlul was a non-resident alien overseas engaged in warfare against the United States who otherwise had no substantial voluntary connection to the United States.  He therefore enjoyed no First Amendment rights, and the making of the *Cole* video was not a constitutionally protected act.[17]

The Supreme Court has consistently held that non-resident aliens abroad with no substantial voluntary connection to the United States – and particularly those aliens engaged in warfare against the United States – do not enjoy First Amendment protection.  United States ex rel. Turner v. Williams, 194 U.S. 279,

---

[17]  Bahlul's contention that he enjoys certain speech rights while incarcerated at Guantanamo Bay, either via the First Amendment or a bilateral treaty with Yemen (Pet. Br. 48-49), is irrelevant as he neither claims that he was prohibited from speaking at his trial nor that he was convicted on the basis of conduct he engaged in while in U.S. custody.

292 (1904) (an unadmitted alien is not "one of the people to whom [First Amendment rights] are secured"); see also United States v. Verdugo-Urquidez, 494 U.S. 259, 265 (1990) (citing Turner for the proposition that an "[e]xcludable alien is not entitled to First Amendment rights"); Kleindienst v. Mandel, 408 U.S. 753, 762 (1972) (citing Turner and holding that a Belgian communist could be excluded from United States). Indeed, this Court has noted that Turner and Kleindienst are "strong" but not exhaustive examples of "the principle that aliens beyond the territorial jurisdiction of the United States are generally unable to claim the protections of the First Amendment" and that "the Supreme Court has never limited its absolute wording of the principle that nonresident aliens are without First Amendment rights." DKT Mem'l Fund Ltd. v. Agency for Int'l Dev., 887 F.2d 275, 284 (D.C. Cir. 1989). To the extent any limitation develops to this categorical rule, it would certainly not provide First Amendment protection to an act undertaken by an enemy alien overseas as part of an armed conflict against the United States. See Johnson v. Eisentrager, 339 U.S. 763, 784 (1950) (rejecting the idea that "freedoms of speech, press, and assembly as in the First Amendment" might be accorded to "irreconcilable enemy elements, guerrilla fighters, and 'were-wolves'"); cf. Chandler v. United States, 171 F.2d 921, 939 (1st Cir. 1948)

73

(affirming conviction of treason of U.S. citizen who, as an employee of the German government, broadcast German propaganda during World War II).

The cases relied on by Bahlul (Pet. Br. 46) are not to the contrary. In Lamont v. Postmaster General, 381 U.S. 301 (1965), the Supreme Court addressed a statute requiring American citizens to fill out an official form if they wanted to receive foreign communist "propaganda" addressed to them, and struck it down "on the narrow ground that the addressee in order to receive his mail must request in writing that it be delivered," and that such an "affirmative obligation" on an American citizen wishing to receive his mail violates the First Amendment. Id. at 307. In Meese v. Keene, 481 U.S. 465 (1987), the Court upheld a statutory provision requiring certain materials to be labeled as "foreign political propaganda." Neither of these cases controls here, where the government is not impeding American citizens' access to protected materials, and neither of these cases suggests that an alien engaged in war against the United States and operating abroad has First Amendment rights, since both concerned rights asserted by U.S. citizens to receive information.

Moreover, the First Amendment rule that Bahlul advocates, namely that an act engaged in by an alien enemy overseas with no substantial connection to the United States is subject to First Amendment protection, is not only contrary to

74

Supreme Court precedent, but would greatly undermine national security.  Indeed, if Bahlul has a First Amendment right to prepare a recruiting video for al Qaeda, then any enemy army would presumably have the right to broadcast propaganda, and the United States would be constitutionally barred from disrupting the signal or attacking the broadcast tower.  Bahlul claims that he is not "asserting a Constitutional right of action from abroad" or "suing to claim rights on a battlefield" (Pet. Br. 47), but that is precisely what he is doing.  He is claiming that making a video for al Qaeda intended to recruit terrorists and to encourage acts of terrorism was a First Amendment protected act for which he cannot now be punished.  If it was a protected act, then he has established a novel constitutional right for alien enemy belligerents; if it was not a protected act, then he may be prosecuted for it (although, in fact, he was prosecuted for much more).  The First Amendment does not protect alien enemies abroad who are at war with the United States, and thus the making of the *Cole* video was not an act immunized from prosecution by the Constitution.

