# 11-1324

[Oral argument scheduled for September 10, 2012]

## United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT
## Docket No. 11-1324

ALI HAMZA SULIMAN AHMAD AL BAHLUL,

*Petitioner,*

*v.*

UNITED STATES,

*Respondent.*

APPEAL FROM
COURT OF MILITARY COMMISSION REVIEW (CMCR-09-001)

## PETITIONER'S REPLY BRIEF

Michel Paradis
CAPT Mary McCormick, JAGC, U.S. Navy
MAJ Todd E. Pierce, JA, U.S. Army
1620 Defense Pentagon
Washington, DC 20301-1620
michel.paradis@osd.mil
TEL: 1.703.696.9490 x115
FAX: 1.703.696.9575

*Counsel for Petitioner*

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

### A. Parties and Amici Appearing Below

The parties and *amici* who appeared before the Court of Military

Commission Review in connection with this appeal were:

1. Ali Hamza Ahmad Suliman al Bahlul, *Appellant*

2. United States of America, *Appellee*

3. *Amicus Curiae* the Office of the Chief Defense Counsel, Col Peter Masciola, USAF (on brief)

4. *Amicus Curiae* Robert David Steele and Others in the United States Intelligence Community, McKenzie Livingston (on brief)

5. *Amicus Curiae* Historians, Political Scientists and Constitutional Law Professors, Sarah Paoletti (on brief)

6. *Amicus Curiae* Nationall Institute of Military Justice, Michelle Lindo (on brief)

7. *Amicus Curiae* Montana Pardon Project, Jeffrey Renz (on brief)

8. *Amicus Curiae* Human Rights Committee of the American Branch of the International Law Association, Jordan J. Paust (on brief)

### B. Parties Appearing in this Court

1. Ali Hamza Ahmad Suliman al Bahlul, *Petitioner*

2. United States of America, *Respondent*

3. *Amicus Curiae* Int'l Law Scholars, David Weissbrodt (on brief)

4. *Amicus Curiae* Retired Military and Intelligence Officers, McKenzie Livingston (on brief)

5. *Amicus Curiae* The National Institute of Military Justice, Steve Vladeck (on brief)

6. *Amicus Curiae* First Amendment Historians, Jeffrey Renz (on brief)

i

## C. Rulings under Review

This appeal is from a decision of the United States Court of Military Commission Review in *United States v. Ali Hamza Ahmad Suliman al Bahlul*, CMCR 09-001(*en banc* September 9, 2011). The decision is appended at App. 3-141 and is reported at 820 F.Supp.2d 1141 (USCMCR 2011).

## D. Related Cases

This case has not previously been filed with this Court or any other court. Counsel are aware of no other cases that meet this Court's definition of related.

Dated: July 2, 2012                           By: /s/ Michel Paradis
                                                    *Counsel for Petitioner*

ii

# TABLE OF CONTENTS

Table of Authorities ........................................................................................ v

Glossary of Terms ......................................................................................... ix

Summary of Argument ...................................................................................1

Argument ........................................................................................................4

I.  The Government cannot Lawfully Divert the Prosecution of Domestic Crimes to a Law-of-War Commission Convened in Guantanamo Bay. ...........4

A.    The government asks this Court to adopt a novel theory that is contrary to settled law..................................................................................................5

    1.  "U.S. common law of war" is an anomalous phrase that gainsays longstanding doctrine and common sense....................................................5
    2.  The government's new theory has no legal precedent. ...........................6
    3.  The government presents martial law cases from the Civil War as precedents for war crimes prosecutions. ..................................................12

B.    U.S. practice demonstrates that the offenses here were not war crimes a century-and-a-half ago and are not war crimes now. ...........................15

    1.  Modern U.S. practice shows that none of the offenses here are stand-alone offenses under the law of war. ..............................................16
    2.  Commissions during the Civil War had no jurisdiction over the kind of offenses here outside areas under martial law. ...........................19

C.    The best evidence of the problems with the charges in this case is the government's inability to settle upon a legal theory to sustain them. ....................26

    1.  The government's theory below divests the courts of their exclusive authority to say what the law is.................................................27
    2.  The CMCR's theory replaces definite universal crimes with indeterminate international norms.........................................................28
    3.  The government's primary theory here vests military commissions with general jurisdiction over the trial of all crimes. ..............................29
    4.  The government's alternative theory would make the war powers a new exception to the *Ex Post Facto* Clause and, in any event, has been explicitly rejected by the Supreme Court. .......................................30
    5.  The traditional test for military commission jurisdiction requires reversal in this case..................................................................................31

**II. The United States cannot put "the Thoughts, the Beliefs, the Ideals of the Accused" on Trial. ........................................................................33**

A.     The First Amendment issues in this case are subject to *de novo* review by this Court. ....................................................................................33

B.     The government cannot criminally prosecute the production of a film free from the constraints of the First Amendment. ..........................................35

C.     *Humanitarian Law Project* did not diminish the judiciary's duty to ensure that thoughts, beliefs and ideals are not put on trial. .............................37

**III. The Government Offers No Rational, let alone Compelling, Reason to Allow Military Commissions to Deny Equal Justice under Law. .....................42**

**Certificate of Compliance with Rule 32(a) .........................................46**

**Certificate of Service.............................................................................47**

iv

# TABLE OF AUTHORITIES

*Petitioner rests his primary reliance on authorities marked with an ***

## Cases

*Belfast v. United States*, 611 F.3d 783 (11th Cir. 2010).........................................20

*Bond v. United States*, 131 S.Ct. 2355 (2011) ........................................................37

*Boos v. Barry*, 485 U.S. 312 (1988).........................................................................31

*Bose Corp. v. Consumers Union of the U.S.*, 466 U.S. 485 (1984)........................34

*Chan Gun v. United States*, 9 App. D.C. 290 (D.C. Cir. 1896)..............................44

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) .............................................35

*DKT Mem'l Fund Ltd. v. U.S.A.I.D.*, 887 F.2d 275 (D.C. Cir. 1989) ....................36

*Duncan v. Kahanamoku*, 327 U.S. 304 (1946).........................................................13

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ................................................................36

*El-Shifa Pharmaceutical Industries Co. v. United States*, 607 F.3d 836
    (D.C. Cir. 2010)....................................................................................................36

*Ex Parte Milligan*, 4 Wall. 2 (1866) ................................................................ 14, 24

*Ex parte Mudd*, 17 F.Cas. 954 (S.D.Fla. 1868) ......................................................23

*\*Ex parte Quirin*, 317 U.S. 1 (1942) .........................2, 4, 6-8, 13, 16, 24, 31-32, 44

*Ford v. Surget*, 97 U.S. 594 (1878) .........................................................................25

*Freeman v. United States*, 761 F.2d 549 (9th Cir. 1985)........................................41

*Green v. United States*, 8 Ct. Cl. 412 (1872)..........................................................25

*\*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) .........4, 6-7, 9-10, 12-13, 16, 19-22, 31

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ................................................................31

*Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976)....................................................44

*Haupt v. United States*, 330 U.S. 631 (1947) ..........................................................37

*Humanitarian Law Project v. Holder*, 130 S.Ct. 2705 (2010) ........................ 37, 38

*In re Murphy*, 17 F.Cas. 1030 (C.C.D.Mo. 1867) ................................................21

*In re Yamashita*, 327 U.S. 1 (1946) ................................................ 4, 6, 13, 16, 31

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) ...........................................35

*Koshkonong v. Burton*, 104 U.S. 668 (1881).........................................27

*Madsen v. Kinsella*, 343 U.S. 341 (1952) ..............................................13

*Marks v. United States*, 430 U.S. 188 (1977) ........................................20

*Miller v. Albright*, 523 U.S. 420 (1998)................................................35

*Mudd v. Caldera*, 134 F.Supp.2d 138 (D.D.C. 2001)..........................23

*Osborne v. Ohio*, 495 U.S. 103 (1990) .................................................40

*Powers v. Ohio*, 499 U.S. 400 (1991) ...................................................36

*Presbyterian Church of Sudan v. Talisman Energy*, 582 F.3d 244
     (2d. Cir. 2009) .................................................................................20

*Prosecutor v. Milutinović*, Decision on Dragoljub Ojdaníc's Motion
     Challenging Jurisdiction-Joint Criminal Enterprise, Case No. IT-
     99-37-AR72, 2003 WL 24014138 (ICTY App. Ch., May 21, 2003) ...............22

*Sanchez-Espinoza v. Reagan*, 770 F.2d 202 (D.C. Cir. 1985)...............36

*Street v. New York*, 394 U.S. 576 (1969)..............................................40

*Talbot v. Seaman*, 1 Cranch 1 (1801) ...................................................5

*Terminiello v. Chicago*, 337 U.S. 1 (1949)..................................... 35, 39

*Texas v. Brown*, 460 U.S. 730 (1983) ..................................................20

*The Antelope*, 10 Wheat. 66 (1825) .....................................................27

