No. 11-1324

_____

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

ALI HAMZA AHMAD SULIMAN AL BAHLUL, Petitioner,

v.

UNITED STATES OF AMERICA, Respondent.

_____

ON PETITION FOR REVIEW FROM THE UNITED STATES COURT
OF MILITARY COMMISSION REVIEW

_____

PETITION OF THE UNITED STATES FOR REHEARING EN BANC

_____

ROB PARK
Acting Deputy General Counsel
U.S. Department of Defense

LISA O. MONACO
 Assistant Attorney General
 for National Security
J. BRADFORD WIEGMANN
Deputy Assistant Attorney General
STEVEN M. DUNNE
Chief, Appellate Unit
JOHN F. DE PUE
JOSEPH F. PALMER
Attorneys
National Security Division
U.S. Department of Justice
Washington, DC 20530

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

STATEMENT REQUIRED BY RULE 35(b)..................................................1

QUESTION PRESENTED ...............................................................................2

STATEMENT ...................................................................................................3

ARGUMENT ....................................................................................................4

    I.      The *Hamdan II* Court Misconstrued the 2006 MCA ...........................4

    II.    The *Hamdan II* Court Misconstrued Article 21 ...................................9

    III.   The Scope of Military Commission Jurisdiction over the
         Offenses Charged in This Case Is a Question of Exceptional
         Importance ........................................................................................13

CONCLUSION ...............................................................................................15

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ...........16

    I.      PARTIES .........................................................................................16

    II.    RULINGS UNDER REVIEW ..........................................................16

CERTIFICATE OF SERVICE ......................................................................18

ADDENDUM ...............................................................................................1a

## TABLE OF AUTHORITIES

Cases:

Colepaugh v. Looney, 235 F.2d 429 (10th Cir. 1956)................................................8

Hamdan v. Rumsfeld, 548 U.S. 557 (2006).........................................6, 7, 12, 13, 14

Hamdan v. United States, 696 F.3d 1238 (D.C. Cir. 2012)...........1, 4, 5, 6, 7, 11, 12

Madsen v. Kinsella, 343 U.S. 341 (1952).................................................................10

Ex parte Quirin, 317 U.S. 1 (1942).........................................................8, 12, 13

United States v. Al Bahlul, 820 F. Supp. 2d 1141 (CMCR 2011) ...........................3

Application of Yamashita, 327 U.S. 1 (1946) .........................................................11

Statutes:

Military Commissions Act of 2006, 10 U.S.C. § 948a *et seq*. ............................1, 2

    10 U.S.C. § 948d(a) (2006) ..........................................................1, 5

    10 U.S.C. § 950p(a) (2006) .................................................................5

    10 U.S.C. § 950p(b) (2006) .........................................................1, 5

    10 U.S.C. § 950u (2006).......................................................................3

    10 U.S.C. § 950v(b) (2006) .................................................................1

    10 U.S.C. § 950v(b)(25) (2006) ........................................................3

    10 U.S.C. § 950v(b)(28) (2006) ........................................................3

Military Commissions Act of 2009:

    10 U.S.C. § 948d (2009)......................................................................7

    10 U.S.C. § 950p(d) (2009) .................................................................7

Pub. L. No. 109-366, § 4(a)(2), 120 Stat. 2631 (2006) ..........................................10

10 U.S.C. § 821 (Art. 21)..................................................4, 9, 10, 11, 13

Miscellaneous:

Jonathan A. Bush, The Prehistory of Corporations and Conspiracy in
        International Criminal Law: What Nuremberg Really Said,
        109 Colum. L. Rev. 1094 (2009)...............................................................8

152 Cong. Rec. H7936 (daily ed. Sept. 29, 2006) .....................................................6

Dep't of the Army, Field Manual 27-10,
        The Law of Land Warfare (1956)...............................................................8

Fed. R. App. P. 35(b) ...........................................................................................2, 13

General Court Martial Order No. 452 (Aug. 22, 1865),
        reprinted in H.R. Doc. No. 55-314 (1899) ......................................................8

H.R. Rep. No. 109-664, Pt. 1 (2005) ....................................................................6, 7

Revision of the Articles of War:  Hearing Before the Subcomm.
        on Military Affairs, appended to S. Rep. No. 64-130 (1916).......................10

Haridimos V. Thravalos, History, Hamdan, and Happenstance: "Conspiracy
        by Two or More To Violate the Laws of War by Destroying Life or
        Property in Aid of the Enemy", 3 Harv. Nat'l Sec. J. 223 (2012) .................8

U.N. War Crimes Commission, 1 L. Rep. Trials of War Criminals (1947)............12

U.N. War Crimes Commission, 11 L. Rep. Trials of War Criminals (1949)............9

William Winthrop, A Digest of Opinions of the Judge Advocate
        General (1880) .................................................................................................8

William Winthrop, Military Law and Precedents (rev. 2d ed. 1920)......................11

<u>STATEMENT REQUIRED BY RULE 35(b)</u>

In the Military Commissions Act of 2006, 10 U.S.C. § 948a *et seq*. ("2006 MCA"), Congress created a comprehensive military commission system to try alien enemy belligerents for offenses, specifically codified in the Act, that the United States has traditionally recognized as offenses subject to trial by military commission.  <u>See</u> 10 U.S.C. § 950v(b) (2006).  The 2006 MCA also explicitly authorizes military commissions to prosecute violations of the codified offenses even if the conduct was committed before the statute's enactment.  <u>Id.</u> § 950p(b); <u>see also</u> <u>id.</u> § 948d(a).  Despite Congress's express authorization, a panel of this Court held that the 2006 MCA did *not* authorize prosecution of pre-enactment conduct except for offenses previously codified or recognized as war crimes under international law.  <u>Hamdan v. United States</u>, 696 F.3d 1238, 1248-49 (D.C. Cir. 2012) ("<u>Hamdan II</u>").

In this case, a panel of this Court vacated Bahlul's military commission convictions for conspiracy, solicitation, and providing material support for terrorism, based on the government's concession that <u>Hamdan II</u> required that result.  Although the offenses committed by Bahlul are included in the 2006 MCA and have been triable by U.S. military commissions since the Civil War, the

charges are not sustainable under <u>Hamdan II</u> because they have not attained

recognition at this time as offenses under customary international law.

The panel's decision in <u>Hamdan II</u> adversely affects the military commission

system that Congress established to try and punish al Qaeda terrorists and other

alien enemy belligerents who committed offenses in the context of hostilities

against the United States before 2006.  The decision effectively nullifies

Congress's clear grant of authority to the President to bring conspiracy,

solicitation, and material support charges against the Nation's enemies for pre-

2006 conduct, including the attacks of September 11, 2001.  The detrimental effect

of <u>Hamdan II</u> on the military commission system is apparent: every pending

military commission prosecution, and every conviction already obtained under that

system, have included either conspiracy or material support charges (or both) for

conduct committed before 2006.  This case accordingly raises a question of

exceptional importance that warrants en banc review.  <u>See</u> Fed. R. App. P. 35(b).

## QUESTION PRESENTED

Whether the Military Commissions Act of 2006, 10 U.S.C. § 948a *et seq*.,

authorizes prosecution of conspiracy, solicitation, and material support for

terrorism offenses for conduct committed before its enactment.

<u>STATEMENT</u>

During the period leading up to the September 11 attacks, Ali Hamza Ahmad Suliman Al Bahlul served as Usama bin Ladin's personal secretary for public relations and as al Qaeda's self-proclaimed "media man."  <u>United States v. Al Bahlul</u>, 820 F. Supp. 2d 1141, 1161-62 (CMCR 2011) (en banc).  Bahlul's services to bin Ladin and al Qaeda included administering oaths of allegiance and preparing "martyr wills" for two of the 9/11 hijackers, as well as producing propaganda calling for volunteers to join al Qaeda's jihad against the United States.  <u>Id.</u>  At trial, Bahlul disputed none of this – his only regret was that he did not play a more direct role in the events of 9/11.  <u>Id.</u> at 1162-64.

In 2008, a military commission convicted Bahlul of conspiring with Usama bin Ladin and others to commit offenses triable by military commission, including murder of protected persons and attacking civilians, an offense codified at 10 U.S.C. § 950v(b)(28) (2006); solicitation of others to commit the same offenses, <u>id.</u> § 950u; and providing material support for terrorism, <u>id.</u> § 950v(b)(25).  Bahlul was sentenced to life imprisonment, and the U.S. Court of Military Commission Review affirmed.  820 F. Supp. 2d at 1155, 1264.

While Bahlul's appeal in this Court was pending, the panel in <u>Hamdan II</u> held that the 2006 MCA did not "authorize *retroactive* prosecution of crimes that

were not prohibited as war crimes triable by military commission under U.S. law at the time the conduct occurred." 696 F.3d at 1241. The panel found that, for pre-2006 conduct, a separate statute, 10 U.S.C. § 821, limited military commission jurisdiction to pre-existing statutory offenses or offenses under the international law of war. 696 F.3d at 1248-51.

In this case, the government acknowledged that the offenses for which Bahlul was convicted have not attained recognition at this time as offenses under customary international law and that, under Hamdan II's reasoning, the convictions should be vacated. The panel then vacated Bahlul's convictions. Al Bahlul v. United States, No. 11-1324, 2013 WL 297726 (D.C. Cir. Jan. 25, 2013).

## ARGUMENT

I.    The *Hamdan II* Court Misconstrued the 2006 MCA

In the 2006 MCA, Congress codified common law offenses that it determined had traditionally been triable by military commission. Both the express terms of the statute and its history make clear that Congress intended to authorize prosecution of these offenses for conduct committed before 2006.

Congress found that the offenses codified in the 2006 MCA had long been subject to military commission jurisdiction:

> The provisions of [the 2006 MCA] codify offenses that have traditionally been triable by military commissions. [The 2006 MCA]

4

> does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission.

10 U.S.C. § 950p(a) (2006).  Prosecution for offenses committed before 2006 is expressly permitted:

> Because the provisions of [the 2006 MCA] (including provisions that incorporate definitions in other provisions of law) are declarative of existing law, they do not preclude trial for crimes that occurred before the date of the enactment of this chapter.

Id. § 950p(b).  The Act also provides that military commissions have jurisdiction over offenses committed "*before*, *on*, or after September 11, 2001."  Id. § 948d(a) (emphasis added).  These provisions make it unmistakably clear that Congress intended the codified offenses to apply to conduct predating the 2006 MCA.

The Hamdan II panel, however, transformed Congress's finding that it was not creating new crimes into a *condition* limiting prosecution for pre-enactment conduct, where the offense was not recognized as an international law war crime. 696 F.3d at 1247-51.  This inversion of Congress's finding – an interpretation that neither party advanced – is inconsistent with the statutory text.  Had Congress intended to impose such a condition, it easily could have done so explicitly.

Hamdan II is also inconsistent with the 2006 MCA's background and purpose.  First, Congress recognized that among the principal candidates for military commission prosecutions were alien enemy belligerents who were being

5

detained at Guantanamo Bay and were suspected of committing offenses before 2006.  <u>See</u> 152 Cong. Rec. H7936 (daily ed. Sept. 29, 2006) (statement of Rep. Hunter); <u>see also</u> H.R. Rep. No. 109-664, Pt. 1, at 25 (2005) ("[T]he committee firmly believes that trial for crimes that occurred before the date of the enactment of this chapter" is permissible.).  Congress's purpose would be frustrated if some of the charges authorized could not be brought against detainees who had conspired to commit and otherwise supported terrorist attacks before 2006.

