# 11-1324

[Oral argument scheduled for Sept. 30, 2013]

## United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT
### Docket No. 11-1324

---

ALI HAMZA SULIMAN AHMAD AL BAHLUL,

*Petitioner,*

*v.*

UNITED STATES,

*Respondent.*

---

APPEAL FROM
COURT OF MILITARY COMMISSION REVIEW (CMCR-09-001)

---

### *EN BANC* BRIEF FOR PETITIONER (CORRECTED)

---

MAJ Todd E. Pierce,
    JA, U.S. Army (Ret.)
Senior Fellow
Univ. of Minnesota
Human Rights Center
Mondale Hall, N-120
229-19th Avenue South
Minneapolis, MN 55455

Michel Paradis
CAPT Mary McCormick,
    JAGC, U.S. Navy
1620 Defense Pentagon
Washington, DC 20301-1620
michel.paradis@osd.mil
TEL: 1.703.696.9490 x115
FAX: 1.703.696.9575


*Counsel for Petitioner*

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

## I.  PARTIES AND *AMICI* APPEARING BELOW

The parties and *amici* who appeared before the Court of Military Commission Review in connection with this appeal were:

1. Ali Hamza Ahmad Suliman al Bahlul, *Appellant*

2. United States of America, *Appellee*

3. *Amicus Curiae* the Office of the Chief Defense Counsel, Col Peter Masciola, USAF (on brief)

4. *Amicus Curiae* Robert David Steele and Others in the United States Intelligence Community, McKenzie Livingston (on brief)

5. *Amicus Curiae* Historians, Political Scientists and Constitutional Law Professors, Sarah Paoletti (on brief)

6. *Amicus Curiae* National Institute of Military Justice, Michelle Lindo (on brief)

7. *Amicus Curiae* Montana Pardon Project, Jeffrey Renz (on brief)

8. *Amicus Curiae* Human Rights Committee of the American Branch of the International Law Association, Jordan J. Paust (on brief)

## B. Parties Appearing in this Court

1. Ali Hamza Ahmad Suliman al Bahlul, *Petitioner*

2. United States of America, *Respondent*

3. *Amicus Curiae* Int'l Law Scholars, David Weissbrodt (on brief)

4. *Amicus Curiae* Retired Military and Intelligence Officers, McKenzie Livingston (on brief)

5. *Amicus Curiae* The National Institute of Military Justice, Steve Vladeck (on brief)

6. *Amicus Curiae* First Amendment Historians, Jeffrey Renz (on brief)

i

## II. RULINGS UNDER REVIEW

This appeal is from a decision of the United States Court of Military Commission Review in *United States v. Ali Hamza Ahmad Suliman al Bahlul*, CMCR 09-001(*en banc* September 9, 2011). The decision is provided at App. 3-141 and is reported at 820 F.Supp.2d 1141 (C.M.C.R. 2011).

## III.     RELATED CASES

This case has not previously been filed with this court or any other court. Counsel are aware of no other cases that meet this Court's definition of related. However, the issues briefed herein relate to this Court's decision in *Hamdan v. United States*, 696 F.3d 1238 (D.C. Cir. 2012).


Dated: May 24, 2013

                                    By: /s/ Michel Paradis
                                         *Counsel for Petitioner*

ii

# TABLE OF CONTENTS

**Table of Authorities** ......................................................................... iv

**Jurisdictional Statement** .................................................................... 1

**Statement of Issues** ............................................................................ 2

**Statutes & Regulations** ...................................................................... 3

**Statement of Facts** .............................................................................. 4

    A. Circumstances leading to Bahlul's Arrest (1999-2001) ...................... 4
    B. Proceedings before Military Commissions (2004-2008) ................... 5
    C. Ultimate Trial & Appeal (2008-2013) ............................................ 7

**Summary of Argument** ..................................................................... 11

**Argument** ........................................................................................... 12

I.    The 2006 Act can only be applied to offenses that were recognized under international law as war crimes when they were allegedly committed. ................ 12

    A. Standard of Review. ..................................................................... 13
    B. The 2006 Act does not retroactively create new crimes. ................ 13
    C. The offenses charged in this case must have been punishable as war crimes under some positive law when they were committed ........... 19
    D. Article 21 deals only with crimes arising under international humanitarian law. ......................................................................... 23

II.   Certified Question – *Ex post Facto* ............................................. 33

III.  Certified Question – Conspiracy ................................................. 39

    A. Treaties & Statutes ...................................................................... 42
    B. War Crime Tribunal Jurisprudence ............................................... 44
    C. Learned Scholarship .................................................................... 54

**Addendum** .......................................................................................... 58

**Certificate of Compliance with Rule 32(a)** ....................................... 64

**Certificate of Service** ........................................................................ 65

# TABLE OF AUTHORITIES

### Cases

*Al-Bihani v. Obama*, 619 F.3d 1 (D.C. Cir. 2010)............................................. 21, 24

*Balzac v. Porto Rico*, 258 U.S. 298 (1922)...........................................................37

*Belfast v. United States*, 611 F.3d 783 (11th Cir. 2010).......................................49

*Bond v. United States*, 131 S.Ct. 2355 (2011) .....................................................36

\* *Bouie v. City of Columbia*, 378 U.S. 347 (1964). .....................................................26

*Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007) ...........................................17

\* *Boumediene v. Bush*, 553 U.S. 723 (2008) ............................... 17, 33, 35, 36, 37, 38

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988)........................................15

\* *Calder v. Bull*, 3 Dall. 386 (1798).................................................................. 14, 33

*Carr v. United States*, 130 S.Ct. 2229 (2010)..........................................................14

*Colepaugh v. Looney*, 235 F.2d 429 (10th Cir. 1956) ..............................................52

*Cummings v. Missouri*, 71 U.S. 277 (1866)...........................................................36

*Dash v. Van Kleeck*, 7 Johns. 477 (N.Y.1811) .......................................................13

*Dorsey v. United States*, 132 S.Ct. 2321 (2012).....................................................15

\* *Downes v. Bidwell*, 182 U.S. 244 (1901).................................................................37

*Duncan v. Kahanamoku*, 327 U.S. 304 (1946).......................................................27

*Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) .........................................................21

*Ex parte Milligan*, 4 Wall. 2 (1866)........................................................................27

*Ex parte Mudd*, 17 F.Cas. 954 (S.D.Fla. 1868) ......................................................52

\* *Ex parte Quirin*, 317 U.S. 1 (1942)................................ 27, 29, 31, 39, 40, 52, 53, 57

\*  Authorities upon which we chiefly rely are marked with asterisks.

*FEC v. Lance*, 617 F.2d 365 (5th Cir. 1980) ............................................................19

*Fletcher v. Peck*, 6 Cranch 87 (1810) ....................................................................36

*Georgia v. United States*, 411 U.S. 526 (1973) ....................................................28

*Gersman v. Group Health Ass'n*, 975 F.2d 886 (D.C. Cir. 1992) ................... 15, 16

\* *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ........... 22, 26, 27, 40, 42, 49, 50, 51, 54

\* *Hamdan v. United States*, 696 F.3d 1238
    (D.C. Cir. 2012) ............................................ 12, 16, 19, 23, 24, 40, 41, 49, 55

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) ..............................................................24

*llinois v. Allen*, 397 U.S. 337 (1973) ....................................................................23

*In re Chiquita Brands Intern., Inc.*, 792 F.Supp.2d 1301 (S.D.Fla.
    2011)......................................................................................................49

*In re Estate of Marcos Human Rights Litigation*, 25 F.3d 1467 (9th
    Cir. 1994) ..............................................................................................40

\* *In re Yamashita*, 327 U.S. 1 (1946) ......................................... 27, 29, 31, 40, 42, 54

*INS v. St. Cyr*, 533 U.S. 289 (2001).......................................................................16

*Jecker v. Montgomery*, 13 How. 498 (1851) ........................................................27

*Johnson v. United States*, 529 U.S. 694 (2000) ............................................. 14, 17

*Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827 (1990)............. 13, 14

*Kinsella v. U.S. ex rel. Singleton*, 361 U.S. 234 (1960) ........................................13

*Kiobel v. Royal Dutch Petroleum*, 621 F.3d 111 (2d Cir. 2010) ...........................39

\* *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994)................................... 13, 34, 36

*Lee v. Madigan*, 358 U.S. 228 (1959)....................................................................31

\* *Lindh v. Murphy*, 521 U.S. 320 (1997) .......................................................... 15, 16

*Liu Bo Shan v. China Const. Bank Corp.*, 421 Fed.Appx. 89 (2d Cir.
    2011)......................................................................................................49

*Lorillard v. Pons*, 434 U.S. 575 (1978) ................................................................28

*Lynce v. Mathis*, 519 U.S. 433 (1997) ....................................................34

*Madsen v. Kinsella*, 343 U.S. 341 (1952) ........................................ 27, 28

*Marbury v. Madison*, 1 Cranch 137 (1803) ............................................18

*Martin v. Hadix*, 527 U.S. 343 (1999) ...................................................15

*Mudd v. Caldera*, 134 F.Supp.2d 138 (D.D.C. 2001)............................52

*Ogden v. Saunders*, 25 U.S. 213 (1827). .............................................34

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972)....................22

\* *Presbyterian Church of Sudan v. Talisman Energy*, 582 F.3d 244 (2d. Cir. 2009)................................................................................................49

*Prosecutor v. Blaskic*, Judgment, Case No. IT-95-14-A, 2004 WL 2781930 (I.C.T.Y. App. Ch., Jul. 29, 2004) ......................................19

*Prosecutor v. Brđanin*, Judgment, Case No. IT-99-36-A, 2007 WL 1826003 (ICTY App. Ch., Apr. 3, 2007)...........................................48

*Prosecutor v. Hadzihasanovic, et al.*, Decision on Interlocutory Appeal Challenging Jurisdiction in Relation to Command Responsibility, Case: IT-01-47-AR72, 2003 WL 23833764 (Jul. 16, 2003)................................................................................................14

*Prosecutor v. Kvočka*, Judgment, Case No. IT-98-30/1-A, 2005 WL 3392999 (ICTY App. Ch., Feb. 28, 2005) .........................................48

*Prosecutor v. Milutinovíc,* Decision on Dragoljub Ojdaníc's Motion Challenging Jurisdiction-Joint Criminal Enterprise, Case No. IT-99-37-AR72, 2003 WL 24014138 (ICTY App. Chamber, May 21, 2003)............................................................................................ 48, 51

\* *Reid v. Covert*, 354 U.S. 1 (1957)................................................... 31, 55

*Runkle v. United States*, 122 U.S. 543 (1887) .......................................13

*Salters v. Tobias*, 3 Paige 338 (N.Y. 1832) ...........................................35

*Solorio v. United States*, 483 U.S. 435 (1987)........................................31

\* *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)............................... 21, 40

*Southern Pacific Co. v. Jensen*, 244 U.S. 205 (1917) ............................21

*Stern v. Marshall*, 131 S.Ct. 2594 (2011) ................................................................13

\* *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984) ................. 39, 40

*Texas v. Brown*, 460 U.S. 730 (1983) .......................................................49

*The Paquete Habana*, 175 U.S. 677 (1900)..................................................41

*The Trial of William Penn*, 6 How. St. Tr. 951 (1670)............................................23

*Toth v. Quarles*, 350 U.S. 11 (1955).........................................................31

*Town of Koshkonong v. Burton*, 104 U.S. 668 (1881)..........................................35

*United States v. Hudson*, 7 Cranch 32 (1812).................................................. 21, 22

*United States v. Lopez*, 514 U.S. 549 (1995)..................................................31

*United States v. Morrison*, 529 U.S. 598 (2000) ............................................. 18, 31

*United States v. Smith*, 5 Wheat. 153 (1820)..................................................29

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ..............................................39

\* *Weaver v. Graham*, 450 U.S. 24 (1981) .....................................................34

*Zaimi v. Untied States*, 476 F.2d 511 (D.C. Cir 1972) ...........................................22

## Constitutional Provisions

\* U.S. Const., art. I § 8, cl. 10............................................................ 29, 31

U.S. Const., art. I § 8, cl. 14...........................................................31

