**No. 11-1324**
ORAL ARGUMENT SCHEDULED FOR SEPT. 30, 2013

────────────────────────

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

────────────────────────

ALI HAMZA AHMAD SULIMAN AL BAHLUL,

*Petitioner,*

v.

UNITED STATES OF AMERICA,

*Respondent,*

────────────────────────

ON PETITION FOR REVIEW FROM THE UNITED STATES COURT OF
MILITARY COMMISSION REVIEW

────────────────────────

**BRIEF OF NATIONAL INSTITUTE OF MILITARY JUSTICE
AS *AMICUS CURIAE* IN SUPPORT OF PETITIONER**

Stephen I. Vladeck
4801 Massachusetts Avenue, N.W.,
Room 386
Washington, DC 20016
Telephone: (202) 274-4241
svladeck@wcl.american.edu

Agnieszka M. Fryszman
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Telephone:  (202) 408-4600
afryszman@cohenmilstein.com

*Attorneys for Amicus Curiae*

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

**A. Parties and *Amici Curiae***

All parties, intervenors, and *amici curiae* appearing in this Court are listed in the Brief of Petitioner. *Amicus curiae* National Institute for Military Justice ("NIMJ") is a District of Columbia nonprofit corporation. Pursuant to Rule 26.1, *amicus* certifies that, other than NIMJ, none of the entities filing this brief are corporate entities or are owned in whole or in part by other corporate entities.

**B. Rulings Under Review**

References to the rulings at issue appear in the Brief of Petitioner.

**C. Related Cases**

Counsel is unaware of any cases related to this appeal other than those listed in the Brief of Petitioner.

**D. Relevant Statutes and Regulations**

Counsel is unaware of any statutes or regulations related to this appeal other than those provided in the Addendum to Petitioner's Brief.

Dated: **June 10, 2013**                    /s/ Agnieszka Fryszman
                                            *Counsel for* Amicus Curiae

i

## COMPLIANCE WITH RULE 29

### A. Consent to File

Pursuant to Fed. R. App. P. 29(a) and Circuit Rule 29(b), *amicus* certifies that all parties have consented to the filing of this brief.

### B. Authorship and Funding

Pursuant to Fed. R. App. P. 29(c)(5), *amicus* certifies that this brief was authored by *amicus* and counsel listed on the front cover. No party or party's counsel authored this brief, in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No other person besides *amicus* and their counsel contributed money that was intended to fund preparing or submitting this brief.

### C. Not Practical To Join in Single Brief

Pursuant to Circuit Rule 29(d), *amicus* certifies that it is not practicable to join all other *amici* in this case in a single brief. We do not claim expertise in the other issues addressed by *amici*, and believe it would be inappropriate to address matters upon which we do not have particular expertise.

<u>Dated</u>: **June 10, 2013**                    /s/ Agnieszka Fryszman
                                *Counsel for* Amicus Curiae

ii

## C<small>ORPORATE</small> D<small>ISCLOSURE</small> S<small>TATEMENT</small>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure,

undersigned counsel states that *amicus curiae* National Institute of

Military Justice is not a publicly-held corporation, issues no stock, and

does not have a parent corporation.

Dated: **June 10, 2013**                              /s/ Agnieszka Fryszman
                                                      *Counsel for* Amicus Curiae

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES......................i

RULE 29 COMPLIANCE STATEMENT ..............................................................ii

CORPORATE DISCLOSURE STATEMENT..........................................................iii

TABLE OF AUTHORITIES..................................................................................v

INTEREST OF *AMICUS CURIAE*......................................................................1

SUMMARY OF ARGUMENT ............................................................................2

ARGUMENT......................................................................................................6

I.   THE PRINCIPAL CONSTITUTIONAL LIMITS ON MILITARY
     JURISDICTION ARE THE JURY TRIAL PROTECTIONS IN
     ARTICLE III AND THE FIFTH AND SIXTH AMENDMENTS........................6

II.  NO EXCEPTION TO THE CONSTITUTION'S JURY-TRIAL
     PROTECTIONS SUPPORTS THE ASSERTION OF
     MILITARY JURISDICTION IN THIS CASE..............................................20

CONCLUSION ................................................................................................34

CERTIFICATE OF COMPLIANCE WITH RULE 32(A).......................................35

CERTIFICATE OF SERVICE ...........................................................................36

# TABLE OF AUTHORITIES[*]

## CASES

*Anderson* v. *Dunn,*
  19 U.S. (6 Wheat.) 204 (1821) ................................................................28

*Boumediene* v. *Bush,*
  553 U.S. 723 (2008) .................................................................................... 1

*Burns* v. *Wilson,*
  346 U.S. 137 (1953) ..................................................................................20

*Callan* v. *Wilson,*
  127 U.S. 540 (1888) .................................................................................. 13

*Cheff* v. *Schnackenberg,*
  384 U.S. 373 (1966) .....................................................................................8

*Clinton* v. *Goldsmith,*
  526 U.S. 529 (1999) .................................................................................... 1

*Codispoti* v. *Pennsylvania,*
  418 U.S. 506 (1974) .....................................................................................8

*Dist. of Columbia* v. *Clawans,*
  300 U.S. 617 (1937) .....................................................................................8

*Dist. of Columbia* v. *Cotts,*
  282 U.S. 63 (1930) .......................................................................................8

*Duncan* v. *Kahanamoku,*
  327 U.S. 304 (1946) ..................................................................................26

---

  [*] Authorities on which *amicus* principally relies are marked with asterisks (*).

v

*Duncan* v. *Louisiana*,
391 U.S. 145 (1968) ................................................................8

*Dynes* v. *Hoover*,
61 U.S. (20 How.) 65 (1857) ................................................ 12

*\* Ex parte Milligan*,
71 U.S. (4 Wall.) 2 (1866) ............................................passim

*\* Ex parte Quirin*,
317 U.S. 1 (1942) ..........................................................passim

*Ex parte Reed*,
100 U.S. 13 (1879) ............................................................. 12

*Grisham* v. *Hagan*,
361 U.S. 278 (1960) ...........................................................11

*\* Hamdan* v. *Rumsfeld* (*Hamdan I*),
548 U.S. 557 (2006) .....................................................passim

*Hamdan* v. *United States* (*Hamdan II*),
696 F.3d 1238 (D.C. Cir. 2012) ............................5, 6, 19, 26

*Houston* v. *Moore*,
18 U.S. (5 Wheat.) 1 (1820) .............................................. 12

*In re Yamashita*,
327 U.S. 1 (1946) ............................................................... 19

