Oral Argument scheduled for September 30, 2013

No. 11-1324

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

ALI HAMZA SULIMAN AHMAD AL BAHLUL,

*Petitioner*,

v.

UNITED STATES,

*Respondent*.

Appeal From the Court of Military Commission Review (CMCR-09-001)

BRIEF *AMICUS CURIAE* OF
CONSTITUTIONAL ACCOUNTABILITY CENTER

Elizabeth B. Wydra
Douglas T. Kendall
Brianne J. Gorod
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, N.W.
Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org

*Counsel for Amicus Curiae*

## STATEMENT REGARDING CONSENT TO FILE
## AND SEPARATE BRIEFING

Pursuant to D.C. Circuit Rule 29(b), undersigned counsel for *amicus curiae* Constitutional Accountability Center ("CAC") represents that all parties have consented to the filing of this brief.[1]

Pursuant to D.C. Circuit Rule 29(d), undersigned counsel for *amicus curiae* certifies that a separate brief is necessary.  CAC is a think tank, public interest law firm, and action center dedicated to fulfilling the progressive promise of our Constitution's text and history.  CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to preserve the rights and freedoms it guarantees.  Thus, CAC is particularly well-suited to discuss the constitutional issue of the application of the Ex Post Facto Clause to the detainees at Guantanamo and to provide the Court with background on the historical importance of that Clause at the Framing.

---

[1] Pursuant to Fed. R. App. P. 29(c), *amicus curiae* states that no counsel for a party authored this brief in whole or in part, and no person other than *amicus curiae* or its counsel made a monetary contribution to its preparation or submission.

i

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* states that no party to this brief is a publicly-held corporation, issues stock, or has a parent corporation.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

I.   PARTIES AND AMICI

Except for Constitutional Accountability Center and any other *amici* who have not yet entered an appearance in the *en banc* proceeding, all parties, intervenors, and *amici* appearing before the Court of Military Commission Review and in this Court are listed in the Brief for Petitioner.

II.  RULINGS UNDER REVIEW

References to the rulings at issue appear in the Brief for Petitioner.

III. RELATED CASES

So far as counsel are aware, this case has not previously been filed with this Court or any other court, and counsel are aware of no other cases that meet this Court's definition of related. The issues briefed herein do, however, relate to this Court's decision in *Hamdan v. United States*, 696 F.3d 1238 (D.C. Cir. 2012).

Dated:  June 10, 2013

By: /s/ Elizabeth Wydra

*Counsel for Constitutional Accountability Center*

iii

## TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE* ............................................................ 1

SUMMARY OF ARGUMENT ................................................................ 1

ARGUMENT ........................................................................... 4

The Constitution's Fundamental Prohibition on Ex Post
Facto Laws Applies in Cases Involving the Guantanamo
Detainees ............................................................................ 4

A. The Ex Post Facto Clause Is a Central Prohibition
in the Constitution That Safeguards Both Separation of
Powers and Individual Liberties ................................................. 5

B. "Practical Considerations" Also Support the
Application of Ex Post Facto Principles to the
Detainees at Guantanamo ......................................................... 11

CONCLUSION ......................................................................... 13

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Boumediene v. Bush*,
    553 U.S. 723 (2008) ....................................................................passim

*Calder v. Bull*,
    3 U.S. 386 (1798) ...................................................................7

*Kaiser Aluminum & Chem. Corp. v. Bonjorno*,
    494 U.S. 827 (1990) ...............................................................8

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ...............................................................7

*Peugh v. United States*,
    569 U.S. ___ (2013) .......................................................6, 10

*Weaver v. Graham*,
    450 U.S. 24 (1981) .........................................................9, 10

Constitutional Provisions and Legislative Materials

*U.S. CONST. art. I, § 9 ...........................................................2, 5

U.S. CONST. art. I, § 10 .........................................................2, 6

Books, Articles, and Other Authorities

*Akhil Reed Amar, *The Bill of Rights as a Constitution*,
    100 YALE L.J. 1131 (1991) ..................................................6, 9

*Akhil Reed Amar, *Foreword: The Document and The Doctrine*,
    114 HARVARD L. REV. 26 (2000) ..............................................6, 7, 9, 10

---

[*] Sources marked with an asterisk are ones on which the brief principally relies.

