**[Oral Argument Scheduled September 30, 2013]**
**No. 11-1324**

_____

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA**

_____

Ali Hamza Suliman Ahmad Al Bahlul,
Petitioner,
v.
United States of America
Respondent.

_____

ON APPEAL FROM THE COURT OF MILITARY COMMISSION REVIEW
(CASE NO. CMCR-09-0002)

_____

BRIEF OF *AMICI CURIAE*
PROFESSORS DAVID GLAZIER AND GARY SOLIS
IN SUPPORT OF PETITIONER AND REVERSAL

> John S. Summers
> Michael J. Newman
> HANGLEY ARONCHICK SEGAL
> PUDLIN & SCHILLER
> One Logan Square, 27th Fl.
> Philadelphia, PA  19103
> (215) 568-6200
> Attorneys for *Amici Curiae*
> David Glazier and Gary Solis

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

I.        INTERESTS OF THE AMICI CURIAE ............................................. 1

II.       SUMMARY OF ARGUMENT .......................................................... 3

III.      ARGUMENT ...................................................................................... 4

   A.     THE JURISDICTION OF MILITARY COMMISSIONS
          TURNS ON AN ANALYSIS OF INTERNATIONAL LAW ............ 4

      1.  Current Military Commission Jurisdiction Is Drawn From The
          Law Of War ................................................................................... 5

      2.  The Law of War Is a Subset of International Law ......................... 7

      3.  The Acceptance of a Domestic Law of War Would Set a
          Precedent That Endangers U.S. Military Personnel ...................... 8

   B.     THE LAW OF WAR HAS EVOLVED SUBSTANTIALLY
          OVER THE LAST 150 YEARS, REQUIRING CAREFUL
          TREATMENT OF HISTORICAL MATERIALS ............................ 10

      1.  The Codification of the Law of War Has Evolved Since the
          Mid-Nineteenth Century ............................................................. 10

      2.  Historical U.S. "Precedents" for Violations of The Law of War
          Must Be Approached With Caution .............................................. 14

   C.     THE HISTORICAL RECORD DOES NOT SUPPORT THE
          PROPOSITION THAT CONSPIRACY IS A VIOLATION OF
          THE LAW OF WAR ...................................................................... 17

      1.  The Government Has Not Successfully Rebutted Many of
          Justice Stevens' Arguments From *Hamdan I* ........................... 19

      2.  Most Historical Examples Of Conspiracy Charges Come From
          Hybrid Military Commissions ...................................................... 21

      3.  Conspiracy Trials Involving Completed Acts Are Not
          Analogous to Inchoate Conspiracies ........................................... 25

IV.       CONCLUSION ................................................................................. 28

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Application of Yamashita*,
  327 U.S. 1, 66 S. Ct. 340, 90 L. Ed. 499 (1946)....................................6

*Ex parte Quirin*,
  317 U.S. 1, 63 S. Ct. 2, 87 L. Ed. 3 (1942)............................7, 19 , 28

*Hamdan v. Rumsfeld*,
  548 U.S. 557 (2006)......................................................................*passim*

*Hamdan v. United States*,
  696 F.3d 1238 (D.C. Cir. 2012)............................................6, 7, 14, 19

*Iannelli v. U. S.*,
  420 U.S. 770, 95 S. Ct. 1284, 43 L. Ed. 2d 616 (1975) .....................18

*In re Murphy*,
  17 F.Cas. 1030 (M.D. Tn. 1874)........................................................25

*The Paquete Habana*,
  175 U.S. 677 (1900).............................................................................3

**CONSTITUTION, STATUTES & RULES**

10 U.S.C. § 821 ...............................................................................5, 6

10 U.S.C. § 950t (2006) ......................................................................5

10 U.S.C. § 950p(d) (2009) ................................................................6

10 U.S.C. § 950v(b)(28) (2006).........................................................17

U.S. Const. art. I, § 8, cl. 10..........................................................3, 6

**TREATIES**

Geneva Convention Relative to the Protection of War Victims Civilian
  Persons, 6.U.S.T. 3516, 75 U.N.T.S. 287 ("Geneva IV"), art. 146-47 .............13

Rome Statute of the International Criminal Court,
July 17, 1998, 2187 U.N.T.S. 90 ...................................................................13

**OTHER AUTHORITIES**

Charges and Specifications Against Robert Louden,
Court Martial case file NN 1074, Box 1627, Record Group 153,
National Archives, Washington D.C. ..............................................................22

Col. William Winthrop, *Military Law and Precedents* (2nd ed. 1920) ........16, 17, 23

David Glazier, *Full and Fair by What Measure?: Identifying the
International Law Regulating Military Commission Procedure*,
24 B.U. Int'l L.J. 55 (2006) ...................................................................1

David Glazier, *Ignorance is Not Bliss: The Law of Belligerent Occupation
and the U.S. Invasion of Iraq,* 58 Rutgers L. Rev. 121 (2005).....................11, 12

David Glazier, *Kangaroo Court or Competent Tribunal? Judging the 21st
Century Military Commission*, 89 Va. L. R. 8 (2003) .........................................2

David Glazier, "*Missing in Action? United States Leadership in the Law of
War,*" 30 U. Pa. J. Int'l Econ. L. 1335 (2009) ....................................................11

David Glazier, *The Misuse of History: Conspiracy and the Guantánamo
Military Commissions*, Loyola Legal Studies Paper No. 2013-27,
(June 9, 2013, 7:43 PM), http://ssrn.com/abstract=2274502......................*passim*

David Glazier, *Playing by the Rules: Combating al Qaeda within the Law of
War*, 51 Wm. & Mary L. Rev. 957 (2009) ...........................................................1

