ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 30, 2013

CASE NO. 11-1324

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

ALI HAMZA AHMAD SULIMAN AL BAHLUL,
PETITIONER,
v.

UNITED STATES OF AMERICA,
RESPONDENT.

ON APPEAL FROM COURT OF MILITARY COMMISSION REVIEW
(CMCR-09-001)

## *EN BANC* BRIEF FOR HISTORIANS, POLITICAL SCIENTISTS AND CONSTITUTIONAL LAW SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF PETITIONER

SARAH H. PAOLETTI, ESQ.
UNIVERSITY OF PENNSYLVANIA LAW SCHOOL
3501 Sansom Street
Philadelphia, PA 19104
(215) 898-8427
*Attorney for Amici Curiae*

Dated: June 10, 2013

# TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………….......2

TABLE OF AUTHORITIES………………………………………...….3-5

IDENTITY AND INTEREST OF *AMICI CURIAE*……………………...….6-8

COMPLIANCE WITH RULE 29…………………………………………...9

SUMMARY OF ARGUMENT……………………………………...………..10-11

I.  ARGUMENT ................................................................................ 12

  A.  The historical relationship between the United States and the Guantanamo Bay Naval Base compels the conclusion that the Constitution must apply to proceedings pertaining to detainees at Guantanamo Bay Naval Base. .............. 12

    1.  The United States' Historical Relationship to Guantanamo Bay Naval Base and Its Exercise of Territorial Sovereignty. .................................................... 13

    2.  The United States' exercise of *de facto* sovereignty over the Guantanamo Bay Naval Base extends to all aspects of social, political and economic life.. 18

  B.  A review of the Supreme Court's jurisprudence on the applicability of the Constitution to non-contiguous territories of the United States compels the conclusion that the Constitution applies to proceedings at Guantanamo Bay. ... 22

  C.  Having established the United States' exercise of *de facto* sovereignty over Guantanamo Bay Naval Base, similar to that exercised in unincorporated territories, the inquiry then is whether there are permissible limitations on which Constitutional provisions must apply. ................................................................. 28

  D.  The legal status of detainees held in Guantanamo Bay has no relevance on their right to fundamental protections under the Constitution. .......................... 32

II.  Conclusion ..................................................................................... 33

CERTIFICATE OF COMPLIANCE (Fed. R. App. 32(a)(7)…………………… .35

# TABLE OF AUTHORITIES

## UNITED STATES SUPREME COURT CASES

*Balzac v. Porto Rico*, 258 U.S. 298 (1922)…………………………….......22, 29

*Boumediene v. Bush*, 553 U.S. 723, 128 S.Ct. 2229 (2008)………………..10-11, 13-15, 17, 21-24, 26-27, 30

*Dorr v. United States*, 195 U.S. 138 (1904)…………………….………22, 24, 28

*Downes v. Bidwell*, 182 U.S. 244 (1901)………………………………….22-24, 28-30, 32

*Hawaii v. Mankichi* 190 U.S. 197 (1903)…………………………………..22

*Johnson v. Eisentrager*, 339 U.S. 763 (1950)………………………………25-26

*Murphy v. Ramsey*, 114 U.S. 15, 44 (1885)………………………………...24

*Rasul v. Bush*, 542 U.S. 466 (2004)……………………………………...10, 12, 21, 24-26

*Reid v. Covert*, 354 U.S. 1 (1956)……………………………………….....30-31, 33-34

*U.S. v. Verdugo-Urquidez*, 494 U.S. 259 (1990)…………………………31

*Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)……………………………..32

## UNITED STATES CIRCUIT COURT CASES

*Canal Zone v. Scott*, 502 F.2d 566, 568 (5th Cir. 1974)………..………………33

*Cuban-American Bar Ass'n v. Christopher*, 43 F.3d 11412 (11th Cir. 1995)…33

*Haitian Ctrs. Council, Inc. v. McNary*, 969 F. 2d 1326 (2d Cir. 1992) *vacated as moot sub nom Sale v. Haitian Centers Council, Inc.* 509 U.S. 918 (1993)……33

*United States v. Husband R. (Roach)*, 453 F.2d 1344, 1058 (5th Cir. 1971) .....33

*Raven v. Panama Canal Co.*, 583 F.2d 169 (5th Cir. 1978), *cert. denied*, 440 U.S. 908 (1979)……………………………………………………………………….33


**UNITED STATES CONSTITUTION**

Article 1………………………………………………………………..……11, 28, 31


**FEDERAL STATUTES**

Military Commissions Act of 2006 (MCA), 10 U.S.C. §§ 948, *et seq*...……..6, 10


**TREATIES AND LEASE AGREEMENTS**

1903 Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, Article III, T.S. No. 418 …………………………………………………....14-15

Treaty Defining Relations with Cuba, May 29, 1934, U.S.-Cuba, Art. III, 48 Stat. 1683, T.S. No. 866…………………………………………………………..…17


**SCHOLARLY AND MISCELLANEOUS MATERIALS**

Christina Duffy Burnett, *A Convenient Constitution? Extraterritoriality after Boumediene*, 109 Colum. L. Rev. 973, 985 (2009)……………………………………..………………….22, 30

Jana K. Lipman, *Guantanamo: A Working Class History Between Empire and Revolution* 21 (2008)……………………………………………………13, 19-20

M.E. Murphy, Rear Admiral, U.S. Navy, *The History of Guantanamo Bay, 1494-1964* (Jan. 5, 1953), available at: http://web.archive.org/web/20060114081444/http://www.nsgtmo.navy.mil/history/gtmohistorymurphyvol1.htm........................................................................ 15-17, 24

Gerald L. Neuman, *Closing the Guantanamo Loophole*, 50 Loyola Law Rev. 1, 39 (2004)………………………………………….……………………...18

Kal Raustiala, *Does the Constitution Follow the Flag?: The Evolution of Territoriality In American Law* 191 (2009)……………..………………12, 18, 23

