En Banc Oral Argument Scheduled For September 30, 2013
No. 11-1324
_____
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

ALI HAMZA AHMAD SULIMAN AL BAHLUL, Petitioner,

v.

UNITED STATES OF AMERICA, Respondent.
_____

ON PETITION FOR REVIEW FROM THE UNITED STATES COURT
OF MILITARY COMMISSION REVIEW
_____

BRIEF FOR THE UNITED STATES
_____

ROB PARK
Acting Deputy General Counsel
U.S. Department of Defense

JOHN P. CARLIN
Acting Assistant Attorney General
for National Security
J. BRADFORD WIEGMANN
Deputy Assistant Attorney General
STEVEN M. DUNNE
Chief, Appellate Unit
JOHN F. DE PUE
JOSEPH F. PALMER
Attorneys
National Security Division
U.S. Department of Justice
Washington, DC 20530

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## I.     PARTIES

Ali Hamza Ahmad Suliman al Bahlul is the petitioner in this case.  The

United States is the respondent.  Amici supporting Bahlul include: The

Constitutional Accountability Center; Seth F. Kreimer, Jana K. Lipman, Kermit

Roosevelt, and Bartholomew H. Sparrow, identified as "Constitutional Law

Scholars"; John M. Bickers, Roger S. Clark, Geoffrey S. Corn, Robert K.

Goldman, Kevin Jon Heller, Kristine A. Huskey, Hope Metcalf, Fionnuala D. Ní

Aoláin, Deborah Pearlstein, Marco Sassòli, Jens David Ohlin, Gabor Rona, and

David Sloss, identified as "International Law Scholars"; The National Institute of

Military Justice; and Professors David Glazier and Gary Solis.

## II.     RULINGS

The ruling under review in this case is the decision of the United States

Court of Military Commission Review affirming Bahlul's convictions.

## III.     PRIOR DECISIONS AND RELATED CASES

The United States Court of Military Commission Review has issued a

published decision in this case.  United States v. Al Bahlul, 820 F. Supp. 2d 1141

(CMCR 2011) (en banc) (Pet. App. 1).  On January 25, 2013, a panel of this Court

issued an order reversing Bahlul's convictions.  Al Bahlul v. United States, No. 11-

i

1324, 2013 WL 297726.  The en banc court, however, vacated that order.  No. 11-1324, Dkt. No. 1432126, Order of the En Banc Court (Apr. 23, 2013).

On October 16, 2012, a panel of this Court issued a decision addressing one of the issues pending in this case: whether material support for terrorism constitutes an offense triable by military commission.  See Hamdan v. United States, 696 F.3d 1238 (D.C. Cir. 2012).

DATED: July 10, 2013                           /s/ John F. De Pue
                                               John F. De Pue
                                               Attorney for Respondent

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

    I.   PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

    II.  RULINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

    III. PRIOR DECISIONS AND RELATED CASES . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  v

GLOSSARY OF ABBREVIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  xiv

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

SUMMARY OF PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

    I.     THE 2006 MCA AUTHORIZES THE PROSECUTION
         OF CONSPIRACY, SOLICITATION, AND MATERIAL
         SUPPORT FOR TERRORISM OFFENSES FOR CONDUCT
         COMMITTED BEFORE ITS ENACTMENT . . . . . . . . . . . . . . . . .  18

         A.    The 2006 MCA Provides Jurisdiction Over Pre-
             Enactment Conduct for All the Offenses It Codifies . . . . . . .  18

  B. Bahlul's Construction of the 2006 MCA as Not
   Providing Jurisdiction Over Pre-Enactment Conduct
   Is Inconsistent with the Statute's Plain Language . . . . . . . . 23

  C. Article 21 Does Not Limit Jurisdiction under the 2006
   MCA Over Bahlul's Conduct . . . . . . . . . . . . . . . . . . . . . . . . . 52

 II. BAHLUL'S CONVICTIONS DID NOT VIOLATE THE
   EX POST FACTO CLAUSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

  A. Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

  B. The Ex Post Facto Clause Does Not Preclude the
   Prosecution of Offenses Traditionally Subject to
   Trial by Military Commission . . . . . . . . . . . . . . . . . . . . . . . . 64

 III. BAHLUL'S ADDITIONAL CONSTITUTIONAL
   ARGUMENTS LACK MERIT . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

STATUTORY ADDENDUM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1a

# TABLE OF AUTHORITIES[1]

<u>Cases</u>:

<u>Boumediene v. Bush</u>, 553 U.S. 723 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

<u>Calder v. Bull</u>, 3 U.S. (3 Dall.) 386 (1798) . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

<u>Colepaugh v. Looney</u>, 235 F.2d 429 (10th Cir. 1956) . . . . . . . . . . . . . . . . . . 38

<u>Collins v. Youngblood</u>, 497 U.S. 37 (1990) . . . . . . . . . . . . . . . . . . . . 34, 66, 69

<u>Downes v. Bidwell</u>, 182 U.S. 244 (1901) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

<u>Duncan v. State</u>, 152 U.S. 377 (1894) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

<u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64 (1938) . . . . . . . . . . . . . . . . . . . . . . . 72

<u>Finzer v. Barry</u>, 798 F.2d 1450 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . 41

<u>Flick v. Johnson</u>, 174 F.2d 983 (D.C. Cir. 1949) . . . . . . . . . . . . . . . . . . . . . . 51

*<u>Hamdan v. Rumsfeld</u>,
  548 U.S. 557 (2006) . . . . . . . . . 4, 5, 27, 32, 35, 37, 38, 40, 41, 42, 44, 47, 48

<u>Hamdan v. United States</u>, 696 F.3d 1238
  (D.C. Cir. 2012) . . . . . . . . . . . . . 11, 12, 13, 25, 30, 34, 48, 49, 50, 60, 61, 72

<u>Holder v. Humanitarian Law Project</u>, 130 S. Ct. 2705 (2010) . . . . . . . . . . . . 41

<u>Hughes Aircraft Co. v. United States ex rel Schumer</u>,
  520 U.S. 939 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

<u>Landgraf v. USI Film Prods.</u>, 511 U.S. 244 (1994) . . . . . . . . . . . . . . . . . . . . 69

---

[1]Authorities upon which we chiefly rely are marked with asterisks.
.

Lynce v. Mathis, 519 U.S. 433 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Madsen v. Kinsella, 343 U.S. 341 (1952) . . . . . . . . . . . . . . . 53, 54, 55, 58, 59

Ex parte Milligan, 71 U.S. (4 Wall.) 2 (1866) . . . . . . . . . . . . . . . . . . . . . . . . . 37

Ex parte Mudd, 17 F. Cas. 954 (S.D. Fla. 1868) . . . . . . . . . . . . . . . . . . . . . . . 36

In re Murphy, 17 F. Cas. 1030 (C.C.D. Mo. 1867) . . . . . . . . . . . 36, 37, 43, 44

Parker v. Levy, 417 U.S. 733 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Ex parte Quirin,
    317 U.S. 1 (1942) . . . . . . . . . . . . . . . . . . 19, 31, 32, 33, 37, 38, 41, 56, 71, 73

Roe v. Flores-Ortega, 528 U.S. 470 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Rogers v. Tennessee, 532 U.S. 451 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Rostker v. Goldberg, 453 U.S. 57 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 54

State v. Hylton, 226 P.3d 246 (Wash. App. 2010) . . . . . . . . . . . . . . . . . . . . . . 67

United States v. Al-Kassar, 660 F.3d 108 (2d Cir. 2011),
    cert. denied, 132 S. Ct. 2374 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

United States v. Ali, No. 12-3056, 2013 WL 2477029
    (D.C. Cir. June 11, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 69

United States v. Arjona, 120 U.S. 479 (1887) . . . . . . . . . . . . . . . . . . . . . . . . . 61

United States v. El-Mezain, 664 F.3d 467 (5th Cir. 2011),
    cert. denied, 133 S. Ct. 525 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

United States v. Harcrow, 66 M.J. 154 (C.A.A.F. 2008) . . . . . . . . . . . . . . . . . 63

United States v. Marcus, 130 S. Ct. 2159 (2010) . . . . . . . . . . . . . . . . . . . .  63, 70

Weaver v. Graham, 450 U.S. 24 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Application of Yamashita, 327 U.S. 1 (1946) . . . . . . . . . . . . . . . . . . . . . .  33, 65

Constitution:

U.S. Constitution:

art. I, § 8, cl. 10 (Define and Punish Clause) . . . . . . . . . . . . . . . . . . 17, 59, 61

art. I, § 8, cl. 18 (Necessary and Proper Clause) . . . . . . . . . . . . . . . . . . . . . . 61

art. I, § 9, cl. 3 (Ex Post Facto Clause)
. . . . . . . . . . . . . . . . . 2, 10, 13, 17, 34, 40, 48, 51, 52, 62, 63, 64, 65, 67, 68

art. III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 65, 68, 71

amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 71

amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 71

Treaties:

Geneva Convention Relative to the Protection of Civilian
Persons in Time of War, Aug. 12, 1949,
6 U.S.T. 3516, T.I.A.S. No. 3365 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 61

Hague Convention No. IV Respecting the Laws and Customs of
War on Land, and Its Annex, Oct. 18, 1907, 36 Stat. 2277 . . . . . . . . . . . . . 56

Statutes:

Act of Aug. 29, 1916, ch. 418, art. 15, 39 Stat. 653 . . . . . . . . . . . . . . . 53, 58, 59

Authorization for Use of Military Force,
Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001) . . . . . . . . . . . . . . . . . 3, 4, 23

Military Commissions Act of 2006, Pub. L. No. 109-366, 120
Stat. 2600 (10 U.S.C. § 948a et seq.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

§ 4(a)(2), 120 Stat. 2631 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 54

10 U.S.C. § 948a (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

10 U.S.C. § 948b(a) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 72

10 U.S.C. § 948d(a) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 21, 24

10 U.S.C. § 950c (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

10 U.S.C. § 950g(a) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

10 U.S.C. § 950p (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24, 28

10 U.S.C. § 950p(a) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 72

10 U.S.C. § 950p(b) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

10 U.S.C. § 950u (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 19, 28

10 U.S.C. § 950v(b)(25) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

10 U.S.C. § 950v(b)(25)(A) (2006) . . . . . . . . . . . . . . . . . . . . . . . 5, 19, 45

10 U.S.C. § 950v(b)(28) (2006) . . . . . . . . . . . . . . . . . . . . 2, 3, 19, 35, 46

Military Commissions Act of 2009, Pub. L. No. 111-84,
div. A, tit. XVIII, 123 Stat. 2574 (2009) . . . . . . . . . . . . . . . . . . . . . . . . 21

10 U.S.C. § 948d (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

10 U.S.C. § 950a(a) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

10 U.S.C. § 950c (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

10 U.S.C. § 950c(a) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

10 U.S.C. § 950f (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

10 U.S.C. § 950g(a) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

10 U.S.C. § 950p(d) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 28, 60

10 U.S.C. § 950t(25) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

10 U.S.C. § 950t(29) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

10 U.S.C. § 950t(30) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

10 U.S.C. § 821 (art. 21, UCMJ)
    . . . 4, 12, 13, 16, 17, 25, 26, 27, 32, 33, 52, 53, 54, 55, 56, 58, 59, 61, 62, 67

10 U.S.C. § 904 (art. 104, UCMJ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

10 U.S.C. § 906 (art. 106, UCMJ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18 U.S.C. § 373 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

18 U.S.C. § 2332(b) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 67

18 U.S.C. § 2339A (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

18 U.S.C. § 2339A(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50


Regulation:

66 Fed. Reg. 57,833 (Nov. 13, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Miscellaneous:

Trial of Altstötter, 6 L. Rep. Trials of War Criminals (1948) . . . . . . . . . . . . 65

Richard R. Baxter, So-Called "Unprivileged Belligerency":
    Spies, Guerrillas, and Saboteurs, 28 Brit. Y.B. Int'l L. 323
    (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

ix

Jonathan A. Bush, <u>The Prehistory of Corporations and Conspiracy in International Criminal Law: What Nuremberg Really Said,</u> 109 Colum. L. Rev. 1094 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Hampton L. Carson, <u>The Law of Criminal Conspiracies and Agreements</u> (1887) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

152 Cong. Rec. 20,727 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

John C. Dehn, <u>The Hamdan Case and the Application of a Municipal Offence</u>, 7 J. Int'l Crim. Justice 63 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Dep't of the Army, Field Manual, FM 27-10, <u>The Law of Land Warfare</u> (1956) . . . . . . . . . . . . . . . . . . . . . . 11, 30, 35, 39, 51

G. I. A. D. Draper, <u>The Status of Combatants and the Question of Guerilla Warfare</u>, 45 Brit. Y.B. Int'l L. 173 (1971) . . . . . . . . . . . . . . . . . 32

<u>The Flick Trial</u>, 9 L. Rep. Trials of War Criminals 16 (1949) . . . . . . . . . . . . . 51

G.C.M.O. No. 356, War Dep't (July 5, 1865) . . . . . . . . . . . . . . . . . . . . . . . . . 35

G.C.M.O. No. 452, War Dep't (Aug. 22, 1865) . . . . . . . . . . . . . . . . . . 36, 43, 45

G.C.M.O. No. 607, War Dep't (Nov. 6, 1865) . . . . . . . . . . . . . . . . . . . . . 36, 42

G.O. No. 13, HQ, Dep't of the Missouri (Dec. 4, 1861) . . . . . . . . . . . . . . . . . 48

G.O. No. 9, HQ, Dep't of the Mississippi (Mar. 25, 1862) . . . . . . . . . . . . 36, 49

G.O. No. 15, HQ, Dep't of the Mississippi (Apr. 3, 1862) . . . . . . . . . . . . . . . 50

G.O. No. 19, HQ, Dep't of the Mississippi (Apr. 24, 1862) . . . . . . . . . . . 49, 50

G.O. No. 100 (Apr. 24, 1863) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

G.O. No. 102, War Dep't (Mar. 15, 1864) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

x

G.O. No. 205, HQ, Dep't of the Missouri (Nov. 10, 1864) . . . . . . . . . . . . . . . . 45

G.O. No. 30, HQ, Northern Dep't (Apr. 21, 1865) . . . . . . . . . . . . . . . . . 43, 45

G.O. No. 52, War Dep't (July 7, 1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Richard Shelly Hartigan, Lieber's Code and the Law of War (1983) . . . . . . . 29

Charles Roscoe Howland, A Digest of Opinions of The Judge Advocate
General of the Army (1912) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

H.R. Doc. No. 55-314 (1899) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36, 43, 45

H.R. Rep. No. 109-664, pt. 1 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27

5 Journal of the Continental Congress (Aug. 21, 1776) . . . . . . . . . . . . . . . . . 30

3 L. Rep. Trials of War Criminals (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

5 L. Rep. Trials of War Criminals (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

11 L. Rep. Trials of War Criminals (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

15 L. Rep. Trials of War Criminals (1949) . . . . . . . . . . . . . . . . . . . . . . . . 57, 58

Letter Order, Gen. HQ, United Nations Command, Tokyo, Japan,
Trial of Accused War Criminals (Oct. 28, 1950) . . . . . . . . . . . . . . . . . . . . . . 39

Francis Lieber, Guerrilla Parties Considered with Reference
to the Laws and Usages of War (1862) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Francis Lieber, Instructions for the Government of
Armies of the United States in the Field (1898) . . . . . . . . . . . . . . . . . . . . . . . 29

The Law of War Crimes, National and International Approaches
(Timothy L.H. McCormack & Gerry J. Simpson eds. 1997) . . . . . . . . . 28, 29

A Manual for Courts-Martial (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Manual for Military Commissions (2010) . . . . . . . . . . . . . . . . . . . . . . . . . 47, 63

Memorandum of Law from Tom C. Clark, Assistant Att'y Gen., to Major
  Gen. Myron C. Kramer, Judge Advocate Gen. (Mar. 12, 1945) . . . . . . . . . 38

11 Op. Att'y Gen. 297 (1865) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Opinion of Special Board of Review, United States v. Colepaugh, CM
  276026 (Mar. 27, 1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 46

Opinion of The Judge Advocate General in the Matter of
  William Murphy (Mar. 21, 1866) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

2 L. Oppenheim, International Law (Arnold D. McNair
  4th ed. 1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 56, 58

Philip R. Piccigallo, The Japanese on Trial, Allied War Crimes
  Operations in the East, 1945-1951 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . 57

Richard D. Rosen, Targeting Enemy Forces in the War on Terror:
  Preserving Civilian Immunity, 42 Vand. J. Transnat'l L. 683 (2009) . . . . . 29

