No. 11-1324

ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 30, 2013

---

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

### ALI HAMZA AHMAD SULIMAN AL BAHLUL,

*Petitioner,*

v.

### UNITED STATES OF AMERICA,

*Respondent*

**On Petition for Review from the United States Court
of Military Commission Review**

---

BRIEF OF *AMICI CURIAE*
FORMER GOVERNMENT OFFICIALS, FORMER MILITARY LAWYERS,
AND SCHOLARS OF NATIONAL SECURITY LAW
IN SUPPORT OF RESPONDENT

---

Peter Margulies
Professor of Law
Roger Williams University School of Law
10 Metacom Avenue
Bristol, RI 02809
Telephone: (401)254-4564
pmargulies@rwu.edu

James A. Schoettler, Jr.
*Attorney of Record*
Adjunct Professor
Georgetown University Law Center
600 New Jersey Avenue, NW
Washington, D.C. 20001
Telephone: (240)893-0688
jas288@law.georgetown.edu

Counsel for *Amici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES .................................................................. iii

GLOSSARY OF ABBREVIATIONS .................................................... iiii

INTERESTS OF THE AMICI CURIAE ................................................. 1

SUMMARY OF ARGUMENT .............................................................. 3

I.    CONSPIRACY AS A MODE OF LIABILITY FOR A COMPLETED WAR CRIME IS RECOGNIZED BY INTERNATIONAL LAW AND SUPPORTED BY THE RECORD AND FINDINGS IN THE INSTANT CASE .............................................. 6

II.   THE DEFENDANT'S CONVICTION COMPLIES WITH THE EX POST FACTO CLAUSE ............................................................................ 11

III.  THE ERROR IN THE INITIAL CONSPIRACY CHARGE WAS HARMLESS BECAUSE AL BAHLUL HAD FAIR NOTICE OF THE CHARGES AGAINST HIM AND AN ADEQUATE OPPORTUNITY TO PREPARE A DEFENSE .......................................... 13

IV.   THE RECORD AND FINDINGS DEMONSTRATE THAT THE INSTRUCTIONS' FAILURE TO REQUIRE A FINDING OF A COMPLETED WAR CRIME WAS HARMLESS ERROR .................... 18

CONCLUSION ................................................................................... 23

APPENDIX ......................................................................................... 24

CERTIFICATE OF COMPLIANCE .................................................... 34

CERTIFICATE OF SERVICE ............................................................. 35

# TABLE OF AUTHORITIES[1]

## UNITED STATES CASES

*Carella v. California*, 491 U.S. 263 (1989) ............................................................ 18

*Ex Parte Quirin*, 317 U.S. 1 (1942) ..................................................................... 11

*Hamdan v. Rumsfeld*, 548 U.S. 557, 600 (2006) (*Hamdan I*)............................. 6, 15

*Hamdan v. United States*, 696 F.3d 1238 (D.C. Cir. 2012) (*Hamdan II*)..... 7, 10, 22

*Neder v. United States*, 527 U.S. 1 (1999)................................. 5, 18, 19, 20, 21, 22

*California v. Roy*, 519 U.S. 2 (1996) ................................................................. 18,19

*Rose v. Clark*, 478 U.S. 570 (1986) ....................................................................... 19

*Stirone v. United States*, 361 U.S. 212, 213-14 (1960)........................................... 14

*United States v. Burge*, 711 F.3d 803, 814 (7th Cir. 2012) ..................................... 14

*United States v. Dupre*, 462 F.2d 131, 140-41 (2d Cir. 2006)................................. 14

*United States v. Miller*, 471 U.S. 130, 134 (1985).................................................. 13

*United States v. Ratliff-White*, 493 F.3d 812 (7th Cir. 2007)......................... 5, 13, 14

*In re Yamashita*, 327 U.S. 1 (1946) ........................................................... 11, 15, 18

---

[1] Authorities upon which *amici* chiefly rely are denoted with asterisks (*).

# BOOKS AND ARTICLES

William C. Banks & Peter Raven-Hansen, *National Security Law and the Power of the Purse* (1994) .................................................................................. 2

Geoffrey S. Corn, Victor M. Hansen, Richard Jackson, M. Christopher Jenks, Eric Talbot Jensen & James A. Schoettler, Jr., *The Law of Armed Conflict: An Operational Approach* (2012) .......................................................... 2

Geoffrey S. Corn, Victor M. Hansen, Dick Jackson, Eric Talbot Jensen, Michael W. Lewis & James A. Schoettler, Jr., T*he War on Terror and the Laws of War: A Military Perspective* (2009) .......................................................... 2

Geoffrey Corn & Eric Talbot Jensen, *Transnational Armed Conflict: A "Principled" Approach to the Regulation of Counter-Terror Combat Operations*, 42 Israel L. Rev. 46, 66 (2009) .......................................................... 2

Stephen Dycus, William C. Banks & Peter Raven-Hansen, *Counterterrorism Law* (2d ed. 2012) .................................................................................................. 2

Stephen Dycus, Arthur C. Berney, William C. Banks & Peter Raven-Hansen, *National Security Law* (5th ed. 2011) .......................................................... 2

William F. Finlason, *Martial Law* 130 (1867) .................................................... 15

Jimmy Gurule & Geoffrey S. Corn, *Principles of Counter-Terrorism Law* (2011) .................................................................................................................. 2

Victor M. Hansen & Lawrence Friedman, *The Case for Congress: Separation of Powers and the War on Terror* (2009) .......................................... 2

O. Holmes, *The Common Law* 1 (1881) ............................................................ 19

Chris Jenks, *Notice Otherwise Given: Will in Absentia Trials at the Special Tribunal for Lebanon Violate Human Rights?*, 33 Fordham Int'l L.J. 57 (2009) .................................................................................................................. 2

iv

Eric Talbot Jensen, *Cyber Warfare and Precautions Against the Effects of Attacks*, 88 Tex. L. Rev. 1533 (2010) ..................................................... 2

Peter Margulies, *Defining, Punishing & Membership in the Community of Nations: Material Support and Conspiracy Charges in Military Commissions*, 36 Fordham Int'l L.J. 1 (2013) ..................................... 10

Michael A. Newton, *Exceptional Engagement: Protocol I and a World United Against Terrorism*, 45 Tex. Int'l L.J. 323 (2009) ...................................... 2

Jens David Ohlin, *Joint Intentions to Commit International Crimes*, 11 Chi. J. Int'l L. 693 (2011) ............................................................................. 5, 7

Beth van Schaack, *Crimen Sine Lege: Judicial Lawmaking at the Intersection of Law and Morals*, 97 Geo. L.J. 119 (2008).................................. 12

