**EN BANC ORAL ARGUMENT SCHEDULED FOR SEPTEMBER 30, 2013**
**Case No. 11-1324**
_____

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

ALI HAMZA AHMAD SULIMAN AL BAHLUL,

*Petitioner,*

v.

UNITED STATES OF AMERICA,

*Respondent.*
_____

**On Petition for Review from the United States Court**
**of Military Commission Review**
_____

**BRIEF OF JOHN D. ALTENBURG, Maj. Gen., U.S. Army (Ret.),**
**STEVEN B. KANTROWITZ, Rear Adm., JAGC, U.S. Navy (Ret.),**
**MICHAEL J. MARCHAND, Maj. Gen., U.S. Army (Ret.),**
**MICHAEL J. NARDOTTI, JR., Maj. Gen., U.S. Army (Ret.),**
**THOMAS L. HEMINGWAY, Brig. Gen., U.S. Air Force (Ret.),**
**WASHINGTON LEGAL FOUNDATION, and**
**ALLIED EDUCATIONAL FOUNDATION AS *AMICI CURIAE***
**IN SUPPORT OF RESPONDENT, SUPPORTING AFFIRMANCE**
_____

Richard A. Samp
  (Counsel of Record)
Cory L. Andrews
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Avenue, NW
Washington, DC  20036
202-588-0302
Dated: July 25, 2013          rsamp@wlf.org

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

### A.    PARTIES AND *AMICI*

All parties and *amici curiae* appearing before the district court and/or in this Court are listed in the brief for Respondent, except for the individuals and organizations who are filing this brief: John D. Altenburg, Steven B. Kantrowitz, Michael J. Marchand, Michael J. Nardotti, Jr., Thomas L. Hemingway, the Washington Legal Foundation, and the Allied Educational Foundation.

### B.    RULINGS UNDER REVIEW

The ruling under review in this case is the decision of the U.S. Court of Military Commission Review, affirming Petitioner's conviction.

### C.    RELATED CASES

Counsel for *amici curiae* is unaware of any related cases before this Court or any other court, other than those cited by the parties.

 /s/ Richard A. Samp
Richard A. Samp

Counsel for *amici curiae*

July 25, 2013

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Circuit Rule 29(b), Fed.R.App.P. 26.1, and Circuit Rule 26.1,

the undersigned counsel states that *amici curiae* Washington Legal Foundation and

Allied Educational Foundation are nonprofit corporations; they have no parent

corporations, and no publicly-held company has a 10% or greater ownership

interest.

 /s/ Richard A. Samp
Richard A. Samp

# TABLE OF CONTENTS

Page

CERTIFICATION AS TO PARTIES, RULINGS, AND RELATED CASES . . . . i

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

GLOSSARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

INTERESTS OF AMICI CURIAE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.   THE DOCTRINE OF CONSTITUTIONAL AVOIDANCE IS
     INAPPLICABLE BECAUSE THE MCA CANNOT PLAUSIBLY BE
     INTERPRETED AS APPLYING ONLY PROSPECTIVELY . . . . . . . . . 13

II.  IN SEEKING PROTECTION UNDER THE EX POST FACTO
     CLAUSE, BAHLUL FACES A STRONG PRESUMPTION THAT
     NONRESIDENT ALIENS WITHOUT CONNECTION TO THE U.S.
     MAY NOT INVOKE CONSTITUTIONAL RIGHTS . . . . . . . . . . . . . . . 17

     A.   Throughout American History, Nonresident Aliens Have Been
          Denied Constitutional Protections Because They Do Not
          Possess Meaningful Ties to American Society . . . . . . . . . . . . . . . . . 18

     B.   This Court's Post-*Boumediene* Decisions Make Clear That
          Guantanamo Detainees, Because They Are Nonresident Aliens,
          Are Entitled to Few Substantive Constitutional Protections . . . . . . 21

**Page**

III.    THE EX POST FACTO CLAUSE IS INTENDED TO SERVE
        PURPOSES THAT ARE OF LIMITED RELEVANCE TO THE
        PROSECUTION OF NONRESIDENT ALIENS . . . . . . . . . . . . . . . . . . . 22

IV.     AT MOST, GUANTANAMO BAY DETAINEES ARE ENTITLED
        TO INVOKE CONSTITUTIONAL PROVISIONS THAT
        REINFORCE FUNDAMENTAL HUMAN VALUES, SUCH AS
        PROTECTION AGAINST TORTURE AND SUMMARY
        EXECUTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

<h1 style="text-align:center">TABLE OF AUTHORITIES</h1>

**Page**

**Cases:**

*al Maqaleh v. Gates*,
  605 F.3d 84 (D.C. Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*al-Madhwani v. Obama*,
  642 F.3d 1071 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

\* *Boumediene v. Bush*,
  553 U.S. 723 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 11, 12, 18, 22, 27

*Boumediene v. Bush*,
  476 F.3d 981 (D.C. Cir. 2007),
  *rev'd on other grounds*, 553 U.S. 723 (2008) . . . . . . . . . . . . . . . . . . . . . . . 26-27

*Demore v. Kim*,
  538 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Dorr v. United States*,
  195 U.S. 138 (1904) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Downes v. Bidwell*,
  182 U.S. 244 (1901) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Hamdan v. Rumsfeld* [*Hamdan I*],
  548 U.S. 557 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 6, 7, 9, 15, 25

*Hamdan v. United States* [*Hamdan II*],
  696 F.3d 1238  (D.C. Cir. 2012) . . . . . . . . . . . . . . . . . . . 3, 4, 6, 7, 13, 14, 15, 16,

\* *Johnson v. Eisentrager*,
  339 U.S. 763 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 20, 21, 22, 27

*Kiyemba v. Obama*,
  559 U.S. 131 (2010) (*per curiam*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

\* *Kiyemba v. Obama*,
  555 F.3d 1022 (D.C. Cir. 2009), *vacated and remanded*, 559 U.S.
  131 (2010), *opinion reinstated*, 605 F.3d 1046 (D.C. Cir. 2010) . . . . . . . . 21, 22

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
  559 U.S. 229 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Rasul v. Bush*,
  542 U.S. 466 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Rasul v. Myers*,
  563 F.3d 527 (D.C. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Page(s)**

