# 11-1324

[Oral argument scheduled for October 22, 2014]

## United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT
### Docket No. 11-1324

ALI HAMZA SULIMAN AHMAD AL BAHLUL,

*Petitioner*,

*v.*

UNITED STATES,

*Respondent*.

APPEAL FROM
COURT OF MILITARY COMMISSION REVIEW (CMCR-09-001)

## BRIEF OF PETITIONER

MAJ Todd E. Pierce,
   JA, U.S. Army (Ret.)
Senior Fellow
Univ. of Minnesota
Human Rights Center
Mondale Hall, N-120
229-19th Avenue South
Minneapolis, MN 55455

Michel Paradis
Mary R. McCormick
1620 Defense Pentagon
Washington, DC 20301-1620
michel.paradis@osd.mil
TEL: 1.703.696-9490 x115
FAX: 1.703.696-9575

*Counsel for Petitioner*

**CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES**

**I.      PARTIES AND *AMICI* APPEARING BELOW**

The parties and *amici* who appeared before the Court of Military Commission Review in connection with this appeal were:

1.  Ali Hamza Ahmad Suliman al Bahlul, *Appellant*

2.  United States of America, *Appellee*

3.  *Amicus Curiae* the Office of the Chief Defense Counsel, Col Peter Masciola, USAF (on brief)

4.  *Amicus Curiae* Robert David Steele and Others in the United States Intelligence Community, McKenzie Livingston (on brief)

5.  *Amicus Curiae* Historians, Political Scientists and Constitutional Law Professors, Sarah Paoletti (on brief)

6.  *Amicus Curiae* National Institute of Military Justice, Michelle Lindo (on brief)

7.  *Amicus Curiae* Montana Pardon Project, Jeffrey Renz (on brief)

8.  *Amicus Curiae* Human Rights Committee of the American Branch of the International Law Association, Jordan J. Paust (on brief)

**II.     PARTIES AND *AMICI* APPEARING IN THIS COURT**

1.  Ali Hamza Ahmad Suliman al Bahlul, *Petitioner*

2.  United States of America, *Respondent*

3.  *Amicus Curiae* Int'l Law Scholars, David Weissbrodt (on brief)

4.  *Amicus Curiae* Retired Military and Intelligence Officers, McKenzie Livingston (on brief)

5.  *Amicus Curiae* The National Institute of Military Justice, Steve Vladeck (on brief)

6.  *Amicus Curiae* First Amendment Historians, Jeffrey Renz (on brief)

7.  *Amicus Curiae* Historians, Political Scientists and Constitutional Law Professors, Sarah Paoletti (on brief)

8.  *Amicus Curiae* David Glazier & Gary Solis, John Summers (on brief)

9.  *Amicus Curiae* Constitutional Accountability Center, Elizabeth Wydra (on brief)

10. *Amicus Curiae* Former Government Officials, Military Lawyers & Scholars, Peter Marguiles (on brief)

11. *Amicus Curiae* Washington Legal Foundation, Richard Samp (on brief)

## III.   RULINGS UNDER REVIEW

This appeal is from a decision of the United States Court of Military Commission Review in *United States v. Ali Hamza Ahmad Suliman al Bahlul*, CMCR 09-001(*en banc* September 9, 2011). The decision is reported at 820 F.Supp.2d 1141 (U.S.C.M.C.R. 2011).

## IV.   RELATED CASES

This case has not previously been filed with this court or any other court. Counsel are aware of no other cases that meet this Court's definition of related.

Dated: August 13, 2014

By: /s/ Michel Paradis
*Counsel for Petitioner*

# TABLE OF CONTENTS

**Table of Contents** ................................................................. iii

**Table of Authorities** ............................................................. v

**Jurisdictional Statement** ...................................................... xi

**Questions Presented** ............................................................ xii

**Glossary of Terms** ............................................................... xiii

**Statement of Facts** ............................................................... 1

**Summary of Argument** ........................................................ 9

**Argument** .......................................................................... 12

I.    Congress Exceeded its Article I § 8 Authority by Defining Crimes Triable by Military Commission that are Not Offenses under the International Law of War. .......................................... 12

   A.    Standard of Review ..................................................... 12

   B.    Law-of-War Military Commissions May Only Try Offenses Against the Law of War under International Law ............... 12

   C.    Conferring this Law-of-War Military Commission with Jurisdiction Over Conspiracy Exceeded the Limits of the Define & Punish Clause ............................................... 22

II.    Congress Violated Article III by Vesting Military Commissions with Jurisdiction to Try Crimes That are Not Offenses under the International Law of War. .......................................... 27

   A.    Standard of Review ..................................................... 27

   B.    The Judicial Power is Reserved to the Courts of Law. .......... 28

   C.    The Military Commission in this Case Threatens the Integrity of the Judicial System. ..................................... 33

III.    Petitioner's Conviction Violates the First Amendment. ..........................38

   A.    Standard of Review ................................................................38

   B.    The Government Put the Accused's Thoughts, Beliefs,
      and Ideals on Trial ...............................................................38

   C.    The Chief Evidence in this Case is Protected Speech .........................42

IV.    The Military Commissions Act of 2006 Discriminates Against
Aliens in Violation of the Equal Protection Component of the Due
Process Clause. ................................................................................47

   A.    Standard of Review ................................................................47

   B.    The 2006 Act's System of *De Jure* Segregation Cannot
      Withstand Strict Scrutiny. ......................................................48

   C.    The 2006 Act's System of *De Jure* Segregation was
      Motivated by Irrational Animus ...............................................51

**Conclusion** ..........................................................................................**54**

**Certificate of Compliance with Rule 32(a)** ........................................**55**

**Certificate of Service** .......................................................................**56**

iv

# TABLE OF AUTHORITIES

*Petitioner places primary reliance on authorities marked with an ***

## Cases

*\*Ex parte Quirin*, 317 U.S. 1 (1942) ...........9, 14-15, 17, 19, 21, 27, 30-31, 48, 49

*\*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) . 10, 14, 18, 21, 23, 28, 33, 36, 46, 49

*\*In re Yamashita*, 327 U.S. 1 (1946) ........................................... 9, 19, 21, 33, 54

*\*Lamont v. Postmaster*, 381 U.S. 301 (1965)......................................................42

*\*Meese v. Keene*, 481 U.S. 465 (1987)................................................................42

*\*Stern v. Marshall*, 131 S.Ct. 2594 (2011) ....................................... 27, 28, 29, 37

*\*Wong Wing v. United States*, 163 U.S. 228 (1896)..................................... 29, 50

*Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995)..................................48

*Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006) ....................................................12

*Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997)...........................12

*Bahlul v. United States*, 2013 WL 297726
  (D.C. Cir., Jan. 25, 2013) ..................................................................................8

*Balzac v. Puerto Rico*, 258 U.S. 298 (1922).......................................................54

*Blair v. United States*, 250 U.S. 273 (1919) .......................................................29

*Bose Corp. v. Consumers Union of the U.S.*, 466 U.S. 485
  (1984) ...............................................................................................................38

*Boumediene v. Bush*, 553 U.S. 723 (2008) .........................................................46

*Brandenburg v. Ohio*, 395 U.S. 444 (1969).........................................................40

*CFTC v. Schor*, 478 U.S. 833 (1986).............................................................. 27, 36

*Citizens United v. FEC*, 558 U.S. 310 (2010)................................................. 38, 43

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)...........................53

*Colepaugh v. Looney*, 235 F.2d 429 (10th Cir.1956) ..........................................14

*Doe v. Exxon Mobil Corp.*, 654 F.3d 11 (D.C. Cir. 2011)...................................19

*Duncan v. Kahanamoku*, 327 U.S. 304 (1946) .............................................. 10, 36

*Estep v. United States*, 327 U.S. 114 (1946).......................................................23

*Ex parte Endo*, 323 U.S. 283 (1944) ................................................................34

*Ex parte Milligan*, 4 Wall. 110 (1866) ................................................ 10, 29, 33

*Faretta v. California*, 422 U.S. 806 (1975) .....................................................35

*Gosa v. Mayden*, 413 U.S. 665 (1973) .............................................................30

*Graham v. Richardson*, 403 U.S. 365 (1971) ........................................... 47, 53

*Hamdan v. United States*, 696 F.3d 1238 (D.C. Cir. 2012) ...................... 8, 18

*Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) .......................................................48

*Hampton v. Mow Sun Wong*, 426 U.S. 88 (1976) ...........................................47

*Hess v. Indiana*, 414 U.S. 105 (1973) .............................................................40

*Jecker v. Montgomery*, 13 How. 498 (1851) ............................................ 10, 29

*Johnson v. Eisentrager*, 339 U.S. 763 (1950) ........................................... 9, 19

*Korematsu v. United States*, 323 U.S. 214 (1944) ..........................................49

*Mackin v. United States*, 117 U.S. 348 (1886) ...............................................32

*Marbury v. Madison*, 1 Cranch 137 (1804) ....................................................24

*NAACP v. Claiborne Hardware*, 458 U.S. 886 (1982) ...................................46

*New York Times v. Sullivan*, 377 U.S. 254 (1964) .........................................44

*NLRB v. Noel Canning*, 134 S.Ct. 2550 (2014) .............................................22

*Northern Pipeline v. Marathon Pipe Line*, 458 U.S. 50 (1982) ............. 32, 35, 37

*Pacemaker Diagnostic Clinic of America v. Instromedix*, 725 F.2d 537 (9th Cir. 1984) ....................................................................27

*Pacific Gas and Elec. Co. v. Public Utilities Com'n of California*, 475 U.S. 1 (1986) .........................................................................43

*Plyler v. Doe*, 457 U.S. 202 (1982) ................................................................47

*Postmaster-General v. Early*, 12 Wheat. 136 (1827) ......................................24

*Prosecutor v. Milutinović,* Decision on Dragoljub Ojdaníc's Motion Challenging Jurisdiction-Joint Criminal Enterprise, Case No. IT-99-37-AR72, 2003 WL 24014138 (ICTY App. Ch., May 21, 2003) .................................................26

*Reid v. Covert*, 354 U.S. 1 (1957) ........................................................ 13, 27, 28

*Romer v. Evans*, 517 U.S. 620 (1996) .............................................................51

*Street v. United States*, 394 U.S. 576 (1969) .......................................44

*Tate v. United States*, 359 F.2d 245 (D.C. Cir. 1966)...........................50

*Terminiello v. Chicago*, 337 U.S. 1 (1949).........................................40

*Texas v. Johnson*, 491 U.S. 397 (1989) ..............................................46

*The Antelope*, 10 Wheat. 66 (1825) ....................................................24

*The Hampton*, 5 Wall. 372 (1866) .......................................................17

*The Paquete Habana*, 175 U.S. 677 (1900)...........................................24

*Toth v. Quarles*, 350 U.S. 11 (1955).....................................................28

*Ullmann v. United States*, 350 U.S. 422 (1956) ...................................35

*United States v. Ali*, 71 M.J. 256 (C.A.A.F. 2012) ...............................47

*United States v. Ali*, 718 F.3d 929 (D.C. Cir. 2013)...............................17

*United States v. Arjona*, 120 U.S. 479 (1887) .......................................24

*United States v. Bahlul*, 820 F.Supp.2d 1141
    (U.S.C.M.C.R. 2011)................................................................ 7, 42

*United States v. Bellaizac-Hurtado*, 700 F.3d 1245
    (11th Cir. 2012) ................................................................ 19, 21, 24

*United States v. Carolene Products Co.*, 304 U.S. 144 (1938) ...........53

*United States v. Caronia*, 703 F.3d 149 (2d Cir. 2012).......................44

*United States v. Doe*, 903 F.2d 16 (D.C. Cir. 1990)..............................47

*United States v. Garcia*, 5 C.M.A. 88 (1954) .......................................47

*United States v. Ghailani*, 733 F.3d 29 (2d Cir. 2013) ........................32

*United States v. Gutierrez*, 64 M.J. 374 (C.A.A.F. 2007) ....................45

*United States v. Lindh*, 227 F.Supp.2d 565 (E.D.Va. 2002)................48

*United States v. Moreland*, 258 U.S. 433 (1922)..................................29

*United States v. Padilla*, 2007 WL 1079090 (S.D.Fla. 2007) .............48

*United States v. Palmer*, 3 Wheat. 610 (1818) .....................................23

