ORAL ARGUMENT SCHEDULED FOR OCT. 22, 2014

**No. 11-1324**

CMCR 09-001

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Ali Hamza Ahmad Suliman al Bahlul,

      Petitioner,

   -v-

United States of America,

      Respondent.

_____

On Appeal from the United States Court of Military Commissions Review
No. 09-001

_____

**BRIEF OF AMICI CURIAE FIRST AMENDMENT SCHOLARS
AND HISTORIANS AND THE MONTANA PARDON PROJECT**

_____

JEFFREY T. RENZ
Clinical Professor of Law
Criminal Defense Clinic
School of Law
The University of Montana
Missoula, Montana  59812
(406) 243-4823

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

All parties, intervenors, and amici appearing in this court are listed in the Brief for Petitioner.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

IDENTITY OF AMICUS CURIAE, INTEREST IN CASE,
   AND SOURCE OF AUTHORITY TO FILE. . . . . . . . . . . . . . . . . . . . 1

    IDENTITY AND INTEREST OF AMICUS CURIAE. . . . . . . . . . . . . . . . . . . 1

    SOURCE OF AUTHORITY TO FILE. . . . . . . . . . . . . . . . . . . . . . . . . . 4

    STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS. . . . . . . 5

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    FREEDOM OF SPEECH AND PRESS (1794-1801). . . . . . . . . . . . . . . . 8

    THE REPUDIATION OF THE VALLANDIGHAM MILITARY TRIBUNAL. . . . . . 16

    CONVICTION AND REDEMPTION (1918-2006). . . . . . . . . . . . . . . . . 18

    LENI RIEFENSTAHL, JULIUS STREICHER, AND THE NUREMBERG
      INTERNATIONAL MILITARY TRIBUNAL. . . . . . . . . . . . . . . . . . . . 22

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

CIRCUIT RULE 28(a) CERTIFICATE. . . . . . . . . . . . . . . . . . . . . . . . . . 30

RULE 32 CERTIFICATE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

i

## TABLE OF AUTHORITIES

### Cases

1 Proceedings of the International Military Tribunal, Nuremberg (English Transl. 1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24-27

41 Proceedings of the International Military Tribunal, Nuremberg (English Transl. 1949).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Ex parte Starr*, 263 F. 145 (D. Mont. 1920). . . . . . . . . . . . . . . . . . . . . . . . . 18

*State of Montana v. Kahn*, 182 P. 107 (Mont. 1919). . . . . . . . . . . . . . . . . . 20

*State of Montana v. Odekirk*, (Cause No. 37, Prairie County 1918). . . . . . 20

*State of Montana v. Smith*, 190 P. 107 (Mont. 1920).. . . . . . . . . . . . . . . . . 20

### Statutes

1918 Mont. L., Ch. 11, § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

1991 Mont. Laws 3437. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

An Act Concerning Aliens, ch. 58, 1 Stat. 570 (1798). . . . . . . . . . . . . . . . . . 13

An Act for the Punishment of Certain Crimes against the United States, Ch. 74, 1 Stat. 596 (1798). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

An Act Respecting Alien Enemies, ch. 66, 1 Stat. 577 (1798). . . . . . . . . . . . 13

An Act to Refund a Fine Imposed on the Late Matthew Lyon, 6 Stat. 802 (1840). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>Other Authorities</u>

1 *The Federalist No. X* (1788) (Legal Classics Reprint 1983). . . . . . . . .  9, 22

Ali, Abdullah Yusuf, *The Meaning of the Holy Qur'an* (11th Ed., Amana 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

An *Address to the Citizens of the United States,* Philadelphia Aurora (Dec. 22, 1794). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Annals of Congress 2902-2903 (5th Cong., 1799). . . . . . . . . . . . . . . . . . . . 13

Annals of Congress 934 (3d Cong., 1794). . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Brown, Richard D., *The Strength of a People: The Idea of an Informed Citizenry in America*, 1650-1870 (University of North Carolina Press, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Capra, Frank, *The Name Above the Title* (MacMillan 1971). . . . . . . . .  22, 23

Curtis, Michael Kent, *Lincoln, Vallandigham, and Anti-war Speech in the Civil War*, 7 William & Mary Bill of Rights J. 105 (1998). . . . . . . . . . . . 16-18

Drayton, Stephen, *List of Members of the Charleston Republican Society*, 14 April 1794, in *Papers of the Republican Society of South Carolina* (Boston Public Library). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Durey, Michael, *Thomas Paine's Apostles: Radical Émigrés and the Triumph of Jeffersonian Republicanism*, 44 William and Mary Quarterly 666 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Editorial*, Porcupine's Gazette (June 27, 1798). . . . . . . . . . . . . . . . . . . . . . 14

Franklin D. Roosevelt, Proclamation 2068 - Christmas Amnesty Proclamation for Certain War-Time Offenders Who Have Completed Their Prison Sentences (Dec. 23, 1933). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Hodgson, Marshall, *The Venture of Islam* (Univ. of Chicago 1974). . . . . .  28

Jaffee, David, *The Village Enlightenment in New England, 1760-1820*, 47 William and Mary Quarterly 327 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

John, Richard, *Spreading the News: The American Postal System from Franklin to Morse* (Harvard University Press, 1998). . . . . . . . . . . . . . . . . 9

