ORAL ARGUMENT SCHEDULED FOR OCT. 22, 2014
———————————————————

## No. 11-1324
———————————————————

### IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT
———————————————————

## ALI HAMZA SULIMAN AHMAD AL BAHLUL,

*Petitioner,*

v.

## UNITED STATES OF AMERICA,

*Respondent.*
———————————————————

On Petition for Review of the
United States Court of Military Commission Review
(CMCR No. 09-001)
———————————————————

### BRIEF OF THE NATIONAL INSTITUTE OF MILITARY JUSTICE AS *AMICUS CURIAE* IN SUPPORT OF THE PETITIONER
———————————————————

STEPHEN I. VLADECK
4801 Massachusetts Avenue, N.W.
Room 350
Washington, DC 20016
(202) 274-4241
svladeck@wcl.american.edu

AGNIESZKA M. FRYSZMAN
COHEN MILSTEIN SELLERS
    & TOLL PLLC
1100 New York Avenue, N.W.
East Tower — Suite 500
Washington, DC 20005
(202) 408-4600
afryszman@cohenmilstein.com

*Attorneys for Amicus Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

### A. Parties and *Amici Curiae*

All parties, intervenors, and *amici curiae* appearing in this Court are listed in the Brief of Petitioner. *Amicus curiae* National Institute of Military Justice ("NIMJ") is a District of Columbia nonprofit corporation. Pursuant to Rule 26.1, *amicus* certifies that, other than NIMJ, none of the entities filing this brief are corporate entities or are owned in whole or in part by other corporate entities.

### B. Rulings Under Review

References to the rulings at issue appear in the Brief of Petitioner.

### C. Related Cases

Counsel is unaware of any cases related to this appeal other than those listed in the Brief of Petitioner.

### D. Relevant Statutes and Regulations

Counsel is unaware of any statutes or regulations related to this appeal other than those provided in the Addendum to Petitioner's Brief.

Dated: **August 18, 2014**                    /s/ Agnieszka Fryszman
                                                                    *Counsel for* Amicus Curiae

i

## <u>COMPLIANCE WITH RULE 29</u>

### A. Consent to File

Pursuant to Fed. R. App. P. 29(a) and Circuit Rule 29(b), *amicus* certifies that all parties have consented to the filing of this brief.

### B. Authorship and Funding

Pursuant to Fed. R. App. P. 29(c)(5), *amicus* certifies that this brief was authored by *amicus* and counsel listed on the front cover. No party or party's counsel authored this brief, in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No other person besides *amicus* and their counsel contributed money that was intended to fund preparing or submitting this brief.

### C. Not Practical To Join in Single Brief

Pursuant to Circuit Rule 29(d), *amicus* certifies that it is not practicable to join all other *amici* in this case in a single brief. We do not claim expertise in the other issues addressed by *amici*, and believe it would be inappropriate to address matters upon which we do not have particular expertise.

<u>Dated</u>: **August 18, 2014**                    /s/ Agnieszka Fryszman
                                                           *Counsel for* Amicus Curiae

ii

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure,

undersigned counsel states that *amicus curiae* National Institute of Military Justice

is not a publicly-held corporation, issues no stock, and does not have a parent

corporation.

Dated:  **August 18, 2014**

/s/ Agnieszka M. Fryszman
*Counsel for* Amicus Curiae

## TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

COMPLIANCE WITH RULE 29 ........................................................................ ii

CORPORATE DISCLOSURE STATEMENT ..................................................... iii

TABLE OF AUTHORITIES ................................................................................ vi

GLOSSARY OF TERMS .................................................................................... xi

INTEREST OF *AMICUS CURIAE* ..................................................................... 1

SUMMARY OF ARGUMENT ............................................................................ 2

ARGUMENT ....................................................................................................... 5

I.    THE PRINCIPAL CONSTITUTIONAL LIMITS ON MILITARY
      JURISDICTION ARE THE JURY-TRIAL PROTECTIONS IN
      ARTICLE III AND THE FIFTH AND SIXTH AMENDMENTS ................ 5

      a.    The Supreme Court Has Repeatedly Distinguished Between
            Congress's Power To Define Offenses and Its Power To
            Subject Offenders to Military Jurisdiction ........................................... 5

      b.    The Supreme Court Has Conditioned Court-Martial Jurisdiction
            on a Specific Exception to the Jury-Trial Protections of Article
            III and the Fifth and Sixth Amendments .............................................. 9

      c.    The Supreme Court Has Conditioned Military Commission
            Jurisdiction on Implicit Exceptions to the Jury-Trial Protections
            of Article III and the Fifth and Sixth Amendments ........................... 12

II.   NO EXCEPTION TO THE CONSTITUTION'S JURY-TRIAL
      PROTECTIONS SUPPORTS THE ASSERTION OF MILITARY
      JURISDICTION IN THIS CASE .............................................................. 16

      a.    The Jury-Trial Provisions Apply To Non-Citizens  Not
            Lawfully Present Within the United States ......................................... 17

      b.    This Case Does Not "Arise in the Land or  Naval Forces" ................ 18

iv

c.    Petitioner is Not Charged With Offenses  Against the
      International Laws of War............................................................21

d.    No Jury-Trial Exception Exists for Violations  of the "Domestic
      Common Law of War".........................................................................24

CONCLUSION ........................................................................................................31

# TABLE OF AUTHORITIES[*]

**Page(s)**

## CASES

*Al Bahlul* v. *United States*,
  No. 11-1324, 2014 WL 3437485 (D.C. Cir. July 14, 2014)
  (en banc) ................................................................21, 22, 24, 27, 28

*Anderson* v. *Dunn*,
  19 U.S. (6 Wheat.) 204 (1821) ...............................................23

*Boumediene* v. *Bush*,
  553 U.S. 723 (2008).................................................................1

*Burns* v. *Wilson*,
  346 U.S. 137 (1953)................................................................16

*Callan* v. *Wilson*,
  127 U.S. 540 (1888)................................................................11

*Cheff* v. *Schnackenberg*,
  384 U.S. 373 (1966)..................................................................6

*Clinton* v. *Goldsmith*,
  526 U.S. 529 (1999)...................................................................1

*Codispoti* v. *Pennsylvania*,
  418 U.S. 506 (1974)..................................................................6

*Dist. of Columbia* v. *Clawans*,
  300 U.S. 617 (1937)..................................................................6

*Duncan* v. *Kahanamoku*,
  327 U.S. 304 (1946)................................................................21

*Duncan* v. *Louisiana*,
  391 U.S. 145 (1968)..................................................................6

---

  \* Authorities on which *amicus* principally relies are marked with asterisks (\*).

