# United States Court of Appeals

## For the District of Columbia Circuit

ALI HAMZA AHMAD SULIMAN  )
AL BAHLUL,                )
                          )
              Petitioner  )          DOCKET NO. 11-1324
                          )
         v.               )          CMCR CASE NO. 09-001
                          )
UNITED STATES OF AMERICA, )          Filed on:  August 18, 2014
                          )
              Respondent  )
                          )

---

## AMICUS CURIAE BRIEF FILED ON BEHALF OF
## ROBERT D. STEELE AND OTHER FORMER MEMBERS
## OF THE U.S. INTELLIGENCE COMMUNITY
## IN SUPPORT OF PETITIONER AND IN SUPPORT OF REVERSAL

---

McKenzie A. Livingston
Member of the Bars of the States of Florida and New York
50 Biscayne Blvd, Unit 4011
Miami, FL 33132
mck.livingston@gmail.com
516-330-6225

# TABLE OF CONTENTS

TABLE OF LEGAL AUTHORITIES ……………………………………… ii

INTEREST OF AMICUS CURIAE AND RULE 29 CERTIFICATION …...……1

SUMMARY OF ARGUMENT ……………………………………………...2

ARGUMENT ……………………………………………………...4

    A. The Right to Know under the First Amendment …………………….…...4

    B. The Value and Use of Open Source Intelligence …………………….…...7

    C. *State of the Ummah* Is Valuable Open Source Intelligence ………………10

    D. The Failure to Apply First Amendment Protections to
       *State of the Ummah* Will Harm National Security by Chilling
       the Availability of Open Source Intelligence in the United States
       and by Hindering Americans' Right to Receive Information ……………..13

CONCLUSION …………………………………………………..18

INTEREST OF AMICI …………………………………………….19

CIRCUIT RULE 28(a) CERTIFICATE ……………………………………24

RULE 32 CERTIFICATE ……………………………………………..24

CERTIFICATE OF SERVICE ……………………………………………...25

i

# TABLE OF LEGAL AUTHORITIES

## Cases

* *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853, 102 S. Ct. 2799, 73 L. Ed. 2d 435 (1982) ...................................4,6

*Boos v. Barry*, 485 U.S. 312, 108 S.Ct. 1157 (1988) ..............................................14

*Boyd v. U.S.*, 116 U.S. 616, 6 S.Ct. 524 (1886) ...................................................15

*Brandenberg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827 (1969)....................................15

* *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876 (2010) ........................6

*First National Bank of Boston v. Bellotti*, 435 U.S. 765 (1978)..............................6

*Hess v. Indiana,* 414 U.S. 105, 94 S.Ct. 326 (1973).................................................15

*Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) .........4

*Lamont v. Postmaster General of the United States*, 381 U.S. 301,
    85 S.Ct. 1493 (1965)........................................................................................14

*Meese v. Keene*, 481 U.S. 465, 107 S.Ct. 1862 (1987)............................................13

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409 (1982)...........15

* *New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196,
    128 S.Ct. 791 (2008)........................................................................................16

*Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of
    Life         Activists*, 244 F.3d 1007 (9th Cir. 2000) .............................................15

*R.A.V. v. City of St. Paul Minnesota*, 505 U.S. 377 (1992)......................................5

* *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794 (1969)...........16

*Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969)...............4

*Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642 (1967) ….......15

* Authorities upon which we chiefly rely are marked with asterisks.

## INTEREST OF AMICUS CURIAE AND RULE 29 CERTIFICATION

Pursuant to Fed. R. App. P. 29(a) and Circuit Rule 29(b), we certify that counsel for Petitioner and counsel for Respondent have consented to the filing of this brief. Amici are prominent current or former members of the United States Intelligence Community, all having served in government and having expertise on the use of open-source intelligence. They file this brief in support of Petitioner because of the vital national security interests served by the First Amendment protection of all speech. This brief was authored or adopted by amici and counsel listed on the front cover. No party or party's counsel authored this brief, in whole or in part. No party or party's counsel contributed money to the preparation or submission of this brief. No other person but counsel contributed money that was intended to fund preparing or submitting this brief. Pursuant to Circuit Rule 29(d), we certify that it was not practicable to join all other amici in this case in a single brief. The national security issues presented in this brief are unique and address subjects not address by other friends of this court.

