[ORAL ARGUMENT NOT YET SCHEDULED]

# No. 11-1324

## UNITES STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ALI HAMZA AHMAD SULIMAN AL BAHLUL,

Petitioner,

v.

UNITED STATES OF AMERICA,

Respondent.

ON PETITION FOR REVIEW FROM THE
UNITED STATES COURT OF MILITARY COMMISSION REVIEW

**BRIEF OF *AMICI CURIAE* JAPANESE AMERICAN CITIZENS LEAGUE,
ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND, ASIAN
AMERICANS ADVANCING JUSTICE - AAJC, ASIAN AMERICANS
ADVANCING JUSTICE - ASIAN LAW CAUCUS, ASIAN AMERICANS
ADVANCING JUSTICE – LOS ANGELES, AND NATIONAL ASIAN
PACIFIC AMERICAN BAR ASSOCIATION IN SUPPORT OF
PETITIONER AND URGING REVERSAL**

Jonathan Hafetz
SETON HALL UNIVERSITY
SCHOOL OF LAW
One Newark Center
Newark, NJ 07102
(973) 642-8492

Lawrence S. Lustberg
Joseph A. Pace
GIBBONS, P.C.
One Gateway Center
Newark, NJ 07102
(973) 596-4500

*Counsel for Amici Curiae*

Dated: August 18, 2014

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for *amici curiae* certifies as follows:

(**A**) **Parties and Amici**.  All parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the Brief for Petitioner Ali Hamza Ahmad Suliman al Bahlul, other than the organizations, listed in Appendix A, filing this brief as *amici curiae.*

(**B**) **Rulings Under Review.**  References to the rulings at issue appear in the Brief for Petitioner Bahlul.

(**C**) **Related Cases.**  Counsel is not aware at this time of any other related case within the meaning of Circuit Rule 28(a)(1)(C).

<u>**CORPORATE DISCLOSURE STATEMENT**</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, *amici curiae* make the following disclosures:

The **Japanese American Citizens League** is a civil rights organization representing Americans of Japanese ancestry. It has no parent companies, and no publicly-held company has a 10% or greater ownership interest in it.

The **Asian American Legal Defense and Education Fund** is a national organization that protects and promotes the civil rights of Asian Americans. It has no parent companies, and no publicly-held company has a 10% or greater ownership in it.

**Asian Americans Advancing Justice – AAJC** is a national organization that works to advance the human and civil rights of Asian Americans, and build and promote a fair and equitable society for all. It has no parent companies, and no publicly-held company has a 10% or greater ownership interest in it.

**Asian Americans Advancing Justice - Asian Law Caucus** is a legal rights organization devoted to serving low-income Asian Pacific American communities, as well as other vulnerable communities. It has no parent companies, and no publicly-held company has a 10% or greater ownership interest in it.

**Asian Americans Advancing Justice - Los Angeles** is a legal services and civil rights organization devoted to serving Asian American, Native Hawaiian, and

Pacific Islander communities. It has no parent companies, and no publicly-held company has a 10% or greater ownership interest in it.

The **National Asian Pacific American Bar Association** is the national association of Asian Pacific American attorneys, judges, law professors, and law students. It has no parent companies, and no publicly-held company has a 10% or greater ownership interest in it.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ i

CORPORATE DISCLOSURE STATEMENT .................................................... ii

TABLE OF CONTENTS ............................................................................... iii

TABLE OF AUTHORITIES ........................................................................... iv

INTEREST OF AMICI AND SUMMARY OF ARGUMENT ............................ 1

ARGUMENT ............................................................................................... 3

I.   THE MILITARY COMMISSIONS ACT, BY CREATING A
     SYSTEM OF JUSTICE THAT IS RESERVED FOR NON-
     CITIZENS, VIOLATES THE EQUAL PROTECTION
     GUARANTEE OF THE CONSTITUTION ............................................. 3

     A.   The Military Commissions Act subjects non-citizens to criminal
          trial in a separate, unequal system .................................................... 3

     B.   By according non-citizen criminal defendants lesser rights, the
          MCA triggers heightened scrutiny ..................................................... 6

II.  HISTORY SHOWS THAT NATIONAL SECURITY MEASURES
     TARGETED EXCLUSIVELY AGAINST NON-CITIZENS OFTEN
     LEAD TO THE WIDESPREAD ABRIDGEMENT OF CITIZENS'
     RIGHTS ........................................................................................... 18

     A.   The internment of Japanese citizens during the Second World
          War had its roots in measures that targeted only non-citizens ......... 19

     B.   The political repression of the McCarthy era grew out of
          measures that were initially imposed upon non-citizens alone ........ 24

CONCLUSION ........................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A and Others v. Sec'y of State for the Home Dep't*,
  [2004] UKHL 56 ..................................................................16, 17

*Abrams v. United States*,
  250 U.S. 616 (1919) ................................................................ 27

*Adarand Constructors, Inc. v. Peña*,
  515 U.S. 200 (1995) ................................................................. 7

*Al-Marri v. Pucciarelli*,
  534 F.3d 213 (4th Cir.  2008) (en banc), *cert. granted*, 555 U.S. 1066,
  *vacated as moot*, 555 U.S. 1220 (2009) ........................................ 18

*Bahlul v. United States*,
  2014 U.S. App. LEXIS 13287 (D.C. Cir. July 14, 2014) ........................2, 6, 14

*Bailey v. Richardson*,
  182 F.2d 46 (D.C. Cir. 1950), *aff'd by an equally divided Court*, 341 U.S.
  918 (1951) .......................................................................... 29

*Barenblatt v. United States*,
  360 U.S. 109 (1959) ................................................................ 30

*Barsky v. United States*,
  167 F.2d 241 (D.C. Cir. 1948), *cert. denied* 334 U.S. 843 .............................. 30

*Boumediene v. Bush*,
  553 U.S. 723 (2008) ................................................................6, 18

*Cleburne v. Cleburne Living Ctr., Inc.*,
  473 U.S. 432 (1985) .........................................................7, 12, 17

*Debs v. United States*,
  249 U.S. 211 (1919) ................................................................ 27

*Demore v. Hyung Joon Kim*,
  538 U.S. 510 (2003) ................................................................. 8

v

*Dennis v. United States*,
  341 U.S. 494 (1951) ................................................................ 31

*Ex Parte Quirin*,
  317 U.S. 1 (1942) ................................................................... 11

*Foley v. Connelie*,
  435 U.S. 291 (1978) ............................................................... 12

*Graham v. Richardson*,
  403 U.S. 365 (1971) .............................................................7, 12

*Hamdan v. Rumsfeld*,
  548 U.S. 557 (2006) ................................................................. 3

*Hamdan v. United States*,
  696 F.3d 1238 (D.C. Cir. 2012) ................................................ 14

*Hamdi v. Rumsfeld*,
  542 U.S. 507 (2004) ...........................................................15, 18

*Korematsu v. United States*,
  323 U.S. 214 (1944) ............................................................... 20

*Korematsu v. United States*,
  584 F. Supp. 1406 (N.D. Cal. 1984) .......................................21, 24

*Mathews v. Diaz*,
  426 U.S. 67 (1976) .................................................................. 8

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ............................................................... 22

*Pennsylvania v. Ritchie*,
  480 U.S. 39 (1987) .................................................................. 4

*Plyler v. Doe*,
  457 U.S. 202 (1982) ..............................................................6, 7

*Richmond v. J.A. Croson Co.*,
  488 U.S. 469 (1989) ............................................................... 19

*Ry. Express Agency, Inc. v. New York*,
    336 U.S. 106 (1949) ................................................................ 16

*Scales v. United States*,
    367 U.S. 203 (1961) ................................................................ 32

*Schenk v. United States*,
    249 U.S. 47 (1919) ................................................................. 27

*Stenberg v. Carhart*,
    530 U.S. 914 (2000) ................................................................ 21

*Takahashi v. Fish & Game Comm'n*,
    334 U.S. 410 (1948) .................................................................. 7

*Turner v. United States*,
    194 U.S. 279 (1904) ................................................................ 25

*United States v. Carolene Prods. Co.*,
    304 U.S. 144 (1938) ................................................................ 11

*Wong Wing v. United States*,
    163 U.S. 228 (1896) ..........................................................8, 9, 11

*Yates v. United States*,
    354 U.S. 298 (1957) ................................................................ 31

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) ...........................................................6, 11

