ORAL ARGUMENT SCHEDULED FOR OCTOBER 22, 2014
No. 11-1324
_____
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

ALI HAMZA AHMAD SULIMAN AL BAHLUL, Petitioner,

v.

UNITED STATES OF AMERICA, Respondent.
_____

ON PETITION FOR REVIEW FROM THE UNITED STATES COURT
OF MILITARY COMMISSION REVIEW
_____

BRIEF FOR THE UNITED STATES
_____

DARRIN HOSTETLER
Deputy General Counsel – Legal Counsel
U.S. Department of Defense

MARK S. MARTINS
Brigadier General
Chief Prosecutor of
Military Commissions

JOHN P. CARLIN
Assistant Attorney General
for National Security
J. BRADFORD WIEGMANN
Deputy Assistant Attorney General
STEVEN M. DUNNE
Chief, Appellate Unit
JOHN F. DE PUE
JOSEPH PALMER
Attorneys
National Security Division
U.S. Department of Justice
Washington, DC 20530

<u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

I.     <u>PARTIES</u>

Ali Hamza Ahmad Suliman al Bahlul is the petitioner in this case.  The United States is the respondent.  Amici supporting Bahlul include:  The National Institute of Military Justice; Professor David Glazier; First Amendment Scholars and Historians and the Montana Pardon Project; Japanese American Citizens League *et al*.; and Robert D. Steele and Other Former Members of the U.S. Intelligence Community.

II.     <u>RULINGS</u>

The ruling under review in this case is the decision of the United States Court of Military Commission Review affirming Bahlul's convictions.

III.     <u>PRIOR DECISIONS AND RELATED CASES</u>

The United States Court of Military Commission Review has issued a published decision in this case.  <u>United States v. Bahlul</u>, 820 F. Supp. 2d 1141 (USCMCR 2011) (en banc).  On January 25, 2013, this Court issued an order reversing Bahlul's convictions.  <u>Bahlul v. United States</u>, No. 11-1324, 2013 WL 297726.  The en banc Court vacated that order and issued a published decision rejecting Bahlul's statutory and Ex Post Facto Clause challenges to his conspiracy conviction, vacating his convictions for solicitation and providing material support

for terrorism, and remanding to the panel for consideration of Bahlul's remaining

challenges to his conspiracy conviction.  <u>Bahlul v. United States</u>, No. 11-1324,

2014 WL 3437485 (D.C. Cir. July 14, 2014).


DATED: September 17, 2014                    <u>/s/</u> John F. De Pue
                                             John F. De Pue
                                             Attorney for Respondent

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

    I.      PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

    II.     RULINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

    III.    PRIOR DECISIONS AND RELATED CASES . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

GLOSSARY OF ABBREVIATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xv

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    I.      CONGRESS HAS AUTHORITY UNDER ARTICLE I TO
          CODIFY CONSPIRACY TO COMMIT OFFENSES TRIABLE
          BY MILITARY COMMISSION AS AN OFFENSE THAT IS
          ITSELF TRIABLE BY MILITARY COMMISSION . . . . . . . . . . . 23

         A.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

         B.    Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

              1.    Congress's War Powers Provide Broad Authority To
                    Codify Conspiracy To Commit Offenses Triable by
                    Military Commission as an Offense That Is Itself
                    Triable by Military Commission . . . . . . . . . . . . . . . . . 27

              2.    Longstanding Practice Demonstrates That the Political
                    Branches Possess the Constitutional Power To Try by

Military Commission Acts That Are Not Recognized
as War Crimes under International Law  . . . . . . . . . . 30

3.  The Supreme Court's Reasoning in *Quirin* Recognizes
Congress's Authority To Make Non-International Law
Offenses Triable by Military Commission . . . . . . . . . 38

4.  Under the Define and Punish Clause, Combined with
the Necessary and Proper Clause, Congress May
Proscribe Conspiracy To Commit Object Offenses
That Are Themselves Violations of the Law of
Nations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

II.  BAHLUL'S TRIAL BY MILITARY COMMISSION FOR
CONSPIRACY DID NOT VIOLATE ANY RIGHT HE MAY
HAVE TO A TRIAL BY JURY IN AN ARTICLE III COURT . . . 49

A.  Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

B.  Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

III.  BAHLUL'S CONVICTION DOES NOT VIOLATE THE
FIRST AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

A.  Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

B.  Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

IV.  THE 2006 MCA DOES NOT IMPERMISSIBLY DISCRIMINATE
AGAINST ALIENS IN VIOLATION OF THE EQUAL
PROTECTION COMPONENT OF THE DUE PROCESS
CLAUSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

A.  Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

B.  Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

iv

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

ADDENDUM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1a

# TABLE OF AUTHORITIES*

<u>Cases</u>:

<u>Al-Bihani v. Obama</u>, 590 F.3d 866 (D.C. Cir. 2010) . . . . . . . . . . . . . . . . . . . .  68

<u>Callanan v. United States</u>, 364 U.S. 587 (1961) . . . . . . . . . . . . . . . . . . . . . . . .  45

*<u>Colepaugh v. Looney</u>, 235 F.2d 429 (10th Cir. 1956) . . . . . . . . . . . . . . . 13, 34

<u>Commodity Futures Trading Comm'n v. Schor</u>, 478 U.S. 833 (1986) . . . 50, 51

<u>DKT Mem'l Fund Ltd. v. Agency for Int'l Dev.</u>, 887 F.2d 275
   (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61

<u>Finzer v. Barry</u>, 798 F.2d 1450 (D.C. Cir. 1986), <u>aff'd in part sub nom.</u>
   <u>Boos v. Barry</u>, 485 U.S. 312 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

<u>Giboney v. Empire Storage & Ice Co.</u>, 336 U.S. 490 (1949) . . . . . . . . . . . . .  63

<u>Graham v. Richardson</u>, 403 U.S. 365 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . .  67

*<u>Hamdan v. Rumsfeld</u>, 548 U.S. 557 (2006) . . . . . . . . . . .  3, 28, 37, 41, 42, 47

<u>Hamdan v. United States</u>, 696 F.3d 1238 (D.C. Cir. 2012) . . . . . . . . . . 9, 31, 43

<u>Harisiades v. Shaughnessy</u>, 342 U.S. 580 (1952) . . . . . . . . . . . . . . . . . . . . . . .  68

*<u>Holder v. Humanitarian Law Project</u>, 130 S. Ct. 2705 (2011) . . . . . . . . . . . .  62

<u>J.W. Hampton, Jr., & Co. v. United States</u>, 276 U.S. 394 (1928) . . . . . . . 31, 65

*<u>Johnson v. Eisentrager</u>, 339 U.S. 763 (1950) . . . . . . . . . . . . . . . . . . . 61, 66, 68

---

*Authorities upon which we chiefly rely are marked with asterisks.
.

Johnson v. United States, 520 U.S. 461 (1997) . . . . . . . . . . . . . . . . . . . . . . . . 49

Kuretski v. Commissioner, 755 F.3d 929 (D.C. Cir. 2014) . . . . . . . . . . . . . . 50

Madsen v. Kinsella, 343 U.S. 341 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Mathews v. Diaz, 426 U.S. 67 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316 (1819) . . . . . . . . . . . . . . . 44

Ex parte Milligan, 71 U.S. (4 Wall.) 2 (1866) . . . . . . . . . . . . . . . . . . . . . . . 57

NLRB v. Noel Canning, 134 S. Ct. 2550 (2014) . . . . . . . . . . . . . . . . . . . . . . 30

Narenji v. Civiletti, 617 F.2d 745 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . 66

New York v. Ferber, 458 U.S. 747 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50
   (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 59

*Palmore v. United States, 411 U.S. 389 (1973) . . . . . . . . . . . . . . . . . . . . . . 58

Peretz v. United States, 501 U.S. 923 (1991) . . . . . . . . . . . . . . . . . . . . . . . 50, 51

*Ex parte Quirin, 317 U.S. 1 (1942) . . . . . . . . 13, 28, 29, 35, 38, 39, 40, 52, 53,
   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 55, 56, 57, 59, 66

Reid v. Covert, 354 U.S. 1 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 56

Stern v. Marshall, 131 S. Ct. 2594 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Arjona, 120 U.S. 479 (1887) . . . . . . . . . . . . . . . . . . . . 44, 45

United States v. Baucum, 80 F.3d 539 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . 25

United States v. Belfast, 611 F.3d 783 (11th Cir. 2010) . . . . . . . . . . . . . . . . . . 47

United States v. Comstock, 560 U.S. 126 (2010) . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Cotton, 535 U.S. 625 (2002) . . . . . . . . . . . . . . . . . . . . . 10, 25

United States v. Drew, 200 F.3d 871 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . 25

United States v. Duggan, 743 F.2d 59 (2d Cir. 1984) . . . . . . . . . . . . . . . . . . . 67

United States v. Feola, 420 U.S. 671 (1975) . . . . . . . . . . . . . . . . . . . . . . . 45, 46

*United States v. Ferreira, 275 F.3d 1020 (11th Cir. 2001) . . . . . . . . . . . 66, 67

United States v. Jannotti, 673 F.2d 578 (3d Cir. 1982) . . . . . . . . . . . . . . . . . . 46

United States v. Nueci-Pena, 711 F.3d 191 (1st Cir. 2013) . . . . . . . . . . . . . . 26

United States v. Olano, 507 U.S. 725 (1993) . . . . . . . . . . . . . . . . . . . . . . 24, 49

United States v. Price, 265 F.3d 1097 (10th Cir. 2001) . . . . . . . . . . . . . . 45, 46

United States v. Rahman, 189 F.3d 88 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . 63

United States v. Stewart, 590 F.3d 93 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . 63

United States ex rel. Turner v. Williams, 194 U.S. 279 (1904) . . . . . . . . . . . 61

*United States v. Verdugo-Urquidez, 494 U.S. 259 (1990) . . . . . . . . 61, 62, 68

Yakus v. United States, 321 U.S. 414 (1944) . . . . . . . . . . . . . . . . . . . . . . 24, 50

Application of Yamashita, 327 U.S. 1 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . 59

Constitution:

U.S. Constitution:

art. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20, 23, 27, 29, 30, 43, 49, 56

    § 8, cl. 3
        (Commerce Clause) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 46

    § 8, cl. 10
        (Define and Punish Clause) . . . . . . . . . . 8, 16, 17, 21, 26, 27, 28, 29, 43,
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 46, 47, 48

    § 8, cl. 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 59

    § 8, cl. 18
        (Necessary and Proper Clause) . . . . . . . . . . . . . . . . . . . . . . 21, 43, 44, 48

    § 9, cl. 3
        (Ex Post Facto Clause) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 14, 15, 26

art. III . . . . . . . . . . . . . . 1, 8, 18, 22, 26, 49, 50, 51, 52, 53, 56, 58, 59, 68, 69

art. IV, § 3, cl. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 19, 22, 26, 60, 61, 62, 63, 64

amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 18, 51, 53, 59, 61, 65

    (Due Process Clause) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 26, 65

amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 18, 49, 51, 53, 59

amend. XIV (Equal Protection Clause) . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

ix

<u>Treaties</u>:

Geneva Convention Relative to the Protection of Civilian
  Persons in Time of War, Aug. 12, 1949,
    6 U.S.T. 3516, T.I.A.S. No. 3365 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Hague Convention No. IV art. 1 (annex), Oct. 18, 1907,
  36 Stat. 2295 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

<u>Statutes</u>:

Authorization for Use of Military Force,
  Pub. L. No. 107-40, 115 Stat. 224 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 <u>et seq.</u> . . . . . . . . . 67

Military Commissions Act of 2006, Pub. L. No. 109-366, 120
  Stat. 2600 (10 U.S.C. § 948a *et seq.*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    10 U.S.C. § 948a(1) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

    10 U.S.C. § 948b(a) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    10 U.S.C. § 948(c) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

    10 U.S.C. § 948(r) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

    10 U.S.C. § 949(c) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

    10 U.S.C. § 949(c)(7) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

    10 U.S.C. § 949(d)(b) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

    10 U.S.C. § 949(f) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

x

10 U.S.C. § 949(j) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

10 U.S.C. § 949(j)(d) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

10 U.S.C. § 949(s) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

10 U.S.C. § 950p(a) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

10 U.S.C. § 950u (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

10 U.S.C. § 950v(b)(25)(A) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

10 U.S.C. § 950v(b)(28) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 48

Military Commissions Act of 2009, Pub. L. No. 111-84,
   div. A, tit. XVIII, 123 Stat. 2574 (2009):

10 U.S.C. § 950g (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

10 U.S.C. § 950t(26) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

10 U.S.C. § 950t(27) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

10 U.S.C. § 821 (UCMJ art. 21) . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 41

10 U.S.C. § 904 (UCMJ art. 104) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

10 U.S.C. § 906 (UCMJ art. 106) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

18 U.S.C. § 2332(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18 U.S.C. § 2339B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

18 U.S.C. § 2441 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

xi

21 U.S.C. § 860(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

50 U.S.C. § 38 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

50 U.S.C. § 105 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Rules:

Military Commissions R. 905 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Military Commissions R. 907 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Miscellaneous:

American Articles of War of 1776, §13, Art. 18 . . . . . . . . . . . . . . . . . . . . . . . 33

American Articles of War of 1806:

Art. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Art. 57 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Art. 101, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 65

Articles of War of 1874:

Art. 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Art. 46 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Articles of War of 1916:

Art. 81 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Art. 82 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Articles of War of 1920:

Art. 81 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Art. 82 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Richard R. Baxter, So-Called "Unprivileged Belligerency":
    Spies, Guerrillas, and Saboteurs, 28 Brit. Y.B. Int'l L. 323
    (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31, 32, 40

Curtis A. Bradley & Jack L. Goldsmith, Congressional Authorization
    and the War on Terrorism, 118 Harv. L. Rev. 2047 (2005) . . . . . . . . . . . . . 32

Hampton L. Carson, The Law of Criminal Conspiracies and Agreements
    (1887) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

John C. Dehn, The Hamdan Case and the Application of a Municipal
    Offence, 7 J. Int'l Crim. Justice 63 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Dep't of the Army, Field Manual, FM 27-10,
    The Law of Land Warfare (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

66 Fed. Reg. 57,833 (Nov. 13, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

H.R. Doc. No. 55-314 (1899) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

H.R. Rep. No. 109-664, pt. 2 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28, 47

