No. 11-1324

ORAL ARGUMENT SCHEDULED FOR OCT. 22, 2014

_____

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

ALI HAMZA AHMAD SULIMAN AL BAHLUL,

*Petitioner,*

v.

UNITED STATES OF AMERICA,

*Respondent*

**On Petition for Review from the United States Court
of Military Commission Review**

_____

BRIEF OF *AMICI CURIAE*
FORMER GOVERNMENT OFFICIALS, FORMER MILITARY LAWYERS,
AND SCHOLARS OF NATIONAL SECURITY LAW
IN SUPPORT OF RESPONDENT
_____

Peter Margulies
Professor of Law
Roger Williams University School of Law
10 Metacom Avenue
Bristol, RI 02809
Telephone: (401)254-4564
pmargulies@rwu.edu

James A. Schoettler, Jr.
*Attorney of Record*
Adjunct Professor
Georgetown University Law Center
600 New Jersey Avenue, NW
Washington, D.C. 20001
Telephone: (240)893-0688
jas288@law.georgetown.edu

Counsel for A*mici Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES ............................................................... iii

GLOSSARY OF ABBREVIATIONS ................................................ vii

INTERESTS OF THE AMICI CURIAE..............................................1

SUMMARY OF ARGUMENT ............................................................3

ARGUMENT ......................................................................................6

I.    ARTICLE I PERMITS CONGRESS TO PROSPECTIVELY
      ESTABLISH MILITARY COMMISSIONS TO TRY ACTS BY
      BELLIGERENTS THAT "THWART OR IMPEDE" THE UNITED
      STATES' MILITARY EFFORT ................................................6

II.   THE "LAW OF NATIONS" CONTEMPLATES THAT OFFENSES
      AGAINST THE LAWS AND CUSTOMS OF WAR WILL INCLUDE
      OFFENSES THAT ARE NOT VIOLATIONS OF INTERNATIONAL
      LAW .................................................................................14

III.  THE DEFINE AND PUNISH CLAUSE SUPPORTS THE
      JURISDICTION OF THE MILITARY COMMISSION IN THE
      INSTANT CASE, BECAUSE DEFENDANT'S CONDUCT WAS
      SUBSTANTIALLY CONGRUENT WITH RECOGNIZED
      VIOLATIONS OF INTERNATIONAL LAW ...........................19

APPENDIX ......................................................................................29

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)(C)....................39

CERTIFICATE OF SERVICE ..........................................................40

ii

# TABLE OF AUTHORITIES[1]

**Cases**

*Al Bahlul v. United States*, 2014 U.S. App. Lexis 13287 (D.C. Cir. July 14, 2014) ........................................................................ 3, 8, 19, 21, 23, 24, 25

*Colepaugh v. Looney*, 235 F.2d 429 (10th Cir. 1956) ..............................................26

*Ex Parte Quirin*, 317 U.S. 1 (1942) .......................................................... 2, 3, 7, 8

*Hamdan v. United States*, 696 F.3d 1238 (D.C. Cir. 2012) ....................................10

*Lichter v. United States*, 334 U.S. 742 (1948) .........................................................10

*One Indus., LLC v. Jim O'Neal Distrib.*, 578 F.3d 1154, 1166 n. 5 (9th Cir. 2009), *cert. denied sub nom. Jim O'Neal Distrib. v. One Indus.*, 130 S. Ct. 1739 (2010) ........................................................................................................22

*Prosecutor v. Brdanin*, Case No. IT-99-36-A, Appeals Chamber Judgment, ¶ 418 (Int'l Crim. Trib. for the Former Yugoslavia Apr. 3, 2007) ...........................6, 24

*Prosecutor v. Tadic*, Case No. IT-94-1-A, Appeals Chamber Judgment, ¶ 199 (Int'l Crim. Trib. for the Former Yugoslavia July 15, 1999 ....................................6, 25

*United States v. Arjona*, 120 U.S. 479 (1887) ....................................................4, 21

*United States v. Bauerbach*, 55 M.J. 501, 504-05 (Army Ct. Crim. App. 2001) ....26

*United States v. Cotton*, 535 U.S. 625, 633 (2002) ................................................23

*United States v. Smith*, 18 U.S. 153 (1820) ............................................................20

---

[1] Authorities upon which *amici* chiefly rely are denoted with asterisks (*).

**Statutes**

10 U.S.C. § 818 ................................................................................17

10 U.S.C. § 821 ................................................................................17

*10 U.S.C. § 906 ..............................................................................12

10 U.S.C. 950f(d) (2014) ..................................................................26

18 U.S.C. § 2332(b) ..........................................................................22

Military Commissions Act of 2006 (MCA 2006). P.L. 109-366 (Oct. 17, 2006). vii

**Other Authorities**

Chris Jenks, *Notice Otherwise Given: Will in Absentia Trials at the Special Tribunal for Lebanon Violate Human Rights?*, 33 Fordham Int'l L.J. 57 (2009).1

Eric Talbot Jensen, *Cyber Warfare and Precautions Against the Effects of Attacks*, 88 Tex. L. Rev. 1533 (2010)...........................................................1, 2

Geoffrey Corn & Eric Talbot Jensen, *Transnational Armed Conflict: A "Principled" Approach to the Regulation of Counter-Terror Combat Operations*, 42 Israel L. Rev. 46 (2009) ..............................................1

Gerhard von Glahn, *Law Among Nations* 703 (7th ed. 1996) .................15

*Instructions for the Government of the United States in the Field, Gen. Order No. 100 (1863) (Lieber Code), *reprinted in* 2 F. Lieber, *Miscellaneous Writings*, 245, 249, 251, 265-266, ¶¶ 13, 19, 101 and 103 (1881).....................................16

iv

*John C. Dehn, *The Hamdan Case and the Application of a Municipal Offence: The Common Law Origins of 'Murder in Violation of the Law of War'*, 7 J. Int'l Crim. Justice 63 (2009) ..................................................................................11

Letter from Herbert Wechsler, Assistant Attorney General, to the Attorney General of the United States, at 4 (Dec. 29, 1944), available at https://docs.google.com/file/d/0B_PclSuEzVCVVURMZE1XYWVUQm8/edit ..................................................................................................................24

Peter Margulies, *Defining, Punishing, and Membership in the Community of Nations: Charging Material Support and Conspiracy in Military Commissions*, 36 Fordham Int'l L.J. 1, 24-28 (2013) ..................................................19

Peter Margulies, *Sur-Reply to Heller on Bahlul* (July 30, 2013), available at http:///www.lawfareblog.com/2013/07/sur-reply-to-heller-on-al-bahlul ............26

*Richard R. Baxter, *So-Called 'Unprivileged Belligerency': Spies, Guerrillas, and Saboteurs*, 28 Brit. Y.B. Int'l L. 328 (1951)................................................. 11, 15

Rome Statute of the International Criminal Court, art. 8, 21 U.N.T.S. 90...............4

*The Federalist No. 37* (James Madison), at 228 (Clinton Rossiter ed., 1961) ........20

*The Federalist No. 42* (James Madison), at 266 (Clinton Rossiter ed. 1961) ..........4

Thomas H. Lee & David L. Sloss, *International Law an Interpretive Tool in the Supreme Court, 1861-1900*, in INTERNATIONAL LAW IN THE U.S. SUPREME COURT: CONTINUITY AND CHANGE 124, 147-48 (David L. Sloss, Michael D. Ramsey & William S. Dodge eds., 2011) ..............................21

