# 11-1324

## United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT
### Docket No. 11-1324

ALI HAMZA SULIMAN AHMAD AL BAHLUL,

*Petitioner,*

*v.*

UNITED STATES,

*Respondent.*

APPEAL FROM
COURT OF MILITARY COMMISSION REVIEW (CMCR-09-001)

## RESPONSE IN OPPOSITION TO PETITION OF THE UNITED STATES FOR REHEARING EN BANC

MAJ Todd E. Pierce,
   JA, U.S. Army (Ret.)
Senior Fellow
Univ. of Minnesota
Human Rights Center
Mondale Hall, N-120
229-19th Avenue South
Minneapolis, MN 55455

Michel Paradis
Mary R. McCormick
1620 Defense Pentagon
Washington, DC 20301-1620
michel.paradis@osd.mil
TEL: 1.703.696.9490 x115
FAX: 1.703.696.9575

*Counsel for Petitioner*

# CONTENTS

**Table of Authorities** ....................................................................... ii

**Glossary of Terms** ......................................................................... iii

**Summary of Argument** ...................................................................1

**Argument** .......................................................................................2

   A.  The Government Grossly Overstates the Impact of the
Majority's Decision and the Breadth of its Holding...............................2

   B.  The Panel Faithfully Applied Binding Precedent...........................7

   C.  Simple Disagreement Between Panel Members Over the
Application of a Rule to a Given Case Does Not Warrant Rehearing
*En Banc*. ......................................................................................12

**Conclusion**.....................................................................................15

**Certificate of Service**...................................................................16

**Attachments**

# TABLE OF AUTHORITIES

*Authorities on which Petitioner principally relies are marked with an ***

## Cases

*\*Bahlul v. United States*, 767 F.3d 1 (D.C. Cir. 2014) (*en banc*)....................... 2, 10

*\*Bartlett v. Bowen*, 824 F.2d 1240 (D.C. Cir. 1987)......................................... 1, 13

*\*Ex parte Quirin*, 317 U.S. 1 (1942) ....................................................... 7, 8, 10, 13

*Al-Bihani v. Obama*, 590 F.3d 866 (D.C. Cir. 2010).............................................2

*Bahlul v. United States ("Bahlul II")*, 2015 WL 3687457
  (D.C. Cir., Jun. 12, 2015) .......................................... 4, 5, 6, 7, 9, 10, 11, 12, 13

*Boumediene v. Bush*, 553 U.S. 723 (2008) ............................................................9

*Callan v. Wilson*, 127 U.S. 540 (1888) ................................................................11

*Carmel v. Texas*, 529 U.S. 513 (2000)...................................................................3

*Cisneros v. Aragon*, 485 F.3d 1226 (10th Cir. 2007) ..........................................3

*Ex parte Milligan*, 4 Wall. 2 (1866)....................................................................11

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ................................................ 9, 10, 14

*In re Murphy*, 17 F.Cas. 1030 (C.C.D.Mo. 1867) ..............................................11

*Marbury v. Madison*, 1 Cranch 137 (1803) ...........................................................9

*Stern v. Marshall*, 131 S.Ct. 2594 (2011)..............................................................9

*United States v. Bahlul*, 820 F.Supp.2d 1141 (U.S.C.M.C.R. 2011) ...................10

## Congressional Materials

10 U.S.C. § 950t...................................................................................................3

Jennifer K. Elsea, CRS Report for Congress, *The Military
  Commissions Act of 2006*, RL33688 (Sept. 27, 2007) ....................................11

Military Commissions Act of 2006, Pub. L. No. 109-366 (2006)..........................3

## Executive Materials

Chief Prosecutor, BG Mark Martins, *Remarks at Guantanamo Bay*
  (Jul. 19, 2015) ...................................................................................................5

Dep't of Defense, *Law of War Manual* (2015)......................................................8

## GLOSSARY OF TERMS

*Bahlul II* ................................................. *Bahlul v. United States*, 2015 WL 3687457
(D.C. Cir., Jun. 12, 2015)

Pet. .......................................................... Petition of the United States for Rehearing
*En Banc*, dated Jul. 27, 2015

Pet.Br. ...........................................................Brief of Petitioner, dated Aug. 13, 2014

## SUMMARY OF ARGUMENT

This Court should deny the government's petition for rehearing *en banc* because it fails to identify a general question of exceptional importance for the full Court to answer. Instead, it recapitulates the merits arguments it made to the panel and presses this Court to assemble *en banc* to re-answer the narrow, case-specific question of whether the Military Commissions Act "violates Article III by authorizing military-commission jurisdiction over conspiracies to commit war crimes by alien unlawful enemy combatants." Pet. at 9.

This question is not worth the full Court's time and resources. The Chief Prosecutor in Guantanamo has long abandoned conspiracy as unnecessary. Most of the government's complaints about systemic harms to the military commission system actually arise from this Court's *en banc* decision on the *Ex Post Facto* Clause, not the panel's decision. And conspiracy's inclusion in the Military Commissions Act has been legally dubious since that law was first enacted. Given that "the institutional cost of rehearing cases *en banc* is extraordinary," *Bartlett v. Bowen*, 824 F.2d 1240, 1243 (D.C. Cir. 1987) (Edwards, J., concurring in the denial of rehearing *en banc*), this Court should not rehear a case *en banc* when the stakes to everyone but the appellant are so low.

## ARGUMENT

### A. The Government Grossly Overstates the Impact of the Majority's Decision and the Breadth of its Holding.

For all of its doom-saying over the consequences of this Court's decision, the government fails to explain with any particularity how this Court has impaired the United States' ability to wage war. Nothing in this Court's opinion interferes with the military's ability to target or detain suspected enemy combatants. Even for the defendant in this case, the Court's decision is not a release order. Its only direct impact will be to require Bahlul's transfer from *de facto* solitary confinement as Guantanamo's only "prisoner" to the general detainee population, where he may be held until the end of hostilities or until he is retried. *Al-Bihani v. Obama*, 590 F.3d 866, 874 (D.C. Cir. 2010).

The impact of the Court's decision on the government's prosecutorial discretion is also modest. This Court has already held that the charge at issue here is triable in a federal court. *Bahlul v. United States*, 767 F.3d 1, 18 (D.C. Cir. 2014) (*en banc*). And even with respect to military commissions, this Court simply reaffirmed the uncontroversial principle that the offenses tried before a law-of-war military commission must be at least colorable violations of the law of war. This is hardly an onerous burden. There are very few crimes that have no counterpart in the law of war, be it murder, rape, or torture. While it is true, for example, that "[a]uto theft is not a violation of international law," *Cisneros v. Aragon*, 485 F.3d

2

1226, 1231 (10th Cir. 2007), the unlawful taking of property generally is prohibited as the offense of pillage. 10 U.S.C. § 950t(5). It just so happens that conspiracy is one of the few offenses that the law of war has consistently and specifically excluded from its jurisdiction.

To obscure the uniqueness of conspiracy in this regard, the government claims that this Court is forcing Congress to "match element-by-element, an established international-law offense," which it further claims jeopardizes "other MCA offenses that do not precisely track war crimes recognized under international law." Pet. at 15. But this "element matching" is already required by the *Ex Post Facto* Clause. All but one Guantanamo detainee was captured prior to the enactment of the Military Commissions Act of 2006, Pub. L. No. 109-366 (2006). Under this Court's previous *en banc* decision, all of the offenses codified in the Military Commissions Act, including conspiracy, must match element-by-element with existing law of war offenses if they are to have retroactive applicability. *See Carmel v. Texas*, 529 U.S. 513, 532 (2000).

What is more, the majority did not hold that Article III requires the same element-by-element analysis that the *Ex Post Facto* Clause does. The inchoate conspiracy conviction in this case stood out as uniquely vulnerable to Article III challenge if for no other reason than the government *conceded* that this crime has been excluded from international law for at least seventy years. Insofar as other

3

offenses are not so clearly and concededly excluded from the law of war, nothing in this Court's decision requires "element-by-element" parity or precludes the courts from giving due deference to Congress.

To the contrary, the majority was careful to make clear that it "has no occasion to decide the extent of that deference because the government has never maintained that Congress defined conspiracy in the 2006 MCA as a violation of the law of nations. … In Bahlul's case, the 'law of nations' … quite clearly does not view conspiracy to be an independent war crime, as the government has conceded." *Bahlul v. United States ("Bahlul II")*, 2015 WL 3687457 at *14 (D.C. Cir., Jun. 12, 2015). In answer to the concerns raised by Judges Brown, Henderson, and Kavanaugh, therefore, this is simply not a case in which the courts have prevented Congress from legislating at the vanguard of international law. The government has already stipulated that Congress was not attempting to lead international law. It was attempting to divert the adjudication of crimes arising solely under domestic law to *ad hoc* military tribunals. Should other offenses in later cases not be so clearly and concededly excluded from the law of war, this Court will have the opportunity at that time to determine how much deference Congress is owed in defining the law of war's outer boundaries.

For the military commissions in Guantanamo, this Court's *en banc* decision applying the rigors of the *Ex Post Facto* Clause was the real decision of

4

exceptional importance. And had the government not pressed for plain error review, it is possible that Bahlul's case and the question of conspiracy more generally would have been resolved over a year ago. *Bahlul II*, 2015 WL 3687457 at *22 (Tatel, J., concurring) ("So why the different result here? The answer is the standard of review. The *en banc* Court came down the way it did, and I voted the way I did, because al Bahlul had forfeited his *ex post facto* challenge by failing to raise it before the Commission, so our review was for plain error."). In fact, few, if any, military commission cases are likely to even reach the Article III issue presented here, because appellants in future cases will have an easier time challenging the charges against them under the stringent elements test required by the *Ex Post Facto* Clause.

There is simply no reason to credit, therefore, the government's fears that this Court's most recent decision will have "significant implications for ongoing prosecutions." Pet. at 15. The Chief Prosecutor in Guantanamo commented on the effect of this Court's decision less than a month ago:

> Regardless of the government's decision [to seek rehearing *en banc*], military commissions will continue moving toward trial in its seven ongoing cases, six of them capital, for charges alleging serious, completed overt acts of the accused that the government maintains constitute longstanding violations of the law of war triable by military commission.

