ORAL ARGUMENT SCHEDULED FOR DEC. 1, 2015

_____

No. 11-1324
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

ALI HAMZA AHMAD SULIMAN AL BAHLUL,

*Petitioner,*

v.

UNITED STATES OF AMERICA,

*Respondent.*

_____

On Petition for Review from the
United States Court of Military Commission Review
(CMCR No. 09-001)

_____

BRIEF OF THE NATIONAL INSTITUTE OF MILITARY JUSTICE
AS *AMICUS CURIAE* IN SUPPORT OF THE PETITIONER

_____

STEPHEN I. VLADECK
4801 Massachusetts Avenue, N.W.
Room 350
Washington, DC 20016
(202) 274-4241
svladeck@wcl.american.edu

J. DOUGLAS RICHARDS
COHEN MILSTEIN SELLERS
 & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
(212) 838-7797
drichards@cohenmilstein.com

*Attorneys for Amicus Curiae*

### CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

#### A. Parties and *Amici Curiae*

All parties, intervenors, and *amici curiae* appearing in this Court are listed in the Brief of Petitioner. *Amicus curiae* National Institute of Military Justice ("NIMJ") is a District of Columbia nonprofit corporation. Pursuant to Rule 26.1, *amicus* certifies that, other than NIMJ, none of the entities filing this brief are corporate entities or are owned in whole or in part by other corporate entities.

#### B. Rulings Under Review

References to the rulings at issue appear in the Brief of Petitioner.

#### C. Related Cases

Counsel is unaware of any cases related to this appeal other than those listed in the Brief of Petitioner.

#### D. Relevant Statutes and Regulations

Counsel is unaware of any statutes or regulations related to this appeal other than those provided in the Addendum to Petitioner's Brief.

<u>Dated</u>: **October 13, 2015**                    <u>/s/ J. Douglas Richards</u>
                                                          *Counsel for* Amicus Curiae

<u>COMPLIANCE WITH RULE 29</u>

## A. Consent to File

Pursuant to Fed. R. App. P. 29(a) and Circuit Rule 29(b), *amicus* certifies that all parties have consented to the filing of this brief.

## B. Authorship and Funding

Pursuant to Fed. R. App. P. 29(c)(5), *amicus* certifies that this brief was authored by *amicus* and counsel listed on the front cover. No party or party's counsel authored this brief, in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No other person besides *amicus* and their counsel contributed money that was intended to fund preparing or submitting this brief.

## C. Not Practical To Join in Single Brief

Pursuant to Circuit Rule 29(d), *amicus* certifies that it is not practicable to join all other *amici* in this case in a single brief. We do not claim expertise in the other issues addressed by *amici*, and believe it would be inappropriate to address matters upon which we do not have particular expertise.

<u>Dated</u>: **October 13, 2015**          /s/ J. Douglas Richards
                                                    *Counsel for* Amicus Curiae

ii

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, undersigned counsel states that amicus curiae National Institute of Military Justice is not a publicly-held corporation, issues no stock, and does not have a parent corporation.

Dated:  **October 13, 2015**

/s/ J. Douglas Richards
*Counsel for* Amicus Curiae

## TABLE OF CONTENTS

                                                                                          Page

CERTIFICATE AS TO PARTIES, RULINGS,
    AND RELATED CASES ...............................................................i

COMPLIANCE WITH RULE 29..................................................................ii

CORPORATE DISCLOSURE STATEMENT ........................................ iii

TABLE OF AUTHORITIES.......................................................................vi

INTEREST OF *AMICUS CURIAE*...........................................................1

SUMMARY OF ARGUMENT .................................................................2

ARGUMENT .............................................................................................5

I.    THE PRINCIPAL CONSTITUTIONAL LIMITS ON
    MILITARY JURISDICTION ARE THE JURY-TRIAL
    PROTECTIONS IN ARTICLE III AND THE FIFTH AND
    SIXTH AMENDMENTS ..................................................................5

    A.    The Supreme Court Has Repeatedly Distinguished
        Between Congress's Power To Define Offenses and Its
        Power To Subject Offenders to Military Jurisdiction.............5

    B.    The Supreme Court Has Conditioned Court-Martial
        Jurisdiction on a Specific Exception to the Jury-Trial
        Protections of Article III and the Fifth and Sixth
        Amendments ..........................................................................9

    C.    The Supreme Court Has Conditioned Military
        Commission Jurisdiction on Implicit Exceptions to the
        Jury-Trial Protections of Article III and the Fifth and
        Sixth Amendments...............................................................12

II.    NO EXCEPTION TO THE CONSTITUTION'S JURY-TRIAL
    PROTECTIONS SUPPORTS THE ASSERTION OF
    MILITARY JURISDICTION IN THIS CASE ...............................16

A.    The Jury-Trial Provisions Apply To Non-Citizens  Not Lawfully Present Within the United States..........................17

B.    This Case Does Not "Arise in the Land or  Naval Forces" .............................................................................. 19

C.    Petitioner is Not Charged With Offenses  Against the International Laws of War...................................................22

D.    No Jury-Trial Exception Exists for Violations  of the "Domestic Common Law of War"...........................................24

E.    "Functional" Analysis Does Not Support a Different Conclusion ........................................................................30

CONCLUSION ........................................................................35

# TABLE OF AUTHORITIES[*]

Page(s)

## CASES

*Al Bahlul* v. *United States* ("*Al Bahlul I*"),
  767 F.3d 1 (D.C. Cir. 2014) (en banc) ........................... 4, 22, 24, 27, 28

*Al Bahlul* v. *United States* ("*Al Bahlul II*"),
  792 F.3d 1 (D.C. Cir. 2015) .................................. 4, 7, 17, 22, 27, 30, 34

*Anderson v. Dunn*,
  19 U.S. (6 Wheat.) 204 (1821) ............................................................. 24

*Boumediene* v. *Bush*,
  553 U.S. 723 (2008) ................................................................................ 1

*Burns* v. *Wilson*,
  346 U.S. 137 (1953) .............................................................................. 16

*Callan* v. *Wilson*,
  127 U.S. 540 (1888) .............................................................................. 11

*CFTC* v. *Schor*,
  478 U.S. 833 (1986) ................................................... 30, 31, 32, 33, 34

*Cheff* v. *Schnackenberg*,
  384 U.S. 373 (1966) ................................................................................ 7

*Clinton* v. *Goldsmith*,
  526 U.S. 529 (1999) ................................................................................ 1

*Codispoti* v. *Pennsylvania*,
  418 U.S. 506 (1974) ................................................................................ 7

*Colepaugh* v. *Looney*,
  235 F.2d 429 (10th Cir. 1956) ......................................................... 27, 28

---

 [*] Authorities on which *amicus* principally relies are marked with asterisks (*).

