No. 11-1324

**ORAL ARGUMENT SCHEDULED FOR DECEMBER 1, 2015**

_____

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

**ALI HAMZA SULIMAN AHMAD AL BAHLUL**

*Petitioner*,

**v.**

**UNITED STATES OF AMERICA**

*Respondent*.

_____

**ON APPEAL FROM THE
COURT OF MILITARY COMMISSION REVIEW (CMCR-09-001)**

_____

**BRIEF OF *AMICI CURIAE*
INTERNATIONAL LAW SCHOLARS
IN SUPPORT OF PETITIONER ON *EN BANC* REVIEW**

_____

William J. Aceves
California Western School of Law
225 Cedar Street
San Diego, CA  92101
Tel (619) 515-1589
Fax (619) 615-1489
wja@cwsl.edu
*Counsel of Record*

Counsel for *Amici Curiae*

David Weissbrodt
University of Minnesota Law School
229 19th Ave. South
Minneapolis, MN 55455
Tel (612) 625-5027
weiss001@umn.edu

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## I. PARTIES AND *AMICI* APPEARING BELOW

The parties and *amici* who appeared before the Court of Military Commission Review in connection with this appeal were:

1.  Ali Hamza Suliman Ahmad al Bahlul, *Petitioner*

2. United States of America, *Respondent*

3. *Amicus Curiae* the Office of the Chief Defense Counsel, Col. Peter Masciola USAF (on brief)

4. *Amicus Curiae* Robert David Steele and Others in the United States Intelligence Community, McKenzie Livingston (on brief)

5. *Amicus Curiae* Historians, Political Scientists and Constitutional Law Professors, Sarah Paoletti (on brief)

6. *Amicus Curiae* National Institute of Military Justice, Michelle Lindo (on brief)

7. *Amicus Curiae* Montana Pardon Project, Jeffrey Renz (on brief)

8. *Amicus Curiae* Human Rights Committee of the American Branch of the International Law Association, Jordan J. Paust (on brief)

## II. PARTIES AND *AMICI* APPEARING IN THIS COURT

The parties and *amici* who are appearing in this Court are:

1. Ali Hamza Suliman Ahmad al Bahlul, *Petitioner*

2. United States of America, *Respondent*

3. *Amicus Curiae* Retired Military and Intelligence Officers, McKenzie Livingston (on brief)

4. *Amicus Curiae* The National Institute of Military Justice, Steve Vladeck (on brief)

5. *Amicus Curiae* First Amendment Historians, Jeffrey Renz (on brief)

6. *Amicus Curiae* Historians, Political Scientists and Constitutional Law Professors, Sarah Paoletti (on brief)

7. *Amicus Curiae* David Glazier & Gary Solis, John Summers (on brief)

8. *Amicus Curiae* Constitutional Accountability Center, Elizabeth Wydra (on brief)

9. *Amicus Curiae* Former Government Officials, Military Lawyers & Scholars, Peter Margulies (on brief)

10. *Amicus Curiae* Washington Legal Foundation, Richard Samp (on brief)

11. *Amicus Curiae* International Legal Scholars, William Aceves (on brief)

## III. RULINGS UNDER REVIEW

This case is on appeal from a decision of the United States Court of Military Commission Review in *United States v. Ali Hamza Ahmad Suliman al Bahlul,* CMCR 09-001(en *banc* September 9, 2011) and which is reported at *United States v. al Bahlul*, 820 F.Supp.2d 1141 (C.M.C.R. 2011).

## IV. RELATED CASES

This case has not been previously filed with this court or any other court. Counsel are unaware of any other related cases.


Dated:          October 13, 2015                    Respectfully submitted


                                                    /s/ William J. Aceves

                                                    William J. Aceves
                                                    California Western School of Law
                                                    225 Cedar Street
                                                    San Diego, CA 92101
                                                    (619) 515-1589
                                                    wja@cwsl.edu

                                                    Counsel for *Amici Curiae*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............ ii

TABLE OF CONTENTS .................................................................................v

TABLE OF AUTHORITIES ........................................................................vi

GLOSSARY OF ABBREVIATIONS ................................................... xii

STATUTES AND REGULATIONS ................................................... xiii

INTEREST OF *AMICI CURIAE* ...............................................................1

STATEMENT OF AUTHORSHIP AND FINANCIAL INTEREST ......................2

SUMMARY OF ARGUMENT ..................................................................2

ARGUMENT ...........................................................................................3

     I.    CONSPIRACY IS NOT AN OFFENSE AGAINST THE LAW OF WAR ...................................................................................5

     II.   THE CRIME OF CONSPIRACY IS INAPPROPRIATE WITHIN THE LAW OF ARMED CONFLICT ...............................................15

CONCLUSION .....................................................................................20

ADDENDUM ........................................................................................21

CERTIFICATE OF COMPLIANCE.......................................................27

CERTIFICATE OF SERVICE ...............................................................28

# TABLE OF AUTHORITIES[1]

## UNITED STATES CASES

*Al Bahlul v. United States*,
    792 F.3d 1 (D.C. Cir. 2015)............................................................................2

*Ex parte Quirin*,
    317 U.S. 1 (1942)...........................................................................................3

*Glasser v. United States*,
    315 U.S. 60 (1942).......................................................................................16

*\*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006).......................................................................................3

*Hamdan v. United States*,
    696 F.3d 1238 (D.C. Cir. 2012)....................................................................4

*In re Yamashita*,
    327 U.S. 1 (1946).................................................................................3, 4, 7

*The Nereide*,
    13 U.S. (9 Cranch) 388 (1815) .....................................................................4

*United States v. Saglietto*,
    41 F. Supp. 21 (E.D.Va. 1941) ...................................................................16

*United States v. Smith*,
    18 U.S. (5 Wheat.) 153 (1820) .....................................................................4

## UNITED STATES STATUTES

*\*Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (2006)
    (codified as amended at 10 U.S.C. § 950t (2010)) .........................................5

---

[1] Authorities upon which *amici* chiefly rely are marked with asterisks (*).

