# 11-1324

[Oral argument scheduled for Dec. 1, 2015]

## United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT
### Docket No. 11-1324

ALI HAMZA SULIMAN AHMAD AL BAHLUL,

*Petitioner,*

*v.*

UNITED STATES,

*Respondent.*

APPEAL FROM
COURT OF MILITARY COMMISSION REVIEW (CMCR-09-001)

### *EN BANC* BRIEF FOR PETITIONER

MAJ Todd E. Pierce,
   JA, U.S. Army (Ret.)
Senior Fellow
Univ. of Minnesota
Human Rights Center
Mondale Hall, N-120
229-19th Avenue South
Minneapolis, MN 55455

Michel Paradis
Mary R. McCormick
1620 Defense Pentagon
Washington, DC 20301-1620
michel.paradis@osd.mil
TEL: 1.703.696.9490 x115
FAX: 1.703.696.9575

*Counsel for Petitioner*

**CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES**

**I.      PARTIES AND *AMICI* APPEARING BELOW**

The parties and *amici* who appeared before the Court of Military Commission Review in connection with this appeal were:

1.  Ali Hamza Ahmad Suliman al Bahlul, *Appellant*

2.  United States of America, *Appellee*

3.  *Amicus Curiae* the Office of the Chief Defense Counsel, Col Peter Masciola, USAF (on brief)

4.  *Amicus Curiae* Robert David Steele and Others in the United States Intelligence Community, McKenzie Livingston (on brief)

5.  *Amicus Curiae* Historians, Political Scientists and Constitutional Law Professors, Sarah Paoletti (on brief)

6.  *Amicus Curiae* National Institute of Military Justice, Michelle Lindo (on brief)

7.  *Amicus Curiae* Montana Pardon Project, Jeffrey Renz (on brief)

8.  *Amicus Curiae* Human Rights Committee of the American Branch of the International Law Association, Jordan J. Paust (on brief)

**II.     PARTIES AND *AMICI* APPEARING IN THIS COURT**

1.  Ali Hamza Ahmad Suliman al Bahlul, *Petitioner*

2.  United States of America, *Respondent*

3.  *Amicus Curiae* Int'l Law Scholars, David Weissbrodt (on brief)

4.  *Amicus Curiae* Retired Military and Intelligence Officers, McKenzie Livingston (on brief)

5.  *Amicus Curiae* The National Institute of Military Justice, Steve Vladeck (on brief)

6.  *Amicus Curiae* First Amendment Historians, Jeffrey Renz (on brief)

7.  *Amicus Curiae* Historians, Political Scientists and Constitutional Law Professors, Sarah Paoletti (on brief)

8.  *Amicus Curiae* David Glazier & Gary Solis, John Summers (on brief)

9.  *Amicus Curiae* Constitutional Accountability Center, Elizabeth Wydra (on brief)

10. *Amicus Curiae* Former Government Officials, Military Lawyers & Scholars, Peter Marguiles (on brief)

11. *Amicus Curiae* Washington Legal Foundation, Richard Samp (on brief)

## III.  RULINGS UNDER REVIEW

This appeal is from a decision of the United States Court of Military Commission Review in *United States v. Ali Hamza Ahmad Suliman al Bahlul*, CMCR 09-001(*en banc* September 9, 2011). The decision is reported at 820 F.Supp.2d 1141 (C.M.C.R. 2011).

## IV.  RELATED CASES

This case has not previously been filed with this court or any other court. Counsel are aware of no other cases that meet this Court's definition of related.

Dated: October 13, 2015

By: /s/ Michel Paradis
                        Counsel for Petitioner

ii

# TABLE OF CONTENTS

Table of Contents ........................................................................................ iii

Table of Authorities .................................................................................... v

Jurisdictional Statement ............................................................................ x

Questions Presented .................................................................................. xi

Glossary of Terms ..................................................................................... xii

Statement of Facts ...................................................................................... 1

Summary of Argument ............................................................................... 9

Argument ................................................................................................... 12

    I.     Congress exceeded its Article I § 8 authority by defining crimes triable by military commission that are not offenses against the law of war. ........................................................................................................ 12

        A.     Standard of Review. .............................................................. 12

        B.     Giving law-of-war military commissions jurisdiction over stand-alone conspiracy charges lacks support in constitutional tradition. ........................................................... 12

        C.     The Define & Punish Clause limits law-of-war military commission jurisdiction to "offenses … against the law of nations." ............................................................................... 18

    II.    Congress violated Article III by vesting military commissions with jurisdiction to try crimes that are not offenses against the law of war. ............. 25

        A.     Standard of Review. .............................................................. 25

        B.     Congress cannot go beyond Article III's exception for law-of-war "offenses" when diverting criminal prosecutions from the courts of law. ..................................... 25

        C.     Giving military commissions jurisdiction over domestic crimes threatens the integrity of the judicial system. ........................... 30

III.    Responses to designated issues ................................................35

Issue 1: The standard of appellate review of Bahlul's conviction for conspiracy to commit war crimes. *See*, *e.g.*, *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932 (2015); *CFTC v. Schor*, 478 U.S. 833 (1986). ..........35

    A.    The issues now before the Court were preserved at trial and, in any event, the government forfeited – indeed waived – any entitlement it might have had to plain error review. ................................................................35

    B.    The constitutionality of the military's jurisdiction over a particular offense is always reviewed *de novo*. ...................................38

    C.    *Wellness* and *Schor* confirm that *de novo* review is required. ...............................................................41

Issue 2: Whether the Define and Punish Clause of Article I of the Constitution gives Congress power to define as an Offense against the Law of Nations – triable before a law-of-war military commission – a conspiracy to commit an Offense against the Law of Nations, to wit, a conspiracy to commit war crimes; and whether the exercise of such power transgresses Article III of the Constitution. ...........................................46

    A.    Because stand-alone conspiracy to commit war crimes is not an offense against the law of nations, Congress cannot proscribe it pursuant to its power to "Define and Punish … offenses against the law of nations." ...................................47

    B.    This Court strictly construes the offenses that the Define & Punish Clause makes triable by military commission. ....................52

    C.    Because stand-alone conspiracy is not an "offense" within the meaning of the Define & Punish Clause, removing its prosecution from the courts of law violates Article III. ......................55

**Conclusion** ...............................................................58

**Certificate of Compliance with Rule 32(a)** .......................................59

**Certificate of Service** ........................................................60

**Statutory Addendum** ...........................................................i

# TABLE OF AUTHORITIES

*Petitioner places primary reliance on authorities marked with an \**

## Cases

*Callan v. Wilson*, 127 U.S. 540 (1888) ...................................................... 28, 57

*CFTC v. Schor*, 478 U.S. 833 (1986)......................................... 25, 33, 41, 42, 44

*Ex parte Quirin*, 317 U.S. 1 (1942) ...9, 10, 14, 16, 17, 19, 21, 25, 28, 39, 49, 56

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) .................. 10, 12, 14, 22, 25, 30, 33

*In re Yamashita*, 327 U.S. 1 (1946) ................................. 9, 10, 18, 21, 30, 49, 58

*Reid v. Covert*, 354 U.S. 1 (1957).................................. 13, 25, 26, 52, 54, 55, 57

*Toth v. Quarles*, 350 U.S. 11 (1955)...................................................... 25, 53, 54

*Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006)....................................................12

*Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997)...........................12

*Baender v. Barnett*, 255 U.S. 224 (1921) ...........................................................51

*Bahlul v. United States*, 2013 WL 297726 (D.C. Cir., Jan. 25, 2013)...................7

*Bahlul v. United States*, 767 F.3d 1 (D.C. Cir. 2014) .................... 7, 20, 25, 30, 36

*Bahlul v. United States*, 792 F.3d 1 (D.C. Cir. 2015) .................... 7, 29, 37, 39, 42

*Blair v. United States*, 250 U.S. 273 (1919) ......................................................26

*Duncan v. Kahanamoku*, 327 U.S. 304 (1946).............................................. 10, 33

*Dynes v. Hoover*, 20 How. 65 (1857) ............................................................ 53, 56

*Estep v. United States*, 327 U.S. 114 (1946).......................................................22

*Ex parte Bollman*, 4 Cranch 75 (1807) ......................................................... 50, 52

*Ex parte Endo*, 323 U.S. 283 (1944).................................................................31

*Ex parte Milligan*, 4 Wall. 110 (1866).................................................... 10, 27, 30

*Ex parte Siebold*, 100 U.S. 371 (1879) .............................................................38

*Faretta v. California*, 422 U.S. 806 (1975) ........................................................32

*Florida v. Nixon*, 543 U.S. 175 (2004) ..............................................................45

*Gosa v. Mayden*, 413 U.S. 665 (1973).................................................................27

*Grisham v. Hagan*, 361 U.S. 278 (1960) ............................................................54

*Hamdan v. United States*, 696 F.3d 1238 (D.C. Cir. 2012) ................................... 7

*In re Heff*, 197 U.S. 488 (1905) ...................................................................... 38

*Jecker v. Montgomery*, 13 How. 498 (1851) ............................................... 10, 27

*Johnson v. Eisentrager*, 339 U.S. 763 (1950) ......................................... 9, 18, 49

*Kinsella v. Singleton*, 361 U.S. 234 (1960) ................................................... 52

*Mackin v. United States*, 117 U.S. 348 (1886) .............................................. 29

*Marbury v. Madison*, 1 Cranch 137 (1804) ................................................ 23, 47

*McClaughry v. Deming*, 186 U.S. 49 (1902) .................................................. 39

*McElroy v. Guagliardo*, 361 U.S. 281 (1960) ............................................ 53, 54

*Mudd v. Caldera*, 134 F.Supp.2d 138 (D.D.C. 2001) ...................................... 56

*NFIB v. Sebelius*, 132 S.Ct. 2566 (2012) ...................................................... 46

*NLRB v. Noel Canning*, 134 S.Ct. 2550 (2014) ............................................. 18

*Northern Pipeline v. Marathon Pipe Line*, 458 U.S. 50 (1982) ............. 29, 32, 34

*O'Callahan v. Parker*, 395 U.S. 258 (1969) .................................................. 40

*O'Donohue v. United States*, 289 U.S. 516 (1933) ......................................... 26

*Pacemaker Diagnostic Clinic of America v. Instromedix*, 725 F.2d 537
    (9th Cir. 1984) ......................................................................................... 25

*Patton v. United States*, 281 U.S. 276 (1930) ............................................... 45

*Pennsylvania v. Nelson*, 350 U.S. 497 (1956) ............................................... 51

*Plaut v. Spendthrift Farm*, 514 U.S. 211 (1995) ....................................... 44, 55

*Prosecutor v. Milutinovíc*, Case No. IT-99-37-AR72, 2003 WL
    24014138 (ICTY App. Ch., May 21, 2003) .............................................. 24

*Rodriguez de Quijas v. Shearson/American Express*, 490 U.S. 477 (1989) ......... 43

*Roell v. Withrow*, 538 U.S. 580 (2003) ........................................................ 44

*Salazar ex rel. Salazar v. District of Columbia*, 602 F.3d 431
    (D.C. Cir 2010) ........................................................................................ 42

*Salinas v. United States*, 522 U.S. 52 (1997) ................................................ 54

*Solomon v. Vilsack*, 763 F.3d 1 (D.C. Cir. 2014) .......................................... 37

*Solorio v. United States*, 483 U.S. 435 (1987) ........................................... 40, 55

*The Antelope*, 10 Wheat. 66 (1825) .............................................................. 48

*The Paquete Habana*, 175 U.S. 677 (1900)...........................................................23

*Ullmann v. United States*, 350 U.S. 422 (1956)....................................................32

*United States v. Ali*, 718 F.3d 929 (D.C. Cir. 2013) .............................................16

*United States v. Arjona*, 120 U.S. 479 (1887) ............................................... 48, 51

*United States v. Bahlul*, 820 F.Supp.2d 1141 (U.S.C.M.C.R. 2011).............7, 36

*United States v. Cotton*, 535 U.S. 625 (2002)......................................................39

*United States v. Delgado-Garcia*, 374 F.3d 1337 (D.C. Cir. 2004) ............. 36, 38

*United States v. Furlong*, 5 Wheat. 184 (1820) ...................................................48

*United States v. Johnson*, 258 F.3d 361 (5th Cir. 2001)......................................26

*United States v. Marigold*, 9 How. 560 (1850)......................................................51

*United States v. Moreland*, 258 U.S. 433 (1922)...................................................26

*United States v. Palmer*, 3 Wheat. 610 (1818) ............................................. 23, 48

*United States v. Prado*, 743 F.3d 248 (7th Cir. 2014) ..........................................37

*United States v. Robbins*, 52 M.J. 159 (C.A.A.F. 1999)......................................40

*United States v. Smith*, 5 Wheat. 153 (1820) .......................................................47

*Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932 (2015) .......... 41, 42, 43, 57

*Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751 (7th Cir. 2013)..................42

*Wilson v. Wall*, 6 Wall. 83 (1867).......................................................................23

*Wong Wing v. United States*, 163 U.S. 228 (1896)...............................................26

*Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987) ..........................26

## Constitutional Provisions

Article I § 8, cl. 1 .............................................................................................51

Article I § 8, cl. 6 .............................................................................................50

Article I § 8, cl. 10 ..... 10, 18, 19, 22, 23, 24, 46, 47, 48, 49, 50, 51, 52, 53, 55, 56

Article I § 8, cl. 13 ...........................................................................................53

