No. 11-1324

ORAL ARGUMENT SCHEDULED FOR DEC. 1, 2015

_____

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

ALI HAMZA AHMAD SULIMAN AL BAHLUL,

*Petitioner,*

v.

UNITED STATES OF AMERICA,

*Respondent*

**On Petition for Review from the United States Court
of Military Commission Review**

_____

BRIEF OF *AMICI CURIAE*
FORMER GOVERNMENT OFFICIALS, FORMER MILITARY LAWYERS,
AND SCHOLARS OF NATIONAL SECURITY LAW
IN SUPPORT OF RESPONDENT

_____

Peter Margulies
Professor of Law
Roger Williams University School of Law
10 Metacom Avenue
Bristol, RI 02809
Telephone: (401)254-4564
pmargulies@rwu.edu

James A. Schoettler, Jr.
*Attorney of Record*
Adjunct Professor
Georgetown University Law Center
600 New Jersey Avenue, NW
Washington, D.C. 20001
Telephone: (240)893-0688
jas288@law.georgetown.edu

Counsel for A*mici Curiae*

i

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................... ii

TABLE OF AUTHORITIES ...................................................... iii

GLOSSARY OF ABBREVIATIONS ................................................ iii

INTERESTS OF THE AMICI CURIAE ..............................................1

SUMMARY OF ARGUMENT ......................................................2

    I.   UNDER THE DEFINE AND PUNISH CLAUSE, CONGRESS SHOULD RECEIVE A MEASURE OF DEFERENCE IN ITS DEFINITION OF DEFENSES ..................................................7

    II.  CONGRESS'S AUTHORIZATION OF MILITARY COMMISSIONS IS CONSISTENT WITH THE SUPREME COURT'S ARTICLE III JURISPRUDENCE .......................................................17

CONCLUSION ..................................................................29

APPENDIX ....................................................................30

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(C) ..........................38

CERTIFICATE OF SERVICE .....................................................39

ii

# TABLE OF AUTHORITIES[1]

## CASES

*Al Bahlul v. United States*, 767 F.3d 1 (D.C. Cir. 2014) (en banc).….2, 4, 6, 8, 12, 23, 25, 26, 27, 28 29

*Al Bahlul v. United States*, 792 F.3d 1 (D.C. Cir. 2015) ........... 3, 5, 7, 8, 16, 19, 23

*Am. Ins. Co. v. Canter*, 26 U.S. (1 Pet.) 511 (1828) ........................................ 17, 18

*Banco Nacional de Cuba v. Sabbatino*, 367 U.S. 398 (1964) ................................15

*\*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986)……….3, 5, 6, 17, 18, 22, 23, 24

*Duncan v. Kahanamoku*, 327 U.S. 304 (1946)........................................................25

*Ex parte Milligan,* 71 U.S. (4 Wall.) 2 (1866)........................................................24

*\*Ex Parte Quirin*, 317 U.S. 1 (1942)................................ 3, 5, 11, 12.13, 22, 24, 25

*Glidden Co. v. Zdanok*, 370 U.S. 530 (1962) ........................................ 5, 17, 18, 19

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ...................................................... 12, 14

*Hamdan v. United States*, 696 F.3d 1238, (D.C. Cir. 2012)...................................25

*In re Terrorist Bombings of U.S. Embassies in E. Africa v. Odeh*, 552 F.3d 93, 104 (2d Cir. 2008)................................................................................................20

*Johnson v. Eisentrager*, 339 U.S. 763 (1950)............................................. 5, 19, 24

*McCulloch v. Maryland*, 17 U.S. 316 (1819) ......................................................4, 10

*Puckett v. United States*, 556 U.S. 129 (2009) .....................................................29

*Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568 (1985)...................5, 17

*United States v. Arjona*, 120 U.S. 479 (1887) ............................................. 3, 10, 16

*United States v. Comstock*, 560 U.S. 126 (2010)........................................ 4, 10, 20

---

[1] Authorities upon which *amici* chiefly rely are denoted with asterisks (*).

*United States v. Smith*, 18 U.S. 153 (1820) ...............................................................9

*Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015) ................. 17, 22, 29

## CONSTITUTION AND STATUTES

Define and Punish Clause, U.S. Const. Art. I, § 8, cl. 10……………….2, 3, 7, 8, 16

Necessary and Proper Clause, U.S. Const. Art. I, § 8, cl. 18………………...3, 9, 10

Authority over Territories, U.S. Const. Art. IV, § 3, cl. 2……………………….18

Military Commissions Act, 10 U.S.C. § 950g(d) (2012).......................................24

War Crimes Act, 18 U.S.C. § 2241 .........................................................................6

## INTERNATIONAL TRIBUNAL CASES

*Handyside v. United Kingdom*, 24 Eur. Ct. H.R. (ser. A) (1976)...........................13

*Prosecutor v. Brdanin*, Case No. IT-99-36-A, Appeals Chamber Judgment, ¶ 418 (Int'l Crim. Trib. for the Former Yugoslavia Apr. 3, 2007)...........................6, 26

*Prosecutor v. Tadic*, Case No. IT-94-1-A, Appeals Chamber Judgment, ¶ 199 (Int'l Crim. Trib. for the Former Yugoslavia July 15, 1999)...................................6, 26

*Zana v. Turkey*, 1997-VII Eur. Ct. H.R. 2533 .......................................................13

## BOOKS AND ARTICLES

Charles A. Shanor, *Counterterrorism Law* (2011) ...................................................2

Charles A. Shanor, *American Constitutional Law: Structure and Reconstruction* (5th ed. 2013)……… …………………………………………………..….2

*Ctr. on Law and Security, Terrorist Trial Report Card: September 11, 2001–September 11, 2011* .............................................................................................21

Emmerich De Vattel, *The Law of Nations or The Principles of Natural Law*, ch. 8, para. 137 (1758) .................................................................................................9

Eric Talbot Jensen, *Cyber Warfare and Precautions Against the Effects of Attacks*, 88 Tex. L. Rev. 1533 (2010)..................................................................................1

iv

Geoffrey Corn & Eric Talbot Jensen, *Transnational Armed Conflict: A "Principled" Approach to the Regulation of Counter-Terror Combat Operations*, 42 Israel L. Rev. 46, 66 (2009) .........................................................1

Geoffrey Corn, Jimmy Gurule, Eric Jensen & Peter Margulies, *National Security Law: Principles and Policy* (2015) .....................................................................25

Geoffrey S. Corn, Victor M. Hansen, Richard Jackson, M. Christopher Jenks, Eric Talbot Jensen & James A. Schoettler, Jr., *The Law of Armed Conflict: An Operational Approach* (2012)...............................................................................2

Jennifer Steinhauer & Charlie Savage, *U.S. Defends Prosecuting Benghazi Suspect in Civilian Rather than Military Court*, N.Y. Times, June 18, 2014, at A10 ......20

Jens David Ohlin, *Joint Intentions to Commit International Crimes*, 11 Chi. J. Int'l L. 693 (2011)...............................................................................................26

Jimmy Gurule & Geoffrey S. Corn, *Principles of Counter-Terrorism Law* (2011)..2

Michael A. Newton, *Exceptional Engagement: Protocol I and a World United Against Terrorism*, 45 Tex. Int'l L.J. 323 (2009) ...................................................1

