**EN BANC ORAL ARGUMENT SCHEDULED FOR DECEMBER 1, 2015**
**Case No. 11-1324**

––––––––––––

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

––––––––––––

ALI HAMZA AHMAD SULIMAN AL BAHLUL,
*Petitioner,*

v.

UNITED STATES OF AMERICA,
*Respondent.*

––––––––––––

**On Petition for Review from the United States Court**
**of Military Commission Review**

––––––––––––

**BRIEF OF JOHN D. ALTENBURG, Maj. Gen., U.S. Army (Ret.),**
**STEVEN B. KANTROWITZ, Rear Adm., JAGC, U.S. Navy (Ret.),**
**MICHAEL J. NARDOTTI, Jr., Maj. Gen., U.S. Army (Ret.),**
**MICHAEL J. MARCHAND, Maj. Gen., U.S. Army (Ret.),**
**THOMAS L. HEMINGWAY, Brig. Gen., U.S. Air Force (Ret.),**
**CHRISTIAN L. REISMEIER, Rear Adm. (Lower Half), JAGC, U.S. Navy (Ret.),**
**WASHINGTON LEGAL FOUNDATION, and**
**ALLIED EDUCATIONAL FOUNDATION AS *AMICI CURIAE***
**IN SUPPORT OF RESPONDENT, SUPPORTING AFFIRMANCE**

––––––––––––

Richard A. Samp
  (Counsel of Record)
Mark S. Chenoweth
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Avenue, NW
Washington, DC  20036
202-588-0302
rsamp@wlf.org

Dated: November 2, 2015

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel of record certifies as follows:

### A.    PARTIES AND *AMICI*

In addition to the parties and *amici curiae* listed in the brief for Petitioners as appearing before the Court of Military Commission Review and/or in this Court, counsel is aware of the following individuals and organizations who have appeared before this Court, all of whom are included on this brief:  John D. Altenburg, Steven B. Kantrowitz, Michael J. Marchand, Michael J. Nardotti, Jr., Thomas L. Hemingway, Christian Reismeier, and the Allied Educational Foundation.

### B.    RULINGS UNDER REVIEW

The ruling under review in this case is the decision of the U.S. Court of Military Commission Review, affirming Petitioner's conviction.

### C.    RELATED CASES

Counsel for *amici curiae* is unaware of any related cases before this Court or any other court, other than those cited by the parties.

  /s/ Richard A. Samp
  Richard A. Samp

  Counsel for *amici curiae*

November 2, 2015

## CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Circuit Rule 29(b), Fed.R.App.P. 26.1, and Circuit Rule 26.1,

the undersigned counsel states that *amici curiae* Washington Legal Foundation and

Allied Educational Foundation are nonprofit corporations; they have no parent

corporations, and no publicly-held company has a 10% or greater ownership

interest in either of them.

 /s/ Richard A. Samp
Richard A. Samp

# TABLE OF CONTENTS

**Page**

CERTIFICATION AS TO PARTIES, RULINGS, AND RELATED CASES . . . .  i

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

GLOSSARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  viii

INTERESTS OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.    ARTICLES I AND II BROADLY EMPOWER THE ELECTED
      BRANCHES TO CONDUCT WAR,  INCLUDING THE POWER TO
      PUNISH ENEMY COMBATANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      A.    The Collective Decision of Congress and the President to Try
            Bahlul Before a Military Commission Is Entitled to Deference . . . . 14

      B.    The Define and Punish Clause Grants Responsibility for Defin-
            ing Offenses Against the Law of Nations to Congress, Not the
            Courts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

            1.    Congress's Decision to Define Conspiracy to Commit War
                  Crimes as an Offense Against the Law of Nations Serves
                  the Purposes of the Law of War . . . . . . . . . . . . . . . . . . . . . . . . 18

            2.    Bahlul Has Misconstrued the Nature of "The Law of
                  Nations" as a Closed Set of Offenses . . . . . . . . . . . . . . . . . . . 20

**Page**

3.   Supreme Court Law-of-War Precedent Requires this Court to Look to Congress for Guidance in Determining the Jurisdiction of Military Commissions . . . . . . . . . . . . . . . . . . 23

C.   Congress's Other Article I Powers Reinforce the Founders' Intent that International Law Not Constrain Congress's Power to Authorize Punishment of Enemy Combatants . . . . . . . . . . . . . . . . . 26

II.   ARTICLE III HAS NEVER BEEN UNDERSTOOD TO CONSTRAIN THE POWER OF THE ELECTED BRANCHES TO TRY ENEMY COMBATANTS BEFORE MILITARY COMMISSIONS . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

iv

# TABLE OF AUTHORITIES

**Page**

**Cases:**

*al Bahlul v. United States*,
   767 F.3d 1 (D.C. Cir. 2014) (*en banc*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*al Bahlul v. United States* ["*Bahlul II*"],
   792 F.3d 1 (D.C. Cir. 2015), *vacated* (Sept. 25, 2015) . . . . . . . . . 7, 8, 17, 18, 29

\*   *Application of Yamashita*,
   327 U.S. 1 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 15, 16, 19, 20, 25, 27

*Boumediene v. Bush*,
   553 U.S. 723 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

\*   *Ex parte Quirin*,
   317 U.S. 1 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 16, 25, 27, 28, 29

*Haig v. Agee*,
   453 U.S. 280 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hamdan v. Rumsfeld*,
   548 U.S. 557 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 6, 23, 24

*Harisiades v. Shaughnessy*,
   342 U.S. 580 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

\*   *Johnson v. Eisentrager*,
   339 U.S. 763 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Loving v. United States*,
   517 U.S. 748 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Meshal v. Higgenbotham*,
   __ F.3d __, 2015 WL 6405207 (D.C. Cir., Oct. 23, 2015) . . . . . . . . . . . . . . . . 15