b.    <u>The First Amendment Does Not Shield from Punishment Those Who Provide Recruitment Services as Part of a Foreign Terrorist Organization</u>

Even if Bahlul had First Amendment rights – indeed, even if he were a United States citizen – he would have no constitutional right to prepare a recruiting video for al Qaeda, as the First Amendment does not prevent the government from punishing the provision of services (speech-related or otherwise) under the direction of or in coordination with a foreign terrorist organization. <u>Holder v. Humanitarian Law Project</u>  ("<u>HLP</u>"), 130 S. Ct. 2705 (2010).

In <u>HLP</u>, American citizen plaintiffs asserted a First Amendment right to provide certain forms of speech-related material support for the non-violent activities of two foreign groups that had been designated as foreign terrorist organizations.  <u>See</u> 130 S. Ct. at 2729.  The Supreme Court rejected the citizens' challenge to the domestic material support statute, holding that Congress's decision to criminalize the provision of material support for foreign terrorist organizations satisfied strict scrutiny review under the First Amendment given the "sensitive and weighty interests of national security and foreign affairs" implicated by foreign terrorist organizations.  <u>Id.</u> at 2727; <u>see also</u> <u>id.</u> at 2723 (describing the narrow category of speech covered by the statute as that speech undertaken "under

76

the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations"); cf. Haig v. Agee, 453 U.S. 280, 308-09 (1981) ("Agee's disclosures, among other things, have the declared purpose of obstructing intelligence operations and the recruiting of intelligence personnel. They are clearly not protected by the Constitution.  The mere fact that Agee is also engaged in criticism of the Government does not render his conduct beyond the reach of the law.").

If the government can punish an American citizen for providing non-violent advocacy training to a foreign terrorist organization, it can certainly punish Bahlul for creating a recruiting video not only in coordination with, but as the top-ranking media official of, al Qaeda.  Indeed, it is telling that, while his initial brief before the CMCR, filed before the Supreme Court's ruling in HLP, made a First Amendment argument, after HLP was decided Bahlul filed a supplemental brief in which he was "compelled to concede" this argument, except to maintain a claim that the trial judge should have given more "guidance" to the jury.  Supp. Br. on Holder v. Humanitarian Law Project 2 (CMCR July 2, 2010).  The HLP decision forecloses any argument that Bahlul's creation of the *Cole* video for al Qaeda is constitutionally protected from punishment.

77

c.    Speech that Constitutes Criminal Activity Such as
Solicitation to Commit a Crime Does Not Enjoy
First Amendment Protection

Finally, it is well established that speech that constitutes the operative

language of solicitation of criminal activity is not protected by the First

Amendment.  See, e.g., United States v. Stevens, 130 S. Ct. 1577, 1584 (2010)

(punishing "speech integral to criminal conduct" does not "raise any

Constitutional problem") (citation omitted); United States v. White, 610 F.3d 956,

960 (7th Cir. 2010); United States v. Rahman, 189 F.3d 88, 117 (2d Cir. 1999);

Rice v. Paladin Enters., Inc., 128 F.3d 233, 248 (4th Cir. 1997).