*Toth v. Quarles*, 350 U.S. 11 (1955)....................................................30

*United States ex rel. Turner v. Williams*, 194 U.S. 279 (1904)..............35

*United States v. Arjona*, 120 U.S. 479 (1887) .....................................27

*United States v. Byfield*, 391 F.3d 277 (D.C. Cir. 2004) .......................34

*United States v. Ferreira*, 275 F.3d 1020 (11th Cir. 2001) ....................................43

*United States v. Furlong*, 5 Wheat. 184 (1820) ........................................................27

*United States v. Lopez-Flores*, 63 F.3d 1468 (9th Cir. 1995)........................... 43-44

*United States v. Lue*, 134 F.3d 79 (2d Cir. 1998) ....................................................43

*United States v. Palmer*, 3 Wheat. 610 (1818) ........................................................27

*United States v. Popa*, 187 F.3d 672 (D.C. Cir. 1999) ............................................35

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1998)..............................................40

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ......................................37

*Washington v. Davis*, 426 U.S. 229 (1976) .............................................................43

*\*Wing Wong v. United States*, 163 U.S. 228 (1896)................................................42

*Yates v. United States*, 354 U.S. 298 (1957) ...........................................................39

*Young v. United States*, 97 U.S. 39 (1877) ..............................................................25

## Statutes

10 U.S.C. §§ 801, *et seq*.....................................................................................19

18 U.S.C. § 1203 ................................................................................................ 42-43

18 U.S.C. § 2339B .....................................................................................................37

18 U.S.C. § 2441 .......................................................................................................19

18 U.S.C. § 373 .........................................................................................................38

Military Commissions Act of 2006, Pub. L. 109-366 (2006)...................................19

## Other Authorities

Chairman of the Joint Chiefs of Staff Instruction 5810.01D,
    Implementation of the DoD Law of War Program (Apr. 30, 2010) ...................6

Dep't of the Army Field Manual 27-10, *The Law of Land Warfare*
    (Jul. 18, 1956)............................................................................................. 6, 19

DoD Directive 2311.01E, DoD Law of War Program (May 9, 2006) .....................6

H.R. Doc. No. 314, 55th Cong., 3d Sess. (1899).......................................23

*In re Guantanamo Bay Detainee Litigation*, Misc. No. 08-442, *et al.*,
    Respondents' Memorandum Regarding Detention Authority
    Relative to Detainees held at Guantanamo Bay
    (D.D.C. Mar. 13, 2009) ...................................................5

International Convention Against the Taking of Hostages, Dec. 18,
    1979, T.I.A.S., No. 11,081 ..............................................42

John Bellinger & William Haynes, *A U.S. Government Response to
    the International Committee of the Red Cross Study Customary
    International Humanitarian Law*. 89 Int'l. Rev. Red Cross 443
    (2007) ........................................................................18

Report of the Deputy Judge Advocate for War Crimes, European
    Command (Jun. 29, 1948)..............................................18

S.Rep. No. 307, 97th Cong., 1st Sess. (1982).........................................37

Samuel T. Morison, *Presidential Pardons and Immigration Law*, 6
    Stan. J. Civ. Rts. & Civ. Lib. 253 (2010)...........................25

*The Tokyo War Crimes Trial: The Complete Transcripts of the
    Proceedings of the International Military Tribunal for the Far
    East* (Ed. Pritchard, J. & Zaide, S. 1981).........................17

The War of the Rebellion: A Compilation of the Official Records of
    the Union and Confederate Armies (1880-1901)...................... 24, 26

*Trials of the Major War Criminals* (1947) ............................................16

*Trials of War Criminals before the Nuremberg Military Tribunals
    Under Control Council Law No. 10* (G.P.O. 1949)...........................17

*United States v. Dire*, Case No. 11-4310, Brief of the United States,
    2011 WL 2941447 (4th Cir. Jul. 22, 2011).........................9

William Winthrop, *Military Law and Precedents* (2d ed. 1920)..............6-7, 14, 29

## GLOSSARY OF TERMS

"The Act" ..............Military Commissions Act of 2006, Pub. L. No. 109-366 (2006)

App. ................................................................... Appendix I (unless otherwise noted)

CMCR .................................................. U.S. Court of Military Commission Review

DoD ............................................................................. U.S. Department of Defense

"The Manual".....................................Robert M. Gates, U.S. Dep't of Def., Manual
for Military Commissions (2008 & 2010)

O.R. .................... The War of the Rebellion: A Compilation of the Official Records
of the Union and Confederate Armies (1880-1901)

Pet. Br. .................................................................... Brief for the Petitioner

Resp. ................................................................................ Brief for the Respondent

Resp. App. ........................................................................... Respondent's Appendix

Supp. App. ......................................................... Petitioner's Supplemental Appendix

UCMJ ................................................................. Uniform Code of Military Justice

Winthrop ................ William Winthrop, *Military Law and Precedents* (2d ed. 1920)

ix

## SUMMARY OF ARGUMENT

**The government cannot lawfully divert the prosecution of domestic crimes to a law-of-war commission convened in Guantanamo Bay.** Yet, the government concedes that this is precisely what it has attempted to do in this case. The government now stipulates that "the offenses of conspiracy, solicitation and providing material support to terrorism have not attained international recognition at this time as offenses under customary international law[.]" Resp. at 50. It nevertheless presses this Court to break new ground and adopt novel legal theories that would allow domestic offenses to be removed from the courts of law whenever the political branches feel military commissions might be more convenient.

The government argues that the separation of powers should yield to the war powers. The only hypothetical limit on the offenses that it can try by military commissions is their inclusion in a newly identified body of "U.S. common law of war." The government claims that this is a body of domestic law, comprised of those offenses that have been historically tried by military commissions. On the government's conception, analogies to any military commission precedent, no matter how old and no matter how anachronistic, are all equally valid to establishing the offenses triable today.

The problem with this theory is that it is ahistorical and ultimately provides no limiting principle at all. Military commissions were convened to try all manner

1

of crimes throughout U.S. history – from ordinary embezzlement to modern war crimes. That is because "military commission" is a general term for *ad hoc* military tribunal. Particularly during the Civil War, military commissions were used in circumstances of martial law and military occupation, which gave them jurisdiction over ordinary crimes. Guantanamo is not, however, under martial law and commissions convened there, so-called law-of-war commissions, are limited to "offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals." *Ex parte Quirin*, 317 U.S. 1, 28 (1942).

That is the standard that controls this case: Were the offenses charged against Mr. Bahlul recognized in international law as violations of the law of war? The government now concedes they were not and that the only way to affirm this conviction is to formulate new legal doctrines that promise to create serious practical and Constitutional problems in far more than terrorism cases. This Court should therefore reverse because doing so is the result dictated by the application of settled law.

**The United States cannot put "the thoughts, the beliefs, the ideals of the accused" on trial.** Yet, that is what the prosecuting attorney in Mr. Bahlul's case exhorted the jury to do. When the prosecution offers a defendant's book collection as incriminating evidence and builds its case around the defendant's production of

2

a film that it impugned as "political propaganda" and "political argument," the judiciary must step-in. The jury in this case was given no instructions on the line between what speech is offensive and what is criminal. This Court should reverse because the government of the United States cannot obtain a conviction and life sentence against an individual by igniting the jury's disgust with the accused's thoughts, beliefs and ideals.

**The government offers no rational, let alone compelling, reason to allow military commissions to deny equal justice under law.** Yet, it argues that this Court should defer to Congress' decision to segregate aliens alone into military commissions. Doing so not only violates the spirit of the Due Process Clause, it violates two centuries of unbroken military tradition, wherein all war criminals, citizen and non-citizen alike, have been tried before the same tribunals to answer for their crimes. This Court should therefore reverse because Congress chose to discriminate against non-citizens in the imposition of the criminal laws for no legitimate legislative purpose.

**ARGUMENT**

I.   **THE GOVERNMENT CANNOT LAWFULLY DIVERT THE PROSECUTION OF DOMESTIC CRIMES TO A LAW-OF-WAR COMMISSION CONVENED IN GUANTANAMO BAY.**

*Ex parte Quirin*, 317 U.S. 1 (1942), sets out the subject-matter jurisdiction that can be lawfully conferred on law-of-war military commissions: "offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals." *Id.* at 28. This was reaffirmed in *In re Yamashita*, 327 U.S. 1, 7 (1946), and *Hamdan v. Rumsfeld*, 548 U.S. 557, 598 (2006) (plurality op.); *id.* at 689 (Thomas, J., dissenting). The only question this Court must answer is whether the offenses charged were "recognized in international law as violations of the law of war." *Yamashita*, 327 U.S. at 14.

The government now concedes that "the offenses of conspiracy, solicitation, and providing material support to terrorism have not attained international recognition at this time as offenses under customary international law[.]" Resp. at 57. Because the controlling law is clear and well established, this concession warrants reversal of the judgment below.