Similarly erroneous is the panel's assumption that, "[i]f Congress had known" that a court would conclude, contrary to Congress's finding, that a codified offense was a "new war crime[]," Congress "would *not* have wanted [such] *new* crimes to be applied retroactively."  <u>Hamdan II</u>, 696 F.3d at 1247-48. Congress was well aware of conflicting opinions regarding the historical status of some of the codified offenses, but the statute contains no suggestion that those offenses should not be applicable to pre-enactment conduct.  Indeed, Congress enacted the 2006 MCA in direct response to the Supreme Court's decision in <u>Hamdan v. Rumsfeld</u>, 548 U.S. 557 (2006) ("<u>Hamdan I</u>"), in which four justices concluded that conspiracy was not triable by military commission in the absence of statutory authorization, <u>id.</u> at 608-11, while three justices reached the opposite conclusion, <u>id.</u> at 697-704 (Thomas, J., dissenting).  In response, Congress

6

concluded that conspiracy was an offense triable by military commission.  <u>See</u> H.R. Rep. No. 109-664, Pt. 1, at 25 ("For the reasons stated in Justice Thomas's opinion, the Committee views conspiracy as a separate offense punishable by military commissions.").  This context leaves no doubt that Congress specifically intended to make *all* of the codified offenses, including conspiracy, applicable to pre-enactment conduct.[1]

The <u>Hamdan II</u> panel also erred in concluding that its construction of the 2006 MCA was necessary to avoid a serious question under the Ex Post Facto Clause.  696 F.3d at 1248.  Contrary to <u>Hamdan II</u>, the 2006 MCA's provision of jurisdiction over Bahlul's conduct does not implicate that clause, because military commissions have throughout our Nation's history tried such conduct.

That traditional practice is especially clear regarding conspiracy.  Several of the most prominent examples of military commission prosecutions in American history involved conspiracy charges, including those against conspirators involved in the assassination of President Lincoln, <u>see</u> <u>Hamdan I</u>, 548 U.S. at 699 (Thomas,

---

[1] In the 2009 Military Commissions Act, Congress reaffirmed that these offenses apply to pre-2006 conduct.  10 U.S.C. § 950p(d) (2009) ("Because the provisions of this subchapter codify offenses that have traditionally been triable under the law of war or otherwise triable by military commission, this subchapter does not preclude trial for offenses that occurred before the date of the enactment of this subchapter."); <u>see also</u> <u>id.</u> § 948d (authorizing jurisdiction over offenses "committed *before, on*, or after September 11, 2001") (emphasis added).

J., dissenting), as well as Nazi saboteurs in Ex parte Quirin, 317 U.S. 1, 22-23

(1942) (noting that military commission charges included conspiracy), and

Colepaugh v. Looney, 235 F.2d 429, 431 (10th Cir. 1956) (same).  See also

William Winthrop, A Digest of Opinions of the Judge Advocate General 328-29

(1880) (including as an "offence[ ] against the laws and usages of war," punished

by military commission, "[c]onspiracy . . . to violate the laws of war by destroying

life or property in aid of the enemy"); Dep't of the Army, Field Manual 27-10, The

Law of Land Warfare ¶ 500 (1956) (conspiracy to commit war crimes is

punishable); Jonathan A. Bush, The Prehistory of Corporations and Conspiracy in

International Criminal Law: What Nuremberg Really Said, 109 Colum. L. Rev.

1094, 1097 (2009) (noting that "some form of conspiracy has been included as a

charge and often as part of a judgment in every major American war crimes trial

program"); Haridimos V. Thravalos, History, *Hamdan*, and Happenstance:

"Conspiracy by Two or More To Violate the Laws of War by Destroying Life or

Property in Aid of the Enemy", 3 Harv. Nat'l Sec. J. 223 (2012) (citing numerous

authorities establishing that conspiracy has traditionally and lawfully been triable

in U.S. military commissions).

　　　　The conspiracy offense has not required, either textually or in practice, the

completion of the object crime.  See General Court Martial Order No. 452 (Aug.

22, 1865), <u>reprinted in</u> H.R. Doc. No. 55-314, at 724 (1899) (Civil War military commission finding George St. Leger Grenfel and others guilty of inchoate conspiracy to violate the laws of war by destroying Chicago). Nor has the United States been alone in employing this offense in military commissions. <u>See</u> U.N. War Crimes Commission, 11 <u>L. Rep. Trials of War Criminals</u> 98 (1949) (providing that "conspiracy in a war crime [is] equally punishable with the crime itself" in Dutch military commissions after World War II). Accordingly, ex post facto concerns provide no justification for the panel's erroneous construction of the 2006 MCA.

II.     The *Hamdan II* Court Misconstrued Article 21

The panel also erred in the second step of its analysis, by construing Article 21 of the Uniform Code of Military Justice ("UCMJ"), 10 U.S.C. § 821, as limiting the jurisdiction of military commissions rather than preserving their pre-existing jurisdiction.

At the time of Bahlul's offenses, Article 21 – which is entitled "Jurisdiction of courts-martial not exclusive" – provided that "[t]he provisions of [the UCMJ] conferring jurisdiction upon courts-martial do not deprive military commissions . . . of concurrent jurisdiction with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions." 10 U.S.C. § 821. The

9

statute does not by its terms restrict the jurisdiction of military commissions, but rather functions as a savings statute to ensure that Congress's extension of court-martial jurisdiction did not deprive military commissions of jurisdiction that they had previously exercised.  See Madsen v. Kinsella, 343 U.S. 341, 349-55 (1952). The statute does *not* say that military commissions are limited to trying statutory offenses or offenses against the law of war.  Indeed, to further clarify that Article 21 should not be construed to limit military commission jurisdiction, Congress, in the 2006 MCA, amended Article 21 to provide that "[t]his section does not apply to a military commission established under [the MCA]."  Pub. L. No. 109-366, § 4(a)(2), 120 Stat. 2631 (2006).  The Hamdan II panel did not address this amendment.

The context and legislative history of Article 21's predecessor, enacted in 1916, further show that it was designed to preserve the full extent of the jurisdiction that U.S. military commissions had traditionally exercised.  Madsen, 343 U.S. at 349-55; see also Revision of the Articles of War:  Hearing Before the Subcomm. on Military Affairs, appended to S. Rep. No. 64-130, at 40 (1916) (statement of Judge Advocate General Crowder, explaining that the article's purpose was to "save[] to these war courts the jurisdiction they now have").  The scope of the jurisdiction that the statute was intended to preserve intact was

10

determined by reference to offenses that U.S. military commissions had historically recognized.  See Application of Yamashita, 327 U.S. 1, 8 (1946) (explaining that Article 21's predecessor "incorporated, by reference, as within the preexisting jurisdiction of military commissions . . . all offenses which are defined as such by the law of war, and which may constitutionally be included within that jurisdiction.  It thus adopted the system of *military common law* applied by military tribunals so far as it should be recognized and deemed applicable by the courts, and *as further defined and supplemented* by the Hague Convention.") (emphases added); William Winthrop, Military Law and Precedents 839 (rev. 2d ed. 1920) (recognizing that "offences in violation of the laws and usages of war, [consisted of] those principally, *in the experience of our wars*, made the subject of charges and trial"); id. at 839-40 (cataloging numerous domestic violations of the "laws of war" triable by military commission).  Thus, under Article 21, conspiracy and other offenses traditionally tried in U.S. military commissions remained triable in that forum after enactment of the UCMJ, even if those offenses were not recognized war crimes under international law.

To be sure, as the Hamdan II panel observed, the courts and other authorities have often stated that the "law of war," including in Article 21, generally refers to the international law of war.  See Hamdan II, 696 F.3d at 1248-49 & n.9.

11

However, the relevant judicial precedents do not hold that international law is *the exclusive source* of the offenses that may be tried by U.S. military commissions, even if an offense is firmly rooted in U.S. domestic military practice.  Indeed, Justice Stevens's plurality opinion in <u>Hamdan I</u> referred to the need for military commissions to comply with, *inter alia*, "the American common law of war," and used this term as distinct from "the rules and precepts of the law of nations."  548 U.S. at 613 (internal quotation marks and citation omitted); <u>see also</u> U.N. War Crimes Commission, 1 <u>L. Rep. Trials of War Criminals</u> 111 (1947) (explaining that U.S. military commissions "have been described as the American Common Law War Courts").  Moreover, the proposition that military commission jurisdiction is invariably limited to international law war crimes is contradicted by the many U.S. precedents recognizing military commission jurisdiction over crimes like conspiracy, spying, and aiding the enemy, regardless of whether they are recognized as offenses under international law.  In <u>Quirin</u>, the Court specifically referred to the spy as an offender "against the law of war," 317 U.S. at 31, even though spying is generally not understood to constitute a violation of the international law of war.  <u>See</u> <u>Hamdan II</u>, 696 F.3d at 1246 n.6 (Kavanaugh, J., concurring) (noting that "Congress has long prohibited war crimes beyond those specified by international law," and citing spying and aiding the enemy).  Notably,

12

the <u>Quirin</u> Court and the <u>Hamdan I</u> plurality did not examine international sources exclusively, nor did they invoke the standards for assessing customary international law.  Instead, they relied heavily on U.S. military commission precedents.  <u>See</u> 317 U.S. at 31-34, 42 n.14; <u>Hamdan I</u>, 548 U.S. at 603-09. Accordingly, Article 21 preserved military commission jurisdiction over offenses that have traditionally been prosecuted in U.S. military commissions, such as conspiracy and the other offenses at issue in this case.

III.     <u>The Scope of Military Commission Jurisdiction over the Offenses Charged in This Case Is a Question of Exceptional Importance</u>

<u>Hamdan II</u>'s construction of the 2006 MCA restricts the authority that Congress explicitly granted to the President for carrying out the Nation's conflict with al Qaeda and associated forces.  The Court's holding therefore presents a question of exceptional importance.  <u>See</u> Fed. R. App. P. 35(b).

Congress enacted the 2006 MCA in response to <u>Hamdan I</u>, in which the Court invited Congress to clarify the President's authority with regard to military commissions.  <u>See</u> <u>Hamdan I</u>, 548 U.S. at 636 (Breyer, J., concurring) ("Nothing prevents the President" from seeking from Congress "legislative authority to create military commissions of the kind at issue here."); <u>id.</u> at 655 (Kennedy, J., concurring) (noting that "Congress may choose to provide further guidance"

13

regarding the "validity of the conspiracy charge," and that "Congress, not the Court, is the branch in the better position" to determine that question). Thus, the 2006 MCA's subsequent codification of offenses, and its decision to apply them to pre-2006 conduct, represents "the result of a deliberative and reflective process engaging both of the political branches." Id. at 637 (Kennedy, J., concurring). Indeed, two Congresses and two Presidents have now determined that such jurisdiction is a lawful application of the political branches' authority to conduct the armed conflict in which our Nation remains engaged. Hamdan II's limitation of that jurisdiction therefore implicates "separation-of-powers concerns of the highest order." Id. at 638 (Kennedy, J., concurring).