U.S. Const., art. I § 9, cl. 2............................................................35

\* U.S. Const., art. I § 9, cl. 3............................................................14

U.S. Const., art. III § 2...............................................................31

## Congressional Materials

\* 10 U.S.C. § 821 ...................................................................... 12, 20

10 U.S.C. § 881 .......................................................................44

10 U.S.C. § 902 ...................................................................................20

10 U.S.C. § 904 ...................................................................................20

10 U.S.C. § 950g (2009) ...................................................... 1, 13, 33, 39

10 U.S.C. § 950p (2006) ......................................................................18

18 U.S.C. § 2339B ................................................................................6

Articles of War, 39 Stat. 652 (1916)....................................................25

Establishing a Uniform Code of Military Justice: Hearings on S. 875
    & H.R. 4080 Before the Committee on Armed Services, 81st
    Cong., 1st Sess. (May 4, 1949) .......................................................30

H.R. Doc. No. 314, 55th Cong., 3d Sess. (1899)...................................52

Military Commissions Act of 2006, Pub. L. No. 109-366 (2006)................. passim

Military Commissions Act of 2009, Pub. L. 111-84 §§ 1801, *et seq.*
    (2009) ...............................................................................................10

Revision of the Articles of War: Hearing Before the Subcomm. on
    Military Affairs, S. Rep. No. 64-130 (1916)................................ 25, 28

Uniform Code of Military Justice, 10 U.S.C. §§ 801, *et seq.*....................................5

War Crimes Act, 18 U.S.C. § 2441 ................................................ 17, 44

## International Agreements

Agreement for the Prosecution and Punishment of the Major War
    Criminals of the European Axis, Aug. 8, 1945, 58 Stat. 1544 .................. 43, 45

American Convention on Human Rights, Nov. 22, 1969, 9 I.L.M. 99 ...................15

Convention on the Prevention and Punishment of the Crime of
    Genocide, Dec. 9, 1948, 102 Stat. 3045.......................................42

Convention Relative to the Protection of Civilian Persons in Time of
    War, Aug. 12, 1949, 6 U.S.T. 3516 ................................................15

Convention Relative to the Treatment of Prisoners of War, Aug. 12,
    1949, 6 U.S.T. 3316 ........................................................................15

International Covenant on Civil and Political Rights, Dec. 16, 1966, 6
    I.L.M. 368.........................................................................................15

Law of the Supreme Iraqi Criminal Tribunal, Al-Waq'I Al-Iraqiya –
    No. 4006 (Oct. 18, 2005) .....................................................43

Rome Statute of the International Criminal Court ("Rome Statute"),
    Jul. 17, 1998, 37 I.L.M. 1002.................................................. 14, 42, 43

Statute of the International Criminal Tribunal for the Prosecution of
    Persons Responsible for Genocide and Other Serious Violations of
    International Humanitarian Law Committed in the Territory of
    Rwanda and Rwandan Citizens Responsible for Genocide and
    Other Such Violations Committed in the Territory of Neighboring
    States, Between 1 January 1994 and 31 December 1994, Nov. 8,
    1994, 33 I.L.M. 1598...........................................................42

Statute of the International Tribunal for the Prosecution of Persons
    Responsible for Serious Violations of International Humanitarian
    Law Committed in the Territory of the Former Yugoslavia Since
    1991, May 25, 1993, 32 I.L.M. 1159 ....................................42

Statute of the Iraqi Special Tribunal (Dec. 10, 2003).............................43

## Miscellaneous

9/11 Commission Report (Jul. 22, 2004)...................................................4

Allison Marston Danner & Jenny S. Martinez, *Guilty Association:
    Joint Criminal Enterprise, Command Responsibility, and the
    Development of International Criminal Law*, 93 Cal. L. Rev. 75
    (2005) ...........................................................................54

Andrea Bianchi & Yasmin Naqvi, *International Humanitarian Law
    and Terrorism* (Hart 2011)...................................................55

Antonio Cassese, *International Criminal Law* (2003) ...........................54

Curtis Bradley & Jack Goldsmith, *Customary International Law as
    Federal Common Law: A Critique of the Modern Position*, 110
    Harv. L. Rev. 815 (1997) ....................................................21

ix

Dep't of the Army Field Manual 27-10, *The Law of Land Warfare*
(Jul. 18, 1956)........................................................................24

International Law Association, Final Report on the Exercise of
Universal Jurisdiction in Respect of Gross Human Rights Offences
(2000) ...............................................................................40

Jens David Ohlin, *Joint Intentions to Commit International Crimes*,
11 Chicago J. of Int'l L. 693 (2011) .......................................56

John Bickers, *Military Commissions are Constitutionally Sound: A
Response to Professors Katyal and Tribe*, 34 Tex. Tech. L.Rev.
899 (2003) ..................................................................... 27, 30, 31

Joseph Story, *Commentaries on the Constitution* (1851) ........................14

L. Rep. Trials of War Criminals (1950)........................................56

Maj. Michael A. Newton, *Continuum Crimes: Military Jurisdiction
Over Foreign Nationals Who Commit International Crimes*, 153
Mil. L. Rev. 1 (1996)..........................................................25

Manual for Courts-Martial, United States (2012)..................................25

Principles of International Law recognized in the Charter of the
Nürnberg Tribunal and in the Judgment of the Tribunal, with
commentaries, Yearbook of the Int'l L. Comm. (1950) ...................50

Report of the Deputy Judge Advocate for War Crimes, European
Command (Jun. 29, 1948) ..................................................47

Restatement (Third) of Foreign Relations (1987)............................ 22, 39

Samuel Morrison, *Accepting Sosa's Invitation: Did Congress expand
the subject-matter jurisdiction of the Alien Tort Statute in the
Military Commissions Act?,* 43 Geo. J. Int'l L. 1097 (2012) ...........50

*The Federalist*, No. 84 (Hamilton) ........................................34

The Tokyo War Crimes Trial: The Complete Transcripts of the
Proceedings of the International Military Tribunal for the Far East
(Ed. Pritchard, J. & Zaide, S. 1981)......................................47

Trial of the Major War Criminals Before the International Military
Tribunal: Nuremberg, 15 November 1945 – 1 October 1946
(1947) ................................................................................................49

Trials of War Criminals before the Nuremberg Military Tribunals
Under Control Council Law No. 10 (G.P.O. 1949) ...........................................47

*United States v. Nashiri*, AE046, Gov't Resp. to Defense Motion to
Dismiss for Lack of Lack of [sic] Jurisdiction over the Charge of
Conspiracy (Mar. 26, 2012) ..............................................................................41

* William Winthrop, *Military Law and Precedents* (2d Ed. 1920)......... 26, 27, 32, 55

# GLOSSARY OF TERMS

2006 Act ...............Military Commissions Act of 2006, Pub. L. No. 109-366 (2006)

2009 Act ............................ Military Commissions Act of 2009, Pub. L. No. 111-84 §§ 1801-1807 (2009)

App. ...................................................................................... Appendix I

App. II ................................................................................. Appendix II

CMCR ................................................... U.S. Court of Military Commission Review

Pet. En Banc ..................................... Respondent's Petition for Rehearing *En Banc*, filed April 26, 2012

Resp. ................................................... Brief for the Respondent, filed May 16, 2012

UCMJ ................................................................. Uniform Code of Military Justice, 10 U.S.C. §§ 801, *et seq*

## JURISDICTIONAL STATEMENT

On September 9, 2011, the Court of Military Commission Review ("CMCR") affirmed the final judgment rendered by a military commission against Petitioner. App. 1-109. Petitioner filed a timely petition for review, 10 U.S.C. § 950g(c) (2009), giving this Court "exclusive jurisdiction to determine the validity" of that final judgment. *Id*. §950g(a).

## STATEMENT OF ISSUES

1.      Are the offenses enumerated in the Military Commissions Act of 2006 applicable to pre-enactment conduct irrespective of whether they were war crimes under international humanitarian law at the time?

2.      **Certified Question – *Ex post facto*.** For purposes of considering whether the Military Commissions Act of 2006 may permissibly proscribe pre-2006 conduct that was not a war crime triable by military commission under 10 U.S.C. § 821 before 2006, does the *Ex Post Facto* Clause apply in cases involving detainees at Guantanamo?

3.      **Certified Question – Conspiracy.** Assuming arguendo that, as *Hamdan II* concluded, the Military Commissions Act of 2006 does not proscribe pre-2006 conduct that was not a war crime triable by military commission under 10 U.S.C. § 821 before 2006, and that 10 U.S.C. § 821 permits trial by military commission only for war crimes that were proscribed under the international law of war at the time of the offense, was conspiracy a violation of the international law of war at the time of Bahlul's offense?

## STATUTES & REGULATIONS

All pertinent statutes and regulations relied on are set forth in the Addendum included with this brief.

# STATEMENT OF FACTS

Ali Hamza Suliman Ahmed al Bahlul ("Bahlul") acknowledges that he is a member of al Qaeda and that his beliefs remain consistent. In his late twenties, he traveled to Afghanistan to participate in the mujahedeen. The record shows that he never had foreknowledge of and did not participate in any terrorist act. His most significant contribution was a 90-minute film that the prosecution described as a "political argument." This film was at the center of the military commission trial that convicted him and from which he now appeals.

## A. Circumstances leading to Bahlul's Arrest (1999-2001)

Bahlul traveled from his home in Yemen to Afghanistan in late 1999. His purpose was to join what was broadly referred to as the "mujahedeen," a diverse group of mostly Arab Muslims, who provided military and other services to the Taliban government in Afghanistan. App. 142.

Once he arrived, Bahlul attended various training camps and grew to admire bin Laden. In late November 1999, Mohammad Atta and Zaid Jarrah arrived at a guesthouse where he was staying. App. 160; 190; 197. Within one or two weeks of their arrival, Bahlul returned to Yemen. App. 197. Atta and Jarrah would go on to organize the September 11th attacks. They were introduced to the al Qaeda leadership and brought into the September 11th plot sometime in late December. 9/11 Commission Report 165-67 (Jul. 22, 2004), App. 232-34; *see also* App. 197.

4

Bahlul returned to Afghanistan in early 2000. He worked for approximately

a year-and-a-half in al Qaeda's media office, which was controlled by a Media

Committee, chaired by Ayman al-Zawahiri. App. 187. In this position, Bahlul had

no authority to distribute propaganda, which was the purview of the Security

Committee. App. 182. After the September 11th attacks, Bahlul stayed in bin

Laden's entourage in Afghanistan for approximately a month before leaving for

Pakistan, where he was arrested by Pakistani authorities, turned over to U.S.

custody, and transferred to Guantanamo Bay. App. 184.

### B. Proceedings before Military Commissions (2004-2008)

Between 2004 and 2006, two different military commissions were convened

to try Bahlul on a single charge of conspiracy. App. 110-119. This conspiracy

charge was supported by eleven overt acts pertaining to his activities with al Qaeda

from 1999 until his arrest. Because of legal challenges in other cases, proceedings

in both of these commissions halted within a few months of beginning.

In October 2006, the President signed the Military Commissions Act of 2006,

Pub. L. No. 109-366 (2006) ("2006 Act"). Section 3 established a procedural

framework for military commissions that varied from the procedures of the

Uniform Code of Military Justice, 10 U.S.C. §§ 801, *et seq*. ("UCMJ"). In

February 2008, a civilian civil servant in the Department of Defense, known as the

"convening authority," convened a military commission to try Bahlul on three

5

charges. App. 120-125. The first charge, conspiracy, was substantively identical to the conspiracy charge in the prior commissions. The second charge, solicitation, alleged that Bahlul's film was made for the purpose of advocating terrorism. The third charge, material support, which is a cognate offense to 18 U.S.C. § 2339B, incorporated the overt acts from the conspiracy charge to allege that Bahlul provided material support to a terrorist organization.

Bahlul was arraigned again in May 2008. He asserted a desire to represent himself and this request was granted by the military judge, COL Peter Brownback, USA. Later that month, COL Brownback was replaced by Col Ronald Gregory, USAF. In August, Col Gregory convened a hearing, on motion of the government, to revisit the issue of self-representation. App. 138. Bahlul stated he was unwilling to proceed because the government had lost a document he had prepared for that purpose. App. 139. Col Gregory allowed Bahlul to absent himself from the hearing and then revoked his *pro se* status *in absentia*. App. 140.