*Johnson* v. *Sayre*,
158 U.S. 109 (1895) ........................................................... 12

*Johnson* v. *United States*,
700 A.2d 240 (D.C. 1997) .................................................. 13

\* *Kinsella* v. *United States ex rel. Singleton*,
   361 U.S. 234 (1960) ................................................ 10, 23, 24, 32

*Kiyemba* v. *Obama*,
   555 F.3d 1022 (D.C. Cir. 2009),
   *vacated and remanded*, 130 S. Ct. 1235 (2010) (per curiam),
   *reinstated on remand*, 605 F.3d 1046 (D.C. Cir. 2010) (per curiam),
   *cert. denied*, 131 S. Ct. 1631 (2011) ..................................... 21

*Kiyemba* v. *Obama*,
   561 F.3d 509 (D.C. Cir. 2009),
   *cert. denied*, 130 S. Ct. 1880 (2010) .................................... 22

*Madsen* v. *Kinsella*,
   343 U.S. 341 (1952) ................................................... 24, 30

*Martin* v. *Mott*,
   25 U.S. (12 Wheat.) 19 (1827) ............................................ 12

*McElroy* v. *United States ex rel. Guagliardo*,
   361 U.S. 281 (1960) ...................................................... 11

*Middendorf* v. *Henry*,
   425 U.S. 25 (1976) ....................................................... 14

*Natal* v. *Louisiana*,
   139 U.S. 621 (1891) ...................................................... 13

*O'Callahan* v. *Parker*,
   395 U.S. 258 (1969) ...................................................... 13

*Rasul* v. *Bush*,
   542 U.S. 466 (2004) ....................................................... 1

\* *Reid* v. *Covert*,
   354 U.S. 1 (1957) ................................................. 9, 10, 23, 32

*Solorio* v. *United States*,
   483 U.S. 435 (1987) ................................................... 13, 14

\* *United States ex rel. Toth* v. *Quarles*,
  350 U.S. 11 (1955) ........................................................ 3, 7, 28, 32

*United States v. Ali*,
  71 M.J. 256 (C.A.A.F. 2012),
  *cert. denied*, No. 12-805, 2013 WL 1942430 (U.S. May 13, 2013). .......15

*United States* v. *Averette*,
  19 U.S.C.M.A. (41 C.M.R.) 363 (1970) ....................................11

*United States* v. *Hamdan*,
  801 F. Supp. 2d 1247 (Ct. Mil. Comm'n Rev. 2011) .............................. 1

*United States* v. *Moreland*,
  258 U.S. 433 (1922) ................................................................ 8

*United States* v. *Seals*,
  130 F.3d 451 (D.C. Cir. 1997) ................................................... 8

*United States* v. *Tiede*,
  86 F.R.D. 227 (U.S. Ct. Berlin 1979) ....................................... 21

*United States* v. *Verdugo-Urquidez*,
  494 U.S. 259 (1990) ............................................................. 21

*Wise* v. *Withers*,
  7 U.S. (3 Cranch) 331 (1806) ................................................ 12

## CONSTITUTIONAL PROVISIONS

U.S. CONST.
  art. I, § 8, cl. 10......................................................passim

  art. I, § 8, cl. 14.............................................. 10, 13, 14, 23

  \* art. III, § 2, cl. 3...................................................passim

\* amend. V .........................................................................passim
\* amend. VI ........................................................................passim

## STATUTES

10 U.S.C.
  § 818 ....................................................................................... 19

  § 821 ....................................................................................... 16

18 U.S.C.
  § 2339B ...................................................................................28

  § 3261(a) .................................................................................. 9

## OTHER AUTHORITIES

Richard R. Baxter,
  *So-Called "Unprivileged Belligerency":*
  *Spies, Guerrillas, and Saboteurs,*
  28 BRIT. Y.B. INT'L L. 323 (1951) ........................................... 18

Brief for the United States,
  *Hamdan* v. *United States* (*Hamdan II*),
  696 F.3d 1238 (D.C. Cir. 2012)......................................... 5, 26

EUGENE R. FIDELL ET AL.,
  MILITARY JUSTICE: CASES AND MATERIALS (2d ed. 2012).......................11

Beth Stephens,
  *Federalism and Foreign Affairs: Congress's Power To "Define and*
  *Punish . . . Offenses Against the Law of Nations,"*
  42 WM. & MARY L. REV. 447 (2000)........................................ 27

\* Stephen I. Vladeck,
  *The Laws of War as a Constitutional Limit on Military Jurisdiction,*
  4 J. NAT'L SEC. L. & POL'Y 295  (2010)..............................passim

Earl Warren,
  *The Bill of Rights and the Military*,
  37 N.Y.U. L. Rev. 181 (1962) ................................................................. 7

William Winthrop, Military Law and Precedents 953–75 (2d ed.
  Beard Books 2000) (1896) ..................................................................... 7

<u>INTEREST OF *AMICUS CURIAE*</u>

The National Institute of Military Justice ("NIMJ") is a District of Columbia nonprofit corporation organized in 1991 to advance the fair administration of military justice and foster improved public understanding of the military justice system. NIMJ's advisory board includes law professors, private practitioners, and other experts in the field, none of whom are on active duty in the military, but nearly all of whom have served as military lawyers—several as flag officers.

NIMJ appears regularly as an *amicus curiae* before the U.S. Court of Appeals for the Armed Forces, and appeared in the U.S. Supreme Court as an *amicus* in support of the government in *Clinton* v. *Goldsmith*, 526 U.S. 529 (1999), and in support of the petitioners in *Rasul* v. *Bush*, 542 U.S. 466 (2004), *Hamdan* v. *Rumsfeld*, 548 U.S. 557 (2006), and *Boumediene* v. *Bush*, 553 U.S. 723 (2008). NIMJ has also appeared as an *amicus* before the Court of Military Commission Review in this case and in *United States* v. *Hamdan*, 801 F. Supp. 2d 1247 (Ct. Mil. Comm'n Rev. 2011).

NIMJ is actively involved in public education through its website, http://www.nimj.org, and through publications including the

1

ANNOTATED GUIDE TO PROCEDURES FOR TRIALS BY MILITARY
COMMISSIONS OF CERTAIN NON-UNITED STATES CITIZENS IN THE WAR
AGAINST TERRORISM (2002), two volumes of MILITARY COMMISSION
INSTRUCTIONS SOURCEBOOKS (2003–04), and the MILITARY COMMISSION
REPORTER (2009–). Although NIMJ has generally avoided taking a
position on the legality of the military commissions established by the
Military Commissions Acts of 2006 and 2009, its interest in this case
derives from its concern that the decisions under review neglected well-
settled constitutional principles concerning the limits on the jurisdiction
of military tribunals. For the reasons set forth below, NIMJ believes
that the government's position and the decisions below would jeopardize
these well-settled principles.