## TABLE OF AUTHORITIES (con.)

**Page(s)**

WILLIAM BLACKSTONE, COMMENTARIES ON THE LAW OF ENGLAND
(1768) ......................................................................................8

William Winslow Crosskey, *The True Meaning of the Constitutional
Prohibition of Ex-Post-Facto Laws*, 14 U. CHI. L. REV. 539 (1947) ......6

MAX FARRAND, THE RECORDS OF THE FEDERAL CONVENTIONS OF 1787
(1937) ......................................................................................8

\*THE FEDERALIST NO. 84 (Alexander Hamilton) ....................................2, 8

\*THE FEDERALIST NO. 44 (James Madison) ...........................................2, 8

\*Wayne A. Logan, *The Ex Post Facto Clause and the Jurisprudence of
Punishment*, 35 AM. CRIM. L. REV. 1261 (1998).....................7, 8, 9, 10

Trevor W. Morrison, *Fair Warning and the Retroactive Judicial Expansion
of Federal Criminal Statutes*, 74 S. CAL. L. REV. 455 (2001) ...............7

Robert G. Natelson, *Statutory Retroactivity: The Founders' View*, 39
IDAHO L. REV. 489 (2002) ...................................................................7

## INTEREST OF *AMICUS CURIAE*

Constitutional Accountability Center (CAC) is a think tank, public interest law firm, and action center dedicated to fulfilling the progressive promise of our Constitution's text and history. CAC works in our courts, through our government, and with legal scholars to improve understanding of the Constitution and to preserve the rights and freedoms it guarantees.

CAC has a strong interest in ensuring that the Constitution applies as robustly as its text and history require. Accordingly, CAC has an interest in ensuring that the Ex Post Facto Clause applies to detainees at Guantanamo.

## SUMMARY OF ARGUMENT

In its Order granting rehearing en banc, this Court asked the parties to brief, in addition to issues already raised, the question whether, "[f]or purposes of considering whether the Military Commissions Act of 2006 may permissibly proscribe pre-2006 conduct that was not a war crime triable by military commission under 10 U.S.C. § 821 before 2006," "the Ex Post Facto Clause appl[ies] in cases involving detainees at Guantanamo." *Amicus* takes no position on whether the Military Commissions Act does, in fact, proscribe conduct that was not a war crime triable by military commission before 2006, but instead focuses exclusively on this Court's question about the extraterritorial application of the Ex Post Facto Clause,

1

a question of fundamental importance to the proper application of our Nation's en-during charter.

As James Madison explained at the birth of the Nation, "ex post facto laws . . . are contrary to the first principles of the social compact, and to every principle of sound legislation."  The Federalist No. 44 (James Madison).  Having drafted the Constitution to include a clause forbidding such retroactive legislation, Alexander Hamilton declared that "the prohibition of *ex-post-facto* laws" was perhaps one of the greatest "securities to liberty and republicanism" in the Constitution because "[t]he creation of crimes after the commission of the fact . . . have been, in all ages, the favorite and most formidable instruments of tyranny."  The Federalist No. 84 (Alexander Hamilton).  This Court has asked whether the Ex Post Facto Clause applies to detainees at Guantanamo:  not only constitutional text and history, but also Supreme Court precedent, counsel that it does.

The Constitution expressly forbids the federal government and the States from passing any ex post facto law.  U.S. Const. art. I, §§ 9, 10.  Considered an essential backstop against tyranny and a bulwark of liberty, the Ex Post Facto Clause serves a structural purpose in our national charter, ensuring that legislatures cannot use retroactive laws to target political opponents or entrench on the authority of the executive and judicial branches, as well as a libertarian purpose, requiring that individuals be given fair notice that certain conduct is criminally punishable.

2

While the Ex Post Facto Clause is unquestionably fundamental to the Con-
stitution—some Framers objected to including the Clause because it proscribed
something so obviously off limits to the government—the question here is whether
this constitutional provision applies outside the territory of the United States.  In
*Boumediene v. Bush*, 553 U.S. 723 (2008), the Supreme Court explained that, to
determine whether a constitutional provision has extraterritorial effect, a court
should look to the "particular circumstances" and "practical necessities" involved
in the case, "and, in particular, whether judicial enforcement of the provision
would be 'impracticable and anomalous.'"  *Id.* at 759; *see id.* at 757-61.  Under the
*Boumediene* test, it is clear that the protections of the Ex Post Facto Clause apply
to detainees at Guantanamo.

This conclusion follows naturally from the Supreme Court's decision in
*Boumediene* because the same "[p]ractical considerations" that compelled the Su-
preme Court to apply the Suspension Clause to the Guantanamo detainees, *see id.*
at 759, 766-71, also require application of the Ex Post Facto Clause to them.  If an-
ything, the case for application of the Ex Post Facto Clause is even stronger be-
cause its application does not entail the costs that the *Boumediene* Court notes
would be associated with offering habeas proceedings.  *See id.* at 769.  *Amicus*
urges the Court to hold that the Ex Post Facto Clause is applicable to Petitioner and
other individuals detained at Guantanamo.