David Glazier, *Precedents Lost: The Neglected History of the Military
Commission*, 46 Va. J. Int'l L. 5 (2005) ...............................................................1

David Glazier, *Still A Bad Idea: Military Commissions Under the Obama
Administration* (Loyola Law School, Legal Studies Paper No. 2010-32)............1

Gary Solis, *The Law of Armed Conflict* (2010) ....................................................2, 17

Gary Solis, *Review of Lincoln's Code: The Laws of War in American
History*, The American Journal of International Law, Vol. 107, No. 1
(January 2013) ........................................................................................11, 12, 15

Gary Solis, *Marines and Military Law in Vietnam* (1989).......................................2

Gary Solis, *Son Thang: An American War Crime* (1997) .........................................2

Haridimos V. Thravalos, *History, Hamdan, and Happenstance:*
    *"Conspiracy by Two or More To Violate the Laws of War by Destroying*
    *Life or Property in Aid of the Enemy,"*
    3 Harv. Nat'l Sec. J. 223 (2012) ...........................................................18, 20, 23

Instructions for the Government of Armies of the United States in the Field
    (Lieber Code), General Orders No. 100, arts. 27 & 40 (Apr. 24, 1863) .............7

Letter from Joseph Holt, Army Judge Advocate General, to the Secretary of
    War, Mar. 21, 1866...................................................................................... 23-24

President Andrew Johnson, General Court-Martial Orders, No. 607, War
    Department, Adjutant-General's Office, Washington, Nov. 6, 1865,
    reprinted in 8 U.S.WAR DEP'T, THE WAR OF THE REBELLION
    (ser. 2) 784, 791 (Washington, Gov't Printing Office 1899) ...........................26

Proceedings of a Military Commission, Convened at Washington D.C. at 18-
    19, available in THE TRIAL (Edward Steers, Jr., ed. (2003)) ...........................26

Robert Cryer *International Criminal Law vs. State Sovereignty: Another
    Round?*, 16 Eur. J. Int'l L. 979 (2005)...............................................................13

Trial of Lieutenant-General Shigeru Sawada and Three Others, United
    Nations War Crimes Commission, 5 Law Reports of Trials of War
    Criminals 1 (1948) .........................................................................................8, 9

Trial of General Tanaka Hisakasu and Five Others, 5 Law Reports of Trials
    of War Criminals 66 (1948).......................................................................... 8-9

Yoram Dinstein, *The Conduct of Hostilities Under the Law of International
    Armed Conflict* (2004) .....................................................................................17

# I.     INTERESTS OF THE AMICI CURIAE[1]

David W. Glazier and Gary D. Solis, who respectfully submit this brief as *amici curiae*, are scholars of military law and the law of war.

Glazier served twenty-one years as a Navy surface warfare officer, culminating with command of the U.S.S. George Philip, a guided missile frigate, before retiring to attend law school.  He is now Professor of Law and Lloyd Tevis Fellow at Loyola Law School, Los Angeles.  Glazier has made the study of military commissions a particular focus of his academic work.  *See*, *e.g.*, David Glazier, *The Misuse of History: Conspiracy and the Guantánamo Military Commissions*, Loyola Legal Studies Paper No. 2013-27, (June 9, 2013, 7:43 PM), http://ssrn.com/abstract=2274502; David Glazier, *Still A Bad Idea: Military Commissions Under the Obama Administration* (Loyola Law School, Legal Studies Paper No. 2010-32); David Glazier, *Playing by the Rules: Combating al Qaeda within the Law of War*, 51 Wm. & Mary L. Rev. 957 (2009); David Glazier, *Full and Fair by What Measure?: Identifying the International Law Regulating Military Commission Procedure*, 24 B.U. Int'l L.J. 55 (2006); David Glazier, *Precedents Lost: The Neglected History of the Military Commission*, 46 Va. J. Int'l

---

[1] Counsel for *amici* represents that they authored this brief and that no person or entity other than *amici* or their counsel made a monetary contribution to the preparation or submission of the brief.  Counsel for *amici* represents that counsel for all parties have consented to the filing of this brief.

L. 5 (2005); David Glazier, *Kangaroo Court or Competent Tribunal? Judging the 21st Century Military Commission*, 89 Va. L. R. 8 (2003).

Solis served two tours of duty in Vietnam as a Marine Corps platoon leader and company commander before attending law school and becoming a judge advocate for the final eighteen years of his distinguished military career. He tried 450 courts-martial as a prosecutor and sat as a military judge for several hundred more. Following his retirement he earned a doctorate in the law of war from the London School of Economics, taught the law of war at the U.S. Military Academy for a decade, and directed West Point's law of war program for six of those years. He has also taught the law of war at the London School of Economics, Georgetown and George Washington University Law Schools, and the International Institute of Humanitarian Law is San Remo, Italy. He has been a scholar in residence at the Library of Congress and is the author of two highly regarded studies of law during the Vietnam conflict: *Marines and Military Law in Vietnam* (1989) and *Son Thang: An American War Crime* (1997). Solis has recently published the most definitive U.S. text on the law of war, *The Law of Armed Conflict* (2010), which is as much an authoritative treatise as a textbook.

With these backgrounds, Glazier and Solis are uniquely placed to provide insight for the historical and legal issues underlying this case. As the Supreme Court has noted, when analyzing customary international law, "resort must be had

- 2 -

to the customs and usages of [c]ivilized nations, and, as evidence of these, to the works of jurists and commentators who by years of labor, research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat." *The Paquete Habana*, 175 U.S. 677, 700 (1900). Glazier's scholarship was cited in the Court of Military Commission Review ("CMCR") opinion that is the subject of this appeal (*see* CMCR 09-001 (September 9, 2011) ("CMCR Op.") at 32),[2] and he therefore has a particular professional interest in this matter. He also submitted an *amicus curiae* brief to this Court in *U.S. v. Hamdan*.