Bartholomew H. Sparrow, *The Insular Cases and the Emergence of American Empire. Landmark Law Cases and American Society* (2006)……….…..…22

Brief of Professors of Constitutional Law and Federal Jurisdiction as Amici Curiae in Support of Petitioners in *Boumediene v. Bush*………………………….23

## INTEREST OF *AMICI CURIAE*

The U.S. District Court for the District of Columbia has granted a rehearing en banc in this case to address, in part, whether the Ex Post Facto Clause applies in cases involving detainees at Guantanamo, when considering whether the Military Commissions Act of 2006 may permissibly proscribe pre-2006 conduct that was not a war crime triable by the military commission under 10 U.S.C. § 821 before 2006. *Amici Curiae*, historians, political scientists, and constitutional law scholars, submit this brief on behalf of Petitioner, to provide the court with the legal and historical arguments pertaining to the Constitution's reach to the Guantanamo Bay Naval Base and proceedings governing detainees held there. This brief does not address the statutory arguments pertaining to the Military Commissions Act of 2006.

*Amici Curiae* are recognized experts in the field, having researched, lectured and published extensively in the area of constitutional law, legal history, and the extraterritorial and territorial reach of the U.S. Constitution, and include:

**Seth F. Kreimer** is the Kenneth W. Gemmill Professor of Law at the University of Pennsylvania Law School. He is an expert in Constitutional Law and Constitutional Remedies, Constitutional Litigation, Civil Liberties, and the First Amendment. He has written and litigated extensively in the all of the above areas.

He was a law clerk to the Hon. Arlin M. Adams, U.S. Court of Appeals for the Third Circuit. He received both his J.D. and his B.A. from Yale University.

**Jana K. Lipman** is an Associate Professor in the Department of History at Tulane University. She is an expert in U.S. foreign relations broadly construed to include diplomatic and non-state actors, with a particular expertise in the social and political histories of Cuba and Vietnam. She conducted the most comprehensive field research on how Guantanamo Bay Naval Base employees navigated the politics and contradictions of living in Cuba and working for the U.S. Military, culminating in the publication of GUANTANAMO: A WORKING-CLASS HISTORY BETWEEN EMPIRE AND REVOLUTION, Berkeley: University of California Press (2009), and "Guantanamo and the Case of Kid Chicle: Labor, Privatization, and the Law in the Expansion of U.S. Empire," in *Transitions and Transformations in the U.S. Imperial State*. Eds. Alfred McCoy and Francisco Scarano. Madison: University of Wisconsin Press (2009).

**Kermit Roosevelt** is a Professor of Law at the University of Pennsylvania Law School. His areas of expertise include Constitutional Law, Conflict of Laws, and Federal Jurisdiction, and he has written extensively in all three areas, including an article titled *Guantanamo and the Conflict of Laws: Rasul and Beyond*, 153 U. PA. L. REV. 2017 (2005). He was a law clerk to the U.S. Supreme Court Associate Justice David H. Souter (1999-2000), and prior to that was a Law Clerk to the Hon.

Stephen F. Williams, U.S. Court of Appeals for the District of Columbia. received

his J.D. from Yale University, and his A.B. from Harvard University.

**Bartholomew H. Sparrow** is a Professor with the Department of

Government, University of Texas at Austin.  His areas of expertise are U.S. foreign

policy, U.S. territorial policy, and political communication.  He is the author of

THE INSULAR CASES AND THE EMERGENCE OF AMERICAN EMPIRE. LANDMARK LAW

CASES AND AMERICAN SOCIETY. Lawrence: University Press of Kansas (2006), an

in depth examination of the *Insular Cases*, and the political implications of those

decisions.  He received his Ph.D. from the University of Chicago, his M.A. from

the University of Texas at Austin, and his B.A. from Dartmouth College.

# COMPLIANCE WITH RULE 29

## A. Consent to File

Pursuant to Fed. R. App. P. 29(a) and Circuit Rule 29(b), amici certify that all parties have consented to the filing of this brief.

## B. Authorship and Funding

Pursuant to Fed. R. App. P. 29(c)(5), amici certify that this brief was authored by counsel listed on the front cover. No party or party's counsel authored this brief, in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No other person but amici and their counsel contributed money that was intended to fund preparing or submitting this brief.

## C. Not Practical to Join in Single Brief

Pursuant to Circuit Rule 29(d), amici certify that it is not practicable to join all other amici in this case in a single brief. We do not claim expertise in the other issues addressed by amici and believe it would be inappropriate to address matters upon which we do not have particular expertise.

June 10, 2013

Sarah H. Paoletti
*Counsel for Amici Curiae*

## SUMMARY OF ARGUMENT

Consistent with more than a century of jurisprudence addressing the Constitution's jurisdictional reach beyond the territory of the United States, there can be no doubt that the Constitution applies to proceedings conducted at Guantanamo Bay Naval Base pursuant to the Military Commissions Act of 2006 (MCA), 10 U.S.C. §§ 948, *et seq.*, in light of the United States' exercise of complete control and *de facto* sovereignty within that territory.

The Supreme Court addressed this issue in *Boumediene v. Bush*, 553 U.S. 723 (2008), and upheld the constitutional right to *habeas corpus* to foreign-born detainees determined to be "enemy combatants." Central to the Court's decision was its determination that although Cuba maintains ultimate *de jure* sovereignty, the United States has "maintained complete and uninterrupted control" over the Guantanamo Naval Base "for over 100 years." *Boumediene*, 533 U.S. at 764. In light of that history, the Court found it an "obvious and uncontested fact that the United States, by virtue of its complete jurisdiction and control over the base, maintains *de facto* sovereignty over this territory." *Id.* at 755 (citing to *Rasul v. Bush*, 542 U.S. 466, 480, *id.*, at 487 (KENNEDY, J., concurring in judgment)).