Revision of the Articles of War, Hearing Before the Subcomm.
  on Military Affairs, appended to S. Rep. No. 64-130 (1916) . . . . . . . . 58, 59

S.C. Res. 1267, U.N. Doc. S/RES/1267 (Oct. 15, 1999) . . . . . . . . . . . . . . . . 70

S.C. Res. 1333, U.N. Doc. S/RES/1333 (Dec. 19, 2000) . . . . . . . . . . . . . . . . 70

Haridimos V. Thravalos, History, Hamdan, and Happenstance,
  3 Harv. Nat'l Sec. J. 223 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 39

1 Trial of the Major War Criminals Before the International
  Military Tribunal (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

U.S. War Dep't, <u>Digest of Opinions of the Judge Advocate General
of the Army 1912-1940</u> (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

U.S. War Dep't, <u>A Manual for Courts-Martial</u> (1917) . . . . . . . . . . . . . . 44, 45

U.S. War Dep't, <u>Rules of Land Warfare</u> (1917) . . . . . . . . . . . . . . . . . . . . 31

1 <u>The War of the Rebellion, Official Records
of the Union and Confederate Armies</u> (1894) . . . . . . . . . . . . . 36, 48, 49, 50

8 <u>The War of the Rebellion, Official Records
of the Union and Confederate Armies</u> (1899) . . . . . . . . . . . . . . . . . . . 43, 45

William Winthrop, <u>A Digest of Opinions of The Judge Advocate
General of the Army</u> (1880) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

William Winthrop, <u>Military Law and Precedents</u>
(2d ed. 1920) . . . . . . . . . . . . . . . . . . . 29, 30, 37, 38, 42, 43, 45, 46, 48, 59, 60

John Fabian Witt, <u>Lincoln's Code: The Laws of War in
American History</u> (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>The Zyklon B Case</u>, 1 L. Rep. Trials of War Criminals (1947) . . . . . . . . . . . 52

xiii

## GLOSSARY OF ABBREVIATIONS

AUMF  . . . . . . . . . . . . . . . . . . . . . . . . . . . . Authorization for Use of Military Force

CMCR  . . . . . . . . . . . . . . . . United States Court of Military Commission Review

Dig. Ops.  . . . . . . . <u>Digest of Opinions of The Judge Advocate General of the Army</u>

FM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Army Field Manual

G.C.M.O. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . General Court Martial Order

G.O.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . General Order

HQ  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Headquarters

H.R. Doc. . . . . . . . . . . . . . . . . . . . . . . . . . . House of Representatives Document

MCA  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Military Commissions Act

NIMJ  . . . . . . . . . . . . . . . . . . . . . . . . . . . . National Institute for Military Justice

Op. Att'y Gen.  . . . . . . . . . . . . . . . . . . . . . . . . . Opinion of the Attorney General

OR  . . . . . . . . . . . . . . . . . <u>Official Records of the Union and Confederate Armies</u>

Pet. App. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appendix to Brief of Petitioner

Pet. Br. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Petitioner's Brief

S.C. Res. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Security Council Resolution

xiv

Supp. Auth.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Supplemental Authorities

UCMJ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Uniform Code of Military Justice

U.N. Doc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . United Nations Document

Winthrop  . . . . . . . . . . . . . . . . . William Winthrop, <u>Military Law and Precedents</u>

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

No. 11-1324

————————————

ALI HAMZA AHMAD SULIMAN AL BAHLUL, Petitioner,

v.

UNITED STATES OF AMERICA, Respondent.

————————————

ON PETITION FOR REVIEW FROM THE UNITED STATES COURT
OF MILITARY COMMISSION REVIEW

————————————

BRIEF FOR THE UNITED STATES

————————————

STATEMENT OF JURISDICTION

The military commission had jurisdiction pursuant to Section 948d(a) of the

Military Commissions Act of 2006 ("2006 MCA"), 10 U.S.C. § 948d(a) (2006).

The United States Court of Military Commission Review ("CMCR") had appellate

jurisdiction under Sections 950c(a) and 950f of the Military Commissions Act of

2009 ("2009 MCA"), 10 U.S.C. §§ 950c(a), 950f (2009).  The CMCR issued its

decision on September 9, 2011.  Bahlul's counsel filed a timely petition for review

in this Court on September 14, 2011, although a question remains whether Bahlul

authorized this appeal.  See No. 11-1324, Dkt. No. 1436058, Order of the En Banc

Court (May 14, 2013) (requiring Bahlul's counsel to obtain a letter from Bahlul stating whether he authorized the appeal); see also Gov't Motion To Dismiss, Dkt. No. 1338888 (Oct. 31. 2011); Roe v. Flores-Ortega, 528 U.S. 470, 479 (2000) ("[T]he decision to appeal rests with the defendant."); United States v. El-Mezain, 664 F.3d 467, 577-78 (5th Cir. 2011) (dismissing unauthorized appeal), cert. denied, 133 S. Ct. 525 (2012).  This Court has "exclusive appellate jurisdiction" to "determine the validity" of the final judgment rendered by Bahlul's military commission, as approved by the convening authority and the CMCR, pursuant to Section 950g(a) of the 2009 MCA.  10 U.S.C. § 950g(a) (2009).

## QUESTIONS PRESENTED

1.  Whether the Military Commissions Act of 2006, 10 U.S.C. § 948a *et seq.* (2006), authorizes prosecution of conspiracy, solicitation, and material support for terrorism offenses for conduct committed before its enactment.

2.  Whether Bahlul's convictions based on conduct that pre-dated enactment of the 2006 MCA violated the Ex Post Facto Clause.

## SUMMARY OF PROCEEDINGS

Bahlul, a detainee at Guantanamo Bay, Cuba, was charged with conspiring with Usama bin Laden and others to commit offenses triable by military commission (including murder of protected persons), an offense codified at 10

2

U.S.C. § 950v(b)(28) (2006) (Charge I); solicitation to commit the substantive

offenses alleged in Charge I, an offense codified at 10 U.S.C. § 950u (2006)

(Charge II); and providing material support for terrorism, an offense codified at 10

U.S.C. § 950v(b)(25) (2006) (Charge III).  Following trial before a military

commission, Bahlul was convicted on all three charges and sentenced to life

imprisonment.  The convening authority approved the findings and sentence.  On

September 9, 2011, the en banc United States Court of Military Commission

Review affirmed.  United States v. Al Bahlul, 820 F. Supp. 2d at 1264.  On

January 25, 2013, a panel of this Court vacated Bahlul's convictions.  Al Bahlul v.

United States, No. 11-1324, 2013 WL 297726.  On April 23, 2013, the en banc

Court granted the government's petition for rehearing en banc and vacated the

panel's order.  No. 11-1324, Dkt. No. 1432126, Order of the En Banc Court.

STATEMENT OF FACTS

1.  On September 11, 2001, the terrorist organization al Qaeda attacked the

United States and murdered nearly 3,000 people.  Prosecution Ex. 14A, at 10-11.

In response, Congress authorized the President to use "all necessary and

appropriate force against those nations, organizations, or persons he determines

planned, authorized, committed, or aided the terrorist attacks that occurred on

September 11, 2001."  Authorization for Use of Military Force (AUMF), Pub. L.

3

No. 107-40, § 2(a), 115 Stat. 224 (2001).  The President ordered the Armed Forces

to subdue al Qaeda and the Taliban regime that harbored it in Afghanistan.  In

addition, the President issued a military order that authorized the trial by military

commission of non-citizens for certain offenses against the United States.  See 66

Fed. Reg. 57,833, 57,834, § 4 (Nov. 13, 2001).

      In Hamdan v. Rumsfeld, 548 U.S. 557 (2006) ("Hamdan I"), the Supreme

Court held that the military commission system established by the President

contravened statutory restrictions on military commission procedures contained in

the Uniform Code of Military Justice ("UCMJ").  Id. at 613-35.  The Court did not

resolve – and was divided 4-3 on – the question whether conspiracy was an offense

triable by military commission in the absence of specific statutory authorization.

See id. at 595-612 (Stevens, Souter, Ginsburg, Breyer, JJ., plurality opinion)

(concluding that conspiracy is not a recognized offense under the law of war as

incorporated in 10 U.S.C. § 821); id. at 697-706 (Thomas, Scalia, Alito, JJ.,

dissenting) ("[C]onspiracy to violate the laws of war is itself an offense cognizable

before a law-of-war military commission.").  In addition, four Justices joined

concurrences inviting Congress to clarify the President's authority with regard to

military commissions.  See id. at 636 (Breyer, Kennedy, Souter, Ginsburg, JJ.,

concurring) ("Nothing prevents the President" from seeking from Congress

4

"legislative authority to create military commissions of the kind at issue here."); <u>id.</u> at 655 (Kennedy, J., concurring) (noting that "Congress may choose to provide further guidance" regarding the "validity of the conspiracy charge," and that "Congress, not the Court, is the branch in the better position" to determine that question).

In response to <u>Hamdan I</u>, Congress enacted the Military Commissions Act of 2006, Pub. L. No. 109-366, 10 U.S.C. § 948a *et seq.* (2006). In the 2006 MCA, Congress established and authorized a military commission system "to try alien unlawful enemy combatants engaged in hostilities against the United States for violations of the law of war and other offenses triable by military commission." <u>Id.</u> § 948b(a). The offenses codified in the 2006 MCA include providing material support for terrorism, <u>id.</u> § 950v(b)(25)(A), solicitation, <u>id.</u> § 950u, and conspiracy, <u>id.</u> § 950v(b)(28).

2. Ali Hamza Ahmad Suliman Al Bahlul was born in Yemen. Tr. 477. In the early 1990s, Bahlul became inspired by al Qaeda ideology and went to Afghanistan to fight the Communist regime. Tr. 479, 504. Bahlul then returned to Yemen for several years. Tr. 480, 505-06; <u>Bahlul</u>, 820 F. Supp. 2d at 1161.

In the late 1990s, Bahlul went back to Afghanistan, with his travel arranged by al Qaeda agents. Tr. 506-07. Bahlul completed paramilitary training at an al

5

Qaeda camp.  Tr. 507-08.  He met Usama bin Laden and swore an oath of "bayat," pledging loyalty to bin Laden and al Qaeda.  Tr. 509-11, 589-90; Pet. App. 143-45; Bahlul, 820 F. Supp. 2d at 1161.

Bin Laden assigned Bahlul, who was well educated and spoke English, to work in al Qaeda's media office.  Tr. 513.  Bin Laden directed Bahlul to create an al Qaeda recruitment video highlighting the October 2000 attack on the *U.S.S. Cole*.  Tr. 514.  Bahlul's video, which called on viewers to execute terrorist attacks against the United States and to come to Afghanistan for training, was translated into several languages and distributed widely outside Afghanistan.  Tr. 534-35, 588-89, 651-52; Bahlul, 820 F. Supp. 2d at 1161-62.  Bahlul's *Cole* movie became one of the most popular of al Qaeda's video productions.  Tr. 810; Bahlul, 820 F. Supp. 2d at 1161.

Bin Laden appointed Bahlul to be his personal secretary for public relations. Tr. 556; Prosecution Ex. 15.  As bin Laden's "media man," Bahlul assisted bin Laden in preparing public statements, and he was responsible for operating bin Laden's communications equipment.  Bahlul, 820 F. Supp. 2d at 1162.

While he was in Afghanistan, Bahlul lived in the same house with Muhammed Atta and Ziad al Jarrah, both of whom later piloted aircraft in the 9/11 attacks.  Tr. 550-55.  Bahlul administered the two hijackers' oaths of loyalty to bin

6

Laden.  Id.; Prosecution Ex. 15.  He also transcribed their "martyr wills"

(videotaped statements made by suicide terrorists in preparation for their mission)

and hand-delivered the documents to bin Laden.  Tr. 553-55; Prosecution Ex. 15;

Bahlul, 820 F. Supp. 2d at 1162.

Just before the 9/11 attacks, Bahlul evacuated al Qaeda's headquarters in

Kandahar with bin Laden.  Tr. 562.  After 9/11, while bin Laden and his entourage

were fleeing the U.S. response, Bahlul operated the radio that bin Laden used to

track the news of the attacks.  Tr. 562-63.

Bahlul was captured in Pakistan, turned over to the United States, and

detained at Guantanamo.  Tr. 946; Bahlul, 820 F. Supp. 2d at 1156.  Bahlul

voluntarily spoke with investigators.  Id. at 1162.  Bahlul acknowledged that he

was an officer in al Qaeda, and he outlined his role in producing the *Cole* video

and providing other public relations services to bin Laden and al Qaeda.  Tr. 485,

492, 512-14.  Bahlul also admitted that he had roomed with 9/11 hijackers Atta and

Jarrah and that he had administered their loyalty oaths and compiled their martyr

wills.  Tr. 550-55; Prosecution Ex. 15.  Bahlul told investigators he had "great

respect" for the hijackers and for the attacks they carried out.  Tr. 593.  During his

detention, Bahlul wrote letters to other al Qaeda leaders expressing pride in having

played a role in the 9/11 attacks, renewing his pledge of loyalty to al Qaeda, and

reaffirming his belief that al Qaeda would ultimately prevail in its war against America.  Bahlul, 820 F. Supp. 2d at 1162.

3.  In 2008, military authorities charged Bahlul under the 2006 MCA with conspiracy, solicitation, and providing material support for terrorism.  The substantive offenses underlying the conspiracy and solicitation charges were murder of protected persons, attacking civilians, attacking civilian objects, murder and destruction of property in violation of the law of war, terrorism, and providing material support for terrorism.  Eleven enumerated acts were alleged as both overt acts in furtherance of the conspiracy and means of providing material support for terrorism.  The overt acts included: undergoing military-type training at an al Qaeda camp; pledging "bayat" to bin Laden and performing personal services for him; preparing the *Cole* video; carrying weapons and a suicide belt to protect bin Laden; arranging for two of the 9/11 hijackers to pledge "bayat" to bin Laden; and "preparing the propaganda declarations styled as martyr wills of Muhammed Atta and Ziad al Jarrah in preparation for the acts of terrorism perpetrated by [them] and others at various locations in the United States on September 11, 2001."  Pet. App. 110-29.

At trial, Bahlul pleaded not guilty but conceded that he had engaged in the charged conduct, except he denied wearing a suicide belt.  Tr. 167, 175-76, 190-95.

Bahlul instructed his counsel not to present a defense.  Tr. 15-17, 77-78, 85, 95, 114; Bahlul, 820 F. Supp. 2d at 1163.

The military commission members unanimously convicted Bahlul of all three charges.  Pet. App. 130-137.  Pursuant to a special verdict form, the members specifically found Bahlul "guilty" of each of the seven objects of the conspiracy, including murder of protected persons and attacking civilians.  Id.  The members also specifically found Bahlul "guilty" of all the overt acts, except for arming himself to prevent bin Laden's capture.  Id.

At sentencing, Bahlul again praised the 9/11 attacks.  He acknowledged that he had been al Qaeda's "media man" and that he would have been the 20th hijacker "but bin Laden refused."  Tr. 968-69, 979; Bahlul, 820 F. Supp. 2d at 1163-64.  The military commission sentenced Bahlul to life imprisonment.  Tr. 992.  On June 3, 2009, the convening authority approved Bahlul's convictions and sentence.  Bahlul, 820 F. Supp. 2d at 1157, 1264.

4.  As provided in the 2006 MCA, Bahlul's case was automatically referred to the CMCR for appellate review.  10 U.S.C. § 950c (2006); see also 10 U.S.C. § 950c (2009).  Bahlul argued, among other things, that Congress could not authorize military commission jurisdiction over offenses, such as conspiracy, solicitation, and providing material support for terrorism, that were not prohibited by

international law as war crimes, and that his prosecution for such offenses based on conduct that occurred prior to 2006 violated the Ex Post Facto Clause. 820 F. Supp. 2d at 1158.

The CMCR rejected Bahlul's claims.[1] At the outset, the CMCR held that Congress's codification of offenses triable by military commission must be "consistent with international norms," but it afforded "great deference" to Congress's definition of those offenses. 820 F. Supp. 2d at 1170-73. Regarding conspiracy, the CMCR noted that U.S. military commissions had consistently recognized conspiracy as a punishable offense from the Civil War through World War II. Id. at 1220. The CMCR recognized that, although "[t]he viability of conspiracy as a war crime" under *international* law "has long been the subject of controversy," id., international tribunals and conventions have imposed liability for conspiracy to commit certain special offenses, including conspiracy to commit crimes against peace and conspiracy to commit genocide. Id. at 1221-22. The CMCR also noted that the Nuremberg Tribunals punished membership in certain

---

[1] The CMCR did not rule on the government's argument that Bahlul had waived all non-jurisdictional claims by failing to raise them at trial. Although the CMCR agreed that Bahlul had failed to timely raise those claims, including specifically his ex post facto claims, the CMCR considered and rejected Bahlul's arguments as if they had been properly preserved. See 820 F. Supp. 2d at 1163-64, 1258.

criminal organizations (such as the S.S.), which the CMCR found to be "directly akin" to Bahlul's service as an officer in al Qaeda. Id. at 1226.  Accordingly, the CMCR concluded that Congress was within its authority to punish Bahlul's conduct as conspiracy under the 2006 MCA.  Id. at 1230-31.  The CMCR further held, relying on similar analogies to offenses that had been punished by international tribunals or other States, that the military commission had jurisdiction to try Bahlul for solicitation and for providing material support for terrorism.  Id. at 1217-18, 1241.