W. Winthrop, *Military Law and Precedents* 841 (rev. 2d ed. 1920) ...................... 15

## INTERNATIONAL CRIMINAL TRIBUNAL CASES

\* *Prosecutor v. Brdanin*, Case No. IT-99-36-A, Appeals Chamber Judgment, ¶¶ 393-95 (Int'l Crim. Trib. for the Former Yugoslavia Apr. 3, 2007) ......................................................................... 4, 6, 7, 12

*Prosecutor v. Kvočka*, Case No. IT-98-30/1-A, Appeals Chamber Judgment, ¶ 43 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 28, 2005) ............... 15, 16

*Prosecutor v. Milutinovic*, Case No. IT-99-37-AR72, Decision on Dragoljub Ojdanic's Motion Challenging Jurisdiction – Joint Criminal Enterprise, Appeals Chamber, ¶ 21 (Int'l Crim. Trib. for the Former Yugoslavia May 21, 2003)........................................................................................ 12

*Prosecutor v. Perisić*, Case No. IT-04-81-A, Appeals Chamber Judgment, ¶ 27 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 28, 2013) ........................ 10

*Prosecutor v. Rwamakuba*, Case No. ICTR-98-44-AR72.4, Decision on Interlocutory Appeal Regarding Application of Joint Criminal Enterprise to the Crime of Genocide, Appeals Chamber, ¶ 24 (Int'l Crim. Trib. for Rwanda Oct. 22, 2004) ........................................................................ 6

*Prosecutor v. Stanisic & Simatovic*, Case No. IT-03-69-T, Trial Chamber Judgment, ¶ 1264 (Int'l Crim. Trib. for the Former Yugoslavia May 30, 2013) ....................................................................................... 10

\* *Prosecutor v. Tadic*, Case No. IT-94-1-A, Appeals Chamber Judgment (Int'l Crim. Trib. for the Former Yugoslavia July 15, 1999) ...................... 3, 4, 7, 8, 21

*Prosecutor v. Taylor*, Case No. SCSL-03-01-T, Judgment, ¶ 482 (Special Court for Sierra Leone, May 18, 2012) ............................................. 10

## CONSTITUTION AND STATUTES

Define and Punish Clause. U.S. Const. art. I, § 8, cl. 10 ..................................... 3, 5

Ex Post Facto Clause, U.S. Const. art. I, § 9, cl. 3 .................................... 3, 5, 11. 13

Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (2006) (codified as amended at 10 U.S.C § 948a (2010)). ................. 3, 11, 12, 13

## OTHER AUTHORITIES

Preamble, Rome Statute of the International Criminal Court, July 17, 1998, 2189 U.N.T.S. 90 ................................................................................. 20

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ICTY | International Criminal Tribunal for the former Yugoslavia |
| JCE | Joint Criminal Enterprise |
| MCA | Military Commissions Act of 2006 |

## INTERESTS OF THE AMICI CURIAE[2]

*Amici curiae* Former Government Officials, Military Lawyers and Scholars of National Security Law, who respectfully submit this brief in support of Respondent, have focused their practice, teaching, and scholarship on harmonizing security needs and procedural safeguards in national security law and the law of armed conflict. Based on that experience, *amici* submit a brief that provides a narrowly tailored basis for upholding the conviction below.

Several members of the group, including Geoffrey S. Corn, Chris Jenks, and Eric Talbot Jensen, have had long and distinguished careers as military lawyers, serving as prosecutors and defense counsel in proceedings under the Uniform Code of Military Justice and as senior advisors on compliance with international law. Most members of the group are now scholars and teachers of national security law

---

[2] The parties have consented to filing of this brief. *Amici* have corresponded with the Washington Legal Foundation (WLF), which has also filed a notice of intent to file an *amicus curiae* brief in support of respondent, and certify pursuant to Circuit Rule 29(d) that a joint brief would be impracticable. In addition, pursuant to Fed. R. App. P. 29(c)(5), counsel for *amici* certify that they authored this brief and that no person or entity other than *amici* or their counsel made a monetary contribution to the preparation or submission of the brief.

and the law of armed conflict, between them writing scores of law review articles[3] and several books, including casebooks used to educate future lawyers who serve in the armed forces of the United States or otherwise practice in the national security field.[4]  Members of the group have also served in the federal government, including positions in the State Department, the Federal Bureau of Investigation, and the Office of the Director of National Intelligence.  The experience of *amici* has proven the value of the United States' adherence to international law.

_____

[3] *See, e.g.,* Geoffrey Corn & Eric Talbot Jensen, *Transnational Armed Conflict: A "Principled" Approach to the Regulation of Counter-Terror Combat Operations,* 42 Israel L. Rev. 46, 66 (2009); Chris Jenks, *Notice Otherwise Given: Will in Absentia Trials at the Special Tribunal for Lebanon Violate Human Rights?,* 33 Fordham Int'l L.J. 57 (2009); Eric Talbot Jensen, *Cyber Warfare and Precautions Against the Effects of Attacks,* 88 Tex. L. Rev. 1533 (2010); Michael A. Newton, *Exceptional Engagement: Protocol I and a World United Against Terrorism,* 45 Tex. Int'l L.J. 323 (2009).

[4] For casebooks, *see* Geoffrey S. Corn, Victor M. Hansen, Richard Jackson, M. Christopher Jenks, Eric Talbot Jensen & James A. Schoettler, Jr., *The Law of Armed Conflict: An Operational Approach* (2012); Stephen Dycus, Arthur C. Berney, William C. Banks & Peter Raven-Hansen, *National Security Law* (5th ed. 2011); Stephen Dycus, William C. Banks & Peter Raven-Hansen, *Counterterrorism Law* (2d ed. 2012).  For other books, *see* William C. Banks & Peter Raven-Hansen, *National Security Law and the Power of the Purse* (1994); Jimmy Gurule & Geoffrey S. Corn, *Principles of Counter-Terrorism Law* (2011); Victor M. Hansen & Lawrence Friedman, *The Case for Congress: Separation of Powers and the War on Terror* (2009); Geoffrey S. Corn, Victor M. Hansen, Dick Jackson, Eric Talbot Jensen, Michael W. Lewis & James A. Schoettler, Jr., *The War on Terror and the Laws of War: A Military Perspective* (2009)

The group's collective experience teaches that compliance with international law often requires careful tailoring of United States legal measures, including the Military Commissions Act of 2006 (MCA). *Amici* believe that narrowly tailored charges of conspiracy as a mode of liability and material support brought under the MCA are analogous to charges of Joint Criminal Enterprise (JCE) and aiding and abetting a war crime, which are recognized under international law. Thus the defendant's conviction did not violate the Ex Post Facto Clause or exceed Congress's authority under the Define and Punish Clause. In the instant case, this narrowly crafted approach provides an alternative to the parties' arguments.