\* *Reid v. Covert*,
354 U.S. 1 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 29

*Ross v. McIntyre*,
140 U.S. 453 (1891) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. al Bahlul*,
820 F. Supp.2d 1141 (C.M.C.R. 2011) . . . . . . . . . . . . . . . . . . . . . . . 6

\* *United States v. Verdugo-Urquidez*,
494 U.S. 259 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Weaver v. Graham*,
450 U.S. 24 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 23

*Zadvydas v. Davis*,
533 U.S. 678 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Statutes and Constitutional Provisions:**

U.S. Const., art. I, § 9, cl. 2 (Suspension Clause) . . . . . . . . . . . . . . . 13, 19, 22, 27

U.S. Const., art. I, § 9, cl. 3 (Ex Post Facto Clause) . . . . . . . 7, 8, 9, 10, 11, 12, 13,
14, 17, 18, 21, 22, 23,
24, 25, 26, 28, 30

U.S. Const., art. I, § 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

U.S. Const., Amend. v (Due Process Clause) . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

U.S. Const., Amend. vi (Confrontation Clause) . . . . . . . . . . . . . . . . . . . . . . . 28

Authorization for Use of Military Force, Pub.L. No. 107-40,
115 Stat. 224 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Military Commissions Act of 2006 (MCA), Pub.L. No. 109-366,
120 Stat. 2600 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 8, 9, 12, 13, 14,
15, 16, 17, 24, 25
10 U.S.C. § 948(a) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
10 U.S.C. § 948d(a) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
10 U.S.C. § 949a-949o (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

vi

**Page(s)**

10 U.S.C. § 950p (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

10 U.S.C. § 950p(a) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

10 U.S.C. § 950v (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

10 U.S.C. § 950t(25), (29), & (30) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Uniform Code of Military Justice (UCMJ),
 10 U.S.C. § 801 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 15

 10 U.S.C. § 821 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

18 U.S.C. § 2339B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**Miscellaneous:**

Akhil Amar, *The Bill of Rights as a Constitution*,
 100 YALE L.J. 1131 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Jules Lobel, *Separation of Powers, Individual Rights, and the Constitution*,
 98 IOWA L. REV. 1629 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Stephen I. Vladeck, *The Suspension Clause as a Structural Right*,
 62 U. MIAMI L. REV. 275 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Detention, Treatment, and Trial of Certain Non-Citizens in the War
 Against Terrorism, 66 Fed. Reg. 57833 (Nov. 13, 2001) . . . . . . . . . . . . . . . . . . 5

*The Federalist No. 26* (Alexander Hamilton) (C. Rossitor ed., 1961) . . . . . . . . . 24

\*  Authorities on which we chiefly rely are marked with asterisks

## GLOSSARY

| | |
|---|---|
| AEF | Allied Educational Foundation |
| MCA | Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (2006) |
| UCMJ | Uniform Code of Military Justice, 10 U.S.C. § 801, *et seq.* |
| WLF | Washington Legal Foundation |

## INTERESTS OF *AMICI CURIAE*[1]

*Amici curiae* are five retired generals or admirals in the U.S. armed forces, and several organizations with an interest in national security issues.  Each of the retired generals/admirals is a former Judge Advocate with extensive experience in addressing law-of-war issues.

Major General John D. Altenburg, U.S. Army (Ret.), served two years as an enlisted man and 28 years as an Army lawyer.  His Military Justice and Combat Operations and Peacekeeping Law experience included service or legal oversight in Vietnam, Special Operations, Operation Desert Storm-Kuwait/Iraq, Operation Restore Hope-Somalia, Operation Uphold Democracy-Haiti, Operation Joint Endeavor/Guard-Bosnia, and Joint Guardian-Kosovo, followed by four years as the Deputy Judge Advocate General (1997-2001).  He served as the Appointing Authority for Military Commissions from 2004 to 2006.

Rear Admiral Steven B. Kantrowitz, JAGC, U.S. Navy (Ret.), served on active duty and in the Reserve of the U.S. Navy from 1974 through 2005.  He retired as a Rear Admiral in the Judge Advocate General's Corps.  During active duty, he served as a judge advocate performing duties involving the full reach of

---

[1]  Pursuant to Fed.R.App.P. 29(c)(5), *amici curiae* states that no counsel for a party authored this brief in whole or in part; and that no person or entity, other than *amici* and their counsel, contributed monetarily to the preparation and submission of this brief.  All parties have consented to the filing of this brief.

military law practice.  This includes service for three years as Special Assistant and Aide to the Judge Advocate General of the Navy. As a Flag officer, he served as the Assistant Deputy Advocate General of the Navy and Deputy Commander, Naval Legal Service Command.

Major General Michael J. Marchand, U.S. Army (Ret.), was serving as the Assistant Judge Advocate General of the Army at the time of his retirement on July 1, 2005.  As the Number 2 uniformed lawyer in the Army, General Marchand was intimately involved in detainee matters at the Army, Department of Defense, and congressional levels.

Major General Michael J. Nardotti, Jr., U.S. Army (Ret.), served 28 years on active duty as a soldier and lawyer.  A decorated combat veteran, he served in Vietnam as an Infantry platoon leader and was wounded in action.  General Nardotti later earned his law degree and performed duties as a Judge Advocate in world-wide assignments for two decades.  He culminated his service as The Judge Advocate General, the senior military lawyer in the Army, from 1993 to 1997.

Brigadier General Thomas L. Hemingway, U.S. Air Force (Ret.), served at the time of his retirement in May 2007 as the Legal Advisor to the Convening Authority in the Department of Defense Office of Military Commissions.  He was commissioned as a second lieutenant in 1962 and entered active service in 1965

2

after obtaining a law degree.  He has served as a staff judge advocate at the group, wing, numbered air force, major command, and unified command level.  He was also an associate professor of law at the U.S. Air Force Academy and a senior judge on the Air Force Court of Military Review.