*United States v. Popa*, 187 F.3d 672 (D.C. Cir. 1999) .........................38

*United States v. Salemeh*, 152 F.3d 88 (2d Cir. 1998)..........................44

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ...................43

*United States v. Windsor*, 133 S.Ct. 2675 (2013)..................................51

*Vasquez v. Hillery*, 474 U.S. 254 (1986) ...........................................47

*Wilson v. Wall*, 6 Wall. 83 (1867)....................................................24

*Yates v. United States*, 354 U.S. 298 (1957).....................................45

*Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987) ...........28

*Zivotofsky ex rel. Zivotofsky v. Kerry*, 725 F.3d 197
    (D.C. Cir. 2013)......................................................................22

## Constitutional Provisions

Article I § 8, cl. 10 ...................................................... 8, 9, 20-23

U.S. Const., amend. 1............................................. 10, 38, 42-43, 46

U.S. Const., amend. 5.......................................................................11

U.S. Const., art. III .............................8, 10, 27, 29-32, 34, 36-37, 43

## U.S. Code

10 U.S.C. § 131................................................................................34

10 U.S.C. § 948c..............................................................................47

10 U.S.C. § 948d..............................................................................47

10 U.S.C. § 950v..............................................................................22

18 U.S.C. § 2332..............................................................................31

18 U.S.C. § 2339B .............................................................................2

## Congressional Materials

12 Stat. 597 § 5 (1862).....................................................................20

Cong. Rec. ........................................................................................52

Military Commissions Act of 2006, 120 Stat. 2600 (2006) ..... 2, 21, 47, 48, 50-52

## Executive Branch Materials

BG Mark Martins, Remarks at Guantanamo Bay (Apr. 13, 2014)......................35

*Military Commissions*, 11 U.S. Op. Atty. Gen. 297 (1865)......... 18, 20, 23, 30, 37

Office of Legal Counsel, *Applicability of Federal Criminal
    Laws and the Constitution to Contemplated Lethal
    Operations Against Shaykh Anwar al-Aulaqi* (Jul. 10, 2010)........................15

Reg. T. Mil. Comm. (2007) ..................................................................34

Remarks of the Attorney General, *Attorney General
    Announces Forum Decisions for Guantanamo Detainees*
    (Nov. 13, 2009) ..................................................................35

Remarks of the Attorney General, *Stopping Terrorists Before
    They Strike: The Justice Department's Power of Prevention*
    (Aug. 16, 2006) ..................................................................52

Report of the Deputy Judge Advocate for War Crimes,
    European Command (Jun. 29, 1948)..................................16

U.S. Dep't of Def., Manual for Military Commissions, Part 2,
    Rules for Military Commissions (2012) ................................ 12, 27

## Miscellaneous

9/11 Commission Report (Jul. 22, 2004) ...............................................5

Charles Siegal, *Deference and its Dangers: Congress' Power
    to 'Define ... Offenses against the Law of Nations'*, 21 Vand.
    J. Transnat'l L. 865 (1988)..................................................23

David Glazier, *Precedents Lost: The Neglected History of the
    Military Commission*, 46 Va. J. Int'l L. 5 (2005)....................... 20, 49

Felix Frankfurter & Thomas Corcoran, *Petty Federal Offenses
    and the Constitutional Guarantees of Trial By Jury*, 39
    Harv.L.Rev. 917 (1926) ......................................................32

Harry Edwards & Linda Elliot, *Federal Courts – Standards of
    Review* (West 2007)...................................................... 12, 27, 38

I.C.R.C., *Commentary: III Geneva Convention Relative to the
    Treatment of Prisoners of War* (1960) ..................................49

John Bickers, *Military Commissions are Constitutionally
    Sound: A Response to Professors Katyal and Tribe*, 34 Tex.
    Tech. L.Rev. 899 (2003) ...................................................20

L. Rep. Trials of War Criminals (1949)...............................................15

Statute of the Iraqi Special Tribunal (2003) .......................................16

*The Federalist* (1961)................................................................ 35, 36

The Tokyo War Crimes Trial: The Complete Transcripts of the
    Proceedings of the International Military Tribunal for the
    Far East (Ed. Pritchard, J. & Zaide, S. 1981)....................................25

Trial of the Major War Criminals Before the International
    Military Tribunal: Nuremberg, 15 November 1945 – 1
    October 1946 (1947) .........................................................................25

Trials of War Criminals before the Nuremberg Military
    Tribunals Under Control Council Law No. 10 (1949)....................16

William Winthrop, *Military Law & Precedents* (2d ed. 1920)............... 13, 20, 49

## JURISDICTIONAL STATEMENT

On September 9, 2011, the Court of Military Commission Review ("CMCR") affirmed the final judgment rendered against Petitioner. *United States v. Bahlul*, 820 F.Supp.2d 1141 (U.S.C.M.C.R. 2011). Petitioner filed a timely petition for review, 10 U.S.C. § 950g(c), giving this Court "exclusive jurisdiction to determine the validity" of that final judgment. *Id*. §950g(a).

## QUESTIONS PRESENTED

1. Did Congress exceed its Article I, § 8 authority by defining crimes triable by military commission that are not offenses under the international law of war?

2. Did Congress violate Article III by vesting military commissions with jurisdiction to try crimes that are not offenses under the international law of war?

3. Did Petitioner's conviction violate the First Amendment?

4. Did the Military Commissions Act of 2006 discriminate against aliens in violation of the equal protection component of the Due Process Clause?

# GLOSSARY OF TERMS

2006 Act ......................... Military Commissions Act of 2006, 120 Stat. 2600 (2006)

App. ....................................................... Petitioner's Appendix, dated Aug. 13, 2014

E.B.Resp. .................................... *En Banc* Brief for Respondent, dated Jul. 10, 2013

Edwards & Elliot ........................... Harry Edwards & Linda Elliot, *Federal Courts – Standards of Review* (West 2007)

CMCR ................................................. U.S. Court of Military Commission Review

Resp. ...................................................... Brief for Respondent, dated May 16, 2012

R.M.C. ......................... U.S. Dep't of Def., *Manual for Military Commissions*, Part 2, Rules for Military Commissions (2012)

Winthrop .................. William Winthrop, *Military Law & Precedents* (2d ed. 1920)

xiii

## STATEMENT OF FACTS

**A.      Circumstances leading to Bahlul's Arrest (1999-2001)**

In 1999, Ali al Bahlul traveled from his home in Yemen to Afghanistan. His purpose was to join what was broadly referred to as the "mujahedeen," a diverse group of mostly Arab Muslims, who supported the Taliban. App. 125. After he arrived, he attended various training camps and grew to admire Usama bin Laden. In early December 1999, he returned to Yemen. App. 126.

Bahlul went back to Afghanistan in 2000 and worked for approximately a year-and-a-half in al Qaeda's media office. This office was controlled by a "Media Committee." App. 128. Bahlul had no authority to distribute propaganda, which was the purview of the "Security Committee." App. 127. A separate "Military Media Office" was responsible for filming bin Laden and producing martyr will videos. App. 138. After the September 11th attacks, Bahlul stayed in bin Laden's entourage for approximately a month before leaving for Pakistan, where he was arrested by local authorities, turned over to U.S. custody, and transferred to Guantanamo. App. 129.

**B.      Proceedings before the Military Commissions (2004-2008)**

Two military commissions were convened to try Bahlul on a single charge of conspiracy between 2004 and 2006. App. 90-99. This conspiracy charge was

1

supported by eleven overt acts pertaining to his activities with al Qaeda from 1999 until his arrest. Because of legal challenges in other cases, both of these commissions were dissolved before reaching a judgment. App. 99.

In October 2006, the President signed the Military Commissions Act of 2006, 120 Stat. 2600 (2006) ("2006 Act"), which established a procedural framework for military commissions that varied from the procedures required by the Uniform Code of Military Justice. In February 2008, charges against Bahlul were re-issued under the 2006 Act. App. 100-105. The first charge, conspiracy, was substantively identical to the conspiracy charge brought before the prior commissions. Two other charges of inchoate solicitation and providing material support to a terrorist organization (assimilated from 18 U.S.C. § 2339B) were also charged on the basis of the same underlying conduct.

Bahlul was arraigned in May 2008. App. 149. He asserted a desire to represent himself and this request was granted by the military judge, COL Peter Brownback, USA, who had been the presiding officer of Bahlul's first two military commissions. Later that month, COL Brownback was replaced by Col Ronald Gregory, USAF. App. 110. In August, Col Gregory convened a hearing, on motion of the government, to revisit the issue of self-representation. App. 150. Bahlul notified the military judge that he was unable to proceed. The government had lost a document he had written, which specified his nine principal objections to the

2

military commission, broadly framed as his "boycott." One of those objections was the requirement that he accept military counsel. App. 152. He then absented himself from the hearing and Col Gregory revoked his *pro se* status. App. 153-154.

At a hearing in September, Bahlul appeared and spoke on his own behalf. He admitted most of the allegations against him, but nevertheless pleaded not guilty, stating "I'm not guilty, and what I did was not a crime." App. 183. He again asserted his "boycott," rejected his appointed military lawyer, and engaged in an extensive colloquy with Col Gregory over his objections to the military commission and the charges. App. 161-162. At Bahlul's request, Col Gregory entered into the record a portion of the transcript from his earlier 2006 military commission, which contained a discussion of Bahlul's objections to the commission's legality. App. 151-152. The quality of the translation reflected in this transcript is extremely poor and inexplicably excludes his fourth objection altogether. App. 111-116. The document listing his written objections has apparently never been found. Col Gregory explained to Bahlul that his boycott was akin to "a motion to dismiss a charge for lack of jurisdiction" and that, as with a motion to dismiss, his continued presence at trial would not be construed as waiving his objections for purposes of appeal. App. 155-158.

### C.     The Evidence at Trial

The factual allegations against Bahlul span the period from his arrival in Afghanistan in 1999 until his arrest two years later. The government's evidence from its interrogations of Bahlul in Guantanamo established that he swore allegiance to bin Laden, provided secretarial and IT support, and edited together the film that was the centerpiece of the government's case. App. 190-194. He denied arming himself and was ultimately acquitted of this allegation. App. 194.

One of his alleged overt acts was that he "prepared the propaganda declarations styled as martyr wills" of Mohammed Atta and Zaid Jarrah. The basis for this allegation is a letter he wrote in 2005 to introduce himself to a high-level al Qaeda leader, who had been publicly taken into U.S. custody. In that letter, he states that he "typed" or "transcribed" ( طبع ) these declarations, apparently after the September 11th attacks. App. 147-148; *see also* App. 173-174 (McFadden testimony). The videos of Atta and Jarrah rehearsing these statements show them reading from and revising their own handwritten remarks. App. II, Disc 2, Tracks #1, #2.[1] These videos were taped in January 2000, at a time when Bahlul was home in Yemen. App. 137, 141, 173.

---

[1] In App. II, Disc 2, Track #2. the tapings appear about 40% of the way through the video; the camera zooms in on the handwritten notes about 60% into the video.

4

Bahlul's personal interactions with Atta and Jarrah appear limited to a one or two-week period in November 1999, when they arrived at a guesthouse where he was staying in Afghanistan. App. 134, 137, 173-174. The 9/11 Commission Report describes Atta and Jarrah being introduced to the al Qaeda leadership and being brought into the September 11th plot sometime after Bahlul had left for Yemen in December 1999. App. 9/11 Commission Report 165-67 (Jul. 22, 2004), App. 20-22; *see also* App. 173-174. The record also shows that Bahlul did not know that Atta or Jarrah were involved in any plot until he recognized their photographs following the September 11th attacks. App. 137, 141, 173-174.

Bahlul's alleged connections to Atta and Jarrah are important to clarify because his trial was not about the September 11th attacks, or any act of terrorism. The government never alleged, nor presented evidence and the members never found that he either participated in the September 11th attacks or had foreknowledge of any terrorist plot. From the opening statement, through the testimony of every witness, to the summation, Bahlul's trial was about his film.