Kramnick, Isaac, *Republicanism and Bourgeois Radicalism: Political Ideology in Late Eighteenth-Century England and America* (Cornell University Press, 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Miller, John C., *Crisis in Freedom* (Little, Brown 1951). . . . . . . . . . . . . 14, 15

*Qur'an* (Abdullah Yusuf Ali. Transl. 2000). . . . . . . . . . . . . . . . . . . . . . . . . 3

*Resolutions*, Wood's Newark Gazette (December 31, 1794). . . . . . . . . . . . 12

Smith, James Morton, *Freedom's Fetters* (Cornell Univ. Press 1956). . . . . 15

Stone, Geoffrey, *Perilous Times: Free Speech in Wartime from the Sedition Act of 1798 to the War on Terrorism* (W.W. Norton & Co. 2004). . . . . . . . 17

*The Address of the Patriotic Societies of the County of Newcastle, State of Delaware: To the People of the United States of America*, Philadelphia Aurora (Jan. 20, 1795). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*The Democratic-Republican Societies, 1790-1800: A Documentary Sourcebook of Constitutions, Declarations, Addresses, Resolutions, and Toasts* (Philip Foner, Ed., Greenwood Press 1976). . . . . . . . . . . . . . . . . 11, 12

Thomas Jefferson, First Inaugural Address, March 4, 1801. . . . . . . . . . . . 8

Trimborn, Jurgen, *Leni Riefenstahl: A Life* (Edna McCown Transl., Faber & Faber 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

Work, Clemens P., *Darkest Before Dawn: Sedition and Free Speech in the American West* (University of New Mexico Press 2005). . . . . . . . . 19, 21, 29

## IDENTITY OF AMICUS CURIAE, INTEREST IN CASE, AND SOURCE OF AUTHORITY TO FILE

1.    **IDENTITY AND INTEREST OF AMICUS CURIAE**.

Ali Hamza Ahmad Suliman al Bahlul was *al Qaeda*'s leading publicist. He produced "*The State of Ummah*," which, the Government contended, was Mr. Ali al Bahlul's most significant contribution to *al Qaeda*.  (Tr. at 316-322).  He also operated a primitive recording studio that recorded messages from Osama bin Laden.  Mr. Ali al Bahlul's words apparently did not appear on these recordings.

The First Amendment Scholars and Historians and the Montana Pardon Project are scholars of the international exchange of popular, unpopular, and abhorrent (to ruling governments) ideas during the late 18th Century, known as the "Republic of Letters," and of the United States' reactions to unpopular and abhorrent speech during times of crisis.

Dr. Caroline Winterer is a Professor of History at Stanford University and holds an appointment by courtesy in Stanford's Classics Department. She participates in Stanford's *Republic of Letters* project, which catalogs and maps the exchanges of letters among the leading thinkers in Europe and North America during the 17th-19th centuries.  She is the author of *Where is America in the Republic of Letters?*, 9 Modern Intellectual

1

History 597 (2012), among many other books and articles. Dr. Winterer is the Associate Editor of the *Oxford Companion to American Intellectual and Cultural History*, is a member of the editorial boards of *Modern Intellectual History* and *Reviews in American History*, among others, and is a member of the advisory board of the *Palgrave Series in Intellectual and Cultural History*.

Dr. Catherine O'Donnell is an Associate Professor of History at Arizona State University. Dr. O'Donnell is the author of *Men of Letters in the Early Republic: Cultivating Forums of Citizenship* (Univ. of North Carolina Press, 2008), as well as other articles and book chapters.

Prof. Clemens P. Work, a lawyer and retired Professor of Journalism at the University of Montana, is the author of *Darkest Before Dawn* (University of New Mexico Press 2005), a history of the enforcement of the federal Espionage Act, the Montana Sedition Act, and other state laws that criminalized speech and publishing during and shortly after World War I. Professor Work and Clinical Professor of Law Jeffrey Renz are the co-founders of the Montana Pardon Project, which petitioned for and obtained pardons for 78 men and women convicted of sedition for words that they uttered during 1917-1918.

2

Prof. Simon Newman is a Professor of History at the University of Glasgow, U.K.  His emphasis is the social and political history of early North America with a focus on the American Revolution.  He has written about European perspectives of revolutionary America.  His most recent relevant article, *La Révolution française vue de loin: la célébration de Valmy à Boston, en Janvier 1793*, 58 Revue d'Histoire Moderne et Contemporaine 80-99 (2011), examines the impact upon the United States of the victory of French revolutionary forces over the Prussians at Valmy.

Mr. Ali al Bahlul and the United States are successors to and inheritors of the traditions of the Republic of Letters.  Mr. Ali al Bahlul's production of "*the State of Ummah*" is centered around the ideas set forth in *al Tawbah*, the ninth *surah*, 38th and 39th *ayat* of the *Qur'an*:

> O ye who believe! what is the matter with you, that, when ye are asked to go forth in the cause of God, ye cling heavily to the earth?  Do ye prefer the life of this world to the Hereafter? But little is the comfort of this life, as compared with the Hereafter.
>
> Unless ye go forth, He will punish you with a grievous penalty, and put others in your place; but Him ye would not harm in the least. For God hath power over all things.