*Dynes* v. *Hoover*,
  61 U.S. (20 How.) 65 (1857) ...........................................................10

*\*Ex parte Milligan*,
  71 U.S. (4 Wall.) 2 (1866) ................................... 11, 12, 13, 14, 25, 26

*\*Ex parte Quirin*,
  317 U.S. 1 (1942)......................... 3, 4, 11, 13, 15, 16, 18, 19, 23, 24, 25, 26, 28

*Grisham* v. *Hagan*,
  361 U.S. 278 (1960)..........................................................................8

*\*Hamdan* v. *Rumsfeld*,
  548 U.S. 557 (2006)..........................................................1, 20, 21, 22, 26

*In re Yamashita*,
  327 U.S. 1 (1946)....................................................................15, 16

*Johnson* v. *Sayre*,
  158 U.S. 109 (1895)...................................................................3, 10

*Johnson* v. *United States*,
  700 A.2d 240 (D.C. 1997) ............................................................11

*\*Kinsella* v. *United States ex rel. Singleton*,
  361 U.S. 234 (1960).............................................................8, 19, 20, 26

*Madsen* v. *Kinsella*,
  343 U.S. 341 (1952).............................................................19, 20, 25

*McElroy* v. *United States ex rel. Guagliardo*,
  361 U.S. 281 (1960)..........................................................................8

*Middendorf* v. *Henry*,
  425 U.S. 25 (1976)........................................................................11

*N. Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*,
  458 U.S. 50 (1982)........................................................................30

*O'Callahan* v. *Parker*,
  395 U.S. 258 (1969)......................................................................10

*Palmore* v. *United States*,
411 U.S. 389 (1973)........................................................................2

*Rasul* v. *Bush*,
542 U.S. 466 (2004)........................................................................1

*\*Reid* v. *Covert*,
354 U.S. 1 (1957)........................................................7, 8, 19, 20

*Solorio* v. *United States*,
483 U.S. 435 (1987)................................................................10, 11

*Stern* v. *Marshall*,
131 S. Ct. 2594 (2011)......................................................2, 6, 29

*Sosa* v. *Alvarez-Machain*,
542 U.S. 692 (2004)......................................................................22

*\*United States ex rel. Toth* v. *Quarles*,
350 U.S 11 (1955)......................................................................5, 23

*United States* v. *Ali*,
71 M.J. 256 (C.A.A.F. 2012), *cert. denied*, 133 S. Ct. 2339 (2013) ................12

*United States* v. *Averette*,
19 U.S.C.M.A. (41 C.M.R.) 363 (1970)........................................9

*United States* v. *Cotton*,
535 U.S. 625 (2002)......................................................................17

*United States* v. *Hamdan*
696 F.3d 1238 (D.C. Cir. 2012)....................................................22

*United States* v. *Hamdan*,
801 F. Supp. 2d 1247 (Ct. Mil. Comm'n Rev. 2011)..........................1

*United States* v. *Tiede*,
86 F.R.D. 227 (U.S. Ct. Berlin 1979)............................................17

*United States* v. *Verdugo-Urquidez*,
494 U.S. 259 (1990)......................................................................17

## CONSTITUTIONAL PROVISIONS

U.S. CONST.
  art. I, § 8, cl. 10 ...............................................................................3, 14

  art. I, § 8, cl. 14 ....................................................................................3

  art. III, § 1 ............................................................................................2

  art. III, § 2, cl. 3 ...................................................................................5

  amend. V .......................................................................................3, 6, 10

  amend. VI.............................................................................................6

## STATUTES

10 U.S.C.
  § 818.....................................................................................................15
  § 821.....................................................................................................13

18 U.S.C. § 3261(a) .................................................................................7

## OTHER AUTHORITIES

Richard R. Baxter, *So-Called "Unprivileged Belligerency": Spies,
   Guerrillas, and Saboteurs*, 28 BRIT. Y.B. INT'L L. 323 (1951)..........15

Military Commissions, 11 OP. ATT'Y GEN. 297 (1865) .........................27

Beth Stephens, *Federalism and Foreign Affairs: Congress's Power To
   "Define and Punish . . . Offenses Against the Law of Nations,"*
   42 WM. & MARY L. REV. 447 (2000) ...............................................22

Stephen I. Vladeck, *Military Courts and Article III*, 103 GEO. L.J.
   (forthcoming 2015) .....................................................................15, 20

Stephen I. Vladeck, *The Laws of War as a Constitutional Limit on
   Military Jurisdiction*, 4 J. NAT'L SEC. L. & POL'Y 295 (2010)...........9, 15, 23, 24

Steve Vladeck, *What's Left of Hamdan II? Quite a Lot, Actually*,
   JUST SECURITY, July 17, 2014, 9:50 a.m.,
   http://justsecurity.org/12989/lefthamdan-ii-lot-actually/ ...................22

Earl Warren, *The Bill of Rights and the Military*,
    37 N.Y.U. L. REV. 181 (1962) ...............................................................................5

WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS
    (2d ed. Beard Books 2000) (1896) ....................................................................5

x

## GLOSSARY OF TERMS

MCA ...................Military Commissions Act of 2006, 120 Stat. 2600 (2006)

NIMJ  ......................................................National Institute of Military Justice

UCMJ  ...................................................... Uniform Code of Military Justice

### INTEREST OF *AMICUS CURIAE*

The National Institute of Military Justice ("NIMJ") is a District of Columbia nonprofit corporation organized in 1991 to advance the fair administration of military justice and foster improved public understanding of the military justice system. NIMJ's advisory board includes law professors, private practitioners, and other experts in the field, none of whom are on active duty in the military, but nearly all of whom have served as military lawyers—several as flag officers.

NIMJ appears regularly as an *amicus curiae* in the U.S. Supreme Court—in support of the government in *Clinton* v. *Goldsmith*, 526 U.S. 529 (1999), and in support of the petitioners in *Rasul* v. *Bush*, 542 U.S. 466 (2004), *Hamdan* v. *Rumsfeld*, 548 U.S. 557 (2006), and *Boumediene* v. *Bush*, 553 U.S. 723 (2008). NIMJ has also appeared as an *amicus* before the Court of Military Commission Review in this case and in *United States* v. *Hamdan*, 801 F. Supp. 2d 1247 (Ct. Mil. Comm'n Rev. 2011), and has filed briefs before both the original three-judge panel and the *en banc* court in this case.