*"A Nation's best defense is an educated citizenry."*
~ Thomas Jefferson

*"A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives."*
~ James Madison

## SUMMARY OF ARGUMENT

The First Amendment of the United States Constitution protects the right of Americans to disseminate as well as receive information. The First Amendment is not merely a privilege or right but serves the vital purpose of being a check on the power of government, by allowing for an open and informed debate. An open society, which allows for the free flow of information and ideas, no matter their source and no matter how unpopular, is the bulwark of democracy. With the ever-increasing capabilities to transmit information across the world instantaneously, the right to receive information – the right to know – has become critical to our national security. There is a strategic need for and an advantage to having knowledge and information in the maximum number of our citizenry. By having an unfettered access to information we know how the world sees us. This leads to informed debate and aids the development of sound national security and foreign policies. Failing to apply First Amendment protections to the propaganda video created by Petitioner limits the free flow of information and interferes with

2

Americans' right to know. Furthermore, it does a grave disservice to our national security because of the chilling effect it would have on the generation and receipt of information relied upon by the Intelligence Community.

Open source intelligence, derived from overt non-clandestine sources, is the most significant source of intelligence for our intelligence and law enforcement agents and is the most valuable source of intelligence collection for understanding the motivations of jihadist and other terrorist groups who target America and American interests. Recognizing the value of open source intelligence, Congress created the National Open Source Center under the Central Intelligence Agency for the collection and analysis of open source intelligence. Contrary to public policy however, Petitioner, Ali Hamza Ahmad Suliman al Bahlul ("al Bahlul" or "Petitioner"), is being punished for speech that is and should be protected under the First Amendment. al Bahlul has been sentenced to life imprisonment for creating in Afghanistan in early 2001 a propaganda video directed towards and widely seen by a U.S. audience, titled *State of the Ummah*. The video was compiled from already publicly available information. It expresses the motivations of and identifies key figures in al Qaeda. Such information is valuable open source intelligence. The future dissemination of valuable information such as this should be encouraged and, at the very least, not prevented.

Should First Amendment protections not apply to *State of the Ummah*, foreign speakers providing information, whether journalists or jihadists, could be

deterred from creating and disseminating such.  Limiting Americans receipt of information – the very availability of which is vital to our democracy and national security – violates the First Amendment and undermines intelligence and law enforcement efforts, presenting a danger, worse than the speech itself, to the nation's security.

ARGUMENT

**A.  The Right to Know under the First Amendment.**

The Supreme Court has held in a variety of contexts that the Constitution protects the right to receive information and ideas.[1]  This concept referred to as the "right to know" was understood by our country's founders as the key to an informed citizenry – the check on our government, which only acts with the consent of the governed.[2]  The freedoms and rights provided under the First

---

[1]  *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867, 102 S. Ct. 2799, 2808, 73 L. Ed. 2d 435 (1982); *Kleindienst v. Mandel*, 408 U.S. 753, 762-763, 92 S.Ct. 2576, 2581, 33 L.Ed.2d 683 (1972); *Stanley v. Georgia*, 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969).

[2] Jeffery A. Smith, *Recognition of a Right to Know in Eighteenth Century America*, presented at the Annual Meeting of the American Political Science Association, Chicago, Ill., August 2007 (explaining the general conception of a right to know as a part of Enlightenment thinking at the time the Constitution and Bill of Rights were drafted).  Professor Smith discusses how:

> Knowing that authorities resorted to suppression and that voters could be ignorant, inconsistent, or irrational, Americans articulated reasons for an informed citizenry. "Public opinion sets bounds to every government," James Madison wrote in a newspaper essay when the Bill of Rights was ratified, "and is the real sovereign in every free one."

4

Amendment are not, and were never intended, as a mere list of individual rights. They serve a broader purpose of acting as a check on government abuse. As the Preamble to the Bill of Rights plainly states:

> THE Conventions of a number of the States having at the time of their adopting the Constitution, expressed a desire, in order to prevent misconstruction or abuse of its powers, that further declaratory and restrictive clauses should be added: And as extending the ground of public confidence in the Government, will best insure the beneficent ends of its institution…

When James Madison condemned the Sedition Act of 1798 as an unconstitutional restriction on thought, he attributed the nation's political progress "to the press alone, chequered as it is with abuses" that are inseparable from its uses.[3] He said the law was "levelled against the right of freely examining public characters and measures, and of free communication among the people thereon, which has ever been justly deemed the only effectual guardian of every other right."[4] Accordingly, in *R.A.V. v. City of St. Paul Minnesota*, 505 U.S. 377, 386 (1992), the Supreme Court ruled that hostility toward a message cannot be the basis for government punishment of expression and noted that content-neutral alternatives are available for resolving matters of concern.

Although not listed under the First Amendment, the right to know is protected under the freedoms of speech and press. In *Pico*, the Supreme Court

---

[3] "Report on the Resolutions," 1799-1800, in *The Writings of James Madison*, ed. Gaillard Hunt (New York: G. P. Putnam's Sons, 1906), 6: 389.