## **STATUTES**

10 U.S.C. § 802 ...................................................................... 10

10 U.S.C. § 810 ........................................................................ 4

10 U.S.C. § 948a (2006) .......................................................3, 18

10 U.S.C. § 948a (2009) ........................................................... 3

10 U.S.C. § 948a(7) ................................................................ 18

10 U.S.C. § 948b(d) ................................................................. 4

10 U.S.C. § 948c (2006) ..................................................................... 3

10 U.S.C. § 948c (2009) ..................................................................... 3

10 U.S.C. § 948d (2006) ................................................................... 18

10 U.S.C. § 948j (2006) ...................................................................... 4

10 U.S.C. § 948r (2006) ...................................................................... 4

10 U.S.C. § 949a (2006) ..................................................................... 4

10 U.S.C. § 949d (2006) ..................................................................... 4

10 U.S.C. § 949j (2006) ...................................................................... 4

10 U.S.C. § 950t ............................................................................... 14

10 U.S.C. §948r ................................................................................. 4

10 U.S.C. §949h ................................................................................. 4

10 U.S.C. §949m ................................................................................ 4

10 U.S.C.§ 948b(d)(A) ....................................................................... 4

18 U.S.C. § 2441 ................................................................................ 5

18 U.S.C. § 3231 .............................................................................. 10

18 U.S.C. App. III §§ 1-16 ................................................................. 4

50 U.S.C. App. § 1989a .................................................................... 21

50 U.S.C. App. § 1989b-4 ................................................................ 21

## OTHER AUTHORITIES

152 Cong. Rec. H7533 (daily ed. Sept. 27, 2006)
(statement of Rep. Hunter) ........................................................... 18

152 Cong. Rec. H7544 (daily ed. Sept. 27, 2006)
(statement of Rep. Buyer) .............................................................. 5

152 Cong. Rec. H7544 (daily ed. Sept. 27, 2006)
(statement of Rep. Wu .................................................................. 5

152 Cong. Rec. S10,251
(daily ed. Sept. 27, 2006) .............................................................. 13

152 Cong. Rec. S10,251 (daily ed. Sept. 27, 2006)
(statement of Sen. Graham) ........................................................... 5

152 Cong. Rec. S10,262 (daily ed. Sept. 27, 2006)
(statement of Sen. Warner) ............................................................ 5

Act of 2006, Pub. L. No. 109-366, sec. 3 ............................................ 3

Act of Mar. 21, 1942, 56 Stat. 173 ................................................... 23

Adam B. Cox,
*Immigration Law's Organizing Principles*, 157 U. Pa. L. Rev. 341 (2008) ....... 9

Ahmad, *Guantánamo is Here*,
2007 U. Chi. Legal F. at 17 (2007) .................................................. 16

Alberto Gonzalez, U.S. Att'y Gen.,
*Remarks at the World Affairs Council of Pittsburgh on Stopping
Terrorists Before They Strike: The Justice Department's Power of
Prevention* (Aug. 16, 2006) .......................................................... 15

Brief for Appellant, *Korematsu v. United States*,
323 U.S. 214 (1944) (No. 22), 1944 WL 42849 ....................................... 19

Brief of *Amicus Curiae* Fred Korematsu, *Rasul v. Bush*,
542 U.S. 466 (2004) (No. 03-334), 2004 WL 103832 .................................. 20

Brief of *Amicus Curiae* Japanese American Citizens League, *Korematsu v.
United States*,
323 U.S. 214 (1944) (No. 22), *reprinted in* Philip B. Kurland & Gerhard
Casper, eds., 42 *Landmark Briefs and Arguments of the Supreme Court of
the United States: Constitutional Law* 309-530 (1975) ............................. 20

Center on Law and Security,
*Terrorist Trial Report Card: September 11, 2001–September 11, 2011*
(2011) ............................................................................... 15

David Cole,
  *Enemy Aliens* (2003) ................................................................................passim

Dep't of Justice, Confession of Error:
  The Solicitor General's Mistakes During the Japanese-American
  Internment Cases, May 20, 2011, *available at*
  http://blogs.justice.gov/main/archives/1346 ................................................... 21

Detention Policy Task Force,
  Memo for the Attorney General, Secretary of Defense, July 20, 2009 at 4–
  5 *available at* http://www.scotusblog.com/wp-
  content/uploads/2009/07/law-of-war-prosecution-prelim-report-7-20-
  09.pdf ......................................................................................................................... 13

Eleanor Bontecou,
  *The Federal Loyalty-Security Program* (1953) .........................................28, 29

Enemy Expatriation Act,
  S. 1698, 112th Cong. (2011) ........................................................................ 19

Espionage Act of 1917, Pub. L. No. 65-24, 40 Stat. 217 .................................... 27

Frank J. Donner,
  *The Un-Americans* (1961) ............................................................................ 30

Hatch Act of 1939, Pub. L. No. 76-252, 53 Stat. 1147 ....................................... 28

Human Rights First,
  *Analysis of Proposed Rules for Military Commissions Trials* (2007) ............... 4

Immigration Act of Feb. 5, 1917, ch. 29, 39 Stat. 874......................................... 26

Immigration Act of Mar. 3, 1903, ch. 102, 32 Stat. 1213 (1903) ....................... 25

Immigration Act of Oct. 16, 1918, ch. 186, 40 Stat. 1012 .................................. 26

Ingrid V. Eagly,
  *Prosecuting Immigration*, 104 Nw. U.L. Rev. 1281 (2010) ............................. 9

Jacobus tenBroek, Edward N. Barnhart & Floyd W. Matson,
  *Prejudice, War and the Constitution* (1954) .................................................. 23

James Morton Smith,
*Freedom's Fetters: The Alien and Sedition Laws and American Civil
Liberties* (1956) ........................................................................... 22

Jennifer K. Elsea, *The Military Commissions Act of 2009:
Overview and Legal Issues*, Cong. Research Service 7-5700 (2014),
*available at* http://fas.org/sgp/crs/natsec/R41163.pdf........................................ 5

Kittel, *Trying Terrorists*,
44 Geo. J. Int'l L. at 804; Katyal, *Equality in the War on Terror*, 59 Stan.
L. Rev. at 1378 .............................................................................. 16

Larkin Kittel, *Trying Terrorists:
The Case for Expanding Jurisdiction of Military Commissions to U.S.
Citizens*, 44 Geo. J. Int'l L. 783, 795-97 (2013).............................................. 12

Linda S. Bosniak,
*Membership, Equality, and the Difference that Alienage Makes*, 69
N.Y.U. L. Rev. 1047, 1097 (1994) ............................................................ 10

Mark E. Neely, Jr.,
*The Fate of Liberty: Abraham Lincoln and Civil Liberties* (1991) .................. 11

Michi Weglyn,
*Years of Infamy: The Untold Story of America's Concentration Camps*
(1976) ............................................................................................. 20

Muneer I. Ahmad, *Guantánamo is Here
The Military Commissions Act and Noncitizen Vulnerability*, 2007 U.
Chi. Legal F. 1, 17 (2007) ............................................................ 13

Neal Katyal, *Equality in the War on Terror*,
59 Stan. L. Rev. 1365, 1370 (2007) ............................................... 11

Philip B. Kurland & Gerhard Casper, eds.,
42 *Landmark Briefs and Arguments of the Supreme Court of the United
States: Constitutional Law* 309-530 (1975) ................................................... 20

Pub. L. No. 107-40,
115 Stat. 224 (2001).................................................................. 14

Ralph Brown, Jr.,
*Loyalty and Security: Employment Tests in the United States* (1958).............. 30

Robert J. Goldstein,
  *Political Repression in Modern America: From 1870 to the Present*
  (1978) ...................................................................................................30, 31

S. Amdt. 753 to H.R. 2112,
  157 Cong. Rec. S6609 (daily ed. Oct. 17, 2011) ........................................... 19

Sedition Act of 1918, Pub. L. No. 65-150, 40 Stat. 553 .................................... 27

Smith Act of 1940, Pub. L. No. 76-670, 54 Stat. 671 ........................................ 31

Terrorist Expatriation Act,
  S. 3327, 111th Cong. (2010) ........................................................................ 19

Uniform Code of Military Justice, Pub. L. No. 81-506, sec. 1, art. 2, 64 Stat.
  107 (1950) ..................................................................................................... 10

William Preston, Jr.,
  *Aliens and Dissenters: Federal Suppression of Radicals 1903-33* (1963)25, 26, 28

Winfield Scott,
  *Memoirs of Lieut.-General Scott*, *L.L.D.* (1864) ........................................... 10

## RULES

Circuit Rule 28(a)(1) .........................................................................................i

Circuit Rule 29(b).............................................................................................. 1

Circuit Rule 29(d)............................................................................................ 34

Fed. R. App. P. 29(c)(5)...................................................................................... 1