1 Halleck's International Law (4th ed. 1908) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

5 Journal of the Continental Congress (Aug. 21, 1776) . . . . . . . . . . . . . . . . . . 33

Francis Lieber, Instructions for the Government of
    Armies of the United States in the Field, General Orders No. 100
    (Apr. 24, 1863) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Memorandum from Herbert Wechsler, Assistant Att'y Gen., to Att'y Gen.
Francis Biddle (Dec. 29, 1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

2 L. Oppenheim, International Law (4th ed. 1926) . . . . . . . . . . . . . . 31, 34, 40

Stephen Z. Starr, Colonel Grenfell's Wars – The Life of a Soldier of
Fortune (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

William Winthrop, Military Law and Precedents (2d ed. 1920) . . . . 28, 33, 34,
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 48, 65

John Fabian Witt, Lincoln's Code: The Laws of War in American
History (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

xiv

## GLOSSARY OF ABBREVIATIONS

App. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Appendix to Petitioner's Brief

AUMF . . . . . . . . . . . . . . . . . . . . . . . . . . . Authorization for Use of Military Force

Glazier Br. . . . . . . . . . . . . . . . . . . . . . . . . . . . . Prof. David Glazier Amicus Brief

Gov't Panel Br. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Government Panel Brief

Gov't E.B. Br. . . . . . . . . . . . . . . . . . . . . . . . . . . . Government En Banc Brief

H.R. Doc. . . . . . . . . . . . . . . . . . . . . . . . . . House of Representatives Document

H.R. Rep. . . . . . . . . . . . . . . . . . . . . . . . . . . House of Representatives Report

JACL Br. . . . . . . . . . . . . Japanese-American Citizens League et al. Amicus Brief

MCA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Military Commissions Act

NIMJ Br. . . . . . . . . . . . . . . . . . . . . National Institute for Military Justice Brief

Pet. Br. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Petitioner's Brief

Supp. App. . . . . . . . . . . . . . . . . . . . . . . . . Government's Supplemental Appendix

U.C.M.J. . . . . . . . . . . . . . . . . . . . . . . . . . . . . Uniform Code of Military Justice

USCMCR . . . . . . . . . . . . . . . United States Court of Military Commission Review

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

No. 11-1324

————————

ALI HAMZA AHMAD SULIMAN AL BAHLUL, Petitioner,

v.

UNITED STATES OF AMERICA, Respondent.

————————

ON PETITION FOR REVIEW FROM THE UNITED STATES COURT
OF MILITARY COMMISSION REVIEW

————————

BRIEF FOR THE UNITED STATES

————————

## ISSUES PRESENTED

1.  Whether the military commission plainly erred in not *sua sponte* dismissing the conspiracy charge against Bahlul on the ground that Congress lacked authority to make that offense triable by military commission.

2.  Whether the military commission plainly erred in not *sua sponte* dismissing the conspiracy charge against Bahlul on the ground that his military commission trial for that offense violated his Article III and Fifth and Sixth Amendment rights to trial by jury in an Article III court.

3.   Whether the military commission plainly erred in not *sua sponte* dismissing the conspiracy charge against Bahlul on the ground that his military commission conviction violated the First Amendment because it was based in part on Bahlul's conduct as a leader of al Qaeda's propaganda operation.

4.   Whether the military commission plainly erred in not *sua sponte* dismissing the conspiracy charge against Bahlul on the ground that the Military Commissions Act of 2006 violated the equal protection component of the Due Process Clause because it limited the jurisdiction of military commissions to offenses committed by alien unlawful enemy combatants.

<u>STATEMENT OF THE CASE</u>

1.   On September 11, 2001, the terrorist organization al Qaeda attacked the United States and murdered nearly 3,000 people.  Prosecution Ex. 14A, at 10-11. In response, Congress authorized the President to use "all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001."  Authorization for Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224 (2001) (AUMF).  In addition, the President issued a military order that authorized the trial by military commission of non-citizens for certain offenses.  <u>See</u> 66 Fed. Reg. 57,833, 57,834, § 4 (Nov. 13, 2001).

2

In <u>Hamdan v. Rumsfeld</u>, 548 U.S. 557 (2006) ("<u>Hamdan I</u>"), the Supreme Court held that the military commission system the President established contravened statutory restrictions on military commission procedures contained in the Uniform Code of Military Justice (UCMJ). <u>Id.</u> at 613-35. The Court was divided on the question whether conspiracy was an offense triable by military commission in the absence of specific statutory authorization. <u>See id.</u> at 595-612 (Stevens, Souter, Ginsburg, Breyer, JJ., plurality opinion) (concluding that conspiracy is not a recognized offense under the law of war as incorporated in 10 U.S.C. § 821); <u>id.</u> at 697-706 (Thomas, Scalia, Alito, JJ., dissenting) ("[C]onspiracy to violate the laws of war is itself an offense cognizable before a law-of-war military commission."). In addition, four Justices joined concurrences inviting Congress to clarify the President's authority with regard to military commissions. <u>See id.</u> at 636 (Breyer, Kennedy, Souter, Ginsburg, JJ., concurring) ("Nothing prevents the President" from seeking from Congress "legislative authority to create military commissions of the kind at issue here."); <u>id.</u> at 655 (Kennedy, J., concurring) (noting that "Congress may choose to provide further guidance" regarding the "validity of the conspiracy charge," and that "Congress, not the Court, is the branch in the better position" to determine that question).

In response to <u>Hamdan I</u>, Congress enacted the Military Commissions Act of 2006, Pub. L. No. 109-366, 10 U.S.C. § 948a *et seq*. ("2006 MCA"). In the 2006 MCA, Congress established a military commission system "to try alien unlawful enemy combatants engaged in hostilities against the United States for violations of the law of war and other offenses triable by military commission." <u>Id.</u> § 948b(a). The offenses codified in the 2006 MCA include providing material support for terrorism, <u>id.</u> § 950v(b)(25)(A), solicitation, <u>id.</u> § 950u, and conspiracy, <u>id.</u> § 950v(b)(28).

2. Ali Hamza Ahmad Suliman Al Bahlul was born in Yemen. Tr. 477. In the late 1990s, Bahlul went to Afghanistan to join al Qaeda. Tr. 504-08; <u>Bahlul</u>, 820 F. Supp. 2d at 1161. Bahlul completed paramilitary training at an al Qaeda camp. Tr. 507-08. He met Usama bin Laden and swore an oath of "bayat," pledging loyalty to bin Laden and al Qaeda. Tr. 509-11, 589-90; <u>Bahlul</u>, 820 F. Supp. 2d at 1161.

Bin Laden assigned Bahlul, who was well educated and spoke English, to work in al Qaeda's media office. <u>Bahlul</u>, 820 F. Supp. 2d at 1161. Bin Laden directed Bahlul to create an al Qaeda recruitment video highlighting the October 2000 attack on the *U.S.S. Cole*, which killed 17 Americans sailors. <u>Id.</u> Bahlul's video, which called on viewers to execute terrorist attacks against the United States

4

and to come to Afghanistan for training, was translated into several languages and
distributed widely outside Afghanistan.  Tr. 534-35, 588-89, 651-52; <u>Bahlul</u>, 820
F. Supp. 2d at 1161-62.  Bahlul's *Cole* movie became one of the most popular of al
Qaeda's video productions.  Tr. 810; <u>Bahlul</u>, 820 F. Supp. 2d at 1161; <u>Bahlul</u>, 2014
WL 3437485, at *1.

Bin Laden appointed Bahlul to be his personal secretary for public relations.
Tr. 556.  As bin Laden's "media man," Bahlul assisted bin Laden in preparing
public statements, and he was responsible for operating bin Laden's
communications equipment.  <u>Bahlul</u>, 820 F. Supp. 2d at 1162.

While he was in Afghanistan, Bahlul lived in the same house with
Muhammed Atta and Ziad al Jarrah, both of whom later piloted aircraft in the 9/11
attacks.  Tr. 550-55.  Bahlul administered the two hijackers' oaths of loyalty to bin
Laden.  <u>Id.</u>; Prosecution Ex. 15.  He also transcribed their "martyr wills"
(videotaped statements made by suicide terrorists in preparation for their mission)
and hand-delivered the documents to bin Laden.  Tr. 552-55; Prosecution Ex. 15;
<u>Bahlul</u>, 820 F. Supp. 2d at 1162.

Just before the 9/11 attacks, Bahlul evacuated al Qaeda's headquarters in
Kandahar with bin Laden.  Tr. 562; <u>Bahlul</u>, 820 F. Supp. 2d at 1162.  While bin
Laden and his entourage were fleeing the U.S. response, Bahlul operated the radio

that bin Laden used to track the news of the attacks.  Tr. 562-63; <u>Bahlul</u>, 820 F.
Supp. 2d at 1162.

Bahlul was captured in Pakistan, turned over to the United States, and
detained at Guantanamo.  Tr. 946; <u>Bahlul</u>, 820 F. Supp. 2d at 1156.  Bahlul
voluntarily spoke with investigators.  <u>Id.</u> at 1162.  Bahlul acknowledged that he
was an officer in al Qaeda, and he outlined his role in producing the *Cole* video
and providing other public relations services to bin Laden and al Qaeda.  <u>Id.</u>; Tr.
485, 492, 512-14.  Bahlul also admitted that he had roomed with 9/11 hijackers
Atta and Jarrah and that he had administered their loyalty oaths and compiled their
martyr wills.  Tr. 550-55; Prosecution Ex. 15.  Bahlul told investigators he had
"great respect" for the hijackers and for the attacks they carried out.  Tr. 593.
During his detention, Bahlul wrote letters to other al Qaeda leaders expressing
pride in his role in the 9/11 attacks, renewing his pledge of loyalty to al Qaeda, and
reaffirming his belief that al Qaeda would ultimately prevail in its war against
America.  Tr. 552; <u>Bahlul</u>, 820 F. Supp. 2d at 1162.

3.  In 2008, military authorities charged Bahlul under the 2006 MCA with
conspiracy, solicitation, and providing material support for terrorism.  The
substantive offenses underlying the conspiracy and solicitation charges were
murder of protected persons, attacking civilians, attacking civilian objects, murder

and destruction of property in violation of the law of war, terrorism, and providing material support for terrorism. App. 106. Eleven enumerated acts were alleged as both overt acts in furtherance of the conspiracy and means of providing material support for terrorism. The overt acts included: undergoing military-type training at an al Qaeda camp; pledging "bayat" to bin Laden and performing personal services for him; preparing the *Cole* video; carrying weapons and a suicide belt to protect bin Laden; arranging for two of the 9/11 hijackers to pledge "bayat" to bin Laden; and "prepar[ing] the propaganda declarations styled as martyr wills of Muhammed Atta and Ziad al Jarrah in preparation for the acts of terrorism perpetrated by [them] and others at various locations in the United States on September 11, 2001." App. 102.

During pretrial hearings, Bahlul announced his intent to boycott the proceedings. Bahlul's defense counsel, following Bahlul's instructions, demanded a speedy trial and "waive[d] all pretrial motions of any kind." Tr. 85. Bahlul pleaded not guilty but conceded that he had engaged in the charged conduct, except he denied wearing a suicide belt. Tr. 167, 175-79, 190-95.

At his military commission trial, Bahlul instructed his counsel not to make arguments or to present a defense. Tr. 15-17, 77-78, 85, 95, 114; Bahlul, 820 F. Supp. 2d at 1163; Bahlul, 2014 WL 3437485, at *2. Bahlul did not raise any claim

7

that Congress lacked authority under the Define and Punish Clause to make conspiracy triable by military commission, nor did he claim that his military commission trial violated his right to be tried by a jury in an Article III court, his right to freedom of speech under the First Amendment, or his right to equal protection under the Due Process Clause.  See Bahlul, 2014 WL 3437485, at *4; Bahlul, 820 F. Supp. 2d at 1258.

The military commission members unanimously convicted Bahlul of all three charges.  Pursuant to a special verdict form, the members specifically found Bahlul "guilty" of each of the seven objects of the conspiracy, including murder of protected persons and attacking civilians.  The members also specifically found Bahlul "guilty" of all the overt acts, except for arming himself to prevent bin Laden's capture.  App. 117-124.

At sentencing, Bahlul again praised the 9/11 attacks.  He claimed that he had been al Qaeda's "media man" and that he would have been the 20th hijacker "but bin Laden refused" because Bahlul's media services were too important to lose. Tr. 968-69, 979; Bahlul, 2014 WL 3437485, at *1.  The military commission sentenced Bahlul to life imprisonment.  Id. at 1164.

8

On June 3, 2009, the convening authority approved Bahlul's convictions and sentence. <u>Bahlul</u>, 820 F. Supp. 2d at 1157, 1264. The USCMCR affirmed in an en banc opinion. <u>Id.</u> at 1158-59.

4. Bahlul's counsel appealed to this Court. While the appeal was pending, a panel of this Court, in <u>Hamdan v. United States</u>, 696 F.3d 1238 (D.C. Cir. 2012) ("<u>Hamdan II</u>"), held that the 2006 MCA did not authorize jurisdiction over material support for terrorism for pre-2006 conduct because that offense was not prohibited under then-existing U.S. law as a war crime triable by military commission. <u>Id.</u> at 1248-53. The government then conceded that the reasoning of <u>Hamdan II</u> required vacatur of Bahlul's convictions, and the panel accordingly vacated them. Order, <u>Bahlul v. United States</u>, No. 11-1324, 2013 WL 297726 (D.C. Cir. Jan. 25, 2013).

5. On April 23, 2013, the en banc Court granted the government's petition for rehearing en banc and vacated the panel's order. Order of the En Banc Court, No. 11-1324, Dkt. No. 1432126.

On July 14, 2014, the en banc Court issued a published decision (1) rejecting Bahlul's statutory and Ex Post Facto Clause challenges to his conspiracy conviction; (2) vacating his convictions for solicitation and providing material support for terrorism; and (3) remanding to the panel for consideration of Bahlul's

9

remaining challenges to his conspiracy conviction.  Bahlul v. United States, No. 11-1324, 2014 WL 3437485 (D.C. Cir. July 14, 2014).