*U.S. Army, Field Manual 27-10, *Law of Land Warfare* ¶77 (1956). ............. 11, 17

*U.S. Constitution, Art. I, § 8 ....................................................................7

*U.S. Constitution, Art. I, § 8, cl. 10 .........................................................7

*U.S. Constitution, Art. I, § 8, cl. 11 .........................................................7

*U.S. Constitution, Art. I, § 8, cl. 14 .........................................................7

*U.S. Constitution, Art. I, § 8, cl. 18 .......................................................................7

*United States v. Hamdan*, Record of Trial, Appellate Exhibit 211—Ruling on Motion to Dismiss Conspiracy (Jun. 1, 2008) ....................................................25

*United States v. Omar Khadr,* Record of Trial, Appellate Exhibit 81—Defense Motion to Strike Surplus Language from Charge III (Jan. 11, 2008) ................25

*Yoram Dinstein, *The Conduct of Hostilities under the Law of International Armed Conflict*, §§ 86-93 (2nd ed. 2010)...................................................... 15, 21

## Treatises

3 EMMERICH DE VATTEL, THE LAW OF NATIONS OR THE PRINCIPLES OF NATURAL LAW ch. 8, para. 137 (1758),...................................................19

Charles Evans Hughes, *War Powers Under the Constitution*, 42 A.B.A. Rep. 232 (1917) ......................................................................................................................10

Jimmy Gurule & Geoffrey S. Corn, *Principles of Counter-Terrorism Law* (2011)..2

*Lassa Oppenheim, 2 *International Law: Disputes, War & Neutrality* § 254, at 456-457 (H. Lauterpacht ed., 5th. ed. 1937).......................................................15

*Lassa Oppenheim, *2 International Law: Disputes, War and Neutrality* § 254, at 454 (H. Lauterpacht ed., Rev'd 6th ed. 1944)......................................................15

*Legal Issues in the Struggle Against Terrorism* (Carolina Academic Press 2010) .37

Stephen Dycus, William C. Banks & Peter Raven-Hansen, *Counterterrorism Law* (2d ed. 2012) ........................................................................................................2

Thomas Erskine Holland, *The Laws of War on Land* (1908)..................................17

William C. Banks & Peter Raven-Hansen, *National Security Law and the Power of the Purse* (1994)....................................................................................................2

*William Winthrop, *Military Law and Precedents* (2d. ed. 1920).....................8, 16

## GLOSSARY OF ABBREVIATIONS

FM                          Field Manual

JCE                         Joint Criminal Enterprise

MCA

                            Military Commissions Act of 2006

## INTERESTS OF THE AMICI CURIAE[2]

*Amici curiae* Former Government Officials, Military Lawyers and Scholars of National Security Law, who respectfully submit this brief in support of Respondent, have focused their practice, teaching, and scholarship on harmonizing security needs and procedural safeguards in national security law and the law of armed conflict.  Based on that experience, *amici* submit a brief that provides a narrowly tailored basis for rejecting the Article I challenge to the conspiracy conviction below.

Several members of the group, including Geoffrey S. Corn, Chris Jenks, and Eric Talbot Jensen, have had long and distinguished careers as military lawyers, serving as prosecutors and defense counsel in proceedings under the Uniform Code of Military Justice and as senior advisors on compliance with international law. Most members of the group are now scholars and teachers of national security law and the law of armed conflict, between them writing scores of law review articles[3]

---

[2] The parties have consented to filing of this brief.  Pursuant to Fed. R. App. P. 29(c)(5), counsel for *amici* certify that they authored this brief and that no person or entity other than *amici* or their counsel made a monetary contribution to the preparation or submission of the brief.

[3] *See, e.g.,* Geoffrey Corn & Eric Talbot Jensen, *Transnational Armed Conflict: A "Principled" Approach to the Regulation of Counter-Terror Combat Operations*, 42 Israel L. Rev. 46, 66 (2009); Chris Jenks, *Notice Otherwise Given: Will in Absentia Trials at the Special Tribunal for Lebanon Violate Human*

and several books, including casebooks used to educate future lawyers who serve in the armed forces of the United States or otherwise practice in the national security field.[4]  Members of the group have also served in the federal government, including positions in the State Department and the Federal Bureau of Investigation.  The experience of *amici* has proven the value of the United States' adherence to international law.

The group's collective experience teaches that Congress's broad Article I war powers allow it to prospectively establish commission jurisdiction over acts of unlawful belligerents that "thwart or impede our military effort," *Ex Parte Quirin*,

---

*Rights?*, 33 Fordham Int'l L.J. 57 (2009); Eric Talbot Jensen, *Cyber Warfare and Precautions Against the Effects of Attacks*, 88 Tex. L. Rev. 1533 (2010); Michael A. Newton, *Exceptional Engagement: Protocol I and a World United Against Terrorism*, 45 Tex. Int'l L.J. 323 (2009).

[4] For casebooks, *see* Geoffrey S. Corn, Victor M. Hansen, Richard Jackson, M. Christopher Jenks, Eric Talbot Jensen  & James A. Schoettler, Jr., *The Law of Armed Conflict: An Operational Approach* (2012); Stephen Dycus, Arthur C. Berney, William C. Banks & Peter Raven-Hansen, *National Security Law* (5th ed. 2011); Stephen Dycus, William C. Banks & Peter Raven-Hansen, *Counterterrorism Law* (2d ed. 2012).  For other books, *see* William C. Banks & Peter Raven-Hansen, *National Security Law and the Power of the Purse* (1994); Jimmy Gurule & Geoffrey S. Corn, *Principles of Counter-Terrorism Law* (2011); Geoffrey S. Corn, Victor M. Hansen, Dick Jackson, Eric Talbot Jensen, Michael W. Lewis & James A. Schoettler, Jr., *The War on Terror and the Laws of War: A Military Perspective* (2009); Michael Newton & Larry May, *Proportionality in International Law* (2014).

317 U.S. 1, 28 (1942) including stand-alone conspiracy to murder civilians.  *Amici* further argue that this Court can decide the case on narrower grounds based on Congress's authority under the Define and Punish Clause, which empowers Congress to define and punish violations of the law of nations.  "[E]ssentially uncontroverted" evidence and the findings of members of the military commission established that defendant's conduct entailed assistance to the completed murder of civilians on September 11, 2001.  *Al Bahlul v. United States*, 2014 U.S. App. Lexis 13287, at 51-52 (D.C. Cir. July 14, 2014).  Defendant's conduct was thus substantially congruent with conspiracy as an internationally recognized mode of liability for a completed war crime.

## SUMMARY OF ARGUMENT

A legislative grant of jurisdiction to military commissions is integral to the President's "power to wage war" pursuant to Congress's authorization of hostilities under Article I.  *Ex Parte Quirin*, 317 U.S. 1, 26 (1942).  In its rehearing en banc in the instant case, this Court assumed that Congress's power is limited by the Ex Post Facto Clause and, applying a plain error standard, this Court found that defendant's conviction did not violate that provision.  *Al Bahlul v. United States*, 2014 U.S. App. Lexis 13287, at 40-67 (D.C. Cir. July 14, 2014) .  Assuming

3

consistency with the Ex Post Facto Clause, courts should accord Congress a measure of deference in setting military commission jurisdiction over belligerent acts that "thwart or impede" the conduct of hostilities by forces of the United States. *Ex Parte Quirin*, 317 U.S. at 28.