Chief Prosecutor, BG Mark Martins, *Remarks at Guantanamo Bay*, at 2 (Jul. 19, 2015) (Attachment A). The Chief Prosecutor then cited the same passage from the

Winthrop treatise that the majority relied upon and agreed that military commissions should only try offenses "'consisting in overt acts, i.e., in unlawful commissions or attempts to commit, and not in intentions merely.'" *Id.* at 2 (*quoting* William Winthrop, *Military Law & Precedents* 841 (1920) (Attachment B)). He assured the public that he had already "taken great care to conform to Winthrop's guidance and to all applicable rules of law in prosecuting cases under the Military Commissions Act." *Id.* And, if anything, he concluded, this Court's decisions strengthened the military commission system as a whole by "affirm[ing] that commissions are a resilient part of our justice and counterterror efforts. They are capable of isolating charges pursued in 2007 (Hicks) and 2008 (Al Bahlul) as not sustainable on appeal and of correcting defects in the earlier post-2001 legal framework." *Id.* at 8. The decision in this case, therefore, foreclosed no options that the government was actually pursuing.

Finally, the majority's decision did nothing to hamper the government's reliance on conspiracy-type theories of liability in the military commissions. As this Court emphasized, its ruling only reaches "Bahlul's conviction for inchoate conspiracy by a law of war military commission." *Bahlul II*, 2015 WL 3687457 at *21. "Military commissions retain the ability to prosecute joint criminal enterprise, aiding and abetting, or any other offenses against the law of war, however it may evolve." *Id.* Nothing in the *Bahlul II* decision, in other words, impairs the

6

government's ability to prosecute those who contribute to the perpetration of

terrorist attacks. And nothing jeopardizes any of the pending prosecutions, which

all involve charges, such as Denying Quarter, Perfidy, and Attacking Civilians,

whose status as law of war offenses is beyond reasonable dispute. *Cases Referred*

*under the Military Commissions Act (2006 & 2009)* (Attachment C).

### B.  The Panel Faithfully Applied Binding Precedent.

The decision's modest impact on other cases is not surprising given how

narrow the majority's opinion actually is. And while it is unhappy with the

outcome, the government musters very few specific complaints with the majority's

reasoning for this Court to reconsider *en banc*. The majority's opinion adhered

closely to the governing Supreme Court precedent and ruled only on the narrow

question of whether inchoate conspiracy was an offense that could be tried in a

law-of-war military commission.

Specifically, the majority assumed that the military commissions in

Guantanamo generally fall within the exception to Article III that the Supreme

Court recognized in *Ex parte Quirin*, 317 U.S. 1 (1942). *Bahlul II*, 2015 WL

3687457 at *8; *see also id*. at *23 (Tatel, J., concurring) ("The question in this case

is whether conspiracy to commit war crimes falls within the military commission

exception to Article III *as articulated by the Supreme Court*. The search for

precedent on that question begins and, for the most part, ends with *Ex Parte*

7

*Quirin*."). In *Quirin*, the Supreme Court confronted the military trial of service

members of an enemy nation, who violated the law of war in the context of an

international armed conflict. The Court held that Article III permits "the practice of

trying, before military tribunals without a jury, offenses committed by enemy

belligerents against the law of war." *Quirin*, 317 U.S. at 41. Accordingly, this

Court concluded "[a]bsent further guidance from the Supreme Court, it must apply

the settled limitations that Article III places on the other branches with respect to

the 'judicial Power of the United States.'" *Bahlul II*, 2015 WL 3687457 at *21.

Inchoate conspiracy was concededly not a war crime under "the law of war as

[being] part of the law of nations." *Id*. at *7 (*quoting Quirin*, 317 U.S. at 28).[1] As a

consequence, "Bahlul's conviction for inchoate conspiracy by a law of war

military commission violated the separation of powers enshrined in Article III

§ 1 and must be vacated." *Id*. at *21.

    The government complains that by applying *Quirin*, the Court has reached a

different conclusion than the political branches did on whether it is constitutional

---

[1] The Department of Defense issued the much-anticipated Dep't of Defense, *Law of War Manual* (2015) (Attachment D), the same day the panel issued its decision in this case. It defines the law of war as "that part of international law that regulates the resort to armed force; the conduct of hostilities and the protection of war victims in both international and non-international armed conflict; belligerent occupation; and the relationships between belligerent, neutral, and non-belligerent States. For the purposes of this manual, the law of war comprises treaties and customary international law applicable to the United States." *Id*. § 1.3.

to try inchoate conspiracies in military commissions. This fact alone, it contends, makes this case exceptionally important because it ostensibly raises "separation-of-powers concerns of the highest order." Pet. at 14 (*quoting Hamdan v. Rumsfeld*, 548 U.S. 557, 638 (2006) (Kennedy, J., concurring)). But the government is wrong to suggest that there is some kind of separation-of-powers crisis because this Court refused, even on an issue dealing with Guantanamo, to accept a "regime in which Congress and the President, not this Court, say 'what the law is.'" *Boumediene v. Bush*, 553 U.S. 723, 765 (2008) (*quoting Marbury v. Madison*, 1 Cranch 137, 177 (1803)). Just as this Court created no separation-of-powers crisis when it determined that parts of the Military Commissions Act violated the *Ex Post Facto* Clause, the majority did nothing more than apply settled law, holding that when "a suit falls within the judicial power, then 'the responsibility for deciding that suit rests with Article III judges in Article III courts.'" *Bahlul II*, 2015 WL 3687457 at *6 (*quoting Stern v. Marshall*, 131 S.Ct. 2594, 2609 (2011)).

In fact, the separation-of-powers concern Justice Kennedy raised in *Hamdan* was over the military's encroachment into the courts' exclusive jurisdiction. If anything, this Court cured that precise separation-of-powers harm by applying the limits set down in *Quirin* and by invalidating a criminal conviction that exceeded those limits. Doing so broke no new ground. Instead, it followed a long tradition of judicial review over "whether the preconditions designed to ensure that a military

9

necessity exists to justify the use of this extraordinary tribunal have been satisfied

here." *Hamdan*, 548 U.S. at 598 (plurality op.); *see also Quirin*, 317 U.S. at 18

(reiterating "the duty which rests on the courts, in time of war as well as in time of

peace, to preserve unimpaired the constitutional safeguards of civil liberty").

 Nor should this Court's conclusion have been surprising. Despite the

government's efforts to recast the nature of the charge in this case,[2] all this Court

did was sustain an as applied challenge to the trial of an inchoate conspiracy in a

---

[2] On page 12 of its petition, without any citation to the record, the government claims the military commission found "that Bahlul's personal actions directly contributed to his co-conspirators' carrying out of the 9/11 attacks." This assertion is false. Four of the five accused in the 9/11 case are charged under the theory that their "personal actions directly contributed to" the attack itself. Were the government serious about this claim in this case, it presumably would have charged Bahlul as such or even joined his prosecution with the other 9/11 defendants. Instead, the uncontested evidence at trial demonstrated that Bahlul had no foreknowledge of any terrorist attack. Pet.Br. 4-5. The military judge specifically instructed the finders of fact that "proof the object of the conspiratorial agreement, the substantive law-of-war offense, 'actually occurred is not required' and '[t]he overt act required for this offense does not have to be a criminal act.'" *Bahlul*, 767 F.3d at 39 (Rogers, J., concurring) (quoting the record). And all of the opinions in this case have found or presupposed that Bahlul was convicted of inchoate conspiracy, not some form of conspiratorial liability that was neither charged nor proven at trial. *Bahlul II*, 2015 WL 3687457 at *1; *id.* at 38 (Henderson, J., dissenting) (analyzing the charge against Bahlul as "inchoate conspiracy"); *Bahlul*, 767 F.3d at 25 (analyzing the weight of precedent for "inchoate conspiracy"); *id.* at 34 (Rogers, J., dissenting in part) (stating that she would "vacate Bahlul's conviction for inchoate conspiracy" under the Ex Post Facto Clause); *id.* at 60 (Brown, J., dissenting in part) (arguing that Congress has the authority to define "the crime of conspiracy as an inchoate offense"); *United States v. Bahlul*, 820 F.Supp.2d 1141, 1233 (U.S.C.M.C.R. 2011) (heading a section with "International Law and Inchoate Liability.").

law-of-war military commission. To even the most casual observer, conspiracy stands out as uniquely out of place amongst the offenses listed in the Military Commissions Act. *Hamdan*, 548 U.S. at 598-612 (plurality op.); *see also* Jennifer K. Elsea, CRS Report for Congress, *The Military Commissions Act of 2006*, RL33688, at 11-12 (Sept. 27, 2007) (doubting whether courts will uphold conspiracy). There is no basis for it in the international law governing armed conflict. And unlike other doubtful offenses, like material support for terrorism, there is a long-standing tradition of requiring conspiracy prosecutions to be conducted in courts of law.

When Congress has attempted in other contexts to divert conspiracy prosecutions from the courts of law, even when punishing the object of the conspiracy might not require a judicial trial, the courts have struck down those attempts as unconstitutional. *Callan v. Wilson*, 127 U.S. 540, 556 (1888). In fact, the only two military commission cases to receive judicial review and to rest on inchoate conspiracy charges were vacated for exceeding the jurisdiction that can lawfully be given to the military. *Ex parte Milligan*, 4 Wall. 2 (1866); *In re Murphy*, 17 F.Cas. 1030 (C.C.D.Mo. 1867) (Miller, J.). While *Quirin* had no occasion to pass judgment on conspiracy specifically, it did not have to. "[I]ts reasoning precludes an Article III exception for conspiracy, which did entail a right to trial by jury at common law." *Bahlul II*, 2015 WL 3687457 at *7. By contrast,

11

ruling for the government in the face of both this history and conspiracy's special

place within the federal criminal justice system would require this Court to adopt a

new rule whereby "Congress could simply declare any crime to be a violation of

the law of war and then vest military commissions with jurisdiction to try it,

thereby gutting Article III's critical protections." *Bahlul II*, 2015 WL 3687457 at

\*25 (Tatel, J., concurring).

### C. Simple Disagreement Between Panel Members Over the Application of a Rule to a Given Case Does Not Warrant Rehearing *En Banc*.

To be sure, the government disagrees. It spends most of its petition

recapitulating the same historical sources and arguments that the panel considered.

The government's complaint is that the majority did not read the relevant

precedents and authorities to be as favorable to its position as the dissent did. But

that is not a good reason for a fourth round of briefing and a further investment of

resources by the full Court. Indeed, when one compares the majority and

dissenting opinions, there is little to no disagreement over the rule to be applied.