*Dist. of Columbia* v. *Clawans*,
  300 U.S. 617 (1937)................................................................7

*Duncan* v. *Kahanamoku*,
  327 U.S. 304 (1946).........................................................21, 22

*Duncan* v. *Louisiana*,
  391 U.S. 145 (1968)................................................................7

*Dynes* v. *Hoover*,
  61 U.S. (20 How.) 65 (1857) .............................................. 10

*Ex parte Milligan*,
  71 U.S. (4 Wall.) 2 (1866)........................... 12, 13, 14, 25, 26

*Ex parte Quirin*,
  317 U.S. 1 (1942)............. 3, 4, 11, 13, 14, 15, 18, 20, 22, 23, 25, 27, 28

*Glidden Co.* v. *Zdanok*,
  370 U.S. 530 (1962)............................................................ 17

*Grisham* v. *Hagan*,
  361 U.S. 278 (1960).............................................................. 9

*Hamdan* v. *Rumsfeld* ("*Hamdan I*"),
  548 U.S. 557 (2006)......................................... 1, 21, 24, 26

*In re Yamashita*,
  327 U.S. 1 (1946)..................................................... 15, 16, 18

*Johnson* v. *Sayre*,
  158 U.S. 109 (1895)...................................................... 3, 10

*Johnson* v. *United States*,
  700 A.2d 240 (D.C. 1997) ................................................ 10

*Kinsella* v. *United States ex rel. Singleton*,
  361 U.S. 234 (1960)................................................. 9, 19, 21

*Madsen* v. *Kinsella*,
  343 U.S. 341 (1952)........................................ 20, 21, 25, 26

*McElroy* v. *United States ex rel. Guagliardo,*
  361 U.S. 281 (1960) ................................................................. 9

*Middendorf* v. *Henry,*
  425 U.S. 25 (1976) ................................................................. 11

*N. Pipeline Constr. Co.* v. *Marathon Pipe Line Co.,*
  458 U.S. 50 (1982) ................................................................. 30

*O'Callahan* v. *Parker,*
  395 U.S. 258 (1969) ............................................................... 10

*Palmore v. United States,*
  411 U.S. 389 (1973) ............................................................... 2

*Rasul* v. *Bush,*
  542 U.S. 466 (2004) ............................................................... 1

\**Reid* v. *Covert,*
  354 U.S. 1 (1957) ............................................... 7, 8, 19, 21

*Solorio* v. *United States,*
  483 U.S. 435 (1987) ........................................................ 10, 11

*Stern* v. *Marshall,*
  131 S. Ct. 2594 (2011) ...................................... 2, 6, 29, 31

*Thomas* v. *Union Carbide Agric. Prods. Co.,*
  473 U.S. 568 (1985) ............................................................... 30

*United States* v. *Ali,*
  71 M.J. 256 (C.A.A.F. 2012) ............................................... 11

*United States* v. *Cotton,*
  535 U.S. 625 (2002) ............................................................... 17

*United States v. Hamdan* ("*Hamdan II*"),
  696 F.3d 1238 (D.C. Cir. 2012) ........................................ 22

*United States* v. *Hamdan,*
  801 F. Supp. 2d 1247 (Ct. Mil. Comm'n Rev. 2011) .............. 1

*United States* v. *Tiede*,
  86 F.R.D. 227 (U.S. Ct. Berlin 1979) .................................................. 18

\**United States ex rel. Toth* v. *Quarles*,
  350 U.S. 11 (1955)........................................................................... 5, 24

*United States* v. *Verdugo-Urquidez*,
  494 U.S. 259 (1990)...................................................................... 17, 18

## CONSTITUTIONAL PROVISIONS

U.S. CONST. art. I, § 8, cl. 10 ............................................................ 3, 14

U.S. CONST. art. I, § 8, cl. 14 ..................................................................3

U.S. CONST. art. III, § 1 ...........................................................................2

U.S. CONST. art. III, § 2, cl. 3 .................................................................6

U.S. CONST. amend. V ....................................................................... 3, 6, 10

U.S. CONST. amend. VI..............................................................................6

## STATUTES

10 U.S.C. § 818 ........................................................................................15

10 U.S.C. § 821 ........................................................................................13

18 U.S.C. § 3261(a) ...................................................................................8

## OTHER AUTHORITIES

Richard R. Baxter,
  *So-Called "Unprivileged Belligerency": Spies, Guerrillas, and
  Saboteurs*, 28 BRIT. Y.B. INT'L L. 323 (1951) ....................................15

Military Commissions,
  11 OP. ATT'Y GEN. 297 (1865) ...............................................................27

Beth Stephens,
> *Federalism and Foreign Affairs: Congress's Power To "Define
> and Punish . . . Offenses Against the Law of Nations,"*
> 42 WM. & MARY L. REV. 447 (2000).....................................................23

Stephen I. Vladeck,
> *Military Courts and Article III*, 103 GEO. L.J. 933 (2015) .......... 15, 21

Earl Warren*, The Bill of Rights and the Military*,
> 37 N.Y.U. L. REV. 181 (1962) ...........................................................5, 6

WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS
> (2d ed. Beard Books 2000) (1896)........................................................5

## GLOSSARY OF TERMS

CFTC............................ Commodities Futures Trading Commission

MCA...........................Military Commissions Acts of 2006 and 2009

NIMJ .....................................National Institute of Military Justice

UCMJ ...........................................Uniform Code of Military Justice

<u>INTEREST OF *AMICUS CURIAE*</u>

The National Institute of Military Justice ("NIMJ") is a District of Columbia nonprofit corporation organized in 1991 to advance the fair administration of military justice and foster improved public understanding of the military justice system. NIMJ's advisory board includes law professors, private practitioners, and other experts in the field, none of whom are on active duty in the military, but nearly all of whom have served as military lawyers—several as flag officers.

NIMJ appears regularly as an *amicus curiae* in the U.S. Supreme Court—in support of the government in *Clinton* v. *Goldsmith*, 526 U.S. 529 (1999), and in support of the petitioners in *Rasul* v. *Bush*, 542 U.S. 466 (2004), *Hamdan* v. *Rumsfeld*, 548 U.S. 557 (2006), and *Boumediene* v. *Bush*, 553 U.S. 723 (2008). NIMJ has also appeared as an *amicus* before the Court of Military Commission Review in this case and in *United States* v. *Hamdan*, 801 F. Supp. 2d 1247 (Ct. Mil. Comm'n Rev. 2011), and has filed briefs before both the original three-judge panel and the *en banc* court in this case.