## INTERNATIONAL CRIMINAL TRIBUNAL CASES

International Military Tribunal, Judgment, *in International Military Tribunal for the Far East* (1948) ...................................................................................7, 8

*15 Law Reports of the Trials of War Criminals* (1950) ............................................7

*15 Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10* (1949) ...........................................................6, 7

*Prosecutor v. Musema*,
    Case No. ICTR-96-13-A, Judgment, (Jan. 27, 2000) ...................................13

*Prosecutor v. Milutinovic*,
    Decision on Dragoljub Ojdanic's Motion Challenging Jurisdiction
    – Joint Criminal Enterprise, Case No. IT-99-37-AR72,
    Appeal Judgment, (May 21, 2003) ............................................................9, 10

*Prosecutor v. Milutinovic*,
    Case No. IT-99-37-AR72, Separate Opinion of Judge David Hunt on
    Challenge by Ojdanic to Jurisdiction-Joint Criminal Enterprise, Appeal
    Judgment, (May 21, 2003) .............................................................................10

*Prosecutor v. Tadic*,
    Case No. IT-94-1-A, Judgment, (July 15, 1999) ...........................................10

*Rwamakuba v. Prosecutor*,
    Case No. ICTR-98-44-AR72.4, Decision on Interlocutory Appeal
    Regarding Application of Joint Criminal Enterprise to the Crime of
    Genocide, (Oct. 22, 2004) .............................................................................10

*United States v. Alstoetter*,
    3 *Trials of War Criminals Before the Nuernberg Military Tribunals
    Under Control Council Law No. 10* (1949)..................................................6, 7

*United States v. Goering*,
    22 *Trials of the Major War Criminals Before the Int'l Military
    Tribunal* 411 (1948).........................................................................................6

## TREATIES, CONVENTIONS, AND RESOLUTIONS

Convention Respecting the Laws and Customs of War on Land,
Oct. 18, 1907, 36 Stat. 2277, 1 Bevans 631 ....................................................9

Convention with Respect to the Laws and Customs of War on Land,
July 29, 1899, 32 Stat. 1803, 1 Bevans 247 ....................................................9

Geneva Convention for the Amelioration of the Condition of the Wounded
and Sick in Armed Forces in the Field, Aug. 12, 1949,
6 U.S.T. 3114, 75 U.N.T.S. 31 .........................................................................8

Geneva Convention for the Amelioration of the Condition of Wounded,
Sick and Shipwrecked Members of Armed Forced at Sea,
Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85 ...............................................8

Geneva Convention Relative to the Treatment of Prisoners of War,
Aug. 12, 1949, 6 U.S.T. 3316; 75 U.N.T.S. 135 .............................................8

Geneva Convention Relative to the Protection of Civilian Persons in
Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 .....................8

Protocol Additional to the Geneva Conventions of 12 August 1949,
and Relating to the Protection of Victims of International Armed
Conflicts, June 8, 1977, 1125 U.N.T.S. 3........................................................8

Protocol Additional to the Geneva Conventions of 12 August 1949, and
Relating to the Protection of Victims of Non-International
Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 609 .......................................8

Rome Statute of the International Criminal Court,
July 17, 1998, 2187 U.N.T.S. 90 (1998) ......................................................11

Statute of the International Court of Justice,
June 26, 1945, 59 Stat. 1055, 3 Bevans 1179.................................................4

Statute of the International Criminal Tribunal for the Former
Yugoslavia, May 25, 1993, 32 I.L.M. 1192 ...................................................9

Statute of the International Criminal Tribunal for Rwanda,
Nov. 8, 1994, 33 I.L.M. 1602 ........................................................................9

U.N. Convention for the Suppression of Terrorist Bombings,
Dec. 15, 1997, 2149 U.N.T.S. 256 .............................................................12

**BOOKS AND ARTICLES**

Antonio Cassese, *Genocide*, in *The Rome Statute of the International
Criminal Court: A Commentary* 335 (Antonio Cassese et al eds., 2002) .....14

Roger S. Clark, *The Military Commissions Act of 2006: An Abject Abdication
by Congress*, 6 Rutgers J.L. & Pub. Pol'y. 78 (2008) ...................................14

David Cole, *Out of the Shadows: Preventive Detention, Suspected Terrorist
and War*, 97 Cal. L. Rev. 693 (2009) ............................................................16

Allison Marston Danner & Jenny S. Martinez, *Guilty Associations: Joint
Criminal Enterprise, Command Responsibility and the Development
of International Criminal Law*, 93 Cal. L. Rev. 75 (2005) ....................10, 11

Mark A. Drumbl, *The Expressive Value of Prosecuting and Punishing
Terrorists:* Hamdan*, the Geneva Conventions, and International
Criminal Law*, 75 Geo. Wash. L. Rev. 1165(2007) ......................................11

David B. Filvaroff, *Conspiracy and the First Amendment*,
121 U. Pa. L. Rev. 189 (1972)......................................................................15

George P. Fletcher, *Hamdan Confronts the Military Commissions Act of
2006*, 45 Colum. J. Transnat'l L. 427 (2007) ...............................................14

George P. Fletcher, *The Storrs Lectures: Liberals and Romantics at War:
The Problem of Collective Guilt*, 111 Yale L.J. 1499 (2002) .......................17

Richard Goldstone, *Justice as a Tool for Peace-Making: Truth Commissions
and International Criminal Tribunals*, 28 N.Y.U. J. Int'l L. & Pol. 485
(1996).............................................................................................................17

*The International Criminal Court: The Making of the Rome Statute*
(Roy S. Lee ed., 1999) .................................................................11

Neal Katyal, *Gitmo' Better Blues,* Slate (Mar. 19, 2004),
http://www.slate.com/id/2097397 ...............................................17

Major Joseph A. Keeler, *Genocide: Prevention Through Nonmilitary
Measures*, 171 Mil. L. Rev. 135 (2002) ......................................13

Mark Lattimer & Philippe Sands, *Justice for Crimes Against Humanity* (2003)....12

Lucy Martinez, *Prosecuting Terrorists at the International Criminal Court:
Possibilities and Problems*, 34 Rutgers L.J. 1 (2002) ...................14

Patrick M. Norton, *A Law of the Future or a Law of the Past? Modern
Tribunals and the International Law of Expropriation*,
85 Am. J. Int'l L. 474 (1991)..........................................................4