Article I § 8, cl. 14 ............................................................................. 40, 53, 54

Article III § 2....................................................................................................26

Article III § 3....................................................................................................50

Article IV § 4, cl. 1...........................................................................................51

## U.S. Code

10 U.S.C. § 131 ........................................................................31

18 U.S.C. § 2332 ...................................................................7, 29

18 U.S.C. § 2339B ....................................................................2

18 U.S.C. § 2384 ......................................................................51

## Congressional Materials

3 Stat. 600 (1820) ...................................................................48

12 Stat. 597 § 5 (1862) ...........................................................19

H.R. Rep. No. 104-698 (1996) ................................................21

H.R. Rep. No. 109-664 (2006) ................................................22

## Executive Materials

Chief Prosecutor, BG Mark Martins, *Remarks at Guantanamo Bay* (Apr. 13, 2014) ...........................................................32

Chief Prosecutor, BG Mark Martins, *Remarks at Guantanamo Bay* (Jul. 19, 2015) ..............................................................13

*Legality of the Use of Military Commissions to Try Terrorists*, 25 Op. O.L.C. 238 (2001) ....................................... 22, 56

*Manual for Courts-Martial* .....................................................39

*Military Commissions*, 11 Op. Att'y Gen. 297 (1865) ......... 17, 20, 23, 28, 34, 56

Office of Legal Counsel, *Applicability of Federal Criminal Laws and the Constitution to Contemplated Lethal Operations Against Shaykh Anwar al-Aulaqi* (Jul. 10, 2010).........................14

Reg. T. Mil. Comm. (2007) .....................................................31

Remarks of the Attorney General, *Attorney General Announces Forum Decisions for Guantanamo Detainees* (Nov. 13, 2009).....................32

Report of the Deputy Judge Advocate for War Crimes, European Command (Jun. 29, 1948)...............................................16

Rules for Military Commissions.................................................38

**Miscellaneous**

9/11 Commission Report (Jul. 22, 2004) .................................................3

Felix Frankfurter & Thomas Corcoran, *Petty Federal Offenses and the Constitutional Guarantees of Trial By Jury*, 39 Harv.L.Rev. 917 (1926) .................................................29

John Bickers, *Military Commissions are Constitutionally Sound: A Response to Professors Katyal and Tribe*, 34 Tex. Tech. L.Rev. 899 (2003) .................................................19

L. Rep. Trials of War Criminals (1950) .................................................15

Sarah Cleveland & William Dodge, *Defining and Punishing Offenses under Treaties*, 124 Yale L.J. 2202 (2015) .................................................23

Statute of the Iraqi Special Tribunal (2003) .................................................16

*The Federalist* (J. Cooke ed., 1961) ................................................. 32, 33

The Tokyo War Crimes Trial: The Complete Transcripts of the Proceedings of the International Military Tribunal for the Far East (Ed. Pritchard, J. & Zaide, S. 1981) .................................................24

Trial of the Major War Criminals Before the International Military Tribunal: Nuremberg, 15 November 1945 – 1 October 1946 (1947) .................................................24

Trials of War Criminals before the Nuremberg Military Tribunals Under Control Council Law No. 10 (G.P.O. 1949) .................................................15

William Winthrop, *Military Law & Precedents* (2d Ed. 1920) .................................................13

## JURISDICTIONAL STATEMENT

On September 9, 2011, the United States Court of Military Commission Review ("CMCR") affirmed the final judgment rendered against Petitioner. *United States v. Bahlul*, 820 F.Supp.2d 1141 (U.S.C.M.C.R. 2011). Petitioner filed a timely petition for review, 10 U.S.C. § 950g(c), giving this Court "exclusive jurisdiction to determine the validity" of that final judgment. *Id*. §950g(a).

# QUESTIONS PRESENTED

1. Did Congress exceed its Article I, § 8 authority by defining crimes triable by law-of-war military commission that are not offenses under the law of war?

2. Did Congress violate Article III by vesting jurisdiction over crimes that are not offenses under the international law of war outside the federal courts?

3. What is the standard of appellate review of Bahlul's conviction for conspiracy to commit war crimes?

4. Does the Define and Punish Clause of Article I of the Constitution gives Congress power to define as an Offense against the Law of Nations – triable before a law-of-war military commission – a conspiracy to commit an Offense against the Law of Nations, to wit, a conspiracy to commit war crimes; and whether the exercise of such power transgresses Article III of the Constitution?

## GLOSSARY OF TERMS

2006 Act ......................... Military Commissions Act of 2006, 120 Stat. 2600 (2006)

E.B.Pet......................................... Petition for Rehearing *En Banc*, filed Jul. 27, 2015

E.B.Resp.................................... *En Banc* Brief for Respondent, dated Jul. 10, 2013

CMCR .................................................. U.S. Court of Military Commission Review

Gov't Resp. ............................................... Brief for Respondent, dated May 16, 2012

UCMJ ........................... Uniform Code of Military Justice, 10 U.S.C. §§ 801, *et seq.*

Winthrop .................. William Winthrop, *Military Law & Precedents* (2d ed. 1920)

## STATEMENT OF FACTS

**A.     Circumstances leading to Bahlul's arrest (1999-2001)**

In 1999, Ali al Bahlul traveled from his home in Yemen to Afghanistan to join what was broadly referred to as the "mujahedeen," a diverse group of mostly Arab Muslims, who supported the Taliban. App. 122. After he arrived, he attended various training camps and grew to admire Usama bin Laden. In early December 1999, he returned to Yemen. App. 123.

Bahlul returned to Afghanistan in early 2000 and worked for approximately a year-and-a-half as bin Laden's secretary and in al Qaeda's media office. This office was controlled by a "Media Committee," chaired by Ayman al-Zawahiri. App. 125. Bahlul had no authority to distribute propaganda, which was the purview of the "Security Committee." App. 124. A separate "Military Media Office" was responsible for filming bin Laden and producing so-called "martyr wills". App. 135. After the September 11th attacks, Bahlul stayed in bin Laden's entourage for approximately a month before leaving for Pakistan, where he was arrested by local authorities, turned over to U.S. custody, and transferred to Guantanamo. App.126.

**B.     Proceedings before the Military Commissions (2004-2008)**

Two military commissions were convened to try Bahlul on a single charge of conspiracy between 2004 and 2006. App. 87-95. This conspiracy charge listed

eleven overt acts pertaining to his support for al Qaeda from 1999 until his arrest. Because of legal challenges in other cases, both of these commissions were dissolved before reaching a judgment. App. 96.

In October 2006, the President signed the Military Commissions Act of 2006, 120 Stat. 2600 (2006) ("2006 Act"). In February 2008, charges against Bahlul were re-issued under the 2006 Act for three inchoate crimes. App. 97-102. The first charge, conspiracy, was substantively identical to the inchoate conspiracy charge in the prior commissions. Two other charges of solicitation and providing material support to a terrorist organization (assimilated from 18 U.S.C. § 2339B) were also charged on the basis of the same underlying conduct.

The factual allegations against Bahlul, which are not in significant dispute, span the period from his arrival in Afghanistan in 1999 until his arrest two years later. The government's evidence from its interrogations of Bahlul in Guantanamo established that he swore allegiance to bin Laden, performed secretarial duties, and edited together the film that was the centerpiece of the government's case. App. 122-139. He had denied wearing explosives and was ultimately acquitted of this allegation. App. 62.

One of his alleged overt acts was that he "prepared the propaganda declarations styled as martyr wills" of Mohammed Atta and Zaid Jarrah. The basis for this allegation is a letter he wrote in 2005 to introduce himself to a high-level al

Qaeda leader, who had been publicly taken into U.S. custody. In that letter, he states that he "typed" or "transcribed" ( طبع ) these declarations, apparently after the September 11th attacks. App. 141-145; *see also* App.71-72 (McFadden testimony). The videos of Atta and Jarrah rehearsing these statements show them reading from and revising their own handwritten remarks. App. II, Disc 2, Tracks #1, #2.[1] These videos were taped in January 2000, at a time when Bahlul was home in Yemen. App. 61; 134; 138; 145.

Bahlul's personal interactions with Atta and Jarrah appear limited to a one or two-week period in November 1999, when they arrived at a guesthouse where he was staying in Afghanistan. App. 71-72; 131;134. The 9/11 Commission Report describes Atta and Jarrah being introduced to the al Qaeda leadership and being brought into the September 11th plot sometime after Bahlul had left for Yemen in early December 1999. App. 9/11 Commission Report 165-67 (Jul. 22, 2004), App.168-170; *see also* App. 71-72. The record also shows that Bahlul did not know that Atta or Jarrah were involved in any plot until he saw their photographs in the media following the September 11th attacks. App. 71-72; 134; 138.

Bahlul's alleged connections to Atta and Jarrah are important to clarify because his trial was not about the September 11th attacks, or any act of terrorism.

---

[1] In App. II, Disc 2, Track #2, the tapings appear about 40% of the way through the video (video time clock at 12:23); the camera zooms in on the handwritten notes about 60% into the video (video time clock at 12:36).

3

The government never alleged, nor presented any evidence and the members never found that he either participated in the September 11th attacks or had foreknowledge of any terrorist plot. From the opening statement, through the testimony of every witness to the summation, Bahlul's trial was about his film.

The film is referred to in the record by various names, including *State of the Ummah*, *The Destruction of the American Destroyer the U.S.S. COLE*, and the *COLE Video.* App. II, Disc.1.[2] Its production is listed as an overt act in support of all of the charges. Bahlul is not in this film. It does not show him committing any crimes and it does not contain do-it-yourself instructions on how to perpetrate crimes. Instead, it is a montage of found footage, which is edited together into what the prosecution described as "propaganda, political argument, and indoctrination of solicitation." App. 66.

Bahlul was arraigned in May 2008. App. 1. He asserted a desire to represent himself and this request was granted by the military judge, COL Peter Brownback, USA. Later that month, COL Brownback was replaced by Col Ronald Gregory, USAF. App. 107. In August, Col Gregory convened a hearing, on motion of the government, to revisit the issue of self-representation. App. 11. Bahlul notified the military judge that he was unable to proceed because the government lost the document he prepared that specified his nine principal objections to the military

---

[2] The film is appended in its entirety in App II, Disc 1.

4

commission, broadly framed as his "boycott" ( عطاق ), which included the requirement that he accept military counsel. App. 13. He then absented himself from the hearing and Col Gregory revoked his *pro se* status. App. 35.

At a hearing in September, Bahlul appeared and spoke on his own behalf. He admitted most of the allegations against him, but nevertheless pleaded not guilty, stating, "I'm not guilty, and what I did was not a crime." App. 53. He asserted his intention to continue his boycott at his trial, again rejected his appointed military lawyer, and engaged in an extensive colloquy with Col Gregory over his objections to the military commission and the charges. App. 51-52; 54-59. At Bahlul's request, Col Gregory entered into the record a portion of the transcript from his earlier 2006 military commission, which contained a discussion of Bahlul's objections to the commission's legality. App. 12-13; 146-151. The original document has apparently never been recovered. The quality of the translation reflected in this transcript is extremely poor and inexplicably excludes his fourth objection altogether. App. 146-151. Col Gregory explained to Bahlul that his boycott was akin to "a motion to dismiss a charge for lack of jurisdiction" and that, as with a motion to dismiss, his continued presence at trial would not be construed as waiving his objections for purposes of appeal. App. 47-50.

Trial commenced on October 27, 2008. App. 64. Bahlul insisted that his appointed military lawyer remain silent throughout. The government called

fourteen witnesses. Three federal prisoners testified about seeing Bahlul's film at terrorist training camps. App. 73-75; 78-81. Law enforcement officers testified on the video's production and the chain of custody linking it to Bahlul. Three interrogators testified largely about his taking credit for the film's production. App. 68-70; 76-77. The government's last witness was a "propaganda expert [to] breakdown this video and place it in the context of other propaganda products produced by al Qaeda and their purposes." App. 316. On November 3, 2008, Bahlul was found guilty on all charges, excepting the overt act alleging he armed himself. App. 114-121.

The sentencing hearing commenced that same day. The government called two witnesses, victims of the *U.S.S. COLE* attack, who testified that they were personally offended after seeing the film on the Internet. App. 83-85. At the conclusion of testimony, Bahlul made an unsworn statement reasserting his beliefs. After an hour of deliberation, the nine-member commission sentenced him to life imprisonment. App. 86.

## C.    Post-Trial Proceedings (2008-2015)

In June 2009, the Convening Authority approved the findings and sentence without exception. App. 103-106. In September 2011, the CMCR issued a decision, denying all of Bahlul's asserted errors. *United States v. Bahlul*, 820 F.Supp.2d 1141 (U.S.C.M.C.R. 2011). In January 2013, this Court vacated his conviction

because none of the offenses charged were war crimes under international law and therefore could not be tried retroactively under *Hamdan v. United States*, 696 F.3d 1238 (D.C. Cir. 2012) ("*Hamdan II*"). *Bahlul v. United States*, 2013 WL 297726 (D.C. Cir., Jan. 25, 2013).

On rehearing *en banc*, this Court reversed the panel's holding respecting the charge of conspiracy, because under plain error review, it was "not a plain *ex post facto* violation to transfer jurisdiction over a [18 U.S.C. § 2332(b)] from an Article III court to a military commission," *Bahlul v. United States*, 767 F.3d 1, 20 (D.C. Cir. 2014) (en banc), and it was "not 'obvious' that conspiracy was not traditionally triable by law-of-war military commission under [10 U.S.C. §] 821" for retroactivity purposes. *Id*. at 27. The full court then remanded to the panel so that it could to decide Bahlul's remaining claims. *Id*. at 31.