Peter Margulies, *Detained Suspected Terrorists: Trial in Military Courts or Civilian Courts?*, 2 Harv. J.L. & Pub. Pol'y (Federalist Edition) 157, 164 n. 52 (2015) ...................................................................................................................26

Peter Margulies, *Justice at War: Military Tribunals and Article III*, 48 U.C. Davis L. Rev. __ (forthcoming 2015) ................................................................. 11, 13

Robert D. Sloane, *Human Rights for Hedgehogs?: Global Value Pluralism, International Law, and Some Reservations of the Fox*, 90 B.U. L. Rev. 975 (2010) ...................................................................................................................13

Thomas H. Lee & David L. Sloss, *International Law an Interpretive Tool in the Supreme Court, 1861-1900*, in INTERNATIONAL LAW IN THE U.S. SUPREME COURT: CONTINUITY AND CHANGE 124 (David L. Sloss, Michael D. Ramsey & William S. Dodge eds., 2011)..........................................11

*The Federalist* No. 37 (Clinton Rossiter ed., 1961) ...............................................9

*The Federalist* No. 42 (Clinton Rossiter ed., 1961) ................................... 3, 8, 9, 10

*The Records of the Federal Convention of 1787*, at 615 (Max Farrand ed., 1966)..2,

8

William Winthrop, *Military Law and Precedents* (2d. ed. 1920)...........................17

**TREATIES**

*Rome Statute of the International Criminal Court*, 21 U.N.T.S. 90.........................6

**OTHER AUTHORITIES**

Transcript of Record at 849, *United States v. Al Bahlul*, 803 R.M.C., Office of Military Comm'n, Dep't of Defense..................................................................28

*United States v. Omar Khadr,* Record of Trial, Appellate Exhibit 81—Defense Motion to Strike Surplus Language from Charge III (Jan. 11, 2008) .................26

## GLOSSARY OF ABBREVIATIONS

JCE                          Joint Criminal Enterprise

## INTERESTS OF THE AMICI CURIAE[2]

*Amici curiae* Former Government Officials, Military Lawyers and Scholars of National Security Law, who respectfully submit this brief in support of Respondent, have focused their practice, teaching, and scholarship on harmonizing security needs and procedural safeguards in national security law and the law of armed conflict.

Members of the group have served in the federal government, including the 9/11 Commission, the State Department, and the Federal Bureau of Investigation. Other members of the group have had distinguished careers as military lawyers, serving as prosecutors and defense counsel in proceedings under the Uniform Code of Military Justice and as senior advisors on compliance with international law. Many members of the group are now scholars and teachers of national security law and the law of armed conflict, between them writing scores of law review articles[3] and many books, including treatises and casebooks used to educate future lawyers

---

[2] The parties have consented to filing of this brief. Pursuant to Fed. R. App. P. 29(c)(5), counsel for *amici* certify that they authored this brief and that no person or entity other than *amici* or their counsel made a monetary contribution to the preparation or submission of the brief.

[3] *See, e.g.,* Geoffrey Corn & Eric Talbot Jensen, *Transnational Armed Conflict: A "Principled" Approach to the Regulation of Counter-Terror Combat Operations*, 42 Israel L. Rev. 46, 66 (2009); Eric Talbot Jensen, *Cyber Warfare and Precautions Against the Effects of Attacks*, 88 Tex. L. Rev. 1533 (2010); Michael A. Newton, *Exceptional Engagement: Protocol I and a World United Against Terrorism*, 45 Tex. Int'l L.J. 323 (2009).

who serve in the armed forces of the United States or otherwise practice in the national security field.[4]   The experience of *amici* has proven the value of both flexibility in adapting to the exigencies of armed conflict and fidelity to international law.

## SUMMARY OF ARGUMENT

The overt acts of the defendant that "directly relate" to the 9/11 attacks demonstrate that Congress has complied with both Article I and Article III in authorizing the trial in military commissions of conspiracy to commit war crimes. *See Al Bahlul v. United States* (*Al Bahlul I*), 767 F.3d 1, 21-22 (D.C. Cir. 2014) (en banc) (describing defendant's conduct).  A measure of deference is due Congress under the Define and Punish Clause, to allow Congress to supply guidance on the "vague" recesses of international law.  *See The Records of the Federal Convention of 1787*, at 615 (Max Farrand ed., 1966) (remarks of Gouverneur Morris); *see also Al Bahlul I*, 767 F.3d at 54 (Brown, J., concurring).  The attacks on, and murder of, civilians on September 11, 2011 constitute clear war crimes under international law.

---

[4] For casebooks, *see* Geoffrey S. Corn, Victor M. Hansen, Richard Jackson, M. Christopher Jenks, Eric Talbot Jensen  & James A. Schoettler, Jr., *The Law of Armed Conflict: An Operational Approach* (2012); Jimmy Gurule & Geoffrey S. Corn, *Principles of Counter-Terrorism Law* (2011); Charles A. Shanor, *American Constitutional Law: Structure and Reconstruction* (5th ed. 2013); Charles A. Shanor, *Counterterrorism Law* (2011).

The links between defendant's conduct and the September 11 attacks provide the limiting principle that the Supreme Court has required in its jurisprudence on non-Article III tribunals. *See Al Bahlul v. United States* (*Al Bahlul II*), 792 F.3d 1, 67 (D.C. Cir. 2015) (Henderson, J., dissenting), citing *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 854 (1986).

In enacting the Define and Punish Clause, the Framers intended to grant Congress a measure of deference in defining offenses against the "law of nations." *See The Federalist* No. 42, at 266 (Clinton Rossiter ed., 1961) (James Madison) (arguing that giving Congress the power to define offenses was necessary "for the sake of certainty and uniformity"); s*ee also United States v. Arjona*, 120 U.S. 479, 484 (1887) (merely citing need for "wise and equitable commercial laws," not treaties or consensus of international law scholars, in upholding statute enacted pursuant to the Define and Punish Clause that prohibited transnational counterfeiting); *Ex Parte Quirin*, 317 U.S. 1, 29, 46 (1942) (disclaiming need to be overly "meticulous" in ascertaining the "precise boundaries" of the "offense[s] against the law of war which the Constitution authorizes to be tried by military commission"). That deference is particularly important since the Supreme Court has acknowledged that military commissions are an "incident" of the vital sovereign power to initiate and wage war. *Id.* at 28. Moreover, under the Necessary and Proper Clause, the establishment of military commissions is "conducive" and "useful" to

3

the exercise of Congress's Article I powers. *See United States v. Comstock*, 560 U.S. 126, 133-34 (2010) (citing *McCulloch v. Maryland*, 17 U.S. 316, 413, 418 (1819)).

The instant case underlines the wisdom of a measure of deference to Congress. The "*entirely* uncontroverted" links between defendant's own acts and the targeting of U.S. civilians on September 11, *Al Bahlul I*, 767 F.3d at 21 (emphasis in original), show that punishing defendant's conduct was entirely consistent with international law. Moreover, even in the absence of links to a completed war crime such as the September 11 attacks, Congress could reasonably determine that waiting for a belligerent in an armed conflict to actually attack or kill civilians would hand the initiative to dangerous nonstate adversaries like Al Qaeda, who habitually fight without distinguishing emblems in violation of the laws of war. Congress could reasonably find that holding a belligerent accountable in a military commission would redress the balance, when the defendant, 1) agreed to commit an established war crime such as the murder of civilians, and, 2) engaged in specific overt acts with the purpose of facilitating that crime.