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
   458 U.S. 50 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Parker v. Levy*,
   417 U.S. 733 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Schlesinger v. Councilman*,
   420 U.S. 738 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

\*   Authorities on which we chiefly rely are marked with asterisks

**Page(s)**

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*United States v. al Bahlul*,
  820 F. Supp.2d 1141 (C.M.C.R. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Smith*,
  18 U.S. 153 (1820) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

\*  *Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 15


**Statutes and Constitutional Provisions:**

U.S. Const., art. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 12, 28, 29

U.S. Const., art. I, § 8, cl. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

U.S. Const., art. I, § 8, cl. 10 (Define and Punish Clause) . . . .  7, 8, 10, 11, 12, 16,
  17, 20, 23, 26, 27, 28

U.S. Const., art. I, § 8, cl. 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

U.S. Const., art. I, § 8, cl. 12, 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

U.S. Const., art. I, § 8, cl. 14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

U.S. Const., art. I, § 9, cl. 3 (Ex Post Facto Clause) . . . . . . . . . . . . . . . . . . . 6, 7

U.S. Const., art. II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 28

U.S. Const., art. II, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

U.S. Const., art. III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12, 13, 28, 30

U.S. Const., art. III, § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 28, 29

U.S. Const., art. III, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

**Page(s)**

Alien Tort Statute (ATS), 28 U.S.C. § 1350 . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

Articles of War, Article 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Authorization for Use of Military Force, Pub.L. No. 107-40,
    115 Stat. 224 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Military Commissions Act of 2006 (MCA), Pub.L. No. 109-366,
    120 Stat. 2600 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 9, 12, 14, 24

        10 U.S.C. § 948d(a) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        10 U.S.C. § 949a-949o (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        10 U.S.C. § 950v(b) (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

10 U.S.C. § 950t(29) (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 24

Uniform Code of Military Justice (UCMJ),
    10 U.S.C. §§ 801 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 8, 24

**Miscellaneous:**

*The Federalist No. 26* (Alexander Hamilton)
    (Clinton Rossiter, ed., 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

H.R. Rep. No. 109-664, Pt. 1, at 24 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Charles D. Siegal, *Deference and Its Dangers: Congress' Power to
    "Define . . . Offenses Against the Law of Nations,"*
    21 Vand. J. Transnat'l L. 865 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Webster's New Collegiate Dictionary* (G. & C. Merriam Co., 1981) . . . . . . . . . 17

# GLOSSARY

AEF               Allied Educational Foundation

MCA             Military Commissions Act of 2006,
                          Pub. L. No. 109-366, 120 Stat. 2600 (2006)

UCMJ           Uniform Code of Military Justice,
                          10 U.S.C. § 801, *et seq.*

WLF               Washington Legal Foundation

## INTERESTS OF *AMICI CURIAE*[1]

*Amici curiae* are six retired generals and admirals in the U.S. armed forces, and two organizations with an interest in national security issues. Each of the retired generals/admirals is a former Judge Advocate with extensive experience in addressing law-of-war issues.

Major General John D. Altenburg, U.S. Army (Retired), served two years as an enlisted man and 28 years as an Army lawyer. His Military Justice and Combat Operations and Peacekeeping Law experience included service or legal oversight in Vietnam, Special Operations, Operation Desert Storm-Kuwait/Iraq, Operation Restore Hope-Somalia, Operation Uphold Democracy-Haiti, Operation Joint Endeavor/Guard-Bosnia, and Joint Guardian-Kosovo, followed by four years as the Deputy Judge Advocate General (1997-2001). He served as the Appointing Authority for Military Commissions from 2004 to 2006.

Rear Admiral Steven B. Kantrowitz, JAGC, U.S. Navy (Retired), served on active duty and in the Reserve of the U.S. Navy from 1974 through 2005. He retired as a Rear Admiral in the Judge Advocate General's Corps. During active duty, he served as a judge advocate performing duties involving the full reach of

---

[1] Pursuant to Fed.R.App.P. 29(c)(5), *amici curiae* state that no counsel for a party authored this brief in whole or in part; and that no person or entity, other than *amici* and their counsel, contributed monetarily to the preparation and submission of this brief. All parties have consented to the filing of this brief.

military law practice.  This includes service for three years as Special Assistant and Aide to the Judge Advocate General of the Navy. As a Flag officer, he served as the Assistant Deputy Advocate General of the Navy and Deputy Commander, Naval Legal Service Command.

Major General Michael J. Marchand, U.S. Army (Retired), served as the Assistant Judge Advocate General of the Army at the time of his retirement in 2005.  As the Number 2 uniformed lawyer in the Army, General Marchand was intimately involved in detainee matters at the Army, Department of Defense, and congressional levels.

Major General Michael J. Nardotti, Jr., U.S. Army (Retired), served 28 years on active duty as a soldier and lawyer.  A decorated combat veteran, he served in Vietnam as an Infantry platoon leader and was wounded in action.  General Nardotti later earned his law degree and performed duties as a Judge Advocate in worldwide assignments for two decades.  His service culminated as The Judge Advocate General, the senior military lawyer in the Army, from 1993 to 1997.

Brigadier General Thomas L. Hemingway, U.S. Air Force (Retired), served at the time of his retirement in May 2007 as the Legal Advisor to the Convening Authority in the Department of Defense Office of Military Commissions.  He was commissioned as a second lieutenant in 1962 and entered active service in 1965

2

after obtaining a law degree.  He has served as a staff judge advocate at the group, wing, numbered air force, major command, and unified command level.  He was also an associate professor of law at the U.S. Air Force Academy and a senior judge on the Air Force Court of Military Review.