Bahlul relies heavily on Brandenberg v. Ohio, 395 U.S. 444 (1969), but

Brandenberg did not involve solicitation of a crime, conspiracy, or material

support, nor does its reasoning suggest the infirmity of these crimes.  The Court in

Brandenberg struck down as facially invalid the Ohio Criminal Syndicalism

statute, which prohibited "'advocat[ing] . . . the duty, necessity, or propriety of

crime, sabotage, violence, or unlawful methods of terrorism as a means of

accomplishing industrial or political reform'" and "'voluntarily assembl[ing] with

any society, group, or assemblage of persons formed to teach or advocate the

doctrines of criminal syndicalism.'"  Id. at 444-45 (alterations in original) (quoting

then-existing provision of Ohio Revised Code).  The Court held that the

78

government may not broadly proscribe advocacy of criminal activity but may bar "advocacy [that] is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." Id. at 447.

Bahlul was not convicted of violating a statute prohibiting advocacy of crimes, nor was his conduct limited to advancing the propriety of crime. Cf. HLP, 130 S. Ct. at 2723 ("Congress has prohibited 'material support,' which most often does not take the form of speech at all."). He was convicted of conspiracy, solicitation, and material support for terrorism, none of which is constitutionally protected. The fact that his conduct may have contained some speech does not immunize otherwise criminal conduct. See, e.g., United States v. El-Mezain, 664 F.3d 467 (5th Cir. 2011) (defendant properly convicted for participation in musical and dramatic performances where he had the specific intent that the performances would raise funds for Hamas); United States v. Stewart, 590 F.3d 93, 115-16 (2d Cir. 2009) (defendant properly convicted for disseminating a fatwah that the jury found to be a "call to arms"); Rahman, 189 F.3d at 117 (defendant properly convicted based on speeches that solicited attacks on U.S. military installations and the murder of Hosni Mubarak).

3.    Neither the Prosecution's Argument Nor the Trial
Court's Instructions to the Jury Constituted Plain Error

Bahlul contends that "the prosecutor's arguments . . . were about a film."

Pet. Br. 43.  But in fact, the prosecutor's discussion of the video (to which Bahlul

did not object) was relevant and appropriate and formed only a piece of the closing

argument, which also focused on the 9/11 martyr wills that Bahlul typed, the

statements Bahlul himself made about his conduct, and the journal he kept while

serving as part of al Qaeda, which (among other things) contained minutes of al

Qaeda leadership meetings.  See Tr. 882-94.  Similarly, the trial court's lengthy

jury instructions, which set forth all of the required elements and repeatedly

instructed that any conviction could only be based on proof of each element

beyond a reasonable doubt, Tr. 842-80, were proper and adequate.  Contrary to

Bahlul's argument (Pet. Br. 52), it was entirely appropriate to include

"propaganda" in the instructions as a type of material support, since speech-related

services to a foreign terrorist organization can constitute material support.  See

HLP, 130 S. Ct. at 2728-30.

Moreover, Bahlul did not object to either the prosecutor's argument or the

trial judge's instructions, nor did he ask for any additional or different instructions,

and thus any challenge is reviewed only for plain error.  There was no error, let

alone the type of "obvious" and prejudicial error that would be necessary for

Bahlul to prevail on plain-error review.  See, e.g., United States v. Young, 470

U.S. 1, 15 (1985) ("[T]he plain-error exception to the contemporaneous-objection

rule is to be used sparingly, solely in those circumstances in which a miscarriage

of justice would otherwise result.") (internal quotation marks and citation

omitted).  Given that Bahlul admits to virtually all of the factual allegations

underlying his convictions, he "cannot show the outcome of the trial would likely

have been different if the trial court had corrected the purported error," foreclosing

any contention that the prosecutor's argument or the jury instructions were

prejudicial under plain-error review.  United States v. Morton, 391 F.3d 274, 277

(D.C. Cir. 2004).

III.  SUBJECTING ONLY ALIEN UNLAWFUL ENEMY
      BELLIGERENTS TO TRIAL BY MILITARY COMMISSION
      DOES NOT VIOLATE THE EQUAL PROTECTION COMPONENT
      OF THE DUE PROCESS CLAUSE

      A.  Standard of Review

      While the question whether the jurisdictional provisions of the MCA violate

the equal protection component of the Fifth Amendment's Due Process Clause is a

question of law that would normally be subject to *de novo* review, because Bahlul

did not raise this claim in the trial court, see, e.g., Tr. 85 ("[t]he defense waives all

pretrial motions of any kind"), it is forfeited.  <u>Olano</u>, 507 U.S. at 731.  This Court

therefore may reverse only on plain-error review.  <u>Salazar</u>, 602 F.3d at 437.