The government urges this Court to affirm by replacing settled law with novel legal theories that are contrary to governing precedent, require sweeping historical revisionism, and compromise the integrity of the separation of powers. This Court should decline this invitation.

4

**A. The government asks this Court to adopt a novel theory that is contrary to settled law.**

The government primarily argues for a new legal theory that it refers to as the "U.S. common law of war." Resp. at 20. Under this theory, the political branches can use their "war-making powers to punish by military commission a class of domestic law crimes." Resp. at 28. In other words, the law of war is no longer a subset of the law of nations, but a body of domestic offenses that occasionally have cognates under international law. The government is unable, however, to support this theory with any precedent and is ultimately forced to argue for a redefinition of "law of war" that is at odds with its most basic purposes.

**1.    "U.S. common law of war" is an anomalous phrase that gainsays longstanding doctrine and common sense.**

As used in the context of adjudication, going at least back to *Talbot v. Seaman*, 1 Cranch 1, 37 (1801), up through and including the government's briefing in the Guantanamo *habeas* litigation, the "laws of war include a series of prohibitions and obligations, which have developed over time and have periodically been codified in treaties such as the Geneva Conventions or become customary international law." *In re Guantanamo Bay Detainee Litigation*, Misc. No. 08-442, *et al*., Respondents' Memorandum Regarding Detention Authority Relative to Detainees held at Guantanamo Bay, at 1 (D.D.C. Mar. 13, 2009). Accordingly, the Supreme Court has consistently held that the subject-matter

jurisdiction of military commissions to prosecute offenses against the law of war derives from Congress' power to "define and punish … offenses against the law of nations." *Quirin*, 317 U.S. at 28; *Yamashita*, 327 U.S. at 7.

U.S. military doctrine is consistent. The Department of Defense continues to define the law of war as, "That part of international law that regulates the conduct of armed hostilities." DoD Directive 2311.01E, DoD Law of War Program ¶ 3.1 (May 9, 2006), Supp. App. 14; *see also* Chairman of the Joint Chiefs of Staff Instruction 5810.01D, Implementation of the DoD Law of War Program ¶ 5(a) (Apr. 30, 2010), Supp. App. 42; Dep't of the Army Field Manual 27-10, *The Law of Land Warfare* ¶ 4 (Jul. 18, 1956) ("FM 27-10"), Supp. App. 3.

This definition is also consistent with common sense. Most wars are fought across international boundaries. Those that are not are still governed by international standards of conduct embodied in Common Article 3 of the Geneva Conventions. *Hamdan*, 548 U.S. at 629-32. Just as there is no "domestic law of the sea," a plethora of "domestic laws of war" would frustrate the very uniformity the law of war aims to ensure in the conduct of hostilities.

## 2.     The government's new theory has no legal precedent.

In order to overcome how contrived its new theory is, the government is forced to rewrite the legal authorities that are indisputably foundational to the issues in this case. It provides a series of abridged quotations from Winthrop, *Ex*

6

*parte Quirin*, *Hamdan v. Rumsfeld*, as well as the CMCR's decision below,
characterized to create the appearance of longstanding support for its new theory.

**Winthrop**. The government begins halfway through Winthrop's
introduction on military commissions, which it reports as saying, "'[I]n general, it
is those provisions of the Constitution which empower Congress to "declare war,"
and "raise armies," and which, in authorizing the initiation of war, authorize the
employment of all necessary and proper agencies for its due prosecution, from
which [the military commission] derives its original sanction.'" Resp. at 25. The
introduction actually begins:

> The Constitution confers upon Congress the power "to
> define and punish offences against the law of nations,"
> and in the instances of the legislation of Congress during
> the late war by which it was enacted that spies and
> guerillas should be punishable by sentence of military
> commission, such commission may be regarded as
> deriving its authority from this constitutional power. But,
> in general, it is those provisions of the Constitution ...

William Winthrop, *Military Law and Precedents* 831 (2d ed. 1920), Supp. App. 74

***Ex parte Quirin***. The government begins its argument with a quote from
*Quirin* made to read, "Each of the offenses at issue has a direct antecedent in 'the
system of common law applied by [this nation's] military tribunals[.]'" Resp. at 20
*quoting Quirin*, 317 U.S. at 30. The sentence from which this excerpt is lifted,
however, is the Court's answer to the "objection that Congress, in providing for the
trial of such offenses, has not itself undertaken to codify that branch of

7

international law or to mark its precise boundaries, or to enumerate or define by statute all the acts which that law condemns." *Quirin*, 317 U.S. at 29.

The government claims that *Quirin* merely "suggested that the law of war was a 'branch of international law[.]'" Resp. at 30 n.5. But that assertion ignores two of *Quirin*'s explicit holdings: that Congress "exercised its authority to define and punish offenses against the law of nations by sanctioning, within constitutional limitations, the jurisdiction of military commissions to try persons for offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals," *Quirin*, 317 U.S. at 28, and that going behind enemy lines to commit hostile acts in the guise of a loyal civilian "constitute[d] an offense against the law of war which the Constitution authorizes to be tried by military commission." *Id*. at 46.

To make *Quirin* fit, the government is forced to argue that the Supreme Court actually sustained this offense "not on customary international law but instead on historical American practice dating to the Revolution." Resp. at 30 n.5. The Court, however, was unequivocal in holding that its status under "the law of war has been so recognized in practice both here and abroad, and has so generally been accepted as valid by authorities on international law that we think it must be regarded as [triable by military commission.]" *Quirin*, 317 U.S. at 35. Indeed, as recently as a year ago, the government argued that *Quirin* "specifically held that

Congress's reference to 'the law of war' [in the Articles of War] was an invocation of international law." *United States v. Dire*, Case No. 11-4310, Brief for the United States, 2011 WL 2941447, at *27 (4th Cir. Jul. 22, 2011) .

The government's effort to relitigate *Quirin* casts no doubt on the holdings that are relevant to this case or to the subsequent decisions that have relied upon them. The law of war is a subset of international law and law-of-war commissions can only be convened to try plainly established violations of that law.

**Hamdan v. Rumsfeld**. The government claims to find significance in the fact that both Justices Stevens and Thomas gave "substantial consideration of domestic U.S. practice" in their respective opinions in *Hamdan*. Resp. at 26. But this observation does not support the government's ultimate conclusion that "Justice Stevens' use of the phrase 'common law of war' is best understood as embracing" its theory of the U.S. common law of war. Resp. at 27.

Justice Stevens, like Winthrop, *Quirin*, *Yamashita*, and the CMCR, firmly grounded the subject-matter jurisdiction of this type of commission on the Define & Punish Clause. *Hamdan*, 548 U.S. at 601 (plurality op.). In rejecting conspiracy as a war crime, Justice Stevens relied on the fact that "international sources confirm that the crime charged here is not a recognized violation of the law of war." *Id.* at 610.

9

Although Justice Thomas dissented on the merits, he also sought to establish conspiracy's status under customary international law, since "the law of war is derived not from domestic law but from the wartime practices of civilized nations, including the United States[.]" *Id*. at 720 n.14 (Thomas, J., dissenting). Likewise, Justice Kennedy, concurring in the judgment, described the law of war as "the body of international law governing armed conflict. … If the military commission at issue is illegal under the law of war, then an offender cannot be tried 'by the law of war' before that commission." *Id*. at 641 (Kennedy, J., concurring).

The government's effort to construe the opinions in *Hamdan* as sustaining commission jurisdiction on a parallel body of U.S. common law of war, therefore, cannot be reconciled with the opinions themselves.

**The CMCR's Decision.** The government did not rely on its U.S. common law of war theory below. Nevertheless, it attempts to construe the CMCR's decision as favorable to its new theory.

The government sought to persuade the CMCR that Congress was entitled to near-total deference in codifying war crimes triable by military commission and that any offense so codified could be applied retroactively without limitation. After stating that it would give the government the benefit of the doubt, the CMCR rejected this argument. "[W]e are not persuaded by the Government's suggestion that Congress' power to 'define and punish ... Offences against the Law of

10

Nations,' … even when exercised in collaboration with the President in a time of armed conflict, includes the power to make conduct punishable by military commission without any reference to international norms." App. 25.

The government claims that the CMCR affirmed material support on the ground that it was a "well-established principle of American military jurisprudence." Resp. at 17. The CMCR, however, spent more than twenty pages listing international legal principles relating to terrorism to support its conclusion that the offense was "consistent with international norms applicable at the time of the charged conduct, consistent with the general principles of law recognized by civilized nations, and constitutes conduct in violation of the common law of armed conflict[.]" App. 63.

The government claims that the CMCR "held that the offence of conspiracy to violate the law of armed conflict … is a long standing offence subject to trial by military commission." Resp. at 18. The CMCR, however, began its analysis by acknowledging that the "viability of conspiracy as a war crime has long been the subject of controversy." App. 86. In affirming this conviction, the CMCR sidestepped the "[r]esolution of this enduring and complex controversy[.]" App. 88. Instead, the "similarity between appellant's conviction of conspiracy in the Specification of Charge I and providing material support for terrorism in the

11

Specification of Charge III" led the CMCR to sustain the charge under the "international norm" approach it adopted for appellate review. App. 89.