En banc review is particularly appropriate here because the reasoning of Hamdan II eliminates military commission jurisdiction over conspiracy or material support charges brought in all of the military commission cases to date that have resulted in convictions, as well as the pending prosecutions of defendants charged with participation in the terrorist attacks of September 11, 2001 and the bombing of the *U.S.S. Cole*. Moreover, the Hamdan II panel's decision has prompted challenges to the remaining, substantive offenses pending against the 9/11 and *U.S.S. Cole* defendants.[2] Finally, the decision constrains the government's ability

---

[2] Following Hamdan II, due to uncertainty about whether the MCA's

to pursue military commission prosecutions against other alien enemy belligerents involved in planning or supporting terrorist acts before 2006 and against whom the government has not yet commenced proceedings.

<u>CONCLUSION</u>

For the foregoing reasons, the petition should be granted.

Respectfully submitted,

ROB PARK
<u>Acting Deputy General Counsel</u>
<u>U.S. Department of Defense</u>

LISA O. MONACO
<u>Assistant Attorney General</u>
<u>for National Security</u>

JOHN F. DE PUE
JOSEPH F. PALMER
<u>Attorneys</u>
<u>U.S. Department of Justice</u>

---

conspiracy offense applies to pre-2006 conduct, the Chief Prosecutor of Military Commissions requested that the Convening Authority withdraw and dismiss the conspiracy charge as a separate, stand-alone offense in <u>United States v. Khalid Shaikh Mohammad</u>.  <u>See</u> AE 107A, Gov't Response to Def. Motion To Dismiss for Lack of Jurisdiction 148 (Jan. 16, 2013) ("Gov't AE 107A Response"), (available at: http://www.mc.mil/CASES/MilitaryCommissions.aspx).  In light of the pendency of Bahlul's appeal, the Convening Authority declined to withdraw the charge "at this time."  <u>See</u> AE 107A, Gov't Supp. to Def. Motion To Dismiss for Lack of Jurisdiction 4 (Jan. 21, 2013), (available at: http://www.mc.mil/CASES/MilitaryCommissions.aspx).  In addition, the prosecution in <u>Mohammad</u> generally opposed a defense motion to dismiss all charges based on <u>Hamdan II</u>, but it did not oppose dismissal of the conspiracy charge as a separate, stand-alone, and inchoate offense, provided that the Commission permits the prosecution to use the conspiracy allegations in proving the remaining, substantive offenses under co-conspirator and other vicarious theories of principal liability.  <u>See</u> Gov't AE 107A Response 2.  The Commission has not yet ruled on the motion.

15

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

I.     PARTIES

Ali Hamza Ahmad Suliman al Bahlul is the petitioner in this case. The

United States is the respondent. Amici supporting Bahlul include: Robert David

Steele, Philip Giraldi, Raymond L. McGovern, Coleen Rowley, Glenn L. Carle,

Lawrence Wilkerson, Thomas Drake, Stephen N. Xenakis, Marc Sageman, Robert

Baer, David C. MacMichael, Raymond Close, and Elizabeth Murray, identified as

"Robert D. Steele and Other Former Members of the U.S. Intelligence

Community"; Caroline Winterer, Catherine O'Donnell, Clemens P. Work, and

Simon Newman, identified as "First Amendment Scholars and Historians and the

Montana Pardon Project"; the National Institute of Military Justice; and William

Aceves, M. Cherif Bassiouni, John M. Bickers, Roger S. Clark, Geoffrey S. Corn,

Constance de la Vega, Robert K. Goldman, Richard Goldstone, Peter Jan

Honigsberg, David J. Luban, Fionnuala d. Ní Aoláin, Jens David Ohlin, Gabor

Rona, Marco Sassòli, David Sloss, Beth Stephens, Jon Van Dyke, Beth Van

Schaack, Stephen I. Vladeck, David S. Weissbrodt, and Richard Wilson, identified

as "International Law Professors."

II.     RULINGS UNDER REVIEW

The ruling under review in this case is the decision of the United States

Court of Military Commission Review affirming Bahlul's convictions.  <u>United States v. Al Bahlul</u>, 820 F. Supp. 2d 1141 (CMCR 2011) (en banc).  On January 25, 2013, a panel of this Court vacated Bahlul's convictions, based on the government's concession that <u>Hamdan v. United States</u>, 696 F.3d 1238 (D.C. Cir. 2012), a case involving some of the same issues as this appeal, required that result.  <u>Al Bahlul v. United States</u>, No. 11-1324, 2013 WL 297726 (D.C. Cir. Jan. 25, 2013).  The panel's order is appended to this petition.


DATED:  March 5, 2013          /s/John F. De Pue
                               John F. De Pue
                               Attorney for Respondent

<u>CERTIFICATE OF SERVICE</u>

U.S. Court of Appeals Docket Number 11-1324

I hereby certify that I electronically filed the foregoing Petition of the United States for Rehearing En Banc with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on March 5, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


DATED: March 5, 2013              /s/John F. De Pue
                                  John F. De Pue
                                  Attorney for Respondent

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

**No. 11-1324**                     **September Term, 2012**

CMCR-09-001

**Filed On:** January 25, 2013

Ali Hamza Ahmad Suliman al Bahlul,

      Petitioner

    v.

United States of America,

      Respondent

**BEFORE:**    Henderson, Rogers, and Tatel, Circuit Judges

## O R D E R

Upon consideration of the supplemental briefs filed by the parties and, in particular, the supplemental brief filed by the Government on January 9, 2013, advising the Court that it takes the "position that *Hamdan*[ *v. United States*, 696 F.3d 1238 (D.C. Cir. 2012)] requires reversal of Bahlul's convictions by military commission," Supplemental Br. for the United States at 1, it is

**ORDERED** that the petitioner's convictions by military commission approved on June 3, 2009, are hereby vacated. *Cf. United States v. Law*, 528 F.3d 888, 909 (D.C. Cir. 2008) (per curiam) (vacating conviction based on Government's concession).

The Clerk is directed to withhold issuance of the mandate herein until seven days after resolution of any timely petition for rehearing or rehearing en banc. *See* Fed. R. App. P. 41(b); D.C. Cir. Rule 41.

**Per Curiam**

                    **FOR THE COURT:**
                    Mark J. Langer, Clerk

          BY:    /s/
                 Cheri Carter
                 Deputy Clerk

**1238**          696 FEDERAL REPORTER, 3d SERIES

under either *Zauderer* or *Central Hudson*, I would reverse. It would remain for the district court on remand to address the tobacco companies' challenges under the Administrative Procedure Act, *see supra* note 1.



**Salim Ahmed HAMDAN, Petitioner**

**v.**

**UNITED STATES of America, Respondent.**

**No. 11–1257.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 3, 2012.

Decided Oct. 16, 2012.

**Background:** Defendant was convicted, in a trial convened at the U.S. Naval Station at Guantanamo Bay, Cuba, before a military commission, Captain Keith J. Allred, JAGC, U.S. Navy, military commission judge, on five specifications of providing material support for terrorism, in violation of the Military Commissions Act of 2006 (MCA). Defendant appealed. The United States Court of Military Commission Review, 801 F.Supp.2d 1247, affirmed. Defendant appealed.

**Holdings:** The Court of Appeals, Kavanaugh, Circuit Judge, held that:

(1) direct appeal of military commission conviction was not moot;

(2) Military Commissions Act of 2006 did not authorize retroactive prosecution for conduct committed before enactment of that Act unless the conduct was already prohibited under existing United States law as a war crime triable by military commission; and

(3) material support for terrorism was not international-law war crime when defendant was charged with such conduct from 1996 to 2001.

Reversed.

Ginsburg, Senior Circuit Judge, filed concurring opinion.

**1. War and National Emergency** ⬖1142

In war, when the United States captures or takes custody of alien enemy combatants or their substantial supporters, it may detain them for the duration of hostilities.

**2. War and National Emergency** ⬖1141

United States may try unlawful alien enemy combatants before military commissions for their war crimes.

**3. War and National Emergency** ⬖1018

Generally speaking, enemy soldiers or combatants are considered unlawful enemy combatants when they, for example, join or support an organization waging unlawful war or they commit specific "acts which render their belligerency unlawful."

**4. War and National Emergency** ⬖1144

Direct appeal of military commission conviction was not moot, although defendant had been released from custody. UCMJ, Art. 21, 10 U.S.C.A. § 821.

**5. Federal Courts** ⬖12.1

Mootness is a jurisdictional question that a court must independently consider.

**6. Criminal Law** ⬖1131(4)

In the criminal context, a direct appeal of a criminal conviction is not mooted by a defendant's release from custody.

### 7. Military Justice ⇨790

The proscription against "aiding the enemy" generally requires breach of a duty of loyalty as well as aid to the enemy. UCMJ, Art. 104, 10 U.S.C.A. § 904.

### 8. War and National Emergency ⇨1141

Military Commissions Act of 2006 did not authorize retroactive prosecution for conduct committed before enactment of that Act unless the conduct was already prohibited under existing United States law as a war crime triable by military commission. UCMJ, Art. 21, 10 U.S.C.A. § 821.

### 9. Constitutional Law ⇨2789, 2790

Among other things, the Ex Post Facto Clause bars laws that retroactively punish conduct that was not previously prohibited, or that retroactively increase punishment for already prohibited conduct; thus, the Ex Post Facto Clause prevents Congress and the Executive from retroactively applying a federal criminal statute to conduct committed before the statute was enacted. U.S.C.A. Const. Art. 1, § 9, cl. 3.

### 10. War and National Emergency ⇨1141

Congress explicitly referred to international law and explicitly incorporated international norms into domestic United States law by means of the express cross-reference to the "law of war" in Military Commissions Act of 2006. UCMJ, Art. 21, 10 U.S.C.A. § 821.

### 11. International Law ⇨1
### War and National Emergency ⇨1000

The term "law of war" in the United States Code and precedent generally refers to the international law of war.

### 12. War and National Emergency ⇨1131, 1141

Material support for terrorism was not international-law war crime when defendant was charged with such conduct from 1996 to 2001, in violation of Military Commissions Act of 2006 (MCA), and thus defendant's conviction for material support for terrorism had to be vacated; neither major conventions on law of war, nor prominent modern international tribunals and leading international-law experts, had identified material support for terrorism as war crime, no person had ever been tried by international-law war crimes tribunal for material support for terrorism, and United States government conceded that material support for terrorism was not recognized international-law war crime. UCMJ, Art. 21, 10 U.S.C.A. § 821.

### 13. International Law ⇨2

United States precedents may inform the content of international law.

———

Joseph M. McMillan argued the cause for petitioner. With him on the briefs were Harry H. Schneider Jr., Charles C. Sipos, Angela R. Martinez, Abha Khanna, Adam Thurschwell, and Jahn C. Olson.

J. Wells Dixon, Shayana D. Kadidal, and Pardiss Kebriaei were on the brief for amicus curiae Center for Constitutional Rights in support of petitioner.

David C. Lachman was on the brief for amicus curiae International Legal Scholars Terry D. Gill and Gentian Zyberi in support of petitioner.

John S. Summers and Michael J. Newman were on the brief for amicus curiae Professor David W. Glazier in support of petitioner.

**1240**            **696 FEDERAL REPORTER, 3d SERIES**

Gene C. Schaerr and Kimball R. Anderson were on the brief for amicus curiae Constitutional Law Scholars in support of petitioner.

Jonathan Hafetz and David Cole were on the brief for amicus curiae Japanese American Citizens League, et al. in support of petitioner.

John F. De Pue, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were Lisa O. Monaco, Assistant Attorney General for National Security, Jeffrey M. Smith, Attorney, Edward S. White, Captain, JAGC, U.S. Navy Appellate Counsel, and Francis A. Gilligan, Appellate Counsel, Office of the Prosecutor for Military Commissions.