At the next hearing, Bahlul was present and spoke for himself. He admitted most of the allegations against him, but nevertheless pleaded not guilty, stating "I'm not guilty, and what I did was not a crime." App. 141. He engaged in an extensive colloquy with Col Gregory over his objections to the military commission's jurisdiction and charges, which he indicated required him to "boycott" his trial. App. 141-47.

6

### C. Ultimate Trial & Appeal (2008-2013)

The factual allegations underlying the charges, which are not in significant dispute, span the period from Bahlul's arrival in Afghanistan in 1999 until his arrest. He admits to swearing allegiance to bin Laden, performing secretarial duties, and editing together the film that was the centerpiece of the government's case. App. 150-51; App. II 1. He denied wearing explosives and was ultimately acquitted of this allegation. App. 174.

One of the alleged overt acts is that he "prepared the propaganda declarations styled as martyr wills" of Atta and Jarrah. The basis for this allegation is a letter he wrote in 2005 to introduce himself to a high-level al Qaeda leader, who had been publicly taken into U.S. custody. In that letter, he states that he "typed" or "transcribed" (طبـع) the martyr wills after the September 11th attacks. App. 204-08; *see also* App. 160 (McFadden testimony). The videos of Atta and Jarrah rehearsing and then taping these statements, which are included in the record, show them reading from and revising their own handwritten remarks. App. II 2, 3. These videos were taped in January 2000, a time when Bahlul was home in Yemen. The record further shows that Bahlul did not know that Atta or Jarrah were involved in any plot until he saw their photographs in the media following the September 11th attacks. App. 160; 197.

7

Bahlul's alleged connections to Atta and Jarrah are important to clarify because his trial was not about the September 11th attacks, or any act of terrorism. The government never alleged, nor presented any evidence, and the commission never found that Bahlul either participated in the September 11th attacks or had foreknowledge of any terrorist plot. From the opening statement, through the testimony of every witness to the summation, Bahlul's trial was about his film.

This film is referred to in the record by various names, including *State of the Ummah* ("*State of the Nation*"), *The Destruction of the American Destroyer the U.S.S. COLE*, and the *COLE Video*. App. II 1. Bahlul allegedly made this film in early 2001. It does not show him committing any crimes. It does not contain do-it-yourself instructions on how to perpetrate crimes. He is not in this film and was not even the cameraman. The film is clips of found footage edited together into a narrative justification of political Salafism; or what the prosecution described as "propaganda, political argument, and indoctrination of solicitation." App. 149.

Trial commenced on October 27, 2008. Bahlul insisted that the military lawyer appointed to him remain silent throughout. The government called fourteen witnesses, who primarily testified about the film and Bahlul's having taken credit for the film's production.

Col. Gregory instructed the "members," a panel of six military officers who sit as a commission's jury, on the inchoate nature of the offenses. With respect to

8

conspiracy, "proof that [any one of the underlying law of war offenses] actually occurred is not required." App. 173; *id*. 174 ("the overt act required for this offense does not have to be a criminal act."). When respect to solicitation, "proof that the offenses listed in the Specification of Charge II actually occurred is not required." App. 176; *id.* ("it is not necessary that the person solicited agree to the [requested crime] or act upon it"); *id.* ("it is not necessary the person advised agrees to the advice or act upon it."). The material support offense was defined in the terms of the statute, such that "Bahlul intentionally provided material support and resources to al Qaeda, an international terrorist organization then engaged in hostilities against the United States[.]" App. 177.

On November 3, 2008, the members found Bahlul guilty on all charges, excepting the overt act alleging that he armed himself. App. 130-37. The sentencing hearing commenced that same day. The government called two witnesses, victims of the U.S.S. COLE attack, who testified that they were personally offended after seeing the film on the Internet. App. 166-71. At the conclusion of testimony, Bahlul made an unsworn statement reaffirming his commitment to al Qaeda and after an hour of deliberation, the members sentenced him to life imprisonment. App. 172.

In June 2009, the convening authority approved the findings and sentence without exception. App. 126-29. On September 1, 2009, Bahlul filed his merits

9

brief with the CMCR. In October, the President signed the Military Commissions Act of 2009, Pub. L. 111-84 §§ 1801, *et seq*. (2009) ("2009 Act"), which modified the commissions' procedures. On September 9, 2011, the CMCR issued its decision, denying all of Bahlul's asserted errors. App. 1-109.

   The instant appeal timely followed. While pending, this Court decided *Hamdan v. United States*, 696 F.3d 1238 (D.C. Cir. 2012) ("*Hamdan II*"). *Hamdan II* vacated the commission conviction of Usama bin Laden's bodyguard for material support for terrorism charges brought under both the §2339A and §2339B variants of the offense. The Court found that these offenses were not proscribed as a war crimes triable by military commission prior to 2006. *Id*. at 1250

   In January 2013, the government conceded that *Hamdan II*'s reasoning was fatal to all of the charges in this case. The government timely petitioned this Court to rehear this case *en banc* in order to revisit its holding in *Hamdan II*. This Court granted that petition on April 23, 2013.

## SUMMARY OF ARGUMENT

This case deals with the retroactive application of a criminal law. The 2006 Act was passed five years after Bahlul was taken into custody. A military commission convicted him for offenses the act proscribed on the basis of allegations that predated its enactment by as many as seven years. The resolution of this case turns on a single question. Were the war crimes for which Bahlul was convicted – to wit, conspiracy, solicitation, and material support for terrorism – war crimes when he is alleged to have committed them?

A vast and unambiguous body of jurisprudence, state practice, and scholarship on international humanitarian law says they were not. The overwhelming majority of historical sources say they were not. And the government concedes they were not. Consequently, the answer to the question at the center of this case is no.

Whatever basis Bahlul's pre-arrest conduct might give the government to detain him under its war powers, and whatever basis it might give the government to pursue a grand jury indictment, the government overstepped the law in seeking to convict him as a war criminal because none of the charges it brought against him were war crimes.

## ARGUMENT

**I.    THE 2006 ACT CAN ONLY BE APPLIED TO OFFENSES THAT WERE RECOGNIZED UNDER INTERNATIONAL LAW AS WAR CRIMES WHEN THEY WERE ALLEGEDLY COMMITTED.**

The temporal scope of the 2006 Act is dictated by ordinary principles of statutory interpretation. In *Hamdan II*, this Court looked first to its text to ascertain whether its proscription of offenses was intended to have retroactive effect. Given the absence of such intent, this Court looked to see whether the relevant portions of the law could be fairly viewed as a recodification of any law existing at the time the offense was allegedly committed. The only possible candidate was 10 U.S.C. § 821 ("Article 21") and its assimilation of law of war offenses. This Court examined whether material support for terrorism was firmly established under international humanitarian law. Finding that it was not – a point the government conceded – this Court held that material support lacked the legal foundation necessary to have been tried in a war crimes tribunal.

In every respect, this Court's approach, reasoning, and result were ordinary and correct. The government's alternative arguments for why this case should come out differently ask this Court to construe the 2006 Act as an *ex post facto* law. At best, the government seeks a reinterpretation of settled law that retroactively expands the jurisdiction of military tribunals to a point that is unprecedented in our constitutional history.

## A. Standard of Review.

This Court exercises de novo review over "matters of law." 10 U.S.C. § 950g(d) (2009). Any time an Article I tribunal is convened, the federal courts must ensure that the Executive is not seeking to "chip away at the authority of the Judicial Branch … 'Slight encroachments create new boundaries from which legions of power can seek new territory to capture.'" *Stern v. Marshall*, 131 S.Ct. 2594, 2620 (2011). The government must "affirmatively and unequivocally" show that the commission had jurisdiction over the charges; nothing is presumed in its favor. *Runkle v. United States*, 122 U.S. 543, 556 (1887) . It must show that it was "restricted to the narrowest jurisdiction deemed absolutely essential" to its constitutionally permissible purposes. *Kinsella v. U.S. ex rel. Singleton*, 361 U.S. 234, 240 (1960).

## B. The 2006 Act does not retroactively create new crimes.

1.      It is a tenet of Western law that substantive enactments should have only prospective effect. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270 (1994); *see generally Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 840-58 (1990) (Scalia, J., concurring) (tracing the historical development of the presumption); *Dash v. Van Kleeck*, 7 Johns. 477, 503 (N.Y.1811) (Kent, C.J.) ("It is a principle in the English common law, as ancient as the law itself, that a statute, even of its omnipotent parliament, is not to have a retrospective effect.").

That principle applies with special force to criminal laws. *See*, *e.g.*, *Carr v. United States*, 130 S.Ct. 2229, 2237 n.6 (2010); *Calder v. Bull*, 3 Dall. 386, 390 (1798). "The *Ex Post Facto* Clause raises to the constitutional level one of the most basic presumptions of our law: legislation, especially of the criminal sort, is not to be applied retroactively." *Johnson v. United States*, 529 U.S. 694, 701-02 (2000). "Retrospective laws are generally unjust; and neither accord with sound legislation nor with the fundamental principles of the social compact." *Kaiser Aluminum*, 494 U.S. at 855-56 (Scalia, J., concurring) (*quoting* Joseph Story, *Commentaries on the Constitution* § 1398 (1851)) (formatting omitted).

The enactment of *ex post facto* laws is among a handful of express prohibitions that Article I imposes on Congress. U.S. Const, art. I § 9, cl. 3. And in international law, this prohibition constitutes the very "principle of legality." *Prosecutor v. Hadzihasanovic, et al.*, Decision on Interlocutory Appeal Challenging Jurisdiction in Relation to Command Responsibility, Case: IT-01-47-AR72, 2003 WL 23833764, ¶51 (Jul. 16, 2003) ("An expansive reading of criminal texts violates the principle of legality, widely recognized as a peremptory norm of international law, and thus of the human rights of the accused."); Rome Statute of the International Criminal Court ("Rome Statute"), Jul. 17, 1998, art. 22(1), 37 I.L.M. 1002 ("A person shall not be criminally responsible … unless the conduct in question constitutes, at the time it takes place, a crime within the jurisdiction of

the Court."); Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, art. 99(1), 6 U.S.T. 3316; Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, art. 67, 6 U.S.T. 3516; *cf.* American Convention on Human Rights, Nov. 22, 1969, art. 9, 9 I.L.M. 99; International Covenant on Civil and Political Rights, Dec. 16, 1966, art. 15, 6 I.L.M. 368.

There is accordingly a strong presumption against the retroactive applicability of any law; a presumption only overcome by "clear congressional intent" in the form of an "unambiguous directive" or "express command" that a law must apply retroactively. *Martin v. Hadix*, 527 U.S. 343, 354 (1999); *Lindh v. Murphy*, 521 U.S. 320, 325 (1997) (describing the "clear-statement rule"). Before even reaching its constitutionality under the *Ex Post Facto* Clause, therefore, this Court must be convinced that the text of the 2006 Act itself "requires" its terms to be applied with *nunc pro tunc* effect to past events. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); *Gersman v. Group Health Ass'n*, 975 F.2d 886, 897 (D.C. Cir. 1992); *see also Dorsey v. United States*, 132 S.Ct. 2321, 2332 (2012) ("[B]efore interpreting a new criminal statute to apply its new penalties to a set of pre-Act offenders, [courts must] assure themselves that ordinary interpretive considerations point clearly in that direction.").

"[T]he existence of 'plausible' alternative interpretations of statutory language [mean] that that language [cannot] qualify as an 'unambiguous'

15

expression" of retroactive effect. *Lindh*, 521 U.S. at 328, n.4. "And cases where [the Supreme] Court has found truly 'retroactive' effect adequately authorized by a statute have involved statutory language that was so clear that it could sustain only one interpretation." *Id*. Consequently, unless the government can show that the only "plausible" interpretation of the 2006 Act's enumeration of offenses was to retroactively create war crimes *as if* they existed before the law's enactment, the "rights of the parties must be adjudicated as they were under the law prevailing at the time of the conduct." *Gersman*, 975 F.2d at 890.