## SUMMARY OF ARGUMENT

The Supreme Court has consistently understood Congress's power
to subject particular conduct to trial by a military tribunal as turning
on two distinct, but often related, constitutional authorities: (1)
Congress's Article I authority to define the offense in question; and (2)
its separate power to subject the offender to trial before a non-Article III
military court. *See, e.g.*, *United States ex rel. Toth* v. *Quarles*, 350 U.S.

11, 14 & n.5 (1955). This bifurcation is largely a byproduct of the jury-trial protections of Article III and the Fifth and Sixth Amendments, which, subject to carefully circumscribed exceptions, generally require trial in a civilian court for all prosecutions under federal law. Relying on these provisions, the Court has repeatedly identified constitutional constraints on military jurisdiction—not because Congress lacks the power to proscribe the relevant conduct in general, but because, except in cases in which a specific exception to the jury-trial provisions applies, military jurisdiction is foreclosed *regardless* of Congress's power to define the underlying offense.

In the context of courts-martial, the Court has tied military jurisdiction to the text of the Grand Jury Indictment Clause of the Fifth Amendment, which exempts from the requirement of presentment or grand jury indictment "cases arising in the land or naval forces." U.S. CONST. amend. V. And in the context of military commissions, the Court has identified a distinct—and atextual—exception to the jury-trial provisions for "offenses committed by enemy belligerents against the law of war." *Ex parte Quirin*, 317 U.S. 1, 42 (1942). Thus, *Quirin* did not turn merely on the fact that Congress had exercised its legislative

3

power under the Define and Punish Clause of Article I; it turned on the separate—but equally important—holdings that (1) the Constitution's jury-trial protections do not extend to enemy belligerents charged with international war crimes; and (2) the defendants *were* enemy belligerents charged with violating the international laws of war.

In light of this settled understanding, it is clear that no exception to the jury-trial provisions applies in the instant case. The Supreme Court has never recognized a categorical exception to the jury-trial protections for non-citizens detained—and tried—outside the territorial United States. Nor can it be argued that this case "arises in the land or naval forces." Time and again, the Court has suggested that a case only "arises in the land or naval forces" when the defendant is formally part of those forces. As Chief Justice Stone put it in *Quirin*, the "objective" of the textual carve-out was "to authorize the trial by court martial of the members of our Armed Forces for all that class of crimes which under the Fifth and Sixth Amendments might otherwise have been deemed triable in the civil courts," 317 U.S. at 43, and nothing more.

Because this case does not "arise[] in the land or naval forces," the validity of military jurisdiction turns not only on whether Congress has

4

the Article I power to define the offenses Petitioner was convicted of committing, but *also* whether an atextual exception to the jury-trial protections applies. And yet, the government conceded in *Hamdan II* that "the offense of providing material support to terrorism has not attained international recognition at this time as a violation of customary international law." Brief for the United States at 55–56, *Hamdan* v. *United States* (*Hamdan II*), 696 F.3d 1238 (D.C. Cir. 2012) (No. 11-1257) [hereinafter "U.S. *Hamdan* Brief"].

Perhaps in light of this concession, the government in *Hamdan* focused its argument instead on the claim that, in the Military Commissions Acts of 2006 and 2009, "Congress has codified the longstanding historical practice of the Executive Branch . . . of trying by military commission individuals who join with, and provide aid and assistance to, unprivileged belligerents in the context of an armed conflict against the United States." *Id.* at 27.

The problems with this argument are three-fold: *First*, the Supreme Court has never recognized a separate and distinct exception to the jury-trial protections for such offenses; the exception recognized in *Quirin* logically and necessarily extends only to violations of the

5

international laws of war. *Second*, the examples on which the government relies in support of its claim all pre-date the relevant Supreme Court jurisprudence recognizing the central role of the jury-trial provisions to the constitutionality of military jurisdiction. *Third*, and finally, even if they have not been overtaken by subsequent events, a cursory review of the Civil War examples marshaled by the government in its *Hamdan* brief reveals that evidence of such a common-law practice is itself equivocal.

Unless this Court recognizes a new and unprecedented exception to the Constitution's jury-trial protections, military commissions may only exercise jurisdiction over cases "arising in the land or naval forces" or offenses committed by enemy belligerents against the international laws of war. Neither scenario is presented here.

## ARGUMENT

I.   THE PRINCIPAL CONSTITUTIONAL LIMITS ON MILITARY JURISDICTION ARE THE JURY TRIAL PROTECTIONS IN ARTICLE III AND THE FIFTH AND SIXTH AMENDMENTS

a.   The Supreme Court Has Repeatedly Distinguished Between Congress's Power To Define Offenses and Its Power To Subject Offenders to Military Jurisdiction

Although military jurisdiction pre-dates the Constitution, *see* WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS 953–75 (2d ed. Beard Books 2000) (1896), the Supreme Court has consistently understood Congress's power to subject particular conduct to trial by a military tribunal as turning on two distinct, but often related, constitutional authorities: (1) Congress's Article I power to define the offense in question; and (2) its separate authority to subject the offender to trial before a non-Article III military court. *See, e.g.*, *United States ex rel. Toth* v. *Quarles*, 350 U.S. 11, 14 & n.5 (1955). *See generally* Earl Warren, *The Bill of Rights and the Military*, 37 N.Y.U. L. REV. 181, 185–92 (1962) (grounding the Court's policing of military jurisdiction in the need to give effect to constitutional boundaries between military and civilian authority).

This bifurcation is largely a byproduct of the jury-trial protections of Article III and the Fifth and Sixth Amendments. *See* U.S. CONST. art. III, § 2, cl. 3 ("The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury . . . ."); *id.* amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval

forces, or in the Militia, when in actual service in time of War or public danger . . . ."); *id.* amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . .").

Subject to carefully circumscribed exceptions,[2] the Constitution's three jury-trial provisions generally require trial in a civilian court for all prosecutions under federal law.[3] Thus, Congress's power to subject particular offenders to military jurisdiction does not turn solely on the Article I authority on which the offense is predicated, but on whether one of the recognized exceptions to the jury-trial protections also applies.