3

**ARGUMENT**

**THE CONSTITUTION'S FUNDAMENTAL PROHIBITION ON EX POST FACTO LAWS APPLIES IN CASES INVOLVING THE GUANTANAMO DETAINEES**

In *Boumediene*, the Supreme Court recognized that the Constitution's protections do not "necessarily stop[] where *de jure* sovereignty ends." *Id.* at 755. Rather, "when the United States acts outside its borders, its powers are not 'absolute and unlimited' but are subject 'to such restrictions as are expressed in the Constitution.'" *Id.* at 765. Although there may be some limits to the Constitution's extraterritorial reach, formal sovereignty is not the sole basis on which constitutional protections are turned on or off—it would be too easy for the political branches to elude such a formalistic restriction and "govern without legal constraint" by "surrendering formal sovereignty over any unincorporated territory to a third party, while at the same time entering into a lease that grants total control over the territory back to the United States." *Id.* As the Court explained, "[o]ur basic charter cannot be contracted away like this." *Id.* at 765; *see id.* ("The Constitution grants Congress and the President the power to acquire, dispose of, and govern territory, not the power to decide when and where its terms apply."). Instead, the Court looked to the "particular circumstances" and "practical necessities" involved in the constitutional claim, "and, in particular, whether judicial enforcement of the provision would be 'impracticable and anomalous.'" *Id.* at 759; *see id.* at 757-61.

4

After considering the historic importance of the Suspension Clause and other factors specific to Guantanamo and those detained there, the Supreme Court concluded in *Boumediene* that the protections of the Suspension Clause apply to the detainees at Guantanamo. *Id.* at 771. This Court should do the same with respect to the Ex Post Facto Clause.

Like the Suspension Clause's protection of the writ of habeas corpus, the Constitution's prohibition on ex post facto laws was of paramount importance to the Framers. Viewed as both a structural safeguard and a protector of individual liberties, the prohibition on ex post facto laws applied to both the federal and state legislatures, reflecting the Framers' view that ex post facto laws were completely impermissible. The centrality of the prohibition to the Framers' view of the constitutional structure makes clear that ex post facto laws become no more permissible simply because they are applied to individuals outside the formal borders of the United States, rather than inside. *Cf. id.* at 739 ("In the system conceived by the Framers the writ had a centrality that must inform proper interpretation of the Suspension Clause.").

## A. The Ex Post Facto Clause Is a Central Prohibition in the Constitution That Safeguards Both Separation of Powers and Individual Liberties.

Article I of the U.S. Constitution, which sets forth limits on the powers of Congress, provides that "[n]o . . . ex post facto Law shall be passed." U.S. Const.

art. I, § 9, cl. 3. The very next section applies the same prohibition to the States:

"No State shall . . . pass any . . . ex post facto Law." *Id.* § 10, cl. 1. Thus, the con-

stitutional text prohibits the mere *passage* of an ex post facto law, regardless of to

whom and where that law will be applied. And unlike many prohibitions in the

Constitution, the prohibition on ex post facto laws was written by the Framers to

limit both the federal and state governments, making such laws completely forbid-

den in the new Nation. *See Peugh v. United States*, 569 U.S. ___ (2013), Slip op.

at 7 (noting that "[t]he Constitution prohibits both federal and state governments

from enacting any '*ex post facto* Law'"); *see also* Akhil Reed Amar, *The Bill of*

*Rights as a Constitution*, 100 Yale L.J. 1131, 1205 (1991) (prohibition on ex post

facto laws was one of "only three things that neither federal nor state government

could do"); Akhil Reed Amar, *Foreword: The Document and the Doctrine*, 114

Harv. L. Rev. 26, 97 (2000) ("Only two other sets of prohibitions in the entire orig-

inal Constitution are given similar status," thus suggesting that the prohibition on

ex post facto laws is a "basic principle—one that the People from the beginning

have believed should command near universal assent in a free republic."); William

Winslow Crosskey, *The True Meaning of the Constitutional Prohibition of Ex-*

*Post-Facto Laws*, 14 U. Chi. L. Rev. 539, 539 (1947) ("It is thus evident that 'ex

post facto Laws' . . . were thoroughly disapproved . . . and were intended by [the

Framers] to be completely impossible under our system.").