Glazier and Solis urge the Court to review closely the Supreme Court precedents and overall development of the law of war in analyzing the appropriate legal scope of military commissions' jurisdiction and the prosecution of conspiracy in military commissions.

## II. SUMMARY OF ARGUMENT

Military commissions are Article I courts drawing authority from Congress's constitutional power to "define and punish … Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10. Their jurisdiction thus arises from both the Constitution and the "law of nations" (more specifically, the law of war). An

---

[2] The CMCR Op. is included in Petitioner's Appendix.

understanding of relevant international law rules is thus necessary to analyze military commission jurisdiction.

The law of war can only be understood as a product of international law. There is no such thing as a domestic law of war, and judicial acceptance of such a novel theory could have grave consequences for the safety of American armed forces abroad. Further, the law of war has evolved substantially over the last 150 years, highlighting the need for caution when relying on historical "precedents."

Careful assessment of both the historical record and current law demonstrate that the military commission trying Ali Hamza Suliman Ahmad Al Bahlul exceeded its lawful jurisdiction by trying him for the offense of conspiracy.[3] Conspiracy, while plainly a U.S. crime, was not a violation of the law of war at the time of Al Bahlul's conduct. There are no valid historical precedents or any legal support in existing treaties or customary international law to support the argument that conspiracy is a violation of the law of war.

## III.   ARGUMENT

### A.   THE JURISDICTION OF MILITARY COMMISSIONS TURNS ON AN ANALYSIS OF INTERNATIONAL LAW

The Government's novel position that there is a domestic law of war that can be applied to determine the boundaries of military commission jurisdiction is

---

[3] Al Bahlul was also found guilty of solicitation and material support for terrrorism. This brief focuses solely on the conspiracy charge.

- 4 -

erroneous.  While there have long been domestic laws regulating warfare, the law of war is a completely separate body of law.  Rather, the law of war, as historically understood and as applied by numerous courts including the U.S. Supreme Court and this Court, is a product of *international* law.  While U.S. cases have contributed to the development of this body of law, they are not an independent source of the law of war.  Moreover, judicial acceptance of a domestic law of war could have significant, negative consequences for American military personnel.  Any analysis of whether military commissions have authority to try Al Bahlul for conspiracy, therefore, cannot merely look to domestic examples.

     1.     <u>Current Military Commission Jurisdiction Is Drawn From The Law Of War</u>

The authority to try defendants by military commission comes from federal statutes and the Constitution.  In 2006, Congress enacted the Military Commissions Act of 2006, Pub. L. No. 109-366 (2006), replaced three years later by the Military Commissions Act of 2009, Pub. L. No. 111-84, 10 U.S.C.A.N. § 948 (2009) (collectively, "MCA").  The MCA authorized military commissions to try persons accused of committing certain specified offenses, including conspiracy. *See* 10 U.S.C. § 950t (2006).  Prior to the passage of the MCA, the statutory authority for military commissions came from 10 U.S.C. § 821, first enacted in 1916, which both "authorized and limited military commissions to try violations of the 'law of

war.'"  *Hamdan v. United States*, 696 F.3d 1238, 1240 (D.C. Cir. 2012) ("Hamdan II").

The MCA and 10 U.S.C. § 821 draw their authority from the Constitution's grant to Congress of the power to "define and punish … Offences against the Law of Nations," U.S. Const. art. I, § 8, cl. 10.  *See Application of Yamashita*, 327 U.S. 1, 7, 66 S. Ct. 340, 344, 90 L. Ed. 499 (1946) ("Congress, in the exercise of the power conferred upon it by Article I, § 8, Cl. 10 of the Constitution to 'define and punish Offenses against the Law of Nations' of which the law of war is a part, had by the Articles of War recognized the 'military commission' appointed by military command, as it had previously existed in United States Army practice, as an appropriate tribunal for the trial and punishment of offenses against the law of war.").  Congress itself recognized that any newly created offenses in the MCA would be impermissible *ex post facto* enactments with respect to detainees who had already been in U.S. custody for several years.  *See* 10 U.S.C. § 950p(d) (2009) ("[The MCA] does not establish new crimes that did not exist before the date of the enactment of this subchapter . . . but rather codifies those crimes for trial by military commission.").  Accordingly, for defendants like Al Bahlul, the MCA was limited to the same violations of the law of war that earlier would have been tried in a military commission under 10 U.S.C. § 821.

2.     The Law of War Is a Subset of International Law

As this Court has recognized, "The Supreme Court's precedents tell us: The 'law of war' referenced in 10 U.S.C. § 821 is the international law of war." *Hamdan II*, 696 F.3d at 1248. For example, the Supreme Court has held that "law of war" is a "branch of international law." *Ex parte Quirin*, 317 U.S. 1, 29, 63 S. Ct. 2, 11, 87 L. Ed. 3 (1942). *See also* Instructions for the Government of Armies of the United States in the Field (Lieber Code), General Orders No. 100, arts. 27 & 40 (Apr. 24, 1863) (describing the law of war as a "branch" of the "law of nations").

Justice Stevens makes a single reference to the "American common law of war" in *Hamdan v. Rumsfeld*, 548 U.S. 557, 613 (2006) (plurality) ("Hamdan I") That sole reference is the only place that this phrase appears in the entirety of the Supreme Court canon, and it is important to note that his supporting citation is to the page in *Quirin* where the Supreme Court declares that military commissions "within constitutional limitations . . . try persons for offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals." *Quirin*, 317 U.S. 1 at 28. This suggests that the "American common law of war" differs only from the international law in that there may be constitutional restrictions that would bar the U.S. "from applying the full body of the international law; it does not even hint that the United States can

*exceed* international law by defining its own war crimes not recognized by the international community." Glazier, *Misuse of History*, *supra,* at 22. Moreover, Justice Stevens also explained in his analysis that an act is only a violation of the law of war when there is "universal agreement and practice both in this country and internationally." *Hamdan I*, 548 U.S. at 603. Accordingly, Supreme Court precedent does not support the purported existence of a domestic law of war.