Given the United States' exercise of *de facto* sovereignty, the inquiry then becomes what constitutional limitations apply to Congressional and Executive authority in the detention and prosecution of individuals charged as "alien enemy

combatants" being held at the Guantanamo Bay Naval Base.  *Amici* herein assert that because the Guantanamo Naval Base operates as part of the United States and not as a separate sovereign territory, the Constitution applies to all proceedings and all individuals held there, subject only to the same limitations that would be found to apply to non-citizens in the territorial United States.  At a minimum, based on the reasoning and holdings consistently put forth in Supreme Court decisions from the *Insular Cases* to *Boumediene*, the Constitution's core protections against government restrictions of fundamental rights, including Article 1 protections regarding *ex post facto* laws and bills of attainder, must govern the proceedings at issue.

In *Hamdan II*, this Court deferred on the constitutional question of "whether or how the Ex Post Facto Clause might apply to prosecutions of noncitizens at Guantanamo Bay," determining that their statutory interpretation obviated the need to reach the ultimate constitutional question." *Hamdan v. United States*, 696 F. 3d 1238, at FN7 (D.C. Cir. 2012).  That question is again before this Court, and *amici* argue the answer to the ultimate constitutional question as to whether the Ex Post Facto Clause applies is an unequivocal "yes."

# I.     ARGUMENT

## A.     The historical relationship between the United States and the Guantanamo Bay Naval Base compels the conclusion that the Constitution must apply to proceedings pertaining to detainees at Guantanamo Bay Naval Base.

The jurisprudence regarding the Constitution's applicability to unincorporated territories held by the United States developed concurrently with the United States' historical relationship as *de facto* sovereign over the Guantanamo Bay Naval Base and compels the conclusion that the Constitution indeed follows the flag to Guantanamo Bay.[1]  The Supreme Court has recognized the history of political, economic, social, and legal control exercised by the United States over Guantanamo Naval Base, concluding the United States exercised *de facto* sovereignty over the territory.  In *Rasul v. Bush*, 542 U.S. 466, 476 (2004), the Court noted the United States "exercises exclusive jurisdiction and control" over the Guantanamo Naval Base.  Justice Kennedy similarly took notice of the "unchallenged and indefinite control that the United States has long exercised over Guantanamo Bay." *Id.* at 488 (KENNEDY, J., concurring).  That exercise of jurisdiction and control compels the conclusion that, at a minimum, those

---

[1] See Kal Raustiala, <u>Does the Constitution Follow the Flag</u>? (2009).

[2]  Quoting from "The Platt Amendment," in *The Cuba Reader: History, Culture, and Politics*, ed. Aviva Chomsky, Barry Carr, and Pamela Maria Smorkaloff (Durham, NC: Duke University Press, 2003), 147-49.

[3] Complete version of 1903 Lease and the Supplementary Agreements are available at: Murphy, M.E., The History of Guantanamo Bay 1494-1964, Online Ed. (1953), App. C, *available at* http://web.archive.org/web/20060114081444/http://www.nsgtmo.navy.mil/history/g

12

constitutional rights deemed critical to the operation of a free government must apply at the Base, and was a key factor in the Supreme Court's determination in *Boumediene v. Bush* that the constitutional right to *habeas corpus* attaches to detainees held on the Guantanamo Naval Base, and is similarly relevant to answering the constitutional question regarding the applicability of the Ex Post Facto Clause.

### 1.    The United States' Historical Relationship to Guantanamo Bay Naval Base and Its Exercise of Territorial Sovereignty.

The factual relationship between the United States and the Guantanamo Bay Naval Base informs the legal conclusion regarding the reach of the Constitution to the Guantanamo Naval Base and is grounded in the broader historical context in which the law developed. The history of the United States' relationship with Guantanamo Bay began in 1898 when the United States became involved in the War of Cuban Independence, which then escalated to the Spanish-American War. As historian Jana Lipman has written: "[f]rom this incipient moment, the history of Guantanamo Bay became entangled with U.S. military history." Jana K. Lipman, *Guantanamo: A Working Class History Between Empire and Revolution* 21 (2008). At the conclusion of the Spanish-American War, Spain ceded Cuba to the United States in the 1898 Treaty of Paris.

For the next three years, the United States maintained military control over and governed Cuba until Cuba agreed to incorporate the Platt Amendment into its constitution.  *Id.* at 23.  The Platt Amendment continued the United States' exercise of control over Cuba: it granted the U.S. military the right to invade Cuba when necessary to "preserve" Cuban independence, limited Cuba's right to enter into treaty agreements with foreign governments, and required Cuba to enter into a lease agreement with the United States for the establishment of territory for coaling and naval stations "to enable the United States to maintain the independence of Cuba, and to protect the people thereof, as well as for its own defense."  *Id.*[2] In 1902, one year after Cuba accepted the Platt Amendment and established itself as a Republic, the U.S. military withdrew from Cuba, but maintained a military presence at Guantanamo Bay.  In 1903, the United States signed a lease agreement for the Guantanamo Naval Base.  *Id.* at 24.

 The manner in which the United States came to take control over the Guantanamo Bay Naval Base bore relevance to the Supreme Court's determination in *Boumediene* that the United States has exercised and continues to exercise plenary jurisdiction over the Guantanamo Naval Base:

> Indeed, it is not altogether uncommon for a territory to be under the *de jure* sovereignty of one nation, while under the plenary control, or

---

[2]  Quoting from "The Platt Amendment," in *The Cuba Reader: History, Culture, and Politics*, ed. Aviva Chomsky, Barry Carr, and Pamela Maria Smorkaloff (Durham, NC: Duke University Press, 2003), 147-49.

practical sovereignty, of another.  This condition can occur when the
territory is seized during war, as Guantanamo was during the Spanish
American War.

*Boumediene*, 533 U.S. at 745.