Judge Sims concurred.  He emphasized "the long-standing public position of the United States Army," as embodied in the 1956 edition of the Army Field Manual on the Law of Land Warfare, that conspiracy to commit a war crime, direct incitement of a war crime, attempted commission of a war crime, and complicity in the commission of such an offense were all properly recognized as existing war crimes well before enactment of the 2006 MCA.  Bahlul, 820 F. Supp. 2d at 1264-65 (Sims, J., concurring) (citing Dep't of the Army, Field Manual 27-10, The Law of Land Warfare ¶ 500 (1956) ("FM 27-10").

5.  Bahlul's counsel filed a petition for appellate review in this Court.  While the appeal was pending, a panel of this Court, in Hamdan v. United States, 696 F.3d 1238 (D.C. Cir. 2012) ("Hamdan II"), considered whether the 2006 MCA

11

authorized Hamdan's military commission to try him for providing material

support for terrorism based on conduct committed before the 2006 MCA's

enactment.  The court recognized that Congress had affirmatively provided for

such jurisdiction and that Congress had stated that the 2006 MCA "codified no

new crimes and thus posed no ex post facto problem."  Id. at 1247.  However, the

court reasoned that, to the extent that the 2006 MCA codified offenses that were

*not* previously recognized offenses, "Congress would *not* have wanted [such] *new*

crimes to be applied retroactively," because doing so would raise "serious

questions of unconstitutionality."  Id. at 1248.  Accordingly, in order to "avoid the

prospect of an Ex Post Facto Clause violation," the court "interpret[ed] the [2006

MCA] so that it does not authorize *retroactive* prosecution for conduct committed

before enactment of that Act unless the conduct was already prohibited under

existing U.S. law as a war crime triable by military commission."  Id.

    To determine whether Hamdan's conduct[2] was previously prohibited, the

Hamdan II court looked to Article 21 of the UCMJ, codified at 10 U.S.C. § 821.

Article 21 provides that the extension of court-martial jurisdiction in the UCMJ

"do[es] not deprive military commissions . . . of concurrent jurisdiction with

---

    [2]  Hamdan was an al Qaeda member who served as Usama bin Laden's
personal driver and bodyguard.  Hamdan's duties also included transporting
weapons.  Hamdan II, 696 F.3d at 1242-43.

respect to offenders or offenses that by statute or by the law of war may be tried by military commissions."  The <u>Hamdan II</u> court construed Article 21 as a limitation on the offenses triable by military commission, and its reference to "the law of war" as encompassing only offenses that are prohibited as war crimes by international law.  696 F.3d at 1248-49.  The <u>Hamdan II</u> court recognized that some forms of terrorism – including intentionally targeting civilian populations – are clearly prohibited by international law as war crimes, and that "there is a strong argument that aiding and abetting" such conduct would also violate the international law of war.  <u>Id.</u> at 1249-51.  Moreover, in a concurring footnote, Judge Kavanaugh concluded that Congress could *prospectively* punish material support for terrorism, because "Congress has long prohibited war crimes beyond those specified by international law."  <u>Id.</u> at 1246 n.6.  However, the court concluded that the 2006 MCA did not authorize jurisdiction over material support for terrorism for pre-2006 conduct, because that offense was not prohibited by international law as a war crime within the meaning of Article 21.  <u>Id.</u> at 1248-52.  In light of that statutory holding, the <u>Hamdan II</u> court found it unnecessary to decide whether or how the Ex Post Facto Clause would apply to military commissions as a constitutional matter.  <u>Id.</u> at 1248 & n.7.

13

The panel in this case directed the parties to file supplemental briefs addressing the effect of Hamdan II. The government conceded that Hamdan II required reversal of Bahlul's convictions because, although the offenses for which Bahlul was convicted had traditionally been triable in U.S. military commissions, they had not attained recognition as offenses under customary international law. The panel then vacated Bahlul's convictions. Al Bahlul v. United States, No. 11-1324, 2013 WL 297726 (D.C. Cir. Jan. 25, 2013).

On April 23, 2013, the en banc court granted the government's petition for rehearing en banc and vacated the panel's order.

## SUMMARY OF ARGUMENT

1. In the Military Commissions Act of 2006, Congress created a comprehensive military commission system to try alien unprivileged enemy belligerents for offenses that, as Congress found, were traditionally recognized under U.S. law and practice as offenses subject to trial by military commission. In the 2006 MCA, Congress expressly permitted trial by military commission for any of the codified offenses for conduct committed prior to the 2006 MCA's enactment. And in a separate provision, Congress provided that military commissions under the 2006 MCA have jurisdiction over all of the offenses for conduct committed before, on, or after September 11, 2001. Those provisions

14

demonstrate that Congress provided for military commission jurisdiction over all of the codified offenses – including the conspiracy, solicitation, and material support for terrorism offenses committed by Bahlul – for conduct committed prior to its enactment.

That construction is confirmed by the statute's background, purpose, and legislative history. Congress enacted the 2006 MCA in direct response to the Supreme Court's decision in Hamdan I, in which several concurring opinions invited Congress to clarify the scope of military commission jurisdiction and the validity of conspiracy charges. Congress responded by finding that the codified offenses, including conspiracy, were traditionally triable by military commission and therefore applicable to pre-enactment conduct. The statute's context and legislative history also establish that Congress intended the military commission system to exercise jurisdiction over conduct related to the September 11 attacks.

The 2006 MCA's jurisdiction over Bahlul's conduct does not implicate ex post facto principles, because the conspiracy, solicitation, and material support for terrorism offenses for which he was convicted were traditionally triable by military commission. The offense of conspiracy, in particular, has traditionally and lawfully been tried by U.S. military commissions since the Civil War and through World War II. Indeed, several of the most prominent examples of military

15

commission prosecutions in American history involved conspiracy charges, including conspiracy charges against the conspirators involved in the assassination of President Lincoln and conspiracy charges against Nazi saboteurs who infiltrated the United States during World War II. There has never been a requirement that the government prove the completion of the object crime. Even if there were such a requirement, it was satisfied in this case by the military commission's finding that Bahlul's co-conspirators completed the September 11 attacks.

U.S. military commissions have also long punished unprivileged belligerents who unlawfully solicit or induce others to commit offenses triable by military commission. And while the "material support" label is a contemporary usage, the act of aiding, assisting, or joining with those engaged in unlawful acts of belligerency has been treated as an offense by the United States and tried by military commissions since the Civil War.

Article 21 of the UCMJ, 10 U.S.C. § 821, does not limit the jurisdiction of military commissions convened under the 2006 MCA for prosecution of pre-enactment conduct to offenses that are prohibited by international law. First, Congress specifically amended Article 21 to provide that it does not apply to a military commission established under the 2006 MCA. Second, Article 21 does not by its terms restrict the jurisdiction of military commissions, but rather

16

functions as a savings statute to ensure that Congress's extension of court-martial jurisdiction in the UCMJ did not deprive military commissions of jurisdiction that they had traditionally exercised.  In addition, the jurisdiction recognized in Article 21 is not restricted to offenses within Congress's power under the Define and Punish Clause.  Congress's constitutional authority to codify military commission offenses resides both in the Define and Punish Clause and in its war-making powers, and, accordingly, both Congress and the President have authorized trial by military commission of offenses, such as spying and sabotage, that international law permits the United States to punish, but which are not prohibited by international law.

2.  Although the Ex Post Facto Clause applies to military commission trials of detainees held at Guantanamo, Bahlul's convictions do not violate that Clause because the 2006 MCA did not create new offenses but merely codified well-established offenses that have long been tried by U.S. military commissions.  The purposes of the Ex Post Facto Clause – providing fair notice and preventing arbitrary and potentially vindictive legislation – are not implicated by Bahlul's prosecution, because his conduct was self-evidently criminal and subject to prosecution under existing criminal statutes, such as 18 U.S.C. § 2332(b) (1998). In addition, Bahlul cannot establish that his forfeited claim of an ex post facto

17

violation affected his substantial rights or seriously affected the fairness, integrity, or public reputation of judicial proceedings.

3. Bahlul's remaining arguments lack merit. The 2006 MCA's codification of offenses triable by military commission does not impermissibly encroach on the judicial power of Article III courts. Moreover, the jury trial guarantees and other procedural safeguards of the Fifth and Sixth Amendments do not apply to offenses traditionally triable by military commission committed by unprivileged enemy belligerents in the context of hostilities against the United States. Nor did the 2006 MCA impermissibly create federal common law crimes. Nothing in the Supreme Court's cases prevents Congress from codifying, and applying to pre-enactment conduct, offenses that were recognized under the common law traditionally applied in military commissions.

ARGUMENT

I.    THE 2006 MCA AUTHORIZES PROSECUTION OF CONSPIRACY, SOLICITATION, AND MATERIAL SUPPORT FOR TERRORISM OFFENSES FOR CONDUCT COMMITTED BEFORE ITS ENACTMENT

    A.    The 2006 MCA Provides Jurisdiction Over Pre-Enactment Conduct for All the Offenses It Codifies

Since the founding of this Nation, the United States has used military commissions to try unprivileged enemy belligerents for crimes committed in the

18

context of hostilities against the United States.  See Ex parte Quirin, 317 U.S. 1,

26-27, 42 n.14 (1942).  Congress has at times codified specific offenses as crimes

subject to trial by military commission, see 10 U.S.C. § 904 (aiding the enemy); id.

§ 906 (spying), but prior to 2006 it had not "crystalliz[ed] in permanent form and

in minute detail" the offenses triable by military commission, Quirin, 317 U.S. at

30.  Instead, U.S. military commissions have exercised jurisdiction over offenses

that have been traditionally recognized as such under the "system of common law

applied by military tribunals."  Id.; cf. Parker v. Levy, 417 U.S. 733, 743-47 (1974)

(recognizing the traditional flexibility of the military's separate legal system).

   After a plurality of the Supreme Court found in Hamdan I that conspiracy

could not be tried by military commission in the absence of explicit legislation,

Congress in the 2006 MCA codified common law offenses that it determined had

traditionally been triable by military commission.  The codified offenses include

the crimes for which Bahlul was convicted: conspiracy to commit offenses triable

by military commission, solicitation of others to commit such offenses, and

providing material support for terrorism.  10 U.S.C. § 950v(b)(28) (2006)

(conspiracy); id. § 950u (solicitation); id. § 950v(b)(25)(A) (material support for

terrorism).

The 2006 MCA expressly authorizes prosecution of the codified offenses for conduct committed before the 2006 MCA's enactment.  Congress included in the 2006 MCA an explicit finding that it was *not* creating new crimes but rather codifying offenses that had long been recognized as subject to military commission jurisdiction:

> The provisions of [the 2006 MCA] codify offenses that have traditionally been triable by military commissions.  [The 2006 MCA] does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission.

10 U.S.C. § 950p(a) (2006).  Congress therefore expressly permitted prosecution of offenses codified in the 2006 MCA for conduct committed before its enactment:

> Because the provisions of [the 2006 MCA] (including provisions that incorporate definitions in other provisions of law) are declarative of existing law, they do not preclude trial for crimes that occurred before the date of the enactment of this chapter.

Id. § 950p(b).  This language unambiguously establishes three principal points:  (1) Congress specifically considered the question whether, in light of ex post facto principles, the statute should permit the codified offenses to be applied to pre-enactment conduct; (2) Congress determined that such application was appropriate because the statute codified pre-existing offenses; and (3) Congress authorized jurisdiction over pre-enactment conduct for all of the offenses codified in the 2006 MCA.

20

A separate provision setting forth the jurisdiction of military commissions under the 2006 MCA provides that such commissions "shall have jurisdiction to try *any offense made punishable by this chapter* or the law of war when committed by an alien unlawful enemy combatant *before, on, or after September 11, 2001*." 10 U.S.C. § 948d(a) (2006) (emphasis added). That provision, like Section 950p, plainly authorizes military commission jurisdiction over conduct committed prior to 2006 for *all* of the codified offenses.

Congress reaffirmed military commissions' jurisdiction over pre-enactment conduct in its most recent action in this area. In 2009, Congress amended the 2006 MCA, <u>see</u> Military Commissions Act of 2009, Pub. L. No. 111-84, div. A, tit. XVIII, 123 Stat. 2574, and adopted without change the 2006 MCA's definitions of conspiracy, solicitation, and material support offenses. <u>See</u> 10 U.S.C. § 950t(25), (29), (30) (2009). Congress also reaffirmed that "[b]ecause the provisions of this subchapter codify offenses that have traditionally been triable under the law of war or otherwise triable by military commission, this subchapter does not preclude trial for offenses that occurred before the date of the enactment of this subchapter." <u>Id.</u> § 950p(d); <u>see also</u> <u>id.</u> § 948d (authorizing military commission jurisdiction "for any offense made punishable by this chapter . . . whether [the] offense was committed before, on, or after September 11, 2001"). Thus, the express terms of

21

both the 2006 MCA and the 2009 MCA manifest the intent of two Congresses that the codified offenses apply to conduct predating the legislation's enactment.  In enacting these statutes, Congress has specifically recognized and ratified this Nation's traditional use of military commissions to try conspiracy, solicitation, and material support for terrorism offenses, it has explicitly authorized jurisdiction over each of those offenses for pre-enactment conduct, and it has expressed its view that such jurisdiction is appropriate and consistent with ex post facto principles.

Although these provisions are clear enough to obviate the need to consider the 2006 MCA's background, purpose, and legislative history, that context nevertheless supports construing the statute, consistent with its plain language, as providing jurisdiction over the codified offenses for pre-enactment conduct.  First, the references in the 2006 MCA to the attacks of September 11 and to the al Qaeda organization that perpetrated them indicate that a major purpose of the legislation was to provide a forum for bringing the September 11 conspirators and their co-belligerents to justice.  See 10 U.S.C. § 948a (2006) (defining enemy combatants to include "a person who is part of the Taliban, al Qaeda, or associated forces"); see also 152 Cong. Rec. 20,727 (Sept. 29, 2006) (The 2006 MCA would "establish[] a system to prosecute the terrorists who on [September 11, 2001] murdered thousands of civilians and who continue to seek to kill Americans both

on and off the battlefield.") (statement of Rep. Hunter); H.R. Rep. No. 109-664, Pt. 1, at 24 (2006) ("[T]he committee firmly believes that trial for crimes that occurred before the date of the enactment of this chapter" is permissible.).

Moreover, the 2006 MCA is designed to establish a military commission system to try offenses arising out of the current armed conflict in which the Nation remains engaged. The statute authorizing the President's use of force in that conflict refers specifically to the September 11 attacks, authorizing force against the "nations, organizations, or persons [the President] determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001." AUMF, § 2(a), 115 Stat. 224 (2001). Congress's purpose in enacting the 2006 MCA would be frustrated if some of the charges authorized could not be brought against the enemies who conspired to commit and otherwise supported the very terrorist attacks that gave rise to the AUMF and the current military commission system.

> B.     Bahlul's Construction of the 2006 MCA as Not Providing Jurisdiction Over Pre-Enactment Conduct Is Inconsistent with the Statute's Plain Language

Bahlul contends (Br. 13-19) that this Court should construe the 2006 MCA not to authorize jurisdiction over his offenses of conviction for conduct committed prior to its enactment. None of Bahlul's arguments provides a legitimate basis for

adopting a construction so clearly contrary to the statute's plain text and manifest purpose.