## SUMMARY OF ARGUMENT

The defendant's acknowledgment of his "simple...indirect role" in the September 11 plot, Petitioner's Appendix (Pet. App.) 208, proved his participation in a Joint Criminal Enterprise (JCE), an offense regularly tried in transnational tribunals. *Prosecutor v. Tadic*, Case No. IT-94-1-A, Appeals Chamber Judgment, ¶ 196 (Int'l Crim. Trib. for the Former Yugoslavia July 15, 1999). Under international law, an individual is guilty of participation in a JCE if he intentionally aids a common plan that results in a completed war crime. *Id.* Participation encompasses serving as a "cog in the wheel of events leading up to the result

3

which in fact occurred." *Id.*, ¶ 199 (quoting from World War II-era precedent). While the defendant was charged with conspiracy, not JCE, international tribunals have recognized that conspiracy as a mode of liability for a *completed* war crime precisely tracks the elements of JCE. *See Prosecutor v. Brdanin*, Case No. IT-99-36-A, Appeals Chamber Judgment, ¶¶ 404, 410 (Int'l Crim. Trib. for the Former Yugoslavia Apr. 3, 2007).

The members of the commission specifically found that the defendant had committed overt acts corresponding to a role in the 9/11 plot, including his administration of Mohammed Atta's and Ziad al Jarrah's *bayat* or loyalty oath to Osama bin Laden. Pet. App. 132. The *bayat* to Atta, the 9/11 plot's ringleader in the United States, and al Jarrah, the pilot on Flight 93, set the 9/11 machinery in motion. The *bayat* bound Atta and al Jarrah to "obey [bin Laden] at all times," Transcript (Tr.) 509, and "die for the sake of Jihad... against the American[s] and the Jews." *Id.* at 510. Moreover, the defendant groomed Atta and al Jarrah for a mission of particular "sensitivity," living with them to "keep them on task." *Id.* at 555-56. Al Bahlul embraced his role with the intention of aiding in the targeting of civilians – indeed, he asserted that Americans were not civilians because they supported the policies of the United States government. Pet. App. 184. Because JCE was an established offense in transnational tribunals at the time of the

defendant's acts, his conviction did not violate the Ex Post Facto Clause, U.S. Const. art. I, § 9, cl. 3, or exceed Congress's authority under the Define and Punish Clause. U.S. Const. art. I, § 8, cl. 10.

Although the initial conspiracy charge against the defendant and an instruction regarding the charge each contained an error, these errors were harmless. The charge sheet contained an error, since it failed to allege a completed war crime. International law generally does not recognize inchoate conspiracy as an offense. *See* Jens David Ohlin, *Joint Intentions to Commit International Crimes*, 11 Chi. J. Int'l L. 693, 702 (2011) (noting that today's transnational tribunals recognize the inchoate offense of conspiracy only in context of genocide). However, the list of overt acts in the charging documents, including administration of the *bayat* to Atta and al Jarrah, provided the defendant with adequate notice that he was being charged in connection with his role in the September 11 attacks. Pet. App. 132. Because the defendant had adequate notice that the charges against him incorporated conspiracy as a mode of liability for a completed war crime, any variance between the charge and the proof was harmless error. *See United States v. Ratliff-White*, 493 F.3d 812 (7th Cir. 2007). A related error in the instructions was similarly harmless, in light of the commission members' specific findings and evidence in the record. See *Neder v. United States*, 527 U.S. 1 (1999).

5

# ARGUMENT

## I. CONSPIRACY AS A MODE OF LIABILITY FOR A COMPLETED WAR CRIME IS RECOGNIZED BY INTERNATIONAL LAW AND SUPPORTED BY THE RECORD AND FINDINGS IN THE INSTANT CASE

Conspiracy as a *mode of liability* for a *completed* war crime has a long pedigree in customary law, international agreements, and the jurisprudence of transnational tribunals, dating from Nuremberg to the present. *See Prosecutor v. Brdanin*, Case No. IT-99-36-A, Appeals Chamber Judgment, ¶¶ 393-404 (Int'l Crim. Trib. for the Former Yugoslavia Apr. 3, 2007) (discussing Nuremberg conspiracy cases brought under Control Council Law No. 10); *Prosecutor v. Rwamakuba*, Case No. ICTR-98-44-AR72.4, Decision on Interlocutory Appeal Regarding Application of Joint Criminal Enterprise to the Crime of Genocide, Appeals Chamber, ¶ 24 (Int'l Crim. Trib. for Rwanda Oct. 22, 2004) (same). In contrast, international law does *not* recognize conspiracy as an *inchoate* offense involving mere agreement. *Hamdan v. Rumsfeld*, 548 U.S. 557, 598-612 (2006) (*Hamdan I*) (plurality opinion). Because of its pedigree, conspiracy as a mode of liability is "firmly established" as an offense under international law. *Hamdan v.*

*United States*, 696 F.3d 1238, 1250 (D.C. Cir. 2012) (*Hamdan II*). That clear

pedigree supports the jurisdiction of military commissions. *Id*. at 1249-51.[5]

According to the ICTY, conspiracy as a mode of liability precisely tracks the

elements of JCE: intentional participation in a common plan that gives rise to a

completed war crime. *See Brdanin Appeals Judgment*, ¶¶ 404, 410; Ohlin, *Joint

Intentions to Commit International Crimes*, 11 Chi. J. Int'l L. at 696-706

(discussing relationship between JCE and conspiracy as mode of liability). JCE

liability is quite broad. In *Prosecutor v. Tadic*, Case No. IT-94-1-A, Appeals

Chamber Judgment (Int'l Crim. Trib. for the Former Yugoslavia July 15, 1999),

the ICTY read the statute to require that a defendant "voluntarily participate in *one

aspect* of the common design" to kill civilians. *Id*., ¶ 196 (emphasis added).

Culpable participation in a JCE includes acts of a defendant who intentionally

serves as a "cog in the wheel of events leading up to the result which in fact

occurred." *Id*., ¶ 199 (quoting from World War II-era precedent). The cases also

do not require that a defendant have specific advance knowledge of a particular

crime. *See Brdanin Appeals Judgment*, ¶ 418 (noting that JCE liability does not

---

[5] Congress may receive greater deference when it prospectively establishes
military commission jurisdiction. *See Hamdan II*, 696 F.3d at 1246 n. 6
(Kavanaugh, J., concurring).

require, beyond a finding of a common purpose, "an additional… agreement to commit… [a] *particular* crime between the accused and the principal perpetrator of a crime") (emphasis added).