The Washington Legal Foundation is a nonprofit public interest law and policy center with supporters in all 50 states.  WLF devotes a substantial portion of its resources to promoting America's security.  To that end, WLF has appeared before this Court and other federal courts on numerous occasions to ensure that the federal government possesses the tools necessary to protect this country from those who would seek to destroy it and/or harm its citizens.  *See, e.g., Kiyemba v. Obama*, 559 U.S. 131 (2010) (*per curiam*); *Boumediene v. Bush*, 553 U.S. 723 (2008); *Hamdan v. Rumsfeld,* 548 U.S. 557 (2006).

The Allied Educational Foundation is a nonprofit charitable and educational foundation based in Englewood, New Jersey.  Founded in 1964, AEF is dedicated to promoting education in diverse areas of study, such as law and public policy, and has appeared as *amicus curiae* in this Court on national security-related issues on a number of occasions.

*Amici* are concerned that the panel decisions in this case and in *Hamdan II* would impose unwarranted restrictions on the authority of the elected branches of

3

government to convene military commissions to conduct trials of law-of-war offenses.  Indeed, every military commission proceeding involving individuals allegedly complicit in the September 11 attacks or the bombing of the *U.S.S. Cole* has included charges whose viability is called into question by *Hamdan II.*

## STATEMENT OF THE CASE

The United States has been at war with militant Islamists since September 11, 2001, when al Qaeda's murderous and unprovoked attack on American civilians resulted in nearly 3,000 deaths.  Immediately thereafter, Congress enacted a resolution expressing its support of the President's use of "all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001."  Authorization for Use of Military Force, Pub.L. No. 107-40, 115 Stat. 224 (2001).  President Bush determined that al Qaeda and the Taliban are such organizations; he authorized the use of force against al Qaeda, the Taliban, and their operatives in Afghanistan and throughout the world.  President Obama has carried forward that policy.  The military campaign against al Qaeda and the Taliban continues unabated, and they continue to pose a substantial threat to national security.

A cornerstone of American policy has been to bring criminal charges before

4

military commissions against al Qaeda leaders responsible for the September 11 attacks. *See* Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism, 66 Fed. Reg. 57833 (Nov. 13, 2001). One such leader was Petitioner Bahlul. Before his capture by allied forces in December 2001, Bahlul was a senior officer in al Qaeda; he served as the head of media relations for the organization and played a major role in events leading up to the September 11 attacks. He has admitted virtually all of the factual allegations made against him by prosecutors, but has denied that his conduct was criminal.

The U.S. Supreme Court ruled in 2006 that the military commissions established to try cases arising from the September 11 attacks lacked "power to proceed" because they had not been established in compliance with procedural rules established by the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 801 *et seq. Hamdan v. Rumsfeld* [*Hamdan I*], 548 U.S. 557, 613 (2006). In response, Congress adopted the Military Commissions Act of 2006 (MCA), Pub. L. No. 109-366, 120 Stat. 2600 (2006), which *inter alia* established procedural rules for the conduct of trials by military commissions. *See, e.g.*, 10 U.S.C. § 949a-949o (2006).[2]

---

[2] In *Hamdan I*, four justices expressed the view (contrary to arguments made by the United States) that the charge filed against the defendant – conspiracy to commit offenses triable by military commissions – was not a charge permitted

5

Bahlul was subsequently charged with three crimes pursuant to the MCA: conspiracy, solicitation of terrorist acts, and providing material support for terrorism.  As his *en banc* brief concedes, Bahlul "admitted most of the allegations against him, but nonetheless pleaded not guilty, stating 'I'm not guilty, and what I did was not a crime.'" Pet. Br. 6.  In 2008, a military commission convicted Bahlul on all charges except for the overt act of arming himself, and sentenced him to life imprisonment.[3]  The *en banc* U.S. Court of Military Commission Review affirmed in 2011.  *United States v. al Bahlul*, 820 F. Supp. 2d 1141 (C.M.C.R. 2011).

While Bahlul's appeal to this Court was pending, the Court issued its decision in *Hamdan v. United States* [*Hamdan II*], 696 F.3d 1238 (D.C. Cir. 2012). *Hamdan II* held that the MCA did not retroactively authorize military commissions to conduct trials for pre-2006 conduct, if the alleged offense was not triable by military commissions at the time the conduct occurred.  Adopting the views of the

---

by federal law (and the UCMJ in particular) because conspiracy is not an offense against the international law of war.  *Hamdan I*, 548 U.S. at 595-613 (Stevens, J., joined by Breyer, Ginsburg, and Souter, JJ.).  Those four justices suggested that the defendant might instead be tried for conspiracy in a civilian court.  *Id.* at 612 n.41. Likely in response to the views expressed by the four justices, the MCA set out a lengthy list of offenses that Congress determined should be triable by military commission, including conspiracy.  10 U.S.C. § 950v (2006).

[3]  In 2009, Congress amended the MCA.  The amended statute continues to include conspiracy, solicitation, and material support of terrorism as among the offenses that may be tried by a military commission, and the definition of those three offenses did not change.  *See* 10 U.S.C. § 950t(25), (29), & (30) (2009).

*Hamdan I* plurality, the Court concluded that pre-2006 law governing military

commissions – *i.e.*, Article 21 of the UCMJ, 10 U.S.C. § 821 – limited

commissions to the trial of offenses that violated the international law of war.  696

F.3d at 1248-49.  The MCA authorizes the trial of some offenses that, the United

States concedes, do not constitute violations of the international law of war,

including the charges of which Hamdan was convicted (material support of

terrorism) as well as the charges of which Bahlul was convicted.  The Court thus

concluded that trying Hamdan for an offense not encompassed by the international

law of war would constitute retroactive application of the MCA and would raise

"serious constitutional issues" under Article I's Ex Post Facto Clause.  *Id.* at 1247.

"To avoid the prospect" of such a constitutional violation, the Court held that the

MCA applies only to crimes committed after the statute's enactment in 2006.  *Id.* at

1248.  Because Hamdan was charged for conduct that occurred between 1996 and

2001, the Court overturned his conviction.  *Id.* at 1253.

   The United States then informed the panel hearing this case that while it

disagreed with *Hamdan I*, the reasoning of that decision required reversal of

Bahlul's conviction.  In light of that concession, the panel vacated the conviction.