### D.     The Film at the Center of this Case

The film is referred to in the record by various names, including *State of the Ummah*, *The Destruction of the American Destroyer the U.S.S. COLE*, and the *COLE Video.* App. II, Disk 1. Its production is listed as an overt act in support of all of the charges. Bahlul is not in this film. It does not show him committing any

5

crimes and it does not contain instructions on how to perpetrate crimes. Instead, it is a montage of found footage, which is edited together into what the prosecution itself described as "propaganda, political argument, and indoctrination of solicitation." App. 198.

The film opens and closes with news footage of the *U.S.S. COLE* overlain by a simulated explosion. The remainder is a collage of news clips, broadcast speeches by bin Laden and others, along with clips from training camp videos. The diverse topics it covers span everything from the Israeli-Palestinian conflict, to corruption in the Saudi government, to the moral necessity of war.

The film is organized into three parts – "The Problem," "The Causes," and "The Solution." The Problem contains news footage about conflicts in which Muslims are ostensibly being victimized. The Causes contains footage primarily about the Saudi royal family. The Solution begins with footage about Muslim migration to Islamic countries. It then proceeds for thirty minutes on "preparation," which is composed of clips from training camp videos and speeches encouraging Muslims to undergo spiritual and military training. Lastly, the film collects footage extoling the moral necessity of "holy war" and praising past suicide attacks.

Trial commenced on October 27, 2008. App. 195. Bahlul insisted that his appointed military lawyer remain silent throughout. The government called fourteen witnesses. Three federal prisoners testified about seeing the film. App.

178-181, 202-207. Law enforcement officers testified on the video's production
and the chain of custody linking it to Bahlul. App. 163-167. Three interrogators
testified largely about his taking credit for the film's production. App. 168-172.
The government's last witness was a "propaganda expert [to] breakdown this video
and place it in the context of other propaganda products produced by al Qaeda and
their purposes." App. 201. On November 3, 2008, Bahlul was found guilty on all
charges, excepting the overt act alleging he armed himself. App. 117-124.

The sentencing hearing commenced that same day. The government called
two witnesses, victims of the *U.S.S. COLE* attack, who testified that they were
offended after seeing the film on the Internet. App. 210-216. At the conclusion of
testimony, Bahlul made an unsworn statement reasserting his beliefs and after an
hour of deliberation, the nine-member commission sentenced him to life
imprisonment. App. 220.

### E.    Post-Trial Proceedings (2008-2011)

In June 2009, the Convening Authority approved the findings and sentence
without exception. App. 106-108. In September 2011, the CMCR issued a decision,
denying all of Bahlul's asserted errors. *United States v. Bahlul*, 820 F.Supp.2d
1141 (U.S.C.M.C.R. 2011). In January 2013, this Court vacated his conviction
because none of the offenses charged were war crimes under international law and
therefore could not be tried retroactively under *Hamdan v. United States*, 696 F.3d

7

1238 (D.C. Cir. 2012) ("*Hamdan II*"). *Bahlul v. United States*, 2013 WL 297726 (D.C. Cir., Jan. 25, 2013).

On rehearing *en banc*, this Court reversed the panel's holding respecting the charge of conspiracy, because under plain error review, it was "not a plain *ex post facto* violation to transfer jurisdiction over a [18 U.S.C. § 2332(b)] from an Article III court to a military commission," *Bahlul v. United States*, 2014 WL 3437485 *12 (D.C. Cir., Jul. 14, 2014), and it was "not 'obvious' that conspiracy was not traditionally triable by law-of-war military commissions under [10 U.S.C. §] 821" for retroactivity purposes. *Id*. at *17. The full court then remanded to this panel to decide whether Bahlul's conviction for conspiracy 1) exceeded the constitutional limits of law-of-war military commissions' jurisdiction under the Article I § 8, cl. 10; 2) violated the separation of powers because a domestic law crime was tried in a non-Article III court; 3) abridged the First Amendment by putting a propaganda film on trial; and 4) denied due process by conditioning personal jurisdiction on the citizenship status of the accused. *Id*. at *21.

8

## SUMMARY OF ARGUMENT

The government tried the accused for three inchoate domestic law crimes before a law-of-war military commission in Guantanamo. None of these crimes are offenses under international law. And none of these crimes alleged that the accused perpetrated or had foreknowledge of any terrorist attack. Instead, the accused is alleged to have been a propagandist and his trial was about a feature-length "political propaganda" film he allegedly authored. This Court vacated his conviction on two of the charges because they violated the Ex Post Facto Clause. His conviction on the remaining inchoate conspiracy charge should be vacated for any one of four independent, but interrelated, reasons.

*First*, law-of-war military commissions can only try offenses that are plainly established under "the rules and precepts of the law of nations, and more particularly the law of war." *Ex parte Quirin*, 317 U.S. 1, 28 (1942). Congress' power to codify those offenses emanates from its power to "Define and Punish … Offenses against the Law of Nations." Article I § 8, cl. 10. In the three cases in which the Supreme Court has upheld the legality of law-of-war military commissions, it was because at least one of the offenses charged was plainly established under international law as an offense against the law of war. *Johnson v. Eisentrager*, 339 U.S. 763, 786-87 (1950); *In re Yamashita*, 327 U.S. 1, 14 (1946); *Quirin*, 317 U.S. at 43. Because conspiracy does not meet that standard, a fact that

9

the government readily concedes, Congress cannot presume to define it as such or punish it in a law-of-war military commission.

*Second*, law-of-war military commissions are Executive Branch tribunals that cannot encroach upon the Article III judicial power to try purely domestic crimes. Where the three Supreme Court cases to affirm the use of military commissions did so because they were being used to try law of war offenses under international law, the four Supreme Court cases to invalidate military commissions did so, at least in part, because they had attempted to usurp the jurisdiction reserved to the courts at common law. *Hamdan v. Rumsfeld*, 548 U.S. 557, 602 (2006) (plurality op.); *Duncan v. Kahanamoku*, 327 U.S. 304, 322 (1946); *Ex parte Milligan*, 4 Wall. 110, 121 (1866); *Jecker v. Montgomery*, 13 How. 498, 515 (1851). The trial of inchoate criminal conspiracies is a classic example of the exercise of the judicial power at common law. The effort to now give that power to an Executive Branch tribunal presents only the latest and most brazen challenge to the separation of powers that the courts have rejected each time it was attempted.

*Third*, in prosecuting Bahlul for authoring a film that made a "political argument," App. 198, the government openly put "the thoughts, the beliefs, the ideals of the accused" on trial. App. 209. Doing so violated basic First Amendment restraints on the government's prosecutorial power that this Court must require

10

these commissions to obey if broadly associational domestic law crimes like conspiracy are now going to be triable by panels of military officers.

*Fourth*, the statute under which Bahlul was tried made alienage a condition for personal jurisdiction. By codifying animus toward a politically disenfranchised class, Congress violated the Fifth Amendment's basic requirement for equal justice under law. This *de jure* segregation of criminal defendants is contrary to centuries of tradition under which citizens were not only triable, but were tried, for war crimes in the same military commissions as non-citizens.

## ARGUMENT

I.    **CONGRESS EXCEEDED ITS ARTICLE I § 8 AUTHORITY BY DEFINING CRIMES TRIABLE BY MILITARY COMMISSION THAT ARE NOT OFFENSES UNDER THE INTERNATIONAL LAW OF WAR.**

A.    **Standard of Review**

The parties agree that this Court reviews the subject-matter jurisdiction of the military commission in this case *de novo*. Resp. 22 ("Questions of law, including whether Congress's constitutional warmaking powers authorize it to make certain offenses triable by military commission, are subject to plenary review by this Court."); *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 73 (1997); *cf.* Harry Edwards & Linda Elliot, *Federal Courts – Standards of Review* 25 (West 2007) ("Edwards & Elliot") ("Unless the record affirmatively demonstrates subject-matter jurisdiction …, the presumption is that a federal court lacks jurisdiction"); R.M.C. 905, 907.

B.    **Law-of-War Military Commissions May Only Try Offenses Against the Law of War under International Law.**

The judgment under review was rendered by a law-of-war military commission, whose jurisdiction is limited to "try[ing] offenses against the law of war." *Bahlul*, 2014 WL 3437485, at *6. As their name suggests, law-of-war military commissions are an extraordinary tribunal whose purpose is "to determine,

12

typically on the battlefield itself, whether the defendant has violated the law of war." *Id*. at 596-97 (plurality op.). A tribunal "[not] mentioned in the Constitution," the constitutionality of a law-of-war military commission depends upon actual "military necessity" and the traditional accommodation of that necessity. *Hamdan*, 548 U.S. at 590. Inchoate conspiracy offenses, like the one charged here, have never been part of that tradition.

   **1.**     This tradition is reflected in the Civil War-era treatise by William Winthrop, sometimes called the "Blackstone of military law." *Reid v. Covert*, 354 U.S. 1, 19, n. 38 (1957) (plurality op.). Winthrop concludes that the only offenses properly punishable in a law-of-war military commission involve "*overt acts*, i.e. in unlawful commissions or actual attempts to commit [a war crime], and not intentions merely." William Winthrop, *Military Law & Precedents* 841 (2d ed. 1920)  (original emphasis); App. 46. He explains that "what would justify in war a precautionary arrest might not always justify a trial as for a specific offence." *Id*.

   Withrop notes that the only time military commissions of any type can try conspiracies is when their jurisdiction is rooted in the imposition of martial law. Winthrop. at 839; App. 44. In those circumstances, a commission can try "[c]rimes and statutory offenses cognizable by State or U.S. courts" or compound offenses, such as where the object offense of a conspiracy is a violation of the law of war. *Id*. Notably, Winthrop illustrates this principle with a series of examples, the second of

which is the case of the Lincoln Assassins and all of which allege the perpetration of completed offenses. *Id*. at 839 n.5; App. 44.

This tradition is also reflected in *Ex parte Quirin*, the first Supreme Court opinion to review the constitutionality of a pure law-of-war military commission. The dispositive question was whether the defendants were charged with "offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals." *Quirin*, 317 U.S. at 28. The Court held that the sabotage charge brought against them "has been so recognized in practice both here and abroad, and has so generally been accepted as valid by authorities on international law that we think it must be regarded as a rule or principle of the law of war[.]" *Id*. at 35-36.[2]

While the saboteurs were also charged with a conspiracy offense, the Court specifically declined to endorse it. *Quirin*, 317 U.S. at 46. Instead, the Court was "careful in its decision to identify an overt, 'complete' act." *Hamdan*, 548 U.S. at 606 (plurality op.). The saboteurs themselves claimed that they had "not actually committed or attempted to commit any act of depredation[.]" But the Court rejected this argument, not because conspiring to violate the law of war was

---

[2] Despite the hundreds of war criminals tried in military commissions throughout the remainder of World War II, the charges in *Quirin* were only re-used once. On habeas review, this commission was sustained because it was indistinguishable from *Quirin*. *Colepaugh v. Looney*, 235 F.2d 429, 433 (10th Cir.1956).

sufficient, but because the substantive "offense was complete" when they

perfidiously crossed the lines out of uniform. *Quirin*, 317 U.S. at 38; Office of

Legal Counsel, *Applicability of Federal Criminal Laws and the Constitution to*

*Contemplated Lethal Operations Against Shaykh Anwar al-Aulaqi* 33, n.44 (Jul. 10,

2010) (suggesting that because "the Court in Quirin focused on conduct taken

behind enemy lines" the Court described "conduct that would constitute perfidy or

treachery."); App. 45.

     This tradition is reflected in the law-of-war military commissions the United

States convened to try war crimes committed on foreign battlefields. Leaving aside

the international criminal tribunals, which have all rejected conspiracy to commit

war crimes as a stand-alone offense, "United States Military Tribunals ... have not

recognized as a separate offense conspiracy to commit war crimes or crimes

against humanity." 15 L. Rep. Trials of War Criminals 90 (1949); App. 2.

     This was not for a lack of aggressive prosecutors pushing to try it. In the U.S.

Army tribunals convened under Control Council Law #10, prosecutors brought

charges for war crimes conspiracies. They defended the charge of conspiracy

because it was a "venerable as well as an ancient concept in the jurisprudence of

England and the United States" and because "the conspiracies involved in these

cases are conspiracies to commit acts well-established as crimes at international

law[.]" 15 Trials of War Criminals before the Nuremberg Military Tribunals Under

15

Control Council Law No. 10, 1085-86 (1949); App. 16-17. These arguments were rejected. The American judges, sitting *en banc*, unanimously concluded that "this tribunal has no jurisdiction to try any defendant upon a charge of conspiracy considered as a separate substantive offense." *Id*. at 1100 (note); App. 18.