*Qur'an*, 9:38-39 (Abdullah Yusuf Ali. Transl. 2000); quoted in *State of Ummah*, 29:30.

3

These *ayat* refer to the failure of some members of the *ummah* to join an expedition to repulse a reported Byzantine incursion at Tabuk in the ninth year after the Muslim community, the *ummah*, had fled from Mecca to Medina.  (9 A.H./630 C.E.)  Abdullah Yusuf Ali, *The Meaning of the Holy Qur'an*, 435 (11th Ed., Amana 2009).  Ali al Bahlul drew parallels between Tabuk and the current state of the *ummah*.  *The State of the Ummah* sought to persuade Muslims that God would treat them like those who failed to join the Tabuk expedition if they failed to come forward to defend Islam against non-Muslims and apostates.

Ideas about the duties of human beings to God and to each other are part of the Republic of Letters.  Rights of conscience, of free speech, and of free press were developed to counter governments' interference in the international exchange of these ideas and their suppression by means of the criminal law.  The United States' history at home and at Nuremberg demonstrate that we have always adhered to the principle of free exchange of ideas, albeit (and too often) after the fact.

2.   **SOURCE OF AUTHORITY TO FILE**.

Pursuant to Fed. R. App. P. 29(a) and Circuit Rule 29(b), we certify

4

that all parties have consented to the filing of this brief.

3. **STATEMENT OF AUTHORSHIP AND FINANCIAL CONTRIBUTIONS.**

This brief was authored or adopted by amici and counsel listed on the front cover. No party or party's counsel authored this brief, in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No other person but amici and their counsel, which is a clinical legal education program of The University of Montana, contributed money that was intended to fund preparing or submitting this brief.

Pursuant to Circuit Rule 29(d), we certify that it was not practicable to join all other amici in this case in a single brief. The authors do not claim expertise in the subjects addressed by other briefs and believe it would be inappropriate to address matters upon which we do not have particular expertise. The information set out in this brief is unique and addresses a subject not addressed by other friends of this court.

## SUMMARY OF ARGUMENT

Americans' and, in particular, the Framers' understanding of freedom of speech and of press extended beyond America's shores. Educated

Americans were attuned to the Republic of Letters – the free flow of
political and other information among citizens of different countries.
Voltaire and Rousseau were not discovered by visitors to France. They
corresponded directly with their counterparts in England and in the British
colonies. Their ideas and the ideas of their correspondents were often
antithetical to the ruling classes. Some were considered treasonous and
were suppressed by British authorities.

The First Amendment to the United States Constitution was
proposed, approved by Congress, and ratified by the States in this historical
context – the context of the need to protect the international flow of
international ideas. This principle extended to ideas that were a threat to
the existing order.

The ratification of the First Amendment and the States' adoption of
their own guarantees of free speech and free press could not ensure that the
government would always adhere to those principles. Assaults upon those
principles began as early as 1794 and continue today. Each time guarantees
of free speech and free press came under attack, the United States was at
war or was anticipating war. With two exceptions, in each instance the
United States acted after the fact by means of pardons and remissions to

6

correct prosecutions that were pursued and convictions obtained because of fear, anger, and prejudice. The two exceptions, the United States' and our allies' treatment of Nazi propagandists Leni Riefenstahl and Julius Streicher, illustrate the application of free speech and free press rights at Nuremberg and the limits on the power to criminalize speech and communication. The Allies' decision not to prosecute Riefenstahl and the International Military Tribunal's decision to limit the scope of the prosecution and conviction of Streicher preserved the Republic of Letters.

Lack of incitement was the key difference between Riefenstahl and Streicher. Knowing incitement distinguished the count for which Streicher was convicted, sentenced, and executed, from the counts that were dismissed by the Tribunal or of which he was acquitted. The Nuremberg Tribunal did not recognize recruiting speech or inspiring speech as war crimes or as crimes against humanity.

Mr. Ali al Bahlul's work pales in comparison to Streicher's poisonous venom. It fails to approach Riefenstahl's skill at inspiration or her glorification of Aryanism and the *National Sozialistischen Deutschen Arbeiterpartei.*

*The State of the Ummah* falls within the boundaries of speech that

7

has historically been beyond the reach of war crimes tribunals and this
Court may conclude that it is beyond the reach of prosecution in a military
commission.

## ARGUMENT

### I.  FREEDOM OF SPEECH AND PRESS (1794-1801).

> [The essential principles of our Government] form the bright
> constellation which has gone before us and guided our steps
> through an age of revolution and reformation . . . .  [S]hould we
> wander from them in moments of error or of alarm, let us
> hasten to retrace our steps and to regain the road which alone
> leads to peace, liberty and safety.

Thomas Jefferson, First Inaugural Address, March 4, 1801.

After the American Revolution, the ideal of *translatio studii*, the
transfer of letters from East to West, animated educated Americans as it
had since the seventeenth century.  Religious societies – including an
American Catholic Church sensitive to charges that "papists" hid the Word
from the flock – not only insisted on the need for lay people to read Bibles
but also printed and promoted religious tracts.  The new federal
government differed from the Europeans by declining to search the mails
for dangerous printed matter and by refusing to have customs officials
confiscate printed material at the nation's borders.  Richard D. Brown, *The*

8

*Strength of a People: The Idea of an Informed Citizenry in America*, 1650-1870 (University of North Carolina Press, 1996); Isaac Kramnick, *Republicanism and Bourgeois Radicalism: Political Ideology in Late Eighteenth-Century England and America* (Cornell University Press, 1990); David Jaffee, *The Village Enlightenment in New England, 1760-1820*, 47 William and Mary Quarterly 327-346 (1990); Richard John, *Spreading the News: The American Postal System from Franklin to Morse* 31 (Harvard University Press, 1998).