NIMJ is actively involved in public education through its website, http://www.nimj.org, and through publications including the ANNOTATED GUIDE TO PROCEDURES FOR TRIALS BY MILITARY COMMISSIONS OF CERTAIN NON-UNITED STATES CITIZENS IN THE WAR AGAINST TERRORISM (2002), two volumes of

MILITARY COMMISSION INSTRUCTIONS SOURCEBOOKS (2003–04), and the

MILITARY COMMISSION REPORTER (2009–). Although NIMJ has generally avoided

taking a position on the legality of the military commissions established by the

Military Commissions Acts of 2006 and 2009, its interest in this case derives from

its concern that the decisions under review neglected well-settled constitutional

principles concerning the limits on the jurisdiction of military tribunals.

## SUMMARY OF ARGUMENT

Despite Article III's mandate that "[t]he judicial power of the United

States . . . shall be vested" in courts staffed by judges with constitutional salary and

tenure protections, U.S. CONST., art. III, § 1, the Supreme Court has historically

recognized three species of permissible *non*-Article III federal adjudication:

territorial courts; adjudication of "public rights" disputes by administrative

agencies or specialized tribunals; and prosecutions before military judges. *See*

*Palmore* v. *United States*, 411 U.S. 389, 400–04 (1973). Although each of these

exceptions has distinct textual, historical, and analytical underpinnings, the Court

has repeatedly stressed the importance of construing such departures narrowly, lest

the courts "compromise the integrity of the system of separated powers and the

role of the [Article III] Judiciary in that system." *Stern* v. *Marshall*, 131 S. Ct.

2594, 2620 (2011).

With regard to military courts, specifically, the Supreme Court has based the departure from Article III upon two distinct considerations: Congress's power to codify the relevant offenses, and the inapplicability of the jury-trial protections of Article III and the Fifth and Sixth Amendments. Thus, the Court has tied the constitutional validity of courts-martial to Congress's plenary power under the Make Rules Clause of Article I, U.S. CONST. art. I, § 8, cl. 14, and the text of the Grand Jury Indictment Clause of the Fifth Amendment, which exempts from the requirement of presentment or grand jury indictment "cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger." *id*. amend. V; *see, e.g.*, *Johnson* v. *Sayre*, 158 U.S. 109, 115 (1895). And in the context of military commissions, the Court has justified the departure from Article III by reference to Congress's power to "define and punish . . . offenses against the law of nations," U.S. CONST. art. I, § 8, cl. 10, and an *a*textual exception to the jury-trial protections for "offenses committed by enemy belligerents against the law of war." *Ex parte Quirin*, 317 U.S. 1, 41 (1942).

Neither of these exceptions, however, justifies the assertion of military jurisdiction in this case. Petitioner's case is not one "arising in the land or naval forces," since Petitioner himself is not *part* of those forces—and the Fifth Amendment was intended "to authorize the trial by court martial of the members of

3

our Armed Forces for all that class of crimes which under the Fifth and Sixth Amendments might otherwise have been deemed triable in the civil courts." *Quirin*, 317 U.S. at 43. Nor does Petitioner's offense fall within the exception recognized in *Quirin*, since, as the government itself concedes, standalone conspiracy is not recognized as a violation of the international laws of war.

The government—and Judge Kavanaugh, in his *en banc* concurrence—nevertheless maintain that there is historical support for trying offenses against the "U.S. common law of war" before military commissions, and that these precedents suggest that Article III does not prohibit the assertion of military jurisdiction over such offenses. In point of fact, though, no U.S. court has ever upheld the jurisdiction of a military tribunal to try an offense that *that* court believed to be a violation of the *domestic*—but not *international*—laws of war. As the Supreme Court has made clear, Article III demands far more historical evidence—and far more compelling prudential justifications—before Congress may depart from its mandate.

4

<u>ARGUMENT</u>

I.  **THE PRINCIPAL CONSTITUTIONAL LIMITS ON MILITARY JURISDICTION ARE THE JURY-TRIAL PROTECTIONS IN ARTICLE III AND THE FIFTH AND SIXTH AMENDMENTS**

### a) The Supreme Court Has Repeatedly Distinguished Between Congress's Power To Define Offenses and Its Power To Subject Offenders to Military Jurisdiction

Although military jurisdiction pre-dates the Constitution, *see* WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS 953–75 (2d ed. Beard Books 2000) (1896), the Supreme Court has consistently understood Congress's power to subject particular conduct to trial by a military tribunal as turning on two distinct, but often related, constitutional authorities: (1) Congress's Article I power to define the offense in question; and (2) its separate authority to subject the offender to trial for that offense before a *non*-Article III military court. *See, e.g.*, *United States ex rel. Toth* v. *Quarles*, 350 U.S. 11, 14 & n.5 (1955). *See generally* Earl Warren, *The Bill of Rights and the Military*, 37 N.Y.U. L. REV. 181, 185–92 (1962) (grounding the Court's policing of military jurisdiction in the need to give effect to constitutional boundaries between military and civilian authority).

This bifurcation is largely a byproduct of the jury-trial protections of Article III and the Fifth and Sixth Amendments. *See* U.S. CONST. art. III, § 2, cl. 3 ("The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury . . . ."); *id.*

5

amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger . . . ."); *id.* amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."). It also reflects the more generic principle recently reiterated by Chief Justice Roberts— that "Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III." *Stern* v. *Marshall*, 131 S. Ct. 2594, 2609 (2011).

Thus, subject to carefully circumscribed exceptions,[2] the Constitution's three jury-trial provisions generally require trial in a civilian court for all prosecutions under federal law. As a result, Congress's power to subject particular offenders to military jurisdiction does not turn solely on the Article I authority on which the

---

2. As the Court explained in *Duncan* v. *Louisiana*, 391 U.S. 145 (1968), "there is a category of petty crimes or offenses which is not subject to the Sixth Amendment jury trial provision." *Id.* at 159; *see also Dist. of Columbia* v. *Clawans*, 300 U.S. 617, 628 (1937). Relatedly, the Court has held that the trial of criminal contempt does not require a jury, at least where the maximum possible sentence is six months or less. *See Codispoti* v. *Pennsylvania*, 418 U.S. 506 (1974); *Cheff* v. *Schnackenberg*, 384 U.S. 373 (1966).

offense is predicated, but on whether a recognized exception to the jury-trial protections also applies.