[4] "Resolutions of 1798," in ibid., 6: 328-29.

explained that the right to receive information "is an inherent corollary of the rights of free speech and press that are explicitly guaranteed by the Constitution," and "the right to receive ideas is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom." 457 U.S. at 867 (emphasis in original). More recently, the Supreme Court held that the First Amendment stands against disfavoring certain speakers, subjects, and viewpoints, recognizing that "[t]he right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. Fed. Election Comm'n*, 130 S. Ct. 876, 898 (2010). This is why the First Amendment serves as a prohibition on government limiting the flow of information. *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978).

As the United States has engaged in a war against terrorism, the all-too-familiar story of unconstitutional and irrational restrictions on the flow of information and punishment of unpopular opinions during wartime has returned.[5]

---

[5] Jeffery A. Smith, WAR & PRESS FREEDOM: THE PROBLEM OF PREROGATIVE POWER (Oxford Univ. Press 1999) (discussing the legal and practical problems with limits on the First Amendment freedoms of speech and press during wartime throughout United States history). Citing Phillip Knightley, The First Casualty, 29-31 (1975), Professor Smith discusses a Civil War example. Writing to the editors of the Memphis Bulletin in 1863, General Sherman said his "first duty is to maintain 'order and harmony,'" and that they needed to heed his "advice." He summarized his expectations in a letter to a fellow General to include that that there must be "no discussion of the policy or measures of Government without the article is reviewed by the Commanding Officer at Memphis,…" Under such

However, such restrictions weaken both our democratic values and our national
security.  Failure to apply First Amendment protections to the propagandist video
created by al Bahlul merely serves to suppress the flow of information from
foreign sources and limit Americans receipt of such.    Because our First
Amendment rights inherently rely on our receipt of information, any restraint
placed on the free flow of information negatively impacts our First Amendment
rights.  Similarly, any restraint placed on the free flow of information negatively
impacts the collection of open source intelligence.

**B.  The Value and Use of Open Source Intelligence.**

Open  source  intelligence  (OSINT)  is  commonly  understood  to  be
intelligence derived from newspapers, journals, radio, television, and the Internet.[6]
In fact, it is much broader and includes virtually all information that can be legally
and ethically elicited from humans inclusive of direct and indirect observation as
well as direct elicitation. Based upon information derived from overt, non-

---

restrictions , "journalists had little to say about graft, desertion, draft resistance,
illness, incompetence, low morale, and the mistreatment of prisoners in the Civil
War."

[6] Richard A. Best, Jr. and Alfred Cumming, *Congressional Research Service
Report for Congress – Open Source Intelligence (OSINT): Issues for Congress*,
December  5,  2007,  (hereinafter  "*CRS  Report*")  *available  at*
http://www.fas.org/sgp/crs/intel/RL34270.pdf, at 5-6. *See also*, Phi Beta Iota –
Public  Intelligence  Blog,  *available  at*  http://www.phibetaiota.net  (containing
*30,*000 pages on open source intelligence from 750 global professionals who
trained  another  7,500).  See also Open Source Solutions website, *available at*
http://www.oss.net/ (containing  links  to  number  of  publications  discussing  the
value of open source intelligence).

clandestine collection, open source intelligence is less expensive and less risky than clandestine intelligence.[7] An estimated 80-90% of all collected U.S. intelligence comes from open sources.[8] A recent example is the U.S. government first learning of North Korean leader Kim Jong-il's death through open sources.[9] It is the most significant source for U.S. intelligence and law enforcement when trying to understand foreign nations, cultures and movements.[10] For instance, *Through Our Enemies Eyes: Osama bin Laden, Radical Islam, and the Future of*

---

[7] *CRS Report* at 5-7.

[8] *CRS Report* at 4.

[9] Mark Hosenball, *U.S. learned of Kim's death from "open" sources*, Reuters, December 21, 2011, *available at* http://www.reuters.com/article/2011/12/21/us-korea-north-usa-intelligence-idUSTRE7BK20720111221 (reporting how the Open Source Center first relayed the news of Kim's death to the U.S. Government).

[10] *CRS Report* at Summary page (stating that OSINT can "provide insights into the types of developments that may not be on the priority list for other systems or may not be susceptible to collection through other intelligence approaches – innovative applications of new technologies, shifts in popular attitudes, emergence of new political and religious movements, growing popular discontent, disillusionment with leadership, etc."). *See also*, Robert David Steele, *Open Source Intelligence*, in Loch Johnson (ed.), HANDBOOK OF INTELLIGENCE STUDIES (NY: Routledge 2007), Chapter 10 (discussing the operational value of open source intelligence as accepted within the North Atlantic Treaty Organization (NATO) and other multinational organizations); Robert David Steele, *Open Source Intelligence*, in Loch Johnson (ed.), STRATEGIC INTELLIGENCE: THE INTELLIGENCE CYCLE (Westport, CT: Praeger 2007), Chapter 6 (discussing the strategic value of OSINT). At page 98, General Tony Zinni, USMC (Ret), then Combatant Commander of the U.S. Central Command (USCENTCOM) states:

> 80% of what I needed to know as CINCENT I got from open sources rather than classified reporting. And within the remaining 20%, if I knew what to look for, I found another 16%. At the end of it all, classified intelligence provided me, at best, with 4% of my command knowledge.