Fed. R. App. P. 32(a) ....................................................................................... 34

Fed. R. App. P. 32(a)(5)..................................................................................... 34

Fed. R. App. P. 32(a)(7)(B)(iii) ....................................................................... 35

Fed. R. Crim. P. 17............................................................................................ 4

R. Mil. Comm'ns 703 (2007) ............................................................................ 4

**REGULATIONS**

Exec. Order No. 10,241, 16 Fed. Reg. 3690 (Apr. 28, 1951) .............................. 29

Exec. Order No. 9066, 7 Fed. Reg. 1407 (Feb. 25, 1942) ................................... 19

Exec. Order No. 9835, 12 Fed. Reg. 1935 (Mar. 21. 1947) ................................ 29

Military Order of Nov. 13, 2001, 66 Fed. Reg. 57,833 ........................................ 3

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. V ...................................................................................6, 17

U.S. Const. amend. VI ...................................................................................... 4

# INTEREST OF *AMICI* AND SUMMARY OF ARGUMENT[1]

*Amici curiae* the Japanese American Citizens League, the Asian American Legal Defense and Education Fund, the National Asian Pacific American Bar Association, Asian Americans Advancing Justice – AAJC, Asian Americans Advancing Justice – Asian Law Caucus, Asian Americans Advancing Justice – Los Angeles, and National Asian Pacific American Bar Association are all non-profit organizations that undertake national advocacy against discrimination. In part because of the experiences of their members before, during, and after World War II, they are committed to the principle that measures singling out non-citizens for disadvantageous treatment are presumptively unconstitutional, and can only be justified if supported by proof satisfying the most stringent constitutional standard.

The Military Commissions Act of 2006 creates a separate, inferior system of criminal justice imposed exclusively on non-citizens. Specifically, the MCA reflects an intentional decision to apply procedures to foreign nationals that would be unacceptable if applied to U.S. citizens. Measures that target non-citizens in this manner are subject to strict scrutiny under the Equal Protection guarantee of the Fifth Amendment, a burden that the military commissions cannot meet because

---

[1] This brief is filed with the consent of the parties. Circuit Rule 29(b). No portion of this brief was authored or funded by counsel for any party, nor did any other person or entity support this brief with monetary contributions. Fed. R. App. P. 29(c)(5).

their discriminatory application to foreign nationals cannot be justified by any relevant distinction between citizens and non-citizens.[2]

*Amici* write with particular sensitivity to this nation's history of discrimination against non-citizens and its pernicious consequences. During the Second World War, more than 100,000 people of Japanese ancestry — citizens and non-citizens alike — were banished from their homes and interned in camps. This shameful episode grew out of measures that initially targeted non-citizens alone. Similarly, the persecution of suspected "subversives" during the McCarthy era, which ultimately affected millions of Americans and for years chilled legitimate political expression, also had its roots in measures initially directed solely against non-citizens. History, then, shows that unduly harsh laws targeting non-citizens too often lead to the widespread abridgement of the rights of all, including those of citizens. Lest that history repeat itself, this Court should find the military commissions unconstitutional for denying equal protection of the laws.

---

[2] Following rehearing *en banc*, the Court remanded this matter to this panel with instructions to address the Equal Protection challenge raised by Petitioner. *Bahlul v. United States*, 2014 U.S. App. LEXIS 13287, at *80 (D.C. Cir. July 14, 2014). That challenge was only addressed in a few paragraphs in Judge Kavanaugh's dissenting opinion, which would have rejected Petitioner's claim. *See id.* at *212-14 (D.C. Cir. July 14, 2014) (Kavanaugh, J., dissenting). For the reasons explained below, *amici* respectfully submit that Judge Kavanaugh was incorrect in concluding that the MCA complies with the dictates of the Equal Protecion Clause.

## ARGUMENT

I. **THE MILITARY COMMISSIONS ACT, BY CREATING A SYSTEM OF JUSTICE THAT IS RESERVED FOR NON-CITIZENS, VIOLATES THE EQUAL PROTECTION GUARANTEE OF THE CONSTITUTION.**

**A.** **The Military Commissions Act subjects non-citizens to criminal trial in a separate, unequal system.**

Since their inception, the post-9/11 military commissions have operated as a separate criminal justice system reserved exclusively for non-citizens. The presidential order that first created the commissions provided jurisdiction to try "any individual who is not a United States citizen" so long as the President determined that the individual had a specified connection to international terrorism. Military Order of Nov. 13, 2001, § 2, 66 Fed. Reg. 57,833. After the Supreme Court held, in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), that the commissions were unlawful, Congress passed legislation that again prescribed that only "a person who is not a citizen of the United States" may be tried in the commissions. Military Commissions Act of 2006, Pub. L. No. 109-366, sec. 3, §§ 948a(3), 948c, 120 Stat. 2600, 2601-02 (2006) ("MCA"). Thus, in intent and effect, the military commissions explicitly discriminate on the basis of citizenship.[3]

---

[3] All references to the "MCA" refer to the Military Commissions Act of 2006, under which petitioner was tried. The law currently in force makes the same distinction based on citizenship. *See* Military Commissions Act of 2009, 10 U.S.C. §§ 948a(1), 948c.

3

The discriminatory classification written into the MCA is far from innocuous: the criminal process created by the MCA is markedly inferior to that afforded by a federal court. Among other deficiencies, the Act permits the admission of hearsay as well as of coerced evidence. *Id*. §§ 948r, 949a(2)(C), 949a(2)(E). It provides the government more latitude to withhold classified information than in federal courts. *Compare* MCA §§ 949d(f), 949j(c)-(d), *with* 18 U.S.C. App. III §§ 1-16. The Act limits the government's disclosure obligations. *Compare* MCA § 949j(d), *with Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987). It does not provide a right to a speedy trial. *Compare* MCA § 948b(d) *with* 10 U.S.C. § 810. And it restricts the accused's right to compulsory process, guaranteeing only a "reasonable opportunity" to obtain evidence and witnesses, subject to further limitation by rule. *Compare* MCA § 948j(a); R. Mil. Comm'ns, R. 703 (2007), *with* U.S. Const. amend. VI; Fed. R. Crim. P. 17. *See generally* Human Rights First, *Analysis of Proposed Rules for Military Commissions Trials* (2007).[4]

---

[4] The MCA of 2009 improved upon the procedural protections provided by the MCA of 2006 in several respects. For example, under the 2009 law, evidence obtained through cruel, inhuman, or degrading treatment is categorically inadmissible. *See* 10 U.S.C. §948r (2012). However, many deficiencies remain. *See, e.g.*, 10 U.S.C.§ 948b(d)(A) (2012) (no speedy trial right); 10 U.S.C. §949m (2012) (only two-thirds of commission members needed to convict for non-capital offenses); 10 U.S.C. §949h (2012) (double jeopardy attaches when guilty verdict becomes final, not when jury is sworn in or when evidence is presented, as provided in civilian courts). *See generally* Jennifer K. Elsea, *The Military*

In these and other provisions, Congress created a less protective criminal forum for non-citizens than that which is available to citizens — including even citizens accused of war crimes. *See* 18 U.S.C. § 2441. The legislative history confirms that this was an intentional decision to apply procedures to foreign nationals that would be unacceptable if applied to U.S. citizens. *See, e.g.*, 152 Cong. Rec. S10,251 (daily ed. Sept. 27, 2006) (statement of Sen. Graham) ("The jurisdiction of military commissions does not allow for the trial of American citizens . . . and those who say otherwise, quite frankly, have not read the legislation because there is a prohibition to that happening."); *id*. at S10,262 (statement of Sen. Warner) ("We have no intention to try to accord aliens engaged as unlawful combatants with all the rights and privileges of American citizens . . . ."); *id*. at H7544 (statement of Rep. Wu) ("[A] military tribunal . . . is not where American civilians should have their rights determined."); *id*. (statement of Rep. Buyer) ("I just want you to know that the world will be able to see what we have created here does not apply to American citizens."). This separate and unequal system of dispensing criminal justice cannot survive constitutional scrutiny.

---

*Commissions Act of 2009: Overview and Legal Issues*, Cong. Research Service 7-5700 (2014), *available at* http://fas.org/sgp/crs/natsec/R41163.pdf.