At the outset, the en banc Court held that Bahlul's claims were subject to plain-error review.  Bahlul, 2014 WL 3437485, at *3-*4.  The Court recognized that Bahlul "forfeited the arguments he now raises" by "flatly refus[ing] to participate in the military commission proceedings and instruct[ing] his trial counsel not to present a substantive defense."  Id. at *4.  The Court acknowledged that Bahlul "objected to the commission's authority to try him," but the Court held that these objections, which were "couched entirely in political and religious terms," were "too general" to preserve his legal claims.  Id.  The Court also rejected the argument that Bahlul's ex post facto claim was "jurisdictional" and therefore not forfeitable under Rules 905 and 907 of the Rules of Military Commissions.  Id. at *4 n.6.  The Court held that Bahlul's claim was not "jurisdictional" because "[t]he question whether [the 2006 MCA] is unconstitutional does not involve 'the courts' statutory or constitutional *power* to adjudicate the case.'"  Id. (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)).

Turning to the merits, the Court rejected Bahlul's statutory claims and held that the 2006 MCA unambiguously provided for military commission jurisdiction

10

over all of the offenses enumerated in the statute, regardless of whether the conduct took place before or after the statute was enacted.  <u>Bahlul</u>, 2014 WL 3437485, at *5-*10.  The Court then addressed Bahlul's ex post facto challenge to his convictions.  The Court acknowledged that the government, in response to the Court's question, conceded that the Ex Post Facto Clause applies in military commission prosecutions of detainees at Guantanamo under the 2006 MCA.  <u>Bahlul</u>, 2014 WL 3437485, at *10.  In light of that concession, the Court assumed, without deciding, that the Clause did apply in such cases.  <u>Id.</u>

The Court then rejected Bahlul's ex post facto challenge to his conspiracy conviction "for two independent and alternative reasons."  <u>Bahlul</u>, 2014 WL 3437485, at *11.  First, the Court noted that Bahlul's conduct was prohibited by a pre-existing federal criminal statute, 18 U.S.C. § 2332(b), which makes it a crime to engage in a conspiracy, outside the United States, to kill a U.S. national.  <u>Id.</u>  The Court held that it was not a "plain" violation of the Ex Post Facto Clause "to transfer jurisdiction" over a pre-existing crime "from an Article III court to a military commission" because "such a transfer does not have anything to do with the definition of the crime, the defenses or the punishment."  <u>Id.</u> at *11-*12.

11

Second, the Court held that it was not "plain" that "conspiracy was not already triable by law-of-war military commission" under 10 U.S.C. § 821[1] at the time of Bahlul's conduct. Bahlul, 2014 WL 3437485, at *11. The Court noted that, because the Supreme Court in Hamdan I was divided on the question whether conspiracy was triable by military commission under Section 821, there was no "clear precedent" establishing that it was error to try Bahlul for that offense. Id. at *14.

The Court noted further that the Supreme Court did not "clearly resolve" a "subsidiary" question: whether Section 821's reference to the "law of war" refers only to international law or whether that term also encompasses "the experience and practice of our wars and our wartime tribunals." Bahlul, 2014 WL 3437485, at *14. The en banc Court recognized that, although some Supreme Court decisions and other sources have described the "law of war" as a branch of international law, "[t]here is also language in [Supreme Court decisions] that domestic precedent is an important part of our inquiry." Id. at *14-*15. The Court also found it "[s]ignificant[]" that "both the Hamdan plurality and dissent relied primarily on *domestic* precedent to ascertain whether conspiracy could be tried" and that the

---

[1] Section 821, which was first enacted in 1916, provides for military commission jurisdiction "with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions." 10 U.S.C. § 821.

Supreme Court in <u>Ex parte Quirin</u>, 317 U.S. 1 (1942), had similarly "evaluat[ed] domestic precedent" to determine whether the Nazi saboteurs in that case were properly charged with a law-of-war offense.  <u>Id.</u> at *15.  The Court therefore followed the lead of the seven justices who considered the conspiracy question in <u>Hamdan I</u> by "look[ing] to domestic wartime precedent to determine whether conspiracy has been traditionally triable by military commission."  <u>Id.</u>

In examining these precedents, the en banc Court recognized that the conviction of the individuals who conspired to assassinate President Lincoln was a "particularly significant" precedent "of a conspiracy charge tried by a military commission."  <u>Bahlul</u>, 2014 WL 3437485, at *16.  The Court also found "noteworthy" the World War II-era conspiracy convictions of Nazi saboteurs, whose military commission convictions were upheld (albeit without specifically addressing the conspiracy charges) in <u>Quirin</u> and <u>Colepaugh v. Looney</u>, 235 F.2d 429 (10th Cir. 1956).  <u>Bahlul</u>, 2014 WL 3437485, at *17.  The Court noted that Presidents Johnson, Roosevelt, and Truman approved the conspiracy charges in the respective cases and that, in the <u>Colepaugh</u> case, Assistant Attorney General Tom C. Clark issued a formal opinion that conspiracy was a cognizable offense in a military commission.  <u>Id.</u> at *16-*17.  The Court concluded that these precedents provided "sufficient historical pedigree" to sustain Bahlul's conspiracy conviction

13

on plain-error review.  Id. at *15, *17.

The Court then reversed Bahlul's convictions for providing material support for terrorism and for soliciting others to commit war crimes.  The Court found that the historical precedents were insufficient to establish that those offenses were traditionally triable in domestic law-of-war military commissions.  Bahlul, 2014 WL 3437485, at *18-*21.

Finally, the en banc Court remanded the case to the panel for consideration of four additional challenges to Bahlul's conspiracy conviction that the Court had not intended the en banc briefing to address: whether "(1) the Congress exceeded its Article I, § 8 authority by defining crimes triable by military commission that are not offenses under the international law of war; (2) the Congress violated Article III by vesting military commissions with jurisdiction to try crimes that are not offenses under the international law of war; (3) [Bahlul's] convictions violate the First Amendment; and (4) the 2006 MCA discriminates against aliens in violation of the equal protection component of the Due Process Clause."  Bahlul, 2014 WL 3437485, at *21 (citations omitted).

Judge Henderson concurred.  Bahlul, 2014 WL 3437485, at *21-*24.  In her view, the Ex Post Facto Clause does not apply to alien unlawful enemy combatants detained at Guantanamo, under either plain error or de novo review.  Judge

14

Henderson would have decided the case on that ground, if the government had not conceded the issue.  Id.

Judge Rogers concurred in the judgment in part and dissented.  Bahlul, 2014 WL 3437485, at *24-*41.  Judge Rogers explained that, in her view, the 2006 MCA did not authorize jurisdiction over any of the offenses for which Bahlul was convicted – including inchoate conspiracy – because none of those offenses were traditionally triable by military commission.  Judge Rogers reasoned that the Civil War and World War II-era conspiracy precedents did not establish that inchoate conspiracy was triable by military commission because they involved a "completed law-of-war offense" in addition to the conspiracy charge.  Id. at *31-*37.  Finally, Judge Rogers concluded that, even if the 2006 MCA authorized jurisdiction over Bahlul's offenses, his convictions should be reversed, under *de novo* review, as violations of the Ex Post Facto Clause.  Id. at *38-*42.

Judge Brown concurred in the judgment in part and dissented in part. Bahlul, 2014 WL 3437485, at *42-*53.  In her view, the domestic precedents – including the Lincoln conspirators' case, Quirin, and Colepaugh – were sufficient to uphold Bahlul's conspiracy conviction even on *de novo* review.  Id. at *43. Judge Brown noted further that she would have reached, and rejected, the residual challenges to Bahlul's conspiracy conviction that the Court remanded to the panel.

15

Id. at *52.  In particular, Judge Brown explained her view that Congress's authority under the Define and Punish Clause is "far greater" than Bahlul's argument suggested and was alone sufficient – even apart from Congress's other war powers – to uphold Congress's authority to codify conspiracy as a war crime. Id. at *44.  Because international law is inherently "undefined" and "adaptable," Judge Brown reasoned, and because the Clause "deliberately place[s] the responsibility and prerogative to interpret and define international law with Congress," the courts must "exhibit tremendous deference" to Congress's authority to interpret and define international law in a "flexible way" that serves the country's "national security interests."  Id. at *45.  In light of the "flexibility" and "deference" that should govern judicial review of congressional action under the Define and Punish Clause, Judge Brown concluded that Congress's prohibition of conspiracy to commit acts of terrorism was "sufficiently grounded in international law" to fall within Congress's broad powers under the Clause.  Id. at *45-*52.

Judge Kavanaugh concurred in the judgment in part and dissented in part. Bahlul, 2014 WL 3437485, at *53-*69.  In Judge Kavanaugh's view, Bahlul's ex post facto challenge to his conspiracy conviction lacked merit, even on *de novo* review, "because conspiracy has long been proscribed under U.S. law as a war crime triable by military commission."  Id. at *55.  Judge Kavanaugh noted that

16

construing Section 821 as limiting military commission jurisdiction to international

law offenses would be inconsistent with Supreme Court cases including Hamdan I,

in which the seven justices who considered the conspiracy issue "analyzed the 'law

of war'" as "the international law of war *supplemented by established U.S. military*

*commission precedents*."  Id. at *58.  Judge Kavanaugh then concluded, relying on

the Lincoln conspiracy case and Quirin, which he identified as "the two most

significant and well-known military commission precedents in American history,"

id. at *60, that U.S. military commission precedents have established conspiracy

"as an offense triable by military commission."  Id. at *58.

Judge Kavanaugh then explained that he would have rejected Bahlul's "far

more sweeping" arguments – which the en banc Court remanded to the panel – that

Congress "lack[ed] constitutional authority to make conspiracy . . . triable by

military commissions *even prospectively*, because those offenses are not proscribed

under the international law of war."  Bahlul, 2014 WL 3437485, at *61.  Judge

Kavanaugh noted that "Congress's authority to establish military commissions"

arises not only from the Define and Punish Clause but also from "the Declare War

and Necessary and Proper Clauses."  Id. at *62.  Judge Kavanaugh reasoned

further that, because "the Declare War Clause and the other Article I war powers

clauses do not refer to international law" and are not limited by it, "international

17

law is not a constitutional constraint when Congress proscribes war crimes triable by military commission." Id. Judge Kavanaugh also noted that "Congress since the earliest days of the Republic" had proscribed non-international law offenses, including spying and aiding the enemy, as offenses triable by military commission. Id. Finally, Judge Kavanaugh explained that the Quirin Court's "approval of spying, a non-international-law-of-war offense, as an offense triable by military commission confirms that Congress has authority under the Constitution to make non-international-law-of-war crimes triable by military commission." Id. at *63. Thus, in Judge Kavanaugh's view, "the constitutional text, longstanding statutes, and Supreme Court precedent all demonstrate" that Congress's Article I authority to proscribe offenses triable by military commission is not limited to violations of international law. Id.

Judge Kavanaugh also found that Article III and the Fifth and Sixth Amendments did not require Congress to limit its definition of cognizable offenses to violations of international law. Bahlul, 2014 WL 3437485, at *63-*64. Judge Kavanaugh noted that, because the Supreme Court in Quirin rejected claims based on the Constitution's jury trial provisions by expressly relying on longstanding statutes that made spying – which was not a violation of international law – triable by military commission, it makes "little sense to read Quirin as barring military

18

commission trial of non-international-law-of-war offenses." Id. at *64. Judge Kavanaugh noted further that "nothing about the Court's reasoning in Quirin on this point depended on whether the offense tried before a military commission was an international law of war offense." Id.

Judge Kavanaugh also concluded that Bahlul's First Amendment claim lacked merit. Bahlul, 2014 WL 3437485, at *65-*66. He noted as an initial matter that Bahlul's conspiracy conviction was based not on speech but on "conduct," including "arrang[ing] for two September 11th hijackers to pledge loyalty oaths to bin Laden." Id. at *65. In the alternative, Judge Kavanaugh reasoned that Bahlul, as a "non-U.S. citizen in Afghanistan," was not protected by the First Amendment at the time of the conduct at issue. Id. Finally, Judge Kavanaugh concluded that, even if the First Amendment did apply, Bahlul's speech, which was "aimed at inciting viewers to join al Qaeda, to kill Americans, and to cause destruction," was not protected under the First Amendment. Id. at *66.

Finally, Judge Kavanaugh concluded that Bahlul's equal protection challenge lacked merit, even on *de novo* review. He noted that the Supreme Court's cases establish that "federal laws drawing distinctions between U.S. citizens and aliens" are "generally permissible," especially "in the context of war and national security," as long as they are "rationally related to a legitimate

19

governmental interest." <u>Bahlul</u>, 2014 WL 3437485, at *65.  Judge Kavanagh

found that Congress's interest in establishing a military forum to try alien unlawful

belligerents was sufficient to "easily satisf[y]" that test.  <u>Id.</u> at *65.

## SUMMARY OF ARGUMENT

Since the earliest days of this Nation, Congress and the Executive Branch,

pursuant to their war powers, have invoked military commissions to try captured

enemy belligerents for war crimes.  The jurisdiction of U.S. military commissions

has traditionally included offenses, such as spying and aiding the enemy, that have

never been international law of war offenses.  In the 2006 MCA, Congress, acting

pursuant to its war powers and consistent with the historical practice of U.S.

military commissions, codified conspiracy to commit substantive offenses triable

by military commission as an offense that is itself triable by military commission.

In this appeal, Bahlul claims that Congress lacked constitutional authority to do so.

Bahlul forfeited his claims by not raising them below, and, in any event, his claims

lack merit.

1.  Congress acted within its Article I powers in making conspiracy a crime

triable by military commission.  At the outset, Congress's constitutional authority

to codify offenses triable by military commission does not arise solely from its

power to define and punish offenses against the law of nations, but also stems from

20

its broad war powers under Article I, Section 8 of the Constitution, coupled with the Necessary and Proper Clause.  Contrary to Bahlul's argument, those provisions do not restrict Congress to codifying only offenses recognized as violations of international law.

In addition, Bahlul's claim is inconsistent with Congress's longstanding practice of making triable by military commission certain offenses, including spying and aiding the enemy, that have never been recognized as violations of international law.

Bahlul's argument also conflicts with the reasoning of the leading Supreme Court cases.  The Quirin decision relied on military commission jurisdiction over spying, although spying is not a violation of international law, and in both Quirin and Hamdan I the Court looked to domestic precedents, rather than only considering international law, to determine whether an offense is lawfully triable by military commission.