Congress's power certainly includes the ability to establish jurisdiction over acts, such as spying and unlawful belligerency, that international law has long permitted states to punish by military tribunal under their municipal law, and which the United States has historically subjected to trial by military commission. In addition, Congress's selection of military commissions as a forum to try charges based on *agreements* to murder civilians is reasonably related to deterrence of the completed murder of civilians, which is an acknowledged war crime under international law. Rome Statute of the International Criminal Court, art. 8, 21 U.N.T.S. 90.

The Framers recognized that the need for uniformity in the United States' views of international law made it "in every respect necessary and proper" to accord Congress a measure of deference in prospectively determining international law's contours. *See The Federalist No. 42* (James Madison), at 266 (Clinton Rossiter ed. 1961). In *United States v. Arjona*, 120 U.S. 479 (1887), the Supreme Court accorded Congress a measure of deference in determining that international

4

counterfeiting was punishable, because of its threat to the international commercial system, even absent any proof that treaties, tribunals, or scholars viewed international counterfeiting as a violation of international law. Similarly, Congress could rationally determine that agreements to murder civilians during wartime are punishable because waiting for a completed crime needlessly puts civilians at risk and hinders U.S. military efforts, two concerns which are at the core of the law of war.

Congress's exercise of its Article 1 "define and punish" power to include an offense that is not a violation of international law as defined by the international community is consistent with the traditional view of the law of war jurisdiction of military tribunals. International law has long recognized the right of nations to use military tribunals to try and punish, as war crimes, war-related offenses such as spying and unlawful participation in hostilities that are not violations of international law. Given this background, Congress rationally could conclude that its "define and punish" power is not limited to international law crimes.

Moreover, jurisdiction over the conduct of the defendant fits Congress's Article I power to "define and punish… Offences against the Law of Nations," U.S. Const. art. I, § 8, cl. 10, since "essentially uncontroverted" evidence linked the defendant's actions to a completed international war crime: the September 11

attacks.  *See Al Bahlul*, 2014 U.S. App. Lexis 13287, at *51-*52.  While the petitioner was convicted of stand-alone conspiracy, the evidence, findings of the members of the military commission, and statements of the defendant as his own counsel all demonstrate the defendant's willing participation in a plot to kill U.S. civilians.  *Id*. at *52 (noting that al Bahlul's conduct, including administering Al Qaeda *bayat* or loyalty oath to key 9/11 figures Mohamed Atta and Ziad Jarrah, "directly relate[d]" to the 9/11 attacks). Under international law, conspiracy as a form of liability for a completed war crime need only entail the defendant's acting as a "cog in the wheel" of preparations for the crime, and need not entail specific advance knowledge of the particular act.  *Prosecutor v. Tadic*, Case No. IT-94-1-A, Appeals Chamber Judgment, ¶ 199 (Int'l Crim. Trib. for the Former Yugoslavia July 15, 1999; *Prosecutor v. Brdanin*, Case No. IT-99-36-A, Appeals Chamber Judgment, ¶ 418 (Int'l Crim. Trib. for the Former Yugoslavia Apr. 3, 2007).  The accountability imposed on the defendant's conduct by members of the military commission was thus entirely consistent with international law.


**ARGUMENT**

**I.   ARTICLE I PERMITS CONGRESS TO PROSPECTIVELY ESTABLISH MILITARY COMMISSIONS TO TRY ACTS BY**

## BELLIGERENTS THAT "THWART OR IMPEDE" THE UNITED STATES' MILITARY EFFORT

Congressional authorization of military commissions is one component of the sovereign "power to wage war." *Ex Parte Quirin*, 317 U.S. at 26 (1942). Congress's war powers are broad. Congress can,

- o "Provide for the Common Defence" U.S. Const. art. I, § 8.

- o "[M]ake Rules for the Government and Regulation of the land and naval forces," *Id*., cl. 14.

- o "[D]eclare War… and make Rules concerning Captures on Land and Water," *Id*., cl. 11, and,

- o "[D]efine and punish… Offences against the Law of Nations." *Id*., cl. 10.

Further, Congress may enact "all Laws which shall be necessary and proper" for executing these powers. Id., cl. 18.

In his classic treatise, *Military Law and Precedents*, Winthrop noted that Congress's authority stems from "those provisions of the Constitution which empower Congress to 'declare war' and 'raise armies,' and… authorize the employment of all necessary and proper agencies for… [war's] due prosecution." William Winthrop, *Military Law and Precedents* 831 (2d. ed. 1920).  As the

7

Supreme Court said in *Ex Parte Quirin*, "[a]n important incident to the conduct of war is the adoption of measures… to seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military effort have violated the law of war."  317 U.S. at 28.

To deter attempts to "thwart or impede [the United States']… military effort," Congress's Article I powers encompass establishment of military commissions that will try and punish opposing belligerents.  To comply with Article I, a congressional grant of jurisdiction to military commissions, like the grant upheld by the Supreme Court in *Ex Parte Quirin,* should be reasonably related to the conduct of war by the United States.[5]

––––––––––––––––––

[5] A grant of jurisdiction should also be consistent with other constitutional provisions, including the Ex Post Facto Clause and Article III.  In its en banc rehearing of the case at bar, this Court held that defendant's conviction did not violate the Ex Post Facto Clause.  *Al Bahlul v. United States*, 2014 U.S. App. Lexis 13287, at 41-67 (D.C. Cir. July 14, 2014).  Article III also presents no obstacle to jurisdiction here.  Military commissions without a jury are an appropriate forum for adjudication of a belligerent's alleged crimes, even when U.S. civilian courts are open.  *Ex Parte Quirin*, 317 U.S. at 44-45.  The defendant by his own admission was a ready, willing, and eager belligerent in Al Qaeda's armed conflict with the United States.  *See* Government's Supplemental App. at 11 (defendant's avowal to military commission that "what I did and… I'm doing right now, is to kill Americans – to fight… America").  His military commission proceeding is thus consistent with Article III.

Congress's grant of military commission jurisdiction to try conspiracy to commit war crimes such as the murder of civilians is reasonably related to both the United States' effective prosecution of its armed conflict with Al Qaeda and the deterrence of an acknowledged international war crime.  Treaties clearly identify the murder of civilians as a war crime.  *See* Art. 8(2)(a)(i), Rome Statute of the International Criminal Court (ICC), 2187 U.N.T.S. 90 (Jul. 17, 1998).  Congress, in the exercise of its war powers, has the discretion to determine that agreements among belligerents to murder innocents in the United States pose an unacceptable risk to U.S. civilians or are reasonably likely to "thwart or impede" the military efforts of the United States.

Under Article I, Congress's discretion should not hinge on whether the conspiracy ultimately led to the murder of civilians, as international tribunals would require.  Congress should be entitled to authorize trial in a military commission of an agreement to murder U.S. civilians by unlawful belligerents.  In the exercise of its war powers, Congress may find that waiting for a completed act of murder by opposing belligerents whom it cannot directly control would pose an unacceptable risk.  Pursuant to its war powers, Congress may determine that the military commission trial of opposing belligerents for conspiracy will allow the U.S. government to both deter acts that violate the law of war and hold wrongdoers

9

accountable.