Instead, the disagreement centers on how the rule applies to the facts of this

particular case.

The panel majority held that *Quirin* limited the jurisdiction of law-of-war

military commissions to those offenses recognized as war crimes under "the law of

war as including that part of the law of nations which prescribes, for the conduct of

war, the status, rights and duties of enemy nations as well as of enemy individuals."
*Bahlul II*, 2015 WL 3687457 at *8 (*quoting Quirin*, 317 U.S. at 27-28). In applying
this rule, the majority found insufficient evidence to demonstrate a tradition of
trying inchoate conspiracies in a law-of-war military commission. *Id*. at *10-11,
*13. In dissent, Judge Henderson agreed that international law yields the governing
standard, but believed that "Congress can … track somewhat ahead of the
international community." *Id*. at *45. Her disagreement with the majority largely
centered on her determination that sufficient precedent existed to view an inchoate
conspiracy as a violation of international norms. *See*, *e.g*., *id*. at *40 ("The
international community *does* recognize that Bahlul violated 'the principles of the
law of nations[.]'"); *id*. at *44 ("Furthermore, international law has developed
since the Nuremberg trials of seventy years ago. International tribunals now
prosecute JCE, which 'functions in ways virtually identical to' inchoate
conspiracy."). In other words, "the dissent's disagreement is not about *whether*
international law constrains congressional authority, only *to what extent*." *Id*. at
*14 (emphasis in original).

   A mere disagreement over the application of an agreed-upon rule does not
justify the exceptional remedy of *en banc* reconsideration. *Bartlett*, 824 F.2d at
1242-43 (Edwards, J.) (granting *en banc* review because "a panel's decision was
either 'clearly wrong' or 'highly dubious' … reduces the 'exceptional importance'

test to a self-serving and result-oriented criterion."); *cf. Hamdan*, 548 U.S. at 603 (plurality op.) ("the disagreement between the majority and the dissenter[] …concern[s] whether the historic and textual evidence constitute[s] clear precedent—not whether clear precedent was required to justify trial by law-of-war military commission.").

Given the history of this litigation, the government has forfeited any right to expect that this Court will convene *en banc* to reconsider whether the majority weighed this precedent correctly. Over two years ago, this Court agreed to rehear the *ex post facto* issues in this case *en banc*. At the time, it appeared that the full Court would decide whether there was sufficient international and historical precedent to try conspiracy under the law of war.

Yet, in its responsive briefing to the *en banc* court, the government opted to argue for plain error review. Even after direct questioning from this Court at oral argument on the wisdom of that choice, counsel for the government stood by its request for plain error review. When it did so, it knew full well that, if it prevailed under plain error review on the *ex post facto* grounds, the panel on remand would decide *de novo* whether conspiracy was triable in a law-of-war military commission under Article III. If settling conspiracy's status once and for all was not exceptionally important the first time this Court heard this case *en banc*, there is no reason to believe it has become so now.

14

## CONCLUSION

For the foregoing reasons, this Court should deny the government's petition to have this case reheard *en banc* a second time.

Respectfully submitted,

 /s/    Michel Paradis
Michel Paradis
Mary R. McCormick
1620 Defense Pentagon
Washington, DC 20301-1620
michel.paradis@osd.mil
TEL: 1.703.696.9490 x115
FAX: 1.703.696.9575

MAJ Todd E. Pierce, JA, U.S. Army (Ret.)
Senior Fellow
Univ. of Minnesota Human Rights Center
Mondale Hall, N-120
229-19th Avenue South
Minneapolis, MN 55455

*Counsel for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2015 a copy of the foregoing (with attachments) was filed electronically with the Court. Notice of this filing will be sent to all parties by operation of this Court's electronic filing system. Parties may access this filing through the Court's system.

Dated: August 13, 2015

Respectfully submitted,

/s/ Michel Paradis
*Counsel for Petitioner*

16

# ATTACHMENTS

A. Chief Prosecutor, BG Mark Martins, *Remarks at Guantanamo Bay* (Jul. 19, 2015)

B. William Winthrop, *Military Law & Precedents* (1920) (excerpt)

C. *Cases Referred under the Military Commissions Act (2006 & 2009)*

D. Dep't of Defense, *Law of War Manual* (2015) (excerpt)

**Attachment A**

Chief Prosecutor, BG Mark Martins, *Remarks at Guantanamo Bay*
(Jul. 19, 2015)

**CHIEF PROSECUTOR MARK MARTINS**
**REMARKS AT GUANTANAMO BAY**
**19 JULY 2015**

Good evening.  This week and next, the Military Commission convened to try the charges against Abd al Hadi al-Iraqi will hold its fifth series of pre-trial sessions without panel members present since he was arraigned in June of last year.  Abd al Hadi, an Iraqi national from the city of Mosul, was arraigned on charges that he committed serious violations of the law of war by conspiring with and leading others, as a senior member of al Qaeda, in a series of unlawful attacks and related offenses in Afghanistan, Pakistan, and elsewhere from 2001 to 2006.  These attacks and other offenses allegedly resulted in the death and injury of U.S. and coalition service members and civilians.

The charges against Abd al Hadi are only allegations.  He is presumed innocent unless and until proven guilty beyond a reasonable doubt.  Matters under consideration by a military commission in this or any other particular case are authoritatively dealt with by the presiding Judge.  Any comments addressing systemic issues that are the subject of frequent questions by interested observers should always be understood to defer to specific judicial rulings, if applicable.  As I have not had occasion to meet with you since February, I will provide a brief overview of what to expect in the coming two weeks of sessions in the *Hadi* case before surveying important developments in appellate proceedings and in other ongoing military commission prosecutions and then generally addressing questions I have received about the future of military commissions within United States national security and justice institutions.

The *Hadi* Commission has issued a docketing order in which it has set forth the matters it intends to consider during these pre-trial sessions.  The docketing order is available at Appellate Exhibit 46.  The Commission has indicated its intent to hear argument and receive evidence, as required, on a defense motion to suppress out-of-court statements of the Accused (AE 45), government motions *in limine* to consider evidence during preliminary matters and to admit evidence for trial on the merits (AE 35 through AE 43), and personal jurisdiction over the Accused (AE 20B).

The *Hadi* Commission has also indicated its intent to hear argument and receive evidence, as required, on a defense motion to dismiss for lack of subject-matter jurisdiction and to compel a status determination under Article 5 of the Third Geneva Convention.  AE 20.  Sixty years ago this month, the Senate unanimously provided its advice and consent to ratifying the Geneva Conventions of 1949.  Today, status determinations under the Third Geneva Convention are an issue that federal civilian courts and military commissions continue to confront.  This past week, the United States District Court for the Eastern District of Virginia rejected claims by Irek Ilgiz Hamidullin, an alleged member of a Taliban-affiliated group of militants operating in Afghanistan, that he should be accorded prisoner-of-war status under Article 4 of the Third Geneva Convention.  *United States v. Hamidullin*, No. 14-cr-140, 2015 WL 4241397 (E.D. Va. July 13, 2015).  In the coming weeks, this Commission will consider claims by Abd al Hadi that, under Article 5 of the Third Geneva Convention, the government must hold a hearing in which a three-officer panel would determine whether he is entitled to prisoner-of-war status.

1

Between the in-court sessions in which the *Hadi* Commission has resolved various legal and evidentiary matters before trial, significant work has remained under way. Since arraignment, the parties have briefed in writing 29 substantive motions, 12 of which the Commission has ruled on. More than 41,082 pages of material comprising the government's case against the Accused, as well as material required to be disclosed to the defense under the government's affirmative discovery obligations, have been provided to the defense. Substantial additional material has been submitted to the Military Judge under classified information procedures to ensure that while the Accused and counsel have a full opportunity to prepare a defense and to receive any and all exculpatory or mitigating evidence, sensitive sources and methods and other classified national security information are protected. 10 U.S.C. § 949p-4; M.C.R.E. 505(f). These examples of the cumulative work accomplished in this case to date, while never offered to suggest that justice can be measured by numerical formula, serve as important indices of the less visible and methodical progress toward trial that occurs. All recent filings and judicial decisions are available on the military commissions' website at www.mc.mil.

Although I will not comment on the specifics of any motions pending before a military commission, I will now turn to recent developments in *Al Bahlul v. United States*, *United States v. Mohammad, et al.*, and *United States v. Al Nashiri*.

### Developments in *Al Bahlul v. United States*

On 12 June 2015, in a two-to-one decision, a panel of the United States Court of Appeals for the District of Columbia Circuit vacated Ali Hamza Ahmad Suliman Al Bahlul's conviction for conspiracy to commit war crimes. The panel held that Bahlul's conviction for "inchoate conspiracy" by a law-of-war military commission "violated the separation of powers enshrined in Article III § 1." *Al Bahlul v. United States*, No. 11-1324, 2015 WL 3687457, at *21 (D.C. Cir. June 12, 2015) ("*Bahlul II*"). The government is considering whether to seek further review of the panel's decision. Regardless of the government's decision, military commissions will continue moving toward trial in its seven ongoing cases, six of them capital, for charges alleging serious, completed overt acts of the accused that the government maintains constitute longstanding violations of the law of war triable by military commission.

Nearly a century ago, Colonel William Winthrop, whom our Supreme Court in its decisions has referred to approvingly as "the Blackstone of military law," provided authoritative guidance that continues to assist military commission prosecutors today. Winthrop wrote that military commissions should try offenses "consisting in *overt* acts, i.e., in unlawful commissions or attempts to commit, and not in intentions merely." William W. Winthrop, *Military Law and Precedents* 831 (rev. 2d ed.1920). While military commissions, not prosecutors, ultimately determine whether an individual defendant is guilty of such offenses beyond a reasonable doubt, and while it is the responsibility of our Nation's courts, not prosecutors, to say with finality "what the law is," I want to reassure all who are interested in how appellate decisions might affect pending charges that we have taken great care to conform to Winthrop's guidance and to all applicable rules of law in prosecuting cases under the Military Commissions Act.

As I discuss further below, recent developments in the pending cases involving six other Guantanamo detainees besides Abd al Hadi reveal important, incremental progress, much of which tends not to capture public attention despite being duly recorded in filings made by the parties with the trial judiciary clerk and then posted on the website. As difficult as it may be to discern amidst the many happenings that command wider interest, we are moving toward trial in these hugely important cases. Meanwhile, as required by repeated Acts of Congress signed into law by the President, those held in Guantanamo remain in secure, humane detention under the law of armed conflict, with a professional and accountable force of service-members doing the detaining and with the legal and factual basis of detention subject to review in our federal courts.