Although NIMJ has generally avoided taking a position on the legality of the military commissions established by the Military

1

Commissions Acts of 2006 and 2009, its interest in this case derives from its concern that the decisions under review neglected well-settled constitutional principles concerning the limits on the jurisdiction of military tribunals.

## SUMMARY OF ARGUMENT

Despite Article III's mandate that "[t]he judicial power of the United States . . . shall be vested" in courts staffed by judges with constitutional salary and tenure protections, U.S. CONST., art. III, § 1, the Supreme Court has historically recognized three species of permissible *non*-Article III federal adjudication: territorial courts; adjudication of "public rights" disputes by administrative agencies or specialized tribunals; and certain prosecutions before military judges. *See Palmore* v. *United States*, 411 U.S. 389, 400–04 (1973). Although each of these exceptions has distinct textual, historical, and analytical underpinnings, the Court has repeatedly stressed the importance of construing such departures narrowly, lest the courts "compromise the integrity of the system of separated powers and the role of the [Article III] Judiciary in that system." *Stern* v. *Marshall*, 131 S. Ct. 2594, 2620 (2011).

With regard to military courts, specifically, the Supreme Court has based the departure from Article III upon two distinct considerations: Congress's power to codify the relevant offenses, and the inapplicability of the jury-trial protections of Article III and the Fifth and Sixth Amendments. Thus, the Court has tied the constitutional validity of courts-martial to Congress's plenary power under the Make Rules Clause of Article I, U.S. Const. art. I, § 8, cl. 14, and the text of the Grand Jury Indictment Clause of the Fifth Amendment, which exempts from the requirement of presentment or grand jury indictment "cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger." *id*. amend. V; *see, e.g.*, *Johnson* v. *Sayre*, 158 U.S. 109, 115 (1895). And in the context of military commissions, the Court has justified the departure from Article III by reference to Congress's power to "define and punish . . . offenses against the law of nations," U.S. Const. art. I, § 8, cl. 10, and an *a*textual exception to the jury-trial protections for "offenses committed by enemy belligerents against the law of war." *Ex parte Quirin*, 317 U.S. 1, 41 (1942).

Neither of these exceptions, however, justifies the assertion of military jurisdiction in this case. Petitioner's case is not one "arising in the land or naval forces," since Petitioner himself is not *part* of those forces—and the Fifth Amendment was intended "to authorize the trial by court martial of the members of our Armed Forces for all that class of crimes which under the Fifth and Sixth Amendments might otherwise have been deemed triable in the civil courts." *Quirin*, 317 U.S. at 43. Nor does Petitioner's offense fall within the exception recognized in *Quirin*, since, as the government itself concedes, standalone conspiracy is not recognized as a violation of the international laws of war.

The government—along with Judge Kavanaugh (in his *en banc* concurrence in *Al Bahlul I*) and Judge Henderson (in her panel dissent in *Al Bahlul II*)—nevertheless maintains that there is historical support for trying offenses against the "U.S. common law of war" before military commissions, and that these precedents suggest that Article III does not prohibit the assertion of military jurisdiction over such offenses. In point of fact, though, no U.S. court has ever upheld the jurisdiction of a military tribunal to try an offense that *that* court believed to be a violation of the *domestic*—but not *international*—laws of war. As the

Supreme Court has made clear, Article III demands far more historical

evidence—and far more compelling prudential justifications—before

Congress may depart from its mandate.

<u>ARGUMENT</u>

I.  THE PRINCIPAL CONSTITUTIONAL LIMITS ON MILITARY
    JURISDICTION ARE THE JURY-TRIAL PROTECTIONS IN
    ARTICLE III AND THE FIFTH AND SIXTH AMENDMENTS

   a. The Supreme Court Has Repeatedly Distinguished
      Between Congress's Power To Define Offenses and Its
      Power To Subject Offenders to Military Jurisdiction

Although military jurisdiction pre-dates the Constitution, *see*

WILLIAM WINTHROP, MILITARY LAW AND PRECEDENTS 953–75 (2d ed.

Beard Books 2000) (1896), the Supreme Court has consistently

understood Congress's power to subject particular conduct to trial by a

military tribunal as turning on two distinct, but often related,

constitutional authorities: (1) Congress's Article I power to define the

offense in question; and (2) its separate authority to subject the offender

to trial for that offense before a *non*-Article III military court. *See, e.g.,*

*United States ex rel. Toth* v. *Quarles*, 350 U.S. 11, 14 & n.5 (1955). *See*

*generally* Earl Warren, *The Bill of Rights and the Military*, 37 N.Y.U. L.

REV. 181, 185–92 (1962) (grounding the Court's policing of military

5

jurisdiction in the need to give effect to constitutional boundaries between military and civilian authority).

This bifurcation is a byproduct of the jury-trial protections of Article III and the Fifth and Sixth Amendments. *See* U.S. CONST. art. III, § 2, cl. 3 ("The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury . . . ."); *id.* amend. V ("No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger . . . ."); *id.* amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."). It also reflects the principle recently reiterated by Chief Justice Roberts—that "Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decisionmaking if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III." *Stern* v. *Marshall*, 131 S. Ct. 2594, 2609 (2011).

Thus, subject to carefully circumscribed exceptions,[2] the Constitution's three jury-trial provisions generally require trial in a civilian court for all prosecutions under federal law. As a result, and contra the bulk of Judge Henderson's analysis in her *Al Bahlul II* panel dissent, *see Al Bahlul* v. *United States* ("*Al Bahlul II*"), 792 F.3d 1, 42–63 (D.C. Cir. 2015) (Henderson, J., dissenting), Congress's power to subject particular offenders to military jurisdiction does not turn solely on the Article I authority on which the offense is predicated, but on whether a recognized exception to the jury-trial protections also applies.

In *Reid* v. *Covert*, 354 U.S. 1 (1957), for example, the Supreme Court rejected Congress's power to court-martial the spouse of a servicemember, at least for a capital offense committed during peacetime. At the heart of Justice Black's analysis for a four-Justice

---

2. As the Court explained in *Duncan* v. *Louisiana*, 391 U.S. 145 (1968), "there is a category of petty crimes or offenses which is not subject to the Sixth Amendment jury trial provision." *Id.* at 159; *see also Dist. of Columbia* v. *Clawans*, 300 U.S. 617, 628 (1937). Relatedly, the Court has held that the trial of criminal contempt does not require a jury, at least where the maximum possible sentence is six months or less. *See Codispoti* v. *Pennsylvania*, 418 U.S. 506 (1974); *Cheff* v. *Schnackenberg*, 384 U.S. 373 (1966).

plurality[3] was his conclusion that the jury-trial provisions applied to trials of U.S. citizens outside the territorial United States—and therefore precluded the exercise of military jurisdiction. *See id.* at 6–14 (plurality opinion). Pointedly, the question was *not* whether Congress lacked the power to subject civilian dependents accompanying U.S. forces in the field to *any* criminal liability. *Cf.* Military Extraterritorial Jurisdiction Act, 18 U.S.C. § 3261(a). Instead, as Justice Black wrote,

> Under the grand design of the Constitution civilian courts are the normal repositories of power to try persons charged with crimes against the United States. And to protect persons brought before these courts, Article III and the Fifth, Sixth, and Eighth Amendments establish the right to trial by jury, to indictment by a grand jury and a number of other specific safeguards.