Note, *Developments in the Law: Criminal Conspiracy,* 72 Harv. L. Rev. 920
(1959)............................................................................................16

Jens David Ohlin¸ *Incitement and Conspiracy to Commit Genocide*, *in The
U.N. Genocide Convention: A Commentary* 186 (Paola Gaeta ed., 2009) ...12

Benjamin E. Rosenberg, *Several Problems in Criminal Conspiracy Laws and
Some Proposals for Reform*, 43 Crim. L. Bull. 427 (2007) .........15

Leila Nadya Sadat, *The International Criminal Court and the Transformation
of International Law: Justice for the New Millennium* (2002).....................12

David Scheffer, *Why Hamdan is Right about Conspiracy Liability*,
Jurist (Mar. 30, 2006), http://jurist.law.pitt.edu/forumy/2006/03/why-
hamdan-is-right-about-conspiracy.php.........................................18

Bradley F. Smith, *Reaching Judgment at Nuremberg* (1977) ...................................6

Telford Taylor, *Anatomy of the Nuremberg Trials: A Personal Memoir* (1992)......7

Telford Taylor, *Nuremberg and Vietnam: An American Tragedy* 19 (1970)..........18

x

Detlev F. Vagts, *Military Commissions: A Concise History*,
101 Am. J. Int'l L. 35 (2007)...........................................................................3

Raha Wala, Note, *From Guantánamo to Nuremberg and Back: An Analysis
of Conspiracy to Commit War Crimes Under International Humanitarian
Law*, 41 Geo J. Int'l L. 683 (2009) ................................................................11

Patricia M. Wald, *To "Establish Incredible Events by Credible Evidence":
The Use of Affidavit Testimony in Yugoslavia War Crimes Tribunal
Proceedings*, 42 Harv. Int'l L.J. 535 (2001)....................................................17

Michael Walzer, *Just and Unjust Wars* (1977).........................................................19

William Winthrop, *Military Law and Precedents* (2d ed. 1920)............................18

## MISCELLANEOUS MATERIALS

Robert H. Jackson, *Report of United States Representative to the International
Conference on Military Trials* 296 (1945) ......................................................5

Telford Taylor, *Final Report to the Secretary of the Army on the Nuernberg Trials
Under Control Council Law No. 10* (1949)......................................................7

*Legal Issues Regarding Military Commissions and the Trial of Detainees for
Violations of the Law of War: Hearing Before S. Comm. on Armed Services*,
111th Cong. 12 (July 7, 2009) .........................................................................3

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| First Geneva Convention | Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field |
| Fourth Geneva Convention | Geneva Convention Relative to the Protection of Civilian Persons in Time of War |
| Genocide Convention | Convention on the Prevention and Punishment of the Crime of Genocide |
| Hague Convention | Convention Respecting the Laws and Customs of War on Land |
| ICTR | International Criminal Tribunal for Rwanda |
| ICTY | International Criminal Tribunal for the former Yugoslavia |
| IMT | International Military Tribunal at Nuremberg |
| IMTFE | International Military Tribunal for the Far East |
| JCE | Joint Criminal Enterprise |
| London Charter | Charter of the International Military Tribunal at Nuremberg |
| MCA | Military Commissions Act |
| Rome Statute | Rome Statute of the International Criminal Court |
| Second Geneva Convention | Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea |
| Third Geneva Convention | Geneva Convention Relative to the Treatment of Prisoners of War |

## STATUTES AND REGULATIONS

All applicable statutes and regulations are contained in the *En Banc* Brief for Petitioner.

## INTEREST OF *AMICI CURIAE*

This Brief of *Amici Curiae* International Law Scholars is respectfully submitted pursuant to Federal Rule of Appellate Procedure 29 and this Court's order of September 25, 2015.  It is filed in support of Petitioner and the assertion that he cannot be prosecuted for conspiracy by a law of war military commission. Both parties have consented to the participation of *Amici* in this case.

*Amici* are legal experts in the fields of international humanitarian law, international criminal law, and human rights.[2]  While they pursue a wide variety of legal interests, they all share a deep commitment to the rule of law and respect for human rights.   *Amici* believe this case raises important issues concerning international humanitarian law and international criminal law.   Based on their scholarship and expertise, they conclude that the charge of conspiracy is not a violation of the law of war.  Accordingly, *Amici* would like to provide this Court with an additional perspective on this issue.  They believe this submission will assist the Court in its deliberations.[3]

---

[2] A list of the *Amici* appear in the Addendum.

[3] Pursuant to Circuit Rule 29(d), *Amici* certify that it is not practicable to join all other *amici* in this case in a single brief. We do not claim expertise in the issues that may be addressed by other *amici,* and we believe it would be inappropriate to address matters upon which we do not have particular expertise.

## STATEMENT OF AUTHORSHIP AND FINANCIAL INTEREST

Pursuant to Fed. R. App. P. 29(c)(5), *Amici* certify that this brief was authored by *Amici* and counsel listed on the front cover. No party or party's counsel authored this brief, in whole or in part. No party or party's counsel contributed money that was intended to fund the preparation or submission of this brief.  No other person but *Amici* and their counsel contributed money that was intended to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

As properly stated by the court in *Al Bahlul v. United States*, 792 F.3d 1 (D.C. Cir. 2015), military commissions may only try offenses against the law of war.  Whether conspiracy is an offense against the law of war is a question of international law. The primary sources of international law, including customary international law, treaties, and proceedings from various international criminal tribunals, demonstrate that conspiracy is not, and has never been, a violation of the law of war.  Indeed, the United States has conceded this point.  *Id*. at 7, 12.

The crime of conspiracy is unique to Anglo-American law. It is absent from all major law of war treaties, including the Geneva and Hague Conventions, and it has been rejected in the proceedings of international criminal tribunals. International humanitarian law has rejected the crime of conspiracy for significant

2

reasons. The charge is overbroad.  It is easy to charge but difficult to defend, and it can serve to assign criminal liability to persons who are not responsible for committing war crimes. Further, the realities of armed conflict cannot practically permit the application of the crime of conspiracy to participants in armed conflict.