On remand, the panel vacated Bahlul's conviction for conspiracy, holding "Bahlul's conviction for inchoate conspiracy by a law of war military commission violated the separation of powers enshrined in Article III § 1 and must be vacated." *Bahlul v. United States*, 792 F.3d 1, 22 (D.C. Cir. 2015) ("*Bahlul II*"). Judge Henderson dissented principally because "the definition and applicability of international law is, in large part, a political determination, … and the decision to try an alien enemy combatant by military commission is part and parcel of waging

war." *Id*. at 28 (Henderson, J., dissenting) (citations omitted). The panel reserved judgment on the remaining grounds. *Id*. at 22.

The government petitioned this Court for rehearing *en banc* on the question of whether "the MCA violates Article III by authorizing military-commission jurisdiction over conspiracies to commit war crimes by alien unlawful enemy combatants." E.B.Pet. at 3. On September 25, 2015, this Court granted rehearing and directed the parties to address the standard of review and the scope of Congress' power under the Define & Punish Clause in addition to the issues raised by the United States in its petition for rehearing *en banc*. Pursuant to this Court's order and the government's petition, Bahlul has reserved his arguments under the First and Fifth Amendments in this brief without prejudice to making them on remand, should the panel's judgment respecting the issues now before this Court be reversed.

## SUMMARY OF ARGUMENT

Petitioner stands convicted of the stand-alone, inchoate crime of conspiracy. The judgment against him was rendered by an *ad hoc* military tribunal. The government claims that this assertion of military jurisdiction was constitutional because the Supreme Court has implied an exception into Article III for law-of-war military commissions. Yet, the government concedes that the judgment in this case fails to satisfy the threshold condition needed to qualify for that exception: The charge alleged is not an offense "recognized in international law as [a] violation[] of the law of war." *In re Yamashita*, 327 U.S. 1, 14 (1946). The judgment in this case must, therefore, be vacated for two independent but interrelated reasons.

*First*, as a function of constitutional tradition and enumerated power, law-of-war military commissions can only be given jurisdiction over offenses that are plainly established under "the rules and precepts of the law of nations, and more particularly the law of war." *Ex parte Quirin*, 317 U.S. 1, 28 (1942). In the three Supreme Court cases to uphold the jurisdiction of a law-of-war military commission, the Court conducted an independent judicial assessment of the offense charged to ensure that it was an offense against the law of nations. *Johnson v. Eisentrager*, 339 U.S. 763, 786-87 (1950); *Yamashita*, 327 U.S. at 14; *Quirin*, 317 U.S. at 43. This was necessary because Congress' power to proscribe those offenses emanates from its power to "Define and Punish … Offenses against

9

the Law of Nations." U.S. Const. art. 1 § 8, cl. 10; *Yamashita*, 327 U.S. at 7; *Quirin*, 317 U.S. at 28. Because conspiracy is not an offense against the law of nations, a fact the government readily concedes, Congress cannot define it as an offense against the law of war or punish it in a law-of-war military commission.

*Second*, law-of war military commissions cannot encroach upon the Article III judicial power to try purely domestic crimes. In the four Supreme Court cases to invalidate military commissions, the Court did so, at least in part, because they had attempted to usurp the jurisdiction reserved to the courts at common law. *Hamdan v. Rumsfeld*, 548 U.S. 557, 602 (2006) (plurality op.); *Duncan v. Kahanamoku*, 327 U.S. 304, 322 (1946); *Ex parte Milligan*, 4 Wall. 110, 121 (1866); *Jecker v. Montgomery*, 13 How. 498, 515 (1851). The trial of criminal conspiracies is a well-established exercise of the judicial power at common law that cannot be diverted to special Executive trial chambers. This Court should therefore affirm the panel's conclusion that the charge here fell outside "the military-commission exception to Article III *as articulated by the Supreme Court*." *Bahlul II*, 792 F.3d at 24 (emphasis in original).

The government, for its part, all but concedes that it cannot fit the judgment in this case into the traditional Article III exception for law-of-war military commissions. And so it asks this Court, in effect, to recognize a new exception. This exception, it contends, should give the political branches the discretion to

remove any federal crime from the courts of law at will, so long as the war powers are invoked. This new exception is justified, not by the text of the Constitution or the traditional accommodation of "military necessity" on the battlefield. It is justified by the candid, albeit brazen, demand that this Court defer to whatever the political branches deem "valuable." E.B.Pet. at 13.

This Court should not so easily abdicate the judicial power of the United States. Every relevant legal authority from every branch of government has limited law-of-war military commissions' subject-matter jurisdiction to the class of offenses made punishable under the Define & Punish Clause. Conspiracy is not such an offense. It is a federal crime. Indeed, it is an infamous crime at common law. The courts are not only open to try federal crimes, but handle such prosecutions routinely. And the judiciary cannot function as a co-equal branch of government if criminal prosecutions can be removed from its jurisdiction whenever the Executive Branch deems its own special trial chambers preferable.

Petitioner therefore asks this Court to vacate the judgment below.

11

## ARGUMENT

## I.   CONGRESS EXCEEDED ITS ARTICLE I § 8 AUTHORITY BY DEFINING CRIMES TRIABLE BY MILITARY COMMISSION THAT ARE NOT OFFENSES AGAINST THE LAW OF WAR.

### A.   Standard of Review.

This Court reviews Congress' power to give military commissions subject-matter jurisdiction over domestic crimes *de novo*. Gov't Resp. 22 ("Questions of law, including whether Congress's constitutional warmaking powers authorize it to make certain offenses triable by military commission, are subject to plenary review by this Court."); *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006). Additional grounds for *de novo* review are given at pages 35-47 below.

### B.   Giving law-of-war military commissions jurisdiction over stand-alone conspiracy charges lacks support in constitutional tradition.

Law-of-war military commissions are "not mentioned in the Constitution," but by constitutional tradition have been upheld as a narrow accommodation for "military necessity." *Hamdan*, 548 U.S. at 590. As their name suggests, they are extraordinary tribunals whose purpose is "to determine, typically on the battlefield itself, whether the defendant has violated the law of war." *Id.* at 596-97 (plurality op.). Inchoate conspiracy offenses, like the one charged here, have never been within law-of-war military commissions' traditional subject-matter jurisdiction, whether convened here or abroad.

12

This tradition is reflected in the Civil War-era treatise by William Winthrop, sometimes called the "Blackstone of military law." *Reid v. Covert*, 354 U.S. 1, 19, n. 38 (1957) (plurality op.). Winthrop concludes that the only offenses properly punishable in a law-of-war military commission are "*overt acts*, i.e. in unlawful commissions or actual attempts to commit [a war crime], and not intentions merely." William Winthrop, *Military Law & Precedents* 841 (2d Ed. 1920) (original emphasis); App. 182. He explains, "what would justify in war a precautionary arrest might not always justify a trial as for a specific offence." *Id*.; *see also* Chief Prosecutor, BG Mark Martins, *Remarks at Guantanamo Bay*, at 2 (Jul. 19, 2015) (citing to this as "authoritative guidance"); App. 217.

Winthrop notes that military commissions can only try conspiracies when their jurisdiction is rooted in the imposition of martial law. Winthrop at 839; App. 180. In those circumstances, they can try "[c]rimes and statutory offenses cognizable by State or U.S. courts" or compound offenses, where the object offense of the conspiracy is a violation of the law of war. *Id*. Winthrop illustrates this principle with a series of examples, which all allege the perpetration of completed offenses, not mere agreements. *Id*. at 839 n.5; App. 180.

*Ex parte Quirin* was the first Supreme Court case involving a pure law-of-war military commission. The dispositive question was whether the defendants were charged with "offenses which, according to the rules and precepts of the law

13

of nations, and more particularly the law of war, are cognizable by such tribunals."
*Quirin*, 317 U.S. at 28. The Court held that the sabotage charge "has been so
recognized in practice both here and abroad, and has so generally been accepted as
valid by authorities on international law that we think it must be regarded as a rule
or principle of the law of war[.]" *Id*. at 35-36.

   While the saboteurs were also charged with a conspiracy offense, the Court
specifically declined to endorse it. *Quirin*, 317 U.S. at 46. Instead, the Court was
"careful in its decision to identify an overt, 'complete' act." *Hamdan*, 548 U.S. at
606 (plurality op.). The saboteurs themselves claimed that they had "not actually
committed or attempted to commit any act of depredation[.]" *Quirin*, 317 U.S. at
38. But the Court rejected this argument, not because conspiring to violate the law
of war was sufficient, but because the substantive "offense was complete" when
they perfidiously crossed the lines out of uniform. *Id.*; Office of Legal Counsel,
*Applicability of Federal Criminal Laws and the Constitution to Contemplated
Lethal Operations Against Shaykh Anwar al-Aulaqi* 33, n.44 (Jul. 10, 2010)
(suggesting that because "the Court in *Quirin* focused on conduct taken behind
enemy lines" the Court described "conduct that would constitute perfidy or
treachery."); App. 225.

   There is also no tradition of trying conspiracies in the law-of-war military
commissions the United States has used to try war crimes committed on foreign

battlefields. Leaving aside the international criminal tribunals, which have all rejected conspiracy to commit war crimes as a stand-alone offense, "United States Military Tribunals ... have not recognized as a separate offense conspiracy to commit war crimes or crimes against humanity." 15 L. Rep. Trials of War Criminals 90 (1950); App. 233.

This was not for a lack of aggressive prosecutors trying to venture beyond the law of war's traditional boundaries. In the U.S. Army tribunals convened under Control Council Law #10, prosecutors brought charges for war crimes conspiracies. They defended their charging decision, claiming that conspiracy was a "venerable as well as an ancient concept in the jurisprudence of England and the United States" and because "the conspiracies involved in these cases are conspiracies to commit acts well-established as crimes at international law[.]" 15 Trials of War Criminals before the Nuremberg Military Tribunals Under Control Council Law No. 10, 1085-86 (G.P.O. 1949); App. 248. The American judges, sitting *en banc*, rejected these arguments. They unanimously concluded that "this tribunal has no jurisdiction to try any defendant upon a charge of conspiracy considered as a separate substantive offense." *Id*. at 1100 (note); App. 249.

The same result was reached by the military commissions the Army convened under a general directive from General Eisenhower to prosecute war crimes elsewhere in Europe. Joint criminal enterprise, called "common design,"

15

was the prosecution's theory of liability in almost every case. Report of the Deputy Judge Advocate for War Crimes, European Command, at 61-62 (Jun. 29, 1948); App. 165-66. This was not a stand-alone offense, however. Rather, "the accused were charged with participation in the execution of a common design to commit described unlawful acts and not a common design as a separate offense." *Id*.

Most recently, this long tradition was reaffirmed in the tribunals the United States created to try Iraqi war criminals. These tribunals had jurisdiction over violations of the laws and customs of war, genocide, crimes against humanity, and three assimilated offenses under Iraqi law dealing with corruption. Statute of the Iraqi Special Tribunal, arts. 10-15 (2003); App. 198-204. While a joint criminal enterprise type of liability appears available for all committed crimes, stand-alone conspiracy only applies to genocide. *Id*. art. 15(b); App. 203-04.

The reason there is no tradition of trying inchoate conspiracies before law-of-war military commissions is that conspiracy is not recognized under international law as a stand-alone offense. *United States v. Ali*, 718 F.3d 929, 942 (D.C. Cir. 2013). The government concedes this without reservation. E.B.Resp. 34. And that concession puts the conspiracy charge in this case at odds with every relevant precedent, which unanimously limit law-of-war military commissions' subject-matter jurisdiction to offenses arising under that "branch of international law" known as the law of war. *Quirin*, 317 U.S. at 29.

16

The government claims the political branches have traditionally "given military tribunals jurisdiction to try offenses that were not violations of international law." E.B.Pet. at 10. But this is at best misleading. However true that may be for "military tribunals" writ large, a category that includes courts-martial and provost courts, the judgment here comes from a law-of-war military commission. As this Court already held *en banc*, that class of military tribunal only has jurisdiction to "try offenses against the law of war." *Bahlul*, 767 F.3d at 7. And despite the government's occasional protestations to the contrary, "*No one … can fail to know that the laws of war constitute a part of the law of nations.*" *Military Commissions*, 11 Op. Att'y Gen. 297, 299-300 (1865) (emphasis added).[3]

The recognition of the offense charged in international law has been essential to the Supreme Court's willingness to uphold the constitutionality of law-of-war military commissions in every case in which it has done so. In *Quirin*, the Court was explicit that the offense was triable because of the "sufficiently precise definition of international law." *Quirin*, 317 U.S. at 29. In *Yamashita*, the Court relied on the Hague Conventions to hold that both the charge and the theory of liability were plainly "recognized in international law as violations of the law of

---

[3] While it is unclear whether the government still makes this argument, its prior briefing has attempted to redefine the "law of war" to mean something other than international law. E.B.Resp. 72. The legal authorities that define the law of war are both numerous and unanimous in describing it, as the Supreme Court did in *Quirin*, as a branch of international law. *Hamdan II*, 696 F.3d at 1248-49 & n. 9 (collecting citations); *Bahlul II*, 792 F.3d at 24-25 (Tatel, J., concurring) (same).

war." *Yamashita*, 327 U.S. at 14. And in *Eisentrager*, the Court relied exclusively on international law authorities to hold that the "[b]reach of the terms of an act of surrender" constituted "an international delinquency if ordered by a belligerent Government, and a war crime if committed without such order." *Eisentrager*, 339 U.S. at 787-88 (quoting Oppenheim, *International Law* 433 (6th ed. 1944)).