A military commission would also obviate logistical problems linked with the civilian trial of a belligerent, like the defendant, captured overseas. Justice Jackson warned that requiring transfer of a defendant to the United States for judicial proceedings would "divert . . . efforts and attention from the military offensive

4

abroad to the legal defensive at home." *See Johnson v. Eisentrager*, 339 U.S. 763, 779 (1950). A military commission avoids these obstacles.

From Chief Justice Marshall to the present, that same attention to "practical problems" has also characterized the Supreme Court's jurisprudence on non-Article III tribunals. *See Glidden Co. v. Zdanok*, 370 U.S. 530, 545 (1962). Instead of "doctrinaire reliance on formal categories," the Court has looked to the link between the tribunal and Congress's Article I powers. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 586-87 (1985). The Court has often exercised deference to avoid "constrict[ing] Congress's ability to take needed and innovative action." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986). That action would include the authorization of a military commission to try charges of conspiracy to commit war crimes, since, as *Quirin* acknowledged, military commissions check the excesses of an adversary in an armed conflict. *Ex Parte Quirin*, 317 U.S. at 28.

Case law on non-Article III tribunals has also looked for a limiting principle that would preserve the integrity of Article III adjudication. When a non-Article III tribunal takes up only a "narrow class" of cases that are ancillary to its acknowledged jurisdiction, the Court has typically viewed the limiting principle as sufficient to protect Article III courts. *Al Bahlul II*, 792 F.3d at 67 (Henderson, J., dissenting), citing *Schor*, 478 U.S. at 854. As a further limit, courts have looked to the

5

availability of review in Article III courts. *Schor*, 478 U.S. at 853. Those limits are in place here.

In the instant case, the direct relationship between the defendant's conduct and the September 11 attacks also provides a limiting principle. Members of the commission made specific findings regarding the defendant's role in the attacks on, and murder of, civilians, during the September 11 attacks. *See Al Bahlul I*, 767 F.3d at 21-22. Attacks on, and murder of, civilians during an armed conflict constitute an acknowledged international war crime and an appropriate subject for proceedings in military commissions. *See Rome Statute of the International Criminal Court*, arts. 8(2)(a)(i), 8(2)(b)(i), 8(2)(b)(iv), 8(2)(c)(i) & 8(2)(e)(i), 21 U.N.T.S. 90 (various offenses under international law involving murder of, or attacks against, civlians in both international and non-international armed conflicts). *Accord* War Crimes Act, 18 U.S.C. § 2241(d)(1)(D) ("murder" within statutory definition of "war crimes" derived from treaties and customary international law.) The theory of Joint Criminal Enterprise (JCE), which international tribunals recognize as a form of liability for war crimes, requires only that a defendant be a "cog in the wheel" of such criminal activity. *See Prosecutor v. Tadic*, Case No. IT-94-1-A, Appeals Chamber Judgment, ¶ 199 (Int'l Crim. Trib. for the Former Yugoslavia July 15, 1999); *Prosecutor v. Brdanin*, Case No. IT-99-36-A, Appeals Chamber Judgment, ¶ 418 (Int'l Crim. Trib. for the Former Yugoslavia Apr. 3, 2007). Defendants' acts, which include recruiting

key 9/11 figures Mohamed Atta and Ziad Jarrah with the intent that they attack and murder civilians on Al Qaeda's behalf and preparing Atta and Jarrah's martyr wills, readily meet this standard.

In the instant case, the direct relationship between the defendant's conduct and the carnage of 9/11 brings defendant's conviction within the "narrow class" of cases that are ancillary to the unquestioned jurisdiction of military commissions. *Al Bahlul II*, 792 F.3d at 67 (Henderson, J., dissenting).   Moreover, the Military Commission Act's provision for de novo review of questions of law by this Court reduces the risk of treading on Article III courts' prerogatives.  *Id*. at 66.  These limits testify to the compliance of the defendant's conviction with Article III.

## ARGUMENT

## I.     UNDER THE DEFINE AND PUNISH CLAUSE, CONGRESS SHOULD RECEIVE A MEASURE OF DEFERENCE IN ITS DEFINITION OF OFFENSES

A measure of deference to Congress in construing the scope of the Define and Punish Clause is necessary and appropriate for implementing the vision of the Framers.  In granting Congress the power to define and punish offences against the law of nations, the Framers sought to remedy what they identified as a salient risk

of international law: that it was "too vague and deficient to be a rule" that would provide adequate guidance. *See The Records of the Federal Convention of 1787*, at 615 (Max Farrand ed., 1966) (remarks of Gouverneur Morris); *see also Al Bahlul I*, 767 F.3d at 54 (en banc) (Brown, J., concurring) (noting that, "[T]he Framers were distinctly aware of the undefined and adaptable nature of international law"). As Madison put it, granting Congress "the power of defining" would supply the clarity that international law lacked. *See The Federalist No. 42*, at 266 (Clinton Rossiter ed., 1961).

A measure of deference is necessary to grant Congress the flexibility that the Framers sought. *Cf. Al Bahlul II*, 792 F.3d at 44   (Henderson, J., dissenting) (concluding, based on drafting history of Define and Punish Clause, that Framers were concerned about international law's uncertainty and as a result believed that, "Congress was not reflexively to follow other nations' lead in formulating offenses but instead to contribute to their formulation"). The panel's decision in the instant case unduly discounts the need for deference. As a result, it risks the uncertainty that the Framers wished to avoid.

The Framers were well-acquainted with the work of the European publicist Vattel, who had explained that a state seeking to comply with international law had

some leeway to "judge… what her own particular situation authorizes."[5]   The Framers knew, based on their reading of Vattel, that customary international law rests on the evolution of state practice.   Moreover, the Framers knew that no preexisting code "delineat[ed] the several objects and limits" of this accretional process.  *See The Federalist* No. 37 (James Madison), at 228.  As Justice Story observed, the Framers worried that divergent interpretations of international law would dilute the power to enforce international law that helped drive the Constitution's enactment.  *See United States v. Smith*, 18 U.S. 153, 159 (1820) (noting Framers understood that the law of nations could not be "completely ascertained and defined" in any preexisting code).  To remedy the problem, Madison urged that the Constitution grant Congress a measure of deference in fixing the content of these fluid norms.  Madison explained that granting Congress this power, along with power to define felonies on the high seas, was crucial "for the sake of certainty and uniformity."  *See The Federalist* No. 42, at 266.

       If there was any doubt about the importance of a measure of deference to Congress in this area, the Necessary and Proper Clause removes that doubt.  *See* U.S. Const., Art. I, § 8, cl. 18.  According to Chief Justice Marshall, the Necessary and

---

[5] Emmerich De Vattel, *The Law of Nations or The Principles of Natural Law*, ch. 8, para. 137 (1758), available at http://www.lonang.com/exlibris/vattel/vatt-308.htm.

9

Proper Clause permits Congress to legislate when an enactment is "conducive," "convenient," or "useful" to Congress's exercise of its Article I powers. *See United States v. Comstock*, 560 U.S. 126, 133-34 (2010) (citing *McCulloch v. Maryland*, 17 U.S. 316, 413, 418 (1819)). Citing the need for certainty and uniformity, Madison concluded that granting a measure of deference to Congress "was in every respect necessary and proper." *See The Federalist* No. 42, at 266. Indeed, the need for deference was bound up with the logic of the Constitution itself. Judicial second-guessing of Congress's choices might have emboldened the states to unilaterally define international law. Indulging the states would have perpetuated the perilous status quo of the Articles of Confederation period, in which any "indiscreet member [could]… embroil the Confederacy with foreign nations." *Id.* at 265.