Rear Admiral (Lower Half) Christian L. Reismeier, JAGC, U.S. Navy (Retired), served for 31 years on active duty, five as a Naval Intelligence officer and 26 as a judge advocate.  He retired in September 2015 after serving as the Assistant Judge Advocate General for the Navy from 2014 to 2015, and Chief Judge, Department of the Navy from 2012-2015.  His previous tours included assignments as a trial judge, Director of the Navy's Criminal Law Division, Chief Judge of the Navy-Marine Corps Court of Criminal Appeals, and Executive Secretary of the President's Detention Policy Task Force.

Washington Legal Foundation is a nonprofit public interest law and policy center with supporters in all 50 states.  WLF devotes a substantial portion of its resources to promoting America's security and defending separation of powers as a bulwark of liberty.  To that end, WLF has appeared before this Court and other federal courts on numerous occasions to ensure that the federal government possesses the tools necessary to protect this country from those who would seek to destroy it and/or harm its citizens.  *See, e.g.*, *Boumediene v. Bush*, 553 U.S. 723

(2008); *Hamdan v. Rumsfeld,* 548 U.S. 557 (2006).

The Allied Educational Foundation is a nonprofit charitable and educational foundation based in Tenafly, New Jersey.  Founded in 1964, AEF is dedicated to promoting education in diverse areas of study, such as law and public policy, and has appeared as *amicus curiae* in this Court on national security-related issues on a number of occasions.

*Amici* are concerned that the panel decision in this case would impose unwarranted restrictions on the authority of the elected branches of government to convene military commissions to conduct trials of law-of-war offenses.  *Amici* deem it inappropriate for the courts to second-guess the considered judgments of the political branches regarding how best to conduct an armed conflict.

## STATEMENT OF THE CASE

The United States has been at war with militant Islamists at least since September 11, 2001, when al Qaeda's murderous attacks on American civilians caused nearly 3,000 deaths.  Immediately thereafter, Congress enacted a resolution expressing its support for the President's use of "all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001."  Authorization for Use of Military Force, Pub.L. No. 107-40, 115 Stat. 224

4

(2001).  President Bush determined that al Qaeda and the Taliban are such organizations; he directed the use of force against al Qaeda, the Taliban, and their operatives in Afghanistan and throughout the world.  President Obama has carried forward that policy.  The military campaign against al Qaeda and the Taliban continues, and they continue to pose a substantial threat to national security.

A cornerstone of American policy has been to bring criminal charges before military commissions against al Qaeda leaders responsible for the September 11 attacks.  One such leader was Petitioner Bahlul.  Before his capture by allied forces in December 2001, Bahlul was a senior officer in al Qaeda; he served as head of media relations for the organization and played a major role in events leading up to the September 11 attacks.  He admitted virtually all of the allegations made against him by prosecutors, but denied that his conduct was criminal and that the charges come within the jurisdiction of military commissions.

The Supreme Court ruled in 2006 that military commissions established to try cases arising from the September 11 attacks lacked "power to proceed" because they had not been established in compliance with procedural rules established by the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 801 *et seq.  Hamdan v. Rumsfeld*, 548 U.S. 557, 613 (2006).  In response, Congress adopted the Military Commissions Act of 2006 (MCA), Pub. L. No. 109-366, 120 Stat. 2600 (2006),

5

which *inter alia* established procedural rules for the conduct of trials by military commissions. *See, e.g.*, 10 U.S.C. § 949a-949o (2006).[2]

Bahlul was subsequently charged with three crimes pursuant to the MCA: conspiracy, solicitation of terrorist acts, and providing material support for terrorism. As his *en banc* brief concedes, Bahlul "admitted most of the allegations against him, but nonetheless pleaded not guilty, stating 'I'm not guilty, and what I did was not a crime.'" Pet. Br. 5. In 2008, a military commission convicted Bahlul on all charges and sentenced him to life imprisonment. The *en banc* U.S. Court of Military Commission Review affirmed. *United States v. al Bahlul*, 820 F. Supp. 2d 1141 (C.M.C.R. 2011).

In 2014, this Court (sitting *en banc*) overturned Bahlul's conviction on two of the three charges, finding that the solicitation and material support convictions violated his rights under Art. I, § 9, cl. 3 of the U.S. Constitution (the *Ex Post*

_____

[2] In *Hamdan*, four justices expressed the view (contrary to arguments made by the United States) that conspiracy to commit offenses triable by military commissions—the charge filed against Salim Hamdan, the defendant—was not a charge triable by military commission, because conspiracy is not an offense against the international law of war and because the UCMJ does not authorize military commissions to try conspiracy charges. *Hamdan*, 548 U.S. at 595-613 (Stevens, J., joined by Breyer, Ginsburg, and Souter, JJ.). Likely in response to the views expressed by the four justices, the MCA set out a lengthy list of offenses that Congress determined should be triable by military commission, including conspiracy. 10 U.S.C. § 950v(b) (2006).

6

*Facto* Clause).  *al Bahlul v. United States*, 767 F.3d 1, 27-31 (D.C. Cir. 2014) (*en banc*).  The Court rejected Bahlul's *Ex Post Facto* Clause challenge to the conspiracy conviction, however, holding *inter alia* that "it is not 'plain' that conspiracy was not already triable by law-of-war military commission under [the UCMJ] when Bahlul's conduct occurred."  *Id.* at 18.  The Court remanded the case to the three-judge panel to consider Bahlul's alternative challenges to the conspiracy conviction.  *Id.* at 31.