    B.    <u>Argument</u>

Bahlul's initial hurdle in bringing an equal protection challenge under the

Fifth Amendment's Due Process Clause is this Court's determination, in several

habeas cases involving alien enemy belligerents challenging their detention under

the AUMF, that "detainees [at Guantanamo Bay] possess no constitutional due

process rights."  <u>Al-Madhwani v. Obama</u>, 642 F.3d 1071, 1077 (D.C. Cir. 2011)

(brackets in original) (citation omitted), <u>petition for cert. pending</u>, No. 11-7020

(filed Oct. 24, 2011); <u>accord</u> <u>Rasul v. Myers</u>, 563 F.3d 527, 531 (D.C. Cir. 2009).

This Court has not specifically addressed whether Fifth Amendment rights apply

in the context of military commission proceedings against aliens detained at

Guantanamo Bay.

Assuming, *arguendo*, that the equal protection component of the Due

Process Clause applies to military commission proceedings against aliens held at

Guantanamo Bay, Bahlul's equal protection argument fails on the merits.  Section

948c of the 2006 MCA limits the jurisdiction of military commissions under that

statute to the enumerated law-of-war violations committed by "[a]ny alien

unlawful enemy combatant." 10 U.S.C. § 948c (2006).  Bahlul claims (Pet. Br. 54-

58) that the equal protection component of the Due Process Clause forbids

Congress from subjecting aliens but not citizens to military commission

proceedings, but the caselaw makes clear that, particularly in the context of an

armed conflict, Congress may differentiate between citizens and aliens without

offending equal protection guarantees so long as a rational basis exists for doing

so.

Congressional policies regarding the treatment of aliens are entitled to a

great deal of deference.  See, e.g., Nyquist v. Mauclet, 432 U.S. 1, 7 n.8 (1977).

As the Supreme Court observed in Mathews v. Diaz:

> [A]ny policy toward aliens is vitally and intricately interwoven
> with contemporaneous policies in regard to the conduct of
> foreign relations, *the war power*, and the maintenance of a
> republican form of government.  Such matters are so
> exclusively entrusted to the political branches of government as
> to be largely immune from judicial inquiry or interference.

 426 U.S. 67, 81 n.17 (1976) (emphasis added; internal quotation marks and

citations omitted);[18] see also Eisentrager, 339 U.S. at 769 (holding that "our law

_____

[18]  Contrary to Bahlul's assertion that Matthews v. Diaz holds that "rational
basis review is only appropriate for alienage distinctions made in matters of
immigration and naturalization, federal benefits, and government employment,"
Pet. Br. 54, that case nowhere states such a limitation and indeed refers to "[a]ny
policy toward aliens."  426 U.S. at 81 n.17.  Ambach v. Norwich, 441 U.S. 68
(1979), which found that a state may discriminate against aliens when hiring
teachers, similarly contains no such holding and, in any event, is irrelevant to the
federal government's power concerning aliens which, as described below, is

does not abolish inherent distinctions recognized throughout the civilized world between citizens and aliens, nor between aliens of friendly and of enemy allegiance").  Legislatively-enacted distinctions between citizens and aliens "do not violate equal protection so long as they are rationally related to a legitimate government interest."  United States v. Ferreira, 275 F.3d 1020, 1025-26 (11th Cir. 2001); see also United States v. Lue, 134 F.3d at 87; Narenji v. Civiletti, 617 F.2d 745, 748 (D.C. Cir. 1979); Heller v. Doe, 509 U.S. 312, 320 (1993) (requiring only "a rational relationship between the disparity of treatment and some legitimate governmental purpose," which the legislature "need not actually articulate" to support its classification) (internal quotation marks and citations omitted). Moreover, in an equal protection challenge by an alien to national security legislation, it is error for a court "to evaluate the policy reasons upon which the [legislation] is based," as the political branches, rather than the courts, are vested with the foreign affairs powers on which alienage-based distinctions are made. Narenji, 617 F.2d at 748.