While its elastic approach to establishing criminal liability was deeply flawed, the CMCR affirmed because "[u]pon consideration of the extant treaty law, customary international law, and general principles of law recognized by civilized nations … [Mr. Bahlul's conduct] violates international norms." App. 112. Had the government conceded below that none of the offenses in this case violate customary international law, the CMCR could not have held as it did.

### 3.    The government presents martial law cases from the Civil War as precedents for war crimes prosecutions.

The vast majority of precedent the government offers to support both the particular charges in this case and its broader legal theory come from the Civil War. But its use of these precedents is frequently misleading.

In *Hamdan*, Justice Stevens admonished that the decisions of Civil War era military tribunals "must . . . be considered with caution." *Hamdan*, 548 U.S. at 596 n.27 (plurality op.). The reason for caution, as detailed in Petitioner's brief, is that "military commission" is a general term for an *ad hoc* military tribunal. A particular commission's subject-matter jurisdiction turns on whether it was convened under three distinct wartime situations that regularly overlapped during

the Civil War: martial law, military occupation and the prosecution of war crimes. Pet. Br. at 34-35.

That ambiguity is important to account for because the first two types of commissions have jurisdiction over ordinary crimes when the regular courts are closed, as well as offenses that arise from the unique demands of military government. *See*, *e.g.*, *Madsen v. Kinsella*, 343 U.S. 341, 348-49 (1952); *Duncan v. Kahanamoku*, 327 U.S. 304, 322-23 (1946) (discussing the Founders' fear of military tyranny and noting that Congress only authorized commissions in places under martial law during the Civil War). Law-of-war commissions, by contrast, can be convened when the regular courts are open, but only for the trial of offenses against customary international law. *Quirin*, 317 U.S. at 28; *Yamashita*, 327 U.S. at 7; *Hamdan*, 548 U.S. at 595-98 (plurality op.).

In *Hamdan*, seven Justices agreed that the jurisdictional distinctions between the three types of commissions remained legally relevant and that any commission convened in Guantanamo was necessarily a law-of-war commission. *Hamdan*, 548 U.S. at 597 (plurality op.); *id.* at 683-84 (Thomas, J., dissenting) (concurring that a law-of-war commission is "the only situation relevant to the instant case").

Nowhere, however, does the government account for the fact that Civil War commissions "regularly tried war crimes and ordinary crimes together." *Hamdan*, 548 U.S. at 608 (plurality op.). Instead, it lumps all commission cases together as

13

equally establishing the "law of war," even though the jurisdictional bases of their offenses are always ambiguous. Winthrop at 839 n.5, Supp. App. 75 (citing the Wirz, Murphy and Lincoln assassin cases as "hybrid" commissions).

Nor does the government account for the fact that it was not uncommon for the phrase "law of war" to be loosely applied during the Civil War as including martial law. During his argument to the Supreme Court in *Milligan*, for example, the Attorney General cautioned against confusing "the laws of war … as a generic term," which included martial law, and "the laws which govern the conduct of belligerents towards each other and other nations, *flagranti bello*." *Ex Parte Milligan*, 4 Wall. 2, 14 (1866) (argument of counsel).

The government not only fails to resolve the jurisdictional ambiguity of what it cites, but it often presents Civil War orders dealing explicitly with martial law as precedent for the law of war in the sense in which it was used in *Quirin* and its progeny. For example, it cites Halleck's General Order No. 13 as having "condemned individuals who aided and assisted lawless conduct by irregular belligerents as criminals subject to trial by military commission," Resp. at 34, 36. What is not mentioned is that the very purpose of this order was to impose martial law in Missouri. Resp. App. at 9.

Likewise, one of the first military commission cases cited is held up as approving the conviction of five men for "'[g]iving aid and comfort to bridge

burners' in violation of the law of war." Resp. at 36. The "law of war" is not

mentioned in this order. Most of the defendants were convicted of treason, which

General Halleck overturned on the ground that "such charges are not triable by

military commission" but rather "must be tried by courts duly constituted by law."

Resp. App. at 12-13. Of the three defendants whose charges are provided in the

order and were not remanded to the civilian courts, two were convicted of "Bridge

and railroad and car burning." *Id.* at 11-12. The specification of that offense, which

the third defendant was alleged to have aided and abetted, states that it was done

"in violation of martial law prevailing in the said Military District of North

Missouri and in the State of Missouri." *Id.*

### B. U.S. practice demonstrates that the offenses here were not war crimes a century-and-a-half ago and are not war crimes now.

The government contends that a modern war crimes prosecution for

conspiracy, solicitation, and material support is supported by the fact that

purportedly analogous offenses were historically "subject to trial by military

commission under the U.S. common law of war." Resp. at 33. The government is

wrong, however, when it claims that U.S. practice supports its view of these

particular charges. On the contrary, U.S. law-of-war commissions consistently

rejected the kinds of offenses alleged here as outside their limited jurisdiction.

15

**1.    Modern U.S. practice shows that none of the offenses here are stand-alone offenses under the law of war.**

Aside from *Hamdan*, the Supreme Court case that deals with issues most like those before this Court is *Yamashita*. Unlike *Quirin* and the Civil War cases, *Yamashita* addresses the extraterritorial wartime conduct of a non-resident alien in which the Court faced the question of whether the charged offense was triable by a law-of-war commission. In response, the Court reaffirmed *Quirin* as the governing standard and held that international law, specifically the Hague Conventions, "plainly imposed on petitioner … an affirmative duty … to prevent the commission, by the troops under his command, of the plain violations of the law of war detailed in the bill of particulars." *Yamashita*, 327 U.S. at 16-17.

The government does not distinguish or cite *Yamashita*. From this post-World War II period, the government largely cites aiding and abetting prosecutions. It claims Julius Streicher was convicted of "conspiracy to commit crimes against humanity by the International Military Tribunal at Nuremberg ("IMT")." Resp. at 63. But Streicher was not convicted of conspiracy. He was convicted of persecution and genocide. 22 *Trials of the Major War Criminals* 547-49 (1947), App. 357- 359. Indeed, Streicher could not have been convicted of conspiracy to commit crimes against humanity because the IMT dismissed all such charges. *Id*. at 469, Supp. App. 12.

16

For all the government's emphasis on a uniquely U.S. common law of war, it is revealing that it is unable to cite any supporting authority from the postwar era. The U.S. Army convened military commissions to try hundreds of people for war crimes in both the Pacific and Europe. As stated in Petitioner's brief, the United States set up a war crimes tribunal as recently as 2003 in Iraq. Pet. Br. at 18. Whenever the U.S. common law of war might conceivably have applied, inchoate liability was rejected.

The International Military Tribunal for the Far East was convened, controlled and administered directly by General MacArthur. It followed the IMT in disallowing conspiracy charges for war crimes and crimes against humanity. *The Tokyo War Crimes Trial: The Complete Transcripts of the Proceedings of the International Military Tribunal for the Far East*. Vol. 22, 47, 448-48, 454 (Ed. Pritchard, J. & Zaide, S. 1981), Supp. App. 37-40.

Despite its broad jurisdiction over offenses arising under the laws of war, the U.S. military tribunals at Nuremberg held that "this tribunal has no jurisdiction to try any defendant upon a charge of conspiracy considered as a separate substantive offense." 15 *Trials of War Criminals before the Nuremberg Military Tribunals Under Control Council Law No. 10*, 1100 (note) (G.P.O. 1949), Supp. App. 12.

The same result was reached by the commissions the Army convened to prosecute atrocities in Europe. Their jurisdiction derived from a general directive

17

from General Eisenhower to prosecute "violations of the laws or customs of war, of the laws of nations, or of the law of occupied territory or any part thereof." Report of the Deputy Judge Advocate for War Crimes, European Command, at 161 (Jun. 29, 1948), Supp. App. 64. In almost every case, the government used "common design" as its theory of liability. *Id.* at 61, Supp. App. 62. When defense counsel objected that this resulted in inchoate crimes, the commissions "pointed out that the accused were charged with participation in the execution of a common design to commit described unlawful acts and not a common design as a separate offense." *Id.* at 62, Supp. App. 63.

Prior to Mr. Bahlul's case, there was no change in U.S. practice. The government quotes from COL Sims' concurrence below, which noted the Army Field Manual references conspiracy. Resp. at 69. While not entirely irrelevant, the government's traditional position has been that military manuals are of marginal value in assessing the state of the law of war. John Bellinger & William Haynes, *A U.S. Government Response to the International Committee of the Red Cross Study Customary International Humanitarian Law*, 89 Int'l. Rev. Red Cross 443, 445 (2007) ("Although manuals may provide important indications of State behavior and *opinio juris*, they cannot be a replacement for a meaningful assessment of operational State practice in connection with actual military operations."). And given the Army's actual practice less than ten years before this manual was

18

promulgated, it is not even clear if this singular reference to conspiracy is intended as a stand-alone offense or a theory of liability. FM 27-10, ¶ 500, Supp. App. 8.