Before: SENTELLE, Chief Judge, KAVANAUGH, Circuit Judge, and GINSBURG, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge KAVANAUGH, with whom Chief Judge SENTELLE joins except as to footnote 6, and with whom Senior Judge GINSBURG joins except as to footnotes 3, 6, and 8.

Concurring Opinion filed by Senior Circuit Judge GINSBURG.

KAVANAUGH, Circuit Judge:

The United States is at war against al Qaeda, an international terrorist organization. Al Qaeda's stated goals are, among other things, to drive the United States from posts in the Middle East, to devastate the State of Israel, and to help establish radical Islamic control over the Greater Middle East. Al Qaeda uses terror to advance its broad objectives. Al Qaeda terrorists do not wear uniforms, and they target American civilians and members of the U.S. Military, as well as U.S. allies. After al Qaeda's attacks on the United States on September 11, 2001, Congress authorized the President to wage war against al Qaeda. That war continues.

[1, 2] In war, when the United States captures or takes custody of alien enemy combatants or their substantial supporters, it may detain them for the duration of hostilities. Moreover, the United States may try *unlawful* alien enemy combatants before military commissions for their war crimes. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 518–24, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004); *Ex parte Quirin*, 317 U.S. 1, 26–45, 63 S.Ct. 2, 87 L.Ed. 3 (1942).

This case raises questions about the scope of the Executive's authority to prosecute war crimes under current federal statutes.

This particular dispute involves the military commission conviction of Salim Hamdan, an al Qaeda member who worked for Osama bin Laden. In 2001, Hamdan was captured in Afghanistan. He was later transferred to the U.S. Naval Base at Guantanamo Bay, Cuba.

Hamdan was not just detained at Guantanamo as an enemy combatant. He was also accused of being an *unlawful* enemy combatant and was tried and convicted by a military commission for "material support for terrorism," a war crime specified by the Military Commissions Act of 2006. *See* 10 U.S.C. § 950t(25); *see also* 10 U.S.C. § 950v(b)(25) (2006) (previous codification of same provision). Hamdan's conviction was based on actions he took from 1996 to 2001—*before* enactment of the Military Commissions Act. At the time of Hamdan's conduct, the extant federal statute authorized and limited military commissions to try violations of the "law of war." 10 U.S.C. § 821.

As punishment for his war crime, Hamdan was sentenced by the military commission to 66 months' imprisonment, with

HAMDAN v. U.S.                    **1241**
Cite as 696 F.3d 1238 (D.C. Cir. 2012)

credit for some time already served. Hamdan's sentence expired in 2008. Although the United States may have continued to detain Hamdan until the end of hostilities pursuant to its wartime detention authority, *see Hamdi,* 542 U.S. at 518–22, 124 S.Ct. 2633, Hamdan was transferred in late 2008 to Yemen and then released there. Even after his release, Hamdan has continued to appeal his U.S. war crimes conviction.

This appeal presents several issues. First, is the dispute moot because Hamdan has already served his sentence and been released from U.S. custody? Second, does the Executive have authority to prosecute Hamdan for material support for terrorism on the sole basis of the 2006 Military Commissions Act—which specifically lists material support for terrorism as a war crime triable by military commission—even though Hamdan's conduct occurred from 1996 to 2001, before enactment of that Act? Third, if not, did the pre-existing statute that authorized war-crimes military commissions at the time of Hamdan's conduct—a statute providing that military commissions may try violations of the "law of war," 10 U.S.C. § 821—proscribe material support for terrorism as a war crime?

We conclude as follows:

First, despite Hamdan's release from custody, this case is not moot. This is a direct appeal of a conviction. The Supreme Court has long held that a defendant's direct appeal of a conviction is not mooted by the defendant's release from custody.

Second, consistent with Congress's stated intent and so as to avoid a serious Ex Post Facto Clause issue, we interpret the Military Commissions Act of 2006 not to authorize *retroactive* prosecution of crimes that were not prohibited as war crimes triable by military commission under U.S. law at the time the conduct occurred. Therefore, Hamdan's conviction may be affirmed only if the relevant statute that was on the books at the time of his conduct—10 U.S.C. § 821—encompassed material support for terrorism.

Third, when Hamdan committed the relevant conduct from 1996 to 2001, Section 821 of Title 10 provided that military commissions may try violations of the "law of war." The "law of war" cross-referenced in that statute is the *international* law of war. *See Quirin,* 317 U.S. at 27–30, 35–36, 63 S.Ct. 2. When Hamdan committed the conduct in question, the international law of war proscribed a variety of war crimes, including forms of terrorism. At that time, however, the international law of war did *not* proscribe material support for terrorism as a war crime. Indeed, the Executive Branch acknowledges that the international law of war did not—and still does not—identify material support for terrorism as a war crime. Therefore, the relevant statute at the time of Hamdan's conduct—10 U.S.C. § 821—did not proscribe material support for terrorism as a war crime.

Because we read the Military Commissions Act not to retroactively punish new crimes, and because material support for terrorism was not a pre-existing war crime under 10 U.S.C. § 821, Hamdan's conviction for material support for terrorism cannot stand. We reverse the judgment of the Court of Military Commission Review and direct that Hamdan's conviction for material support for terrorism be vacated.[1]

---

**1.** Our judgment would not preclude detention of Hamdan until the end of U.S. hostilities against al Qaeda. Nor does our judgment preclude any future military commission

charges against Hamdan—either for conduct prohibited by the "law of war" under 10 U.S.C. § 821 or for any conduct since 2006 that has violated the Military Commissions

**1242**          **696 FEDERAL REPORTER, 3d SERIES**

I

In 1996, Salim Hamdan traveled from his native Yemen to Pakistan and then to Afghanistan to participate in jihad. In Afghanistan, Hamdan attended an al Qaeda training camp. At the camp, Hamdan received weapons training, met Osama bin Laden, and listened to bin Laden's lectures.

Later in 1996, Hamdan became an al Qaeda driver. His duties included transporting personnel, supplies, and weapons between an al Qaeda guesthouse and al Qaeda's al Farouq training camp in Afghanistan. Eventually, Hamdan became Osama bin Laden's personal driver and bodyguard.

In August 1996, Osama bin Laden publicly declared war on the United States. That declaration came after various al Qaeda terrorist attacks, including the 1993 bombing of the World Trade Center. In 1998, bin Laden issued a fatwa calling for the indiscriminate killing of Americans, including American civilians. Hamdan was fully aware of bin Laden's public statements targeting the United States.

In August 1998, al Qaeda operatives bombed U.S. Embassies in Kenya and Tanzania, killing 257 people, including 12 Americans. Hamdan was generally aware that such an attack was planned. Around the time of the attack, Hamdan assisted Osama bin Laden in evacuating from Kandahar and moving around Afghanistan.

Later in August 1998, asserting the President's Article II power of self-defense, President Clinton ordered the U.S. Military to bomb targets in Afghanistan in an attempt to kill bin Laden. Bin Laden narrowly avoided being killed in that military action.

In October 2000, at the direction of bin Laden and senior al Qaeda leaders, al Qaeda bombed the U.S.S. Cole off the coast of Yemen, killing 17 Americans and injuring many others. Around that time, Hamdan returned to Afghanistan from Yemen.

In August 2001, Hamdan drove bin Laden to various planning meetings in Afghanistan. Several days before September 11, 2001, bin Laden told Hamdan that they had to evacuate their compound because of an impending operation. Hamdan drove bin Laden to Kabul. They later moved to a series of locations around Afghanistan.

On September 11, 2001, al Qaeda attacked the United States, killing thousands of civilians and causing massive long-term damage to the American economy and way of life.

In the days following the attacks of September 11, 2001, Congress passed and President George W. Bush signed the Authorization for Use of Military Force. That law authorized the President

> to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Pub. L. No. 107–40, 115 Stat. 224 (2001).

Consistent with the 2001 Authorization for Use of Military Force, President Bush directed the use of force to kill or capture and detain al Qaeda operatives, and where

Act. Nor does our judgment preclude appropriate criminal charges in civilian court. Moreover, our decision concerns only the commission's legal authority. We do not have occasion to question that, as a matter of fact, Hamdan engaged in the conduct for which he was convicted.

HAMDAN v. U.S.                     1243
Cite as 696 F.3d 1238 (D.C. Cir. 2012)

appropriate to try unlawful al Qaeda combatants who had committed war crimes. On October 7, 2001, as part of the overall operation, President Bush ordered U.S. troops into Afghanistan to wage war against al Qaeda there, as well as against the Taliban government that was in control of Afghanistan and had been supporting and harboring al Qaeda.

On November 13, 2001, the President issued an executive order establishing military commissions to try al Qaeda members and aiders and abettors who had committed war crimes as defined under the "laws of war" or other "applicable laws." Military Order of Nov. 13, 2001, 66 Fed. Reg. 57,833; 57,833–34. The executive order did not purport to rely solely on the President's constitutional authority; rather, it cited two separate statutes as congressional authorization for the President to employ military commissions: the 2001 Authorization for Use of Military Force and 10 U.S.C. § 821, the long-standing statute that authorized military commissions to try violations of the "law of war."

In November 2001, Hamdan was captured in Afghanistan while driving toward Kandahar. The car he was driving contained two anti-aircraft missiles. Also in the car was an al Qaeda-issued document that authorized the bearer to carry a weapon in Afghanistan. Hamdan's captors turned him over to U.S. authorities. He was later transferred to Guantanamo Bay, Cuba, and the U.S. Military detained him there as an enemy combatant.

[3] At Guantanamo, Hamdan not only was detained as an enemy combatant but also was eventually charged with one count of conspiracy and was to be tried before a

military commission as an *unlawful* enemy combatant who had committed war crimes.[2] Hamdan raised various legal objections to the prosecution, and the case ultimately wound its way to the Supreme Court. The Supreme Court held that the military commission rules then in place contravened statutory limits because the rules did not comply in certain respects with statutory restrictions contained in 10 U.S.C. § 836. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 613–35, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006). The Court split 4–3 on and thus did not decide a separate issue: whether conspiracy was a cognizable charge in a military commission under the "law of war" for purposes of 10 U.S.C. § 821. *Compare Hamdan*, 548 U.S. at 595–612, 126 S.Ct. 2749 (Stevens, J., plurality opinion) (conspiracy is not a law of war crime), *with id.* at 697–706, 126 S.Ct. 2749 (Thomas, J., dissenting) (conspiracy is a law of war crime). (Justice Kennedy did not address that issue; Chief Justice Roberts did not participate in the case.)

In the *Hamdan* case, several Justices specifically invited Congress to clarify the scope of the President's statutory authority to use military commissions to try unlawful alien enemy combatants for war crimes. *See Hamdan*, 548 U.S. at 636, 126 S.Ct. 2749 (Breyer, J., concurring); *id.* at 636–37, 126 S.Ct. 2749 (Kennedy, J., concurring).

In the wake of the Supreme Court's decision in *Hamdan*, Congress enacted a new military commissions statute. *See* Military Commissions Act of 2006, Pub. L. No. 109–366, 120 Stat. 2600. Of particular relevance here, Congress expanded military commissions beyond prosecuting vio-

---

**2.** Generally speaking, enemy soldiers or combatants are considered *unlawful* enemy combatants when they, for example, join or support an organization waging unlawful war or they commit specific "acts which render their

belligerency unlawful." *Ex parte Quirin,* 317 U.S. 1, 31, 63 S.Ct. 2, 87 L.Ed. 3 (1942). For purposes of the war against al Qaeda, this concept is now defined by statute. *See* 10 U.S.C. § 948a.