2.     The primary evidence against such an interpretation is that the 2006 Act is a criminal statute. One would expect Congress to have been especially clear in stating its intent to pass such a law if only because of how unusual it would be. "[W]hen a particular interpretation of a statute invokes the outer limits of Congress' power, we expect a clear indication that Congress intended that result." *INS v. St. Cyr*, 533 U.S. 289, 299 (2001).

Instead, there is no indication in the 2006 Act's text or legislative history that Congress was looking to break new ground under the *Ex Post Facto* Clause. As this Court has noted, the text of the statute strongly indicates "Congress would *not* have wanted *new* crimes to be applied retroactively." *Hamdan II*, 696 F.3d at 1248 (emphasis in original).

16

When Congress intends to overcome the strong presumption that a law takes effect on the day of its enactment, it typically includes an effective date provision. Indeed, the presence of an effective date is the gold standard of legislative clarity in terms of giving a law an abnormal temporal scope. *Johnson*, 529 U.S. at 702. And its absence is the traditional hallmark of prospective legislation. *Id*.

Two separate sections of the 2006 Act contained effective date provisions. Section 3, which pertained to military commission jurisdiction, is not one of them. The first was the effective date of §7's jurisdictional bar on *habeas* actions filed by Guantanamo detainees. *Id*. §7(b). This Court and the Supreme Court looked to this provision as an unambiguous expression of Congressional intent to divest the federal courts of pre-enactment *habeas* cases. *Boumediene v. Bush*, 553 U.S. 723, 738 (2008); *Boumediene v. Bush*, 476 F.3d 981, 987 (D.C. Cir. 2007).

The second was the effective date of §6's amendments to the War Crimes Act, 18 U.S.C. § 2441. Prior to 2006, the act incorporated international humanitarian law by reference, including a broad prohibition on "grave breaches" of the Geneva Conventions. Section 6 enumerated a definitional list of "grave breaches" covered by the act. In a subsection entitled, "Retroactive Applicability," Congress included a clear statement that the "amendments made by this subsection … shall take effect as of November 26, 1997, *as if* enacted immediately after the

17

amendments made by section 583 of Public Law 105-118 (as amended by section 4002(e)(7) of Public Law 107-273)." *Id.* §6(a)(2) (emphasis added).

3.    Contrast that level of clarity with the government's best candidate for the 2006 Act's retroactive applicability – 10 U.S.C. § 950p (2006). Section 950p is self-identified as a Congressional statement of the "purpose" and "effect". The "purpose" of enumerating substantive offenses was to "not establish new crimes" but to codify offenses that Congress believed military commission generally had tried in the past. Its stated "effect" was to be "declarative of existing law" such that its enumeration of offenses would not create retroactivity problems.

Given its precatory language, §950p has all the traditional indicia of a Congressional finding. It does not instruct anyone to do or not do anything. Instead, it expresses a sense of Congress. The government itself recognizes this when it argues that §950 is a Congressional "finding that it was not creating new crimes[.]" Pet. En Banc, at 5. As such, it is no more binding on this Court than any other Congressional finding, *United States v. Morrison*, 529 U.S. 598, 614 (2000), especially insofar as it purports to "say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177 (1803). And far from a clear statement of retroactivity, §950p strongly indicates that Congress did not want or intend the 2006 Act to change the substantive law applicable to pre-enactment conduct.

18

To be sure, in purporting to "codify" offenses, as opposed to "criminalize" them, Congress acted in the apparent belief that the offenses it enumerated were previously punishable as codified. The recodification of extant offenses without substantive change is generally consistent with the *Ex Post Facto* Clause, *see FEC v. Lance*, 617 F.2d 365, 370 (5th Cir. 1980), as well as the relevant practice under international humanitarian law. *See*, *e.g.*, *Prosecutor v. Blaskic*, Judgment, Case No. IT-95-14-A, 2004 WL 2781930, ¶141 (I.C.T.Y. App. Ch., Jul. 29, 2004) ("[W]hile the Statute of the International Tribunal lists offences over which the International Tribunal has jurisdiction, the Tribunal may enter convictions only where it is satisfied that the offence is proscribed under customary international law at the time of its commission[.]"). But if Congress was wrong in its belief, nothing in the 2006 Act requires its enumerated offenses to be applied *as if* they had been enacted at some indefinite point in the past.

### C. The offenses charged in this case must have been punishable as war crimes under some positive law when they were committed.

The essential question is what precise law Congress intended the 2006 Act to recodify. In *Hamdan II*, this Court correctly looked to the UCMJ, which was the only federal law to proscribe war crimes triable by military commission prior to 2006. *Hamdan II*, 696 F.3d at 1245. The UCMJ contained three provisions vesting commissions with jurisdiction. Sections 902 and 904 carried over commission's

longstanding jurisdiction over the crimes of spying and aiding the enemy. 10 U.S.C. §§ 902, 904. Section 821, known as "Article 21," broadly conferred jurisdiction over "offenders or offenses that by statute or by the law of war may be tried by military commissions, provost courts, or other military tribunals." *Id*. §821.

In its briefing in support of rehearing *en banc*, the government argued that this Court erred in looking to Article 21 because §4 of the 2006 Act amended it. Section 4 added a savings clause to Article 21 and other provisions of the UCMJ, stating that they do "not apply to a military commission established under" §3 of the 2006 Act. 2006 Act §4(a)(2); Pet. En Banc at 10.

The problem with this argument is that if this savings clause is interpreted as jettisoning the UCMJ altogether, then the 2006 Act is left with nothing to re-codify. The government claims that this vacuum is filled by a heretofore-unknown body it has called the "U.S. common law of war." Resp. at 20-28; *see also* Pet. En Banc at 11-12. But it never identifies what positive legal authority made this special common law actionable prior to the 2006 Act. There is no pre-2006 statute empowering federal courts, let alone *ad hoc* military tribunals, to fashion their own subject matter jurisdiction over "U.S. common law of war" offenses. Indeed, there is no mention of such a common law in any statute, not the least the 2006 Act.

Without that foundation, such a common law simply did not exist. "[T]he common law is not a brooding omnipresence in the sky." *Southern Pacific Co. v.*

20

*Jensen*, 244 U.S. 205, 222 (1917) (Holmes, J., dissenting). Since *Erie*, all federal

common law is, in effect, the interstitial elaboration of some positive

Congressional authorization for judicial lawmaking. *Erie R. Co. v. Tompkins*, 304

U.S. 64, 78 (1938); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 726 (2004); *cf. Jensen*,

244 U.S. at 221 (Holmes, J., dissenting); *Al-Bihani v. Obama*, 619 F.3d 1, 17-18

(D.C. Cir. 2010) (Kavanaugh, J., concurring in the denial of rehearing *en banc*)

("*Erie* means that, in our constitutional system of separated powers, federal courts

may not enforce law that lacks a domestic sovereign source."); *see also* Curtis

Bradley & Jack Goldsmith, *Customary International Law as Federal Common

Law: A Critique of the Modern Position*, 110 Harv. L. Rev. 815, 856 (1997).

Even when Congress positively authorizes judicial lawmaking, the courts are

rightly cautious in imposing liability for past conduct that Congress had not

previously specified with particularity. *Sosa*, 542 U.S. at 726 ("[T]he general

practice has been to look for legislative guidance before exercising innovative

authority over substantive law."). And such caution is especially warranted when

the courts are being asked to exercise "a jurisdiction that remained largely in

shadow for much of the prior two centuries." *Id.*

Moreover, common law federal crimes were recognized as anathema to our

constitutional system well before *Erie. United States v. Hudson*, 7 Cranch 32

(1812). Part of their rejection stems from the profound doubts they raise about fair

notice and crime by analogy. *Hamdan v. Rumsfeld*, 548 U.S. 557, 602 n.34 (2006)
(plurality op.); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 169 n.12 (1972)
("[p]unishment by analogy . . . though long common in Russia, [is] not compatible
with our constitutional system."); *Zaimi v. Untied States*, 476 F.2d 511, 523-24
(D.C. Cir 1972).

The overriding problem with common law crimes, however, is that they are
irreconcilable with the basic separation of legislative and judicial powers. The
Constitution creates no common law jurisdiction. A crime not proscribed in an act
of Congress, signed by the President, and enrolled in the federal code is not a crime.
*Hudson*, 7 Cranch at 33. To be sure, even crimes well founded in customary
international law are not self-executing. They require affirmative proscription by
Congress in positive federal law. Restatement (Third) of Foreign Relations, *cmt*. i
(1987) ("An international agreement cannot take effect as domestic law without
implementation by Congress if the agreement would achieve what lies within the
exclusive law-making power of Congress under the Constitution. Thus, … it has
been assumed that an international agreement creating an international crime (e.g.,
genocide) or requiring states parties to punish certain actions (e.g., hijacking) could
not itself become part of the criminal law of the United States, but would require
Congress to enact an appropriate statute before an individual could be tried or
punished for the offense.").

It therefore does not matter if the government can show historical examples of offenses being brought before military commissions and it does not matter if it wishes to broadly characterize these examples as a special common law. All such a history might suggest is that Congress might have the legislative authority to proscribe those offenses. But if Congress had not yet chosen to codify an offense at the time it was allegedly committed, the resort to a common law to sustain it is the resort to "no law at all." *The Trial of William Penn*, 6 How.St.Tr. 951, 958-59 (1670) ("The question is not, whether I am Guilty of this Indictment, but whether this Indictment be legal. It is too general and imperfect an answer, to say it is the common-law, unless we knew both where and what it is. For where there is no law, there is no transgression; and that law which is not in being, is so far from being common, that it is no law at all.") (*quoted in Illinois v. Allen*, 397 U.S. 337, 354 (1973) (Brennen, J., concurring)).

### D. Article 21 deals only with crimes arising under international humanitarian law.

The government makes the alternative argument that the 2006 Act's offenses did, in fact, recodify the subject matter jurisdiction conferred by Article 21. Pet. En Banc. at 10-11. Its ultimate complaint with this Court's decision in *Hamdan II* is that the panel defined "law of war" as a branch of international law. *Id*. at 11.

23

We will not repeat the recitation of authority on which this Court relied to show why this common sense definition of "law of war" was correct. *Hamdan II*, 696 F.3d at 1248-49. "Brushing aside such precedent – particularly when doing so gives rise to a host of new questions never dealt with by this Court – is unjustified and unwise." *Hamdi v. Rumsfeld*, 542 U.S. 507, 523 (2004) (plurality op.).

All we would add is that this is also how judges, scholars, and military manuals have traditionally explained Article 21. Dep't of the Army Field Manual 27-10, *The Law of Land Warfare* ¶ 505 (Jul. 18, 1956) ("FM 27-10"), App. 253-55 ("Trials [for the punishment of war crimes] ... *d. How Jurisdiction Exercised*. War crimes are within the jurisdiction of general courts-martial (UCMJ, Art. 18), military commissions, provost courts, military government courts, and other military tribunals (UCMJ, Art. 21) of the United States, as well as of international tribunals. *e. Law Applied*. As the international law of war is part of the law of the land in the United States, enemy personnel charged with war crimes are tried directly under international law without recourse to the statutes of the United States. However, directives declaratory of international law may be promulgated to assist such tribunals in the performance of their function."); *Al-Bihani*, 619 F.3d at 14-15 (D.C. Cir. 2010) (Kavanaugh, J., concurring in the denial of rehearing *en banc*); *id*. at 6 (Brown, J.) (endorsing Judge Kavanaugh's "detailed concurrence" and its enumeration of those "international norms" which have been "explicitly

incorporated into our domestic law by the political branches"); Maj. Michael A.

Newton, *Continuum Crimes: Military Jurisdiction Over Foreign Nationals Who*

*Commit International Crimes*, 153 Mil. L. Rev. 1, 21 (1996) ("Article 21 grants

jurisdiction *only* over violations of the international laws of war.") (emphasis in

original); Manual for Courts-Martial, United States, Part I, ¶1 (2012) ("*Sources of*

*military jurisdiction*. The sources of military jurisdiction include the Constitution

and international law. International law includes the law of war").