---

2. As the Court explained in *Duncan* v. *Louisiana*, 391 U.S. 145 (1968), "there is a category of petty crimes or offenses which is not subject to the Sixth Amendment jury trial provision." *Id.* at 159; *see also Dist. of Columbia* v. *Clawans*, 300 U.S. 617, 628 (1937). Relatedly, the Court has held that the trial of criminal contempt does not require a jury, at least where the maximum possible sentence is six months or less. *See Codispoti* v. *Pennsylvania*, 418 U.S. 506 (1974); *Cheff* v. *Schnackenberg*, 384 U.S. 373 (1966).

3. Indeed, the jury trial protections even apply to federal prosecutions in the non-Article III D.C. Superior Court. *See, e.g., Dist. of Columbia* v. *Cotts*, 282 U.S. 63, 72–73 (1930); *Callan* v. *Wilson*, 127 U.S. 540, 557 (1888); *United States* v. *Seals*, 130 F.3d 451, 457 n.6 (D.C. Cir. 1997) (citing *United States* v. *Moreland*, 258 U.S. 433 (1922)).

In *Reid* v. *Covert*, 354 U.S. 1 (1957), for example, the Supreme Court rejected Congress's power to court-martial the spouse of a service member, at least for a capital offense committed during peacetime. At the heart of Justice Black's analysis for a four-Justice plurality[4] was his conclusion that the jury-trial provisions applied to trials of U.S. citizens outside the territorial United States—and therefore precluded the exercise of military jurisdiction. *See id.* at 6–14 (plurality opinion). Pointedly, the question was *not* whether Congress lacked the power to subject civilian dependents accompanying U.S. forces in the field to *any* criminal liability. *Cf.* Military Extraterritorial Jurisdiction Act, 18 U.S.C. § 3261(a) (authorizing civilian trials of individuals "employed by or accompanying the Armed Forces outside the United States" for conduct that would constitute a federal felony if committed within the "special maritime and territorial jurisdiction of the United States"). Instead, as Justice Black wrote,

> Under the grand design of the Constitution civilian courts are the normal repositories of power to try persons charged with crimes against the United States. And to protect

---

4. Justices Frankfurter and Harlan separately concurred in the judgment to provide a majority for the result. *See Reid*, 354 U.S. at 41–64 (Frankfurter, J., concurring in the result); *id.* at 65–78 (Harlan, J., concurring in the result).

> persons brought before these courts, Article III and the
> Fifth, Sixth, and Eighth Amendments establish the right to
> trial by jury, to indictment by a grand jury and a number of
> other specific safeguards.

*Reid*, 354 U.S. at 21 (plurality opinion); *see also id.* at 9 n.12 ("It is

common knowledge that the fear that jury trial might be abolished was

one of the principal sources of objection to the Federal Constitution and

was an important reason for the adoption of the Bill of Rights."); *id.* at

10 ("Trial by jury in a court of law and in accordance with traditional

modes of procedure after an indictment by grand jury has served and

remains one of our most vital barriers to governmental arbitrariness.").

Three years later, when a majority of the Court followed Justice

Black and extended *Reid* to bar court-martial jurisdiction over *all*

peacetime offenses by civilians, it reasoned that "This Court cannot

diminish and expand [Congress's power under the Make Rules Clause],

either on a case-by-case basis or on a balancing of the power there

granted Congress against the safeguards of Article III and the Fifth and

Sixth Amendments." *Kinsella* v. *United States ex rel. Singleton*, 361

U.S. 234, 246 (1960). In other words, the constitutionality of military

jurisdiction could not turn on the difference between capital and non-

capital offenses, *see id.*, or between civilian employees and dependents,

*see McElroy* v. *United States ex rel. Guagliardo*, 361 U.S. 281 (1960); *Grisham* v. *Hagan*, 361 U.S. 278 (1960), because the Constitution's jury-trial protections themselves brook no such distinction, *cf. United States* v. *Averette*, 19 U.S.C.M.A. (41 C.M.R.) 363 (1970) (interpreting UCMJ provision authorizing court-martial jurisdiction over civilian contractors during "time of war" to require a *declared* war, which Vietnam was not, in order to avoid serious constitutional question). *See generally* EUGENE R. FIDELL ET AL., MILITARY JUSTICE: CASES AND MATERIALS 335–444 (2d ed. 2012) (summarizing the relevant jurisprudence).

Instead, except in cases in which a recognized exception to the jury-trial provisions applies, military jurisdiction is foreclosed regardless of the underlying substantive offense or the specific source of Congress's power to define it. *See* Stephen I. Vladeck, *The Laws of War as a Constitutional Limit on Military Jurisdiction*, 4 J. NAT'L SEC. L. & POL'Y 295, 308 (2010) ("[T]hese cases do not just support the conclusion that Congress only has the authority to 'make rules' for individuals in the armed forces; they establish the equally important idea that the validity of military (versus civilian) jurisdiction turns on the

inapplicability of the grand- and petit-jury trial rights in Article III and the Fifth and Sixth Amendments.").

### b. The Supreme Court Has Conditioned Court-Martial Jurisdiction on a Specific Exception to the Jury-Trial Protections of Article III and the Fifth and Sixth Amendments

In the context of courts-martial, the Supreme Court has relied on the text of the Grand Jury Indictment Clause of the Fifth Amendment, which exempts from the requirement of presentment or grand jury indictment "cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger." U.S. Const. amend. V; *see, e.g.*, *Johnson* v. *Sayre*, 158 U.S. 109, 115 (1895); *Ex parte Reed*, 100 U.S. 13 (1879); *Dynes* v. *Hoover*, 61 U.S. (20 How.) 65 (1857); *Martin* v. *Mott*, 25 U.S. (12 Wheat.) 19 (1827); *Houston* v. *Moore*, 18 U.S. (5 Wheat.) 1 (1820); *Wise* v. *Withers*, 7 U.S. (3 Cranch) 331 (1806).[5] To that end, when the Supreme Court in *Solorio* v. *United States*, 483

---

5. Although Justice Marshall suggested that the "actual service" clause may have meant to modify *both* prior clauses in the Fifth Amendment (and therefore constrain all military jurisdiction to a "time of War or public danger"), *see Solorio* v. *United States*, 483 U.S. 435, 451 n.2 (1987) (Marshall, J., dissenting), the Court long ago rejected that view, holding that the "actual service" proviso only applies to—and circumscribes military jurisdiction over—the militia, *see, e.g.*, *Sayre*, 158 U.S. at 115.

U.S. 435 (1987), abandoned the "service connection" test[6] in favor of the proposition that service members may be tried by court-martial for *any* offense Congress prescribes, that conclusion reflected not just the "natural meaning" of the Make Rules Clause, but *also* "the Fifth Amendment's exception for 'cases arising in the land or naval forces.'" *Id.* at 439.