The Framers' paramount concern about retroactive legislation was a response to the "excesses of Parliament," as well as "colonial governments."  Wayne A. Logan, *The Ex Post Facto Clause and the Jurisprudence of Punishment*, 35 Am. Crim. L. Rev. 1261, 1275 (1998).  As the Supreme Court explained in 1798, "[t]he prohibition against their making any ex post facto laws was introduced for greater caution, and very probably arose from the knowledge, that the Parliament of Great Britain claimed and exercised a power to pass such laws."  *Calder v. Bull*, 3 U.S. 386, 389 (1798).  This concern manifested in other aspects of the Constitution, as well.  *See* Amar, *Foreword*, *supra*, at 97 ("The Ex Post Facto Clauses stand back to back with the Bill of Attainder Clauses, which reflect a similar cluster of concerns."); Robert G. Natelson, *Statutory Retroactivity: The Founders' View*, 39 Idaho L. Rev. 489, 492 (2002) (noting that "[a] strong policy against retroactive lawmaking runs throughout other parts of the Constitution" and "[t]hat this policy pervades so much of the Constitution suggests it was strongly felt, and central to the constitutional bargain").

Indeed, the principle that "law should not criminalize conduct that was lawful when committed has a pedigree long predating the Constitution."  Trevor W. Morrison, *Fair Warning and the Retroactive Judicial Expansion of Federal Criminal Statutes*, 74 S. Cal. L. Rev. 455, 462 (2001); *see, e.g.*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994) (this "presumption against retroactive legislation

7

is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic"); *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990) (Scalia, J., concurring) (the "principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal"); 1 William Blackstone, Commentaries *46 (noting that ex post facto laws are "cruel and unjust").

As the Framers themselves explained, "ex post facto laws . . . are contrary to the first principles of the social compact, and to every principle of sound legislation."  Federalist No. 44; *see* Federalist No. 84 (noting that "the prohibition of ex-post-facto laws" was perhaps one of the greatest "securities to liberty and republicanism" in the Constitution because "[t]he creation of crimes after the commission of the fact . . . have been, in all ages, the favorite and most formidable instruments of tyranny"); *see generally* Logan, *supra*, at 1275 ("Pronouncements attending the adoption of the Constitution make clear the Framers' near obsessive concern over the threat of retroactively-designed laws.").[2]

---

[2] Some Framers argued that there was no need to include the prohibition because such laws were so clearly void.  *See* 2 Farrand, The Records of the Federal Convention of 1787, at 376 (1937) (Oliver Ellsworth explaining that "[t]here was no lawyer, no civilian who would not say that [such] laws were void of themselves"); *id.* ("Mr. Wilson was against inserting anything in the Constitution as to ex post facto laws.  It will bring reflexions on the Constitution – and proclaim that we are ignorant of the first principles of Legislation, or are constituting a Government which will be so."); *id.* at 378-79 ("G. Morris Willson Dr. Johnson etc thought the first an unnecessary guard as the principles of justice law et[c] were a

The prohibition on ex post facto laws was designed to serve at least two significant purposes.  First, as the Supreme Court has recognized, "[t]he *ex post facto* prohibition . . . upholds the separation of powers by confining the legislature to penal decisions with prospective effect and the judiciary and executive to applications of existing penal law."  *Weaver v. Graham*, 450 U.S. 24, 29 n.10 (1981); *see* Amar, *Bill of Rights*, *supra*, at 1205 (noting that the ex post facto prohibitions "obviously have structural overtones sounding in separation of powers").  More specifically, the Ex Post Facto Clause ensures that legislatures do not target political opponents or invade the province of the other branches.  *See* Amar, *Foreword*, *supra*, at 97 (noting that without the ex post facto prohibition "the legislature could target known political opponents (who cannot change their past actions)" and "invade the province of the judicial branch (by acting to punish known persons for what they have already done"); Logan, *supra*, at 1267 ("the [Ex Post Facto] Clause has guarded against the 'hydraulic pressures' that periodically beset our majoritarian political processes and compel lawmakers to impose retroactive punishments on maligned individuals and groups 'of the moment'"); *Weaver*, 450 U.S. at 29 ("[t]he ban also restricts governmental power by restraining arbitrary and potentially vindictive legislation").

---

perpetual bar to such – To say that the legis. shall not pass an ex post facto law is the same as to declare they shall not do a thing contrary to common sense – that they shall not cause that to be a crime which is no crime").