      3.      The Acceptance of a Domestic Law of War Would Set a Precedent That Endangers U.S. Military Personnel

Not only is the argument for a domestic law of war unprecedented and meritless, but it poses real dangers to U.S. military personnel abroad. Even if the Court were inclined to accept the Government's position that there is a domestic law of war (which it should not), the consequences of such a ruling should give the Court significant pause.

As an initial matter, the international nature of the law of war protects U.S. military personnel from the inequities of foreign law. For example, in two instances following World War II, the United States prosecuted Japanese military personnel for denying captured Americans a fair trial. *See* Trial of Lieutenant-General Shigeru Sawada and Three Others, United Nations War Crimes Commission, 5 Law Reports of Trials of War Criminals 1 (1948); Trial of General Tanaka Hisakasu and Five Others, 5 Law Reports of Trials of War Criminals 66

(1948). In both cases, the commissions returned convictions despite the fact that the Japanese defendants asserted compliance with a domestic Japanese statute. *See* Trial of Shigeru Sawada at 3; Trial of Tanaka Hisaka at 74 n.1. Thus, an international law of war protects U.S. military personnel from foreign domestic laws.

In contrast, the prosecution by American military commission of crimes purported to be part of a domestic law of war will prove harmful for U.S. soldiers. If the U.S. can apply a domestic law of war, untethered from international standards and practices, then other countries can do the same. Current or future U.S. adversaries could seize upon the logic argued by the Government to assert the right to try captured U.S. soldiers under their own conceptions of what is impermissible in war. Glazier, *Misuse of History*, *supra*, at 53-54.

This risk is particularly significant when one considers two nations with whom the United States could end up in an armed conflict: Iran and China. Iran could plausibly assert the right to go back through some 2,500 years of Persian history and a wide range of Islamic law precedents. *Id*. at 53. Chinese military history is even more daunting; it has historical records dating back four millennia. Either country could almost certainly find examples of having punished conduct not currently proscribed by the international law of war to imprison, or even execute, captured U.S. military personnel. *Id*.

The law of war has developed over the last century and a half as an international body of law evenhandedly providing combatants of all nations a stable and consistent set of rules by which to engage in warfare. Respectfully, for the sake of the many thousands of military personnel deployed overseas, this Court should avoid creating a system that lacks this important consistency.

**B.    THE LAW OF WAR HAS EVOLVED SUBSTANTIALLY OVER THE LAST 150 YEARS, REQUIRING CAREFUL TREATMENT OF HISTORICAL MATERIALS**

International law is not a fixed canon, but rather develops over time, primarily through agreement to treaties such as the Hague and Geneva Conventions and the development of customary international law. Historical "precedents," particularly ones that are from a single nation's history, thus require careful scrutiny before use in addressing questions regarding current law.

1.    The Codification of the Law of War Has Evolved Since the Mid-Nineteenth Century

Although attempts to regulate warfare date back to Sun Zi and other ancient writers, modern law of war codification effectively originated in the mid-nineteenth century. In 1863, President Lincoln approved the "Instructions for the Government of Armies of the United States in the Field," commonly called the "Lieber Code" after their primary author, Professor Francis Lieber, to be issued to Union forces under cover of General Order No. 100 during the Civil War. The

Lieber Code set forth rules to guide the conduct of Union troops. They dealt with issues ranging from the treatment of prisoners of war to the punishment for spying. The Lieber Code is generally recognized as the first modern articulation of conflict norms and profoundly influenced subsequent law of war codification. *See* David Glazier, *Ignorance is Not Bliss: The Law of Belligerent Occupation and the U.S. Invasion of Iraq*, 58 Rutgers L. Rev. 121, 129 (2005); *see also* Gary Solis, *Review of Lincoln's Code: The Laws of War in American History*, The American Journal of International Law, Vol. 107, No. 1 (January 2013) at 280 ("[The Lieber Code] was a landmark achievement as the first instruction on the customs and usage of war of that day intended for soldiers in the field.").[4]

Concurrent developments in Switzerland saw the creation of what became the International Committee of the Red Cross, which was instrumental in coordinating the 1864 conference that produced the initial Geneva Convention.

_____

[4] The Lieber Code, which was created by the United States government to guide the conduct of American troops in the field, is recognized as a forerunner of the international law of war. *See* David Glazier, "*Missing in Action? United States Leadership in the Law of War*," 30 U. Pa. J. Int'l Econ. L. 1335, 1337 (2009) ("The Lieber Code was subsequently adopted in large measure by a number of European armies, and is directly acknowledged as the basis for subsequent law of war codifications, including the Hague Regulations Respecting the Laws and Customs of War on Land which remain valid law to this day."). The Lieber Code therefore shows the important role that the U.S. can play in influencing the creation of the law of war. It should not, however, be taken as evidence that the U.S. can unilaterally make law or that there is a valid domestic law of war. *See* Section III.A, *supra*.

This treaty codified several important humanitarian protections, including mandating equal treatment of incapacitated soldiers regardless of their nationality and giving medical personnel immunity from attack.