The 1903 lease agreement between the United States and Cuba granted the

United States jurisdiction over the territory held as the Guantanamo Naval Base for

the continued and indefinite benefit of the United States.  The 1903 lease provided:

> While on the one hand the United States recognizes the continuance
> of the ultimate sovereignty of the Republic of Cuba over the above
> described areas of land and water, on the other hand the Republic of
> Cuba consents that during the period of the occupation by the United
> States of said areas under the terms of this agreement the *United
> States shall exercise complete jurisdiction and control over and within
> said areas* with the right to acquire (under conditions to be hereafter
> agreed upon by the two Governments) for the public purposes of the
> United States any land or other property therein by purchase or by
> exercise of eminent domain with full compensation to the owners
> thereof.

1903 Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba,

Article III, T.S. No. 418 (emphasis added).[3]

In later treaties, the United States confirmed its criminal jurisdiction in

Cuban territory, further emphasizing its plenary control over the territory.   A

supplemental lease signed July 1903 provided clear jurisdictional guidelines

---

[3] Complete version of 1903 Lease and the Supplementary Agreements are
available at: Murphy, M.E., The History of Guantanamo Bay 1494-1964, Online
Ed. (1953), App. C, *available at*
http://web.archive.org/web/20060114081444/http:/www.nsgtmo.navy.mil/history/g
tmohistorymurphyvol1.htm..

regarding the criminally-charged, in a manner that mirrors a country's exercise of

jurisdiction in extradition agreements between sovereign nations.  Article IV of the

1903 Supplementary Agreement provides:

> Fugitives from justice charged with crimes or misdemeanors
> amenable to Cuban law, taking refuge within said areas, shall be
> delivered up by the United States authorities on demand by duly
> authorized Cuban authorities.   On the other hand, the Republic of
> Cuba agrees that fugitives from justice charged with crimes or
> misdemeanors amenable to United States law, committed with said
> areas, taking refuge in Cuban territory shall on demand, be delivered
> up to duly authorized United States authorities.

*Murphy, M.E., The History of Guantanamo Bay 1494-1964, Online Ed. (1953),*

*App. C,* available at:

*http://web.archive.org/web/20060114081444/http:/www.nsgtmo.navy.mil/history/g*

*tmohistorymurphyvol1.htm.*[4]

In 1934, the United States accepted Cuba's abrogation of the Platt

Amendment and formally annulled it, while at the same time renegotiating its lease

agreement with Cuba confirming and extending indefinitely, or until the United

States opts to abandon the Base, the same essential terms of control and

---

[4] Rear Admiral Murphy does note that, in practice, Cuba and the United States did
not necessarily follow the provisions in the 1903 supplementary agreement related
to who had jurisdiction over criminal defendants, in part because until the passage
of the Uniform Code of Military Justice in 1951, there was "no peacetime legal
machinery for trying such offenders.  Accordingly, we have habitually requested
local Cuban courts to exercise concurrent jurisdiction and handle such cases…. In
a reciprocal manner, U.S. military personnel, charged with offenses in Cuba, are
habitually turned over to U.S. jurisdiction for legal action." *Id.* at Ch. 3.

jurisdiction of the initial lease agreement.  As M.E. Murphy, Rear Admiral, U.S.

Navy, concluded in a history of the Base originally published in 1953:[5]

> Thus it is clear that *at Guantanamo Bay we have a Naval reservation which, for all practical purposes, is American territory*.  Under the foregoing agreements, the United States has for approximately fifty years exercised the essential elements of sovereignty over this territory, without actually owning it.  Unless we abandon the area or agree to a modification of the terms of our occupancy, we can continue in the present status as long as we like.  Persons on the reservation are amenable only to United States legislative enactments.  There are a few restrictions on our freedom of action, but they present no serious problem.

 (Emphasis added).  Murphy, M.E., The History of Guantanamo Bay 1494-1964,

Online Ed. (1953), Ch. 3 *available at*

http://web.archive.org/web/20060114081444/http:/www.nsgtmo.navy.mil/history/g

tmohistorymurphyvol1.htm.   Stated another way, "Under the terms of 1934

Treaty… Cuba effectively has no rights as a sovereign until the parties agree to

modification of the 1903 Lease Agreement or the United States abandons the

base." *Boumediene*, 533 U.S. at 753 (citing to Treaty Defining Relations with

Cuba, May 29, 1934, U.S.-Cuba, Art. III, 48 Stat. 1683, T.S. No. 866).

      Further indicating the United States' exercise of indefinite *de facto*

sovereignty, at present day, the Guantanamo Naval Base is the only major U.S.

---

[5] Murphy, M.E., The History of Guantanamo Bay 1494-1964, Online Ed. (1953), App. C, *available at*
http://web.archive.org/web/20060114081444/http:/www.nsgtmo.navy.mil/history/g
tmohistorymurphyvol1.htm.

Military Base not governed by a Status of Forces Agreement (SOFA), through

which the United States negotiates the legal relationship with the host country, and

sets forth a series of understandings regarding what laws apply to the occupants of

the base and how they will be enforced.  See Gerald L. Neuman, *Closing the*

*Guantanamo Loophole*, 50 Loyola Law Rev. 1, 39 (2004); Kal Raustiala, *Does the*

*Constitution Follow the Flag?: The Evolution of Territoriality In American Law*

191 (2009).  As constitutional law scholar Gerald Neuman has noted: "Given the

totality of U.S. territorial jurisdiction on the base, and the lack of access to the rest

of Cuba since 1959, no such agreement is needed…. At Guantanamo, the United

States is accountable only to itself."  Neuman, *supra*, 50 Loyola L. Rev. at 39.

> **2.**     **The United States' exercise of *de facto* sovereignty over the**
> **Guantanamo Bay Naval Base extends to all aspects of social,**
> **political and economic life.**

Throughout the past century, the United States has repeatedly exercised its

jurisdiction and control – *de facto* sovereignty – over the Guantanamo Naval Base;

evidence of this exercise of control can be found in all areas of social, political, and

economic life on the Naval Base over the past century.