1.  Bahlul maintains (Br. 13-19) that the 2006 MCA fails to provide for pre-enactment jurisdiction with sufficient clarity to overcome the presumption against retroactive application of criminal statutes.  But Bahlul's characterization of the relevant statutory language as merely expressing a "sense of Congress" that has no effect on the statute's meaning makes no sense.  There would be no reason for Congress to include language expressing its "sense" that the statute permits prosecution for pre-enactment conduct if it did not intend to authorize such prosecutions.  Bahlul's dismissal (Br. 18) of Section 950p because it is labeled as a general statement of the statute's "purpose" and "effect" would similarly render the provision meaningless.  In any event, that analysis cannot be applied to Section 948d(a), which is labeled "Jurisdiction" and provides unambiguously for jurisdiction over *all* of the codified offenses for conduct before, on, or after September 11, 2001.  The presumption Bahlul relies on has no application when Congress has spoken as plainly as it has here.[3]

---

[3]  Bahlul also argues (Br. 17-18) that the 2006 MCA cannot have retroactive effect because it does not provide for a specific effective date.  But the statute does refer to a specific date prior to its enactment – September 11, 2001 – and authorizes jurisdiction over all of the codified offenses for conduct committed before, on, or after that date.  10 U.S.C. § 948d(a) (2006).  That provision alone is

2.  Bahlul relies (Br. 16) on <u>Hamdan II</u>'s assumption that, "[i]f Congress had known" that a court would conclude, contrary to Congress's finding, that the only offenses previously triable by military commission were offenses against international law and that a codified offense was a "new war crime[]," Congress "would *not* have wanted [such] *new* crimes to be applied retroactively."  696 F.3d at 1247-48.  That reliance is misplaced.

First, that construction is inconsistent with the statutory text.  Nothing in the 2006 MCA suggests that Congress intended, as the <u>Hamdan II</u> court held, for its authorization of jurisdiction over pre-enactment conduct to depend on whether the offense was an international-law war crime and therefore clearly subject to military commission jurisdiction under Article 21.  See <u>Hamdan II</u>, 696 F.3d at 1247 (holding that 10 U.S.C. § 821 (Article 21 of the UCMJ) was "the federal statute in effect" prior to the 2006 MCA and that military commissions could only prosecute war crimes under Article 21 for international-law war crimes).  Had Congress intended that result, it easily could have referred explicitly to international law and expressly provided that *only* such offenses (along with the statutory offenses of spying and aiding the enemy) could be applied to pre-enactment conduct.  But it did neither.  To the contrary, Congress included a provision in the 2006 MCA that

---

sufficiently clear to overcome any applicable presumption against retroactivity.

amended Article 21 to provide that "[t]his section does not apply to a military

commission established under [the MCA]."  2006 MCA, § 4(a)(2), 120 Stat. 2631.

That amendment establishes that, whatever limits Article 21 may impose on

military commission jurisdiction, those limits do not apply to military

commissions, such as the one here, established under the 2006 MCA.  Thus,

Hamdan II's interpretation of the 2006 MCA, which reads Article 21 as an implicit

limit on the 2006 MCA's express provision of pre-enactment jurisdiction for all of

the codified offenses, cannot be squared with Congress's amendment of

Article 21.[4]

Moreover, in enacting the 2006 MCA, Congress was fully aware of

conflicting opinions regarding whether some of the codified offenses were actually

"new crimes," but the statute contains no suggestion that Congress intended to

provide only prospective jurisdiction over those offenses.  Indeed, Congress

enacted the 2006 MCA in direct response to the Supreme Court's decision in

Hamdan I, in which four justices concluded that, in the absence of specific

---

[4] The Hamdan II court also erred in interpreting Article 21 to restrict
jurisdiction to war crimes prohibited by international law.  See Part I(C), infra.  But
the point for present purposes is that, regardless of how Article 21 is construed,
Congress in amending Article 21 made it plain that Article 21 is irrelevant to
determining the scope of military commission jurisdiction provided for in the 2006
MCA.

statutory authorization, conspiracy was not an offense triable by military commission, 548 U.S. at 608-11 (opinion of Stevens, J.), while three members of the Court reached the opposite conclusion. Id. at 697-704 (Thomas, J., dissenting). The legislative history indicates that Congress considered the views of both the plurality and the dissenters and concluded that conspiracy is subject to trial by military commission. See H.R. Rep. No. 109-664, Pt.1, at 25 ("In Hamdan, the Supreme Court left open the question as to whether conspiracy to commit a war crime itself constituted a substantive offense. For the reasons stated in Justice Thomas's opinion, the Committee views conspiracy as a separate offense punishable by military commission."). Thus Congress, fully aware of the Justices' conflicting views, codified conspiracy as an offense under the 2006 MCA that is applicable to pre-enactment conduct. See id. at 24 ("[B]ecause the provisions of this subchapter . . . are declarative of existing law, the committee firmly believes that trial for crimes that occurred before the date of the enactment of this chapter might be prosecuted with this subchapter.").

3. Bahlul contends (Br. 19-23) that, when Congress stated that it was codifying pre-existing crimes, Congress must have codified only offenses that were already punishable *by statute*, and the relevant statute, Article 21, punished only offenses that were prohibited as war crimes under international law. Bahlul's

27

proposed reading of the 2006 MCA is both atextual and ahistorical. The 2006

MCA does not refer to statutory or international-law offenses only; rather,

Congress referred to offenses "that have traditionally been triable by military

commissions." 10 U.S.C. § 950p (2006); see also 10 U.S.C. § 950p(d) (2009)

(codifying offenses that "have traditionally been triable under the law of war or

otherwise triable by military commission"). That language refers to a class of

offenses – lawfully triable in U.S. military commission practice – that is broader

than the group of offenses that are currently prohibited by the international law of

war. Indeed, the common law of war developed in U.S. military tribunals, which

Bahlul dismisses as irrelevant, served as an important foundation and source of the

later development of international law relied on by Bahlul.

    As amici Professors Glazier and Solis acknowledge (Amici Br. 15), although

theorists have since ancient times sought to develop legal limits on States' practice

of warfare, a systemized body of international law establishing individual criminal

responsibility for specific acts during warfare is a relatively modern innovation that

was in its infancy at the time that our Nation was applying the law of war during

the Civil War. The adoption of the Hague Conventions of 1899 and 1907 "marked

the first occasions on which subjects of the international legal system had agreed to

international laws of war binding on States Parties." The Law of War Crimes,

National and International Approaches 43 (Timothy L.H. McCormack & Gerry J.

Simpson eds. 1997) (footnote omitted). The law and practice of U.S. Civil War-

era military commissions, in particular Professor Francis Lieber's Instructions for

the Government of Armies of the United States in the Field (1898), promulgated

during the Civil War as General Orders No. 100 (Apr. 24, 1863), served as a vital

source of that systemized body of treaty law. See John Fabian Witt, Lincoln's

Code: The Laws of War in American History 323 (2012); Richard Shelly Hartigan,

Lieber's Code and the Law of War 1-2, 22-26 (1983); Richard D. Rosen, Targeting

Enemy Forces in the War on Terror: Preserving Civilian Immunity, 42 Vand. J.

Transnat'l L. 683, 695 (2009). Until the adoption of the Hague Convention and

later treaties, "offenses in violation of the laws and usages of war [consisted of]

those principally, *in the experience of our wars*, made the subject of charges and

trial." William Winthrop, Military Law and Precedents 839 (2d ed. 1920)

(emphasis added) ("Winthrop").[5] As Winthrop's enumeration of exemplary crimes

demonstrates, that class of offenses was more inclusive than those prohibited by

international law. Compare id. at 839-40 (e.g., furnishing money, arms, or

---

[5] This is not to say that our Nation's law of war during the nineteenth
century had no grounding in international law. As Winthrop also explained, "the
Law of War *in this country* . . . consists mainly of general rules derived from
international law *supplemented by acts and orders of the military power* and a few
legislative provisions." Winthrop at 773 (second emphasis added).

equipment to the enemy; aiding in the escape of soldiers held as prisoners of war; acting as a spy) with 2 L. Oppenheim, International Law 411-12 (Arnold D. McNair 4th ed. 1926) ("2 Oppenheim") (enumerating "the more important violations" of the international law of war).

Moreover, the well-recognized offenses of spying and aiding the enemy are not "war crimes . . . specified by international law." Hamdan II, 696 F.3d at 1246 n.6 (Kavanaugh, J., concurring). Nonetheless, since the beginning of our nation, spying has been treated as a crime subject to trial by military tribunal, see Winthrop at 765; 5 Journal of the Continental Congress 693 (Resolution of Aug. 21, 1776), and both spying and aiding the enemy have been codified in the UCMJ as offenses subject to trial by military commission.[6] The unquestioned validity of those traditional offenses further establishes that international law need not affirmatively prohibit an offense for it to be triable by military commission and

---

[6] See 2 Oppenheim at 286-87, 413-15 (although international law permits a belligerent to engage in espionage and other clandestine activity within enemy lines, international law also permits the opposing party to punish such acts); John C. Dehn, The Hamdan Case and the Application of a Municipal Offence, 7 J. Int'l Crim. Justice 63, 75 (2009) ("[P]unishment [for spying] was only permitted by the law of nations, not directly imposed or required by it."); Richard R. Baxter, So-Called "Unprivileged Belligerency": Spies, Guerrillas, and Saboteurs, 28 Brit. Y.B. Int'l L. 323, 333 (1951) ("[T]he actions of a spy are not an international crime."); FM 27-10, ¶ 77, app. A-21 ("Spies are punished, not as violators of the laws of war, but to render that method of obtaining information as dangerous, difficult, and ineffective as possible.").

30

that Congress could properly codify offenses recognized under the "system of common law" traditionally applied by our Nation's military tribunals.  Quirin, 317 U.S. at 30.

Both the writings of prominent commentators and judicial precedent further demonstrate that "offenses that have traditionally been triable by military commissions" include a broader class of offenses than those recognized as violations of international law.  For example, Professor Oppenheim explained that certain acts committed by unprivileged belligerents were "war crimes, not because they really are violations of recognised rules regarding warfare, but because [in the interests of their own safety] the enemy has the right to consider and punish them as acts of illegitimate warfare."  2 Oppenheim at 413.  Thus,

> four different kinds of war crimes must be distinguished on account of the essentially different character of the acts: namely, (1) violations of recognised rules regarding warfare committed by members of the armed forces, (2) all hostilities in arms committed by individuals who are not members of the enemy armed forces, (3) espionage and war treason, [and] (4) all marauding acts.

Id. at 410.  See also 11 Op. Att'y Gen. 297, 312 (1865) (referring to "unit[ing] with banditti, jayhawkers, guerrillas, or any other unauthorized marauders" as a "high offence against the laws of war"); U.S. War Dep't, Rules of Land Warfare ¶¶ 369-374 (1917) (designating as "war criminals" persons committing hostile acts while

31

not members of the armed forces, including highway robbery, espionage, armed prowling, and marauding, even though such offenses are not today described as violations of international law); G. I. A. D. Draper, <u>The Status of Combatants and the Question of Guerilla Warfare</u>, 45 Brit. Y.B. Int'l L. 173, 176 (1971).

More recently, Justice Stevens' plurality opinion in <u>Hamdan I</u> referred to the need to comply with, *inter alia,* "the *American* common law of war" and used the term as distinct from the "rules and precepts of the law of nations." 548 U.S. at 613 (emphasis added). Justice Stevens also observed that Congress, through Article 21, had "'incorporated by reference' the common law of war, which may render triable by military commission certain offenses not defined by statute." <u>Id.</u> at 602 (quoting <u>Quirin</u>, 317 U.S. at 30). In determining whether that body of law permitted the trial of conspiracy by military commission, Justice Stevens canvassed not only international law but also purely domestic precedents, suggesting that the common law of war embraces offenses that, although not prohibited by international law, may be punished by the United States under international law and had traditionally been subject to trial by U.S. military commissions. <u>Id.</u> at 603-09; <u>see also</u> <u>id.</u> at 698 (Thomas, J., dissenting) (noting that "[t]he common law of war as it pertains to offenses triable by military commission is derived from the 'experience of our wars' and our wartime

32

tribunals"); <u>Quirin</u>, 317 U.S. at 31-34, 42 n.14 (referring to a spy as an offender "against the law of war" even though spying during war, while permitted to be punished under international law, is not understood as a violation of international law, and relying largely on U.S. practice in concluding that spying was a war crime subject to trial by military commission); <u>Application of Yamashita</u>, 327 U.S. 1, 8 (1946) (explaining that, in enacting the predecessor to Article 21, Congress "adopted the system of military common law applied by military tribunals . . . *as further defined and supplemented* by the Hague Convention") (emphasis added).

Thus, in codifying "offenses that have traditionally been triable by military commission," Congress invoked the longstanding common law and historical practice of U.S. military commissions. Bahlul's construction, which insists that Congress codified only statutory or international law offenses, disregards that common law and conflicts with the language of the 2006 MCA.[7]

4. Finally, Bahlul contends (Br. 13-16), relying again on <u>Hamdan II</u>, that the en banc Court should adopt his interpretation of the 2006 MCA in order to avoid a

---

[7] The extent of Bahlul's flight from the statutory text is most apparent when he argues (Br. 23) that, for non-international law offenses, it "does not matter" whether there are "historical examples" of the offense being charged before military commissions. Thus, under Bahlul's theory, in determining the scope of offenses Congress meant to include as "offenses that have traditionally been triable by military commission," it makes no difference whether the offense was traditionally triable by military commission.

serious question of unconstitutionality under the Ex Post Facto Clause.  See 696

F.3d at 1248.  However, the 2006 MCA's provision of jurisdiction over Bahlul's

conduct does not implicate the Clause, because the conduct committed by Bahlul

has been traditionally triable under the system of common law long applied by

U.S. military commissions.

   With respect to Bahlul's conspiracy conviction, the government has

acknowledged that conspiracy has not attained recognition at this time as an

offense under customary international law.[8]  This is true even when the objects of

the conspiracy are offenses prohibited by customary international law, as some of

them are in this case.  That concession, however, does not lead to the conclusion

that Bahlul's conspiracy conviction for pre-enactment conduct under the 2006

MCA raises ex post facto concerns.  The Ex Post Facto Clause bars retroactive

application of a "statute which punishes as a crime an act previously committed,

which was innocent when done."  Collins v. Youngblood, 497 U.S. 37, 42 (1990)

(citation omitted).  The Supreme Court has explained that the "central concerns"

underlying the Ex Post Facto Clause are "the lack of fair notice and governmental

restraint" when the law changes the legal consequences of acts completed before

---

[8] See No. 11-1324, Dkt. No. 1432126, Order of the En Banc Court 2 (Apr. 23, 2013) (requesting the parties' views on this question).

34

the law's effective date.  <u>Lynce v. Mathis</u>, 519 U.S. 433, 441 (1997) (citation

omitted).  Congress's decision to make conspiracy punishable by military

commission for pre-2006 conduct does not run afoul of those principles because of

the longstanding practice of trying conspiracy offenses in U.S. military

commissions.

a.  Although uncodified until the enactment of the 2006 MCA,[9] the offense

of conspiracy to violate the laws of war, including conspiracy to murder protected

persons or to attack civilians and civilian objects, is both firmly rooted in our

Nation's history and expressly recognized in "the long-standing public position of

the United States Army."   <u>Al Bahlul</u>, 820 F. Supp. 2d at 1264-65 (Sims, J.,

concurring) (citing FM 27-10, ¶ 500).  As Justice Thomas observed in <u>Hamdan I</u>,

"in the highest  profile case to be tried before a military commission relating to [the

Civil War], namely, the trial of the men involved in the assassination of President

Lincoln, the charge provided that those men had 'combin[ed], confederat[ed], and

conspir[ed] . . . to kill and murder' President Lincoln."  548 U.S. at 699 (Thomas,

J., dissenting) (quoting General Court-Martial Order ("G.C.M.O.") No. 356, War

Dep't (July 5, 1865), <u>reprinted in</u> H.R. Doc. No. 55-314, at 696 (1899)); <u>see also</u>

_____

[9]  The conspiracy offense is codified at 10 U.S.C. § 950v(b)(28) (2006).  <u>See</u>
Statutory Addendum.