In the instant case, the defendant al Bahlul's contributions to the September 11 plot parallel the ICTY's definition of JCE. Al Bahlul's acknowledgment that he had played a "simple… indirect role" in the September 11 attacks, Pet. App. 208, showed that he "voluntarily participate[d] in one aspect of the common design" to kill civilians. *Tadic Appeals Judgment*, ¶ 196. Al Bahlul assisted in this common plan by grooming Atta and al-Jarrah for Al Qaeda's lethal handiwork.

This grooming process started with the *bayat* that the defendant administered to Atta and al Jarrah. As an FBI agent testified at defendant's trial, the *bayat* administered to Atta and al Jarrah was not an empty ritual. Rather, it was a means for impelling the oath-taker to action. As the agent testified, the *bayat* was an "oath that you… join in this war together for better or for worse, in secret or… overtly… you obey at all times regardless if you like the order or if you don't. And you're willing to die for the sake of Jihad." Tr. 509. The oath taken by the defendant and then given by him to Atta and al Jarrah specifically mentioned the "Jihad of Usama bin Laden against the American[s] and the Jews." *Id*. at 510.

8

The *bayat* was only the tip of the iceberg of the defendant's relationship with Atta and al Jarrah. As the defendant told the FBI, the two key 9/11 figures roomed with the defendant in bin Laden's compound. *Id.* at 555. According to the FBI agent who testified based on his interviews with Al Qaeda figures and knowledge of Al Qaeda tradecraft, this placement of Atta and al Jarrah with the defendant was not fortuitous. The agent explained that it was "normal for people who have a task, who have a mission, to be isolated, not to be put in a guesthouse or in a training camp. They will be taken aside because of the sensitivity of the mission." *Id.* As the agent observed, "people who stayed with suicide attackers have a motivational role to keep them focused, to keep them on task..." *Id.* at 555-56. In short, the agent concluded, al Bahlul was not merely sharing quarters with Atta and al Jarrah; rather, he was "coordinating their stay" to optimize their utility for the organization. *Id.* at 555.

The lethal consequences of this participation were not lost on the defendant – in fact, they were precisely the point. As he told the FBI without hesitation, killing United States civilians, including women and children, was perfectly appropriate. *Id.* at 502-03. The defendant's rationale was straightforward: "[It]t is legitimate," he told the FBI, "to kill all Americans because they pay taxes" that support the government. Pet. App. 184. Moreover, once captured, al Bahlul was

9

eager to inform the FBI that his willing facilitation had borne fruit. He touted his role in Al Qaeda's propaganda exploitation of the September 11 tragedy, boasting that at bin Laden's request he had prepared an analysis of the attacks' economic consequences for the United States. *Id*. at 194. Defendants' specific involvement with the preparation and aftermath of the September 11 attacks distinguish his case from that of Salim Hamdan, whose acts were largely limited to generic activities such as driving bin Laden to "various planning meetings." *Hamdan II*, 696 F.3d at 1242. The facts in defendant's case satisfy the elements of JCE – willing participation in a common plan resulting in a completed crime.[6]

---

[6] *See* Peter Margulies, *Defining, Punishing & Membership in the Community of Nations: Material Support and Conspiracy Charges in Military Commissions*, 36 Fordham Int'l L.J. 1, 84-87 (2013). Because al Bahlul administered the *bayat* to two of the key September 11 hijackers and helped "keep them on task," Tr. 555-56, his conduct also met the requirements for aiding and abetting liability. *See Prosecutor v. Perisić*, Case No. IT-04-81-A, Appeals Chamber Judgment, ¶ 27 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 28, 2013) (holding that the actus reus of aiding and abetting requires that the defendant's conduct was "specifically... directed towards relevant crimes"); *see also Prosecutor v. Taylor*, Case No. SCSL-03-01-T, Judgment, ¶ 482 (Special Court for Sierra Leone, May 18, 2012) (defining aiding and abetting broadly as lending "practical assistance, encouragement, or moral support to the perpetration of a crime or underlying offence"). To be guilty of aiding and abetting, a defendant need not have knowledge of the particular crime that his conduct has facilitated. *See Prosecutor v. Stanisic & Simatovic*, Case No. IT-03-69-T, Trial Chamber Judgment, ¶ 1264 (Int'l Crim. Trib. for the Former Yugoslavia May 30, 2013) (noting that a defendant, "does not...need to know either the precise crime that was intended or

10

## II.   THE DEFENDANT'S CONVICTION COMPLIES WITH THE EX POST FACTO CLAUSE

Because of the pedigree of conspiracy as a mode of liability, the conviction in the instant case complied with the Ex Post Facto Clause, U.S. Const. art. I, § 9, cl. 3, even though the specific conduct at issue preceded enactment of the Military Commissions Act of 2006.  The Supreme Court has held that, even absent a statute that specifically punishes particular conduct, military tribunals authorized by Congress can try individuals for violations of the customary international law of armed conflict.  *See Ex Parte Quirin*, 317 U.S. 1, 46 (1942) (finding that "the Constitution authorizes" military commission jurisdiction over "acts [that] constitute an offense against the law of war"); *In re Yamashita*, 327 U.S. 1, 7 (1946) (noting that, "Congress, by sanctioning trial of enemy combatants for violations of the law of war by military commission, had not attempted to codify the law of war or to mark its precise boundaries").

Transnational tribunals have reached the same conclusion in construing the international law principle of legality, which limits punishable conduct to acts that violated a binding norm that was recognized as such at the time of the conduct.

---

the one that was actually committed; it is sufficient that he or she be aware that one of a number of crimes will probably be committed, if one of those crimes is in fact committed") (emphasis added).

11

*See* Beth van Schaack, *Crimen Sine Lege: Judicial Lawmaking at the Intersection of Law and Morals*, 97 Geo. L.J. 119, 121, 125-41 (2008) (defining principle and tracing its application in Nuremberg and subsequent international tribunals). The ICTY recognized JCE as a mode of liability even though JCE was not "*explicitly*" authorized in the ICTY statute. *See Prosecutor v. Milutinovic*, Case No. IT-99-37-AR72, Decision on Dragoljub Ojdanic's Motion Challenging Jurisdiction – Joint Criminal Enterprise, Appeals Chamber, ¶ 21 (Int'l Crim. Trib. for the Former Yugoslavia May 21, 2003) (emphasis added).[7] Implicit authorization for JCE was considered sufficient, because customary international law provided the defendant with adequate notice at the time of his conduct that his acts were unlawful. *Id*.