*al Bahlul v. United States*, 2013 WL 297726 (D.C. Cir. Jan. 25, 2013).  The Court

later granted the United States's petition for rehearing *en banc* and vacated the

panel's decision. Its April 25, 2013, order granting the petition expressly asked the parties to address two issues, including the following: "For purposes of considering whether the [MCA] may permissibly proscribe pre-2006 conduct that was not a war crime triable by military commission under 10 U.S.C. § 821 before 2006, does the Ex Post Facto Clause apply in cases involving detainees at Guantanamo?" This brief focuses exclusively on that issue.

## SUMMARY OF ARGUMENT

*Amici curiae* agree with the United States that the charges on which Bahlul was tried – conspiracy, solicitation, and material support for terrorism – have traditionally been triable by military commission, and that the UCMJ was not intended to prevent such trials. Accordingly, federal law cannot plausibly be understood to bar military commissions from trying the three offenses in question, because there is no evidence to suggest that Congress intended the MCA to restrict the scope of previously recognized military commission jurisdiction.

*Amici* write separately to focus on issues arising under the Ex Post Facto Clause. That clause provides, "No Bill of Attainder or ex post facto Law shall be passed." U.S. Const., art. I, § 9, cl. 3. Bahlul contends that if the MCA is interpreted as providing military commissions with retroactive authority to try the three offenses at issue, then the MCA violates the Ex Post Facto Clause. That

8

contention is without merit.  Nothing in case law governing the extraterritorial application of the U.S. Constitution lends support to Bahlul's assertion that enemy combatants being detained at Guantanamo Bay, Cuba are entitled to invoke the protections of the Clause.

As an initial matter, the Court may not properly invoke the doctrine of constitutional avoidance as a means of ducking the Ex Post Facto Clause issue. Courts are permitted to invoke that doctrine *only* when a statute has more than one plausible interpretation; in those circumstances, a court may choose the interpretation that avoids serious issues of unconstitutionality.  When it adopted the MCA, however, Congress left no doubt that it intended to permit leaders of the September 11 conspiracy to be subject to military commission trials based on any or all of the offenses specified in the statute.  *See, e.g.,* 10 U.S.C. § 948(a) (2006). Indeed, military commission trials of al Qaeda leaders being held at Guantanamo Bay was the MCA's *raison d'etre*.  Congress adopted the statute to remove the roadblock to such trials that had been created by the Supreme Court's *Hamdan I* decision. If Congress had not intended that the offenses listed in the MCA would be retroactively applicable to actions taken by al Qaeda leaders between 1999 and 2001 time frame, it would have had no reason to include those offenses within the MCA.  Because the MCA cannot plausibly be interpreted as permitting the

9

offenses with which Bahlul was charged (conspiracy, solicitation, and material support of terrorism) to be tried by a military commission only with respect to conduct that occurred after 2006, the Court may not avoid addressing the Ex Post Facto Clause issue.

Bahlul may not invoke the protections of the Ex Post Facto Clause because that provision was never intended to protect individuals, such as Bahlul, with no meaningful connection with the United States. "By the constitution a government is ordained and established 'for the United States of America,' and not for countries outside of their limits." *Ross v. McIntyre*, 140 U.S. 453, 464 (1891). The Supreme Court has made clear that the Constitution has virtually no application to nonresident aliens not within the sovereign territory of the United States. *Johnson v. Eisentrager*, 449 U.S. 763 (1950). It held in 2008 that detainees at Guantanamo Bay have a constitutional right of access to civilian courts and that the Suspension Clause prevents Congress from amending the habeas corpus statute in an effort to prevent such access. *Boumediene v. Bush*, 553 U.S. 723 (2008). In reaching that decision, however, the Court stated that it was not deciding whether Guantanamo Bay detainees, once inside the federal courthouse door, would be entitled to assert rights under any other constitutional provision. Indeed, *Boumediene* stated explicitly that it was not calling into question the continued viability of *Eisentrager*

10

or the other Supreme Court decisions that have denied constitutional protections to nonresident aliens.  In the years following *Boumediene*, this Court has issued numerous decisions making clear that detainees at Guantanamo Bay and other U.S. military facilities enjoy considerably fewer constitutional rights than do citizens.

Bahlul's constitutional argument boils down to this: the Founders felt very strongly that ex post facto laws are a grave danger to individual liberty, and thus that they intended the Ex Post Facto Clause to protect all people, not just American citizens.  *Amici* do not mean to disparage the importance of the Ex Post Facto Clause to the American form of government, but the evidence suggests that the Founders felt at least as strongly about virtually every provision of the Constitution and Bill of Rights.  Given the general understanding that nonresident aliens are entitled to considerably fewer constitutional protections than are U.S. citizens, Bahlul's assertion that the Ex Post Facto Clause provides important protections is insufficient to demonstrate that the Clause should be provided an exalted status in legal proceedings involving Guantanamo Bay detainees.

The Ex Post Facto Clause forbids enactment of a law that imposes a punishment for an act which was not punishable at the time it was committed.  The Framers intended the Clause to serve two purposes:  (1) to provide fair warning of prohibited activity, thereby permitting individuals to conform their conduct to the

11

law; and (2) to restrain arbitrary and potentially vindictive use of legislative power. Neither rationale carries significant force in the context of nonresident aliens.

First, it is difficult to imagine that nonresident aliens such as Bahlul – a citizen of Yemen who was living in Afghanistan during relevant time periods – are in any position to monitor developments in American law. There is no suggestion that a belief that conspiracy was not an offense triable by American military commissions played a role in Bahlul's decision to enter into a conspiracy to murder American civilians. Second, there is no evidence that the Founders saw a need to restrict Congress's powers in order to prevent it from adopting vindictive legislation aimed at enemy combatants. On the contrary, to the extent that they feared military excesses, that fear was directed at the Executive Branch. The Framers viewed Congress as an important check against military adventurism by the President. In this instance, both the Executive and Legislative branches agree that those nonresident aliens who planned the September 11 attacks should be subject to trial by military commission with respect to each of the offenses enumerated in the MCA. There is no evidence to suggest that the Framers adopted the Ex Post Facto Clause in order to prevent the elected branches of government from making such determinations.