The same result was reached by the military commissions the Army convened under a general directive from General Eisenhower to prosecute war crimes elsewhere in Europe. Joint criminal enterprise, then called "common design," was the prosecution's theory of liability in almost every case. Report of the Deputy Judge Advocate for War Crimes, European Command, at 61 (Jun. 29, 1948); App. 71. And when defense counsel objected that conspiracy was not a stand-alone offense under the law of war, the commissions "pointed out that the accused were charged with participation in the execution of a common design to commit described unlawful acts and not a common design as a separate offense." *Id*. at 62; App. 72.

More recently, this long tradition was reflected in the war crimes tribunal the United States created to try Iraqi war criminals. This tribunal had jurisdiction over violations of the laws and customs of war, genocide, crimes against humanity, and three assimilated offenses under Iraqi law dealing with corruption. Statute of the Iraqi Special Tribunal, arts. 10-15 (2003); App. 79-84. While a joint criminal

enterprise type of liability appears available for all crimes, stand-alone conspiracy only applied to genocide. *Id*. at art. 14; App. 83.

**2.**    The reason there is no tradition of trying inchoate conspiracies before law-of-war military commissions is that conspiracy is not recognized under international law as a stand-alone offense. *United States v. Ali*, 718 F.3d 929, 942 (D.C. Cir. 2013). The government concedes this without reservation. E.B.Resp. 34. And that puts the conspiracy charge in this case, which is already unprecedented in U.S. military tradition, fundamentally at odds with these commissions' narrow constitutional authority to try offenses arising under that "branch of international law" known as the law of war. *Quirin*, 317 U.S. at 29.

The government has sought to avoid this conclusion by asking this Court to redefine the "law of war" to mean something other than the international law governing the conduct of hostilities. E.B.Resp. 72. But its effort to separate the law of war from international law is quixotic.[3] The legal authorities that define the law

---

[3] Not only was the notion of a separate "domestic law of war" unheard of until the government asked this Court to recognize one, the redundant term "international law of war" is virtually nonexistent until the past five years. A simple database search turns up at least 220 cases in which the phrase "law of war" has occurred in the decisions of the Supreme Court and the Courts of Appeal. Before 2010, that phrase is modified by the word "international" in only one of those cases and there, it is used to contrast causes of action arising under the "law of war" from those arising under federal statutes. *The Hampton*, 5 Wall. 372, 375 (1866) (contrasting a condemnation arising under a statute, from one "condemned under the international laws of war by which she became lawful prize").

17

of war as it relates to military commissions are both numerous and unanimous in describing it, as the Supreme Court did in *Quirin*, as a branch of international law. *See*, *e.g.*, *Hamdan II*, 696 F.3d at 1248-49 & n. 9 (collecting citations). But two of these authorities deserve special attention.

One is the Attorney General opinion that reviewed the trial of the Lincoln Assassins. This Court held that "this highest-level Executive Branch deliberation is worthy of respect in construing the law of war." *Bahlul*, 2014 WL 3437485, at *16. And when describing the law of war applicable to military commissions, the Attorney General opinion treats its meaning as obvious. "*No one* … can fail to know that the laws of war constitute a part of the law of nations." *Military Commissions*, 11 U.S. Op. Atty. Gen. 297, 299-300 (1865) (emphasis added).

The other is *Hamdan*, wherein one of the few points of unanimity was that "the law of war is derived not from domestic law but from the wartime practices of civilized nations, including the United States[.]" *Hamdan*, 548 U.S. at 701 n.14 (Thomas, J., dissenting); *id*. at 641 (Kennedy, J., concurring) (the law of war "derives from 'rules and precepts of the law of nations'; it is the body of international law governing armed conflict"); *id*. at 601-11 (plurality op.). While all of the Justices considered domestic precedents to varying degrees, none of them contended that these sources somehow reflected domestic law. Instead, these domestic precedents were examples of international law being applied

18

domestically and therefore evidence of the state practice that defines the law of nations. *See Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 42-43 (D.C. Cir. 2011) *vacated on other grounds by* 527 Fed.Appx. 7 (D.C. Cir. 2013); *Bellaizac-Hurtado*, 700 F.3d, at 1252.

The recognition of the offense charged in international law has been essential to the Supreme Court's reasons for upholding the constitutionality of law-of-war military commissions in every case in which it has done so. In *Quirin*, the Court was explicit that the offense was triable because of the "sufficiently precise definition of international law." *Quirin*, 317 U.S. at 29. In *Yamashita*, the Court relied on the Hague Conventions to hold that both the charge and the theory of liability were plainly "recognized in international law as violations of the law of war." *Yamashita*, 327 U.S. at 14. And in *Eisentrager*, the Court relied exclusively on international law authorities to hold that the "[b]reach of the terms of an act of surrender" constituted "an international delinquency if ordered by a belligerent Government, and a war crime if committed without such order." *Eisentrager*, 339 U.S. at 787-88 (quoting Oppenheim, *International Law* 433 (6th ed, 1944)).

**3.**    The need to establish the charged offenses under international law is largely a consequence of the constitutional authority from which law-of-war military commissions derive their subject-matter jurisdiction. Since earliest use of military commissions pursuant to Congressional authorization in 1862, 12 Stat.

597 § 5 (1862), the constitutional authority to convene them has been recognized as flowing from Congress' authority to "Define and Punish … offenses against the law of nations." U.S. Const. art. 1, cl. § 10. David Glazier, *Precedents Lost: The Neglected History of the Military Commission*, 46 Va. J. Int'l L. 5, 9-10 (2005) ("Today's tribunals are trying law of war violations, invoking congressional authority 'to define and punish. . .Offenses against the Law of Nations.'"); John Bickers, *Military Commissions are Constitutionally Sound: A Response to Professors Katyal and Tribe*, 34 Tex. Tech. L.Rev. 899, 914 (2003) ("While [Article I § 8, cls. 11-15] authorize Congress to exercise legislative authority regarding military government or martial law, the authority for a law of war commission springs from [the Define & Punish Clause].").

The Define & Punish Clause is the authority to which both Winthrop and the Attorney General looked when military commissions were convened during the Civil War. Winthrop, at 831 ("The Constitution confers upon Congress the power 'to define and punish offences against the law of nations,' and in the instances of the legislation of Congress during the late war by which it was enacted that spies and guerillas should be punishable by sentence of military commission, such commission may be regarded as deriving its authority from this constitutional power."); 11 U.S. Op. Atty. Gen. at 312  ("Hence, the expression in the Constitution that 'Congress shall have power to define and punish … offences

20

against the law of nations.' Many of the offences against the law of nations for which a man may, by the laws of war, lose his life, his liberty, or his property, are not crimes. ... [But] for that offence he must answer to the laws of war, and the tribunals legalized by that law.").

The Define & Punish Clause is the authority to which the Supreme Court looked during World War II. *Quirin*, 317 U.S. at 28; *Yamashita*, 327 U.S. at 7 ("[In *Quirin*,] we had occasion to consider at length the sources and nature of the authority to create military commissions for the trial of enemy combatants for offenses against the law of war. We there pointed out that Congress, in the exercise of the power conferred upon it by Article I, § 8, cl. 10 of the Constitution to 'define and punish … Offenses against the Law of Nations,' of which the law of war is a part … had recognized the 'military commission' … an appropriate tribunal for the trial and punishment of offenses against the law of war."); *see also Bellaizac-Hurtado*, 700 F.3d at 1253 (describing *Quirin* as an example of the Supreme Court cases which have "upheld federal statutes as a constitutional exercise of the power granted under the [Define & Punish] Clause.").

The Define & Punish Clause is the authority to which the plurality looked in *Hamdan*, 548 U.S. at 601. And it is the only source of constitutional authority to which Congress looked when enacting the 2006 Act. H.R. Rep. No. 109-664, Pt. 1, at 24 (2006) (the offenses enumerated in the 2006 Act are a "codification of the

law of war into the United States Code pursuant to Congress's constitutional authority to 'Define and Punish ... Offences against the Law of Nations.'").

Given its consistency and unanimity across branches of government, this traditional gloss on the constitutional source of law-of-war military commissions' subject-matter jurisdiction is so well-established as to now be part of the Constitution itself. *NLRB v. Noel Canning*, 134 S.Ct. 2550, 2564 (2014); *Zivotofsky ex rel. Zivotofsky v. Kerry*, 725 F.3d 197, 222 (D.C. Cir. 2013) ("To hold otherwise, we would have to disregard not only … the Supreme Court's repeated statements to the same effect, ... [but also] centuries of largely consistent historical practice"). And given that there is no dispute that conspiracy is not a war crime under international law, there can be no dispute that it falls outside the limited subject-matter jurisdiction that law-of-war military commissions can constitutionally exercise.

### C.    Conferring this Law-of-War Military Commission with Jurisdiction Over Conspiracy Exceeded the Limits of the Define & Punish Clause

The only thing that makes this case remarkable is the fact that Congress codified a conspiracy offense that it asserted was triable by military commission. 10 U.S.C. § 950v(28) (2006). As noted above, Congress did this in a self-conscious exercise of its power under the Define & Punish Clause. The problem is that to the extent this statute conferred pure law-of-war military commissions with

22

jurisdiction over inchoate conspiracy crimes, Congress exceeded the "constitutional limitations" on its power "to provide [that] jurisdiction[.]" *Hamdan*, 548 U.S. at 645 (Kennedy, J., concurring).

The Define & Punish Clause, like the war powers more generally, "is not a blank check to be used in blind disregard of all the individual rights which we have struggled so long to recognize and preserve." *Estep v. United States*, 327 U.S. 114, 132 (1946) (Murphy, J., concurring). "To define is to give the limits or precise meaning of a word or thing in being; to make is to call into being. Congress has power to define, not to make, the laws of nations ... Hence Congress may define those laws, but cannot abrogate them[.]" 11 U.S. Op. Atty. Gen. at 299; Charles Siegal, *Deference and its Dangers: Congress' Power to 'Define ... Offenses against the Law of Nations'*, 21 Vand. J. Transnat'l L. 865, 877 (1988) ("The notion of 'define,' however, was not that Congress could invent new offenses, but rather that it could clarify existing offenses.").

In the first decades after the Founding, the Supreme Court made clear that the Define & Punish Clause's grant of proscriptive power extended only to offenses that were actually recognized under international law. *United States v. Palmer*, 3 Wheat. 610, 641-42 (1818) (Johnson, J., concurring) ("Congress cannot make that piracy which is not piracy by the law of nations, in order to give jurisdiction to its own courts over such offenses."). This has included areas like the

23

slave trade, where the United States actively sought to lead the advancement of international law, but had not yet succeeded. *The Antelope*, 10 Wheat. 66, 122 (1825) (Marshall, C.J.) ("As no nation can prescribe a rule for others, none can make a law of nations[.]"). And more recently, it has included criminal acts like drug trafficking, which are subjects of international coordination, but have not ripened into offenses under international law. *Bellaizac-Hurtado*, 700 F.3d at 1258 ("Because drug trafficking is not a violation of customary international law, we hold that Congress exceeded its power, under the [Define & Punish] Clause[.]").

Deciding the content of international law, in turn, falls firmly within this Court's judicial power to "say what the law is." *Marbury v. Madison*, 1 Cranch 137, 177 (1804); *The Paquete Habana*, 175 U.S. 677, 700 (1900). That is true even when Congress purports to opine on the intended meaning of a treaty. *Wilson v. Wall*, 6 Wall. 83, 89 (1867). "[A] mistaken opinion of the legislature concerning the law, does not make law." *Postmaster-General v. Early*, 12 Wheat. 136, 148 (1827). The question of whether conspiracy is firmly established as "an offense against the law of nations," therefore, depends on this Court's determination of its status under international law, "not on any declaration to that effect by Congress." *United States v. Arjona*, 120 U.S. 479, 488 (1887).

The answer in this case is both plain and uncontested. "[C]onspiracy has not attained recognition at this time as an offense under customary international law."

24

E.B.Resp. 34. In the plainest terms possible, that concession demonstrates that the conspiracy offense charged in this case exceeded Congress' power under the Define & Punish Clause. And even if that party concession were not sufficient by itself, it expresses the state practice of the United States.