In Federalist X, James Madison wrote eloquently of the need to protect the rights of those, including religious sects, "who are united and actuated by some common impulse or passion, or of interest, adverse to the rights of other citizens." I *The Federalist* 56 (1788) (Legal Classics Reprint 1983). Madison incorporated that protection in his draft of the First Amendment. Nevertheless some in the founding generation continued to believe that the government should have the ability to punish speech disruptive to good order. Assaults on press and speech freedoms began within a few years of the First Amendment's ratification. The outcomes of those battles reveal the scope of the freedom of speech and press.

In Europe war raged between Great Britain and republican and, later,

Napoleonic France.  During this period French refugees and Irish and British radical émigrés flooded into the United States.  The power of the Federal government over the speech and writing of both American citizens and aliens was tested, first in the aftermath of the Whiskey Rebellion in 1794, and then following the Sedition Act of 1798.

In his annual address to Congress in November 1794, shortly after his suppression of the Whiskey Rebellion, President Washington declared that he held "certain self-created societies" to be responsible for the uprising. Journal of the House 234 (3d Congress 1794).  This was (and was understood to be) an attack on the Democratic-Republican societies.  These societies formed the foundations of the nation's first opposition party. Washington resolved to use his office rather than the courts to condemn them and to limit their power.

The first major debate in the United States over press freedom was triggered by Washington's attack. Members of the Democratic-Republican Society of Newcastle, Delaware, were typical in their observation that "the highest authority" in the nation had attacked the "legality of our associations." *The Address of the Patriotic Societies of the County of Newcastle, State of Delaware: To the People of the United States of*

10

*America*, Philadelphia Aurora (Jan. 20, 1795).

Members of these societies included both citizens and non-citizens. Some Americans felt that such groups as the German Republican Society of Philadelphia and the Republican Society of Charleston, South Carolina, were acting as agents of foreign nations. *The Democratic-Republican Societies, 1790-1800: A Documentary Sourcebook of Constitutions, Declarations, Addresses, Resolutions, and Toasts* 7 (Philip Foner, Ed., Greenwood Press 1976). Members of the Charleston society included French, Irish, and Scottish immigrants. Stephen Drayton, *List of Members of the Charleston Republican Society*, 14 April 1794, in *Papers of the Republican Society of South Carolina* (Boston Public Library). Members of these societies and the supporters of the nascent Jeffersonian party asserted that their constitutional rights of freedom of speech and press, which they defended as universal rights, were unrestricted by nationality or citizenship. In Philadelphia the members of the Democratic Society of Pennsylvania pointed out that,

> Freedom of thought, and a free communication of opinions by speech or through the medium of the press, are the safeguards of our Liberties . . . . it is freedom in the communication of sentiments, [by] speech or through the press. The liberty is an imprescriptable right, independent of any Constitution or social compact: it is as complet [sic] a right as that which any man

11

> has to the enjoyment of his life.  These principles are eternal -
> they are recognised by our Constitution; and the nation is
> already enslaved that does not acknowledge their truth.

An *Address to the Citizens of the United States,* Philadelphia Aurora (Dec. 22, 1794); *see also* Foner at 99.

The Republican Society of Newark, New Jersey, published the view that "the freedom of opinion is a right inherent in nature, and never was intended to be surrendered to government."  *Resolutions*, Wood's Newark Gazette (December 31, 1794); *see* Foner at 148-149.  Writing less than three years after the First Amendment's ratification, these Americans recognized the freedoms of speech and press as universal and unrestricted rights.

The international nature of the conflict over speech and press cannot be avoided.  As French, Irish and British émigrés who supported the Republican opposition poured into the United States, they were regularly castigated by the Federalist press.  Historian Michael Durey identified seventy-four radical newspaper editors and writers and members of Democratic-Republican societies who arrived during these years.  By the end of the 1790s, between fifteen and twenty per cent of the Democratic-Republican newspapers were edited by radical émigrés.  Michael Durey, *Thomas Paine's Apostles: Radical Émigrés and the Triumph of*

12

*Jeffersonian Republicanism*, 44 William and Mary Quarterly 666, 683 (1987).

Washington's speech triggered a Congressional inquiry. After four days of debate in the House over a measure to censure the societies, James Madison finally rose to speak. He reminded the members of the House:

> Opinions are not the objects of legislation . . . . You animadvert on the abuse of reserved rights: how far will this go? It may extend to the liberty of speech, and of the press. It is vain to say that this indiscriminate censure is no punishment. If it falls on classes, or individuals, it will be a severe punishment. He wished it to be considered how extremely guarded the Constitution was in respect to cases not within its limits . . . .

Annals of Congress 934 (3d Cong., 1794).

Madison's words were persuasive. In 1794 no law outlawed the Democratic-Republican societies, nor were any of their members prosecuted for any offense.