In *Reid* v. *Covert*, 354 U.S. 1 (1957), for example, the Supreme Court rejected Congress's power to court-martial the spouse of a servicemember, at least for a capital offense committed during peacetime. At the heart of Justice Black's analysis for a four-Justice plurality[3] was his conclusion that the jury-trial provisions applied to trials of U.S. citizens outside the territorial United States— and therefore precluded the exercise of military jurisdiction. *See id*. at 6–14 (plurality opinion). Pointedly, the question was *not* whether Congress lacked the power to subject civilian dependents accompanying U.S. forces in the field to *any* criminal liability. *Cf*. Military Extraterritorial Jurisdiction Act, 18 U.S.C. § 3261(a) (authorizing civilian trials of individuals "employed by or accompanying the Armed Forces outside the United States" for conduct that would constitute a federal felony if committed within the "special maritime and territorial jurisdiction of the United States"). Instead, as Justice Black wrote,

> Under the grand design of the Constitution civilian courts are the
> normal repositories of power to try persons charged with crimes
> against the United States. And to protect persons brought before these

---

3. Justices Frankfurter and Harlan separately concurred in the judgment to provide a majority for the result. *See Reid*, 354 U.S. at 41–64 (Frankfurter, J., concurring in the result); *id*. at 65–78 (Harlan, J., concurring in the result).

> courts, Article III and the Fifth, Sixth, and Eighth Amendments
> establish the right to trial by jury, to indictment by a grand jury and a
> number of other specific safeguards.

*Reid*, 354 U.S. at 21 (plurality opinion); *see also id*. at 9 n.12 ("It is common

knowledge that the fear that jury trial might be abolished was one of the principal

sources of objection to the Federal Constitution and was an important reason for

the adoption of the Bill of Rights."); *id*. at 10 ("Trial by jury in a court of law and

in accordance with traditional modes of procedure after an indictment by grand

jury has served and remains one of our most vital barriers to governmental

arbitrariness.").

Three years later, when a majority of the Court followed Justice Black and

extended *Reid* to bar court-martial jurisdiction over *all* peacetime offenses by

civilians, it reasoned that "This Court cannot diminish and expand [Congress's

power under the Make Rules Clause], either on a case-by-case basis or on a

balancing of the power there granted Congress against the safeguards of Article III

and the Fifth and Sixth Amendments." *Kinsella* v. *United States ex rel. Singleton*,

361 U.S. 234, 246 (1960). In other words, the constitutionality of military

jurisdiction could not turn on the difference between capital and non-capital

offenses, *see id.*, or between civilian employees and dependents, *see McElroy* v.

*United States ex rel. Guagliardo*, 361 U.S. 281 (1960); *Grisham* v. *Hagan*, 361

8

U.S. 278 (1960), because the Constitution's jury-trial protections themselves brook no such distinction, *cf. United States* v. *Averette*, 19 U.S.C.M.A. (41 C.M.R.) 363 (1970) (interpreting UCMJ provision authorizing court-martial jurisdiction over civilian contractors during "time of war" to require a *declared* war, which Vietnam was not, in order to avoid serious constitutional question).

Instead, except in cases in which a recognized exception to the jury-trial provisions applies, military jurisdiction is foreclosed regardless of the underlying substantive offense or the specific source of Congress's power to define it. *See* Stephen I. Vladeck, *The Laws of War as a Constitutional Limit on Military Jurisdiction*, 4 J. NAT'L SEC. L. & POL'Y 295, 308 (2010) ("[T]hese cases do not just support the conclusion that Congress only has the authority to 'make rules' for individuals in the armed forces; they establish the equally important idea that the validity of military (versus civilian) jurisdiction turns on the inapplicability of the grand- and petit-jury trial rights in Article III and the Fifth and Sixth Amendments.") [hereinafter "Vladeck, *Laws of War*"].

  b) **The Supreme Court Has Conditioned Court-Martial Jurisdiction on a Specific Exception to the Constitution's Jury-Trial Protections**

In the context of courts-martial, the Supreme Court has justified the departure from Article III by reference to the text of the Grand Jury Indictment

9

Clause of the Fifth Amendment, which exempts from the requirement of presentment or grand jury indictment "cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger." U.S. CONST. amend. V; *see, e.g.*, *Johnson* v. *Sayre*, 158 U.S. 109, 115 (1895); *Dynes* v. *Hoover*, 61 U.S. (20 How.) 65 (1857).[4] To that end, when the Supreme Court in *Solorio* v. *United States*, 483 U.S. 435 (1987), abandoned the "service connection" test[5] in favor of the proposition that servicemembers may be tried by court-martial for *any* offense Congress prescribes, that conclusion reflected not just the "natural meaning" of the Make Rules Clause, but *also* "the Fifth Amendment's exception for 'cases arising in the land or naval forces.'" *Id*. at 439.

To be sure, the rights to criminal trial by petit jury in Article III and the Sixth Amendment include no comparable textual exception. Nevertheless, the

---

4. Although Justice Marshall has suggested that the "actual service" clause may have meant to modify *both* prior clauses in the Fifth Amendment (and therefore constrain all military jurisdiction to a "time of War or public danger"), *see Solorio* v. *United States*, 483 U.S. 435, 451 n.2 (1987) (Marshall, J., dissenting), the Court long ago rejected that view, holding that the "actual service" proviso only applies to—and circumscribes military jurisdiction over—the called-forth militia, *see, e.g.*, *Sayre*, 158 U.S. at 115.

5. The Court had articulated the "service connection" test in *O'Callahan* v. *Parker*, 395 U.S. 258 (1969), holding that the Constitution only authorized military jurisdiction over servicemembers for offenses directly related to their military service, *id*. at 272–74.

10

courts have consistently held that an atextual carve-out to those provisions is necessarily reflected in (and follows from) the text of the Grand Jury Indictment Clause. *See, e.g.*, *Johnson* v. *United States*, 700 A.2d 240, 243 (D.C. 1997) ("In cases involving the right to a jury trial, the Supreme Court has never distinguished the claims brought under the Due Process Clause, the Sixth Amendment, and Article III." (citing *Callan* v. *Wilson*, 127 U.S. 540 (1888); and *Natal* v. *Louisiana*, 139 U.S. 621 (1891))); *see also Ex parte Quirin*, 317 U.S. 1, 39 (1942) ("The Fifth and Sixth Amendments, while guaranteeing the continuance of certain incidents of trial by jury which Article III, § 2 had left unmentioned, did not enlarge the right to jury trial as it had been established by that Article."). As then-Justice Rehnquist summarized in *Middendorf* v. *Henry*, 425 U.S. 25 (1976),

> Dicta in *Ex parte Milligan* said that "the framers of the Constitution, doubtless, meant to limit the right of trial by jury, in the sixth amendment, to those persons who were subject to indictment or presentment in the fifth." In *Ex parte Quirin*, it was said that "'cases arising in the land or naval forces' . . . are expressly excepted from the Fifth Amendment, and are deemed excepted by implication from the Sixth."