*America*, is a book based wholly on open-source materials and which is relied upon by many in the Intelligence Community, as well as by policy makers and law enforcement involved in counter-terrorism efforts.[11]

Open source intelligence is considered particularly valuable when dealing with borderless terrorist groups. Jihadist groups, like al Qaeda, use the Internet to raise money and communicate.[12] In a 1997 Open Source Solutions Network, Inc. (OSS.Net) project commissioned by the U.S. Special Operations Command (USSOCOM), the Internet was surveyed for identifying and evaluating terrorist, insurgent, and opposition websites. Ultimately 396 such websites, in 29 languages, were identified and evaluated. The material present across all of these sites was helpful in determining whether the site was in relation to active terrorism, an emergent insurgency, or legitimate opposition.

The U.S. Government and Intelligence Community have focused more and more on the value of open source intelligence. After Government Commissions criticized the Intelligence Community for failing to make greater use of open source intelligence and recommended that it be used more,[13] Congress passed the

---

[11] Michael Scheur, THROUGH OUR ENEMIES EYES: OSAMA BIN LADEN, RADICAL ISLAM, AND THE FUTURE OF AMERICA (1st Ed., 2002).

[12] *CRS Report* at 3 (citing the as-Sahab Institute – al Qaeda's Internet-based messaging and propaganda multimedia production facility – as an example of why OSINT is so important in today's technology-driven and globalized world).

[13] Commission on the Roles and Capabilities of the United States Intelligence Community (the "Aspin-Brown Commission"), *Preparing for the 21st Century: An*

Intelligence Reform and Terrorism Protection Act of 2004.[14] The Act recognized the value of open source intelligence and called for the creation of a National Open Source Center. In November 2005, the Office of the Director of National Intelligence established the National Open Source Center under the management of the Central Intelligence Agency.

Because open source intelligence relies on foreign speech, any restraint placed upon such speech negatively affects the collection, reliability, and use of such intelligence by the U.S. Intelligence Community as well as the media, the public, and Congress.

## C. *State of the Ummah* **Is Valuable Open Source Intelligence.**

al Bahlul was captured by Pakistani forces who turned him over to U.S. custody in December 2001 and transferred to Guantanamo Bay in January 2002.[15]

---

*Appraisal of U.S. Intelligence*, March 1, 1996, at p. 88; National Commission on Terrorist Attacks upon the United States (the "9/11 Commission"), *The 9/11 Commission Report*, July 22, 2004, at pp. 399-400 and 413. *See also*, The Commission on the Intelligence Capabilities of the United States Regarding Weapons of Mass Destruction, *Report to the President of the United States*, March 31, 2005, at p. 389.

[14] 118 STAT. 3638, P.L. 108-458, December 17, 2004, *available at* http://www.nctc.gov/docs/pl108_458.pdf. In particular, see Section 1052, addressing open source intelligence. Subsection (a)(1) states that it is the "sense of Congress that… open-source intelligence is a valuable source that must be integrated into the intelligence cycle to ensure that United States policymakers are fully and completely informed."

[15] Brief on Behalf of Petitioner, dated March 9, 2012, ("Petitioner's Brief"), at p. 5.

The foundation of the central charge in the government's case[16] against al Bahlul was his production of a propaganda video called *State of the Ummah* in early 2001.[17]

    *State of the Ummah* is an hour-and-forty-five minute documentary. It contains information that is freely available on the Internet such as news footage of the Saudi royal family, conflicts involving Muslims (e.g., the Israeli-Palestinian conflict), as well as broadcast speeches of Bin Laden and other al Qaeda members regarding the moral necessity of holy war. There is nothing in *State of the Ummah* that is not readily available in hundreds of other forms. The documentary is essentially a "re-mix" of open source intelligence, including the repeated use of dated sources.

    While the material in *State of the Ummah* may be offensive to some viewers, especially in a post-9/11 world, nothing in the video represents a direct threat to the United States of America or to any U.S. citizen. Indeed, the film is actually helpful to the U.S. Intelligence Community, Congress and other policy and decision

---

[16] Petitioner's Brief, at pp. 8-9.