**B.    By according non-citizen criminal defendants lesser rights, the MCA triggers heightened scrutiny.**

Because the MCA intentionally discriminates against non-citizens, it must withstand the highest level of scrutiny under the Equal Protection guarantee. The Equal Protection guarantee "is not confined to the protection of citizens;" its "provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, *or of nationality*." *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (emphasis added). Indeed, even "aliens whose presence in this country is unlawful" are protected "from invidious discrimination by the Federal Government." *Plyler v. Doe*, 457 U.S. 202, 210 (1982).[5]

---

[5] The Equal Protection guarantee applies notwithstanding that Bahlul's prosecution occurred at Guantánamo. In *Boumediene v. Bush*, the Supreme Court observed that "[i]n every practical sense Guantanamo is not abroad; it is within the constant jurisdiction of the United States." 553 U.S. 723, 769 (2008). Although that decision applied to the Suspension Clause, no authority would support its limitation to that constitutional provision. *See Boumediene*, 553 U.S. at 765 (expressing concern with the proposition that "the political branches have the power to switch the Constitution on or off at will" by choosing to act on territory over which the government has "total control," but where there is not "formal sovereignty"); *id.* at 765 (expressing concern with the proposition that "the political branches have the power to switch the Constitution on or off at will" by choosing to act on territory over which the government has "total control," but where there is not "formal sovereignty"). Nor has this Court limited the constitutional guarantees accorded Guantánamo detainees to rights under the Suspension Clause. *See Bahlul v. United States*, 2014 U.S. App. LEXIS 13287 (D.C. Cir. July 14, 2014) (confirming that the Ex Post Facto Clause applies to prosecution of Guantánamo detainees).

Moreover, it is now black-letter law that "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." *Graham v. Richardson*, 403 U.S. 365, 372 (1971). Accordingly, like statutes that create racial classifications, laws that single out non-citizens for different treatment — like the MCA — are "constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995); *see also Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985) ("[W]hen a statute classifies by . . . alienage" it is "subjected to strict scrutiny."); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 420 (1948). ("[T]he power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits.").

To be sure, the Supreme Court has recognized that in certain domains the federal government may draw lines between aliens and citizens subject without triggering strict scrutiny. But this authority has been carefully confined to two discrete areas. First, the federal government may treat aliens differently, subject to relaxed scrutiny, in matters of immigration and naturalization. *See, e.g., Demore v.*

---

Furthermore, and in any event, the MCA fully empowers the government to utilize military commissions for non-citizens not just at Guantánamo, but also within the United States, where the Equal Protection Clause would apply even under pre-*Boumediene* precedents. *Plyler*, 457 U.S. at 210 (collecting cases).

*Hyung Joon Kim*, 538 U.S. 510, 521 (2003) (upholding mandatory detention pending deportation for a certain class of non-citizens, noting that "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens") (internal quotation marks omitted).   And second, Congress may condition discretionary benefits on a person's immigration status, subject only to rational basis review. *See Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976) ("The decision to share [public welfare benefits] with our guests may take into account the character of the relationship between the alien and this country.").

But the MCA falls within neither of these exceptions: it does not regulate admission, exclusion or deportation of aliens; nor does it govern the dispensation of public benefits.  Rather, it regulates the criminal process, an area of the law that is among the most carefully safeguarded by the Equal Protection guarantee. Indeed, it has been settled law for more than a century that the Equal Protection guarantee requires non-citizens to be afforded the same rights as citizens in the adjudication and punishment of crimes.  Thus, in *Wong Wing v. United States*, 163 U.S. 228 (1896), four Chinese laborers were brought before a federal commissioner, who determined that under the Chinese exclusion laws, they were not lawfully within the United States.  The commissioner, however, did not simply order the men deported.  Instead, he mandated that they first serve a sentence of

8

sixty days hard labor.  These sentences were imposed based on the same cursory

hearing that determined deportability – a hearing devoid of the protections afforded

criminal defendants.  *Id*. at 236.  They were, in other words, subject to a separate,

inferior process for adjudicating criminal punishment reserved exclusively for a

class of foreigners – in that case, unauthorized Chinese immigrants.

The Supreme Court rejected this scheme.  Because the Chinese exclusion

laws imposed criminal penalties, and not merely deportation, the "legislation, to be

valid, must provide for a judicial trial to establish the guilt of the accused,"

including all of the guarantees afforded by the Fifth and Sixth Amendments.  *Id*. at

237-38.    The Court thus affirmed that Equal Protection prohibits federal

discrimination against non-citizens with respect to criminal justice, and that non-

citizens are entitled to the same criminal process as citizens.  That is, *Wing Wong*

established "the equality principle of criminal law – that the criminal sphere cannot

be governed by the exceptionalism of immigration law."   Ingrid V. Eagly,

*Prosecuting Immigration*, 104 Nw. U. L. Rev. 1281, 1292 (2010); *id*. at 1291

("treatment of non-citizens caught up in the criminal system is separate and apart

from their treatment under the plenary power doctrine and decisions regarding

admission or removal"); *see also* Adam B. Cox, *Immigration Law's Organizing*

*Principles*, 157 U. Pa. L. Rev. 341, 386 n.136 (2008) (citing *Wong Wing* for the

proposition that "for over a century clear Supreme Court precedent has accorded

9

non-citizens charged with crimes the same due process protections available to citizens"); Linda S. Bosniak, *Membership, Equality, and the Difference that Alienage Makes*, 69 N.Y.U. L. Rev. 1047, 1097 (1994) ("*Wong Wing* stands for the following proposition: The mere fact that the object of government power is an alien does not mean that the government is exercising its immigration power.").

This proposition survived, unquestioned, until the creation of the military commissions in 2001. In ordinary civilian courts, of course, there is no lesser criminal process for aliens. *See, e.g.*, 18 U.S.C. § 3231 (providing criminal jurisdiction without regard to the defendant's nationality). Nor is there a separate system for aliens in courts-martial. Thus, the Uniform Code of Military Justice, which established the modern system of courts-martial, has always authorized jurisdiction to try both U.S. servicemen and foreign forces. Pub. L. No. 81-506, sec. 1, art. 2, 64 Stat. 107 (1950); 10 U.S.C. § 802 (providing courts-martial jurisdiction over U.S. servicemembers, but also "prisoners of war" and "persons serving with or accompanying an armed force in the field").

Even prior iterations of military commissions have never expressly discriminated against foreign nationals. The first military commissions, established during the Mexican War, ensured that "all offenders, Americans and Mexicans, were alike punished." Winfield Scott, *Memoirs of Lieut.-General Scott, L.L.D.* 392-95 (1864). Commissions during the Civil War were not limited

10

exclusively to Confederates. *See* Mark E. Neely, Jr., *The Fate of Liberty* 174 (1991). And President Roosevelt's Order authorizing the military trial of the German saboteurs during the Second World War applied equally to citizens and non-citizens alike. *Ex Parte Quirin*, 317 U.S. 1, 37-38 (1942) (upholding convictions of the saboteurs, including one U.S. citizen). *See also* Neal Katyal, *Equality in the War on Terror*, 59 Stan. L. Rev. 1365, 1370 (2007) (noting that "[t]he commissions set up by the MCA, like President Bush's first set of military commissions, appear to be the first ones in American history designed to apply only to foreigners.").

With the MCA, Congress has repudiated this history and violated the century-old guarantee that, in matters of criminal justice in particular, "'the equal protection of the laws is a pledge of the protection of equal laws.'" *Wong Wing*, 163 U.S. at 238 (quoting *Yick Wo*, 118 U.S. at 369). In consigning non-citizens, who are without political representation, to an inferior system of criminal justice, the MCA engenders precisely the type of unequal treatment that strict scrutiny is designed to guard against. Modern Equal Protection jurisprudence is founded upon the recognition that "more searching judicial inquiry" is required when "the operation of those political processes ordinarily to be relied upon to protect minorities" is frustrated or inoperable. *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938). And insofar as "aliens . . . have no direct voice in the

11

political processes," *Foley v. Connelie*, 435 U.S. 291, 294 (1978), "[a]liens as a class are a prime example of a 'discrete and insular' minority for whom heightened judicial solicitude is appropriate," *Graham*, 403 U.S. at 371 (quoting *Carolene Prods.*, 304 U.S. at 152 n.4). *See also Cleburne*, 473 U.S. at 440 (strict scrutiny necessary "because [alienage] discrimination is unlikely to be soon rectified by legislative means"). Thus, in singling out non-citizens and subjecting them to trial in a forum with degraded protections, the MCA triggers the most searching scrutiny. It cannot withstand such review.

### C.    The MCA cannot pass the rational basis test, much less the heightened scrutiny required by the Equal Protection guarantee.