Even if Congress's authority to enact the 2006 MCA arose only under the Define and Punish Clause, that Clause does not restrict Congress to proscribing only crimes that are violations of international law.  Where, as here, Congress has the authority to make the underlying object offenses triable by military commission, the Necessary and Proper Clause authorizes Congress to proscribe

21

conspiracy to commit those offenses.

2. Bahlul's related argument that Congress lacks the constitutional authority to make non-international law offenses triable by a military commission rather than by an Article III court is inconsistent with <u>Quirin</u>. The <u>Quirin</u> Court held that the right to trial by jury in an Article III court has never extended to persons properly subject to military commission jurisdiction. And, as <u>Quirin</u> explains, that category includes enemy belligerents charged with offenses, such as spying and sabotage, that are not violations of international law.

3. Bahlul's conspiracy conviction did not violate the First Amendment. Bahlul cannot claim the protections of the First Amendment for his activities in Afghanistan in connection with an armed conflict against the United States. But even if the First Amendment extended to Bahlul's conduct as the leader of al Qaeda's media branch, his rights were not violated because the First Amendment permits prohibition of speech-related conduct that is on behalf of or coordinated with a foreign terrorist organization. Bahlul's speech was also unprotected because it was an integral part of a criminal conspiracy. Finally, Bahlul's conviction was not based exclusively on speech. The military commission convicted him by special verdict of committing several overt acts that did not involve expressive conduct.

22

4.  The fact that the 2006 MCA confines the jurisdiction of military commissions to *alien* unlawful enemy combatants does not violate Bahlul's right to equal protection under the Due Process Clause.  Assuming *arguendo* that equal protection rights apply in the context of military commission proceedings against aliens held at Guantanamo, Congress's creation of a military commission system to try non-U.S. citizens for certain offenses is rationally related to the government's national security interest in establishing a military forum for offenses committed by alien unlawful belligerents in the context of hostilities against the United States.

I.  <u>CONGRESS HAS AUTHORITY UNDER ARTICLE I TO CODIFY CONSPIRACY TO COMMIT OFFENSES TRIABLE BY MILITARY COMMISSION AS AN OFFENSE THAT IS ITSELF TRIABLE BY MILITARY COMMISSION</u>

A.  <u>Standard of Review</u>

Bahlul did not raise at trial his claim that Congress lacked constitutional authority under Article I to make conspiracy triable by military commission.  His claim should therefore be reviewed for plain error.  A plain error is "[1] an error [2] that is plain and [3] that affect[s] substantial rights."  <u>Bahlul</u>, 2014 WL 3437485, at *4 (internal quotation marks and citation omitted).  "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or

23

public reputation of judicial proceedings." Id. (internal quotation marks and citation omitted).

As the Supreme Court has stated, "'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.'" United States v. Olano, 507 U.S. 725, 731 (1993) (quoting Yakus v. United States, 321 U.S. 414, 444 (1944)). To preserve a claim of error for appellate review, the accused must make a timely objection with sufficient clarity and specificity to "have alerted the trial court to the substance of the petitioner's point." Bahlul, 2014 WL 3437485, at *3 (citation omitted). Bahlul did not raise the claims he now asserts with sufficient specificity to preserve them for appellate review. See id. at *4 ("Bahlul forfeited the arguments he now raises" by "flatly refus[ing] to participate in the military commission proceedings"). As the en banc Court held, Bahlul's "object[ions] to the commission's authority to try him" were "couched entirely in political and religious terms" and were "'too general'" to preserve the constitutional claims he has raised on appeal. Id. (citation omitted).

Bahlul's contention (Br. 12) that his constitutional challenge to Congress's authority to proscribe conspiracy is jurisdictional and therefore not forfeitable is

24

incorrect.  The Supreme Court has explained that "jurisdiction" in this context

refers only to "the courts' statutory or constitutional *power* to adjudicate the case."

United States v. Cotton, 535 U.S. 625, 630 (2002) (internal quotation marks and

citation omitted).  This Court has held that, because a challenge to Congress's

authority to enact a criminal statute does not affect the adjudicatory authority of the

court, such claims are not "jurisdictional" and can be forfeited or waived.  See

United States v. Baucum, 80 F.3d 539, 540-41 (D.C. Cir. 1996) (holding that a

Commerce Clause challenge to 21 U.S.C. § 860(a), which prohibits certain drug

activity near schools, was not jurisdictional); see also United States v. Drew, 200

F.3d 871, 876 (D.C. Cir. 2000) (rejecting defendant's attempt to "label[] a

challenge to the constitutionality of a statute a jurisdictional issue").  As this Court

has explained, treating Article I challenges as jurisdictional would mean that

federal courts (or military commissions), which "hav[e] an obligation to address

jurisdictional questions *sua sponte*, would have to assure themselves of a statute's

validity as a threshold matter in any case," contravening the settled principle that

courts should "declin[e] to address constitutional questions not put in issue by the

parties."  Baucum, 80 F.3d at 541.

     Consistent with that principle, the en banc Court held that Bahlul's ex post

facto challenge to the constitutionality of the 2006 MCA was not "jurisdictional"

25

because "[t]he question whether that Act is unconstitutional does not involve the courts' statutory or constitutional *power* to adjudicate the case." <u>Bahlul</u>, 2014 WL 3437485, at *4 n.6 (internal quotation marks and citations omitted). Bahlul does not explain how his Define and Punish Clause challenge can be jurisdictional in light of the en banc Court's holding that his ex post facto claim was not.[2] <u>See</u> <u>Bahlul</u>, 2014 WL 3437485, at *69 (Kavanaugh, J., concurring) (noting that "plain error review" is the "standard of review that the majority opinion indicates must be applied" to Bahlul's remaining claims); <u>see also</u> <u>United States v. Nueci-Pena</u>, 711 F.3d 191, 197 (1st Cir. 2013) (holding that the proper standard of review was plain error where the defendant forfeited his claim that Congress exceeded its Define

---

[2] Contrary to Bahlul's contention (Br. 12), the government in its initial brief to the panel did not "agree" that his constitutional challenges were jurisdictional. Although the government stated that Congress's authority to make offenses triable by military commission was a "[q]uestion[] of law" and that such questions are "subject to plenary review," Gov't Panel Br. 22, that does not amount to a concession that Bahlul's constitutional claims are jurisdictional. Bahlul initially raised those constitutional arguments in support of a statutory claim that the 2006 MCA should be narrowly construed, and the government's brief specifically argued that, to the extent Bahlul raised "direct constitutional claims" under the Define and Punish Clause, Article III, the Ex Post Facto Clause, the First Amendment, or the equal protection component of the Due Process Clause, those claims were forfeited. Gov't Panel Br. 65, 69-70, 81-82; <u>see also</u> <u>Bahlul</u>, 2014 WL 3437485, at *4 n.5 ("The Government argued for plain-error review before the CMCR, in its original brief to a panel of this Court and in its brief to the *en banc* court.").

and Punish Clause power in enacting the Maritime Drug Law Enforcement Act).

Bahlul's claim is non-jurisdictional and subject to plain-error review.

     B.    <u>Argument</u>

         1.    *Congress's War Powers Provide Broad*
             *Authority To Codify Conspiracy To Commit Offenses Triable*
             *by Military Commission as an Offense That Is Itself Triable by*
             *Military Commission*

Bahlul's claim that Congress lacked authority under Article I to codify

conspiracy as an offense triable by military commission is unavailing under any

standard of review.

Bahlul's Article I challenge to his conspiracy conviction relies (Br. 19-26)

on the premise that the Define and Punish Clause – which in Bahlul's view

restricts Congress to proscribing recognized violations of international law – is the

exclusive basis under which Congress can codify offenses subject to trial by

military commission.  That premise is not correct.

In <u>Hamdan I</u>, the Supreme Court expressly recognized that Congress's

constitutional authority to define offenses subject to trial by military commission is

derived not only from the Define and Punish Clause but also from its constitutional

war powers.  548 U.S. at 591-92.  Quoting Colonel William Winthrop, whom the

Court has recognized as the "Blackstone of Military Law," <u>Reid v. Covert</u>, 354

U.S. 1, 19 n.38 (1957), the <u>Hamdan I</u> Court stated that "'[i]n general, it is those provisions of the Constitution which empower Congress to 'declare war' and 'raise armies,' and which, in authorizing the initiation of *war*, authorize the employment of all necessary and proper agencies for its due prosecution, from which [the military commission] derives its original sanction.'"  548 U.S. at 592 n.21 (quoting William Winthrop, <u>Military Law and Precedents</u> 831 (2d ed. 1920) ("<u>Winthrop</u>"); <u>see also</u> <u>Winthrop</u> at 831 (The military commission is "an instrumentality for the more efficient execution of the war powers vested in Congress and the power vested in the President as Commander-in-chief in war."); <u>Madsen v. Kinsella</u>, 343 U.S. 341, 346 & n.9 (1952) (quoting <u>Winthrop</u> to justify Congress's constitutional authority to make offenses subject to trial by military commission); <u>Quirin</u>, 317 U.S. at 25-26 (identifying and enumerating Congress's war powers as the source of authority to establish military commissions); <u>Bahlul</u>, 2014 WL 3437485, at *62 (Kavanaugh, J., concurring) ("Congress's authority to establish military commissions" arises not only from the Define and Punish Clause but also from "the Declare War and Necessary and Proper Clauses.").[3]

---

[3] The 2006 MCA, which codifies not only offenses under the law of nations but also offenses "that have traditionally been triable by military commissions," <u>see</u> 10 U.S.C. § 950p(a) (2006), indicates that Congress understood that its authority to specify offenses triable by military commission did not arise solely from its power under the Define and Punish Clause.  <u>See also</u> H.R. Rep. No. 109-

In addition to the Supreme Court's recognition that Congress's authority in this area stems from its war powers, the fact that most of the military commissions in our nation's history have been created by the Executive Branch further establishes that war powers are a key source of authority for the creation of military commissions. Unlike Congress, the Executive does not possess any explicit power to "define and punish" offenses against the law of nations, but like Congress, it does possess war powers. See, e.g., Quirin, 317 U.S. at 26. It would be anomalous if the Executive Branch could draw on its war powers in creating military commissions but that Congress could not draw on its own war powers when codifying offenses subject to trial by military commission.

For these reasons, Congress's constitutional authority to designate offenses as triable by military commission rests largely on its Article I war powers and not on the Define and Punish Clause alone. The text of Article I contains no limitation suggesting that Congress's war powers restrict Congress to establishing military commission jurisdiction only over wartime acts that are recognized violations of international law. Bahlul, 2014 WL 3437485, at *62 (Kavanaugh, J., concurring) (noting that, because "the Declare War Clause and the other Article I war powers

---

664, pt. 2, at 15 (2006) ("Constitutional Authority Statement" identifying both the Define and Punish Clause and the war powers as authority for enactment of the 2006 MCA).

clauses do not refer to international law" and are not limited by it, "international

law is not a constitutional constraint when Congress proscribes war crimes triable

by military commission"). Thus, the constitutional text of Article I does not

support Bahlul's claim that Congress's authority to codify offenses triable by

military commission is limited to recognized international law violations.

> 2. *Longstanding Practice Demonstrates That the Political Branches Possess the Constitutional Power To Try by Military Commission Acts That Are Not Recognized as War Crimes under International Law*

That Congress may exercise the authority to make non-international law

offenses subject to trial by military commission is confirmed by Congress's

practice, since the earliest days of our Government, of authorizing military

commissions to try offenses, such as spying, that have never been recognized as

violations of international law.

"[T]he longstanding practice of the government . . . can inform our

determination of what the law is." NLRB v. Noel Canning, 134 S. Ct. 2550, 2560

(2014) (internal quotation marks and citation omitted). The Supreme Court "has

repeatedly laid down the principle that a contemporaneous legislative exposition of

the Constitution when the founders of our government and framers of our

Constitution were actively participating in public affairs long acquiesced in"

informs the construction to be given its provisions.  J.W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 412 (1928).  As explained below, longstanding statutes and the historical practice of U.S. military commissions confirm Congress's power to codify non-international law offenses, such as conspiracy, as offenses triable by military commission.

Contemporaneous with the framing of the Constitution and continuing until the present, Congress and the Executive have made subject to trial by military commission offenses committed by enemy belligerents that have never been recognized as violations of international law.  Most significantly, "the offense of spying . . . was not and has never been an offense under the international law of war."  Bahlul, 2014 WL 3437485, at *63 (Kavanaugh, J., concurring); see Hamdan II, 696 F.3d at 1247 n.6 (opinion of Kavanaugh, J.).  International law scholars have long recognized that "[t]he actions of a spy are not an international crime."  Richard R. Baxter, So-Called 'Unprivileged Belligerency'; Spies, Guerrillas, and Saboteurs, 28 Brit. Y.B. Int'l L. 323, 329, 333 (1951) ("Baxter").  Rather, an individual who engages in spying merely forfeits his claim to "any of the protected statuses which international law has created."  Id. at 329 (noting "a virtual unanimity of opinion that . . . spies do not violate international law"); 2 L. Oppenheim, International Law 287 (4th ed. 1926) ("2 Oppenheim") (noting that "it

31

has always been considered lawful to employ spies," but that such activity exposes

them to treatment as "war criminals" subject to punishment).[4]

Likewise, aiding the enemy and engaging in acts of warfare as an

unprivileged belligerent have never been violations of international law.  Baxter at

337 (noting that when "guerrilla warfare [is] carried out in occupied areas, it would

appear . . . that [it] constitute[s] no violation of any duty imposed by international

law and cannot therefore be stigmatized as violative of international law"); Curtis

A. Bradley & Jack L. Goldsmith, Congressional Authorization and the War on

Terrorism, 118 Harv. L. Rev. 2047, 2132 (2005) (describing "spying and aiding the

enemy" as within the "historical jurisdiction" of U.S. military commissions

although not offenses governed by "international law").