In order to exercise its "power to wage war successfully," *Lichter v. United States*, 334 U.S. 742, 767 n. 9 (1948), *citing* Charles Evans Hughes, *War Powers Under the Constitution*, 42 A.B.A. Rep. 232, 238 (1917), Congress must be able to prescribe uniform substantive rules for each of the domains in which military commissions can operate: occupation of another state's sovereign territory, martial law, and the law of war. *See Hamdan v. United States*, 696 F.3d 1238, 1246 n. 6 (D.C. Cir. 2012) (Kavanaugh, J., writing for himself). Any difference in Congress's ability to prescribe such rules creates gaps that enemies can exploit. An adversary subject as a matter of constitutional law to more lenient prospective rules in one domain has an incentive to target that domain with conduct that would "thwart or impede" the United States' war effort.

While Congress is clearly empowered to subject criminal violations of international law to trial by military commission, it has a long historical practice of subjecting other violations of the laws and customs of war such as spying and unlawful belligerency to trial by military commission. International law in these cases countenances the municipal trial of these type of offenses by civil or military commission trial, even if not a violation of international law. Consider the case of

10

espionage in wartime.  Spying is not a violation of international law.  As the U.S. Army's authoritative Field Manual on the Law of Land Warfare states: "Spies are punished, not as violators of the laws of war, but to render that method of obtaining information as dangerous, difficult, and ineffective as possible."  U.S. Army, Field Manual 27-10, *Law of Land Warfare* ¶77 (1956).  *See also* Richard R. Baxter, *So-Called 'Unprivileged Belligerency': Spies, Guerillas, and Saboteurs*, 28 Brit. Y.B. Int'l L. 328-29 (1951) (expressing skepticism that espionage is violation of law of nations and noting that international law countenances trial of unlawful belligerency by municipal military commission); *cf.* John C. Dehn, *The Hamdan Case and the Application of a Municipal Offence: The Common Law Origins of 'Murder in Violation of the Law of War'*, 7 J. Int'l Crim. Justice 63, 73-79 (2009) (analyzing Baxter's view).  If one accepts petitioner's argument, Congress can only constitutionally designate wartime espionage for trial by military commission in two narrow compartments: foreign territory occupied by United States forces or territory subject to martial law.  That leaves a substantial quantum of cases where even Congress's prospective designation of wartime espionage as an offense triable in a military commission would be unconstitutional unless international law affirmatively provided for such trials.

Despite petitioner's argument that commission jurisdiction is limited to

11

violations of international law, Congress has consistently granted jurisdiction over wartime spying to military commissions, without qualification.  In Section 106 of the Uniform Code of Military Justice, Congress has provided:

> Any person who in time of war is found lurking as a spy or acting as a spy in or about any place, vessel, or aircraft, within the control or jurisdiction of any of the armed forces… shall be tried by a general court-martial or by a military commission and on conviction shall be punished by death.

10 U.S.C. § 906.

In so doing, Congress might reasonably believe that spying by a belligerent requires a trial by military commission because of the potential of the offense to deprive U.S. forces of the crucial element of surprise or otherwise undermine the United States' strategic and tactical objectives.  Moreover, Congress could find that other alternatives, such as a prosecution in a civilian court, could disrupt the "military effort" of the United States by requiring transportation of the defendant to the United States for trial.  The civilian trial option could increase security concerns in the U.S. homeland (such as the potential for escape), and heighten the risk of disclosure of sensitive military information.[6]     Petitioner's grudging

---

[6] Unlike trial in a civilian court, trial by military commission does not require that proceedings be conducted in the United States, thereby allowing the

approach to Article I would hamstring Congress's power to address these concerns.[7]   Judicial deference to Congress's determination is particularly appropriate given the deference courts have traditionally accorded to joint action by Congress and the President in wartime.   Illustrating the importance of this deference, no court has struck down on Article I grounds a congressional grant of jurisdiction to military commissions.   This Court should not venture onto that uncharted territory.

---

U.S. government to hold its enemies outside the U.S. homeland while trying them for acts that the Congress has determined are offenses against the law of war.

   [7] As the Supreme Court has held, the historical pedigree of military commission adjudication of charges of wartime spying demonstrates that such proceedings are not "trials" within the meaning of Article III and the Fifth and Sixth Amendments.  *See Ex Parte Quirin*, 317 U.S. at 39 (explaining that military commissions "are not courts in the sense of the Judiciary Article").  In *Ex Parte Quirin*, the Court indicated that military commission proceedings on unlawful belligerent acts are also not "trials" in this sense.  *Id*. at 41 (holding that no express textual exception to Article III is necessary "in order to continue the practice of trying [conduct based on lawful belligerency]…before military tribunals without a jury").  *Ex Parte Quirin* also relied on the long-standing recognition in international law of a state's ability to subject unlawful belligerents to adjudication by municipal military commission.  *Id*. at 30-31 (noting that "the law of war draws a distinction… between those who are lawful and unlawful combatants").

13

## II.  THE "LAW OF NATIONS" CONTEMPLATES THAT OFFENSES AGAINST THE LAWS AND CUSTOMS OF WAR WILL INCLUDE OFFENSES THAT ARE NOT VIOLATIONS OF INTERNATIONAL LAW

International law does not limit the offenses that can be punished under the law of war to international law violations.  For example, an individual who engages in hostilities in an armed conflict against a State without being part of another State's regular or irregular armed forces has long been subject to punishment if captured by the State against which he committed belligerent acts. His liability to punishment derives from the lack of compliance with international standards for lawful belligerency but his crime is not an international one.  Rather he is subject to prosecution by the State he attacked as a matter of its domestic law. Yet his actions are considered a violation of the law of war.

These principles are explained in some detail in Oppenheim's treatise on international law:

> Since International Law is a law between States only and exclusively, no rules of International Law can exist to prohibit private individuals from taking up arms, and committing hostilities against the enemy. But private individuals committing such acts do not enjoy the privileges of members of armed forces, and the enemy has, according to a customary rule of International Law, the right to consider, and punish, such individuals as war criminals. Hostilities in arms committed by private individuals are war crimes, not because they really are violations of recognized rules regarding warfare, because

14

they enemy has the right to consider and punish them as acts of illegitimate warfare.

Lassa Oppenheim, 2 *International Law: Disputes, War & Neutrality* § 254, at 456-457 (H. Lauterpacht ed., 5th. ed. 1937).[8]  Baxter makes the same point:

> [T]he spy [is] a belligerent who has failed to meet the conditions established by law for favoured treatment upon capture… his 'punishment' if he fails so to qualify is essentially a matter of domestic law or practice.

Baxter, *So-Called 'Unprivileged Belligerency': Spies, Guerillas, and Saboteurs*, 28 Brit. Y.B. Int'l L. at 338.  *See also* Yoram Dinstein, *The Conduct of Hostilities under the Law of International Armed Conflict*, §§ 86-93 (2nd ed. 2010); Gerhard von Glahn, *Law Among Nations* 703 (7th ed. 1996) ("Private individuals who assert a right to take up arms and commit hostile acts against an enemy … may be treated as war criminals by the enemy.")