### *Developments in* **United States v. Mohammad, et al.**

In *Mohammad*, the Commission issued a Third Amended Protective Order #1 To Protect Against Disclosure of National Security Information. AE 13BBBB. In doing so, the Commission, among other rulings, granted the government's motion to amend Protective Order #1 (AE 13RRR) to reflect that certain formerly classified information requiring restrictive handling by that order no longer requires such handling. AE 13AAAA at 18; AE 13BBBB at 4-5. Last December the Senate Select Committee on Intelligence made public the Executive Summary of its Study on the Rendition, Detention, and Interrogation ("RDI") Program. Upon release, the unredacted portions of the Executive Summary that had been classified were declassified. The amendments to the Protective Order reflect these declassification decisions by removing restrictive-handling requirements for certain formerly classified information.

In particular, the amendments by the Commission remove two paragraphs from the Protective Order: (1) the paragraph regarding enhanced interrogation techniques that were applied to the Accused from on or around the specified capture date through 6 September 2006, including descriptions of the techniques as applied, the duration, frequency, sequencing, and limitations of those techniques and (2) the paragraph regarding descriptions of the Accused's confinement conditions from on or around the specified capture date through 6 September 2006. The remaining protections in the Order continue to apply and are binding.

The Commission also ordered all defense-team members who will have access to classified discovery provided by the government to sign the "Memorandum of Understanding Regarding the Receipt of Classified Information" by 7 August 2015. AE 13AAAA at 18. This memorandum, routinely required of counsel who receive classified information in discovery in federal civilian courts, obligates defense-team members to protect genuine sources and methods while handling classified information provided to them in discovery.

Also in *Mohammad*, the Commission denied Khalid Shaikh Mohammad's request that the Commission reconsider its decision to deny defense motions to abate the proceedings. AE 155KK. In 2013, the defense filed three motions to abate the proceedings alleging "infringements of Defense's privileged work-product and communications stored on or transmitted over government-provided information systems." *Id*. (citing AE 155A, AE 155J, and AE 155M). In October 2013, the Commission denied those motions (AE 155II), finding that "[n]o evidence supports the Accuseds' concern the purported loss of data or problems with communication were the result of any attempt by the Prosecution or DoD to compromise

Defense files or encumber Defense efforts to represent their respective clients." AE 155II. The government takes very seriously both the effective representation of counsel and the attorney-client privilege that is central to such representation. Last month, the Commission denied Mr. Mohammad's motion to reconsider its ruling, reasoning that Mr. Mohammad failed to raise "any new matters." AE 155KK.

In a separate ruling, the Commission also denied Mustafa Ahmed Adam Al Hawsawi's motion alleging that his current conditions of confinement do not comply with international humanitarian law standards. AE 303D. The Commission concluded, among other findings, that Mr. al Hawsawi failed to present "any case law or other authority to this Commission that concludes any policy, procedure, or practice that differed from any practice at The Hague is 'inhuman' or having significant impact to a right or privilege of the Accused before this Commission and thus requiring the relief the Defense requested." *Id*. at 5. The Commission also rejected Mr. al Hawsawi's claim that the detainees' "quality of life effects" are "adversely affecting 'the quality of engagement' of representation." *Id*. at 6.

The next pre-trial sessions in *Mohammad* are scheduled to occur over a two-week period from 24 August 2015 through 4 September 2015. AE 325D.

### *Developments in* United States v. Al Nashiri

On 27 March 2015, the government filed its second interlocutory appeal in *Al Nashiri*. The government appealed to the United States Court of Military Commission Review ("U.S.C.M.C.R."), our first reviewing court, from the Commission's order excluding substantial government evidence material to its burden of proof on an element of the terrorism charge. AE 248T. The government had previously appealed to the U.S.C.M.C.R. from the Commission's dismissal of the charges related to the attack on the MV *Limburg*. AE 168L/AE 248H. In April, the Commission granted the defense motion to abate all future commission sessions pending resolution of the two interlocutory appeals. AE 340J.

While the first interlocutory appeal was pending before the U.S.C.M.C.R., Mr. Al Nashiri petitioned the D.C. Circuit for a writ of mandamus and prohibition to the U.S.C.M.C.R. alleging that military judges are assigned to that court in violation of the Appointments Clause and cannot be freely removed in violation of the Commander-in-Chief Clause of the U.S. Constitution. The D.C. Circuit stayed the appeal so that it could consider the writ petition. Briefing in the second interlocutory appeal was also stayed pending the D.C. Circuit's consideration of the writ petition.

On 23 June 2015, the D.C. Circuit denied the writ petition and dissolved the stay. The court concluded that issuing the writ would be inappropriate because Mr. Al Nashiri "can adequately raise his constitutional challenges on appeal from final judgment." *In re Al-Nashiri*, No. 14-1203, 2015 WL 3851966, at *1, *13 (D.C. Cir. June 23, 2015). Although the D.C. Circuit did not resolve questions raised by the Appointments Clause challenge, it did note that "the President and Senate could decide to put to rest any Appointments Clause questions regarding the CMCR's military judges . . . by re-nominating and re-confirming the military judges to be *CMCR* judges." *Id*. at *13. While not conceding these steps are constitutionally required, the government moved the U.S.C.M.C.R. to stay the proceedings as it explores options

for re-nomination and re-confirmation of the military judges as U.S.C.M.C.R. judges. On 26 June 2015, the U.S.C.M.C.R. granted the motion. The government is working diligently to explore these options and will update the court on its progress every thirty days.

Meanwhile, the prosecution has achieved major milestones in its compliance with the Commission's 24 June 2014 Order in *Al Nashiri*. *See* AE 120AA. Working seven days a week, the prosecution has substantially responded to the June Order with respect to all ten categories of information identified in the Order, and it continues to seek access to other, potentially discoverable information. AE 120JJJJ. The Commission has already approved requests for six of the ten categories, while other requests remain pending with the Commission.

As with the June Order, the prosecution has been working diligently to comply with the Commission's 17 December 2014 Trial Conduct Order. AE 330. The prosecution reviewed the pre-existing protective order governing RDI information and moved the Commission to amend the protective order to reflect recent declassification decisions. AE 13R. In February, the Commission granted the prosecution's motion and removed restrictive-handling requirements for certain formerly classified information. AE 13S. The prosecution also completed a classification review of all motions where the Commission has taken final action and provided the Commission and the defense with all filings reflecting updated classification markings. AE 330B. The prosecution will do the same for motions where the Commission has *not* taken final action by 7 September 2015 or, where appropriate, after the Commission takes final action. (The prosecution has made similar strides in compliance with the Commission's Trial Conduct Order in *Mohammad*. For details, *see Mohammad*, AE 331B.)

Also, on 18 February 2015, the Senate Select Committee on Intelligence authorized the Office of the Chief Prosecutor of Military Commissions to review the full "Committee Study of the Central Intelligence Agency's Detention and Interrogation Program." AE 206Q. On 28 April 2015, the Commission denied Mr. Al Nashiri's motion to compel the production of the full Study to the defense, instead permitting the prosecution to continue its work begun in February 2015 to review the Study for potentially discoverable information to provide the defense. AE 206U.

### Questions Received About the Future of Military Commissions

Since the June 12th decision by the D.C. Circuit panel in *Bahlul II*, which I mentioned earlier, I have received questions from some of you about the future of military commissions. While it is always appropriate to take stock of our institutions to ensure that they are accountable to the law and to the people and that they serve our national security interests and the interests of justice, the latest round of commentary by some that *Bahlul II* spells doom for military commissions is, in my view, both overstated and myopic. In short, military commissions—along with our federal courts and other instruments of national authority—are carrying an important and lawful burden within the larger effort to maintain peace and security. We should expect that they will continue to carry that burden, while upholding our cherished values, for the foreseeable future.

National policy regarding detention operations is contained in Executive Order 13,492 of January 2009 and in other applicable directives and laws.  This framework of policy and law is sound, and it fully complies with the international law of armed conflict, including the Geneva Convention requirement that detainees be treated humanely and that they be tried for pre-capture offenses only by regularly constituted courts "affording all of the judicial guarantees recognized as indispensable by civilized peoples."  The framework recognizes that a nation such as the United States must have secure, humane, and legitimate options for detention of transnational terrorists who threaten our people because our service-members in armed conflict are required by the law and by our values to give quarter to those they capture alive.  And yet, while we will not release untried law of war detainees who present a clear and continuing danger to the American people and to peace-loving peoples around the globe, we must resort to extended detention only after exhausting all lawful alternatives and only with oversight and safeguards in place to prevent such extended detention from creating a new normal.

Congress, acting eight times with guidance from the courts across two administrations, has deemed military commissions to be the forum best suited to try a narrow but critically important category of cases.  By law, military commissions are the only available forum for U.S. criminal trials of Guantanamo detainees.  And for certain cases, they are also the most appropriate.  As the National Security Strategy for 2015 affirmed, "[w]here prosecution is an option, we will bring terrorists to justice through both civilian and, when appropriate, reformed military commission proceedings that incorporate fundamental due process and other protections essential to the effective administration of justice."

Advocates for using only civilian prosecutions offer diverse rationales, but in defending a deservedly proud tradition of law enforcement and nonmilitary criminal justice, they fail to make the more difficult case that military commission war crimes trials are unneeded.  In our nation's recent experience, federal civilian agents and prosecutors can and do disrupt and punish a wide variety of terrorist and other organized threats—including through the charging of precursor crimes such as identity fraud or immigration violations—and the legitimacy of a federal court conviction is unquestioned. But federal civilian courts' exclusion of reliable and lawfully collected hearsay statements is problematic when witnesses inhabit the same ungoverned regions where war crimes were hatched and are thus unavailable for trial.  Also, the requirement that statements by an accused be preceded by warnings of the rights to remain silent and to have an attorney also makes little sense in a situation of genuine overseas hostilities.

And of the nineteen federal court prosecutions since 9/11 of al Qaeda members who were captured overseas and were also triable for war crimes—a more pertinent data point than the hundreds of purely domestic prosecutions often cited by private advocacy groups that are openly committed to military commissions' extinction—all but one came into our custody through law enforcement cooperation with foreign governments who lacked lawful mechanisms for further incapacitating the individuals.  This is hardly a convincing record for banning military commission trials that feature sensible and fair evidentiary rules suited to punishing members of irregular hostile groups, who plan attacks from difficult-to-reach sanctuaries in increasing numbers.