*Reid*, 354 U.S. at 21 (plurality opinion); *see also id.* at 9 n.12.

Three years later, when a majority of the Court followed Justice Black and extended *Reid* to bar court-martial jurisdiction over *all* peacetime offenses by civilians, it reasoned that "This Court cannot diminish and expand [Congress's power under the Make Rules Clause], either on a case-by-case basis or on a balancing of the power there

---

3. Justices Frankfurter and Harlan separately concurred in the judgment to provide a majority for the result. *See Reid*, 354 U.S. at 41–64 (Frankfurter, J., concurring in the result); *id.* at 65–78 (Harlan, J., concurring in the result).

granted Congress against the safeguards of Article III and the Fifth and Sixth Amendments." *Kinsella* v. *United States ex rel. Singleton*, 361 U.S. 234, 246 (1960). In other words, the constitutionality of military jurisdiction could not turn on the difference between capital and non-capital offenses, *see id.*, or between civilian employees and dependents, *see McElroy* v. *United States ex rel. Guagliardo*, 361 U.S. 281 (1960); *Grisham* v. *Hagan*, 361 U.S. 278 (1960), because the Constitution's jury-trial protections themselves brook no such distinction.

Instead, except in cases in which a recognized exception to the jury-trial provisions applies, military jurisdiction is foreclosed regardless of the underlying substantive offense or the specific source of Congress's power to define it.

> **b. The Supreme Court Has Conditioned Court-Martial Jurisdiction on a Specific Exception to the Constitution's Jury-Trial Protections**

In the context of courts-martial, the Supreme Court has justified the departure from Article III by reference to the text of the Grand Jury Indictment Clause of the Fifth Amendment, which exempts from the requirement of presentment or grand jury indictment "cases arising in the land or naval forces, or in the Militia, when in actual service in time

of War or public danger." U.S. CONST. amend. V; *see, e.g.*, *Johnson* v. *Sayre*, 158 U.S. 109, 115 (1895); *Dynes* v. *Hoover*, 61 U.S. (20 How.) 65 (1857). To that end, when the Supreme Court in *Solorio* v. *United States*, 483 U.S. 435 (1987), abandoned the "service connection" test[4] in favor of the proposition that servicemembers may be tried by court-martial for *any* offense Congress prescribes, that conclusion reflected not just the "natural meaning" of the Make Rules Clause, but *also* "the Fifth Amendment's exception for 'cases arising in the land or naval forces.'" *Id.* at 439.

To be sure, the rights to criminal trial by petit jury in Article III and the Sixth Amendment include no comparable textual exception. Nevertheless, courts have consistently concluded that an atextual carve-out to those provisions is necessarily reflected in (and follows from) the text of the Grand Jury Indictment Clause. *See, e.g.*, *Johnson* v. *United States*, 700 A.2d 240, 243 (D.C. 1997) ("In cases involving the right to a jury trial, the Supreme Court has never distinguished the claims brought under the Due Process Clause, the Sixth Amendment,

---

4. The Court had articulated the "service connection" test in *O'Callahan* v. *Parker*, 395 U.S. 258 (1969), holding that the Constitution only authorized military jurisdiction over servicemembers for offenses directly related to their military service, *id.* at 272–74.

and Article III." (citing *Callan* v. *Wilson*, 127 U.S. 540 (1888); and *Natal*

v. *Louisiana*, 139 U.S. 621 (1891))); *see also Ex parte Quirin*, 317 U.S. 1,

39 (1942) ("The Fifth and Sixth Amendments, while guaranteeing the

continuance of certain incidents of trial by jury which Article III, § 2

had left unmentioned, did not enlarge the right to jury trial as it had

been established by that Article."). *See generally Middendorf* v. *Henry*,

425 U.S. 25, 33–34 (1976).

Because the Supreme Court has thereby assumed that the jury-

trial provisions should be read *in pari materia*, the question of whether

court-martial jurisdiction is appropriate has reduced in almost every

case to whether the dispute "arises in the land or naval forces." And in

light of *Solorio*, in cases involving active-duty servicemembers, the jury-

trial question merges with the question of Congress's Article I power;

per Chief Justice Rehnquist's analysis, any conduct Congress could

validly proscribe through the Make Rules Clause necessarily involves a

case "arising in the land or naval forces." In other contexts, however,

those questions have remained analytically distinct. *Cf. United States*

v. *Ali*, 71 M.J. 256 (C.A.A.F. 2012) (upholding court-martial of civilian

contractor on ground that, as a non-citizen outside the territorial

11

United States, the defendant was categorically unprotected by the jury

trial provisions of the Fifth and Sixth Amendments).

### c. The Supreme Court Has Conditioned Military Commission Jurisdiction on Implicit Exceptions to the Constitution's Jury-Trial Protections

Although the dataset is far smaller, the Supreme Court has

followed a similar, bifurcated approach to the constitutional limits of

military commission jurisdiction. Thus, in *Ex parte Milligan*, 71 U.S. (4

Wall.) 2 (1866), the Court rejected the assertion of military jurisdiction

over a civilian accused of conspiring to steal Union weapons and

liberate Confederate prisoners from Union POW camps. In so holding,

the gravamen of the majority's constitutional objection was not that

Congress lacked Article I authority to proscribe Milligan's substantive

conduct in the abstract, but rather the central role of the jury-trial

protections, *see, e.g.*, *id*. at 123, along with the inapplicability of any

exception based upon martial rule, since the civilian courts were open

and their processes unobstructed, *see id*. at 127.[5]

---

5. In his four-Justice concurrence in *Milligan*, Chief Justice Chase disagreed with the majority as to whether Congress *could* authorize military commissions in appropriate circumstances, *see, e.g.*, *Milligan*, 71 U.S. (4 Wall.) at 136–37 (opinion of Chase, C.J.). Nevertheless, the concurring Justices appeared to agree that the reason why President

To whatever extent the Court in *Quirin* otherwise backtracked from some of its broader pronouncements in *Milligan*, it again embraced this bifurcated analysis of the constitutionality of military jurisdiction. Thus, Chief Justice Stone separately addressed whether Congress had in fact validly prohibited the conduct in question under Article I and whether the exercise of military—rather than civilian—jurisdiction was appropriate. To the former, the opinion focused on Article 15 of the Articles of War (present-day Article 21 of the UCMJ, 10 U.S.C. § 821). Through that provision, Chief Justice Stone explained,

> Congress has explicitly provided, so far as it may constitutionally do so, that military tribunals shall have jurisdiction to try offenders or offenses against the law of war in appropriate cases. Congress, in addition to making rules for the government of our Armed Forces, has thus exercised its authority to define and punish offenses against the law of nations by sanctioning, within constitutional limitations, the jurisdiction of military commissions to try persons for offenses which, according to the rules and precepts of the law of nations, and more particularly the law of war, are cognizable by such tribunals.