## ARGUMENT

Because military commissions are explicitly limited to the trial of recognized offenses against the law of war, the military commission may not prosecute the crime of conspiracy.  The Supreme Court, in *Hamdan v. Rumsfeld*, 548 U.S. 557, 596 n.27 (2006) (plurality opinion) explicitly recognized that "commissions convened during time of war but under neither martial law nor military government may try only offenses against the laws of war."[4] The Executive Branch concurs: "[t]he President has made clear that military commissions are to be used only to prosecute law of war offenses." *Legal Issues Regarding Military Commissions and the Trial of Detainees for Violations of the*

---

[4] *See also Ex parte Quirin*, 317 U.S. 1, 30 (1942) ("Congress has incorporated by reference, as within the jurisdiction of military commissions, all offenses which are defined as such by the law of war, and which may constitutionally be included within that jurisdiction.") (internal citation omitted); *In re Yamashita*, 327 U.S. 1, 7-8 (1946). The *Quirin* Court explicitly declined to decide the constitutionality of any charges beyond law of war violations. 317 U.S. at 46. *See generally* Detlev F. Vagts, *Military Commissions: A Concise History*, 101 Am. J. Int'l L. 35, 36-37 (2007) ("[MCA military commissions] find their substantive rules in international law.")

*Law of War: Hearing Before S. Comm. on Armed Services*, 111th Cong. 12 (July 7, 2009) (submitted statement of David Kris, Assistant Attorney General). Whether an offense violates the law of war turns on international law. *Hamdan v. United States*, 696 F.3d 1238, 1250 (D.C. Cir. 2012); *In re Yamashita*, 327 U.S. 1, 7 (1946); *cf. The Nereide*, 13 U.S. (9 Cranch) 388, 418 (1815).

The most authoritative recitation of the sources of international law is Article 38(1) of the Statute of International Court of Justice. *See* Patrick M. Norton, *A Law of the Future or a Law of the Past? Modern Tribunals and the International Law of Expropriation*, 85 Am. J. Int'l L. 474, 497 (1991). It states that international law derives from conventions and treaties, international customary law, and general principles of law recognized by civilized nations, and may be identified through "judicial decisions and the teachings of the most highly qualified publicists of the various nations." Statute of the International Court of Justice, art. 38(1), June 26, 1945, 59 Stat. 1055, 3 Bevans 1179. The Supreme Court has long recognized the same sources. *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160-61 (1820) ("the law of nations . . . may be ascertained by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law."). These sources of international law establish that the crime of conspiracy is not an offense against the law of war.

4

## I.    CONSPIRACY IS NOT AN OFFENSE AGAINST THE LAW OF WAR.

The Military Commissions Act of 2006 (MCA), Pub. L. No. 109-366, 120 Stat. 2600, 2630 (2006) (codified as amended at 10 U.S.C. § 950t(29) (2010)), states that a person who "conspires to commit one or more substantive offenses triable by military commission" may be punished for the crime of "conspiracy." The crime of conspiracy, as defined by the MCA, is an inchoate offense that does not function as a theory of liability for other substantive crimes. So-defined, the crime does not appear in any of the major treaties governing the methods and means of warfare, and it has never been recognized by any international military tribunal. Rather, the international community has specifically, and repeatedly, rejected conspiracy as an offense against the law of war.

In establishing the Nuremberg trials, the international community also rejected inclusion of conspiracy as a war crime. In those deliberations, André Gros of the French delegation explained that the French system does not recognize conspiracy as it is found in Anglo-Saxon law. *See* Robert H. Jackson, *Report of United States Representative to the International Conference on Military Trials* 296 (1945). Professor Gros believed that importing conspiracy into international humanitarian law would inappropriately extend liability to innocent actors: "When you say that a state which launches a war has committed a crime, you do not imply

that the members of that state are criminals." *Id*. at 297. For these reasons, the drafters determined that the crime of conspiracy "was too vague and so unfamiliar . . . that it would lead to endless confusion." Bradley F. Smith, *Reaching Judgment at Nuremberg* 51 (1977).

The judgment of the International Military Tribunal at Nuremberg (IMT) explicitly declined to recognize the inchoate crime of conspiracy to commit war crimes as a discrete substantive offense. *See United States. v. Goering*, 22 *Trials of the Major War Criminals Before the International Military Tribunal* 411, 469 (1948). The tribunal explained that the London Charter did "not add a new and separate crime" of conspiracy to commit war crimes and crimes against humanity. *Id*. Underlying the tribunal's rejection of inchoate conspiracy for war crimes was concern that an "overbroad application of the conspiracy principle may drag innocent people into the prosecution's net." Telford Taylor, *Anatomy of the Nuremberg Trials: A Personal Memoir* 553 (1992).

The criminal tribunals conducted by the Allied Powers under Control Council Law No. 10 also refused to treat conspiracy as a violation against the law of war. *See* 15 *Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10*, at 1077-1100 (1949). The tribunals ruled that they had "no jurisdiction to try any defendant upon a charge of conspiracy considered as a separate substantive offense." *United States v. Alstoetter*, 3 *Trials*

6

*of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10*, at 956 (1949). Under Control Council Law No. 10 "no defendant was convicted of conspiracy." Telford Taylor, *Final Report to the Secretary of the Army on the Nuernberg Trials Under Control Council Law No. 10*, at 92 (1949). The U.N. War Crimes Commission similarly noted that the United States Military Tribunals did "not recognise[] as a separate offence conspiracy to commit war crimes or crimes against humanity." 15 *Law Reports of the Trials of War Criminals* 90 (1949).

In addition, the Charter for the International Military Tribunal for the Far East (IMTFE), the tribunal responsible for prosecuting members of the Japanese government after World War II, did not "confer any jurisdiction in respect of a conspiracy to commit any crime other than a crime against peace."[5] *See* International Military Tribunal, Judgment, *in International Military Tribunal for*

---

[5] Nor does *In re Yamashita* point in a different direction. While the Supreme Court permitted the imposition of punishment on someone who was not present at the time the crimes were committed, it was only because the Court found that the law of war "presupposes" that commanders could be held responsible for the acts of their subordinates. *In re Yamashita*, 327 U.S. 1, 15 (1946). Even in the more fluid setting of the law of armed conflict at the time, the Court found that command responsibility had been the basis for assigning liability both by and against the United States. *In re Yamashita*, 327 U.S. 1, 16 (1946) (citing U.S. military tribunals in the Philippines in 1901). It is also true that command responsibility has remained a source of liability under more recent international law instruments. In both *Yamashita* and the more recent expressions of the law of armed conflict, though, command responsibility is limited to cases where the underlying crimes were actually committed.