Given its consistency and unanimity across branches of government, this traditional gloss on the constitutional scope of law-of-war military commissions' subject-matter jurisdiction is so well established as to now be part of the Constitution itself. *NLRB v. Noel Canning*, 134 S.Ct. 2550, 2564 (2014). And given that there is no dispute that stand-alone conspiracy is not a war crime under international law, it falls outside the limited subject-matter jurisdiction that law-of-war military commissions can constitutionally exercise.

**C.     The Define & Punish Clause limits law-of-war military commission jurisdiction to "offenses … against the law of nations."**

The need to establish the charged offenses under international law is not only a consequence of tradition. It is a consequence of the fact that the Define & Punish Clause is the constitutional authority from which law-of-war military commissions derive their subject-matter jurisdiction. U.S. Const. art. 1 § 8, cl. 10. Until this case, no one – not even proponents of military commissions – has doubted this. John Bickers, *Military Commissions are Constitutionally Sound: A*

18

*Response to Professors Katyal and Tribe*, 34 Tex. Tech. L.Rev. 899, 914 (2003)

("While [Article I § 8, cls. 11-15] authorize Congress to exercise legislative

authority regarding military government or martial law, the authority for a law of

war commission springs from [the Define & Punish Clause].").

The government nevertheless asks this Court to ignore all precedent and

hold that "the Define & Punish Clause does not mark the boundary of

congressional authority here." E.B.Pet. at 11. It claims that the Define & Punish

Clause cannot be the sole constitutional source of these commissions' subject-

matter jurisdiction because "the executive has traditionally defined many of the

offenses to be tried in military commissions," despite the fact that the President

"does not possess any explicit constitutional power to 'define and punish'

offenses." *Id.* at 11-12. This argument has no good authority behind it and its

premises are simply wrong.

**1.**      As a threshold matter, every law-of-war military commission to

receive favorable judicial review has been supported by a Congressional law.

During the Civil War, Congress authorized military commissions in 1862. 12 Stat.

597 § 5 (1862). And in the context of World War II, law-of-war military

commissions' subject-matter jurisdiction derived from Article 15 of the Articles of

War. *Quirin*, 317 U.S. at 29. In fact, in *Quirin*, the Court dismissed the objection

that Congress had "not itself undertaken to codify that branch of international law

or to mark its precise boundaries, or to enumerate or define by statute all the acts which that law condemns." *Id*. Article 15's general incorporation of the "law of war" was sufficient because it "adopted by reference the sufficiently precise definition of international law." *Id*.

2.      The government has no good authority to support the notion that law-of-war military commissions' subject-matter jurisdiction can go beyond the express terms of the Define & Punish Clause and draw from the emanations and penumbra of the war powers. To the contrary, every relevant legal authority from every branch of government has rested law-of-war military commissions' subject-matter jurisdiction solely and exclusively on the Define & Punish Clause.

The earliest is the Attorney General opinion reviewing the trial of the Lincoln Assassins. This Court held *en banc* that "this highest-level Executive Branch deliberation is worthy of respect in construing the law of war." *Bahlul*, 767 F.3d at 25. The Attorney General rested his analysis on "the expression in the Constitution that 'Congress shall have power to define and punish … offences against the law of nations.' Many of the offences against the law of nations for which a man may, by the laws of war, lose his life, his liberty, or his property, are not crimes. ... [But] for that offence he must answer to the laws of war, and the tribunals legalized by that law." 11 Op. Att'y Gen. at 312. Winthrop reiterates this in the first sentence of his chapter on military commissions. Winthrop at 831; App.

177 ("The Constitution confers upon Congress the power 'to define and punish offences against the law of nations,' and in the instances of the legislation of Congress during the late war by which it was enacted that spies and guerillas should be punishable by sentence of military commission, such commission may be regarded as deriving its authority from this constitutional power.").

In World War II, the Supreme Court rested law-of-war military commissions' jurisdiction on Congress' "authority to define and punish offenses against the law of nations[.]" *Quirin*, 317 U.S. at 28. This conclusion has been consistently reaffirmed. *Yamashita*, 327 U.S. at 7 ("[In *Quirin*,] we … pointed out that Congress, in the exercise of the power conferred upon it by Article I, § 8, cl. 10 of the Constitution to 'define and punish … Offenses against the Law of Nations,' of which the law of war is a part … had recognized the 'military commission' … an appropriate tribunal for the trial and punishment of offenses against the law of war."); *see also* H.R. Rep. No. 104-698 (1996), at 7 (citing *Quirin* in support of Congress' authority to enact the War Crimes Act under the Define & Punish Clause, because the "constitutional authority to enact federal criminal laws relating to the commission of war crimes is undoubtedly the same as the authority to create military commissions to prosecute perpetrators of these crimes.").

In the context of the War on Terror, both the plurality in *Hamdan* and the Office of Legal Counsel looked to the Define & Punish Clause as the constitutional

foundation of law-of-war military commissions. *Hamdan*, 548 U.S. at 601

(plurality op.); *Legality of the Use of Military Commissions to Try Terrorists*, 25

Op. O.L.C. 238, 244 (2001) ("Congress has authority to "define and punish ...

Offences against the Law of Nations." ... Authorizing the use of military

commissions to enforce the laws of war – which are considered a part of the 'Law

of Nations' – is certainly a permissible exercise of these authorities."). And the

Define & Punish Clause is the *only* authority to which Congress looked when it

enacted the 2006 Act. H.R. Rep. No. 109-664, Pt. 1, at 24 (2006) (the offenses

enumerated in the 2006 Act are a "codification of the law of war into the United

States Code pursuant to Congress's constitutional authority to 'Define and

Punish ... Offences against the Law of Nations.'").

    **3.**    Insofar as Congress sought to give law-of-war military commissions

jurisdiction over crimes that were not "offenses against the law of nations," as it

did when it codified the crime of conspiracy, it exceeded the "constitutional

limitations" on its power "to provide [that] jurisdiction." *Hamdan*, 548 U.S. at 645

(Kennedy, J., concurring). The Define & Punish Clause, like the war powers more

generally, "is not a blank check to be used in blind disregard of all the individual

rights which we have struggled so long to recognize and preserve." *Estep v. United

States*, 327 U.S. 114, 132 (1946) (Murphy, J., concurring).

"To define is to give the limits or precise meaning of a word or thing in being; to make is to call into being. Congress has power to define, not to make, the laws of nations[.] ... Hence Congress may define those laws, but cannot abrogate them[.]" 11 Op. Att'y Gen. at 299. As is detailed at pages 47-52 below, the Define & Punish Clause's grant of proscriptive power has extended only to offenses that were actually recognized under international law since the earliest days of the Republic. *See also United States v. Palmer*, 3 Wheat. 610, 641-42 (1818) (Johnson, J., concurring) ("Congress cannot make that piracy which is not piracy by the law of nations, in order to give jurisdiction to its own courts over such offenses."); Sarah Cleveland & William Dodge, *Defining and Punishing Offenses under Treaties*, 124 Yale L.J. 2202, 2282 (2015) ("Congress has some discretion … to define offenses under customary international law and treaties, but it may not create or relabel offenses that are not recognized by international law.").

The question of whether conspiracy is "an offense against the law of nations," therefore, depends solely on this Court's independent determination of "what the law is." *Marbury v. Madison*, 1 Cranch 137, 177 (1804); *The Paquete Habana*, 175 U.S. 677, 700 (1900); *Wilson v. Wall*, 6 Wall. 83, 89 (1867). The answer is both plain and uncontested. "[C]onspiracy has not attained recognition at this time as an offense under customary international law." E.B.Resp. 34.

23

This is not a case, therefore, where a statute has crystalized a burgeoning but contestable norm of international law. Congress enacted a crime in explicit reliance on the Define & Punish Clause that has been affirmatively excluded from the law of war at every turn. It was unanimously dismissed at Nuremberg in a case that involved the most widespread, concerted war criminality in human history. 22 Trial of the Major War Criminals Before the International Military Tribunal: Nuremberg, 15 November 1945 – 1 October 1946, 469 (1947) ("Nuremberg Judgment"); App. 245. It was dismissed at the Tokyo Tribunals, which were under the direct authority of General MacArthur. *The Tokyo War Crimes Trial: The Complete Transcripts of the Proceedings of the International Military Tribunal for the Far East*. Vol. 22, 47, 448-48, 454 (1981); App. 227-231. And it has been rejected by the international criminal tribunals convened in the post-Cold War era. *Prosecutor v. Milutinovíc*, Case No. IT-99-37-AR72, 2003 WL 24014138 (ICTY App. Ch., May 21, 2003).

Conspiracy is an Anglo-American concept that is dangerously broad in its sweep when used to punish the enemy in war. There is no tradition of prosecuting it before law-of-war military commissions. And it lacks any grounding in the law of nations. Accordingly, the judgment below should be vacated because Congress exceeded the lawful and traditional scope of its constitutional powers to confer jurisdiction upon law-of-war military commissions.

24

## II. CONGRESS VIOLATED ARTICLE III BY VESTING MILITARY COMMISSIONS WITH JURISDICTION TO TRY CRIMES THAT ARE NOT OFFENSES AGAINST THE LAW OF WAR.

### A. Standard of Review.

This Court reviews *de novo* whether the charged offense of conspiracy is "defined as such by the law of war [and] … may constitutionally be included within that jurisdiction." *Quirin*, 317 U.S. at 30. This Court applies strict scrutiny to any apparent effort to vest the judicial power in a non-Article III tribunal. *CFTC v. Schor*, 478 U.S. 833, 848 (1986); *Pacemaker Diagnostic Clinic of America v. Instromedix*, 725 F.2d 537, 543-44 (9th Cir. 1984) (*en banc*) (Kennedy, J.). Additional grounds for *de novo* review are given at pages 35-47 below.

### B. Congress cannot go beyond Article III's exception for law-of-war "offenses" when diverting criminal prosecutions from the courts of law.

Military tribunals, and military commissions in particular, raise "separation-of-powers concerns of the highest order." *Hamdan*, 548 U.S. at 638 (Kennedy, J., concurring). As the Supreme Court has held time and again, the job of the military is to fight wars, not conduct criminal trials. *Reid*, 354 U.S. at 35 (plurality op.); *Toth v. Quarles*, 350 U.S. 11, 17 (1955). "Even when confronted with the exigencies of war, '[the Court] cannot compromise the integrity of the system of separated powers and the role of the Judiciary in that system.'" *Bahlul*, 767 F.3d at 35 (Rogers, J., concurring in part and dissenting in part) (quoting *Stern*, 131 S.Ct.

25

at 2620). Military commissions are a reluctant and narrow exception to these "settled principles." *Id.*

Except when legislating to govern the civil administration of federal enclaves, Congress cannot circumvent the federal courts by giving the judicial power to Executive Branch tribunals. *Stern*, 131 S.Ct. at 2620; *Reid*, 354 U.S. at 21 (plurality op.); *O'Donohue v. United States*, 289 U.S. 516, 530 (1933) ("Such exceptions serve rather to emphasize the generally inviolate character of the plan."). "The judicial power is the power to decide, in accordance with law, who should prevail in a case or controversy. *See* Art. III, § 2. That includes the power to serve as a neutral adjudicator in a criminal case." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 816 (1987) (Scalia, J., concurring).

Adjudicating cases that entailed a jury trial right at common law implicates the "essential attributes of judicial power." *Stern*, 131 S.Ct. at 2616; *see also Blair v. United States*, 250 U.S. 273, 280 (1919) (describing the core incidents of the judicial power); *United States v. Johnson*, 258 F.3d 361, 370 (5th Cir. 2001) (whenever an Article I court "encroaches upon a district court's exclusive felony trial domain, Article III concerns move to the forefront."). This principle holds true regardless of the legal status of the parties before the court. *Wong Wing v. United States*, 163 U.S. 228, 237 (1896).

26

The first two military commission judgments to be reviewed by the Supreme Court were vacated, at least in part, for having usurped the judicial power. The first arose in the context of the Mexican War. *Jecker v. Montgomery*, 13 How. 498 (1851). The Navy convened what would now be recognized as an occupation commission to decide a prize case in Monterey, California. The Supreme Court unanimously vacated the commission's judgment because admiralty cases were within the exclusive jurisdiction of the federal courts and military commissions "were not courts of the United States, and had no right to adjudicate upon a question of prize or no prize." *Id*. at 515. The second case was *Ex parte Milligan*, 4 Wall. 110 (1866). The Court held that Indiana was not a theatre of hostilities or subject to martial law. Consequently, military commissions had no lawful subject-matter jurisdiction over crimes committed there because "[e]very trial involves the exercise of judicial power" and "no part of judicial power of the country was conferred on them." *Id*. at 121.

A law-of-war military commission, like any military tribunal, "is an Article I legislative court with jurisdiction independent of the judicial power created and defined by Article III." *Gosa v. Mayden*, 413 U.S. 665, 686 (1973). In *Quirin*, the Supreme Court found that the law-of-war commission at issue did not usurp the judicial power, but only because the charge of perfidious sabotage was not a crime triable by jury at common law. *Quirin*, 317 U.S. at 28.