The Supreme Court has long practiced deference in its assessment of Congress's power under the Define and Punish Clause. In *United States v. Arjona*, 120 U.S. 479 (1887), the Court cited the policy benefits of a global system of "wise and equitable commercial laws," *id.* at 484, in upholding Congress's power under the Define and Punish Clause to prohibit the counterfeiting of foreign currencies. Because counterfeiting distorted the international financial framework, the Court asserted that laxity in deterring counterfeiting would have "disturb[ed]… harmony between… governments." *Id.* at 486-87. This policy rationale was sufficient to uphold the statute at issue. The Court felt no need to cite treaties or past state

practice, which did not in any case designate counterfeiting as a violation of international law.[6]

The Supreme Court followed a similarly deferential approach in *Ex Parte Quirin*, 317 U.S. 1 (1942). In *Quirin*, the Court upheld military commission convictions during World War II of individuals who on the orders of the German High Command had disembarked on the East Coast of the United States and put on civilian clothes with the intent of committing acts of sabotage. No treaty designated such conduct as a war crime, and scholars were split on its status under international law. Furthermore, the *Quirin* defendants had not been able to consummate their plans for wreaking tangible harm within the United States. The Court did not view either of these factors as impairing Congress's power to designate offenses for trial by military commissions. Assessing Congress's authority, the Court, in an opinion by Chief Justice Stone, warned against being unduly "meticulous," *id*. at 46, about the "precise boundaries" of international law. *Id*. at 29.

The logic of the *Quirin* Court's heavy reliance on U.S. historical practice also indicates that Congress should receive a measure of deference. Interpreting a

---

[6] *See* Thomas H. Lee & David L. Sloss, *International Law an Interpretive Tool in the Supreme Court, 1861-1900*, in INTERNATIONAL LAW IN THE U.S. SUPREME COURT: CONTINUITY AND CHANGE 124, 147-48 (David L. Sloss, Michael D. Ramsey & William S. Dodge eds., 2011); Peter Margulies, *Justice at War: Military Tribunals and Article III*, 48 U.C. Davis L. Rev. __ (forthcoming 2015), available at http://ssrn.com/abstract=2572375, at 43-44.

11

congressional authorization for military commissions to try offenses against the "law of war," Chief Justice Stone cited examples from U.S. history, starting with the Revolutionary War. *See Ex Parte Quirin*, 317 U.S. at 31 n. 9 (citing military commission conviction of British major John Andre), *id*. at 31 n. 10 (citing examples from Civil War, including feigning civilian status to capture a ship and derail a train); *see also Hamdan v. Rumsfeld*, 548 U.S. 557, 603-09 (2006) (plurality opinion) (also citing U.S. examples). As this Court stated in its prior en banc opinion, U.S. practice both evidences and informs the body of overall state practice that forms customary international law. *Al Bahlul I*, 767 F.3d at 23-24. If the Supreme Court in *Ex Parte Quirin* could rely on U.S. practice to discern the scope of Congress's broad authorization of commissions to try violations of the law of war, then surely *Congress itself* can rely on U.S. practice if it wishes to define those offenses more specifically. Admittedly, U.S. practice is not the sole touchstone in ascertaining the scope of Congress's power under the Define and Punish Clause. However, the *Quirin* Court's reluctance to embark on a quest for the law of war's "ultimate boundaries," *Ex Parte Quirin*, 317 U.S. at 46, counsels a measure of deference to Congress's assessment of those boundaries in light of U.S. practice.

A measure of deference to sovereign states is also a significant element in transnational human rights adjudication. Transnational tribunals such as the European Court of Human Rights (ECHR) have long accorded states a measure of

deference, often referred to in ECHR cases as a "margin of appreciation."[7]  The margin of appreciation gives states space to interpret human rights guarantees such as freedom of expression in light of sovereign interests such as national security and public safety.[8]  A measure of deference to Congress is thus entirely consistent with the "rules and precepts of the law of nations" that the Supreme Court looked to for guidance in *Quirin*.  *See* 317 U.S. at 28.

Deference is singularly appropriate in the military commissions context, because of the importance of the Article I powers at issue and their intersection with the President's Article II power as commander in chief.  As the Supreme Court said in *Ex Parte Quirin*, "[a]n important incident to the conduct of war is the adoption of measures [such as military commissions] … to seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military effort have violated the law of war."  317 U.S. at 28; *cf.* Margulies, *Justice at War*, at 44-

---

[7] *See Handyside v. United Kingdom*, 24 Eur. Ct. H.R. (ser. A) (1976); *see also* Robert D. Sloane, *Human Rights for Hedgehogs?: Global Value Pluralism, International Law, and Some Reservations of the Fox*, 90 B.U. L. Rev. 975, 983 (2010) (arguing that margin of appreciation lets sovereign states "implement or interpret human rights in ways that may be sensitive or responsive to prevailing social, cultural, and other norms within their polities").

[8] *See Zana v. Turkey*, 1997-VII Eur. Ct. H.R. 2533 (citing the margin of appreciation granted states in upholding conviction, despite protections for free expression in European Convention on Human Rights, of an official who, after attacks on civilians by a terrorist group, described the group as a "national liberation movement").

13

47 (discussing how Ex Post Facto concerns spurred focus on "law of war" in *Quirin*). The United States' war-fighting capability benefits from the accountability that military commissions impose on adversaries in an armed conflict who do not comply with the laws and usages of war. *See* William Winthrop, *Military Law and Precedents* 831 (2d. ed. 1920) (noting that a military commission "is simply an instrumentality for the more efficient execution of the war powers vested in Congress and the power vested in the President as Commander-in-chief").

The Supreme Court's latest decision on military commissions, *Hamdan v. Rumsfeld*,[9] dovetails with granting Congress a measure of deference.  In *Hamdan*, the Court ruled that the President lacked authority to *unilaterally* establish military commissions that lacked the procedural safeguards that Congress had required.  *Id.* at 620-25.  Writing for a plurality of Justices asserting that inchoate conspiracy was not a war crime, Justice Stevens expressly reserved whether *Congress* — as opposed to the President acting in defiance of Congress — could designate conspiracy for trial in military commissions.  *Id.* at 601.  Highlighting the *Hamdan* Court's hesitancy to hamstring Congress, Justice Kennedy declined to join Justice Stevens's plurality opinion on conspiracy.  Instead, Justice Kennedy stressed the role of Congress, noting that, "Congress, *not the Court*, is the branch in the better position

---

[9] 548 U.S. 557 (2006).

to undertake the 'sensitive task of establishing a principle not inconsistent with the national interest or with international justice.'"  *Id.* at 655 (emphasis added) (citing *Banco Nacional de Cuba v. Sabbatino*, 367 U.S. 398 (1964)).

In the instant case, Congress could reasonably determine that authorizing military commissions to try conspiracies by belligerents to commit war crimes served the United States' interest in effective war-fighting.  Limiting military commissions to trial of charges based on *completed* war crimes would hamstring the war effort in a conflict against an unscrupulous nonstate adversary such as Al Qaeda or ISIS.  Accountability for foreign belligerents would devolve into a waiting game, with recourse on hold until a war crime such as attacks on, or the murder of, civilians actually occurred.  Congress could rationally determine that agreements to attack and murder civilians as a method of warfare reinforced by specific overt acts are triable in military commissions because waiting for a completed crime needlessly puts civilians at risk.