On June 12, 2015, a divided panel overturned the conspiracy conviction, holding that trying conspiracy charges before a military commission "violated the separation of powers enshrined in Article III, § 1" of the Constitution.  *al Bahlul v. United States*, 792 F.3d 1, 22 (D.C. Cir. 2015).  The panel majority recognized that Article I of the Constitution authorizes Congress to "define and punish . . . Offences against the Law of Nations,"[3] and that Congress may provide that trials of enemy combatants for law-of-war offenses may be conducted by military commissions.  *Id.* at 14-15.[4]  The panel nonetheless held that Congress exceeded its constitutional authority when it purported to authorize military commissions to

---

[3]  U.S. Const., Art. I, § 8, cl. 10 (the Define and Punish Clause).

[4]  Congress relied on its powers under the Define and Punish Clause when determining (in the MCA) that conspiracy charges should be triable by military commission.  H.R. Rep. No. 109-664, Pt. 1, at 24 (2006).

7

try conspiracy charges, declaring, "Congress cannot, pursuant to the Define and Punish Clause, declare an offense to be an international war crime when the international law of war concededly does not." *Id*. at 15.

Judge Henderson dissented. *Id.* at 27-72. First, she disputed the majority's premise that the law of nations does not condemn Bahlul's conduct:

> The international community *does* recognize that Bahlul violated "the principles of the law of nations, as they resulted from usages established among civilized peoples, from the laws of humanity and the dictates of the public conscience," [*Ex parte*] *Quirin*, 317 U.S. [1,] 35 [(1942)], and the Congress has done nothing more than provide for the limits or precise meaning of those principles in authorizing the trial and sentencing by military commission for the violation thereof.

*Id.* at 43. Second, she argued that Article I of the Constitution broadly empowers Congress to conduct war—including the capture, detention, and trial of unlawful combatants—and that those Article I war powers are not constrained by international law. *Id.* at 44. She would also have held that Article III does not constrain Congress's authority to provide for trial of unlawful enemy combatants before military commissions because such trials are a well-recognized exception to the Judicial Power Clause. *Id.* at 63-69.

## SUMMARY OF ARGUMENT

In adopting the MCA, Congress expressly authorized the President to establish military commissions with jurisdiction "to try any offense made

8

punishable by [the MCA] or the law of war when committed by an alien unlawful enemy combatant." 10 U.S.C. § 948d (2006). Among the crimes made punishable by the MCA is "conspiracy . . . to commit one or more substantive offenses triable by military commission," if the defendant "knowingly does an overt act to effect the object of the conspiracy." 10 U.S.C. § 950t(29).

Bahlul asks this Court to overrule the collective decision of Congress and the President that the charges against Bahlul—that he conspired to commit war crimes that caused thousands of American deaths—should be heard by a military commission. The Court should decline that request, not least of all because the Constitution entrusts the conduct of war to the elected branches of government; and the punishment of enemy combatants has long been viewed as "[a]n important incident to the conduct of war" and is sanctioned by Congress "without qualification . . . so long as a state of war exists." *Application of Yamashita*, 327 U.S. 1, 11-12 (1946). When the President and Congress act in concert, "the United States is invested with all the attributes of sovereignty," and the courts "should hesitate long before limiting or embarrassing such powers." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-37 & n.2 (1952) (Jackson, J., concurring).

Bahlul can point to *no* court decision that has overturned the verdict of a military commission on the ground that the Constitution deprived the commission

9

of jurisdiction over the charges presented.  The Supreme Court has repeatedly

rejected such jurisdictional challenges, even in instances in which (unlike here)

Congress has not expressly authorized commission jurisdiction over the specific

charge at issue.  Instead, in the absence of express authorization, the Court has

looked to the American common law of war in determining whether charges

against an enemy combatant may properly be tried before a military commission.

As the United States has well documented, American history is replete with

examples of conspiracy charges being tried by military commissions.

Bahlul nonetheless argues that the Constitution bars Congress from

authorizing the trial of conspiracy charges by military commissions because

international criminal tribunals generally have not recognized conspiracy as a

triable offense against international law.  He asserts that Article I's Define and

Punish Clause restrains congressional power, such that Congress may declare

conduct a violation of the law of war only if the international community agrees

that that precise conduct may be prosecuted as an "Offence[ ] against the Law of

Nations."

Neither the language nor the history of the Define and Punish Clause

supports Bahlul's assertion.  The Founders gave *Congress*, not the courts or the

international community, the authority to "define" such offenses.  The Supreme

10

Court has made clear that it will defer to the judgment of Congress regarding the definition of "the law of nations" and the charges that may properly be lodged against an enemy combatant in military commission proceedings.

Bahlul's contention that the Define and Punish Clause "establishes a closed set of offenses," Pet. Br. 57, fundamentally misconstrues the nature of "the law of nations," which has never been well defined and which most assuredly is not static in nature. In light of those characteristics, it defies reason to suggest that the Founders intended to give precedence to the views of the international community over those of Congress regarding the precise, current definition of the law of nations.

Moreover, there is every reason to believe that the international community condemns the conduct for which Bahlul was convicted: not only conspiring to commit war crimes (including murder of protected persons) but also performing numerous overt acts to further the conspiracy (including undergoing military training, protecting Osama bin Laden with weapons, and providing direct assistance to the 9/11 hijackers). Congress acted well within its constitutional authority when it determined that this type of misconduct, universally condemned by societies throughout the world, could be prosecuted by means of a conspiracy trial before a military commission.

11

Furthermore, the Define and Punish Clause is but one of numerous provisions of Articles I and II that grant the elected branches broad authority to wage war.  Thus, even if it were true that the power conferred by the Define and Punish Clause were somehow limited by reference to international law (and it is not), those other war-power grants are not similarly tempered and provide Congress and the President ample authority to specify war crimes triable by military commission.

Nor does Article III support Bahlul's efforts to invalidate the MCA.  Bahlul contends that the separation-of-powers concerns that animate Article III require that if the United States wishes to charge him with conspiracy, it must initiate criminal proceedings in a civilian court.  But the courts have long understood that Article III is inapplicable to military proceedings involving enemy combatants or members of our own armed forces.  Just as Article III does not prevent Congress from expanding the scope of service-connected infractions that may be lodged against members of our armed forces in court-martial proceedings, so too may Congress expand the scope of infractions that may be lodged against enemy combatants before military commissions.