Bahlul relies on Graham v. Richardson, 403 U.S. 365 (1971), to argue that statutory distinctions based on alienage must generally be subject to review under a strict scrutiny standard.  See Pet. Br. 54.  But Graham addressed the entirely

---

substantially broader than that of the states.

84

different question of the protection of aliens against state laws pursuant to the Equal Protection Clause of the Fourteenth Amendment.  See 403 U.S. at 372.  As the court of appeals explained in Ferreira, 275 F.3d at 1025, classifications based on alienage are subject to a strict scrutiny standard when enacted by a state, but not when enacted by the federal government.  Legislation enacted by Congress that distinguishes between citizens and aliens is governed by the rational basis test because the express constitutional powers granted to Congress permit it to make such distinctions.  Id.

As the Ferriera court explained, rational basis review entails a two-step inquiry.  The reviewing court first identifies a legitimate governmental purpose that Congress "could have been pursuing" when it enacted the challenged legislation.  275 F.3d at 1026 (citation omitted).  The reviewing court then asks "whether a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose."[19]  Id.

Like the treatment of aliens under the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 et seq., see United States v. Duggan, 743 F.2d 59, 75-76 (2d Cir.

---

[19]  Bahlul fails to cite this applicable standard, relying erroneously on Judulang v. Holder, 132 S. Ct. 476 (2011).  See Pet. Br. 57.  But Judulang is not an equal protection case – it is a case applying "ordinary principles of administrative law" in the review of an agency policy.  132 S. Ct. at 490.

1984), the treatment of alien enemy belligerents under the MCA easily survives rational basis scrutiny. Congress had a vital national security interest in establishing a military forum in which to bring to justice foreign unlawful belligerents whose purpose it is to terrorize innocent U.S. citizens and to murder U.S. military personnel, and Congress chose to do so in a way that does not necessitate admitting such aliens into the United States. Moreover, the MCA reflects the long-standing assumption that, in time of armed conflict, enemy aliens are, of necessity, subject to a different legal regime than citizens. See Harisiades v. Shaughnessy, 342 U.S. 580, 587 (1952) ("[w]ar, of course, is the most usual occasion for extensive resort to the power" to treat aliens differently); Eisentrager, 339 U.S. at 771 ("It is war that exposes the relative vulnerability of the alien's status."); Al-Bihani v. Obama, 590 F.3d 866, 877 n.3 (D.C. Cir. 2010) (noting that "the procedures to which Americans are entitled are likely greater than the procedures to which non-citizens seized abroad during the war on terror are entitled"), cert. denied, 131 S. Ct. 1814 (2011).

Bahlul cites Hamdan for the proposition that "[i]n all previous conflicts, 'the principle of procedural parity was espoused as a background assumption.'" Pet. Br. 57 (quoting Hamdan, 548 U.S. at 617). The "procedural parity" to which the Hamdan Court was referring was not, as Bahlul strongly implies, trying both

citizens and aliens in civilian courts.  Rather, the procedural parity was between

the procedures applied to our soldiers in courts-martial and the procedures applied

to enemy belligerents in military commissions.  See 548 U.S. at 617.  The

procedural protections under the MCA (unlike the ones criticized in Hamdan) are

very similar to those available in courts-martial.  While there are differences,

Bahlul does not claim that any such differences prejudiced him, and it is difficult

to see how they could have, given that he admits to virtually all of the factual

allegations against him and does not contest that each of the elements of each of

the charges was proven.  Pet. Br. 24.

87

## CONCLUSION

Al Bahlul's convictions should be affirmed.