In terms of U.S. law at the time relevant to the charges here, the most definitive U.S. practice is Congress' history of legislation in the area of war crimes. The Geneva Conventions were ratified and included no inchoate liability of the kind at issue here. *Hamdan*, 548 U.S. at 604 (plurality op.). The War Crimes Act, 18 U.S.C. § 2441, contained no inchoate war crimes. Nor did the Uniform Code of Military Justice, 10 U.S.C. §§ 801, *et seq.* ("UCMJ"). Conspiracy under the UCMJ applied only to persons "subject to this chapter," only covered conspiracies "to commit an offense under this chapter," and made no mention of being triable by a military commission. *Id.* § 881. None of these laws changed until the Military Commissions Act of 2006, Pub. L. 109-366 (2006), when Congress amended the War Crimes Act and the UCMJ to now include conspiracies. *Id.* §§ 4(b) (amending the UCMJ), 6(b) (amending the War Crimes Act).

### 2. Commissions during the Civil War had no jurisdiction over the kind of offenses here outside areas under martial law.

If one reviews the Civil War authorities cited in support of each of the charges here, martial law was a jurisdictional prerequisite. Any time charges comparable to those here were brought outside areas under martial law, the commissions were invalidated as exceeding their lawful jurisdiction.

19

### a.     U.S. practice during the Civil War shows that conspiracy to commit war crimes was not a stand-alone offense under the law of war.

The government's historical argument in support of conspiracy is little more than a recapitulation of the sources Justice Stevens rejected in *Hamdan* as failing to make even a "'merely colorable' case for inclusion of conspiracy among those offenses cognizable by law-of-war military commission." *Hamdan*, 548 U.S. at 604-13 (plurality op.). While the relevant parts of Justice Stevens' opinion spoke only for a plurality, "as the considered opinion of four Members of [the Supreme] Court it should obviously be the point of reference for further discussion of the issue." *Texas v. Brown*, 460 U.S. 730, 737 (1983). This is especially so when "every Court of Appeals that considered the question" has treated the opinion as authoritative. *See Marks v. United States*, 430 U.S. 188, 194 (1977).[1]

The government attempts to minimize the persuasive force of Justice Stevens' opinion on the ground that he was allegedly unaware of the case of William Murphy, due to a misprint in the *Digest Opinions of the Judge Advocate*

---

[1] *See*, *e.g.*, *Presbyterian Church of Sudan v. Talisman Energy*, 582 F.3d 244, 260 (2d. Cir. 2009) *cert. denied* 131 S.Ct. 79 (2010) ("[respecting] conspiracy as an inchoate offense, the Supreme Court held in *Hamdan v. Rumsfeld*, … that 'the only conspiracy crimes that have been recognized by international war crimes tribunals … are conspiracy to commit genocide and common plan to wage aggressive war.'"); *Belfast v. United States*, 611 F.3d 783, 812 (11th Cir. 2010) ("a conspiracy to violate the customary international law of war was not an offense punishable under that body of law in a military commission.").

*General of the Army*. Resp. at 42 n.10.[2] The government makes much of the

Murphy commission. It includes more than forty pages of its archival documents in

its appendix, Resp. App. at 72-115, and repeatedly cites it as a military commission

prosecution of an inchoate conspiracy to commit war crimes after martial law had

been lifted and, hence, as a violation of the law of war of the kind described in

*Quirin*. Resp. at 41, 42 n.10, 46 n.11.

The problem with the Murphy commission, which the government never

discloses, is that Justice Miller, riding circuit, held it to be unlawful on *habeas*

review. *In re Murphy*, 17 F.Cas. 1030 (C.C.D.Mo. 1867). Issuing the writ, Justice

Miller held that because martial law had been lifted by the time of his trial,

Murphy was "tried by and held under the sentence of a court which had no

jurisdiction of his person or of his offence." *Id*. at 1032. He further ruled that it

would be unconstitutional to affirm on the basis of a postwar statute Congress had

passed to ratify military commission judgments. "No clearer case of an *ex post*

*facto* law could be framed. Its effect is to hold men in confinement for offences not

punishable at the time they were committed, and to detail such persons in a

servitude imposed by a court which had no jurisdiction to try them." *Id*.

---

[2] Justice Stevens was at least aware of Winthrop's discussion of the Murphy case, notwithstanding the alleged misprint. In the very next sentence of his opinion, Justice Stevens quotes from the footnote in Winthrop's treatise where Murphy's conspiracy charge is listed as a hybrid offense. *Hamdan*, 548 U.S at 608.

The government's misplaced reliance on the Murphy commission also highlights a larger problem with its attempt to fit the charges against Mr. Bahlul into the doctrinal framework of the nineteenth century. While Murphy was alleged to have conspired with others, he was charged with substantive offenses. Charges in these commissions would often use the word "conspire" along with "combine," "confederate" or other similar words to indicate the co-perpetration of an otherwise charged crime. *See Hamdan*, 548 U.S. at 604 n.35 (plurality op.).

This practice was not unlike the modern doctrine of joint criminal enterprise. Referred to as "common plan" and "common design" after World War II, it is a doctrine of principal liability for co-perpetrated war crimes, not a stand-alone offense. *Hamdan*, 548 U.S. at 611 n.40 (plurality op.); *Prosecutor v. Milutinovíc*, Decision on Dragoljub Ojdaníc's Motion Challenging Jurisdiction-Joint Criminal Enterprise, Case No. IT-99-37-AR72, 2003 WL 24014138 (ICTY App. Ch., May 21, 2003) ("*Milutinovíc*"). The Wirz commission, for example, which involved systemic detainee abuse at Andersonville, Resp. App. at 63-75, is a paradigmatic case of what is now known as "Category 2" joint criminal enterprise. *See Milutinovíc* at ¶ 6 (Hunt, J., concurring).

While many of the other Civil War commissions also fit this pattern, the most famous is the case against the Lincoln assassins, who were charged with "combining, confederating, and conspiring together … to kill and murder, within

22

the Military Department of Washington, and within the fortified and intrenched

(sic) lines thereof, Abraham Lincoln[.]" H.R. Doc. No. 314, 55th Cong., 3d Sess.,

696 (1899). The government cites the Lincoln commission with great fanfare. But

its federal court review shows that these charges were affirmed as a form of

participation in the completed crime. Judge Friedman, for example, affirmed the

Army's determination that Dr. Samuel Mudd was properly convicted under the law

of war for having "aided and abetted President Lincoln's assassins." *Mudd v.

Caldera*, 134 F.Supp.2d 138, 147 (D.D.C. 2001). The same reasoning is apparent

in the *habeas* decision rendered in Mudd's case, where the district court described

the offense as "a conspiracy to commit the military crime which one of their

number did commit[.]" *Ex parte Mudd*, 17 F.Cas. 954 (S.D.Fla. 1868).[3]

> **b.    U.S. practice during the Civil War shows that solicitation to commit war crimes was not a stand-alone offense under the law of war.**

The government string cites general orders from the Civil War that it claims

"demonstrate that those who induced others to commit offenses triable by military

commission were frequently prosecuted." Resp. at 48. All of these commissions

---

[3] The district court appears to have been satisfied that martial law prevailed in Washington, D.C., which it described as "a fortified city, which had been invaded during the war." *Mudd*, 17 F.Cas. at 954. The Army also relied on the fact that Washington "remained under a form of martial law at the time of the Lincoln assassination[.]"*Mudd*, 134 F.Supp.2d at 142.

23

were convened in Missouri after it had been put under martial law and typically described the accused's conduct as "treasonous."

The government leaves out the commission of Lambdin Milligan, whose charges were near-identical to those brought against Mr. Bahlul. G.O. No. 27, Hdqtrs. Dist. of Ind. (May 9, 1865), O.R., Ser. 2, vol. 8, at 543-48, Supp. App. 53-59. Milligan was charged with incitement because he "did, by public addresses, by secret circulars and communications, and by other means, endeavor to and did arouse sentiments of hostility to the Government of the United States, and did attempt to induce the people to revolt against said Government." *Id*. He was also charged with conspiring with and supporting a "secret unlawful society or organization" dedicated to the violent overthrow of the government. *Id*. This was all alleged to have occurred in Indiana, where the commission was convened.

Because Indiana had never been under martial law, the Supreme Court ruled that this commission could not constitutionally exercise jurisdiction over these charges. *Milligan*, 4 Wall. at 121-22. In *Quirin*, the Supreme Court distinguished *Milligan* on the ground that his commission involved offenses that could "not be triable by military tribunal." *Quirin*, 317 U.S. at 19.