**1244**          **696 FEDERAL REPORTER, 3d SERIES**

lations of the generic "law of war," spying, and aiding the enemy, which were the crimes listed by statute at the time. *See* 10 U.S.C. §§ 821, 904, 906. Of most importance here, Congress alleviated some of the uncertainty highlighted in *Hamdan* about the phrase "law of war" in 10 U.S.C. § 821 by listing a large number of specific war crimes that could be charged by military commission, including conspiracy and material support for terrorism. *See* § 3(a), 120 Stat. at 2630. (In 2009, Congress enacted a new Military Commissions Act; that law did not make changes relevant to this case. *See* Pub. L. No. 111–84, 123 Stat. 2574.)

After passage of the 2006 Military Commissions Act, Hamdan was charged anew before a U.S. military commission on one charge of conspiracy and one charge, containing eight specifications, of material support for terrorism.

At his military commission trial, Hamdan was acquitted of conspiracy but convicted of five specifications of material support for terrorism. In August 2008, he was sentenced to 66 months' confinement and credited for having already served most of that time.

When his sentence ended later in 2008, the war against al Qaeda had not ended. Therefore, the United States may have continued to detain Hamdan as an enemy combatant. *See Hamdan*, 548 U.S. at 635, 126 S.Ct. 2749; *Hamdi v. Rumsfeld*, 542 U.S. 507, 518–24, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004). But in November 2008, Hamdan was transferred by the U.S. Military to Yemen, and he was then released on or about January 8, 2009, in Yemen.

After his release, Hamdan nonetheless continued to appeal his U.S. military commission conviction. On appeal to the en banc Court of Military Commission Review, Hamdan argued (i) that Congress

lacked authority under Article I of the Constitution to make material support for terrorism a war crime triable by military commission; (ii) that in any event, the 2006 Military Commissions Act, which listed material support for terrorism as a war crime, could not be *retroactively* applied to him because his conduct occurred from 1996 to 2001; and (iii) that the statute in effect at the time of his alleged conduct— 10 U.S.C. § 821, which limited military commissions to violations of the "law of war"—did not authorize prosecution of material support for terrorism as a war crime. In 2011, the Court of Military Commission Review affirmed the conviction. *See United States v. Hamdan*, 801 F.Supp.2d 1247 (C.M.C.R.2011) (en banc).

By statute, Hamdan has an automatic right of appeal to this Court. *See* 10 U.S.C. § 950g.

## II

**[4, 5]** We must first address the issue of mootness—that is, whether this appeal is moot because Hamdan has been released from U.S. custody. Although the parties agree that the appeal is not moot, mootness is a jurisdictional question that we must independently consider. *See United States v. Juvenile Male*, —— U.S. ——, 131 S.Ct. 2860, 2864–65, 180 L.Ed.2d 811 (2011); *Sibron v. New York*, 392 U.S. 40, 50 n. 8, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

**[6]** This case is a direct appeal of a military commission conviction. In the criminal context, a direct appeal of a criminal conviction is not mooted by a defendant's release from custody. *See Sibron*, 392 U.S. 40, 88 S.Ct. 1889. The Supreme Court has so ruled in part because of the collateral legal consequences of a conviction—namely, the possibility that the defendant could commit or be tried for a new

offense, the punishment for which could take account of a past conviction. Those collateral consequences are of course present in virtually all criminal cases (other than, for example, when the defendant has died after the conviction and thus obviously cannot commit a new offense). The same collateral consequences are present in military commission conviction cases. *See, e.g.,* MANUAL FOR MILITARY COMMISSIONS, Rules 1001(a)(2), 1001(b)(1)(A) (2012) (in military commission sentencing, the prosecution may "introduce evidence of military or civilian convictions, foreign or domestic, of the accused" as an aggravating factor); 18 U.S.C. § 3553(a)(1) (sentencing courts shall take into account "the history and characteristics of the defendant").[3] Applying the relevant Supreme Court precedent, we therefore conclude that a direct appeal of a military commission conviction is likewise not mooted by the defendant's release.

To be sure, that principle generally does not apply to the habeas context where a detainee is challenging the basis for executive detention. Such a habeas case is sometimes moot after the detainee's release. *See Spencer v. Kemna,* 523 U.S. 1, 8–14, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998); *Gul v. Obama,* 652 F.3d 12, 17 (D.C.Cir. 2011). In our recent habeas decision in *Gul,* where a former Guantanamo detainee objected to a military detention determination after his release, this Court dismissed the case as moot.

But Hamdan is not just a military detainee; he has been convicted of a war crime by military commission. Therefore, our recent decision in *Gul* does not control here. Rather, this case is controlled by the principle that a direct appeal of a conviction is not mooted by the defendant's release from custody.

This case is not moot.

III

**[7]** Under a law now codified at 10 U.S.C. § 821, Congress has long authorized the Executive to use military commissions to try war crimes committed by the enemy. *See Ex parte Quirin,* 317 U.S. 1, 63 S.Ct. 2, 87 L.Ed. 3 (1942). That statute authorizes military commissions to try violations of the "law of war"—a term, as we explain below, that has long been understood to mean the international law of war. *See Hamdan v. Rumsfeld,* 548 U.S. 557, 603, 610, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006) (plurality); *id.* at 641, 126 S.Ct. 2749 (Kennedy, J., concurring); *Quirin,* 317 U.S. at 27–30, 35–36, 63 S.Ct. 2. Two other longstanding statutes separately authorize military commission prosecutions for spying and aiding the enemy. *See* 10 U.S.C. §§ 904, 906.[4]

---

**3.** In his concurring opinion, Judge Ginsburg calls for a change to existing Supreme Court mootness doctrine. In doing so, Judge Ginsburg suggests that Hamdan is in Yemen and has little chance of landing in future trouble in the U.S. legal system. Maybe. Maybe not.

**4.** The "aiding the enemy" proscription in 10 U.S.C. § 904, which was first codified in the Articles of War of 1806, *see* WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS 102–03, 981 (rev. 2d ed. 1920), generally requires breach of a duty of loyalty as well as aid to the enemy. *See Hamdan,* 548 U.S. at 600–01 n. 32, 126 S.Ct. 2749 (plurality) ("aiding the enemy may,

in circumstances where the accused owes allegiance to the party whose enemy he is alleged to have aided, be triable by military commission"). The breach of loyalty requirement is made explicit in the 2006 Military Commissions Act, which re-codified the crime. 10 U.S.C. § 950t(26) ("Any person subject to this chapter who, *in breach of an allegiance or duty to the United States,* knowingly and intentionally aids an enemy of the United States, or one of the co-belligerents of the enemy, shall be punished as a military commission under this chapter may direct.") (emphasis added).

**1246**          **696 FEDERAL REPORTER, 3d SERIES**

After the Supreme Court's 2006 decision in *Hamdan*, Congress enacted a new military commissions statute that, among other things, clarified the scope of the Executive's authority to try war crimes. *See* Military Commissions Act of 2006, Pub. L. No. 109–366, 120 Stat. 2600. Of particular relevance here, Congress expanded military commissions beyond trying violations of the generic "law of war," spying, and aiding the enemy. Congress instead also listed a large number of specific war crimes that could be tried by military commission, including conspiracy and material support for terrorism. *See id.* § 3(a), 120 Stat. at 2630 (now codified at 10 U.S.C. § 950t).

[8] Hamdan argues that Congress lacked authority under Article I of the Constitution—namely, the Define and Punish Clause—to define material support for terrorism as a war crime subject to trial by a U.S. military commission.[5] Hamdan maintains that Congress's authority under the Define and Punish Clause is limited to proscribing offenses that are already illegal under international law. And Hamdan

contends that material support for terrorism is not a recognized international-law war crime. The Government responds that Hamdan's focus on the Define and Punish Clause alone is misplaced. According to the Government, the Declare War Clause and other war clauses in Article I, as supplemented by the Necessary and Proper Clause, independently authorize Congress to establish military commissions to try an enemy's war crimes. And the Government further contends that Congress's broad authority under the Declare War Clause is not constrained by the evolving and often difficult to discern standards of international law. Therefore, as the Government sees it, Congress has authority to make material support for terrorism a war crime triable by military commission.

We do not decide that antecedent question. Even assuming arguendo that Congress had authority under its various Article I war powers to establish material support for terrorism as a war crime in the Military Commissions Act of 2006,[6] we

---

5.  The Define and Punish Clause provides that Congress has the power: "To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. CONST. art. I, § 8, cl. 10.

6.  Judge Kavanaugh alone concurs in this footnote. Because the question of Congress's Article I power to make material support for terrorism a war crime has been thoroughly briefed and argued, because that question is logically antecedent to the ex post facto issue, and because of the importance of deciding wartime cases in a way that provides clear guidance, Judge Kavanaugh believes it appropriate to address the antecedent question—as the Supreme Court itself did in resolving similar antecedent issues in both *Hamdi* and *Hamdan*. *See Hamdi*, 542 U.S. at 516–24, 533–34, 124 S.Ct. 2633 (resolving several "threshold" questions, including whether enemy combatants may be detained for the duration of hostilities, before concluding that the procedures used to detain Hamdi were in-

sufficient); *Hamdan*, 548 U.S. at 593–94, 126 S.Ct. 2749 (resolving antecedent question whether relevant statutes generally authorized military commissions, before concluding that the commission in Hamdan's case contravened separate statutory limits). Here, Judge Kavanaugh would conclude that Congress has authority under Article I, § 8 to establish material support for terrorism as a war crime that, when committed by an alien, may be tried by military commission. Although material support for terrorism is not yet an international-law war crime, Congress's war powers under Article I are not defined or constrained by international law. The Declare War Clause and the other Article I war powers clauses do not refer to international law, unlike the Define and Punish Clause. Moreover, Congress has long prohibited war crimes beyond those specified by international law. *See* 10 U.S.C. § 904 (aiding the enemy); *id.* § 906 (spying); *cf. Quirin*, 317 U.S. 1, 63 S.Ct. 2. The U.S. Constitution

conclude that the Act did not authorize *retroactive* prosecution for conduct that was committed before the Act's enactment and was not prohibited by U.S. law at the time the conduct occurred. Here, Hamdan's conduct occurred from 1996 to 2001—before enactment of the Military Commissions Act. And as we will explain, the federal statute in effect at the time of Hamdan's conduct—10 U.S.C. § 821—did *not* authorize prosecution for material support for terrorism.

A

As is clear from the text of the Military Commissions Act of 2006, Congress was quite concerned about the ex post facto implications of retroactively prosecuting someone under the Act for conduct committed before its enactment. Congress tried to deal with any ex post facto problem by declaring in the text of the statute that "[t]he provisions of this subchapter codify offenses that have traditionally been triable by military commissions. This chapter does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission." § 3(a), 120 Stat. at 2624. The Act continued: "Because the provisions of this subchapter (including provisions that incorporate definitions in other provisions of law) are declarative of existing law, they do not preclude trial for crimes that occurred before the date of the enactment of this chapter." *Id.*

[9] As Congress well understood when it appended this unusual statement to the statute, the U.S. Constitution bars Congress from enacting punitive ex post facto laws. *See* U.S. Const. art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed."). Among other things, the Ex Post Facto Clause bars laws that retroactively punish conduct that was not previously prohibited, or that retroactively increase punishment for already prohibited conduct. *See Collins v. Youngblood*, 497 U.S. 37, 42, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990); *Calder v. Bull*, 3 U.S. 386, 3 Dall. 386, 1 L.Ed. 648 (1798) (opinion of Chase, J.). The Ex Post Facto Clause thus prevents Congress and the Executive from retroactively applying a federal criminal statute to conduct committed before the statute was enacted.