     1.    Nevertheless, the government insists that this Court got it wrong. In

place of what this Court held, the government offers a revisionist interpretation of

Article 21. Pet. En. Banc at 10. The government claims that this revisionism is

required by the legislative history of Article 21's predecessor, Article of War 15,

39 Stat. 652 (1916). *Id*. Specifically, the government points to the testimony of

General Crowder, the then-Judge Advocate General of the Army, who testified that

Article of War 15 was intended to "save[] to these war courts the jurisdiction they

now have[.]" *Id*. (*quoting* Revision of the Articles of War: Hearing Before the

Subcomm. on Military Affairs, appended to S. Rep. No. 64-130, at 40 (1916)).

From this, the government concludes that every offense ever made triable by a

military commission prior to that date constituted a unique subject-matter

jurisdiction grounded in a "U.S. common law of war" and that Article of War 15's

25

use of "law of war" was actually a reference to this domestic common law, not to what is now generally called international humanitarian law.

As a threshold matter, expanding the jurisdictional scope of Article 21 as the government proposes presents its own retroactivity problem. Courts, no less than legislatures, cannot revise the settled interpretation of criminal statutes in a way that "unexpectedly broadens a statute which on its face had been definite and precise." *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964). This is particularly true when the pre-existing interpretation of a statute is based on the most natural reading of its terms. *Id*. Doing so is nothing less than an "unforeseeable judicial enlargement of a criminal statute, applied retroactively," which "operates precisely like an *ex post facto* law[.]" *Id*. So even if this Court should reconsider the settled interpretation of Article 21, such a revision could still only be prospective.

The greater problem, however, is that the government's revisionism of Article 21 is wrong. "Military commission" is simply a generic term for *ad hoc* military tribunal convened during wartime. *Hamdan*, 548 U.S. at 595-596 (plurality op.); *id*. at 683 (Thomas, J., dissenting); *see also* William Winthrop, *Military Law and Precedents* 838 (2d Ed. 1920), App. 249 . A given commission derives its jurisdiction from the circumstances under which it is convened and the authority of the commander calling it into existence.

26

Commissions convened to govern areas under martial law and occupation will typically exercise general jurisdiction, including over civil cases, because they are assuming the functions of the civilian courts, which have been closed due to the exigencies of war. *Madsen v. Kinsella*, 343 U.S. 341, 357 (1952); *Duncan v. Kahanamoku*, 327 U.S. 304, 328 (1946); *Ex parte Milligan*, 4 Wall. 2, 127 (1866); *Jecker v. Montgomery*, 13 How. 498, 515 (1851).

Law of war commissions, by contrast, are "utterly different." *Hamdan*, 548 U.S. at 596 (plurality op.) (*quoting* John Bickers, *Military Commissions are Constitutionally Sound: A Response to Professors Katyal and Tribe*, 34 Tex. Tech. L.Rev. 899, 902 (2003)). They can operate in parallel to an otherwise functioning court system because their jurisdiction is limited to the prosecution of war crimes. *Id*. at 595-98; *Duncan*, 327 U.S. at 314; *In re Yamashita*, 327 U.S. 1, 7 (1946); *Ex parte Quirin*, 317 U.S. 1, 28 (1942); *see also* Bickers, at 912-14 ("Law of war military commissions are tightly circumscribed – by the Constitution, by statute, and by international law – as to the types of offenses that they may try.").

Prior to 1916, the vast majority of commissions were convened in areas under foreign occupation or martial law and when they prosecuted war crimes, as such, they typically would draw on their "hybrid" character to try ordinary crimes as well. *Hamdan*, 548 U.S. at 608 (plurality op.); Bickers, at 908-09; Winthrop, at 839, App. 250. Consequently, even if we are to assume that General Crowder was

27

asking Congress to ratify previous military practice, there is no evidence that he

was asking Congress to collapse the basic jurisdictional distinctions between types

of commissions. Rather, his priority was ensuring that the Articles of War's

expansion of court-martial jurisdiction would not foreclose the liberty of "the

military commander in the field in time of war … to employ either form of court

that happens to be convenient." Revision of the Articles of War: Hearing Before

the Subcomm. on Military Affairs, S. Rep. No. 64-130 (1916) (*quoted in Madsen*,

343 U.S. at 353).

   2. Taken in their best light, the government's excerpts from Article of

War 15's legislative history are only useful to the extent that they informed

Congress' understanding of what it was enacting with Article 21. If one looks to

Article 21's legislative history, however, there is no doubt that Congress

understood itself to be codifying international law, particularly in light of how the

Supreme Court interpreted and applied Article of War 15 in the preceding decade.

*Lorillard v. Pons*, 434 U.S. 575, 580 (1978); *Georgia v. United States*, 411 U.S.

526, 532-33 (1973) (re-enacting Congress presumed to adopt Supreme Court's

interpretation of statute where it was discussed in committee hearings).

   In *Ex parte Quirin*, the Court analyzed whether Article of War 15's conferral

of jurisdiction over "offenders or offenses that, by statute or by the law of war may

be triable by such military commissions" was sufficiently specific in providing fair

notice of what was criminalized. *Quirin*, 317 U.S. at 27. In holding that it was, the Court cited *United States v. Smith*, 5 Wheat. 153 (1820). *Smith* dealt with the piracy statute and upheld Congress' incorporation of customary international law by reference pursuant to the Define & Punish Clause, U.S. Const., art. I § 8, cl. 10.

Relying on *Smith*, *Quirin* held that "[i]t is no objection that Congress, in providing for the trial of [law of war] offenses, has not itself undertaken to codify that branch of international law or to mark its precise boundaries, or to enumerate or define by statute all the acts which that law condemns." *Quirin*, 317 U.S. at 29. In holding that the specific offense charged was appropriately triable, the Court concluded that its status under "the law of war has been so recognized in practice both here and abroad, and has so generally been accepted as valid by authorities on international law that we think it must be regarded as [triable by military commission.]" *Id.* at 35.

*Quirin*'s interpretation of Article of War 15 was reaffirmed in *Yamashita*. That case squarely presented the question of what legal authority granted a military commission the jurisdiction to try a foreign national for war crimes alleged to have occurred on a foreign battlefield. The Court's answer was Article of War 15 as interpreted four years earlier in *Quirin*. *Yamashita*, 327 U.S. at 7.

In re-codifying the substance of Article of War 15 as Article 21, members of Congress understood that they were re-codifying the reasoning of *Quirin*, not a

general "U.S. common law of war." The Chairman of the Senate Judiciary Committee described the Article 21 as "stem[ming] from [Article of War] 15. The Supreme Court has held that by this provision Congress has explicitly provided, so far as it may constitutionally do so, that military tribunals shall have jurisdiction to try offenders or offenses against the law of war in appropriate cases (*Ex Parte Quirin* (1942), 317 U.S. 1, 28)." Establishing a Uniform Code of Military Justice: Hearings on S. 875 & H.R. 4080 Before the Committee on Armed Services, 81st Cong., 1st Sess. at 106 (May 4, 1949) (Statement of Senator McCarran, Chairman of the Committee on the Judiciary); *see also id*. at 975 (Mar. 23, 1949) (same); Bickers, at 918 ("As noted above, it was Article 15 that the Supreme Court had recognized as the congressional authorization for commissions in the *Quirin* case. As the source of the phrase 'triable by … military commissions,' it incorporated the governing rules and standards of international law as the subject matter jurisdiction for such commissions. The UCMJ was enacted after the *Quirin* opinion. … The subsequent enactment of nearly identical language, in the form of Article 21, UCMJ, affirms that reading.").

3.    Congress understood Article 21 as an incorporation of international law by reference, just as the Supreme Court had in *Quirin*. The significance of that understanding is rooted the specific legislative power Congress was acting under. Just as the federal courts have no common law jurisdiction, Congress cannot enact

criminal legislation as if it had general police powers. *Morrison*, 529 U.S. at 617; *United States v. Lopez*, 514 U.S. 549, 564 (1995). And even when it can enact crimes, Article III is explicit that "the trial of *all* crimes" is entrusted to the federal courts. U.S. Const., art. III § 2 (emphasis added).

Congress' authority to make exceptions to Article III for military tribunals is narrow and jealously policed. *Lee v. Madigan*, 358 U.S. 228, 232 (1959); *Reid v. Covert*, 354 U.S. 1, 21 (1957) (plurality op.); *Toth v. Quarles*, 350 U.S. 11, 21-22 (1955). When convened outside areas of foreign occupation or martial law, military jurisdiction is confined to the literal terms of discrete grants of authority enumerated in Article I § 8. *Toth*, 350 U.S. at 14-15.

The constitutional authority to divert the prosecution of military service members to courts-martial is an explicit extension of Congress' authority "To make Rules for the Government and Regulation of the land and naval Forces[.]". U.S. Const., art. I § 8, cl. 14; *Solorio v. United States*, 483 U.S. 435, 441 (1987); *Toth*, 350 U.S. at 14. And its authority to remove criminal prosecutions for war crimes from the federal courts to military commissions is a narrowly confined exercise of its authority under the Define & Punish Clause. *See*, *e.g.*, *Yamashita*, 327 U.S. at 7; *Quirin*, 317 U.S. at 28; Bickers, at 914 ("While [Article I § 8 cls. 11-15] authorize Congress to exercise legislative authority regarding military government or martial law, the authority for a law of war commission springs from

31

[the Define & Punish Clause].”); Winthrop, at 831; App. 246 (“The Constitution confers upon Congress the power ‘to define and punish offences against the law of nations,’ and in the instances of the legislation of Congress during the late war by which it was enacted that spies and guerillas should be punishable by sentence of military commission, such commission may be regarded as deriving its authority from this constitutional power.”).

The lack of good precedent for the government’s “U.S. common law of war” revisionism of Article 21 is a reflection of the fact that such a theory is unmoored from any enumerated power and has no rational stopping place. As the government has acknowledged, it means that Congress could give military commissions jurisdiction over any offense, so long as it approximates some charge previously brought before any type of military tribunal. Resp. at 37. If such a theory is accepted, Congress could authorize the Department of Defense to convene commissions to try aliens, citizens, and corporations alike for anything analogous to furnishing soldiers with liquor, bribery, and embezzlement, which were all tried by commission during the Civil War and even sometimes characterized as violating the “law of war.” Winthrop at 339-40; App. 250-51.

There is no indication that Congress intended such an extreme result in its enactment of Article 21. And there is no evidence of such intent in its enactment of the 2006 Act.

32

## II.     CERTIFIED QUESTION – *EX POST FACTO*

**For purposes of considering whether the Military Commissions Act of 2006 may permissibly proscribe pre-2006 conduct that was not a war crime triable by military commission under 10 U.S.C. § 821 before 2006, does the *Ex Post Facto* Clause apply in cases involving detainees at Guantanamo? – *Yes*.**

### A.  Standard of Review.

This Court exercises de novo review over "matters of law." 10 U.S.C. § 950g(d) (2009) . In determining what parts of the Constitution apply in Guantanamo, the Court must determine whether a particular provision "protects persons as well as citizens," such as "the Constitution's separation-of-powers structure[.]" *Boumediene*, 553 U.S. at 743. If it does, that provision applies unless it is clear that "judicial enforcement of the provision would be 'impracticable and anomalous.'" *Id*. at 759-60.

### B.  The *Ex Post Facto* Clause applies at Guantanamo.

The prohibition against *ex post facto* laws is among the most fundamental protections contained in the Constitution. *See*, *e.g.*, *Calder*, 3 U.S. at 388 (*ex post facto* laws are among those legislative acts that are "contrary to the great first principles of the social compact"). The *Ex Post Facto* Clause, along with protections against bills of attainder and the suspension of the writ of *habeas corpus*, established "perhaps greater securities to liberty and republicanism than any [the Constitution] contains. The creation of crimes after the commission of the

33

fact, or, in other words, the subjecting of men to punishment for things which, when they were done, were breaches of no law, and the practice of arbitrary imprisonments, have been, in all ages, the favorite and most formidable instruments of tyranny." *The Federalist*, No. 84 (Hamilton). Not only is the ban fundamental to the American experience, *ex post facto* laws "are condemned by the universal sentence of civilized man." *Ogden v. Saunders*, 25 U.S. 213, 266 (1827).