To be sure, Article III and the Sixth Amendment include no comparable textual exception for trial by petit jury in cases arising in the land and naval forces. Nevertheless, the courts have consistently held that an atextual carve-out to those provisions is necessarily reflected in (and follows from) the text of the Grand Jury Indictment Clause. *See, e.g.*, *Johnson* v. *United States*, 700 A.2d 240, 243 (D.C. 1997) ("In cases involving the right to a jury trial, the Supreme Court has never distinguished the claims brought under the Due Process Clause, the Sixth Amendment, and Article III." (citing *Callan* v. *Wilson*, 127 U.S. 540 (1888); and *Natal* v. *Louisiana*, 139 U.S. 621 (1891))); *see also Ex parte Quirin*, 317 U.S. 1, 39 (1942) ("The Fifth and Sixth

---

6. The Court had articulated the "service connection" test in *O'Callahan* v. *Parker*, 395 U.S. 258 (1969), holding that the Constitution only authorized military jurisdiction over service members for offenses directly related to their military service, *id.* at 272–74.

Amendments, while guaranteeing the continuance of certain incidents

of trial by jury which Article III, § 2 had left unmentioned, did not

enlarge the right to jury trial as it had been established by that

Article.").  As then-Justice Rehnquist summarized in *Middendorf* v.

*Henry*, 425 U.S. 25 (1976),

> Dicta in *Ex parte Milligan* said that "the framers of the
> Constitution, doubtless, meant to limit the right of trial by
> jury, in the sixth amendment, to those persons who were
> subject to indictment or presentment in the fifth." In *Ex
> parte Quirin*, it was said that "'cases arising in the land or
> naval forces' . . . are expressly excepted from the Fifth
> Amendment, and are deemed excepted by implication from
> the Sixth."

*Id.* at 33–34 (citations omitted). Because the Supreme Court has

thereby assumed that the jury-trial provisions should be read *in pari*

*materia*, the question of whether court-martial jurisdiction is

appropriate has reduced in almost every case to whether the dispute

"arises in the land or naval forces." And in light of *Solorio*, in cases

involving active-duty service members, the jury-trial question merges

with the question of Congress's Article I power; per Chief Justice

Rehnquist's analysis, any conduct Congress could validly proscribe

through the Make Rules Clause necessarily involves a case "arising in

the land or naval forces." In other contexts, however, those questions

have remained analytically distinct. *Cf. United States v. Ali*, 71 M.J. 256 (C.A.A.F. 2012) (upholding court-martial of civilian contractor on narrow ground that, as a non-citizen outside the territorial United States, the defendant was categorically unprotected by the jury trial provisions of the Fifth and Sixth Amendments), *cert. denied*, No. 12-805, 2013 WL 1942430 (U.S. May 13, 2013).

### c. The Supreme Court Has Conditioned Military Commission Jurisdiction on Implicit Exceptions to the Jury-Trial Protections of Article III and the Fifth and Sixth Amendments

Although the dataset is far smaller, the Supreme Court has followed a similar, bifurcated approach to the constitutional parameters of military commission jurisdiction. Thus, in *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866), the Court rejected the assertion of military jurisdiction over a civilian accused of plotting to steal Union weapons and liberate Confederate prisoners from Union POW camps. In so holding, the gravamen of the majority's constitutional objection was not that Congress could not proscribe Milligan's substantive conduct in the abstract, but rather the central role of the jury-trial protections, *see, e.g., id.* at 123, along with the inapplicability of any exception based on

15

martial rule, since the civilian courts were open and their processes unobstructed, *see id*. at 127.[7]

To whatever extent the Court in *Quirin* otherwise backtracked from some of its broader pronouncements in *Milligan*, it again embraced this differentiated approach to the constitutionality of military jurisdiction. Thus, Chief Justice Stone separately addressed whether Congress had in fact validly prohibited the conduct in question and whether the exercise of military—rather than civilian—jurisdiction was appropriate. To the former, the opinion focused on Article 15 of the Articles of War (present-day Article 21 of the UCMJ, 10 U.S.C. § 821). Through that provision, Chief Justice Stone explained,

> Congress has explicitly provided, so far as it may constitutionally do so, that military tribunals shall have jurisdiction to try offenders or offenses against the law of war in appropriate cases. Congress, in addition to making rules for the government of our Armed Forces, has thus exercised its authority to define and punish offenses against the law of nations by sanctioning, within constitutional limitations, the jurisdiction of military commissions to try

---

7. In his four-Justice concurrence in *Milligan*, Chief Justice Chase disagreed with the majority as to whether Congress *could* authorize military commissions in appropriate circumstances, *see, e.g.*, *Milligan*, 71 U.S. (4 Wall.) at 136–37 (opinion of Chase, C.J.). Nevertheless, the concurring Justices appeared to agree that the reason why President Lincoln could not unilaterally so provide was the jury-trial protections relied upon by the majority, *see, e.g.*, *id.* at 137.

persons for offenses which, according to the rules and
precepts of the law of nations, and more particularly the law
of war, are cognizable by such tribunals.

*Id.* at 28. In other words, Congress had "incorporated by reference, as

within the jurisdiction of military commissions, all offenses which are

defined as such by the law of war, and which may constitutionally be

included within that jurisdiction." *Id.* at 30.

Critically, though, the conclusion that Congress had validly

exercised its power under the Define and Punish Clause of Article I, *see*

U.S. CONST. art. I, § 8, cl. 10 (empowering Congress "[t]o define and

punish . . . Offences against the Law of Nations . . . ."), did not resolve

the validity of *military* jurisdiction over such offenses. Instead, because

of *Milligan*, the Court separately had to assess whether the exercise of

military jurisdiction was inconsistent with the Constitution's jury-trial

protections:

We may assume, without deciding, that a trial
prosecuted before a military commission created by military
authority is not one "arising in the land . . . forces," when the
accused is not a member of or associated with those forces.
But even so, the exception [in the Grand Jury Indictment
Clause] cannot be taken to affect those trials before military
commissions which are neither within the exception nor
within the provisions of Article III, § 2, whose guaranty the
Amendments did not enlarge. . . . An express exception from
Article III, § 2, and from the Fifth and Sixth Amendments, of

17

trials of petty offenses and of criminal contempts has not
been found necessary in order to preserve the traditional
practice of trying those offenses without a jury. It is no more
so in order to continue the practice of trying, before military
tribunals without a jury, *offenses committed by enemy
belligerents against the law of war.*

*Id.* at 41 (emphasis added; alteration and first omission in original).