Second, the prohibition protects individual liberties by ensuring that individuals are given fair notice of what conduct is proscribed. *See Peugh*, Slip op. at 13 (plurality) (noting that "basic principles of fairness . . . animate the *Ex Post Facto* Clause" because "[t]he Clause ensures that individuals have fair warning of applicable laws," "guards against vindictive legislative action," and "safeguards 'a fundamental fairness interest . . . in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life'"); *Weaver*, 450 U.S. at 28-29 ("the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed"); *see also* Amar, *Foreword*, *supra*, at 97 (one purpose of the prohibition was to ensure that legislatures could not "deprive citizens of fair notice of the basic norms of conduct they must observe"); Logan, *supra*, at 1276 (noting that the purpose of the Clause was to give people "notice of the wrongfulness of behavior").

Thus, the Ex Post Facto Clause—no less than the Suspension Clause—was of fundamental importance to the Framers, both as a tool for safeguarding the critical separation of powers between the branches and for protecting individual liberties. Indeed, the prohibition on ex post facto laws was, in the Framers' view, so fundamental that no legislature should ever be able to enact such laws. In light of that history, it is clear that the Framers meant what they said—Congress shall not

10

"pass" an ex post facto law, even one that would only be applied outside the Nation's borders.

### B. "Practical Considerations" Also Support the Application of Ex Post Facto Principles to the Detainees at Guantanamo.

In *Boumediene*, after surveying the history of the writ of habeas corpus and the Court's case law on the extraterritorial application of the Constitution, the Supreme Court held that "[p]ractical considerations" govern whether any particular provision of the Constitution applies extraterritorially. *Id.* at 757-61; *see id.* at 759 ("[Justice Black] read the Insular Cases to teach that whether a constitutional provision has extraterritorial effect depends upon the 'particular circumstances, the practical necessities, and the possible alternatives which Congress had before it' and, in particular, whether judicial enforcement of the provision would be 'impracticable and anomalous'").

In considering the Suspension Clause specifically, the Court held that "at least three factors are relevant in determining" its reach: "(1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ." *Id.* at 766. Applying those factors, the Court first noted that the detainees denied that they are enemy combatants and that the procedures used to make the status determination "fall well short of the procedures and

11

adversarial mechanisms that would eliminate the need for habeas corpus review." *Id.* at 767. Applying the second factor, the Court held that "Guantanamo Bay . . . is no transient possession. In every practical sense Guantanamo is not abroad; it is within the constant jurisdiction of the United States." *Id.* at 768-69. Finally, the Court noted that while "there are costs to holding the Suspension Clause applicable in a case of military detention abroad," those concerns were not "dispositive." *Id.* at 769. Further, "in light of the plenary control the United States asserts over [the base at Guantanamo]," the Court saw "no credible arguments that the military mission at Guantanamo would be compromised if habeas corpus courts had jurisdiction to hear the detainees' claims." *Id.*

If the Suspension Clause has "full effect at Guantanamo Bay," *id.* at 771, it follows *a fortiori* that the Ex Post Facto Clause should as well. The same practical considerations the Court deemed relevant in *Boumediene* weigh even more heavily in favor of the Constitution's applicability here than they did in *Boumediene*. The only factor that is meaningfully different is the third. As the Court noted in *Boumediene*, "[h]abeas corpus proceedings may require expenditure of funds by the Government and may divert the attention of military personnel from other pressing tasks." *Id.* at 769. None of those costs will follow from applying the Ex Post Facto Clause at Guantanamo. Rather, if this Court holds that the Ex Post Facto Clause applies, all that means is that the Government will have to charge the de-

12

tainees with offenses that were criminal at the time they acted.  Our Founders

would not have thought that any legislature had the power to do otherwise.  *See*

*supra* at 7-8 & n.2.  Prohibiting retroactive prosecutions in a democratic republic

is, as the Framers believed, as basic as common sense.

## CONCLUSION

For the foregoing reasons, *amicus* respectfully requests that the Court hold

that the Ex Post Facto Clause applies to Petitioner and other individuals detained at

Guantanamo.

Respectfully submitted,

/s/ Elizabeth B. Wydra
Elizabeth B. Wydra
Douglas T. Kendall
Brianne J. Gorod
CONSTITUTIONAL ACCOUNTABILITY CENTER
1200 18th Street, N.W.
Suite 501
Washington, D.C. 20036
(202) 296-6889
elizabeth@theusconstitution.org
*Counsel for Amicus Curiae*

Dated: June 10, 2013

13

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 3,080 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I further certify that the attached *amicus* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 14-point Times New Roman font.

Executed this 10th day of June, 2013.

/s/ Elizabeth B. Wydra
Elizabeth B. Wydra

*Counsel for Constitutional Accountability Center*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on June 10, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 10th day of June, 2013.

/s/ Elizabeth B. Wydra
Elizabeth B. Wydra

*Counsel for Constitutional Accountability Center*