Later diplomatic conferences at The Hague in 1899 and 1907 produced a range of agreements, including conventions for the peaceful settlement of disputes and regulations for the conduct of war on land. These treaties created legal standards that both regulated the conduct of warfare and detailed additional protections for non-combatants and those hors de combat. Glazier, *Ignorance Is Not Bliss*, *supra*, at 131-33. Indeed, it has been noted that while many "usages and customs of war" existed through history, the modern "law of war" did not really come into being until the 1907 Hague Convention. Solis, *Review of Lincoln's Code*, *supra*, at 281-82. The Hague accords did not address individual criminal liability, however, speaking only to national responsibility to make reparations for wrongdoing. Modern law dealing with war crimes is thus largely a post-World War II development, highlighting the unreliability of earlier "precedents." Glazier, *Misuse of History*, *supra,* at 2-3; 15-16.

The scope of international humanitarian law was substantially expanded via the four 1949 Geneva Conventions following the Second World War.[5] Each of the

---

[5] Two Additional Geneva Protocols were established in the 1970s and a third in 2005.

four Geneva Conventions includes an article identifying "grave breaches," that is to say, war crimes, which States are called upon to criminalize subject to universal jurisdiction.  *See, e.g.*, Geneva Convention Relative to the Protection of War Victims Civilian Persons, 6.U.S.T. 3516, 75 U.N.T.S. 287 ("Geneva IV"), art. 146-47. These are the first treaties to specifically define any such crimes.

This trend continued during the last decades of the twentieth century as the international community codified a growing set of international crimes and created both tribunals and forums in which to prosecute them.  *See, e.g.*, Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90.  The Rome Statute establishes potential jurisdiction over (i) genocide; (ii) crimes against humanity; (iii) war crimes; and (iv) the crime of aggression.  *Id*.  War crimes include such violations as willful killing and the taking of hostages.  *Id*. at art. 7. This document has been called "the most comprehensive, definitive and authoritative list of war crimes."  Robert Cryer, *International Criminal Law vs. State Sovereignty: Another Round?*, 16 Eur. J. Int'l L. 979, 990 (2005).  Efforts by individual states to define war crimes lacking clear support in the Rome Statute or other international legal documents must therefore be viewed very skeptically. Significantly, the Rome Statute does not include conspiracy.

2.     Historical U.S. "Precedents" for Violations of The Law of War Must Be Approached With Caution

Having no treaties or other international codifications of the law of war to support their theory that conspiracy is an established war crime, the Government must rely on a superficial analysis of a handful of purported precedents from previous American military commissions.  These "precedents" are problematic for two reasons.  First, such examples are insufficient to create customary international law.  Also, the rapid evolution of the law of war renders such "precedents" potentially unreliable.[6]

The Government's U.S.-centric examples fail to establish customary international law.  For a rule or principle to become customary international law, State practice of that rule or principle "must be both *extensive and representative*." 1 Int'l Com. of the Red Cross, Customary International Humanitarian Law, 180 (Jean-Marie Henckaerts & Louise Doswald eds., 2005) (emphasis in original).  A single State's actions are insufficient to fulfill the "extensive" and the "representative" elements necessary to establish entry into customary international law.  *See Hamdan II*, 696 F.3d at 1252 ("To be sure, U.S. precedents may inform the content of international law.  But those Civil War precedents fail to establish

---

[6] Additional weaknesses in specific examples are discussed in Section III.C, *infra*.

- 14 -

material support for terrorism as a war crime under the international law of war as of 1996 to 2001.").

The Government's examples are also problematic because of their age. As Section III.B.1 illustrates, *supra*, the law of war has changed dramatically over time, particularly since codification efforts began in the mid-nineteenth century. The Civil War, which provides many of the Government's purported examples of the prosecution of conspiracy as a law of war offense, was merely the infancy of the modern development of the law of war. As Solis recently noted, "In the midnineteenth century, no actual law of war existed[.]" Solis, *Review of Lincoln's Code* at 281.

Even the jurisdiction of military commissions has changed significantly over time. Although military commissions currently only have jurisdiction over violations of the law of war, they used to have broader jurisdiction. Colonel William Winthrop, called the "Blackstone of military law," has explained that there were four categories of persons subject to military commission jurisdiction:

> (1) Individuals of the enemy's army who have been guilty of illegitimate warfare or other offences in violation of the laws of war; (2) Inhabitants of enemy's country occupied and held by the right of conquest; (3) Inhabitants of places or districts under martial law; (4) Officers and soldiers of our own army, or persons serving with it in the field, who, in time of war, become chargeable with crimes or offences not cognizable, or

- 15 -

> triable, by the criminal courts or under the Articles of
> war.

Col. William Winthrop, *Military Law and Precedents* 838 (2nd ed. 1920).[7]  Often

times, a military commission would be "hybrid" (*i.e.*, have concurrent jurisdiction

under more than one of these categories).  In all but the first of these four

categories, military commissions are applying forms of "domestic" law rather than

the law of war.  In those settings, therefore, conspiracy could be prosecuted under a

commission's domestic law authority in territory under its control. But the

Guantánamo commissions *only* draw authority from the international law of war,

and it must be shown that inchoate conspiracy violates that body of law if it is to be

validly prosecuted there.  Glazier, *Misuse of History*, *supra,* at 4.

The evolution of the treatment of unprivileged belligerents provides a good

example of the need for caution before treating historical examples as relevant to

current law.  Winthrop held in his 19th century treatise that "Irregular armed bodies

or persons not forming part of the organized forces of a belligerent . . . are not in

general recognized as legitimate troops . . . but may upon capture be summarily

---

[7] Winthrop also addressed the categories of crimes that military commissions could try in his treatise, classifying them as:  "(1) Crimes and statutory offences cognizable by State or U.S. courts, and which would properly be tried by such courts if open and acting; (2) Violations of the laws and usages of war cognizable by military tribunals only; (3) Breaches of military orders or regulations for which offenders are not legally triable by court-martial under the Articles of war." *Military Law and Precedents* at 839.

punished even with death."    Military Law and Precedents, 783.    He then

specifically listed individuals who participated in guerilla raids as among those

liable to trial by law of war military commissions. *Id.* at 838. In comparison,

modern law of war experts are in general agreement that unprivileged belligerents

(*i.e.*, those failing to meet the requirements of Hague Convention IV, *supra*, at art.