From the official opening of the Guantanamo Naval Base, the United States

has regulated and continues to regulate all activities taking place within its

territorial confines.  A leading historian of Cuban socio-political life has conducted

a comprehensive historical study of the relationship between the United States and

the non-U.S. workers employed at the Guantanamo Naval Base, concluding that "in the years after the Cuban revolution, the U.S. government successfully redefined the naval base as an island unto itself." Jana K. Lipman, *Guantanamo: A Working-Class History between Empire and Revolution* (2009), 10.  After the United States carved out the territory for its exclusive use in 1902, Lipman notes, it began to regulate the movement of employees onto and off the base, requiring specific admission cards and identification cards and subjecting employees to security checks.  *Id*. at 40-42.[6]   In 1933, when Cuba passed what has been referred to as the Law of Fifty Percent, mandating that fifty percent of all employment had to go to Cubans, the United States considered itself to be operating outside of the jurisdiction of Cuba, and not so bound.  *Id.* at 44-46.  As Lipman noted:

> Conceding to Cuban labor demands could create a slippery slope and erode U.S. authority.  As one base commander stated, if Cuban labor laws applied to workers on the base, it "might easily progress to the application of other Cuban law" on GTMO.  He feared that any adherence to Cuban law would "nullify" the United States' "complete jurisdiction."

*Id.* at 71.  Thus, it was clear from its early labor and employment regulation on the Base that the United States determined what rules would apply and how they would be enforced.

---

[6] As Lipman notes, foreign nationals comprise the overwhelming majority of individuals working at Guantanamo Bay Naval Base as cooks, gardeners, and laborers. *Id.* at 9.

Following Castro's rise to power, the United States termed the Cuban employees who lived on the Base full-time as "permanent base residents". Permanent base residents had similar rights to family migration to the United States as permitted to Cubans living in the United States. During the 1965-1973 airlifts of Cubans to Miami, following the 1965 Varadero Family Claim Program, which allowed Cuban residents in America to bring family members to the United States, the Johnson and Nixon Administrations granted permanent base residents the same rights to family migration as those Cubans who were residents of the United States. *Id.* at 200. These measures essentially recognized the Guantanamo Naval Base as the legal equivalent of the territorial United States.

The United States' tacit, and in some cases explicit, recognition of the Guantanamo Naval Base as the legal equivalent of the territorial United States, was evidenced again during what has been dubbed the "Mariel Boat Lift." In describing the historical moment when the United States changed course on its open reception of Cuban migrants after the government of Cuba opened the Mariel port in 1980, Lipman recounts:

> [S]everal U.S. politicians openly suggested sending these undesirable refugees back to Cuba, specifically through the U.S. naval base in Guantanamo Bay. They recognized GTMO's ambiguous position as a stateless space, within Cuba, but not of it…. The Reagan administration considered transporting these individuals to GTMO. Presidential spokesperson David Gergen emphasized that such a move would not technically be deportation, because the United States did

not *"consider the base to be Cuban territory."* [Citation omitted]
(emphasis added).

*Id.* at 206-07.  The historical record demonstrates that the United States operates as
the sole legal authority on the Guantanamo Naval Base, a legal authority that
extends beyond matters of immigration and employment to the governance of all
aspects of life. As the *Boumediene* Court concluded, there is "no reason to believe
an order from a federal court would be disobeyed at Guantanamo." *Boumediene*,
533 U.S. at 751.

The Supreme Court recognized the significance of legal, political and socio-
economic history of the Guantanamo Naval Base in *Boumediene*, and explicitly
distinguished between the narrow, technical definition of *de jure* sovereignty and
actual sovereignty.  The Court "took notice of the obvious and uncontested fact
that the United States, by virtue of its complete jurisdiction and control over the
base, maintains *de facto* sovereignty over this territory," *Boumediene*, 533 U.S. at
755 (citing to Rasul v. Bush, 542 U.S. at 480; *id.*, at 487 (KENNEDY, J.,
concurring in judgment)).  That determination was central to the Court's analysis
regarding the jurisdictional reach of the Constitution to Guantanamo Bay in
*Boumediene* and the applicability of habeas rights, and is equally central to the
argument herein pertaining to applicability of the Ex Post Facto Clause.

**B.    A review of the Supreme Court's jurisprudence on the applicability of the Constitution to non-contiguous territories of the United States compels the conclusion that the Constitution applies to proceedings at Guantanamo Bay.**

While the jurisprudential history of the Constitution's intra-territorial and extraterritorial reach began with the U.S. territorial expansion South and West, in accordance with Art. IV §3 of the Constitution, an inquiry into the territorial reach of the Constitution over locations such as Guantanamo Naval Base best begins at the turn of the 20th Century with the series of cases collectively referred to as the *Insular Cases*.[7]  In those cases, the Supreme Court addressed the applicability of the Constitution to unincorporated U.S. territories, including Puerto Rico, Guam, the Philippines, and later Hawaii.[8]  As the Supreme Court noted in *Boumediene*, in

_____

[7] Earlier cases addressing the reach of the Constitution over newly acquired territories are ambiguous as to whether the Constitution was applied by its own force, or as a result of legislation.  Rev. State. §1891 provided: "The Constitution and all laws of the United States which are not locally inapplicable shall have the same force and effect within all the Organized Territories, and in every Territory hereafter organized as elsewhere within the United States."  See Christina Duffy Burnett, *A Convenient Constitution? Extraterritoriality after Boumediene*, 109 Colum. L. Rev. 973, 985 (2009).