Ex parte Mudd, 17 F. Cas. 954, 954 (S.D. Fla. 1868) (holding that the Lincoln conspirators were properly subjected to trial by military commission because conspiring to assassinate "the Commander in Chief of the army for military reasons" was a violation of the law of war); G.C.M.O. No. 607, War Dep't (Nov. 6, 1865), reprinted in H.R. Doc. No. 55-314, at 785, 789 (conviction of former Confederate Army Captain Henry Wirz for "combin[ing], confederat[ing], and conspir[ing] with [others] . . . in violation of the laws of war" to kill and mistreat Union prisoners); G.C.M.O. No. 452, War Dep't (Aug. 22, 1865), reprinted in H.R. Doc. No. 55-314, at 724-25 (approving conviction of G. St. Leger Grenfel for "[c]onspiring, in violation of the laws of war, to release the rebel prisoners" and "[c]onspiring, in violation of the laws of war, to lay waste and destroy the city of Chicago"); General Order ("G.O.") No. 9, HQ, Dep't of the Mississippi (Mar. 25, 1862), reprinted in 1 The War of the Rebellion, Official Records of the Union and Confederate Armies ("OR"), ser. II, at 470 (1894) (approving conviction of Joseph Sublett for conspiring to fire on trains); Opinion of the Judge Advocate General in the Matter of William Murphy (Mar. 21, 1866) (available at XVI JAG Record Books 280) (approving conviction by military commission for conspiracy to burn steamboats);[10] William Winthrop, A Digest of Opinions of the Judge Advocate

---

[10]  In In re Murphy, 17 F. Cas. 1030 (C.C.D. Mo. 1867), Justice Miller

General of the Army 328-29 (1880) ("Dig. Ops.") (including "[c]onspiracy by two or more to violate the laws of war by destroying life or property in aid of the enemy" as an "offence[] against the laws and usages of war"); Charles Roscoe Howland, A Digest of the Opinions of the Judge Advocate General of the Army 1071 (1912) (noting that conspiracy "to violate the laws of war by destroying life or property in aid of the enemy" was an offense against the law of war that was "punished by military commissions" throughout the Civil War).[11]

---

granted Murphy's habeas petition, reasoning that the military commission lacked jurisdiction because the civil courts were open. Id. at 1031-32 (citing Ex parte Milligan, 71 U.S. (4 Wall.) 2 (1866)). Nothing in Justice Miller's decision, however, suggested that a properly convened military commission could not try conspiracy. Moreover, in Quirin, the Supreme Court rejected Justice Miller's reasoning, holding that Milligan is "inapplicable" where the defendant was a belligerent associated with the enemy's armed forces and subject to the laws of war. 317 U.S. at 45-46.

[11] Bahlul maintains (Br. 54-58) that Winthrop rejected conspiracy as an offense against the law of war. See also Hamdan I, 548 U.S. at 608 (plurality opinion). However, Winthrop included that very offense in the 1880 edition of the Dig. Ops., and his treatise, likewise, asserts that conspiracy was subject to prosecution as either a violation of the law of war or of the civil law depending on the nature of the base offense. See Winthrop at 842.

The Hamdan I plurality similarly discounted the references to conspiracy in the Dig. Ops. on the ground that it failed to cite any cases including a conspiracy offense. 548 U.S. at 607-08. However, the Dig. Ops. did cite the Murphy case, which the Hamdan I plurality overlooked due to an error in labeling the volume numbers in the JAG record books. See Haridimos V. Thravalos, History, *Hamdan and Happenstance*, 3 Harv. Nat'l Sec. J. 223, 250-54 (2012).

Similarly, during the Second World War, enemy spies and saboteurs were

convicted by military commissions of conspiring to commit war crimes.  <u>See</u>

<u>Quirin</u>, 317 U.S. at 23 (noting that military commission charges against eight Nazi

saboteurs included, among other offenses, conspiracy to violate the laws of war);[12]

<u>Colepaugh v. Looney</u>, 235 F.2d 429, 431-33 (10th Cir. 1956) (noting that military

commission convictions against other Nazi saboteurs included conspiring to

clandestinely enter the United States for the purpose of spying and sabotage).[13]

And, during the Korean conflict, General MacArthur issued regulations making

---

[12]  Bahlul minimizes (Br. 52-53) the significance of <u>Quirin</u> because the
Supreme Court did not reach the saboteurs' challenge to the conspiracy charges in
that case.  <u>See also</u> <u>Hamdan I</u>, 548 U.S. at 606 (plurality opinion).  However, the
effect of the Supreme Court's decision was to leave intact those charges, the
subsequent convictions, and the decisions of the military tribunal and the
Executive Branch that conspiracy was properly cognizable by military
commission.  <u>See also</u> <u>id.</u> at 699 (Thomas, J., dissenting) ("the common law of war
cannot be ascertained from [the Supreme] Court's failure to pass upon an issue . . .
in its opinion; rather, it is ascertained by the practice and usage of war") (citing
<u>Winthrop</u> at 839).  The conspiracy charges in <u>Quirin</u> thus exemplify our military's
practice of trying conspiracy in military commissions.

[13]  In connection with Colepaugh's military commission proceedings, then-
Assistant Attorney General Tom Clark issued an opinion that it is "well established
that a conspiracy to commit an offense against the laws of war is itself an offense
cognizable by a commission administering military justice."  Memorandum of Law
from Tom C. Clark, Assistant Att'y Gen., to Major Gen. Myron C. Kramer, Judge
Advocate Gen. (Mar. 12, 1945) (Supp. Auth. 133).  A special board of review
reached the same conclusion.  Opinion of Special Board of Review, <u>United States</u>
<u>v. Colepaugh</u>, CM 276026, at 29 (Mar. 27, 1945) (Supp. Auth. 140).
Subsequently, the Judge Advocate General and President Truman approved the
convictions.  <u>See</u> G.O. No. 52, War Dep't (July 7, 1945) (Supp. Auth. 146-50).

conspiracy to commit war crimes an offense subject to trial by military

commission.  See Letter Order, Gen. HQ, United Nations Command, Tokyo,

Japan, Trial of Accused War Criminals (Oct. 28, 1950) (Rules of Criminal

Procedure for Military Commissions, Rule 4).  In 1956, the United States Army

reaffirmed its longstanding position that conspiracy is triable by military

commission by providing explicitly in its field manual on the law of land warfare

that conspiracy to commit war crimes is a punishable offense.  See

FM 27-10, ¶ 500.

     In short, domestic precedents "from the Civil War to beyond World War II"

establish that conspiracy to violate the law of war "has traditionally and lawfully

been tried by law-of-war military commission."  Haridimos V. Thravalos, History,

*Hamdan* and Happenstance, 3 Harv. Nat'l Sec. J. 223, 223-24 (2012); see Jonathan

A. Bush, The Prehistory of Corporations and Conspiracy in International Criminal

Law: What Nuremberg Really Said, 109 Colum. L. Rev. 1094, 1097 (2009)

("[S]ome form of conspiracy has been included as a charge and often as part of a

judgment in every major American war crimes trial program.").

     Bahlul contends (Br. 39-48) that treaties and the statutes of modern

international criminal tribunals generally have not recognized inchoate conspiracy

to commit war crimes as a separate, stand-alone offense.  That is true but not

39

dispositive.  Because U.S. military commissions have long prosecuted conspiracy, the 2006 MCA's codification of that offense does not implicate the Ex Post Facto Clause, regardless of the status of inchoate conspiracy under international law.  Cf. United States v. Ali, No. 12-3056, 2013 WL 2477029, at *14 (D.C. Cir. June 11, 2013) ("Our duty is to enforce the Constitution, laws, and treaties of the United States, not to conform the law of the land to norms of customary international law.") (citation omitted).

        b.  Bahlul relies (Br. 49-56) on Justice Stevens' plurality opinion in Hamdan I to argue that conspiracy is not a cognizable offense even in U.S. military commissions.  That reliance is misplaced for several reasons.  First, at the time of Hamdan I, Congress had never "positively identified 'conspiracy' as a war crime." 548 U.S. at 601-02.  In the absence of a congressional definition, the plurality applied a "high standard" requiring "plain and unambiguous" precedent in order to mitigate the risk of an improper delegation of congressional power to "military hands."  Id. at 602-03.  That standard no longer applies, because "Congress has, in exercise of its constitutional authority . . . positively identified 'conspiracy' as a war crime" in two separate statutes.  Id. at 601-02.  Accordingly, rather than adopting the approach that the plurality applied to the unilateral Executive Branch military commission at issue in Hamdan I, this Court should afford proper

40

deference to the determination of two Congresses and two Presidents that
prosecution of conspiracy offenses based on pre-2006 conduct is a lawful
application of the government's authority to conduct the armed conflict in which it
remains engaged.  See, e.g., id. at 655 (Kennedy, J., concurring) ("Congress, not
the Court, is the branch in the better position" to determine the "validity of the
conspiracy charge."); Rostker v. Goldberg, 453 U.S. 57, 70 (1981) ("judicial
deference . . . is at its apogee when legislative action under the congressional
authority to raise and support armies . . . is challenged"); Holder v. Humanitarian
Law Project, 130 S. Ct. 2705, 2727 (2010) (courts should defer to inferences drawn
by Congress and the President implicating sensitive and weighty national security
interests); Quirin, 317 U.S. at 25 (wartime decisions involving military
commissions "are not to be set aside by the courts without the clear conviction that
they are in conflict with the Constitution"); Finzer v. Barry, 798 F.2d 1450, 1458-
59 (D.C. Cir. 1986).

As Bahlul observes (Br. 50), Justice Stevens' opinion discounted the
significance of Civil War-era military commission prosecutions for conspiracy on
the ground that those commissions sometimes functioned simultaneously as martial
law courts, constituted to enforce the civil law when local courts are not
functioning, as well as law-of-war military commissions.  In their dual capacity,

41

the plurality reasoned, such tribunals often charged "hybrid" crimes, 548 U.S. at

609 & n.37, making it unclear whether the conspiracy was charged as a civil

infraction or a war crime.  But, as Winthrop explained, the nature of the charged

offense is generally discernible because, where an offense is a civil crime, it is

commonly designated as such in the specification; and "where [it is] a violation of

the laws of war, [it is alleged] by simple terms of description" designating the

nature of the offense "or simply Violation of the Laws of War."  <u>Winthrop</u> at 842.

Moreover, crimes like murder and conspiracy could fall within either category

depending on the specifics of the crime.  Thus, "[w]here the offence [was] both a

crime against society and a violation of the laws of war, the charge . . . not

unfrequently represented both elements, as 'Murder, in violation of the laws of

war,' [or] 'Conspiracy, in violation [of the laws of war].'"  <u>Id.</u>; <u>see also</u> <u>id.</u> at 839

n.5 (citing Grenfel's conviction as a conspiracy "of the first and second classes

combined," <u>i.e.</u>, offenses that are both civil offenses subject to trial by a martial

law court and war crimes triable by a military commission).

     Winthrop's observations are supported by numerous cases that make clear

that the offender was convicted for conspiracy to violate the "laws of war."  For

example, Henry Wirz was convicted by military commission of conspiring, "in

violation of the laws of war," to impair the lives of prisoners.  G.C.M.O. No. 607,

H.R. Doc. No. 55-314, at 789.  G. St. Leger Grenfel was convicted of

"[c]onspiring, in violation of the laws of war, to release the rebel prisoners of war"

and "[c]onspiring, in violation of the laws of war, to lay waste and destroy the city

of Chicago."  G.C.M.O. No. 452, H.R. Doc. No. 55-314, at 724.  The same

commission convicted Charles Walsh and others of "[c]onspiring, in violation of

the laws of war," to commit the same offenses.  G.O. No. 30, HQ, Northern Dep't

(Apr. 21, 1865), reprinted in 8 OR, ser. II, at 502-03 (1899).  The specifications in

these cases allege conspiracies "in violation of the laws of war," leaving no doubt

that the conspiracy offenses were prosecuted as war crimes and not as civil

offenses.[14]

Finally, many of the relevant military commission conspiracy prosecutions

were held at locations where the civilian courts were functioning.  See, e.g., In re

---

[14]  Amici Glazier and Solis (Amici Br. 21-25) speculate that, because some
civil war conspiracy cases were not expressly captioned as "violation[s] of the law
of war," those cases may have been tried as martial law crimes.  In each instance,
however, it is plain from the nature of the contemplated offense that the
prosecution was for a violation of the law of war.  In Murphy and Louden, the
defendants were charged with conspiring with rebel forces to burn steamboats, see
Supp. Auth. 66-67, 83, 90, an offense that Winthrop identified as a violation of the
law of war, Winthrop at 839 n.5.  Indeed, in Murphy the ensuing substantive count
alleged steamboat burning as a "[v]iolation of the laws and customs of war."
Supp. Auth. 66-67.  And in Cambron, the defendant was charged with conspiring
to release rebel prisoners.  Supp. Auth. 94.  As the Grenfel and Walsh cases
demonstrate, that offense was also viewed as a violation of the law of war and was
identified by Winthrop as such.  Winthrop at 840.

43

Murphy, 17 F. Cas. at 1031 (noting that, during Murphy's trial by military commission in St. Louis, Missouri for conspiracy to burn steamboats, "the courts of the United States were open, and perfectly competent to the trial of any offences within their jurisdiction").  More recently, the military commission proceedings in Quirin and Colepaugh were both conducted in the continental United States.  In those cases, the functioning of the civilian courts precluded jurisdiction by a martial law court, and therefore those conspiracies must have been charged as violations of the law of war rather than as civil offenses.

c.  Bahlul also contends (Br. 52) that, because Quirin and the Civil War-era cases alleged conspiracies in which the object offenses were completed, those precedents do not establish that inchoate conspiracy was an offense triable in U.S. military commissions.  See Hamdan I, 548 U.S. at 608-09 (plurality opinion).  But the fact that conspiracy charges included allegations that the conspirators succeeded does not imply that a completed substantive offense was a legal requirement for conviction.  See id. at 701 n.13 (Thomas, J., dissenting).  Moreover, Bahlul's argument is inconsistent with the contemporaneous understanding of conspiracy in both civilian and military law, which did not require completion of a substantive offense.  See, e.g., Hampton L. Carson, The Law of Criminal Conspiracies and Agreements 124-25 (1887); U.S. War Dep't, A

44

Manual for Courts-Martial 275 (1917) ("The mere entry into a corrupt

agreement . . . constitutes the [conspiracy] offense."); U.S. War Dep't, Dig. Ops.

1912-1940 at 351 (1942) (opining that, under military law, "an overt act is not

required to be either alleged or proved").

      In addition, during the Civil War era, defendants were regularly convicted of

conspiracies that were charged as unconsummated offenses.  For example, in

Grenfel, the President approved the defendant's conviction for conspiring, in

violation of the laws of war, to release rebel prisoners and to destroy Chicago, even

though the charges did not allege that Grenfel accomplished either objective.

G.C.M.O. No. 452, reprinted in H.R. Doc. No. 55-314, at 724; see also G.O. No.

102, War Dep't (Mar. 15, 1864) (conviction of Robert Louden of conspiracy to

destroy steamboats even though consummation of the offense was not alleged);

G.O. No. 205, HQ, Dep't of the Missouri (Nov. 10, 1864) (Cambron convicted of

conspiring to release a captured guerrilla without allegation that guerrilla was

released); G.O. No. 30, reprinted in 8 OR, ser. II, at 502-03 (convictions of Charles

Walsh and others of conspiring to release rebel prisoners and to destroy Chicago

even though completion of the offenses was not alleged).   If, in these cases,

consummation of the conspiracy had been an element of the offense, it would have

been necessary to allege it in the specification.  See Winthrop at 842; see also id. at

150.  Thus, Bahlul's contention that inchoate conspiracy was not a cognizable offense does not square with the historical record.  See Colepaugh, CM 276026, at 28-29 (special board of review concluding that "conspiracies without overt acts are offenses triable by military tribunals") (Supp. Auth. 143).

Even if Bahlul were correct that a conspiracy conviction requires proof of a completed offense, that would not help him because that criterion was met in this case.  First, to sustain a conviction for conspiracy under the 2006 MCA, the government must prove that the defendant personally committed an overt act "to effect the object of the conspiracy."  10 U.S.C. § 950v(b)(28) (2006).  That requirement was satisfied by the commission's findings that Bahlul, among other acts, administered the loyalty oaths and transcribed the martyr wills of two 9/11 hijackers.  Pet. App. 130-37.

The charges and the commission's verdict also establish that Bahlul's co-conspirators succeeded in committing the substantive war crimes they conspired with him to commit.  The commission, pursuant to a special verdict form, specifically found Bahlul "guilty" of "preparing the propaganda declarations styled as martyr wills of Muhammed Atta and Ziad al Jarrah in preparation for the acts of terrorism *perpetrated by [them] on September 11, 2001*."  Pet. App. 125, 133 (emphasis added).  Bahlul did not dispute that his co-conspirators completed the

46

9/11 attacks, and in fact he expressed pride in having made a contribution to the enterprise.  Tr. 552.  Accordingly, the verdict in this case incorporates a specific finding that Bahlul's co-conspirators perpetrated the 9/11 attacks in furtherance of the conspiracy.  The commission's verdict thus establishes Bahlul's "personal involvement," Hamdan I, 548 U.S. at 609, in overt acts that included completed, substantive war crimes.  Prosecution of such offenses is consistent with our nation's longstanding practices and the common law of war traditionally applied in U.S. military commissions.  Indeed, had Bahlul been charged with substantive offenses under a Pinkerton theory, as military law permits, see Manual for Courts-Martial IV-6 (2012) ("[e]ach conspirator is liable for all offenses committed pursuant to or in furtherance of the conspiracy by any of the co-conspirators"); Manual for Military Commissions IV-24 (2010) (same), the commission's findings would establish his personal liability for the completed offenses.