Post-World War II tribunals held that customary international law prohibited intentional participation in a common plan resulting in a completed war crime. *See Brdanin*, Case No. IT-99-36-A, Appeals Chamber Judgment, ¶¶ 393-404 (Int'l Crim. Trib. for the Former Yugoslavia Apr. 3, 2007). On September 11, 2001, this customary prohibition had been in place for over fifty years. The Military Commissions Act of 2006 established the jurisdiction of military commissions "to

---

[7]   Available on Westlaw at 2003 WL 24014138 and at http://www.eccc.gov.kh/sites/default/files/documents/courtdoc/00207160-00207178.pdf.

try any offense made punishable by… the law of war." See § 948d, Pub. L. No. 109-366, 120 Stat. 2603. The defendant's conviction for aid to the September 11 plot therefore comports with the Ex Post Facto Clause.

## III.   THE ERROR IN THE INITIAL CONSPIRACY CHARGE WAS HARMLESS BECAUSE AL BAHLUL HAD FAIR NOTICE OF THE CHARGES AGAINST HIM AND AN ADEQUATE OPPORTUNITY TO PREPARE A DEFENSE

In addition to fair notice that his or her acts violated the law at the time of the conduct at issue, a defendant on trial must have adequate notice of the charges he or she faces. *See United States v. Miller*, 471 U.S. 130, 134 (1985) (asking whether the defense was "on notice that the offense was charged and would need to be defended against"). Modest variance between the charges as originally filed and the evidence at trial has been viewed as harmless error, as long as the variance did not "prejudice[] the fairness of respondent's trial." *Id*. In the instant case, the defendant had adequate notice that he was being charged with conspiracy as a mode of liability for a completed war crime and was afforded a fair opportunity to put on a defense.

United States courts have routinely found harmless error where evidence introduced at trial exhibited minor variance with the charging document. For example, in *United States v. Ratliff-White*, 493 F.3d 812 (7th Cir. 2007), the court

13

found harmless error where an indictment for alleged fraud in billing the Veterans'
Administration referred to one specific step in the payment process, while proof at
trial dealt with another step. *Id*. at 821-24; *see also United States v. Dupre*, 462
F.2d 131, 140-41 (2d Cir. 2006) (indictment charged that defendant caused
investor to wire money from Ohio to New York; evidence failed to establish this
transfer but showed others as part of same scheme). Courts have found prejudice
only where evidence at trial concerned a distinct scheme not included in the
indictment. *See Stirone v. United States*, 361 U.S. 212, 213-14 (1960) (vacating
conviction of union official where charge involved extortion in provision of sand
for construction of steel plant and evidence concerned extortion in shipment of
steel from completed plant). Where the charge and the evidence introduced
involved related acts in an ongoing scheme, courts have held that the variance was
harmless because the defendant "could not have been surprised" by the evidence
introduced and was therefore "not deprived of an adequate opportunity to prepare a
defense." *See Ratliff-White*, 493 F.3d at 823; *see also United States v. Burge*, 711
F.3d 803, 814 (7th Cir. 2012) (variance between charge and evidence was harmless
error because the defendant had "reasonable notice of the charges against him and
an adequate opportunity to prepare his defense").

14

The same pragmatic approach has characterized the judicial response to charges in military commissions and transnational tribunals adjudicating alleged violations of the laws of armed conflict. In *In re Yamashita*, 327 U.S. 1 (1946), the Supreme Court observed that, "[o]bviously charges of violations of the law of war triable before a military tribunal need not be stated with the precision of a common law indictment." *Id.* at 17. In his plurality opinion in *Hamdan I*, Justice Stevens cautioned against reliance on the "label" attached to conduct charged in a military commission, asserting that the label mattered less than the "succession of... acts" alleged by the prosecution. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 600 n. 32 (2006) (quoting Civil War-era opinion of U.S. Army Judge Advocate General). Elsewhere in his opinion, Justice Stevens recognized the historical importance to the prosecution in military commissions of specifying overt acts, noting that "'*overt acts*' constituting war crimes... [were] the only proper subject" of law-of-war military commissions. *Id.* at 608, *citing* W. Winthrop, *Military Law and Precedents* 841 (rev. 2d ed. 1920) and William F. Finlason, *Martial Law* 130 (1867) (emphasis in original). The International Criminal Tribunal for the former Yugoslavia has also adopted a practical approach to notice, holding that the failure to plead the charge of JCE does not require vacating the trial court judgment when defendants had received notice of the "factual basis of the charges against them."

15

*Prosecutor v. Kvočka*, Case No. IT-98-30/1-A, Appeals Chamber Judgment, ¶ 43 (Int'l Crim. Trib. for the Former Yugoslavia Feb. 28, 2005).

Based on the record and findings in *al Bahlul*, the defendant received ample notice that he was being charged with conduct properly triable before a military commission. While the list of charges filed with the Convening Authority in al Bahlul's case did not cite universally accepted war crimes such as aiding and abetting or conspiracy as a mode of liability for a completed war crime, the list of overt acts attached to the charge sheet provided the defendant with adequate notice. One specification cited al Bahlul's alleged administration of the *bayat* to Atta and al Jarrah. *See* Overt Act List at (g), Pet. App. 122. The defendant had previously written a letter asserting that this act played a "role" in the attacks. *See* Prosecution Exhibit 15, Pet. App. 208. Another overt act alleged expressly drew the connection between the defendant's acts and September 11, charging that the defendant had prepared the martyr wills of Atta and al Jarrah "in preparation for" the 9/11 attacks. *See* Overt Act List at (h), Pet. App. 122. This list of overt acts gave the defendant the notice he needed to prepare a defense.

The defendant's trial strategy demonstrated that he fully understood the import of the overt acts alleged in the charging packet. The defendant offered no evidence. However, his statements at trial in his capacity as his own defense

16

counsel are instructive, not for their truth, which was not considered by the members of the commission, but as a gauge of his understanding of the charges he faced. Acting as his own counsel, al Bahlul echoed his earlier claim in a letter admitted into evidence that he had not enjoyed the "honor" of *videotaping* the martyr wills, because bin Laden had sent him back to Yemen at the time of the taping. *See* Tr. 193-94; *see also* Prosecution Exhibit 15, Pet. App. 208 (letter written by the defendant). The defendant's position at trial indicated that he fully understood the overt act specification in the charging document that he had "prepared" the martyr wills of Atta and al Jarrah. *Id.* at 122. The members of the commission nonetheless found that the defendant had prepared the martyr wills, *id.* at 133, apparently relying on the acknowledgment in the letter from the defendant that he had "typed their [Atta's and al Jarrah's] martyr wills on a computer and personally handed it" to bin Laden. *Id.* at 208. Acting as his own defense counsel, the defendant readily acknowledged that he had committed the charged overt act of administering the *bayat* to Atta and al Jarrah. Tr. 193-94. The members of the commission expressly found this as a fact, apparently relying again on the defendant's letter. *See* Pet. App. 132; *see also id.* at 208 (defendant's letter).