*Boumediene* sets forth a framework for determining the circumstances under

12

which an individual is permitted to invoke the protections of the Suspension

Clause to gain access to civilian courts. That framework does not translate well to

constitutional issues arising outside the context of the Suspension Clause. Given

Bahlul's status as a nonresident alien located outside of the sovereign territory of

the U.S. and with no ties to American society, he possesses a minimal claim to

protection under the Constitution. He has not demonstrated that the factors that

motivated the Framers to adopt the Ex Post Facto Clause have any application to

overseas aliens in general and to him in particular. *Boumediene* explained at length

that the Suspension Clause serves an overriding separation-of-powers purpose by

ensuring that the judiciary can serve as a check on excesses by the other branches

of the Government. The Ex Post Facto Clause does not serve that same function,

nor has Bahlul demonstrated that it protects rights of the highest magnitude – such

as protection against torture, summary execution, or prolonged arbitrary detention.

## ARGUMENT

## I.    THE DOCTRINE OF CONSTITUTIONAL AVOIDANCE IS INAPPLICABLE BECAUSE THE MCA CANNOT PLAUSIBLY BE INTERPRETED AS APPLYING ONLY PROSPECTIVELY

*Hamdan II* concluded that trying Hamdan for an offense not encompassed

by the international law of war would constitute retroactive application of the

MCA and would raise "serious constitutional issues" under Article I's Ex Post

13

Facto Clause. *Hamdan II*, 696 F.3d at 1247. "To avoid the prospect" of such a constitutional violation, the Court held that the MCA applies only to crimes committed after the statute's enactment in 2006. *Id.* at 1248. Because Hamdan was charged based on conduct that occurred between 1996 and 2001, the Court overturned his conviction. *Id.* at 1253. The parties agree that *Hamdan II*'s holding required that Bahlul's conviction be vacated as well, given that the offenses for which he was charged involved conduct that pre-dated adoption of the MCA.

*Hamdan II* improperly applied the doctrine of constitutional avoidance. The doctrine is inapplicable to this case and does not permit the Court to avoid addressing Bahlul's Ex Post Facto Clause claim. "The avoidance canon . . . is a tool for choosing between competing plausible interpretations of a statutory text." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 239 (2010). In applying that tool, courts are to "consider only those constructions of a statute that are fairly possible." *Id.* The construction urged by Bahlul and adopted by *Hamdan II* – that the MCA applies only prospectively – simply is not plausible.

*Hamdan II* arrived at its prospective-only interpretation of the MCA by reasoning as follows:

> The question for ex post facto purposes is this: If Congress had known that the Act was codifying some new crime, would Congress have wanted the new crime to be enforced retroactively? To begin with, the statutory text reveals a tight causal link between (i) Congress's belief that the statute

14

> codified only crimes under pre-existing law and (ii) Congress's statement
> that the statute therefore could apply to conduct before enactment.  That
> causal link suggests that Congress would *not* have wanted *new* crimes to be
> applied retroactively. . . . At a minimum, we know that the statutory text
> does not contemplate or address the possibility of retroactively applying new
> crimes, leaving us with at least something of an ambiguity.  And courts
> interpret ambiguous statutes to avoid serious questions of
> unconstitutionality.

*Id.* at 1247-48 (emphasis in original).

*Hamdan II* misread the MCA.  The statutory language cited by the Court –
codified at 10 U.S.C. § 950p (2006) –  includes no suggestion that Congress
intended that the substantive offenses listed in the MCA were to be triable by
military commissions *only* if reviewing courts later concluded that existing federal
law already permitted such trials.  Rather, Congress was aware that some
(including the *Hamdan I* plurality) had contended that the UCMJ limited the
jurisdiction of military commissions to offenses against the international law of
war – thereby allegedly precluding prosecutions for, among other offenses,
conspiracy and material support of terrorism.  The statutory language at issue was
Congress's means of expressing disagreement with that contention; it was asserting
(as Congress often does) that some judges had misinterpreted existing federal law,
and that Congress knew best what its own statutes meant:  "The provisions of this
subchapter codify offenses that have traditionally been triable by military
commissions.  This chapter does not establish new crimes that did not exist before

15

its enactment, but rather codifies those crimes for trial by military commission."
10 U.S.C. § 950p(a) (2006). That language is that of a Congress that fully intended
its statutory list of offenses to apply to the 1996-2001 activities of the Guantanamo
Bay detainees, not the language of a Congress that was unsure of the state of
existing law and was seeking guidance on that score from the Supreme Court or the
D.C. Circuit.

Any possibility of ambiguity is eliminated by the provision establishing the
jurisdiction of military commissions: "JURISDICTION. – A military commission
under this chapter shall have jurisdiction to try any offense made punishable by
this chapter or the law of war when committed by an alien unlawful enemy
combatant before, on, or after September 11, 2001." 10 U.S.C. § 948d(a) (2006).
Congress thereby made plain its intent that the MCA's list of triable offenses
should govern all military commission trials of those responsible for the September
11 attacks. *Hamdan II* inferred that "Congress would *not* have wanted *new* crimes
to be applied retroactively," 696 F.3d at 1248. But that inference is irrelevant to
the issues at hand: did Congress determine that offenses listed in the MCA were
not new crimes but rather were all previously triable by military commission, and
did it intend that its list of crimes should apply to military commission proceedings
against the September 11 conspirators? The answer to each questions is an

16

unequivocal "yes."

In sum, the doctrine of constitutional avoidance is inapplicable to this case because there is only one plausible interpretation of the MCA: Congress intended its list of substantive offenses to apply to all trials conducted by military commissions without regarding to the date on which the underlying conduct occurred.

## II.   IN SEEKING PROTECTION UNDER THE EX POST FACTO CLAUSE, BAHLUL FACES A STRONG PRESUMPTION THAT NONRESIDENT ALIENS WITHOUT CONNECTION TO THE U.S. MAY NOT INVOKE CONSTITUTIONAL RIGHTS

The Ex Post Facto Clause, Art. I, § 9, cl, 3,  bars any federal law that "imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Weaver v. Graham*, 450 U.S. 24, 28 (1981).  Bahlul contends that, until the 2006 adoption of the MCA,  federal law did not permit his alleged offenses to be tried before a military commission.  He argues that because the conduct for which he was charged occurred between 1999 and 2001, the United States violated his rights under the Ex Post Facto Clause when it invoked the MCA as its basis for bringing those charges.