This is not a case, therefore, where a statute has crystalized a burgeoning but contestable norm of international law. Congress enacted a crime triable by a law-of-war military commission, in explicit reliance on its power under the Define & Punish Clause, that has been affirmatively excluded from the law of war at every turn. *Bahlul*, 2014 WL 3437485, at *30-31 (Rogers, J., concurring in part) (collecting cases). It was unanimously dismissed as a stand-alone war crime at Nuremberg in a case that involved the most wide-spread, concerted war criminality in human history. 22 Trial of the Major War Criminals Before the International Military Tribunal: Nuremberg, 15 November 1945 – 1 October 1946, 469 (1947) ("Nuremberg Judgment"); App. 14. It was dismissed at the Tokyo Tribunals, which were under the direct authority of General MacArthur. The Tokyo War Crimes Trial: The Complete Transcripts of the Proceedings of the International Military Tribunal for the Far East. Vol. 22, 448-54 (1981); App. 36-37. And it has been uniformly rejected by the international criminal tribunals convened in the post-Cold War era. *See*, *e.g.*, *Prosecutor v. Milutinovíc,* Decision on Dragoljub

Ojdaníc's Motion Challenging Jurisdiction-Joint Criminal Enterprise, Case No. IT-99-37-AR72, 2003 WL 24014138 (ICTY App. Ch., May 21, 2003).

Conspiracy has been excluded from the law of war because it is a uniquely Anglo-American concept that is dangerously broad in its sweep when used to punish the enemy in war. There is no tradition of prosecuting it before law-of-war military commissions as an inchoate offense. It lacks any grounding in the law of nations. And it cannot be punished as such in a law-of-war military commission. Accordingly, the judgment below should be vacated as exceeding the lawful subject-matter jurisdiction that law-of-war military commissions can constitutionally exercise.

## II. CONGRESS VIOLATED ARTICLE III BY VESTING MILITARY COMMISSIONS WITH JURISDICTION TO TRY CRIMES THAT ARE NOT OFFENSES UNDER THE INTERNATIONAL LAW OF WAR.

### A. Standard of Review

This Court reviews *de novo* whether the charged offense of conspiracy is "defined as such by the law of war [and] … may constitutionally be included within that jurisdiction." *Ex parte Quirin*, 317 U.S. 1, 30 (1942); *cf.* Edwards & Elliot, at 26 ("Subject matter jurisdiction, which is a central and defining concept in federal jurisprudence, encompasses the Article III [requirements that] … keep[] the federal courts within the bounds of the Constitution and Congress have prescribed[.]") (quotations omitted); R.M.C. 905, 907.

This Court strictly scrutinizes any apparent effort to vest the judicial power of the United States in a non-Article III tribunal. *CFTC v. Schor*, 478 U.S. 833, 848 (1986); *Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc.*, 725 F.2d 537, 543-44 (9th Cir. 1984) (*en banc*) (Kennedy, J.). This Court must be sure that the political branches are not seeking to "chip away at the authority of the Judicial Branch ... 'Slight encroachments create new boundaries from which legions of power can seek new territory to capture.'" *Stern v. Marshall*, 131 S.Ct. 2594, 2620 (2011) (quoting *Reid*, 354 U.S. at 39).

27

### B.     The Judicial Power is Reserved to the Courts of Law.

Military tribunals, and military commissions in particular, raise "separation-of-powers concerns of the highest order." *Hamdan*, 548 U.S. at 638 (Kennedy, J., concurring). As the Supreme Court has held time and again, the job of the military is to fight wars, not conduct criminal trials. *Reid*, 354 U.S. at 35 (plurality op.) ; *Toth v. Quarles*, 350 U.S. 11, 17 (1955). "Even when confronted with the exigencies of war, '[the Court] cannot compromise the integrity of the system of separated powers and the role of the Judiciary in that system.'" *Bahlul*, 2014 WL 3437485, at *25 (Rogers, J., concurring in part) (quoting *Stern*, 131 S.Ct. at 2620). Military commissions are a reluctant and narrowly circumscribed exception to these "settled principles." *Id*.

Except when legislating to govern the civil administration of federal enclaves, Congress cannot circumvent the federal courts by giving Executive tribunals the judicial power. *Stern*, 131 S.Ct. at 2620; *Reid*, 354 U.S. at 21 (plurality op.); *O'Donohue v. United States*, 289 U.S. 516, 530 (1933) ("Such exceptions serve rather to emphasize the generally inviolate character of the plan."). "The judicial power is the power to decide, in accordance with law, who should prevail in a case or controversy. *See* Art. III, § 2. That includes the power to serve as a neutral adjudicator in a criminal case." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 816 (1987) (Scalia, J., concurring).

28

If a non-Article III tribunal is exercising subject-matter jurisdiction that would have entailed the right to a jury trial at common law, then it is impermissibly usurping the "essential attributes of judicial power." *Stern*, 131 S.Ct. at 2616; *see also Blair v. United States*, 250 U.S. 273, 280 (1919) (describing the core common law incidents of the judicial power). Whenever an Article I court "encroaches upon a district court's exclusive felony trial domain, Article III concerns move to the forefront." *United States v. Johnson*, 258 F.3d 361, 370 (5th Cir. 2001). This is true regardless of the legal status of the parties before the court. *Wong Wing v. United States*, 163 U.S. 228, 237 (1896); *United States v. Moreland*, 258 U.S. 433, 441 (1922).

The first two military commission judgments to ever reach the Supreme Court were vacated, at least in part, for having usurped the judicial power of the United States. The first arose in the context of the Mexican War. *Jecker v. Montgomery*, 13 How. 498 (1851). The Navy convened what would now be recognized as an occupation commission to decide a prize case in Monterey, California. The Supreme Court unanimously vacated the commission's judgment because admiralty cases were within the exclusive jurisdiction of the federal courts and military commissions "were not courts of the United States, and had no right to adjudicate upon a question of prize or no prize." *Id*. at 515. The second case was *Ex parte Milligan*, 4 Wall. 110 (1866). The Court held that Indiana was not a

theatre of hostilities or subject to martial law. Consequently, military commissions had no lawful subject-matter jurisdiction over crimes committed there because "[e]very trial involves the exercise of judicial power" and "no part of judicial power of the country was conferred on them." *Id.* at 121.

The first Supreme Court case to affirm the jurisdiction of a law-of-war military commission was *Ex parte Quirin*, 317 U.S. 1 (1942). A law-of-war military commission, like any military tribunal, "is an Article I legislative court with jurisdiction independent of the judicial power created and defined by Article III." *Gosa v. Mayden*, 413 U.S. 665, 686 (1973) (citing *Quirin*, 317 U.S. at 39). The Court held that the law-of-war commission at issue in *Quirin* did not usurp the judicial power, but only because the charge of perfidious sabotage was not triable by jury at common law. *Quirin*, 317 U.S. at 28.

The reason sabotage did not entail a jury trial right at common law was because law of war offenses generally were not considered "crimes" at all. *Quirin*, 317 U.S. at 39-40; 11 U.S. Op. Atty. Gen. at 312-13 ("Infractions of the laws of nations are not denominated *crimes*, but *offenses*. … *Offenses* against the laws of war must be dealt with and punished under the Constitution as the laws of war, they being a part of the law of nations, direct; *crimes* must be dealt with and punished as the Constitution, and laws made in pursuance thereof, may direct."). The Court categorized offenses against the law of war into the same general class

30

as "petty offenses," which were also not considered "crimes" at common law and consequently are outside the scope of Article III. *Quirin*, 317 U.S. at 39-41.[4]

Relying on the "petty offense" cases, the Court concluded that in "light of this long-continued and consistent interpretation," the Constitution did not require "offenses against the law of war not triable by jury at common law be tried only in the civil courts." *Quirin*, 317 U.S. at 40. The Court was careful, however, to emphasize that the corollary of its holding was that law-of-war military commissions could not reach beyond this class of law of war offenses to try the "class of offenses constitutionally triable only by a jury." *Quirin*, 317 U.S. at 29.

Here, the government concedes that inchoate conspiracy is solely a domestic law crime. In fact, the government has contended that the conspiracy charge in this case was, in effect, an assimilation of 18 U.S.C. § 2332(b), in order to save it from an *ex post facto* challenge. E.B.Resp. 67; *see also Bahlul*, 2014 WL 3437485, at *12. Section 2332(b) is a crime against the United States that, over the thirty years of its existence, has only ever been tried in a federal court. And the stand-alone offense of conspiracy, more generally, has been consistently cited as the

---

[4] Because the trial of petty offenses is not an exercise of the judicial power, Congress is free to delegate that jurisdiction to a quasi-judicial forum like a police court or a magistrate judge. *See* George Doub & Lionel Kestenbaum, *Federal Magistrates for the Trial of Petty Offenses: Need and Constitutionality*, 107 U.Pa.L.Rev. 453, 462 (1959) (reviewing "the ample historical evidence, … that the term 'judicial power' did not comprehend the disposition of petty offenses.").

paradigmatic case of an "infamous crime" that was triable only by jury at common law. *See*, *e.g.*, *Mackin v. United States*, 117 U.S. 348, 354 (1886) (conspiracy charges "are infamous crimes, within the meaning of the fifth amendment of the constitution"); Felix Frankfurter & Thomas Corcoran, *Petty Federal Offenses and the Constitutional Guarantees of Trial By Jury*, 39 Harv.L.Rev. 917, 979 (1926) ("The Supreme Court, therefore, has given emphatic recognition to the common-law and colonial exemption of 'petty offenses' from the constitutional requirement of jury trial. … Conspiracy, we know, is not a petty offense.").[5]

Kept within their traditional sphere, military commissions do not violate Article III because the trial of law of war offenses arising under the law of nations, which are not "crimes" at common law, does not present the risk that a military tribunal will usurp the judicial power. The military trial of domestic law crimes, such as the conspiracy charge in this case, however, "replace[s] the principles delineated in our precedents, rooted in history and the Constitution, with a rule of broad legislative discretion that could effectively eviscerate the constitutional guarantee of an independent Judicial Branch of the Federal Government." *Northern Pipeline v. Marathon Pipe Line*, 458 U.S. 50, 73 (1982) (plurality op.).

---

[5] After the accused was convicted in this case, at least one military commission defendant was removed for trial in the Southern District of New York and sentenced to life for conspiracy to bomb the U.S. embassies in 1998. *United States v. Ghailani*, 733 F.3d 29 (2d Cir. 2013).

**C.     The Military Commission in this Case Threatens the Integrity of the Judicial System.**

Traditionally, military commissions have been a "court of last resort." *Milligan*, 4 Wall. 132 (Chase, C.J., concurring). Their original purpose was to fill statutory gaps in the personal or subject-matter jurisdiction of courts-martial that arose on the battlefield. *Hamdan*, 548 U.S. at 624. Whatever legitimate criticisms can be levied against the "drumhead courts" of the Civil War, *Bahlul*, 2014 WL 3437485, at *18, those tribunals did serve the military's need to govern an often hostile population during a nationwide insurgency that killed a half-million people. And though controversial in the context of World War II, *Yamashita*, 317 U.S. at 26-30 (Murphy, J., dissenting), military commissions were a rough, but ready, means by which to obtain swift justice on the battlefield for massive atrocities committed during the exigencies of a world war.

Nothing about the accused's trial resembles any of the traditional military commissions the government relies upon as precedent. The accused's commission was "appointed not by a military commander in the field of battle, but by a [civilian civil servant] stationed away from any active hostilities." *Hamdan*, 548 U.S. at 612 (plurality op.). Rather than swift justice, Bahlul's weeklong trial commenced nearly seven years after he was brought to Guantanamo. The witnesses were not pulled from the battlefield, but were FBI interrogators, forensics analysts, a paid subject-matter expert, and three federal prisoners, who

were brought to Guantanamo by the Bureau of Prisons pursuant to cooperation agreements. Whereas Article III review of military commissions has historically been limited to writs of habeas corpus to ensure against extraordinary battlefield excesses, this very appeal demonstrates how these tribunals have been permanently grafted onto the judicial system.