The election of 1796 changed this landscape as Federalists took control of the House, Senate, and Presidency. War with France appeared imminent and republican speech was seen to aid the enemy. On the House floor Rep. George Thatcher argued:

> The tongue is an unruly member. There is no difference between the tongue and the press except every press ought to be considered as a million of tongues, and ought to be guarded with a million of guards.

13

Annals of Congress 2902-2903 (5th Cong., 1799).  Congress quickly passed

and President Adams signed the Alien and Sedition Acts.   An Act

Concerning Aliens, ch. 58, 1 Stat. 570; An Act Respecting Alien Enemies,

ch. 66, 1 Stat. 577; An Act for the Punishment of Certain Crimes against the

United States, Ch. 74, 1 Stat. 596 (1798).

The international flavor of the speech and press debate once again

revealed itself as the Federalist *Porcupine's Gazette* rejoiced at the

apprehension of a French émigré:

> The fellow had said that ADAM'S head would be off in six
> months, and that JEFFERSON would be in his place. If no one
> else could be found, it is said, he added that [he] himself would
> be the executioner.

*Editorial*, Porcupine's Gazette (June 27, 1798).

The Frenchman and the Republican editor of the *Aurora* who

published the opinion were convicted of sedition and "remanded to prison."

Vermont Congressman Matthew Lyon was indicted, convicted, and

jailed for arguing that under President Adams, "every consideration of the

public welfare was swallowed up in a continual grasp for power, in an

unbounded thirst for ridiculous pomp, foolish adulation, and selfish

avarice" and for having printed a letter that suggested that Congress

commit the President to the madhouse.  He was fined $1,060.96 and

14

sentenced to four months confinement.  John C. Miller, *Crisis in Freedom*, 106-108 (Little, Brown 1951).  During its brief life, fourteen indictments were brought under the Sedition Act, mostly against editors and publishers of Republican newspapers.  Some of these papers were closed down, while others silenced their voices for fear of the repercussions. James Morton Smith, *Freedom's Fetters* 182-184 (Cornell Univ. Press, Ithaca, 1956).  The accused included Irishman William Duane, editor of the *Philadelphia Aurora*, wrote a series of scathing editorials.  *Crisis in Freedom* at 199-200.  The Federalist Senate charged that he made "false, scandalous, defamatory, and malicious assertions."  *Crisis in Freedom* at 201.  Summoned to appear before the Senate, Duane fled.  He was quickly charged with sedition.  *Crisis in Freedom* at 200; *Freedom's Fetters* at 301-302.

Duane was never tried, however, as newly-elected President Jefferson directed that all sedition prosecutions were to be discontinued.  *Freedom's Fetters* at 305.  Jefferson promptly pardoned and offered a formal apology to every person convicted of violating the Sedition Act.  In 1840, Congress remised the full amount of Rep. Lyon's fine, with interest. An Act to Refund a Fine Imposed on the Late Matthew Lyon, 6 Stat. 802 (1840).  The bill demonstrated the sincerity of the apology and public distaste for the

Sedition Act but was an empty gesture for Lyon, who died in 1822.

The conclusion to which we are drawn is that at the time of the adoption of the First Amendment, Americans recognized that freedoms of speech and press extended to citizens and non-citizens alike and that they should check government in time of peace and in times of crisis. More important, the views of those who lived at the time, including the view of the author of the First Amendment, demonstrated that the power of government, especially a government of limited powers, could not reach conscientious beliefs or the expression of those beliefs. When the government departed from these principles, its citizens were prompt to correct the error, to pardon the victims of its abuse and to recognize through apology, its wrongs.  The pattern would sadly repeat itself over the next 200 years.


## II.    THE REPUDIATION OF THE VALLANDIGHAM MILITARY TRIBUNAL

We reverence Freedom of Discussion – by which we mean
Freedom to uphold perverse and evil theories, since nobody
ever doubted the right to uphold the other sort.

N.Y. Daily Tribune 5 (May 18, 1863), in Michael Kent Curtis, *Lincoln, Vallandigham, and Anti-war Speech in the Civil War*, 7 Wm. & Mary Bill

16

Rts. J. 105, 145 (1998).

On May 1, 1863, at a political rally in Mount Vernon, Ohio, Clement Vallandigham, a former member of Congress and an opponent of the Civil War, said that the war was "a wicked, cruel, and unnecessary war;" "a war not being waged for the preservation of the Union;" "a war for the purpose of crushing out liberty and erecting a despotism;" "a war for the freedom of the blacks and the enslavement of the whites." Vallandigham was promptly brought before a military commission and sentenced to confinement for the duration of the war. President Lincoln commuted his sentence to "exile." 7 Wm. & Mary Bill Rts. J. at 131; Geoffrey Stone, *Perilous Times: Free Speech in Wartime from the Sedition Act of 1798 to the War on Terrorism* 118 (W.W. Norton & Co. 2004). Vallandigham, however, returned to the North, participated in the 1864 Democratic Convention, and continued to advocate against the war. Lincoln, having been pilloried in both the Democratic and Republican press for Vallandigham's arrest, now ignored him, although the commutation of Vallandigham's sentence was conditional and he could have been confined at any time. 7 Wm. & Mary Bill Rts. J. at 136.