*Id*. at 33–34 (citations omitted). Because the Supreme Court has thereby assumed that the jury-trial provisions should be read *in pari materia*, the question of whether court-martial jurisdiction is appropriate has reduced in almost every case to whether the dispute "arises in the land or naval forces." And in light of *Solorio*,

11

in cases involving active-duty servicemembers, the jury-trial question merges with the question of Congress's Article I power; per Chief Justice Rehnquist's analysis, any conduct Congress could validly proscribe through the Make Rules Clause necessarily involves a case "arising in the land or naval forces." In other contexts, however, those questions have remained analytically distinct. *Cf. United States v. Ali*, 71 M.J. 256 (C.A.A.F. 2012) (upholding court-martial of civilian contractor on ground that, as a non-citizen outside the territorial United States, the defendant was categorically unprotected by the jury trial provisions of the Fifth and Sixth Amendments), *cert. denied*, 133 S. Ct. 2339 (2013).

### c) The Supreme Court Has Conditioned Military Commission Jurisdiction on Implicit Exceptions to the Constitution's Jury-Trial Protections

Although the dataset is far smaller, the Supreme Court has followed a similar, bifurcated approach to the constitutional limits of military commission jurisdiction. Thus, in *Ex parte Milligan*, 71 U.S. (4 Wall.) 2 (1866), the Court rejected the assertion of military jurisdiction over a civilian accused of plotting to steal Union weapons and liberate Confederate prisoners from Union POW camps. In so holding, the gravamen of the majority's constitutional objection was not that Congress could not proscribe Milligan's substantive conduct in the abstract, but rather the central role of the jury-trial protections, *see, e.g.*, *id*. at 123, along with

12

the inapplicability of any exception based upon martial rule, since the civilian courts were open and their processes unobstructed, *see id*. at 127.[6]

To whatever extent the Court in *Quirin* otherwise backtracked from some of its broader pronouncements in *Milligan*, it again embraced this differentiated approach to the constitutionality of military jurisdiction. Thus, Chief Justice Stone separately addressed whether Congress had in fact validly prohibited the conduct in question and whether the exercise of military—rather than civilian—jurisdiction was appropriate. To the former, the opinion focused on Article 15 of the Articles of War (present-day Article 21 of the UCMJ, 10 U.S.C. § 821). Through that provision, Chief Justice Stone explained,

> Congress has explicitly provided, so far as it may constitutionally do so, that military tribunals shall have jurisdiction to try offenders or offenses against the law of war in appropriate cases. Congress, in addition to making rules for the government of our Armed Forces, has thus exercised its authority to define and punish offenses against the law of nations by sanctioning, within constitutional limitations, the jurisdiction of military commissions to try persons for offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals.

---

6. In his four-Justice concurrence in *Milligan*, Chief Justice Chase disagreed with the majority as to whether Congress *could* authorize military commissions in appropriate circumstances, *see, e.g.*, *Milligan*, 71 U.S. (4 Wall.) at 136–37 (opinion of Chase, C.J.). Nevertheless, the concurring Justices appeared to agree that the reason why President Lincoln could not unilaterally so provide was the jury-trial protections relied upon by the majority, *see, e.g.*, *id*. at 137.

13

*Id*. at 28. In other words, Congress had "incorporated by reference, as within the

jurisdiction of military commissions, all offenses which are defined as such by the

law of war, and which may constitutionally be included within that jurisdiction."

*Id*. at 30.

Critically, though, the conclusion that Congress had validly exercised its

power under the Define and Punish Clause of Article I, *see* U.S. CONST. art. I, § 8,

cl. 10 (empowering Congress "[t]o define and punish . . . Offences against the Law

of Nations . . . ."), did not resolve the validity of *military* jurisdiction over such

offenses. Instead, because of *Milligan*, the Court separately had to assess whether

the exercise of military jurisdiction was inconsistent with the Constitution's jury-

trial protections:

> An express exception from Article III, § 2, and from the Fifth and
> Sixth Amendments, of trials of petty offenses and of criminal
> contempts has not been found necessary in order to preserve the
> traditional practice of trying those offenses without a jury. It is no
> more so in order to continue the practice of trying, before military
> tribunals without a jury, *offenses committed by enemy belligerents
> against the law of war*.

*Id*. at 41 (emphasis added).

Thus, based on a combination of policy considerations and an enigmatic statutory precedent,[7] *see* Vladeck, *Laws of War*, *supra*, at 318 & nn.124–25, the Court in *Quirin* recognized an exception to the jury-trial provisions for "offenses committed by enemy belligerents against the law of war," an exception the application of which necessarily turned on the Court's separate conclusion that the charged offenses *were* war crimes. *See Quirin*, 317 U.S. at 30–38; *accord. In re Yamashita*, 327 U.S. 1, 7–9 (1946); *cf.* 10 U.S.C. § 818 ("General courts-martial also have jurisdiction to try any person who by the law of war is subject to trial by

---

7. In particular, *Quirin* relied on an 1806 statute in which Congress had subjected alien spies to military jurisdiction. *See* 317 U.S. at 41–42. As Chief Justice Stone wrote, "[t]his enactment must be regarded as a contemporary construction of both Article III, § 2, and the Amendments as not foreclosing trial by military tribunals, without a jury, of offenses against the law of war committed by enemies not in or associated with our Armed Forces." *Id*. at 41.

In retrospect, many have argued that *Quirin* was simply incorrect on this point—that whether or not the jury-trial protections include an exception for offenses against the law of war, spying is *not* such an offense—and was not at the time. *See, e.g.*, Richard R. Baxter, *So-Called "Unprivileged Belligerency": Spies, Guerrillas, and Saboteurs*, 28 Brit. Y.B. Int'l L. 323, 333 (1951). Whether a separate jury-trial exception might justify military jurisdiction over alien spies today, *see, e.g.*, Stephen I. Vladeck, *Military Courts and Article III*, 103 Geo. L.J. (forthcoming 2015), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2419342. [hereinafter "Vladeck, *Military Courts*"], is therefore a separate question—and critically for present purposes, one *not* resolved by *Quirin*. *See* Part II, *infra*.

15

a military tribunal and may adjudge any punishment permitted by the law of war.").

Put another way, the constitutionality of the commissions in both *Quirin* and *Yamashita* did not turn merely on the fact that Congress had exercised its power under the Define and Punish Clause of Article I; it turned on the separate—but equally important—holdings that (1) the Constitution's jury-trial protections do not extend to individuals subject to the laws of war who are charged with international war crimes; and (2) the defendants in those cases *were* such individuals charged with such offenses. Because the commissions in both cases therefore properly exercised jurisdiction, there was nothing more for the civilian courts to resolve via collateral habeas corpus review. *See, e.g.*, *Yamashita*, 327 U.S. at 8; *cf. Burns* v. *Wilson*, 346 U.S. 137 (1953) (plurality opinion) (expanding the scope of collateral habeas in military cases to include whether the military courts "fully and fairly" considered the defendant's constitutional claims).