[17] *State     of     the     Ummah,     available     at* http://video.google.com/videoplay?docid=2881554347384416020 (first part) and http://video.google.com/videoplay?docid=-435140218278297028 (second part), is also known as *The Destruction of the American Destroyer the U.S.S. COLE* and the *COLE Video. State of the Ummah* is the original name by which it is popularly known and is the name used throughout this amicus brief.

makers, and citizens in understanding and appreciating what may motivate extreme and fervent Muslims to join al Qaeda and other jihadist groups.

*State of the Ummah* is not a bomb-making video or instructional training video that could pose a security problem in and of itself. The content contained in the documentary – religious and political propaganda – is well within the types of political videos commonly made inside and outside the United States.[18] In 1994, for example, Steve Emerson made a Public Broadcast Service (PBS) one-hour documentary showing imams in the U.S., on U.S. soil, calling for the murder of Americans. Even after being displayed across the nation, this film failed to arouse concern. However, it was an important reflection on the depth of grievance and anger towards the U.S. some Muslims harbor. Similarly, *State of the Ummah* was an excellent window into the ideologies and purpose of the al Qaeda organization prior to 9/11.

*State of the Ummah,* readily available on the Internet prior to 9/11, exemplified the motivations of al Qaeda and identified several key figures in the jihadist movement. A low-level but valuable collage of images and articulations, *State of the Ummah* is exactly the type of intelligence the Government would have paid for before technological advances made such information so widely and

---

[18] Many books, such as *American Jihad: The Terrorists Living Among Us* and *Why the Rest Hates the West: Understanding the Roots of Global Rage*, are no different in substance – only in tone and form – from *State of the Ummah.*

publicly available. The Intelligence Community readily relies upon materials falling into the same category as *State of the Ummah* – political or religious propaganda – to analyze foreign groups and political movements. If materials similar to *State of the Ummah* were not available, the amount of information available for intelligence purposes would be significantly reduced. Indeed, the material present across all of the websites analyzed in the 1997 Open Source Solutions Network survey was similar to that presented in *State of the Ummah*.

**D.  The Failure to Apply First Amendment Protections to** *State of the Ummah* **Will Harm National Security by Chilling the Availability of Open Source Intelligence in the United States and by Hindering Americans' Right to Receive Information.**

Failure to apply the protections afforded by the First Amendment to *State of the Ummah* will have a chilling effect on the availability of foreign information, including open source intelligence. This in turn will diminish the U.S. Intelligence Community's and the public's (including the media and Congress') sensitivities to and understanding of certain foreign political and religious movements, thereby harming our national security.

Since the 1960s, the U.S. Supreme Court has recognized the value of foreign speech to Americans and the right of Americans to receive such speech. Accordingly, the Court has afforded foreign speech, including foreign political

propaganda, the protections of the First Amendment.[19] If First Amendment protections did not apply, prospective foreign speakers – fearing criminal prosecution or civil suit – would be deterred from expressing certain viewpoints.[20] This, of course, would limit the availability of foreign information, including open source intelligence, and directly interfere with Americans' right to know.

*State of the Ummah* is undeniably political propaganda that must be afforded the protections of the First Amendment. Though the video was produced abroad, the Government's expert witness testified that *State of the Ummah* was directed towards a U.S. audience and, in fact, was viewed widely in the U.S. Moreover, *State of the Ummah* does not lose its First Amendment protections because it advocates violence. While the views expressed in *State of the Ummah* may be considered by some to be deplorable, repugnant, and offensive, that is not grounds to find those views to be outside the protections of the First Amendment.[21]

---

[19] *See*, *Lamont v. Postmaster General of the United States*, 381 U.S. 301, 85 S.Ct. 1493 (1965); and *Meese v. Keene*, 481 U.S. 465, 107 S.Ct. 1862 (1987) (discussing the Court's decision in Lamont).

[20] Credentialed and accomplished foreign journalists and reporters working for news organizations who produce films and articles could also be deterred. Foreign reporting is often a vital source of open source intelligence. One example is the Al Jazeera reporter Yosri Fouda, who tracked down two al Qaeda leaders, Khalid Sheikh Mohammed and Ramzi Bin AlShibh, on his own before they were captured by U.S. forces. Although al Qaeda contacted and provided Mr. Fouda with information to help their own cause, Mr. Fouda's openly published book *Masterminds of Terror* was an enormous benefit to U.S. intelligence officials.