The MCA's discriminatory treatment of non-citizens fails to serve *any* legitimate governmental interest, much less one sufficiently compelling to survive heightened scrutiny. To be sure, scholars and policymakers have advanced multiple concerns – *e.g.*, the difficulty of preserving evidence in battlefield conditions or locating witnesses abroad – as justifications for using military commissions in lieu of civilian trials. *See* Larkin Kittel, *Trying Terrorists: The Case for Expanding Jurisdiction of Military Commissions to U.S. Citizens*, 44 Geo. J. Int'l L. 783, 795-97 (2013) (discussing rationales for military commissions). Accordingly, the Executive has directed prosecutors choosing between civil and military prosecution to consider "the nature of the offenses to be charged; the identity of victims of the offense; the location in which the offense occurred and

12

the context in which the defendant was apprehended; evidentiary issues; and the extent to which the forum would permit a full presentation of the accused's wrongful conduct."  Detention Policy Task Force, Memo for the Attorney General, Secretary of Defense, July 20, 2009 at 4-5 *available at* http://www.scotusblog.com/wp-content/uploads/2009/07/law-of-war-prosecution-prelim-report-7-20-09.pdf.   However, even assuming the legitimacy of the arguments in favor of trying war crimes in military commissions, none of these rationales or concerns remotely justifies limiting their use to non-citizens.  As one scholar notes, under the MCA, the "deciding factor as to whether an individual in the 'war on terror' will be subject to the degraded proceedings of a military commission is alienage," rather than "the exigencies of war."  Muneer I. Ahmad, *Guantánamo is Here: The Military Commissions Act and Non-citizen Vulnerability*, 2007 U. Chi. Legal F. 1, 17 (2007).  Thus, the MCA would afford an American citizen who detonated a weapon of mass destruction and was captured in a foreign battlefield the benefit of a trial in civilian court.  *See* 152 Cong. Rec. S10,251 (daily ed. Sept. 27, 2006) (statement of Sen. Graham) ("*Under no circumstance* can an American citizen be tried in a military commission.") (emphasis added).  Yet a lawful permanent resident who committed a comparatively trivial crime – for example, acting as the aforementioned citizen's

chef or driver,[6] *see* 10 U.S.C. § 950t (defining conspiracy and material support as war crimes, subject to military commission jurisdiction) – could receive the substantially inferior protections of a military commission.

There is simply nothing in the MCA's legislative history – nor in the history of terrorism prosecutions – that so much as hints at a rationale for subjecting non-citizens alone to military commissions. Both Congress and the Executive appear to believe that non-citizens and citizens pose an equal threat in the war on terror. Congress did not, for example, differentiate between citizens and non-citizens in the Authorization for the Use of Military Force, which provided the President with the authority to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001." Pub. L. No. 107-40, 115 Stat. 224 (2001). And Executive officials have repeatedly voiced the view that domestic terror cells were a threat on par with external ones. *See, e.g.*, Alberto Gonzalez, U.S. Att'y Gen., *Remarks at the World Affairs Council of Pittsburgh on*

---

[6] This is far from hypothetical. The government charged Salim Ahmed Hamdan with material support for acting as Osama bin Laden's driver. While that conviction was found to violate the Ex Post Facto clause and, like Bahlul's, vacated, *see Hamdan v. United States*, 696 F.3d 1238 (D.C. Cir. 2012) (noting that material support was not a war crime prior to the MCA's enactment), *accord Bahlul*, 2014 U.S. App. LEXIS 13287, at *80 (D.C. Cir. July 14, 2014), the government could potentially charge a non-citizen before a military commission for any such material support offense committed after the MCA became law.

*Stopping Terrorists Before They Strike: The Justice Department's Power of Prevention* (Aug. 16, 2006) ("[T]he threat of homegrown terrorist cells ... may be as dangerous as groups like al Qaeda, if not more so."); *see also Hamdi v. Rumsfeld*, 542 U.S. 507, 519 (2004) ("A citizen, no less than an alien, can be part of or supporting forces hostile to the United States or coalition partners and engaged in an armed conflict against the United States, such a citizen, if released, would pose the same threat of returning to the front during the ongoing conflict.") (internal quotation omitted). Nor is there any indication in the legislative history or elsewhere that non-citizens are more difficult to prosecute in Article III courts. To the contrary, the government has successfully prosecuted both citizens and non-citizens for terrorism-related crimes in federal court. *See generally* Ctr. on Law & Sec., *Terrorist Trial Report Card* (2011) (collecting statistics on terrorism prosecutions).

The absence of any congressional findings that non-citizens are more dangerous or more difficult to try in civilian courts is telling. In the words of one commentator, echoed by many others:

> Congress does not have legitimate, rational policy reasons for applying inferior procedures only to non-citizens that are unlawful enemy belligerents; rather, it seems that Congress has merely political reasons for not applying those procedures to U.S. citizen unlawful enemy belligerents. Stated simply, Congress authorized the use of inferior procedures only against non-citizens because it did not think it could get away with applying them to everyone. As a result, the current statutory regime is blatantly discriminatory against non-citizens.

15

Kittel, *Trying Terrorists*, 44 Geo. J. Int'l L. at 804; Katyal, *Equality in the War on Terror*, 59 Stan. L. Rev. at 1378 (defenders of limiting military commission jurisdiction to non-citizens can "invoke little beyond the obvious political convenience of stilling the voices that might otherwise rise up in protest were American citizens included in the MCA"); Ahmad, *Guantánamo is Here*, 2007 U. Chi. Legal F. at 17 (2007) (same). This differential treatment, rooted entirely in political expediency, is the hallmark of an equal protection violation. As Justice Jackson famously remarked, "nothing opens the door to arbitrary actions so effectively as to allow . . . officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected." *Ry. Express Agency, Inc. v. New York*, 336 U.S. 106, 112 (1949) (Jackson, J., concurring).

In considering the precise issue presented here, this Court does not write on a blank slate. To the contrary, the impropriety of selectively imposing harsh measures on foreign nationals is reflected in a decision of the United Kingdom's highest court invalidating a national security measure enacted shortly after the attacks of September 11, 2001. *A and Others v. Sec'y of State for the Home Dep't*, [2004] UKHL 56. The law there in question permitted non-citizens (and non-citizens alone) to be detained indefinitely without trial on suspicion of links to terrorism. The high court invalidated the law as impermissible discrimination. *Id.*

16

¶¶ 73, 85, 97, 139, 159, 189, 234, 240.  The opinions noted that the government could not demonstrate that the threat from a terrorist is greater if he is a foreigner than if he is a citizen.  *Id*. ¶¶ 77-78, 138, 183, 228.  They also noted that the government had emphatically rejected analogous detention regimes for British nationals, describing such measures as draconian and unnecessary.  *Id*. ¶¶ 83, 188, 228-231.  As Baroness Hale put it, "if it is not necessary to lock up the nationals it cannot be necessary to lock up the foreigners."  *Id*. ¶ 231.  Accordingly, the law was found to discriminate unjustifiably against non-citizens.

An identical analysis holds for the MCA, which must, then, fail under the Equal Protection guarantee of the Fifth Amendment.  *See Cleburne*, 473 U.S. at 439 ("Equal Protection . . . is essentially a direction that all persons similarly situated should be treated alike.").  This Court should simply not permit a separate and unequal criminal system to persist when it cannot be justified by any relevant distinction between citizens and non-citizens.  Rather, this Court should invalidate the MCA on the ground that there is no justification whatsoever for the creation of a separate, inferior criminal system reserved exclusively for non-citizens, let alone one that is narrowly tailored to serve a compelling government interest.[7]

_____

[7] Indeed, far from being narrowly tailored, the military commissions created by the MCA are neither temporary institutions; nor are they limited to those detained at Guantánamo.  Instead, the MCA establishes a permanent, second-class justice system of global reach.  The commissions thus have jurisdiction over crimes committed in connection with any "hostilities against the United States or its co-

17

## II. HISTORY SHOWS THAT NATIONAL SECURITY MEASURES TARGETED EXCLUSIVELY AGAINST NON-CITIZENS OFTEN LEAD TO THE WIDESPREAD ABRIDGEMENT OF CITIZENS' RIGHTS.