Nonetheless, since the beginning of our nation, the Continental Congress,

and subsequently the U.S. Congress, have made spying and aiding the enemy

---

[4] See also Dep't of the Army, Field Manual 27-10, The Law of Land Warfare, ¶ 77 (1956) ("Spies are punished, not as violators of the laws of war, but to render their method of obtaining information as dangerous, difficult, and ineffective as possible."); John C. Dehn, The *Hamdan* Case and the Application of a Municipal Offense, 7 J. Int'l Crim. Justice 63, 75 (2009) ("[P]unishment [for spying] was only *permitted* by the law of nations, not directly imposed or required by it."); 1 Halleck's International Law 629 (4th ed. 1908) ("The spy himself . . . is not guilty of any crime in the sense in which that term is used in the law of nations, although military usages . . . universally permit the execution of a spy . . . .") (citation omitted).

offenses punishable by a military tribunal.  See Winthrop at 518 (recounting 1780 trial of British Major John André by a board of officers for spying); id. at 765 (quoting 5 Journals of the Continental Congress 693 (Resolution of Aug. 21, 1776) (providing that "all persons, not members of, nor owing allegiance to, any of the United States of America . . . who shall be found lurking as spies . . . shall suffer death, according to the law and usage of nations, by sentence of a court-martial")); American Articles of War of 1776, § 13, Art. 18 (making "whoever shall" aid the enemy triable by court-martial), (Winthrop at 967); see also American Articles of War of 1806, Art. 101, § 2 (spying) (Winthrop at 985); id. Art. 56, 57 (aiding the enemy) (Winthrop at 981); Articles of War of 1874, Art. 46 (spying) (Winthrop at 989); id. Art. 45 (aiding the enemy) (Winthrop at 989); Articles of War of 1916, Art. 82 (spying) (39 Stat. 663); id. Art. 81 (aiding the enemy) (39 Stat. 663); Articles of War of 1920, Art. 82 (spying) (41 Stat. 804); id. Art. 81 (aiding the enemy) (41 Stat. 804); 10 U.S.C. § 906 (Art. 106, UCMJ) (spying); 10 U.S.C. § 904 (Art. 104, UCMJ) (aiding the enemy); 10 U.S.C. § 950t(27) (2009) (spying); id. § 950t(26) (aiding the enemy).

The law governing the scope of offenses that are traditionally triable in U.S. military commissions has consisted of the "international law of war *supplemented by established U.S. military commission precedents*."  See Bahlul, 2014 WL

33

3437485, at *58 (Kavanaugh, J., concurring); <u>Winthrop</u> at 779 ("[T]he law of war

in this country . . . consists mainly of general rules derived from International Law

supplemented by acts and orders of the military power and a few legislative

provisions"); <u>id.</u> at 839 (noting that, until the adoption of a system of international

agreements at the end of the century, "violation[s] of the laws and usages of war

[consisted of offenses] principally, *in the experience of our wars*, made the subject

of charges and trial") (emphasis added).  That domestic practice is consistent with

international law, which not only prohibits certain conduct as war crimes subject to

military trial but also permits the trial of certain offenses that are not, themselves,

prohibited by international law as war crimes, including spying, aiding the enemy,

and other unlawful acts by unprivileged belligerents.  <u>See</u> 2 <u>Oppenheim</u> at 410,

413-14 (recognizing that certain acts committed by unprivileged belligerents are

punishable as war crimes, "not because they really are violations of recognised

rules regarding warfare, but because [in the interests of their own safety] the

enemy has the right to consider and punish them as acts of illegitimate warfare").

Thus, while the law of war permits trial of international law war crimes, it also

permits trying other offenses that the jurisdiction of military commissions has

traditionally included.  Such unlawful acts committed by unprivileged belligerents

during hostilities are within Congress's authority to punish as offenses triable by

military commission.  See Quirin, 317 U.S. at 35-36 (recognizing that, under both

the "practical administrative construction by [U.S.] military authorities" and

international law, the "commission of hostile acts" by "unlawful combatants" is

"punishable as such by military commission").

The traditional practice of U.S. military commissions includes trying

offenses not yet recognized as violations of international law such as the offense of

conspiracy.  As the government has argued throughout this case, individuals have

been tried before military commissions for conspiracy to commit war crimes

throughout this Nation's history.  Bahlul, 2014 WL 3437485, at *15 (concluding

that "domestic wartime precedent . . . provides sufficient historical pedigree to

sustain Bahlul's [conspiracy] conviction on plain-error review"); id. at *43

(Brown, J., concurring) (finding that "domestic practice traditionally treated

conspiracy as an offense triable by military commission"); id. at *58-*60

(Kavanaugh, J., concurring) (same).[5]  The statutes proscribing spying and aiding

_____

[5] The domestic practice included the conspiracy convictions in Quirin and
the case of the Lincoln conspirators, "the two most well-known and important U.S.
military commissions in American history."  Bahlul, 2014 WL 3437485, at *59
(Kavanaugh, J., concurring).  In addition, in Colepaugh v. Looney, 235 F.2d 429,
432-33 (10th Cir. 1956), the court of appeals upheld, on habeas review, the
convictions by military commission of a German-American who, along with a
compatriot, had surreptitiously entered the United States to spy on behalf of
Germany.  A special board of review, the Judge Advocate General, and President
Truman each approved the two men's convictions for, among other things,

35

the enemy as offenses triable by military commission, together with the historical

Executive Branch practice of trying non-international law offenses,[6] including

conspiracy, in military commissions, "supports the conclusion that international

law is not a constitutional constraint when Congress proscribes war crimes triable

by military commission."  Bahlul, 2014 WL 3437485, at *62 (Kavanaugh, J.,

concurring).

Bahlul (Br. 17) and amicus Glazier (Br. 15-16) argue that inchoate

conspiracy was never recognized as an offense triable by military commission.

See also Bahlul, 2014 WL 3437485, at *33-*35 (Rogers, J., dissenting)

(concluding that U.S. military commission precedents only recognized conspiracy

when charged in conjunction with a completed offense).  But the fact that in most

cases conspiracy was charged together with an allegation that the offense was

---

conspiring to clandestinely enter the United States for the purpose of espionage.  In
affirming the convictions, the Special Board of Review observed that "[i]t is well
established that conspiracy to commit an offense against the laws of war is in itself
an offense cognizable by a [military] commission."  Supp. App. 76.  See also
Bahlul, 2014 WL 3437485, at *59 (Kavanaugh, J., concurring).

[6] Most significantly, the Instructions for the Government of the Armies of
the United States in the Field, prepared by Professor Francis Lieber and
promulgated by the Secretary of War as General Orders No. 100 (Apr. 24, 1863),
broke new ground within the international community in addressing the status and
treatment of guerillas and irregular combatants during an armed conflict.  See John
Fabian Witt, Lincoln's Code: The Laws of War in American History 323, 344-45
(2012).

completed does not establish that a completed offense was a legal requirement for a conspiracy conviction.  See Hamdan I, 548 U.S. at 701 n.13 (Thomas, J., dissenting).  Moreover, Bahlul's argument is inconsistent with the contemporaneous understanding of the law of conspiracy in both the civilian and military context, which did not require completion of a substantive offense.  See, e.g., Hampton L. Carson, The Law of Criminal Conspiracies and Agreements 124-25 (1887).  Finally, during the Civil War, defendants were regularly convicted of conspiracies that were charged as unconsummated offenses.  For example, following a 60-day military commission trial held at Cincinnati, a renowned British soldier-of-fortune, and later Confederate Colonel, named George St. Leger Grenfell was convicted of conspiracy to violate the laws of war based on his participation in a plot, which was never carried out, to free prisoners held at a camp in Chicago and to destroy that city.  See H.R. Doc. No. 55-314, at 724 (1899) (Supp. App. 64); Stephen Z. Starr, Colonel Grenfell's Wars – The Life of a Soldier of Fortune 4-6, 217-19, 244 (1971).  The President approved Grenfell's conspiracy conviction even though the charge did not allege that the object offenses were completed.  Supp. App. 64.

In light of this history, this Court should not construe Congress's power to punish offenses by military commission to be limited to violations of international

37

law.  Adopting Bahlul's position would render the spying and aiding-the-enemy statutes unconstitutional from the beginning.  Bahlul's position would also inappropriately restrict Congress's ability, in the absence of broad concurrence by the international community, to adapt the range of offenses triable by military commission in light of future changes in the practice of modern warfare and the norms that govern it.  See Bahlul, 2014 WL 3437485, at *61 (Kavanaugh, J., concurring).

> 3. *The Supreme Court's Reasoning in* Quirin *Recognizes Congress's Authority To Make Non-International Law Offenses Triable by Military Commission*

Bahlul's argument that Congress may only codify offenses that are recognized violations of international law cannot be squared with the reasoning of the Supreme Court's cases in Quirin and Hamdan I.  In Quirin, the Court's decision relied on the jurisdiction of military commissions over spying, an offense that is not a violation of international law.  See 317 U.S. at 41-42.  And the Court in Quirin, as well as both the plurality and dissent in Hamdan I, looked to domestic precedents and practice to determine whether an offense is lawfully triable by military commission, an inquiry that would be largely superfluous if international law were the only source that matters.

38

In <u>Quirin</u>, the Supreme Court considered whether members of the German armed forces could be tried by military commission for clandestinely entering the United States without uniforms to commit sabotage.  Recognizing that Congress had authorized the use of military tribunals to try "offenders or offenses against the law of war in appropriate cases" (317 U.S. at 28), the <u>Quirin</u> Court observed that "[t]he spy who secretly and without uniform passes the military lines of a belligerent in time of war, seeking to gather military information and communicate it to the enemy, or an enemy combatant who without uniform comes secretly through the lines for the purpose of waging war by destruction of life or property, are familiar examples of belligerents who are generally deemed not to be entitled to the status of prisoners of war, but to be offenders against the law of war subject to trial and punishment by military tribunals."  <u>Id.</u> at 31.  The <u>Quirin</u> Court did not rule that such offenses, themselves, violated international law.  And, as noted above, "the offense of spying on which the [<u>Quirin</u>] Court relied was not and has never been an offense under the international law of war."  <u>Bahlul</u>, 2014 WL 3437485, at *64 (Kavanaugh, J., concurring).

Indeed, in concluding that the spy was an offender against the law of war, the <u>Quirin</u> Court relied on authorities that explicitly rejected the proposition that

spying was a violation of international law,[7] and the Court looked to the American common law of war – "the practice of our own military authorities before the adoption of the Constitution, and during the Mexican and Civil Wars" (317 U.S. at 31-33 & nn.9-10; 42 & n.14) – to establish that the United States had always viewed spying and the kindred offense of sabotage as offenses subject to trial by military commission.  And although the Quirin Court also considered "[a]uthorities on International Law," it concluded – consistent with our nation's understanding of the status of spying – that those authorities were unanimous in their view that persons who commit acts of belligerency behind enemy lines in civilian dress are liable to punishment for violating the laws of war.  Id. at 35 n.12.

Nothing in Quirin suggests that spying was ever a violation of international law, or that *international law* requires its prohibition and punishment.  See Baxter at 331 & n.3.  Instead, Quirin interpreted the category of "offense[s] against the law of war" to include offenses that were traditionally triable by military commission under domestic practice and precedents but that were not viewed as violations of international law.  In sum, "Quirin's approval of spying, a non-international-law-of-war offense, as an offense triable by military commission," as

_____

[7] See 317 U.S. at 30 n.7 (citing, e.g., Hague Convention No. IV art. 1 (annex), Oct. 18, 1907, 36 Stat. 2295 ); id. at 31 n.8 (citing 2 Oppenheim).

well as its reliance on domestic practice and precedents, "confirms that Congress has authority under the Constitution to make [such] crimes triable by military commission." <u>Bahlul</u>, 2014 WL 3437485, at *63 (Kavanaugh, J., concurring).

Nor does <u>Hamdan I</u> support Bahlul's claim (Br. 18-19) that international law alone governs the scope of our nation's law of war. In that case, a plurality of the Supreme Court considered the question whether inchoate conspiracy constituted a violation of the law of war subject to trial by military commission under 10 U.S.C. § 821. While the seven justices who addressed that question were divided in their views, <u>compare</u> <u>Hamdan I</u>, 548 U.S. at 595-612 (opinion of Stevens, J.) (conspiracy to violate the law of war not triable by military commission ) <u>with</u> <u>id.</u> at 697-706 (Thomas, J., dissenting) (contra), all agreed that resolution of the question did not turn solely on whether conspiracy was a violation of international law. <u>See</u> <u>Bahlul</u>, 2014 WL 3437485, at *15 (noting that "both the <u>Hamdan</u> plurality and dissent relied primarily on *domestic* precedent to ascertain whether conspiracy could be tried"). Only after canvassing domestic precedents (548 U.S. at 604-09) did Justice Stevens conclude that the government had failed to make a "substantial showing" that the crime of conspiracy has been tried as such "in this country by any law-of-war military commission." <u>Id.</u> at 603-04 (opinion of Stevens, J.). Although reaching a different conclusion, Justice Thomas observed

that "[t]he common law of war as it pertains to offenses triable by military commission is derived from the 'experience of our wars' and our wartime tribunals."  Id. at 689 (quoting Winthrop, at 839).  Analyzing domestic precedents from the Civil War through World War II, Justice Thomas concluded that "[t]he experience of our wars, is rife with evidence that establishes beyond any doubt that conspiracy to violate the laws of war" is triable by military commission.  Id. at 698 (internal quotation marks and citation deleted).

Finally, the en banc Court in this case considered domestic precedent, not solely international law, in determining whether Bahlul was properly tried by a military commission for conspiracy.  See Bahlul, 2014 WL 3437485, at *15 (noting that, under the Supreme Court's cases, "domestic precedent is an important part of our inquiry" whether conspiracy was triable by military commission).  The en banc Court therefore "look[ed] to domestic wartime precedent" and concluded that it "provides sufficient historical pedigree to sustain Bahlul's conviction [against an ex post facto challenge] on plain-error review."  Id. at *15.  If Bahlul's argument that only international law offenses may be tried by military commission were correct, the extensive consideration of domestic precedents in all of these cases would have been beside the point.

42

>    4.    *Under the Define and Punish Clause, Combined with the*
>          *Necessary and Proper Clause, Congress May Proscribe*
>          *Conspiracy To Commit Object Offenses That Are Themselves*
>          *Violations of the Law of Nations*

Even if Congress's authority here arose only under the Define and Punish

Clause and not Congress's other Article I war powers, Congress is not restricted

under that Clause only to criminal offenses that are violations of international law.

Rather, Congress may, under the Necessary and Proper Clause, proscribe

conspiracy to commit war crimes, such as terrorist attacks against civilians, that are

themselves violations of the law of nations as a necessary and proper

implementation of its power and responsibility to prevent and punish such

violations.