---

[8] *See also* Lassa Oppenheim, *2 International Law: Disputes, War and Neutrality* § 254, at 454 (H. Lauterpacht ed., Rev'd 6th ed. 1944) ("Private individuals who take up arms and commit hostilities against the enemy do not enjoy the privilege of the armed forces, and the enemy has, according to a customary rule of International Law, the right to teat such individuals as war criminals.") The Supreme Court in *Ex Parte Quirin* cites to this same section of an edition of the Oppenheim treatise appearing in 1940 in support of its holding that "[u]nlawful combatants are … subject to trial and punishment by military tribunals for acts which render their belligerency unlawful." 317 U.S. at 31.

The United States has consistently defined offenses triable in military commissions under the "laws of war" with reference to international norms as interpreted by the United States. U.S. practice has not been limited to international law violations as defined by the global community. In Article 13 of the Lieber Code, military commissions are expressly described as the military courts that enforce a non-statutory "common law of war" – a body of law that also is referred to in three other provisions of the Code. Instructions for the Government of the United States in the Field, Gen. Order No. 100 (1863) (Lieber Code), *reprinted in* 2 F. Lieber, *Miscellaneous Writings*, 245, 249, 251, 265-266, ¶¶ 13, 19, 101 and 103 (1881). According to Winthrop, "the Law of War *in this country* is not a formal written code, but consists mainly of general rules derived from International Law, supplemented by acts and orders of the military power and a few legislative provisions." *Military Law and Precedents* at 773 (emphasis in original).

The United States has interpreted the "common law of war" to permit military tribunals to try defendants for a range of war-related offenses that are not crimes under international law but which international law recognizes may be prosecuted by military commission as a matter of municipal law. The United States also has adapted its own legal concepts into the enforcement of international norms. Thus, for example, the chapter on war crimes in the Army Field Manual

16

27-10, written in 1956, expressly states that conspiracy to commit war crimes is punishable. FM 27-10, ¶ 500.  The U.S. position is consistent with the discretion that international law grants to individual states to define law of war offenses for their military tribunals.  *See* Thomas Erskine Holland, *The Laws of War on Lan*d 59-60 (1908) ("Individuals offending against the laws of war are liable to such punishment as is prescribed by the military code of the belligerent into whose hands they may fall, or in default of such code, then to such punishment as may be ordered, in accordance with the laws and usages of war, by a military court."); *see also* Yoram Dinstein, *The Conduct of Hostilities under the Law of International Armed Conflict* § 86 (2nd ed. 2010) ("an unlawful combatant… is susceptible to being prosecuted and punished by military tribunals").

Petitioner's narrow approach to Congress's Article I "define and punish" power would inevitably limit the jurisdiction of all military tribunals, including courts martial, over an adversary's conduct.  The law of war jurisdiction of military commissions and courts-martial overlap.  *Compare* Article 18 of the Uniform Code of Military Justice ("UCMJ"), 10 U.S.C. § 818 ("General courts-martial also have jurisdiction to try any person who by the law of war is subject to trial by a military tribunal and may adjudge any punishment permitted by the law of war.") *with* Article 21 of the UCMJ, 10 U.S.C. § 821 ("The provisions of this chapter

17

conferring jurisdiction upon courts-martial do not deprive military commissions…

of concurrent jurisdiction with respect to offenders or offenses that by statute or by

the law of war may be tried by military commissions, provost courts, or other

military tribunals.") A decision to preclude Congress from empowering military

commissions to try war-related offenses that are not recognized by the international

community as violations of international law, such as unlawful participation in

hostilities or conspiracy to commit war crimes, would deprive the United States of

the ability to try such offenses in military courts, which are the only U.S. courts

that sit extraterritorially today,[9] and instead force the President to bring enemy

combatants into the United States for trial in civilian courts in cases where the

crimes involved are not defined by the international community as violations of

international law.  The Framers could not have intended to constrict Congress's

war powers in this fashion.   Such a result is also contrary to Congress'

longstanding practice of subjecting to trial by military tribunal those acts of

illegitimate warfare and other violations of the laws and usages of war that

---

[9] There are no U.S. civilian courts outside the United States at present that could try Petitioner or any other individual charged with crimes or offenses under U.S. law.

18

international law leaves to municipal jurisdiction.

### III. THE DEFINE AND PUNISH CLAUSE SUPPORTS THE JURISDICTION OF THE MILITARY COMMISSION IN THE INSTANT CASE, BECAUSE DEFENDANT'S CONDUCT WAS SUBSTANTIALLY CONGRUENT WITH RECOGNIZED VIOLATIONS OF INTERNATIONAL LAW

The Framers intended that Congress enjoy a measure of deference in the prospective exercise of its authority under the Define and Punish Clause. *Al Bahlul,* 2014 U.S. App. Lexis 13287, at *147-58  (Brown, J., concurring); Peter Margulies, *Defining, Punishing, and Membership in the Community of Nations: Charging Material Support and Conspiracy in Military Commissions*, 36 Fordham Int'l L.J. 1, 24-28 (2013).  While that deference is not unlimited, it encompasses the jurisdiction of a military commission in this case, which adjudicated conduct that was substantially congruent to well-recognized violations of the international law of war.

The Framers were well-acquainted with the work of the European publicist Vattel, who had explained that a state seeking to comply with international law had

19

some leeway to "judge… what her own particular situation authorizes."[10]   Because the Framers also knew that customary international law, which hinges on state practice, is formed through a process of accretion and evolution, they recognized that even the "most enlightened legislators" would fail in precisely demarcating international law's boundaries.[11]   As Justice Story indicated in *United States v. Smith*,[12] the Framers granted *Congress* the power to define offenses against the law of nations because they understood that the law of nations could not be "completely ascertained and defined"[13] in any extant code.   Madison reinforced this view regarding the Define and Punish Clause's treatment of felonies on the high seas.   In The Federalist No. 42, Madison noted that wide variations in the definition of felonies could impair the implementation of the authority that the Constitution conveyed.   "[F]or the sake of certainty and uniformity," Madison

---

[10] 3 EMMERICH DE VATTEL, THE LAW OF NATIONS OR THE PRINCIPLES OF NATURAL LAW ch. 8, para. 137 (1758), available at http://www.lonang.com/exlibris/vattel/vatt-308.htm.

[11] *See The Federalist No. 37* (James Madison), at 228 (Clinton Rossiter ed., 1961) (describing difficulty of "delineating the several objects and limits of different codes of laws… [including] common law… [and] maritime law").

[12] 18 U.S. 153 (1820).

[13] *Id.* at 159.

20

urged, granting to Congress "the power of defining… was in every respect necessary and proper."[14]

Where, as in the instant case in its present posture, a statute complies with the Ex Post Facto Clause, the Supreme Court has typically deferred to Congress's definitions of international law under the Define and Punish Clause. In *United States v. Arjona*,[15] the Court cited the policy benefits of a global system of "wise and equitable commercial laws," *id*. at 484, in upholding Congress's power under the Define and Punish Clause to prohibit the counterfeiting for foreign currencies. The Court asserted that laxity in deterring counterfeiting would have "disturb[ed]… harmony between… governments."[16]  The Court upheld the legislation based on the risk the defendant's *conduct* posed to international cooperation, despite the silence in treaties or state practice on counterfeiting as a violation of international law.[17]

---

[14] The Federalist No. 42, at 266.

[15] 120 U.S. 479 (1887).

[16] *Id*. at 486-87.

[17] *See* Thomas H. Lee & David L. Sloss, *International Law an Interpretive Tool in the Supreme Court, 1861-1900*, in INTERNATIONAL LAW IN THE U.S. SUPREME COURT: CONTINUITY AND CHANGE 124, 147-48 (David L. Sloss, Michael D. Ramsey & William S. Dodge eds., 2011).