6

For those who are interested in the details, the nineteen cases are as follows: 1. Jabarah (S.D.N.Y. 2002); 2. Nalfi (S.D.N.Y. 2003); 3. Afridi (S.D. Ca. 2004); 4. Zayed (E.D.N.Y. 2005); 5. Moayed (E.D.N.Y. 2005); 6. Syed (S.D. Ca. 2006); 7. Kassir (S.D.N.Y. 2009); 8. Delaema (D.D.C. 2009); 9. Siddiqui (S.D.N.Y. 2010); 10. Ghailani (S.D.N.Y. 2010); 11. Warsame (S.D.N.Y. 2011); 12. Issa (S.D.N.Y. 2011); 13. Ghaith (S.D.N.Y. 2014); 14. Hamza (S.D.N.Y. 2014); 15. Babar (D. Conn. 2014); 16. Bary (S.D.N.Y. 2014); 17. Fawwaz (S.D.N.Y. 2014); 18. Naseer (E.D.N.Y. 2015); 19. Hamidullin (E.D. Va.) (ongoing). The U.S. gained custody of five of these persons from the U.K. (14-18), two from Hong Kong (3, 6), two from Germany (5, 6), one from Canada (1), one from the Netherlands (8), one from the Czech Republic (7), one from Ghana (12), one from Kenya (2), one from Jordan (13). Only four came from portions of South West Asia containing large regions of ungoverned space (Afghanistan-9 & 19; Pakistan-10; and international waters near the Arabian Peninsula-11), and these four required close coordination with U.S. military forces and non-standard law enforcement detention. A comparison of these prosecutions with the fifteen thus far tried or arraigned by military commission is instructive, though beyond the scope of these remarks. The fifteen military commissions prosecutions are as follows: 1. Hicks (2007); 2. Hamdan (2008); 3. Bahlul (2008); 4. Qosi (2010); 5. Khadr (2010); 6. Noor (2011); 7. Khan (2012); 8. Darbi (2014); 9. Nashiri (ongoing); 10. KSM (ongoing); 11. Khallad (ongoing); 12. Ramzi (ongoing); 13. Hawsawi (ongoing); 14. Ammar (ongoing); 15. Hadi (ongoing).  I reiterate that the Accused in ongoing cases are presumed innocent unless and until proven guilty beyond a reasonable doubt.

It is by no means a decisive rejoinder to point to early military commission convictions that have since been overturned on appeal.  This is because the sound legal framework for detention and trial now in place has successfully incapacitated many demonstrably dangerous members of al Qaeda and associated forces, and legitimate *incapacitation* of terrorist threats is a separate good from the legitimate *adjudication* of such threats as criminals.  Those incapacitated have included not only detainees who have been tried by military commission—with some of these now released and cleared of their war crimes convictions through subsequent court review—but also a larger number who cannot be criminally tried and yet for whom continued detention under the law of war is proper and justified.

The example of David Hicks illustrates the distinction between legitimate incapacitation and criminal adjudication.  David Hicks pled guilty to providing material support to terrorism in violation of the Military Commissions Act of 2006 ("2006 M.C.A.").  He did so upon voluntarily admitting, with advice of counsel, that he had trained at Al Qaeda's Farouq camp and Tarnak Farm complex in Afghanistan, met with Usama Bin Laden, joined Al Qaeda and Taliban forces preparing to fight United States and Northern Alliance forces near Kandahar in September 2001, and joined the ongoing fighting against Coalition forces in Konduz the following month before fleeing the battlefield.  Opinion, *Hicks v. United States*, No. 13-004 (U.S.C.M.C.R. Feb. 18, 2015).  These admissions clearly established every day of his five-plus years of detention by the United States as an unprivileged belligerent to have been lawful within the 2001 Authorization for the Use of Military Force.  Mr. Hicks acknowledged—again on advice of zealous and competent defense counsel and before an independent judge who had the duty to reject a plea not believed to be knowing, voluntary and intelligent—that "he has never been the victim of any illegal treatment at the hands of any personnel while in the custody or control of the United States." *Id.*  Mr. Hicks was repatriated to Australia in May 2007.  There is no indication that

upon subsequent release from detention by Australian officials he has ever since returned to hostilities with al Qaeda.

In February, Mr. Hicks successfully appealed his conviction before the United States Court of Military Commission Review on grounds that its reviewing court—the en banc United States Court of Appeals for the District of Columbia Circuit—had ruled last year in *Al Bahlul v. United States* that providing material support for terrorism was not triable by military commission for conduct that occurred before Congress enacted the 2006 M.C.A. The government did not elect to appeal the *Hicks* decision. While Mr. Hicks's public statements indicate no inclination to again travel overseas to wage jihad with a terrorist group, laws in Australia and the United States now expressly criminalize extraterritorial provision of material support to such groups.

Although the U.S.C.M.C.R.'s February ruling in *Hicks* was the last occasion causing some commentators to dramatically predict the demise of military commissions, the ruling instead affirmed that commissions are a resilient part of our justice and counterterror efforts. They are capable of isolating charges pursued in 2007 (*Hicks*) and 2008 (*Al Bahlul*) as not sustainable on appeal and of correcting defects in the earlier post-2001 legal framework. These cases, and the daily work of military commission prosecutors to try every detainee who can be tried under the law, make that framework strong and legitimate, in turn legitimating the extended law of war detention that in hard cases must be resorted to, subject now to habeas corpus review by our federal courts. Meanwhile, those hard cases themselves number in the several dozens, and the humane but secure incapacitation of these detainees has helped safeguard national security and continues to do so.

Thus, as I have said before in restating sound strategy and policy, we must use all lawful instruments of national power and authority to protect against modern threats. Military commissions have a narrow but important role in pursuit of that worthy goal.

*     *     *     *     *

In closing, let us pause to honor the four U.S. Marines and one U.S. Sailor killed as a result of the attacks in Chattanooga, Tennessee on Thursday and to express our deepest condolences to their families and our solidarity with their fellow service-members. We also wish a full and speedy recovery to the police officer and Marine Corps recruiter who were injured in the shootings that day. To those who have served and will serve in the years to come, and to all the Marines, Soldiers, Sailors, Airmen, Coast Guardsmen, and other public servants who support these proceedings, I want to publicly thank you for your many contributions and sacrifices—all of which are humbly appreciated.

**Attachment B**

William Winthrop, *Military Law & Precedents* (1920) (excerpt)

**As to offences.** In the war with Mexico, as has heretofore been noticed, the tribunal known as the "military commission" was employed for the trial and punishment of the ordinary crimes such as in a state of peace would have been taken cognizance of by the criminal courts, while violations of the laws of war were referred to another tribunal designated as "council of war." In 1309 the simpler system matured in our recent war both jurisdictions were, as has been seen, united in one court for which was preferably retained the name of military commission. The offences cognizable by military commissions may thus be classed as follows: (1) Crimes and statutory offences cognizable by State or U. S. courts, and which would properly be tried by such courts if open and acting; (2) Violations of the laws and usages of war cognizable by military tribunals only; (3) Breaches of military orders or regulations for which offenders are not legally triable by court-martial under the Articles of war.

Of the offences of the *first* class, those most frequently brought to trial before military commissions during the late war, as shown by the General Orders, were murder, manslaughter, robbery, larceny, burglary, rape, arson, assault and battery, and attempts to commit the same; criminal conspiracies,[5] riot, perjury, 1310 bribery, accepting bribes, forgery, fraud,[6] embezzlement, misappropriation or other illegal disposition of public property, receiving stolen goods, obtaining money or property under false pretences, making or uttering counterfeit money, uttering false Treasury notes, breaches of the peace and disorderly conduct, keeping a disorderly house, selling obscene books, &c., malicious mischief or trespass, carrying concealed weapons, abuse of official authority by civil officials, resisting or evading the draft, discouraging enlistments, purchasing arms, clothing, &c., from soldiers, in violation of Sec. 5438, Rev. Sts., aiding desertion, &c., in violation of Sec. 5455, Rev. Sts. "*Treason*"—it may be added—was not unfrequently charged, but mostly as a name for some violation of the class next to be mentioned.

Of the *second* class, of offences in violation of the laws and usages of war, those principally, in the experience of our wars, made the subject of charges and trial, have been—breaches of the law of non-intercourse with the enemy,

---

[5] Among the conspiracies of this class, or of the first and second classes combined, may be noted the following:—that of Bowles, Milligan and Horsey, convicted of conspiring together, and with other members of the so-called "Order of American Knights" or "Sons of Liberty," against the U. S. Government, and in the interest of the Rebellion, (G. C. M. O. 214 of 1865;)—that of Herold, Payne and others convicted of conspiring with John Wilkes Booth, Jefferson Davis and sundry other persons in the assassination of President Lincoln and the attempted assassination of the Secretary of State, Mr. Seward, (G. C. M. O. 356 of 1865;)—that of Capt. Henry Wirz of the confederate army, convicted of conspiring with Jefferson Davis, James A. Seddon, Howell Cobb, John H. Winder, Richard B. Winder and others, against the lives and health of Union soldiers held as prisoners of war at Andersonville, Ga., (G. C. M. O. 607 of 1865;)—that of William Murphy, convicted of conspiring with Davis, Seddon, Judah P. Benjamin and others, to burn and destroy boats on the western rivers, (G. C. M. O. 107 of 1866;)—that of the persons concerned in the resisting and defeating of the draft, especially in Carbon, Columbia, Schuylkill, Clearfield and Luzerne Counties, Pennsylvania, in 1864–5, (G. O. 23, 64, 67, 68, 69, Dept. of the Susquehanna, 1864; Do. 82, 85, Dept. of Pa., 1864; Do. 4, 6, 36, Id., 1865;)—that of G. St. Leger Grenfel and his associates, (Charles Walsh, Buckner S. Morris, R. T. Semmes and others,) convicted of an attempt to release the confederate prisoners of war at Camp Douglass near Chicago, and to lay waste and destroy that city, (G. O. 30, Northern Dept., 1865;)—that of T. E. Hogg and others convicted of being concerned in the attempt to seize the steamer Salvador at Panama, in 1864, (G. O. 27, Dept. of the Pacific, 1865).