*Id.* at 28. In other words, Congress had "incorporated by reference, as within the jurisdiction of military commissions, all offenses which are

---

Lincoln could not unilaterally so provide was the jury-trial protections relied upon by the majority, *see, e.g., id.* at 137.

13

defined as such by the law of war, and which may constitutionally be included within that jurisdiction." *Id.* at 30.

Critically, though, the conclusion that Congress had validly exercised its power under the Define and Punish Clause of Article I, *see* U.S. CONST. art. I, § 8, cl. 10 (empowering Congress "[t]o define and punish . . . Offences against the Law of Nations . . . ."), did not resolve the validity of *military* jurisdiction over such offenses. Instead, because of *Milligan*, the Court separately had to assess whether the exercise of military jurisdiction was inconsistent with the Constitution's jury-trial protections:

> An express exception from Article III, § 2, and from the Fifth and Sixth Amendments, of trials of petty offenses and of criminal contempts has not been found necessary in order to preserve the traditional practice of trying those offenses without a jury. It is no more so in order to continue the practice of trying, before military tribunals without a jury, *offenses committed by enemy belligerents against the law of war.*

*Id.* at 41 (emphasis added).

Thus, based on a combination of policy considerations and an enigmatic statutory precedent,[6] the Court in *Quirin* recognized an

---

6. In particular, *Quirin* relied upon an 1806 statute in which Congress had subjected alien spies to military jurisdiction. *See* 317 U.S.

exception to the jury-trial provisions for "offenses committed by enemy belligerents against the law of war," an exception the application of which necessarily turned on the Court's separate conclusion that the charged offenses *were* war crimes. *See Quirin*, 317 U.S. at 30–38; *accord. In re Yamashita*, 327 U.S. 1, 7–9 (1946); *cf.* 10 U.S.C. § 818 ("General courts-martial also have jurisdiction to try any person who by the law of war is subject to trial by a military tribunal and may adjudge any punishment permitted by the law of war.").

Put another way, the constitutionality of the commissions in both *Quirin* and *Yamashita* did not turn merely on the fact that Congress

---

at 41–42. As Chief Justice Stone wrote, "[t]his enactment must be regarded as a contemporary construction of both Article III, § 2, and the Amendments as not foreclosing trial by military tribunals, without a jury, of offenses against the law of war committed by enemies not in or associated with our Armed Forces." *Id.* at 41.

In retrospect, many have argued that *Quirin* was simply incorrect on this point—that whether or not the jury-trial protections include an exception for offenses against the law of war, spying is *not* such an offense—and was not at the time. *See, e.g.*, Richard R. Baxter, *So-Called "Unprivileged Belligerency": Spies, Guerrillas, and Saboteurs*, 28 BRIT. Y.B. INT'L L. 323, 333 (1951). But whether a *separate* jury-trial exception might justify military jurisdiction over alien spies today, *see, e.g.*, Stephen I. Vladeck, *Military Courts and Article III*, 103 GEO. L.J. 933, 990–92 (2015), the above quote underscores that *Quirin* sustained such jurisdiction on the assumption that it was covered by the *same* jury-trial exception—and so its discussion of spying is immaterial here.

had validly exercised its power under the Define and Punish Clause of Article I; it turned on the separate—but equally important—holdings that (1) the Constitution's jury-trial protections do not extend to individuals subject to the laws of war who are charged with international war crimes; and (2) the defendants in those cases *were* such individuals charged with such offenses. Because the commissions in both cases therefore properly exercised jurisdiction, there was nothing more for the civilian courts to resolve via collateral habeas corpus review. *See, e.g.*, *Yamashita*, 327 U.S. at 8; *cf. Burns* v. *Wilson*, 346 U.S. 137 (1953) (plurality opinion) (expanding the scope of collateral review of courts-martial).

## II. NO EXCEPTION TO THE CONSTITUTION'S JURY-TRIAL PROTECTIONS SUPPORTS THE ASSERTION OF MILITARY JURISDICTION IN THIS CASE

As Part I summarized, the constitutionality of military jurisdiction in a particular case turns on *both* Congress's Article I power to define the relevant offense *and* the inapplicability of the jury-trial protections of Article III and the Fifth and Sixth Amendments. In this

Part, *amicus* explains why no exception to the jury-trial provisions supports the assertion of military jurisdiction in this case.[7]

### a. The Jury-Trial Provisions Apply To Non-Citizens Not Lawfully Present Within the United States

First, contra Judge Henderson's analysis in her *Al Bahlul II* panel dissent, *see Al Bahlul II*, 792 F.3d at 71–72 (Henderson, J., dissenting), it bears emphasizing that the Supreme Court has never recognized a categorical exception to the jury-trial protections for non-citizens detained—and tried—outside the territorial United States. Instead, the Court's jurisprudence has largely reflected Justice Kennedy's concurrence in *United States* v. *Verdugo-Urquidez*, 494 U.S. 259 (1990), which suggested that the constitutional calculus changes dramatically once the United States affirmatively seeks to prosecute non-citizens for extraterritorial conduct. *See, e.g., id.* at 278 (Kennedy, J., concurring)

---

7. *Amicus* agrees with Petitioner that his Article III challenge is subject to *de novo*—not plain error—review, whether or not it was properly preserved below, and whether or not a party in other circumstances may validly "consent" to otherwise impermissible non-Article III adjudication. *See United States* v. *Cotton*, 535 U.S. 625, 630–31 (2002); *see also Glidden Co. v. Zdanok*, 370 U.S. 530, 536 (1962) (plurality opinion) ("[T]he disruption to sound appellate process entailed by entertaining objections not raised below . . . is plainly insufficient to overcome the strong interest of the federal judiciary in maintaining the constitutional plan of separation of powers.").