7

*the Far East* 48, 413, 449-51 (1948).

The four Geneva Conventions and two Additional Protocols do not recognize the offense of conspiracy:

• Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3114, 75 U.N.T.S. 31[hereinafter First Geneva Convention];

• Geneva Convention for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949, 6 U.S.T. 3217, 75 U.N.T.S. 85 [hereinafter Second Geneva Convention];

• Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 [hereinafter Third Geneva Convention].

• Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 [hereinafter Fourth Geneva Convention].

• Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts, art. 48 June 8, 1977, 1125 U.N.T.S. 3 [hereinafter Protocol I].

• Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non-International Armed Conflicts, June 8, 1977, 1125 U.N.T.S. 609 [hereinafter Protocol II].

The four Geneva Conventions provide a thorough list of actions that represent "grave breaches" against the law of war. First Geneva Convention, art. 50; Second Geneva Convention, art. 51; Third Geneva Convention, art. 130; Fourth Geneva Convention, art. 147. Nowhere in any of these conventions does the concept, let alone the crime, of conspiracy to commit such acts appear. The crime

of conspiracy does not appear in the Hague Conventions of 1899 and 1907 – two early and significant official statements of the law of war. *See* Convention Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277, 1 Bevans 631; Convention with Respect to the Laws and Customs of War on Land, July 29, 1899, 32 Stat. 1803, 1 Bevans 247.

The international community has expressly rejected conspiracy as a war crime in more recent instruments. The statutes establishing the International Criminal Tribunal for the former Yugoslavia (ICTY) and the International Criminal Tribunal of Rwanda (ICTR) contain no recognition of the crime of conspiracy in relation to war crimes or crimes against humanity. *See* Statute of the International Criminal Tribunal for Rwanda art. 2(3)(b), Nov. 8, 1994, 33 I.L.M. 1602; Statute of the International Criminal Tribunal for the Former Yugoslavia art. 4(3)(b), May 25, 1993, 32 I.L.M. 1192. Prosecutions in these tribunals have instead focused on "joint criminal enterprise" (JCE) liability. JCE liability is not the same as conspiracy. The ICTY has expressly recognized that "criminal liability pursuant to a joint criminal enterprise is not a liability for . . . conspiring to commit crimes." *Prosecutor v. Milutinovic*, Case No. IT-99-37- AR72, Decision on Dragoljub Ojdanic's Motion Challenging Jurisdiction – Joint Criminal Enterprise, Appeal Judgment, ¶ 26, (May 21, 2003). Unlike conspiracy, JCE liability is not a stand-alone inchoate crime and "does not create a separate crime of participating

9

through the means identified in that doctrine." *Rwamakuba v. Prosecutor*, Case No. ICTR-98-44-AR72.4, Decision on Interlocutory Appeal Regarding Application of Joint Criminal Enterprise to the Crime of Genocide, ¶ 30, (Oct. 22, 2004). Instead, JCE liability arises when a substantive war crime – such as willful killing or torture – is committed pursuant to a common plan or scheme, and the perpetrator of the underlying crime has the intent to execute that scheme. *See Prosecutor v. Tadic*, Case No. IT-94-1-A, Judgment, ¶ 189-90, (July 15, 1999).

Hence, joint criminal enterprise is different from conspiracy. In conspiracy, the agreement itself constitutes the essence of the crime, and prosecutors need only demonstrate this agreement to secure a conviction. *See, e.g.*, Model Penal Code §5.03(1)(a) (explaining that a person is guilty of conspiracy if he "agrees with such other person or persons that they or one or more of them will engage in conduct that constitutes such crime"). By contrast, "the liability of a member of a joint criminal enterprise will depend on the commission of criminal acts in furtherance of that enterprise," – proof of a "mere agreement" is not sufficient. *Prosecutor v. Milutinovic*, Case No. IT-99-37-AR72, Appeal Judgment, Decision on Dragoljub Ojdanic's Motion Challenging Jurisdiction – Joint Criminal Enterprise, ¶ 23, (May 21, 2003). Thus, the idea that joint criminal enterprise is a form of conspiracy is "entirely fallacious." Allison Marston Danner & Jenny S. Martinez, *Guilty Associations: Joint Criminal Enterprise, Command*

*Responsibility, and the Development of International Criminal Law*, 93 Cal. L. Rev. 75, 119 (2005) (quoting *Prosecutor v. Milutinovic*, Case No. IT-99-37-AR72, Separate Opinion of Judge David Hunt on Challenge by Ojdanic to Jurisdiction-Joint Criminal Enterprise, Appeal Judgment, ¶ 23, (May 21, 2003)). The plurality in *Hamdan v. Rumsfeld* also distinguished between "liability theories such as joint criminal enterprise, which are recognized by international law, from stand-alone crimes such as . . . conspiracy." Mark A. Drumbl, *The Expressive Value of Prosecuting and Punishing Terrorists:* Hamdan*, the Geneva Conventions, and International Criminal Law*, 75 Geo. Wash. L. Rev. 1165, 1172, 1174 (2007).[6]

The Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90 (Rome Statute), also refused to adopt conspiracy as a war crime. The drafters of the Rome Statute sought to codify the existing principles of international law. *See The International Criminal Court: The Making of the Rome Statute* 30-31 (Roy S. Lee ed., 1999). In doing so, the drafters recognized that previous international agreements did not criminalize conspiracy and reaffirmed

---

[6] Conspiracy-based vicarious liability is not directly at issue in this appeal because it was not established in the statutory language of the MCA of 2006 nor was it laid out in the charge sheet against the Petitioner. Nonetheless, it is worth noting that international humanitarian law has rejected conspiracy-based vicarious liability for many of the same reasons that it has rejected the inchoate crime of conspiracy. *See* Raha Wala, Note, *From Guantánamo to Nuremberg and Back: An Analysis of Conspiracy to Commit War Crimes Under International Humanitarian Law*, 41 Geo J. Int'l L. 683, 705 (2011).

that international consensus. *See id.* at 199-200 (noting that the Rome Statute drafters adopted the language of the 1997 U.N. Convention for the Suppression of Terrorist Bombings, Dec. 15, 1997, 2149 U.N.T.S. 256, which does not include the crime of conspiracy).