27

The reason sabotage did not entail a jury trial right at common law was because law of war offenses generally were not considered "crimes" at all, but rather "offenses" that have never entailed a jury trial right. *Quirin*, 317 U.S. at 39-40; 11 Op. Att'y Gen. at 312-13 ("Infractions of the laws of nations are not denominated *crimes*, but *offenses*. … *Offenses* against the laws of war must be dealt with and punished under the Constitution as the laws of war, they being a part of the law of nations, direct; *crimes* must be dealt with and punished as the Constitution, and laws made in pursuance thereof, may direct."). The Court therefore categorized law of war offenses in the same general class as "petty offenses," which were also not considered "crimes" at common law and consequently are outside the textual scope of Article III. *Quirin*, 317 U.S. at 39-41 (citing, *inter alia*, *Callan v. Wilson*, 127 U.S. 540, 549 (1888)).

Relying on the "petty offense" cases, the Court concluded that in "light of this long-continued and consistent interpretation," the Constitution did not require "offenses against the law of war not triable by jury at common law be tried only in the civil courts." *Quirin*, 317 U.S. at 40. The Court was careful, however, to emphasize that the corollary of its holding was that law-of-war military commissions could not reach beyond this class of law of war offenses to try the "class of offenses constitutionally triable only by a jury." *Quirin*, 317 U.S. at 29.

28

Here, the government concedes that conspiracy is solely a domestic law crime. In fact, the government contended that the conspiracy charge in this case was an assimilation of 18 U.S.C. § 2332(b), in order to save it from an *ex post facto* challenge. E.B.Resp. 67. Section 2332(b) is a crime against the United States that, over the thirty years of its existence, has only ever been tried in a federal court. And the stand-alone offense of conspiracy, more generally, is the paradigmatic case of an "infamous crime" that was triable only by jury at common law. *See*, *e.g.*, *Mackin v. United States*, 117 U.S. 348, 354 (1886) (conspiracy charges "are infamous crimes, within the meaning of the fifth amendment of the constitution"); Felix Frankfurter & Thomas Corcoran, *Petty Federal Offenses and the Constitutional Guarantees of Trial By Jury*, 39 Harv.L.Rev. 917, 979 (1926).

"The question, therefore, is whether a law of war military commission may try domestic offenses – specifically conspiracy – without intruding on the judicial power in Article III." *Bahlul II*, 792 F.3d at 10. The answer is no. Even when acting under the war powers, the political branches are not free to "replace the principles delineated in our precedents, rooted in history and the Constitution, with a rule of broad legislative discretion that could effectively eviscerate the constitutional guarantee of an independent Judicial Branch of the Federal Government." *Northern Pipeline v. Marathon Pipe Line*, 458 U.S. 50, 73 (1982) (plurality op.).

29

**C.     Giving military commissions jurisdiction over domestic crimes threatens the integrity of the judicial system.**

Traditionally, military commissions have been a "court of last resort." *Milligan*, 4 Wall. at 132 (Chase, C.J., concurring). Their original purpose was to fill statutory gaps in the personal or subject-matter jurisdiction of courts-martial that arose on the battlefield. *Hamdan*, 548 U.S. at 624. Whatever legitimate criticisms can be levied against the "drumhead justice" of the Civil War, *Bahlul*, 767 F.3d at 27, those tribunals met the military's need to govern an often hostile population during a nationwide insurgency that killed a half-million people. And though controversial in the context of World War II, *Yamashita*, 317 U.S. at 26-30 (Murphy, J., dissenting), military commissions were a rough, but ready, means by which to obtain swift justice during the exigencies of a world war.

Nothing about the accused's trial resembles any of the traditional military commissions the government relies upon as precedent. The accused's commission was "appointed not by a military commander in the field of battle, but by a [civilian civil servant] stationed away from any active hostilities." *Hamdan*, 548 U.S. at 612 (plurality op.). Rather than swift justice, Bahlul's weeklong trial commenced nearly seven years after he was brought to Guantanamo. The witnesses were not pulled from the battlefield, but were FBI interrogators, forensics analysts, a paid subject-matter expert, and three federal prisoners, who were brought to Guantanamo by the Bureau of Prisons pursuant to cooperation

30

agreements. Whereas Article III review of military commissions has historically been limited to writs of habeas corpus to ensure against extraordinary battlefield excesses, this very appeal demonstrates how these tribunals have been permanently grafted onto the judicial system.

In fact, while called a "military" commission, the tribunal here was not even convened by the military, let alone in response to some battlefield necessity. It was bureaucratically convened "by a civilian agency … not by the military." *Ex parte Endo*, 323 U.S. 283, 298 (1944). The Office of Military Commissions is a component of the Office of the Secretary of Defense, a civilian agency that is forbidden from establishing a military staff. 10 U.S.C. § 131(c). While service members are given temporary assignments in the Office of Military Commission's various subcomponents, the permanent staff of these commissions is composed entirely of civilians. The "military" character of these proceedings is by law, and increasingly in practice, defined solely by the trial judges and the "members," who serve as a jury under the supervision of a civilian political appointee, who, in turn, answers to the Secretary of Defense. Reg. T. Mil. Comm. §§ 2-1, *et seq*. (2007).

If this Court is willing to look past the "military commissions" label, it will see an unprecedented system of criminal trial chambers established within the Executive Branch, which purport to exercise subject-matter jurisdiction over purely domestic law crimes. Everything about this novel criminal justice system

31

and the government's justifications for sustaining it in this case realizes the Founders' fear that Executive trial chambers would "supplant completely our system of adjudication in independent Art. III tribunals and replace it with a system of 'specialized' legislative courts." *Northern Pipeline*, 458 U.S. at 64 (plurality op.); *see also The Federalist No. 47*, at 303 (Madison) (J. Cooke ed., 1961); App. 190; *Faretta v. California*, 422 U.S. 806, 802 (1975); *Ullmann v. United States*, 350 U.S. 422, 427 (1956).

Indeed, the modern military commission holds itself out as equal to the federal judiciary in a self-conscious effort to compete for its jurisdiction. The Chief Prosecutor has advertised the fact that "[a]lthough the procedural differences between the forums are actually slight, they can be decisive." Chief Prosecutor, BG Mark Martins, *Remarks at Guantanamo Bay* (Apr. 13, 2014); App. 215. These commissions offer, not a tool of last resort on the battlefield, but a "pragmatic choice" for the "prosecutors and counter-terror professionals in our interagency community[.]" *Id*. The former Attorney General likewise noted that "many cases could be prosecuted in either federal courts or military commissions[.]" Remarks of the Attorney General, Attorney General Announces Forum Decisions for Guantanamo Detainees (Nov. 13, 2009); App. 163. These commissions are not needed to dispense swift military justice, but to afford civilian prosecutors within the Department of Justice the liberty to make "case by case decisions" about which

forum is more favorable based on, among other factors, the likelihood that a federal judge will admit evidence against an accused. *Id*.

While the Executive Branch understandably welcomes the opportunity these tribunals provide to forum shop, that is precisely the problem. The government cannot "transform military commissions from a tribunal of true exigency into a more convenient adjudicatory tool." *Hamdan*, 548 U.S. at 625; *see also Duncan*, 327 U.S. at 322 ("Legislatures and courts are not merely cherished American institutions; they are indispensable to our government. Military tribunals have no such standing."). If the separation of powers means anything, it is that the federal judiciary cannot be required to compete for jurisdiction over the trial of federal crimes on a "case-by-case" basis. "Article III, Section 1 seeks to ensure such respect by barring congressional attempts to transfer jurisdiction to non-Article III tribunals for the purpose of emasculating constitutional courts, and thereby preventing the encroachment or aggrandizement of one branch at the expense of the other." *Schor*, 478 U.S. at 850.

Competition for jurisdiction distorts the criminal justice system with powerful incentives to ape the expediency, severity, and secrecy that are associated with military commissions. The Framers created an independent federal judiciary in order to ensure an "independent spirit in the judges, which must be essential to the faithful performance of so arduous a duty." *The Federalist No. 78*, at 437

(Hamilton) (J. Cooke ed., 1961); App. 188. The judicial system cannot function if it labors under political pressure to prove that it "works" as well as military commissions on pain of being circumvented for all but the disposition of post-trial appeals. *Northern Pipeline*, 458 U.S. at 86 n.39 (plurality op.). Article III can "neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decision making if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III." *Stern*, 131 S.Ct. at 2609.

If this Court allows military commissions' to reach beyond their traditional jurisdictional competence over offenses arising under "the laws of war, they being a part of the law of nations," 11 Op. Att'y Gen. at 312-13, the military commissions in Guantanamo will continue to drift from their historical roots and constitutional justifications. They will establish themselves as – either in fact or as precedent for – a permanent system of Executive trial chambers that offer a ready competitor to the courts of law, whenever and for however long the political branches invoke the war powers. The only safeguard against that danger, the safeguard that Article III has put in place, is for the "trial of all crimes" to remain the responsibility of the courts, not an administrative agency within the Department of Defense.

### III.   RESPONSES TO DESIGNATED ISSUES

**Issue 1**: **The standard of appellate review of Bahlul's conviction for conspiracy to commit war crimes.** *See*, *e.g.*, *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932 (2015); *CFTC v. Schor*, 478 U.S. 833 (1986).

This Court reviews the Article I and Article III issues in this case *de novo* for three principal reasons: 1) these issues were preserved at trial and, in any event, the government long ago forfeited any entitlement it might have had to plain error review; 2) these grounds are always reviewed *de novo* under the relevant military law; and 3) under the Supreme Court's decisions in *Wellness* and *Schor*, the claims presented here implicate the structural integrity of the federal judiciary.

### A.   The issues now before the Court were preserved at trial and, in any event, the government forfeited – indeed waived – any entitlement it might have had to plain error review.

With the benefit of hearing Bahlul's protests in person, including his protests to the military character of his trial, App. 5, the presiding military judge construed Bahlul's self-styled "boycott" as a jurisdictional motion. App. 49-50. The military judge even went so far as to reassure Bahlul that his "continued presence at the trial does not waive the motion for appeal." App. 49. At no point did the government object or insist that Bahlul make a formal motion for preservation.

When this case first went up to the CMCR on appeal, the government did not contest the preservation of the issues now before this Court or assert an entitlement to plain error review. The government's only procedural objection was

35

to the fact that Bahlul's appointed military lawyer had purportedly waived the *ex post facto*, free speech, equal protection, and bill of attainder claims.[4] In making this argument, the government expressly declined any claim of waiver on the issue of whether "the charges are war crimes triable by military commission," stipulating that this challenge "alleges a ground for relief that has not been waived." App. 161; *see also Bahlul*, 820 F.Supp.2d at 1256 (noting that the government only "asserts that appellant waived the First Amendment, *Ex Post Facto*, Bill of Attainder, and Equal Protection challenges raised in his appeal by failing to raise those issues below."). The government "thus waived its waiver argument on that point." *United States v. Delgado-Garcia*, 374 F.3d 1337, 1340 (D.C. Cir. 2004) .

Furthermore, as this Court has held, "waiver and forfeiture are not the same." *Bahlul*, 767 F.3d at 10 n.6. The government never asserted forfeiture before the CMCR or an entitlement to plain error review. Its failure to assert its right to a more favorable standard of review during the first two years that this case was pending on appeal would ordinarily be preclusive of any claim that it may raise now. "By failing to argue forfeiture or a failure to properly plead the claims before

---

[4] While the government no longer argues for waiver, this omnibus waiver was done in Bahlul's absence and before he was notified that his *pro se* status had been revoked. This lawyer never formed an attorney-client relationship with Bahlul and Bahlul repeatedly rejected this lawyer. The USCMCR accordingly declined to accept this lawyer's assertion of waiver as preclusive of its review and, instead, reached all of the issues presented to it *de novo*. *Bahlul*, 820 F.Supp.2d at 1258.

36

the [CMCR], the [government] has—in a word—forfeited [its] forfeiture argument here." *Solomon v. Vilsack*, 763 F.3d 1, 13 (D.C. Cir. 2014); *United States v. Prado*, 743 F.3d 248, 252 (7th Cir. 2014) ("[W]here the government fails to assert that an argument was forfeited and fails to identify the standard of review appropriate for such a forfeiture, the issue is treated as if the objection were raised below and the standard of review appropriate to such an issue controls."). And even if its claim of "waiver" before the CMCR could be construed to have also preserved a forfeiture objection, the government expressly forwent any procedural objection – forfeiture or waiver – to the questions now before this Court.

If there was any doubt that the government "forfeited its forfeiture argument" with respect to whether "the charges are war crimes triable by military commission," the government raised no objection to the panel's holding respecting the standard of review in its most recent petition for rehearing *en banc*. Judge Henderson, in dissent, wrote at length about the standard of review. *Bahlul II*, 792 F.3d at 29-41 (Henderson, J., dissenting). And while the government relied heavily on this dissent to support its petition, it neither cited nor sought the full court's review of the standard of review.[5]

---

[5] In its previous petition for rehearing, the government likewise chose not to assert forfeiture with respect to the statutory construction question that had been the basis of *Hamdan II*. It conceded at oral argument that the consequence of its doing so was to "have waived the waiver" on that issue, albeit not on the Ex Post Facto Clause claim. *Bahlul v. United States*, Case No. 11-1324, Argument Transcript, at

In sum, the government long ago elected to have these issues heard *de novo*, regardless of any argument for a more favorable standard of review that might have been available to it. After seven years of post-trial litigation, this Court should not use plain error review to salvage arguments that fail to withstand ordinary judicial scrutiny.