Deference to Congress under the Define and Punish Clause is not unlimited. Congress could not authorize military commission trials for offenses lacking a reasonable relationship to a specific crime under international law.  For example, the Define and Punish Clause would not empower Congress to permit trial by military commission of individuals who had merely provided financial support to a foreign terrorist group such as Al Qaeda, even if such assistance occurred during an armed

conflict.  The mere provision of financial support to an organization lacks the requisite nexus to one or more specific war crimes recognized under international law, such as attacks on, or the murder of, civilians.  However, where such a nexus exists, extending a measure of deference to Congress is consistent with the Framers' scheme.

In contrast with the deference to such measures urged by the Framers and the case law, the panel opinion in the instant case sought to make Article I an obstacle course that would discourage the most intrepid legislator.  The panel opinion imposed a clear statement requirement without precedent in the annals of the Define and Punish Clause, insisting that Congress had to proclaim expressly that it was legislating pursuant to this authority to be worthy of deference.  The Supreme Court did not insist on this clear statement in *United States v. Arjona*, 120 U.S. 479, 486-87 (1887), and the panel opinion cited no basis for treating the instant case more rigidly.  Judge Henderson, dissenting from the panel's decision, aptly termed the clear statement requirement a "Mother, may I?" test.  *Al Bahlul II*, 792 F.3d at 49.  Forcing Congress to hurdle such barriers in the exercise of its war powers could not be further from the flexibility contemplated by the Framers.

## II.    CONGRESS'S AUTHORIZATION OF MILITARY COMMISSIONS IS CONSISTENT WITH THE SUPREME COURT'S ARTICLE III JURISPRUDENCE

The strength of Congress's Article I interest has always been a cornerstone of the Court's pragmatic analysis of Article III's requirements. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1945 (2015) (considering "the congressional purpose behind the jurisdictional delegation"), citing *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 855 (1986). The Court has repeatedly cautioned against a "doctrinaire reliance on formal categories." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 586-87 (1985). Instead, as Justice Harlan said of Chief Justice Marshall's approach, the Court has been cognizant of its "responsibility to see the Constitution *work*." *See Glidden Co. v. Zdanok*, 370 U.S. 530, 547 (1962) (emphasis added), citing *Am. Ins. Co. v. Canter*, 26 U.S. (1 Pet.) 511, 512 (1828). To that end, in addition to accounting for Congress's purposes, courts have considered "the demonstrated need for the delegation," including whether using non-Article III tribunals promotes the Constitution's structural scheme. *Schor*, 478 U.S. at 855. Courts have also focused on the "limited nature of the delegation," including the "degree of judicial control saved to the federal courts." *Id*. Defendant's conviction meets this test.

17

A. *The Use of Military Commissions to Try Belligerents for Conspiracy to Commit War Crimes Serves Article I Purposes*

Since Chief Justice Marshall, attentiveness to Congress's exercise of Article I authority has been a hallmark of the Court's analysis of non-Article III tribunals. In *Canter*, Chief Justice Marshall wrote for the Court, finding that Congress's establishment of non-Article III tribunals to serve as courts of general jurisdiction in U.S. territories was consistent with Article III.   *Canter*, 26 U.S. at 512.  Against the backdrop of Congress's Article I authority over territories, U.S. Const., Art. IV, § 3, cl. 2, Justice Harlan read Chief Justice Marshall's opinion as an acknowledgment of the "practical problems" of territorial administration, such as the obsolescence of Article III courts of general jurisdiction when a territory acceded to statehood. *Zdanok*, 370 U.S. at 545.

The Court continued this theme of deference to congressional purposes in *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986).  In *Schor*, the Court upheld a regulation that authorized the CFTC to hear both customer complaints against brokers under the agency's enabling statute and broker counterclaims.  Justice O'Connor, writing for the Court, observed that authorizing the agency to hear such counterclaims served the legislative goals of providing an "inexpensive and expeditious" process for customers. *Id*. at 836.  In deferring to Congress's intent, Justice O'Connor warned that "formalistic and unbending rules"

18

could "constrict Congress's ability to take needed and innovative action pursuant to its Article I powers." *Id*. at 851.

Requiring that a conventional Article III court try the defendant in the instant case would similarly deprive Congress of needed flexibility. As Justice Jackson explained in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), requiring an Article III trial for an enemy belligerent apprehended abroad would create significant practical and logistical problems for the conduct of hostilities by the United States. *See id*. at 779 (noting that transportation and security for such defendants and witnesses would "divert . . . efforts and attention from the military offensive abroad to the legal defensive at home").

Congress should also receive deference here because in the instant case and those of other belligerents captured abroad, "practical problems," *Zdanok*, 370 U.S. at 545, would strain the resources and instrumentalities of Article III adjudication. Judge Tatel, concurring in the panel decision, unduly discounted the problems confronted by Article III courts in cases of transnational terrorism involving defendants captured abroad. *See Al Bahlul II*, 792 F.3d at 27. Judge Tatel's own sources illustrate those formidable costs.

The two individual cases cited by Judge Tatel demonstrate that the prosecution in an Article III court of a suspected terrorist apprehended abroad is a complex endeavor with myriad moving parts, involving overseas capture,

19

investigation, interrogation, and multinational transfers of custody.  *See* Jennifer

Steinhauer & Charlie Savage, *U.S. Defends Prosecuting Benghazi Suspect in*

*Civilian Rather than Military Court*, N.Y. Times, June 18, 2014, at A10 (noting the

use of U.S. personnel abroad to capture Ahmed Abu Khattala, who was subsequently

arraigned in federal court in Washington, D.C. on charges of leading the 2012 attack

on the U.S. diplomatic mission in Benghazi, Libya); *see also In re Terrorist*

*Bombings of U.S. Embassies in E. Africa v. Odeh*, 552 F.3d 93, 104 (2d Cir. 2008)

(in the course of upholding the convictions of the defendants on charges based on

the 1998 bombings of the U.S. embassies in Kenya and Tanzania, court noted that

one defendant was arrested by Pakistani authorities, sent to Kenya, and eventually

transferred to U.S.).   In the two cases described above, the U.S. government

summoned the resources required to hurdle these road-blocks.  However, enacting

legislation under the Necessary and Proper Clause that is "conducive" to exercise of

its Article I powers, *United States v. Comstock*, 560 U.S. 126, 133-34 (2010),

Congress could reasonably find that the Executive Branch should have the option of

resorting to a military commission when impediments to Article III courts appear

particularly onerous or where it is preferable, for security or other reasons, to try the

defendant outside of the United States.  Deference to Congress is particularly

sensible in the instant case, which adds the chaos of an armed conflict and enduring

security concerns about domestic prosecution to an already arduous array of barriers

to Article III adjudication.