12

**ARGUMENT**

## I.   ARTICLES I AND II BROADLY EMPOWER THE ELECTED BRANCHES TO CONDUCT WAR, INCLUDING THE POWER TO PUNISH ENEMY COMBATANTS

The United States charged Bahlul with playing a central role in the activities of al Qaeda, an organization it has determined planned and committed the September 11, 2001 attacks on the United States.  Bahlul has "admitted most of the allegations against him."  Pet. Br. 5.  Although he contends that his admitted activities were not criminal, a military commission (following trial) determined otherwise and convicted him of conspiracy to commit war crimes.  The overt acts the commission found that Bahlul performed to further the conspiracy included: undergoing military-type training at an al Qaeda camp; pledging "bayat" to Osama bin Laden and performing personal services for him; preparing an al Qaeda recruitment video that highlighted al Qaeda's October 2000 attack on the *U.S.S. Cole* (which killed 17 American sailors) and that called on viewers to carry out terrorist attacks against the United States; carrying weapons and a suicide belt to protect bin Laden; arranging for two of the 9/11 hijackers to pledge "bayat" to bin Laden; and preparing propaganda declarations (styled as "martyr wills") for those two hijackers.

13

In challenging his conviction, Bahlul does not contest that prosecutors could have brought the same conspiracy charges against him in a civilian, Article III court.  Nor does he contest that Congress adopted a statute (the MCA) that expressly granted military commissions jurisdiction to try the conspiracy charges and that the military acted pursuant to that authorization .  Rather, he asks this Court to overrule the political branches of government and declare that Congress and the Executive Branch lacked constitutional authority to take those steps.

### A.     The Collective Decision of Congress and the President to Try Bahlul Before a Military Commission Is Entitled to Deference

Bahlul's request is extraordinary.  No federal court has ever overturned the verdict of a military commission on the ground that the Constitution deprived the commission of jurisdiction over the charges presented.  The absence of such precedent is unsurprising given the considerable deference the judiciary owes to the national security-related decisions of the federal government.  As the Supreme Court has repeatedly stated, "Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention. . . . [M]atters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'"  *Haig v. Agee*, 453 U.S. 280, 292 (1981) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)).  *See also Loving v. United States*, 517

14

U.S. 748, 768  (1996) (stating that "we give Congress the highest deference in ordering military affairs."); *Meshal v. Higgenbotham*, __ F.3d __, 2015 WL 6405207 at *8 (D.C. Cir., Oct. 23, 2015) ("Matters touching on national security and foreign policy fall within an area of executive action where courts hesitate to intrude absent congressional authorization.").

Deference is particularly warranted given that the President initiated commission proceedings against Bahlul with the express authorization of Congress.  "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375 (2000) (quoting *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring)).[5]

Indeed, in previous challenges to the jurisdiction of military commissions, the Supreme Court has upheld jurisdiction even though Congress had not *expressly* granted the commission jurisdiction over the charge at issue and even though the charge had an uncertain pedigree under international law.  Thus, for example, in

---

[5] *See also, Youngstown*, 343 U.S. at 645 (Jackson, J., concurring) (courts "should indulge the widest latitude of interpretation to sustain" the President's command of "the instruments of national force, at least when turned against the outside world for the security of our society.").

*Yamashita* the Court upheld the jurisdiction of a military commission over charges that the defendant failed to control the operation of troops under his command, despite the absence of any statute expressly authorizing such charges and despite the absence of international-law precedent for the charges. 327 U.S. at 13-18. In lieu of express congressional approval and an international law pedigree, the Court has stated that military commission jurisdiction is appropriate when the American military has a history of having employed military commissions to try the charges in question. *See, e.g., Quirin*, 317 U.S. at 31. In light of Congress's adoption of the MCA, which expressly grants military commissions jurisdiction over conspiracy charges, the case for judicial deference to the decision to try Bahlul before a military commission is even stronger.

### B.    The Define and Punish Clause Grants Responsibility for Defining Offenses Against the Law of Nations to Congress, Not the Courts

Bahlul nonetheless argues that the Constitution bars Congress from authorizing the trial of conspiracy charges by military commissions because international criminal tribunals generally have not recognized conspiracy as a triable offense against international law. He asserts that Article I's Define and Punish Clause restrains congressional power, such that Congress may declare that conduct violates the law of war only if the international community agrees that that precise conduct may be prosecuted as an "Offence[ ] against the Law of Nations."

16

Neither the language nor the history of the Define and Punish Clause supports Bahlul's assertion. Rather than constraining congressional power by requiring Congress to conform to international norms, the clause states explicitly that Congress is entitled not only to adopt statutes punishing violations of the law of nations, but also to "define" the content of that law. To "define" is "to fix or mark the limits of" a term, or "to discover or set forth the meaning of (as a word)." *Webster's New Collegiate Dictionary* (G. & C. Merriam Co., 1981). In adopting the MCA, Congress defined "Offences against the Law of Nations" as including conspiring to commit war crimes and then engaging in an overt act to effect the object of the conspiracy. It does not matter that a federal judge might have adopted a different definition; the Constitution assigns the task of defining what constitutes "Offences against the Law of Nations" to Congress, not the courts.