Respectfully submitted,

MARK S. MARTINS                     LISA O. MONACO
 Brigadier General, U.S. Army        Assistant Attorney General
 Chief Prosecutor                    for National Security
                                    J. BRADFORD WIEGMANN
EDWARD S. WHITE                      Deputy Assistant Attorney General
 Captain, JAGC, U.S. Navy           STEVEN M. DUNNE
 Appellate Counsel                   Chief, Appellate Unit
                                    JOHN F. DE PUE
FRANCIS A. GILLIGAN                 JEFFREY M. SMITH
 Appellate Counsel                   Attorneys
 Office of the Prosecutor for        National Security Division
 Military Commissions                U.S. Department of Justice

88

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), and with this Court's Order dated March 30, 2012, granting respondent's consent motion for leave to file an oversized brief, because:

> this brief contains 19,822 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportionally spaced typeface using WordPerfect Version 12 in 14 point font size and Times New Roman type style.

DATED: May 16, 2012

_____/s/John F. De Pue_____
John F. De Pue
Attorney for Respondent

89

<u>CERTIFICATE OF SERVICE</u>

U.S. Court of Appeals Docket Number 11-1324

I hereby certify that I electronically filed the foregoing Brief for the United States with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on May 16, 2012.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED: May 16, 2012                    ____/s/John F. De Pue____
                                       John F. De Pue
                                       Attorney for Respondent

# STATUTORY ADDENDUM

## CONTENTS

Military Commissions Act of 2006, Pub. L. No. 109-366,
120 Stat. 2600 (Oct. 17, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3a

    § 948a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3a

    § 948c. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3a

    § 950p. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3a

    § 950u. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3a

    § 950v(b)(24). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4a

    § 950v(b)(25). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4a

    § 950v(b)(26). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4a

    § 950v(b)(27). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5a

    § 950v(b)(28). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5a

Military Commissions Act of 2009, Pub. L. No. 111-84, div. A, tit. XVIII,
123 Stat. 2574 (Oct. 28, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6a

    § 950c(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6a

    § 950f. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6a

    § 950g(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7a

    § 950p(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7a

    § 950t(25). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8a

§ 950t(26). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8a

§ 950t(27). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8a

§ 950t(29). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8a

§ 950t(30). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9a

10 U.S.C. § 904 (UCMJ art. 104). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10a

18 U.S.C. § 2339A (2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10a

**Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (Oct. 17, 2006)**

### § 948a. Definitions

In this chapter:

   (1) UNLAWFUL ENEMY COMBATANT.-(A) The term "unlawful enemy combatant" means-

      (i) a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces); or

      (ii) a person who, before, on, or after the date of the enactment of the Military Commissions Act of 2006, has been determined to be an unlawful enemy combatant by a Combatant Status Review Tribunal or another competent tribunal established under the authority of the President or the Secretary of Defense.

### § 948c. Persons subject to military commissions

Any alien unlawful enemy combatant is subject to trial by military commission under this chapter.

### § 950p. Statement of substantive offenses

   (a) PURPOSE.-The provisions of this subchapter codify offenses that have traditionally been triable by military commissions. This chapter does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission.

   (b) EFFECT.-Because the provisions of this subchapter (including provisions that incorporate definitions in other provisions of law) are declarative of existing law, they do not preclude trial for crimes that occurred before the date of the enactment of this chapter.

### § 950u. Solicitation

Any person subject to this chapter who solicits or advises another or others to commit one or more substantive offenses triable by military commission under this

chapter shall, if the offense solicited or advised is attempted or committed, be punished with the punishment provided for the commission of the offense, but, if the offense solicited or advised is not committed or attempted, he shall be punished as a military commission under this chapter may direct.

## § 950v. Crimes triable by military commissions

. . .

(b) OFFENSES.-The following offenses shall be triable by military commission under this chapter at any time without limitation:

. . .