24

### c. U.S. practice during the Civil War shows that material support crimes were not stand-alone offenses under the law of war.

The government attempts to fit material support into Civil War commissions dealing with aiding guerillas. Resp. at 33-39. All of these cases equally arose under martial law and if the Supreme Court's invalidating similar charges in *Milligan* is any guide, such offenses were not triable outside areas governed by the military.

Even if martial law were not at issue, the specifications of these offenses reveal that, like *Quirin*, the criminality turned on the individual having perpetrated hostile acts from within the Union's lines. Given the nature of the Civil War, anyone inside the United States who joined with or provided aid to the rebellion was a criminal. *Ford v. Surget*, 97 U.S. 594, 605 (1878). After the war, tens of thousands citizens and resident aliens alike ultimately claimed the benefit of a Presidential pardon. Samuel T. Morison, *Presidential Pardons and Immigration Law*, 6 Stan. J. Civ. Rts. & Civ. Lib. 253, 304-11 (2010).

If a non-resident alien aided the enemy, however, the Supreme Court held that "[h]e was no offender, in a criminal sense. He had committed no crime against the laws of the United States or the laws of nations[.]" *Young v. United States*, 97 U.S. 39, 66 (1877); *see also Green v. United States*, 8 Ct. Cl. 412, 419-20 (1872) (holding that "no crime can be imputed" to a non-resident alien for giving "material aid . . . to the rebellion."); Report of Maj. L. C. Turner to Col. James A.

25

Hardie (Jun. 4, 1864), O.R., Ser. 2, vol. 7, at 194-95, Supp. App. 50-51 (report of military commission holding that non-resident aliens committed no crime by serving on blockade running vessels).

### C. The best evidence of the problems with the charges in this case is the government's inability to settle upon a legal theory to sustain them.

Below, the government argued that Congress was entitled to near-absolute deference in declaring what offenses constituted war crimes triable by military commission. The CMCR rejected this argument but nevertheless sustained this conviction because it viewed Mr. Bahlul's alleged conduct as inconsistent with international norms. Here, the government argues that even though these offenses are not war crimes as that term has historically been understood, they are close enough to offenses historically tried under a newly identified body of U.S. common law of war. In the alternative, it asks this Court to hold that the political branches can grant military commissions general jurisdiction by augmenting their war powers with the Necessary & Proper Clause.

To prevail, the government needs to make law with this case. The kind of legal theories this Court would have to accept in order to affirm, however, would spawn constitutional problems that will infect far more than terrorism cases. The government's theories threaten to divest the judiciary of its core functions whenever the government claims some arguable relationship to the war powers.

26

**1.     The government's theory below divests the courts of their exclusive authority to say what the law is.**

If the government's theory below is accepted, then Congress has the plenary power to declare not only what the law of nations is and will be, but also what it has been. Short of actually conducting legislative trials, it is difficult to imagine a greater encroachment on the separation of the political and judicial powers. "[T]o declare what the law is, or has been, is a judicial power, to declare what the law shall be is legislative [.]" *Koshkonong v. Burton*, 104 U.S. 668, 678 (1881).

Even prospectively, the Supreme Court has routinely disallowed Congressional efforts to "define" offenses as against the law of nations if they were not, in fact, part of customary international law. *United States v. Furlong*, 5 Wheat. 184, 198 (1820); *United States v. Arjona*, 120 U.S. 479, 488 (1887) ("Whether the offense as defined is an offense against the law of nations depends on the thing done, not on any declaration to that effect by Congress."); *United States v. Palmer*, 3 Wheat. 610, 641-42 (1818) (Johnson, J., concurring) ("Congress cannot make that piracy which is not piracy by the law of nations, in order to give jurisdiction to its own courts over such offenses."). The Court even invalidated Congressional efforts to criminalize the foreign slave trade, which had been prohibited in the United States and Great Britain, but had not yet ripened into a universally binding rule of international law. *The Antelope*, 10 Wheat. 66, 122 (1825) (Marshall, C.J.) ("As no nation can prescribe a rule for others, none can make a law of nations; and

27

this traffic remains lawful to those whose governments have not forbidden it.").[4]

To hold otherwise would mean that there were no limits on Congress' proscriptive

power under the Define & Punish Clause.

> ## 2.     The CMCR's theory replaces definite universal crimes with indeterminate international norms.

If the CMCR's theory is accepted, Congress' powers under the Define &

Punish Clause are similarly unbounded. The only constraint would be that courts

on review could assess whether an offense is inconsistent with international norms

specified at some indeterminate level of generality. Many of the problems with the

CMCR's approach are detailed in Petitioner's merits brief. Pet. Br. at 23-42.

---

[4] The morality of the slave trade was not at issue. Three years earlier, Justice Story, riding circuit, had opined that the slave trade was a violation of customary international law because it was "repugnant to the great principles of Christian duty, the dictates of natural religion, the obligations of good faith and morality, and the eternal maxims of social justice." *United States v. La Jeune Eugenie*, 26 F. Cas. 832, 846 (C.C.D.Mass. 1822). For Chief Justice Marshall, however, the mere fact that the practice was morally reprehensible did not make it a violation of international law. *The Antelope*, 23 U.S. at 121-22 ("Whatever might be the answer of a moralist to this question, a jurist must search for its legal solution in [State practice] ... If we resort to this standard as the test of international law, the question ... is decided in favour of the legality of the trade."). *Cf. Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 795-96 (D.C. Cir. 1984) (Edwards, J., concurring) (holding that "no matter how repugnant it might be to our own legal system," terrorism is not a violation of the law of nations because "the nations of the world are so divisively split on the legitimacy of such aggression as to make it impossible to pinpoint an area of harmony or consensus.").

Among the most pernicious is that "international norms" provide no constraint at all. Nearly everything in the modern world touches on some international norm – be it domestic relations, arms trafficking, or intellectual property. The CMCR's theory entails that Congress can not only divert the adjudication of any international norm to a military commission, but assume general police powers.

### 3.    The government's primary theory here vests military commissions with general jurisdiction over the trial of all crimes.

If the government's theory here is accepted, then a law-of-war commission can be given jurisdiction over any offense that approximates any charge ever brought before any type of military tribunal. Resp. at 37. That would include anything analogous to furnishing soldiers with liquor, bribery, and embezzlement, which were all tried by military commission during the Civil War and even sometimes characterized as violating the law of war. Winthrop at 339-40, Supp. App. 75-76.

Like its other theories, the U.S. common law of war theory has no rational stopping place. Given the thousands of commissions convened during the Civil War in places like Missouri, military commissions could assume jurisdiction whenever the government claims some convenience under the war powers.

29

### 4. The government's alternative theory would make the war powers a new exception to the *Ex Post Facto* Clause and, in any event, has been explicitly rejected by the Supreme Court.

The government offers the alternative argument that this conviction should be affirmed because "Congress reasonably determined" that including these offenses in the Military Commissions Act "fulfills its international responsibilities to prevent and to punish terrorism." Resp. at 57. While again conceding that none of the offenses before this Court have "attained international recognition at this time as offenses under customary law, the Define and Punish Clause, in tandem with the Necessary and Proper Clause, affords Congress ample authority to make these offenses subject to trial and punishment by military commission." *Id*. at 50.

The fatal flaw in this alternative theory is that the Necessary & Proper Clause affords Congress no added leeway to broaden the otherwise strictly circumscribed jurisdiction of military tribunals. The government made the identical argument in *Toth v. Quarles*, 350 U.S. 11 (1955), and the Supreme Court held that even its broad authority to regulate the Armed Forces "does not empower Congress to deprive people of trials under Bill of Rights safeguards, and we are not willing to hold that power to circumvent those safeguards should be inferred through the Necessary and Proper Clause." *Id*. at 21-22.

The government also never explains how it is necessary, proper or consistent with the *Ex Post Facto* Clause to retroactively punish offenses that the government

30

concedes, even today, are not offenses against the law of nations. Even where Congress legislates to make specific treaty obligations enforceable, it is not thereby relieved of the Constitution's explicit textual constraints. *Cf. Boos v. Barry*, 485 U.S. 312 (1988). And the government implicitly concedes the weakness of this argument when it can only answer the *ex post facto* problems in this case by reverting back to the argument that Mr. Bahlul should have been on notice of what violated "our own nation's common law of war[.]" Resp. at 68.

### 5.    The traditional test for military commission jurisdiction requires reversal in this case.

None of the offenses of which Mr. Bahlul stands convicted were positively identified by Congress as war crimes at any time relevant to his having committed them. These inchoate offenses have historically been rejected both here and abroad. And the government concedes that even today, they do not violate customary international law.

These undisputed facts would have been fatal to the charge in *Quirin*. They would have been fatal in *Yamashita*. They were fatal for a plurality in *Hamdan*. And they evidently would have been fatal in the Civil War cases of *Murphy* and *Milligan*. "Brushing aside such precedent – particularly when doing so gives rise to a host of new questions never dealt with by this Court – is unjustified and unwise." *Hamdi v. Rumsfeld*, 542 U.S. 507, 523 (2004) (plurality op.).