As Congress itself recognized in the statutory text, retroactive prosecution by military commission could similarly raise serious constitutional issues, at the very least. As stated in the statutory text, however, Congress believed that the Act codified no new crimes and thus posed no ex post facto problem. As we explain below, Congress's premise was incorrect. The statute does codify some new war crimes, including material support for terrorism. The question for ex post facto purposes is this: If Congress had known that the Act was codifying some new crimes, would Congress have wanted the new crimes to be enforced retroactively? To begin with, the statutory text reveals a tight causal link between (i) Congress's

does not give the international community—either directly, or indirectly through the vehicle of international law—a judicially enforceable veto over Congress's exercise of its war powers. Put simply, the United States may be a leader in the international community, not just a follower, when Congress authorizes war against a terrorist organization or makes crimes such as material support for terrorism war crimes triable by military commission.

To be sure, it is often prudent for Congress and the President to coordinate closely with the international community and pay careful attention to international law when authorizing war and enacting war crimes. But those policy factors, political realities, and international-law considerations are not *constitutional* constraints incorporated into the Article I war powers clauses and thereby enforceable in U.S. courts.

**1248**          **696 FEDERAL REPORTER, 3d SERIES**

belief that the statute codified only crimes under pre-existing law and (ii) Congress's statement that the statute could therefore apply to conduct before enactment. That causal link suggests that Congress would *not* have wanted *new* crimes to be applied retroactively. The Executive Branch agrees with that interpretation of the statute, stating: "Congress incorporated ex post facto principles into the terms of the MCA itself." Brief for the United States at 66. At a minimum, we know that the statutory text does not contemplate or address the possibility of retroactively applying new crimes, leaving us with at least something of an ambiguity. And courts interpret ambiguous statutes to avoid serious questions of unconstitutionality. *See Rapanos v. United States,* 547 U.S. 715, 738, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006) (plurality opinion of Scalia, J.) (constitutional avoidance where statute "raises difficult questions" of constitutionality); *Cherokee Nation of Oklahoma v. Leavitt,* 543 U.S. 631, 646, 125 S.Ct. 1172, 161 L.Ed.2d 66 (2005) (avoiding an interpretation that "may violate the Constitution"). To avoid the prospect of an Ex Post Facto Clause violation here, we interpret the Military Commissions Act of 2006 so that it does not authorize *retroactive* prosecution for conduct committed before enactment of that Act unless the conduct was already prohibited under existing U.S. law as a war crime triable by military commission. In this case, therefore, Hamdan's conviction stands or falls on whether his conduct was prohibited by the pre-existing statute,

10 U.S.C. § 821, at the time he committed the conduct.[7]

**B**

Before enactment of the Military Commissions Act in 2006, U.S. military commissions could prosecute war crimes under 10 U.S.C. § 821 for violations of the "law of war." The Government suggests that at the time of Hamdan's conduct from 1996 to 2001, material support for terrorism violated the "law of war" referenced in 10 U.S.C. § 821. It is true that in the text of the Military Commissions Act of 2006, Congress declared its belief that material support for terrorism was a pre-existing crime under the law of war and thus under 10 U.S.C. § 821. *See* § 3a, 120 Stat. at 2624. But exercising our independent review, as we must when considering the ex post facto implications of a new law, *see Calder v. Bull,* 3 U.S. 386, 3 Dall. 386, 1 L.Ed. 648 (1798) (opinion of Chase, J.); *Marbury v. Madison,* 5 U.S. 137, 1 Cranch 137, 2 L.Ed. 60 (1803), we conclude otherwise. Material support for terrorism was not a war crime under the law of war referenced in 10 U.S.C. § 821 at the time of Hamdan's conduct.

[10, 11]   Analysis of this issue begins by determining what body of law is encompassed by the term "law of war" in 10 U.S.C. § 821. The Supreme Court's precedents tell us: The "law of war" referenced in 10 U.S.C. § 821 is the international law of war.[8] *See Hamdan,* 548 U.S. at 603, 126 S.Ct. 2749 (plurality) (act is law

---

7. To be clear, we do not here decide whether or how the Ex Post Facto Clause might apply to this case. As we interpret the statute, that ultimate constitutional question need not be decided.

8. It has been suggested that courts should not use international law as a free-floating tool to alter how the courts would otherwise interpret a domestic U.S. statute *when the statute does not incorporate or refer to international*

law. *See Al–Bihani v. Obama,* 619 F.3d 1, 5–8 (D.C.Cir.2010) (Brown, J., concurring in denial of rehearing en banc); *id.* at 9–23 (Kavanaugh, J., concurring in denial of rehearing en banc). But that interpretive issue is not implicated in this case. As Congress has often done, and as explained in an *Al–Bihani* concurrence, Congress here *explicitly* referred to international law and *explicitly* incorporated international norms into domes-

of war offense when "universal agreement and practice both in this country and internationally" recognize it as such) (internal quotation marks omitted); *id.* at 610, 126 S.Ct. 2749 (analyzing international sources to determine whether conspiracy was "recognized violation of the law of war"); *id.* at 641, 126 S.Ct. 2749 (Kennedy, J., concurring) ("the law of war" referenced in 10 U.S.C. § 821 "derives from rules and precepts of the law of nations" and is "the body of international law governing armed conflict") (internal quotation marks omitted); *Quirin*, 317 U.S. at 29, 63 S.Ct. 2 ("law of war" referenced in 10 U.S.C. § 821 is a "branch of international law"); *id.* at 27–28, 63 S.Ct. 2 (The "law of war" is "that part of the law of nations which prescribes, for the conduct of war, the status, rights and duties of enemy nations

as well as of enemy individuals."); *see also* Instructions for the Government of Armies of the United States in the Field (Lieber Code), General Orders No. 100, arts. 27 & 40 (Apr. 24, 1863) (describing the law of war as a "branch" of the "law of nations"); O.L.C. Memorandum from Patrick F. Philbin to Alberto R. Gonzales 5 (Nov. 6, 2001) ("laws of war" are "considered a part of the 'Law of Nations' "); *id.* at 29, 63 S.Ct. 2 ("the term 'law of war' used in 10 U.S.C. § 821 refers to the same body of international law now usually referred to as the 'laws of armed conflict' ").[9]

We turn, then, to the question whether material support for terrorism is an international-law war crime.

**[12]** It is true that international law establishes at least some forms of *terror-*

---

tic U.S. law in 10 U.S.C. § 821 by means of the express cross-reference to the "law of war." *See id.* at 10, 13–15 (Kavanaugh, J., concurring in denial of rehearing en banc) (explaining that distinction).

**9.** *See also* Curtis A. Bradley & Jack L. Goldsmith, *The Constitutional Validity of Military Commissions,* 5 GREEN BAG 2d 249, 256 (2002) ("As noted above, President Bush's Military Order, 10 U.S.C. § 821, and Supreme Court precedent all indicate that the jurisdiction of military commissions extends (at least) to violations of the international laws of war."); Maj. Michael A. Newton, *Continuum Crimes: Military Jurisdiction Over Foreign Nationals Who Commit International Crimes,* 153 MIL. L. REV. 1, 21 (1996) ("Therefore, the entire scope of history and American jurisprudence compel the conclusion that Article 21 grants jurisdiction *only* over violations of the international laws of war. The text of Article 21 leads to the same conclusion."); Ruth Wedgwood, *Al Qaeda, Terrorism, and Military Commissions,* 96 AM. J. INT'L L. 328, 334 (2002) ("This statutory language" in 10 U.S.C. § 821 "acknowledges that the jurisdiction of military commissions is defined by the norms of the customary law of nations, namely, the law of war.").

Even outside the context of 10 U.S.C. § 821, the term "law of war" in the U.S. Code

and precedent generally refers to the international law of war. *See Madsen v. Kinsella,* 343 U.S. 341, 354, 72 S.Ct. 699, 96 L.Ed. 988 (1952) (The "law of war" includes that part of "the law of nations" which "defines the powers and duties of belligerent powers."); *Prize Cases,* 67 U.S. 635, 667, 2 Black 635, 17 L.Ed. 459 (1863) ("The laws of war, as established among nations, have their foundation in reason, and all tend to mitigate the cruelties and misery produced by the scourge of war."); *Hearings on H.R. 2498 (UCMJ) Before the H. Comm. on Armed Servs.,* 81st Cong. 959 (1949) (Representative Overton Brooks, Chairman, House Subcommittee No. 1 on Armed Services: "What is a law of war?" Colonel John P. Dinsmore: " 'Law of war' is set out in various treaties like the Geneva convention and supplements to that." Representative Brooks: "International law." Colonel Dinsmore: "Yes, sir."); U.S. ARMY JAG. LAW OF WAR HANDBOOK 20 (Maj. Keith E. Puls ed., 2005) (identifying "customary international law"—that is, "the 'unwritten' rules that bind all members of the community of nations" during war as one of the two major sources of the law of war, along with conventional international law); MANUAL FOR COURTS-MARTIAL UNITED STATES, at I–1 (2012) ("The sources of military jurisdiction include the Constitution and international law. International law includes the law of war.").

**1250**          **696 FEDERAL REPORTER, 3d SERIES**

*ism*, including the intentional targeting of civilian populations, as war crimes. *See, e.g.*, Rome Statute of the International Criminal Court art. 8(2)(b), July 17, 1998, 2187 U.N.T.S. 90; Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Geneva IV), art. 33, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287; Commission of Responsibilities, Conference of Paris 1919, Violation of the Laws and Customs of War 17 (Clarendon Press 1919) (the Allied Nations condemned Germany for "the execution of a system of terrorism" after World War I).

But the issue here is whether *material support for terrorism* is an international-law war crime. The answer is no. International law leaves it to individual nations to proscribe material support for terrorism under their domestic laws if they so choose. There is no international-law proscription of material support for terrorism.

To begin with, there are no relevant international *treaties* that make material support for terrorism a recognized international-law war crime. Neither the Hague Convention nor the Geneva Conventions— the sources that are "the major treaties on the law of war"—acknowledge material

support for terrorism as a war crime. *See Hamdan*, 548 U.S. at 604, 126 S.Ct. 2749 (plurality); Geneva Convention Relative to the Protection of Civilian Persons in Time of War (Geneva IV), Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287; Hague Convention (IV) Respecting the Laws and Customs of War on Land and Its Annex, Oct. 18, 1907, 36 Stat. 2277.

Nor does customary international law otherwise make material support for terrorism a war crime. Customary international law is a kind of common law; it is the body of international legal principles said to reflect the consistent and settled practice of nations. *See* Restatement (Third) of Foreign Relations Law of the United States § 102(2) (1987) ("Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation"). It is often difficult to determine what constitutes customary international law, who defines customary international law, and how firmly established a norm has to be to qualify as a customary international law norm. *Cf. Sosa v. Alvarez–Machain*, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).[10]

---

10.  Although customary international law, including the customary international law of war, contains some well-defined prohibitions at the core, the contours of customary international law are imprecise. That imprecision provides good reason for Congress and the Executive, when they want to outlaw violations of perceived international-law norms, to enact statutes outlawing specific conduct, rather than simply prohibiting violation of something as vague as "international law" or "the law of nations" or "the law of war." Congress has done so in many recent statutes, including the Military Commissions Act of 2006. Pub. L. No. 109–366, 120 Stat. 2600 (2006). *See also* War Crimes Act of 1996, Pub. L. No. 104–192, 110 Stat. 2104; Torture Victim Protection Act of 1991, Pub. L. No. 102–256, 106 Stat. 73 (1992); Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94–583, 90 Stat. 2891.