The consequent presumption against retroactivity is so "deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic" that it "finds expression in several provisions of our Constitution." *Landgraf*, 511 U.S. at 265-66; *see also Lynce v. Mathis*, 519 U.S. 433, 439-40 (1997) (noting the "expression in several provisions" and, further, that "[t]he specific prohibition on *ex post facto* laws is only one aspect of the broader constitutional protection against arbitrary changes in the law.").

The *ex post facto* ban serves several important ideals, including giving individuals "fair warning" of what the law demands as well as controlling the excesses of "governmental power by restraining arbitrary and potentially vindictive legislation." *Weaver v. Graham*, 450 U.S. 24, 28-29 & n. 10 (1981). But the ideal that answers the question this Court has posed is that the *Ex Post Facto* Clause is designed to "uphold[] the separation of powers by confining the legislature to

34

penal decisions with prospective effect and the judiciary and executive to applications of existing penal law." *Id*.

The *Ex Post Facto* Clause ensures that it is the judiciary, and the judiciary alone, who will "say what the law is." The mere fact that Congress is legislating on subject matters relating to foreign affairs does not somehow make it anything more or other than a legislature. To be sure, short of conducting its own trials, it is difficult to think of a greater usurpation of judicial power than a binding Congressional declaration of what the law was *before* it took any legislative action. *Town of Koshkonong v. Burton*, 104 U.S. 668, 678 (1881) ("'[Declaratory laws] can have no binding effect; and if the judge is satisfied the legislative construction is wrong, he is bound to disregard it.' … [T]o declare what the law is, or has been, is a judicial power, to declare what the law shall be is legislative[.]").(*quoting Salters v. Tobias*, 3 Paige 338, 344 (N.Y. 1832))

The role of the *Ex Post Facto* Clause within "the Constitution's separation-of-powers structure" means that, like the Suspension Clause, U.S. Const., art. I § 9, cl. 2, it necessarily "protects persons as well as citizens[.]" *Boumediene*, 553 U.S. at 743. Indeed, the *Ex Post Facto* Clause shares the same history and function that was "central to [the Supreme Court's] analysis" of the writ's reach in *Boumeidene*. *Id*. at 746. Like the Suspension Clause, the Framers intended the *Ex Post Facto* Clause to guard against "excited actions" and "'manifested a determination to

35

shield themselves and their property from the effects of those sudden and strong

passions to which men are exposed.'" *Cummings v. Missouri*, 71 U.S. 277, 322

(1866) (*quoting Fletcher v. Peck*, 6 Cranch 87, 137-38 (1810) (Marshall, C.J.)).

The *Ex Post Facto* Clause is designed to address the high risk that, in response to

"political pressures," such as those excited in the aftermath of September 11th, the

legislature "may be tempted to use retroactive legislation as a means of retribution

against unpopular groups or individuals." *Landgraf*, 511 U.S. at 266.

  The Constitution's provisions protecting *habeas corpus* and banning *ex post*

*facto* serve the same values of protecting against arbitrary impositions on

individual liberty, the Framers' distrust of governmental excess, and

encroachments on the separation of powers. *Boumediene*, 553 U.S. at 742-43, 746.

Indeed, these prohibitions are in adjacent clauses of Article I § 9. *Boumediene*'s

separation-of-powers analysis, therefore, entails the application of the *Ex Post*

*Facto* Clause to any Congressional law, whether it is to be applied in Guantanamo

or the District of Columbia. And it entails that Bahlul, a criminal defendant haled

into a judicial system created by such a law, can "object that [his conviction]

results from disregard of the federal structure of our Government." *Bond v. United*

*States*, 131 S.Ct. 2355, 2366-67 (2011).

  This is confirmed by the *Boumediene*'s reliance on the *Insular Cases* in

evaluating the scope of the Constitution's applicability more generally to

unincorporated territories like Guantanamo, which are under the U.S.'s complete jurisdiction and control. *Boumediene*, 553 U.S. at 757. The *Insular Cases* set the framework for deciding which of the Constitution's "'provisions were applicable by way of limitation upon the exercise of executive and legislative power in dealing with new conditions and requirements.'" *Id.* at 758 (*quoting Balzac v. Porto Rico*, 258 U.S. 298, 312 (1922)).

The foundational case was *Downes v. Bidwell*, 182 U.S. 244 (1901), wherein the Court held that "when the Constitution declares that 'no bill of attainder or *ex post facto* law shall be passed,' and that 'no title of nobility shall be granted by the United States,' it goes to the competency of Congress to pass a bill *of that description.* Perhaps the same remark may apply to the First Amendment[.]" *Id.* at 277 (emphasis in original). As the Court would say in *Boumediene*, these aspects of the Constitution cannot be "contracted away" in matters of foreign affairs, *Boumediene*, 553 U.S. at 765, because they "go to the very root of the power of Congress to act at all, irrespective of time or place[.]" *Downes*, 182 U.S. at 277.

In the instant case, the Government has pointed to no practical barriers to the application of the *Ex Post Facto* Clause to military commissions held at Guantanamo, nor can it. The government itself has relied upon *Downes* to suggest that it views the *Ex Post Facto* Clause as applicable to this case. Resp. at 67 n.16 ("The Supreme Court has described the *Ex Post Facto* Clause as a structural

37

limitation on Congress's power, *Downes* … and Congress incorporated *ex post facto* principles into the terms of … § 950p(b) (2006).").

In holding that Guantanamo detainees may not be deprived of *habeas*, the Supreme Court concluded that "[t]he laws and Constitution are designed to survive, and remain in force, in extraordinary times. Liberty and security can be reconciled; and in our system they are reconciled within the framework of the law." *Boumediene*, 553 U.S. at 798. Just as the Suspension Clause protects against arbitrary imprisonment, the *Ex Post Facto* Clause protects against arbitrary prosecution. Because there is no meaningful distinction between these fundamental constitutional limits, this Court should find that the *Ex Post Facto* Clause applies to criminal prosecutions brought in Guantanamo.

## III.   CERTIFIED QUESTION – CONSPIRACY

**Assuming arguendo that, as *Hamdan II* concluded, the Military Commissions Act of 2006 does not proscribe pre-2006 conduct that was not a war crime triable by military commission under 10 U.S.C. § 821 before 2006, and that 10 U.S.C. § 821 permits trial by military commission only for war crimes that were proscribed under the international law of war at the time of the offense, was conspiracy a violation of the international law of war at the time of Bahlul's offense? – *No*.**

### A.  Standard of Review.

This Court exercises de novo review over "matters of law." 10 U.S.C. § 950g(d) (2009). Whether a charged offense violates the law of war, turns on its recognition by "universal agreement and practice" both here and abroad as a war crime. *Quirin*, 317 U.S. at 30.

### B.  Inchoate conspiracy is not a violation of the law of war.

War criminals are not ordinary offenders or felons. They are *hostis humani generis* – enemies of all mankind. *Kiobel v. Royal Dutch Petroleum*, 621 F.3d 111, 116 (2d Cir. 2010) *aff'd on other grounds* 133 S.Ct. 1659 (2013); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 781 (D.C. Cir. 1984) (Edwards, J., concurring). Their acts compel all nations of the world to exercise universal jurisdiction to punish them wherever they are found. *United States v. Yousef*, 327 F.3d 56, 104-07 (2d Cir. 2003); *see also* Restatement (Third) of Foreign Relations § 404, *cmt.* a (1987); International Law Association, Final Report on the Exercise

39

of Universal Jurisdiction in Respect of Gross Human Rights Offences 3, 6-7 (2000); App. 368-74.

War crimes are consequently a narrow "handful of heinous actions – each of which violates definable, universal and obligatory norms[.]" *Sosa*, 542 U.S. at 732 (*quoting Tel-Oren*, 726 F.2d at 781 (Edwards, J., concurring)). In order for an offense to have that status, it must have the "definite content and acceptance among civilized nations" that offenses like piracy had in the Eighteenth Century. *Sosa*, 542 U.S. at 732; *see also Hamdan*, 548 U.S. at 602-03 & n.34, 605 (plurality op.) ("[T]he Government must make a substantial showing that the crime for which it seeks to try a defendant by military commission is acknowledged to be an offense against the law of war."); *Yamashita*, 327 U.S. at 14 (stating that the offense charged was "plainly" a violation of the Hague Convention); *Quirin*, 317 U.S. at 30 (the offense alleged was recognized by "universal agreement and practice" both here and abroad as an offense against the "law of war"); *Hamdan II*, 696 F.3d at 1250 n.10 (war crimes must be "firmly grounded in international law"); *Yousef*, 327 F.3d at 105 (war crimes are "universally condemned by the community of nations"); *In re Estate of Marcos Human Rights Litigation*, 25 F.3d 1467, 1475 (9th Cir. 1994) ("Actionable violations of international law must be of a norm that is specific, universal, and obligatory").

As the government has readily conceded, inchoate conspiracies do not rise to that level. En Banc Pet. at 4 ("[T]he offenses for which Bahlul was convicted have not attained recognition at this time as offenses under customary international law"); Resp. at 57 ("[C]onspiracy, solicitation, and material support have not attained international recognition at this time as offenses under customary international law[.]"); *see also United States v. Nashiri*, AE046, Gov't Resp. to Defense Motion to Dismiss for Lack of Lack of [sic] Jurisdiction over the Charge of Conspiracy, at 21-22 (Mar. 26, 2012) ("[H]istory reflects a lack of international consensus for treating the standalone offense of conspiracy as a war crime as a matter of customary international law[.]").

In fact, it is fair to say that the government understates the rejection of war crime conspiracies from international law. If one consults the authoritative sources of the law of war – to wit, war crimes treaties and statutes, war crimes tribunals, and credible law of war scholars – they uniformly demonstrate conspiracy's deliberate exclusion from the narrow class of war crimes. *The Paquete Habana*, 175 U.S. 677, 700-01 (1900); *Hamdan II*, 696 F.3d at 1250. ("[N]either the major conventions on the law of war nor prominent modern international tribunals nor leading international-law experts have identified material support for terrorism as a war crime.").

41

**A. Treaties & Statutes**

No major convention on the law of war or statute purporting to codify war crimes identified conspiracy to commit war crimes as a stand-alone offense at the time of Bahlul's alleged conduct. This includes the Hague Conventions, on which the Supreme Court relied in *Yamashita*, 327 U.S. at 14. It includes the Geneva Conventions. *Hamdan*, 548 U.S. at 604 (plurality op.). It includes the Rome Statute.

When the international community has seen a special need to criminalize conspiracies, it has done so. That special need has only arisen in the unique context of genocide and the waging of aggressive war by a nation-state. *See*, *e.g.*, Convention on the Prevention and Punishment of the Crime of Genocide, Dec. 9, 1948, art. 3, 102 Stat. 3045 ("Genocide Convention"); Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia Since 1991, May 25, 1993, art. 4(3), 32 I.L.M. 1159; Statute of the International Criminal Tribunal for the Prosecution of Persons Responsible for Genocide and Other Serious Violations of International Humanitarian Law Committed in the Territory of Rwanda and Rwandan Citizens Responsible for Genocide and Other Such Violations Committed in the Territory of Neighboring States, Between 1 January 1994 and 31 December 1994, Nov. 8, 1994, art. 2(3), 33 I.L.M. 1598; Agreement for the Prosecution and Punishment of the Major War

42

Criminals of the European Axis ("London Charter"), Aug. 8, 1945, art. 6(a), 58 Stat. 1544. *But see* Rome Statute, art. 25 (excluding conspiracy to commit genocide from the jurisdiction of the International Criminal Court).

The consensus rejection of conspiracy, and inchoate war crimes more generally, remained undisturbed up through the creation of the Supreme Iraqi Criminal Tribunal. Law of the Supreme Iraqi Criminal Tribunal, Al-Waq'I Al-Iraqiya – No. 4006 (Oct. 18, 2005) ("Iraqi Tribunal"); App. 296-322. The Iraqi Tribunal was established a year before the passage of the 2006 Act and was designed for the prosecution of war criminals in Iraq, such as Saddam Hussein. The Iraqi Tribunal has jurisdiction over violations of the laws and customs of war, genocide, crimes against humanity, and three assimilated offenses under Iraqi law dealing with corruption. *Id*. at arts. 11-14. Inchoate liability of any kind is only cognizable for genocide offenses. *Id*. at art. 15.