Thus, based on a combination of policy considerations and an
enigmatic statutory precedent,[8] *see* Vladeck, *supra*, at 318 & nn.124–
25, the Court in *Quirin* recognized an exception to the jury-trial
provisions for "offenses committed by enemy belligerents against the
law of war," an exception the application of which necessarily turned on
the Court's separate conclusion that the charged offenses *were* war

---

8. In particular, *Quirin* relied on an 1806 statute in which Congress
had subjected alien spies to military jurisdiction. *See* 317 U.S. at 41–42.
As Chief Justice Stone wrote, "[t]his enactment must be regarded as a
contemporary construction of both Article III, § 2, and the Amendments
as not foreclosing trial by military tribunals, without a jury, of offenses
against the law of war committed by enemies not in or associated with
our Armed Forces." *Id.* at 41.

It is quite clear in retrospect, however, that *Quirin* was simply
incorrect on this point—that whether or not the jury-trial protections
include an exception for offenses against the law of war, spying is *not*
such an offense—and was not at the time. *See* Richard R. Baxter, *So-
Called "Unprivileged Belligerency": Spies, Guerrillas, and Saboteurs*, 28
BRIT. Y.B. INT'L L. 323, 333 (1951). Whether a separate jury-trial
exception justifies military jurisdiction over alien spies is therefore a
separate question—one not raised in *Quirin* or here.

crimes. *See Quirin*, 317 U.S. at 30–38; *accord. In re Yamashita*, 327 U.S. 1, 7–9 (1946); *cf.* 10 U.S.C. § 818 ("General courts-martial also have jurisdiction to try any person who by the law of war is subject to trial by a military tribunal and may adjudge any punishment permitted by the law of war.").

Put another way, the constitutionality of the commissions in both *Quirin* and *Yamashita* did not turn merely on the fact that Congress had exercised its power under the Define and Punish Clause of Article I; it turned on the separate—but equally important—holdings that (1) the Constitution's jury-trial protections do not extend to enemy belligerents charged with international war crimes; and (2) the defendants in those cases *were* enemy belligerents charged with violating the international laws of war.[9] Because the commissions in both cases therefore properly exercised jurisdiction, there was nothing more for the civilian courts to resolve via collateral habeas corpus review. *See, e.g.*, *Yamashita*, 327

---

9. This analysis helps to explain why Judge Kavanaugh's solo discussion of Congress's powers to define non-international war crimes in footnote 6 of *Hamdan II* is necessarily incomplete. *See Hamdan II*, 696 F.3d at 1246 n.6 (opinion of Kavanaugh, J.). Whatever the Article I source of Congress's power to proscribe particular conduct, one must still identify an exception to the jury-trial provisions that authorizes *military*—rather than *civilian*—trial of such an offense.

U.S. at 8 ("[O]n application for habeas corpus we are not concerned with the guilt or innocence of the petitioners. We consider here only the lawful power of the commission to try the petitioner for the offense charged."); *cf. Burns* v. *Wilson*, 346 U.S. 137 (1953) (plurality opinion) (expanding the scope of collateral habeas in military cases after *Quirin* and *Yamashita* to include whether the military courts "fully and fairly" considered the defendant's constitutional claims).

## II. NO EXCEPTION TO THE CONSTITUTION'S JURY-TRIAL PROTECTIONS SUPPORTS THE ASSERTION OF MILITARY JURISDICTION IN THIS CASE

As Part I summarized, the constitutionality of the assertion of military jurisdiction in a particular case turns on both Congress's Article I power to define the relevant offense and the inapplicability of the jury-trial protections of Article III and the Fifth and Sixth Amendments. In this Part, *amicus* turns to why no exception to the jury-trial provisions justifies the assertion of military jurisdiction in this case.

### a. The Jury-Trial Provisions Apply To Non-Citizens Not Lawfully Present Within the United States

First, although the government has not made this argument, it bears emphasizing that the Supreme Court has never recognized a

categorical exception to the jury-trial protections for non-citizens

detained—and tried—outside the territorial United States. Instead, the

Court's jurisprudence has largely reflected Justice Kennedy's

concurrence in *United States* v. *Verdugo-Urquidez*, 494 U.S. 259 (1990),

which suggested that the constitutional calculus changes dramatically

once the United States affirmatively seeks to prosecute non-citizens for

extraterritorial conduct. *See, e.g.*, *id.* at 278 (Kennedy, J., concurring)

("The United States is prosecuting a foreign national in a court

established under Article III, and all of the trial proceedings are

governed by the Constitution. All would agree, for instance, that the

dictates of the Due Process Clause of the Fifth Amendment protect the

defendant."); *see also United States* v. *Tiede*, 86 F.R.D. 227 (U.S. Ct.

Berlin 1979) (holding that non-citizens tried before a U.S. court in

Berlin were entitled to a trial by jury). Thus, whether or not non-

citizens detained at Guantánamo may affirmatively invoke

constitutional protections in *civil* proceedings,[10] it necessarily follows

---

10. This Court has suggested that the Due Process Clause does not
apply to the Guantánamo detainees. *See Kiyemba* v. *Obama*, 555 F.3d
1022, 1026–27 (D.C. Cir. 2009), *vacated and remanded*, 130 S. Ct. 1235
(2010) (per curiam), *reinstated on remand*, 605 F.3d 1046 (D.C. Cir.
2010) (per curiam), *cert. denied*, 131 S. Ct. 1631 (2011). Nevertheless,

that the same considerations govern the constitutionality of military jurisdiction in this case as those identified in Part I, *supra*.

Further to that point, in both *Quirin* and *Yamashita*, the Supreme Court declined to rest its analysis on the conclusion that the jury-trial provisions categorically did not apply to the defendants, who, with one exception, were non-citizens not lawfully present within the United States at the time of their capture. If the jury-trial provisions simply did not apply to non-citizens not lawfully present within the United States, the implicit law-of-war exception recognized in those cases would have been all-but unnecessary. Thus, the fact that Petitioner is a non-citizen detained outside the territorial United States is of no moment in assessing the applicability of the jury-trial provisions.

### b. This Case Does Not "Arise in the Land or Naval Forces"

Nor can it be argued that this case "arises in the land or naval forces," and therefore falls within the textual exception to the jury-trial provisions recognized by the Court in its court-martial jurisprudence.

---

no subsequent decision has relied on this holding, and other cases have assumed without deciding that the Fifth Amendment *does* apply. *See, e.g.*, *Kiyemba* v. *Obama*, 561 F.3d 509, 514 n.4 (D.C. Cir. 2009), *cert. denied*, 130 S. Ct. 1880 (2010).