1) do not commit a war crime by participating in hostilities, but rather lose their

belligerent immunity from domestic law.    Thereafter, they may be prosecuted for

ordinary criminal offenses, by ordinary criminal courts, for *any* act of violence

they commit.    Yoram Dinstein, *The Conduct of Hostilities Under the Law of*

*International Armed Conflict*, 31 (2004); Solis, *The Law of Armed Conflict*, *supra*,

at 206-08.    Accordingly, a simplistic showing of past military commission

prosecutions is insufficient to establish jurisdiction over similar conduct by today's

law of war commissions.

### C.    THE HISTORICAL RECORD DOES NOT SUPPORT THE PROPOSITION THAT CONSPIRACY IS A VIOLATION OF THE LAW OF WAR

Al Bahlul was found guilty of the offense of conspiracy, an offense codified

by the MCA.  *See* 10 U.S.C. § 950v(b)(28) (2006).  The Government has cited to a

number of examples of prior military commission prosecutions of conspiracy to support the argument that conspiracy is a violation of the law of war.[8]

Putting aside the Government's reliance on an erroneous theory of domestic law of war, *see* Section III.A, *supra*, and a suspect category of examples, *see* Section III.B, *supra*, there are several major problems with the Government's conspiracy argument. First, Justice Stevens' plurality opinion identified problematic aspects of the Government's conspiracy argument which it cannot rebut. Second, many of the Government's examples involve hybrid military commissions applying a mix of domestic law and the law of war, in which conspiracy fell under the commissions' jurisdiction as a martial law tribunal rather than a war crimes tribunal. Finally, for the few conspiracies prosecuted by military commissions operating solely as a war crimes tribunal, the misconduct involved completed acts, rendering them unfit as examples of *inchoate* conspiracy as a war crime.[9] Because conspiracy was not a violation of the law of war at the time of his

---

[8] In previous Government briefs, many of these examples are incorporated by reference to Haridimos V. Thravalos, *History, Hamdan, and Happenstance: "Conspiracy by Two or More To Violate the Laws of War by Destroying Life or Property in Aid of the Enemy,"* 3 Harv. Nat'l Sec. J. 223 (2012).

[9] "Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes. Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act." *Iannelli v. U. S.*, 420 U.S. 770, 777, 95 S. Ct. 1284, 1289, 43 L. Ed. 2d 616 (1975).

alleged misconduct, Al Bahlul's conviction cannot stand and must be vacated. *Hamdan II*, 696 F.3d at 1253.

1.     The Government Has Not Successfully Rebutted Many of Justice Stevens' Arguments From *Hamdan I*

In the plurality portion of the *Hamdan I*, Justice Stevens concluded that conspiracy was not a violation of the law of war.[10]  While some of his arguments have been rendered moot by the subsequent enactment of the MCA, other points have yet to be persuasively countered.  First, he addressed the Government's reliance on *Quirin*, which he found unjustified:

> If anything, *Quirin* supports Hamdan's argument that conspiracy is not a violation of the law of war. Not only did the Court pointedly omit any discussion of the conspiracy charge, but its analysis of Charge I placed special emphasis on the completion of an offense; it took seriously the saboteurs' argument that there can be no violation of a law of war—at least not one triable by military commission—without the actual commission of or attempt to commit a "hostile and warlike act."

*Hamdan I*, 548 U.S. at 606-07.

Next, Justice Stevens focused on the scholarship of Colonel Winthrop and military historian Charles Roscoe Howland.  Justice Stevens noted that "the records of cases that Howland cites following his list of offenses . . . provide no

---

[10] Justice Kennedy determined that it was unnecessary for the Court to reach the issue, rendering that section of the *Hamdan I* decision a plurality opinion. *Hamdan I*, 548 U.S. at 655 (J. Kennedy concurring in part).

support for the inclusion of conspiracy as a violation of the law of war" and

"Winthrop . . . excludes conspiracy of any kind from his own list of offenses

against the law of war." *Id*. at 607.[11]  While Justice Stevens acknowledged that

Winthrop did include "criminal conspiracies" as crimes of both first class (*i.e.*, an

ordinary crime that fell under a commission's martial law jurisdiction) and second

class (*i.e.*, a war crime that fell under a commission's law of war jurisdiction), he

explained that "conspiracy 'of the first and second classes combined' is . . . best

understood as a species of compound offense of the type tried by the hybrid

military commissions of the Civil War." *Id*. at 608.

Finally, and crucially, Justice Stevens noted that "international sources

confirm that the crime charged here is not a recognized violation of the law of

war." *Id*. at 610.  As he explained, conspiracy is not included in any international

treaties concerning the law of war, and the small number of conspiracies that have

---

[11]  Haridimos Thravalos subsequently suggested that Justice Stevens'
observations about Howland were incorrect.  *See* Thravalos, *History, Hamdan, and
Happenstance*, *supra*, at 250-252.  Thravalos discovered that Howland did, in fact,
cite to the Civil War-era military commission prosecution of William Murphy for
conspiracy, but Justice Stevens missed the reference because of a filing error in the
original JAG documents.  *Id*.  However, this discovery would not alter Justice
Stevens' conclusions.  As discussed in Section III.C.2, *infra*, the prosecution of
Murphy occurred in a hybrid commission, with the conspiracy charge apparently
falling under the martial law jurisdiction of the commission.  *See* Glazier, *Misuse
of History*, *supra*, at 33-40.

been prosecuted by international criminal tribunals require "actual participation in a 'concrete plan to wage war.'" *Id.* Justice Stevens took particular notice that "[t]he International Military Tribunal at Nuremberg, over the prosecution's objections, pointedly refused to recognize as a violation of the law of war conspiracy to commit war crimes." *Id.*

Ultimately, Justice Stevens concluded that the Government "failed even to offer a 'merely colorable' case for inclusion of conspiracy among those offenses cognizable by law-of-war military commission." *Id.* at 611. As will be discussed below, the Government does no better here.