[8] The following Insular Cases were cited by the *Boumediene* Court: *Balzac v. Porto Rico*, 258 U.S. 298 (1922); *Dorr v. United States*, 195 U.S. 138 (1904); *Hawaii v. Mankichi* 190 U.S. 197 (1903); *De Lima v. Bidwell*, 182 U.S. 1 (1901); *Dooley v. United States*, 182 U.S. 222 (1901); *Armstrong v. United States*, 182 .S. 243 (1901); *Downes v. Bidwell*, 182 U.S. 244 (1901).  For a complete history of the Insular Cases, see Bartholomew H. Sparrow The Insular Cases and the Emergence of American Empire. Landmark Law Cases and American Society (2006).  A comprehensive review of territorial application of the Constitution, beginning with the United States' acquisition of contiguous territories as the United States

each of the *Insular Cases* the Court held that "the Constitution has independent force in these territories, a force not contingent upon acts of legislative grace." *Boumediene*, 533 U.S. at 757. Justice White provided the clearest statement regarding the reach of the Constitution in his concurring opinion in *Downes v. Bidwell*, 182 U.S. 244 (1901):

> In the case of the territories, as in every other instance, when a provision of the Constitution is invoked, the question which arises is, not whether the Constitution is operative, for that is self-evident, but whether the provision relied on is accountable.

*Downes*, 182 U.S. at 292 (White, J., concurring).

The Supreme Court in *Boumediene* agreed. Precedent provided the Constitution applied in full in fully incorporated territories "surely destined for statehood," and applied at least in part in the unincorporated territories. *Boumediene*, 533 U.S. at 757. While the Court noted the difficulty of enforcing the constitutional rights and protections at issue, and conceded the enforceability of certain constitutional provisions due to the practical difficulties associated with doing so, those issues create an inquiry separate and distinct from the question as to whether the Constitution has force at all.[9]

---

expanded, is provided in Kal Raustiala <u>Does the Constitution Follow the Flag</u>? *passim* (2009).

[9] The Brief of Professors of Constitutional Law and Federal Jurisdiction as Amici Curiae in Support of Petitioners in *Boumediene v. Bush*, drew the following conclusion from their clear analysis of the Insular Cases:

In its decision in *Boumediene v. Bush*, the U.S. Supreme Court put to rest any lingering questions about the application of the Constitution to Guantanamo Naval Base when it held unequivocally that detainees charged by the U.S. Government as unlawful enemy combatants, possess the constitutional right to habeas corpus.  As the Court unequivocally stated:

> Our basic Charter cannot be contracted away…. The Constitution grants Congress and the President the power to acquire, dispose of, and govern territory, not the power to decide when and where its terms apply.  Even when the United States acts outside its borders, its powers are not "absolute and unlimited" but are subject "to such restrictions as are expressed in the Constitution."

> *Boumediene*, 533 U.S. at 765 (citing to *Murphy v. Ramsey*, 114 U.S. 15, 44 (1885).

In reaching its holding, the Court advanced the legal analysis put forth in *Rasul v. Bush*, which had most recently held that the statutory right to habeas corpus under 28 USC §2241 applied to the detainees in Guantanamo.  While both

---

The *Insular Cases* concluded that constitutional provisions to not extend to a particular territory by will of Congress, but rather, as a result of the relationship that Congress creates between the United States and the territory. *Downes v. Bidwell*, 182 U.S. 244, 289 (1901) (Opinion of White, J.); *Dorr v. United States*, 195 U.S. 138, 142 (1904). The *Insular Cases* struck a compromise between the forces of constitutionalism and the forces of empire by guaranteeing that the Constitution's most fundamental rights would be honored wherever the United States possesses governing authority.  In such cases, it is the exercise of complete U.S. jurisdiction and control, not nominal sovereignty, that justifies the application of a correlative set of rights. 2007 WL 2441580, 16.

decisions looked extensively at the history of the writ of habeas corpus and
historically grounded importance of the writ, as Justice Kennedy emphasized in his
concurring opinion, "What matters is the unchallenged and indefinite control that
the United States has long exercised over Guantanamo Bay." *Rasul*, 542 at 487
(KENNEDY, J., concurring).   It is this exercise of "plenary and exclusive
jurisdiction," discussed *supra*, that ultimately mandates application of
constitutional protections as well.

In distinguishing its decision of more than half a century earlier in *Johnson
v. Eisentrager*, 339 U.S. 763 (1950), the *Rasul* Court analyzed the criteria the
*Eisentrager* Court used to decide constitutional rights did not apply.[10]  The Court
identified the legal, physical and temporal nature of the United States' control
exercised by the United States over the Guantanamo Naval Base from that
exercised in Landsberg Prison in occupied Germany, in distinguishing the
detainees' respective rights to the writ of habeas corpus.  Petitioners in *Rasul* were
"imprisoned in territory over which the United States exercises exclusive
jurisdiction and control." *Rasul*, 542 U.S. at 466.  Justice Kennedy's analytical

---

[10] The criteria employed by the Court in determining the Writ of Habeas did not
extend to detainees held in the Landsberg Prison in Prison in occupied Germany
were: the persons seeking the writ were enemy aliens; they had never been to or
resided in the United States; they were captured outside of U.S. territory and had
been held in military custody as prisoners of war; they were tried and convicted
outside the United States by a Military Commission; they were tried for laws of
war committed outside the United States; and their place of imprisonment was at
all times outside the United States.  339 U.S. at 777.

framework for distinguishing the Petitioners in *Johnson v. Eisentrager* and the

petitioners in his concurring opinion in *Rasul* provided the basis for the Court's

determination that not just the statutory right but the constitutional right to habeas

corpus applied in *Boumediene*.  That analysis is worth repeating here as it provides

the framework for concluding the applicability of the Constitution more generally

to detainees held at Guantanamo Naval Base.  The first critical distinguishing fact

was the following:

> Guantanamo Bay is in every practical respect a United States territory,
> and it is one far removed from any hostilities…. What matters is the
> unchallenged and indefinite control that the United States has long
> exercised over Guantanamo Bay.