In sum, the historical practice of our Nation's military commissions establishes that conspiracy is an offense triable by military commission.  Accordingly, the 2006 MCA's codification of that longstanding crime implicates no ex post facto concerns.

5.  The conduct punished by the offenses codified in the 2006 MCA as providing material support for terrorism and solicitation has also long been triable

by military commission.  The 2006 MCA's provision of jurisdiction over such

conduct for acts committed prior to its enactment therefore does not raise a serious

question of unconstitutionality under the Ex Post Facto Clause.

a.  In <u>Hamdan II</u>, the government argued that the offense of providing

material support to terrorists[15] prohibits the same conduct, under a modern label, as

the traditional offense of joining with or providing aid to guerrillas and other

unlawful belligerents.  The latter offense has been triable by military commission

at least since the Civil War.  <u>See</u>, <u>e.g.</u>, Francis Lieber, <u>Guerrilla Parties Considered</u>

<u>with Reference to the Laws and Usages of War</u> 5-8, 18-19 (1862); G.O. No. 13,

HQ, Dep't of the Missouri (Dec. 4. 1861), <u>reprinted in</u> 1 OR, ser. II, at 234.

The <u>Hamdan II</u> court reasoned that these precedents were unclear because

they could have involved martial law courts rather than law-of-war military

commissions.  696 F.3d at 1252 (citing <u>Hamdan I</u>, 548 U.S. at 602 (plurality

opinion)).  But Winthrop specifically identified "engaging in illegal warfare as a

guerilla" and unauthorized support to the enemy, including "with money, arms,

provisions, medicines &c.," as "offenses in violation of the laws and usages of

war," and he made no mention of such offenses in summarizing "crimes and

statutory offenses" triable by martial law courts.  <u>Winthrop</u> at 839-40.  More

---

[15]  The offense of providing material support for terrorism is codified at 10 U.S.C. § 950v(b)(25)(A) (2006).  <u>See</u> Statutory Addendum.

48

significantly, many of the relevant precedents were expressly captioned as "violations of the laws of war." See, e.g., G.O. No. 9, 1 OR, ser. II, at 464-71 (approving convictions, in "*violation of the laws of war*," of (a) William Kirk for membership in a "marauding or guerilla band"; (b) John W. Montgomery for membership in the same band and for "purchasing and driving cattle" for the band; (c) I.N. Giddings for "spy[ing]" for the band; and (d) William Lisk for furnishing a firearm to a guerrilla for the purpose of firing on U.S. troops); G.O. No. 19, HQ, Dep't of the Mississippi (Apr. 24, 1862), 1 OR, ser. II, at 476-83 (approving convictions for "violation of the laws of war" to include joining, aiding, and assisting a band of robbers; furnishing clothing and goods; and feeding and sheltering outlaws who had destroyed a railroad).   Thus, the charges in these cases make clear that they were prosecuted as law-of-war violations rather than by a martial law court as civil offenses.

The Hamdan II court also reasoned that these precedents were "murky" because some were more akin to aiding and abetting offenses than to material support offenses.  696 F.3d at 1252.  Although in some instances the charges alleged the defendants' personal involvement in guerrilla attacks, many of the offenses cited above were grounded merely on the act of *joining* bodies of guerrillas and marauders – conduct indistinguishable from providing oneself as

49

"personnel" to terrorists under 18 U.S.C. § 2339A(b)(1) – or furnishing weapons, shelter, or sustenance to them.  As the <u>Hamdan II</u> court recognized, 696 F.3d at 1251-52, such conduct is distinguishable from aiding and abetting.

b.  Solicitation of others to commit offenses triable by military commission also possesses a venerable lineage as an offense triable by military commission, originating long before its codification in the 2006 MCA.[16]  For example, during the Civil War, a military commission convicted Francis Skinner of "counsel[ing]" and "invit[ing]" others to destroy a railroad in violation of the law of war.  G.O. No. 19, 1 OR, ser. II, at 476-77.  James W. Barnes was convicted of inciting others to attack a dwelling, in violation of the law of war.  <u>Id.</u> at 478.  And Edward Wingfield was convicted of "[i]nciting unlawful warfare" to "take up arms and to commit acts of hostility against the property of the United States and the property and persons [in its protection] contrary to the laws and customs of war."  G.O. No. 15, HQ, Dep't of the Mississippi (Apr. 3, 1862), 1 OR, ser. II, at 475.

Bahlul's solicitation offense involved virtually identical conduct.  Bahlul admitted that the central purpose of the *Cole* video was to "build on the . . . attack for recruitment purposes and propaganda purposes" (Tr. 534-35) and to "instigate recruitments for suicide bombers" (Tr. 545).  His assistance to two 9/11 hijackers,

---

[16]  The offense of solicitation is codified at 10 U.S.C. § 950u (2006).  <u>See</u> Statutory Addendum.

facilitating their pledges of "bayat" to bin Laden and typing their martyr wills, had the dual purposes of "motivat[ing]" the two in following through with their suicide mission and recruiting other terrorists for al Qaeda.  Tr. 552-54.

Because both providing material support to unlawful combatants and solicitation to commit offenses triable by military commission are themselves offenses that have long been punishable by military commission, neither offense raises a serious question under the Ex Post Facto Clause.  Moreover, longstanding U.S. military doctrine, embodied in FM 27-10, The Law of Land Warfare, provides notice that the United States viewed "direct incitement" of a war crime and "complicity" in the commission of a war crime as punishable.  See id. ¶ 500. Indeed, at the end of World War II, both the knowing facilitation of war crimes and solicitation to commit such acts were subject to punishment by international military tribunals.  For example, in 1947, a U.S. military tribunal, sitting in Nuremberg, Germany, as an "international tribunal," convicted Friedrich Flick and Otto Steinbrinck of providing financial support to the Nazi S.S.  See The Flick Trial, 9 L. Rep. Trials of War Criminals 1, 16, 28-29 (1949); Flick v. Johnson, 174 F.2d 983, 985 (D.C. Cir. 1949).  Similarly, a British military tribunal sentenced to death the owner of a German chemical firm who, "in violation of the laws and usages of war," supplied the gas-producing substance Zyklon B to the S.S., "well

knowing" that it would be used to murder concentration camp inmates.  The Zyklon B Case, 1 L. Rep. Trials of War Criminals 93, 93 (1947).  The Nuremburg International Military Tribunal convicted Nazi propagandist Julius Streicher, publisher of the anti-Semitic weekly *Der Sturmer*, of inducing others to commit murder of protected persons "on political and racial grounds in connection with War Crimes, as defined by the [Nuremberg] Charter."  1 Trial of the Major War Criminals Before the International Military Tribunal 301, 304 (1947); see also 820 F. Supp. 2d at 1240-41 (finding Bahlul's conduct analogous to Streicher's). Prosecution of such conduct under the 2006 MCA accordingly raises no concerns under the Ex Post Facto Clause.

C.    Article 21 Does Not Limit Jurisdiction under the 2006 MCA Over Bahlul's Conduct

The jurisdiction of military commissions under the 2006 MCA is not limited by Article 21 of the UCMJ, codified at 10 U.S.C. § 821.  First, Congress explicitly provided that Article 21 does not apply to military commission proceedings under the 2006 MCA.  Second, Article 21, as its text and history make clear, was intended to preserve, rather than restrict, the *pre-existing* jurisdiction of military commissions.  Finally, even if Article 21 is construed as narrowing traditional military commission jurisdiction, it would not preclude jurisdiction over Bahlul's

52

conduct because that conduct constituted an offense that "by the law of war may be tried by military commissions" within the meaning of Article 21.

1. At the time of Bahlul's offenses, Article 21, which is entitled "Jurisdiction of courts-martial not exclusive," provided that "[t]he provisions of [the UCMJ] conferring jurisdiction upon courts-martial do not deprive military commissions, provost courts, or other military tribunals of concurrent jurisdiction with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions, provost courts, or other military tribunals."  10 U.S.C. § 821 (2004).  This language does not purport to restrict or limit the jurisdiction of military commissions in any manner.  Indeed, Article 21 presupposes the previous existence of traditional, common-law military commission jurisdiction and seeks to preserve it.

As the Court explained in Madsen v. Kinsella, 343 U.S. 341 (1952), the purpose of the substantially identical precursor provision to Article 21, Article 15 of the Articles of War of 1916 (Act of Aug. 29, 1916, ch. 418, art. 15, 39 Stat. 653), was merely to "forestall[]" claims that "the jurisdiction of courts-martial over civilian offenders and over certain nonmilitary offenses, automatically deprived military commissions and other military tribunals of whatever existing jurisdiction they then had over such offenders and offenses."  343 U.S. at 351-52.  Thus,

53

Congress in Article 21 recognized the historic jurisdiction and practice of military commissions and approved their continued use.  Nothing in Article 21 suggests any intent to restrict military commissions from trying offenses that were well established in the law and practice of U.S. military commissions.  The purpose of Article 21 was to *preserve* existing military commission jurisdiction, not to confine it.  Madsen, 343 U.S. at 350 (Article 21 "expressly preserved to 'military commissions, provost courts, or other military tribunals' all of their existing concurrent jurisdiction.").

To further clarify that Article 21 should not be construed to limit military commission jurisdiction, Congress amended Article 21 in the same statute to provide that Article 21 "does not apply to a military commission established under [the MCA]."  2006 MCA, § 4(a)(2), 120 Stat. 2631.  The amendment was likely a response to the plurality opinion in Hamdan I, which referred to Article 21 as defining jurisdictional limitations on military commissions.  However, the amendment makes clear that Congress interpreted Article 21 as permitting prosecution of offenses that have long been tried by U.S. military commissions, including conspiracy.  That determination is entitled to deference.  See Rostker, 453 U.S. at 64-65.  The Hamdan II court did not consider Congress's amendment of Article 21.

54

Nor is the exercise of jurisdiction preserved in Article 21 governed by whether the offense is prohibited by international law.  Article 21 preserves jurisdiction over "offenses that by statute or by the law of war may be tried by military commissions."  Even assuming that the "law of war" in Article 21 refers to international law exclusively, Article 21 does not limit jurisdiction only to violations of international law.  The language of Article 21 does not refer to "violations of international law" but to offenses that "by the law of war may be tried by military commissions," i.e., offenses that the law of war *permits* military commissions to try.  That reading is confirmed by Article 21's application not only to "military commissions" but also to "provost courts" and "other military tribunals."  The jurisdiction of the latter two categories of tribunals is not limited to offenses prohibited by international law; rather, such tribunals, in order to maintain order where the civilian government is not functioning, generally apply either regulations issued by the governing military force or the civil law of the occupied locality.  See, e.g., Madsen, 343 U.S. at 361 (approving use of military government court to administer the German Criminal Code in occupied territory at the end of World War II); Geneva Convention Relative to the Protection of Civilian Persons in Time of War art. 64, Aug. 12, 1949, 6 U.S.T. 3516, T.I.A.S. No. 3365; Winthrop at 840-41 (enumerating cognizable offenses).  In light of the well-established

jurisdiction that the latter two classes of military courts have traditionally exercised over domestic offenses, Article 21 cannot reasonably be construed to confine the jurisdiction of the three classes of military tribunals to violations of international law.

As noted, the international law of war not only prohibits certain conduct as war crimes subject to military trial, it also permits the trial of certain offenses that are not, themselves, prohibited by international law as war crimes, including spying, aiding the enemy, and other unlawful acts by unprivileged belligerents. See Hague Convention No. IV Respecting the Laws and Customs of War on Land, and Its Annex art. 30, Oct. 18, 1907, 36 Stat. 2277; 2 Oppenheim at 410, 413-14. Thus, while the law of war permits trial of international-law war crimes, it also permits trying other offenses that the jurisdiction of military commissions has traditionally included.  These unlawful acts committed by unprivileged belligerents during hostilities are within Article 21's jurisdiction as offenses that "by the law of war may be tried by military commissions."  See Quirin, 317 U.S. at 35-36 (recognizing that, under both the "practical administrative construction by [U.S.] military authorities" and international law, the "commission of hostile acts" by "unlawful combatants" is "punishable as such by military commission" and therefore such offenses fall within the scope of Article 21).

56

Indeed, other States have, by their conduct, demonstrated such an understanding of military commission jurisdiction.  Following World War II, the allied nations that conducted their own war crimes prosecutions in military tribunals routinely relied, as part of the substantive law governing such proceedings, on their own principles of municipal law.  See, e.g., 15 L. Rep. Trials of War Criminals 8 (1949) (noting that British military tribunals imported into the law of war the British common law distinction between murder and manslaughter); 5 L. Rep. Trials of War Criminals 94-96 (1948) (jurisdiction of Australian military tribunals included not only violations of international law but also offenses defined as war crimes by the tribunal's charter, including currency violations, cannibalism, and crimes against peace); 11 L. Rep. Trials of War Criminals 86-87 (1949) (Dutch tribunals mainly punished "existing provisions of Dutch common penal law"); 3 L. Rep. Trials of War Criminals 95 (1948) (same for French tribunals); see also Philip R. Piccigallo, The Japanese on Trial, Allied War Crimes Operations in the East, 1945-1951, at 126, 159, 175-76, 203 (1979) (summarizing Allied powers' reliance on municipal law in war crimes prosecutions of Japanese war criminals).  Notably, some States' military tribunals adopted offenses or theories of criminal responsibility identical or similar to conspiracy.  See 11 L. Rep. Trials of War Criminals 98 (in Dutch military commissions, conspiracy to commit a war crime

57

was subject to punishment "equally . . . with the crime"); 15 L. Rep. Trials of War Criminals 90-91 (noting that French military tribunals convicted various persons of engaging in an "association de malfaiteurs," i.e., an association formed for a criminal purpose); see also 2 Oppenheim at 415 (noting that "[c]onspiracy against the armed forces" is a species of "war treason" that international law permits a belligerent to punish as a war crime).  Thus, other nations have authorized their military commissions to prosecute offenses that are not prohibited as international-law war crimes, including conspiracy, and they have regularly applied principles of their own domestic jurisprudence to govern war crimes charges.

2.  The legislative history of Article 21's predecessor demonstrates that its purpose was to preserve the full extent of jurisdiction that U.S. military commissions had traditionally exercised.  As Brigadier General Enoch Crowder, Judge Advocate General of the Army, testified, the article's purpose was to "save[] to those war courts the jurisdiction they now have."[17]  Revision of the Articles of War, Hearing Before the Subcomm. on Military Affairs, appended to S. Rep. No. 64-130, at 40 (1916).  To illustrate the scope of that jurisdiction, General Crowder inserted in his remarks an explanation from Winthrop that identified offenses, such

---

[17]  As General Crowder was the proponent of Article 15, the Supreme Court has recognized his testimony as "authoritative."  See Madsen, 343 U.S. at 353.

as engaging in guerrilla activities, that were not prohibited by international law as war crimes but had historically been tried by U.S. military commissions.  Id.  Thus, the original purpose of Article 15 cannot be reconciled with the premise of Hamdan II that the successor provision, Article 21, permitted only violations of international law to be tried by military commission.[18]

3.  Bahlul, supported by amicus National Institute for Military Justice, argues (Pet. Br. 31-32; NIMJ Amicus Br. 26-33) that Article 21 must be limited to violations of international law because only such violations fall within Congress's authority "[t]o define and punish . . . Offences against the Law of Nations."  U.S. Const. art. I, § 8, cl. 10.  However, Bahlul's assumption that the authority to prosecute offenses by military commissions derives exclusively from the Define and Punish Clause is incorrect.  Although the Define and Punish Clause constitutes one basis for exercising such authority, see Winthrop at 831, "in general, it is those

_____

[18]  Bahlul argues (Br. 28-30) that legislative history shows that Congress, when it replaced Article 15 with Article 21 in 1950, intended to restrict the jurisdiction of military commissions to violations of international law.  However, Article 21 was merely a "reenactment" of Article 15 that "preserve[d] existing Army and Air Force law which gives concurrent jurisdiction to military tribunals."  Madsen, 343 U.S. at 351 n.17.  Nor does the cursory reference to Quirin in Article 21's legislative history suggest that Congress intended to limit military commission jurisdiction to violations of international law, see Pet. Br. 30, because the spying and sabotage offenses in Quirin were not regarded as violations of international law.

provisions of the Constitution which empower Congress to 'declare war,' and 'raise armies,' and which, in authorizing the initiation of *war*, authorize the employment of all necessary and proper agencies for its due prosecution, from which [the military commission] derives its original sanction." Id.  As Judge Kavanaugh acknowledged in Hamdan II, even though some offenses codified in the 2006 MCA are not international-law war crimes, "Congress's war powers under Article I are not defined or constrained by international law.  The Declare War Clause and the other Article I war powers clauses do not refer to international law, unlike the Define and Punish Clause."  696 F.3d at 1246 n.6 (Kavanaugh, J., concurring).  Indeed, since the beginning of our nation, both the President and Congress, in the exercise of their war powers, have authorized the trial by military commission of offenses such as spying and aiding the enemy that are not prohibited under international law as war crimes, but which the law of war permits the United States to punish.  Id.  Finally, in the 2009 MCA, Congress implicitly recognized that its authority to codify offenses triable by military commission goes beyond the Define and Punish Clause.  See 10 U.S.C. § 950p(d) (2009) (codifying offenses "that have traditionally been triable under the law of war or *otherwise triable by military commission*")  (emphasis added).