Adequate notice to a defendant does not require uniform findings in the defendant's favor. It merely requires that the defendant have a fair opportunity to

17

contest the charges against him.   The charging documents in their entirety, including the listing of specific overt acts alleged, gave al Bahlul this opportunity. "[T]ested by any reasonable standard," the charging documents in al Bahlul's case "adequately allege[d] a violation of the law of war."  *Yamashita*, 327 U.S. at 17. Given the evidence in the record of al Bahlul's contributions to the preparation for 9/11, requiring greater precision would merely add another layer to the veil of "impunity" that courts have pierced in cases adjudicating war crimes.  *Id.* at 15.

## IV.    THE RECORD AND FINDINGS  DEMONSTRATE THAT THE INSTRUCTIONS' FAILURE TO REQUIRE A FINDING OF A COMPLETED WAR CRIME WAS HARMLESS ERROR

Courts commonly apply a harmless error test to errors in jury instructions, including those that concern the elements of offenses.  See *Neder v. United States*, 527 U.S. 1 (1999); *California v. Roy*, 519 U.S. 2 (1996); *Carella v. California*, 491 U.S. 263 (1989). The erroneous instruction is merely an "error in the trial process", not a structural flaw in the "framework within which the trial proceeds..." *Neder*, 527 U.S. at 8 (citation omitted).  In the instant case, the instruction that a guilty verdict on conspiracy did not require a completed war crime was harmless error, in light of the evidence and the commission members' specific factual findings.

18

Courts have routinely found harmless error analysis applicable to jury instructions where the jury verdict "effectively embraces" the point in dispute. *Roy*, 519 U.S. at 7 (Scalia, J., concurring). In one case, a jury had found that the defendant without provocation shot to death two other persons after following them for about an hour. The Supreme Court held that harmless error analysis was appropriate even though the trial judge had erroneously instructed the jury to *presume* intent to harm the victims – a necessary element of second-degree murder. *Rose v. Clark*, 478 U.S. 570 (1986). The Court noted that although this instruction was erroneous, a correct instruction would still have permitted the jury to *infer* malice from the defendant's actions. *Id*. at 581. Here, the Court reasoned, this inference was "overpowering." *Id*.[8]

Following Holmes's observation that the "life of the law has not been logic but experience," *Neder*, 527 U.S. at 15, citing O. Holmes, *The Common Law* 1 (1881), a reviewing court will generally find that mistaken jury instructions are harmless if the court "can find that the record developed at trial establishes guilt beyond a reasonable doubt." *Rose*, 478 U.S. at 579. Where a new trial would not result in additional evidence on the point in question, but would simply relitigate

---

[8] The Court then remanded for a determination by the court below of whether the error was harmless. *Id*. at 584.

19

other matters in which the instructions were correct, courts have generally found the faulty instruction to be harmless error. See *Neder*, 527 U.S. at 15 (applying harmless error standard to judge's failure to instruct jury in tax fraud case on need to find that misstatements were material, where defendant had underreported income in the amount of $5 million).

The harmless error standard governs the instruction in the instant case. The instruction on conspiracy in the instant case was erroneous, because it permitted the members of the commission to find the defendant guilty of conspiracy based on mere agreement, without a completed crime. *Amici* concede that, unless this Court accepts the government's broader "United States common law of war" argument, conspiracy as a mode of liability is the only variety of conspiracy charge that supports military commission jurisdiction in this case. Conspiracy as a mode of liability by definition requires a completed crime. However, the instruction's error was harmless, because the commission members' specific findings and the evidence in the case readily satisfy the broad standard for JCE liability.

Liability for JCE is broad, to deprive perpetrators of war crimes of the impunity that they have long enjoyed. *Cf.* Preamble, Rome Statute of the International Criminal Court, July 17, 1998, 2189 U.N.T.S. 90 (noting importance of putting an "end to impunity for the perpetrators" of war crimes). To prevail on a

20

charge of JCE, the prosecution need only show that a defendant intentionally participated in "one aspect" of a common plan to target civilians. *Tadic*, Case No. IT-94-1-A, Appeals Chamber Judgment, ¶ 196 (Int'l Crim. Trib. for the Former Yugoslavia July 15, 1999). In the instant case, the members of the commission found that the defendant had administered the *bayat* to Atta and al Jarrah. Pet. App. 132. Sufficient evidence indicated that this act, by qualifying Atta and al Jarrah to give their lives in jihad against America, was a necessary building block in the arrangements for September 11. In a letter admitted into evidence, the defendant himself described the *bayat* as constituting "simple... indirect" aid to the September 11 plot. Pet. App. 208. Moreover, other evidence in the case cast the defendant as "coordinating... [Atta and al Jarrah's] stay" with bin Laden as the two men prepared for a mission of great "sensitivity." Tr. 555. Although the defendant did not testify under oath, his statements on the record while acting as his own counsel acknowledged that he had administered the *bayat*. Tr. 193-94. In theory, the defendant could deny the allegation at a second trial. However, the impact of his letter acknowledging the *bayat* renders that strategy both improbable and unlikely to lead to a different result.

In sum, the instruction here had no greater impact than the instruction in *Neder*, 527 U.S. at 15. There, the defendant had faulted the omission of the

21

materiality element from instructions on tax fraud. However, the defendant did not

contest at trial or suggest on appeal that he would dispute the materiality of

underreporting $5 million in profits he netted from obtaining fraudulent real estate

loans. *Id*. Viewing the failure to disclose $5 million in income as manifestly

material, the Court found that the omission of the materiality element was harmless

error. *Id*. at 19-20. In the instant case, the broad legal standard for JCE, the ample

evidence, the commission members' specific findings, and the defendant's

statements as his own counsel at trial reflect a comparable absence of prejudice.