Bahlul's constitutional claim hinges at the outset on a determination that nonresident aliens possess constitutional interests of the sort he asserts.  As the

17

Supreme Court stressed in *Boumediene* and *Rasul v. Bush*, 542 U.S. 466 (2004),

the extent to which nonresident aliens should be deemed entitled to constitutional

protections is informed largely by whether such protections have been recognized

throughout Anglo-American legal history.[4]  As shown below, there is no historical

support for granting nonresident aliens rights under either the Ex Post Facto Clause

or virtually all other provisions of the U.S. Constitution.

> **A.    Throughout American History, Nonresident Aliens Have Been Denied Constitutional Protections Because They Do Not Possess Meaningful Ties to American Society**

Bahlul cites *Boumediene* for the proposition that aliens at Guantanamo Bay

are entitled to Ex Post Facto Clause protections in the absence of evidence of

"practical barriers" to recognition of such protections.  Pet. Br. 37.  Bahlul's

argument is based on a misreading of *Boumediene* and, if accepted, would require

overturning 200 years of American constitutional history.  *Boumediene* addressed

---

[4]  *See Rasul v. Bush,* 542 U.S. at 481 ("application of the habeas statute to persons detained at [Guantanamo Bay] is consistent with the historical reach of the writ of habeas corpus"); *Boumediene*, 553 U.S. at 799 (Souter, J., concurring) ("[N]o one who reads the Court's opinion in *Rasul* could seriously doubt that the jurisdictional question must be answered the same way in purely constitutional cases, given the Court's reliance on the historical background of habeas generally in answering the statutory question."); *see also, id.* at 746-52 (discussing at length the history of habeas corpus at common law before stating that "no certain conclusions" could be drawn regarding whether the common-law writ of habeas corpus ran only to those territories over which the British Crown was sovereign).

18

the geographic scope of federal court jurisdiction; it determined that federal court habeas corpus jurisdiction extended to anyone located in a territory over which the United States exercises *de facto* sovereignty, in the absence of evidence that the exercise of such jurisdiction would be "impractical or anomalous," *Boumediene*, 553 U.S. at 771, and that the Constitution's Suspension Clause limits Congress's power to contract that jurisdiction.[5] *Boumediene* explained, however, that access to the writ of habeas corpus does not afford a detainee substantive rights, but rather provides "fundamental *procedural* protections." *Id.* at 798 (emphasis added). The "privilege" of habeas corpus "entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to the erroneous application or interpretation of relevant law." *Id.* at 779. It does not grant him a right to invoke substantive protections of the U.S. Constitution.

Indeed, the Supreme Court has repeatedly held that even when aliens are permitted to invoke federal court jurisdiction, they are entitled to significantly fewer constitutional protections than citizens. For example, in *Demore v. Kim,* 538 U.S. 510 (2003), the Court held that a *resident* alien subject to removal proceedings may be detained by immigration authorities for the duration of those

---

[5] As an example of a setting in which exercise of *habeas* jurisdiction would be "impractical or anomalous," the Court cited a detention facility "located in an active theater of war." *Id.*

19

proceedings, even though the Constitution would prohibit detention of a citizen under analogous circumstances.  The Court explained, "[T]his Court has firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens."  538 U.S. at 522.

Nonresident aliens possess still fewer claims to constitutional protections than do resident aliens.  As the Supreme Court has explained, "It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside our geographic borders."  *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  For example, the Court in *Eisentrager* rejected efforts by German citizens – arrested in China and imprisoned as war criminals in an American facility in Germany after World War II – to win release by asserting a violation of their Fifth Amendment rights.  The Court concluded none of its precedents supported the prisoners' claim to Fifth Amendment protections, stating they had no legitimate claim to such protections in the absence of any ties to American society:

> Such extraterritorial application of organic law would have been so significant an innovation in the practice of governments that, if intended or apprehended, it should scarcely have failed to excite contemporary comment.  Not one word can be cited.  No decision of this Court supports such a view.  *Cf. Downes v. Bidwell*, 182 U.S. 244 [(1901)].  None of the learned commentators on our Constitution has ever hinted at it.  The practice of every modern government is opposed to it.

20

*Eisentrager*, 339 U.S. at 784.[6]  The Court later described *Eisentrager*'s "rejection

of extraterritorial application of the Fifth Amendment" as "emphatic."  *United*

*States v. Verdugo-Urquidez,* 494 U.S. 259, 269 (1990).

> **B.    This Court's Post-*Boumediene* Decisions Make Clear That Guantanamo Detainees, Because They Are Nonresident Aliens, Are Entitled to Few Substantive Constitutional Protections**

In its post-2008 decisions, this Court has repeatedly recognized that

*Boumediene* did not alter the longstanding doctrine that nonresident aliens –

including those being detained at Guantanamo Bay – by and large are not entitled

to assert rights enumerated in the U.S. Constitution.  For example, in reversing a

district court judgment that the Fifth Amendment required the release of  several

Guantanamo detainees, the Court stated in 2009, "[T]he due process clause cannot

support the court's order of release.  Decisions of the Supreme Court and of this

court . . . hold that the due process clause does not apply to aliens without property

or presence in the sovereign territory of the United States."  *Kiyemba v. Obama*,

555 F.3d 1022, 1027 (D.C. Cir. 2009), *vacated and remanded*, 559 U.S. 131

---

[6]  The United States cites *dictum* in the separate opinion of Justice Brown in *Downes* (one of the "*Insular Cases*") in support of its assertion that nonresident aliens are entitled to protection under the Ex Post Facto Clause.  U.S. Br. 64 (citing 182 U.S. at 277).  The above quotation indicates that the Supreme Court disagrees with that interpretation of *Downes*.  Indeed, elsewhere in his opinion, Justice Brown stated, "[T]he constitution does not apply to foreign countries or to trials conducted therein."  *Id.* at 270 (opinion of Brown, J.).