In fact, while called a "military" commission, the tribunal that tried Bahlul was responsive to no pressing military necessity. It was bureaucratically convened "by a civilian agency … not by the military." *Ex parte Endo*, 323 U.S. 283, 298 (1944). The Office of Military Commissions is a component of the Office of the Secretary of Defense, a civilian agency that is forbidden from establishing a military staff. 10 U.S.C. § 131(c). While service members are given temporary assignments in the Office of Military Commission's various subcomponents, the permanent staff of these commissions is composed entirely of civilians. The "military" character of these proceedings is by law, and increasingly in practice, defined solely by the trial judges and the members, who serve at will under a civilian political appointee, who, in turn, answers to the Secretary of Defense. Reg. T. Mil. Comm. §§ 2-1, *et seq.* (2007).

If this Court looks past the "military commissions" label, it will see an unprecedented system of criminal tribunals established within the Executive Branch, which purport to exercise jurisdiction over purely domestic law crimes.

Everything about this novel criminal justice system realizes the Founders' fear of Executive trial chambers and "threatens to supplant completely our system of adjudication in independent Art. III tribunals and replace it with a system of 'specialized' legislative courts." *Northern Pipeline*, 458 U.S. at 64; *see also The Federalist No. 47*, at 302-303 (Madison) (1961); App. 53; *Faretta v. California*, 422 U.S. 806, 802 (1975); *Ullmann v. United States*, 350 U.S. 422, 427 (1956).

Indeed, the modern military commission has held itself out as equal to the federal courts in a self-conscious effort to compete for their jurisdiction. The Chief Prosecutor has advertised the fact that "[a]lthough the procedural differences between the forums are actually slight, they can be decisive." BG Mark Martins, Remarks at Guantanamo Bay (Apr. 13, 2014); App. 64. These commissions offer, not a tool of last resort for the military, but a "pragmatic choice" for the "prosecutors and counter-terror professionals in our interagency community[.]" *Id*. The Attorney General has likewise acknowledged that "many cases could be prosecuted in either federal courts or military commissions[.]" Remarks of the Attorney General, *Attorney General Announces Forum Decisions for Guantanamo Detainees* (Nov. 13, 2009); App. 70. These commissions are not needed to dispense swift justice on the battlefield, but to afford civilian prosecutors within the Department of Justice the liberty to make "case by case decisions" about which

35

forum is more favorable based on, among other factors, the likelihood that a federal judge will admit the available evidence against an accused. *Id.*

While the Executive Branch understandably welcomes the opportunity these tribunals provide to forum shop, that is precisely the problem. The government cannot "transform military commissions from a tribunal of true exigency into a more convenient adjudicatory tool." *Hamdan*, 548 U.S. at 625; *see also Duncan*, 327 U.S. at 322 ("Legislatures and courts are not merely cherished American institutions; they are indispensable to our government. Military tribunals have no such standing."). If the separation of powers means anything, it is that the federal judiciary cannot be required to compete for jurisdiction over the trial of federal crimes on a "case-by-case" basis. "Article III, Section 1 seeks to ensure such respect by barring congressional attempts to transfer jurisdiction to non-Article III tribunals for the purpose of emasculating constitutional courts, and thereby preventing the encroachment or aggrandizement of one branch at the expense of the other." *Schor*, 478 U.S. at 850.

This competition distorts the justice system with powerful incentives to ape the expediency, severity, and secrecy that are associated with military commissions. The Framers created an independent federal judiciary to ensure an "independent spirit in the judges, which must be essential to the faithful performance of so arduous a duty." *The Federalist No. 78*, at 469 (Hamilton) (1961); App. 49. The

judicial system cannot function if it is under political pressure to prove that it "works" as well as military commissions on pain of being circumvented for all but the disposition of post-trial appeals. *Northern Pipeline*, 458 U.S. at 86 n.39 (plurality op.). Article III can "neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decision making if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III." *Stern*, 131 S.Ct. at 2609.

If military commissions' subject-matter jurisdiction is allowed to encroach beyond their traditional competence over offenses arising under "the laws of war, they being a part of the law of nations," 11 U.S. Op. Atty. Gen. at 312-13, the military commissions in Guantanamo will continue to drift from their historical roots and constitutional justifications. They will become, either in fact or precedent for, a permanent Executive court system that offers a ready competitor to the courts of law, whenever and for how long the war powers are invoked. The only safeguard against that danger, the safeguard that Article III has put in place, is for the "trial of all crimes" to remain the responsibility of the courts, not an administrative agency within the Department of Defense.

37

### III.    PETITIONER'S CONVICTION VIOLATES THE FIRST AMENDMENT.

### A.    Standard of Review

The scope of the First Amendment's application is a question of law that this Court decides *de novo*. *United States v. Popa*, 187 F.3d 672, 674 (D.C. Cir. 1999). Likewise, whether a trial judgment impermissibly infringes the freedom of speech is reviewed *de novo*. "[I]n cases raising First Amendment issues [the Supreme Court has] repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Bose Corp. v. Consumers Union of the U.S.*, 466 U.S. 485, 499 (1984); *see also* Edwards & Elliot, at 3-4; 13-14; App. 28-31. "[W]hether by design or inadvertence … [l]aws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (internal quotations omitted).

### B.    The Government Put the Accused's Thoughts, Beliefs, and Ideals on Trial.

The weeklong trial underlying this appeal was not about the terrorist attacks on September 11, 2001. It was not about the inner-workings of al Qaeda. It was not about a terrorist mastermind. It was not about the planning or perpetration of any

38

terrorist attack. Instead, in the autumn of 2008, before a nine-member military commission, the government of the United States put a film on trial.

The "chief evidence that you have in this case" is a film. App. 209. The military commission spent more than 90-minutes viewing the film in open court. Of the all the witnesses who testified on the merits and at sentencing, all but one was called to describe the substance, the audience, and the message of this film or to link its production to the accused. Of these, only the government interrogators had ever met the accused. Half of the witnesses testified to little more than their reactions to having watched this film.

As Bahlul himself protested, specifically invoking the "freedom of the press," "I'm a media man, and I want you to know that you are prosecuting a media man … and you are not prosecuting an al Qaeda member who is about to do an operation." App. 159. The prosecution, in presenting its case, did not disagree.

The government explained that Bahlul's film "is propaganda, a political argument and indoctrination of solicitation." App. 198. "One of the central goals of the al Qaeda organization was to bring forth an Islamic government that met the desires of the leadership of al Qaeda, of Usama bin Laden and Ayman Zawahiri." *Id*. Bahlul should be convicted as a war criminal, the prosecution contended, because his film helped "to spread this message." *Id*. The prosecution impugned the film's use of music to "increase [its] emotional appeal." App. 206 (testimony of

Mr. Kohlmann). It told the commission that the film was a "nonkinetic weapon," App. 208, "a weapon that will never cease to fire," App. 219, and a "virus" that "creates more hate" and "creates more terrorism." App. 218.

In summation, the prosecution told the panel that they should convict Bahlul and sentence him to life imprisonment because this film "contains the thoughts, the beliefs, the ideals of the accused[.]" App. 209. To corroborate those beliefs, the prosecution offered Bahlul's personal library into evidence, or more specifically photocopies of the covers of his books, which were sufficient to convey to the members "the subject of the book which is shown by the title." App. 196.

The government presented no evidence that Bahlul's film, which remains available for purchase on Amazon.com, somehow surpassed the thousands of other arguably loathsome examples of political propaganda that stock the marketplace of ideas in the Internet age. By the government's own description, the film offered nothing more than a "political argument" whose vaguely stated objective was to "motivate more attacks of a similar nature" to the bombing of the *U.S.S. COLE*. App. 217. Seen even in this most negative light, therefore, this film is nothing more than the "advocacy of illegal action at some indefinite future time," which is insufficient as a matter of law to constitute incitement. *Hess v. Indiana*, 414 U.S. 105, 108 (1973); *see also Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *Terminiello v. Chicago*, 337 U.S. 1, 4 (1949).

40

The government called three federal prisoners, American citizens who saw the film when they traveled to al Qaeda training camps. The first witness, Mr. Goba, stated that the message he took from it was the moral necessity to migrate to Afghanistan and prepare for war against the West. App. 202-203. The second witness, Mr. Taher, testified that when it was shown at an al Qaeda guesthouse in Pakistan, where the audience would presumably be self-selected for incitement, there "wasn't really that much of a reaction at the guesthouse, no." App. 204. The third witness, Mr. Alwan, testified that rather than stifling deliberation, the film provoked a lengthy debate amongst the prospective recruits over whether suicide bombing could ever be morally justified. App. 179-180.

Far from incitement, both Taher and Alwan testified that watching the video made them less likely to join al Qaeda on ideological grounds. App. 204 (testimony of Taher); App. 181. (testimony of Alwan). Other than the understandable offense that the victims of the attack on the *U.S.S. COLE* felt after seeing the film on the Internet, App. 210-216, the only other testimony on the film's effect was a "propaganda expert," who noted that some terrorism suspects had been arrested with a copy on their hard drives. App. 201.

This evidence, it should be said, did not compromise the case the prosecution sought to mount at trial. It proved it. All the prosecution aimed to

41

prove was that this film was "political propaganda" and that Bahlul was a criminal for having authored it.

### C.     The Chief Evidence in this Case is Protected Speech

The Supreme Court has passed at least twice upon the protection afforded to foreign political propaganda, as such. In *Lamont v. Postmaster*, 381 U.S. 301 (1965), the Court struck down import regulations on foreign political propaganda because it was as much a part of the "flow of ideas to the public" as union advocacy or religious leafleting. *Id*. at 306. In *Meese v. Keene*, 481 U.S. 465 (1987), the Court held that "the term 'political propaganda' does nothing to place regulated expressive materials 'beyond the pale of legitimate discourse.'" *Id*. at 480 (citation omitted). It is plainly settled, therefore, that the government cannot use the laws to "prohibit, edit, or restrain the distribution of advocacy materials in an ostensible effort to protect the public from conversion, confusion or deceit." *Meese*, 481 U.S. at 480. This is true whether censorship is directed at the point of delivery (as in *Lamont*) or the point of origin (as here).

The CMCR held that because Bahlul is a non-resident alien, the government was under no obligation to comply with the First Amendment when prosecuting him. *Bahlul*, 820 F.Supp.2d at 1244-45. This is plainly wrong. The notion that the government can put a film on trial without any regard for the First Amendment is

unsupported in law and is irreconcilable with the core values the First Amendment aims to protect.

"The identity of the speaker is not decisive in determining whether speech is protected." *Pacific Gas and Elec. Co. v. Public Utilities Com'n of California*, 475 U.S. 1, 8 (1986); *see also Citizens United*, 588 U.S. at 340 ("Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. ... Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others. ... As instruments to censor, these categories are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content.").

The CMCR's holding was based on a misreading of the plurality opinion in *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264-75 (1990) (plurality op.). *Verdugo* asked whether the Fourth Amendment applied extraterritorially to afford a foreigner a right to privacy for the purposes the warrant requirement while abroad. This case, by contrast, does not involve the extraterritorial application of the Constitution. The question is not whether the First Amendment protected Bahlul in Afghanistan, it is whether it controlled the government "at trial." *Id*. at 264; *cf. id*. at 278 (Kennedy, J., concurring ("The United States is prosecuting a foreign national in a court established under Article III, and all of the trial proceedings are governed by the Constitution.")). The violation of the First

Amendment in this case arose, not abroad, but when the government decided to convene a military commission on U.S. territory in order to put a film on trial. *New York Times v. Sullivan*, 377 U.S. 254, 265-66 (1964).

This First Amendment violation was exacerbated by the fact that the military judge took no steps to remind the commission that "the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. United States*, 394 U.S. 576, 592 (1969). Nor did he admonish the commission or the prosecution that the accused's "political beliefs were not on trial." *United States v. Salemeh*, 152 F.3d 88, 112 (2d Cir. 1998). To the contrary, "the government's summation and the [military judge's] instruction left the [members] to understand that [Bahlul's] speech was itself the proscribed conduct." *United States v. Caronia*, 703 F.3d 149, 161 (2d Cir. 2012). The military judge even went beyond the statutory definition of "material support" and instructed the members that producing "propaganda" or "recruiting materials" was *per se* illicit. App. 175.