When the *Chicago Times* protested Vallandigham's treatment,

General Ambrose Burnside shut it down saying, "That freedom of discussion and criticism which is proper in the politician and the journalist in time of peace, becomes rank treason when it tends to weaken the confidence of the soldier in his officers and his Government." 7 Wm. & Mary Bill Rts. J. at 133.  This triggered another storm of protest across the North.  Lincoln revoked the order and the *Chicago Times* continued to publish throughout the war.  *Id*. at 134.  Once again government excess had yielded to its citizens' understanding of the rights of free speech and press.

### III.    CONVICTION AND REDEMPTION (1918-2006)

> As for the horrifying sentence [imposed on Starr], . . . it, with too many like, goes far to give color, if not justification, to the bitter comment of George Bernard Shaw, satirist and cynic, that during the war the courts in France, bleeding under German guns, were very severe; the courts in England, hearing but the echoes of those guns, were grossly unjust; but the courts of the United States, knowing naught save censored news of those guns, were stark, staring, raving mad.

United States District Judge George Bourquin, in *Ex parte Starr*, 263 F. 145, 146-147 (D. Mont. 1920).

Between 1917 and 1920, following America's involvement in World War I, 20 states and two territories adopted legislation criminalizing words, publications, or acts that were perceived to undermine the war effort.  In

18

February 1918, the Montana Legislature enacted the first such law, the

Montana Sedition Act.  The Act prohibited "disloyal, profane, violent,

scurrilous, contemptuous, slurring or abusive language" about the

government, "language calculated to bring" the United States or its armed

forces "into contempt, scorn, contumely or disrepute," "any language

calculated to incite or inflame resistance" to authority, exhortations to

strike, and language that causes disaffection among the armed forces.  In

Montana "sedition" was punishable by fines up to $20,000 and up to 20

years in prison.  1918 Mont. L., Ch. 11, § 1.

In February and March 1918, the Montana Legislature impeached

and convicted District Judge Charles Crum for "disloyal" statements but in

particular for acting as a witness for Ves Hall, who had been accused and

acquitted of violating the federal Espionage Act.  *Darkest Before Dawn* at

131-132.

Seventy-nine men and women, including a saloon swamper, a

newspaper editor and the pastor of the pacifist Church of the Brethren were

convicted.  The law fell heavily on those who had emigrated from Germany

and the Austro-Hungarian Empire.

Similar words led to prison or to acquittal. The statements, "This is a

19

rich man's war and we have no business in it;" "this is a rich man's war and a poor man's fight;" "the rich men rule the country. . . ." resulted in the acquittal of O.O. Odekirk in Terry, Montana. *State of Montana v. Odekirk*, (Cause No. 37, Prairie County 1918). In contrast, "This is a rich man's war and we have no business in it; they talk about Hooverism--it's a joke. Nobody pays any attention to it. It don't amount to anything. . . The poor man has no show in this war. The soldiers are fighting the battles of the rich," earned Ben Kahn 20 years in prison. *State of Montana v. Kahn*, 182 P. 107 (Mont. 1919).

The Montana Supreme Court observed that the Sedition Act was enacted for "for the peace and safety of society." *State of Montana v. Smith*, 190 P. 107, 111 (Mont. 1920). Nevertheless such laws are enacted only when the country faces an emergency and fears words or, as in the case before this Court, fears words and images.

After the emergency ended, President Wilson's successors pardoned all who had been convicted under the federal Espionage and Sedition Acts. *See* Franklin D. Roosevelt, Proclamation 2068 - Christmas Amnesty Proclamation for Certain War-Time Offenders Who Have Completed Their Prison Sentences (Dec. 23, 1933) (http://www.presidency.ucsb.edu/ws/

index.php?pid= 14588&st=&st1=# (accessed March 6, 2006).  In 1927, the

Governor of California pardoned Anita Whitney, one month after the

Supreme Court of the United States affirmed her conviction.  Whitney, in a

trial larded with testimony about IWW violence, had been convicted of

violating California's criminal syndicalism law for having participated in a

meeting to organize a branch of the Communist Labor Party.  *Darkest*

*Before Dawn* at 256-259.

On January 25, 1991, the Montana Senate noted that "the emotional

fervor surrounding the United States' entry into World War I" had led to

Judge Crum's impeachment.  The Senate asserted that "the people of

Montana in a reavowal of the principles of free speech and responsive

democratic government, desire to right a historical wrong," and

unanimously and posthumously absolved and exonerated Judge Crum.

1991 Mont. Laws 3437.  In the final act of redemption, on May 3, 2006, in a

formal ceremony attended by scores of their relatives, Montana Governor

Brian Schweitzer pardoned everyone who had been accused or convicted of

under Montana's Sedition Act.

Once again the Republic had righted itself and recognized that rights

of conscience, of free speech, and of the press applied during wartime and

extended to German immigrants and former members of the German and

Austro-Hungarian armies.  The lessons of 1801, 1864, and 1918 would be

applied in the next great emergency – the Second World War.


**IV.    LENI RIEFENSTAHL, JULIUS STREICHER, AND THE NUREMBERG INTERNATIONAL MILITARY TRIBUNAL.**

> Although *Triumph of the Will* fired no gun and dropped no
> bombs, as a psychological weapon aimed at destroying the will
> to resist, it was just as lethal.