## II.    NO EXCEPTION TO THE CONSTITUTION'S JURY-TRIAL PROTECTIONS SUPPORTS THE ASSERTION OF MILITARY JURISDICTION IN THIS CASE

As Part I summarized, the constitutionality of military jurisdiction in a particular case turns on both Congress's Article I power to define the relevant offense and the inapplicability of the jury-trial protections of Article III and the

16

Fifth and Sixth Amendments. In this Part, *amicus* explains why no exception to the jury-trial provisions supports the assertion of military jurisdiction in this case.[8]

### a) The Jury-Trial Provisions Apply To Non-Citizens Not Lawfully Present Within the United States

First, although the government has not made this argument, it bears emphasizing that the Supreme Court has never recognized a categorical exception to the jury-trial protections for non-citizens detained—and tried—outside the territorial United States. Instead, the Court's jurisprudence has largely reflected Justice Kennedy's concurrence in *United States* v. *Verdugo-Urquidez*, 494 U.S. 259 (1990), which suggested that the constitutional calculus changes dramatically once the United States affirmatively seeks to prosecute non-citizens for extraterritorial conduct. *See, e.g.*, *id.* at 278 (Kennedy, J., concurring) ("The United States is prosecuting a foreign national in a court established under Article III, and all of the trial proceedings are governed by the Constitution. All would agree, for instance, that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant."); *see also United States* v. *Tiede*, 86 F.R.D. 227 (U.S. Ct.

---

8. *Amicus* agrees with Petitioner that his Article III challenge to his conspiracy conviction is "jurisdictional" insofar as it asserts that the Constitution *itself* divested the military commission of subject-matter jurisdiction over standalone conspiracy offenses. So construed, it is clear that Petitioner's Article III challenge is subject to *de novo*—not plain error—review, whether or not it was properly preserved below. *See United States* v. *Cotton*, 535 U.S. 625, 630–31 (2002).

17

Berlin 1979) (holding that non-citizens tried before a U.S. court in Berlin were entitled to a trial by jury). Thus, whether or not non-citizens detained at Guantánamo may affirmatively invoke constitutional protections in *civil* proceedings, it necessarily follows that the considerations identified in Part I, *supra*, also govern the constitutionality of military jurisdiction in this case.

Further to that point, in both *Quirin* and *Yamashita*, the Supreme Court declined to rest its analysis on the conclusion that the jury-trial provisions categorically did not apply to the defendants, who, with two exceptions, were non-citizens not lawfully present within the United States at the time of their capture. If the jury-trial provisions simply did not apply to non-citizens not lawfully present within the United States, the implicit law-of-war exception recognized in those cases would have been all-but unnecessary. Thus, the fact that Petitioner is a non-citizen detained outside the territorial United States is of no moment in assessing the applicability of the jury-trial provisions.

### b) This Case Does Not "Arise in the Land or Naval Forces"

Nor can it be argued that this case "arises in the land or naval forces," and therefore falls within the textual exception to the jury-trial provisions recognized by the Court in its court-martial jurisprudence. As the cases surveyed in Part I demonstrate, the Supreme Court has taken a literal approach to the scope of this

18

textual exception, holding, for example, that conduct by civilian employees of the military and servicemember dependents does not "arise in the land or naval forces" even when it takes place while those individuals are accompanying the armed forces in the field. As Justice Clark explained in *Singleton*, "If civilian dependents are included in the term 'land and naval Forces' at all, they are subject to the full power granted the Congress therein to create capital as well as noncapital offenses." 361 U.S. at 246; *see also Reid*, 354 U.S. at 22 (plurality) (construing the Grand Jury Indictment Clause alongside the Make Rules Clause, which "does not encompass persons who cannot fairly be said to be 'in' the military service").

Time and again, the Court has suggested that a case only "arises in the land or naval forces" when the defendant is necessarily part of those forces. As Chief Justice Stone put it in *Quirin*, the "objective" of the textual carve-out was "to authorize the trial by court martial of the members of our Armed Forces for all that class of crimes which under the Fifth and Sixth Amendments might otherwise have been deemed triable in the civil courts," 317 U.S. at 43, and nothing more.

The only exception the Court has recognized to this rule has no relevance here. *Madsen* v. *Kinsella*, 343 U.S. 341 (1952), sustained the use of a military commission in what was then occupied Germany to try the civilian wife of a servicemember for her husband's murder, in violation of the German Criminal

19

Code. In effect, *Madsen* upheld the constitutionality of "occupation courts" in circumstances in which no civilian jurisdiction was available, *see id.* at 356–60, insinuating (albeit without *any* analysis) that such courts did not offend the jury-trial protections because cases like Madsen's "ar[ose] in the land or naval forces." *See id.* at 359 & n.26.

To be sure, *Madsen* is probably better understood as turning on a distinct aspect of Justice Burton's analysis, *i.e.*, that the U.S. occupation courts were consistent with international law in light of the absence of functioning civil judicial authority, *see, e.g.*, *id.* at 354–55, especially since the Court's construction of the Fifth Amendment was necessarily overtaken by the Court's subsequent—and narrower—approach in *Reid* and *Singleton*. *See generally* Vladeck, *Military Courts*, *supra*. In any event, though, *Madsen* is inapposite here because the tribunals established by the Military Commissions Acts of 2006 and 2009 are not functioning in this case as "occupation courts." *See Hamdan* v. *Rumsfeld* ("*Hamdan I*"), 548 U.S. 557, 595–96 (2006) ("The third type of commission, convened as an 'incident to the conduct of war' when there is a need 'to seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military effort have violated the law of war,' has been described as 'utterly different' from the other two." (citations and footnotes omitted)); *see also*

20

*id*. at 596–97 ("Not only is its jurisdiction limited to offenses cognizable during time of war, but its role is primarily a factfinding one—to determine, typically on the battlefield itself, whether the defendant has violated the law of war.").

There is no question that martial law has not been declared here. Similarly, the military commission did not exercise jurisdiction in this case "as part of a temporary military government over occupied enemy territory or territory regained from an enemy where civilian government cannot and does not function." *Duncan* v. *Kahanamoku*, 327 U.S. 304, 314 (1946). Thus, the exception to the Grand Jury Indictment Clause for cases "arising in the land or naval forces" does not apply. *See al Bahlul* v. *United States*, No. 11-1324, 2014 WL 3437485, at *6 (D.C. Cir. July 14, 2014) (en banc) (noting that Petitioner was tried by a "law-of-war military commission").