[21] *Boos v. Barry*, 485 U.S. 312, 322, 108 S.Ct. 1157 (1988) ("As a general matter, we have indicated that in public debate our own citizens must tolerate insulting,

Despite advocating violence, *State of the Ummah* was not capable of producing imminent lawless action and, thus, it constitutes protected speech.[22] The Government cannot "saddle political speakers with implications their words do not literally convey but are later 'discovered' by judges and juries with the benefit of hindsight and by reference to facts over which the speaker has no control." [23]

This is exactly what happened to al Bahlul. He produced a political propaganda video from readily available sources on the Internet in support of al

and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment."). *See also*, *Boyd v. U.S.*, 116 U.S. 616, 635, 6 S.Ct. 524, 535 (1886), *abrogated on other grounds*; and *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642 (1967), stating:

> It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

[22] *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409 (1982) (holding that despite express calls for violence, and the context of actual violence, statements were protected because they were political statements publicly made, rather than made directly at the speakers' targets); *Hess v. Indiana,* 414 U.S. 105, 108, 94 S.Ct. 326 (1973) (advocating 'illegal action at some indefinite future time' is protected); *Brandenberg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827 (1969) (holding that the First Amendment protects speech that encourages others to commit violence, unless the speech is capable of "producing imminent lawless action").

[23] *Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 244 F.3d 1007, 1019 (9th Cir. 2000).

Qaeda in early 2001. Based upon events subsequent to the production of the video, namely the 9/11 terrorist attacks on the United States, what is traditionally protected speech is now in hindsight found to be not only unprotected speech but grounds for criminal charges of conspiracy, solicitation, and material support for terrorism carrying a sentence of life imprisonment. The imposition of such liability on al Bahlul has a chilling effect on foreign speech and other forms of expression, the bases of open source intelligence – a vital component of our nation's intelligence apparatus.

The application of the First Amendment in this case is not to protect a terrorist but rather to protect the First Amendment right to know by ensuring the continuing free flow of information and exchange of ideas in the United States.[24] In a globalized, digital world, the marketplace of ideas has become ever more borderless. The protection of the free exchange of ideas, whether those ideas or expressions are homegrown or generated abroad, is necessary for our national security as open source intelligence is based upon Americans' receipt of ideas and

---

[24] *New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 128 S.Ct. 791, 801 (2008) ("The First Amendment creates an open marketplace where ideas, most especially political ideas, may compete without government interference (citing *Abrams v. United States,* 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919)"); *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390, 89 S.Ct. 1794 (1969) ("It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail . . .. It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here.")

expressions. It is because the U.S. has so stringently protected the free flow of information and exchange of ideas, that our national security is so strong. To maintain the marketplace of ideas, and in the interest of our national security, *State of the Ummah* must be provided the same First Amendment protections as any other political propaganda before subjecting the speakers of such propaganda to criminal prosecution or civil liability.

The free flow of information in the U.S. has enabled law enforcement to monitor radical movements more closely and, in some cases, has allowed these movements to "blow off steam." It allows potential recruits to see what those organizations are really about and takes away some of their mystique – both of which are capable of precluding new membership. Indeed, two of the three government witnesses testified that, after watching *State of the Ummah*, they were *less* likely to join al Qaeda on ideological grounds.[25] Censorship and prosecution therefore tend to foster radicalization and make more difficult the efforts of law enforcement and intelligence agents to nip the threats of radical groups in the bud.

The principles applied to al Bahlul will be applied to all speakers abroad. A conviction solely on the basis of the composite of publicly available information presented in *State of the Ummah* could have a chilling effect on Americans' receipt

---

[25] Petitioner's Brief, at p. 51.

of information.  Anything that interferes with our right to know, limits the ability for us to be an informed citizenry and makes the country less safe.

CONCLUSION

For the foregoing reasons, the video produced by Petitioner, *State of the Ummah*, is protected speech under the First Amendment.  Failure to protect such speech under the First Amendment has a chilling effect on the dissemination of information and negatively impacts Americans' right to know, as well as the collection, use and reliability of open source intelligence.  To limit the free flow of information traditionally protected under the First Amendment is not only contrary to our democratic values and public policy, but also detrimental to the nation's security.

Respectfully submitted on behalf of the Amicus Curiae,

/s/ M.A. Livingston
McKenzie A. Livingston, Esq.
Member of the Bars of the States of
   New York and Florida
50 Biscayne Blvd, Unit 4011
Miami, FL 33132
mck.livingston@gmail.com
516-330-6225

# INTEREST OF AMICI

**Robert David Steele**.  Mr. Steele is 30-year veteran of the U.S. Government who held Top Secret/Sensitive Compartmented Clearances during that time (1976-2006). He served as a Marine Corps infantry officer, a joint military intelligence officer, a clandestine case officer for the Central Intelligence Agency, and is the founding senior civilian of the Marine Corps Intelligence Center. He is the Chief Executive Officer (CEO) of Open Source Solutions Network, Inc. and of Earth Intelligence Network.  He has trained over 7,500 mid-career intelligence professionals from over 40 countries.  Mr. Steele authored the Open Source Intelligence (OSINT) Handbooks for the Defense Intelligence Agency, the North Atlantic Treaty Organization and the Partnership for Peace, and the Special Operations Forces (Civil Affairs).  Among his publications are ON INTELLIGENCE: SPIES AND SECRECY IN AN OPEN WORLD (Foreword by Senator David Boren), THE NEW CRAFT OF INTELLIGENCE: PERSONAL, PUBLIC, & POLITICAL (Foreword by Senator Pat Roberts), and THE SMART NATION ACT: PUBLIC INTELLIGENCE IN THE PUBLIC INTEREST (Foreword by Congressman Rob Simmons.