History shows that strict scrutiny is crucially important when national security measures single out non-citizens for worse treatment. Harsh measures, first imposed against non-citizens, have repeatedly come to diminish the rights of all. This pattern has produced two of the most shameful episodes in American legal history: the internment of tens of thousands of citizens of Japanese ancestry

---

belligerents." MCA §§ 948a(1), 948d(a). These hostilities include the ongoing conflict against terrorist organizations, which has no end in sight. *See, e.g.*, 152 Cong. Rec. H7533 (daily ed. Sept. 27, 2006) (statement of Rep. Hunter) ("We don't know if this enemy will be defeated this decade, the next decade or even longer than that."); *Hamdi v. Rumsfeld*, 542 U.S. 507, 520 (2004) (It "is not farfetched" that the Government would "not consider this unconventional war won for two generations."); *Boumediene*, 553 U.S. at 771, 785 (the conflict "may last a generation or more" and is already "among the longest wars in American history"). Moreover, the commissions are not limited to the present hostilities against al Qaeda and associated forces, but extend to future conflicts in which the United States may engage. *See* 10 U.S.C. § 948a(7) (providing for personal jurisdiction over "unprivileged enemy belligerents," defined to include *any* individual who has "engaged in . . . [or] purposefully and materially supported hostilities against the United States or its coalition partners," without limitation to those that supported al Qaeda or associated forces). And the jurisdiction of the commissions is global, reaching even non-citizens arrested within the United States. *See Al-Marri v. Pucciarelli*, 534 F.3d 213 (4th Cir. 2008) (*en banc*) (military detention authority extends to non-citizen arrested inside the United States), *cert. granted*, 555 U.S. 1066, *vacated as moot*, 555 U.S. 1220 (2009). Because this parallel court system does not, by design, apply to U.S. citizens, the political process is unlikely to serve as an effective check on its rules or its operation. This Court should not permit it to become entrenched in our nation's legal landscape or to expand its reach any further.

during the Second World War, and the political repression of millions of Americans during the McCarthy era. In order to avoid the repetition of these tragic episodes, the MCA should be subject to strict scrutiny and declared unconstitutional. *Cf. Richmond v. J.A. Croson Co.*, 488 U.S. 469, 501 (1989) (considering the "history of racial classifications" in forbidding "blind judicial deference to legislative or executive pronouncements of necessity").[8]

### A. The internment of Japanese citizens during the Second World War had its roots in measures that targeted only non-citizens.

On February 19, 1942, President Roosevelt issued an executive order empowering military commanders to order the exclusion of "any and all persons" from designated areas. Exec. Order No. 9066, 7 Fed. Reg. 1407 (Feb. 25, 1942). Over the next eight months, the military forced nearly 120,000 individuals of Japanese ancestry on the West Coast to leave their homes for mass internment camps established inland. *See* Brief for Appellant at 3-34, *Korematsu v. United States*, 323 U.S. 214 (1944) (No. 22), 1944 WL 42849 (detailing progression of

---

[8] That the MCA's reach could, in the absence of the Court's intervention, in fact be extended further is apparent. Congress has considered legislation that would require some non-citizens arrested in the United States to be tried in military commissions. *See* S. Amdt. 753 to H.R. 2112, 157 Cong. Rec. S6609 (daily ed. Oct. 17, 2011) (amendment of Sen. Ayotte prohibiting certain Article III prosecutions) (defeated on a 52-47 vote). There are also proposals to allow the government to strip Americans accused of terrorist crimes of their citizenship, so as to permit their prosecution in military commissions. *See* Terrorist Expatriation Act, S. 3327, 111th Cong. (2010); Enemy Expatriation Act, S. 1698, 112th Cong. (2011).

military orders). The edicts were explicitly racist and made no distinction between citizen and non-citizen. Lieutenant General John Dewitt, who issued the exclusion orders, is infamous for testifying to Congress that "[a] Jap is a Jap. It makes no difference whether he is an American citizen or not." Brief of *Amicus Curiae* Japanese American Citizens League at 198, *Korematsu*, 323 U.S. 214, *reprinted in* Philip B. Kurland & Gerhard Casper, eds., 42 *Landmark Briefs and Arguments of the Supreme Court of the United States: Constitutional Law* 309-530 (1975). Secretary of War Henry Stimson concurred: "Their racial characteristics are such that we cannot understand or trust even the citizen Japanese." Michi Weglyn, *Years of Infamy* 43 (1976). Ultimately, more than 70,000 U.S. citizens of Japanese descent — almost 90% of the Japanese-American population — were among those banished from their homes and placed into concentration camps. Brief of *Amicus Curiae* Fred Korematsu at 12, *Rasul v. Bush*, 542 U.S. 466 (2004) (No. 03-334), 2004 WL 103832.

The constitutionality of the Japanese internment reached the Supreme Court in 1944, on appeal from a criminal conviction for violating the military's exclusion order. *Korematsu*, 323 U.S. 214. The Supreme Court upheld the conviction, deferring to the government's unjustified and unproven assumption about the loyalty of all persons of Japanese descent. *Id*. at 218 ("[E]xclusion of those of

Japanese origin was deemed necessary because of the presence of an unascertained number of disloyal members of the group.").

It is now well established that "military necessity did not warrant the exclusion and detention of ethnic Japanese." *Korematsu v. United States*, 584 F. Supp. 1406, 1416 (N.D. Cal. 1984) (discussing findings of congressional commission). The internment — and the Supreme Court's decision endorsing it — are now widely regarded as among the most shameful episodes in American legal history. Numerous Supreme Court Justices have explicitly repudiated the *Korematsu* decision. *See* David Cole, *Enemy Aliens* 99 & n.42 (2003) (collecting cases). Justice Scalia, for example, placed it on par with *Dred Scott*. *See Stenberg v. Carhart*, 530 U.S. 914, 953 (2000) (Scalia, J., dissenting). And Congress has "recognize[d] that . . . a grave injustice was done to both citizens and permanent resident aliens of Japanese ancestry by the evacuation, relocation, and internment of civilians during World War II," and has ordered that victims be paid reparations. 50 U.S.C. App. §§ 1989a(a), 1989b-4.[9]

As noted, the Japanese internment affected citizens and non-citizens alike. But its legal basis was found in measures that targeted non-citizens and, more

---

[9] In 2011, the U.S. Solicitor General formerly recognized that the Solicitor General who argued *Korematsu* had misled the Court and relied on gross racial generalizations. *See* Dep't of Justice, Confession of Error: The Solicitor General's Mistakes During the Japanese-American Internment Cases, May 20, 2011, *available at* http://blogs.justice.gov/main/archives/1346.

specifically, in the longstanding wartime authority to detain citizens of enemy nations indiscriminately.  More than two centuries ago, Congress enacted the now infamous Alien and Sedition Acts, inspired by fears that the radicalism of the French Revolution would infect American politics.  *See* James Morton Smith, *Freedom's Fetters* 13-21, 63-68 (1956).  During the same three-week period in 1798, Congress enacted the Enemy Aliens Act.  *Id*. at 438-42.  That law granted the President nearly unfettered authority to intern and deport citizens of foreign countries against whom the United States had declared war,  *id*. at 440-41, effectively creating an irrebuttable presumption that enemy aliens are dangerous based solely on their national identity and authorizing their detention without judicial process.

The Alien and Sedition Acts were met with widespread protest, and both laws were repudiated after the next election.  *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 273-76 (1964).  The Enemy Aliens Act, however, was never repealed. To the contrary, the Act was repeatedly invoked to permit mass detention and deportation of foreigners in wartime.  It remained on the books when the United States entered the Second World War.  Indeed, the day after Pearl Harbor was attacked, 900,000 Japanese, German and Italian nationals were classified as enemy aliens potentially subject to summary detention or deportation under the Act.  Cole, *supra*, at 93.

22

In the face of anti-Japanese racism during the Second World War, the crucial limit imposed by the Enemy Aliens Act — that only non-citizens could be interned — was quickly breached. The army argued that even citizens of Japanese descent were presumptively disloyal and remained "enemy aliens." Thus, General DeWitt wrote that "[t]he Japanese race is an enemy race and while many second and third generation Japanese born on United States soil, possessed of United States citizenship, have become 'Americanized,' the racial strains are undiluted." Final Report of General DeWitt, *quoted in*, Jacobus tenBroek, Edward N. Barnhart & Floyd W. Matson, *Prejudice, War and the Constitution* 110 (1954). These arguments faced essentially no opposition among the civilian leadership of the government, and led quickly to President Roosevelt's Executive Order 9066, which provided plenary military authority to displace and intern citizens. *Id.* at 111-12. Within a month, Congress had put the weight of the criminal law behind the exclusion orders. *Id.* at 112-14; Act of Mar. 21, 1942, 56 Stat. 173.

The army wasted little time exercising its newfound authority, quickly escalating the restrictions placed on the Japanese-American population from curfews and local exclusion orders to mass displacement and internment in inland concentration camps. *See* tenBroek, Barnhart & Matson, *supra*, at 112-13, 116-19. In this way, the longstanding wartime authority to detain non-citizens without an

individualized showing of dangerousness swept across the citizen-non-citizen divide with almost no opposition, riding a wave of racist paranoia.