In this case, there is no question that at least some of the object offenses

underlying Bahlul's conspiracy conviction are themselves violations of

international law of war.  See Hamdan II, 696 F.3d at 1249-50 ("[I]nternational

law establishes at least some forms of *terrorism*, including the intentional targeting

of civilian populations, as war crimes.").  It follows that Congress's constitutional

authority to "Define and Punish" permits it to criminalize such acts of terrorism

committed during an armed conflict to help the United States fulfill its

international responsibilities.  See Geneva Convention Relative to the Protection of

43

Civilian Persons in Time of War, 6 U.S.T. 3516, T.I.A.S. No. 3365 (Aug. 12, 1949), arts. 33 (prohibiting terrorism against civilians as a mode of warfare), 146 (requiring signatories to enact legislation sanctioning grave breaches).

The Necessary and Proper Clause vests Congress with "broad power to enact laws that are 'convenient, or useful' or 'conducive' to the . . . 'beneficial exercise'" of its specific legislative powers.  United States v. Comstock, 560 U.S. 126, 133-34 (2010) (quoting McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 413, 417-18 (1819)); see id. at 134 (a statute is necessary and proper when it "constitutes a means that is rationally related to the implementation of a constitutionally enumerated power").  The Necessary and Proper Clause thus provides Congress with broad authority to implement its power to define and punish offenses against the law of nations by enacting ancillary legislation that is necessary for the United States to carry out its responsibility under the law of nations to take effective action to prevent terrorism.

In United States v. Arjona, 120 U.S. 479, 487-89 (1887), the Supreme Court held that Congress had the authority under the Define and Punish Clause, coupled with the Necessary and Proper Clause, to prohibit counterfeiting the notes or securities of another nation.  The Court found that the law of nations recognizes the obligation of nations to punish those who, within its own jurisdiction, counterfeit

44

the money of another nation.  Id. at 484.  Given that obligation, the Court found

that a prohibition against the counterfeiting of foreign securities was "necessary

and proper to afford th[e] protection" against counterfeiting foreign currency as "it

is one that is needed to carry into execution a power conferred by the constitution."

Id. at 487.  The Court concluded that, "if the thing made punishable is one which

the United States are required by their international obligations to use due

diligence to prevent, it is an offense against the law of nations."  Id. at 488.

Congress could likewise reasonably conclude in the 2006 MCA that punishing as

war crimes not only acts of terrorism themselves, but also conspiracy to engage in

such acts, was necessary to comply with our nation's international responsibilities.

Because "[c]oncerted action both increases the likelihood that the criminal

object will be successfully attained and decreases the probability that the

individuals involved will depart from their path of criminality," Congress may

criminalize conspiracies.  Callanan v. United States, 364 U.S. 587, 593-94 (1961);

see also United States v. Feola, 420 U.S. 671, 694 (1975).  Congress's authority

does not require that the illegal agreement or any act in furtherance of it be

sufficient on its own to trigger a specific legislative power.  If commission of the

substantive crime that is the conspiracy's object would be within the scope of

permissible congressional regulation, then so is the conspiracy.  See, e.g., United

<u>States v. Price</u>, 265 F.3d 1097, 1107 n.2 (10th Cir. 2001) (holding in the context of

a Commerce Clause challenge to 21 U.S.C. § 846, which prohibits drug trafficking

conspiracies, that "if the underlying substantive provision is constitutional, a

provision which criminalizes conspiracy to commit the underlying crime is also

constitutional"); <u>United States v. Jannotti</u>, 673 F.2d 578, 591-94 (3d Cir. 1982) (en

banc) (rejecting "restrictive view of Congress' constitutional power to legislate"

that would have required an "actual potential effect on interstate commerce" for a

Hobbs Act conspiracy conviction).  Prohibiting the conspiracy is rationally related

to prohibition of the object offenses because once the conspiratorial agreement has

been forged, "[c]riminal intent has crystallized, and the likelihood of actual,

fulfilled commission warrants preventive action."  <u>Feola</u>, 420 U.S. at 694.

    This Court has also recognized that the Define and Punish Clause

"authorize[s] Congress to derive from the often broadly phrased principles of

international law a more precise code . . . necessary to bring the United States into

compliance with rules governing the international community."  <u>See</u> <u>Finzer v.</u>

<u>Barry</u>, 798 F.2d 1450, 1455 (D.C. Cir. 1986), <u>aff'd in part sub nom.</u> <u>Boos v. Barry</u>,

485 U.S. 312 (1988).  The process of translating the law of nations into the precise

prohibitions of a domestic penal code requires the judiciary to "give Congress

extraordinary deference when it acts under its Define and Punish Clause powers."

<u>Bahlul</u>, 2014 WL 3437485, at \*49 (Brown, J., concurring); <u>see also</u> <u>Hamdan I</u>, 548 U.S. at 645 ("Congress has the power and responsibility to determine the necessity for military courts, and to provide the jurisdiction and procedures applicable to them."); <u>id.</u> at 655 (Kennedy, J., concurring) (declining to address whether conspiracy was triable by military commission because "Congress, not the Court, is the branch in the better position to undertake the sensitive task of establishing a principle not inconsistent with the national interest or with international justice.") (internal quotation marks and citation omitted); <u>United States v. Belfast</u>, 611 F.3d 783, 805 (11th Cir. 2010) ("[T]he judiciary's role in reviewing the acts of Congress in th[e] area [of foreign relations, necessary and proper to effectuate the enumerated powers of the Constitution] must be appropriately circumscribed.").

This Court should likewise defer to Congress's determination that the Define and Punish Clause (as well as its war powers) affords it authority to codify inchoate conspiracy as an offense subject to trial by military commission. <u>See</u> H.R. Rep. No. 109-664, pt. 2, at 15 (2006) (citing the Define and Punish Clause as one of several constitutional bases supporting enactment of the 2006 MCA). There is more than ample justification for doing so here. First, as Judge Brown observed, international treaties and international criminal tribunals have adopted a "hybrid approach" to the offense of conspiracy as a war crime, recognizing conspiracy as a

47

stand-alone offense for genocide and waging aggressive war, and using conspiracy as a mode of establishing liability for all other law of war violations. <u>Bahlul</u>, 2014 WL 3437485, at *50 (Brown, J., concurring). And when conspiracy is used as a mode of liability, there is a requirement that the contemplated offense be completed or attempted. <u>Id.</u>; <u>see also</u> Assistant Att'y Gen. Herbert Wechsler, Memorandum for Att'y Gen. Francis Biddle 3 (Dec. 29, 1944) (Supp. App. 86). Although the requirement in the 2006 MCA that the defendant personally commit an overt act (10 U.S.C. § 950v(b)(28) (2006))[8] is not equivalent to the requirement that the object crime be completed, Congress's adaptation of the offense to conform to common law notions of criminal responsibility is an exercise of "precisely the kind of discretion and flexibility the Define and Punish Clause envisions" when Congress adapts "recognized international law to fit the country's particular needs and legal system." <u>Bahlul</u>, 2014 WL 3437485, at *50 (Brown J., concurring).

For all of these reasons, Congress has authority, under the Define and Punish and Necessary and Proper Clauses, as well as under its war powers, to codify the offense of conspiracy to commit war crimes as an offense triable by military

---

[8] Congress's inclusion of an overt-act-by-the-accused requirement is consistent with Winthrop's understanding that military commissions should try "*overt acts* . . . and not . . . intentions merely . . . ." <u>Winthrop</u> at 841.

commission. At a minimum, Bahlul cannot carry his burden to establish plain

error, because he cannot point to any clear precedent showing that Congress's

authority to codify offenses triable by military commission is limited to offenses

that are recognized violations of international law.  Indeed, two judges of this

Court have concluded, applying *de novo* review, that Congress has authority under

Article I to codify conspiracy as an offense triable by military commission.  See

Bahlul, 2014 WL 3437485, at *45-*52 (Brown, J., concurring); id. at *61-*63

(Kavanaugh, J., concurring).

## II.    BAHLUL'S TRIAL BY MILITARY COMMISSION FOR CONSPIRACY DID NOT VIOLATE ANY RIGHT HE MAY HAVE TO A TRIAL BY JURY IN AN ARTICLE III COURT

### A.    Standard of Review

Bahlul failed to raise before the military commission any claim that he had a

right to a jury trial in an Article III court.  As a result, he is only entitled to relief

upon a showing of plain error.

Forfeited claims that a defendant was denied his constitutional rights to a

jury trial are subject to plain-error review.  Johnson v. United States, 520 U.S. 461,

465-66 (1997) (violation of Sixth Amendment right to jury determination of all

elements of offense is subject to plain-error review if not objected to at trial); see

also Olano, 507 U.S. at 731 (plain error applies to forfeiture of "'a constitutional

49

right,' or a right of any other sort" (quoting <u>Yakus</u>, 321 U.S. at 444)).   The

Supreme Court has similarly indicated that a right to be tried in an Article III court

is a personal right that may be waived or forfeited.  <u>Peretz v. United States</u>, 501

U.S. 923, 936-37 (1991) (holding that a defendant has no constitutional right to

have an Article III judge preside at jury selection if the defendant has raised no

objection to the judge's absence).

In <u>Commodity Futures Trading Comm'n v. Schor</u>, 478 U.S. 833 (1986), the

Supreme Court held that Article III's "guarantee of an independent and impartial

adjudication by the federal judiciary of matters within the judicial power of the

United States . . . serves to protect primarily personal, rather than structural,

interests," and that "as a personal right, Article III's guarantee of an impartial and

independent federal adjudication is subject to waiver, just as are other personal

constitutional rights that dictate the procedures by which civil and criminal matters

must be tried."  <u>Id.</u> at 848-49.  The Supreme Court has suggested that Article III

also imposes certain "structural" limits that, like subject matter jurisdiction, are not

subject to waiver or consent by the parties.  <u>Peretz</u>, 501 U.S. at 936-37; <u>Schor</u>, 478

U.S. at 850-51; <u>see also</u> <u>Kuretski v. Commissioner</u>, 755 F.3d 929, 937 (D.C. Cir.

2014).  To the extent Bahlul raises such "structural" claims, however, they are

without merit.  As explained below, the 2006 MCA's grant of military commission

jurisdiction to try conspiracy offenses does not create a "substantial threat to the separation of powers," Schor, 478 U.S. at 854, because military commissions have historically been viewed as falling outside the requirement of Article III adjudication. Moreover, any potential encroachment on separation of powers principles is mitigated by the availability under the MCA of plenary review in Article III court. See 10 U.S.C. § 950g (2009).

Although Bahlul styles his claim (Br. 27-29) as a challenge to the military commission's subject matter jurisdiction, an Article III challenge is distinct from a subject-matter jurisdiction challenge. See Stern v. Marshall, 131 S. Ct. 2594, 2601 (2011) (holding that, although a bankruptcy court had statutory jurisdiction to enter a judgment on a common-law tort counterclaim filed by a bankruptcy petitioner, the court lacked the constitutional authority under Article III to do so); Peretz, 501 U.S. at 953 (Scalia, J., dissenting) (noting that the claim that the district court delegated functions to a magistrate in violation of Article III "goes to the lawfulness of the manner in which [the court] acted, but not to its jurisdiction to act"). There is no question that, under the relevant provisions of the 2006 MCA, the military commission had subject-matter jurisdiction over Bahlul's conspiracy charge. See Bahlul, 2014 WL 3437485, at *5-*10. Whether Bahlul's trial by military commission violated Article III or the Fifth and Sixth Amendments does

51

not affect that jurisdiction, but only the validity of the statute (and the conviction).

See id. at *4 n.6.  Accordingly, Bahlul's claim that he was entitled to a jury trial in

Article III court is not jurisdictional and was forfeited.

B.    Argument

Even assuming that Bahlul, as an alien unprivileged enemy belligerent

detained at Guantanamo, may raise the claim that his military commission trial

violated his constitutional rights to trial by jury in an Article III court, that claim

fails on the merits under any standard of review.  Bahlul argues (Br. 30-32) that

Congress violated Article III by authorizing it to try by military commission

offenses, such as conspiracy, that are not violations of international law.  As shown

above, that argument is inconsistent with two centuries of historical practice

followed or acquiesced in by each of the three coordinate branches of government.

If adopted, Bahlul's argument would retrospectively cast doubt on the

constitutional validity of the most prominent military commission precedents in

our nation's history.

More fundamentally, however, as the Quirin Court explained, military

commissions are "not courts in the sense of the Judiciary Article . . . which in the

natural course of events are usually called upon to function under conditions

precluding resort to . . . procedures [governing such courts]."  317 U.S. at 39.  To

the contrary, "it was not the purpose or effect of § 2 of Article III, read in the light of the common law, to enlarge the then existing right to a jury trial. The object was to preserve unimpaired trial by jury *in all those cases in which it had been recognized by the common law* and in all cases of a like nature as they might arise in the future." Id. (emphasis added). The Quirin Court further observed that:

> Section 2 of the Act of Congress of April 10, 1806, 2 Stat. 371, derived from the Resolution of the Continental Congress of August 21, 1776, imposed the death penalty on alien spies 'according to the law and usage of nations, by sentence of a general court martial.' *This enactment must be regarded as a contemporary construction of both Article III, s 2, and the Amendments as not foreclosing trial by military tribunals, without a jury, of offenses against the law of war committed by enemies not in or associated with our Armed Forces.*

Id. at 41 (emphasis added).

The Quirin Court applied the same reasoning to procedural rights embraced by Article III and the Fifth and Sixth Amendments. The Court observed that, as in the case of proceedings involving petty offenses and contempts at common law, the rights to presentment by a grand jury and to trial by a petit jury "were procedures unknown to military tribunals." 317 U.S. at 39. Each constitutes an instance of an offense against the United States for which a penalty is imposed, "but [is] not deemed to be within Article III, § 2 or the provisions of the Fifth and Sixth Amendments relating to 'crimes, and, criminal prosecutions.'" Id. at 40. "In

light of this long-continued and consistent interpretation we must conclude that § 2 of Article III and the Fifth and Sixth Amendments cannot be taken to have extended the right to demand a jury to trials by military commission, or to have required that offenses against the law of war not triable by jury at common law be tried only in the civil courts." Id.