As Judge Brown suggested in her concurrence in *al Bahlul*, Congress could surely have found that conduct such as al Bahlul's was a violation of international law analogous to Arjona's. *Al Bahlul*, 2014 U.S. App. Lexis 13287, at 164-70. While al Bahlul's conviction was for stand-alone conspiracy, not conspiracy as a theory of liability for a completed war crime, the evidence and findings in this case rendered the two charges substantially congruent. See *One Indus., LLC v. Jim O'Neal Distrib.*, 578 F.3d 1154, 1166 n. 5 (9th Cir. 2009), *cert. denied sub nom. Jim O'Neal Distrib. v. One Indus.*, 130 S. Ct. 1739 (2010) (affirming district court's granting of summary judgment on state law action for unfair competition on finding that elements of state law claims were "substantially congruent" to federal Lanham Act claims). While conspiracy as a theory of liability requires proof of an additional element, the evidence and findings in the instant case clearly supplied that element.

In its en banc decision in the instant case, this Court articulated a theory analogous to substantial congruency to support its finding that the federal crime of conspiracy to murder U.S. persons overseas, 18 U.S.C. § 2332(b), provided fair warning to al Bahlul under the Ex Post Facto Clause. The majority noted that only two modest elements separated conspiracy as agreement in al Bahlul's commission proceeding from the elements that needed to be proven under the federal criminal

22

statute.  The court further noted that the overt acts pleaded, proved, and found by the members of the military commission in al Bahlul's case tracked those elements. For example, the majority cited the need to show that al Bahlul intended to kill U.S. persons through acts conducted abroad.  The majority then noted that the military commission had specifically found that Bahlul had committed overt acts that "directly relate[d]" to the 9/11 attacks.  *Al Bahlul,* 2014 U.S. App. Lexis 13287, at *52.  Evidence of these elements, the majority found, was "*entirely* uncontroverted" in al Bahlul's case.  *Id*. at 51 (emphasis in original).

A similar congruency exists in the instant case between al Bahlul's overt acts and the elements required under international law to prove conspiracy as a theory of liability for the murder of civilians.  Only one element – a nexus to a completed war crime recognized as such under international law – separated the stand-alone conspiracy charge in al Bahlul's case from conspiracy as a theory of liability.  Evidence that was "essentially uncontroverted" in al Bahlul's case, *id*. at *51, *citing United States v. Cotton*, 535 U.S. 625, 633 (2002), proved that element.

In the instant case, a letter from al Bahlul introduced into evidence acknowledged that the defendant's conduct was related – albeit in a "simple" and "indirect" way – to the 9/11 attacks, which of course entailed the murder of civilians.  *See* Pet. App. I 148.  In the letter, al Bahlul admitted one of the overt

23

acts cited in the charges: administering an al Qaeda loyalty oath to two key participants in the 9/11 plot: Mohamed Atta, the plot's ringleader in the U.S., and Ziad Jarrah, one of the pilots. *Id.* Although al Bahlul did not have advance knowledge of the attacks, evidence also showed that al Bahlul administered the oath with the intent that Atta and Jarrah would kill American civilians. *Id.* at 136. The members of the military commission specifically found that al Bahlul had administered the loyalty oath with this intent. *Id.* at 100, 102, 106. This act, as well as others, led the en banc court in the instant case to find that the defendant had engaged in conduct "directly relate[d]" to the 9/11 attacks. *Al Bahlul v. United State*s, 2014 U.S. App. Lexis 13287, at *52. No one, including the defendant, has questioned whether the 9/11 attacks actually occurred; indeed, the defendant's letter acknowledging his role in the attacks took their occurrence as a given. *Cf.* Letter from Herbert Wechsler, Assistant Attorney General, to the Attorney General of the United States, at 4 (Dec. 29, 1944), available at https://docs.google.com/file/d/0B_PclSuEzVCVVURMZE1XYWVUQm8/edit (noting in the context of the Nuremberg trials that "the fundamental facts with respect to the Nazi program are so notorious… that they are not seriously open to disproof").

24

That finding would also support conviction for the internationally recognized war crime of murder of civilians, based on conspiracy as a theory of liability for a completed act.  Conspiracy as a mode of liability for a *completed* war crime tracks the elements of the Joint Criminal Enterprise (JCE) theory of liability commonly used in the International Criminal Tribunal for the Former Yugoslavia. *See Prosecutor v. Brdanin*, Case No. IT-99-36-A, Appeals Chamber Judgment, ¶¶ 404, 410 (Int'l Crim. Trib. for the Former Yugoslavia Apr. 3, 2007).   Under international law, an individual is guilty of participation in a JCE if he intentionally aids a common plan that results in a completed war crime.  *Prosecutor v. Tadic*, Case No. IT-94-1-A, Appeals Chamber Judgment, ¶ 196 (Int'l Crim. Trib. for the Former Yugoslavia July 15, 1999.  International agreements have prohibited such aid in order to end the impunity that formerly prevailed.  *See* Preamble, Rome Statute, 2187 U.N.T.S. 90.  Culpable aid includes serving as a "cog in the wheel of events leading up to the result which in fact occurred."  *Tadic*, Case No. IT-94-1-A, ¶ 199.  The defendant's admitted administration of the *bayat* to Atta and Jarrah met this standard.[18]

---

[18] The substantial congruence between conspiracy as a form of liability and the evidence here is not diminished by the prosecution's withdrawing of a

In sum, the record of trial in the instant case rendered the conduct supporting

al Bahlul's conviction substantially congruent to conduct that would support

conviction in any international tribunal.[19] Therefore, jurisdiction here is entirely

---

Racketeering Influenced and Corrupt Organizations Act (RICO) "enterprise"
charge that was broader than either JCE or stand-alone conspiracy. While JCE
requires aiding a completed international war crime and stand-alone conspiracy
requires intent to engage in unlawful conduct, the withdrawn RICO-based
enterprise charge merely required proof that the defendant had "joined" a criminal
organization. *See Al Bahlul v. United States*, 2014 U.S. App. Lexis 13287, at *33
n.12 (majority opinion); *see also United States v. Omar Khadr,* Record of Trial,
Appellate Exhibit 81—Defense Motion to Strike Surplus Language from Charge
III (Jan. 11, 2008), at 4 (stating that merely "*joining* an 'enterprise of persons who
shared a common criminal purpose'" does not constitute conspiracy under U.S.
criminal law) (emphasis added); *United States v. Hamdan*, Record of Trial,
Appellate Exhibit 211—Ruling on Motion to Dismiss Conspiracy (Jun. 1, 2008)
(rejecting RICO enterprise theory because Congress "did nothing… to depart from
the traditional construction of conspiracy in enacting the MCA."); *cf.* Peter
Margulies, *Sur-Reply to Heller on Bahlul* (July 30, 2013), available at
http:///www.lawfareblog.com/2013/07/sur-reply-to-heller-on-al-bahlul (discussing
background of withdrawn RICO enterprise charge). Thus, the prosecution's
withdrawal of the RICO charge against al Bahlul does not diminish the viability of
either a JCE charge or the stand-alone conspiracy charge that provided the basis for
the defendant's conviction.