[6] Among the various forms of *fraud* charged is that of defacing or altering the "U. S." brand on public animals, with fraudulent intent. See cases in G. C. M. O. 488 of 1865; G. O. 111, Dept. of the Mo., 1863; Do. 72, Dept. of Ark., 1864.

such as running or attempting to run a blockade;[7] unauthorized contracting, trading or dealing with, enemies, or furnishing them with money, arms, provisions, medicines, &c.;[8] conveying to or from them dispatches, letters, or other communications, passing the lines for any purpose without a permit, or coming back after being sent through the lines and ordered not to return; aiding the enemy by harboring his spies, emissaries, &c., assisting his people or friends to cross the lines into his country, acting as guide to his troops,[9] aiding the escape of his soldiers held as prisoners of war,[10] secretly recruiting for his army,[11] negotiating and circulating his currency or securities—as 'confederate notes or bonds in the late war,[12] hostile or disloyal acts, or publications or declarations calculated to excite opposition to the federal government or sympathy with the enemy,[13] &c.; engaging in illegal warfare as a guerilla, or by the deliberate burning, or other destruction of boats, trains, bridges, buildings, &c.; acting as a spy, taking life or obtaining any advantage by means of treachery; abuse or violation of a flag of truce; violation of a parole[14] or of an oath of allegiance or amnesty,[15] breach of bond given for loyal behaviour, good conduct, &c.;[16] resistance to the constituted military authority, bribing or attempting to bribe officers or soldiers or the constituted civil officials; kidnapping or returning persons to slavery in disregard of the President's proclamation of freedom to the slaves, of January 1, 1863.[17]

1311

Of the *third* class are acts prohibited by express order, or in breach of military discipline, such as selling to soldiers citizens' clothing, furnishing them with liquor, introducing liquor or other forbidden articles into the camps, &c.,

---

[7] See case of running the blockade and conveying munitions to the enemy, in G. C. M. O. 254, 338, 344, of 1864.

[8] In this class is included the offence, several times brought to trial, of selling contraband goods, with a view to their being carried secretly through the lines to the enemy, by other persons. See convictions in G. C. M. O. 398 of 1864; Do. 55, 57, 58, 74, of 1865.

[9] A very grave offence where the offender voluntarily offers his services as such guide. Bluntschli § 634.

[10] G. O. 55, Div. W. Miss., 1864; Do. 47, Dept. of the Mo., 1864; Do. 75, Dept. of the Ark., 1864; Do. 30, Northern Dept., 1865.

[11] G. O. 114 of 1863; G. C. M. O. 155, 249, of 1864.

[12] G. O. 135, 169, Dept. of the Mo., 1864; Do. 35,, Middle Dept., 1865. And compare Horn *v.* Lockhart, 17 Wallace, 580.

[13] G. C. M. O. 270, 273, 294, of 1864; Do. 214 of 1865, (case of Bowles, Milligan, and Horsey;) G. O. 7, Dept. of the Mo., 1862; Do. 148, Id., 1863; Do. 86, 154, Id., 1864; Do. 68, Dept. of the Ohio, 1863, (case of Vallandigham;) Do. 121, Middle Dept., 1864; Do. 24, 67, Dept. of Susquehanna, 1864; Do. 5, Dept. of N. Mex., 1864; Do. 1, Dept. of No. Ca., 1866. And see cases in the following Orders, of treating with disrespect the U. S. flag by pulling down, tearing, defacing, &c.: S. O. 70, Dept. of the Gulf, 1862; G. O. 28, Id., 1865; Do. 50, Middle Dept., 1863; Do. 50, Dept. of the Mo., 1863; Do. 8, Dept. of the Miss., 1866; Do. 26, Fourth Mil. Dist., 1864. And see remarks of Maj. Gen. Thomas in G. O. 21, Dept. of the Tenn., 1867. In this list also may be classed the cases in which the offender is charged as—"Being a bad and dangerous man," or in terms to that effect. See G. O. 229 of 1863; G. C. M. O. 304 of 1864; G. O. 19, Dept. of the Miss., 1862; Do. 34, Dept. of the Mo., 1863; Do. 41, Middle Mil. Dept., 1865; Do. 11, Dept. of Fla., 1866.

[14] Violations of parole by paroled prisoners of war are noted under TITLE III, *ante*. As to cases of violation of a parole given not to render aid or services to the enemy, see G. O. 20, Dept. of the Mo., 1862; Do. 34, 82, Id., 1863; Do. 43, Middle Dept., 1864; Do. 28, Id., 1865.

[15] See G. O. 229 of 1863; where a conviction of a violation of an oath of allegiance was disapproved on the ground that the violation consisted not in acts but in words only.

[16] G. O. 34, Dept. of the Mo., 1863; Do. 63, Sixteenth Army Corps, 1863.

[17] G. O. 7 of 1864; G. C. M. O. 146, 250, of 1864; G. O. 106, Sixteenth Army Corps, 1863; Do. 155, Dept. of No. Ca., 1865.

dealing in articles likely to reach and relieve the enemy, violating police, sanitary, or quarantine regulations, &c.[18]

1312    **Offences not cognizable.** The subject of the jurisdiction of military commissions is further illustrated by a reference to the classes of cases of which these tribunals cannot legally take cognizance.

Thus they have no jurisdiction of the purely military offences specified in the Articles of war and made punishable by sentence of court-martial; and in repeated cases where they have assumed such jurisdiction their proceedings have been declared invalid in General Orders.[19]

So, being properly criminal courts, they have no jurisdiction of private controversies between individuals relating to pecuniary obligations, the title to property, &c.[20] Such matters pertain to the province of the local courts, or to tribunals erected in their stead, and expressly invested with a *civil* jurisdiction, by the military commander.[21]

It may be added that the jurisdiction of the military commission should be restricted to cases of offence consisting in *overt acts, i. e.* in unlawful commissions or actual attempts to commit, and not in intentions merely.[22] Thus what would justify in war a precautionary arrest might not always justify a trial as for a specific offence.

**PROCEDURE.** In the absence of any statute or regulation governing the proceedings of military commissions, the same are commonly conducted according to the rules and forms governing courts-martial.[23] These war-courts

1313    are indeed more summary in their action than are the courts held under the Articles of war,[24] and, as their powers are not defined by law, their proceedings—as heretofore indicated—will not be rendered *illegal* by the omission of details required upon trials by courts-martial, such, for example, as the administering of a specific oath to the members,[25] or the affording the accused an opportunity of challenge.[26] So, the *record* of a military commission will be legally sufficient though much more succinct than the form adopted by courts-martial, as—for example—where it omits to set forth the testimony, or states it only in substance. But, as a general rule, and as the only quite safe and satisfactory course for the rendering of justice to both parties, a military commission will—like a court-martial—permit and pass upon objections interposed to members, as indicated in the 88th Article of war, will formally arraign

---

[18] See a case in G. O. 85, Dept. of the Mo., 1865, of a person tried by this court for *voting* without the qualifications required by existing Orders.

[19] G. O. 20, 190, 287, of 1847, (Gen. Scott;) G. O. 16, Dept. of the Mo., 1861; Do. 1, 18, Id., 1862; Do. 34, 56, Id., 1863; Do. 150, Dept. of the Ohio, 1863; Do. 27, Dept. of the Northwest, 1864; Do. 66, 72, Dept. of Va. & No. Ca., 1865. This rule was not always strictly observed, especially in cases of offences falling within the description of the present 45th and 46th (then 56th and 57th) Articles.

[20] State *v.* Stillman, 7 Cold., 341; G. O. 1, Dept. of the Mo., 1862; Do. 197, Id., 1864; DIGEST, 507–8.

[21] Of course a court designated as a "military commission" might legally be so invested by the commander, the mere name being immaterial; but where no such specific authority is expressly given, a military commission so called is, by the invariable usage of the service, a criminal court only.

[22] Finlason, Com. on Mar. Law, 130; G. O. 229 of 1863.

[23] Finlason, Com. on Mar. Law, 9, 141; 1 Bishop, C. L. § 45, 52; G. O. 1, 7, Dept. of the Mo., 1862; Do. 150, Dept. of the Ohio, 1863; Do. 27, Dept. of the N. West, 1864; DIGEST, 501.

[24] Hough, 383; Finlason, Com. on Mar. Law, 127.

[25] In some cases indeed proceedings and sentence have been declared inoperative because of this omission. See G. O. 91, 95, 101, 162, of 1863. They were in fact subject to disapproval but not inoperative.

[26] See case in G. O. 257 of 1863, where the omission, as indicated by the record, of this and sundry other formalities was deemed sufficient to invalidate the sentence in a capital case. It would more properly have been *disapproved.*

**Attachment C**

*Cases Referred under the Military Commissions Act (2006 & 2009)*

# Cases Referred under the Military Commissions Act (2006 & 2009)

## Open Cases

| Accused | Charges | Status |
|---|---|---|
| Abd al Hadi al-Iraqi | Denying Quarter (10 U.S.C. § 950t(6))<br>Attacking Protected Property (10 U.S.C. § 950t(4))<br>Using Treachery Or Perfidy (10 U.S.C. § 950t(17))<br>Attempted Use Of Treachery Or Perfidy (10 U.S.C. § 950t(28))<br>*Conspiracy (10 U.S.C. § 950t (29))* | Pre-trial hearings |
| Khalid Sheikh Mohammed<br>Walid Bin 'Attash<br>Ramzi Binalshibh<br>Ali Abdul Aziz Ali<br>Mustafa al Hawsawi | *Conspiracy (10 U.S.C. § 950t (29))*<br>Attacking Civilians (10 U.S.C. § 950t (2))<br>Attacking Civilian Objects (10 U.S.C. § 950t (3))<br>Murder In Violation Of The Law Of War (10 U.S.C. § 950t (15))<br>Destruction Of Property In Violation Of The Law Of War (10 U.S.C. § 950t (16))<br>Hijacking Or Hazarding A Vessel Or Aircraft (10 U.S.C. § 950t (23))<br>Terrorism (10 U.S.C. § 950t (24)) | Pre-trial hearings |
| Abd al Rahim al Nashiri | Using Treachery Or Perfidy (10 U.S.C. § 950t(17))<br>Murder In Violation Of The Law Of War (10 U.S.C. § 950t (15))<br>Attempted Murder In Violation Of The Law Of War (10 U.S.C. § 950t(28))<br>Terrorism (10 U.S.C. § 950t (24))<br>*Conspiracy (10 U.S.C. § 950t (29))*<br>Intentionally Causing Serious Bodily Injury (10 U.S.C. § 950t(13))<br>Attacking Civilians (10 U.S.C. § 950t (2))<br>Attacking Civilian Objects (10 U.S.C. § 950t (3))<br>Hijacking Or Hazarding A Vessel Or Aircraft (10 U.S.C. § 950t (23)) | Pre-trial hearings, currently stayed following two interlocutory appeals by the United States to the CMCR |
| Majid Khan | *Conspiracy (10 U.S.C. § 950t (29))*<br>Murder In Violation Of The Law Of War (10 U.S.C. § 950t (15))<br>Attempted Murder In Violation Of The Law Of War (10 U.S.C. § 950t(28))<br>*Providing Material Support For Terrorism (10 U.S.C. § 950t(25))*<br>Spying (10 U.S.C. § 950t(27)) | Pled guilty, awaiting sentencing |