("The United States is prosecuting a foreign national in a court established under Article III, and all of the trial proceedings are governed by the Constitution. All would agree, for instance, that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant."); *see also United States* v. *Tiede*, 86 F.R.D. 227 (U.S. Ct. Berlin 1979) (holding that non-citizens tried before a U.S. court in Berlin were entitled to a trial by jury).[8] Thus, whether or not non-citizens detained at Guantánamo may affirmatively invoke constitutional protections in *civil* proceedings, it necessarily follows that the considerations identified in Part I, *supra*, also govern the constitutionality of military jurisdiction in this case.

Further to that point, in both *Quirin* and *Yamashita*, the Supreme Court declined to rest its analysis on the conclusion that the jury-trial provisions categorically did not apply to the defendants, who, with two exceptions in *Quirin*, were non-citizens not lawfully present within the United States at the time of their capture. If the jury-trial provisions simply did not apply to non-citizens not lawfully present within the

---

8. In contrast to these precedents, none of the cases cited by Judge Henderson in *Al Bahlul II* involved jury-trial rights in a criminal case. *See Al Bahlul II*, 792 F.3d at 71–72 (Henderson, J., dissenting).

United States, the implicit law-of-war exception recognized in those cases would have been all-but unnecessary. Thus, the fact that Petitioner is a non-citizen detained outside the territorial United States is of no moment in assessing the applicability of the jury-trial provisions.

> **b. This Case Does Not "Arise in the Land or Naval Forces"**

Nor can it be argued that this case "arises in the land or naval forces," and therefore falls within the textual exception to the jury-trial provisions recognized by the Court in its court-martial jurisprudence. As the cases surveyed in Part I demonstrate, the Supreme Court has taken a literal approach to the scope of this textual exception, holding, for example, that conduct by civilian employees of the military and servicemember dependents does not "arise in the land or naval forces" even when it takes place while those individuals are accompanying the armed forces in the field. *See Singleton*, 361 U.S. at 246; *see also Reid*, 354 U.S. at 22 (plurality) (construing the Grand Jury Indictment Clause alongside the Make Rules Clause, which "does not encompass persons who cannot fairly be said to be 'in' the military service").

Time and again, the Court has suggested that a case only "arises in the land or naval forces" when the defendant is necessarily part of those forces. As Chief Justice Stone put it in *Quirin*, the "objective" of the jury-trial exception was "to authorize the trial by court martial of the members of our Armed Forces for all that class of crimes which under the Fifth and Sixth Amendments might otherwise have been deemed triable in the civil courts," 317 U.S. at 43, and nothing more.

The only departure the Court has recognized from this rule has no relevance here. *Madsen* v. *Kinsella*, 343 U.S. 341 (1952), sustained the use of a military commission in what was then occupied Germany to try the civilian wife of a servicemember for her husband's murder, in violation of the German Criminal Code. In effect, *Madsen* upheld the constitutionality of "occupation courts" in circumstances in which no civilian jurisdiction was available, *see id.* at 356–60, insinuating (albeit without any analysis) that such courts did not offend the jury-trial protections because cases like Madsen's "ar[ose] in the land or naval forces." *See id.* at 359 & n.26.

To be sure, *Madsen* is probably better understood as turning on a distinct aspect of Justice Burton's analysis, *i.e.*, that the U.S. occupation

courts were consistent with international law in light of the absence of

functioning civil judicial authority, *see, e.g.*, *id.* at 354–55, especially

since the Court's construction of the Fifth Amendment was necessarily

overtaken by its subsequent—and narrower—approach in *Reid* and

*Singleton. See* Vladeck, *Military Courts*, *supra*, at 990.

 In any event, though, *Madsen* is inapposite here because the

tribunals established by the Military Commissions Acts of 2006 and

2009 are not functioning in this case as "occupation courts." *See*

*Hamdan* v. *Rumsfeld* ("*Hamdan I*"), 548 U.S. 557, 595–96 (2006) ("The

third type of commission, convened as an 'incident to the conduct of war'

when there is a need 'to seize and subject to disciplinary measures those

enemies who in their attempt to thwart or impede our military effort

have violated the law of war,' has been described as 'utterly different'

from the other two." (citations and footnotes omitted)).

 There is no question that martial law has not been declared here.

Similarly, the military commission did not exercise jurisdiction in this

case "as part of a temporary military government over occupied enemy

territory or territory regained from an enemy where civilian

government cannot and does not function." *Duncan* v. *Kahanamoku*,

327 U.S. 304, 314 (1946). Thus, the exception to the Grand Jury

Indictment Clause for cases "arising in the land or naval forces" does

not apply. *See Al Bahlul* v. *United States* ("*Al Bahlul I*"), 767 F.3d 1, 7

(D.C. Cir. 2014) (en banc) (noting that Petitioner was tried by a "law-of-

war military commission").

### c. The Jury-Trial Exception Recognized in *Quirin* Does Not Apply Here

As the government noted before the *en banc* court in *Al Bahlul I*,

it "has acknowledged that conspiracy has not attained recognition at

this time as an offense under customary international law. . . . even

when the objects of the conspiracy are offenses prohibited by customary

international law . . . ." Brief for the United States at 34, *Al Bahlul I*,

767 F.3d 1 [hereinafter "U.S. *Bahlul* Brief"]; *see also United States* v.

*Hamdan* ("*Hamdan II*"), 696 F.3d 1236, 1249–53 (D.C. Cir. 2012).

Judges Kavanaugh and Henderson have nevertheless concluded

that an offense need not be so recognized in order for it to fall within the

scope of Congress's power under the Define and Punish Clause, or its

other Article I authorities, *see Al Bahlul II*, 792 F.3d at 43–44

(Henderson, J., dissenting); *Hamdan II*, 696 F.3d at 1246 n.6 (solo

opinion of Kavanaugh, J.); *see also* U.S. *Bahlul* Brief at 60. But whether

or not that is true (a question on which *amicus* takes no position), it elides the critical distinction to which *amicus* has repeatedly adverted— between Congress's power to define the underlying offense in the abstract and the existence of a specific exception to the jury-trial provisions justifying the assertion of military, rather than civilian, jurisdiction. Even if Congress has the power to decide for *itself* that particular conduct constitutes a violation of the law of nations for purposes of imposing *civilian* criminal or civil liability, *see, e.g.*, Beth Stephens, *Federalism and Foreign Affairs: Congress's Power To "Define and Punish . . . Offenses Against the Law of Nations*," 42 WM. & MARY L. REV. 447 (2000), the exception to the jury-trial protections identified by the Supreme Court in *Quirin* extends only to offenses committed by enemy belligerents against the *international* laws of war, *see, e.g.*, *Quirin*, 317 U.S. at 41.