Prominent scholars recognize that the Rome Statute "provides the most comprehensive, definitive and authoritative list of war crimes and crimes against humanity attracting individual criminal liability." Mark Lattimer & Philippe Sands, *Justice for Crimes Against Humanity* 5 (2003). The drafting process was a "quasi-legislative event that produced a criminal code for the world." Leila Nadya Sadat, *The International Criminal Court and the Transformation of International Law: Justice for the New Millennium* 263 (2002). In this light, the contents of the Rome Statute provide particular insight into what crimes constitute offenses against the law of nations.

It is instructive to consider how conspiracy has been addressed in the context of the crime of genocide. The drafters of the Genocide Convention included the crime of conspiracy in the treaty because "genocide was horrendous enough that conspiracy to commit it was sufficiently disruptive to the international system." Jens David Ohlin¸ *Incitement and Conspiracy to Commit Genocide*, *in The U.N. Genocide Convention: A Commentary* 186, 192 (Paola Gaeta ed., 2009). Likewise, the ICTR explicitly recognized that, in contrast to agreements to commit

12

other crimes, agreements to commit genocide should be punished because of the very "serious nature of the crime of genocide." *See Prosecutor v. Musema*, Case No. ICTR-96-13-A, Judgment, ¶ 185, (Jan. 27, 2000). Genocide creates an entirely unique set of responsibilities and liabilities for states. Conspiracy to commit genocide is the only conspiracy offense recognized as a separate crime in the statutes of the ICTY and ICTR – further evidence that with respect to other tribunal offenses, their drafters rejected conspiracy as a stand-alone crime.

Conspiracy to commit the crime of genocide is not applicable to this case. Conspiracy with respect to genocide is unique, and the international community has accepted it, specifically, for two reasons: first, the sheer enormity of wrongdoing that is genocide, and second, the elaborate and far-reaching planning inherent in a crime as vast and complex as genocide.

The offense of genocide is a complex crime that necessarily involves intricate planning and a systematic implementation. *See* Major Joseph A. Keeler, *Genocide: Prevention Through Nonmilitary Measures*, 171 Mil. L. Rev. 135, 163-70 (2002).  The universally accepted definition of genocide requires "intent to destroy, in whole or in part, a national, ethnical, racial or religious group."  Rome Statute, art. 6.  To satisfy this element of intent, there "must be actual or attempted destruction of the physical existence of the group, not merely an attempt to alter or influence the economic, social or cultural character of the group . . . ." Lucy

13

Martinez, *Prosecuting Terrorists at the International Criminal Court: Possibilities and Problems*, 34 Rutgers L.J. 1, 23 (2002).[7] In sum, the crime of conspiracy to commit genocide is wholly unlike conspiracy to commit terrorism. Conspiracy to commit genocide is different both in its enormity and the intricacy of planning and organization (conspiring) it requires.

The international community has signaled that conspiracy should not be extended further than the crime of genocide. The drafters of the Rome Statute of the International Criminal Court chose not to include conspiracy as a punishable offense, *even* for the commission of genocide. The Rome Diplomatic Conference concluded that conspiracy was "a concept that ha[d] not found the support of all the civil law countries present" during the drafting of the statute. Antonio Cassese, *Genocide, in The Rome Statute of the International Criminal Court: A Commentary* 335, 347 (Antonio Cassese et al. eds., 2002). Except in the context of genocide, "every relevant international treaty on international humanitarian law or international criminal law had deliberately avoided the concept and language of conspiracy." George P. Fletcher, *Hamdan Confronts the Military Commissions Act of 2006*, 45 Colum. J. Transnat'l L. 427, 448 (2007). *See also* Roger S. Clark, *The Military Commissions Act of 2006: An Abject Abdication by Congress*, 6 Rutgers

---

[7] Isolated acts of terrorism, such as the bombing of the U.S.S. Cole, are not acts of genocide under international law. *See* Lucy Martinez, *Prosecuting Terrorists at the International Criminal Court: Possibilities and Problems*, 34 Rutgers L.J. 1, 26 (2002).

J.L. & Pub. Pol'y. 78, 99-105 (2008).

In sum, the crime of conspiracy for war crimes is not found in any treaties governing international criminal law. It is not part of customary international law. It has not been prosecuted by an international criminal tribunal. As a result, it is not an offense against the law of war.

## II.    THE CRIME OF CONSPIRACY IS INAPPROPRIATE WITHIN THE CONTEXT OF ARMED CONFLICT.

International rejection of the crime of conspiracy as a violation of the law of war is firmly based in the unique realities of armed conflict. Conspiracy permits punishment for simply agreeing to be a member of an organization that may commit a crime. *See* David B. Filvaroff, *Conspiracy and the First Amendment*, 121 U. Pa. L. Rev. 189, 191 (1972) ("It is the agreement itself which is the touchstone of illegality, irrespective of whether or not efforts have actually been made to implement prohibited objectives, and apparently without regard even to whether the combination is capable of achieving them."). A defendant does not even need to effectuate any crime to be punished for conspiracy because it "imposes criminal liability at the earliest and most tentative stages of a criminal endeavor – as soon as two people agree, however halfheartedly, to commit a crime." *See* Benjamin E. Rosenberg, *Several Problems in Criminal Conspiracy Laws and Some Proposals for Reform*, 43 Crim. L. Bull. 427, 432 (2007).

By contrast, the law of armed conflict has persistently focused on concrete violations, avoiding membership-based sanctions, even when regulating the actions of non-state actors. Imposing punishment for such agreements in the context of armed conflict would expose all members of a military organization to equal liability, regardless of their behavior or standing in the organization. Courts have recognized that with respect to membership in military organizations, it is illogical to punish agreements. "A person in the military service . . . is acting under the compulsion of the grave penalties which military law traditionally prescribes for nonobedience to military orders. Participation in a crime actuated solely by the compelling fear of personal harm negatives the very requisites of conspiracy." *United States v. Saglietto*, 41 F. Supp. 21, 33 (E.D. Va. 1941).