## B.     The constitutionality of the military's jurisdiction over a particular offense is always reviewed *de novo*.

Regardless of the precise objections made at trial, forfeiture does not apply to a military commission's "lack of jurisdiction or failure of a charge to allege an offense." Rules for Military Commissions 905(e); *see also id*. 907(b)(1). Whether an offence tried by the military is constitutionally triable by the military is a quintessential question of subject-matter jurisdiction. It presents "a claim that – *judged on its face* – [alleges that] the charge is one which the State may not constitutionally prosecute." *Delgado-Garcia*, 374 F.3d at 1343 (quotations omitted; original emphasis); *Ex parte Siebold*, 100 U.S. 371, 376-77 (1879) ("An offence created by [an *ultra vires* statute] is not a crime. A conviction under it is not merely erroneous, but is illegal and void, and cannot be a legal cause of imprisonment."); *In re Heff*, 197 U.S. 488, 505-06 (1905) (scope of Congress' legislative power to enact crimes is jurisdictional).

---

34 (D.C. Cir., Sept. 30, 2013). Its decision not to challenge the panel's holding on the standard of review in its second petition for rehearing has the same effect.

This case poses the identical jurisdictional challenges raised via habeas corpus in *Quirin*, *Yamashita*, and *Hamdan* to the military's lack of "power to adjudicate the case." *United States v. Cotton*, 535 U.S. 625, 630 (2002). The fact that those cases reached the issues here via habeas corpus demonstrates the issues' non-forfeitability. Indeed, at the time *Quirin* was decided, the only challenge that could be brought against a military tribunal was to its "jurisdiction." *Quirin*, 317 U.S. at 46. Since this case "begins and, for the most part, ends with *Ex Parte Quirin*," *Bahlul II*, 792 F.3d at 24 (Tatel, J., concurring), this Court's direct review should not be any less rigorous than the Supreme Court's analysis of the identical constitutional questions via collateral attack.

*De novo* review is also supported by ordinary military law, under which military jurisdiction over a particular charge is a core question of subject-matter jurisdiction that can be raised at any time. *Manual for Courts-Martial*, App. 21 ¶ 68(b)(3) (2012) ("failure to allege an offense" includes the objection that the charge is not "an offense of which a court-martial may take cognizance."); *see also Bahlul*, 767 F.3d. at 51 (Brown, J., concurring in part and dissenting in part); *id*. at 78-79 (Kavanaugh, J., concurring in part and dissenting in part). Military tribunals have no inherent jurisdiction, but are instead created *ad hoc* to try specific charges against a specific accused. *McClaughry v. Deming*, 186 U.S. 49, 64-65 (1902). A challenge to the charge therefore goes directly to whether the tribunal itself is

lawfully constituted. As a consequence, military law recognizes that an appellant may challenge whether an offense was improperly put under military jurisdiction at any time. *United States v. Robbins*, 52 M.J. 159, 160 (C.A.A.F. 1999) ("If the offense was improperly assimilated [into military law], it was not cognizable by a court-martial."). The starkest example of this was *O'Callahan v. Parker*, 395 U.S. 258 (1969) *overruled on other grounds by Solorio v. United States*, 483 U.S. 435 (1987). *O'Callahan* held that Congress' power under Article I § 8, cl. 14 did not authorize courts-martial to try service-members for offenses that were not "service connected." *O'Callahan* was decided via habeas corpus, despite the petitioner's failure to raise this challenge at trial or on direct appeal *twelve* years earlier.

Finally, nothing compels this Court to circumscribe its review of the fundamental questions now before it. This Court's review of military commission judgments is not governed by Fed.R.Crim.Pro. 52(b), which does not apply to military tribunals generally. *Bahlul*, 792 F.3d at 6-7; *United States v. Powell*, 49 M.J. 460, 463 (C.A.A.F. 1998) ("There is no military counterpart to Fed.R.Crim.Pro. 52(b) in the Manual for Courts-Martial."). The CMCR, for its part, reviewed the issues now before the Court *de novo*. And this Court's statutory jurisdiction extends to all "matters of law, including the sufficiency of the evidence to support the verdict." 10 U.S.C. § 950g(d).

**C.** **Wellness** **and** **Schor** **confirm that** **de novo** **review is required.**

*Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932 (2015) and *CFTC v. Schor*, 478 U.S. 833 (1986), both support *de novo* review of the issues presented. *Wellness* and *Schor* dealt with litigants who knowingly and voluntarily opted to have their civil claims heard in a binding, but nevertheless non-judicial forum. The Supreme Court concluded that Article III was not violated in these cases because the jurisdiction of the alternative fora was contingent upon the parties' knowing and voluntary consent. When combined with Article III courts' "supervisory authority over the process," party consent ensured that political branches were not sidelining the judiciary. *Wellness*, 135 S.Ct. at 1444. This was by way of contrast to *Northern Pipeline* and *Stern*, wherein the Court struck down the effort to hale litigants into a non-judicial forum against their will, when the rights involved entailed a judicial trial at common law.

The most relevant fact for this Court's purposes was that the Article III claim was reviewed *de novo* in both cases. This was despite the petitioner-appellants' initial consent and subsequent failure to object in the alternative forum. In both cases, the respondent-appellee objected to the Article III claims being heard for the first time on appeal. Yet, in *Wellness*, the Seventh Circuit overruled the objection on the ground that waiver and consent cannot be "dispositive because of the structural role of Article III, § 1." *Wellness Int'l Network, Ltd. v. Sharif*, 727

41

F.3d 751, 771 (7th Cir. 2013). The Supreme Court accepted this conclusion

without discussion and proceeded immediately to the merits of the Article III claim.

*Wellness*, 135 S.Ct. at 1941-42. And in *Schor*, the Supreme Court itself overruled

this objection because "the parties cannot by consent cure the constitutional

difficulty for the same reason that the parties by consent cannot confer on federal

courts subject-matter jurisdiction[.]" *Schor*, 478 U.S. at 850-51.

By putting structural Article III claims on par with subject-matter

jurisdiction, the Supreme Court could not have been more explicit that appellate

review of these claims does not rise or fall on the parties' trial level motion

practice. And the fact that *Wellness* and *Schor* were both civil appeals reinforces

the weight of this rule, insofar as appellate review of unpreserved claims in civil

cases is far more circumscribed than in criminal appeals. *Salazar ex rel. Salazar v.

District of Columbia*, 602 F.3d 431, 436 (D.C. Cir 2010).

To be sure, on the basis of *Wellness*, Judge Henderson maintained, "An

enemy combatant must knowingly and voluntarily consent to non-Article III

adjudication before his consent can ward off a violation of the Judicial Power

Clause. … But we should not even review a Judicial Power Clause challenge if he

forfeits the argument by failing to timely raise it." *Bahlul II*, 792 F.3d at 37. This

argument centered on the premise that *Wellness* should be construed to have

42

overruled *Schor* and its progeny, effectively making trial-level forfeiture

dispositive. *Id.* at 35. There are three problems with this argument.

    *First*, even assuming that *Wellness* could be construed to lay the groundwork

for a change in the law that will make Article III objections subject to the "raise or

waive" standard, this Court cannot ignore *Schor*'s explicit holding to the contrary.

*Rodriguez de Quijas v. Shearson/American Express*, 490 U.S. 477, 484 (1989) ("If

a precedent of this Court has direct application in a case, yet appears to rest on

reasons rejected in some other line of decisions, the Court of Appeals should

follow the case which directly controls, leaving to this Court the prerogative of

overruling its own decisions."). "Whatever one thinks of *Schor*, it is still the law of

this Court[.]" *Wellness*, 135 S.Ct. at 1949 (Alito, J., concurring).

    *Second*, this argument depends on a distinction between the forfeiture and

waiver of Article III claims that does not make sense of either *Wellness* or *Schor*.

Neither case involved express waivers. Instead, the argument was that the litigant's

conduct implied consent to proceeding in the alternative forum. In other words,

both cases were forfeiture cases, not waiver cases. The Supreme Court made this

point explicit in *Wellness*, 135 S.Ct. at 1941 n.5. And after concluding *de novo* that

litigant consent can cure the specific Article III problem presented, the "forfeiture"

questions the Court remanded back to the Seventh Circuit related to "whether

Sharif in fact consented to the Bankruptcy Court's adjudication[.]" *Id.* at 1948.

*Third*, and most importantly, this argument confuses the standard of review the Supreme Court applied with its holdings on the merits of the Article III questions presented. In neither case did the Court hold that its appellate review of the Article III question was precluded by the waiver doctrine. Nor did it rely on the parties' forfeiture below to limit it its review to plain error. Instead, both cases addressed the merits squarely. And on those merits, the Court held that Article III is not violated because "the decision to invoke this forum is left entirely to the parties and the power of the federal judiciary to take jurisdiction of these matters is unaffected." *Schor*, 478 U.S. at 855; *see also Plaut v. Spendthrift Farm*, 514 U.S. 211, 231-32 (1995) (the integrity of the Judicial Power is protected so long as waiver and consent remain "subject to the control of [Article III] courts").

If anything, *Wellness* and *Schor* support Bahlul's claim on the merits, not just the standard of review. In both cases, the litigant's ability to make a knowing and voluntary choice of one forum over another protected against the danger that the political branches were circumventing the Courts. That ability to meaningfully choose "preserve[d] a litigant's right to insist on trial before an Article III district judge insulated from interference with his obligation to ignore everything but the merits of a case." *Roell v. Withrow*, 538 U.S. 580, 588 (2003). To ensure that consent is knowing and voluntary, the Court has insisted that "the litigant or counsel was made aware of the need for consent and the right to refuse it, and still

44

voluntarily appear[] to try the case" in the alterative forum. *Id*. at 590. Indeed, in the criminal context, the jury trial requirement is one of the few, but well-established, rights that can only be waived with the "express and intelligent consent of the defendant." *Patton v. United States*, 281 U.S. 276, 312 (1930); *see also Florida v. Nixon*, 543 U.S. 175, 187 (2004).

Whatever else can be said of Bahlul's behavior at trial, nothing could be construed as the kind of consent at issue in *Wellness* and *Schor*. This is not a case in which the government and Bahlul agreed to resolve their disputes in a military tribunal. While his *pro se* objections lacked the specificity expected of a lawyer, there is no plausible reading of the record that would manifest Bahlul's knowing and voluntary *consent* to being tried. He even went so far as to absent himself until the military judge reassured him that "I understand that you still do not recognize the legitimacy and/or lawfulness of these proceedings; and the fact of your presence here does not change that, unless you tell me that it does." App. 47.

In sum, the issue before the Court is whether Congress can create a parallel criminal justice system. This is a system that the Executive Branch may elect to use at its sole discretion to prosecute purely domestic crimes. And it relegates the federal judiciary to conducting post-trial review as if these special tribunals were the equivalent of district courts. On its face, that raises stark implications for the institutional integrity of the Judicial Branch that this Court reviews *de novo*.

45

**<u>Issue 2</u>: Whether the Define and Punish Clause of Article I of the Constitution gives Congress power to define as an Offense against the Law of Nations – triable before a law-of-war military commission – a conspiracy to commit an Offense against the Law of Nations, to wit, a conspiracy to commit war crimes; and whether the exercise of such power transgresses Article III of the Constitution.**

The Define & Punish Clause grants Congress only the authority its text confers. For the reasons given above, no one claims that stand-alone conspiracy to commit war crimes is an offense against the law of nations. Congress may therefore not "create" such a crime in an ostensible exercise of its power to "Define and Punish … offenses against the law of nations," any more than it may "create" interstate commerce pursuant to its constitutional power to "regulate" it. *NFIB v. Sebelius*, 132 S.Ct. 2566, 2589 (2012).

What is more, this case involves the use of military tribunals. Whenever Congress seeks to circumvent the courts, its constitutional authority for doing so is strictly construed. The courts must be satisfied that the offense is "plainly" within the Constitution's letter and spirit. In this case, when the crime at issue is the infamous crime of stand-alone, inchoate conspiracy, Congress has not only exceeded its legislative powers, it has invaded the core judicial power reserved to the courts of law under Article III.

**A.    Because stand-alone conspiracy to commit war crimes is not an offense against the law of nations, Congress cannot proscribe it pursuant to its power to "Define and Punish … offenses against the law of nations."**

The Define & Punish Clause grants Congress the power to "Define and punish … offenses against the law of nations." U.S. Const., art. 1 § 8, cl. 10. That discrete grant of legislative authority textually specifies its own limits. When acting under its authority, Congress can only proscribe "offenses against the law of nations." It cannot use this authority to enact other stand-alone crimes, simply because they may somehow relate to offenses under international law.

While the Define & Punish Clause has been infrequently invoked as a source of legislative power, the cases to have reviewed Congressional action under it establish two principles. First, the lawfulness of a particular exercise of the Define & Punish Clause turns solely and exclusively on a judicial determination of the content of international law. As a question of "what the law is," the courts afford Congress no deference in identifying whether a particular offense is, in fact, recognized under international law. *Marbury*, 1 Cranch at 177. Second, the offense proscribed must itself be an actual offense under the law of nations, not simply a crime that bears some relationship to international law.