The other source cited by Judge Tatel shows that the sample of Article III terrorism cases is heavily skewed toward defendants investigated and arrested in the United States. An investigation, unlike the instant case, that unfolds in the domestic realm does not raise the challenges for the coordination of law enforcement operations, military and intelligence requirements, and physical security that arise when defendants arrested abroad are brought to trial in the United States. *See Ctr. on Law and Security, Terrorist Trial Report Card: September 11, 2001–September 11, 2011*, available at http://www.lawandsecurity.org/Publications/Terrorism-Trial-Report-Card, at 26 (Karen J. Greenberg ed., 2011) (stating that fully 41 percent of criminal terrorism prosecutions in domestic courts involved informants who recruited individuals in the United States in connection with sting operations); *id*. at 4-5 (attributing growth in prosecutions since 2009 to domestic sting operations and cases involving U.S. individuals prosecuted for aid to the Somali terrorist organization, Al Shabab). For example, sting operations that have been a major source of domestic terrorism prosecutions are far more difficult to mount in a foreign state that may be indifferent or hostile to U.S. interests.

Military commissions cannot and should not replace Article III courts, but they can help fill the gap. As the Court observed in *Quirin*, military commissions are "usually called upon to function under conditions" that rule out resort to "familiar

parts of the machinery for criminal trials in the civil courts." *See Ex Parte Quirin*, 317 U.S. at 39.  The authorization of military commissions in this cabined context is a reasonable congressional response to these practical impediments.

B.  *Military Commissions' Power to Try Belligerents for Conspiracy to Commit War Crimes Supplies a Limiting Principle That Does Not Impermissibly Intrude on the Jurisdiction of Article III Courts*

In assessing whether Congress's exercise of its Article I powers is consistent with Article III, courts have looked for a limiting principle that will prevent intrusions on Article III adjudication and the jurisdiction of state courts.  *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1945 (2015), citing *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 855 (1986) (describing importance of "limited nature of the delegation" to non-Article III tribunals).  Such limits can include curbs on the types of cases that the non-Article III tribunal will adjudicate and provisions for review that will ensure supervision by an Article III court.  *Schor*, 478 U.S. at 855.  Limits like these ensure that the non-Article III tribunals established by Congress will not "impermissibly threaten[] the institutional integrity of the Judicial Branch."  *Id*. at 851.

As the Supreme Court indicated in *Schor*, the touchstone is always the "practical effect" of the intrusion on Article III courts, *id*., not the application of "formalistic and unbending rules," *id*., or "fear of where some hypothetical 'slippery

slope' may deposit us." *Id*. at 852. In the instant case, factors including substantive limits on military commission jurisdiction, de novo judicial review, and the "uncontroverted evidence" that the defendant's acts "directly relate" to the completed war crimes of September 11, *Al Bahlul I*, 767 F.3d at 21-22, combine to form an effective limiting principle.

The Court's decision in *Schor* illustrates the practical lens through which the Court has viewed effective limits on the reach of non-Article III tribunals. In *Schor*, the Court noted approvingly that the challenged jurisdiction of the CFTC dealt only with a "narrow class" of cases, entailing broker counterclaims against customers for shortfalls in customer accounts. *Schor*, 478 U.S. at 854. Moreover, the Court observed, the CFTC's legal rulings were subject to de novo review in an Article III court. *Id*. at 853.

As Judge Henderson observed in her dissent from the panel decision, significant substantive constraints cabin military commissions' ability to try individuals for conspiracy. *Al Bahlul II*, 792 F.3d at 67. The government would have to show that, 1) the defendant was a belligerent in an armed conflict with the U.S., who, 2) agreed to commit an established war crime such as the murder of civilians, and, 3) engaged in specific overt acts with the purpose of facilitating that crime. Operating under such constraints, a military commission that tried belligerents on conspiracy to attack or murder civilians would be dealing only with

a "narrow class" of matters besides its core jurisdiction.  In addition, the Military Commission Act's provision for de novo review of questions of law by this Court will prevent the overreaching that the Supreme Court has warned against in other cases.  *Id.* at 66, citing Military Commissions Act, 10 U.S.C. § 950g(d) (2012).

The "origins," *Schor*, 478 U.S. at 851, of the adjudication of offenses committed by belligerents reflect these limits.  Throughout U.S. history, military commissions have adjudicated charges against belligerents in armed conflicts related to violations of the law of war.  *See*, *e.g.*, *Ex Parte Quirin*, 317 U.S. at 31 n. 9 (citing military commission trial of British major John Andre during Revolutionary War for passing behind U.S. lines out of uniform on military mission); *see also id.* at n. 10 (discussing Mexican-American War and Civil War practice).

The Supreme Court has been particularly emphatic in upholding the military commission conviction of a belligerent captured abroad.  *See Johnson v. Eisentrager*, 339 U.S. 763, 779 (1950) (noting that hearing in Article III court of petition challenging military commission conviction of belligerent captured and detained abroad would "hamper the war effort").  On the rare occasions that the Supreme Court has overturned military commission convictions or dispositions in similar tribunals, it has typically done so in cases involving *non-belligerents* arrested or apprehended on U.S. sovereign territory.  *See Ex parte Milligan,* 71 U.S. (4 Wall.) 2, 131 (1866) (noting that Milligan, a resident of Indiana, "was not engaged in legal

24

acts of hostility against the government, and only such persons, when captured, are prisoners of war"); *Duncan v. Kahanamoku*, 327 U.S. 304, 313-14 (1946) (vacating conviction of non-belligerent in military tribunal established in Hawaii under declaration of martial law); *cf. Ex Parte Quirin*, 317 U.S. at 45 (distinguishing *Milligan* as case not involving belligerent); *see generally* Geoffrey Corn, Jimmy Gurule, Eric Jensen & Peter Margulies, *National Security Law: Principles and Policy* 305-06 (2015) (explaining case law).  In addition to the panel decision here, this Court has overturned the military commission conviction of a foreign belligerent captured abroad in only one other case, in which the government failed to adduce evidence that the defendant, who had been Osama bin Laden's driver and bodyguard, had engaged in overt acts more specific than driving bin Laden to "various planning meetings."  *See Hamdan v. United States*, 696 F.3d 1238, 1242 (D.C. Cir. 2012).

In contrast, as this Court's previous en banc decision determined, members of the military commission specifically found that the overt acts of the defendant in the instant case "directly relate" to completed war crimes such as the murder of civilians in the September 11 attacks.  *Al Bahlul I*, 767 F.3d at 21-22.  Those specific findings establish the very elements that would support a conviction in an international tribunal: that the defendant intentionally participated in a common plan to murder civilians that in fact resulted in such murders.  Under international law, conspiracy as a form of liability for a completed war crime entails the defendant's role as a "cog

25

in the wheel" of preparations for the crime, and does *not* require specific advance knowledge of the particular crime at issue. *Prosecutor v. Tadic*, Case No. IT-94-1-A, Appeals Chamber Judgment, ¶ 199 (Int'l Crim. Trib. for the Former Yugoslavia July 15, 1999); *cf. Prosecutor v. Brdanin*, Case No. IT-99-36-A, Appeals Chamber Judgment, ¶¶ 404, 410, 418 (Int'l Crim. Trib. for the Former Yugoslavia Apr. 3, 2007) (discussing links between conspiracy as mode of liability and the Joint Criminal Enterprise (JCE) theory relied on by the tribunal); Jens David Ohlin, *Joint Intentions to Commit International Crimes*, 11 Chi. J. Int'l L. 693, 702 (2011) (noting "substantial historical support for the idea that common purpose liability and conspiracy liability are one and the same").[10]  The accountability imposed on the