The history of the Constitutional Convention confirms that the Founders made Congress the ultimate arbiter regarding what should constitute "Offences against the Law of Nations." As Judge Henderson has noted, the initial draft of the clause authorized Congress only to "punish" such offenses. *Bahlul II*, 792 F.3d at 44 (Henderson, J., dissenting) (citing Charles D. Siegal, *Deference and Its Dangers: Congress' Power to "Define . . . Offenses Against the Law of Nations,"* 21 VAND. J. TRANSNAT'L L. 865, 876 (1988)). The Convention amended the

17

clause—to grant Congress authority to "define" such offenses as well—at the

suggestion of Gouverneur Morris, who argued that "passive reliance on the

international community [to define offenses against the law of nations] was

unworkable because the law of nations is often too vague and deficient to be a

rule." *Ibid*. *See United States v. Smith*, 18 U.S. 153, 159 (1820) (the Constitution

granted Congress "the power to define" because "[o]ffences . . . against the law of

nations cannot, with any accuracy, be said to be completely ascertained and

defined in any public code recognised by the common consent of nations.").

1.    **Congress's Decision to Define Conspiracy to Commit War Crimes as an Offense Against the Law of Nations Serves the Purposes of the Law of War**

Bahlul was convicted of conspiracy to commit war crimes, and he does not

contest that the objects of his conspiracy (including murder of protected persons

and terrorism) were, indeed, war crimes.  As the United States has conceded,

however, international criminal tribunals do not recognize conspiracy as a triable

offense under international law.  Although Anglo-American law has long regarded

conspiracy to commit a criminal act as a chargeable offense, legal systems based

on civil law have been reluctant to accept inchoate conspiracy as a stand-alone

crime—and that reluctance has led international criminal tribunals to refrain from

entertaining conspiracy charges.

18

But none of the American case law on which Bahlul relies suggests that federal courts may challenge the jurisdiction of a military commission to try an alleged violation of the law of nations on the ground that international criminal tribunals have not previously entertained charges containing precisely the same elements.  Indeed, the Supreme Court rejected a challenge of that exact nature in *Yamashita*.

The defendant, the commander of Japanese forces in the Phillippines at the conclusion of World War II, was convicted by a military commission of "breach of a duty . . . as an army commander to control the members of his command," thereby allowing them to commit atrocities against civilian populations. *Yamashita*, 327 U.S. at 14.  The majority did not dispute the assertion of Justice Murphy (in dissent) that "the charge made against [the Japanese commander] is clearly without precedent in international law or in the annals of recorded military history."  *Id.* at 40 (Murphy, J., dissenting).  The majority upheld the military commission's jurisdiction over the failure-to-control charge based not on an assertion that the charge had ever been accepted by the international community as a violation of international law, but rather on a finding that the charge was consistent with "the purpose of the law of war":

> It is evident that the conduct of military operations by troops whose excesses are unrestrained by the orders or efforts of their commander

19

> would almost certainly result in violations *which it is the purpose of the law of war to prevent*. Its purpose to protect civilian populations and prisoners of war from brutality would largely be defeated if the commander of an invading army could with impunity neglect to take reasonable measures for their protection.

*Id.* at 15 (emphasis added). *Yamashita* strongly supports Congress's authority under the Define and Punish Clause to authorize the military-commission trial of enemy combatants on conspiracy charges. As in *Yamashita*, it is self-evident that charging enemy combatants who conspire to commit war crimes serves "the purpose of the law of war," which is to prevent the commission of war crimes, such as the attack on civilian populations on September 11, 2001.

### 2.    Bahlul Has Misconstrued the Nature of "The Law of Nations" as a Closed Set of Offenses

Bahlul contends that the Define and Punish Clause "establishes a closed set of offenses," Pet. Br. 57, thereby indicating that Congress may punish only those offenses that are universally accepted by the international community at any given moment in time. That contention fundamentally misconstrues the nature of "the law of nations," which has never been well defined and which most assuredly is not static in nature. In light of those characteristics, it defies reason to suggest that the Constitution provides that the views of the international community be given precedence over those of Congress regarding the precise, current definition of the law of nations.

20

In 1789, "the law of nations" referred principally to "the general norms governing the behavior of national states with each other" as well as to a small number of rules governing individual conduct that had the potential to affect international affairs. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 714-15 (2004).[6] The 18th-century international community did not accept modern-day human rights law (*e.g.*, prohibitions against genocide and state-sponsored slavery) as part of "the law of nations."

At the same time, the Founders recognized that the law of nations was not static, but rather would evolve over time. That recognition is evidenced by the Alien Tort Statute (ATS), 28 U.S.C. § 1350, a 1789 statute that grants district courts original jurisdiction over civil actions "by an alien for a tort only, committed in violation of the law of nations." As the Supreme Court explained in *Sosa*, the 1789 Congress expected federal courts to recognize ATS tort actions not only for the three offenses recognized by the law of nations in 1789 (and incorporated into federal law as part of the federal common law) but also for a "narrow class" of offenses that might be incorporated into the law of nations during later generations. *Sosa*, 542 U.S. at 729.

---

[6] *Sosa* identified three offenses against the law of nations that in 1789 were applicable to individuals: violation of safe conducts, infringements of the rights of ambassadors, and piracy. *Id.* at 715.

21

*Sosa* nonetheless held that federal courts must exercise "great caution" in recognizing any new federal-common-law causes of action under the ATS. *Id.* at 728. Among the reasons for requiring caution was the inherently undefined and adaptable nature of the law of nations. *Id.* at 732. Instead, the Court concluded that courts should generally await guidance from Congress regarding what conduct constitutes a "violation of the law of nations" and is redressable by aliens in federal court under the ATS. *Id.* at 726.

Similar considerations mandate that federal courts should look to Congress, not to the international community, in determining the scope of the evolving "Offences against the Law of Nations" that Congress and the President are entitled to punish. As noted above, the Founders assigned Congress the role of "defin[ing]" offenses against the law of nations precisely because the law of nations is too vague to be easily applied by the courts.