(24) TERRORISM.-Any person subject to this chapter who intentionally kills or inflicts great bodily harm on one or more protected persons, or intentionally engages in an act that evinces a wanton disregard for human life, in a manner calculated to influence or affect the conduct of government or civilian population by intimidation or coercion, or to retaliate against government conduct, shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

(25) PROVIDING MATERIAL SUPPORT FOR TERRORISM.-

(A) OFFENSE.-Any person subject to this chapter who provides material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, an act of terrorism (as set forth in paragraph (24)), or who intentionally provides material support or resources to an international terrorist organization engaged in hostilities against the United States, knowing that such organization has engaged or engages in terrorism (as so set forth), shall be punished as a military commission under this chapter may direct.

(B) MATERIAL SUPPORT OR RESOURCES DEFINED.- In this paragraph, the term "material support or resources" has the meaning given that term in section 2339A(b) of title 18.

(26) WRONGFULLY AIDING THE ENEMY.-Any person subject to this chapter who, in breach of an allegiance or duty to the United States, knowingly and intentionally aids an enemy of the United States, or one of the co-belligerents

4a

of the enemy, shall be punished as a military commission under this chapter may direct.

(27) SPYING.-Any person subject to this chapter who with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign power, collects or attempts to collect information by clandestine means or while acting under false pretenses, for the purpose of conveying such information to an enemy of the United States, or one of the co-belligerents of the enemy, shall be punished by death or such other punishment as a military commission under this chapter may direct.

(28) CONSPIRACY.-Any person subject to this chapter who conspires to commit one or more substantive offenses triable by military commission under this chapter, and who knowingly does any overt act to effect the object of the conspiracy, shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

**Military Commissions Act of 2009, Pub. L. No. 111-84, div. A, tit. XVIII, 123 Stat. 2574 (Oct. 28, 2009)**

### § 950c. Appellate referral; waiver or withdrawal of appeal

(a) AUTOMATIC REFERRAL FOR APPELLATE REVIEW.-Except as provided in subsection (b), in each case in which the final decision of a military commission under this chapter (as approved by the convening authority) includes a finding of guilty, the convening authority shall refer the case to the United States Court of Military Commission Review.  Any such referral shall be made in accordance with procedures prescribed under regulations of the Secretary.

### § 950f. Review by United States Court of Military Commission Review

(a) ESTABLISHMENT.-There is a court of record to be known as the "United States Court of Military Commission Review" (in this section referred to as the "Court").  The Court shall consist of one or more panels, each composed of not less than three appellate military judges.  For the purpose of reviewing decisions of military commissions under this chapter, the Court may sit in panels or as a whole, in accordance with rules prescribed by the Secretary of Defense.

(b) JUDGES.-(1) Judges on the Court shall be assigned or appointed in a manner consistent with the provisions of this subsection.

(2) The Secretary of Defense may assign persons who are appellate military judges to be judges on the Court.  Any judge so assigned shall be a commissioned officer of the armed forces, and shall meet the qualifications for military judges prescribed by section 948j(b) of this title.

(3) The President may appoint, by and with the advice and consent of the Senate, additional judges to the United States Court of Military Commission Review.

(4) No person may serve as a judge on the Court in any case in which that person acted as a military judge, counsel, or reviewing official.

(c) CASES TO BE REVIEWED.-The Court shall, in accordance with procedures prescribed under regulations of the Secretary, review the record in each case that is referred to the Court by the convening authority under section 950c of this title with respect to any matter properly raised by the accused.

(d) STANDARD AND SCOPE OF REVIEW.-In a case reviewed by the Court under this section, the Court may act only with respect to the findings and

6a

sentence as approved by the convening authority.  The Court may affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as the Court finds correct in law and fact and determines, on the basis of the entire record, should be approved.  In considering the record, the Court may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the military commission saw and heard the witnesses.

(e) REHEARINGS.-If the Court sets aside the findings or sentence, the Court may, except where the setting aside is based on lack of sufficient evidence in the record to support the findings, order a rehearing.  If the Court sets aside the findings or sentence and does not order a rehearing, the Court shall order that the charges be dismissed.