31

The subject-matter jurisdiction of law-of-war commissions is the same as it always has been: "offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals." *Quirin*, 317 U.S. at 28. Because the government now concedes that the offenses it brought against Mr. Bahlul do not qualify under that standard, reversing this conviction on these particular charges is the necessary consequence of the straightforward application of settled law.

## II.    THE  UNITED  STATES  CANNOT  PUT  "THE THOUGHTS,  THE  BELIEFS,  THE  IDEALS  OF THE ACCUSED" ON TRIAL.

### A. The First Amendment issues in this case are subject to *de novo* review by this Court.

The government argues that the First Amendment issues in this case should be subject to plain error review because the military attorney appointed to assist Mr. Bahlul at trial forfeited them. The record shows, however, that even though Col. Gregory revoked Mr. Bahlul's *pro se* status, he allowed him to speak for himself throughout the proceedings and, for all practical purposes, represent himself. The government viewed his pre-trial conduct this way and asked to clarify if he would continue with this "hybrid-representation" at trial. Supp. App. 84. It is true that Mr. Bahlul's lengthy monologues lack the precision expected of a lawyer. But when asked to enter his pleas, he lodged what can only be described as legal objections to the charges against him.

With respect to the First Amendment, Mr. al Bahlul repeatedly argued that he was a "media man" being silenced by the government:

> ACC [MR. AL BAHLUL]: But I'm a media man, and I want you to know that you are prosecuting a media man and – as a comparison; and unless you – I'm not a – you are prosecuting a media member of al Qaeda and you are not prosecuting an al Qaeda member who is about to do an operation. … And a media man from outside that was able to prove to the world the way of silencing people and the freedom of the press in this country.

Supp. App. 80-81.

Entering his plea to the solicitation charge, he objected that he was not guilty of "instigation to commit deliberate killing against protected individuals." Supp. App. 82. He instead asserted, as the government would later argue to the jury, that his film was "instigation to jihad. I played this role in media in al Qaeda, and I do the same here in the military court." *Id.*; *see also* Supp. App. 79 ("ACC [MR. AL BAHLUL]: And I am a media man, and I understand from that this is shutting someone off, but in an American way, or silencing someone."); *id.* 83 ("ACC [MR. AL BAHLUL]: All right. All right. Now it showed—it showed that you close mouths and shut up mouths here even in the military court, just with excuse that it's administration and law.").

Even had Mr. Bahlul not raised the "freedom of the press" and contested his guilt on the basis that war propaganda does not constitute criminal solicitation, First Amendment defenses are not subject to waiver "in circumstances which fall short of being clear and compelling." *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 143-45 (1967); *see also Bose Corp. v. Consumers Union of the U.S.*, 466 U.S. 485, 499 (1984). Mr. Bahlul's articulated defense as a "media man" put the Commission on notice of the First Amendment issues in this case well beyond what is ordinarily expected from a *pro se* accused. *United States v. Byfield*, 391 F.3d 277, 281 (D.C. Cir. 2004). Compounded by "a legal landscape whose contours are in a state of evolving definition and uncertainty," *City of St. Louis v. Praprotnik*, 485 U.S. 112,

34

120 (1988), Mr. Bahlul's failure to lodge supplementary objections to the

Commission's jury instructions and findings creates no clear or compelling basis

on which this Court should forgo its usual *de novo* review under the First

Amendment. *Terminiello v. Chicago*, 337 U.S. 1, 5 (1949); *United States v. Popa*,

187 F.3d 672, 674 (D.C. Cir. 1999).

### B. The government cannot criminally prosecute the production of a film free from the constraints of the First Amendment.

The government attempts to avoid the merits of Mr. Bahlul's objections on

what are at bottom standing grounds. It claims that if a non-resident alien can

assert the First Amendment as a defense to criminal prosecution, "then any enemy

army would presumably have the right to broadcast propaganda, and the United

States would be constitutionally barred from disrupting the signal or attacking the

broadcast tower." Resp. at 75. It places its primary reliance on two immigration

cases, which were cited in Mr. Bahlul's merits brief and rested on the fact that "an

unadmitted and nonresident alien, had no Constitutional right of entry to this

country as a nonimmigrant or otherwise." *Kleindienst v. Mandel*, 408 U.S. 753,

762 (1972); *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904).

Mr. Bahlul stipulates that the political branches have plenary authority over

immigration, *Miller v. Albright*, 523 U.S. 420, 455-56 (1998), and that non-

resident aliens generally have no standing to bring Constitutional causes of actions

35

against the government. *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 206-07 (D.C. Cir. 1985). Moreover, any lawsuit challenging military targeting would likely be foreclosed by the political question doctrine. *El-Shifa Pharmaceutical Industries Co. v. United States*, 607 F.3d 836, 844 (D.C. Cir. 2010) (en banc).

Standing to sue, however, is not an issue in this case and the specter of enemy aliens suing to enjoin foreign military operations on First Amendment or any Constitutional ground is a red herring. This conviction arose out of an integrated criminal justice system that Congress created under this Court's direct appellate review. When the government uses criminal prosecutions to punish the advocacy of political arguments that it wishes to eradicate like a "virus," "the primary constitutional violation occure[s] during the trial itself." *Powers v. Ohio*, 499 U.S. 400, 412 (1991); *Eisenstadt v. Baird*, 405 U.S. 438, 445 n.5 (1972).

This Court recognized this very distinction in *DKT Mem'l Fund v. U.S.A.I.D.*, 887 F.2d 275 (D.C. Cir. 1989). While dismissing the foreign plaintiffs on prudential standing grounds, this Court was careful to note that its analysis would have been different had they been "within the custody or control of the United States" in the way a criminal defendant is. *Id*. at 285. Having been taken into the government's custody and control as a criminal accused, Mr. Bahlul can rightly claim that the "constitutional structure of our Government that protects individual liberty is compromised," when the government then asks this Court to

36

affirm the conviction it obtained against him for producing political propaganda. *Bond v. United States*, 131 S.Ct. 2355, 2365 (2011); *cf. United States v. Verdugo-Urquidez*, 494 U.S. 259, 278 (1990) (Kennedy, J. concurring) ("The United States is prosecuting a foreign national in a court established under Article III, and all of the trial proceedings are governed by the Constitution.").

### C. *Humanitarian Law Project* did not diminish the judiciary's duty to ensure that thoughts, beliefs and ideals are not put on trial.

The government rightly looks to *Humanitarian Law Project v. Holder*, 130 S.Ct. 2705 (2010), as its best case both substantively and for the opinion's broader language. In a pre-enforcement, facial challenge to 18 U.S.C. § 2339B, the Supreme Court held that an individual could be lawfully prosecuted for providing speech-linked services to proscribed organizations, insofar as it was not the speech itself being punished, but the provision of services. *Id.* at 2726. This is not unlike the analysis found in the treason cases the government relies upon, insofar as the Constitutional protection of the underlying conduct is irrelevant to a treason charge. *Haupt v. United States*, 330 U.S. 631, 634 (1947).

Where *Humanitarian Law Project* stops and this case begins is with the fact that Mr. Bahlul is not mounting an abstract facial challenge to the consistency of the solicitation, conspiracy or material support laws with the First Amendment. His objection is that these laws were used to put his thoughts, beliefs and ideals on

trial. That is not Mr. Bahlul's characterization of the record. Those are the words of his prosecutor, who told the jury that the chief evidence in this case was a film and exhorted them to punish him for what he advocates.[5]

The government claims that because the Military Commissions Act is facially neutral, this Court need not undertake any First Amendment analysis of how it was applied. Resp. at 78-79. But that position is contrary to decades of settled law, *Humanitarian Law Project*, 130 S.Ct. at 2724, and is inconsistent with Congress' presumed intent.

The Act's solicitation offense is drawn from the federal solicitation statute. 18 U.S.C. § 373. Before enacting it, Congress expressed great sensitivity to the "line-drawing problem … presented between legitimately proscribable criminal activity and criticism of the government, advocacy of political ideologies, other expression or advocacy of ideas that enjoys constitutional protection." S.Rep. No. 307, 97th Cong., 1st Sess. 183 (1982), Supp. App. 70. The Senate Report states that the federal solicitation statute was intended to narrowly apply to genuine criminal transactions and that when political advocacy became intertwined with alleged criminality, *Brandenburg* and its progeny would "operate as supplementary restrictions on the applicability of the section." *Id.* at 182; Supp. App. 69.

---

[5] The supplemental appendix includes the prosecution's summation of the evidence in full along with the jury instructions. Supp. App. 106-62.