At the same time, the imprecision of customary international law calls for significant caution by U.S. courts before permitting civil or criminal liability premised on violation of such a vague prohibition. *Cf. Sosa v. Alvarez–Machain*, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). A general prohibition against violations of "international law" or the "law of nations" or the "law of war" may fail in certain cases to provide the fair notice that is a foundation of the rule of law in the United States. Therefore, as the Supreme Court required in an analogous context in *Sosa*, and as the plurality suggested in *Hamdan*, imposing liability on the basis of a violation of "international law" or the "law of nations" or the "law of war" generally must be based on norms firmly grounded in international law. *See Sosa*, 542 U.S. at 724–38, 124 S.Ct. 2739; *Hamdan*, 548 U.S. at 602–03 & n. 34, 605, 126 S.Ct. 2749 (plurality). In

But here, the content of customary international law is quite evident. Material support for terrorism was not a recognized violation of the international law of war as of 2001 (or even today, for that matter). As we have noted, the Geneva Conventions and the Hague Convention do not prohibit material support for terrorism. The 1998 Rome Statute of the International Criminal Court, which catalogues an extensive list of international war crimes, makes no mention of material support for terrorism. *See* Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90. Nor does the Statute of the International Tribunal for the Former Yugoslavia, the Statute of the International Tribunal for Rwanda, or the Statute of the Special Court for Sierra Leone. *See* Statute of the International Tribunal for the Former Yugoslavia, adopted by S.C. Res. 827, U.N. Doc. S/RES/827 (1993), reprinted in 32 I.L.M. 1159, 1192; Statute of the International Tribunal for Rwanda, adopted by S.C. Res. 955, U.N. Doc. S/RES/955 (1994), reprinted in 33 I.L.M. 1598, 1602 (includes terrorism itself as a crime); Statute of the Special Court for Sierra Leone art. 3(d), Jan. 16, 2002, 2178 U.N.T.S. 138 (same). Nor have any international tribunals exercising common-law-type power determined that material support for terrorism is an international-law war crime.

Commentators on international law have similarly explained that material support for terrorism is not an international-law war crime. *See, e.g.,* ANDREA BIANCHI & YASMIN NAQVI, INTERNATIONAL HUMANITARIAN LAW AND TERRORISM 244 (2011) ("there is little evidence" that a proscription of "material support for terrorism" is "considered to be part of the laws and customs of war"). Nor is the offense of material support for terrorism listed in the JAG handbook on the law of war. *See* U.S. ARMY JAG, LAW OF WAR HANDBOOK (Maj. Keith E. Puls ed., 2005); *see also* Jennifer K. Elsea, *The Military Commissions Act of 2006: Analysis of Procedural Rules and Comparison with Previous DOD Rules and the Uniform Code of Military Justice* 12 (CRS, updated Sept. 27, 2007) ("defining as a war crime the 'material support for terrorism' does not appear to be supported by historical precedent") (footnote omitted).

In short, neither the major conventions on the law of war nor prominent modern international tribunals nor leading international-law experts have identified material support for terrorism as a war crime. Perhaps most telling, before this case, no person has ever been tried by an international-law war crimes tribunal for material support for terrorism.

Not surprisingly, therefore, even the U.S. Government concedes in this case that material support for terrorism is not a recognized international-law war crime. No treaty that the Government has cited or that we are aware of identifies material support for terrorism as a war crime. And the Government further admits: The "offense of providing material support to terrorism, like spying and aiding the enemy, has not attained international recognition at this time as a violation of customary international law." Brief for the United States at 48; *see also id.* at 55–56 (same).

To be sure, there is a strong argument that aiding and abetting a recognized international-law war crime such as terrorism is itself an international-law war crime. And there are other similar war crimes.

this case, the asserted norm has no grounding in international law, much less firm ground-

ing.

But Hamdan was not charged with aiding and abetting terrorism or some other similar war crime. He was charged with material support for terrorism. And as the Government acknowledges, aiding and abetting terrorism prohibits different conduct, imposes different mens rea requirements, and entails different causation standards than material support for terrorism. If the Government wanted to charge Hamdan with aiding and abetting terrorism or some other war crime that was sufficiently rooted in the international law of war (and thus covered by 10 U.S.C. § 821) at the time of Hamdan's conduct, it should have done so.

[13] The Government latches on to a few isolated precedents from the Civil War era to prop up its assertion that material support for terrorism was a pre-existing war crime as of 2001 for purposes of 10 U.S.C. § 821. There are several independent reasons that those cases fail to support the Government's argument. *First*, the Civil War cases did not involve any charges of material support for terrorism. Instead, several cases involve guerillas who were punished for taking up "arms" as "insurgents"—that is, for direct attacks rather than material support. *See, e.g.*, G.O. No. 15, HQ, Dep't of the Mississippi (Apr. 3, 1862), 1 OR ser. II, at 472–76. Others were convicted of "joining, aiding and assisting a band of robbers and bandits"—in other words, what we would likely call aiding and abetting, not material support. G.O. No. 19, HQ, Dep't of the Mississippi (Apr. 24, 1862), 1 OR ser. II, at 478. In short, those precedents are at best murky guidance here. *Cf. Hamdan*, 548 U.S. at 602, 126 S.Ct. 2749 (plurality) (requiring "plain and unambiguous" precedent). *Second*, those Civil War commissions were in part military tribunals governing certain territory—which are a separate form of military

commission subject to a separate branch of law, and not the kind of law-of-war military commission at issue here. As others have suggested, their precedential value is therefore limited. *See Hamdan*, 548 U.S. at 596 n. 27, 126 S.Ct. 2749; *id.* at 608, 126 S.Ct. 2749 (plurality) (The "military commissions convened during the Civil War functioned at once as martial law or military government tribunals and as law-of-war commissions. Accordingly, they regularly tried war crimes and ordinary crimes together.") (citation omitted). *Third*, and perhaps most to the point, those cases do not establish that material support for terrorism was a war crime recognized under *international law* as of 1996 to 2001 when Hamdan committed his conduct, which is the relevant inquiry under 10 U.S.C. § 821. The Government contends that those Civil War precedents illuminate what it calls the "U.S. common law of war"—not the international law of war. But the statutory constraint here imposed by 10 U.S.C. § 821 is the international law of war. As the Government told the Supreme Court in *Quirin*, "This 'common law of war' is a centuries-old body of largely unwritten rules and principles of *international* law which governs the behavior of both soldiers and civilians during time of war." Brief for the United States at 29, in *Quirin*, 317 U.S. 1, 63 S.Ct. 2 (emphasis added) (citation omitted). To be sure, U.S. precedents may inform the content of international law. But those Civil War precedents fail to establish material support for terrorism as a war crime under the international law of war as of 1996 to 2001. And even the Government admits that material support for terrorism was not an international-law war crime as of 1996 to 2001.

In short, material support for terrorism was not an international-law war crime

under 10 U.S.C. § 821 at the time Hamdan engaged in the relevant conduct.

\*    \*    \*

Because we read the Military Commissions Act not to sanction retroactive punishment for new crimes, and because material support for terrorism was not a pre-existing war crime under 10 U.S.C. § 821, Hamdan's conviction for material support for terrorism cannot stand. We reverse the decision of the Court of Military Commission Review and direct that Hamdan's conviction for material support for terrorism be vacated.

*So ordered.*

GINSBURG, Senior Circuit Judge, concurring:

I join the decision of the Court but, with respect to its holding Mr. Hamdan's appeal of his criminal conviction by military commission is not moot, I do so only because precedent so dictates. I write separately to explain the unfortunate state of that precedent, which requires us to review the conviction of a man long since transferred to Yemen who, even if his conviction were overturned and he were to hear of it, would not be affected in any way by the result. Because today's decision has no actual consequence for Mr. Hamdan, his case is moot in fact, though, curiously, not in law.

The Supreme Court "presumes" the appeal of a criminal conviction is not moot unless "it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction." *Sibron v. New York*, 392 U.S. 40, 57, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *see United States v. Juvenile Male*, —— U.S. ——, 131 S.Ct. 2860, 2864, 180 L.Ed.2d 811 (2011) (per curiam) ("When the defendant challenges his underlying *conviction*, this Court's cases have long presumed the existence of collateral consequences"). The Government concedes, as Hamdan's counsel contends, that it cannot show there is "no possibility" Hamdan's conviction will have a collateral legal consequence for him. The parties' mutual desire to have the court decide this case on its merits is of no moment, however; an Article III court has an "independent obligation to be sure [it] ha[s] jurisdiction," *High Plains Wireless, LP v. FCC*, 276 F.3d 599, 605 (D.C.Cir.2002), which here requires us to determine whether the case has become moot on appeal.

A criminal conviction may and often does have consequences beyond the penalties imposed in the sentence. In *Sibron*, the Court held the defendant's appeal of his conviction was not moot, even though his sentence had expired during the pendency of the appeal, because that conviction, left undisturbed, could increase his sentence if he were later to be convicted of another crime. 392 U.S. at 56, 88 S.Ct. 1889; *accord United States v. Morgan*, 346 U.S. 502, 512–13, 74 S.Ct. 247, 98 L.Ed. 248 (1954) ("Although the term has been served, the results of the conviction may persist. Subsequent convictions may carry heavier penalties"). Similarly, in *Carafas v. LaVallee*, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968), the Court concluded that a continuing civil disability stemming from a criminal conviction, such as a bar to voting in state elections or to serving as a juror, also keeps a criminal appeal from becoming moot. Even an adverse immigration consequence, including a bar on re-entering United States, may suffice to keep a case alive and hence to preserve appellate jurisdiction. *See, e.g., United States v. Hamdi*, 432 F.3d 115, 121 (2d Cir.2005).

Although, in considering a challenge to a

**1254**                          **696 FEDERAL REPORTER, 3d SERIES**

criminal conviction,* "the Court [has] abandoned all inquiry into the actual existence of specific collateral consequences and in effect presumed that they exist[ ]," *Sibron*, 392 U.S. at 55, 88 S.Ct. 1889, the presumption is rebutted if the alleged collateral consequences are foreclosed as a matter of law. In *Perez v. Greiner*, 296 F.3d 123 (2d Cir.2002), the Second Circuit held moot the direct appeal of a criminal conviction on the ground there was "no material possibility that [the defendant] will suffer collateral consequences on the basis of the challenged conviction," *id.* at 125. The defendant in that case had been deported when his appeal was heard and was ineligible to reenter the country because of an earlier conviction. With the defendant "permanently barred from this country on a wholly separate ground, the currently challenged . . . conviction [could] have no meaningful effect on his admissibility and hence [could not] serve as a possible collateral consequence." *Id.* at 126.