These aspects of the Iraqi Tribunal's jurisdiction were carried over from a predecessor tribunal created by the Coalition Provisional Authority. Statute of the Iraqi Special Tribunal, arts. 10-15 (Dec. 10, 2003); App. 209-30. In other words, as late as December 2003, the legal and diplomatic position of the United States on the offenses cognizable by a war crimes tribunal mirrored the international consensus. Conspiracy and inchoate liability more broadly were reserved for the unique and plainly established legal regime governing crimes of genocide.

43

Congress consistently excluded conspiracy whenever it sought to codify war crimes prior to 2006. The War Crimes Act, 18 U.S.C. § 2441, contained no inchoate war crimes. Nor did the UCMJ. Conspiracy under the UCMJ applied only to persons "subject to this chapter," only covered conspiracies "to commit an offense under this chapter," and, in contrast to its sections proscribing spying and aiding the enemy, was not made triable by military commission. *Id*. § 881.

This remained the law until Congress amended both statutes in the 2006 Act. Section 4(b) amended the UCMJ to now punish anyone "who conspires with any other person to commit an offense under the law of war … as a court-martial or military commission may direct." Equally, §6(b) enumerated "grave breaches" of the Geneva Conventions cognizable under the War Crimes Act and specified their applicability to anyone who "commits, or conspires or attempts to commit" them.

Every positive enactment to identify war crimes prior to 2006, therefore, rejected conspiracy to commit war crimes as a stand-alone offense, along with inchoate war crimes more broadly. Only in the context of enacting the 2006 Act did Congress even suggest that this consensus should be disturbed.

## B. War Crime Tribunal Jurisprudence

The founding documents of every war crimes tribunal since World War II have excluded war crime conspiracies and other inchoate war crimes. Very often, the statutes or orders establishing war crimes tribunals did not enumerate an

44

exclusive list of offenses by name. Rather, in the mode of Article 21, these tribunals were given broad subject-matter jurisdiction over the law of war and it remained to the judicial components of these tribunals to determine whether a particular charge was, in fact, cognizable under the law of war. In every case, conspiracy to commit war crimes as a stand-alone offense was rejected.

1.    The most prominent example was when prosecutors charged the Nazi leadership with conspiracy to commit war crimes and crimes against humanity at the International Military Tribunal at Nuremberg ("IMT"). The London Charter, which established the IMT, granted the tribunal jurisdiction over war crimes, defined broadly as "violations of the laws or customs of war[.]" London Charter, art. 6(c). It further provided that "Leaders, organizers, instigators and accomplices participating in the formulation or execution of a common plan or conspiracy to commit any of the foregoing crimes are responsible for all acts performed by any persons in execution of such plan." *Id*.

The judges of the tribunal, representing the United States, France, the United Kingdom, and the Soviet Union, unanimously dismissed charges that alleged conspiracy to commit war crimes as a stand-alone offense. Conspiracy was only independently actionable for aggression. For all other offenses, conspiracy was simply a method of proving "the responsibility of persons participating in a common plan" for otherwise perpetrated war crimes and crimes against humanity,

45

not merely entering into a plan to commit them. 22 Trial of the Major War Criminals Before the International Military Tribunal: Nuremberg, 15 November 1945 – 1 October 1946, 469 (1947); App. 355-360 ("Nuremberg Judgment").

In fact, the IMT's description of conspiracy to wage aggressive war looks more like modern notions of command responsibility than what is now thought of as inchoate conspiracy. In the judgment of the IMT, such a "conspiracy must be clearly outlined in its criminal purpose. It must not be too far removed from the time of decision and of action." Nuremberg Judgment, at 467. The IMT went on to put special emphasis on the fact that criminal liability reached only the central organizers of what was by that time the unquestionably completed initiation of an illegal war. Being a Nazi ideologue was not sufficient. "The planning, to be criminal, must not rest merely on the declarations of a party programme, such as are found in the twenty five points of the Nazi Party, announced in 1920, or the political affirmations expressed in *Mein Kampf* in later years." *Id*.

The IMT's holdings on conspiracy have only solidified over the intervening seventy years. Despite its broad jurisdiction over offenses arising under the laws of war, the United States' separate military tribunals at Nuremberg held that "this tribunal has no jurisdiction to try any defendant upon a charge of conspiracy considered as a separate substantive offense." 15 Trials of War Criminals before

46

the Nuremberg Military Tribunals Under Control Council Law No. 10, 1100 (note) (G.P.O. 1949); App. 256-57.

The International Military Tribunal for the Far East was convened, controlled, and administered directly by General MacArthur. It followed the IMT in disallowing conspiracy charges for war crimes and crimes against humanity. The Tokyo War Crimes Trial: The Complete Transcripts of the Proceedings of the International Military Tribunal for the Far East. Vol. 22, 47, 448-48, 454 (Ed. Pritchard, J. & Zaide, S. 1981); App. 287-91.

The same result was reached by the commissions the Army convened to prosecute atrocities in Europe. Their jurisdiction derived from a general directive from General Eisenhower to prosecute "violations of the laws or customs of war, of the laws of nations, or of the law of occupied territory or any part thereof." Report of the Deputy Judge Advocate for War Crimes, European Command, at 161 (Jun. 29, 1948); 350-54. In almost every case, the government used "common design" as its theory of liability. *Id*. at 61. When defense counsel objected that this resulted in inchoate crimes, the commissions "pointed out that the accused were charged with participation in the execution of a common design to commit described unlawful acts and not a common design as a separate offense." *Id.* at 62.

47

When war crimes tribunals were convened to prosecute atrocities in the 1990s, the IMT's precedent remained the standard. Inchoate liability was reserved for genocide offenses because it had been provided for in the Genocide Convention.

For war crimes, the International Criminal Tribunal for the Former Yugoslavia ("ICTY") has reiterated time and again that conspiracy is not a stand-alone offense. *See*, *e.g.*, *Prosecutor v. Milutinovíc,* Decision on Dragoljub Ojdaníc's Motion Challenging Jurisdiction-Joint Criminal Enterprise, Case No. IT-99-37-AR72, 2003 WL 24014138 (ICTY App. Chamber, May 21, 2003) ("*Milutinovíc*"). The only doctrine even resembling conspiracy is its use of common plan, now called "joint criminal enterprise," as a theory of liability. The ICTY has been emphatic in holding that joint criminal enterprise is a narrow means by which to prove an individual's perpetration of serious crimes; "it is not a crime in itself." *Prosecutor v. Kvočka*, Judgment, Case No. IT-98-30/1-A, 2005 WL 3392999, ¶ 91 (ICTY App. Ch., Feb. 28, 2005); *see also Prosecutor v. Brđanin*, Judgment, Case No. IT-99-36-A, 2007 WL 1826003, ¶ 431 (ICTY App. Ch., Apr. 3, 2007) ("[When guilt is established on the basis of a joint criminal enterprise], the accused has done far more than merely associate with criminal persons. He has the intent to commit a crime, he has joined with others to achieve this goal, and he has made a significant contribution to the crime's commission.").

48

2.      When the Supreme Court last addressed the war crimes jurisdiction of military commissions, Justice Stevens found that the government had failed to make even a "'merely colorable' case for inclusion of conspiracy among those offenses cognizable by law-of-war military commission." *Hamdan*, 548 U.S. at 604-13 (plurality op.). This finding was based upon a rigorous and comprehensive survey of U.S. and international precedent going back to before the Civil War. While the relevant parts of this opinion spoke only for a plurality, "as the considered opinion of four Members of [the Supreme] Court it should obviously be the point of reference for further discussion of the issue." *Texas v. Brown*, 460 U.S. 730, 737 (1983). This is especially so when "every Court of Appeals that considered the question," *see Marks v. United States*, 430 U.S. 188, 194 (1977), has treated the opinion as authoritative. *See*, *e.g.*, *Belfast v. United States*, 611 F.3d 783, 812 (11th Cir. 2010) (*citing Hamdan* for the rejection of conspiracy under the law of war); *Presbyterian Church of Sudan v. Talisman Energy*, 582 F.3d 244, 260 (2d. Cir. 2009) (same).[1]

---

[1] *Presbyterian Church* was brought under the Alien Tort Statute. It stands as one example of a unanimous body of federal cases to have either held or taken for granted that conspiracies are not actionable under that law. *See*, *e.g.*, *Liu Bo Shan v. China Const. Bank Corp.*, 421 Fed.Appx. 89, 94 n.6 (2d Cir. 2011); *In re Chiquita Brands Intern., Inc.*, 792 F.Supp.2d 1301, 1340-41 (S.D.Fla. 2011); *cf. Hamdan II*, 696 F.3d at 483 n.10 (suggesting that the standard for imposing criminal liability should be no less than civil liability under the Alien Tort Statute); Samuel Morison, *Accepting Sosa's Invitation: Did Congress expand the subject-matter jurisdiction of the Alien Tort Statute in the Military Commissions Act?*, 43 Geo. J. Int'l L. 1097,

As a reference point, Justice Stevens rightly gave the most weight to post-WWII precedents and progressively less weight to examples drawn from further in the past. In part, as discussed above, this was because the Civil War era precedents "must . . . be considered with caution", because the bases of their jurisdiction was almost always confounded by their concurrent authority to adjudicate martial law offenses. *Hamdan*, 548 U.S. at 596 n.27 (plurality op.).

Of overriding significance, however, was that World War II brought about a sea change in the laws of war; a sea change led by the United States. It prompted the Geneva Conventions and a whole host of law of war treaties and jurisprudence in the following half century. And the law of war as we know it today is rooted in the lessons-learned from Nuremberg. Principles of International Law recognized in the Charter of the Nürnberg Tribunal and in the Judgment of the Tribunal, with commentaries, Yearbook of the Int'l L. Comm. 2.374-78 (1950); App. 339-44 ("Nuremberg Principles"). The Nuremberg Principles, written to memorialize those lessons, not only excludes conspiracy from its enumeration of war crimes, but states as a core principle that only "[c]omplicity in the *commission* of … a war crime … is a crime under international law." *Id*. at 377 (emphasis added).

---

1109 (2012) ("The second salient principle endorsed by *Sosa*'s analysis is the unity of customary international law as a body of substantive norms, regardless of whether the norm in question is being enforced in a criminal or civil context.").

3.    The government has thus far relied on cases from well before Nuremberg. Indeed, it places its greatest reliance on commissions convened during the Civil War. And to the government's credit, if one looks to charges in Civil War-era commissions, one does see that some allege that a defendant did "conspire" to commit a law of war offense.

What one also sees, however, is that even if we ignore the ambiguities created by martial law, "conspire" is frequently listed with "combine," "confederate," and other redundant synonyms to indicate the co-perpetration of an otherwise charged crime. *See Hamdan*, 548 U.S. at 609 (plurality op.). This practice was not unlike the modern doctrine of joint criminal enterprise or "common plan" after World War II, insofar as it signaled that the defendant was principally liable for perpetrated war crimes, not mere agreements to commit them. *Id*. at 611 n.40. The Wirz commission, for example, which involved systemic and proven detainee abuse at Andersonville, App. 375-83, is a paradigmatic case of what is now known as "Category 2" joint criminal enterprise. *See Milutinovíc* at ¶ 6 (Hunt, J., concurring).