As the cases surveyed in Part I demonstrate, the Supreme Court has taken a literal approach to the scope of this textual exception, holding, for example, that conduct by civilian employees of the military and service member dependents does not "arise in the land or naval forces" even when it takes place while those individuals are accompanying the armed forces in the field. As Justice Clark explained in *Singleton*, "If civilian dependents are included in the term 'land and naval Forces' at all, they are subject to the full power granted the Congress therein to create capital as well as noncapital offenses." 361 U.S. at 246; *see also Reid*, 354 U.S. at 22 (plurality) (construing the Grand Jury Indictment Clause alongside the Make Rules Clause, which "does not encompass persons who cannot fairly be said to be 'in' the military service").

Time and again, the Court has suggested that a case only "arises in the land or naval forces" when the defendant is formally part of those forces. As Chief Justice Stone put it in *Quirin*, the "objective" of the textual carve-out was "to authorize the trial by court martial of the members of our Armed Forces for all that class of crimes which under the Fifth and Sixth Amendments might otherwise have been deemed triable in the civil courts," 317 U.S. at 43, and nothing more.

23

The only exception the Court has recognized to this rule has no relevance here. *Madsen* v. *Kinsella*, 343 U.S. 341 (1952), sustained the use of a military commission in what was then occupied Germany to try the civilian wife of a service member for her husband's murder, in violation of the German Criminal Code. In effect, *Madsen* upheld the constitutionality of "occupation courts" in circumstances in which no civilian jurisdiction was available, *see id.* at 356–60, insinuating (albeit without *any* analysis) that such courts did not offend the jury-trial protections because cases like Madsen's "ar[ose] in the land or naval forces." *See id.* at 359 & n.26.

To be sure, *Madsen* is probably better understood as turning on a distinct aspect of Justice Burton's analysis, *i.e.*, that the U.S. occupation courts were consistent with the laws of war in light of the absence of functioning civil judicial authority, *see, e.g.*, *id.* at 354–55, especially since the Court's construction of the Fifth Amendment was necessarily overtaken by the Court's subsequent—and narrower—approach in *Reid* and *Singleton*. In any event, though, *Madsen* is inapposite here because the tribunals established by the Military Commissions Acts of 2006 and 2009 are not functioning in this case as "occupation courts." As Justice

Stevens summarized in *Hamdan* v. *Rumsfeld* (*Hamdan I*), 548 U.S. 557

(2006),

> Commissions historically have been used in three situations.
> First, they have substituted for civilian courts at times and
> in places where martial law has been declared. . . . Second,
> commissions have been established to try civilians "as part
> of a temporary military government over occupied enemy
> territory or territory regained from an enemy where civilian
> government cannot and does not function." . . . The third
> type of commission, convened as an "incident to the conduct
> of war" when there is a need "to seize and subject to
> disciplinary measures those enemies who in their attempt to
> thwart or impede our military effort have violated the law of
> war," has been described as "utterly different" from the other
> two.

*Id.* at 595–96 (citations and footnotes omitted); *see also id.* at 596–97

("Not only is its jurisdiction limited to offenses cognizable during time of

war, but its role is primarily a factfinding one—to determine, typically

on the battlefield itself, whether the defendant has violated the law of

war.").

There is no question that martial law has not been declared here.

Similarly, the military commission did not exercise jurisdiction in this

case "as part of a temporary military government over occupied enemy

territory or territory regained from an enemy where civilian

government cannot and does not function." *Duncan* v. *Kahanamoku*,

25

327 U.S. 304, 314 (1946). Thus, the exception to the Grand Jury

Indictment Clause for cases "arising in the land or naval forces" does

not apply.

### c. Petitioner is Not Charged With Offenses Against the International Laws of War

Because this case does not "arise[] in the land or naval forces," the

validity of military jurisdiction turns on whether Congress has the

Article I power to define the offenses of which Petitioner was convicted

and whether an *a*textual exception to the jury-trial protections applies.

Although *amicus* will not here rehearse the extensive arguments offered

by Petitioner in his merits brief or by other *amici curiae*, suffice it to say

that there is a serious question whether the charges pursuant to which

Petitioner was convicted are in fact recognized violations of the

international laws of war such that they fall within Congress's power to

"define and punish . . . Offences against the law of nations." U.S. CONST.

art. I, § 8, cl. 10; *cf. Hamdan II*, 696 F.3d at 1249–53.

The government has nevertheless maintained that an offense need

not be so recognized in order for it to fall within the scope of Congress's

power under the Define and Punish Clause, *see, e.g.*, U.S. *Hamdan*

Brief at 56, or its other Article I authorities, *see Hamdan II*, 696 F.3d at

26

1246 n.6 (opinion of Kavanaugh, J.). But whether or not this view is correct (a question on which *amicus* takes no position), it elides the critical distinction to which *amicus* has repeatedly adverted—between Congress's power to define the underlying offense and the existence of an exception to the jury-trial provisions justifying the assertion of military, rather than civilian, jurisdiction. Even if Congress has the abstract power to decide for *itself* that particular conduct constitutes a violation of the law of nations for purposes of imposing *civilian* criminal or civil liability, *see, e.g.*, Beth Stephens, *Federalism and Foreign Affairs: Congress's Power To "Define and Punish . . . Offenses Against the Law of Nations,"* 42 WM. & MARY L. REV. 447 (2000), the exception to the jury-trial protections identified by the Supreme Court in *Quirin* extends only to offenses committed by enemy belligerents against the *international* laws of war, *see, e.g.*, *Quirin*, 317 U.S. at 41; *see also* Vladeck, *supra*, at 338 ("Congress may have some leeway to subject less well established offenses . . . to prosecution in the civilian criminal courts, but fundamental principles of American constitutional law . . . compel the conclusion that any exception justifying trial in a military court be founded on the clearest of precedent.").

That is to say, regardless of whether Congress is entitled to interpretive latitude in defining war crimes under the Define and Punish Clause or its other enumerated powers, such deference does not extend to a determination that the offenses in question are fit for *military* adjudication. After all, "The caution that must be exercised in the incremental development of common-law crimes by the judiciary is . . . all the more critical when reviewing developments that stem from military action." *Hamdan I*, 548 U.S. at 602 n.34 (plurality); *see also Toth*, 350 U.S. at 23 n.22 ("Determining the scope of the constitutional power of Congress to authorize trial by court-martial presents another instance calling for limitation to 'the least possible power adequate to the end proposed.'" (quoting *Anderson* v. *Dunn*, 19 U.S. (6 Wheat.) 204, 231 (1821))).