2.     <u>Most Historical Examples Of Conspiracy Charges Come From Hybrid Military Commissions</u>

The Government fails to establish that conspiracy is a violation of the law of war because many of its examples come from hybrid commissions with concurrent jurisdiction over martial law and war crimes.

The Civil War provides several examples of conspiracy prosecutions by hybrid commissions. One such example concerns Robert Louden, a Mississippi River "boat burner" who was tried by military commission in Saint Louis, Missouri in December 1863. As martial law was then in effect in Saint Louis, the commission's jurisdiction was not limited to violations of the law of war. Glazier, *Misuse of History*, *supra,* at 40-42.

- 21 -

Louden faced three charges:   (1) "transgressing the law of war," (2) "spying," and (3) "[c]onspiring with the rebel enemies of the United States." Charges and Specifications Against Robert Louden, Court Martial case file NN 1074, Box 1627, Record Group 153, National Archives, Washington D.C.  First, it is notable that Louden's conspiracy charge is a separate and independent count from the charge of "transgressing the law of war," and that the latter charge makes no mention of conspiracy.  The fair reading, therefore, is that conspiracy is not a violation of the law of war.  Second, it is unclear how it could be considered a war crime for Louden – described as a "rebel enemy of the United States," *id*. – to conspire with other rebel enemies "to embarrass and impede the military authorities in the suppression of the existing rebellion."  If this were the case, any functioning army would violate the law of war.[12]   The better interpretation, therefore, is that the conspiracy charge fell under the commission's martial law jurisdiction.  Glazier, *Misuse of History*, *supra,* at 41.[13]

---

[12] The duty of loyalty is best understood as a domestic matter rather a war crime, as it concerns a citizen's duty to his country rather than a belligerent's duty to a universal standard relating to warfare.  Glazier, *Misuse of History*, *supra,* at 14.

[13] The trial of John Cambron fails as an adequate example for the same reason as the Louden case.  Glazier, *Misuse of History*, *supra,* at 42-43.  Similarly, Colonel Winthrop identifies the case of Colonel George St. Leger Grenfel, who was accused of conspiracy to "release rebel prisoners" and "destroy the City of

Another example from the Civil War era concerns William Murphy, who was tried by military commission in Saint Louis in 1865, shortly after martial law was lifted for Saint Louis. Thravalos, *History, Hamdan, and Happenstance, supra*, at 252-55. The termination of martial law in Saint Louis, however, did not mean that the military commission trying Murphy only prosecuted law of war violations. At that time, U.S. military commissions exercised martial law jurisdiction even when regular courts were open and available. Glazier, *Misuse of History*, *supra*, at 34. For example, the two military commission cases decided by the Supreme Court during that era concerned martial law trials of citizens in areas that had functioning courts. *Id*. And, in the initial 1865 version of his digest, written the year before the Supreme Court decided *Milligan*, Winthrop identified several opinions allowing trial by military commission even though federal courts were open. *Id*. Thus, it seems likely that Murphy's military commission was, in fact, a hybrid tribunal, notwithstanding the previous lifting of martial law.

Murphy was charged with "Conspiracy to burn and destroy steamboats and other property belonging to, or in the service of the United States of America or available for such services with intent to aid the Rebellion against the United States." Letter from Joseph Holt, Army Judge Advocate General, to the Secretary

---

Chicago," as a mixed charge involving both martial law and law of war elements. Winthrop, *Military Law and Precedents*, *supra*, at 839 n.5.

of War, Mar. 21, 1866 (reviewing the military trial of William Murphy and recommending approval of his sentence). Murphy also was *separately* charged with "Violation of the laws and customs of war." *Id*. As with Louden, the commission's division of conspiracy and violation of the law of war into separate counts demonstrates that conspiracy is not a law of war violation. Glazier, *Misuse of History*, *supra,* at 39-40.

Further, although the commission trying Murphy noted in the specifications for the conspiracy charge that Murphy was a "citizen of the United States," the specifications for the violation of the laws of war charge identified him as "a citizen of the United States, *and a rebel enemy thereof*." Letter from Joseph Holt, *supra* (emphasis added). This distinction shows that the conspiracy charge involved domestic, criminal breaches (*i.e.*, Murphy's duty owed to the United States as a citizen) whereas the "violation of the laws and customs of war" concerned his role as a "rebel enemy," placing him outside of domestic duties and "within the ambit of the law of war." Glazier, *Misuse of History, supra*, at 37.[14] Final confirmation that Murphy's case was based at least in part on martial law

---

[14] Thravalos' article also identifies two examples from the Boer War, which took place in South Africa in the late 19th and early 20th Century. British tribunals from this war likely were of the nature of a hybrid tribunal, and the paperwork regarding the cases suggests that the conspiracy charges were heard under the authority of British martial law. There is nothing to suggest the cases concerned violations of the law of war. Glazer, *Misuse of History*, *supra*, at 48-49.

was provided when Supreme Justice Miller, riding circuit in Missouri, vacated Murphy's conviction based on the *Milligan* holding (which he had not joined) as an impermissible exercise of martial law when regular courts were open. *In re Murphy*, 17 F.Cas. 1030 (M.D. Tn. 1874).