*Rasul*, 542 U.S. at 488 (KENNEDY, J., concurring).  In reaching that conclusion,

he notes the Court's explanation of the history of the Guantanamo Naval Base, and

the lease agreement governing the territory: "this lease is no ordinary lease.  Its

term is indefinite and at the discretion of the United States." *Id.*  He further

elaborates: "From a practical perspective the indefinite lease of Guantanamo Bay

has produced a place that belongs to the United States, extending the 'implied

protection' of the United States to it."  *Id.* (citation omitted).

Reiterating the findings in *Rasul*, and central to the argument as to the

applicability of the Constitution in the case at hand, the Court in *Boumediene* held:

Guantanamo Bay "is no transient possession…. In every practical sense,

Guantanamo is not abroad, it is in the constant jurisdiction of the United States,"

and in that way it is very different from the Landsberg Prison in occupied Germany. *Boumediene*, 533 U.S. at 769. Unlike the Landsberg Prison in occupied Germany, where the United States was accountable to the Allied Forces, only the United States operates at the Guantanamo Naval Base. As noted by the Supreme Court: "No Cuban court has jurisdiction to hear these petitioners' claims, and no law other than the laws of the United States applies at the Naval Station." *Id.* at 751.[11] Scholars, advocates, and courts alike have noted that because Guantanamo Naval Base operates independent of any other sovereign, and is under the complete and indefinite control of the United States, to allow it to operate outside the laws of the United States would result in the creation of "legal black hole." *See* Lord Johan Steyn*, Guantanamo Bay: The Legal Black Hole,* 53 INT'L AND COMP. L. Q. 1 (2004).

The Court's repeated statements affirming that Guantanamo Bay is under the *de facto* sovereign jurisdiction of the United States is entirely consistent with the social, historical, and legal record discussed above. That historical exercise of *de facto* sovereign jurisdiction compels the conclusion that the Constitution applies. Consistent with the Supreme Court's precedent from the *Insular Cases* to *Boumediene*, and the intervening decisions, therefore, the Constitution must be deemed to be in force over the proceedings at issues in this case.

---

[11] <u>See also</u>, discussion *infra,* I.A.1.

**C.    Having established the United States' exercise of *de facto* sovereignty over Guantanamo Bay Naval Base, similar to that exercised in unincorporated territories, the inquiry then is whether there are permissible limitations on which Constitutional provisions must apply.**

The *Insular Cases* provided the first opportunity for the Supreme Court to explore the reach of the Constitution over unincorporated territories.  And in those cases, the Court repeatedly resolved that the Constitution did apply, but then looked at whether the specific constitutional provisions at issue were applicable and enforceable.  As the Supreme Court clearly stated in *Dorr v. United States*, 195 U.S. 138 (1904), it is settled law that "the Constitution of the United States is the only source of power authorizing action by any branch of the Federal government. *Id.* at 140.

In *Downes*, the Supreme Court began to distinguish among those constitutional rights that cannot be transgressed anywhere at any time because they are central to the exercise of a free government.  *Downes v. Bidwell*, 182 U.S. 244 (1901) (upholding Art. 1, § 8 of the Constitution declaring "all duties, imposts, and excises shall be uniform throughout the United States" did not apply to the unincorporated territory of Puerto Rico).  As Justice Brown stated in *Downes*, there exists "a clear distinction between such prohibitions as go to the very root of the power of Congress to act at all, irrespective of time of place, and such as are

operative only 'throughout the United States' or among the several states." *Id.* at 277.

In the last of the *Insular Cases*, the Court in *Balzac v. Porto Rico*, 258 U.S. 298 (1922) held the Constitution applies "by way of limitation upon the exercise of executive and legislative power in dealing with new conditions and requirements." *Id.* at 312.  The Court in *Balzac* went on to state that the United States was bound to provide "guaranties of certain fundamental personal rights declared in the Constitution." *Id*.  As with the Court's determination in *Balzac* and the earlier *Insular Cases*, the inquiry this Court is bound to consider is not whether the Constitution applies: "The Constitution of the United States is in force … wherever and whenever the sovereign power of the government is exerted." *Id.* The query instead is where to draw the lines regarding those constitutional rights that apply at all times, and those from which the United States may deviate depending on the circumstances.

In *Downes v. Bidwell*, Justice Brown distinguished between "natural rights" that should apply  to territories over which the United States exercises legal jurisdiction and remedial guarantees.  He explained:

> [T]here may be a distinction between certain natural rights enforced in the Constitution by prohibitions against interference with them, and what may be termed artificial or remedial rights which are peculiar to our own system of jurisprudence.  Of the former class are the rights to one's own religious opinions and to a public expression of them, …; the right to personal liberty and individual property; to freedom of

speech and of the press; to free access to courts of justice, to due process of law, and to an equal protection of the laws.

*Downes*, 182 U.S. at 282-283.  While not seeking to provide a definitive list of

which provisions must govern at all times, Justice Brown specifically identified:

> Thus, when the Constitution declares that 'no bill of attainder or *ex post facto* law shall be passed,' … it goes to the competency of Congress to pass a bill *of that description*.

*Downes*, 182 U.S. at 277.  Thus he began to categorize those "certain natural

rights" which cannot be transgressed, and those that are "remedial rights

which are peculiar to our own system of jurisprudence." *Id.* at 282.

> As constitutional law scholar Christina Duffy Burnett has concluded:
>
> While the Insular Cases … alluded more generally to "principles which are the basis of all free government" and to "restrictions of so fundamental a nature that they cannot be transgressed although not expressed in so many words in the Constitution," all of the Justices agreed that prohibitions such as those respecting bills of attainder, ex post facto laws, and titles of nobility limited Congressional power even in the unincorporated territories, thus confirming the Constitution's central referent in the analysis.

Christina Duffy Burnett, *A Convenient Constitution?: Extraterritoriality after*

*Boumediene*, 109 Colum. L. Rev. 973, 1013 (quoting from *Downes v. Bidwell*, 182

U.S. 244, 291).