60

In addition, because "international law establishes at least some forms of
*terrorism*, including the intentional targeting of civilian populations, as war
crimes," Hamdan II, 696 F.3d at 1249-50, it follows that Congress's constitutional
authority to "Define and Punish" permits it to criminalize such acts of terrorism to
help the United States fulfill its international responsibilities.  See Geneva
Convention Relative to the Protection of Civilian Persons in Time of War arts. 33,
146.  The Define and Punish Clause, coupled with the Necessary and Proper
Clause, affords Congress ample authority to enact ancillary legislation "needed to
carry into execution" such responsibilities.  See United States v. Arjona, 120 U.S.
479, 487-88 (1887) (Congress could prohibit counterfeiting foreign securities as
"necessary and proper to afford th[e] protection" against counterfeiting foreign
currency, an obligation imposed by international law).  Congress could likewise
reasonably conclude in the 2006 MCA that punishing conspiracy to engage in, or
providing material support to, acts of terrorism committed during war was
necessary to comply with our nation's international responsibilities.

Thus, because Congress has authority under its war powers to provide
military commission jurisdiction over offenses that have traditionally been triable
by military commission regardless of whether they are prohibited by international
law, there is no reason to construe Article 21, contrary to its text, legislative

61

history, and the Supreme Court's <u>Quirin</u> decision, as limiting military

commissions' jurisdiction to violations of international law.  Instead, consistent

with Article 21 and the 2006 MCA, military commission jurisdiction extends to

offenses committed in the context of hostilities that international law permits States

to punish, and that the United States has historically punished.

II.    BAHLUL'S CONVICTIONS DID NOT VIOLATE THE EX POST
       FACTO CLAUSE

       Given a proper construction of the 2006 MCA, Bahlul was lawfully tried and

convicted for his pre-2006 conduct under the statute.  Several additional issues,

avoided by the <u>Hamdan II</u> court, therefore arise:  (1) What standard of review

governs Bahlul's claims under the Ex Post Facto Clause? (2) Does the Ex Post

Facto Clause apply in cases involving detainees at Guantanamo? and (3) Was there

a reversible ex post facto violation in this case?  As explained below, because

Bahlul did not raise at trial any claims under the Ex Post Facto Clause, his claim of

an ex post facto violation is reviewed for plain error.   Although the Ex Post Facto

Clause applies in military commission prosecutions of detainees at Guantanamo, it

should apply flexibly in the military commission context because of the common

law nature of military commission proceedings.  Applying that principle here, there

was no reversible ex post facto error because Bahlul's conduct was criminal when

done and Bahlul had "fair warning" that his conduct could subject him to criminal prosecution.

A.    Standard of Review

Bahlul did not raise any claims under the Ex Post Facto Clause at his military commission trial. Al-Bahlul, 820 F. Supp. 2d at 1258. His claim of an ex post facto violation is therefore subject to plain error review. United States v. Marcus, 130 S. Ct. 2159, 2165 (2010); United States v. Harcrow, 66 M.J. 154, 157-59 (C.A.A.F. 2008) (applying plain error doctrine to forfeited constitutional claim); cf. Manual for Military Commissions II-68 (failure to timely raise claims constitutes waiver); 10 U.S.C. § 950a(a) (2009) ("A finding or sentence of a military commission under this chapter may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused."). Under the plain error standard, an appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious; (3) the error affected the appellant's substantial rights; and (4) "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Marcus, 130 U.S. at 2164 (citation omitted).

B.    The Ex Post Facto Clause Does Not Preclude the Prosecution of
      Offenses Traditionally Subject to Trial by Military Commission

To answer the first question posed by the Court,[19] the United States' position

is that the Ex Post Facto Clause applies in military commission prosecutions under

the 2006 MCA of detainees at Guantanamo.  Although neither the Supreme Court

nor this Court has specifically addressed whether an alien unprivileged belligerent

detained at Guantanamo may assert rights pursuant to the Ex Post Facto Clause, its

application is supported by the unique combination of circumstances in this case.

The Supreme Court has long recognized the Clause's structural function in U.S.

law.  See Weaver v. Graham, 450 U.S. 24, 29-30 (1981) ("The presence or absence

of an affirmative, enforceable right is not relevant . . . to the *ex post facto*

prohibition."); Downes v. Bidwell, 182 U.S. 244, 277 (1901) (opinion of Brown,

J.) (describing the Clause as a structural limitation that "goes to the competency of

Congress to pass a bill *of that description*").  Here, other circumstances support

application of the ex post facto clause to these proceedings, including the fact that

the prosecutions were held at Guantanamo, over which the United States

"maintains *de facto* sovereignty," Boumediene v. Bush, 553 U.S. 723, 755 (2008),

and were conducted pursuant to a statute that provides for review of convictions by

---

[19]  See No. 11-1324, Dkt. No. 1432126, Order of the En Banc Court 2 (Apr.
23, 2013).

an Article III court, see 10 U.S.C. § 950g(a) (2006). In addition, the CMCR

assumed that the Clause applied in this case, see Al Bahlul, 820 F. Supp. 2d at

1218, and the military judge who presided over Hamdan's military commission

trial held that the Clause applied in that proceeding. See United States v. Hamdan,

AE 263, Military Judge Ruling on Defense Motion to Dismiss (D012) at 2 (July

14, 2008) (available at http://www.mc.mil/CASES/MilitaryCommissions.aspx).

Acknowledging, as the government does, that the Ex Post Facto Clause

applies here, it does not follow that the Clause applies in the same fashion as it

does to ordinary criminal proceedings. The common-law nature of military

commission proceedings "presupposes a measure of evolution that is incompatible

with stringent application of *ex post facto* principles." Rogers v. Tennessee, 532

U.S. 451, 461 (2001); cf. Yamashita, 327 U.S. at 17 ("[C]harges of violations of

the law of war triable before a military tribunal need not be stated with the

precision of a common law indictment."); Trial of Alstotter, 6 L. Rep. Trials of

War Criminals 41 (1948) ("To have attempted to apply the *ex post facto* principle

to judicial decisions of common international law would have been to strangle that

law at birth.").

The Ex Post Facto Clause bars retroactive application of a "statute which

punishes as a crime an act previously committed, which was innocent when done;

65

which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense [previously] available." Collins, 497 U.S. at 42 (internal citation omitted); see also Calder v. Bull, 3 U.S. (3 Dall.) 386, 390 (1798) (opinion of Chase, J.) (listing as examples of ex post facto laws a "law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action"; a "law that aggravates a crime, or makes it greater than it was, when committed"; and a "law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender").

Bahlul does not claim that the 2006 MCA increased his punishment or deprived him of a previously available defense. Rather, he claims that his conduct, for ex post facto purposes, was innocent at the time he committed it because, he argues, no U.S. statute authorized military commission trials for inchoate conspiracy, solicitation, or material support for terrorism.

Bahlul is incorrect. As set forth above, U.S. military commissions have tried enemy belligerents for conspiracy to commit war crimes since at least the Civil War. U.S. military commissions have also traditionally tried and punished the conduct embraced by Bahlul's convictions for solicitation and material support for

66

terrorism.  That longstanding practice forecloses Bahlul's forfeited ex post facto claim, whether military commission jurisdiction over Bahlul's conduct was statutorily authorized by Article 21 or was established by the pre-existing common law of war.  Cf. State v. Hylton, 226 P.3d 246, 252-53 (Wash. App. 2010) (finding no Ex Post Facto Clause violation where a state legislature codified a pre-existing common law rule regarding sentencing enhancement, even though the defendant's conduct occurred before the codification and the codification modified the common law rule).  Either way, U.S. law and practice established that such conduct was subject to trial by military commission.  Thus, even if Bahlul is correct in interpreting Article 21 as reaching only international-law offenses, that would not establish an ex post facto violation here because Bahlul was convicted for pre-existing common law offenses codified by the 2006 MCA.

In addition, Bahlul's conduct was, at the time he committed it, already unlawful under existing criminal statutes.  See, e.g., 18 U.S.C. § 2332(b) (1998) (criminalizing conspiracy outside the United States to kill a U.S. national); id. § 2339A (punishing providing material support to a violation of Section 2332(b)); id. § 373 (punishing solicitation to commit a crime of violence).  The fact that the MCA provides a different forum for adjudicating such conduct does not implicate ex post facto concerns in this case because any procedural differences between the

67

military commission system and a prosecution in an Article III court did not affect Bahlul's substantial rights, given that he admitted the relevant factual allegations and did not offer any defense or objections at his trial.  See Hughes Aircraft Co. v. United States ex rel Schumer, 520 U.S. 939, 951 (1997) ("Statutes merely addressing *which* court shall have jurisdiction to entertain a particular cause of action can fairly be said merely to regulate the secondary conduct of litigation and not the underlying primary conduct of the parties."); see also Duncan v. State, 152 U.S. 377, 382-83 (1894) (the Ex Post Facto Clause is not concerned with "the abolition of courts and creation of new ones" in the absence of a substantial effect on a defendant's procedural protections); United States v. Al Kassar, 660 F.3d 108, 119 (2d Cir. 2011) (noting, for due process purposes, that because supplying weapons "to a known terrorist organization with the understanding that those weapons would be used to kill U.S. citizens and destroy U.S. property is self-evidently criminal," it is inconsequential whether defendants understood that they could be subject to prosecution in the United States), cert. denied, 132 S. Ct. 2374 (2012).

The Ex Post Facto Clause's purposes – to provide fair notice to defendants and to prevent arbitrary and vindictive legislation – are not implicated where an officer of an organization that has declared war on the United States is subject to a

68

military commission trial for committing self-evidently criminal conduct targeting

U.S. civilians.  As this Court has recently held in the due process context, a foreign

defendant who commits obviously criminal conduct cannot complain that he

lacked fair notice that he might be subject to criminal prosecution in the United

States.  Ali, 2013 WL 2477029, at *14 ("Fair warning does not require that the

defendants understand that they could be subject to criminal prosecution *in the*

*United States* so long as they would reasonably understand that their conduct was

criminal and would subject them to prosecution somewhere.").

     Thus, Bahlul cannot plausibly argue that, at the time of the applicable

conduct, he lacked "fair warning" that his conduct could subject him to criminal

punishment.  See, e.g., Landgraf v. USI Film Prods., 511 U.S. 244, 266-67 (1994).

None of the offenses of which Bahlul was convicted criminalized conduct that was

"innocent when done," see Collins, 497 U.S. at 42, nor were they of a nature that a

person would not reasonably understand that the underlying conduct was criminal.

Bahlul was charged with and convicted of, among other things, participating in a

conspiracy to attack civilians that resulted in the death of almost 3,000 Americans.

He did not lack fair notice, under either due process or ex post facto principles, that

he could be brought before a U.S. tribunal to answer for such conduct.  See Ali,

2013 WL 2477029, at *14 (holding that the Hostage Taking Convention provided

sufficient notice, for due process purposes, that defendant could be prosecuted by any State party to the treaty for negotiating on behalf of pirates, even though his own State had not signed the convention); see also S.C. Res. 1267, U.N. Doc. S/RES/1267 (Oct. 15, 1999) (resolution outlining steps that States should take in order to help bring to justice Usama bin Laden and his associates, including the imposition of appropriate penalties against individuals); S.C. Res. 1333, U.N. Doc. S/RES/1333 (Dec. 19, 2000) (same).

Finally, even if Bahlul's military commission convictions amounted to an ex post facto violation that was sufficiently "obvious" to satisfy the plain error standard, the violation claimed by Bahlul does not satisfy the third and fourth prongs of plain error review. Because Bahlul had ample notice that his conduct, which he proudly admitted, was criminal and subject to prosecution by the United States, he cannot show that his prosecution for that conduct affected his substantial rights or seriously affected the fairness, integrity, or public reputation of judicial proceedings. See Marcus, 130 U.S. at 2164.

## III. BAHLUL'S ADDITIONAL CONSTITUTIONAL ARGUMENTS LACK MERIT

There is no merit to Bahlul's suggestion (Br. 30-31) that Congress's codification of offenses that it finds to have been traditionally triable by military

commission impermissibly trenches upon the judicial authority of the federal courts under Article III. The judicial article does not foreclose the "traditional practice" of trying enemy belligerents before military tribunals for offenses against the law of war. See Quirin, 317 U.S. at 39-41. Similarly, Amicus NIMJ argues that "the exception to the jury-trial protections identified by the Supreme Court in Quirin extends only to offenses committed by enemy belligerents against the *international* laws of war." NIMJ Amicus Br. 27. But Quirin expressly identified spying as an offense that does not fall within the scope of the Fifth and Sixth Amendments, 317 U.S. at 41, and spying, as NIMJ acknowledges (Amicus Br. 18 & n.8), is not a war crime prohibited by international law. Accordingly, Quirin lends no support to NIMJ's argument that, in the exercise of its constitutional powers, Congress can only authorize military commission jurisdiction, where the rights to indictment and a jury trial do not apply, over war crimes prohibited by international law.

Bahlul's related argument (Br. 32) that affording Congress the authority to codify violations of common law war crimes would permit the retrospective prosecution of a limitless range of offenders and offenses is, in the context of this case, purely academic. Military commission jurisdiction under the 2006 MCA extends only to "alien unlawful enemy combatants engaged in hostilities against

71

the United States," 10 U.S.C. § 948b(a) (2006), a category that includes Bahlul.  In addition, the 2006 MCA codifies only offenses "that have traditionally been triable by military commissions."  Id. § 950p(a) (2006).   As demonstrated above, the offenses for which Bahlul was convicted are firmly grounded in U.S. military commission practice.  This case, therefore, provides no occasion to plumb the theoretical limits of Congress's authority to make less well-grounded offenses triable by military commission.[20]

Nor is there merit to Bahlul's argument (Br. 20-22) that, in the wake of Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938), Congress must particularly specify the offenses that it wishes to make subject to trial by military commission.  As Bahlul concedes (Br. 24), no one disputes that, insofar as such offenses are derived from international law, "recourse to the statutes of the United States" is not required.  Bahlul provides no reason why a different principle of specificity should govern offenses cognizable under our domestic law of war.  Moreover, Quirin recognized that, in authorizing the trial of offenses by military tribunals, "Congress had the choice of crystallizing in permanent form and in minute detail every

---

[20]  This is not to say that, when acting *prospectively* pursuant to its war-making powers, Congress is necessarily limited to identifying traditional law-of-war violations as subject to trial by military commission when such offenses are committed by an enemy combatant in the context of an armed conflict.  See Hamdan II, 696 F.3d at 1247 n.6 (Kavanaugh, J., concurring).  The precise contours of such prospective authority, however, are not at issue here.

offense against the law of war, or of adopting the system of common law applied by military tribunals so far as it should be recognized and deemed applicable by the courts," and that it could properly choose "the latter course." 317 U.S. at 30. Finally, in codifying pre-existing common law offenses in the 2006 MCA, Congress did not rely on "common law jurisdiction" (Pet. Br. 22) over such offenses. Instead, Congress simply looked to common law antecedents to determine what offenses were traditionally triable by military commission. Nothing in <u>Erie</u> prevents Congress from relying in that way on the system of common law traditionally applied in U.S. military commissions.

<u>CONCLUSION</u>

The convictions should be affirmed.

Respectfully submitted,

ROB PARK                                JOHN P. CARLIN
<u>Acting Deputy General Counsel</u>        <u>Acting Assistant Attorney General</u>
<u>Department of Defense</u>                <u>for National Security</u>

                                        J. BRADFORD WIEGMANN
                                        <u>Deputy Assistant Attorney General</u>

                                        STEVEN M. DUNNE
                                        <u>Chief, Appellate Unit</u>

                                        JOHN F. DE PUE
                                        JOSEPH PALMER
                                        <u>Attorneys</u>
                                        <u>National Security Division</u>
                                        <u>U.S. Department of Justice</u>
                                        <u>Washington, D.C. 20530</u>

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

     1.  This brief complies with the type-volume limitation of Fed. R. App. P.
32(a)(7)(B), and with this Court's Order dated July 2, 2013, granting respondent's
consent motion for leave to file an oversized brief, because:

> this brief contains 16,774 words, excluding the parts of
> the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)
> and Circuit Rule 32(a)(1).