Therefore, the mistaken instruction here was similarly harmless.[9]

---

[9] The same harmless error analysis applies to the instructions on material support, which supplied two alternative bases for finding the defendant guilty. One centered on "an agreement… to provide material support or resources to be used in preparation for or in carrying out an act of terrorism." Tr 856-57. The second involved material support to Al Qaeda as an organization. *Id*. at 857. The second instruction contained a material error: it required a finding of guilt for conduct, such as providing services to a terrorist group unrelated to a specific war crime, that is illegal under federal law but nonetheless beyond the jurisdiction of a military commission. *See Hamdan II*, 696 F.3d at 1249-52. In contrast, the first instruction featured the same harmless error as the instruction on conspiracy: it failed to require proof of a completed war crime. The specific findings on material support in the instant case demonstrate that the members of the commission analyzed the defendant's conduct under the first instruction and found a completed crime. The commission members found that the defendant's administering the *bayat* to Atta and al Jarrah was an overt act furthering material support of terrorism. Pet. App. 136. That finding hinged on evidence of the *bayat*'s

22

## CONCLUSION

The convictions should be affirmed.

Dated: July 25, 2013

<div style="margin-left:50%">

Respectfully submitted,

/s/ James A. Schoettler, Jr
James A. Schoettler, Jr.
*Attorney for Amici Curiae*
Adjunct Professor
Georgetown University Law Center
600 New Jersey Avenue, NW
Washington, D.C. 20001
Telephone: (240)893-0688
jas288@law.georgetown.edu

</div>

Peter Margulies
Professor of Law
Roger Williams University School of Law
10 Metacom Avenue
Bristol, RI 02809
Telephone: (401)254-4564
pmargulies@rwu.edu

Counsel for *Amici Curiae*

---

importance in qualifying Atta and al Jarrah for crucial missions, such as the September 11 attacks. Tr. 509-10.

## Appendix

**Kenneth Anderson** is Professor of Law at Washington College of Law, American University, and Visiting Fellow, Hoover Institution on War, Revolution, and Peace, Stanford University. A contributor to the Opinio Juris and Lawfare blogs, he is the author of several books, including *Living with the U.N.: American Responsibilities and International Order* (2012). He has also authored numerous law review articles, including publications in the American Journal of International Law, the Chicago Journal of International Law, and the European Journal of International Law.

**Paul R. Baier** is George M. Armstrong, Jr. Professor of Law at the Paul M. Hebert Law Center, Louisiana State University. Professor Baier has argued before the Fifth Circuit Court of Appeals and the Louisiana Supreme Court. He has written numerous law review articles, including pieces in the Texas, Tulane, and Vanderbilt law reviews, and the op-ed, *The laws of war: Should military tribunal try al Qaeda?*, Wash. Times, March 28, 2006, A23, published the day of the oral argument in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006).

24

**William C. Banks** is the College of Law Board of Advisors Distinguished Professor at Syracuse University, Professor of Public Administration in Syracuse University's Maxwell School of Citizenship and Public Affairs, and founding director of Syracuse's Institute for National Security and Counterterrorism. He is co-author of two casebooks, 1) *National Security Law* (5th ed. 2011) (with Stephen Dycus, Arthur C. Berney, and Peter Raven-Hansen); and, 2) *Counterterrorism Law* (2d ed. 2012) (with Dycus and Raven-Hansen). He recently edited the Oxford University Press collection, *Counterinsurgency Law: New Directions in Asymmetric Warfare* (2013), and is Editor-in-Chief of the *Journal of National Security Law & Policy*.

**Dru Brenner-Beck** is a legal consultant on international law matters who served as a Judge Advocate in the United States Army, retiring as a Lieutenant Colonel. After retirement, she clerked for the Honorable Carlos F. Lucero on the United States Court of Appeals for the Tenth Circuit. In her last assignment as a Judge Advocate, she served as the Deputy Legal Counsel for the Department of the Army's Inspector General (DAIG), where she participated in the review of inspections on detainee abuse after Abu Ghraib. Prior assignments included service as the Chief of Military and Civil Law for the U.S. Army Europe, with an

area of responsibility covering 93 nations. She is the author of a chapter, *Trial and Punishment for Battlefield Misconduct*, in the forthcoming second edition of *The War on Terror and the Laws of War: A Military Perspective* (Oxford University Press), and co-author (with Professor Geoffrey Corn) of a chapter, *Viewing Treaties through a Military Lens*, in the forthcoming *Treaties as Law of the Land? Change and Uncertainty in the Domestic Effects of International Agreements* (Cambridge University Press).

**Marion "Spike" Bowman** is currently a Senior Fellow at the George Washington University Homeland Security Policy Institute and a Distinguished Fellow at the University of Virginia Center for National Security Law and Policy. He formerly served as Deputy General Counsel and Senior Counsel, National Security Law, Federal Bureau of Investigation. Prior to civilian service, Mr. Bowman served as a captain in the United States Navy.

**Geoffrey S. Corn** is a Professor of Law and Presidential Research Professor at South Texas College of Law. He has written many law review articles on national security law and the law of armed conflict, including publications in the Berkeley Journal of International Law (with Chris Jenks), the Texas International Law

Journal (with Lieutenant Colonel Gary Corn), and the Vanderbilt Transnational Law Journal (with Professor Laurie Blank). He is also the co-author with Victor Hansen, Richard Jackson, Christopher Jenks, Eric Talbot Jensen and James A. Schoettler, Jr. of *The Law of Armed Conflict: An Operational Approach* (2012). Before entering the professoriat, Professor Corn served as a Judge Advocate General in the United States Army, retiring as a Lieutenant Colonel. In his last position, Professor Corn served as the Army's senior law of war expert in the Office of the Judge Advocate General and Chief of the Law of War Branch in the International Law Division.

**Victor Hansen** is Associate Dean and Professor of Law at New England Law School. He has published numerous articles in law reviews, including the Journal of National Security Law and Policy (with Geoffrey Corn), the North Carolina Journal of International Law and Commercial Regulation, and the American Journal of Legal History. An expert on military justice, he is co-author with David A. Schlueter, Charles H. Rose and Christopher Behan of *Military Crimes and Defenses* (2007). He is also co-author with Geoffrey S. Corn, Richard Jackson, Christopher Jenks, Eric Talbot Jensen and James A. Schoettler, Jr. of *The Law of Armed Conflict: An Operational Approach* (2012). Before joining legal academia,

Professor Hansen spent twenty years in the United States Army, for much of that time serving as a Judge Advocate. In his last assignment, Professor Hansen served as a regional defense counsel for the United States Army Trial Defense Service.