(2010), *opinion reinstated*, 605 F.3d 1046 (D.C. Cir. 2010); *accord*, *al-Madhwani*

*v. Obama*, 642 F.3d 1071, 1077 (D.C. Cir. 2011).

The Court has expressly affirmed that *Boumediene* does not call into

question the continued vitality of *Eisentrager*, *Verdugo-Urquidez*, and similar

decisions that have rejected constitutional claims asserted by nonresident aliens:

> The Court acknowledged [in *Boumediene*] that it had never before
> determined that the Constitution protected aliens detained abroad, [128 S.
> Ct.] at 2262, and explicitly confined its constitutional holding "only" to the
> extraterritorial reach of the Suspension Clause, *id*. at 2275.  The Court
> stressed that its decision "does not address *the content of the law* that
> governs petitioners' detention."  *Id.* at 2277 (emphasis added).  With those
> words, the Court in *Boumediene* disclaimed any intention to disturb existing
> law governing the extraterritorial reach of any constitutional provisions,
> other than the Suspension Clause.

*Rasul v. Myers*, 563 F.3d 527, 531 (D.C. Cir. 2009); *accord, Kiyemba*, 555 F.3d at

1032; *al Maqaleh v. Gates*, 605 F.3d 84, 98 (D.C. Cir. 2010).

## III.  THE EX POST FACTO CLAUSE IS INTENDED TO SERVE PURPOSES THAT ARE OF LIMITED RELEVANCE TO THE PROSECUTION OF NONRESIDENT ALIENS

The Ex Post Facto Clause, in conjunction with Art. I, § 10's similar

constraint on state governments, without question serve as important checks

against abuse of power by all levels of American government.  In light of the

Court's recognition, however, that nonresident aliens in many instances are *not*

entitled to invoke the substantive protections of the U.S. Constitution, it is

22

incumbent upon Bahlul to demonstrate why he nonetheless should be permitted to assert rights under the Ex Post Facto Clause in these proceedings.  Bahlul has failed to make any such demonstration.

The Ex Post Facto Clause forbids enactment of a law that imposes a punishment for an act which was not punishable at the time it was committed.  The Framers intended the Clause to serve two purposes:  (1) to provide fair warning of prohibited activity, thereby permitting individuals to conform their conduct to the law; and (2) to restrain arbitrary and potentially vindictive use of legislative power. *Weaver v. Graham*, 450 U.S. 24, 28-29 (1981).  Neither rationale carries significant force in the context of nonresident aliens, and thus there is little reason to believe that the Founders intended the Ex Post Facto Clause to have greater extraterritorial application than do other substantive constitutional provisions.

First, it is difficult to imagine that nonresident aliens such as Bahlul, a citizen of Yemen who was living in Afghanistan during relevant time periods, are in any position to monitor developments in American law.  There is no suggestion that a belief that conspiracy was not an offense triable by American military commissions played a role in Bahlul's decision to enter into a conspiracy to murder American civilians.  Thus, nonresident aliens have no reliance-based grounds for objecting to prosecution under statutes adopted after the fact.

23

Second, there is no evidence that the Founders saw a need to restrict

Congress's powers in order to prevent it from adopting vindictive legislation aimed

at enemy combatants.  On the contrary, to the extent that they feared military

excesses, that fear was directed at the Executive Branch.  The Framers viewed

Congress as an important check against military adventurism by the President.

*Reid v. Covert*, 354 U.S. 1, 68 (1957) ("[W]hat [the Founders] feared was a

military branch unchecked by the legislature, and susceptible of use by an arbitrary

executive power.  So far as I know, there is no evidence at all that the Founders

intended to limit the power of the people, as embodied by the legislature, to make

such laws in the regulation of the land and naval forces as are necessary to the

proper functioning of those forces.") (Harlan, J., concurring in the judgment); *The

Federalist No. 26*, at 168 (Alexander Hamilton) (C. Rossitor ed., 1961) ("The idea

of restraining the legislative authority in the means of providing for the national

defense is one of those refinements which owe their origin to a zeal for liberty

more ardent than enlightened.").  In this instance, both the Executive and

Legislative branches agree that those nonresident aliens who planned the

September 11 attacks should be subject to trial by military commission with

respect to each of the offenses enumerated in the MCA.  There is no evidence to

suggest that the Framers adopted the Ex Post Facto Clause in order to prevent the

24

elected branches of government from making such determinations. *See Hamdan I*, 548 U.S. at 636 (Breyer, J., concurring) ("Congress has denied the President the legislative authority to create military commissions of the kind at issue here. Nothing prevents the President from returning to Congress to seek the authority he believes necessary.")

There are several additional reasons why application of the Ex Post Facto Clause is particularly inapt with respect to Guantanamo Bay detainees. While the international law of war does not prohibit the offenses with which Bahlul and other detainees have been charged, American law clearly does. *See, e.g.,* 18 U.S.C. §§ 371, 2339B. Indeed, Justice Stevens suggested in his *Hamdan I* plurality opinion that Hamdan could be charged with conspiracy in a civilian court. 548 U.S. at 612 n.41. Given that those detainees were already subject to prosecution in civilian courts for the offenses set forth in the MCA, Congress's decision to make them subject to prosecution in a different court bears no resemblance to the sorts of abuses against which the Ex Post Facto Clause was intended to guard. Second, there is no evidence to suggest that Congress was acting arbitrarily or vindictively when it adopted the MCA. To the contrary, the evidence suggests that when it included within the MCA an enumeration of offenses that could be tried before a military commission, Congress believed in good faith that it was merely codifying

existing American law.  That good-faith belief was certainly reasonable when one

considers, for example, that conspiracy is an offense that has been tried before

military commissions throughout U.S. history.

    Bahlul argues that the Ex Post Facto Clause deserves an exalted status

among constitutional rights because it represents "a structural limitation on

Congress's power."  Pet. Br. 37-38.  That argument is apparently based on the

wording of the Clause; the Clause is phrased as a prohibition against certain

actions by Congress (no ex post facto law "shall be passed") rather than as a grant

of a right to individuals in their dealings with the Government.  Some have argued

that "structural" provisions of the Constitution should be enforceable throughout

the world because they allegedly create absolute limits on the power of the federal

government to act – without regard to the identity of those affected.  However, the

purported distinction between "structural" provisions and "individual rights"

provisions has been soundly criticized by academia[7] and has drawn little or no

support from the case law.  *See, e.g., Boumediene v. Bush*, 476 F.3d 981, 993 (D.C.