Col Gregory plainly failed to carry out the unique responsibilities a military judges bears when presiding over a military trial. Given the differences between the participants' status in a military tribunal as opposed to a civilian court, a military judge has an independent obligation to control the conduct of the trial and to instruct the members on the actual weight to accord the prosecution's evidence.

*See*, *e.g.*, *United States v. Gutierrez*, 64 M.J. 374, 376 (C.A.A.F. 2007) ("A

military judge has a *sua sponte* duty to give certain instructions when reasonably

raised by the evidence, even though the instructions are not requested by the

parties."). This duty was particularly important here given the prosecution's trial-

long campaign to inflame the patriotic passions of the military officers deciding the

case. *Yates v. United States*, 354 U.S. 298, 327 (1957) ("Vague references to

'revolutionary' or 'militant' action of an unspecified character, which are found in

the evidence, might in addition be given too great weight by the jury in the absence

of more precise instructions.").

    If nothing else, this case starkly illustrates the danger of transplanting

domestic law-enforcement crimes, like conspiracy and material support for

terrorism, into law-of-war military commissions. Despite the government's recent

efforts to play up Bahlul's indirect connections to the September 11th attacks, its

trial strategy was to exploit the sweeping breadth of implied criminality that a

conspiracy charge allows in order to put the "message" of a film on trial, to

condemn the author of that message as a "propagandist," and to exhort the

members to imprison him for life because their "duty as officers of the Armed

Forces of the United States military is to protect the United States." App. 219.

    If this Court ultimately allows law-of-war military commissions to go

outside the traditional international law bounds of their subject-matter jurisdiction,

prosecutors will now have broad forms of inchoate and associational liability, like the conspiracy charge in this case, to use in war crimes trials. If this innovation is not going to swallow the heightened standard of individual culpability that is at the heart of the law of war, the First Amendment must constrain the government's understandable temptation to conflate the members' hatred of the enemy with proof that a particular enemy committed a war crime.

Even assuming an inchoate conspiracy can now be tried before a law-of-war military commission, therefore, vacatur is still warranted because Bahlul should be tried, if at all, for his criminal acts, not his thoughts, beliefs, and ideals. *See NAACP v. Claiborne Hardware*, 458 U.S. 886, 928 (1982). The Constitution requires the government win political arguments with persuasion, not military trials and life-imprisonment. *Texas v. Johnson*, 491 U.S. 397, 419 (1989). "The laws and Constitution are designed to survive, and remain in force, in extraordinary times." *Boumediene v. Bush*, 553 U.S. 723, 798 (2008). Bahlul may be an enemy of the United States and, as such, invite hatred. He may also risk being targeted on the battlefield or detained indefinitely once captured. "But in undertaking to try [him] and subject him to criminal punishment, the Executive is bound to comply with the rule of law that prevails in this jurisdiction." *Hamdan*, 548 U.S. at 634.

IV.   **THE MILITARY COMMISSIONS ACT OF 2006 DISCRIMINATES AGAINST ALIENS IN VIOLATION OF THE EQUAL PROTECTION COMPONENT OF THE DUE PROCESS CLAUSE.**

A.   **Standard of Review**

The 2006 Act conditions the personal jurisdiction of a military commission on the nationality of the accused. 10 U.S.C. §§ 948c, 948d (2006). The effect of this is to create a segregated criminal justice system for non-citizens. Objections to the personal jurisdiction of a military tribunal are always reviewed *de novo* because "the status of the individual is the focus for determining both jurisdiction over the offense and jurisdiction over the person." *United States v. Ali*, 71 M.J. 256, 264 (C.A.A.F. 2012); *see also United States v. Garcia*, 5 C.M.A. 88, 94 (1954).

"[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." *Graham v. Richardson*, 403 U.S. 365, 372 (1971); *see also Plyler v. Doe*, 457 U.S. 202, 210 (1982); *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976). When found, invidious discrimination in the administration of the criminal justice system "undermines the structural integrity of the criminal tribunal itself, and is not amenable to harmless-error review." *Vasquez v. Hillery*, 474 U.S. 254, 263 (1986); *see also United States v. Doe*, 903 F.2d 16, 26 (D.C. Cir. 1990).

47

**B.    The 2006 Act's System of *De Jure* Segregation Cannot Withstand Strict Scrutiny.**

The segregation of non-citizens into military commissions cannot be "narrowly tailored to further compelling governmental interests." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995). This is because there is no rational, let alone compelling, "governmental interest" that justifies discrimination against non-citizens in the application of the criminal law generally or the law of war, in particular.

The Supreme Court long ago held that American citizens are subject to the jurisdiction of law-of-war military commissions to the same extent as aliens. *Quirin*, 317 U.S. at 37-38. Citizens are just as capable of joining al Qaeda, and "if released, would pose the same threat of returning to the front during the ongoing conflict." *Hamdi v. Rumsfeld*, 542 U.S. 507, 519 (2004) (plurality op.). That is the lesson of the federal prosecutions of American citizens over the past decade for criminal conduct that is arguably far more culpable than the conduct charged against the accused. *See*, *e.g.*, *United States v. Lindh*, 227 F.Supp.2d 565 (E.D.Va. 2002) (the so-called "American Taliban" case); *United States v. Padilla*, 2007 WL 1079090 (S.D.Fla. 2007) (the so-called "dirty bomber," tried on unrelated charges).

*Quirin*'s holding, moreover, is consistent with an unbroken tradition of American law-of-war military commissions, which prior to enactment of the 2006 Act – and fully consistent with court-martial practice – have never made a

jurisdictional distinction on the basis of national origin, and have in fact tried American citizens as violators of the law of war. American Joshua Hett Smith, for example, was tried in 1780 as a co-conspirator of Major John André in a "special court-martial" that Winthrop describes as a predecessor of the law-of-war military commission. Winthrop, at 832; App. 42. During the Mexican War, at least one American was tried by General Winfield Scott's "Councils of War," which are generally considered to be the first fully-developed law-of-war military commissions. *Hamdan*, 548 U.S. at 590; Glazier, 46 Va. J. Int'l L. at 37. During the Philippine insurrection, which was the next major use of military commissions following the Civil War, at least three Americans were tried under these commissions' law of war jurisdiction. Glazier, 46 Va. J. Int'l L. at 52.

Even during World War II, where national security was used as a rationale for invidious discrimination, *Korematsu v. United States*, 323 U.S. 214, 219 (1944), the United States did not establish special tribunals to try aliens apart from non-citizens. *Quirin*, 317 U.S. at 37-38; *see also* I.C.R.C., Commentary: III Geneva Convention Relative to the Treatment of Prisoners of War 623 (1960). ("Nationals, friends, enemies, all should be subject to the same rules of procedure and judged by the same courts. There is therefore no question of setting up special tribunals to try war criminals of enemy nationality.").

49

The constitutional and historical uniqueness of the 2006 Act cannot be overstated. Neither Congress nor any other American legislature has ever succeeded in establishing a criminal justice system that facially discriminates on the basis of nationality. *Wong Wing*, 163 U.S. at 238 ("[A]ll persons within the territory of the United States are entitled to the protection guaranteed by [the Fifth and Sixth Amendments] … aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law."). Nor has Congress ever legislated a separate system of military tribunals for aliens alone. Were it to do so, it would be discriminating against the non-citizen members of our own Armed Forces, who fight alongside American service members every day to defend the Constitution.

Since before the Founding, the military has consistently tried American enemy combatants and alien enemy combatants before the same military tribunals. The 2006 Act violates the equal justice requirements of the Constitution and an unbroken tradition of United States military practice. "Both equal protection and due process emphasize the central aim of our entire judicial system – all people charged with crime must, so far as the law is concerned, 'stand on an equality before the bar of justice in every American court.'" *Tate v. United States*, 359 F.2d 245, 250 (D.C. Cir. 1966).

50

### C.    The 2006 Act's System of *De Jure* Segregation was Motivated by Irrational Animus.

Separate from the 2006 Act's inability to withstand strict scrutiny, "the Constitution's guarantee of equality must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot justify disparate treatment of that group." *United States v. Windsor*, 133 S.Ct. 2675, 2693 (2013). When disparate treatment is motivated by nothing more than "animus toward the class it affects; it lacks a rational relationship to legitimate state interests." *Romer v. Evans*, 517 U.S. 620, 632 (1996).

The 2006 Act's choice, for the first time in U.S. history, to create a segregated criminal justice system was motivated by nothing more than animus toward non-citizens and the desire to avoid the political accountability that would result if citizen constituents were triable by military commission. The 2006 Act's legislative history leaves no doubt that Congress created criminal procedures that it viewed as unacceptable if applied to U.S. citizens.[6] Segregating aliens into military

---

[6] *See*, *e.g.*, 152 Cong. Rec. S10250 (Sept. 27, 2006) (Sen. Warner) ("It is wrong to say that this provision captures any U.S. citizens. It does not. It is only directed at aliens – aliens, not U.S. citizens[.]"); *id*. at S10251 (Sen. Graham) ("Under no circumstance can an American citizen be tried in a military commission. The jurisdiction of military commissions does not allow for the trial of American citizens or lawful combatants, and those who say otherwise, quite frankly, have not read the legislation because there is a prohibition to that happening."); *id*. at S10274 (Sen. Bond) ("These people are not U.S. citizens, arrested in the U.S. on some civil offense; they are, by definition, aliens engaged in or supporting terrorist

commissions was not based on their dangerousness, but a general feeling that Guantanamo detainees did "not deserve the same panoply of rights preserved for American citizens in our legal system." 152 Cong. Rec. S10395 (Sept. 28, 2006) (Sen. Cornyn).

Indeed, "homegrown" citizen terrorists were recognized as an equal or greater threat. Remarks of the Attorney General, *Stopping Terrorists Before They Strike: The Justice Department's Power of Prevention* (Aug. 16, 2006). App. 67. Yet, the supporters of the 2006 Act were candid that it leaves this greater threat deliberately untouched:

> Let's say an American citizen has been arrested for aiding and abetting a terrorist, maybe even participating in a conspiracy, or maybe participating in an action that harmed or killed American citizens. That American citizen cannot be tried in the military commission. His coconspirators could be tried in a military commission if they were an alien, but if that other coconspirator is an American citizen, they will be prosecuted under Title 18.

152 Cong. Rec. H7940 (Sept. 27, 2006) (Rep. Buyer).[7] In this context, alienage is "a classification whose relationship to an asserted goal is so attenuated as to render

---

hostilities against the U.S."); *id.* at S10267 (Sen. Kyl)  ("This legislation has nothing to do with citizens.").

[7] *See also* 156 Cong. Rec. S3078 (May 4, 2010) (Sen. Sessions)  ("I want to be sure. I think we have this matter straight. … If their actions amount to a violation of the rules of war, an alien unlawful enemy belligerent can be tried in civilian court, if we choose, or tried by a military commission. But if they are a citizen and they are caught under these circumstances, they can be detained in military custody, but

the distinction arbitrary and irrational." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 466 (1985).

Modern equal protection jurisprudence rests on the recognition that "more searching inquiry" is required when "the operation of those political processes ordinarily to be relied upon to protect minorities" is curtailed. *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n. 4 (1938). The Supreme Court has repeatedly offered aliens as "a prime example of a 'discrete and insular' minority for whom heightened judicial solicitude is appropriate." *Graham*, 403 U.S. at 371.

By segregating non-citizens into an inferior criminal justice system, the law under which Bahlul was convicted is unprecedented and bears no rational relationship to any governmental interest that the Constitution condones. Accordingly, the judgment below must be vacated.

---

they can't be tried by a military commission. They can only be tried by the civilian courts in civilian trials.").

## CONCLUSION

This Court should vacate what remains of the judgment below because these law-of-war military commissions have strayed from their traditional and constitutionally defined jurisdiction over offenses that are plainly "recognized in international law as violations of the law of war." *Yamashita*, 327 U.S. at 14. Alternatively, if law-of-war military commissions can now be given the judicial power to try wholly domestic law crimes, then they must respect the "guaranties of certain fundamental personal rights declared in the Constitution," *Balzac v. Puerto Rico*, 258 U. S. 298, 312 (1922), including the evenhanded application of the criminal law.