Frank Capra, *The Name Above the Title* 328 (MacMillan 1971).

From 1794 to 1945, in times of emergency, the United States

government forgot that "The protection of these faculties [of men] is the

first object of government."  A. Hamilton, *Federalist X*.  Government forgot

freedoms of speech and press and prosecuted speech and publications that

was seen to undermine the safety of the Republic.  Once the emergency

ended, those who were prosecuted, whether citizen or non-citizen, loyal or

"disloyal," were pardoned with an accompanying apology.  Neither would

be necessary for Leni Riefenstahl, the creative director and producer of

*Triumph of the Will*, or Julius Streicher, the Nazis' leading "Jew-baiter."  In

their cases, the principles that govern free speech and free press were

properly applied and only the most narrow class of publication was

22

punished.

Leni Riefenstahl, "Hitler's videographer," was one of the most renowned producers of political propaganda. Riefenstahl was an actress, dancer, and director who gained notoriety in Germany in the early 1930s. After hearing Hitler speak in 1932, she was overcome by what she described as his talent and vision. Jurgen Trimborn, *Leni Riefenstahl: A Life* 212, 225 (Edna McCown Transl., Faber & Faber 2007). She was asked and agreed to film the 1933 and 1934 Nazi Party rallies at Nuremberg. The two films, *Victory of Faith* (1933) and *Triumph of the Will* (1934), solidified the ideals of the Nazi Party. The films recorded Hitler preaching his messages of purification and messages promoting the eradication of those 'inferior' people in order to restore Germany to its once prideful and powerful former self.

Messages advocating removal of all those who did not conform to a certain Nazi ideal characterized the decade of mass extermination promulgated by the Nazi Party. Capra at 328-329. *Triumph of the Will* was shown throughout the world and was shown at every German movie theater until 1945. Trimborn at 124. The film helped in gain mass support for the Nazi movement and garnered sympathy and support for Nazi

Germany around the world.  After producing and directing these two films, Riefenstahl created an 18-minute film, *Day of Freedom:  Armed Forces and the German Army*.  This film captured the 1935 Nazi Party rally at Nuremberg and is recognized as an inspiration for the Nuremberg Laws that stripped German Jews of citizenship and property.  The films Leni Riefenstahl created were tremendously successful and are widely regarded by the film industry the most effective pieces of propaganda ever produced.

Although the United States banned the documentaries as Nazi propaganda, Trimborn at 120-122, Riefenstahl was never prosecuted for producing them.  Their dates are the key: all three pre-dated the war; all three predated the commencement of the "final solution."  Riefenstahl may have produced a recruiting video for the NSDAP, but she could not be accused of inciting others to murder millions of innocents.

The Allies applied the same principles to the works of Julius Streicher when he was brought before the International Military Tribunal at Nuremberg.  Streicher published *Der Stürmer*, a Nazi newspaper that at its peak had over a half-million subscribers.  Exhibit Streicher-19, XLI Proceedings of the International Military Tribunal, Nuremberg  558 (English Ed. 1949) (hereinafter IMT); I IMT at 302.

24

Four counts were brought against the Nuremberg defendants. Count I accused the individual defendants, including Streicher, of conspiracy to commit war crimes, crimes against peace, and crimes against humanity. Counts II and III accused individual defendants of crimes against peace and of war crimes. Count IV accused the individual defendants of crimes against humanity. The Charter that established the IMT defined crimes against humanity as:

> (c) . . . namely, murder, extermination, enslavement, deportation, and other inhumane acts committed  against any civilian population, before or during the war; or persecutions on political, racial, or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of the domestic law of the country where perpetrated.

I IMT at 253.

In a parallel to the treatment of Riefenstahl, the acts that constituted Streicher's crimes against humanity were limited to those committed after the outbreak of hostilities. I IMT at 254.

Streicher was named only with respect to Counts I and IV. Following his trial, the IMT found without dissent that Streicher had not participated in making policy and therefore concluded that he could not be guilty under Count I.

25

With respect to Count IV, the IMT made several key findings and

conclusions:

> [T]he poison Streicher injected into the minds of thousands of
> Germans . . . caused them to follow the National Socialist policy
> of Jewish persecution and extermination.

I IMT at 302.

> With knowledge of the extermination of the Jews in the
> Occupied Eastern Territory, this defendant continued to write
> and publish his propaganda of death.  Testifying in this trial, he
> vehemently denied any knowledge of mass executions of Jews.
> But the evidence makes it clear that he continually received
> current information on the progress of the "final solution."  His
> press photographer was sent to visit the ghettos of the East in
> the spring of 1943, the time of the destruction of the Warsaw
> ghetto.

I IMT at 303.

> Streicher's incitement to murder and extermination at the time
> when Jews in the East were being killed under the most
> horrible conditions clearly constitutes persecution on political
> and racial grounds in connection with War Crimes, as defined
> by the Charter, and constitutes a Crime against Humanity.

I IMT at 304.

The evidence that warranted these findings was not limited to one

issue of *Der Stürmer*.  Since 1923 Streicher had called for "a punitive

expedition" against Jews, for their extermination, for their annihilation, for

their deaths.  I IMT at 302-303.  He said, "The sun will not shine on the

26

nations of the earth until the last Jew is dead."  I IMT at 34.  He declared

that every Jew is "a parasite, an enemy, an evil-doer, a disseminator of

diseases who must be destroyed in the interest of mankind."  I IMT at 302.