### c) The Jury-Trial Exception Recognized in *Quirin* Does Not Apply Here

As the government noted before the *en banc* court, it "has acknowledged that conspiracy has not attained recognition at this time as an offense under customary international law. . . . even when the objects of the conspiracy are offenses prohibited by customary international law . . . ." Brief for the United States at 34, *al Bahlul*, 2014 WL 3437485 [hereinafter "U.S. *Bahlul* Brief"]; *see*

21

*also United States* v. *Hamdan* ("*Hamdan II*"), 696 F.3d 1236, 1249–53 (D.C. Cir. 2012).[9]

The government has nevertheless maintained that an offense need not be so recognized in order for it to fall within the scope of Congress's power under the Define and Punish Clause, or its other Article I authorities, *see, e.g.*, U.S. *Bahlul* Brief at 60; *see also Hamdan II*, 696 F.3d at 1246 n.6 (solo opinion of Kavanaugh, J.). But whether or not that is true (a question on which *amicus* takes no position), it elides the critical distinction to which *amicus* has repeatedly adverted—between Congress's power to define the underlying offense and the existence of an exception to the jury-trial provisions justifying the assertion of military, rather than civilian, jurisdiction. Even if Congress has the abstract power to decide for *itself* that particular conduct constitutes a violation of the law of nations for purposes of imposing *civilian* criminal or civil liability, *see, e.g.*, Beth Stephens, *Federalism and Foreign Affairs: Congress's Power To "Define and Punish . . . Offenses*

---

9. Although the *en banc* court overruled *Hamdan II*'s holding that the MCA did not apply retroactively, *see al Bahlul*, 2014 WL 3437485, at *5, it did not disturb *Hamdan II*'s other holdings—including its conclusion that "imposing liability on the basis of a violation of 'international law' or the 'law of nations' or the 'law of war' generally must be based on norms firmly grounded in international law." *Hamdan II*, 696 F.3d at 1250 n.10 (citing *Hamdan I*, 548 U.S. at 602-03 & n.34; and *Sosa* v. *Alvarez-Machain*, 542 U.S. 692, 724-38 (2004)). *See generally* Steve Vladeck, *What's Left of Hamdan II? Quite a Lot, Actually…*, JUST SECURITY, July 17, 2014, 9:50 a.m., http://justsecurity.org/12989/left-hamdan-ii-lot-actually/.

*Against the Law of Nations*,*"* 42 WM. & MARY L. REV. 447 (2000), the exception to the jury-trial protections identified by the Supreme Court in *Quirin* extends only to offenses committed by enemy belligerents against the *international* laws of war, *see, e.g.*, *Quirin*, 317 U.S. at 41; *see also* Vladeck, *Laws of War*, *supra*, at 338 ("Congress may have some leeway to subject less well established offenses . . . to prosecution in the civilian criminal courts, but fundamental principles of American constitutional law . . . compel the conclusion that any exception justifying trial in a military court be founded on the clearest of precedent.").

Thus, regardless of whether Congress is entitled to interpretive latitude in defining war crimes under the Define and Punish Clause or its other enumerated powers, such deference does not extend to a determination that the offenses in question are fit for *military* adjudication. After all, "The caution that must be exercised in the incremental development of common-law crimes by the judiciary is . . . all the more critical when reviewing developments that stem from military action." *Hamdan I*, 548 U.S. at 602 n.34 (plurality); *see also Toth*, 350 U.S. at 23 n.22 ("Determining the scope of the constitutional power of Congress to authorize trial by court-martial presents another instance calling for limitation to 'the least possible power adequate to the end proposed.'" (quoting *Anderson* v. *Dunn*, 19 U.S. (6 Wheat.) 204, 231 (1821))).

23

Even assuming *arguendo* that Congress has the constitutional power to define the offenses here at issue, then, the government's concession that such offenses are *not* recognized by the international laws of war should be dispositive of its ability to subject them to trial by military commission, at least based on the jury-trial exception recognized in *Quirin*. *See* Vladeck, *Laws of War*, *supra*, at 337–41.

### d) There Is No Jury-Trial Exception for Violations of the "U.S. Common Law of War"

Perhaps in light of this understanding, the government has rested its defense of Petitioner's conviction on the distinct claim that Congress's power to define the offenses in question and subject them to trial by military tribunal derives from the "the common law of war developed in U.S. military tribunals," U.S. *Bahlul* Brief, *supra*, at 28, also referred to as the "U.S. common law of war." *al Bahlul*, 2014 WL 3437485, at *56–59 (Kavanaugh, J., concurring in the judgment in part and dissenting in part).

The problems with this argument are three-fold: *First*, and most significantly, the Supreme Court has *never* recognized a separate and distinct exception to the jury-trial provisions of Article III and the Fifth and Sixth Amendments for such offenses. Thus, even if reliance upon wholly domestic precedents places the government's Article I argument on stronger footing, it

24

comes at the expense of the jury-trial exception recognized in *Quirin*, which was necessarily (and logically) limited to offenses against the *international* laws of war—again, based upon the prevailing understanding at the Founding. *See Quirin*, 317 U.S. at 42–44.

*Second*, the examples that the government and Judge Kavanaugh invoke as holding to the contrary all pre-date the jury-trial jurisprudence surveyed in Part I, *supra*. Indeed, the government cannot point to a single post-*Milligan* case (let alone a post-*Quirin* precedent) in which the federal courts approved the use of military commissions to try offenses against the "U.S. common law of war," as such. Even in *Madsen*, the Supreme Court held the jury-trial protections inapplicable to occupation courts not because the authority to convene such tribunals derived from common law (even though, based on the Civil War-era precedents on which the government has relied in this litigation, it arguably did), but because of Justice Burton's cryptic conclusion that cases before such courts "ar[ose] in the land or naval forces." *See Madsen*, 343 U.S. at 359 & n.26.

*Third*, and finally, as even a cursory review of the Civil War examples marshaled by the government reveals, even the government's evidence is itself equivocal. Whether Civil War-era military tribunals were trying law-of-war offenses or ordinary municipal crimes was often immaterial to their jurisdiction,

25

since they typically functioned as *both* law-of-war and occupation courts. *See*
*Hamdan I*, 548 U.S. at 608 (plurality opinion) ("[T]he military commissions
convened during the Civil War functioned at once as martial law or military
government tribunals and as law-of-war commissions. Accordingly, they regularly
tried war crimes and ordinary crimes together." (citation omitted)). And in any
event many—if not most—of the Civil War-era precedents were necessarily
undermined by *Milligan*, at least in those cases in which civilian criminal
jurisdiction was available. *See* 71 U.S. (4 Wall.) at 127.