**Robert Baer.** Mr. Baer served in the CIA's Directorate of Operations from 1976 to 1997 and was assigned to Damascus, Beirut, New Delhi, Paris, Iraq, and Rabat. Mr. Baer speaks Arabic, Farsi, and French. He is a columnist for *Time.com*.  He has authored four books and has written for such publications as the WALL STREET JOURNAL and WASHINGTON POST. He also is an anchor for British television documentaries on suicide bombers.

**Philip Giraldi, Ph.D.**  Dr. Giraldi is a 22-year veteran of U.S. intelligence who held Top Secret/Sensitive Compartmented Clearances from 968 through 2002.  He is a former CIA counter-terrorism specialist and military intelligence officer who served eighteen years overseas in Turkey, Italy, Germany, and Spain.  Since 1992, he has been engaged in security consulting for a number of Fortune 500 corporate clients.  Dr. Giraldi is a recognized authority on international security and counterterrorism issues who is a member of the American Conservative Defense Alliance and of Veteran Intelligence Professionals for Sanity.  He is a Contributing Editor who writes on terrorism, intelligence, and security issues for *The American Conservative* magazine.  He has written numerous op-ed pieces and has appeared frequently on television and radio.  He prepares and edits a nationally syndicated subscription service newsletter on September 11th issues for corporate clients.

**Raymond L. McGovern**.  Mr. McGovern served as an Army infantry/intelligence officer in the early sixties and then as a CIA all-source analyst from the administration of John F. Kennedy to that of George H.W. Bush.  In the 1980s, he headed the Analysis Group of the Foreign Broadcast Information Service (FBIS), which published studies based on the open-source material collected by FBIS.  While serving in various presidential administrations, Mr. McGovern's duties included chairing National Intelligence Estimates (NIEs), preparing the President's Daily Brief (PDB), and conducting one-on-one early morning briefings based on the PDB for the Vice President and other senior advisers.

**Coleen Rowley**.  Ms. Rowley is a retired FBI Special Agent (1981-2004) who spent most of her early career investigating a range of crimes, but mostly "organized criminal groups" such as Italian LCN and drug trafficking groups.  From 1990 to 2003, she served as the Minneapolis FBI's Chief Division Counsel and later she was assigned to intelligence matters and oversight of the Minneapolis Division's informant and confidential source program.   After 9/11 she provided testimony to the joint Senate-House Intelligence Committee Inquiry, the Senate Judiciary Committee and to the Department of Justice Inspector General, who were investigating pre-9/11 lapses and intelligence failures.  Ms. Rowley is the author of the chapter "Civil Liberties and Effective Investigation" in PATRIOTISM, DEMOCRACY AND COMMON SENSE: RESTORING AMERICAN'S PROMISE AT HOME AND ABROAD (Eisenhower Foundation 2004).

**Glenn L. Carle.**  Mr. Carle served 23 years as an Operations Officer in the CIA, his last position being the Deputy National Intelligence Officer for Transnational Threats on the National Intelligence Council (the United States' most senior body for strategic intelligence analysis, which reports directly to the President and Combatant Commanders).  He served many years abroad, on four continents, and also served several years on detail to the Executive Office of the President.  Mr. Carle has worked on terrorism, European political and security issues, the Balkans, Central America, African, and international trade issues throughout his career.  He is the author of THE INTERROGATOR, which details his involvement interrogating a top al Qaeda suspect.

**Lawrence Wilkerson.**  Mr. Wilkerson is Distinguished Visiting Professor of Government and Public Policy at the College of William and Mary in Williamsburg, Virginia.  His last positions in government were chief of staff to Colin Powell at the U.S. Department of State (2002-2005) and Associate Director and member of the State Department's Policy Planning Staff under Ambassador Richard Haass (2001-2002).  Wilkerson served 31 years in the Army as both an enlisted man and an officer from 1966 to 1997.

**Thomas Drake.**  Mr. Drake was a senior official at the National Security Agency. While at the NSA, he became a material witness and whistleblower for two 9/11 congressional investigations and a Department of Defense Inspector General audit of a flagship program called Trailblazer and an alternative program called Thinthread. The Justice Department subsequently prosecuted Mr. Drake for espionage as a whistleblower and lost. His case was highlighted by Jane Mayer in The New Yorker and by Scott Pelley on 60 Minutes.