Forty years after the Supreme Court denied his appeal, when Fred Korematsu again turned to the courts, seeking to have his conviction vacated, the district court succinctly summarized the great lesson of the case:

> [Korematsu] stands as a constant caution that in times of war or declared military necessity our institutions must be vigilant in protecting constitutional guarantees. It stands as a caution that in times of distress the shield of military necessity and national security must not be used to protect governmental actions from close scrutiny and accountability. It stands as a caution that in times of international hostility and antagonisms our institutions, legislative, executive and judicial, must be prepared to exercise their authority to protect all citizens from the petty fears and prejudices that are so easily aroused.

*Korematsu*, 584 F. Supp. at 1420. This Court should heed this lesson and subject the military commissions to "close scrutiny and accountability" lest individuals — citizens and non-citizens alike — once again become victims of just such "petty fears and prejudices." *Id*.

**B.    The political repression of the McCarthy era grew out of measures that were initially imposed upon non-citizens alone.**

Like the Japanese internment, the political repression of the Cold War is among the most unsettling episodes in our history. The so-called McCarthy era was characterized by stultifying official persecution of disfavored political views. Millions of Americans had their loyalties questioned. Tens of thousands lost jobs or were blacklisted for their suspected associations with the Communist Party.

24

These official and semi-official sanctions were imposed without regard to whether people actually engaged in or furthered any illegal or violent activity, and usually without individuals knowing their accusers or having any meaningful chance to defend themselves.

Also like the Japanese internment, the roots of McCarthyism can be traced to policies that initially targeted aliens. In 1901, President McKinley was assassinated by an avowed anarchist, Leon Czolgosz. While Czolgosz was a U.S. citizen, Congress responded by targeting non-citizens, enacting the Immigration Act of 1903, which for the first time established an ideological test for immigration, prohibiting entry to "anarchists, or persons who believe in or advocate the overthrow by force or violence of the [U.S.] Government . . . or of all government or of all forms of law." Ch. 102, § 2, 32 Stat. 1213, 1214 (1903). The statute was upheld in *Turner v. United States*, 194 U.S. 279 (1904), and subsequently deployed against non-citizen members of politically unpopular groups like the Industrial Workers of the World, which organized unskilled workers and was sharply critical of various government policies. *See* William Preston, Jr., *Aliens and Dissenters* 88-103 (1963).

As the First World War approached, the government's campaign against the perceived threat from radical foreign ideologies intensified and the scope of the ideological exclusion provisions of immigration law expanded apace. Thus, a

1917 law extended the bar to entry to individuals who advocated destruction of property alone or who merely disbelieved in or opposed organized government. Immigration Act of 1917, ch. 29 § 19, 39 Stat. 874.   Another law permitted deportation on these grounds of any non-citizen, no matter how long he had resided in the United States.  Immigration Act of Oct. 16, 1918, ch. 186, 40 Stat. 1012; *see* Cole, *supra*, at 109-11.

Importantly, the 1917 immigration law was the first to introduce the principle of guilt-by-association, excluding aliens not just for their own political advocacy and beliefs, but also for membership in organizations deemed to espouse prohibited ideas.  *Id*. at 109-10.  This theory of liability was quickly given broad application.  By 1918, immigration officials had taken the view that the mere payment of dues to an organization was tantamount to advocating for any and all political doctrines that the group espoused.  *See* Preston, *supra*, at 173.  Immigrant members of such purportedly subversive organizations were thus subjected to "ideological cross-examinations" and had the "burden . . . to prove the innocence of their associations."  *Id*.

These ideological tests, initially reserved for non-citizens, would twice cross over to affect large numbers of citizens.  With America's entry into the war, Congress enacted first the Espionage Act and then the Sedition Act.  The Espionage Act made it a crime to cause insubordination or disloyalty in the

26

military, and to advocate resistance to federal law. Pub. L. No. 65-24, 40 Stat. 217 (1917). The Sedition Act went further, making it a crime to utter "any disloyal, profane, scurrilous, or abusive language . . . as regards the form of government of the United States, or the Constitution, or the flag." Pub. L. No. 65-150, 40 Stat. 553 (1918). Both laws applied equally to citizens and non-citizens.

During the course of the war, more than 1,000 persons were prosecuted under these laws for engaging in prohibited political activity. *See* Cole, *supra*, at 112. The Supreme Court upheld these prosecutions, approving, for example, the conviction of the Secretary of the Socialist Party for conspiring to print and circulate leaflets arguing that conscription violated the Thirteenth Amendment. *Schenk v. United States*, 249 U.S. 47 (1919); *see also Debs v. United States*, 249 U.S. 211 (1919) (upholding conviction of Socialist presidential candidate for speech praising individuals who had opposed conscription); *Abrams v. United States*, 250 U.S. 616 (1919) (upholding conviction for throwing anti-Government leaflets from office building).

After the war, Congress repealed these wartime powers against citizens. But persecution of immigrants for their political beliefs and associations only accelerated, foreshadowing the repression of the McCarthy era. In 1919, the United States suffered the first "Red Scare" in the wake of domestic bombings attributed to anarchist groups. That winter, Attorney General A. Mitchell Palmer

27

and J. Edgar Hoover, then head of the DOJ's alien radical division, orchestrated a series of raids targeting immigrants suspected of membership in allegedly radical organizations. The Palmer raids, as they are now known, rounded up nearly ten thousand immigrants in a largely indiscriminate dragnet. Preston, *supra*, at 208-221.

Those arrested in the raids faced deportation, often for nothing more than their suspected associations with organizations deemed to espouse prohibited ideologies. *Id*. at 223-24. Many of the resulting deportation orders were ultimately cancelled by the Acting Secretary of Labor, Lewis Post. But the Palmer raids on immigrants nevertheless provided a blueprint for the subsequent repression of citizens during the Cold War and for targeting disfavored ideologies by imposing administrative sanctions for citizens' alleged associations and sympathies. *See* Cole, *supra*, at 122-28.

Thus, in 1939, Congress enacted the first laws imposing ideological tests on citizens. The Hatch Act prohibited members of the Communist Party and other groups from federal employment, contracts and grants. Pub. L. No. 76-252, 53 Stat. 1147 (1939). In the ensuing years, the FBI intensively investigated the political activities of federal employees, drawing up a blacklist of forty-seven "subversive" groups. Eleanor Bontecou, *The Federal Loyalty-Security Program* 165-67 (1953). In 1947, President Truman expanded the reach of these

28

investigations, establishing the Federal Employee Loyalty Program, which mandated an affirmative review of every employee's loyalty. Exec. Order No. 9835, 12 Fed. Reg. 1935 (Mar, 21. 1947). The Order required dismissal if there were "reasonable grounds" to find disloyalty, which could be proved by membership in, or even "sympathetic association" with, a "subversive" group. *Id*; *see also* Exec. Order No. 10,241, 16 Fed. Reg. 3690 (Apr. 28, 1951) (requiring dismissal if there was even "a reasonable doubt" as to an employee's loyalty).

Armed with a presidential command to expand blacklisting efforts already underway, the Attorney General's list grew dramatically. Groups were added in secret, with no formal procedures and no ability for a group to challenge its designation. By 1950, the blacklist had ballooned to 197 groups. Bontecou, *supra*, at 171, l57-204. A year later, the Supreme Court upheld the loyalty program's sweeping ideological inquests. *Bailey v. Richardson*, 182 F.2d 46, 57-58 (D.C. Cir. 1950), *aff'd by* 341 U.S. 918 (1951).

The Attorney General's list came to be used well beyond the Federal Employee Loyalty Program for which it was created. It was deployed by the IRS, immigration authorities, state governments, public schools, the entertainment industry and others, all of which used it to target individuals with suspected affiliations to the listed groups. *Bontecou*, *supra*, at 176-79. The consequences of the list were astounding. Approximately 13.5 million workers — one of five —

29

were forced to take a loyalty oath, obtain a security clearance, undergo a private employer's investigation, or otherwise be subjected to scrutiny. Ralph Brown, Jr., *Loyalty and Security* 181 (1958). Just as it had previously done against non-citizens through the threat of deportation, the government deployed the potent threat of blacklisting to repress dissident political affiliations among the citizenry. *See* Robert J. Goldstein, *Political Repression in Modern America* 308-11 (1978).

These official and semi-official ideological restrictions on employment were amplified by congressional investigations that had the purpose and effect of publicly denouncing individuals and organizations for their supposed political views. The chairman of the House Committee on Un-American Activities ("HUAC") described its purpose candidly: "The chief function of the committee . . . has always been the exposure of un-American activities." *Barsky v. United States*, 167 F.2d 241, 256 n.19 (D.C. Cir. 1948) (Edgerton, J., dissenting) (quoting Rep. Thomas), *cert. denied* 334 U.S. 843.