Bahlul (Br. 24-25) and NIMJ (Br. 23-30) argue that the Quirin Court's reference to the "law of war" precludes Congress from making non-international law offenses triable by military commission because the exemption from the right to a jury trial "extends only to offenses committed by enemy belligerents against the *international* laws of war." NIMJ Br. 23. But that argument disregards the fact that the sabotage offense at issue in Quirin – which the Court viewed as akin to spying – is not and has never been an offense under the international law of war. See Bahlul, 2014 WL 3437485, at *64 (Kavanaugh, J., concurring). Consequently, Quirin cannot be read as "barring military commission trial of non-international-law-of-war offenses," as the decision rested on a longstanding statute making an offense triable by military commission that is not a violation of international law. Id. Moreover, because spying was never an international crime, the Quirin Court's reasoning undercuts NIMJ's claim (Br. 24) that "the Supreme Court has *never* recognized a[n] . . . exception to the jury-trial provisions of Article III and the Fifth

54

and Sixth Amendments for such offenses."

Bahlul maintains (Br. 31-32) that the charge at issue in Quirin was cognizable by a military commission only because it was not triable by jury at common law and that, by the same token, if an offense, such as conspiracy, is triable by jury, it is not cognizable by a military commission. He is wrong on both counts. Quirin held that, at common law, there was no entitlement to a jury trial for a violation of the law of war, not that such an offense *could not* be tried by a jury should Congress choose to make it a federal crime. Indeed, the Court specifically noted that the Espionage Act of 1917 authorized trial in federal court for certain offenses that "interfere with the prosecution of war," 317 U.S. at 27 (see 50 U.S.C. § 105 (1940)), and that the Act did not limit concurrent jurisdiction of courts-martial and military commissions over such offenses. Id. (citing 50 U.S.C. § 38 (1940)). Nothing in Quirin suggests that concurrent federal jurisdiction over offenses that also constitute violations of the law of war divests military tribunals of jurisdiction. See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 63 n.14 (1982) (plurality opinion) ("legislative courts may be granted jurisdiction over some cases and controversies to which the Art. III judicial power might also be extended"). If Bahlul's argument were correct, the fact that 18 U.S.C. § 2441 authorizes, *inter alia*, the trial of grave breaches of the Geneva

55

Conventions of 1949 in federal district court, when committed by or against U.S. nationals or members of its armed forces, would divest military commissions and courts-martial of jurisdiction over such offenses.

More fundamentally, however, the Quirin Court explained that offenses against the law of war are cognizable by military commissions because they are committed by "enemy belligerents" who are "not in or associated with our Armed Forces." Quirin, 317 U.S. at 41. Thus, the Court rejected petitioner Haupt's claim that U.S. citizenship entitled him to a jury. The Court noted that Haupt was charged "as an enemy belligerent." Id. at 38. It is that status and not the fact that the underlying *actus reus* is not triable by a jury that exempts such offenders from the right to a jury trial. It also provides the basis for distinguishing cases in which the Supreme Court has reversed the court-martial convictions of citizens who were not members of the "land and naval Forces." U.S. Const. Art. I, § 8, cl. 14. See, e.g., NIMJ Br. at 19 (citing, e.g., Reid v. Covert, 354 U.S. 1 (1957) (plurality opinion) (prohibiting court-martial of civilian dependent for murder)).[9] In contrast

---

[9] For the same reason, there is no merit to NIMJ's related argument (Br. 22-23) that, even if Congress possesses Article I power to make punishable offenses that do not clearly violate international law, that would not exempt them from the right to a trial by an Article III court. Although Congress has no *carte blanche* to transform offenses committed by civilians in a purely civilian context into an offense cognizable by a military commission, when an offense is committed by an enemy belligerent against the United States in the context of an armed conflict,

with enemy belligerents, the Constitution exempts citizens who are not members of the land and naval forces from trial by a military court.

As in <u>Quirin</u>, the 2006 MCA confines its jurisdiction narrowly to "unlawful enemy combatant[s]" who have "engaged in . . . or . . . purposefully and materially supported hostilities against the United States . . . ."  10 U.S.C. § 948a(1) (2006).  Moreover, the offense of conspiracy to commit war crimes has throughout our history been tried by U.S. military commissions.  Contrary to Bahlul's argument (Br. 32), making that narrow class of offenders subject to trial by military commission for committing, in the context of hostilities against the United States, the long-recognized offense of conspiracy does not threaten to "eviscerate the constitutional guarantee of an independent Judicial Branch."[10]

_____

under the reasoning of <u>Quirin</u>, the offender has no constitutional entitlement to a jury trial as that right has never been extended to such offenders and offenses.

[10]  Bahlul's reliance (Br. 29) on <u>Ex parte Milligan</u>, 71 U.S. (4 Wall.) 2 (1866), is misplaced.   As the Supreme Court explained in <u>Quirin</u>, <u>Milligan</u> is "inapplicable" where, as here, the defendant was a belligerent associated with the enemy's armed forces and subject to the laws of war.  317 U.S. at 45-46.

57

In addition to being foreclosed by <u>Quirin</u>, Bahlul's claim relies on the assumption that the Constitution requires all acts made punishable by Congress to be tried in federal district court. That assumption is mistaken. In <u>Palmore v. United States</u>, 411 U.S. 389 (1973), the Supreme Court rejected a similar argument that criminal offenses enacted by Congress for the District of Columbia could only be tried in an Article III court. <u>Id.</u> at 397-98, 402, 410. The Court observed that Article III did not require Congress "to create [any] inferior Art. III courts to hear and decide cases within the judicial power of the United States, including those criminal cases arising under the laws of the United States." <u>Id.</u> at 401. Consequently, "[i]t was neither the legislative nor judicial view . . . [that] the enforcement of federal criminal law [had] been deemed the exclusive province of federal Art. III courts." <u>Id.</u> at 402. Congress, the <u>Palmore</u> Court noted, had at various times left the enforcement of selected criminal laws to state courts; vested non-Article III courts with jurisdiction over criminal laws governing the territories; granted courts-martial jurisdiction over violations of military law; and vested like authority in "Consular Courts" and other tribunals comprised of judges possessing limited tenure. <u>Id.</u> at 402-04. Congress's ability to do so rests on other constitutional authorities, including its power over territories (U.S. Const. Art. IV, § 3, cl. 2) and its power "to make Rules for the Government and Regulation of the

land and naval Forces" (U.S. Const. Art. I, § 8, cl. 14).  <u>Northern Pipeline</u>, 458

U.S. at 64-65.  Here, Congress's determination to vest military tribunals with the

responsibility to adjudicate offenses it has designated as traditionally triable by

military commission "involves a constitutional grant of power that has been

historically understood as giving the political Branches of Government

extraordinary control over the precise subject matter at issue."  <u>Northern Pipeline</u>,

458 U.S. at 66.

Finally, Bahlul's contention (Br. 33) that military commissions have

traditionally been limited to providing "swift justice on the battlefield" is unsound.

The commission in <u>Quirin</u> was held in Washington, D.C., 317 U.S. at 23, and the

proceedings in <u>Colepaugh</u> were conducted in New York, Supp. App. 74.  In

<u>Application of Yamashita</u>, 327 U.S. 1 (1946), in which the commission was held in

the Philippines, a U.S. territory at the time, the Supreme Court rejected the

defendant's claim that the Executive lacked authority to convene a military

commission after hostilities in the Pacific Theater had ended.  <u>Id.</u> at 12-13.  The

Court held that such determinations rest "not with the courts, but with the political

branch of the Government . . . ."  <u>Id.</u>

For all of these reasons, Bahlul's claim that Article III and the Fifth and

Sixth Amendments permit military commissions to try only violations of the

international law of war is not supported by the constitutional text, is foreclosed by

the rationale of Quirin, and is inconsistent with traditional U.S. military

commission practice.  And in any event, Bahlul cannot establish that any error was

"plain," because there is no clear precedent establishing the purported

constitutional limitation he invokes.

### III.     BAHLUL'S CONVICTION DOES NOT VIOLATE THE FIRST AMENDMENT

#### A.     Standard of Review

Bahlul did not raise any First Amendment claim before the military

commission, and his claim is therefore reviewed only for plain error.  Bahlul, 2014

WL 3437485, at *4.

#### B.     Argument

Bahlul argues (Br. 38-42) that his prosecution and conviction for conspiracy

rested solely on his exercise of First Amendment rights – the preparation of an al

Qaeda recruitment video highlighting the October 2000 attack on the *U.S.S. Cole*.

However, Bahul's claim fails at the outset because, as a non-resident alien overseas

engaged in warfare against the United States who otherwise had no substantial

voluntary connections to the United States, he cannot claim the protections of the

First Amendment.

The Supreme Court has held that non-resident aliens abroad with no substantial voluntary connections to the United States – and particularly those engaged in warfare against the United States – do not enjoy First Amendment protection.  See United States v. Verdugo-Urquidez, 494 U.S. 259, 265 (1990) (citing United States ex rel Turner v. Williams, 194 U.S. 279, 292 (1904), for the proposition that an "[e]xcludable alien is not entitled to First Amendment rights"); Johnson v. Eisentrager, 339 U.S. 763, 784 (1950) (rejecting the idea that "freedoms of speech, press, and assembly as in the First Amendment" might be accorded to "irreconcilable enemy elements, guerrilla fighters, and 'were-wolves'"); DKT Mem'l Fund Ltd. v. Agency for Int'l Dev., 887 F.2d 275, 284 (D.C. Cir. 1989) (noting that "the Supreme Court has never limited its absolute wording of the principle that nonresident aliens are without First Amendment rights").  In short, "Bahlul had no First Amendment rights as a non-U.S. citizen in Afghanistan when he led bin Laden's media operation."  Bahlul, 2014 WL 3437485, at *65, (Kavanaugh, J., concurring).[11]

---

[11] Relying on Verdugo, Bahlul maintains (Br. 43-44) that this case "does not involve the extraterritorial application of the Constitution" because the relevant question is not whether the First Amendment protected him in Afghanistan, but whether the First Amendment protected him in Guantanamo at the time of his trial. Nothing in Verdugo supports that argument, which is based on the erroneous premise that First Amendment freedom of speech, like the Fifth Amendment privilege against self-incrimination, is exclusively a "trial right" where "a

61

Even if Bahlul could invoke rights under the First Amendment, he would have no constitutional right to prepare a recruiting video on behalf of al Qaeda because it is permissible for the government to punish providing speech-related services to terrorists under the direction of or in coordination with a foreign terrorist organization.  In <u>Holder v. Humanitarian Law Project</u>, 561 U.S. 1 (2010) ("<u>HLP</u>"), the Supreme Court rejected a citizen's First Amendment-based challenge to the federal statute prohibiting providing material support to terrorist organizations, 18 U.S.C. § 2339B, on the ground that the statute prohibited certain forms of speech-related material support, including advocacy training, for the non-violent activities of designated foreign terrorist organizations ("FTOs").  The <u>HLP</u> Court found that the statute satisfied strict scrutiny review under the First Amendment in view of the "sensitive and weighty interests of national security and foreign affairs" implicated by such groups (561 U.S. at 33-34), particularly when the expressive activities are "directed to, coordinated with, or controlled by foreign terrorist groups."  <u>Id.</u> at 36.

---

constitutional violation occurs only at trial."  494 U.S. at 264.  Bahlul was prosecuted for conduct he committed in Afghanistan, not in Guantanamo.  Accordingly, as Judge Kavanaugh recognized, whether Bahlul "may have some First Amendment rights at Guantanamo . . . for any speech [he] engage[d] in *there*" is irrelevant; the question is whether the First Amendment "appl[ies] to Bahlul's speech in Afghanistan."  <u>Bahlul</u>, 2014 WL 3437485, at *65-*66 (Kavanaugh, J., concurring).  The answer to that question is no.  <u>Id.</u> at *66.

In this case, Bahlul admitted that his speech-related conduct, including his production of the *U.S.S. Cole* video, was performed in coordination with and on behalf of al Qaeda – indeed he led bin Laden's media activities.  HLP makes clear that the First Amendment does not prohibit punishment of those activities.

Moreover, the First Amendment does not protect speech constituting "an integral part of conduct in violation of a valid criminal statute."  New York v. Ferber, 458 U.S. 747, 761-62 (1982) (citation omitted); see Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 497-98 (1949) (speech may be enjoined if it is in furtherance of a conspiracy to commit a crime).  In this case, Bahlul was not convicted of violating a statute prohibiting advocacy, even advocacy of unlawful conduct, but for participating in a conspiracy by, among other activities, producing a video designed to induce recruits to join the terrorist organization and to conduct attacks against civilians.  The fact that his conduct in furtherance of the objectives of that conspiracy contained a communicative component does not immunize him from prosecution because his media activities were integral to a criminal conspiracy in furtherance of terrorist activities.  See, e.g., United States v. Stewart, 590 F.3d 93, 115-16 (2d Cir. 2009) (defendant properly convicted for disseminating a fatwah that the jury found to be a "call to arms"); United States v. Rahman, 189 F.3d 88, 116-17 (2d Cir. 1999) (defendant properly convicted of

63

seditious conspiracy and solicitation based on speeches that solicited attacks on U.S. military installations and the murder of the President of Egypt).

Finally, contrary to Bahlul's claim, Bahlul's conviction was not based exclusively on speech. As the charging document demonstrates (App. 100-05), he was convicted of conspiring with bin Ladin and others to, *inter alia*, murder protected persons. He was specifically convicted by special verdict of committing ten separate overt acts, many of which, including undergoing military-type training at an al Qaeda camp and arranging for two of the 9/11 hijackers to pledge allegiance to bin Laden, did not involve First Amendment activity. Id. at 119-20; see Bahlul, 2014 WL 3437485, at *65 (Kavanaugh, J., concurring) ("Bahlul was convicted of conspiracy based on his conduct.").

IV.    THE 2006 MCA DOES NOT IMPERMISSIBLY DISCRIMINATE AGAINST ALIENS IN VIOLATION OF THE EQUAL PROTECTION COMPONENT OF THE DUE PROCESS CLAUSE

A.    Standard of Review

Bahlul did not raise any claim that the 2006 MCA unlawfully discriminates against aliens before the military commission. His claim is therefore reviewed for plain error. Bahlul, 2014 WL 3437485, at *4.