[19] This Court could also remand to the Court of Military Commission
Review (CMCR) to determine whether defendant's conduct was related to the
completed murder of civilians. *See* 10 U.S.C. 950f(d) (2014) ("The Court may
affirm only such findings of guilty, and the sentence or such part or amount of the
sentence, as the Court finds correct in law and fact and determines, on the basis of
the entire record, *should be approved*. In considering the record, the Court may
weigh the evidence, judge the credibility of witnesses, and *determine controverted
questions of fact*, recognizing that the military commission saw and heard the

consistent with Congress's power under the Define and Punish Clause. *Cf.*
*Colepaugh v. Looney*, 235 F.2d 429, 432 (10th Cir. 1956) (noting, in upholding
military commission conviction of Nazi spies apprehended in the United States
during World War II, that conduct "determinative of guilt or innocence" can also
"determine[] military jurisdiction").

---

witnesses."); *United States v. Bauerbach*, 55 M.J. 501, 504-05 (Army Ct. Crim.
App. 2001) (explaining broad appellate responsibilities of military tribunal). In
this phase of the proceedings, the CMCR could consider evidence heard by
members of the military commission, including defendant's admission that he
roomed with Atta and Jarrah in Osama bin Laden's compound and an FBI agent's
testimony that defendant had acted as Atta and Jarrah's minder to keep them on
task. *See* Pet. App. I at 126; *cf.* Government's Supplemental App. 46 (testimony of
FBI agent with experience in Al Qaeda tradecraft that Atta and Jarrah had been
"taken aside because of the sensitivity of the mission" and defendant "was
coordinating their stay" with bin Laden).

27

## CONCLUSION

The convictions should be affirmed.

Dated: September 22, 2014

                                                  Respectfully submitted,

                                                  /s/ James A. Schoettler, Jr.
Peter Margulies                                   James A. Schoettler, Jr.
Professor of Law                                  *Attorney for Amici Curiae*
Roger Williams University School of Law           Adjunct Professor
10 Metacom Avenue                                 Georgetown University Law Center
Bristol, RI 02809                                 600 New Jersey Avenue, NW
Telephone: (401)254-4564                          Washington, D.C. 20001
pmargulies@rwu.edu                                Telephone: (240)893-0688
                                                  jas288@law.georgetown.edu

              Counsel for *Amici Curiae*

28

## APPENDIX

**Kenneth Anderson** is Professor of Law at Washington College of Law, American University, and Visiting Fellow, Hoover Institution on War, Revolution, and Peace, Stanford University.  A contributor to the Opinio Juris and Lawfare blogs, he is the author of several books, including *Living with the U.N.: American Responsibilities and International Order* (2012).  He has also authored numerous law review articles, including publications in the American Journal of International Law, the Chicago Journal of International Law, and the European Journal of International Law.

**Paul R. Baier** is Chief Judge Henry Politz Professor of Law at the Paul M. Hebert Law Center, Louisiana State University.  Professor Baier has argued before the Fifth Circuit Court of Appeals and the Louisiana Supreme Court.  He has written numerous law review articles, including pieces in the Texas, Tulane, and Vanderbilt law reviews, and the op-ed, *The laws of war: Should military tribunal try al Qaeda?*, Wash. Times, March 28, 2006, A23, published the day of the oral argument in *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006).  Prof. Baier is the editor of *Mr. Justice and Mrs. Black: The Memoirs of Justice Hugo L. Black and Elizabeth*

*Black* (1986). He is completing a biography of Colonel Frederick Bernays Wiener, a noted expert in military justice who participated in many cases before the United Supreme Court including *Reid v. Covert*, 354 U.S. 1 (1955); Justice William O. Douglas called Wiener a "twentieth century William Winthrop."

**William C. Banks** is the College of Law Board of Advisors Distinguished Professor at Syracuse University, Professor of Public Administration in Syracuse University's Maxwell School of Citizenship and Public Affairs, and founding director of Syracuse's Institute for National Security and Counterterrorism. He is co-author of two casebooks, 1) *National Security Law* (5th ed. 2011) (with Stephen Dycus, Arthur C. Berney, and Peter Raven-Hansen); and, 2) *Counterterrorism Law* (2d ed. 2012) (with Dycus and Raven-Hansen). He recently edited the Oxford University Press collection, *Counterinsurgency Law: New Directions in Asymmetric Warfare* (2013), and is Editor-in-Chief of the *Journal of National Security Law & Policy*.

**Dru Brenner-Beck** is a legal consultant on international law matters who served as a Judge Advocate in the United States Army, retiring as a Lieutenant Colonel. After retirement, she clerked for the Honorable Carlos F. Lucero on the United

30

States Court of Appeals for the Tenth Circuit. In her last assignment as a Judge Advocate, she served as the Deputy Legal Counsel for the Department of the Army's Inspector General (DAIG), where she participated in the review of inspections on detainee abuse after Abu Ghraib.  Prior assignments included service as the Chief of Military and Civil Law for the U.S. Army Europe, with an area of responsibility covering 93 nations.  She is the author of a chapter, *Trial and Punishment for Battlefield Misconduct*, in the forthcoming second edition of *The War on Terror and the Laws of War: A Military Perspective* (Oxford University Press), and co-author (with Professor Geoffrey Corn) of a chapter, *Viewing Treaties through a Military Lens*, in the forthcoming *Treaties as Law of the Land? Change and Uncertainty in the Domestic Effects of International Agreements* (Cambridge University Press).

**Marion "Spike" Bowman** is currently a Senior Fellow at the George Washington University Homeland Security Policy Institute and a Distinguished Fellow at the University of Virginia Center for National Security Law and Policy.  He formerly served as Deputy General Counsel and Senior Counsel, National Security Law, Federal Bureau of Investigation.  Prior to civilian service, Mr. Bowman served as a captain in the United States Navy.

31

**Geoffrey S. Corn** is a Professor of Law and Presidential Research Professor at South Texas College of Law. He has written many law review articles on national security law and the law of armed conflict, including publications in the Berkeley Journal of International Law (with Chris Jenks), the Texas International Law Journal (with Lieutenant Colonel Gary Corn), and the Vanderbilt Transnational Law Journal (with Professor Laurie Blank). He is also the co-author with Victor Hansen, Richard Jackson, Christopher Jenks, Eric Talbot Jensen and James A. Schoettler, Jr. of *The Law of Armed Conflict: An Operational Approach* (2012). Before entering the professoriat, Professor Corn served as a Judge Advocate General in the United States Army, retiring as a Lieutenant Colonel. In his last position, Professor Corn served as the Army's senior law of war expert in the Office of the Judge Advocate General and Chief of the Law of War Branch in the International Law Division.

**John Dehn** is Assistant Professor of Law at Loyola University Chicago School of Law. He served for fifteen years as an Army Judge Advocate. Prof. Dehn is a member of the Editorial Committee of the Journal of International Criminal Justice. His publications include, *Targeted Killing, Human Rights and*

32

*Ungoverned Spaces: Considering Territorial State Human Rights Obligations*, 54
Harv. Int'l L.J. Online 84 (2013), *The Commander-in-Chief and the Necessities of
War: A Conceptual Framework*, 83 Temple L. Rev. 599 (2011); and *The Hamdan
Case and the Application of a Municipal Offence: The Common Law Origins of
'Murder in Violation of the Law of War'*, 7 J. Int'l Crim. Justice 63 (2009).