**Note:** Charges liable to challenge under *Bahlul v. United States* are rendered in italic font.

# Cases Referred under the Military Commissions Act (2006 & 2009)

| | Charges | |
|---|---|---|
| Ahmed al Darbi | Attacking Civilians (10 U.S.C. § 950t (2))<br>Attacking Civilian Objects (10 U.S.C. §950t (3))<br>Hazarding A Vessel (10 U.S.C. § 950t (23))<br>Terrorism (10 U.S.C. § 950t(24))<br>Attempt (10 U.S.C. § 950t(28))<br>  Specification 1: Hazarding a Vessel<br>  Specification 2: Terrorism | Pled guilty, awaiting sentencing |
| Ali al Bahlul | *Conspiracy (10 U.S.C. § 950v(b)(28) (2006))*<br>*Solicitation (10 U.S.C. § 950u (2006))*<br>*Providing Material Support For Terrorism (10 U.S.C. § 950v(b)(2) (2006))* | Found guilty, judgment vacated by *United States v. Bahlul* (D.C. Cir. 2014) and *United States v. Bahlul* (D.C. Cir. 2015) |
| Omar Khadr<br>*repatriated* | Murder In Violation Of The Law Of War (10 U.S.C. § 950t (15))<br>Attempted Murder In Violation Of The Law Of War (10 U.S.C. § 950t(28))<br>*Conspiracy (10 U.S.C. § 950t (29))*<br>*Providing Material Support For Terrorism (10 U.S.C. § 950t(25))*<br>Spying (10 U.S.C. § 950t(27)) | Pled guilty, repatriated to Canada to serve the remainder of his sentence, appeal pending in the CMCR |
| Ibrahim al Qosi<br>*repatriated* | *Conspiracy (10 U.S.C. § 950t (29))*<br>*Providing Material Support For Terrorism (10 U.S.C. § 950t(25))* | Pled guilty, repatriated to Sudan after serving his sentence, appeal pending in the CMCR |

## Closed Cases

| Charges | Charges | Charges |
|---|---|---|
| Noor Uthman Muhammed<br>*repatriated* | *Conspiracy (10 U.S.C. § 950t (29))*<br>*Providing Material Support For Terrorism (10 U.S.C. § 950t(25))* | Pled guilty, repatriated to Sudan after serving his sentence, charges subsequently dismissed by the Convening Authority pursuant to *United States v. Bahlul* (D.C. Cir. 2014) |
| Mohammed Kamin | *Providing Material Support For Terrorism (10 U.S.C. § 950v(b)(2)) (2006)* | Charges dismissed without prejudice pursuant to E.O. 13492 |

**Note:** Charges liable to challenge under *Bahlul v. Untied States* are rendered in italic font.

# Cases Referred under the Military Commissions Act (2006 & 2009)

| | | |
|---|---|---|
| Mohammed Jawad<br>*repatriated* | Attempted Murder In Violation Of The Law Of War (10 U.S.C. § 950t (2007))<br>Intentionally Causing Serious Bodily Injury (10 U.S.C. § 950v(13)(2006)) | Charges dismissed, repatriated to Afghanistan after prevailing via *habeas corpus* |
| Mohammed Hashim | *Providing Material Support For Terrorism (10 U.S.C. § 950v(b)(2) (2006)*<br>*Spying (10 U.S.C. § 950t(27) (2006))* | Charges dismissed without prejudice pursuant to E.O. 13492 |
| Ahmed Khalfan Ghailani | *Conspiracy (10 U.S.C. § 950v(b)(28) (2006)*<br>Murder of Protected Persons (10 U.S.C. § 950(v)(1) (2006))<br>Murder in Violation of the Law of War (10 U.S.C. § 950(v)(15)(2006))<br>Attacking Civilians (10 U.S.C. § 950v(2)(2006))<br>Intentionally Causing Serious Bodily Injury (10 U.S.C. § 950v(13)(2006))<br>Destruction of Property in Violation of the Law of War (10 U.S.C. § 950v(16)(2006))<br>Terrorism (10 U.S.C. § 950v(24)(2006))<br>*Providing Material Support For Terrorism (10 U.S.C. § 950v(b)(2)) (2006)* | Charges dismissed without prejudice, prosecution transferred to the S.D.N.Y., convicted, and sentenced to life imprisonment |
| Salim Hamdan<br>*repatriated* | *Conspiracy (10 U.S.C. § 950v(b)(28) (2006)*<br>*Providing Material Support For Terrorism (10 U.S.C. § 950v(b)(25) (2006))* | Found guilty, in part, repatriated to Yemen after serving his sentence, judgment vacated by *United States v. Hamdan* (D.C. Cir. 2012) |
| David Hicks<br>*repatriated* | *Providing Material Support For Terrorism (10 U.S.C. § 950v(b)(25) (2006))* | Pled guilty, repatriated to Australia after serving his sentence, judgement vacated by the CMCR pursuant to *United States v. Bahlul* (D.C. Cir. 2014) |

**Note**: Charges liable to challenge under *Bahlul v. Untied States* are rendered in italic font.

**Attachment D**

Dep't of Defense, *Law of War Manual* (2015) (excerpt)

| Signal | Function and Examples of Use |
|--------|------------------------------|
| *e.g.,* | Added to any of the other signals when the cited authority is one of several authorities (some of which remain uncited) that stand for the same proposition |
| | International humanitarian law is an alternative term for the law of war that may be understood to have the same substantive meaning as the law of war.[12] |
| | [12] *See, e.g., Overview of the Amendment to the Convention on the Physical Protection of Nuclear Material*, 6, Enclosure to Condoleezza Rice, Letter of Submittal, Jun. 11, 2007, MESSAGE FROM THE PRESIDENT OF THE UNITED STATES TRANSMITTING AMENDMENT TO THE CONVENTION ON THE PHYSICAL PROTECTION OF NUCLEAR MATERIAL (THE "AMENDMENT"). A CONFERENCE OF STATES PARTIES TO THE CONVENTION ON THE PHYSICAL PROTECTION OF NUCLEAR MATERIAL, ADOPTED ON OCTOBER 28, 1979, ADOPTED THE AMENDMENT ON JULY 8, 2005, AT THE INTERNATIONAL ATOMIC ENERGY AGENCY IN VIENNA, TREATY DOC. 110-6, 6 (2007) ("(2) The United States of America understands that the term 'international humanitarian law' in Paragraph 5 of the Amendment (Article 2 of the Convention on the Physical Protection of Nuclear Material, as amended) has the same substantive meaning as the law of war."). |

## 1.3 DEFINITION OF THE LAW OF WAR

For the purposes of this manual, the *law of war* is that part of international law that regulates the resort to armed force; the conduct of hostilities and the protection of war victims in both international and non-international armed conflict; belligerent occupation; and the relationships between belligerent, neutral, and non-belligerent States.[6]

For the purposes of this manual, the law of war comprises treaties and customary international law applicable to the United States.[7]

### 1.3.1 Law of War – Notes on Terminology.

1.3.1.1 *Different Definitions of the Law of War*. The law of war may be defined slightly differently in other publications. For example, DoD issuances have defined the law of war more narrowly than the definition discussed in this section (*e.g.,* by omitting reference to that part of international law that regulates the resort to armed force).[8]

---

[6] *Refer to* § 3.2 (Situations to Which the Law of War Applies).

[7] *Refer to* § 1.7 (Treaties); § 1.8 (Customary International Law).

[8] *For example,* DOD DIRECTIVE 2310.01E, *DoD Detainee Program*, 14 (Aug. 19, 2014) ("law of war. The part of international law that regulates the conduct of hostilities and the protection of victims of armed conflict in both international and non-international armed conflict and occupation, and that prescribes the rights and duties of neutral, non-belligerent, and belligerent states. It is often called the 'law of armed conflict' or 'international humanitarian law,' and is specifically intended to address the circumstances of armed conflict. It encompasses all international law applicable to the conduct of military operations in armed conflicts that is binding on the United States or its individual citizens, including treaties and international agreements to which the United States is a party (e.g., the Geneva Conventions of 1949), and applicable customary international law."); DOD DIRECTIVE 2311.01E, *DoD Law of War Program*, ¶3.1 (May 9, 2006, Certified Current as of Feb. 22, 2011) ("Law of War. That part of

1.3.1.2 *Law of War versus International Humanitarian Law and Law of Armed Conflict*. The *law of war* is often called the *law of armed conflict*. Both terms can be found in DoD directives and training materials. *International humanitarian law* is an alternative term for the law of war that may be understood to have the same substantive meaning as the law of war.[9] In other cases, international humanitarian law is understood more narrowly than the law of war (*e.g.*, by understanding international humanitarian law not to include the law of neutrality).[10]

1.3.2 The Law of War's Relationship to Other Bodies of Law. An issue that often confronts law of war practitioners is the relationship of the law of war to other bodies of law, especially when rules in those bodies of law may appear to conflict with rules reflected in the law of war. These apparent conflicts are often resolved by considering the principle that the law of war is the *lex specialis* governing armed conflict.[11] How a law of war rule relates to a particular rule that is not grounded in the law of war may depend on the specific legal rule in question.

In general, the law of war may relate to other bodies of law through: (1) law of war rules superseding rules in other bodies of law with respect to armed conflict; (2) construing the rules in other bodies of law to avoid conflict with law of war rules; (3) law of war rules informing the content of general standards in other bodies of law, should such standards be construed to apply

---

international law that regulates the conduct of armed hostilities. It is often called the 'law of armed conflict.' The law of war encompasses all international law for the conduct of hostilities binding on the United States or its individual citizens, including treaties and international agreements to which the United States is a party, and applicable customary international law.").