Thus, regardless of whether Congress is entitled to interpretive latitude in defining war crimes under the Define and Punish Clause or its other enumerated powers, such deference does not extend to a determination that the offenses in question are fit for *military* adjudication. After all, "The caution that must be exercised in the

23

incremental development of common-law crimes by the judiciary

is . . . all the more critical when reviewing developments that stem from

military action." *Hamdan I*, 548 U.S. at 602 n.34 (plurality); *see also*

*Toth*, 350 U.S. at 23 n.22 ("Determining the scope of the constitutional

power of Congress to authorize trial by court-martial presents another

instance calling for limitation to 'the least possible power adequate to

the end proposed.'" (quoting *Anderson* v. *Dunn*, 19 U.S. (6 Wheat.) 204,

231 (1821))).

### d. There Is No Jury-Trial Exception for Violations of the "U.S. Common Law of War"

Perhaps in light of this understanding, the government has rested

its defense of Petitioner's conviction on the distinct claim that

Congress's power to define the offenses in question and subject them to

trial by military tribunal derives from the "the common law of war

developed in U.S. military tribunals," U.S. *Bahlul* Brief, *supra*, at 28,

also referred to as the "U.S. common law of war." *Al Bahlul I*, 767 F.3d

at 67–70 (Kavanaugh, J., concurring in the judgment in part and

dissenting in part).

The problems with this argument are three-fold: *First*, and most

significantly, the Supreme Court has never recognized a separate and

24

distinct exception to the jury-trial provisions of Article III and the Fifth and Sixth Amendments for such offenses. Thus, even if reliance upon wholly domestic precedents places the government's Article I argument on stronger footing, it comes at the expense of the jury-trial exception recognized in *Quirin*, which was necessarily (and logically) limited to offenses against the *international* laws of war—again, based upon the prevailing understanding at the Founding. *See Quirin*, 317 U.S. at 42–44.

*Second*, the examples that Judges Kavanaugh and Henderson have invoked as providing to the contrary all pre-date the jury-trial jurisprudence surveyed in Part I, *supra*. Indeed, neither Judges Kavanaugh and Henderson nor the government can point to a single post-*Milligan* case (let alone a post-*Quirin* precedent) in which the federal courts specifically approved the use of military commissions to try offenses against the "U.S. common law of war," *as such*. Even in *Madsen*, the Supreme Court held the jury-trial protections inapplicable to occupation courts not because the authority to convene such tribunals derived from common law (even though, based on the Civil War-era precedents on which the government has relied in this litigation, it

25

arguably did), but because of Justice Burton's cryptic conclusion that cases before such courts "ar[ose] in the land or naval forces." *See Madsen*, 343 U.S. at 359 & n.26.

*Third*, and finally, even the Civil War-era evidence purportedly supporting the government's position is equivocal. Whether Civil War-era military tribunals were trying law-of-war offenses or ordinary municipal crimes was often immaterial to their jurisdiction, since they typically functioned as *both* law-of-war and occupation courts. *See Hamdan I*, 548 U.S. at 608 (plurality opinion) ("[T]he military commissions convened during the Civil War functioned at once as martial law or military government tribunals and as law-of-war commissions. Accordingly, they regularly tried war crimes and ordinary crimes together." (citation omitted)). And in any event many—if not most—of the Civil War-era precedents were necessarily undermined by *Milligan*, at least in those cases in which civilian criminal jurisdiction was available. *See* 71 U.S. (4 Wall.) at 127; *see also Hamdan I*, 548 U.S. at 596 n.27 (plurality opinion).

Comparable flaws pervade the examples on which Judge Kavanaugh's concurrence in *Al Bahlul I* and Judge Henderson's dissent

26

in *Al Bahlul II* have rested—the military commission trial arising out of the Lincoln assassination, *Quirin* itself, and the Tenth Circuit's post-*Quirin* decision in *Colepaugh* v. *Looney*, 235 F.2d 429 (10th Cir. 1956). *See Al Bahlul II*, 792 F.3d at 59–62 (Henderson, J., dissenting); *Al Bahlul I*, 767 F.3d at 67–70 (Kavanaugh, J., concurring in the judgment in part and dissenting in part).

With regard to the Lincoln assassination trial, Attorney General Speed's legal opinion is crystal clear that he believed the constitutional authority to subject the conspirators to trial by military commission derived *entirely* from the conclusion that their conduct violated the international laws of war. *See* Military Commissions, 11 OP. ATT'Y GEN. 297, 313 (1865) ("Trials for offences against the laws of war are not embraced or intended to be embraced in those [constitutional] provisions."); *id.* at 316 ("If the persons charged have offended against the laws of war, it would be as palpably wrong for the military to hand them over to the civil courts, as it would be wrong in a civil court to convict a man of murder who had, in time of war, killed another in battle."). Speed may well have been *wrong* that the offenses at issue were recognized violations of the international law of war (or that the

27

civilian courts could not try international war crimes), but neither analytical shortcoming supports Judge Kavanaugh's reading of the case—*i.e.*, that "the Lincoln conspirators case looms as an especially clear and significant precedent" for military commission trials of conspiracy as a *domestic* law-of-war offense. *Al Bahlul I*, 767 F.3d at 69 (Kavanaugh, J., concurring in the judgment in part and dissenting in part).

Nor is the trial of the Nazi saboteurs any different, for the Supreme Court there expressly *declined* to uphold the saboteurs' conspiracy conviction, relying instead on its conclusion that the saboteurs had violated the international laws of war by passing surreptitiously behind enemy lines during wartime. Indeed, the only time "conspiracy" is ever even *mentioned* in Chief Justice Stone's opinion for the Court is in his summary of the original charges against the defendants. *See Quirin*, 317 U.S. at 23. The same flaw pervades Judge Henderson's reliance upon *Colepaugh*, which nowhere analyzed whether the crime of *inchoate* conspiracy could lawfully be tried by a military commission. *See* 235 F.2d 429.

A proper assessment of these historical examples thus illuminates the novelty of the government's position: Prior to the MCA, no U.S. court had ever upheld the power of a military commission like the ones at issue here to try an offense on the ground that it is a violation of the domestic—but not international—laws of war. And although the distinction between domestic and international war crimes may appear semantic, it is a vital constitutional line that the Supreme Court has never crossed—and for good reason. Once military commissions are free to try offenses simply because the U.S. government decrees them to be "war crimes," the line between civilian and military jurisdiction could become elusive—if not altogether illusory.