Furthermore, the circumstantial evidence normally used to prove crimes of conspiracy is not a practical or rational method to demonstrate wrongdoing in the fog of war.[8] *See* David Cole, *Out of the Shadows: Preventive Detention, Suspected Terrorist and War*, 97 Cal. L. Rev. 693, 711 (2009) (recognizing the difficulty of gathering evidence in military conflict). Former Chief Judge Patricia Wald of this

---

[8] In many conspiracy prosecutions, the case must be proved through circumstantial evidence. *Cf.*, *Glasser v. United States*, 315 U.S. 60, 80 (1942) ("Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a development and collocation of circumstances") (internal quotations omitted); Note, *Developments in the Law: Criminal Conspiracy,* 72 Harv. L. Rev. 920, 984 (1959) ("Since conspiracy is a crime which by its nature tends to be secret . . . [m]ost conspiracy convictions therefore rest on inferences from circumstantial evidence.").

Circuit has recognized the unique evidentiary problems of prosecuting war crimes. *See* Patricia M. Wald, *To "Establish Incredible Events by Credible Evidence": The Use of Affidavit Testimony in Yugoslavia War Crimes Tribunal Proceedings*, 42 Harv. Int'l L.J. 535, 536 (2001).

In addition, the focus of conspiracy on the notion of collective wrongdoing, as opposed to individualized guilt, does not accord with the realities of war. "[T]he practical impact of conspiracy doctrines is to aggravate individual criminal liability by making co-conspirators liable for any and all substantive offenses committed by members of the group." George P. Fletcher, *The Storrs Lectures: Liberals and Romantics at War: The Problem of Collective Guilt*, 111 Yale L.J. 1499, 1512 (2002). Punishing collective guilt presents a variety of damaging consequences in the context of armed conflict. These prosecutions have the ability to implicate minor figures who, in reality, have not participated in the egregious actions of the larger organization. *See* Neal Katyal, *Gitmo' Better Blues,* Slate (Mar. 19, 2004), http://www.slate.com/id/2097397 (arguing that the current prosecutions by the United States have focused on inconsequential figures who have not committed serious war crimes). Moreover, a focus on group transgressions can lead to the damaging "imposition of collective guilt on an ethnic, religious, or other group," which undermines the value of international criminal tribunals. *See* Richard Goldstone, *Justice as a Tool for Peace-Making: Truth Commissions and*

*International Criminal Tribunals*, 28 N.Y.U. J. Int'l L. & Pol. 485, 488 (1996). For these reasons, Article 33 of the Fourth Geneva Convention expressly prohibits collective punishment, stating that "[n]o protected person may be punished for an offense he or she has not personally committed." Fourth Geneva Convention, art. 33.

Violations of the law of war are distinctly different from domestic criminal law. Prosecutions that may be appropriate in times of peace are unacceptable in times of war. "[I]n war something more is required than evidence that one might have agreed in some vague or ambiguous way, or inferentially by simply being in close proximity to the master planners and implementers, with a plan or design to violate the law of war." David Scheffer, *Why Hamdan is Right about Conspiracy Liability*, Jurist (Mar. 30, 2006), http://jurist.org/forum/2006/03/why-hamdan-is-right-about-conspiracy.php; *see also* William Winthrop, *Military Law and Precedents* 840 (2d ed. 1920) ("the jurisdiction of the military commission should be restricted to cases of offence consisting in *overt acts*"). As noted by Telford Taylor, "[w]ar consists largely of acts that would be criminal if performed in time of peace." Telford Taylor, *Nuremberg and Vietnam: An American Tragedy* 19 (1970). There is little doubt that if the crime of conspiracy were truly a violation of the law of war, thousands of American servicemen and women could be subjected to criminal prosecutions. For example, "[i]f we are fully to assign

18

blame for the [My Lai] massacre, then, there are a large number of officers whom we would have to condemn."  Michael Walzer, *Just and Unjust Wars* 322 (1977).

The international community, in treaties, declarations, and practice, has realized that inchoate crimes such as conspiracy are not suited to address offenses committed in the midst of armed conflict. Prosecuting conspiracy under the law of war would damage the integrity and credibility of international criminal tribunals and the coherence of the laws of war themselves. The crime of conspiracy is not a violation of the law of war and, therefore, cannot be prosecuted in the military commissions.

## CONCLUSION

The United States has long recognized and respected the law of war and the proper role of military justice. In *Hamdan*, the Supreme Court indicated the United States must conform its prosecutions in military tribunals to violations of the law of war. As demonstrated here, conspiracy is not an offense against the law of war. For these reasons, Petitioner may not be prosecuted for conspiracy in a military commission.

October 13, 2015                               Respectfully submitted,


                                               /s/ William Aceves

                                               Counsel for *Amici Curiae*

                                               William J. Aceves
                                               California Western School of Law
                                               225 Cedar Street
                                               San Diego, CA  92101
                                               (619) 515-1589
                                               wja@cwsl.edu

                                               David Weissbrodt
                                               University of Minnesota Law School
                                               229 19th Ave. South
                                               Minneapolis, MN 55455
                                               (612) 625-5027
                                               weiss001@umn.edu

20

# ADDENDUM

Institutional affiliations are listed for informational purposes only.

**John M. Bickers** is a Professor of Law at Northern Kentucky University Salmon P. Chase College of Law. He was previously a member of the Judge Advocate General's Corp and served in the United States Army for more than two decades. His publications include *Too Little, Too Late? Why President Obama's Well-Intentioned Reforms of the Military Commissions May Not Be Enough to Save Them*, 31 Whittier L. Rev. 381 (2010) and *Military Commissions Are Constitutionally Sound: A Response To Professors Katyal And Tribe*, 34 Tex. Tech L. Rev. 899 (2003), which was cited by the Supreme Court in *Hamdan v. Rumsfeld*.

**Roger S. Clark** is a Board of Governors Professor at Rutgers University School of Law Camden. He has been teaching and writing on the international protection of human rights for nearly fifty years. He is co-author of *International Criminal Law: Cases and Materials* (LexisNexis 3d ed. 2009) and *Understanding International Criminal Law* (LexisNexis 2d ed. 2008).