The Supreme Court's first opinions to address the Define & Punish Clause were a series of cases that dealt with the meaning of the 1790 piracy statute. *United States v. Smith*, 5 Wheat. 153 (1820); *United States v. Furlong*, 5 Wheat. 184

47

(1820); *Palmer*, 3 Wheat. at 631. In *Furlong*, the issue was whether a "murder committed at sea on board a foreign vessel be punishable by the laws of the United States if committed by a foreigner upon a foreigner." *Id*. at 194. The Court opined at length on the elements of piracy under international law and imposed a limiting construction on the statute to prevent it from reaching foreign nationals, because to expand the definition of piracy beyond the bounds of international law would exceed "the acknowledged scope of [Congress'] legitimate powers." *Id*. at 197; *see also Palmer*, 3 Wheat. at 641-42 (Johnson, J., concurring).

The next case to address Congress' power under the Define & Punish Clause was *The Antelope*, 10 Wheat. 66 (1825). In 1820, Congress enacted a law extending the law of prize to cover slave-trading vessels as part of an international effort to abolish the slave trade. 3 Stat. 600 (1820). When a seizure under this law was ultimately challenged, the Court held that it had to meet "the test of international law." *The Antelope*, 10 Wheat. at 122. In rejecting its legality, the Court held that as "no nation can prescribe a rule for others, none can make a law of nations[.]" *Id*. Because Congress' extension of the law of prize failed the test of international law circa 1820, it "transcend[ed] the legislative power." *Id*.

The first law to be unambiguously sustained under the "offenses" portion of the Define & Punish Clause was a statute prohibiting the counterfeiting of foreign currency. *United States v. Arjona*, 120 U.S. 479 (1887). In evaluating Congress'

48

power to enact the prohibition, the Court conducted a thorough survey of the

relevant international law. The Court emphasized the particularly judicial nature of

its inquiry, ruling that "[w]hether the offense as defined is an offense against the

law of nations depends on the thing done, not on any declaration to that effect by

Congress." *Id.* at 488. Because counterfeiting foreign currency was, in fact, an

offense against the law of nations, the Define & Punish Clause empowered the

"government to provide for the punishment of such an offense." *Id.* at 487.

The next series of cases to rest on the Define & Punish Clause involved the

World War II era habeas cases that challenged military commissions' jurisdiction.

*Quirin*, 317 U.S. at 28; *Yamashita*, 327 U.S. at 7; and *Eisentrager*, 339 U.S. at 786.

All three sustained the legality of law-of-war military commissions pursuant to

Article 15 of the Articles of War. The Court held that Article 15 constituted a

complete delegation of Congress' "authority to define and punish offenses against

the law of nations." *Quirin*, 317 U.S. at 28; *Yamashita*, 327 U.S. at 7. Accordingly,

in each case, the Court conducted its own inquiry into the relevant international

law to ascertain whether the offense was "recognized in practice both here and

abroad … by authorities on international law." *Quirin*, 317 U.S. at 38.

More recently, the Eleventh Circuit struck down the federal prohibition on

extraterritorial drug trafficking as beyond the scope of the Define & Punish Clause.

The Court began from the premise that "we look to international law to ascertain

49

the scope of power granted to Congress under the [Define & Punish] Clause."
*Bellaizac-Hurtado*, 700 F.3d at 1251. The Court recognized that the drug trade is a
matter of international concern, including several multilateral treaties, but found
that "the international community has addressed drug trafficking at the domestic,
instead of international, level." *Id*. at 1256. Because drug trafficking had not yet
crystalized into a stand-alone offense against the law of nations, "Congress
exceeded its power" in seeking to criminalize it under the Define & Punish Clause.
*Id*. at 1258.

This tradition of judicial vigilance is consistent with how the Supreme Court
has policed the textual limits of the Constitution's other penal provisions. The
Define & Punish Clause is one of only three specific grants of constitutional power
to enact criminal laws. The other two are the Treason Clause, Article III § 3, and
the Counterfeiting Clause, Article I § 8, cl. 6. The Supreme Court has strictly
construed all three as limited to their terms.

In *Ex parte Bollman*, 4 Cranch 75 (1807), the Court granted a writ of habeas
corpus to vacate the convictions of two men, who had conspired to commit treason
with Aaron Burr. The Court held that the Constitution both "defined and limited
the crime." *Id*. at 127. Under those limits, an inchoate conspiracy to levy war was
insufficient to establish treason. "However flagitious may be the crime of
conspiring to subvert by force the government of our country, such conspiracy is

not treason. To conspire to levy war, and actually to levy war, are distinct offences." *Id*. Congress has therefore had to criminalize conspiracy to commit treason as a distinct offense, 18 U.S.C. § 2384, pursuant to its separate legislative authority under Article I § 8, cl. 1, to provide for the common defense, and under Article IV § 4, cl. 1, to ensure a republican form of government. *Pennsylvania v. Nelson*, 350 U.S. 497, 504 (1956).

Likewise, the Supreme Court has strictly construed Congress' power under the Counterfeiting Clause to reach only the criminalization of "counterfeiting the Securities and current Coin of the United States." In *United States v. Marigold*, 9 How. 560 (1850), the Court held that trafficking in counterfeit currency could not be proscribed pursuant to the Counterfeiting Clause because "the clause of the Constitution authorizing Congress to provide for the punishment of counterfeiting the securities and current coin of the United States does not embrace within its language the offence of uttering or circulating spurious or counterfeited coin[.]" *Id*. at 567. Instead, the Court was forced to sustain the law as an exercise of the Coin Money Clause. *Id*.; *see also Baender v. Barnett*, 255 U.S. 224 (1921) (sustaining the prohibition on counterfeiting equipment under the Coin Money Clause, not the Counterfeiting Clause); *Arjona*, 120 U.S. at 487 (sustaining the prohibition counterfeiting *foreign* currency under the Define & Punish Clause, not the Counterfeiting Clause).

51

Insofar as stand-alone conspiracy is not an offense against the law of nations, the Define & Punish Clause's limited grant of authority to proscribe actual offenses against the law of nations cannot sustain it. Indeed, one need only replace the elements of treason with the phrase "offense against the law of nations" in *Bollman* to see why Congress cannot proscribe conspiracy to commit war crimes pursuant to a constitutional authority that only authorizes it to proscribe war crimes. "However flagitious may be the crime of conspiring to [commit offenses against the law of nations], such conspiracy is not [an offense against the law of nations]." *Bollman*, 4 Cranch at 127. Put simply, when Congress legislates under the Define & Punish Clause, it may not "defy [the] unambiguous language of art. I, § 8, cl. [10], as well as the historical background thereof and the precedents with reference thereto." *Kinsella v. Singleton*, 361 U.S. 234, 243 (1960).

**B.     This Court strictly construes the offenses that the Define & Punish Clause makes triable by military commission.**

This case does not simply ask whether the Define & Punish Clause authorizes Congress to define crimes that do not, in fact, exist under international law. It asks whether Congress can take the extraordinary additional step of using that power to confer jurisdiction over such crimes on "executive tribunals whose personnel are in the executive chain of command[.]" *Reid*, 354 U.S. at 36.

52

Any effort to confer criminal jurisdiction on a military tribunal presents an "exception" to the constitutional scheme, which requires the Courts to "strictly construe[]" the constitutional basis for that exception. *Toth*, 350 U.S. at 42. The government therefore bears a heavy burden to demonstrate that the military's assertion of jurisdiction in a given case is unambiguously within the plain text of the relevant Article I power. "Determining the scope of the constitutional power of Congress to authorize trial by [the military] presents another instance calling for limitation to 'the least possible power adequate to the end proposed.'" *Id*. at 22-23 (quoting *Anderson v. Dunn*, 6 Wheat. 204, 231 (1821)); *McElroy v. Guagliardo*, 361 U.S. 281, 286 (1960).

The best illustration of the courts' vigilance in protecting Article III jurisdiction is the Supreme Court's consistent rejection of efforts to expand court-martial jurisdiction over individuals not formally inducted into military service. Just as military commissions' subject-matter jurisdiction is rooted in the Define & Punish Clause, the jurisdiction of ordinary courts-martial is predicated on Article I § 8, cls. 13-14, which grant Congress the broad power "[t]o provide and maintain a Navy," and "[t]o make Rules for the Government and Regulation of the land and naval Forces." *Dynes v. Hoover*, 20 How. 65, 97 (1857). Like the Define & Punish Clause, the scope of the constitutional grant of authority establishes its own limits. Courts-martial can only try members of the "land and naval Forces."

53

Despite emphatic arguments about the war powers, the need to ensure military effectiveness abroad, and the "conditions of world tension, which exist at the present time," *Reid*, 354 U.S. at 34, the Supreme Court has rejected every plea that it adopt a "broad construction of the language used in the constitutional provision relied on." *Toth*, 350 U.S. at 15. Hence, the phrase "land and naval Forces" has been read to exclude former service members, even for violations of military law committed whilst they were still in the armed forces. *Toth*, 350 U.S. at 15. It excludes civilians accompanying the armed forces overseas, even when the victim of the crime is a service-member. *Reid*, 354 U.S. at 47. It even excludes military contractors, who are deployed alongside the military abroad. *McElroy*, 361 U.S. at 286; *Grisham v. Hagan*, 361 U.S. 278, 280 (1960).

If Congress lacks the power to stretch the definition of "land and naval Forces" to include those who accompany the military "abroad at Government expense and receiving other benefits from the Government," *Reid*, 354 U.S. at 23, it lacks the power to stretch the definition of "offenses against the law of nations" to include a stand-alone offense that the government itself concedes has "not attained recognition at this time as an offense under customary international law." E.B.Resp. 34. Conspiracy is a stand-alone crime that targets a "distinct evil." *Salinas v. United States*, 522 U.S. 52, 65 (1997). But it is an evil that the law of nations does not proscribe. Just as the Make Rules Clause does not authorize

54

Congress to give courts-martial jurisdiction over "every event or transaction that bears some relation to 'the land and naval Forces,'" *Reid*, 354 U.S. at 44 (Frankfurter, concurring), the Define & Punish Clause does not grant it the authority to send any offense that "bears some relation" to the law of war to a military commission.

**C.    Because stand-alone conspiracy is not an "offense" within the meaning of the Define & Punish Clause, removing its prosecution from the courts of law violates Article III.**

Whatever power Congress may have to define new crimes under the Define & Punish Clause, diverting the prosecution of conspiracy, in particular, to a law-of-war military commission independently violates Article III. The reason the Supreme Court has "strictly construed" Congress' Article I § 8 powers, when those powers are being used to confer jurisdiction on non-judicial tribunals, is because "[e]very extension of military jurisdiction is an encroachment on the jurisdiction of the civil courts." *Reid*, 354 U.S. at 21. Article III requires "high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the heat of interbranch conflict." *Plaut*, 514 U.S. at 239.

The constitutionality of courts-martial depends, solely and exclusively, on the "military status of the accused." *Solorio*, 483 U.S. at 438-39. The Constitution makes various express exceptions for the regulation of the "land and naval Forces," which make the jurisdiction of courts-martial and Article III courts "entirely

independent of each other" on that basis. *Dynes*, 20 How. at 97. The Constitution, in other words, creates a special category of personal jurisdiction to which its judicial trial requirements do not apply. Courts-martial do not violate Article III so long as their personal jurisdiction only reaches the "land and naval Forces."

Law-of-war military commissions, by contrast, have unlimited personal jurisdiction. "Under *Quirin*, citizens and non-citizens alike—whether or not members of the military, or under its direction or control, may be subject to the jurisdiction of a military commission for violations of the law of war." *Mudd v. Caldera*, 134 F.Supp.2d 138, 145-46 (D.D.C. 2001) *aff'd on other grounds* 309 F.3d 819 (D.C. Cir. 2002). They nevertheless avoid the Constitution's judicial trial requirements by limiting their subject-matter jurisdiction to a special category of offenses against the law of nations. "The critical distinction is the nature of the offense. … Offenses triable by the laws of war are not within the constitutional protections attached to criminal trials." 25 Op. O.L.C. at 254-55.

As detailed on pages 25-30 above, the only reason law-of-war military commissions do not infringe Article III is because "offenses" within the meaning of the Define & Punish Clause are not "crimes" within the meaning of Article III. This offense/crime distinction has been recognized since at least the Civil War. 11 Op. Att'y Gen. at 312-13. It was the basis of the Supreme Court's holding in *Quirin*, 317 U.S. at 39-40. And in the same way that the "land and naval Forces"

56

exception establishes a closed-set of defendants, the Define & Punish Clause establishes a closed-set of offenses, whose universally identifiable boundaries prevent political encroachment into the exclusive jurisdiction of the courts of law.

To the extent Congress enacts a criminal prohibition that is not an actual "offense against the law of nations," it simply enacts a federal "'crime' within the meaning of the third article of the Constitution[.]" *Callan*, 127 U.S. at 548. Even assuming, therefore, that Congress could criminalize "conspiracy to commit war crimes," that stand-alone "crime" entails a right to a judicial trial, even though the object "offense" may not. Indeed, whatever other stand-alone crimes Congress may enact to augment the law of nations, conspiracy to commit such an offense plainly falls within the judicial power. Given "the nature of the crime of conspiracy at common law," the Supreme Court has already held it to be a "crime" within the meaning of Article III, even when the object offense "may be proceeded against summarily in any tribunal legally constituted for that purpose[.]" *Id*. at 556-57.