---

[10] JCE, which requires active participation in a common plan to commit a war crime (for example, murder of civilians), is distinct from the Racketeering Influenced and Corrupt Organizations Act (RICO) enterprise theory that the government dropped in several military commissions cases, including al Bahlul's. The RICO theory that the government dropped hinged on *mere membership* in an organization and does not require the active participation contemplated by JCE. *See Al Bahlul I*, 767 F.3d at 20 n. 12 (noting that dropped charge had alleged that al Bahlul had merely "joined" a criminal enterprise); *see also United States v. Omar Khadr,* Record of Trial, Appellate Exhibit 81—Defense Motion to Strike Surplus Language from Charge III (Jan. 11, 2008), at 4, available at http://www.mc.mil/Portals/0/pdfs/Khadr/Khadr%20(AE081)%20Def%20Mot.pdf (stating that merely "*joining* an 'enterprise of persons who shared a common criminal purpose'" does not even constitute conspiracy under U.S. criminal law) (emphasis added); *cf.* Peter Margulies, *Detained Suspected Terrorists: Trial in Military Courts or Civilian Courts?*, 2 Harv. J.L. & Pub. Pol'y (Federalist Edition) 157, 164 n. 52 (2015), available at http://www.harvard-jlpp.com/wp-content/uploads/2015/02/Marguiles_Final.pdf (explaining context of dropped RICO enterprise theory and distinguishing it from JCE).

defendant's conduct by members of the military commission was thus entirely consistent with international law.

Article III courts would not be imperiled by the trial of conspiracy charges, like those in the instant case, that reasonably relate to clear law of war violations such as the murder of civilians during an armed conflict. This limitation would preclude conspiracy charges based on a wide swathe of conduct, such as the mere provision of financial support to a foreign terrorist group such as Al Qaeda, even if such assistance occurred during an armed conflict. Such prosecutions would have to occur, if at all, in an Article III court. Military commission jurisdiction over conspiracy would thus be limited to matters closely linked to commissions' unquestioned jurisdiction over international war crimes.

Al Bahlul's links to the attacks on and murder of civilians on September 11 impose a further limit in the instant case. In its previous en banc decision, this Court found that the military commission proceeding included "*entirely* uncontroverted" evidence that al Bahlul had engaged in overt acts that "directly relate" to the 9/11 attacks. *Al Bahlul I*, 767 F.3d at 21-22 (emphasis in original). Those links to the attacks on and murder of civilians on 9/11 demonstrate that the military commission in the instant case did not stray far from military commissions' "primary, and unchallenged, adjudicative function." *Schor*, 478 U.S. at 854.

The 9/11-related overt acts cited in al Bahlul's charging packet included the

following: 1) administering a *bayat* or al Qaeda loyalty oath to two key participants in the 9/11 plot:  Mohamed Atta, the plot's ringleader in the U.S., and Ziad Jarrah, one of the pilots, and 2) preparing the martyr wills of Atta and Jarrah, in which each explained the reasons that they had agreed to participate in a suicide attack.  The listing of overt acts alleged that al Bahlul had performed these actions with the intent that Atta and Jarrah would kill American civilians.  *Al Bahlul I*, 767 F.3d at 21-22.

The instructions of the military judge to the members of al Bahlul's military commission allowed the members to find that al Bahlul had participated in acts related to the 9/11 attacks on civilians.  *See* Transcript of Record at 849, *United States v. Al Bahlul*, 803 R.M.C., Office of Military Comm'n, Dep't of Defense, available   at   http://www.mc.mil/Portals/0/pdfs/alBahlul/Bahlul%20Transcript.pdf (instructing members that an overt act "must be a clear indication that the conspiracy *is being carried out*") (emphasis added).  The members of the military commission specifically found that al Bahlul had committed these overt acts.  *Al Bahlul I*, 767 F.3d at 21-22.

The findings regarding Al Bahlul's role in the 9/11 attacks demonstrate that the military commission in the instant case hewed close to its historic role as an adjudicator of responsibility for war crimes.  That limit is consistent with Article II's

protection of judicial independence.[11]  Fortified by this limiting principle, al Bahlul's

conviction comports with Article III.

## CONCLUSION

This Court should reject defendant's Article I and Article III challenges and

affirm defendant's conviction.

Dated: November 2, 2015

Respectfully submitted,


Peter Margulies                                       James A. Schoettler, Jr.
Professor of Law                                      *Attorney for Amici Curiae*
Roger Williams University School of Law  Adjunct Professor
10 Metacom Avenue                                Georgetown University Law Center
Bristol, RI 02809                                      600 New Jersey Avenue, NW
Telephone: (401)254-4564                       Washington, D.C. 20001
pmargulies@rwu.edu                              Telephone: (240)893-0688
                                                              jas288@law.georgetown.edu


Counsel for *Amici Curiae*

---

[11] Because *amici* believe that this Court should uphold al Bahlul's conviction
on the merits, *amici* do not take a position on whether al Bahlul has forfeited his
ability to seek de novo review of his Article I and Article III challenges.

## APPENDIX

**Kenneth Anderson** is Professor of Law at Washington College of Law, American University, and Visiting Fellow, Hoover Institution on War, Revolution, and Peace, Stanford University.  A contributor to the Opinio Juris and Lawfare blogs, he is the author of several books, including *Living with the U.N.: American Responsibilities and International Order* (2012).  He has also authored numerous law review articles, including publications in the American Journal of International Law, the Chicago Journal of International Law, and the European Journal of International Law.


**Philip C. Bobbitt** is Herbert Wechsler Professor of Federal Jurisprudence and Director of the Center for National Security at Columbia Law School.  He has served as Associate White House Counsel, Counselor on International Law at the U.S. State Department, Legal Counsel to the U.S. Senate Iran-Contra Committee, and Director for Intelligence and Senior Director for Strategic Planning at the National Security Council.  His books include, *The Shield of Achilles: War, Peace, and the Course of History* (2002), *Terror and Consent* (2008), and *The Garments of Court and Palace: Machiavelli and the World That He Made* (2013); his articles include *The Age of Consent*, 123 Yale L.J. 2334 (2014).

30

**Marion "Spike" Bowman** is currently a Senior Fellow at the George Washington University Homeland Security Policy Institute and a Distinguished Fellow at the University of Virginia Center for National Security Law and Policy. He formerly served as Deputy General Counsel and Senior Counsel, National Security Law, Federal Bureau of Investigation. Prior to civilian service, Mr. Bowman served as a captain in the United States Navy.

**George D. Brown** is Robert Drinan, S.J., Professor of Law at Boston College Law School. An expert on federal courts and the intersection of federal jurisdiction and national security, he served as Chair of the Section on Federal Courts of the Association of American Law Schools. His publications include, '*Counter-Counter-Terrorism Via Lawsuit' – The* Bivens *Impasse*, 82 S. Cal. L. Rev. 841 (2009); *Accountability, Liability, and the War on Terror: Constitutional Tort Suits as Truth and Reconciliation Vehicles*, 63 Fla. L. Rev. 193 (2011); and *Punishing Terrorists: Congress, the Sentencing Commission, the Guidelines, and the Courts*, 23 Cornell J.L. & Pub. Pol'y 517 (2014).