Moreover, there is no plausible basis to conclude that the Founders hamstrung Congress by making it subservient to evolving legal standards emanating from overseas. It is one thing to claim that the Founders wanted to limit congressional power by tying it for all time to a fixed body of legal principles that were accepted by the international community in 1789 (a claim Bahlul does not make). It is quite another thing to claim that the Constitution grants the

22

international community the authority to decide whether to expand or contract congressional power under the Define and Punish Clause. Significantly, Bahlul would cede this power to the international community not in connection with the issue of concern to that community (the recognition of inchoate conspiracy prosecutions) but in connection with a separation-of-powers issue (whether conspiracy charges against enemy combatants should be tried before military commissions or civilian courts) regarding which international law takes no position.

### 3.    Supreme Court Law-of-War Precedent Requires this Court to Look to Congress for Guidance in Determining the Jurisdiction of Military Commissions

All of the Supreme Court's military commission decisions have concluded that courts should look principally to Congress for guidance in determining whether a military commission may exercise jurisdiction over a charged offense. For example, the petitioner in *Hamdan* claimed, *inter alia*, that a military commission lacked jurisdiction under the law of war to try him on conspiracy charges. Although the Court ended up not reaching the conspiracy issue, four members of the court would have held that federal law at the time (early 2006) did not permit military commissions to hear conspiracy charges. *Hamdan*, 548 U.S. at 595-613 (Stevens, J., joined by Souter, Ginsburg, and Breyer, JJ.).

23

The three justices who joined Justice Stevens's opinion (Justices Souter, Ginsburg, and Breyer) signed their names to a separate concurring opinion, which explained that whether the military possesses authority to try enemy combatants is a decision that should generally be left up to Congress, and that Congress had not authorized the conspiracy trials proposed by the Executive Branch:

> The Court's conclusion [that the Executive Branch had not established the challenged military commission in compliance with procedural rules established by the UCMJ] ultimately rests on a single ground: Congress has not issued the Executive a "blank check."   Indeed, Congress has denied the President the legislative authority to create military commissions of the kind at issue here.  Nothing prevents the President from returning to Congress to seek the authority he believes necessary. . . . [I]nsistence [on consultation with Congress] strengthens the Nation's ability to determine—through democratic means—how best to do so.  *The Constitution places its faith in those democratic means.*  Our Court today simply does the same.

*Id*. at 636 (Breyer, J., concurring, joined by Kennedy, Souter, and Ginsburg, JJ.) (emphasis added).  Congress responded by adopting the MCA later in 2006, and federal law now explicitly authorizes military commissions to try conspiracy charges.  10 U.S.C. § 950t(29).  As Justice Breyer indicated, federal courts should "place [their] faith" in the democratic process and accede to Congress's determination.

Other decisions from the Court are similar.  In *Johnson v. Eisentrager*, 339 U.S. 763, 785 (1950), the Court held unequivocally that "the Constitution does not

24

confer a right of personal security or an immunity from military trial and

punishment upon an alien enemy engaged in the hostile service of a government at

war with the United States."   Once it determined that the elected branches of

government had conferred jurisdiction on the military commission whose judgment

was being challenged, the Court ceased its analysis, concluding, "it was for [the

commission] to determine *whether the laws of war applied* and whether an offense

against them had been committed."  *Id*. at 788 (emphasis added).

In neither *Quirin* nor *Yamashita* had Congress adopted legislation expressly

granting military commissions jurisdiction over the offenses charged.  Only after

noting the absence of such express authorization[7] did the Court seek other indicia

that the commissions possessed the requisite jurisdiction—*e.g.*, recognition of the

charges under the international law of war or the historical practice of the

American military.  *Quirin*, 317 U.S. at 28-38; *Yamashita*, 327 U.S. at 13-18.  The

Court made clear in *Yamashita* that it was relying on the international law of war

(as its basis for upholding the commission's verdict) only in the absence of an

express directive from Congress.  *Id*. at 16 ("We do not make the laws of war but

---

[7]  During World War II, federal law authorized trial of offenses against the
law of war before military commissions, Article 15 of the Articles of War, but did
not specify which offenses met that definition.

we respect them *so far as they do not conflict with the commands of Congress* or the Constitution.") (emphasis added).

In sum, Congress has determined that conspiracy to commit war crimes is an offense against the law of nations and is triable before military commissions. Congress acted within the powers granted to it under the Define and Punish Clause in making that determination. That determination is entitled to deference from the courts, particularly because it advances the purposes of the law of war.

### C.  Congress's Other Article I Powers Reinforce the Founders' Intent that International Law Not Constrain Congress's Power to Authorize Punishment of Enemy Combatants

The Define and Punish Clause is but one of numerous provisions of Articles I and II that grant the elected branches broad authority to wage war. Thus, even if it were true that the power conferred by the Define and Punish Clause were limited by reference to international law (and it is not), those other grants of the war powers are not similarly tempered and provide Congress and the President with ample authority to specify war crimes triable by military commission.

In addition to the powers conferred by the Define and Punish Clause, Article I grants Congress numerous defense-related powers, including to "provide for the common Defence," Art. I, § 8, cl. 1; to "raise and support Armies" and to "provide and maintain a Navy," Art. I, § 8, cl. 12, 13; to "make Rules for the Government

26

and Regulation of the land and naval Forces," Art. I, § 8, cl. 14; and to "declare War, grant Letters of Marque and Reprisal, and Make Rules concerning Captures on Land and Water," Art. I, § 8, cl. 11. The Constitution also authorizes Congress to "make all laws which shall be necessary and proper for carrying into Execution the foregoing Powers." Article II, § 2 provides, *inter alia*, that "The President shall be Commander in Chief of the Army and Navy of the United States."

Collectively, these provisions grant enormous power to the United States in national security matters. The Define and Punish Clause is the only one of these enumerated powers that is even arguably tempered by a requirement that it be exercised in conformity with international law norms.