## § 950g. Review by United States Court of Appeals for the District of Columbia Circuit; writ of certiorari to Supreme Court

(a) EXCLUSIVE APPELLATE JURISDICTION.-Except as provided in subsection (b), the United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction to determine the validity of a final judgment rendered by a military commission (as approved by the convening authority and, where applicable, the United States Court of Military Commission Review) under this chapter.

## § 950p. Definitions; construction of certain offenses; common circumstances

. . .

(d) EFFECT.-The provisions of this subchapter codify offenses that have traditionally been triable by military commission.  This chapter does not establish new crimes that did not exist before the date of the enactment of this subchapter, as amended by the National Defense Authorization Act for Fiscal Year 2010, but rather codifies those crimes for trial by military commission.  Because the provisions of this subchapter codify offenses that have traditionally been triable under the law of war or otherwise triable by military commission, this subchapter does not preclude trial for offenses that occurred before the date of the enactment of this subchapter, as so amended.

## § 950t. Crimes triable by military commission

The following offenses shall be triable by military commission under this chapter at any time without limitation:

   . . .

(25) PROVIDING MATERIAL SUPPORT FOR TERRORISM.-
   (A) OFFENSE.-Any person subject to this chapter who provides material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, an act of terrorism (as set forth in paragraph (24) of this section), or who intentionally provides material support or resources to an international terrorist organization engaged in hostilities against the United States, knowing that such organization has engaged or engages in terrorism (as so set forth), shall be punished as a military commission under this chapter may direct.
   (B) MATERIAL SUPPORT OR RESOURCES DEFINED.- In this paragraph, the term "material support or resources" has the meaning given that term in section 2339A(b) of title 18.
   (26) WRONGFULLY AIDING THE ENEMY.-Any person subject to this chapter who, in breach of an allegiance or duty to the United States, knowingly and intentionally aids an enemy of the United States, or one of the co-belligerents of the enemy, shall be punished as a military commission under this chapter may direct.
   (27) SPYING.-Any person subject to this chapter who, in violation of the law of war and with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign power, collects or attempts to collect information by clandestine means or while acting under false pretenses, for the purpose of conveying such information to an enemy of the United States, or one of the co-belligerents of the enemy, shall be punished by death or such other punishment as a military commission under this chapter may direct.

   . . .

(29) CONSPIRACY.-Any person subject to this chapter who conspires to commit one or more substantive offenses triable by military commission under this subchapter, and who knowingly does any overt act to effect the object of the conspiracy, shall be punished, if death results to one or more of the victims, by

death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

 (30) SOLICITATION.-Any person subject to this chapter who solicits or advises another or others to commit one or more substantive offenses triable by military commission under this chapter shall, if the offense solicited or advised is attempted or committed, be punished with the punishment provided for the commission of the offense, but, if the offense solicited or advised is not committed or attempted, shall be punished as a military commission under this chapter may direct.

**10 U.S.C. § 904. Art. 104.**

**§ 904. Art. 104. Aiding the enemy**

Any person who-

    (1) aids, or attempts to aid, the enemy with arms, ammunition, supplies, money, or other things; or

    (2) without proper authority, knowingly harbors or protects or gives intelligence to, or communicates or corresponds with or holds any intercourse with the enemy, either directly or indirectly;

shall suffer death or such other punishment as a court-martial or military commission may direct. This section does not apply to a military commission established under chapter 47A of this title.

**18 U.S.C. §  2339A (2006)**

**§ 2339A. Providing material support to terrorists**

    (a) OFFENSE.-Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, or 2340A of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section 46502 or 60123(b) of title 49, or any offense listed in section 2332b(g)(5)(B) (except for sections 2339A and 2339B) or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

(b) DEFINITIONS.-As used in this section-

(1) the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

(2) the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

(3) the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.

11a