The record shows that Mr. Bahlul was never involved in the operational planning of any terrorist attack. App. 264, 271-72. The government claims that it "introduced physical evidence and testimony from individuals alleged to have been solicited by Bahlul to commit terrorist acts[.]" Resp. at 16. But those individuals actually testified that Mr. Bahlul's film, which they viewed at training camps in Afghanistan, only caused them to question whether they should be involved with al Qaeda at all. App. 203-14. They did not testify to having ever met Mr. Bahlul and the government put on no evidence indicating that he personally solicited anyone to do anything. Mr. Bahlul's alleged criminality derives not from his having made particular offers to commit crimes, but his making a political film whose alleged purpose was the advocacy of the use of force and of law violation.

Since at least *Terminiello*, the First Amendment has supplemented facially neutral laws by requiring instructions on the bounds of the freedom of speech, when the government uses them to punish political expression. Such guidance is especially important when the average juror is apt to find the accused's beliefs to be alien or threatening. *Yates v. United States*, 354 U.S. 298, 327 (1957) ("Vague references to 'revolutionary' or 'militant' action of an unspecified character, which are found in the evidence, might in addition be given too great weight by the jury in the absence of more precise instructions.").

39

The government relies heavily upon *United States v. Rahman*, 189 F.3d 88 (2d Cir. 1998). But it neglects to disclose that the Second Circuit affirmed in significant part because of the jury instructions. *Id*. at 118 ("Judge Mukasey properly protected against the danger that Abdel Rahman might be convicted because of his unpopular religious beliefs that were hostile to the United States. He explained to the jury the limited use it was entitled to make of the material received as evidence of motive. He instructed that a defendant could not be convicted on the basis of his beliefs or the expression of them – even if those beliefs favored violence."). In every post-trial decision the government cites, the trial judge properly admonished the jury that it was not there to decide the merits of the accused's beliefs and that the advocacy of violence was not a criminal act.

The government offers snippets of testimony from the record in an effort to persuade this Court, in effect, that Mr. Bahlul would have been convicted even if the jury had been given proper instructions. The problem is that, even if true, the Commission's failure to properly instruct the jury on the First Amendment is equivalent to its failing to instruct on the elements of the offense. *Cf. Osborne v. Ohio*, 495 U.S. 103, 124-25 (1990). When the government makes the accused's production of a film the centerpiece of its case against him, the record must unambiguously show that the verdict and sentence rest solely on what is criminal about his having made it. *See Street v. New York*, 394 U.S. 576, 587 (1969)

40

("[E]ven assuming that the record precludes the inference that appellant's conviction might have been based solely on his words, we are still bound to reverse if the conviction could have been based upon both his words and his act.").

Because no First Amendment instructions were given at all, this case comes to this Court in the same posture as *Freeman v. United States*, 761 F.2d 549 (9th Cir. 1985). There, a tax-protestor was charged under a fourteen-count indictment for soliciting and aiding and abetting tax evasion, largely through public how-to seminars. Relying on *Brandenburg*, then-Judge Kennedy reversed on the twelve counts that did not involve the one-on-one facilitation of crime, ruling that "the jury should have been charged that the expression was protected unless both the intent of the speaker and the tendency of his words was to produce or incite an imminent lawless act, one likely to occur." *Id*. at 552.

To be sure, Mr. Bahlul did nothing to ingratiate himself to the military commission that convicted him. But the First Amendment does not require a defendant to be the voice of reason at trial – whether he is Clarence Brandenburg, Fred Phelps or Ali Hamza al Bahlul. Given the tenor of the prosecution's case, a jury in a trial such as this cannot be left to believe that their disgust with what the accused advocates is relevant to deciding whether he is a war criminal deserving of life imprisonment.

41

### III.  THE GOVERNMENT OFFERS NO RATIONAL, LET ALONE COMPELLING, REASON TO ALLOW MILITARY COMMISSIONS TO DENY EQUAL JUSTICE UNDER LAW.

The government frames its defense of the military commission system as a plea for rational basis scrutiny. What is sought, however, is not any particular type of scrutiny, but deference. According to the government, "Congressional policies regarding the treatment of aliens are entitled to a great deal of deference." Resp. at 83. There is no doubt that Congress can make rational distinctions between citizens and non-citizens. In the areas of immigration, naturalization, and political privileges, the very essence of citizenship is involved and distinctions between citizens and non-citizens are typically rational.

Military commissions are criminal courts, not immigration or naturalization services. As such, the government cannot discriminate against the accused on the basis of alienage absent some compelling state interest. *Wing Wong v. United States*, 163 U.S. 228, 238 (1896) (upholding deportation order for aliens but invalidating prison sentence because it was imposed without a trial conforming to the Fifth and Sixth Amendments that a citizen would have received).

The criminal authorities the government offers deal with the Hostage Taking Act, 18 U.S.C. § 1203. Resp. at 85. The enactment of the Hostage Taking Act, however, was not motivated by an intent to discriminate and is, in fact, a paradigm case for the rational use of citizenship to achieve rational legislative objectives

42

pertaining to international affairs. *See Washington v. Davis*, 426 U.S. 229 (1976).

It applies to U.S. citizens as well as aliens; both may be offenders and both may be

victims. 18 U.S.C. §1203(b). The sole difference between their treatment is that the

statute does not apply where both offenders and victims are citizens, the conduct

took place within the U.S., and the offender was found within the U.S. *Id.* §

1203(b)(2). Even where these conditions are met, citizen-on-citizen conduct falls

under the statute if the aim of the hostage-taking is coercing the United States

government into taking or refraining from some action. 18 U.S.C. § 1203(b)(2).

Courts addressing challenges to the Hostage Taking Act have found these

distinctions rationally related to legitimate state ends, and thus constitutional. *See*,

*e.g.*, *United States v. Ferreira*, 275 F.3d 1020, 1025-27 (11th Cir. 2001), *cert.*

*denied sub nom. Martinez v. United States*, 535 U.S. 977 (2002); *United States v.*

*Lue*, 134 F.3d 79, 86-87 (2d Cir. 1998); *United States v. Lopez-Flores*, 63 F.3d

1468, 1473 (9th Cir. 1995). That conclusion was warranted because the Hostage

Taking Act was passed to fulfill the United States' international obligations under

the International Convention Against the Taking of Hostages, Dec. 18, 1979,

T.I.A.S., No. 11,081 ("Hostage Convention"). *Lue*, 134 F.3d at 83-84. The

Convention itself exempts purely domestic hostage-taking because it "lacks an

international aspect." *Lopez-Flores*, 63 F.3d at 1473 n.2; Hostage Convention, art.

13. The Hostage Taking Act's use of citizenship is therefore rationally related to

43

the legitimate end of minimizing the intrusion of federal criminal jurisdiction in areas that fall under the States' police power. *Lopez-Flores*, 63 F.3d at 1473.

No such arguments can be made on behalf the Military Commissions Act's jurisdictional limitation to aliens. The government argues for rational basis scrutiny but never articulates what makes the discrimination the Court confronts in this case rational, let alone compelling. The nature of terrorism means that there is a substantial, if not greater, threat posed by would-be citizen terrorists. Citizen war criminals are as amenable to law-of-war commission jurisdiction as aliens. *Quirin*, 317 U.S. at 37-38. And the United States military has an unbroken tradition of trying aliens and citizens side-by-side for war crimes. The government is left with pleas for deference because there is nothing rational to defend.

The Act's discrimination is invidious. When a law's purpose is simply to target a politically disenfranchised class, it implicates the central concern of modern equal protection jurisprudence. It is discrimination whose sole purpose and effect is to deny equal justice under law. "The federal sovereign, like the States, must govern impartially. The concept of equal justice under law is served by the Fifth Amendment's guarantee of due process, as well as by the Equal Protection Clause of the Fourteenth Amendment." *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976); *Chan Gun v. United States*, 9 App. D.C. 290, 298 (D.C. Cir. 1896).

44

## CONCLUSION

For the reasons stated above and in Petitioner's brief, the judgment below should be reversed.

Respectfully submitted,

 /s/ Michel Paradis
Michel Paradis
CAPT Mary McCormick, JAGC, U.S. Navy
MAJ Todd E. Pierce, JA, U.S. Army
1620 Defense Pentagon
Washington, DC 20301-1620
michel.paradis@osd.mil
TEL: 1.703.696.9490 x115
FAX: 1.703.696.9575

*Counsel for Petitioner*

45

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.      This brief complies with the type-volume limitations imposed by Fed. R. App. P. 32(a)(7)(B) as modified by this Court's order in this case of March 30, 2012 because:

[X] this brief contains 10,599 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ] this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point font size and Times New Roman type style; *or*

[ ] this brief has been prepared in a monospaced typeface using _____ with _____.

Dated: July 2, 2012

Respectfully submitted,

/s/ Michel Paradis
*Counsel for Petitioner*

46

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2012 a copy of the foregoing was filed electronically with the Court. Notice of this filing will be sent to all parties by operation of this Court's electronic filing system. Parties may access this filing through the Court's system.


Dated: July 2, 2012

Respectfully submitted,


/s/ Michel Paradis
*Counsel for Petitioner*

47