Hamdan and the Government each point to a collateral consequence of Hamdan's conviction. Hamdan claims his conviction for material support of terrorism makes

him subject to permanent mandatory exclusion from the United States. *See* 8 U.S.C. § 1182(a)(3)(B)(i)(I), (V). For its part, the Government claims Hamdan's conviction may expose him to an enhanced sentence if in the future he commits a new offense and is tried therefore in a civilian or military court of the United States. *See* Dep't of Defense, Manual for Military Commissions, Rule 1001(b)(1)(A) (2010) ("The trial counsel may introduce [in a sentencing proceeding] evidence of [prior] military or civilian convictions, foreign or domestic, of the accused"); 18 U.S.C. § 3553(a)(1) (sentencing court shall consider "the history and characteristics of the defendant"). The adverse collateral consequence raised by Hamdan is foreclosed as a matter of law. The adverse collateral consequence posed by the Government is so far-fetched that the application of the *Sibron* presumption in this case risks making our opinion merely advisory.

The adverse immigration consequence alleged by Hamdan is impossible as a matter of law because Hamdan is already subject to mandatory exclusion from the United States regardless whether his conviction stands. The Immigration and

---

* Contrary to the Court's reading of the relevant precedents, Ct. Op. at 12, the Supreme Court does not distinguish between direct review of a criminal conviction and a collateral attack on a criminal conviction, by way of a petition for a writ of habeas corpus or otherwise. The Supreme Court has, on several occasions, indicated the *Sibron* presumption applies in a collateral proceeding for post-conviction relief. *See, e.g., Carafas v. LaVallee*, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968) (holding habeas challenge to criminal conviction not moot due to "collateral consequences" of conviction); *Lane v. Williams*, 455 U.S. 624, 634, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982) (Marshall, J., dissenting) ("The majority recognizes that in habeas corpus challenges to criminal convictions, the case 'is moot only if it is shown there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged con-

viction' " (quoting *Sibron* )). *Spencer v. Kemna*, 523 U.S. 1, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998), and *Gul v. Obama*, 652 F.3d 12, 19 (D.C.Cir.2011), were habeas cases that did not apply the *Sibron* presumption, but the inapplicability of the presumption did not depend upon a distinction between direct review and habeas. In *Spencer*, the petitioner challenged not a criminal conviction but rather the revocation of his parole. In *Gul*, the petitioner challenged not a criminal conviction but rather his designation as an enemy combatant. Neither decision rested merely upon the ground the case sounded in habeas. The present Court's different view of the matter is of no moment, however; as explained below, binding precedent unfortunately but unambiguously dictates the *Sibron* presumption applies to the direct review of a criminal conviction, such as Hamdan presents here.

Naturalization Act (INA) provides: "Any alien who . . . has engaged in a terrorist activity . . . is inadmissible." 8 U.S.C. § 1182(a)(3)(B)(i)(I).    The Government provided overwhelming evidence, none of which Hamdan bothers to dispute, demonstrating that he engaged in "terrorist activity" within the meaning of the INA, including the provision of material support for terrorism.*   The INA makes Hamdan inadmissible not for his conviction, which we reverse,* but rather for having knowingly supported terrorist activities, a historical fact we cannot reverse.   *Cf. Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135, 3 L.Ed. 162 (1810) ("The past cannot be recalled by the most absolute power").   Nor is it conceivable that an immigration court, which applies a

standard of proof much more favorable to the Government than does a military commission, *compare* 8 U.S.C. § 1229a(c)(2) ("In the proceeding [for deciding whether an alien is admissible,] the alien has the burden of establishing . . . the alien is clearly and beyond doubt entitled to be admitted"), *with* 10 U.S.C. § 949*l* (4) (in a military commission "the burden of proof to establish the guilt of the accused beyond a reasonable doubt is upon the United States"), would find Hamdan in fact had not provided any of the five types of material support for which he was convicted and therefore may be admitted to the United States.*   Because Hamdan is already barred from entering the United States due to his past involvement in terrorism, his current conviction has no in-

---

* The INA defines "[e]ngage in terrorist activity" to include committing "an act that the actor knows, or reasonably should know, affords material support . . . :

   (aa) for the commission of a terrorist activity;

   (bb) to any individual who the actor knows, or reasonably should know, has committed or plans to commit terrorist activity; [or]

   (cc) to a terrorist organization . . . [designated as such by the Secretary of State]. . . ."

*Id.* § 1182(a)(3)(B)(iv)(VI).   A military commission, the Convening Authority, and the Court of Military Commission Review each separately found beyond a reasonable doubt that Hamdan provided material support generally to al Qaeda, and specifically for an act of terrorism by, among other things, serving as Osama bin Laden's driver and bodyguard from 1996 to 2001, with the knowledge Hamdan "was protecting the leader of al Qaeda" and was "facilitating communication and planning used for acts of terrorism," *United States v. Hamdan*, 801 F.Supp.2d 1247, 1259 (C.M.C.R.2011); *see also id.* at 1254, 1258, 1323.   Al Qaeda has been designated as a "foreign terrorist organization" by the State Department since 1999.   *See* Designation of Foreign Terrorist Organizations, 64 Fed. Reg. 55,012, 55,012 (Oct. 8, 1999) (initial designa-

tion); 66 Fed. Reg. 51,088, 51,089 (Oct. 5, 2001) (redesignation).

* Although we reverse Hamdan's criminal conviction for material support, we do so not for lack of evidence but rather because the Military Commissions Act of 2006 does not authorize retroactive prosecution for an act that was not criminal when done.   There is no comparable bar to retroactivity that prevents the Government from attaching to those same acts adverse immigration consequences.   *See Marcello v. Bonds*, 349 U.S. 302, 314, 75 S.Ct. 757, 99 L.Ed. 1107 (1955) ("the prohibition of the ex post facto clause does not apply to deportation").

* In addition to that statutory basis for Hamdan's permanent exclusion, Hamdan would not be physically able to re-enter the country because of his automatic inclusion, as a former Guantanamo detainee, on the 'No Fly List.'   *See* 49 U.S.C. § 44903(j)(2)(C)(v);   *cf. Gul v. Obama*, 652 F.3d 12, 19 (D.C.Cir.2011) (former detainees are "barred from flights entering the United States regardless whether a court declares they were unlawfully detained.   An order granting a detainee's habeas petition would not mean his exoneration, nor would it be a determination he does not pose a threat to American interests; it would mean only that the Government has not proven the detainee more likely than not 'materially support[ed]' " terrorism).

cremental effect upon his admissibility and hence the immigration consequence he proffers cannot serve as a basis for our jurisdiction. *Cf. Gul*, 652 F.3d at 19–20 (where detention at Guantanamo Bay, rather than designation as enemy combatant, is the ground for inadmissibility, immigration consequence of challenge to designation "too speculative to sustain the exercise of our jurisdiction").

The only other collateral consequence alleged is the Government's preposterously hypothetical prospect of an enhanced sentence if Hamdan is in the future convicted in the United States for committing another crime. The Supreme Court held in *Sibron* that the hypothetical future sentencing enhancement is sufficient to support the presumption that the conviction being appealed will have an adverse collateral consequence and hence to keep the appeal from being moot. *Sibron*, 392 U.S. at 56, 88 S.Ct. 1889. Subsequent cases, however, cast doubt upon the continuing validity of *Sibron* as applied to this case. In *Spencer v. Kemna* the Court declined to extend the *Sibron* presumption to the appeal of a parole revocation because any collateral consequence in a future sentencing "was contingent upon [the defendant again] violating the law, getting caught, and being convicted." 523 U.S. 1, 15, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998); *see also Lane v. Williams*, 455 U.S. 624, 633 n. 13, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982) ("The parole violations that remain a part of respondents' records cannot affect a subsequent parole determination unless respondents again violate state law, are returned to prison, and become eligible for parole. Respondents themselves are able—and indeed required by law—to prevent such a possibility from occurring").

That is, although in *Sibron* a conviction was presumed to have adverse consequences for the defendant in a future hypothetical sentencing, in *Spencer* the hypothetical sentencing consequences of a defendant's parole revocation were held insufficient to keep his case from being moot because such consequences are speculative and depend upon future unlawful conduct by the defendant. Both holdings were categorical; they did not depend at all upon the particular defendant's probability of recidivating. Therefore, the defendants' future crimes, apprehension, and conviction were equally speculative in both cases. It is entirely unclear, therefore, how the hypothetical sentencing consequences of a parole revocation could be too speculative to support a finding of collateral consequences, while the hypothetical sentencing consequences of a conviction could be concrete and certain enough to support the presumption of collateral consequences, and hence Article III jurisdiction, in all criminal appeals.

Nonetheless, "[i]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). Accordingly, because Hamdan's case is a direct appeal of his criminal conviction rather than review of a parole revocation as in *Spencer*, the Court is bound to hold the *Sibron* presumption applies and therefore the hypothetical future sentencing consequences of Hamdan's conviction are sufficient to keep his appeal from being moot.

Finally, I note that although this is an "appeal of a criminal conviction," we have strayed far from the familiar territory of *Sibron* and its progeny, which deemed sentencing consequences the antidote to mootness. The criminal conviction in each of those cases was entered in a regularly

constituted civilian court, and the criminal defendant served time in a domestic prison before being released into the sovereign territory of the United States. As such, upon his release the defendant was subject to the criminal laws of the United States and of the State in which he was located. Recidivism being common in the United States, it is unfortunately reasonable to suppose such a defendant may again be convicted for violating a state or federal law.* By contrast, Hamdan is presumably in Yemen and is certainly not in the United States; so far as the record shows, he has never entered the United States nor expressed any desire to do so; and he is barred, both legally and physically, from entering the United States. As a result, the only possible future sentencing consequence of his conviction by a military commission would be through extraterritorial application of our criminal law to a federal crime yet to be committed, or through a successive prosecution in a military commission for a future violation of the law of war. It is, to say the least, far more speculative that Hamdan may find himself again being sentenced in the United States than it is an domestic criminal may recidivate and find himself before a domestic criminal court.



---

* Recidivism rates of convicts released from prisons in the United States are well-known and substantial. *See* Dep't of Justice, Bureau of Justice Statistics, Recidivism of Prisoners Released in 1994 1 (June 2002) (using a sample of 272,111 former prisoners in 15 states, study showed 46.9% were convicted of another offense within three years of release). Recidivism rates among Guantanamo detainees are comparatively speculative, but insofar as they are known, are rather modest. *See* Director of National Intelligence, Summary of the Reengagement of Detainees Formerly Held at Guantanamo Bay, Cuba 1 (March 1, 2012) (of

UNITED STATES of America, Appellee

v.

Gregory TERRELL, Appellant.

No. 07–3054.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 14, 2012.

Decided Oct. 19, 2012.

**Background:** Defendant pleaded guilty to unlawful possession with intent to distribute five grams or more of cocaine base, and was sentenced by the United States District Court for the District of Columbia to 210 months of imprisonment, five years of supervised release, and a $100 special assessment. Defendant appealed.

**Holdings:** The Court of Appeals, Williams, Senior Circuit Judge, held that:

(1) defendant's challenges to his sentence were subject to plain error review;

(2) district court's failure to apply sentencing guidelines in effect at time of offense did not constitute plain error;

(3) district court committed clear error in requiring "compelling reasons" to sentence defendant below the guidelines range;

599 detainees released from Guantanamo, 4.7% detained again and "confirmed of reengaging" in hostilities over a nine-year period). Presuming that collateral consequences arise from a conviction by a military commission for violating the law of war and persist after the convict is released into a foreign country, therefore, hardly seems justified. *Cf. Gul,* 652 F.3d at 17 ("not[ing] detention at Guantanamo and designation as an enemy combatant are recent phenomena; [therefore a court] ha[s] no basis for inferring they routinely have collateral consequences").