The most famous Civil War-era commission to fit this pattern is the case against the Lincoln assassins, who were charged with "combining, confederating, and conspiring together ... to kill and murder, within the Military Department of Washington, and within the fortified and intrenched (sic) lines thereof, Abraham

51

Lincoln[.]" *Reprinted in* H.R. Doc. No. 314, 55th Cong., 3d Sess., 696 (1899). The government has placed heavy reliance upon the Lincoln case in establishing its U.S. common law of war. But the case's federal court review shows that these charges were understood to have alleged participation in the completed crime of killing Lincoln. Judge Friedman, for example, affirmed the Army's determination that Dr. Samuel Mudd was properly convicted under the law of war for having "aided and abetted President Lincoln's assassins." *Mudd v. Caldera*, 134 F.Supp.2d 138, 147 (D.D.C. 2001). And the same reasoning is apparent in the *habeas* decision rendered in Mudd's case, wherein the district court described the offense as "a conspiracy to commit the military crime which one of their number did commit[.]" *Ex parte Mudd*, 17 F.Cas. 954 (S.D.Fla. 1868).[2]

The only other significant pre-Nuremberg authority to suggest war crime conspiracies is *Quirin*.[3] The final allegation against the saboteurs was "Conspiracy to commit the offenses alleged in charges 1, 2 and 3." *Quirin*, 317 U.S. at 23. The continuing relevance of this charge, however, is doubtful for three reasons.

_____

[2] The district court also appears to have been satisfied that martial law prevailed in Washington, D.C., which it described as "a fortified city, which had been invaded during the war." *Mudd*, 17 F.Cas. at 954. The Army also relied on the fact that Washington "remained under a form of martial law at the time of the Lincoln assassination[.]" *Mudd*, 134 F.Supp.2d at 142.

[3] *Colepaugh v. Looney*, 235 F.2d 429 (10th Cir. 1956) is substantively identical to *Quirin* and relies on *Quirin* as controlling. It provides no discussion, positive or negative, of conspiracy under the laws of war.

*First*, the conspiracy alleged was not inchoate. Like the charge against the Lincoln assassins, the application of "common plan" after the war, and the use of joint criminal enterprise today, this conspiracy allegation was part-and-parcel of the fully charged and completed offenses at the center of the case.

*Second*, the Supreme Court pointedly did not reach the viability of the conspiracy charge in deciding the case. Instead it looked to Charge 1 and emphasized that because of the "nature of the offense which the Government charges and which the Act of Congress, by incorporating the law of war, punishes," the "offense was complete" as soon as the saboteurs crossed enemy lines whilst misrepresenting themselves as civilians. *Quirin*, 317 U.S. at 38. Given the nature of the Court's review on *habeas*, the fact that this charge set "forth a violation of the law of war" left the Court "no occasion to pass on the adequacy of the" remaining charges and specifications. *Id*. at 46.

*Third*, the conspiracy charge in *Quirin* has been given little, if any, precedential weight. This is clear from the past seventy years of jurisprudence from Nuremberg through Iraq. And it is clear from the Supreme Court's decision in *Yamashita*. At issue in that case was whether a commander was liable for the war crimes of subordinates. Given how broadly conspiracy sweeps in terms of vicarious liability, it would have made for an ideal charge under the facts of the case. Nevertheless, the Supreme Court was compelled to rely upon the defendant's

unique position as a military commander as the legal basis for his vicarious war crimes liability. *Yamashita*, 327 U.S. at 14.

Here, the conspiracy charge against Bahlul was inchoate and alleged no underlying crime. The military judge instructed the jury that finding the commission or completion of any underlying war crime was "not required." If the conspiracy charge in this case is sustained, it will be a first. There is no precedent for convicting someone as a war criminal irrespective of whether they were personally culpable for a fully completed, charged, and proven war crime.

### C. Learned Scholarship

Every credible, independent scholar has recognized that an inchoate conspiracy to commit war crimes is not a stand-alone offense under the international laws of war. *See*, *e.g.*, Antonio Cassese, *International Criminal Law* 191 (2003) ("In international law, while attempt is regarded as admissible as a *general* class of inchoate crimes, conspiracy and incitement are only prohibited as 'preliminary' (not consummated) offences when connected to the most serious crime, genocide."); Allison Marston Danner & Jenny S. Martinez, *Guilty Association*, 93 Cal. L. Rev. 75, 114-16 (2005) (explaining why the substantive offense of conspiracy is not universally recognized in international law).

The list of scholars includes Col. William Winthrop, sometimes called the "Blackstone of military law[.]" *Hamdan*, 548 U.S. at 597 (plurality op.) (*quoting*

54

*Reid*, 354 U.S. at 19 n.38 (plurality op.)). In his chapter on military commission

jurisdiction during the Civil War, he "excludes conspiracy of any kind from his

own list of offenses against the law of war." *Id*. at 608 (*citing* Winthrop, at 839-40;

App. 250-51). He goes on to be critical of inchoate liability more broadly, writing

that "the jurisdiction of the military commission should be restricted to cases of

offence consisting in *overt acts, i.e.* in unlawful commissions or actual attempts to

commit, and not in intentions merely." Winthrop, at 841; App. 252 (emphasis in

original).

The list of authorities also includes the treatise this Court relied upon in

rejecting pre-2006 allegations of material support for terrorism. *Hamdan II*, 696

F.3d at 1251 (*citing* Andrea Bianchi & Yasmin Naqvi, *International Humanitarian*

*Law and Terrorism* 243-47 (Hart 2011); App. 238-44 ("Some of the crimes listed

[in the 2009 Act] are without a doubt part of the laws and customs of war.

However, there is little evidence that some of the other crimes listed within the said

chapter, such as terrorism, providing material support for terrorism, and conspiracy,

may be considered as part of the laws and customs of war.")).

In fact, conspiracy's rejection has been so emphatic that scholars and war

crimes tribunals have been unable to settle on theories of vicarious liability out of

the fear that conspiracy could enter through the back door. Jens David Ohlin, *Joint*

*Intentions to Commit International Crimes*, 11 Chicago J. of Int'l L. 693, 696

(2011) ("Proponents of [joint criminal enterprise liability ("JCE")] ... are inclined to distance themselves from a formulation that sounds too much like conspiracy. The received wisdom among international lawyers is that conspiracy is a decidedly common law doctrine that finds insufficient international support to be considered part of international criminal law. Consequently, if JCE amounts to *ersatz* conspiracy, it will be rejected too").

In sum, the finding of the UN War Crimes Commission in 1950 remains as true now as it did sixty-three years ago. While the United States and war crimes tribunals have punished conspiracies to wage aggressive war and made regular use of "common design" as a means of establishing liability for completed offenses, "United States Military Tribunals … have not recognized as a separate offense conspiracy to commit war crimes or crimes against humanity." 15 L. Rep. Trials of War Criminals 90 (1950); 328-338.[4]

---

[4] Per our understanding of this Court's order, we have limited our briefing to the question of conspiracy. We are prepared to provide further briefing on the remaining two charges – i.e. inchoate solicitation and the §2339B-type material support offense – should that be necessary. As the government concedes, the defects are the same and, indeed, logically follow from international law's rejection of inchoate conspiracy.

## CONCLUSION

The subject-matter jurisdiction of law-of-war commissions is the same as it always has been: "offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals." *Quirin*, 317 U.S. at 28. Because the government now concedes that the offenses it brought against Bahlul do not qualify under that standard, a concession supported by the overwhelming weight of international legal authority, reversing this conviction on these particular charges is the necessary consequence of the straightforward application of settled law.

Respectfully submitted,

 /s/ Michel Paradis
Michel Paradis
CAPT Mary McCormick, JAGC, U.S. Navy
1620 Defense Pentagon
Washington, DC 20301-1620
michel.paradis@osd.mil
TEL: 1.703.696.9490 x115
FAX: 1.703.696.9575

MAJ Todd E. Pierce, JA, U.S. Army (Ret.)
Senior Fellow
Univ. of Minnesota Human Rights Center
Mondale Hall, N-120
229-19th Avenue South
Minneapolis, MN 55455

*Counsel for Petitioner*

## ADDENDUM

**10 U.S.C. § 821:**

The provisions of this chapter conferring jurisdiction upon courts-martial do not deprive military commissions, provost courts, or other military tribunals of concurrent jurisdiction with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions, provost courts, or other military tribunals.

**10 U.S.C. § 881:**

**Art. 81. Conspiracy**

Any person subject to this chapter who conspires with any other person to commit an offense under this chapter shall, if one or more of the conspirators does an act to effect the object of the conspiracy, be punished as a court-martial may direct.

**10 U.S.C. § 904:**

**Art. 104. Aiding the Enemy**

Any person who —

(1) aids, or attempts to aid, the enemy with arms, ammunition, supplies, money, or other things; or

(2) without proper authority, knowingly harbors or protects or gives intelligence to or communicates or corresponds with or holds any intercourse with

the enemy, either directly or indirectly; shall suffer death or such other punishment as a court-martial or military commission may direct.

**10 U.S.C. § 906:**

**Art. 106.  Spies**

Any person who in time of war is found lurking as a spy or acting as a spy in or about any place, vessel, or aircraft, within the control or jurisdiction of any of the armed forces, or in or about any shipyard, any manufacturing or industrial plant, or any other place or institution engaged in work in aid of the prosecution of the war by the United States, or elsewhere, shall be tried by a general court-martial or by a military commission and on conviction shall be punished by death.

**10 U.S.C. § 950g (2009):**

(a) EXCLUSIVE APPELLATE JURISDICTION. —Except as provided in subsection (b), the United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction to determine the validity of a final judgment rendered by a military commission (as approved by the convening authority and, where applicable, the United States Court of Military Commission Review) under this Chapter.

(b) EXHAUSTION OF OTHER APPEALS. —The United States Court of Appeals for the District of Columbia Circuit may not review a final judgment

59

described in subsection (a) until all other appeals under this chapter have been waived or exhausted.

**\*\*\***

(d) SCOPE AND NATURE OF REVIEW. —The United States Court of Appeals for the District of Columbia Circuit may act under this section only with respect to the findings and sentence as approved by the convening authority and as affirmed or set aside as incorrect in law by the United States Court of Military Commission Review, and shall take action only with respect to matters of law, including the sufficiency of the evidence to support the verdict.

**10 U.S.C. § 950p (2006):**

(a) Purpose.--The provisions of this subchapter codify offenses that have traditionally been triable by military commissions. This chapter does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission.

**18 U.S.C. § 2441:**

**18 U.S.C. § 2339A:**

**(a) Offense.—** Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842 (m) or (n),

60

844 (f) or (i), 930 (c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442 of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section 46502 or 60123 (b) of title 49, or any offense listed in section 2332b (g)(5)(B) (except for sections 2339A and 2339B) or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

   **(b) Definitions.—** As used in this section—

   **(1)** the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

61

**(2)** the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

**(3)** the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.

### 18 U.S.C. § 2339B:

**(a) Prohibited Activities.—**

**(1) Unlawful conduct.—** Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

\*          \*          \*

**(d) Extraterritorial Jurisdiction.—**

**(1) In general.—** There is jurisdiction over an offense under subsection (a) if—

62

(A) an offender is a national of the United States (as defined in section 101(a)(22) of the Immigration and Nationality Act (8 U.S.C. 1101 (a)(22))) or an alien lawfully admitted for permanent residence in the United States (as defined in section 101(a)(20) of the Immigration and Nationality Act (8 U.S.C. 1101 (a)(20)));

(B) an offender is a stateless person whose habitual residence is in the United States;

(C) after the conduct required for the offense occurs an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States;

(D) the offense occurs in whole or in part within the United States;

(E) the offense occurs in or affects interstate or foreign commerce; or

(F) an offender aids or abets any person over whom jurisdiction exists under this paragraph in committing an offense under subsection (a) or conspires with any person over whom jurisdiction exists under this paragraph to commit an offense under subsection (a).

(2) **Extraterritorial jurisdiction.—** There is extraterritorial Federal jurisdiction over an offense under this section.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

**Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

1. This brief complies with the type-volume limitations imposed by f Fed. R. App. P. 32(a)(7)(B) because:

[X] this brief contains 12,954 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ] this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point font size and Times New Roman type style; *or*

[ ] this brief has been prepared in a monospaced typeface using _____ with _____.

Dated: May 24, 2013

Respectfully submitted,

/s/ Michel Paradis
*Counsel for Petitioner*

64

## CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2013 a copy of the foregoing was filed electronically with the Court. Notice of this filing will be sent to all parties by operation of this Court's electronic filing system. Parties may access this filing through the Court's system.

Dated: May 28, 2013

Respectfully submitted,

/s/ Mary McCormick
*Counsel for Petitioner*

65