Thus, even assuming *arguendo* that Congress has the constitutional power to define the offenses here at issue, *cf.* 18 U.S.C. § 2339B (imposing civilian criminal liability for the provision of material support to designated foreign terrorist organizations), the government's concession that such offenses are *not* recognized by the international laws of war should be dispositive of its ability to subject

28

them to trial by military commission, at least based on the jury-trial

exception recognized in *Quirin*. *See* Vladeck, *supra*, at 337–41.

### d. No Jury-Trial Exception Exists for Violations of the "Domestic Common Law of War"

Perhaps in light of this understanding, the government has rested

its argument instead on the claim that Congress's power to define the

offenses in question derives from the "U.S. common law of war," *i.e.*,

"U.S. common law traditionally applied in wartime." U.S. *Hamdan* Brief

at 22. Thus, the government has argued, in the MCA, "Congress has

codified the longstanding historical practice of the Executive

Branch . . . of trying by military commission individuals who join with,

and provide aid and assistance to, unprivileged belligerents in the

context of an armed conflict against the United States." *Id.* at 27.

The problems with this argument are three-fold: *First*, and most

significantly, the Supreme Court has never recognized a separate and

distinct exception to the jury-trial provisions of Article III and the Fifth

and Sixth Amendments for such offenses. Thus, even if the

government's Article I argument is therefore on stronger footing, it

comes at the expense of the jury-trial exception recognized in *Quirin*,

which was necessarily (and logically) limited to offenses against the

*international* laws of war.

*Second*, the examples on which the government relies in support

of its claim all pre-date the jurisprudence discussed in Part I, *supra*.

Indeed, the government cannot point to a single post-*Milligan* case (let

alone a post-*Quirin* precedent) in which the federal courts approved the

use of military commissions to try offenses against the "U.S. common

law of war." Even in *Madsen*, the Supreme Court held the jury-trial

protections inapplicable to occupation courts not because the authority

to convene such tribunals derived from common law (even though,

based on the Civil War-era precedents surveyed by the government in

its brief in *Hamdan*, it arguably did), but because of its cryptic

conclusion that cases before such courts "ar[ose] in the land or naval

forces." *See Madsen*, 343 U.S. at 359 & n.26.

*Third*, and finally, as even a cursory review of the Civil War

examples marshaled by the government in its *Hamdan* brief reveals,

the evidence of such a common-law practice is itself equivocal. For

example, General Halleck's General Order No. 1, as the government's

brief notes, authorized commissions only for offenses "not triable by

courts-martial and not within the jurisdiction of any existing civilian court." *See* U.S. *Hamdan* Brief at 31. In other words, whether these tribunals were trying law-of-war offenses or ordinary municipal crimes was immaterial to their jurisdiction, since they functioned as *both* law-of-war and occupation courts. *See Hamdan I*, 548 U.S. at 608 (plurality opinion) ("[T]he military commissions convened during the Civil War functioned at once as martial law or military government tribunals and as law-of-war commissions. Accordingly, they regularly tried war crimes and ordinary crimes together." (citation omitted)).

And in any event, the Union Army's prosecutions of guerrillas in military commissions, which, as the government concedes, turned on an allegation that the defendant acted *independently* of the enemy, *see* U.S. *Hamdan* Br. at 35–36, were necessarily undermined by *Milligan*— at least in those cases in which civilian criminal jurisdiction was available. *See* 71 U.S. (4 Wall.) at 127.

In short, the Civil War examples relied upon by the government all appear to have involved assertions of military jurisdiction that were either (1) as *de facto* occupation courts; or (2) overtaken by subsequent events, *e.g.*, *Milligan*. As Justice Stevens explained in *Hamdan I*, "The

Civil War precedents must therefore be considered with caution; as we recognized in *Quirin*, . . . commissions convened during time of war but under neither martial law nor military government may try only offenses against the law of war." 548 U.S. at 596 n.27 (plurality opinion) (citation omitted). Thus, even if the government's examples unequivocally supported military jurisdiction, such jurisdiction must be reconciled with subsequent case law, including *Milligan*, *Quirin*, *Toth*, *Reid*, and *Singleton*.

*   *   *

The government's brief in *Hamdan* argued that "Because Congress acted within its constitutional authority in codifying the offense of providing material support to terrorism, and because similar offenses committed in the context of armed conflict have traditionally been tried by military tribunals, the offense is properly triable by military commission." U.S. *Hamdan* Brief at 46. For the reasons articulated above, the former contention is necessary but insufficient, and the latter is inapposite. Unless this Court recognizes a new and unprecedented exception to the jury-trial protections of Article III and the Fifth and Sixth Amendments, military commissions may only exercise jurisdiction over cases "arising in the land or naval forces" or

32

offenses committed by enemy belligerents against the international laws of war. As Petitioner, other *amici curiae*, and we have separately explained, neither scenario is presented here.

<u>C</u>ONCLUSION

For the foregoing reasons, *amicus* respectfully submits that the decision below be reversed, and the Petitioner's conviction vacated for lack of jurisdiction.

<u>Dated</u>: **June 10, 2013**

/s/ Agnieszka Fryszman
AGNIESZKA FRYSZMAN
COHEN, MILSTEIN, SELLERS
& TOLL, P.L.L.C.
1100 New York Avenue, N.W.
West Tower—Suite 500
Washington, DC 20005
(202) 408-4600
afryszman@cohenmilstein.com

STEPHEN I. VLADECK
4801 Massachusetts Avenue, N.W.
Room 386
Washington, DC 20016
(202) 274-4241
svladeck@wcl.american.edu

*Counsel for* Amicus Curiae

## C<small>ERTIFICATE OF</small> C<small>OMPLIANCE</small> W<small>ITH</small> R<small>ULE</small> 32(<small>A</small>)

Pursuant to Rule 32(a) of the Federal Rules of Appellate

Procedure, the undersigned counsel of record certifies as follows:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    a. This brief contains **6942** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    a. This brief has been prepared in a proportionally spaced typeface using *Microsoft Word 2010* in *Century Schoolbook*, 14-point font.

<u>Dated</u>: **June 10, 2013**                    /s/ Agnieszka Fryszman
                                        *Counsel for* Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2013, a copy of the foregoing was filed electronically with the Court. Notice of this filing will be sent to all parties by operation of this Court's electronic filing system. Parties may access this filing through the Court's system.

Dated: **June 10, 2013**                    /s/ Agnieszka Fryszman
                                            *Counsel for* Amicus Curiae