Conspiracy was also charged in a number of military commission trials conducted during the Philippine Insurgency between 1899 and 1902. The U.S. Army was the governing authority in that territory during this period, however, and close examination reveals that this charge was levied in the application of domestic law under military government authority, and not in those cases based solely on the law of war. Accordingly, as with the Civil War-era military commissions, these Philippine commissions do not establish that the U.S. has ever prosecuted conspiracy as a war crime, let alone that conspiracy actually is a violation of the law of war. *See* Glazier, *Misuse of History*, *supra,* at 45-48.

3.    Conspiracy Trials Involving Completed Acts Are Not
         Analogous to Inchoate Conspiracies

The Government does not provide any examples of inchoate conspiracies prosecuted by military commissions operating as a strict law of war tribunal. As Justice Stevens stated in *Hamdan I*, Winthrop emphasized that "'overt acts' constituting war crimes are the *only* proper subject at least of those military tribunals not convened to stand in for local courts." *Hamdan I*, 548 U.S. at 608

- 25 -

(plurality opinion) (emphasis added). This observation is borne out by the historical record.

One of the most famous examples of conspiracy arising out of the Civil War was the trial by military commission of the conspirators implicated in the assassination of President Lincoln. While tried by a military commission operating as a law of war tribunal, the conspiracy charge against the Lincoln conspirators involved completed acts, not an inchoate offense. *See* Proceedings of a Military Commission, Convened at Washington D.C. at 18-19, available in THE TRIAL (Edward Steers, Jr., ed. (2003)).

Similarly, the trial by military commission of Captain Henry Wirz, the commander of a horrific prisoner-of-war camp in Andersonville, Georgia, involved conspiracy for completed acts. *See* President Andrew Johnson, General Court-Martial Orders, No. 607, War Department, Adjutant-General's Office, Washington, Nov. 6, 1865, reprinted in 8 U.S.WAR DEP'T, THE WAR OF THE REBELLION (ser. 2) 784, 791 (Washington, Gov't Printing Office 1899). As Justice Stevens noted in *Hamdan I*, "Wirz was alleged to have *personally committed* a number of atrocities against his victims." 548 U.S. at 609 (emphasis in original). Further, the Judge Advocate General trying the case decided that one of the co-conspirators could not be tried by military commission because there was insufficient evidence of any specific overt acts by that co-conspirator:

- 26 -

> [I]n the case of R.B. Winder . . . no such specific overt
> acts of violation of the laws of war are as yet fixed upon
> him as to make it expedient to prefer formal charges and
> bring him to trial.

*Id.* (quoting historical record).  Accordingly, the Lincoln conspirators and the Wirz case do not provide support for inchoate conspiracy as a war crime.

Similarly, the World War II-era prosecution of American William Curtis Colepaugh and German Erich Gimpel for, *inter alia*, conspiracy also fails to provide an example of inchoate conspiracy being prosecuted as a war crime.  The defense challenged the validity of the conspiracy charge based on its failure to state any overt acts, but the Government successfully rebutted that argument by incorrectly stating that conspiracy was used two years earlier and upheld by the U.S. Supreme Court in *Quirin*.  Glazier, *Misuse of History*, *supra,* at 24.  But, as Justice Stevens noted in *Hamdan I*, "That the defendants in *Quirin* were charged with conspiracy is not persuasive, since the Court declined to address whether the offense actually qualified as a violation of the law of war—let alone one triable by military commission."  548 U.S. at 605 (plurality opinion).  Indeed, the *Quirin* Court specifically explained that "[s]ince the first specification of Charge I set forth a violation of the law of war, we have no occasion to pass on the adequacy of the second specification of Charge I, or to construe the 81st and 82nd Articles of War for the purpose of ascertaining whether the specifications under Charges II

- 27 -

and III allege violations of those Articles or whether if so construed they are constitutional." *Quirin*, 317 U.S. at 46. As Justice Stevens later pointed out, "No mention was made at all of Charge IV—the conspiracy charge." *Hamdan I*, 548 U.S. at 605 (plurality opinion). Given that Colepaugh and Gimbel's prosecution was based on an inaccurate reading of *Quirin*, their prosecution should not be cited as an example of inchoate conspiracy as a violation of the law of war.

## IV.  CONCLUSION

When placing conspiracy in the proper historical context, it is clear that it does not violate the law of war. The Government's argument that conspiracy is a part of a domestic common law of war is therefore incorrect on multiple fronts. This Court should reverse the CMCR's decision.

Respectfully Submitted,

DATED:  June 10, 2013            By:   /s/John S. Summers
                                      Attorney for *Amicus Curiae*
                                      David Glazier

                                 John S. Summers
                                 Michael J. Newman
                                 HANGLEY ARONCHICK SEGAL
                                 PUDLIN & SCHILLER
                                 One Logan Square, 27th Fl.
                                 Philadelphia, PA  19103
                                 (215) 568 6200
                                 Attorneys for *Amici Curiae* David
                                 Glazier and Gary Solis

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitations, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)B) because this brief contains 6684 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word  2007 in 14 point font size and Times New Roman type style.

DATED:  June 10, 2013                          By:   /s/ John S. Summers

                                                           Attorney for *Amici Curiae*
                                                           David Glazier and Gary Solis

## CERTIFICATE OF SERVICE

When All Case Participants are Registered
for the Appellate CM/ECF System

U.S. Court of Appeals Docket Number(s):  11-1257

I hereby certify that I electronically filed the foregoing with the Clerk of the Court of the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on November 15, 2011.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED: June 10, 2013          By:  __/s/ John S. Summers_____

                              Attorney for *Amici Curiae*
                              David Glazier and Gary Solis