In *Reid v. Covert*, 354 U.S. 1 (1956), the Court introduced the inquiry as to

whether judicial enforcement would be "impracticable and anomalous," *Id.* at 74-

75, but maintained the distinction between remedial rules or rights, and

fundamental or natural rights and restrictions.  While returning to this inquiry in

*U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 277-278 (1990), the Court was careful to

distinguish "a remedial question" regarding the Fourth Amendment rights, and the

separate and distinct question about "the existence *vel non* of the constitutional

violation." 494 U.S. at 264.F[12]F  At issue in *Verdugo-Urquidez* was whether the

Fourth Amendment applied to the United States' DEA's warrantless search and

seizure of evidence obtained in Mexico and used to convict a Mexican national.

The Court therefore was able to categorize the Fourth Amendment exclusionary

rule as a remedial rule, and therefore distinct from those "principles which are the

basis of all free government."  Having categorized the right as remedial, the next

line of inquiry is whether enforcement of the remedial rights is "altogether

impracticable and anomalous." (KENNEDY, J., concurring, citing to Reid v.

Covert, 354 U.S. at 74).

    The constitutional inquiry posed in these proceedings, pertaining to whether

the Art. 1 Ex Post Facto Clause should be granted full force and effect to detainees

---

[12] Justice Kennedy provided a careful and comprehensive summary of the law on
this issue in his concurring opinion, stating: "I take it to be correct, as the plurality
in *Reid v. Covert* sets forth, that the Government may act only as the Constitution
authorizes, whether the actions in question are foreign or domestic. [Citation
omitted.]   The question before us then became what constitutional standards apply
when the government acts, in reference to an alien, within its sphere of foreign
operations…. We must interpret constitutional protections in light of the undoubted
power and authority abroad."  *U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 277 (J.
KENNEDY, concurring).

held at Guantanamo Bay Naval Base must be answered in the affirmative. The

right asserted by Petitioner against the application of *ex post facto* laws is among

the rights contemplated by the Court in earlier decisions, and specifically

mentioned in *Downes v. Bidwell*, as central to the operation of a free government

must have application here. Finally, there are no sound arguments regarding the

impracticality and anomalousness of the constitutional claims raised herein that

can trump their application and enforcement.

> **D.     The legal status of detainees held in Guantanamo Bay has no
> relevance on their right to fundamental protections under the
> Constitution.**

As the Supreme Court has repeatedly held, non-citizens are entitled to the

protection of their fundamental constitutional rights regardless of their legal status.

In the first of the *Insular Cases* to address the constitutional rights of non-citizens

outside the United States and its formally incorporated territories, the Court clearly

stated:

> Even if regarded as aliens, they are entitled under the principles of the
> Constitution to be protected in life, liberty and property. This has
> been frequently held by this court in respect to the Chinese, even
> when aliens, not possessed of the political rights of citizens of the
> United States. *Yick Wo v. Hopkins*, 118 U.S. 356 (additional citations
> omitted).

*Downes v. Bidwell*, 182 U.S. at 283.

The doctrine emanating from the *Insular Cases* regarding the rights of non-citizens has parallels in cases arising out of the Panama Canal Zone, a territory governed much in the same way as the Guantanamo Naval Base.  In *Canal Zone v. Scott*, 502 F.2d 566, 568 (5th Cir. 1974), the Fifth Circuit held: "non-citizens and citizens of the United States resident in such territories are treated alike, since it is the territorial nature of the Canal Zone and not the citizenship of the defendant that is dispositive."  *See also*, *United States v. Husband R. (Roach)*, 453 F.2d 1344, 1058 (5th Cir. 1971); *Raven v. Panama Canal Co.*, 583 F.2d 169 (5th Cir. 1978), *cert. denied*, 440 U.S. 908 (1979).  As with the *Insular Cases* and the jurisprudence arising out of the Panama Canal Zone, it is the nature of Guantanamo Naval Base and the Government's exercise of *de facto* sovereign control over that territory, and not the alienage of the individuals, that matters in determining the reach of the Constitution.[13]

## II.    Conclusion

Justice Black, writing for the majority in *Reid v. Covert*, warned:

The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become

---

[13] The Second and Eleventh Circuits issued conflicting decisions about the applicability of the Bill of Rights asylum seekers captured at sea and held at the Guantanamo Naval Base.  *Compare Haitian Ctrs. Council, Inc. v. McNary*, 969 F. 2d 1326 (2d Cir. 1992) *vacated as moot sub nom Sale v. Haitian Centers Council, Inc.* 509 U.S. 918 (1993), *with Cuban-American Bar Ass'n v. Christopher*, 43 F.3d 11412 (11th Cir. 1995) (denying the application of the Bill of Rights).

inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefit of a written Constitution and undermine the basis of our government.

Reid v. Covert, 354 U.S. 1, 14 (1957). Justice Black's statement resonates more than half a century later; this court should not collude in the attempt to render the protections of the constitution inoperative by geographical manipulation.

DATE: June 10, 2013

Respectfully submitted,

Sarah H. Paoletti, Esq.
Counsel to *Amici Curiae,*
*Historians, Political Scientists, and*
*Constitutional Law Scholars*
Univ. of Pennsylvania Law School
3501 Sansom Street
Philadelphia, PA 19104
(215) 898-8427
paoletti@law.upenn.edu

34

<u>CERTIFICATE OF COMPLIANCE, Fed. R. App. P. 32(a)(7)</u>

Counsel for *Amici Curiae* herein certifies this brief is in compliance with the word limitation of 7,000 words set for an amicus curiae brief.  This brief contains 6,077 words (inclusive of summary of argument, argument, footnotes and citations).

DATE: June 10, 2013

_____
Sarah H. Paoletti, Esq.
Counsel to *Amici Curiae*,
*Historians, Political Scientists, and*
*Constitutional Law Scholars*