     2.  This brief complies with the typeface requirements of Fed. R. App. P.
32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportionally spaced
> typeface using Microsoft Word 2010 in 14 point font size
> and Times New Roman type style.

DATED: July 10, 2013                          /s/ John F. De Pue
                                             John F. De Pue
                                             Attorney for Respondent

75

<u>CERTIFICATE OF SERVICE</u>

U.S. Court of Appeals Docket Number 11-1324

I hereby certify that I electronically filed the foregoing Brief for the United States with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on July 10, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


DATED: July 10, 2013                     /s/ John F. De Pue
                                         John F. De Pue
                                         Attorney for Respondent

<u>STATUTORY ADDENDUM</u>

<u>CONTENTS</u>

Military Commissions Act of 2006, Pub. L. No. 109-366,
  120 Stat. 2600 (Oct. 17, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3a

  § 4(a)(2) (120 Stat. 2631) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3a

  § 948a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3a

  § 948c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3a

  § 948d(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4a

  § 950p . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4a

  § 950u . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4a

  § 950v(b)(24) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4a

  § 950v(b)(25) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5a

  § 950v(b)(26) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5a

  § 950v(b)(27) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5a

  § 950v(b)(28) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5a

Military Commissions Act of 2009, Pub. L. No. 111-84, div. A, tit. XVIII,
  123 Stat. 2574 (Oct. 28, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6a

  § 948d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6a

  § 950c(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6a

  § 950f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6a

§ 950g(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7a

§ 950p(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7a

§ 950t(25) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8a

§ 950t(26) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8a

§ 950t(27) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8a

§ 950t(29) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9a

§ 950t(30) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9a

Uniform Code of Military Justice:

10 U.S.C. § 821 (Art. 21, UCMJ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10a

10 U.S.C. § 904 (Art. 104, UCMJ ) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10a

10 U.S.C. § 906 (Art. 106, UCMJ ) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10a

1916 Articles of War, Act of Aug. 29, 1916, ch. 418, art. 15, 39 Stat. 653 . . . . 11a

Title 18 U.S. Code:

18 U.S.C. § 373 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12a

18 U.S.C. § 2332(b) (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12a

18 U.S.C. § 2339A (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13a

18 U.S.C. § 2339A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13a

**Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (Oct. 17, 2006)**

**§ 4(a)(2), 120 Stat. 2631**

**SEC. 4. AMENDMENTS TO UNIFORM CODE OF MILITARY JUSTICE.**

(a) CONFORMING AMENDMENTS.-Chapter 47 of title 10, United States Code (the Uniform Code of Military Justice), is amended as follows:
. . .

(2) EXCLUSION OF APPLICABILITY TO CHAPTER 47A COMMISSIONS.- Sections 821, 828, 848, 850(a), 904, and 906 (articles 21, 28, 48, 50(a), 104, and 106) are amended by adding at the end the following new sentence: "This section does not apply to a military commission established under chapter 47A of this title.".

**§ 948a. Definitions**

In this chapter:

(1) UNLAWFUL ENEMY COMBATANT.-(A) The term "unlawful enemy combatant" means-

(i) a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces); or

(ii) a person who, before, on, or after the date of the enactment of the Military Commissions Act of 2006, has been determined to be an unlawful enemy combatant by a Combatant Status Review Tribunal or another competent tribunal established under the authority of the President or the Secretary of Defense.

**§ 948c. Persons subject to military commissions**

Any alien unlawful enemy combatant is subject to trial by military commission under this chapter.

## § 948d. Jurisdiction of military commissions

(a) JURISDICTION.-A military commission under this chapter shall have jurisdiction to try any offense made punishable by this chapter or the law of war when committed by an alien unlawful enemy combatant before, on, or after September 11, 2001.

## § 950p. Statement of substantive offenses

(a) PURPOSE.-The provisions of this subchapter codify offenses that have traditionally been triable by military commissions. This chapter does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission.

(b) EFFECT.-Because the provisions of this subchapter (including provisions that incorporate definitions in other provisions of law) are declarative of existing law, they do not preclude trial for crimes that occurred before the date of the enactment of this chapter.

## § 950u. Solicitation

Any person subject to this chapter who solicits or advises another or others to commit one or more substantive offenses triable by military commission under this chapter shall, if the offense solicited or advised is attempted or committed, be punished with the punishment provided for the commission of the offense, but, if the offense solicited or advised is not committed or attempted, he shall be punished as a military commission under this chapter may direct.

## § 950v. Crimes triable by military commissions

. . .

(b) OFFENSES.-The following offenses shall be triable by military commission under this chapter at any time without limitation:

. . .

(24) TERRORISM.-Any person subject to this chapter who intentionally kills or inflicts great bodily harm on one or more protected persons, or intentionally engages in an act that evinces a wanton disregard for human life, in a manner calculated to influence or affect the conduct of government or civilian population by intimidation or coercion, or to retaliate against government conduct, shall be

punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

(25) PROVIDING MATERIAL SUPPORT FOR TERRORISM.-

(A) OFFENSE.-Any person subject to this chapter who provides material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, an act of terrorism (as set forth in paragraph (24)), or who intentionally provides material support or resources to an international terrorist organization engaged in hostilities against the United States, knowing that such organization has engaged or engages in terrorism (as so set forth), shall be punished as a military commission under this chapter may direct.

(B) MATERIAL SUPPORT OR RESOURCES DEFINED.- In this paragraph, the term "material support or resources" has the meaning given that term in section 2339A(b) of title 18.

(26) WRONGFULLY AIDING THE ENEMY.-Any person subject to this chapter who, in breach of an allegiance or duty to the United States, knowingly and intentionally aids an enemy of the United States, or one of the co-belligerents of the enemy, shall be punished as a military commission under this chapter may direct.

(27) SPYING.-Any person subject to this chapter who with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign power, collects or attempts to collect information by clandestine means or while acting under false pretenses, for the purpose of conveying such information to an enemy of the United States, or one of the co-belligerents of the enemy, shall be punished by death or such other punishment as a military commission under this chapter may direct.

(28) CONSPIRACY.-Any person subject to this chapter who conspires to commit one or more substantive offenses triable by military commission under this chapter, and who knowingly does any overt act to effect the object of the conspiracy, shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

**Military Commissions Act of 2009, Pub. L. No. 111-84, div. A, tit. XVIII, 123 Stat. 2574 (Oct. 28, 2009)**

### § 948d. Jurisdiction of military commissions

A military commission under this chapter shall have jurisdiction to try persons subject to this chapter for any offense made punishable by this chapter, sections 904 and 906 of this title (articles 104 and 106 of the Uniform Code of Military Justice), or the law of war, whether such offense was committed before, on, or after September 11, 2001, and may, under such limitations as the President may prescribe, adjudge any punishment not forbidden by this chapter, including the penalty of death when specifically authorized under this chapter. A military commission is a competent tribunal to make a finding sufficient for jurisdiction.

### § 950c. Appellate referral; waiver or withdrawal of appeal

(a) AUTOMATIC REFERRAL FOR APPELLATE REVIEW.-Except as provided in subsection (b), in each case in which the final decision of a military commission under this chapter (as approved by the convening authority) includes a finding of guilty, the convening authority shall refer the case to the United States Court of Military Commission Review. Any such referral shall be made in accordance with procedures prescribed under regulations of the Secretary.

### § 950f. Review by United States Court of Military Commission Review

(a) ESTABLISHMENT.-There is a court of record to be known as the "United States Court of Military Commission Review" (in this section referred to as the "Court"). The Court shall consist of one or more panels, each composed of not less than three appellate military judges. For the purpose of reviewing decisions of military commissions under this chapter, the Court may sit in panels or as a whole, in accordance with rules prescribed by the Secretary of Defense.

(b) JUDGES.-(1) Judges on the Court shall be assigned or appointed in a manner consistent with the provisions of this subsection.

(2) The Secretary of Defense may assign persons who are appellate military judges to be judges on the Court. Any judge so assigned shall be a commissioned officer of the armed forces, and shall meet the qualifications for military judges prescribed by section 948j(b) of this title.

6a

(3) The President may appoint, by and with the advice and consent of the Senate, additional judges to the United States Court of Military Commission Review.

(4) No person may serve as a judge on the Court in any case in which that person acted as a military judge, counsel, or reviewing official.

(c) CASES TO BE REVIEWED.-The Court shall, in accordance with procedures prescribed under regulations of the Secretary, review the record in each case that is referred to the Court by the convening authority under section 950c of this title with respect to any matter properly raised by the accused.

(d) STANDARD AND SCOPE OF REVIEW.-In a case reviewed by the Court under this section, the Court may act only with respect to the findings and sentence as approved by the convening authority. The Court may affirm only such findings of guilty, and the sentence or such part or amount of the sentence, as the Court finds correct in law and fact and determines, on the basis of the entire record, should be approved. In considering the record, the Court may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the military commission saw and heard the witnesses.

(e) REHEARINGS.-If the Court sets aside the findings or sentence, the Court may, except where the setting aside is based on lack of sufficient evidence in the record to support the findings, order a rehearing. If the Court sets aside the findings or sentence and does not order a rehearing, the Court shall order that the charges be dismissed.

## § 950g. Review by United States Court of Appeals for the District of Columbia Circuit; writ of certiorari to Supreme Court

(a) EXCLUSIVE APPELLATE JURISDICTION.-Except as provided in subsection (b), the United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction to determine the validity of a final judgment rendered by a military commission (as approved by the convening authority and, where applicable, the United States Court of Military Commission Review) under this chapter.

## § 950p. Definitions; construction of certain offenses; common circumstances

. . .

(d) EFFECT.-The provisions of this subchapter codify offenses that have traditionally been triable by military commission. This chapter does not establish

new crimes that did not exist before the date of the enactment of this subchapter, as amended by the National Defense Authorization Act for Fiscal Year 2010, but rather codifies those crimes for trial by military commission. Because the provisions of this subchapter codify offenses that have traditionally been triable under the law of war or otherwise triable by military commission, this subchapter does not preclude trial for offenses that occurred before the date of the enactment of this subchapter, as so amended.

## § 950t. Crimes triable by military commission

The following offenses shall be triable by military commission under this chapter at any time without limitation:

 . . .

 (25) PROVIDING MATERIAL SUPPORT FOR TERRORISM.-

  (A) OFFENSE.-Any person subject to this chapter who provides material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, an act of terrorism (as set forth in paragraph (24) of this section), or who intentionally provides material support or resources to an international terrorist organization engaged in hostilities against the United States, knowing that such organization has engaged or engages in terrorism (as so set forth), shall be punished as a military commission under this chapter may direct.

  (B) MATERIAL SUPPORT OR RESOURCES DEFINED.- In this paragraph, the term "material support or resources" has the meaning given that term in section 2339A(b) of title 18.

 (26) WRONGFULLY AIDING THE ENEMY.-Any person subject to this chapter who, in breach of an allegiance or duty to the United States, knowingly and intentionally aids an enemy of the United States, or one of the co-belligerents of the enemy, shall be punished as a military commission under this chapter may direct.

 (27) SPYING.-Any person subject to this chapter who, in violation of the law of war and with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign power, collects or attempts to collect information by clandestine means or while acting under false pretenses, for the purpose of conveying such information to an enemy of the United States, or one of the co-belligerents of the enemy, shall be punished by death or such other punishment as a military commission under this chapter may direct.

 . . .

(29) CONSPIRACY.-Any person subject to this chapter who conspires to commit one or more substantive offenses triable by military commission under this subchapter, and who knowingly does any overt act to effect the object of the conspiracy, shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

(30) SOLICITATION.-Any person subject to this chapter who solicits or advises another or others to commit one or more substantive offenses triable by military commission under this chapter shall, if the offense solicited or advised is attempted or committed, be punished with the punishment provided for the commission of the offense, but, if the offense solicited or advised is not committed or attempted, shall be punished as a military commission under this chapter may direct.

**Uniform Code of Military Justice:**

**10 U.S.C. § 821. Art. 21**

**§ 821. Art. 21. Jurisdiction of courts-martial not exclusive**

The provisions of this chapter conferring jurisdiction upon courts-martial do not deprive military commissions, provost courts, or other military tribunals of concurrent jurisdiction with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions, provost courts, or other military tribunals. This section does not apply to a military commission established under chapter 47A of this title.

**10 U.S.C. § 904. Art. 104.**

**§ 904. Art. 104. Aiding the enemy**

Any person who-
   (1) aids, or attempts to aid, the enemy with arms, ammunition, supplies, money, or other things; or
   (2) without proper authority, knowingly harbors or protects or gives intelligence to, or communicates or corresponds with or holds any intercourse with the enemy, either directly or indirectly;
shall suffer death or such other punishment as a court-martial or military commission may direct.  This section does not apply to a military commission established under chapter 47A of this title.

**10 U.S.C. § 906. Art. 106.**

**§ 906. Art. 106. Spies**

Any person who in time of war is found lurking as a spy or acting as a spy in or about any place, vessel, or aircraft, within the control or jurisdiction of any of the armed forces, or in or about any shipyard, any manufacturing or industrial plant, or any other place or institution engaged in work in aid of the prosecution of the war by the United States, or elsewhere, shall be tried by a general court-martial or by a military commission and on conviction shall be punished by death. This section

does not apply to a military commission established under chapter 47A of this title.

**1916 Articles of War, Act of Aug. 29, 1916, ch. 418, art. 15, 39 Stat. 653**

ART. 15. NOT EXCLUSIVE.-The provisions of these articles conferring jurisdiction upon courts-martial shall not be construed as depriving military commissions, provost courts, or other military tribunals of concurrent jurisdiction in respect of offenders or offenses that by the law of war may be lawfully triable by such military commissions, provost courts, or other military tribunals.

**Title 18 U.S. Code:**

**18 U.S.C. § 373 (1998)**

**§ 373. Solicitation to commit a crime of violence**

(a) Whoever, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct, shall be imprisoned not more than one-half the maximum term of imprisonment or (notwithstanding section 3571) fined not more than one-half of the maximum fine prescribed for the punishment of the crime solicited, or both; or if the crime solicited is punishable by life imprisonment or death, shall be imprisoned for not more than twenty years.

(b) It is an affirmative defense to a prosecution under this section that, under circumstances manifesting a voluntary and complete renunciation of his criminal intent, the defendant prevented the commission of the crime solicited. A renunciation is not "voluntary and complete" if it is motivated in whole or in part by a decision to postpone the commission of the crime until another time or to substitute another victim or another but similar objective. If the defendant raises the affirmative defense at trial, the defendant has the burden of proving the defense by a preponderance of the evidence.

(c) It is not a defense to a prosecution under this section that the person solicited could not be convicted of the crime because he lacked the state of mind required for its commission, because he was incompetent or irresponsible, or because he is immune from prosecution or is not subject to prosecution.

**18 U.S.C. § 2332(b) (1998)**

**§ 2332.** Criminal penalties

   . . .

(b) ATTEMPT OR CONSPIRACY WITH RESPECT TO HOMICIDE.-Whoever outside the United States attempts to kill, or engages in a conspiracy to kill, a national of the United States shall-

   (1) in the case of an attempt to commit a killing that is a murder as defined in

this chapter, be fined under this title or imprisoned not more than 20 years, or both; and

(2) in the case of a conspiracy by two or more persons to commit a killing that is a murder as defined in section 1111(a) of this title, if one or more of such persons do any overt act to effect the object of the conspiracy, be fined under this title or imprisoned for any term of years or for life, or both so fined and so imprisoned.

## 18 U.S.C. § 2339A (1998)

### § 2339A. Providing material support to terrorists

(a) OFFENSE.-Whoever, within the United States, provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332c, or 2340A of this title or section 46502 of title 49, or in preparation for, or in carrying out, the concealment or an escape from the commission of any such violation, shall be fined under this title, imprisoned not more than 10 years, or both.

(b) DEFINITION.-In this section, the term "material support or resources" means currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.

## 18 U.S.C. § 2339A

### § 2339A. Providing material support to terrorists

(a) OFFENSE.-Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, or 2340A of this title, section

13a

236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section 46502 or 60123(b) of title 49, or any offense listed in section 2332b(g)(5)(B) (except for sections 2339A and 2339B) or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

(b) DEFINITIONS.-As used in this section-

(1) the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials;

(2) the term "training" means instruction or teaching designed to impart a specific skill, as opposed to general knowledge; and

(3) the term "expert advice or assistance" means advice or assistance derived from scientific, technical or other specialized knowledge.