**Christopher Jenks** is Director of the Criminal Justice Clinic and Assistant Professor of Law at SMU Dedman School of Law. Professor Jenks has published articles in an array of law reviews, including the Stanford Law and Policy Review (with Eric Talbot Jensen), the University of Pennsylvania Journal of International Law (with Geoffrey Corn), and the Berkeley Journal of International Law. He is also co-author with Geoffrey S. Corn, Victor M. Hansen, Richard Jackson, Eric Talbot Jensen, and James A. Schoettler, Jr. of *The Law of Armed Conflict: An Operational Approach* (2012). Before entering legal education, Professor Jenks served as a Judge Advocate in the United States Army, stationed in posts from Korea and Iraq to Washington, D.C. His service included working as deputy division chief of the Army's litigation division, attorney adviser at the Department of State, and chief of the International Law Branch of the Office of the Judge Advocate General in the Pentagon.

28

**Eric Talbot Jensen** is an Associate Professor at Brigham Young University Law School.  He has written widely for law reviews on the law of armed conflict, including publications in the Texas, Temple, and Israel Law Reviews and the Virginia Journal of International Law, Vanderbilt Journal of Transnational Law, and Stanford Journal of International Law.  He is also co-author with Geoffrey S. Corn, Victor M. Hansen, Richard Jackson, M. Christopher Jenks, and James A. Schoettler, Jr. of *The Law of Armed Conflict: An Operational Approach* (2012). Before entering legal education, Professor Jensen was as a Judge Advocate in the United States Army, including service as the Chief of the Army's International Law Branch.

**Robert H. Knowles** is an Assistant Professor of Law at Valparaiso University School of Law.  He has published law review articles in the Iowa and Washington University Law Reviews, the New York University Annual Survey of American Law, and the Harvard International Law Journal Online.

**Michael W. Lewis** is Professor of Law at Ohio Northern Claude W. Pettit College of Law.  A regular contributor to the Opinio Juris international law blog, Professor Lewis has published widely on national security law and the law of armed conflict,

29

including a chapter in *The War on Terror and the Laws of War: A Military Perspective* (Oxford University Press 2009), and articles in the American Journal of International Law, the Texas International Law Journal, the University of Pennsylvania Law Review PENNumbra, and the Washington and Lee Law Review. Before joining the ranks of legal educators, Professor Lewis was a fighter pilot in the United States Navy, including an assignment enforcing the no-fly zone over Iraq in the 1990s.

**Michael A. Newton** is Professor of the Practice of Law, Vanderbilt University Law School and formerly was Senior Advisor to the United States Ambassador-at-Large for War Crimes Issues, United States Department of State. In his work at the State Department, Professor Newton provided support to a number of bodies, including the Sierra Leone Special Court, established to promote accountability for war crimes. A member of the executive council of the American Society of International Law, Professor Newton has written or co-authored a number of books and scores of op-ed pieces and law review articles, including publications in the Duke Journal of Comparative and International Law, the International Review of the Red Cross, the Netherlands Yearbook of International Law, and the Stanford Journal of International Law. Prior to service at the State Department, Professor

30

Newton served as a Judge Advocate in the United States Army, where among other duties he organized and led human rights and rules of engagement education for Multinational Forces and International Police deploying into Haiti in 1994.

**Peter Raven-Hansen** is Glen Earl Weston Research Professor of Law, George Washington University, where he is Co-director of the National Security and U.S. Foreign Relations Law Program.   Professor Raven-Hansen is co-author (with Stephen Dycus, Arthur L. Berney & William C. Banks) of *National Security Law* (5th ed. 2011) and co-author (with Dycus and Banks) of *Counterterrorism Law* (2d ed. 2012).  He has written many law review articles, including publications in the American Journal of International Law, the Indiana Law Journal, the Iowa Law Review, and the Texas Law Review.   He also has served as co-counsel for plaintiffs, who are victims of terrorist attacks or the survivors of victims, in lawsuits against alleged financiers of terrorism, including *Linde v. Arab Bank, PLC*, No. 04-cv-2799 (E.D.N.Y.).

**Harvey Rishikof** is a Teaching Professor and Director of Cybersecurity and the Law at Drexel University's iSchool and Earle Mack School of Law.  He chairs the American Bar Association's Standing Committee on Law and National Security

31

and was a senior policy advisor at the Office of the Director of National Intelligence. He has taught national security law at the National War College and Roger Williams University School of Law, where he served as Dean. He has also served as administrative assistant to the Chief Justice of the United States Supreme Court.

**Robert F. Turner** is Professor and co-founder and Associate Director, Center for National Security Law, University of Virginia. Professor Turner, who served three terms as chair of the American Bar Association's Standing Committee on Law and National Security, also formerly served as Principal Deputy and acting Assistant Secretary of State for Legislative and Intergovernmental Affairs; Special Assistant to the Under Secretary of Defense for Policy; Counsel, President's Intelligence Oversight Board; and Charles H. Stockton Chair of International Law, United States Naval War College. Before his civilian service, Professor Turner served two tours of duty with the United States Army in Vietnam. He is the author and/or editor of more than fifteen books and monographs, including (with John Norton Moore) the collection, *Legal Issues in the Struggle Against Terrorism* (Carolina Academic Press 2010), as well as numerous law review articles, including

publications in the Harvard Journal of Law and Public Policy, the Journal of National Security Law and Policy, and the Virginia Journal of International Law.

**Rachel VanLandingham** is the Bruce R. Jacob Visiting Assistant Professor of Law at Stetson University School of Law.   Before entering legal education, Professor VanLandingham served as a Judge Advocate in the United States Air Force.   She served as chief of International Law and Liaison to the International Committee of the Red Cross at U.S. Central Command, and as Deputy Director of the Department of Law at the U.S. Air Force Academy.   She is the author of the article, *Meaningful Membership: Making War a Bit More Criminal*, forthcoming in the Cardozo Law Review.

**Benjamin Wittes** is Senior Fellow, Governance Studies, at the Brookings Institution.   A founder and editor in chief of the Lawfare blog, he is author of the books, *Law and the Long War: The Future of Justice in the Age of Terror* (2008) and *Detention and Denial: The Case for Candor After Guantanamo* (2011).

33

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(C)

I hereby certify, pursuant to Fed. R. App. P. 32(a)(7)(C) and D.C. Circuit Rule 32(a), that the foregoing brief has been prepared in a proportionally spaced 14-point Times New Roman typeface using Microsoft Word 2010 and contains 5,350 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(ii).

Dated: July 25, 2013

/s/ James A. Schoettler, Jr.

James A. Schoettler, Jr.
Attorney for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of July, 2013, I caused true and correct copies of the foregoing brief of *amici curiae* Former Government Officials, Military Lawyers and Scholars of National Security Law to be served via electronic mail upon all counsel of record, by operation of the Court's ECF system.

/s/ James A. Schoettler, Jr.

James A. Schoettler, Jr.
Attorney for *Amici Curiae*