---

    [7] *See, e.g.*, Akhil Amar, *The Bill of Rights as a Constitution*, 100 YALE L.J.
1131, 1132 (1991); Jules Lobel, *Separation of Powers, Individual Rights, and the
Constitution*, 98 IOWA L.REV. 1629, 1660 (2013); Stephen I. Vladeck, *The
Suspension Clause as a Structural Right*, 62 U. MIAMI L.REV. 275, 276 (2008) (the
line dividing structural limitations from individual rights "is elusive at best, if not
downright illusory.").

Cir. 2007), *rev'd on other grounds*, 553 U.S. 723 (2008) (the distinction between

structural limitations on congressional power and provisions protecting individual

constitutional rights "is no distinction at all.  Constitutional rights are rights against

the government and, as such, *are* restrictions on government power.").

## IV.    AT MOST, GUANTANAMO BAY DETAINEES ARE ENTITLED TO INVOKE CONSTITUTIONAL PROVISIONS THAT REINFORCE FUNDAMENTAL HUMAN VALUES, SUCH AS PROTECTION AGAINST TORTURE AND SUMMARY EXECUTION

Bahlul urges the Court to import into this case the three-factor framework

adopted by *Boumediene* for use in determining the circumstances under which an

individual is permitted to invoke the protections of the Suspension Clause.[8]  But

that framework does not translate well to constitutional issues arising outside the

context of the Suspension Clause.  For example, as *Eisentrager* and *Boumediene*

pointed out, the propriety of granting an alleged enemy combatant access to

American civilian courts under the Suspension Clause can vary widely depending

on whether the detention site is in a war zone and on the level of manpower

diversion that responding to the habeas petition will entail.  *See, e.g., Eisentrager*,

---

[8]  *Boumediene*, 553 U.S. at 766 ("[W]e conclude that at least three factors are relevant in determining the reach of the Suspension Clause: (1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ.").

27

339 U.S. at 779 ("It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home.").  In contrast, those factors will often be irrelevant in determining when a defendant in a trial before a military commission should be entitled to invoke a particular substantive constitutional right.  Granting a defendant protection under, for example, the Ex Post Facto Clause or the Confrontation Clause would likely present an identical set of "practical difficulties" in every military commission proceeding.

An appropriate alternative procedure for determining the extraterritorial reach of the Constitution is suggested by the Supreme Court's decisions in the *Insular Cases*.  The Court recognized that there is a hierarchy of constitutional rights; some are objectively more "fundamental" than others.  *See, e.g., Dorr v. United States*, 195 U.S. 138, 148-49 (1904) (only "fundamental" constitutional rights are guaranteed to inhabitants of unincorporated U.S. territories such as the Philippines; the right to a jury trial is not among those fundamental rights).

The *Insular Cases* involved territories over which the United States unquestionably exercised *de jure* sovereignty.  Accordingly, nonresident aliens in areas (such as Guantanamo Bay) over which the United States exercises only *de*

28

*facto* sovereignty have a lesser claim to constitutional protection and should be required to demonstrate that the right they seek invoke is even more "fundamental" than those recognized by the *Insular Cases*.

Amici respectfully suggest that the Court adopt the mode of analysis advocated by Justice Harlan in his opinion in *Reid v. Covert*, 354 U.S. 1, 65-78 (1957) (Harlan, J., concurring in the judgment), an opinion on which *Boumediene* heavily relied. In rejecting a categorical approach that specific constitutional provisions are always applicable to American citizens located abroad, Justice Harlan stated, "[T]he question of which specific safeguards of the Constitution are appropriately to be applied in a particular context overseas can be reduced to the issue of what process is 'due' a defendant in the particular circumstances of a particular case." *Id.* at 75. Harlan concluded that even American citizens are not entitled to invoke all provisions of the Constitution when they are abroad. He concluded that Americans living at overseas U.S. military bases because they were married to military personnel were constitutionally entitled to jury trials in a civilian court if charged with a capital crime (murdering their spouses) but probably would not have that right if charged with a lesser crime. *Id.* at 74-79.

As a nonresident alien located in an area over which the U.S. does not exercise *de jure* sovereignty and possessed of no ties to the U.S., Bahlul holds a

29

very weak claim for protection under the U.S. Constitution.  The Harlan standard

nonetheless suggests that he possesses "life" and "liberty" interests that afford him

at least minimal protections.  Those interests likely include protections against

summary execution, torture, and long-term arbitrary detention.  Those interests

also likely include a right of access to the federal courts because without such

access Bahlul would not have the ability to protect his other constitutional rights.

The Court need not define precisely what process is "due" to Bahlul under the facts

of this case.  It suffices to conclude, for the reasons set forth in Section III above,

that protection under the Ex Post Facto Clause is not included within the process

due him.

## CONCLUSION

*Amici curiae* request that the Court affirm the judgment below.

Respectfully submitted,


 /s/ Richard A. Samp
Richard A. Samp
  (Counsel of Record)
Cory L. Andrews
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave., NW
Washington, DC  20036
(202) 588-0302
Dated: July 25, 2013          rsamp@wlf.org


30

## <u>CERTIFICATE OF COMPLIANCE</u>

I am an attorney for *amici curiae* Washington Legal Foundation, *et al*.

Pursuant to Fed.R.App.P. 32(a)(7)(C), I hereby certify that the foregoing brief of

WLF is in 14-point, proportionately spaced Times New Roman type.  According to

the word processing system used to prepare this brief (WordPerfect X5), the word

count of the brief is 6,994, not including the certificate as to parties, table of

contents, table of authorities, glossary, certificate of service, and this certificate of

compliance.


<u>/s/ Richard A. Samp</u>
Richard A. Samp

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 25, 2013, I electronically filed the brief of *amici curiae* John D. Altenburg, *et al.*, with the Clerk of the Court of the U.S. Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


 /s/ Richard A. Samp
Richard A. Samp