Respectfully submitted,

 /s/    Michel Paradis
Michel Paradis
Mary R. McCormick
1620 Defense Pentagon
Washington, DC 20301-1620
michel.paradis@osd.mil
TEL: 1.703.696.9490 x115
FAX: 1.703.696.9575

MAJ Todd E. Pierce, JA, U.S. Army (Ret.)
Senior Fellow
Univ. of Minnesota Human Rights Center
Mondale Hall, N-120
229-19th Avenue South
Minneapolis, MN 55455

*Counsel for Petitioner*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

**Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

1. This brief complies with the type-volume limitations imposed by Fed. R. App. P. 32(a)(7)(B) as augmented by Petitioner's motion to this Court on August 1, 2013, because:

[X] this brief contains 12,484 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ] this brief uses a monospaced typeface and contains ____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point font size and Times New Roman type style; *or*

[ ] this brief has been prepared in a monospaced typeface using _____ with _____.

Dated: August 13, 2014

Respectfully submitted,


/s/ Michel Paradis
*Counsel for Petitioner*

55

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2014 a copy of the foregoing was filed electronically with the Court. Notice of this filing will be sent to all parties by operation of this Court's electronic filing system. Parties may access this filing through the Court's system.


Dated: August 13, 2014

                              Respectfully submitted,


                              /s/ Michel Paradis
                              *Counsel for Petitioner*

# STATUTORY ADDENDUM

Article I § 8, cls. 10-15 ................................................................... 2

Article III ...................................................................................... 2

First Amendment ........................................................................... 3

Fifth Amendment .......................................................................... 3

10 U.S.C. § 131(c) ........................................................................ 4

10 U.S.C. 821 ............................................................................... 4

10 U.S.C. § 948c (2006) ............................................................... 4

10 U.S.C. § 948d(a) (2006) ........................................................... 4

10 U.S.C. § 950f(e) (2009) ........................................................... 4

10 U.S.C. § 950g (2009) ............................................................... 5

10 U.S.C. § 950v(28) (2006) ......................................................... 6

18 U.S.C. § 2332(b) ...................................................................... 6

18 U.S.C. § 2339B (excerpt) .......................................................... 6

12 Stat. 597 § 5 ............................................................................ 7

Reg. T. Mil. Comm. §§ 2-1, *et seq*. (2007) ................................... 7

R.M.C. 905 (excerpt) (2012) ....................................................... 10

R.M.C. 907 (excerpt) (2012) ....................................................... 10

## Article I § 8, cls. 10-15

The Congress shall have power …

> To define and punish piracies and felonies committed on the high seas, and offenses against the law of nations;

> To declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water;

> To raise and support armies, but no appropriation of money to that use shall be for a longer term than two years;

> To provide and maintain a navy;

> To make rules for the government and regulation of the land and naval forces;

> To provide for calling forth the militia to execute the laws of the union, suppress insurrections and repel invasions;

## Article III

**§1.** The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. The judges, both of the supreme and inferior courts, shall hold their offices during good behavior, and shall, at stated times, receive for their services, a compensation, which shall not be diminished during their continuance in office.

**§2.** The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority;--to all cases affecting ambassadors, other public ministers and consuls;--to all cases of admiralty and maritime jurisdiction;--to controversies to which the United States shall be a party;--to controversies between two or more states;--between a state and citizens of another state;--between citizens of different states;--between citizens of the same state claiming lands under grants of different states, and between a state, or the citizens thereof, and foreign states, citizens or subjects.

2

In all cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be party, the Supreme Court shall have original jurisdiction. In all the other cases before mentioned, the Supreme Court shall have appellate jurisdiction, both as to law and fact, with such exceptions, and under such regulations as the Congress shall make.

The trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the state where the said crimes shall have been committed; but when not committed within any state, the trial shall be at such place or places as the Congress may by law have directed.

**§3.** Treason against the United States, shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort. No person shall be convicted of treason unless on the testimony of two witnesses to the same overt act, or on confession in open court. The Congress shall have power to declare the punishment of treason, but no attainder of treason shall work corruption of blood, or forfeiture except during the life of the person attainted.

## Amendment I

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

## Amendment V

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

**10 U.S.C. § 131(c)**

Officers of the armed forces may be assigned or detailed to permanent duty in the Office of the Secretary of Defense. However, the Secretary may not establish a military staff in the Office of the Secretary of Defense.

**10 U.S.C. 821**

The provisions of this chapter conferring jurisdiction upon courts-martial do not deprive military commissions, provost courts, or other military tribunals of concurrent jurisdiction with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions, provost courts, or other military tribunals. This section does not apply to a military commission established under chapter 47A of this title.

**10 U.S.C. § 948c (2006)**

Any alien unlawful enemy combatant is subject to trial by military commission under this chapter.

**10 U.S.C. § 948d(a) (2006)**

A military commission under this chapter shall have jurisdiction to try any offense made punishable by this chapter or the law of war when committed by an alien unlawful enemy combatant before, on, or after September 11, 2001.

**10 U.S.C. § 950f(e) (2009)**

If the Court sets aside the findings or sentence, the Court may, except where the setting aside is based on lack of sufficient evidence in the record to support the findings, order a rehearing. If the Court sets aside the findings or sentence and does not order a rehearing, the Court shall order that the charges be dismissed.

4

**10 U.S.C. § 950g (2009)**

(a) Exclusive Appellate Jurisdiction.— Except as provided in subsection (b), the United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction to determine the validity of a final judgment rendered by a military commission (as approved by the convening authority and, where applicable, as affirmed or set aside as incorrect in law by the United States Court of Military Commission Review) under this chapter.

(b) Exhaustion of Other Appeals.— The United States Court of Appeals for the District of Columbia Circuit may not review a final judgment described in subsection (a) until all other appeals under this chapter have been waived or exhausted.

(c) Time for Seeking Review.— A petition for review by the United States Court of Appeals for the District of Columbia Circuit must be filed in the Court of Appeals—

(1) not later than 20 days after the date on which written notice of the final decision of the United States Court of Military Commission Review is served on the parties; or

(2) if the accused submits, in the form prescribed by section 950c of this title, a written notice waiving the right of the accused to review by the United States Court of Military Commission Review, not later than 20 days after the date on which such notice is submitted.

(d) Scope and Nature of Review.— The United States Court of Appeals for the District of Columbia Circuit may act under this section only with respect to the findings and sentence as approved by the convening authority and as affirmed or set aside as incorrect in law by the United States Court of Military Commission Review, and shall take action only with respect to matters of law, including the sufficiency of the evidence to support the verdict.

(e) Review by Supreme Court.— The Supreme Court may review by writ of certiorari pursuant to section 1254 of title 28 the final judgment of the United States Court of Appeals for the District of Columbia Circuit under this section.

5

**10 U.S.C. § 950v(28) (2006)**

Any person subject to this chapter who conspires to commit one or more substantive offenses triable by military commission under this chapter, and who knowingly does any overt act to effect the object of the conspiracy, shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

**18 U.S.C. § 2332(b)**

Whoever outside the United States attempts to kill, or engages in a conspiracy to kill, a national of the United States shall—

(1) in the case of an attempt to commit a killing that is a murder as defined in this chapter, be fined under this title or imprisoned not more than 20 years, or both; and

(2) in the case of a conspiracy by two or more persons to commit a killing that is a murder as defined in section 1111 (a) of this title, if one or more of such persons do any overt act to effect the object of the conspiracy, be fined under this title or imprisoned for any term of years or for life, or both so fined and so imprisoned.

**18 U.S.C. § 2339B (excerpt)**

(1) Unlawful conduct.— Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989). …

6

**12 Stat. 597 § 5**

*And be it further enacted*, That the President shall appoint, by and with the advice and consent of the Senate, a judge advocate general, with the rank, pay, and emoluments of a colonel of cavalry, to whose office shall be returned, for revision, the records and proceedings of all courts-martial and military commissions, and where a record shall be kept of all proceedings had thereupon. And no sentence of death, or imprisonment in the penitentiary, shall be carried into execution until the same shall have been approved by the President.

**Reg. T. Mil. Comm. §§ 2-1, *et seq*. (2007)**

**2-1. Organization.**

The Office of the Convening Authority for Military Commissions is established in the Office of the Secretary of Defense under the authority, direction, and control of the Secretary of Defense. The Office of the Convening Authority shall consist of the Director of the Office of the Convening Authority, the convening authority, the legal advisor to the convening authority, and such other subordinate officials and organizational elements as are within the resources of the Secretary of Defense.

**2-2. Authority to Convene Military Commissions**

Pursuant to 10 U.S.C. § 948h, the Secretary of Defense or any officer or official of the United States designated by the Secretary for that purpose may convene military commissions. No specific form or order is designated as required to effect the appointment of one or more convening authorities by the Secretary of Defense.

**2-3. Responsibilities and Functions**

 a. In performing duties directly related to military commissions, the convening authority shall:

1. dispose of charges forwarded to the convening authority by the trial counsel through the legal advisor, by either referring any or all charges to a military commission, returning them to

7

trial counsel with directions for further action, or dismissing them;

2. issue orders convening one or more military commissions to try alien unlawful enemy combatants for violations of the law of war or other crimes triable by military commissions;

3. detail as military commission members and alternate members those commissioned officers who are, in the opinion of the convening authority, best qualified for duty by reason of age, education, training, experience, length of service, and judicial temperament;

4. detail or employ qualified court reporters to make verbatim records of all commission sessions;

5. detail or employ qualified interpreters who shall interpret for the commissions and, as necessary, for the accused;

6. appoint all other personnel necessary to facilitate military commissions;

7. approve or disapprove requests from the prosecution to communicate with news media representatives regarding military commission cases and other matters related to military commissions;

8. approve or disapprove plea agreements with an accused;

9. order that such investigative or other resources be made available to defense counsel and the accused as deemed necessary by the convening authority for a fair trial;

10. employ those experts requested by a party and found by the convening authority to be relevant and necessary;

11. be responsible for effecting preparation of the record of trial;

12. consider matters submitted by an accused with respect to the findings and sentence prior to taking action on the case;

8

13. take such action on the findings and sentence deemed by the convening authority appropriate;

14. forward the case (as approved by the convening authority) to the Court of Military Commission Review; and

15. perform such other functions as the Secretary of Defense or an appellate court may prescribe.

b. In the performance of assigned functions ad responsibilities, the convening authority for military commissions shall:

1. report directly to the Secretary of Defense or this designee;

2. use existing facilities and services of the Department of Defense and other federal agencies, whenever practicable, to avoid duplication and to achieve an appropriate level of efficiency and economy;

3. communicate directly with the heads of other DOD components as necessary to carry out assigned functions. Communications to the military departments shall be transmitted through the Secretaries of the military departments, their designees, or as otherwise provided by law or directed by the Secretary of Defense. Communications to the Commanders of the Combatant Commands, except in unusual circumstances, shall be transmitted through the Chairman of the Joint Chiefs of Staff; and

4. communicate with other Government officials, representatives of the legislative branch, members of the public, and representatives of foreign governments, as applicable, in carrying out assigned functions.

9

**Rules for Military Commissions (2012)**

**Rule 905 (excerpt)**:  Motions generally

(b) *Pre-trial motions*. Any defense, objection, or request which is capable of determination without the trial of the general issue of guilt may be raised before trial. The following must be raised before a plea is entered:

(1) Defenses or objections based on defects (other than jurisdictional defects) in the swearing, forwarding, investigation, or referral of charges;

(2) Defenses or objections based on defects in the charges and specifications (other than any failure to show jurisdiction or to charge an offense, which objections shall be resolved by the military judge at any time during the pendency of the proceedings);

*                      *                      *

(e) *Effect of failure to raise defenses or objections*. Failure by a party to raise defenses or objections or to make motions or requests which must be made before pleas are entered under section (b) of this rule shall constitute waiver. The military judge for good cause shown may grant relief from the waiver. Other motions, requests, defenses, or objections, except lack of jurisdiction or failure of a charge to allege an offense, must be raised before the commission is adjourned for that case and, unless otherwise provided in this Manual, failure to do so shall constitute waiver.

**Rule 907 (excerpt)**:  Motions to dismiss

(b) *Grounds for dismissal*. Grounds for dismissal include the following—

(1) *Nonwaivable grounds*. A charge or specification shall be dismissed at any stage of the proceedings if:

(A) The military commission lacks jurisdiction to try the accused for the offense; or

(B) The specification fails to state an offense.

10