This incitement lasted for two decades and appeared in many issues of *Der*

*Stürmer*.

Thus, the IMT limited the offense of crimes against humanity to

knowing and repeated incitements to murder.  Even at Nuremberg, after

millions of innocents had been murdered before and during World War II,

mere propaganda, even for recruitment, was not defined as a criminal

offense.

In contrast, the United States' initial charge against Ali al Bahlul with

respect to *The State of Ummah*, alleged that the video glorified the attack

on the USS Cole, that it was prepared to recruit, motivate, and awaken, and

that it "inspired" others.  App. 145.  The revised charge and specification

added an allegation that *The State of Ummah*, (called in the charge, "The

Destruction of the American Destroyer *U.S.S. Cole*") was produced to incite

persons to commit terrorism.  App.  155-158.  The video was alleged to be

one of the overt acts in furtherance of a conspiracy, App. 155, evidence of

solicitation, App. 156, and evidence of material support.  App. 157.

The Government called the video "The Destruction of the American Destroyer *U.S.S. Cole*," but asserted that video of the attack on the *U.S.S. Cole* played a very small role in *The State of Ummah*. App. 189. Re-titling the video in this way reflected the anger of the United States, in the same way that the prosecutions of dissenters reflected the country's anger in 1798, 1863, and 1918.

The Government asserted that *The State of Ummah* was intended to persuade Muslims that suicide attacks were not forbidden by the *Qur'an* or Islamic law and that conflict with Muslim governments was also permissible. App. 190. (This last was an odd allegation, since wars against recusants began in the 7th Century C.E. (1st Century A.H.) with the wars of the *Riddah*, led by the first Caliph, Abu Bakr, and were followed a few years later by the *Fitnah* Wars in which each faction asserted the "true" faith. Marshall Hodgson, *The Venture of Islam*, 198, 212-223 (Univ. of Chicago 1974).) The evidence and assertions of the government against Mr. Al Bahlul were no more than that *The State of Ummah* <u>inspired</u> many to join *Al Qaeda* or to act against others.

In Mr. Ali al Bahlul's case, the government reached beyond its constitutional powers when it sought to criminalize religious speech, even

religious speech that "inspires" others to act. Religious speech in the United States has inspired many to act – against abortion clinics, against federal agents. Although we prosecuted those who took those actions, we do not prosecute those who spoke.

Whether supporting radical Republican ideals in the 18th Century, opposing the war to reunite the Union in the mid-19th Century, opposing World War I in the early 20th Century, or advocating joining the *National Sozialistischen Deutschen Arbeiterpartei* in the mid-20th Century, words, writings, and images that inspired others to act have universally been recognized as beyond the reach of criminal prosecution, albeit often after the convictions of those who fell victim to the times.

## CONCLUSION

The generation of World War I failed to protect freedom of expression. What will we do?

Clemens P. Work, *Darkest Before Dawn* at 259.

This Court should take several lessons from this history. At the time that the First Amendment was adopted, Americans recognized that free speech and free press encompassed the international exchange of ideas known as the Republic of Letters. This exchange was not only considered to

29

be within the scope of the First Amendment, but beyond the reach of government.  In the late 18th and early 19th Centuries, Americans recognized that the rights of conscience, of free speech, and of free press were held by citizens and non-citizens alike.  Each time that the government neglected those lessons, that neglect was eventually repudiated by Americans and by succeeding administrations.  Nevertheless, those citizens and non-citizens who uttered unpopular, dissenting, and abhorrent views – people who would later be pardoned and exonerated – suffered needlessly because of a state of fear and anxiety and by reason of political incitement at home.

By the time of the Nuremberg Tribunal, however, the lesson had been learned.  Propaganda alone was beyond accusation and conviction of crime; repeated incitement to commit crimes against humanity was not.

These Amici urge this Court to consider Ali al Bahlul's work, *The State of Ummah* against this backdrop of history.

## CIRCUIT RULE 28(a) CERTIFICATE

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies:

30

1.      All parties, intervenors, and amici appearing in this Court are listed in the Brief for the Appellant. Pursuant to Rule 26.1, amici certify that none of the entities filing this brief are corporate entities.

2.      References to the rulings at issue appear in the Brief for Appellant.

3.      Counsel is unaware of any cases related to this appeal except for those listed in the Brief for the Appellant.

4.      Counsel is unaware of statutes or regulations related to this appeal except for those listed in the Brief for the Appellant.

## RULE 32 CERTIFICATE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,116 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface Wordperfect X6 in 14 point type and Georgian font, except for headings, which are in Helvetica font.

DATED:      August 18, 2014

_____/s/ Jeffrey T. Renz_____
JEFFREY T. RENZ
Clinical Professor of Law
School of Law
University of Montana
32 Campus Drive
Missoula, MT 59812
406-243-4823
jeff.renz@umontana.edu
criminaldefenseclinic@umontana.edu

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2014, a copy of the foregoing was filed electronically with the Court.  Notice of this filing will be sent to all parties by operation of this Court's electronic filing system.  Parties may access this filing through the Court's system.

Dated:  August 18, 2014

_____/s/ Jeffrey T. Renz_____