      In short, the Civil War examples relied upon by the government all appear to
have involved assertions of military jurisdiction that were either (1) as *de facto*
martial law/occupation courts; or (2) overtaken by subsequent events, *e.g.*,
*Milligan*. As Justice Stevens explained in *Hamdan I*, "The Civil War precedents
must therefore be considered with caution; as we recognized in
*Quirin*, . . . commissions convened during time of war but under neither martial
law nor military government may try only offenses against the law of war." 548
U.S. at 596 n.27 (plurality opinion) (citation omitted). Thus, even if the
government's examples unequivocally supported military jurisdiction, such
jurisdiction must be reconciled with subsequent case law, including *Milligan*,
*Quirin*, *Toth*, *Reid*, and *Singleton*.

26

Comparable flaws pervade the two examples on which Judge Kavanaugh rested his analysis in his *en banc* concurrence—the military commission trial arising out of the Lincoln assassination and *Quirin* itself. *See al Bahlul*, 2014 WL 3437485, at *58–63 (Kavanaugh, J., concurring in the judgment in part and dissenting in part). With regard to the Lincoln assassination trial, Attorney General Speed's legal opinion is crystal clear that he believed the constitutional authority to subject the conspirators to trial by military commission derived *entirely* from the conclusion that their conduct violated the international laws of war. *See* Military Commissions, 11 OP. ATT'Y GEN. 297, 313 (1865) ("Trials for offences against the laws of war are not embraced or intended to be embraced in those [constitutional] provisions."); *id*. at 316 ("If the persons charged have offended against the laws of war, it would be as palpably wrong for the military to hand them over to the civil courts, as it would be wrong in a civil court to convict a man of murder who had, in time of war, killed another in battle."). Speed may well have been *wrong* that the offenses at issue were recognized violations of the international law of war (or that the civilian courts could not try international war crimes), but neither analytical shortcoming supports Judge Kavanaugh's reading of the case—*i.e.*, that "the Lincoln conspirators case looms as an especially clear and significant precedent" for military commission trials of conspiracy as a *domestic* law-of-war offense. *al*

27

*Bahlul*, 2014 WL 3437485, at *58 (Kavanaugh, J., concurring in the judgment in part and dissenting in part).

Nor is the trial of the Nazi saboteurs any different, for the Supreme Court there expressly *declined* to uphold the saboteurs' conspiracy conviction, relying instead on its conclusion that the saboteurs had violated the international laws of war by passing surreptitiously behind enemy lines during wartime. Indeed, the only time "conspiracy" is ever even *mentioned* in Chief Justice Stone's opinion for the Court is in his summary of the original charges against the defendants. *See Quirin*, 317 U.S. at 23.

Thus, Judge Kavanaugh's conclusion in his *en banc* concurrence that al Bahlul's Article III challenge "is inconsistent with the Lincoln conspirators and Nazi saboteurs conspiracy convictions, and it cannot be squared with *Quirin*," *al Bahlul*, 2014 WL 3437485, at *63 (Kavanaugh, J., concurring in the judgment in part and dissenting in part), reads into those precedents conclusions that are both legally anachronistic and factually infirm.   Instead, as *amicus* has demonstrated, the Lincoln assassination trial was predicated on the (debatable) conclusion that the conspirators' offenses were international war crimes; and *Quirin* deliberately sidestepped ruling on the saboteurs' conspiracy convictions in favor of its

28

conclusion that a separate, completed offense *was* a violation of the international laws of war.

A proper assessment of these historical examples thus illuminates the *novelty* of the government's position: Before the MCA, no U.S. court had ever upheld the power of a military commission like the ones at issue here to try an offense on the ground that it is a violation of the *domestic*—but not *international*—laws of war. And although the distinction between domestic and international war crimes may appear semantic, it is a vital constitutional line that the Supreme Court has never crossed—and for good reason. Once military commissions are free to try offenses simply because the U.S. government decrees them to be "war crimes," the line between civilian and military jurisdiction could become elusive—if not altogether illusory.

The government dismisses these concerns as "academic." U.S. *Bahlul* Brief, *supra*, at 71. But as Chief Justice Roberts wrote three years ago, "[w]e cannot compromise the integrity of the system of separated powers and the role of the Judiciary in that system, even with respect to challenges that may seem innocuous at first blush." *Stern*, 131 S. Ct. at 2620. And whatever the merit of the exceptions to the jury-trial protections that the Supreme Court has historically identified, the government has offered no historical, analytical, or prudential justification for a

29

new exception for offenses against the "U.S. common law of war." *See N. Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U.S. 50, 70 (1982) (plurality opinion) (noting that, in each instance in which the Supreme Court has upheld non-Article III federal adjudication, it "has recognized certain exceptional powers bestowed upon Congress by the Constitution or by historical consensus. Only in the face of such an exceptional grant of power has the Court declined to hold the authority of Congress subject to the general prescriptions of Art. III.").

## CONCLUSION

For the foregoing reasons, *amicus* respectfully submits that Petitioner's conspiracy conviction should be vacated for lack of jurisdiction.

Dated: **August 18, 2014**

/s/ Agnieszka Fryszman

**AGNIESZKA FRYSZMAN**
COHEN, MILSTEIN, SELLERS
& TOLL, P.L.L.C.
1100 New York Avenue, N.W.
West Tower—Suite 500
Washington, DC  20005
(202) 408-4600
afryszman@cohenmilstein.com

**STEPHEN I. VLADECK**
4801 Massachusetts Avenue, N.W.
Room 350
Washington, DC  20016
(202) 274-4241
svladeck@wcl.american.edu

**COUNSEL FOR AMICUS CURIAE**

31

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, the undersigned counsel of record certifies as follows:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   a. This brief contains **6994** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   a. This brief has been prepared in a proportionally spaced typeface using *Microsoft Word 2010* in *Times New Roman*, 14-point font.

<u>Dated</u>: **August 18, 2014**                    /s/ Agnieszka Fryszman
                                        *Counsel for* Amicus Curiae

32

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 18, 2014, a copy of the foregoing was filed electronically with the Court. Notice of this filing will be sent to all parties by operation of this Court's electronic filing system. Parties may access this filing through the Court's system.

<u>Dated</u>: **August 18, 2014**                    /s/ Agnieszka Fryszman
                                                                *Counsel for* Amicus Curiae

33