**Stephen N. Xenakis, M.D., Brigadier General (Ret), USA.**  Dr. Xenakis served 28 years in the United States Army as a medical corps officer.  He held a wide of variety of assignments as a clinical psychiatrist, staff officer, and senior commander including Commanding General of the Southeast Army Regional Medical Command.  Dr. Xenakis has written widely on medical ethics, military medicine, and the treatment of detainees.  He has published editorials in the Washington Post and a number of other national magazines and journals, including book chapters and legal reviews.  Dr. Xenakis has an active clinical and consulting practice, and currently is working on the clinical applications of quantitative electroencephalography (QEEG) to brain injury and other neurobehavioral conditions.

**Marc Sageman, M.D., Ph.D.** Dr. Sageman holds an M.D. and Ph.D. in political sociology from New York University. After being a Flight Surgeon for the U.S. Navy, Dr. Sageman served seven years as an Operation Officer in the CIA, with past postings in Islamabad and New Delhi. He left the agency and became a forensic psychiatrist and faculty member at the University of Pennsylvania, where he taught law and psychiatry. After the attacks of 9/11, he used open source material to write two of the most cited books in the field of terrorism research, UNDERSTANDING TERROR NETWORKS and LEADERLESS JIHAD. His use of empirical evidence from open sources changed the methodology in the field. As a result of this open source research, he was hired as a consultant to Sandia National Laboratory, the U.S. Secret Service, the National Intelligence Council, the New York Police Department and is now the adviser to the Deputy Chief of Staff of the Army (Intelligence). In each of these positions, he has shown how to use the tools of social sciences and apply them to empirical evidence, most of which is open source.

**David C. MacMichael, Ph.D.** Dr. MacMichael was a private in the U.S. Marine Corps from 1946-1948. From 1965-1969, he was assigned to the U.S. mission Bangkok, Thailand, office of Special Assistant for Counter-Insurgency. For several years thereafter, he worked as a private consultant. From 1981-1983, Dr.

MacMichael worked as a senior estimates officer in the Analytic Group of the CIA's National Intelligence Council. Thereafter, he was a vocal critic of CIA covert operations, testifying at the World Court in the case of *Nicaragua v. United States* in 1985. Dr. MacMichael helped organize the Association of National Security Alumni, a group of former U.S. intelligence officers opposed to use of so-called "covert operations" as a means of conducting U.S. foreign policy. He headed the Association's Washington office, edited and published the magazine *Unclassified*. Dr. MacMichael has written for numerous publications and has spoken widely both in the U.S. and overseas. With the run up to Iraq War in 2002, he joined the Veteran Intelligence Professionals for Sanity (VIPS), a group of ex-U.S. intelligence officers opposing the U.S.'s use of falsified intelligence to support wars on Iraq and Afghanistan. He currently serves on a steering group of that organization.

**Raymond Close.** Mr. Close is a 26-year CIA veteran who has served as a Middle East specialist, with service in Lebanon, Egypt, Pakistan and Saudi Arabia. He was Chief of Station, Saudi Arabia from 1970-1977. Mr. Close was also a member of the advisory committee serving the Iraq Study Group.

**Elizabeth Murray.** Ms. Murray served as Deputy National Intelligence Officer for the Near East in the National Intelligence Council before retiring after a 27-year career in the U.S. government, where she specialized in Middle Eastern political and media analysis. She is a member of Veteran Intelligence Professionals for Sanity (VIPS).

## CIRCUIT RULE 28(a) CERTIFICATE

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies:

1. All parties, intervenors, and amici appearing in this Court are listed in the Brief for the Petitioner. Pursuant to Rule 26.1, amici certify that none of the entities filing this brief are corporate entities.

2. References to the rulings at issue appear in the Brief for the Petitioner.

3. Counsel is unaware of any cases related to this appeal except for those listed in the Brief for the Petitioner.

4. Counsel is unaware of statutes or regulations related to this appeal except for those listed in the Brief for the Petitioner.

## RULE 32 CERTIFICATE

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C) and D.C. Circuit Rule 32(a)(2)(B), the foregoing brief amicus curiae was prepared using Microsoft Word 2003. It is proportionately spaced, has a typeface of 14 points or more and contains 6,509 words.

Dated: August 18, 2014

By: /s/ M.A. Livingston
McKenzie A. Livingston
Member of the Bars of the
    States of New York and Florida
50 Biscayne Blvd, Unit 4011
Miami, FL 33132
mck.livingston@gmail.com
516-330-6225

23

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2014 a copy of the foregoing was filed electronically with the Court. Notice of this filing will be sent to all parties by operation of this Court's electronic filing system. Parties may access this filing through the Court's system.

Dated: August 18, 2014

                                    Respectfully submitted,

                                    /s/ M.A. Livingston

24