Between 1945 and 1960, HUAC interrogated more than 3,000 witnesses. Frank J. Donner, *The Un-Americans* 9 (1961). It called friendly witnesses to name lists of alleged Communist sympathizers. It grilled suspected "subversives" about their political associations. It freely issued contempt citations for refusing to cooperate. *See, e.g.*, *Barsky*, 167 F.2d 241; *Barenblatt v. United States*, 360 U.S. 109 (1959). It instigated private blacklists by targeting industries, including

Hollywood. Goldstein, *supra*, at 306-08. Like the loyalty programs, the relentless congressional investigations of suspected subversives had an enormous chilling effect on citizens' political activities.

Alongside these non-criminal measures targeting political dissent was the Smith Act, which made it a federal crime for anybody, including a citizen, to advocate the overthrow of the government by force or violence, to organize a group advocating those ends, or to join such a group, with knowledge of its ends. Pub. L. No. 76-670, 54 Stat. 671 (1940). With this statute, the 1903 immigration law that pioneered ideological exclusion was given the full force of the criminal law, applicable against citizens and foreigners alike. The Act also incorporated the theory of guilt by association first developed in the 1917 immigration law, making it a crime to join a group that advocated unlawful ideas, even if the individual did not himself support those particular ideas. *Id.*

The Supreme Court in 1951 upheld the Smith Act in *Dennis v. United States*, 341 U.S. 494 (1951). Over the next six years, more than 100 citizens were prosecuted for involvement in Communism, repeating the kind of political prosecutions that had been prevalent during the First World War. Eventually, the Supreme Court intervened, holding in 1957 that the government could only prosecute advocacy of illegal action, and not advocacy of mere ideas or principles, *Yates v. United States*, 354 U.S. 298 (1957), and then in 1961 that membership in

31

the Communist Party could be punished only upon proof of specific intent to further the Party's illegal ends, *Scales v. United States*, 367 U.S. 203 (1961). These decisions effectively ended political prosecutions under the Smith Act, but they came well after the worst of the McCarthy era had passed.

In sum, like the Japanese internment, McCarthy era political persecution had its roots in measures targeting non-citizens. But here too, racism pushed the policy of internment across the citizen-non-citizen divide; in this case, a wave of political hostility and paranoia during the Cold War swept ideological tests from the immigration context into citizens' lives. As with the Japanese internment, the courts were slow to engage in close scrutiny of these measures. This Court should not make the same mistake, for if it does, history teaches, it is but a short step to the weakening or evisceration of the rights of citizens as well as non-citizens. It should, instead, apply the strictest judicial scrutiny to the military commissions and invalidate them for impermissibly discriminating on the basis of citizenship.

## **<u>CONCLUSION</u>**

For these reasons, *amici* urge the Court to subject the MCA to strict scrutiny and to find that its imposition of a separate, unequal court system on non-citizens violates the Constitution's Equal Protection guarantee because it is not narrowly tailored to serve the government's interest in combating terrorism. Accordingly, it should vacate Bahlul's conviction for conspiracy.

Respectfully submitted,

Lawrence S. Lustberg, Esq.
Joseph A. Pace, Esq.
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102
(973) 596-4500

Jonathan Hafetz
SETON HALL UNIVERSITY
SCHOOL OF LAW
One Newark Center
Newark, NJ 07102
(973) 642-8492
*Counsel for Amici Curiae*

Dated: August 18, 2014

## CERTIFICATIONS

1.    Certification Pursuant to Circuit Rule 29(d)

Pursuant to Circuit Rule 29(d), counsel for *amici curiae* Japanese American Citizens League, Asian American Legal Defense and Education Fund, Asian Americans Advancing Justice – AAJC, Asian Americans Advancing Justice – Asian Law Caucus, Asian Americans Advancing Justice – Los Angeles, and the National Asian Pacific American Bar Association certify that, to the best of their knowledge, no other brief *amicus curiae* addresses the subject matter discussed herein.  In this brief, *amici* argue that the Military Commissions Act of 2006, which creates a criminal justice system reserved exclusively for non-citizens, cannot survive the strict scrutiny required under the Equal Protection guarantee of the Fifth Amendment.  In support of this argument, *amici* recount the history of the Japanese Internment during the Second World War and of the widespread political persecution that characterized the McCarthy era.  *Amici* submit that this historical experience militates strongly in favor of applying strict scrutiny to invalidate the military commissions.  None of the other *amici* make any analogous arguments with regard to Equal Protection, nor do they recount this history.

2.    Certification of Word Count

I hereby certify that this brief complies with the type and volume limitations of Federal R. of App. P. 29(d), 32(a)(7), 29(d) and Circuit Rule 32(a).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because this

brief has been prepared using a proportionally spaced typeface using Microsoft Office Word with 14-point font. According to the word-count feature of Microsoft Office Word 2002, it contains 6,718 words, exclusive of those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32.

3.    <u>Certification of Service</u>

I hereby certify that I have this day caused a true and correct copy of the foregoing brief to be served upon counsel of record for the parties via electronic mail, by operation of the Court's CM/ECF system.

DATED: August 18, 2014                          <u>/s/Joseph A. Pace</u>

## APPENDIX A: LIST AND DESCRIPTION OF *AMICI CURIAE*

The **Japanese American Citizens League** ("JACL") was established in 1929 and is the oldest and largest civil rights organization representing Americans of Japanese ancestry.  Among other things, the JACL has opposed discriminatory immigration and naturalization laws at the federal level and alien land laws at the state level.  It also was one of the leading organizations supporting compensation for Japanese American wrongly imprisoned during World War II.

The **Asian American Legal Defense and Education Fund** ("AALDEF"), founded in 1974, is a national organization that protects and promotes the civil rights of Asian Americans.  By combining litigation, advocacy, education, and organizing, AALDEF works with Asian American communities across the country to secure human rights for all.  The discrimination against non-citizens in the military commissions system undermines one of the central democratic principles of our country and affects the rights of citizens and non-citizens alike.

**Asian Americans Advancing Justice - AAJC**  is a national non-profit, non-partisan organization whose mission is to advance the civil and human rights of Asian Americans, and build and promote a fair and equitable society for all. Founded in 1991 and based in Washington, DC, Advancing Justice-AAJC is a leading expert in areas such as immigration and immigrant rights, language access,

36

census, voting rights, affirmative action, and race relations. Advancing Justice-AAJC advocates for equal protection of the law without discrimination.

The mission of **Asian Americans Advancing Justice - Asian Law Caucus** is to promote, advance, and represent the legal and civil rights of Asian and Pacific Islander ("API") communities. Recognizing that social, economic, political and racial inequalities continue to exist in the United States, Advancing Justice - Asian Law Caucus is committed to the pursuit of equality and justice for all sectors of society with a specific focus directed toward addressing the needs of low-income, immigrant, and underserved APIs. As the oldest Asian American legal rights organization devoted to protecting the civil rights of all racial and ethnic minorities, it has a strong interest in protecting the integrity of the core constitutional principle of equal protection of the law for all communities of color.

**Asian Americans Advancing Justice - Los Angeles** is the nation's largest legal services and civil rights organization devoted to the needs of Asian American, Native Hawaiian and Pacific Islander (NHPI) communities. Its mission is to advocate for civil rights, provide legal services and education, and build coalitions to positively influence and impact Asian American and NHPI communities and to create a more equitable and harmonious society. Advancing Justice - LA focuses on the most vulnerable members of Asian American and NHPI communities as well as other immigrant and low-income communities,

37

while also building a strong voice for civil rights and social justice. Accordingly, Advancing Justice - LA has a strong interest in promoting the civil rights and safeguarding the constitutional protections afforded to all communities, including citizens and non-citizens alike.

The **National Asian Pacific American Bar Association** ("NAPABA") is the national association of Asian Pacific American attorneys, judges, law professors, and law students. NAPABA represents the interests of over 40,000 attorneys and more than 60 local Asian Pacific American bar associations, who work variously in solo practices, large firms, corporations, legal services organizations, non-profit organizations, law schools, and government agencies. Since its inception in 1988, NAPABA has served as the national voice for Asian Pacific Americans in the legal profession and has promoted justice, equity, and opportunity for Asian Pacific Americans. NAPABA engages in civil rights advocacy on various fronts and given the discrimination and mistreatment Asian Pacific Americans have encountered throughout various periods in American history, NAPABA has a particular interest in ensuring that all non-citizens are afforded due process.