64

B.     <u>Argument</u>

Section 948c of the 2006 MCA limits the jurisdiction of military commissions under that statute to enumerated law-of-war violations committed by "[a]ny alien unlawful enemy combatant."  10 U.S.C. § 948c.  Bahlul's argument that this limitation violates his Due Process rights is inconsistent with this Court's repeated holdings that the Clause has no application to detainees challenging their detention under the AUMF at Guantanamo.  See <u>Bahlul</u>, 2014 WL 3437485, at *23 (Henderson, J., concurring) (citing cases).  This Court, however, has not specifically addressed whether Fifth Amendment Due Process rights apply in the context of military commission proceedings and need not do so here.

Assuming *arguendo* that the equal protection component of the Due Process Clause applies to military commission proceedings conducted at Guantanamo Bay, Bahlul's argument fails on the merits.  First, Bahlul's claim (Br. 48-49) that the 2006 MCA represents the first time that "American law-of-war military commissions" have "made a jurisdictional distinction on the basis of national origin" is not correct.  Early statutes, including the 1806 Articles of War, limited trial of spies by a military tribunal to non-citizens.  <u>Winthrop</u> at 765-66; 2 Stat. 359, Art. 101, § 2.  The practice of the early Congresses informs "the construction to be given [to the Constitution's] provisions," <u>Hampton</u>, 276 U.S. at 412, and as

the Quirin Court explained, the early spying legislation, which made alien but not citizen spies subject to the jurisdiction of a military tribunal, "must be regarded as a contemporary construction of [the Constitution]."  317 U.S. at 41.

Moreover, particularly in wartime, congressional policies regarding the treatment of aliens are entitled to great deference.  See Mathews v. Diaz, 426 U.S. 67, 81 n.17 (noting that policies toward aliens are "exclusively entrusted to the political branches" and "largely immune from judicial inquiry"); see also Eisentrager, 339 U.S. at 769 ("our law does not abolish inherent distinctions recognized throughout the civilized world between citizens and aliens, nor between aliens of friendly and of enemy allegiance").

In any event, legislatively-enacted distinctions between citizens and aliens "do not violate equal protection so long as they are rationally related to a legitimate government interest."  United States v. Ferreira, 275 F.3d 1020, 1025-26 (11th Cir. 2001); Narenji v. Civiletti, 617 F.2d 745, 748 (D.C. Cir. 1979).  It is error for a court "to evaluate the policy reasons upon which the [legislation] is based," because the political branches, rather than the courts, are vested with the foreign affairs powers on which alienage-based distinctions are made.  Id.

Under rational-basis review,[12] the reviewing court first identifies a legitimate governmental purpose that Congress "*could* have been pursuing" when it enacted the challenged legislation.  Ferreira, 275 F.3d at 1026 (citation omitted).   The court then inquires "whether a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose."  Id.

Like the treatment of aliens under the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 *et seq.*, see United States v. Duggan, 743 F.2d 59, 75-76 (2d Cir. 1984), the treatment of alien enemy belligerents under the MCA easily survives rational-basis scrutiny.  Congress has a vital national security interest in establishing a military forum in which to bring to justice alien unlawful belligerents whose purpose it is to terrorize innocent U.S. citizens and to murder U.S. military personnel, see Bahlul, 2014 WL 3437485, at *65 (Kavanaugh, J., concurring) (recognizing this interest as sufficient), and Congress has done so in a

---

[12] Relying on Graham v. Richardson, 403 U.S. 365 (1971), Bahlul (Br. 47, 53) and JACL (Br. 7) argue that statutory distinctions based upon alienage are generally governed by the strict-scrutiny standard.  Graham, however, addressed the different question of the protection of aliens against *state laws* pursuant to the Equal Protection Clause of the Fourteenth Amendment.  See 403 U.S. at 372.  As the Ferreira court explained, classifications based on alienage are subject to a strict-scrutiny standard when enacted by a state, but the rational-basis test applies to federal statutes that distinguish between citizens and aliens because the express constitutional powers granted to Congress permit it to make such distinctions.  275 F.3d at 1025.

manner that provides numerous safeguards to ensure a fundamentally fair proceeding.  The distinction drawn by Congress also reflects the longstanding assumption that, in time of armed conflict, enemy aliens are, of necessity, subject to different legal regimes than citizens.  See Harisiades v. Shaughnessy, 342 U.S. 580, 587 (1952) ("[w]ar, of course, is the most usual occasion for extensive resort to the power" to treat aliens differently); Eisentrager, 339 U.S. at 771 ("[i]t is war that exposes the relative vulnerability of the alien's status").  Congress could reasonably have determined that, because the protections of various constitutional and statutory provisions may apply to a greater degree to citizens detained abroad in connection with hostilities against the United States, it is appropriate for criminal charges against such citizens to be adjudicated in Article III courts rather than in a military commission. See Verdugo, 494 U.S. at 275 (Kennedy, J., concurring) ("In cases involving the extraterritorial application of the Constitution, [the Court has] taken care to state whether the person claiming its protection is a citizen or an alien.") (citation omitted); Al-Bihani v. Obama, 590 F.3d 866, 877 n.3 (D.C. Cir. 2010) (noting that "the procedures to which Americans are entitled are likely greater than the procedures to which non-citizens seized abroad during the war on terror are entitled").

Finally, amicus JACL claims (Br. 4) that the MCA's criminal procedures are "markedly inferior" than those afforded a defendant tried in federal court. Although the procedural entitlements conferred by the MCA are robust and similar to those governing courts-martial,[13] any distinction between military commission proceedings and those in federal court are inconsequential in this case. Bahlul admitted virtually all of the factual allegations against him and elected not to file pretrial motions or to present a defense. He has therefore never attempted to demonstrate how the deprivation of any procedural protection that he might have enjoyed in a trial by an Article III court prejudiced him.

---

[13] The 2006 MCA provided extensive procedural safeguards that ensured that Bahlul's trial was fundamentally fair. Bahlul was, for example, statutorily entitled to be represented by appointed counsel at no cost to himself or to retain counsel of his own choosing (10 U.S.C. § 949c); to be present at all proceedings (id. § 949d(b)); to challenge commission members for cause or peremptorily (id. § 949f); to compulsory process to obtain witnesses and evidence (id. § 949j); to the discovery of exculpatory evidence (id. § 949j(d)); to protection against compulsory self-incrimination (id. § 948r); to cross-examine adverse witnesses (id. § 949c(b)(7)); and to protection against cruel or unusual punishment (id. § 949s).

## CONCLUSION

For the foregoing reasons, Bahlul's conspiracy conviction should be

affirmed.

Respectfully submitted,

DARRIN HOSTETLER                    JOHN P. CARLIN
Deputy General Counsel – Legal Counsel   Assistant Attorney General
U.S. Department of Defense          for National Security

MARK S. MARTINS                     J. BRADFORD WIEGMANN
Brigadier General, U.S. Army        Deputy Assistant Attorney General
Chief Prosecutor of
Military Commissions                STEVEN M. DUNNE
                                    Chief, Appellate Unit

                                    JOHN F. DE PUE
                                    JOSEPH PALMER
                                    Attorneys
                                    National Security Division
                                    U.S. Department of Justice
                                    Washington, D.C. 20530

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), and with this Court's Order dated September 11, 2014, granting respondent's consent motion for leave to file an oversized brief, because:

> this brief contains 15,660 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point font size and Times New Roman type style.

DATED: September 17, 2014              <u>/s/ John F. De Pue</u>
                                       John F. De Pue
                                       Attorney for Respondent

71

<u>CERTIFICATE OF SERVICE</u>

U.S. Court of Appeals Docket Number 11-1324

I hereby certify that I electronically filed the foregoing Brief for the United States with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on September 17, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED: September 17, 2014                    /s/ John F. De Pue
                                             John F. De Pue
                                             Attorney for Respondent

## STATUTORY ADDENDUM

Except for the following, all applicable statutes, etc., are contained in the Brief for Petitioner.

## CONTENTS

Military Commissions Act of 2006, Pub. L. No. 109-366,

    120 Stat. 2600 (Oct. 17, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3a

    § 948a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3a

    § 950p . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3a

    § 950v(b)(24) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3a

    § 950v(b)(26) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4a

    § 950v(b)(27) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4a

    § 950v(b)(28) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4a

Military Commissions Act of 2009, Pub. L. No. 111-84, div. A, tit. XVIII,

    123 Stat. 2574 (Oct. 28, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5a

    § 950p(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5a

    § 950t(26) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5a

    § 950t(27) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5a

    § 950t(29) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5a

Uniform Code of Military Justice:

    10 U.S.C. § 904 (Art. 104, UCMJ ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7a

10 U.S.C. § 906 (Art. 106, UCMJ ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7a

Title 18 U.S. Code:

18 U.S.C. § 2441(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8a

18 U.S.C. § 2441(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8a

18 U.S.C. § 2441(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8a

**Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (Oct. 17, 2006)**

### § 948a. Definitions

In this chapter:

(1) UNLAWFUL ENEMY COMBATANT.-(A) The term "unlawful enemy combatant" means-

(i) a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces); or

(ii) a person who, before, on, or after the date of the enactment of the Military Commissions Act of 2006, has been determined to be an unlawful enemy combatant by a Combatant Status Review Tribunal or another competent tribunal established under the authority of the President or the Secretary of Defense.

### § 950p. Statement of substantive offenses

(a) PURPOSE.-The provisions of this subchapter codify offenses that have traditionally been triable by military commissions. This chapter does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission.

(b) EFFECT.-Because the provisions of this subchapter (including provisions that incorporate definitions in other provisions of law) are declarative of existing law, they do not preclude trial for crimes that occurred before the date of the enactment of this chapter.

### § 950v. Crimes triable by military commissions

. . .

(b) OFFENSES.-The following offenses shall be triable by military commission under this chapter at any time without limitation:

. . .

(24) TERRORISM.-Any person subject to this chapter who intentionally kills or inflicts great bodily harm on one or more protected persons, or intentionally engages in an act that evinces a wanton disregard for human life, in a manner calculated to influence or affect the conduct of government or civilian population

by intimidation or coercion, or to retaliate against government conduct, shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

. . .

(26) WRONGFULLY AIDING THE ENEMY.-Any person subject to this chapter who, in breach of an allegiance or duty to the United States, knowingly and intentionally aids an enemy of the United States, or one of the co-belligerents of the enemy, shall be punished as a military commission under this chapter may direct.

(27) SPYING.-Any person subject to this chapter who with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign power, collects or attempts to collect information by clandestine means or while acting under false pretenses, for the purpose of conveying such information to an enemy of the United States, or one of the co-belligerents of the enemy, shall be punished by death or such other punishment as a military commission under this chapter may direct.

(28) CONSPIRACY.-Any person subject to this chapter who conspires to commit one or more substantive offenses triable by military commission under this chapter, and who knowingly does any overt act to effect the object of the conspiracy, shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

**Military Commissions Act of 2009, Pub. L. No. 111-84, div. A, tit. XVIII, 123 Stat. 2574 (Oct. 28, 2009)**

**§ 950p. Definitions; construction of certain offenses; common circumstances**

. . .

(d) EFFECT.-The provisions of this subchapter codify offenses that have traditionally been triable by military commission. This chapter does not establish new crimes that did not exist before the date of the enactment of this subchapter, as amended by the National Defense Authorization Act for Fiscal Year 2010, but rather codifies those crimes for trial by military commission. Because the provisions of this subchapter codify offenses that have traditionally been triable under the law of war or otherwise triable by military commission, this subchapter does not preclude trial for offenses that occurred before the date of the enactment of this subchapter, as so amended.

**§ 950t. Crimes triable by military commission**

The following offenses shall be triable by military commission under this chapter at any time without limitation:

. . .

(26) WRONGFULLY AIDING THE ENEMY.-Any person subject to this chapter who, in breach of an allegiance or duty to the United States, knowingly and intentionally aids an enemy of the United States, or one of the co-belligerents of the enemy, shall be punished as a military commission under this chapter may direct.

(27) SPYING.-Any person subject to this chapter who, in violation of the law of war and with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign power, collects or attempts to collect information by clandestine means or while acting under false pretenses, for the purpose of conveying such information to an enemy of the United States, or one of the co-belligerents of the enemy, shall be punished by death or such other punishment as a military commission under this chapter may direct.

. . .

(29) CONSPIRACY.-Any person subject to this chapter who conspires to commit one or more substantive offenses triable by military commission under this subchapter, and who knowingly does any overt act to effect the object of the conspiracy, shall be punished, if death results to one or more of the victims, by

death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

**Uniform Code of Military Justice:**

**10 U.S.C. § 904. Art. 104.**

**§ 904. Art. 104. Aiding the enemy**

Any person who-
   (1) aids, or attempts to aid, the enemy with arms, ammunition, supplies, money, or other things; or
   (2) without proper authority, knowingly harbors or protects or gives intelligence to, or communicates or corresponds with or holds any intercourse with the enemy, either directly or indirectly;
shall suffer death or such other punishment as a court-martial or military commission may direct.  This section does not apply to a military commission established under chapter 47A of this title.

**10 U.S.C. § 906. Art. 106.**

**§ 906. Art. 106. Spies**

Any person who in time of war is found lurking as a spy or acting as a spy in or about any place, vessel, or aircraft, within the control or jurisdiction of any of the armed forces, or in or about any shipyard, any manufacturing or industrial plant, or any other place or institution engaged in work in aid of the prosecution of the war by the United States, or elsewhere, shall be tried by a general court-martial or by a military commission and on conviction shall be punished by death. This section does not apply to a military commission established under chapter 47A of this title.

7a

**Title 18 U.S. Code:**

**18 U.S.C. § 2441**

(a) OFFENSE.-Whoever, whether inside or outside the United States, commits a war crime, in any of the circumstances described in subsection (b), shall be fined under this title or imprisoned for life or any term of years, or both, and if death results to the victim, shall also be subject to the penalty of death.

(b) CIRCUMSTANCES.-The circumstances referred to in subsection (a) are that the person committing such war crime or the victim of such war crime is a member of the Armed Forces of the United States or a national of the United States (as defined in section 101 of the Immigration and Nationality Act).

(c) DEFINITION.-As used in this section the term "war crime" means any conduct-

(1) defined as a grave breach in any of the international conventions signed at Geneva 12 August 1949, or any protocol to such convention to which the United States is a party.