**Victor Hansen** is Associate Dean and Professor of Law at New England Law
School.  He has published numerous articles in law reviews, including the Journal
of National Security Law and Policy (with Geoffrey Corn), the North Carolina
Journal of International Law and Commercial Regulation, and the American
Journal of Legal History.  An expert on military justice, he is co-author with David
A. Schlueter, Charles H. Rose and Christopher Behan of *Military Crimes and
Defenses* (2007).  He is also co-author with Geoffrey S. Corn, Richard Jackson,
Christopher Jenks, Eric Talbot Jensen and James A. Schoettler, Jr. of *The Law of
Armed Conflict: An Operational Approach* (2012).  Before joining legal academia,
Professor Hansen spent twenty years in the United States Army, for much of that
time serving as a Judge Advocate.  In his last assignment, Professor Hansen served
as a regional defense counsel for the United States Army Trial Defense Service.

**Christopher Jenks** is Director of the Criminal Justice Clinic and Assistant Professor of Law at SMU Dedman School of Law. Professor Jenks has published articles in an array of law reviews, including the Stanford Law and Policy Review (with Eric Talbot Jensen), the University of Pennsylvania Journal of International Law (with Geoffrey Corn), and the Berkeley Journal of International Law. He is also co-author with Geoffrey S. Corn, Victor M. Hansen, Richard Jackson, Eric Talbot Jensen, and James A. Schoettler, Jr. of *The Law of Armed Conflict: An Operational Approach* (2012). Before entering legal education, Professor Jenks served as a Judge Advocate in the United States Army, stationed in posts from Korea and Iraq to Washington, D.C. His service included working as deputy division chief of the Army's litigation division, attorney adviser at the Department of State, and chief of the International Law Branch of the Office of the Judge Advocate General in the Pentagon.

**Eric Talbot Jensen** is an Associate Professor at Brigham Young University Law School. He has written widely for law reviews on the law of armed conflict, including publications in the Texas, Temple, and Israel Law Reviews and the Virginia Journal of International Law, Vanderbilt Journal of Transnational Law, and Stanford Journal of International Law. He is also co-author with Geoffrey S.

34

Corn, Victor M. Hansen, Richard Jackson, M. Christopher Jenks, and James A. Schoettler, Jr. of *The Law of Armed Conflict: An Operational Approach* (2012). Before entering legal education, Professor Jensen was as a Judge Advocate in the United States Army, including service as the Chief of the Army's International Law Branch.

**Michael W. Lewis** is Professor of Law at Ohio Northern Claude W. Pettit College of Law.  A regular contributor to the Opinio Juris international law blog, Professor Lewis has published widely on national security law and the law of armed conflict, including a chapter in *The War on Terror and the Laws of War: A Military Perspective* (Oxford University Press 2009), and articles in the American Journal of International Law, the Texas International Law Journal, the University of Pennsylvania Law Review PENNumbra, and the Washington and Lee Law Review.  Before joining the ranks of legal educators, Professor Lewis was a fighter pilot in the United States Navy, including an assignment enforcing the no-fly zone over Iraq in the 1990s.

**Michael A. Newton** is Professor of the Practice of Law, Vanderbilt University Law School and formerly was Senior Advisor to the United States Ambassador-at-

35

Large for War Crimes Issues, United States Department of State.  In his work at the State Department, Professor Newton provided support to a number of bodies, including the Sierra Leone Special Court, established to promote accountability for war crimes.  A member of the executive council of the American Society of International Law, Professor Newton has written or co-authored a number of books and scores of op-ed pieces and law review articles, including publications in the Duke Journal of Comparative and International Law, the International Review of the Red Cross, the Netherlands Yearbook of International Law, and the Stanford Journal of International Law.  Prior to service at the State Department, Professor Newton served as a Judge Advocate in the United States Army, where among other duties he organized and led human rights and rules of engagement education for Multinational Forces and International Police deploying into Haiti in 1994.

**Peter Raven-Hansen** is Glen Earl Weston Research Professor of Law, George Washington University, where he is Co-director of the National Security and U.S. Foreign Relations Law Program.  Professor Raven-Hansen is co-author (with Stephen Dycus, Arthur L. Berney & William C. Banks) of *National Security Law* (5th ed. 2011) and co-author (with Dycus and Banks) of *Counterterrorism Law* (2d ed. 2012).  He has written many law review articles, including publications in the

36

American Journal of International Law, the Indiana Law Journal, the Iowa Law Review, and the Texas Law Review.  He also has served as co-counsel for plaintiffs, who are victims of terrorist attacks or the survivors of victims, in lawsuits against alleged financiers of terrorism, including *Linde v. Arab Bank, PLC*, No. 04-cv-2799 (E.D.N.Y.).

**Charles A. Shanor** is Professor of Law at Emory University School of Law.  His publications include, *American Constitutional Law: Structure and Reconstruction* (5th ed., West 2013); *Counterterrorism Law* (Foundation Press 2011); and *Terrorism, Historical Analogies, and Modern Choices*, 24 Emory Int'l L. Rev. 589 (2010).  Professor Shanor served as General Counsel of the U.S. Equal Employment Opportunity Commission, 1987-1990.  He founded and currently serves as co-director of the Emory Law Volunteer Clinic for Veterans.

**Robert F. Turner** is Professor and co-founder and Associate Director, Center for National Security Law, University of Virginia.  Professor Turner, who served three terms as chair of the American Bar Association's Standing Committee on Law and National Security, also formerly served as Principal Deputy and acting Assistant Secretary of State for Legislative and Intergovernmental Affairs; Special Assistant

to the Under Secretary of Defense for Policy; Counsel, President's Intelligence Oversight Board; and Charles H. Stockton Chair of International Law, United States Naval War College.  Before his civilian service, Professor Turner served two tours of duty with the United States Army in Vietnam.  He is the author and/or editor of more than fifteen books and monographs, including (with John Norton Moore) the collection, *Legal Issues in the Struggle Against Terrorism* (Carolina Academic Press 2010), as well as numerous law review articles, including publications in the Harvard Journal of Law and Public Policy, the Journal of National Security Law and Policy, and the Virginia Journal of International Law.

**Rachel VanLandingham** is Assistant Professor of Law at Southwestern Law School.  Before entering legal education, Professor VanLandingham served as a Judge Advocate in the United States Air Force.  She served as chief of International Law and Liaison to the International Committee of the Red Cross at U.S. Central Command, and as Deputy Director of the Department of Law at the U.S. Air Force Academy.  She is the author of the article, *Meaningful Membership: Making War a Bit More Criminal*, 35 Cardozo L. Rev. 79 (2013).

38

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)(C)

I hereby certify, pursuant to Fed. R. App. P. 32(a)(7)(C) and D.C. Circuit Rule 32(a), that the foregoing brief has been prepared in a proportionally spaced 14-point Times New Roman typeface using Microsoft Word 2010 and contains 6,349 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Dated: September 22, 2014

/s/ James A. Schoettler, Jr.

James A. Schoettler, Jr.
Attorney for *Amici Curiae*

39

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of September, 2014, I caused true and correct copies of the foregoing brief of *amici curiae* Former Government Officials, Military Lawyers and Scholars of National Security Law to be served via electronic mail upon all counsel of record, by operation of the Court's ECF system.

/s/ James A. Schoettler, Jr.

James A. Schoettler, Jr.
Attorney for *Amici Curiae*

40