[9] *See, e.g.*, *Overview of the Amendment to the Convention on the Physical Protection of Nuclear Material*, 6, Enclosure to Condoleezza Rice, *Letter of Submittal*, Jun. 11, 2007, MESSAGE FROM THE PRESIDENT OF THE UNITED STATES TRANSMITTING AMENDMENT TO THE CONVENTION ON THE PHYSICAL PROTECTION OF NUCLEAR MATERIAL (THE "AMENDMENT"). A CONFERENCE OF STATES PARTIES TO THE CONVENTION ON THE PHYSICAL PROTECTION OF NUCLEAR MATERIAL, ADOPTED ON OCTOBER 28, 1979, ADOPTED THE AMENDMENT ON JULY 8, 2005, AT THE INTERNATIONAL ATOMIC ENERGY AGENCY IN VIENNA, TREATY DOC. 110-6, 6 (2007) ("(2) The United States of America understands that the term 'international humanitarian law' in Paragraph 5 of the Amendment (Article 2 of the Convention on the Physical Protection of Nuclear Material, as amended) has the same substantive meaning as the law of war."); FRITS KALSHOVEN & LIESBETH ZEGVELD, CONSTRAINTS ON THE WAGING OF WAR: AN INTRODUCTION TO INTERNATIONAL HUMANITARIAN LAW 11 (International Committee of the Red Cross, 3rd ed., 2001) ("The law of war nowadays is often referred to by a phrase better suited to express its object and purpose, such as 'international humanitarian law applicable in armed conflict' or 'humanitarian law' – we shall be using these terms interchangeably, as we do with 'war' and 'armed conflict'.").

[10] Christopher Greenwood, *Historical Development and Legal Basis*, *in* DIETER FLECK, THE HANDBOOK OF HUMANITARIAN LAW IN ARMED CONFLICTS 9 (¶102) (1999) ("The term 'international humanitarian law' is of relatively recent origin and does not appear in the Geneva Conventions of 1949. ... International humanitarian law thus includes most of what used to be known as the laws of war, although strictly speaking some parts of those laws, such as the law of neutrality, are not included since their primary purpose is not humanitarian.").

[11] *See, e.g.*, Mary McLeod, Acting Legal Adviser, Department of State, *Opening Statement at 53rd Session of the U.N. Committee Against Torture, Nov. 3 – 28, 2014*, Nov. 12, 2014 (noting that "the law of armed conflict is the controlling body of law with respect to the conduct of hostilities and the protection of war victims,"); U.S. Delegation to U.N. General Assembly Third Committee, *Statement Clarifying Legal Points of Importance*, 2004 DIGEST OF UNITED STATES PRACTICE IN INTERNATIONAL LAW 331 ("Third, with respect to [preambular paragraph ('PP')] 4 and PP6, references to human rights law during armed conflict by necessity refer only to those provisions, if any, that may be applicable. As may be well known, it is the position of the United States Government that the Law of War is the *lex specialis* governing armed conflict.") (amendment in original).

8

to armed conflict; and (4) law of war treaties explicitly incorporating concepts from other bodies of law.

In some cases, it may be difficult to distinguish between these approaches, and different entities may apply different approaches to achieve the same result.[12] Although there are different approaches and although the ultimate resolution may depend on the specific rules and context, the law of war, as the *lex specialis* of armed conflict, is the controlling body of law with regard to the conduct of hostilities and the protection of war victims.[13]

1.3.2.1 *The Law of War as the Lex Specialis Governing Armed Conflict*. The maxim *lex specialis derogat legi generali* means that "[a]s a rule the special rule overrides the general law."[14] The rule that is more specifically directed towards the action receives priority because it takes better account of the particular features of the context in which the law is to be applied, thus creating a more equitable result and better reflecting the intent of the authorities that have made the law.[15]

The law of war has been developed with special consideration of the circumstances of war and the challenges inherent in its regulation by law. Thus, for example, the exigencies of armed conflict cannot justify violating the law of war.[16] Moreover, lawmakers sometimes have

---

[12] *Report of the International Law Commission, Fifty-sixth session (3 May-4 June and 5 July-6 August 2004)*, U.N. Doc. A/59/10 ¶304 (2004) ("In introducing the part of the study concerning the function and scope of the *lex specialis* rule, the Chairman stressed several points. First, he emphasized that recourse to the *lex specialis* rule was an aspect of legal reasoning that was closely linked to the idea of international law as a legal system. The *lex specialis* maxim sought to harmonize conflicting standards through interpretation or establishment of definite relationships of priority between them. In fact, he said, it was often difficult to distinguish between these two aspects of the functioning of the technique: the interpretation of a special law in the light of general law, and the setting aside of the general law in view of the existence of a conflicting specific rule. ... The adoption of a systemic view was important precisely in order to avoid thinking of *lex specialis* in an overly formal or rigid manner. Its operation was always conditioned by its legal-systemic environment.").

[13] *Observations of the United States of America on the Human Rights Committee's Draft General Comment 35: Article 9*, June 10, 2014, ¶20 ("While the United States acknowledges that difficult questions arise regarding the applicability of international human rights law in situations of armed conflict, the draft does not accord sufficient weight to the well-established principle that international humanitarian law, as the *lex specialis* of armed conflict, is the controlling body of law with regard to the conduct of hostilities and the protection of war victims.").

[14] Colleanu v. German State, German-Rumanian Mixed Arbitral Tribunal, Jan. 12, 1929, *reprinted in* H. LAUTERPACHT, V INTERNATIONAL LAW REPORTS 438 (1929). *See also* GROTIUS, LAW OF WAR & PEACE 428 (2.16.29.1) ("[A]mong agreements which are equal in respect to the qualities mentioned, that should be given preference which is most specific and approaches most nearly to the subject at hand; for special provisions are ordinarily more effective than those that are general").

[15] U.N. International Law Commission, *Conclusions of the work of the Study Group on the Fragmentation of International Law: Difficulties arising from the Diversification and Expansion of International Law* 2(7) (2006) ("*Rationale of the principle*. That special law has priority over general law is justified by the fact that such special law, being more concrete, often takes better account of the particular features of the context in which it is to be applied than any applicable general law. Its application may also often create a more equitable result and it may often better reflect the intent of the legal subjects.").

[16] *Refer to* § 2.2.2 (Military Necessity and Law of War Rules).

9

considered peacetime rules appropriate to apply during armed conflict, and in certain of these cases, they have explicitly incorporated such concepts into the law of war.[17]

Thus, traditionally, the law of war has been described as the only "authoritative rules of action between hostile armies," or as superseding ordinary law in the actual theater of military operations.[18] Similarly, law of war treaties have been viewed as a clear example of a *lex specialis* in relation to treaties providing peacetime norms concerning the same subjects.[19]

        1.3.2.2 *Construing Other Laws to Avoid Conflict With the Law of War*. Potential conflicts between the law of war and other law may be resolved by construing such other law to avoid conflict with law of war rules.

Underlying this approach is the fact that the law of war is firmly established in customary international law as a well-developed body of law that is separate from the principles of law generally applicable in peace.[20] Lawmakers have been understood not to amend that well-developed body of law, absent affirmative evidence of an intention to do so.[21] In a similar

---

[17] *Refer to* § 1.3.2.4 (Explicit Incorporation of Concepts From Other Bodies of Law Into the Law of War).

[18] *See* LIEBER CODE art. 40 ("There exists no law or body of authoritative rules of action between hostile armies, except that branch of the law of nature and nations which is called the law and usages of war on land."). *See also* WINTHROP, MILITARY LAW & PRECEDENTS 773-74 ("By the term LAW OF WAR is intended that branch of International Law which prescribes the rights and obligations of belligerents, or—more broadly—those principles and usages which, in time of war, define the status and relations not only of enemies—whether or not in arms—but also of persons under military government or martial law and persons simply resident or being upon the theatre of war, and which authorizes their trial and punishment when offenders. Unlike Military Law Proper, the Law of War *in this country* is not a formal written code, but consists mainly of general rules derived from International Law, supplemented by acts and orders of the military power and a few legislative provisions. In general it is quite independent of the ordinary law. 'On the actual theatre of military operations,' as is remarked by a learned judge, 'the ordinary laws of the land are superseded by the laws of war. The jurisdiction of the civil magistrate is there suspended, and military authority and force are substituted.' Finding indeed its original authority in the war powers of Congress and the Executive, and thus constitutional in its source, the Law of War may, in its exercise, substantially supersede for the time even the Constitution itself –as will be hereinafter indicated.").

[19] C. Wilfred Jenks, *The Conflict of Law-Making Treaties*, 30 BRITISH YEARBOOK OF INTERNATIONAL LAW 401, 446 (1953) ("A clear illustration of [the *lex specialis* principle's] applicability is afforded by instruments relating to the laws of war which, in the absence of evidence of a contrary intention or other special circumstances, must clearly be regarded as a *leges speciales* in relation to instruments laying down peace-time norms concerning the same subjects.").

[20] Edwin D. Williamson, Agent of the United States of America, *Preliminary Objections Submitted by the United States of America*, Case Concerning the Aerial Incident of 3 July 1988, I.C.J. (Iran v. United States), 200-01 (Mar. 4, 1991) ("The laws of armed conflict are firmly established in customary international law as a well-developed body of law separate from the principles of law generally applicable in times of peace.").

[21] *See, e.g.*, Case Concerning Oil Platforms (Iran v. United States), Preliminary Objection, Judgment,1996 I.C.J. 874, 876 (Dissenting Opinion of Vice-President Schwebel) ("It is plain that this is a Treaty which is essentially concerned with encouraging mutually beneficial trade and investments and closer economic intercourse on the basis of reciprocal equality of treatment. There is no suggestion of regulating the use of armed force by one party against the other. ... None of these core provisions of the Treaty suggests that attacks by armed forces of one party against what it treats as military objectives within the jurisdiction of the other party are within the reach of the Treaty. It is significant as well that the Treaty contains none of the treaty provisions which typically do bear on the international use of force."); *Written Statement of the Government of the United States of America*, 34, Jun. 20, 1995, I.C.J., Request by the United Nations General Assembly for an Advisory Opinion on the Legality of the Threat or Use of Nuclear Weapons ("No international environmental instrument is expressly applicable in armed conflict. No such