The government dismisses these concerns as "academic." U.S. *Bahlul* Brief, *supra*, at 71. But as Chief Justice Roberts wrote three years ago, "[w]e cannot compromise the integrity of the system of separated powers and the role of the Judiciary in that system, even with respect to challenges that may seem innocuous at first blush." *Stern*, 131 S. Ct. at 2620. And whatever the merit of the exceptions to the jury-trial protections that the Supreme Court has historically identified, the government has offered no historical, analytical, or

29

prudential justification for a new exception for offenses against the "U.S. common law of war." *See N. Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U.S. 50, 70 (1982) (plurality opinion) (noting that, in each instance in which the Supreme Court has upheld non-Article III federal adjudication, it "has recognized certain exceptional powers bestowed upon Congress by the Constitution or by historical consensus. Only in the face of such an exceptional grant of power has the Court declined to hold the authority of Congress subject to the general prescriptions of Art. III.").

### e. "Functional" Analysis Does Not Support a Different Conclusion

In her *Al Bahlul II* dissent, Judge Henderson reached a contrary result largely by analogy to the multi-factor balancing test the Supreme Court has sometimes used to determine whether certain "public rights" disputes may be resolved by non-Article III federal adjudicators. *See Al Bahlul II*, 792 F.3d at 64–65 (Henderson, J., dissenting) (citing *CFTC* v. *Schor*, 478 U.S. 833 (1986); *Thomas* v. *Union Carbide Agric. Prods. Co.*, 473 U.S. 568 (1985)).

Whatever the merits of such an approach in the public rights context, *amicus* believes that it has no relevance to the permissible

scope of non-Article III military adjudication.[9] But even if it did, *amicus* agrees with the *Al Bahlul II* panel majority that such an approach leads to the same result in this case—the rejection of the commissions' power to try inchoate conspiracy.

Consider, for example, the first prong of *Schor*—"the extent to which the 'essential attributes of judicial power' are reserved to Article III courts, and, conversely, the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts." 478 U.S. at 851. In *Schor* itself, Justice O'Connor emphasized that allowing the CFTC to entertain the small class of state-law counterclaims at issue "leaves far more of the 'essential attributes of judicial power' to Article III courts," since, among other things, the CFTC "does not exercise 'all ordinary powers of district courts,' and thus may not, for instance, *preside over jury trials*." *Id.* at

---

9.  Although the constitutional concern in the context of unduly expansive non-Article III public rights adjudication goes entirely to the arrogation of Article III judicial power, *see, e.g.*, *Stern*, 131 S. Ct. at 2615, the concern in the context of unduly expansive *military* adjudication is *both* about diluting Article III *and* about depriving criminal defendants of their constitutional rights to an Article III civilian judge, a grand jury indictment, and a petit jury trial. Thus, one will find nary a reference to such functional analysis in any of the numerous cases in which the Supreme Court has invalidated (or sustained) Congress's assertion of military jurisdiction.

31

853 (emphasis added). Here, in contrast, the military commissions *are* trial courts, presiding over criminal trials (with military "juries"), and exercising the "essential attributes of judicial power" by, among other things, rendering final criminal verdicts and sentences. Thus, unlike the kinds of civil claims at issue in the public rights context (which typically arise under state law and are routinely not only heard by non-Article III courts, including state courts, but are resolved under state, not federal law), it is not at all obvious why the first *Schor* factor weighs in favor of (as opposed to against) non-Article III military adjudication of domestic federal crimes.

Similar analysis applies to the second *Schor* factor—"the origins and importance of the right to be adjudicated." 478 U.S. at 851. Compared to state-law civil counterclaims filed as part of CFTC reparation proceedings, it cannot be denied that federal criminal prosecutions—and the loss of liberty (if not life) that they implicate—involve the most fundamental and important of rights to be adjudicated. And if the purpose of the second *Schor* factor is to prefer Article III adjudication for especially novel and/or significant legal and constitutional claims, then it is especially difficult to see how this factor

weighs in favor of the novel non-Article III military adjudication of domestic federal crimes.

Analysis of the third *Schor* factor—"the concerns that drove Congress to depart from the requirements of Article III," *id.*—only cements the inappropriateness of non-Article III adjudication in this case. In *Schor*, for example, Justice O'Connor highlighted the extent to which, "When Congress authorized the CFTC to adjudicate counterclaims, its primary focus was on making effective a specific and limited federal regulatory scheme, not on allocating jurisdiction among federal tribunals." *Id.* at 855.

Here, in contrast, the military commissions were created at least in part to avoid concerns raised by the procedural and evidentiary protections that would otherwise have applied to prosecutions in Article III courts. As Judge Henderson candidly conceded, the MCA was motivated by, among other things, "concerns [from] the potential disclosure of highly classified information; the efficiency of military-commission proceedings; the military's expertise in matters of national security; the inability to prosecute enemy combatants due to speedy-

trial violations; [and] the inadmissibility of certain forms of evidence."
*Al Bahlul II*, 792 F.3d at 67–68 (Henderson, J., dissenting).

Thus, contra *Schor*, the concerns justifying Congress's departure from Article III in this case had everything to do with *avoiding* Article III adjudication—and, as the track record of the commissions sadly underscores, nothing whatsoever to do with streamlining judicial review of a complex administrative scheme. Whether *Schor*'s factors would *ever* support military commission trials, they certainly do not here.

## CONCLUSION

For the foregoing reasons, *amicus* respectfully submits that Petitioner's conspiracy conviction should be vacated for lack of jurisdiction.

Dated: **October 13, 2015**

/s/ J. Douglas Richards
J. DOUGLAS RICHARDS
COHEN MILSTEIN SELLERS
 & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY  10005
(212) 838-7797
drichards@cohenmilstein.com

STEPHEN I. VLADECK
4801 Massachusetts Avenue, N.W.
Room 350
Washington, DC  20016
(202) 274-4241
svladeck@wcl.american.edu

*Counsel for* Amicus Curiae

### CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Pursuant to Rule 32(a) of the Federal Rules of Appellate

Procedure, the undersigned counsel of record certifies as follows:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

    a. This brief contains **6,998** words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    a. This brief has been prepared in a proportionally spaced typeface using *Microsoft Word 2010* in *Century Schoolbook*, 14-point font.


Dated: **October 13, 2015**                    /s/ J. Douglas Richards
                                                                       *Counsel for* Amicus Curiae

CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2015, a copy of the foregoing was filed electronically with the Court. Notice of this filing will be sent to all parties by operation of this Court's electronic filing system. Parties may access this filing through the Court's system.

Dated: **October 13, 2015**                    /s/ J. Douglas Richards
                                                           *Counsel for* Amicus Curiae