**Robert K. Goldman** is Louis C. James Scholar and professor of law at American University Washington College of Law. He has served on the International

Commission of Jurists' Eminent Jurists Panel on Terrorism, Counter-Terrorism and Human Rights, as the UN Human Rights Commission's Independent Expert on the protection of human rights and fundamental freedoms while countering terrorism, and as President of the Organization of American States' Inter-American Commission on Human Rights. His publications include *The Protection of Human Rights: Past, Present and Future* (1972) and *The International Dimension of Human Rights: A Guide For Application in Domestic Law* (2001), as well as numerous other books, reports, papers and articles.

**Kevin Jon Heller** is a Professor of Criminal Law at the University of London's School of Oriental and African Studies (SOAS). He is also a Principal Fellow at Melbourne Law School and an Academic Member of Doughty Street Chambers. Professor Heller's academic writing has appeared in a variety of journals, including the *European Journal of International Law*, the *American Journal of International Law*, the *Journal of International Criminal Justice*, the *Harvard International Law Journal*, the *Michigan Law Review*, the *Leiden Journal of International Law*, the *Journal of Criminal Law & Criminology*, *Criminal Law Forum*, and the *Georgetown International Environmental Law Review*. His book *The Nuremberg Military Tribunals and the Origins of International Criminal Law* was published by Oxford University Press in June 2011, and Stanford University

Press published his edited book (with Markus Dubber) *The Handbook of Comparative Criminal Law* in February 2011.

**Hope Metcalf** directs the Arthur Liman Public Interest Program and co-teaches the Allard K. Lowenstein International Human Rights Clinic at Yale Law School. Metcalf formerly directed the National Litigation Project of the Lowenstein Clinic, formed in 2002 to address human rights violations arising out of U.S. counterterrorism policies. She has represented numerous alleged unlawful belligerents in habeas petitions, civil damages actions, and military commissions proceedings and has filed amicus briefs in many post-9/11 cases before the Supreme Court and courts of appeals. Metcalf is a graduate of Yale University and New York University School of Law and clerked for the Honorable Justice Virginia Long of the New Jersey Supreme Court.

**Fionnuala D. Ní Aoláin** holds the Robina Chair in Law, Public Policy and Society at the University of Minnesota Law School. She is also the co-founder and associate director of the Transitional Justice Institute at the University of Ulster. Her research interests include international law, human rights law, national security law, transitional justice, and feminist legal theory. She is author of *The Politics of Force: Conflict Management and State Violence in Northern*

23

*Ireland* (Blackstaff Press 2000), and is co-author of *Law in Times of Crisis: Emergency Powers in Theory and Practice* (Cambridge University Press 2006), *International Human Rights: Law, Policy, and Process* (LexisNexis 4th ed. 2009), and *Guantanamo and Beyond: Exceptional Courts and Military Commissions in Comparative Perspective* (CUP, 2013). She is Board Chair of the Open Society Women's Program and a Board Member of the Center for Victims of Torture National Committee.

**Deborah Pearlstein** is an Associate Professor of Law at Cardozo Law School, where she teaches constitutional law, international law, and the law of war and contemporary conflicts. She previously served as an Associate Research Scholar in the Law and Public Affairs Program at the Woodrow Wilson School for Public and International Affairs at Princeton University, and visiting appointments at the University of Pennsylvania Law School and Georgetown University Law Center. Her research focuses on national security law and the separation of powers, and has appeared in journals including the Harvard Law Review, University of Pennsylvania Law Review, and Columbia Human Rights Law Review.

**Gabor Rona** is a Visiting Professor of Law at Cardozo Law School. He is the former International Legal Director of Human Rights First where he represented Human Rights First on matters of international human rights and international humanitarian law. He previously served as a Legal Advisor to the International Committee of the Red Cross (ICRC) in Geneva, where he focused on the application of international humanitarian and human rights law to counter-terrorism policies and practices. He also represented the ICRC in connection with the establishment of the International Criminal Court and other tribunals. He has taught International Humanitarian Law and International Criminal Law at the International Institute of Human Rights in Strasbourg, France and the University Centre for International Humanitarian Law in Geneva, Switzerland.

**Marco Sassòli** is Professor of Law and Director of the Department of International Law and International Organisation of the University of Geneva, and Associate Professor at the University of Quebec in Montreal. He is member of the International Commission of Jurists and chaired from 2004-2013 the Board of Geneva Call, an NGO which engages with armed non-State actors to adhere to humanitarian norms. He worked for the International Committee of the Red Cross from 1985-97. He has also served as Executive Secretary of the International Commission of Jurists and as Registrar at the Swiss Supreme Court.

25

**David Sloss** is Professor of Law at Santa Clara School of Law. He is co-editor of *International Law in the U.S. Supreme Court: Continuity and Change* (Cambridge University Press 2011) and editor of *The Role of Domestic Courts in Treaty Enforcement: a Comparative Study* (Cambridge University Press 2009).

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(C)

I hereby certify, pursuant to Fed. R. App. P. 32(a)(7)(C) and D.C. Circuit Rule 32(a), that the foregoing brief is proportionally spaced, has a typeface of 14 point, and contains 5,725 words, (which does not exceed the applicable 7,000 word limit).

Dated:          October 13, 2015          Respectfully submitted

/s/ William J. Aceves

William J. Aceves
California Western School of Law
225 Cedar Street
San Diego, CA 92101
(619) 515-1589
wja@cwsl.edu

Counsel for *Amici Curiae*

27

## CERTIFICATE OF SERVICE

I, William J. Aceves, the undersigned, hereby certify that I am employed by California Western School of Law at 225 Cedar Street, San Diego, California 92101. I further declare under penalty of perjury that on October 13, 2015, I caused to be served a true copy of the foregoing Brief of *Amici Curiae* International Law Scholars via the Court's CM/ECF electronic filing system.


Dated:        October 13, 2015        Respectfully submitted


                                        /s/ William J. Aceves

                                        William J. Aceves
                                        California Western School of Law
                                        225 Cedar Street
                                        San Diego, CA 92101
                                        (619) 515-1589
                                        wja@cwsl.edu

                                        Counsel for *Amici Curiae*

28