The conviction here must be vacated because the political branches have assumed the power to remove a federal crime – indeed an infamous crime that entailed a jury trial at common law – from the federal courts to an Executive trial chamber. This is not just a "slight encroachment" upon Article III. *Stern*, 131 S.Ct. at 2620 (quoting *Reid*, 354 U.S. at 39). It is a "brazen usurpation" of it. *Wellness*, 135 S.Ct. at 1960 (Roberts, C.J., dissenting).

57

## CONCLUSION

This Court should vacate the judgment below because these law-of-war military commissions have strayed from their traditional and constitutionally defined purpose to try offenses that are plainly "recognized in international law as violations of the law of war." *Yamashita*, 327 U.S. at 14.


Respectfully submitted,

/s/     Michel Paradis
Michel Paradis
Mary R. McCormick
1620 Defense Pentagon
Washington, DC 20301-1620
michel.paradis@osd.mil
TEL: 1.703.696.9490 x115
FAX: 1.703.696.9575

MAJ Todd E. Pierce, JA, U.S. Army (Ret.)
Senior Fellow
Univ. of Minnesota Human Rights Center
Mondale Hall, N-120
229-19th Avenue South
Minneapolis, MN 55455

*Counsel for Petitioner*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

### Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitations imposed by Fed. R. App. P. 32(a)(7)(B) as augmented by Petitioner's motion to this Court on August 1, 2013, because:

[X] this brief contains 13,922 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ] this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point font size and Times New Roman type style; *or*

[ ] this brief has been prepared in a monospaced typeface using _____ with _____.

Dated: October 13, 2015

Respectfully submitted,

/s/ Michel Paradis
*Counsel for Petitioner*

59

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2015 a copy of the foregoing was filed electronically with the Court. Notice of this filing will be sent to all parties by operation of this Court's electronic filing system. Parties may access this filing through the Court's system.

Dated: October 13, 2015

Respectfully submitted,

/s/ Michel Paradis
*Counsel for Petitioner*

# STATUTORY ADDENDUM

Article I § 8, cls. 10-15 .................................................................. ii

Article III ..................................................................................... ii

Fifth Amendment ........................................................................ 3

10 U.S.C. § 131(c) ...................................................................... 3

10 U.S.C. 821 ............................................................................. iv

10 U.S.C. § 948c (2006) ............................................................ iv

10 U.S.C. § 948d(a) (2006) ........................................................ iv

10 U.S.C. § 950f(e) (2009) ........................................................ iv

10 U.S.C. § 950g (2012) ............................................................ 4

10 U.S.C. § 950v(28) (2006) ..................................................... 5

18 U.S.C. § 2332(b) ................................................................... vi

18 U.S.C. § 2339B (excerpt) ...................................................... vi

18 U.S.C. § 2384 ........................................................................ 6

12 Stat. 597 § 5 .......................................................................... vi

Reg. T. Mil. Comm. §§ 2-1, *et seq*. (2007) .................................. vii

R.M.C. 905 (excerpt) (2012) ...................................................... 10

R.M.C. 907 (excerpt) (2012) ...................................................... 10

## Article I § 8, cls. 10-15

The Congress shall have power …

> To define and punish piracies and felonies committed on the high seas, and offenses against the law of nations;

> To declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water;

> To raise and support armies, but no appropriation of money to that use shall be for a longer term than two years;

> To provide and maintain a navy;

> To make rules for the government and regulation of the land and naval forces;

> To provide for calling forth the militia to execute the laws of the union, suppress insurrections and repel invasions;

## Article III

**§1.** The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. The judges, both of the supreme and inferior courts, shall hold their offices during good behavior, and shall, at stated times, receive for their services, a compensation, which shall not be diminished during their continuance in office.

**§2.** The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority;--to all cases affecting ambassadors, other public ministers and consuls;--to all cases of admiralty and maritime jurisdiction;--to controversies to which the United States shall be a party;--to controversies between two or more states;--between a state and citizens of another state;--between citizens of different states;--between citizens of the same state claiming lands under grants of different states, and between a state, or the citizens thereof, and foreign states, citizens or subjects.

In all cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be party, the Supreme Court shall have original jurisdiction. In all the other cases before mentioned, the Supreme Court shall have appellate jurisdiction, both as to law and fact, with such exceptions, and under such regulations as the Congress shall make.

The trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the state where the said crimes shall have been committed; but when not committed within any state, the trial shall be at such place or places as the Congress may by law have directed.

**§3.** Treason against the United States, shall consist only in levying war against them, or in adhering to their enemies, giving them aid and comfort. No person shall be convicted of treason unless on the testimony of two witnesses to the same overt act, or on confession in open court. The Congress shall have power to declare the punishment of treason, but no attainder of treason shall work corruption of blood, or forfeiture except during the life of the person attainted.

## Amendment V

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

## 10 U.S.C. § 131(c)

Officers of the armed forces may be assigned or detailed to permanent duty in the Office of the Secretary of Defense. However, the Secretary may not establish a military staff in the Office of the Secretary of Defense.

**10 U.S.C. 821**

The provisions of this chapter conferring jurisdiction upon courts-martial do not deprive military commissions, provost courts, or other military tribunals of concurrent jurisdiction with respect to offenders or offenses that by statute or by the law of war may be tried by military commissions, provost courts, or other military tribunals. This section does not apply to a military commission established under chapter 47A of this title.

**10 U.S.C. § 948c (2006)**

Any alien unlawful enemy combatant is subject to trial by military commission under this chapter.

**10 U.S.C. § 948d(a) (2006)**

A military commission under this chapter shall have jurisdiction to try any offense made punishable by this chapter or the law of war when committed by an alien unlawful enemy combatant before, on, or after September 11, 2001.

**10 U.S.C. § 950f(e) (2009)**

If the Court sets aside the findings or sentence, the Court may, except where the setting aside is based on lack of sufficient evidence in the record to support the findings, order a rehearing. If the Court sets aside the findings or sentence and does not order a rehearing, the Court shall order that the charges be dismissed.

**10 U.S.C. § 950g (2012)**

(a) Exclusive Appellate Jurisdiction.— Except as provided in subsection (b), the United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction to determine the validity of a final judgment rendered by a military commission (as approved by the convening authority and, where applicable, as affirmed or set aside as incorrect in law by the United States Court of Military Commission Review) under this chapter.

(b) Exhaustion of Other Appeals.— The United States Court of Appeals for the District of Columbia Circuit may not review a final judgment described in subsection (a) until all other appeals under this chapter have been waived or exhausted.

(c) Time for Seeking Review.— A petition for review by the United States Court of Appeals for the District of Columbia Circuit must be filed in the Court of Appeals—

> (1) not later than 20 days after the date on which written notice of the final decision of the United States Court of Military Commission Review is served on the parties; or

> (2) if the accused submits, in the form prescribed by section 950c of this title, a written notice waiving the right of the accused to review by the United States Court of Military Commission Review, not later than 20 days after the date on which such notice is submitted.

(d) Scope and Nature of Review.— The United States Court of Appeals for the District of Columbia Circuit may act under this section only with respect to the findings and sentence as approved by the convening authority and as affirmed or set aside as incorrect in law by the United States Court of Military Commission Review, and shall take action only with respect to matters of law, including the sufficiency of the evidence to support the verdict.

(e) Review by Supreme Court.— The Supreme Court may review by writ of certiorari pursuant to section 1254 of title 28 the final judgment of the United States Court of Appeals for the District of Columbia Circuit under this section.

## 10 U.S.C. § 950v(28) (2006)

Any person subject to this chapter who conspires to commit one or more substantive offenses triable by military commission under this chapter, and who knowingly does any overt act to effect the object of the conspiracy, shall be punished, if death results to one or more of the victims, by death or such other punishment as a military commission under this chapter may direct, and, if death does not result to any of the victims, by such punishment, other than death, as a military commission under this chapter may direct.

v

**18 U.S.C. § 2332(b)**

Whoever outside the United States attempts to kill, or engages in a conspiracy to kill, a national of the United States shall—

(1) in the case of an attempt to commit a killing that is a murder as defined in this chapter, be fined under this title or imprisoned not more than 20 years, or both; and

(2) in the case of a conspiracy by two or more persons to commit a killing that is a murder as defined in section 1111 (a) of this title, if one or more of such persons do any overt act to effect the object of the conspiracy, be fined under this title or imprisoned for any term of years or for life, or both so fined and so imprisoned.

**18 U.S.C. § 2339B (excerpt)**

(1) Unlawful conduct.— Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989). …

**18 U.S.C. § 2384  Seditious conspiracy**

If two or more persons in any State or Territory, or in any place subject to the jurisdiction of the United States, conspire to overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, or to oppose by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof, they shall each be fined under this title or imprisoned not more than twenty years, or both.

**12 Stat. 597 § 5**

*And be it further enacted*, That the President shall appoint, by and with the advice and consent of the Senate, a judge advocate general, with the rank, pay, and emoluments of a colonel of cavalry, to whose office shall be returned, for revision, the records and proceedings of all courts-martial and military commissions, and where a record shall be kept of all proceedings had thereupon. And no sentence of death, or imprisonment in the penitentiary, shall be carried into execution until the same shall have been approved by the President.

**Reg. T. Mil. Comm. §§ 2-1, *et seq*. (2007)**

**2-1. Organization.**

The Office of the Convening Authority for Military Commissions is established in the Office of the Secretary of Defense under the authority, direction, and control of the Secretary of Defense. The Office of the Convening Authority shall consist of the Director of the Office of the Convening Authority, the convening authority, the legal advisor to the convening authority, and such other subordinate officials and organizational elements as are within the resources of the Secretary of Defense.

**2-2. Authority to Convene Military Commissions**

Pursuant to 10 U.S.C. § 948h, the Secretary of Defense or any officer or official of the United States designated by the Secretary for that purpose may convene military commissions. No specific form or order is designated as required to effect the appointment of one or more convening authorities by the Secretary of Defense.

**2-3. Responsibilities and Functions**

 a. In performing duties directly related to military commissions, the convening authority shall:

1. dispose of charges forwarded to the convening authority by the trial counsel through the legal advisor, by either referring any or all charges to a military commission, returning them to

trial counsel with directions for further action, or dismissing them;

2. issue orders convening one or more military commissions to try alien unlawful enemy combatants for violations of the law of war or other crimes triable by military commissions;

3. detail as military commission members and alternate members those commissioned officers who are, in the opinion of the convening authority, best qualified for duty by reason of age, education, training, experience, length of service, and judicial temperament;

4. detail or employ qualified court reporters to make verbatim records of all commission sessions;

5. detail or employ qualified interpreters who shall interpret for the commissions and, as necessary, for the accused;

6. appoint all other personnel necessary to facilitate military commissions;

7. approve or disapprove requests from the prosecution to communicate with news media representatives regarding military commission cases and other matters related to military commissions;

8. approve or disapprove plea agreements with an accused;

9. order that such investigative or other resources be made available to defense counsel and the accused as deemed necessary by the convening authority for a fair trial;

10. employ those experts requested by a party and found by the convening authority to be relevant and necessary;

11. be responsible for effecting preparation of the record of trial;

12. consider matters submitted by an accused with respect to the findings and sentence prior to taking action on the case;

13. take such action on the findings and sentence deemed by the convening authority appropriate;

14. forward the case (as approved by the convening authority) to the Court of Military Commission Review; and

15. perform such other functions as the Secretary of Defense or an appellate court may prescribe.

b. In the performance of assigned functions ad responsibilities, the convening authority for military commissions shall:

1. report directly to the Secretary of Defense or this designee;

2. use existing facilities and services of the Department of Defense and other federal agencies, whenever practicable, to avoid duplication and to achieve an appropriate level of efficiency and economy;

3. communicate directly with the heads of other DOD components as necessary to carry out assigned functions. Communications to the military departments shall be transmitted through the Secretaries of the military departments, their designees, or as otherwise provided by law or directed by the Secretary of Defense. Communications to the Commanders of the Combatant Commands, except in unusual circumstances, shall be transmitted through the Chairman of the Joint Chiefs of Staff; and

4. communicate with other Government officials, representatives of the legislative branch, members of the public, and representatives of foreign governments, as applicable, in carrying out assigned functions.

**Rules for Military Commissions (2012)**

**Rule 905 (excerpt)**:  Motions generally

(b) *Pre-trial motions*. Any defense, objection, or request which is capable of determination without the trial of the general issue of guilt may be raised before trial. The following must be raised before a plea is entered:

(1) Defenses or objections based on defects (other than jurisdictional defects) in the swearing, forwarding, investigation, or referral of charges;

(2) Defenses or objections based on defects in the charges and specifications (other than any failure to show jurisdiction or to charge an offense, which objections shall be resolved by the military judge at any time during the pendency of the proceedings);

*       *       *

(e) *Effect of failure to raise defenses or objections*. Failure by a party to raise defenses or objections or to make motions or requests which must be made before pleas are entered under section (b) of this rule shall constitute waiver. The military judge for good cause shown may grant relief from the waiver. Other motions, requests, defenses, or objections, except lack of jurisdiction or failure of a charge to allege an offense, must be raised before the commission is adjourned for that case and, unless otherwise provided in this Manual, failure to do so shall constitute waiver.

**Rule 907 (excerpt)**:  Motions to dismiss

(b) *Grounds for dismissal*. Grounds for dismissal include the following—

(1) *Nonwaivable grounds*. A charge or specification shall be dismissed at any stage of the proceedings if:

(A) The military commission lacks jurisdiction to try the accused for the offense; or

(B) The specification fails to state an offense.

x