**Geoffrey S. Corn** is a Professor of Law and Presidential Research Professor at South Texas College of Law. He has written many law review articles on national security

law and the law of armed conflict, including publications in the Berkeley Journal of International Law (with Chris Jenks), the Texas International Law Journal (with Lieutenant Colonel Gary Corn), and the Vanderbilt Transnational Law Journal (with Professor Laurie Blank). He is also the co-author, with Jimmy Gurule, Eric Talbot Jensen, and Peter Margulies, of *National Security Law: Principles and Policy* (2015), and co-author, with Victor Hansen, Richard Jackson, Christopher Jenks, Eric Talbot Jensen and James A. Schoettler, Jr., of *The Law of Armed Conflict: An Operational Approach* (2012). Before entering legal academia, Professor Corn served as a Judge Advocate General in the United States Army, retiring as a Lieutenant Colonel. In his last position, Professor Corn served as the Army's senior law of war expert in the Office of the Judge Advocate General and Chief of the Law of War Branch in the International Law Division.

**John Dehn** is Assistant Professor of Law at Loyola University Chicago School of Law. He served for fifteen years as an Army Judge Advocate. Prof. Dehn is a member of the Editorial Committee of the Journal of International Criminal Justice. His publications include, *Targeted Killing, Human Rights and Ungoverned Spaces: Considering Territorial State Human Rights Obligations*, 54 Harv. Int'l L.J. Online 84 (2013), *The Commander-in-Chief and the Necessities of War: A Conceptual Framework*, 83 Temple L. Rev. 599 (2011); and *The Hamdan Case and the*

*Application of a Municipal Offence: The Common Law Origins of 'Murder in Violation of the Law of War'*, 7 J. Int'l Crim. Justice 63 (2009).

**Victor Hansen** is Associate Dean and Professor of Law at New England Law School.  He has published numerous articles in law reviews, including the Journal of National Security Law and Policy (with Geoffrey Corn), the North Carolina Journal of International Law and Commercial Regulation, and the American Journal of Legal History.  An expert on military justice, he is co-author with David A. Schlueter, Charles H. Rose and Christopher Behan of *Military Crimes and Defenses* (2007).  He is also co-author with Geoffrey S. Corn, Richard Jackson, Christopher Jenks, Eric Talbot Jensen and James A. Schoettler, Jr. of *The Law of Armed Conflict: An Operational Approach* (2012).  Before joining legal academia, Professor Hansen spent twenty years in the United States Army, for much of that time serving as a Judge Advocate.  In his last assignment, Professor Hansen served as a regional defense counsel for the United States Army Trial Defense Service.

**Eric Talbot Jensen** is an Associate Professor at Brigham Young University Law School.  He has written widely for law reviews on the law of armed conflict, including publications in the Texas, Temple, and Israel Law Reviews and the

Virginia Journal of International Law, Vanderbilt Journal of Transnational Law, and Stanford Journal of International Law.  He is also co-author with Geoffrey S. Corn, Victor M. Hansen, Richard Jackson, M. Christopher Jenks, and James A. Schoettler, Jr. of *The Law of Armed Conflict: An Operational Approach* (2012).  Before entering legal education, Professor Jensen was as a Judge Advocate in the United States Army, including service as the Chief of the Army's International Law Branch.

**Robert H. Knowles** is an Assistant Professor of Law at Valparaiso University School of Law, where he teaches National Security Law, Civil Procedure, and Administrative Law.  He has published articles in the Iowa and Washington University Law Reviews, the New York University Annual Survey of American Law, and the Harvard International Law Journal Online, and authored *National Security Rulemaking*, 41 Fla. St. U.L. Rev. 884 (2014).  He has also represented Guantanamo detainees in habeas litigation.

**Michael A. Newton** is Professor of the Practice of Law, Vanderbilt University Law School and formerly was Senior Advisor to the United States Ambassador-at-Large for War Crimes Issues, United States Department of State.  In his work at the State Department, Professor Newton provided support to a number of bodies, including

the Sierra Leone Special Court, established to promote accountability for war crimes. A member of the executive council of the American Society of International Law, Professor Newton has written or co-authored a number of books and scores of op-ed pieces and law review articles, including publications in the Duke Journal of Comparative and International Law, the International Review of the Red Cross, the Netherlands Yearbook of International Law, and the Stanford Journal of International Law. Prior to service at the State Department, Professor Newton served as a Judge Advocate in the United States Army, where among other duties he organized and led human rights and rules of engagement education for Multinational Forces and International Police deploying into Haiti in 1994.

**Charles A. Shanor** is Professor of Law at Emory University School of Law. His publications include, *American Constitutional Law: Structure and Reconstruction* (5th ed., West 2013); *Counterterrorism Law* (Foundation Press 2011); and *Terrorism, Historical Analogies, and Modern Choices*, 24 Emory Int'l L. Rev. 589 (2010). Professor Shanor served as General Counsel of the U.S. Equal Employment Opportunity Commission, 1987-1990. He founded and currently serves as co-director of the Emory Law Volunteer Clinic for Veterans.

**Rachel VanLandingham** is Assistant Professor of Law at Southwestern Law School.  Before entering legal education, Professor VanLandingham served as a Judge Advocate in the United States Air Force.  She served as chief of International Law and Liaison to the International Committee of the Red Cross at U.S. Central Command, and as Deputy Director of the Department of Law at the U.S. Air Force Academy.  She is the author of the article, *Meaningful Membership: Making War a Bit More Criminal*, 35 Cardozo L. Rev. 79 (2013).


**Ryan Vogel** is a visiting assistant professor of law at the Chicago-Kent College of Law at the Illinois Institute of Technology, where he writes and teaches on national security, international law, the law of armed conflict, and international criminal justice.  Previously, Professor Vogel served in the Office of the Secretary of Defense, including five years in the Detainee Policy office.  Professor Vogel holds an L.L.M. in public international law, with a certificate in national security law, from the Georgetown University Law Center.  He earned both a J.D. and an M.A. in international affairs from American University.  He is the author of the article, *Drone Warfare and the Law of Armed Conflict*, 39 Denver J. Int'l L. & Pol'y 101 (2010).


**Philip Zelikow** is the White Burkett Miller Professor of History at the University of

36

Virginia, where he formerly served as dean of the Graduate School of Arts and Sciences and director of the Miller Center of Public Affairs.  Professor Zelikow began his career as a trial and appellate lawyer.  He subsequently served on the staff of the National Security Council staff under President George H.W. Bush, as a professor of public policy at Harvard University, as director of the 9/11 Commission established by Congress to investigate the September 11 attacks, and as Counselor to Secretary of State Condoleezza Rice.  He has also been a member of the Intelligence Advisory Board, and currently serves as a member of the Defense Policy Board advising Secretary of Defense Ashton Carter.  With Ernest May, he edited *The Kennedy Tapes: Inside the White House During the Cuban Missile Crisis* (rev. ed. 2001), and with Graham Allison he co-authored the revised version of *Essence of Decision: Explaining the Cuban Missile Crisis* (1999).

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)(C)

I hereby certify, pursuant to Fed. R. App. P. 32(a)(7)(C) and D.C. Circuit Rule 32(a), that the foregoing brief has been prepared in a proportionally spaced 14-point Times New Roman typeface using Microsoft Word 2010 and contains 6,860 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(ii).

Dated: November 2, 2015

/s/ James A. Schoettler, Jr.

James A. Schoettler, Jr.

Attorney for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of November, 2015, I caused true and correct copies of the foregoing brief of *amici curiae* Former Government Officials, Military Lawyers and Scholars of National Security Law to be served via electronic mail upon all counsel of record, by operation of the Court's ECF system.

/s/ James A. Schoettler, Jr.

James A. Schoettler, Jr.
Attorney for *Amici Curiae*

40