The Supreme Court has repeatedly recognized that the elected branches' authority to wage war includes the power to punish captured enemy combatants for violating legal norms. *Quirin*, 317 U.S. at 28-29 ("An important incident to the conduct of war is the adoption of measures by the military command not only to repel and defeat the enemy, but to seize and subject to disciplinary measures those enemies who in their attempt to thwart or impede our military have violated the law of war."); *Yamashita*, 327 U.S. at 12 ("The war power, from which the [military] commission derives its existence, is not limited to victories in the field, but carries with it the inherent power to guard against the immediate renewal of the

27

conflict, and to remedy, *at least in ways Congress has recognized*, the evils which the military operations have produced.") (emphasis added).

*Quirin* explicitly cited each of the war-making powers of Article I and II in upholding the authority of the military to try enemy combatants before military commissions.  *See, e.g.*, 317 U.S. at 25 ("But the detention and trial of petitioners—ordered by the President in the declared exercise of his powers as Commander in Chief of the Army in time of war and of great public danger—are not to be set aside by the courts without the clear conviction that they are in conflict with the Constitution or laws of Congress constitutionally enacted.") Those citations render implausible Bahlul's contention that the authority of the elected branches to convene military commissions derives solely from the Define and Punish Clause.

## II.   ARTICLE III HAS NEVER BEEN UNDERSTOOD TO CONSTRAIN THE POWER OF THE ELECTED BRANCHES TO TRY ENEMY COMBATANTS BEFORE MILITARY COMMISSIONS

Under Article III, § 1, the judicial power of the United States is "vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  The Judicial Power Clause, Article III, § 2, provides that the "judicial Power shall extend to all Cases" and "Controversies." Bahlul

28

argues that the United States violated Article III, §§ 1 and 2 by trying him before an Article I court.  That argument is without merit.

The Supreme Court has long explained that the commands of Article III "must be interpreted in light of the historical context in which the Constitution was written." *N. Pipeline Constr. Co. v. Marathon Pipe Line Co*. 458 U.S. 50, 64 (1982) (plurality opinion).  The "historical context" with respect both to members of the U.S. armed forces and to enemy combatants is that—since the time of ratification of the Constitution—they have been subject to trials before special military tribunals.  In light of that history, it is well accepted that the Judicial Power Clause generally does not apply to such proceedings.  *See, e.g., Quirin*, 317 U.S. at 41 (citing an 1806 federal statute, which was derived from a 1776 Resolution of the Continental Congress, authorizing trial of alleged spies before military tribunals; the Court viewed that statute as evidence that early Congresses accepted that the Judicial Power Clause did not foreclose trial by Article I military tribunals).

The panel interpreted *Quirin* as creating a narrow "exception" to Article III, limited to the trial of enemy combatants charged with "international law of war offenses"; it concluded that the "exception" was inapplicable here because conspiracy does not qualify as such an offense.  *Bahlul II*, 792 F.3d at 8-10.  But

29

the inapplicability of Article III to law-of-war military commissions and courts-martial is largely unrelated to the specific charges being tried. Rather, it arises in recognition of the unique status of the military within our society and its unique needs: "The military is 'a specialized society separate from civilian society' with 'laws and traditions of its own [developed] during its long history.'" *Schlesinger v. Councilman*, 420 U.S. 738, 757 (1975) (quoting *Parker v. Levy*, 417 U.S. 733, 743 (1974)). Just as Article III does not prevent Congress from expanding the scope of service-connected infractions that may be lodged against members of our armed forces in court-martial proceedings, so too may Congress expand the scope of infractions that may be lodged against enemy combatants before military commissions.

Finally, the separation-of-powers concerns raised by Bahlul in connection with his Article III claim are more imagined than real. Such concerns can arise when the Executive is operating in an unchecked fashion. The Framers viewed Congress as an important check against Executive Branch military adventurism. Threats to the separation of powers are reduced considerably when, as here, the Executive Branch is operating with the full knowledge and express concurrence of Congress. *The Federalist No. 26*, at 168 (Alexander Hamilton) (Clinton Rossiter, ed., 1961) ("The idea of restraining the legislative authority in the means of

30

providing for the national defense is one of those refinements which owe their origin to a zeal for liberty more ardent than enlightened.").

The more serious threat to separation of powers arises when the judiciary seeks to wrest control of the war-making powers from the elected branches of government.  The Constitution assigns responsibility for national security matters—including the punishment of unlawful enemy combatants—to Congress and the President, and the federal courts almost surely are abusing their powers when they interfere with national-security operations undertaken by the military with the full support of Congress.

## CONCLUSION

*Amici curiae* request that the Court affirm the judgment of the U.S. Court of Military Commission Review.

Respectfully submitted,


 /s/ Richard A. Samp
Richard A. Samp
Mark S. Chenoweth
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave., NW
Washington, DC  20036
(202) 588-0302
Dated: November 2, 2015          rsamp@wlf.org

## <u>CERTIFICATE OF COMPLIANCE</u>

I am an attorney for *amici curiae* John D. Altenburg, *et al*.  Pursuant to

Fed.R.App.P. 32(a)(7)(C), I hereby certify that the foregoing brief of *amici curiae*

is in 14-point, proportionately spaced Times New Roman type.  According to the

word processing system used to prepare this brief (WordPerfect X5), the word

count of the brief is 6,955, not including the certificate as to parties, table of

contents, table of authorities, glossary, certificate of service, and this certificate of

compliance.


<u>/s/ Richard A. Samp</u>
Richard A. Samp

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2015, I electronically filed the brief of *amici curiae* John D. Altenburg, *et al.*, with the Clerk of the Court of the U.S. Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


 /s/ Richard A. Samp
Richard A. Samp